MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
KARA J. JANSSEN – 274762
GINGER JACKSON-GLEICH – 324454
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:      (415) 433-6830
Email:        mbien@rbgg.com
              egalvan@rbgg.com
              kjanssen@rbgg.com
              gjackson-gleich@rbgg.com

OREN NIMNI*
  Mass. Bar No. 691821
AMARIS MONTES*
  Md. Bar No. 2112150205
D DANGARAN*
  Mass. Bar No. 708195
RIGHTS BEHIND BARS
416 Florida Avenue N.W. #26152
Washington, D.C.  20001-0506
Telephone:      (202) 455-4399
Email:        oren@rightsbehindbars.org
              amaris@rightsbehindbars.org
              d@rightsbehindbars.org

SUSAN M. BEATY – 324048
CALIFORNIA COLLABORATIVE FOR
IMMIGRANT JUSTICE
1999 Harrison Street, Suite 1800
Oakland, California  94612-4700
Telephone:      (510) 679-3674
Email:        susan@ccijustice.org

*Pro hac vice applications pending

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.; G.M.; A.S.; and L.T., individuals on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS, a governmental entity; BUREAU OF PRISONS DIRECTOR COLETTE PETERS, in her official capacity; FCI DUBLIN WARDEN THAHESHA JUSINO, in her official capacity; OFFICER BELLHOUSE, in his individual capacity; OFFICER GACAD, in his individual capacity; OFFICER JONES, in his individual capacity; LIEUTENANT JONES, in her individual capacity; OFFICER LEWIS, in his individual capacity; OFFICER NUNLEY, in his individual capacity, OFFICER POOL, in his individual capacity, LIEUTENANT PUTNAM, in his individual capacity; OFFICER SERRANO, in his individual capacity; OFFICER SHIRLEY, in his individual capacity; OFFICER SMITH, in his individual capacity; and OFFICER VASQUEZ, in her individual capacity,<br><br>            Defendants. | Case No.:  4:23-cv-04155<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................... 1

JURISDICTION AND VENUE ....................................................................................... 5

THE PARTIES ................................................................................................................ 5

FACTUAL ALLEGATIONS .......................................................................................... 12

I.      Federal Law Requires BOP to Take Action to Prevent and Appropriately Respond
        to Reports of Staff Sexual Misconduct ........................................................... 12

II.     The BOP Has Failed to Detect, Prevent, and Address Sexual Misconduct by BOP
        Staff and Failed to Act and Hold Staff Accountable for Decades ..................... 15

III.    The BOP Has Failed to Take Action to Stop Ongoing Sexual Assault and
        Harassment and to Protect the Individuals in Its Care at FCI Dublin ............... 25

        A.      Individuals Incarcerated at FCI Dublin Continue to Face Sexual Assault and
                Harassment On An Ongoing Basis ......................................................... 26

        B.      Survivors Continue to Face Severe Retaliation for Reporting Abuse, Which
                Chills Further Reporting and Obstructs Investigations into Abuse ........... 34

                1.      Retaliation After Reporting Abuse ............................................. 35

                2.      Preemptive Retaliation to Prevent Reporting .............................. 38

        C.      Survivors Have No Way To Confidentially Report Abuse. ...................... 40

        D.      Staff Are Not Held Accountable for Abuse. ........................................... 43

        E.      Survivors of Sexual Abuse and Retaliation at Dublin Have Experienced
                Grievous Physical, Mental, Dignitary, and Economic Injuries. ............... 44

        F.      Survivors of and Witnesses to Sexual Abuse Are Denied Access to Mental
                Health Care and Medical Care to Address Their Mental and Physical
                Injuries. .............................................................................................. 46

                1.      Mental Health Care Is Wholly Inadequate ................................. 46

                2.      Survivors Lack Access to Adequate Medical Care ...................... 48

        G.      Conditions for Sexual Violence Remain at FCI Dublin. .......................... 49

        H.      Dublin Officers Established a Trafficking System to Illicit Sexual Acts and
                Forced Labor from Plaintiffs. ............................................................... 51

CLASS ACTION ALLEGATIONS ................................................................................. 54

        Numerosity:  Fed. R. Civ. P. 23(a)(1) ....................................................... 54

Commonality:  Fed. R. Civ. P. 23(a)(2) .................................................................55

Typicality:  Fed. R. Civ. P. 23(a)(3) ....................................................................55

Adequacy:  Fed. R. Civ. P. 23(a)(4) ....................................................................55

Fed. R. Civ. P. 23(b)(1) ........................................................................................55

Fed. R. Civ. P. 23(b)(2) ........................................................................................56

CLAIMS FOR RELIEF .................................................................................................56

DEMAND FOR JURY TRIAL .....................................................................................82

PRAYER FOR RELIEF .................................................................................................82

# INTRODUCTION

1.     For years, people incarcerated at the Federal Correctional Institute, Dublin ("FCI Dublin"), a federal female[1] low-security prison with an adjacent satellite camp, have been subjected to rampant ongoing sexual abuse that continues to this day.  Plaintiffs, and the putative class members they represent, have endured horrific abuse and exploitation at the hands of facility staff, including but not limited to: rape and sexual assault; manipulation and sexual coercion, including officers entering into relationships with incarcerated individuals and officers forcing incarcerated individuals to undress in order to be released from cells or for exchange of goods; degrading sexual comments; voyeurism and taking and sharing explicit photos; drugging, groping, and other forms of abuse during medical exams; and targeted abuse towards immigrants under threat of deportation.  The Federal Bureau of Prisons ("BOP") has been aware of these problems for decades and has failed, and continues to fail, to take action to protect those in its care by preventing and addressing rampant staff sexual misconduct.

2.     Officers, supervisors, and leadership throughout FCI Dublin were and continue to be aware of the ongoing sexual abuse at the facility, and not only fail to prevent it but also affirmatively take actions that allow abuse to continue.  Staff protect their abusive colleagues by failing to investigate claims or respond meaningfully, and by retaliating against those who report abuse.

3.     People incarcerated at FCI Dublin have no way to safely report sexual misconduct.  Survivors must frequently report to the same staff members who abused them or who allowed the abuse to occur.  When survivors report abuse to facility staff, their experiences are often not kept confidential.  When survivors attempt to use the "confidential" email system report to outside authorities at the U.S. Department of Justice ("DOJ"), they must do so on public computers in full view of staff and other incarcerated persons.  Those reports are often, in turn, sent back to FCI Dublin officials.  As a result, survivors frequently face immediate retaliation, including placement

---

[1] Though FCI Dublin is designated an all-female facility, it houses women, transgender men, and non-binary people.  This complaint uses gender-inclusive language to refer to people incarcerated at FCI Dublin, including multiple transgender plaintiffs and declarants referenced herein.

in solitary confinement, repeated and unjustified strip and cell searches, and transfer to other facilities away from their families and support systems.  This pervasive retaliation deters many survivors from reporting their abuse.

4.      This dangerous state of affairs has continued, unabated, across multiple decades and multiple administrations.  In recent years, staff sexual abuse at FCI Dublin has been so severe that the facility became the center of a sprawling criminal investigation, multiple Congressional inquiries, and national media attention.  The United States Senate's Permanent Subcommittee on Investigations devoted multiple hearings to addressing its causes and impact, and issued a report in December 2022 describing the abuse as "horrific" and Defendant BOP's investigative practices as "seriously flawed," and concluding that "BOP management failures enabled continued sexual abuse of female prisoners by BOP's own employees."[2]

5.      Eight former officers—including former Warden Ray Garcia and a former chaplain—have been charged with sexual misconduct for incidents spanning from 2019 into 2021, with more charges likely forthcoming.  *See United States v. Garcia*, No. 4:21-cr-00429-YGR (N.D. Cal.) (sentenced to 70 months in prison and 15 years of supervised released following jury trial); *United States v. Highhouse*, No. 4:22-cr-00016-HGS (N.D. Cal.) (sentenced to 84 months in federal prison and 5 months of supervised release following guilty plea); *United States v. Chavez*, No. 4:22-cr-00104-YGR-1 (N.D. Cal.) (sentenced to 20 months in federal prison and 10 years of supervised release following guilty plea); *United States v. Klinger*, No. 21-MJ-71085-MAG (N.D. Cal.) (awaiting sentencing following guilty plea); *United States v. Bellhouse*, No. 4:22-cr-00066-YGR (N.D. Cal.) (found guilty following jury trial; awaiting sentencing); *United States v. Smith*, No. 4:23-cr-00110-YGR-1 (charges pending); *United States v. Nunley*, No. 4:23-cr-00213-HSG (N.D. Cal.) (awaiting sentencing following guilty plea for 4 counts of sexual abuse of a ward, 5 counts of abusive sexual contact, and 1 count of false statements to a government agency); *United*

---

[2] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 1 (Dec. 13, 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf (hereinafter "Senate Report").

1    *States v. Jones*, No. 4:23-cr-00212-HSG (N.D. Cal.) (awaiting sentencing following guilty plea for

2    6 counts of sexual abuse of a ward and 1 count of false statements to a government agency).

3         6.      Numerous survivors have also filed civil actions against the BOP and abusive

4    officials in recent years, and dozens more are expected to file in the near future. *See Peterson v.*

5    *Martinez*, No. 3:19-cv-01447-WHO, 2020 WL 4673953 (N.D. Cal Aug. 12, 2020); *See Reyes v.*

6    *United States*, No. 4:22-cv-07704 (N.D. Cal. filed Dec. 6, 2022); *M.S. v. Fed. Corr. Inst. – Dublin*

7    *et al.*, No. 4:22-cv-08924 (N.D. Cal. filed Dec. 16, 2022); *Preciado v. Bellhouse et al.*, No. 4:22-

8    cv-09096 (N.D. Cal. filed Dec. 23, 2022); *D V v. United States of America (Fed. Bureau of*

9    *Prisons) et al.*, No. 4:23-cv-02135 (N.D. Cal. filed May 2, 2023); *J v. United States of America*

10    *(Fed. Bureau of Prisons) et al.*, No. 4:23-cv-02201 (N.D. Cal filed May 5, 2023); *C v. United*

11    *States of America (Fed. Bureau of Prisons) et al.*, No. 4:23-cv-02206 (N.D. Cal. filed May 5,

12    2023); *A v. United States of America (Fed. Bureau of Prisons) et al.*, No. 4:23-cv-02342 (N.D.

13    Cal. filed May 12, 2023); *R v. United States of America (Fed. Bureau of Prisons) et al.*, No. 4:23-

14    cv-02405 (N.D. Cal. filed May 16, 2023); *DS v. United States of America (Fed. Bureau of*

15    *Prisons) et al.*, No. 4:23-cv-02668 (N.D. Cal. filed May 30, 2023); *A v. United States of America*

16    *(Fed. Bureau of Prisons) et al.*, No. 4:23-cv-03475 (N.D. Cal. filed July 12, 2023); *S v. United*

17    *States of America et al.*, No. 4:23-cv-03538 (N.D. Cal. filed July 17, 2023); *C v. United States of*

18    *America (Fed. Bureau of Prisons) et al.*, No. 4:23-cv-03558 (N.D. Cal. filed July 18, 2023); *S. M.*

19    *v. United States of America (Fed. Bureau of Prisons) et al.*, No. 4:23-cv-03562 (N.D. Cal. filed

20    July 18, 2023); *J.O. v. United States of America (Fed. Bureau of Prisons) et al.*, No. 4:23-cv-

21    03700 (N.D. Cal. filed July 26, 2023).

22         7.      In the wake of the federal criminal investigation and the resulting public scandal,

23    Warden Garcia and many others have been removed from their positions at FCI Dublin. But these

24    actions were not even initiated by the BOP, and the systemic issues which allowed BOP

25    employees' grievous sexual abuse remain deeply entrenched—subjecting everyone detained at

26    FCI Dublin to extreme risk of serious emotional and physical harm. This risk of sexual abuse is

27    compounded by system-wide barriers to accessing counsel, a lack of safe and confidential

28    reporting mechanisms, ongoing retaliation for reporting, and denial of access to medical and

1    mental health care for survivors and those otherwise affected by the ongoing abuse.

2        8.    Despite their awareness of these long-standing problems, Defendants have failed to

3    take critically needed action, including failing to: (1) adequately, hire, train and supervise

4    employees to prevent their ongoing sexual misconduct and abuse of power; (2) implement a

5    confidential and reliably available method for individuals to report abuse to fully independent

6    outside authorities who are not employed by the BOP; (3) properly investigate claims of abuse; (4)

7    cease the policy and practice of placing individuals who report sexual abuse into solitary

8    confinement; (5) address rampant retaliation against survivors, including but not limited to

9    punitive solitary confinement, cell and strip searches, and transfers, which harm survivors and

10   deter others from reporting; (6) ensure that officers who have substantiated claims of sexual

11   assault and harassment against them are promptly fired and not permitted to return to BOP

12   employment; (7) provide constitutionally adequate medical and mental health care to survivors of

13   sexual abuse; (8) provide timely and consistent access to confidential legal calls and attorney

14   visits; (9) provide survivors with documentation of reports of staff misconduct and facilitate the

15   U-visa certification process for noncitizen survivors who report and assist in the investigation of

16   staff abuse; (10) create a process to assist survivors of abuse with compassionate release petitions;

17   (11) install fixed cameras in areas where abuse is known to occur and properly monitor and

18   maintain the fixed cameras that do exist; and (12) address increasingly dire living conditions that

19   contribute to ongoing sexual exploitation of incarcerated persons.

20       9.    FCI Dublin and the BOP's inadequate systems for preventing, detecting,

21   investigating, and responding to sexual abuse put people incarcerated at FCI Dublin at substantial

22   risk of serious harm from sexual assault, harassment, and retaliation by staff.  The Eighth

23   Amendment prohibits prison staff from engaging in sexual abuse or sexual conduct with the

24   people in their custody. *Bearchild v. Cobban*, 947 F.3d 1130, 1144 (9th Cir. 2020) ("We now

25   hold that a prisoner presents a viable Eighth Amendment claim where he or she proves that a

26   prison staff member, acting under color of law and without legitimate penological justification,

27   touched the prisoner in a sexual manner or otherwise engaged in sexual conduct for the staff

28   member's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the

prisoner.").  It is well established that individuals may sue to enjoin constitutional violations directly under the Constitution.  *See Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019) ("Plaintiffs may bring their challenge through an equitable action to enjoin unconstitutional official conduct, or under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., as a challenge to a final agency decision that is alleged to violate the Constitution, or both."); *Farmer v. Brennan*, 511 U.S. 825, 846 (1994) ("If the court finds the Eighth Amendment's subjective and objective requirements satisfied [with regard to a federal prisoner], it may grant appropriate injunctive relief.").

10.     The BOP's failures—and the resulting pervasive culture of sexual misconduct and retaliation at FCI Dublin—cause ongoing harm to the people incarcerated at the facility.  These failures are in violation of the Eighth Amendment's prohibition on cruel and unusual punishment and Fifth Amendment protections of substantive due process, as well as federal statutory law, including the Trafficking Victims Protection Act ("TVPA").  This complaint seeks to remedy these failures on behalf of the putative class and to compensate named Plaintiffs for the immense harms they have suffered.

## JURISDICTION AND VENUE

11.     An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

12.     This action involves claims arising under the United States Constitution.  The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332, and authority to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e) because at least one plaintiff resides in this district, one or more defendants resides in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## THE PARTIES

14.     Plaintiff California Coalition for Women Prisoners (CCWP) is a grassroots advocacy organization—with members inside and outside prison—that challenges the institutional

violence imposed on women, transgender people, and communities of color by the prison industrial complex.  CCWP expends substantial time and resources to advance these issues. CCWP's programs focus on visiting and corresponding with incarcerated women and transgender, and gender non-conforming, individuals to help incarcerated persons advocate to change brutal conditions of confinement, win release, and challenge the foundations of the criminal legal system. CCWP is a member of Survived & Punished, a national coalition that organizes to de-criminalize efforts to survive domestic and sexual violence, to support and free criminalized survivors, and to abolish gender violence, policing, prisons, and deportations.  CCWP operates chapters in Oakland, California, as well as in Los Angeles, California, and its members include individuals currently and formerly incarcerated at FCI Dublin.

15.     CCWP has been injured as a direct result of Defendants' actions and omissions alleged herein because it must expend resources advocating for its members and constituents who are harmed by Defendants' actions and omissions, including Defendants' ongoing failure to protect individuals from systematic sexual abuse and retaliation, and to ensure affected individuals have access to methods for reporting abuse as well as mental health support; and general failure to meet the duty of "safekeeping, care . . . [and] protection" as required by 18 U.S.C. § 4042(a)(2), (3) in regard to those incarcerated at FCI Dublin.

16.     Additionally, because CCWP has members who are currently, and were formerly, in FCI Dublin, one or more of CCWP's members have been injured as a direct result of Defendants' actions and omissions, including Defendants' ongoing failure to protect individuals from systematic sexual and retaliation, and to ensure affected individuals have access to methods for reporting abuse as well as mental health support; and general failure to meet the duty of "safekeeping, care . . . [and] protection" as required by 18 U.S.C. § 4042(a)(2), (3) in regard to those incarcerated at FCI Dublin.

17.     Examples of CCWP members who have been injured include:  A.R., who was sexually harassed and groped by Officer Caston in early 2023 and subjected to ongoing retaliation after reporting the assault; A.S., who was repeatedly sexually assaulted by Officer Nunley and has faced retaliation since reporting his abuse in early 2023; C.H., who has endured years of

transphobic harassment and threats of retaliation by FCI Dublin staff; M.S., who was sexually harassed by a medical technician throughout 2022, and has suffered medical neglect since reporting; N.A., who was repeatedly sexually harassed and groped by Officer Ramos for years, and ignored by various FCI Dublin staff when she attempted to report him, and continues to face retaliation from staff; Y.M., who was repeatedly threatened by Officer Smith after witnessing his sexual abuse of her cellmate, and is currently suffering medical neglect; T.M., who was sexually harassed by Officer Cooper while in the shower in June 2023, and faced retaliation after reporting; and Z.T.S., who was sexually harassed,  assaulted, and threatened by multiple officers in the kitchen, and retaliated against for reporting.

18.     CCWP has approximately 220 members at multiple correctional facilities including FCI Dublin.  All of CCWP's members at FCI Dublin are at ongoing risk of sexual assault due to BOP's failure to ensure their safekeeping and care.   CCWP can bring this action on behalf of its members because the interests at stake are germane to CCWP's purpose and CCWP seeks only declaratory and injunctive relief on behalf of its members.

19.     Plaintiff R.B. has been incarcerated at FCI Dublin since 2013 and at all times material to this action has been incarcerated in the custody and control of the BOP.  Plaintiff R.B. has been sexually harassed and abused while incarcerated at FCI Dublin. Plaintiff R.B. witnessed widespread sexual abuse of her friends, including her cellmate, and was sexually harassed and retaliated against herself.  She lives in ongoing fear of further sexual abuse from those she depends upon for her care due to the institution's ongoing failures to address rampant staff misconduct and failure to ensure Plaintiff R.B.'s safekeeping, care, and protection.  Plaintiff R.B. is also a member of CCWP.

20.     Plaintiff A.H.R. has been incarcerated at FCI Dublin since May 2019 and at all times material to this action has been incarcerated in the custody and control of the BOP.  Plaintiff A.H.R. is a transgender man and uses he/him pronouns.  Plaintiff A.H.R. has been sexually harassed and abused while incarcerated at FCI Dublin.  Plaintiff A.H.R. was coerced into serving as a lookout for officers as they sexually abused incarcerated women and was himself sexually harassed and groped by BOP staff.  He lives in ongoing fear of further sexual abuse from those he

1    depends upon for his care due to the institution's ongoing failures to address rampant staff

2    misconduct and failure to ensure Plaintiff A.H.R.'s safekeeping, care, and protection.  Plaintiff

3    A.H.R. is also a member of CCWP.

4         21.    Plaintiff S.L. has been incarcerated at FCI Dublin since 2016 and at all times

5    material to this action has been incarcerated in the custody and control of the BOP.  Plaintiff S.L.

6    has been sexually harassed and abused while incarcerated at FCI Dublin. Plaintiff S.L. was

7    sexually abused by an officer for months; when that officer left BOP after being confronted about

8    his actions, he moved to another state to be near S.L.'s family.  Plaintiff S.L. continues to

9    experience retaliation and threats from BOP staff who blame her for the officer's departure. She

10   lives in ongoing fear of further sexual abuse from those she depends upon for her care due to the

11   institution's ongoing failures to address rampant staff misconduct and failure to ensure Plaintiff

12   S.L.'s safekeeping, care, and protection.  Plaintiff S.L. is also a member of CCWP.

13        22.    Plaintiff J.L. has been incarcerated at FCI Dublin since 2020 and at all times

14   material to this action has been incarcerated in the custody and control of the BOP.  Plaintiff J.L.

15   has been sexually harassed and abused while incarcerated at FCI Dublin.  Plaintiff J.L. endured

16   months of abuse by an officer who supervised her in the kitchen; the officer harassed, threatened,

17   assaulted, and raped her. She lives in ongoing fear of further sexual abuse from those she depends

18   upon for her care due to the institution's ongoing failures to address rampant staff misconduct and

19   failure to ensure Plaintiff J.L.'s safekeeping, care, and protection.  Plaintiff J.L. is also a member

20   of CCWP.

21        23.    Plaintiff J.M. has been incarcerated at FCI Dublin since 2018 and at all times

22   material to this action has been incarcerated in the custody and control of the BOP.  Plaintiff J.M.

23   has been sexually harassed and abused while incarcerated at FCI Dublin.  Plaintiff J.M.

24   witnessed multiple officers sexually abusing incarcerated women and was herself abused by medical staff.

25   She lives in ongoing fear of further sexual abuse from those she depends upon for her care due to

26   the institution's ongoing failures to address rampant staff misconduct and failure to ensure

27   Plaintiff J.M.'s safekeeping, care, and protection. Plaintiff J.M. is also a member of CCWP.

28        24.    Plaintiff G.M. has been incarcerated at FCI Dublin since 2020 and at all times

material to this action has been incarcerated in the custody and control of the BOP.  Plaintiff G.M. has been sexually harassed and abused while incarcerated at FCI Dublin. Multiple guards sexually harassed and groped her and demanded to see parts of her body. She lives in ongoing fear of further sexual abuse from those she depends upon for her care due to the institution's ongoing failures to address rampant staff misconduct and failure to ensure Plaintiff G.M.'s safekeeping, care, and protection.  Plaintiff G.M. is also a member of CCWP.

25.     Plaintiff A.S. has been incarcerated at FCI Dublin since 2020 and at all times material to this action has been incarcerated in the custody and control of the BOP.  Plaintiff A.S. has been sexually harassed and abused while incarcerated at FCI Dublin.  Plaintiff A.S. experienced relentless harassment by multiple officers, one who required her to expose her body to him and watch him masturbating, and others who retaliated against her after the officer who had abused her was placed on leave.  She lives in ongoing fear of further sexual abuse from those she depends upon for her care due to the institution's ongoing failures to address rampant staff misconduct and failure to ensure Plaintiff A.S.'s safekeeping, care, and protection.

26.     Plaintiff L.T. has been incarcerated at FCI Dublin since 2019 and at all times material to this action has been incarcerated in the custody and control of the BOP.  Plaintiff L.T. has been sexually harassed and abused while incarcerated at FCI Dublin. Plaintiff L.T. was harassed and groped by an officer who forced her and others to strip and dance for him and was well known for trading food and basic goods with incarcerated individuals in exchange for sexual acts.  She lives in ongoing fear of further sexual abuse from those she depends upon for her care due to the institution's ongoing failures to address rampant staff misconduct and failure to ensure Plaintiff L.T.'s safekeeping, care, and protection.  Plaintiff L.T. is also a member of CCWP.

27.     Defendant United Stated of America Federal Bureau of Prisons ("BOP") is a governmental entity that operates and is in possession and control of the Federal Correctional Institute Dublin ("FCI Dublin").  FCI Dublin is a federal female low-security correctional institution with an adjacent minimum-security satellite camp located at 5701 8th Street, Dublin, California.

28.     Defendant Colette Peters is the current director of the BOP and is sued in her

1  official capacity.

2  29.  Defendant Thahesha Jusino is the current Warden of FCI Dublin and is sued in her

3  official capacity.

4  30.  Defendant Officer Bellhouse was an officer at FCI Dublin during the relevant

5  period and is sued in his individual capacity.  While performing the acts and omissions that

6  Plaintiffs allege in this complaint, Officer Bellhouse was acting within the scope of his official

7  employment, or with the BOP's permission and consent and under color of federal law.

8  31.  Defendant Officer Gacad was an officer at FCI Dublin during the relevant period

9  and is sued in his individual capacity.  While performing the acts and omissions that Plaintiffs

10  allege in this complaint, Officer Gacad was acting within the scope of his official employment, or

11  with the BOP's permission and consent and under color of federal law.

12  32.  Defendant Officer Jones was an officer at FCI Dublin during the relevant period

13  and is sued in his individual capacity.  While performing the acts and omissions that Plaintiffs

14  allege in this complaint, Officer Jones was acting within the scope of his official employment, or

15  with the BOP's permission and consent and under color of federal law.

16  33.  Defendant Lieutenant Jones was an officer at FCI Dublin during the relevant period

17  and is sued in her individual capacity.  While performing the acts and omissions that Plaintiffs

18  allege in this complaint, Lieutenant Jones was acting within the scope of her official employment,

19  or with the BOP's permission and consent and under color of federal law.

20  34.  Defendant Officer Lewis was an officer at FCI Dublin during the relevant period

21  and is sued in his individual capacity.  While performing the acts and omissions that Plaintiffs

22  allege in this complaint, Officer Lewis was acting within the scope of his official employment, or

23  with the BOP's permission and consent and under color of federal law.

24  35.  Defendant Officer Nunley was an officer at FCI Dublin during the relevant period

25  and is sued in his individual capacity.  While performing the acts and omissions that Plaintiffs

26  allege in this complaint, Officer Nunley was acting within the scope of his official employment, or

27  with the BOP's permission and consent and under color of federal law.

28  36.  Defendant Officer Serrano was an officer at FCI Dublin during the relevant period

and is sued in his individual capacity.  While performing the acts and omissions that Plaintiffs allege in this complaint, Officer Serrano was acting within the scope of his official employment, or with the BOP's permission and consent and under color of federal law.

37.     Defendant Officer Shirley was an officer at FCI Dublin during the relevant period and is sued in his individual capacity.  While performing the acts and omissions that Plaintiffs allege in this complaint, Officer Shirley was acting within the scope of his official employment, or with the BOP's permission and consent and under color of federal law.

38.     Defendant Officer Smith was an officer at FCI Dublin during the relevant period and is sued in his individual capacity.  While performing the acts and omissions that Plaintiffs allege in this complaint, Officer Smith was acting within the scope of his official employment, or with the BOP's permission and consent and under color of federal law.

39.     Defendant Officer Pool was an officer at FCI Dublin during the relevant period and is sued in his individual capacity.  While performing the acts and omissions that Plaintiffs allege in this complaint, Officer Pool was acting within the scope of his official employment, or with the BOP's permission and consent and under color of federal law.

40.     Defendant Lieutenant Putnam was an officer at FCI Dublin during the relevant period and is sued in his individual capacity.  While performing the acts and omissions that Plaintiffs allege in this complaint, Lieutenant Putnam was acting within the scope of his official employment, or with the BOP's permission and consent and under color of federal law.

41.     Defendant Officer Vazquez was an officer at FCI Dublin during the relevant period and is sued in her individual capacity.  While performing the acts and omissions that Plaintiffs allege in this complaint, Officer Vazquez was acting within the scope of her official employment, or with the BOP's permission and consent and under color of federal law.

42.     While acting and failing to act as alleged herein, Defendants, and each of them, had complete custody and total control of Plaintiffs.  Plaintiffs were, and continue to be, dependent upon Defendants for their personal security and necessities.

43.     In performing the acts and/or omissions contained herein, Defendants, and each of them, acted under color of federal law, and Plaintiffs are informed and believe each acted

maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate indifference to the rights and personal security of Plaintiffs. Each of them knew or should have known that their conduct, attitudes, actions, and omissions were, and are, a threat to Plaintiffs and to their constitutionally and statutorily protected rights. Despite this knowledge Defendants failed to take steps to protect Plaintiffs and to ensure their constitutional rights were satisfied while in the custody of Defendants.

44.     Individual Defendants further directly assaulted, harassed, demeaned, degraded, and trafficked particular Plaintiffs as alleged herein.

## FACTUAL ALLEGATIONS

I.    **Federal Law Requires BOP to Take Action to Prevent and Appropriately Respond to Reports of Staff Sexual Misconduct**

45.     Prison staff sexual abuse of incarcerated people constitutes a form of torture that violates the Eighth Amendment. *See Bearchild v. Cobban*, 947 F.3d 1130, 1144 (9th Cir. 2020). Such abusive sexual contact also violates federal criminal law. *See, e.g.*, 18 U.S.C. §§ 2243, 2244.

46.     The Prison Rape Elimination Act ("PREA") of 2003 required the Attorney General to promulgate rules to prevent sexual abuse prison facilities. *See* 34 U.S.C. § 30307. In 2012, the U.S. Department of Justice issued regulations designed to "prevent, detect, and respond to prison rape." *See* 28 C.F.R. § 115, 77 Fed. Reg. No. 119 (June 20, 2012). These regulations were immediately binding on BOP facilities. *Id.*

47.     Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance policy for sexual abuse and sexual harassment"; prevention, reporting, detection, and response to such behavior; "the right of inmates to . . . be free from retaliation for reporting sexual abuse and sexual harassment"; signs and dynamics of sexual abuse in confinement, and "common reactions of … victims"; and "how to avoid inappropriate relationships with inmates." *Id.* § 115.31(a). The training must be "tailored to the gender of the inmates at the employee's facility," and the agency must conduct a refresher training on PREA standards every two years. *Id.* § 115.31(b)–(c). In off years from the training, "the agency shall provide refresher information on current sexual abuse and sexual harassment

policies." *Id.* § 115.31(c).

48.     The regulations greatly restrict the circumstances whereby officers may view incarcerated people's naked bodies.  They state that facilities "shall not conduct cross-gender strip searches or cross-gender visual body cavity searches . . . except in exigent circumstances or when performed by medical practitioners." *Id.* § 115.15(a).  Facilities must document all such searches. *Id.* § 115.15(c).  Facilities are also required to "implement policies and procedures that enable inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks." *Id.* § 115.15(d).

49.     For positions in which someone "may have contact with inmates," PREA prohibits the hiring or promotion of anyone who has engaged in sexual *abuse* of incarcerated people or has been adjudicated to have been sexually abusive in the community.  *Id.* § 115.17(a).  However, BOP has interpreted these rules to not prohibit BOP from promoting or transferring staff members who were found to have sexually *harassed* incarcerated people in their custody.  *See* BOP Program Statement on Sexually Abusive Behavior, No. 5324.12 at 20–21.

50.     PREA regulations also mandate staff reporting.  BOP must "require all staff to report immediately . . . any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility, whether or not it is part of the agency; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a).

51.     The regulations mandate that BOP provide "multiple internal ways" for incarcerated people to "privately report" sexual abuse, sexual harassment, and retaliation.  *Id.* § 115.51(a).  In addition, BOP is required to "provide at least one way for inmates to report abuse or harassment to a public or private entity or office that is not part of the agency, and that is able to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials, allowing the inmate to remain anonymous upon request." *Id.* § 115.51(b).  BOP is required to "accept reports made verbally, in writing, anonymously, and from third parties and

shall promptly document any verbal reports." *Id.* § 115.51(c).  BOP is also required to provide incarcerated people "with access to outside victim advocates for emotional support services related to sexual abuse" and must "enable reasonable communication between inmates and these organizations and agencies, in as confidential a manner as possible." *Id.* § 115.53(a).

52.     Per PREA regulations, administrative investigations of alleged sexual abuse by a staff member or incarcerated person are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a). Investigators must be specially trained in sexual abuse investigations and must "gather and preserve direct and circumstantial evidence," including interviewing "alleged victims, suspected perpetrators, and witnesses" and "shall review prior complaints and reports of sexual abuse involving the suspected perpetrator." *Id.* § 115.71(c)-(b).  The agency is prohibited from determining an alleged victim's credibility based on their "status as inmate or staff." *Id.* § 115.71(e).  Investigations are further required to "include an effort to determine whether staff actions or failures to act contributed to the abuse." *Id.* § 115.71(f).  "The departure of the alleged abuser or victim from the employment or control of the facility or agency shall not provide a basis for terminating an investigation." *Id.* § 115.71(j).

53.     Substantiated allegations of potentially criminal conduct must be referred for prosecution and the agency must retain written reports of investigations for five years beyond the end of the staff member's employment. *Id.* § 115.71(h)–(i).  After investigating an incarcerated person's allegation that they were abused, BOP must inform that person of whether their allegation was found to be substantiated, unsubstantiated, or unfounded, even if the investigation was completed by another agency. *Id.* § 115.73(a)–(b).  The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. *Id.* § 115.76(b).

54.     PREA also includes measures designed to prevent staff retaliation following incarcerated persons' reports of abuse.  PREA requires that BOP establish a policy to prevent retaliation, and that staff monitor retaliation, provide "emotional support services for inmates . . . who fear retaliation," and monitor for at least 90 days the conduct and treatment of incarcerated people who report abuse. *Id.* § 115.67.  These protective measures include strict limits on the use

of administrative segregation.  The regulations provide: "Inmates at high risk for sexual victimization shall not be placed in involuntary segregated housing unless an assessment of all available alternatives has been made, and . . . there is no available alternative means of separation from likely abusers.  If a facility cannot conduct such an assessment immediately, the facility may" hold the individual in segregated housing for "less than 24 hours while conducting the assessment."  *Id.* § 115.43(a).  Any incarcerated person placed in protective custody for this purpose "shall have access to programs, privileges, education, and work opportunities to the extent possible."  *Id.* § 115.43(b).

55.   BOP has failed to adhere to PREA regulations.  From inadequate training, to lack of confidential reporting mechanisms and access to outside support services, to failures in administrative investigations, widespread misuse of administrative segregation, and rampant staff retaliation, its actions and failures to act have created an environment that has exposed, and continues to expose, the people in its custody to an unconscionable risk of sexual violence.

56.   As one survivor of staff sexual abuse at Dublin remarked at the trial of the former Warden, Ray Garcia, PREA "really doesn't exist in Dublin."  Transcript at 401, *United States v. Garcia*, No. CR-21-00429-YGR (N.D. Cal. Nov. 29, 2022).

## II.   The BOP Has Failed to Detect, Prevent, and Address Sexual Misconduct by BOP Staff and Failed to Act and Hold Staff Accountable for Decades

57.   Sexual assault and harassment have been serious, systemic problems in BOP facilities generally—and at FCI Dublin in particular—for decades.  Defendants BOP and FCI Dublin officials have been aware of these problems and have failed to take action.

58.   Court documents from the 1990s and 2000s reveal that assaults occurred frequently at FCI Dublin in those two decades.  During that time, at least four BOP employees at FCI Dublin were convicted or pleaded guilty to sexually abusing incarcerated women.[3]

59.   In 1998, the BOP settled a lawsuit involving FCI Dublin officers who placed incarcerated women in a men's solitary confinement unit and allowed them to be raped by the men being held there.  In the wake of that incident, the Bureau agreed to a variety of reforms intended

---

[3] Senate Report at 18.

1  to address sexual assault in BOP facilities including providing training to prevent abuse, providing

2  psychological and medical services, and adopting measures to protect confidentiality.  These

3  reforms were ultimately ineffective or abandoned.[4]

4        60.     In 2004, the DOJ's Office of the Inspector General ("OIG") completed a review of

5  BOP's staff disciplinary process and found significant deficiencies.  In particular, the report found

6  that more than 20% of cases with sustained allegations of misconduct (including sexual

7  misconduct) received little to no discipline despite the egregious nature of the conduct at issue.[5]

8        61.     The following year, the DOJ's OIG issued another report specifically focused on

9  deterring sexual abuse by BOP staff.  In that report, Kathleen Hawk Sawyer, the Director of the

10  BOP from 1993 to 2003, stated that sexual abuse of incarcerated people was the biggest problem

11  she faced as BOP Director and acknowledged that such abuse "can significantly harm inmates –

12  the very people the federal government charges the BOP with protecting."[6]  The report noted that

13  the BOP "recognized that staff sexual abuse is a significant problem within its institutions,"

14  concluded that laws intended to deter sexual abuse by BOP staff members were deficient in

15  critical ways.[7]

16        62.     In the early 2010s, the media reported that "a dozen [FCI] Dublin employees were

17  removed for sexually abusing inmates, including one who videotaped himself having sex with

18  inmates and stored those tapes in a prison locker."  None of those employees were arrested.[8]

19        63.     In 2019, the Congressional House Subcommittee on National Security reported that

20

21  [4] *Lucas v. White*, 63 F. Supp. 2d 1046, 1051 (N.D. Cal. 1999) (indicating BOP's agreement to
   these reforms on a national level and the government's agreement to comprehensive monitoring
22  them).

23  [5] Subcommittee on National Security, Majority Staff Memorandum, Independent Investigations
   and Employee Discipline at the Bureau of Prisons (Jan. 2, 2019), available at
24  https://oversight.house.gov/wp-content/uploads/2019/01/Memo-to-Chairman-Russell-re-BOP.pdf
   (discussing U.S. DEP'T OF JUSTICE, FED. BUREAU OF PRISONS, REVIEW OF THE FEDERAL BUREAU
25  OF PRISONS' DISCIPLINARY SYSTEM, No. I-2004-008 (2004)) (hereinafter "National Security
   Memorandum").

26  [6] OFFICE OF THE INSPECTOR GEN., U.S. DEP'T OF JUSTICE, DETERRING STAFF SEXUAL ABUSE OF
   FEDERAL INMATES 3, 7 (Apr. 2005).

27  [7] *Id.*

28  [8] Senate Report at 18.

widespread misconduct in the federal prison system was tolerated and routinely covered up or ignored, including among senior officials.[9]  To that end, the Subcommittee found that "individuals deemed responsible for misconduct were shuffled around, commended, awarded, promoted, and even allowed to retire with a clean record and full benefits before any disciplinary action could apply."  The report also observed that problems had plagued the BOP's disciplinary process for years and noted that the 2004 report by the DOJ Office of the Inspector General had found similar problems fifteen years before.[10]

64.     Beginning several years ago, a wave of currently and formerly incarcerated people came forward with their experiences of staff sexual abuse at FCI Dublin.  In 2019, an individual incarcerated at FCI Dublin filed a lawsuit alleging that a BOP officer, Officer Martinez, forced her to have sexual intercourse and that the warden at the time, Wiley Jenkins, failed to take action to stop the abuse.

65.     That same year, an incarcerated woman reported to FCI Dublin staff, the FBI, and the U.S. Attorney's Office that she had been raped by former FCI Dublin Chaplain James Highhouse.  Highhouse denied the allegations and was permitted to continue working at the facility, while the woman was deported.  In early 2022, the DOJ Civil Rights Division filed a criminal indictment against Highhouse for sexually abusing the woman who reported him three years prior.  Highhouse subsequently pled guilty and was sentenced to seven years in prison. Court records show that the former chaplain engaged in sexually predatory conduct with at least six incarcerated women between 2014 to 2019.

66.     In or around 2020, the DOJ launched a criminal investigation that has led to charges against eight former FCI Dublin officials, including former Warden Ray Garcia.  While one officer is awaiting trial, seven officials have now been convicted of, or pled guilty to sexually abusing a total of at least 20 incarcerated women.  Court records indicate that all seven of these men committed additional, uncharged abuse of other incarcerated women.  A significant number

---

[9] *See* National Security Memorandum at 1.

[10] *Id.* at 9.

1  of additional FCI Dublin staff have been placed on administrative leave pending further

2  investigation—including as recently as August 10, 2023—and additional criminal indictments are

3  expected.

4          67.     In June 2021, former officer Ross Klinger became the first Dublin official to be

5  criminally charged.  After Officer Klinger pled guilty to sexually abusing two incarcerated

6  women, one survivor stated that he had accessed her private medical records to learn about the

7  mental health issues she faced and then used that information to prey on her.[11]

8          68.     Former FCI Dublin Warden Ray Garcia was indicted in September 2021, and was

9  subsequently convicted of sexually abusing three incarcerated women following a jury trial.

10  Garcia sexually assaulted at least one incarcerated woman, ordered multiple women—including

11  Plaintiff L.T.'s niece—to strip naked for him while he took photos, and stored a "large volume of

12  sexually graphic photographs" on his BOP-issued cellphone.  Garcia had served as the PREA

13  compliance officer at FCI Dublin, where he was responsible for ensuring compliance with PREA

14  policies and training other employees.  Following his conviction, the DOJ Inspector General noted

15  that Garcia "created a heinous culture that failed to protect female inmates from widespread sexual

16  abuse and violence at the hands of other Dublin employees."[12]

17          69.     In early 2022, two more former FCI Dublin officials--named Defendant John

18  Bellhouse and Enrique Chavez—were charged with sexually abusing women in their custody.

19  Defendant Officer Bellhouse was convicted of sexually abusing two incarcerated women on

20  multiple occasions following a jury trial, and Officer Chavez pled guilty to sexually assaulting an

21  incarcerated woman multiple times.

22          70.     In August 2022, former Dublin Officer Nicholas Ramos died by suicide while on

23

24  _____

25  [11] Lisa Fernandez, *Woman at Center of Dublin Prison Sex Scandal Says Guard Used Mental Health Files to Prey on Her*, KTVU FOX 2 (Mar. 14, 2022, 5:50 AM), https://www.ktvu.com/news/woman-at-center-of-dublin-prison-sex-scandal-says-guard-used-mental-health-files-to-prey-on-her.

26

27  [12] U.S. Attorney's Office, Press Release, *Former Federal Prison Warden Sentenced to More Than Five Years In Prison For Sexual Abuse of Three Female Inmates* (Mar. 22, 2023), https://www.justice.gov/usao-ndca/pr/former-federal-prison-warden-sentenced-more-five-years-prison-sexual-abuse-three.

28

administrative leave and under investigation for sexually abusing incarcerated women.  Many currently and formerly incarcerated women have reported that Ramos subjected them to abuse including sexual assault, forcing them to strip, and relentless retaliation.

71.     In the last several months, three additional former FCI Dublin officials—all named Defendants—have been criminally charged.  In May 2023, Defendant Officer Smith was indicted on 12 counts for sexually abusing three incarcerated women and is currently awaiting trial. Officer Smith—widely known as "Dirty Dick Smith"—abused dozens of incarcerated women beginning as early as 2015 and continuing until at least August 2021, including Plaintiffs L.T., G.M., and A.S.

72.     In July 2023, Defendants Andrew Jones and Nakie Nunley pleaded guilty to sexual abuse.  *See* Plea Agreement, *United States v. Jones*, No. 4:23-cr-00212-HSG (N.D. Cal. July 13, 2023); Plea Agreement, *United States v. Nunley*, No. 4:23-cr-00213-HSG (N.D. Cal. July 13, 2023).  Defendant Officer Jones admitted to sexually assaulting five incarcerated women— including Plaintiff J.L, whom he raped in the food service warehouse.  *See* Plea Agreement at 4, *United States v. Jones*, No. 4:23-cr-00212-HSG (N.D. Cal. July 13, 2023).  Defendant Officer Nunley admitted to sexually assaulting seven incarcerated women under his supervision, including through rape, forced digital penetration, and forced oral sex.

73.     The federal criminal investigation has made clear that FCI Dublin staff explicitly target immigrant women for abuse, leveraging the threat of deportation.[13]  In relevant instances, officers told survivors that they "looked in their files" and knew that they were subject to immigration detainers, or they threatened to notify immigration authorities if survivors reported their abuse.  For example, Officer Chavez sexually abused multiple Mexican immigrant women, and has even traveled to Mexico to visit a woman that he abused after she was released and

---

[13] *See* Victoria Law, *These Survivors Rooted Out Sexual Abuse In Federal Prison. Now they Face Deportation*. THE APPEAL (June 2, 2023), https://theappeal.org/fci-dublin-u-visas-sexual-abuse-deportation/; Sam Levin, *She reported being abused by US prison guards. Now she faces deportation*, THE GUARDIAN (Apr. 6, 2023), https://www.theguardian.com/us-news/2023/apr/06/federal-prison-sexual-abuse-deportation-california-mexico; Lisa Fernandez, *Dozens of Dublin prison sex survivors face deportation*, KTVU, (March 15, 2023), https://www.ktvu.com/news/dozens-of-dublin-prison-sex-survivors-face-deportation.

1  deported.  At least a dozen women who were sexually assaulted by FCI Dublin staff have already

2  been deported, and dozens more are currently facing deportation, including multiple women who

3  testified on behalf of the government at both former Warden Garcia's and Defendant Officer

4  Bellhouse's trials.  Noncitizen survivors qualify for visas for victims of crime but require

5  certifications from law enforcement agencies affirming that they reported abuse.  BOP and FCI

6  Dublin officials have acknowledged that they are authorized to sign visa certifications, but they

7  have so far refused to do so.

8      74.    In the wake of these criminal indictments, FCI Dublin has been the subject of

9  significant media coverage and public scrutiny.  For example, in early 2022, the Associated Press

10  ("AP") investigated conditions at the prison.  The investigation included a review of internal BOP

11  documents, court documents, and statements from incarcerated persons, as well as interviews with

12  staff.  The investigation "found a permissive and toxic culture at [FCI Dublin]," that had

13  "enabl[ed] years of sexual misconduct by predatory employees and cover-ups that have largely

14  kept the abuse out of the public eye."[14]

15      75.    The investigation also shed light on the administration of then-Acting Warden

16  Thomas Hinkle.  Hinkle, a former BOP Deputy Regional Director, was installed as warden of FCI

17  Dublin in January 2022, despite a long history of misconduct in BOP.  That misconduct

18  encompassed extensive physical abuse of incarcerated people, including an incident where he held

19  down a person in his custody while another BOP officer sexually assaulted that person.[15]

20      76.    Unsurprisingly, as Acting Warden of FCI Dublin, Hinkle used his position to

21  intimidate those reported staff sexual assault, and actively prevented Congressional representatives

22  from meeting with incarcerated persons privately to learn more about their experiences.[16]  For

23

24  _____

[14] Michael Balsamo & Michael Sisak, *AP Investigation: Women's prison fostered culture of abuse*
(Feb. 6, 2022, 7:04 AM), https://apnews.com/article/coronavirus-pandemic-health-california-
25  united-states-prisons-00a711766f5f3d2bd3fe6402af1e0ff8.

26  [15] Michael R. Sisak & Michael Balsamo, *AP Investigation: Prison boss beat inmates, climbed
ranks*, (Dec. 9, 2022, 11:52 AM), https://apnews.com/article/prisons-us-department-of-justice-
27  united-states-government-e68aaf2e4ead5c9bfb0659db46275405.

[16] Associated Press, '*Abhorrent': Prison Boss's Alleged Intimidation of Witness at NorCal
28  Federal Facility Concerns DOJ*, KTLA 5 (Mar. 3, 2022 9:46 PM),

example, after one female BOP employee filed a harassment complaint against a prison manager at FCI Dublin, Warden Hinkle met with her alone, in violation of established protocols.  His actions suggested an attempt to quiet her complaint, and his conduct drew an unusual public rebuke from the Justice Department, which said: "These allegations, if true, are abhorrent."[17]

77.     In light of its findings about Warden Hinkle, the AP investigation concluded that his frequent promotions into positions of leadership at BOP "raise serious questions about the agency's . . . explicit commitment to rooting out abuse."[18]

78.     In the past two years, numerous federal officials have expressed outrage over abuse at the FCI Dublin and demanded that the BOP act.[19]  For example, in late 2022, several members of Congress representing California wrote to the FCI Dublin administration following a visit to the facility.  They noted that that "conditions at FCI Dublin continue[d] to deteriorate," and warned that reports of staff sexual abuse were not kept confidential and "led to unacceptable retaliation."

79.     In the summer of 2022, Deputy Attorney General Lisa Monaco ordered the creation of a DOJ Working Group "to review the Department's approach to rooting out and preventing sexual misconduct by BOP employees."  The Working Group issued a report in November 2022, which included over fifty specific recommendations to better protect the safety and wellbeing of those in BOP custody and hold accountable those who abuse positions of trust.

80.     The Working Group observed "the need for *immediate* actions to address the Department's approach to sexual misconduct perpetrated by BOP staff, as well as the importance

---

https://ktla.com/news/abhorrent-prison-bosss-alleged-intimidation-of-witness-at-norcal-federal-facility-concerns-doj/

[17] *Ibid.*

[18] Sisak & Michael Balsamo, *AP Investigation: Prison boss beat inmates.*

[19] *See, e.g.*, Letter from Senators Durbin, Grassley, Feinstein, and Padilla to Attorney General Garland and Deputy Attorney General Monaco (Dec. 12, 2022), https://www.grassley.senate.gov/imo/media/doc/durbin_grassley_to_justice_deptbopsexualmisconduct.pdf; Letter from Representatives Swalwell, Bass, DeSaulnier, and Chu to FCI Dublin Warden Jusino (Dec. 9, 2022), https://swalwell.house.gov/sites/evo-subsites/swalwell-evo.house.gov/files/FCI%20Dublin%20Letter%20to%20Warden%20-%20FINAL.pdf; Letter from Eight Members of Congress to BOP Director Carvajal (March 3, 2022), https://swalwell.house.gov/media-center/press-releases/swalwell-joins-colleagues-calling-inspector-general-horowitz-and.

of further review to consider longer-term—and more systemic—changes."[20]  The Working Group also reported that "BOP has received hundreds of complaints of sexual abuse perpetrated by its employees over the past five years."  It further concluded that, even if some of those complaints were not meritorious, "the volume alone is a strong signal of the need for attention to this problem."[21]

81.  As with the AP investigation, the Working Group heard from stakeholders, who "raised troubling allegations of a culture of permissiveness toward staff misconduct and retaliation against victims who report abuse."  It reported that "internal and external stakeholders all emphasized that prevention [of sexual abuse] begins with changing [BOP] culture . . . to promote a safer . . . environment."[22]  The Working Group also noted that "[d]uring listening sessions, advocates and formerly incarcerated women identified several obstacles to reporting sexual abuse, including a fear of not being believed, a fear of retaliation, and a fear that reporting would not result in consequences for the perpetrator."[23]  Several people mentioned that BOP staff tried to deter individuals from reporting abuse by threatening to restrict access to their children.[24]

82.  The Working Group found problems with BOP investigation policies as well, namely that "BOP has assigned Special Investigative Services ('SIS') lieutenants to conduct intake of allegations of sexual misconduct," but that "SIS officers are usually corrections officers who rotate in and out of that position without specialized sex-crime or trauma-informed training."  This arrangement means that intakes are often conducted in a harmful or traumatic manner and that survivors of sexual abuse are deterred from reporting because "SIS officers may be—or appear to victims to be—friends or colleagues of the alleged perpetrators, creating at least the

---

[20] Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons 1, 2 ("DOJ Report"), (Nov. 2, 2022), available at https://www.justice.gov/d9/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf (emphasis added).

[21] *Id.* at 4.

[22] *Id.* at 5.

[23] *Id.* at 5.

[24] *Id.* at 12.

appearance of a conflict of interest."[25]

83.    The Working Group also criticized the fact that Wardens have been in charge of whether allegations of misconduct will lead to disciplinary investigations, an arrangement that has been referred to as "putting the fox in charge of the henhouse."[26]

84.    Taken together, the problems identified by the DOJ Working Group have reduced accountability for BOP staff misconduct and contributed to a toxic culture in which sexual abuse of incarcerated people is institutionally tolerated and frighteningly common.

85.    A month after the Working Group issued its report, the United States Senate's Permanent Subcommittee on Investigations concluded its own months' long investigation into BOP staff sexual abuse, and issued a report entitled "Sexual Abuse of Female Inmates in Federal Prisons."  The Subcommittee's report made clear that sexual abuse of incarcerated people is a significant, widespread, decades-long problem in BOP facilities generally, and at FCI Dublin in particular.  The report found that—during the past decade alone—women in at least two-thirds of federal women's prisons have been abused by BOP employees,[27] and that at multiple BOP facilities, including FCI Dublin, numerous women have "endured ongoing abuse for months or years."[28]

86.    The Subcommittee's report referred to the abuse at FCI Dublin as "horrific" and, like other reports before it, found that BOP had (1) failed to detect, prevent, and respond to sexual abuse of people incarcerated at FCI Dublin and at other women's prisons; (2) widely failed to hold employees accountable for misconduct; and (3) failed to take agency-wide action to address sexual abuse by BOP employees.[29] The Subcommittee also found that "senior BOP officials admitted . . . that there was a 'culture of abuse' at FCI Dublin."[30]

---

[25] *Id.* at 15.

[26] Benjamin Tschirhart, *With "Fox in Charge of the Henhouse," Almost All Misconduct Accusations Against BOP Staff Result in No Discipline*, PRISON LEGAL NEWS, Mar. 2023, at 1.

[27] Senate Report at 1.

[28] *Id.* at 2.

[29] *Id.* at 4–5.

[30] *Id.* at 3.

87.     The Subcommittee further found that "BOP management failures enabled continued sexual abuse of female prisoners by BOP's own employees" and that BOP's investigative practices are "seriously flawed" with "a backlog of 8,000 internal affairs cases, including at least hundreds of sexual abuse cases," including some cases that had been pending for more than five years.[31]  One former FCI Dublin Warden recalled that such delays had plagued the complaint investigation process for "the entirety of his 20-plus year career with BOP."[32]

88.     In a recent memorandum to the BOP Director, the Inspector General noted that "the BOP will not rely on inmate testimony to make administrative misconduct findings and take disciplinary action against BOP employees, unless there is evidence aside from inmate testimony that independently establishes the misconduct, such as a video capturing the act of misconduct, conclusive forensic evidence, or an admission from the subject."[33]  In other words, without corroborating evidence, the words of abuse survivors are disbelieved by BOP and considered insufficient to substantiate allegations of misconduct.

89.     The Inspector General warned that BOP's reluctance to credit survivor testimony "enhances the likelihood that employees who have engaged in misconduct avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates."[34]  It also "likely emboldens miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences."[35]

90.     Instead of disciplining staff over allegations of misconduct, BOP routinely either takes no action or transfers them to other institutions without further recourse, allowing misconduct to continue at the new facility.  Other times, staff deemed responsible for misconduct

---

[31] *Id.* at 1, 25.

[32] *Id.* at 26.

[33] Management Advisory Memorandum from Michael E. Horowitz, Inspector General, U.S. Department of Justice to Colette S. Peters, Director, Federal Bureau of Prisons 1 (Oct. 12, 2022), https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[34] *Id.* at 3.

[35] *Id.* at 4.

1   are permitted to retire (with full benefits) before any disciplinary action can apply.[36] And criminal

2   punishment for action involving sexual abuse of incarcerated people is even less likely than

3   administrative punishment.  When a BOP employee is officially accused of wrongdoing, there is

4   only a three-tenths of one percent likelihood that the person will be criminally convicted.[37]

5   **III.   The BOP Has Failed to Take Action to Stop Ongoing Sexual Assault and Harassment and to Protect the Individuals in Its Care at FCI Dublin**

6
7       91.     Despite the BOP's awareness of these long-running conditions and problems, the

    agency has failed to act.  The same conditions which created the cesspool of sexual abuse at
8
    Dublin persist today.  Specifically, the BOP has failed to: (1) adequately hire, train, and supervise
9
    its employees to their prevent their abuse of power; (2) implement any truly confidential method
10
    for individuals to report abuse to outside authorities who are not employed by the BOP;
11
    (3) properly investigate claims of abuse; (4) address rampant retaliation against victims, including
12
    but not limited to solitary confinement, punitive cell and strip searches, and punitive transfers,
13
    which harm survivors and deter others from reporting; (5) ensure that officers who have
14
    substantiated claims of sexual abuse and harassment against them are promptly fired and not
15
    permitted to return to BOP employment; (6) provide constitutionally adequate medical and mental
16
    health care to survivors; (7) provide access to counsel; (8) provide survivors with documentation
17
    of reports of staff misconduct and facilitate the U-visa certification process for noncitizen
18
    survivors who report and assist in the investigation of staff abuse; (9) create a process to assist
19
    survivors of abuse with compassionate release petitions; (10) install fixed cameras in areas where
20
    abuse is known to occur and failed to properly monitor and maintain the fixed cameras that do
21
    exist; (11) address increasingly dire living conditions at the facility that contribute to ongoing
22
    sexual violence at the facility.
23
        92.     As a result of these institutional failures, people incarcerated at FCI Dublin
24
    continue to face an imminent risk of sexual assault, harassment, and retaliation.
25

26

27   [36] *See* National Security Memorandum at 1.

28   [37] Benjamin Tschirhart, *With "Fox in Charge of the Henhouse," Almost All Misconduct Accusations Against BOP Staff Result in No Discipline*, Prison Legal News, Mar. 2023, at 1.

1    **A.    Individuals Incarcerated at FCI Dublin Continue to Face Sexual Assault and Harassment On An Ongoing Basis.**

2

3    93.    Officers at FCI Dublin have been undeterred by the internal investigations, criminal

4    prosecutions, and even convictions of former staff members.  Even after Warden Garcia was

5    removed from his position and the first Dublin officers were criminally charged the summer of

6    2021, rampant sexual abuse has continued at FCI Dublin, grievously injuring named plaintiffs and

7    many others.  On information and belief, officers at FCI Dublin continue to be placed on

8    administrative leave pending investigation of allegations of sexual misconduct, including as

9    recently as August 10, 2023. Plaintiffs, and other putative class members continue to report

10   ongoing sexual assault and harassment by staff.

11   94.    **Plaintiff J.L.** is one of countless people who were sexually abused by officers

12   working in the kitchen, including well after Warden Garcia was suspended.  Plaintiff J.L. was

13   forcibly raped, assaulted, and harassed by her kitchen supervisor, Defendant Officer Jones.

14   95.    Around July 2021, Defendant Officer Jones began to taunt Plaintiff J.L. because of

15   her weight, calling her "big," then he began to flirt with her.  Jones provided Plaintiff J.L. special

16   benefits for this sexual attention: he allowed her to have food from the kitchen and allowed her to

17   use the kitchen to cook.  He also brought Plaintiff J.L. special treats from the outside, like chips,

18   chocolate bars, and ice cream which he would leave in the freezer for her.

19   96.    As time went on, Defendant Officer Jones' behavior became assaultive.  One day,

20   he asked Plaintiff J.L. to go into the walk-in fridge to get him something for his meal.  Kitchen

21   officers routinely used the walk-in fridge to abuse incarcerated women, because it was private and

22   out of view of security cameras.  Once inside the fridge, Jones grabbed Plaintiff J.L., bent her

23   over, and rubbed his penis against her buttocks over their clothing.  A few days later, he removed

24   her from her unit and ordered her to get his parmesan cheese out of the walk-in freezer.  When

25   they entered the freezer, he tried to kiss her, but she told him she ate tuna to avoid kissing him.

26   Instead of kissing her, he pulled up her shirt, groped her, and sucked on her right breast with his

27   mouth.  She was afraid to do anything to stop him.  He stopped when he thought he heard

28   someone coming.

97.     The next day, Plaintiff J.L. attempted to leave work, but Defendant Officer Jones instructed her to wait.  He took Plaintiff J.L. into the warehouse, where they entered a smaller room with a door—another location known to be out of view of security cameras.  Jones pulled down her pants, bent her over, and vaginally raped her without a condom, pushing into her so hard that her head repeatedly hit the concrete wall in front of them.  When he was about to orgasm, he turned Plaintiff J.L. around and ejaculated into her mouth and onto her shirt.

98.     While this was happening, Defendant Officer Pool was in the staff office in the kitchen about forty feet from the warehouse.  A few days after her rape, Pool—who also worked in the kitchen and sexually abused numerous kitchen workers—began calling Plaintiff J.L. "Becky the Slave."  Plaintiff J.L. understood "Becky" to be slang for a person who performs oral intercourse.

99.     Defendant Officer Jones recently admitted to sexually assaulting five incarcerated women—including Plaintiff J.L.—in a single year.  *See* Plea Agreement at 4, *United States v. Jones*, No. 4:23-cr-00212-HSG (N.D. Cal. July 13, 2023).

100.    **Plaintiff G.M.** endured horrendous sexual harassment and abuse by Defendant Officers Smith and Nunley.

101.    Defendant Officer Nunley supervised Plaintiff G.M. at Unicor—the for-profit call center that operates inside FCI Dublin—from approximately September 2020 until September 2021.  Several months after Plaintiff G.M. started working at the call center, Defendant Officer Nunley began throwing notes at her instructing her to meet him in the back.  He would tell Plaintiff G.M. that he wanted to have sex with her and promised to write her letters of recommendation and send money to her kids in exchange.  On one occasion, Defendant Officer Nunley took papers from Plaintiff G.M.'s desk and said he would only return them if she had sex with him. When she refused, he shredded the papers.

102.    While Plaintiff G.M. was at her workstation, in view of others, Defendant Officer Nunley often would come up behind her, pull her hair, rub her shoulders, and attempt to kiss her.  On one occasion in the spring of 2021, while showing G.M. pictures of himself at a football game on his computer, Nunley came up behind her, rubbed his penis against her backside and attempted

to kiss her neck.

103.    Plaintiff G.M. was also abused by Defendant Officer Smith.  When Plaintiff G.M. was in the quarantine unit during the summer of 2020, Smith would regularly enter the showers to watch Plaintiff G.M. and other women shower.  He would refuse to give Plaintiff G.M. a towel unless she walked over to him naked.  He would demand that Plaintiff G.M. "show him something" in order to send out mail.  Plaintiff G.M. also witnessed Defendant Officer Smith make other incarcerated women perform sexual acts in order to access basic privileges, including sending mail out.

104.    Plaintiff G.M. witnessed other officers in the quarantine unit use food and hygiene products as bribes in the same manner.  She once witnessed officers tell women that if they wanted a Kit-Kat bar they needed to "break off a piece" for the officer, which meant revealing or touching themselves.

105.    **Plaintiff L.T.** is also a survivor of Defendant Officer Smith.  From the time she arrived at FCI Dublin, Plaintiff L.T. was aware of Smith's reputation as a sexual abuser.  She knew that he regularly flirted with and touched women in her housing unit.  She knew that when he worked the night shift, he would turn on the music in his office and expect women to dance for him.  She heard him tell other incarcerated people that he liked to see "titties."

106.    Then in June 2021, Defendant Officer Smith forced Plaintiff L.T. to strip for him, and then assaulted her.  As people were getting ready for bed, Smith came to L.T.'s doorway.  He asked her to dance for him.  Plaintiff L.T. felt like she had no other option because he was in charge and could make her life hard if she said no and began to dance for him.  While Plaintiff L.T. was dancing, Smith asked to touch her breasts.  Plaintiff L.T. pulled up her blouse and Smith groped her bare breasts with his hands.  He then returned to his desk.  Plaintiff L.T. then saw another girl come down from her cell and dance for Smith in front of the officers' station.

107.    After this initial incident, Defendant Officer Smith began bringing his radio to the housing unit and would ask Plaintiff L.T. and other women to dance for him whenever he was working the evening shift.  Everyone in the facility, including the officers, knew that Smith was holding these strip shows, but they did nothing to stop him.  In exchange, Smith would let L.T.

and others have additional privileges including moving around the unit as they wanted during facility-wide lock downs and quarantines, turning up the officers' MP3 music, drinking, and generally creating a "party" atmosphere when he would have them dance and strip for him. It was understood that they allowed L.T. and others out of their cells to do what they wanted for the officers' whole shift from—2 pm until the 10 pm count—as long as they "entertained" Defendant Officer Smith and the other officers. Officers Smith, Williams, Bell, and others facilitated this exchange by opening the doors and allowing them to roam free while no one else could so that L.T. and others could dance for them.

108.   **Plaintiff A.S.** has endured abuse and retaliation by multiple Dublin officials. Defendant Officer Smith relentlessly sexually harassed Plaintiff A.S. from around September 2020 through August 2021, including up to four times a week from November 2020 through March 2021 during a COVID lockdown.

109.   Defendant Officer Smith began harassing Plaintiff A.S. around September 2020. He called her into his office and asked her about her time in state prison. He told her that state prison was nothing like the BOP because in state prison, officials would provide contraband to women incarcerated in order to obtain sexual favors, whereas at BOP officers did not need to do that. Soon after this conversation, Smith began asking Plaintiff A.S. to "show him something." He commented on how pretty her breasts looked and told her that he wanted to see them. In exchange, he would trade her a drink from his office.

110.   During a COVID lockdown around January 2021, Defendant Officer Smith's abuse intensified. He would intercept Plaintiff A.S. and others on their way to the shower, and demand that they take off their robes and show him their naked bodies. He repeatedly threatened disciplinary action if A.S. and others did not disrobe in front of him. On one occasion, he pulled back the shower curtain and watched Plaintiff A.S. shower. Also, during lockdown, Defendant Officer Smith would watch Plaintiff A.S. in her cell when naked. Several times, Smith locked A.S.'s cell door and refused to open it unless she disrobed for him. He also threated to issue disciplinary actions against Plaintiff A.S. and others unless they stripped for him.

111.   After that lockdown ended, Defendant Officer Smith began calling A.S. to his

office over the intercom.  One time, when she arrived at his office, he was masturbating himself over his pants.  He forced Plaintiff A.S. to stand in front of him, and stared at her while he continued masturbating.

112.    In August 2021, after the Warden was placed on administrative leave, Defendant Officer Smith was again demoted to working the perimeter, where he continued his harassment. While Plaintiff A.S. walked the yard during recreation, Defendant Officer Smith drove by in a car and asked Plaintiff A.S. to "show me something."

113.    When Plaintiff A.S. refused Defendant Officer Smith's advances, his friend, Officer Ramos, retaliated by tossing and searching her cell.  Ramos also took Plaintiff A.S.'s roommates' items intentionally to create conflict between them.  Ramos told Plaintiff A.S. that if she did not do what he said, another officer would "hit" her room again, meaning search her cell without reason and take her possessions.  On one occasion, Ramos escorted Plaintiff A.S. to an office, and had Officer DeLuca strip search her, seemingly for no reason.  Ramos and DeLuca took Plaintiff A.S.'s property during this incident.

114.    **Plaintiff S.L.** has been assaulted, harassed, and stalked by Defendant Officer Lawrence Gacad.  Gacad's abuse began in March 2022, nearly a year after the Warden was placed on administrative leave.  Gacad began flirting with Plaintiff S.L. and dedicating songs to her that he played on his computer.  He dropped her notes in her cell during rounds, telling her that she was beautiful, that he was in love with her.  His messages explained his infatuation with Plaintiff S.L. saying, "Back in September 2021, since I first laid eyes on you, I knew you were going to be my future wife."  He also began sending her electronic messages using a pseudonym.  He gave Plaintiff S.L. gifts including a necklace, watch, and earrings.

115.    After several weeks, their relationship became sexual.  Around April 2022, Defendant Officer Gacad grabbed Plaintiff S.L. while she was working in the yard office and groped her buttocks and kissed her.  Soon after, during a trash run, he pulled Plaintiff S.L. into the yard office, groped her body, and kissed her.  After this incident, he began to grope and kiss her every time they took out the trash, approximately once a week.  In May 2022, Defendant Officer Gacad was working in Plaintiff S.L.'s housing unit at night when he appeared in the doorway to

her room.  She was naked, having just come from the shower, and he kissed her and touched her genitals.  On one last occasion around May 2022, while Defendant Officer Gacad was working in the officers' station in her unit, he again kissed Plaintiff S.L.

116.    In June 2022, after another incarcerated person reported Gacad's abuse, Plaintiff S.L. and Defendant Officer Gacad were questioned about their rumored relationship by Defendant SIS Officer Lt. Putnam.  Defendant Officer Gacad promptly quit.

117.    After he quit, Defendant Officer Gacad continued to harass, stalk, and torment Plaintiff S.L.  After she was released from the SHU, Plaintiff S.L. continued to receive messages from Defendant Officer Gacad on CorrLinks for months.  In the beginning of July 2022, Plaintiff S.L. was shocked to see Defendant Officer Gacad in her parents' home in Arizona during a video visit wearing a mask.  Defendant Officer Gacad told S.L.'s parents that he loved her and stayed with them for several weeks.  He has since moved to Phoenix, and now works with Plaintiff S.L.'s mother at the VA hospital.

118.    Though Plaintiff S.L. ended their relationship and told Defendant Officer Gacad to stay away from her, as of Spring of 2023, she believes he is still in communication with her family.  Plaintiff S.L. is now terrified of being transferred to a facility in Phoenix or returning to her home, where her abuser resides.

119.    **Plaintiff A.H.R.** has been sexually harassed and retaliated against by multiple officers at FCI Dublin.  Throughout 2020 and 2021, Plaintiff A.H.R. was forced to act as a lookout by Defendant Officer Jones in the kitchen and Defendant Officer Bellhouse in the Safety Office, while the officers had sex with incarcerated women.

120.    In early 2020, Plaintiff A.H.R. took a job in the food service department as a butcher and shortly thereafter, Defendant Officer Jones began to flirt with several of the girls that worked with Plaintiff A.H.R.  Soon after, he began ordering Plaintiff A.H.R. to work as a look out for him while he had sex with incarcerated women.

121.    Defendant Officer Jones made it clear that Plaintiff A.H.R. could have anything he wanted from the kitchen, such as cheese and vegetables, in exchange for his work as a lookout.

122.    Being forced into this lookout role made Plaintiff A.H.R. deeply uncomfortable.

He quit his position in food service to try to avoid taking part in Defendant Officer Jones's abuse.

123.    Soon after, when Plaintiff A.H.R. began working in a new job in the Safety Department, he was once again forced to act as a lookout for Defendant Officer Bellhouse. Bellhouse forced Plaintiff A.H.R. to work as a lookout as Bellhouse had sex with the women that A.H.R. worked with.  Plaintiff A.H.R. worked as a lookout until Bellhouse was walked off the job for his inappropriate sexual relationships.

124.    In exchange for working as a lookout, Defendant Officer Bellhouse gave Plaintiff A.H.R. food such as pizza, bagels, candy, and energy drinks such as Monsters and Red Bulls. Plaintiff A.H.R. knew that this was a way to ensure he would help the officers and stay quiet. Plaintiff A.H.R. believes that these officers targeted him to work as a lookout because he is a transgender man, and they believed that it would not raise suspicion if they had a man working with them.

125.    From around July to November 2022, Plaintiff A.H.R. was himself sexually harassed by Defendant Officer Vazquez.  Vazquez would often remove A.H.R. from his living area or workplace.  Defendant Officer Serrano often assisted Defendant Officer Vazquez to take Plaintiff A.H.R. to private rooms where it was well known that there were no cameras.  Once there, Vazquez would flirt with A.H.R. and often asked why he didn't look for women "beyond the fence."  She also hugged A.H.R. on a number of occasions and kissed him on the lips.  For these sexual favors, Defendant Officer Vazquez brought Plaintiff A.H.R. contraband such as Red Bulls, candy bars, and clothing, and gave him special privileges such as using staff computers.

126.    Defendant Officers Vazquez and Serrano began to intentionally interfere with Plaintiff A.H.R.'s romantic relationship with another incarcerated person in an attempt to separate him from his partner.  Around September 6, 2022, Defendant Officers Vazquez and Serrano took him to a staff office.  Serrano told him about the email messages that his incarcerated girlfriend was exchanging with Defendant Officer Gacad.  Vasquez allowed A.H.R. to use her computer to view these email messages.  Defendant Officers Vazquez and Serrano also let A.H.R. listen to phone calls between his incarcerated girlfriend and Defendant Officer Gacad.

127.    Shortly after Plaintiff A.H.R. filed an emergency request for administrative remedy

1   in March 2023, Defendant Officer Vazquez was placed on administrative leave.

2       128.    **Plaintiff J.M.** witnessed Defendant Officers Jones and Pool sexually abusing

3   incarcerated women in early 2022 and was herself abused by FCI Dublin medical staff.

4       129.    In November 2021, Nurse Fraser Cohen inappropriately groped Plaintiff J.M.'s

5   naked breast while administering an "EKG" for an unknown medical reason.  At least two other

6   incarcerated women report that Nurse Cohen forced them to disrobe and inappropriately fondled

7   their breasts during medical exams in 2021 and 2022.  In June 2022, Cohen took another

8   incarcerated woman to the medical office multiple times a week outside of normal hours and

9   weekends and sedated her to the point of unconsciousness for no apparent medical reason.  On at

10  least one occasion, this woman awoke and found that Nurse Cohen was fondling her bare breasts.

11      130.    In July 2022, Nurse Wilson came into Plaintiff J.M.'s cell and gave her an injection

12  that knocked her out for several hours.  Staff never explained why she was given this shot, or what

13  happened when she was unconscious, but the experience made her even more afraid to engage and

14  seek medical care at the facility due to fears that she would be groped or otherwise drugged and

15  assaulted.

16      131.    **Plaintiff R.B.**'s recent experiences show that people at FCI Dublin continue to

17  endure degrading sexual comments and invasions of privacy on a regular basis.  Plaintiff R.B. has

18  a medical condition that requires her to give herself rectal enemas at least once per day. In order to

19  administer the enema, she has to disrobe from the waist down.  Previously, she was housed alone

20  to protect her privacy, but on November 23, 2022, Case Manager O'Brien, and Unit Manager

21  Groover told R.B. that she would be getting a roommate.  Plaintiff R.B.'s enema process can take

22  up to two hours, but FCI Dublin only requires her roommate to leave for twenty minutes.  In

23  addition, staff refuse to allow R.B. to cover her window while she administers the enema.  In

24  March 2023, Officer Cortez went so far as to shine a flashlight on Plaintiff R.B. while she was

25  administering an enema in her room, causing her intense humiliation and fear.

26      132.    Numerous **CCWP members** have endured sexual assault and harassment by FCI

27  Dublin officials, even after former Warden Garcia was put on leave.  For example, many CCWP

28  members were abused by members of the kitchen staff throughout 2021 and into 2022, including

1    Defendant Officers Pool, O'Connor, Kinlaw, and St. Clair, who remain on administrative leave

2    pending investigation into sexual abuse allegations.  Combined, these kitchen officers have

3    victimized dozens of additional putative class members at FCI Dublin—raping them, groping

4    them, harassing them, threatening them, and ordering others to assist with their abuse.  These

5    officers would regularly provide the women they abused with fresh fruits, vegetables, dairy

6    products, and fish and meats in exchange for sexual favors, or to curry survivors and witnesses'

7    silence.

8        133.    Other CCWP members have been sexually abused by staff in recent months.  For

9    example, around February 2023, CCWP member A.R., was sexually harassed and groped by

10    Officer Caston while in the SHU.  Caston grabbed A.R.'s breast, told officers to look at A.R.s "big

11    ass titties," denied A.R. menstrual products, and interfered with their outgoing mail.  In June 2023,

12    while CCWP member T.M. was in the shower, Officer Cooper kicked open the curtain and shown

13    a flashlight on her naked body.  T.M. later to spoke to multiple other women who said that Cooper

14    had also walked in on them while showering.

15        134.    These allegations represent just a small fraction of the ongoing sexual abuse and

16    harassment inflicted on people at FCI Dublin in the past two years.  And yet, the picture painted is

17    clear: despite a growing number of criminal indictments of former officers at FCI Dublin, the

18    people incarcerated at FCI Dublin and its satellite camp continue to face an unconscionable,

19    serious risk of sexual assault and harassment.  This is not a problem of "bad apples."  The entire

20    orchard is plagued.

21    **B.    Survivors Continue to Face Severe Retaliation for Reporting Abuse, Which
       Chills Further Reporting and Obstructs Investigations into Abuse.**

22

23        135.    Sexual abuse at FCI Dublin continues in part because there is a widespread,

24    entrenched practice of severe retaliation against survivors who report staff misconduct.  This

25    retaliation is not subtle.  Those who report staff misconduct are verbally threatened, physically

26    assaulted, strip searched, sent to solitary confinement, transferred to other BOP institutions away

27    from their families, terminated from their jobs, denied medical care, given false disciplinary

28    tickets, subjected to arbitrary cell searches and destruction of property—and are even targeted for

further sexual abuse.  Many at the prison report that retaliation has even intensified since many officers have been suspended and criminally charged.

136.    This retaliation chills reporting and fuels further abuse.  Many people incarcerated at FCI Dublin are scared to report the abuse they experience out of fear of retaliation.  A significant number of survivors who have witnessed retaliation against others who reported abuse have been deterred from reporting their own, fearing they would suffer similar retaliation.

### 1.    Retaliation After Reporting Abuse

137.    Named Plaintiffs and numerous CCWP members have experienced retaliation after reporting abuse by FCI Dublin staff.

138.    For example, **Plaintiff J.M.** was placed in the SHU for over two weeks in October 2022, soon after making a legal call regarding abuse at FCI Dublin.  During that period staff prevented her from calling her lawyer.

139.    After filing a PREA complaint and speaking with an FBI officer, **Plaintiff G.M.** was placed in the SHU for four and a half months on a false write up.  Since her retaliatory SHU placement, Plaintiff G.M.'s confidential legal mail has been opened, and her room has been repeatedly searched, as recently as March 2023.  In addition, beginning in January 2023, Defendant Officer Shirley and Defendant Lt. Jones have harassed Plaintiff G.M. and other incarcerated people for reporting sexual abuse.  Defendant Officer Shirley asked Plaintiff G.M. if she was "working for them" and going to "report me to the FBI."

140.    Even failing to comply with demands to report abuse could result in retaliation.  In July 2022, Defendant SIS Lt. Putnam placed **Plaintiff S.L.** in the SHU after she refused to speak with OIG about her relationship with Defendant Officer Gacad, who had quit the month prior.  Defendant Lt. Putnam further confiscated all of Plaintiff S.L.'s property, and never returned it.  Plaintiff S.L. believes that SIS staff still have her property, including evidence of her relationship with Defendant Officer Gacad.

141.    After Plaintiff S.L. worked up the courage to report Defendant Officer Gacad, she faced retaliation from other officers.  Defendant Officer Serrano blamed S.L. for getting another Dublin officer walked off and called S.L. "bitch" and other degrading names.  Serrano also

removed Plaintiff S.L.'s mail from the mailbox and read it aloud to others in an attempt to intimidate her from reporting.  Prior to being walked off for misconduct allegations, Defendant Lt. Jones also threatened Plaintiff S.L. and regularly embarrassed her in front of her entire unit. Officers also spread gossip and give cruel directives about people who report sexual abuse; for example, Officers Serrano and Vazquez would say to people "don't speak to [S.L.]" as a way to ensure she kept quiet.

142.    After **Plaintiff A.H.R.** reported Defendant Officer Gacad's abuse of Plaintiff S.L. to Defendant Lt. Putnam in November 2022, officers retaliated against him by threatening him. Defendant Officer Serrano came to his door and told him, "You better tell your fucking bitch to not report us."  Officers also spread rumors about his and Plaintiff S.L.'s cooperation with investigations.

143.    **Plaintiff L.T.** was afraid to report because she knew that staff routinely retaliated against survivors and was aware that Defendant SIS Lt. Putnam was friends with many abusive officers, including Warden Garcia.  After Plaintiff L.T. spoke with the U.S. Attorney's Office and filed an emergency request for an administrative remedy in March 2023, officers verbally harassed and strip-searched her. As a result, she continues to be afraid to report any future abuse.

144.    After **Plaintiff A.S.** reported Defendant Officer Smith's abuse to SIS around April 2023, Defendant Officer Lewis ordered Plaintiff A.S. to unzip her commissary-issued sweatshirt to expose her clothed chest while leaving Food Service, something female officers had never ordered her to do before.  When Defendant Officer Lewis told her to keep "running [her] mouth," Plaintiff A.S. reported his harassment to SIS.  The same day, staff searched her room in apparent retaliation.  Defendant Officer Lewis has forced Plaintiff A.S. to unzip her sweatshirt countless times since then.

145.    **Plaintiff R.B.** was also afraid to report staff abuse because she witnessed retaliation against survivors who did report abuse, including retaliatory placement in SHU.  When she did eventually report former Warden Garcia's abuse, she faced retaliation.  Plaintiff R.B. was close friends with M.H., who confided in Plaintiff R.B. about her physical relationship with Warden Garcia.  Once, following an argument he had with M.H., Warden Garcia came over to

Plaintiff R.B. and ask if she "could keep this one calm," which R.B. understood to be a request to help keep M.H. quiet about their illicit relationship. After Plaintiff R.B. was subpoenaed to testify for the government against the former Warden, she lost her job in the Warden's Complex suddenly and without any explanation. One day months later, after Plaintiff R.B. and others returned to their unit following a legal visit, Officer Craig forced the entire unit to attend a "Town Hall" meeting, during which he screamed at and berated them. R.B. and others understood this to be punishment for meeting with attorneys.

146.    Many **CCWP members** have also been retaliated against for reporting abuse and speaking with outside advocates. For example, after CCWP member A.R. reported being sexually harassed and groped by Officer Caston in early 2023, staff kept A.R. in the SHU for weeks for seemingly no reason, then transferred them to a far-off facility. After CCWP member T.M. reported that Officer Cooper sexually harassed her in the shower in June 2023, guards gave her a bogus write-up, searched her cell, and destroyed her property.

147.    CCWP member A.S. was repeatedly sexually assaulted and harassed by Officer Nunley throughout 2020 and 2021, and finally worked up the courage to share her experiences with an attorney in March 2023. Just days after her first legal call, officers took her to the SHU for weeks for "wearing green pants." After her attorney successfully advocated for her release from the SHU, officers have continued to retaliate against her, including by searching her room countless times. CCWP member N.A. was sexually harassed and assaulted by Officer Ramos repeatedly for years, until he was walked off around March 2022. After she reported him to the Warden and the OIG, Ramos was not held accountable, and he only became more aggressive. Other staff continue to retaliate against N.A. including by harassing at her, screaming at her in front of other incarcerated women, and throwing her in the SHU as recently as March 2023. CCWP member M.S. was sexually harassed by a medical technician, who forced M.S. to disrobe unnecessarily and smacked her butt during a medical exam in May 2022. Shortly after M.S. reported the technician to SIS in June 2022, M.S. developed a sinus infection. Medical staff ignored her many requests for care, and by the time she was seen in late August, she was in constant, excruciating pain, and had to go on very intense antibiotics.

148.   After many Plaintiffs submitted emergency requests for administrative remedies regarding staff misconduct in February and March 2023, FCI Dublin strip searched dozens of people on their way to and from legal visits with undersigned counsel and CCWP advocates.  Strip searches around legal visits were previously unheard of at FCI Dublin, and many understood this to be punishment for speaking with attorneys.

149.   Other survivors were transferred soon after reporting their abuse and filing emergency requests, which they and others still at FCI Dublin believe was retaliation and an effort to suppress further reports.  Other survivors have experienced repeated and invasive drug tests that began only after they reported abuse; SHU placement on obviously pretextual or false charges; direct threats of physical violence from officers who had been abusing them; unnecessary strip searches on a near-daily basis for months after reporting; termination from their jobs; medical neglect; and being prohibited from using the phone or conducting video visits with family.

150.   Even after some survivors were transferred to other facilities, retaliation resulting from reporting their abuse at Dublin continued at their new facilities.  For example, after one individual was transferred to FDC SeaTac, that individual was retaliated against for having reported at FCI Dublin, including through use of force, false write-ups, barring him from using the phone, being placed in the SHU.  After another survivor was transferred to FCI Phoenix, she was "marked as a 'troublemaker' because she was at Dublin," was denied a job because of it, and officers at the facility further retaliated after her name was released in the news.  A group of survivors and witnesses now at FPC Bryan are disparagingly referred to by staff as "the Dublin girls," indicating they will be targeted for disfavor.

### 2.   Preemptive Retaliation to Prevent Reporting

151.   Survivors and witnesses of abuse also experienced threats and preemptive retaliation from officers who suspected they would report their abuse.

152.   For example, after **Plaintiff J.L.** told another incarcerated person about Defendant Officer Jones' abuse, he threatened Plaintiff J.L. with physical violence.  One day when J.L. went to dinner, Defendant Officer Jones pulled her to the side and told her he was going to "beat [her] ass because [h]e was pissed" that she reported the abuse.  He said she needed to "keep [her] mouth

1    shut" so that '[they]' don't get into trouble."

2        153.    Defendant Lt. Jones also repeatedly threatened to punish **Plaintiff J.L, Plaintiff**

3    **A.S.,** and others if they reported staff misconduct. Before she was placed on administrative leave

4    in March 2023 following sexual misconduct allegations, Lt. Jones was well known for screaming

5    at incarcerated women, blaming them for the staff walk-offs and sexual abuse, and threatening

6    collective punishment.  When she first came to Dublin, she told people incarcerated there that she

7    was retaliating against them for the things that were being said about officers there.  She told

8    Plaintiff A.S. and her roommates: "I came here because of everything that's going on, you can go

9    ahead and write me up, it's not gonna go anywhere."

10       154.    In January 2023, Defendant Lt. Jones pat searched all the kitchen workers,

11   including Plaintiff J.L., in front of four male officers.  Defendant Lt. Jones intimidated Plaintiff

12   J.L. and her coworkers and forced them put their food trays on the ground with geese excrement.

13   Defendant Lt. Jones screamed at those watching, including Plaintiff A.S.:  "Stop staring, you'll be

14   next."  She shouted things like:  "You wouldn't have to deal with staff like me if you hadn't gotten

15   rid of all the good ones," and "you told on all the good ones." Lt. Jones told Plaintiff J.L. and the

16   other kitchen workers that she loved to send people to the SHU and told them to "make sure to

17   write your lawyers about this," and "when you write to your lawyers, make sure you spell my

18   name right.  It is J-O-N-E-S." This made it clear to Plaintiff J.L. that staff read their emails and

19   letters so that they would know who was reporting abuse and who they would target for future

20   retaliation.

21       155.    Many CCWP members have experienced preemptive retaliation.  For example,

22   Defendant Officer Smith threatened CCWP member Y.M. after she witnessed his rampant abuse.

23   Smith harassed many women in Y.M.'s housing unit, specifically targeting Mexican immigrant

24   women.  Smith had sexual relationships with two of Y.M.'s former cellmates; he would enter the

25   cell and order Y.M. to leave so that he could have sexual contact with her roommate.  Smith told

26   Y.M. that he knew that her son was in federal prison, and that if she reported him, her son would

27   bet hurt.  Staff also used physical violence and threats to attempt to silence CCWP member Z.T.S..

28   After Z.T.S. walked in on Officer Chavez having sex with an incarcerated woman in the

warehouse in late 2019, Chavez grabbed Z.T.S. by the shirt, shoved her against a wall, and violently shook her by her work uniform while her coworkers looked on.  Defendant Officer Jones was in a sexual relationship with Z.T.S.'s cellmate, and after the relationship ended, Jones lashed out at both Z.T.S. and her cellmate. He shoved Z.T.S.'s cellmate against a hot oven, and verbally abused Z.T.S., calling her a "fucking wetback" and threatening: "I'll slap the shit out of you if you ever say anything."  Defendant Officer Jones also instructed another incarcerated woman to "do whatever you need to do to put [Z.T.S.] in the SHU." That woman made a false report that Z.T.S. got into a fight with her, and Z.T.S. was thrown into the SHU for a month.

156.    Multiple noncitizen survivors and witnesses of staff abuse were threatened with deportation.  Officers told them that they would contact immigration authorities if they reported staff misconduct.

157.    Others incarcerated at FCI Dublin similarly experienced anticipatory retaliation, such as physical violence and threats of additional violence; sexual assault; verbal abuse and epithets; threats of retaliatory SHU placements; and being fired from a job because an abusive officer suspected a survivor would report him.  Others were placed in the SHU in what they understood to be an effort to suppress individual reports of abuse, or a threat of "collective punishment" if they reported officers' abuse.  Additionally, one officer that was abusing an individual he knew had kids threatened to cut off visits with her children if she reported him. Then-Warden Garcia threatened to transfer one woman "to a facility further away from her children" if she told any other incarcerated women of their relationship.

158.    The fact that this practice and culture of retaliation and victim-blaming persists to this day at FCI Dublin and at other facilities, illustrates the BOP's continuing failure to adequately hire, train, and supervise staff to prevent sexual misconduct.

**C.    Survivors Have No Way To Confidentially Report Abuse.**

159.    Even when survivors at FCI Dublin muster the courage to report sexual abuse despite the very real and continuing risk of retaliation, they face immense hurdles to ensuring that their abuse is effectively addressed by BOP.

160.    As a threshold matter, many at FCI Dublin do not know how to report staff

misconduct.  Prison staff have routinely failed to explain the process of reporting sexual abuse and harassment when people arrive at FCI Dublin (or at any point thereafter).

161.    Though the BOP claims that incarcerated persons can report staff misconduct through multiple means – including by speaking directly with facility staff, by emailing DOJ officials, or by communicating with outside counsel – there is no effective way to confidentially report sexual assault and abuse by staff at FCI Dublin.

162.    When incarcerated persons report abuse directly to FCI Dublin staff, officers consistently refuse to take allegations seriously.  Many survivors have disclosed staff misconduct to prison officials in the past several years, to no effect.  In many cases, staff appear to not act because they are friends with the officer who perpetrated the abuse. Staff also consistently refuse to provide blank administrative grievance forms or refuse to accept filled out forms.

163.    For example, Defendant Lt. Putnam has led internal investigations of staff misconduct at FCI Dublin for years and remains in a leadership role to this day.  Throughout the time that former Warden Garcia and convicted former officials were sexually abusing people in their custody, Defendant Lt. Putnam received dozens of reports of staff abuse.  Indeed, many named Plaintiffs and CCWP members reported staff abuse to Lt. Putnam in recent years.  Instead of acting on those reports, Defendant Lt. Putnam would tell those who reported abuse: "You should keep quiet, do your time, and don't make problems."  It was also well known that Lt. Putnam was close to Warden Garcia and other abusers.

164.    Furthermore, when incarcerated persons report abuse to staff, their experiences are often not kept confidential, and are instead shared among staff and even other incarcerated people. For example, after Plaintiff A.H.R. reported Defendant Officer Gacad's ongoing sexual abuse of Plaintiff S.L., Defendant Lt. Jones and Defendant Officer Serrano began retaliating against S.L. Lt. Jones and Officer Serrano have threatened her, embarrassed her in front of her unit, read her aloud mail to others, monitored her calls, spread rumors about her, called her a "bitch" and told others, "don't speak to [S.L.]"

165.    If survivors attempt to use the "confidential" DOJ email to report to an outside, supervisory authority, they must do so on the unit with the screen they are typing on in full view

of staff and other incarcerated persons.  Recently, BOP installed what they called "privacy" screens on the computers, but they are ineffective.  They only block people from seeing the screen if they are sitting directly to the side of it, otherwise anyone looking generally at the computers can still see what is being typed.  Regardless, reports made to DOJ's OIG are routinely sent back to FCI Dublin's SIS office for investigation, resulting in the same internal reporting concerns.  Therefore, to date, there is no confidential mechanism for survivors to report sexual abuse, harassment, or retaliation to entities outside the BOP with supervisory authority.

166.    Moreover, despite years of outcry from legal advocates, people at FCI Dublin continue to have extremely limited access to counsel.  Attorneys report that it takes weeks or months to schedule legal visits if they are scheduled at all.  There are also no private meeting rooms for on-site legal visitation.  Legal visits take place in large rooms used for family visitation, in view and in earshot of other incarcerated people and custody staff.  Currently, legal visitation at FCI Dublin and the satellite camp is available just two half days per week.

167.    The newly instituted unmonitored pilot legal line remains inaccessible for many survivors at FCI Dublin, especially those housed in the satellite camp and in the SHU.  Advocates report difficulty getting their numbers added to the approved list for the pilot line.  The phones are located in locked spaces, meaning that incarcerated persons have to ask staff to provide them access.  Due to the pervasive atmosphere of retaliation and lack of confidentiality at FCI Dublin, some are afraid that the staff will listen into calls on the pilot line.

168.    Legal mail continues to be seriously delayed, and improperly opened, in contravention of federal regulation.

169.    All other means of communicating with the outside world—including the BOP email system, regular phone calls, and regular mail—are heavily monitored by staff. Many people at FCI Dublin report that staff read their emails and letters, and listen to their calls, and reference the contents in later conversations.  For example, after CCWP member M.S. wrote to an attorney stating that "abuse is still happening here," Defendant Lt. Putnam pulled her into a private room to question her about what she had shared with the attorney.

**D.     Staff Are Not Held Accountable for Abuse.**

170.    After reports are made, and evidence of staff misconduct is provided, action is often not swiftly taken against officers.  Indeed, oftentimes, no action is taken at all.  As a result of this pattern of inaction and retaliation, people incarcerated at FCI Dublin broadly understand that even brazen sexual abuse and harassment will not be meaningfully sanctioned at FCI Dublin.

171.    For example, after **Plaintiff R.B.** summoned the courage to report Defendant Officer O'Connor—for sexually harassing another incarcerated woman, and physically threatening R.B. when she tried to intervene to three different members of the Task Force—no actions were taken against him.

172.    After **Plaintiff A.H.R.** reported Defendant Officer Gacad's ongoing sexual misconduct in November 2022, Lt. Putnam said it was "too much" for him to deal with and did not follow-up with A.H.R. until A.H.R. filed an emergency request for administrative remedy in March 2023 through his attorneys.

173.    In addition, when allegations were first made about Defendant Officer Gacad's sexual relationship with **Plaintiff S.L.,** Defendant Gacad was permitted to voluntarily resign his post at FCI Dublin and remains free in the community to continue his harassment of Plaintiff S.L. and her family.  Plaintiff S.L.'s own report about misconduct by Defendant Officer Gacad was not investigated until June 2023.

174.    **Plaintiff J.L.** reported her abuse by Defendant Officer Jones to Defendant Lt. Putnam in May 2022, and participated in an FBI interview in August 2022, but she received no information about the investigation or any support until she filed an emergency grievance about conditions in March 2023.

175.    **Plaintiff G.M.** reported her abuse in July 2022 and spoke to the FBI in August 2022, but she did not receive any follow-up about the investigation for many months, nor did she receive any support, only retaliation.

176.    **Plaintiff A.S.** reported Defendant Officer Lewis's sexual harassment to SIS repeatedly, but no action has been taken against him.

177.    In recent months, **Plaintiff L.T.** has gone to SIS to report Defendant Officer

Smith's abuse at least four times, SIS staff ignore her and do nothing to help.  Plaintiff L.T. has also tried to report issues using the forms they provide for administrative remedies, but officers refuse to take them.

178.    Even where multiple people have reported abuse by specific officers, those officers have remained employed by BOP.  For example, both Plaintiff S.L. and Plaintiff A.H.R. have reported retaliation by Defendant Officer Serrano, yet the officer remains on staff at FCI Dublin.  Defendant Officers O'Connor and Kinlaw are still on administrative leave pending criminal investigations, and as of May 2023, FCI Dublin was still accepting "bids" from them for their positions in the kitchen.

179.    Some survivors have reported abuse directly to BOP officials overseeing FCI Dublin and still faced inaction.  For example, in 2021 when one incarcerated woman reported Defendant Officer Smith's persistent harassment of her to a visiting BOP representative, the representative acknowledged there were other reports on Defendant Officer Smith but offered no indication that the report would be taken seriously, saying only, "It's normal for that to happen to women like you, you are pretty."

180.    Furthermore, even in cases where officers have been criminally convicted for abuse at FCI Dublin, the BOP has failed to make any reparations to survivors of their abuse who remain in BOP custody.  BOP has declined to certify U-Visa applications to survivors who aid in internal investigations of officers and face deportation, it has broadly declined to sign compassionate release petitions of survivors and testifying witnesses, and there has been no apology made to survivors by the officers involved or the FCI administration that permitted these egregious human rights violations to occur.  It is no surprise, in this context, that sexual abuse continues.

**E.    Survivors of Sexual Abuse and Retaliation at Dublin Have Experienced Grievous Physical, Mental, Dignitary, and Economic Injuries.**

181.    As a result of the BOP's failure to prevent officers' sexual violence, survivors of sexual abuse and retaliation at FCI Dublin have suffered grievous harm, with ongoing effects.  The injuries inflicted upon them by abusive officers include physical pain from rape, mental anguish, extreme emotional distress and resulting physical symptoms, economic damages, dignitary harms,

1    profound social isolation, and undue invasion of privacy.

2         182.    The Plaintiffs in this case have all suffered serious injuries following staff sexual

3    abuse and retaliation at FCI Dublin.  The widespread staff misconduct at FCI Dublin has forced

4    Plaintiff CCWP to divert critical resources to provide its members needed support resources,

5    engage in public advocacy efforts, and respond to members' urgent mental and physical health

6    needs.

7         183.    **Plaintiff R.B.** was recently diagnosed with depression and prescribed anti-

8    depressants.  Stress and anxiety have caused her hair to fall out, her to lose weight, and interfered

9    with her ability to sleep.

10        184.    **Plaintiff A.H.R.** was forced to quit his job in Food Service to avoid witnessing

11   former Defendant Officer Jones' rapes of incarcerated women.  He has suffered anxiety and

12   depression and has experienced fear for his personal safety and humiliation as a result of his own

13   sexual harassment by Defendant Officer Vazquez.

14        185.    **Plaintiff S.L.** has suffered extreme emotional distress as a result of her abuse by

15   Defendant Officer Gacad and retaliation by multiple Dublin officials.  Her chronic stress is so

16   severe that it has disrupted her menstrual cycle.

17        186.    **Plaintiff J.L.** was diagnosed with PTSD as a result of her abuse by Defendant

18   Officer Jones.  For months, she slept constantly and confined herself to her room because she was

19   afraid of what officers could do.

20        187.    **Plaintiff J.M.** has experienced intense anxiety, depression, and insomnia. After

21   being placed in the SHU, she was so distraught that she was placed on suicide watch.

22        188.    **Plaintiff G.M.** has experienced severe depression and PTSD due to the abuse she

23   witnessed and experienced.  Her symptoms were exacerbated after staff chose to withdraw G.M.

24   from prescribed medication for a period of two months.  She has suffered a partial blindness as a

25   result of her chronic stress.

26        189.    **Plaintiff A.S.** has experienced intense anxiety, which is exacerbated each time she

27   has to interact with officers at Dublin.

28        190.    **Plaintiff L.T.** has experienced anxiety, depression, and insomnia, and cries

1   constantly.

2   **F.      Survivors of and Witnesses to Sexual Abuse Are Denied Access to Mental
         Health Care and Medical Care to Address Their Mental and Physical Injuries.**

3

4          191.    After suffering grievous mental and physical injury, survivors continue to be

5   denied basic mental health and medical care.

6                  **1.      Mental Health Care Is Wholly Inadequate**

7          192.    Survivors of sexual abuse at FCI Dublin suffered and continue to suffer severe

8   emotional distress resulting from their abuse.  For example, many survivors have suffered

9   depression, suicidality, intense anxiety, panic attacks, and paranoia.  Some survivors who were

10  able to get mental health care are now on psychotropic medications to treat anxiety and depression

11  or sleep disorders.  Others have been unable to obtain adequate mental health care, prolonging or

12  worsening their emotional distress.

13         193.    Many survivors live in a perpetual state of fear.  Some survivors are too afraid to

14  leave their rooms, go anywhere alone or be alone anywhere in custody, or shower alone for fear of

15  being abused (beyond the reach of surveillance cameras), and some feel ill at the sight of officers'

16  grey uniforms.  For some, the officers' sexual abuse triggered their previous traumatic experiences

17  of surviving sexual abuse or domestic violence, exacerbating their emotional distress.   Due to the

18  gravity of the emotional harms and the pervasive culture of sexual abuse at FCI Dublin, survivors'

19  emotional distress persists after they are transferred or released, or their abusers have been walked

20  off.

21         194.    Survivors are not provided with adequate mental health care at FCI Dublin to

22  address the psychological trauma that officers' abuse and retaliation has caused.  Though FCI

23  Dublin recently re-established an agreement with an outside agency, Tri-Valley Haven, to provide

24  legally required mental health services to survivors of sexual abuse at the facility, these services

25  were not available at the facility for over a year.  Even now, there is no direct way for survivors to

26  confidentially contact the outside mental health agency, Tri-Valley Haven, to request mental

27  health services.  Survivors must either put in a request to Tri-Valley Haven, or use the new pilot

28  legal phones, which can often only be accessed with staff assistance.  Even once contacted, very

few survivors at FCI Dublin have been able to see a counselor from Tri-Valley Haven in-person or able to speak with them on a confidential line.  Those lucky few are only permitted five thirty-minute sessions with unlicensed counselors.  Survivors of abuse at Dublin who BOP subsequently transferred to other facilities do not have any access to outside specialized support services from Tri-Valley Haven or other analogous organizations.

195.    For example, despite requesting services from Tri-Valley Haven multiple times, it took months for **Plaintiff S.L.** and **Plaintiff G.M.** to receive care.  Plaintiff S.L. was dismayed that she had to repeat her trauma to a new counselor at each session.  Meanwhile, **Plaintiff R.B.** and others who have requested to meet with Tri-Valley Staff have been told that the list is "full."

196.    This obstructionism compounds the problem that many people incarcerated at FCI Dublin do not trust the mental health professionals that work at the prison and do not feel safe talking with them; they know that information they share related to their traumatic experiences with sexual assault and harassment do not stay confidential.  For example, **Plaintiff L.T.** was retaliated against after she spoke to her attorneys and the BOP psychologist.  After she spoke to them, she was moved out of her unit in retaliation.  When L.T. inquired as to why she was moved, her unit manager, Officer Craig, told her it was because of "all the lies you guys are telling, you guys are going to psychology and telling lies about PREA." Officer Craig is married to the psychologist who L.T. reported to, Dr. Mulcahy.  Plaintiff L.T. knew that Officer Craig's comments meant that he had discussions with his wife about what she reported when she attempted to access mental health care.  As a result, L.T. is afraid of accessing any mental health care in the facility or reporting what she experienced.

197.    Even where survivors have felt safe to seek mental health care at FCI Dublin, many either cannot actually access the care or it is severely inadequate.  For example, facility staff told Plaintiff G.M. to just "do breathing exercises" after she was abused by two officers.  When another survivor sought mental health care at the direction of SIS in 2021, none of the therapists she met with spoke Spanish, her primary language, so they were unable to assist her.

198.    Recently, FCI Dublin has gone so far as to cut off numerous survivors' psychiatric medications.  For example, around December 2022, clinicians at FCI Dublin took **Plaintiff G.M.**

1  off her psychiatric medications for three months.  This practice is widespread, disabling, and

2  dangerous: several survivors who were taken off of mood stabilizing medications after reporting

3  abuse have been on suicide watch at Dublin in recent months.

4       199.    Further, individuals who have testified in criminal cases concerning abuse at FCI

5  Dublin have experienced extreme difficulty accessing victim-witness advocates appointed to them

6  by the U.S. Attorney's Office.  After months of struggling to communicate with clients, the

7  Family Violence Law Center, one of the agencies contracted to provide services to victims and

8  witnesses in the criminal proceedings, wrote to BOP officials pleading for improved access.  As a

9  result of these challenges, survivors who have been summoned to share their painful experiences

10  in court, and who have anxiously prepared to testify, are left to decompensate without access to

11  any mental healthcare.

12                 **2.**      **Survivors Lack Access to Adequate Medical Care**

13       200.    Survivors have experienced many physical symptoms of emotional distress,

14  including insomnia, loss of a menstrual cycle, partial vision loss, hair loss, and weight loss.

15  Accessing medical care to address these concerns is next to impossible, in part due to lack of

16  resources.  People at FCI Dublin have to wait weeks or months to see a medical provider if they

17  are even able to see one at all.  Problems around medical neglect are especially acute for

18  survivors' reproductive health issues.

19       201.    Multiple medical providers at FCI Dublin have abused individuals in their care,

20  which has deterred others from seeking care or going back for additional care.  Many people

21  incarcerated at FCI Dublin have also been denied access to basic medical care after reporting

22  sexual abuse.  Medical staff also frequently do not keep patients' health information private and

23  discuss patients' medical issues in the presence of other staff and incarcerated persons.

24       202.    For example, **Plaintiff S.L.** reported that she sliced her finger in May 2023, but

25  was not able to get stitches until the following day; she now has permanent nerve damage.  She is

26  also afraid to seek medical care for a gynecological problem because she fears that the officers

27  who escort her to the appointment will spread rumors about her.

28       203.    **Plaintiff R.B.** required an ultrasound of her breast according to a medical doctor.

When the time for her appointment came, there was no doctor at FCI Dublin and they figured out the order was accidentally written for the wrong breast.  Without a physician at the facility, Dublin staff could not change the order, so they did the ultrasound on the wrong breast.  Plaintiff R.B. is still waiting on the facility to send her out for an ultrasound on the correct breast.

204.     Prior to being incarcerated, **Plaintiff G.M.** had a splenectomy in 2017.  When she arrived at FCI Dublin, she was taken off her blood-clotting medicine.  Compounded by her extreme distress following staff sexual abuse, she is now starting to go blind as a result.  Since February, she has been losing vision in her eye, and it was several months before she could see an eye specialist.  Her vision loss episodes have been getting more frequent and are now accompanied by headaches; she has also fallen off the bed multiple times because of her vision loss and she has bruises all over her body.  Every time she goes to sick call, they have no record of her problems.  When she has inquired about her care, staff asked what her "motive" is and whether she is going to file a grievance against them.

205.     **Plaintiff A.H.R.** pulled a muscle in his back and was experiencing significant pain; clinicians refused to give him ibuprofen to treat it.  He also suffered a weeks-long respiratory illness that caused him to spit up blood and feel as though he could not breathe, but medical staff at FCI Dublin did nothing to treat it.

206.     **Plaintiff L.T** has been unable to access all necessary care for her respiratory condition or her hearing loss and has been provided expired medication.

207.     Numerous CCWP members report egregious medical neglect.  For example, after reporting sexual harassment by a medical technician, one CCWP member was denied care for her sinus infection for over two months.  Facility staff have denied another CCWP member's repeated requests to remove her IUD, which was inserted over a decade ago and must be removed.

**G.     Conditions for Sexual Violence Remain at FCI Dublin.**

208.     The pervasive culture of victim-blaming and misogyny at BOP, where survivors are treated as responsible for their own abuse, has remained unchanged.  This is compounded by BOP's failure to ensure that staff are held accountable for their actions, that meaningful reparations (e.g., compassionate release) are made to survivors, and that their mental and physical

1    wellbeing is provided for.

2        209.    In addition, the people incarcerated at FCI Dublin remain incredibly isolated

3    despite being in a low-security prison.  There is almost no educational programming at FCI

4    Dublin.  Family visitation is limited to weekends and holidays.  Institutional "blind spots" created

5    by lack of fixed and body-worn cameras persist, and it is well known that abusers make use of

6    locations where no cameras are present.  Even now that FCI Dublin has begun to put up more

7    cameras, there are still places where they are absent (e.g., the walk-in freezer in the kitchen,

8    certain staff offices) and those that are present are covered in dark-colored glass so it is impossible

9    to tell where they are pointing or whether they are working.  This isolation—from family,

10   community, attorneys, and even internal supervision—creates a climate ripe for widespread sexual

11   violence.

12       210.    Moreover, living conditions at FCI Dublin remain dire.  There is widespread black

13   mold and asbestos.  Frequently there are problems with drinking water and hot water for showers.

14   There is no kitchen serving hot food in the camp.  Food is often expired and moldy.  Commissary

15   prices for basic hygiene items can be exorbitant.  The lack of fresh food and basic necessities are

16   conditions of deprivation which make people imprisoned vulnerable to sexual exploitation.  It

17   allows officers to trade fresh fruit and vegetables, candy, and basic items like hand sanitizer to

18   women in exchange for sexual favors – a practice that many Plaintiffs and putative class members

19   have repeatedly experienced.  When people are safe and have what they need, the risk of sexual

20   violence is reduced.

21       211.    Of course, sexual abuse is also accomplished via threats and force.  Individual

22   officers at FCI Dublin retain discretion to issue tickets that could result in a person being put in the

23   SHU without cause, or strip searched on flimsy pretext, or have their property destroyed—all

24   actions that have the effect of allowing sexual abuse to continue.  If sexual abuse by staff at FCI

25   Dublin is to stop, officers' almost unlimited discretion over the lives and safety of incarcerated

26   people must be curtailed.

27       212.    These conditions all contribute to an environment where incarcerated people are

28   dehumanized, exploitable, isolated, and thus highly vulnerable to staff sexual abuse.

213.     The BOP's failures—and the resulting conditions of confinement and culture of sexual misconduct at FCI Dublin—cause very real harm to the people incarcerated in these facilities, in violation of the Eighth Amendment prohibition on cruel and unusual punishment and the Fifth Amendment substantive due process, as well as federal statutory law, including the Trafficking Victims Protection Act.

**H.     Dublin Officers Established a Trafficking System to Illicit Sexual Acts and Forced Labor from Plaintiffs.**

214.     As detailed in prior allegations, there is a facility-wide system of sexual abuse and retaliation at FCI Dublin, and this system has resulted in particularized injuries for Plaintiffs under the Constitution and the forced trafficking of Plaintiffs for sexual and labor purposes as prohibited by the Trafficking Victims Protection Act.

215.     FCI Dublin Officers and their supervisors have created an intricate trafficking system where incarcerated people are forced to commit sexual acts in exchange for valuable items and special benefits or force incarcerated people to work as lookouts so that officers may engage in their abuse.

216.     As detailed in the individualized accounts of harm of **S.L., L.T., G.M., A.H.R.** and **A.S.**, it is common practice for officers to illicit sexual favors in exchange for contraband or other benefits.  Of the named plaintiffs, more than half were solicited into a sex trafficking or labor trafficking system where sexual favors were exchanged for goods or benefits.

217.     Officers solicit sexual favors such as oral and penetrative sex, digital penetration, stripping, fondling, forced sex with other incarcerated people, and forced masturbation.

218.     Officers take advantage of the isolation of incarcerated people to solicit sexual acts from them, often forcing them to endure sexually explicit comments about their bodies or manipulating them with gestures of love and adoration through notes, songs, or direct comments.

219.     Officers at every level have knowingly created and maintained a complex system of payment for these sexual acts.  The dire living conditions at FCI Dublin create a context where basic necessities, hot or fresh food, sanitary items, and commissary items are extremely valuable goods that officers use as bartering tools in exchange for sexual favors.  At times, they even

1   exchange illicit substances, such as drugs and alcohol, for sexual acts.

2       220.    Officers also take advantage of the lack of resources and programming at FCI

3   Dublin, to aid their payment system.  They offer special benefits that incarcerated people could not

4   access otherwise in exchange for sexual acts, such as access to cellphones, use of staff computers,

5   disciplinary benefits, letters of recommendation, and offers to help incarcerated people—either

6   monetarily, or with access to reentry resources— when they are released.  Such rewards were

7   specifically offered to plaintiffs **G.M., A.S., S.L.** and others.

8       221.    Officers knowingly use their power and authority to force, threaten and coerce

9   incarcerated people into committing sex acts.  Because officers have the authority to direct

10  incarcerated people's actions and movements—whether as work supervisors or as unit officers—

11  Dublin officers exploit this authority to direct people into areas where they can be alone in order to

12  command incarcerated people to sexually gratify them.  Officers also withhold basic necessities or

13  repeatedly lock people into their cells until they provide them with sexual favors.

14      222.    Officers employ a cycle of retaliation to coerce incarcerated people into their

15  trafficking system and prevent reporting.  Officers terrorize incarcerated people with threats of

16  physical or sexual abuse, disciplinary actions, and legal consequences if they do not commit

17  sexual acts or if they report abuse.  For example, incarcerated people who are noncitizens are

18  threatened with immigration consequences if they do not commit sex acts or if they report abuse.

19      223.    Other incarcerated people are threatened with disciplinary actions such as

20  disciplinary reports, punitive cell searches, loss of job assignments, and solitary confinement if

21  they refuse sexual advances.  As such, officers' unlimited discretion to control incarcerated people

22  physically and through threatened legal process, coalesce into coercive tactics that force

23  incarcerated people into their sex trafficking system.

24      224.    This trafficking system is a coordinated venture, where officers actively assist other

25  perpetrating officers in exploiting incarcerated people within FCI Dublin walls.  Officers help

26  perpetrating officers by assisting them to isolate and transport incarcerated people to areas where

27  perpetrating officers can receive sexual favors.  Other officers support perpetrating officers by

28  failing to report sexual abuse that they are aware of, and even go so far as to joke or taunt

incarcerated people who they know are involved in their sex trafficking system.

225.   FCI Dublin officers have created a network of protection where officers act as lookouts themselves or use the forced labor of other incarcerated people to act as lookouts while they receive sexual gratification.  These lookouts keep watch to ensure other officers or incarcerated people do not walk by areas where perpetrating officers are engaging in sexual acts to prevent being caught.  Officers coerce incarcerated people to perform forced labor using their status as supervising officers who can issue disciplinary actions, order work assignments, or dictate incarcerated people's movements to force them to work as lookouts against their will.  In exchange, officers once again provide valuable goods to pay them for their forced labor including outside food, drinks, commissary items, or special benefits.

226.   This system of trafficking, assault, harassment, and obstruction resulted in serious harms to named plaintiffs and others incarcerated at FCI Dublin.

227.   In particular, Plaintiffs **A.S.**, **G.M.**, **L.T.**, **A.H.R.,** and **S.L.** were all coerced into performing particular sex acts in exchange for special benefits or items of value.

228.   Additionally, Plaintiffs such as **A.H.R.** were coerced into performing forced labor for officers' benefit such as acting as a "lookout" while the officers engaged in sexual abuse.

229.   **L.T.** and others were further coerced into performing other forced labor such as stripping for officers in staged strip shows.

230.   Officers obstruct internal, criminal, or legislative investigations of the sex trafficking and abuse by officers.  Many FCI Dublin officers have been charged with making false statements to investigators in government agencies tasked with investigating claims of abuse, including the Department of Justice Office of Inspector General (OIG) and the FBI.[38]  They have also committed perjury while testifying in their criminal charges and lied about the abuse they committed in attempts to cover up their abuse.[39] Officers intimidate trafficking survivors and witnesses of abuse by threatening to beat incarcerated people, throw them in solitary confinement,

---

[38] Nunley Plea Agreement at 7; Jones Agreement at 6, Highhouse Sentencing memo at 6, Garcia Sentencing Memo at 5

[39] Garcia Sentencing Memo at 10.

or conduct indiscriminate searches without cause. This obstruction has occurred at all levels of leadership, from the previous warden targeting whistleblowers and preventing survivors from speaking to legislative representatives,[40] to line officers committing acts of cover-up on an everyday basis.  It is this system of protection, conspiracy, and obstruction which allows the "rape club" to continue.

**CLASS ACTION ALLEGATIONS**

231.    Plaintiffs bring this action on their own behalf and, pursuant to Rules 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all others similarly situated. Plaintiffs bring the claims articulated herein on behalf of all persons incarcerated at FCI Dublin currently or in the future ("Class").  All incarcerated people at the facility are at risk of substantial harm due to the BOP's failure to *prevent* sexual assaults, intimidation, physical, sexual, and verbal abuse, threats of violence, sexual harassment, retaliation, and other violations of law against Plaintiffs and related failures to *investigate* sexually based misconduct and hold BOP staff accountable.

**Numerosity:  Fed. R. Civ. P. 23(a)(1)**

232.    The proposed class as defined is sufficiently numerous that joinder of all members of the class is impracticable and unfeasible.  As of August 14, 2023, the BOP reports that there are approximately 674 incarcerated people at FCI Dublin including 549 at the FCI facility and 125 at the attached Camp—an increase of over 150 people since May 2023.  There are also a significant number of individuals in the community on probation, mandatory supervision, and home confinement, who are subject to being returned to FCI Dublin at any time on an alleged violation or revocation of their supervision.  Although the proposed class is transitory and people will cycle into and out of the prison, the members of the proposed class at any given time will be readily identifiable using records maintained in the ordinary course of business by BOP.

---

[40] ASSOCIATED PRESS, *"'Abhorrent': Prison Boss's Alleged Intimidation of Witness at NorCal Federal Facility Concerns DOJ*, KTLA, (Mar. 3, 2022) https://ktla.com/news/abhorrent-prison-bosss-alleged-intimidation-of-witness-at-norcal-federal-facility-concerns-doj/.

1  **Commonality:  Fed. R. Civ. P. 23(a)(2)**

2       233.   There are questions of law and fact common to the Class, including, but not limited

3  to:

4        o   Whether Defendants' policies and practices concerning allowance of sexual

5           assault, lack of accountability, retaliation and ineffective reporting mechanisms

6           place members of the class at a substantial risk of harm;

7        o   Whether Defendants, upon knowing of staff sexual abuse and harmful

8           conditions for years, have been deliberately indifferent to that risk;

9        o   Whether Defendants have abdicated their oversight obligations to ensure

10          adequate medical and mental health responses have been taken to mitigate the

11          risk of harm to the class; and

12       o   Whether, as part of their denial of effective reporting mechanisms, Defendants'

13         denial of access to counsel violates the constitutional rights of the class.

14  **Typicality:  Fed. R. Civ. P. 23(a)(3)**

15       234.   The claims of the named Plaintiffs are typical of the claims of the members of the

16  proposed class.  Plaintiffs and all other members of the class have sustained similar injuries arising

17  out of and caused by Defendants' common course of conduct and policies in violation of the law

18  as alleged herein.

19  **Adequacy:  Fed. R. Civ. P. 23(a)(4)**

20       235.   Plaintiffs are members of the class and will fairly and adequately represent and

21  protect the interests of the putative class members because they have no disabling conflict(s) of

22  interest that would be antagonistic to the interests of the other class members.  Plaintiffs, as well as

23  plaintiff class members, seek to enjoin the unlawful acts and omissions of Defendants.  Plaintiffs

24  have retained counsel who are competent and experienced in complex class action litigation and

25  litigation on behalf of incarcerated people.

26  **Fed. R. Civ. P. 23(b)(1)**

27       236.   Since the number of class members is approximately 532 on any given day,

28  separate actions by individuals could result in inconsistent and varying decisions, which in turn

1   would result in conflicting and incompatible standards of conduct for Defendants.  Plaintiffs

2   challenge Defendants' policies and practices that apply generally to the class, so that final

3   injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

4   **Fed. R. Civ. P. 23(b)(2)**

5       237.    This action is maintainable as a class action pursuant to Federal Rule of Civil

6   Procedure 23(b)(2) because all Defendants have acted and failed to act on grounds that apply

7   generally to the class, so that final injunctive or corresponding declaratory relief is appropriate

8   respecting the class and will apply to all members of the class.

9                                          **CLAIMS FOR RELIEF**

10                                      **FIRST CLAIM FOR RELIEF**
                                **(Eighth Amendment, Cruel and Unusual Punishment)**
11                                         **(Injunctive Relief Only)**
                           **Against Defendant BOP and All Official Capacity Defendants**
12

13      238.    Plaintiffs incorporate by this reference the allegations contained in the preceding

14  paragraphs as if set forth fully herein.

15      239.    Defendants have a non-delegable duty to ensure that the conditions of confinement

16  in facilities operated by BOP employees and contractors are constitutionally adequate.

17      240.    Defendants failed to adequately monitor, oversee, and administer FCI Dublin and

18  violated Plaintiffs' rights to be free from cruel and unusual punishment while they were

19  incarcerated at FCI Dublin by subjecting them to, or failing to prevent, sexual assaults,

20  intimidation, physical, sexual and verbal abuse, threats of violence, sexual harassment, retaliation,

21  and other violations of law against Plaintiffs, and by failing to investigate such violations, as set

22  forth herein, subjected Plaintiff to unnecessary and wanton infliction of pain and physical injury

23  and continue to subject Plaintiffs to a significant risk of serious harm.  This abuse occurred under

24  coercive circumstances and by intentionally subjecting Plaintiffs to these acts, Defendants acted

25  maliciously, in a manner that is deeply offensive to human dignity and void of penological

26  justification.

27      241.    Additionally, in acting and failing to act as alleged herein, Defendants subject

28  Plaintiffs to unnecessary and wanton infliction of pain and injury and continue to subject Plaintiffs

1    to a significant risk of serious harm by failing to properly evaluate, train, discipline, and supervise

2    custody personnel to prevent physical harm to, and/or sexual harassment of, incarcerated persons;

3    by failing to investigate allegations of physical harm to and/or sexual harassment of incarcerated

4    persons; and by failing to prevent retaliation against incarcerated persons for complaints of such

5    abuse.

6        242.    Defendants' failures, as described herein, and those of their agents, officials,

7    employees, and all persons acting in concert with them, and are the proximate cause of the

8    Plaintiffs' ongoing deprivation of rights secured by the United States Constitution under the

9    Eighth Amendment.

10        WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

11
                         **SECOND CLAIM FOR RELIEF**
                  **(Fifth Amendment, Substantive Due Process)**
12                           **(Injunctive Relief Only)**
           **Against Defendant BOP and All Official Capacity Defendants**
13

14        243.    Plaintiffs incorporate by this reference the allegations contained in the preceding

15    paragraphs as if set forth fully herein.

16        244.    Defendants have a non-delegable duty to ensure that the conditions of confinement

17    in facilities operated by BOP employees and contractors are constitutionally adequate.

18        245.    In acting and failing to act as alleged herein, Defendants violated Plaintiffs' right to

19    personal security, subjecting Plaintiffs to unnecessary and wanton infliction of serious pain and

20    injury and to a significant risk of serious harm in violation of their substantive due process rights

21    under the Fifth Amendment.

22        246.    Defendants have been and are aware of all the deprivations complained of herein

23    and have condoned or been deliberately indifferent to such conduct.

24        247.    Defendants' failures, as described herein, and those of their agents, officials,

25    employees, and all persons acting in concert with them, and are the proximate cause of the

26    Plaintiffs' ongoing deprivation of rights secured by the United States Constitution under the Fifth

27    Amendment.

28        WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

**THIRD CLAIM FOR RELIEF**
**(Retaliation for Exercise of First Amendment Rights)**
**(Injunctive Relief Only)**
**Against Defendant BOP and All Official Capacity Defendants**

248.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

249.    Defendants have a non-delegable duty to ensure that the conditions of confinement in facilities operated by BOP employees and contractors are constitutionally adequate.

250.    In acting and failing to act as alleged herein, Defendants subjected Plaintiffs to sexual assaults, abuse, and harassment, and/or failed to adequately investigate and take reasonable measures to protect Plaintiffs, as described herein, in retaliation for Plaintiffs' complaints to prison authorities regarding such unlawful conduct.

251.    Defendants have been and are aware of the retaliation complained of herein and have condoned or been deliberately indifferent to such conduct.

252.    Defendants' failures, as described herein, and those of their agents, officials, employees, and all persons acting in concert with them, and are the proximate cause of the Plaintiffs' ongoing deprivation of rights secured by the United States Constitution under the First Amendment.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

**FOURTH CLAIM FOR RELIEF**
**(Eighth Amendment, Cruel and Unusual Punishment)**
**(Damages)**
**Plaintiff G.M. Against Defendant Officer Nunley, Officer Smith, Lt. Putnam**

253.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

254.    Defendant Officers Nunley and Smith subjected G.M. to serious bodily harm as defined by the Eight Amendment when they sexually assaulted and harassed G.M. and provided or withheld privileges to coerce sexual favors from G.M.

255.    Defendant Lt. Putnam was deliberately indifferent to the substantial likelihood of serious harm to G.M.  Despite knowledge, Defendant Lt. Putnam did nothing to prevent the

1  alleged sexual misconduct and, after G.M. reported such misconduct to Defendant Lt. Putnam, she

2  was retaliated against.

3         256.    Defendants' actions and failures described here caused the Plaintiff's physical,

4  emotional, and constitutional harms, and she has a claim for damages for such violations under

5  ongoing deprivation of rights secured by the United States Constitution under the Eighth

6  Amendment.

7         257.    This claim for damages is cognizable under *Bivens v. Six Unknown Named Agents*,

8  403 U.S. 388 (1971) because it claims the same harm and injury as recognized in *Carlson v.*

9  *Green* 446 U.S. 14 (1980) and *Farmer v. Brennan* 511 U.S. 825 (1994), two recognized *Bivens*

10  contexts.

11        258.    WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

**FIFTH CLAIM FOR RELIEF**
**(Eighth Amendment, Cruel and Unusual Punishment)**
**(Damages)**
**Plaintiff S.L. Against Defendant Officers Gacad and Putnam**

15        259.    Plaintiff incorporates by this reference the allegations contained in the preceding

16  paragraphs as if set forth fully herein.

17        260.    Defendant Officer Gacad subjected S.L. to cruel and unusual as defined by the

18  Eight Amendment when he sexually touched, assaulted, and harassed S.L. and provided or

19  withheld privileges to coerce sexual favors from S.L.

20        261.    Defendant Lt. Putnam was deliberately indifferent to the substantial likelihood of

21  serious harm to S.L.  Despite knowledge, Defendant Lt. Putnam did nothing to prevent the alleged

22  sexual misconduct.

23        262.    Defendants' actions and failures described here caused the Plaintiff's physical,

24  emotional, and constitutional harms, and she has a claim for damages for such violations under

25  ongoing deprivation of rights secured by the United States Constitution under the Eighth

26  Amendment.

27        263.    This claim for damages is cognizable under *Bivens v. Six Unknown Named Agents*,

28  403 U.S. 388 (1971) because it claims the same harm and injury as recognized in *Carlson v.*

*Green* 446 U.S. 14 (1980) and *Farmer v. Brennan* 511 U.S. 825 (1994), two recognized *Bivens* contexts.

264.    WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

**SIXTH CLAIM FOR RELIEF**
**(Eighth Amendment, Cruel and Unusual Punishment)**
**(Damages)**
**Plaintiff J.L. Against Defendants Officer Jones, Officer Pool, Lt. Putnam**

265.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

266.    Defendant Officer Jones subjected J.L. to serious bodily harm as defined by the Eight Amendment he sexually assaulted, coerced sexual favors from, and threatened to punish S.L. unless she provided sexual favors.

267.    Defendant Officer Pool and Defendant Lieutenant Putnam were deliberately indifferent to the substantial likelihood of serious harm to J.L.  They both knew of ongoing and likely assaults of J.L. and did nothing to investigate or prevent such harm.

268.    Defendants' actions and failures described here caused the Plaintiff's physical, emotional, and constitutional harms, and she has a claim for damages for such violations under ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

269.    This claim for damages is cognizable under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) because it claims the same harm and injury as recognized in *Carlson v. Green* 446 U.S. 14 (1980) and *Farmer v. Brennan* 511 U.S. 825 (1994), two recognized *Bivens* contexts.

270.    WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

**CLAIMS FOR RELIEF UNDER THE TVPA**

271.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

272.    The exploitation of vulnerable people is so common that Congress has passed the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1581 *et. seq*., a comprehensive

statutory framework imposing both criminal and civil liability, *see* 18 U.S.C. § 1595, of persons engaging or attempting to engage or benefit from sexual exploitation and labor trafficking or obstructing anti-trafficking enforcement.

273.    Specifically, the TVPA punishes anyone who attempts to, conspires to, or actively "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or . . . benefits, financially or by receiving anything of value, from participation in a [trafficking] venture" while knowing "that means of force, threats of force, fraud, coercion . . . will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a); 18 U.S.C. § 1594.

274.    "Coercion" means "threats of serious harm to or physical restraint against any person . . . any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person" or "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2).

275.    "Serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5).

276.    The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action. 18 U.S.C. § 1591(e)(1).

277.    Commercial sex act "means any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C § 1591(e)(3).

278.    Additionally, the TVPA  punishes anyone who "knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means.

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

18 U.S.C. § 1589 (a).

279.     The TVPA punishes anyone who knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d). 18 U.S.C. § 1589 (b).

280.     The term "abuse or threatened abuse of law or legal process" in the forced labor provision means "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."  18 U.S.C. § 1589 (c)(1).

281.     The term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589 (c)(12).

282.     The TVPA also punishes anyone who "obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section," 18 U.S.C. § 1591(d).

283.     The TVPA allows "[an] individual who is a victim of a violation of this chapter [to] bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)

1    in an appropriate district court of the United States and may recover damages and reasonable

2    attorneys fees." 18 U.S.C. § 1595(a).

3          284.   Congress grants a plaintiff up to ten years in which to bring a civil action under 18

4    U.S.C. § 1595(c).

**SEVENTH CLAIM FOR RELIEF**
**Plaintiff S.L. Against Defendant Officers Gacad, Putnam, Vazquez, Serrano, and Lt. Jones**
***Plaintiff S.L. against Defendant Officer Gacad***
(Sex Trafficking)

8          285.   Defendant Officer Gacad engaged or attempted to engage in sex trafficking of

9    Plaintiff S.L. as prohibited under 18 U.S.C. § 1591; § 1594(a).

10         286.   Defendant Gacad Officer forced Plaintiff S.L. to engage in commercial sex acts

11   within the meaning 18 U.S.C. § 1591.  These sex acts included kissing and groping her body,

12   including her buttocks and genitals.

13         287.   Defendant Officer Gacad knowingly recruited, enticed, and solicited Plaintiff S.L.

14   by making repeated romantic overtures, flirting, and harassing her, and offering special benefits

15   and things of value for sex acts.

16         288.   Defendant Officer Gacad made Plaintiff S.L. commit these sexual acts through

17   force, fraud, or coercion within the meaning of 18 U.S.C. § 1591.  He did so by:

18         •      Using physical force to grab Plaintiff S.L. and grope her body;

19         •      Assaulting her in places where she could not easily escape;

20         •      Using his power and status as a correctional officer and work supervisor
                  who has the power to control and direct incarcerated persons and their
21                movements to have Plaintiff S.L. engage in commercial sexual acts with
                  him;

22
           •      Stalking her family's home and workplace to intimidate Plaintiff S.L.
23

24         289.   These methods of force, fraud, and coercion were a plan designed to make Plaintiff

25   S.L. believe that she would suffer serious harm should she not obey his sexual advances.

26         290.   These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a

27   network of officers that were intended to cause a person to believe that failure to perform an act

28   would result in serious harm or physical restraint.

291.    Defendant Officer Gacad exchanged valuable goods and special benefits for these sex acts.  In this way, Defendant Officer Gacad's conduct constitutes an attempt to engage in sex in exchange for things of value, the definition of commerciality under 18 U.S.C. § 1591.

292.    These acts constitute civil wrongs inflicted on Plaintiff and actionable under 18 U.S.C. § 1595.

293.    Defendant's conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm and she has a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.

294.    Defendant's conduct warrants the Court's imposition of compensatory and punitive damages against the Defendants.

295.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendants' wrongful conduct.

## EIGHTH CLAIM FOR RELIEF
### *Plaintiff S.L. Against Defendant Officers Putnam, Vazquez, Serrano, and Lt. Jones*
(Obstruction)

296.    Defendant Officers Putnam, Vazquez, Serrano, and Lt. Jones together and individually obstructed or attempted to obstruct enforcement efforts or investigations into the sex trafficking of Plaintiff S.L. under 18 U.S.C. § 1591(d), 18 U.S.C. §1592.  They did so in the following ways:

- Defendant Officer Putnam stole Plaintiff S.L.'s personal property that contained evidence of her relationship with Defendant Officer Gacad;

- After being informed of the abuse, Defendant Officer Putnam failed to further investigate the sex trafficking committed by Defendant Officer Gacad;

- Defendant Officers Serrano and Vazquez attempted to silence and isolate Plaintiff S.L.;

- Defendant Officers Serrano and Vazquez allowed other people to listen to her private conversations to track and interfere with her communications and ability to confidentially report;

- Defendant Officer Serrano read Plaintiff S.L.'s private mail out loud, and consistently humiliated her to intimidate her from report;

- Defendant Lt. Jones consistently threatened Plaintiff S.L. and humiliated her after S.L. reported in order to intimidate her from making future reports;

1    • Defendant Officers Vazquez, Serrano, and Lt. Jones also knowingly failed
2    to report the abuse and harassment that Defendant Officer Gacad was
     committing.

3    297. These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a

4    network of officers that were intended to cause a person to believe that reporting would result in

5    serious harm or physical restraint.

6    298. These acts constitute civil wrongs inflicted on Plaintiff and are actionable under 18

7    U.S.C. § 1595.

8    299. Defendants' conduct has caused Plaintiff serious harm including, without limitation,

9    physical, psychological, emotional, financial, and reputational harm, and she has a claim for

10   damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. §1592, 18 U.S.C. § 1595.

11   300. Defendants' conduct warrants the Court's imposition of compensatory and punitive

12   damages against the Defendants.

13   301. Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and

14   reasonable attorneys' fees for the Defendants' wrongful conduct.

15                        **NINTH CLAIM FOR RELIEF**
     **Plaintiff A.H.R. against Defendant Officers Vazquez, Jones, Bellhouse, Serrano**
16              *Plaintiff A.H.R. Against Defendant Vazquez*
                            (Sex Trafficking)
17

18   302. Defendant Officer Vazquez engaged or attempted to engage in sex trafficking of

19   Plaintiff A.H.R. as prohibited under 18 U.S.C. § 1591; § 1594(a).

20   303. Defendant Officer Vazquez forced Plaintiff A.H.R. to engage in commercial sex

21   acts within the meaning 18 U.S.C. § 1591. These sex acts included kissing, hugging, and other

22   physical touching.

23   304. Defendant Officer Vazquez knowingly recruited, enticed, and solicited Plaintiff

24   A.H.R. by removing him from his housing unit and work assignments and exchanging special

25   benefits and things of value for sex acts.

26   305. Defendant Officer Vasquez made Plaintiff A.H.R. commit these sex acts through

27   force, fraud, or coercion within the meaning of 18 U.S.C. § 1591. He did so by:

28                        • Using his power and status as a correctional officer who has the power to

control and direct incarcerated persons and their movements in order to facilitate sex acts;

- Removing him from his housing unit and work assignments into isolated locations to engage in sex acts;

- Interfering in his romantic relationship with his partner to manipulate him.

306. These methods of force, fraud, and coercion were a plan designed to make Plaintiff A.H.R. believe that he would suffer serious harm should he not obey the sexual advances.

307. These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a network of officers that were intended to cause a person to believe that failure to perform an act would result in serious harm or physical restraint.

308. Defendant Officer Vazquez exchanged valuable goods and special benefits for these sex acts. In this way, Defendant Officer Vazquez's conduct constitutes the attempt to engage in sex in exchange for things of value, the definition of commerciality under 18 U.S.C. § 1591.

309. These acts constitute civil wrongs inflicted on Plaintiff and are actionable under 18 U.S.C. § 1595.

310. Defendant's conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm, and she has a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.

311. Defendant's conduct warrants the Court's imposition of compensatory and punitive damages against the Defendant.

312. Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendant's wrongful conduct.

### TENTH CLAIM FOR RELIEF
***Plaintiff A.H.R. Against Defendant Officers Jones and Bellhouse***
(Forced Labor)

313. Defendant Officers Jones and Bellhouse obtained or attempted to obtain the forced labor of Plaintiff A.H.R. as prohibited under 18 U.S.C. § 1589.

314. Defendant Officers Jones and Bellhouse forced Plaintiff A.H.R. to work as a lookout to facilitate their sexual abuse and harassment of other incarcerated persons in the facility

which constitutes as labor under 18 U.S.C. § 1589.

315.    Defendant Officers Jones and Bellhouse provided valuable goods in exchange for A.H.R.'s work as a lookout.

316.    Defendant Officer Jones and Bellhouse, who had the power to control and direct incarcerated persons, coerced Plaintiff A.H.R. to perform these services by using their power and status as correctional officers and work supervisors of Plaintiff A.H.R.

317.    Defendant Officers Jones and Bellhouse forced Plaintiff A.H.R. into performing this service by a scheme, plan, or pattern of retaliatory actions that intended to cause Plaintiff A.H.R. to believe that if he did not perform such services, he would suffer serious harm or physical restraint.

318.    These acts constitute civil wrongs inflicted on Plaintiff and are actionable under 18 U.S.C. § 1595.

319.    Defendants' conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm, and he has a claim for damages for such violations under 18 U.S.C. § 1589, 18 U.S.C. § 1595.

320.    Defendants' conduct warrants the Court's imposition of punitive damages against the Defendants.

321.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendants' wrongful conduct.

### ELEVENTH CLAIM FOR RELIEF
*Plaintiff A.H.R. Against Defendant Officer Serrano*
(Obstruction)

322.    Defendant Officer Serrano obstructed or attempted to obstruct enforcement efforts or investigations into the sex trafficking of Plaintiff A.H.R. under 18 U.S.C. § 1591(d); 18 U.S.C. § 1592.  He did so by:

- Assisting Defendant Officer Vazquez in obtaining and taking Plaintiff A.H.R. to locations where he could sexually abuse him;

- Making direct threats to Plaintiff A.H.R. to prevent him and others from reporting abuse;

- Interfering with Plaintiff A.H.R.'s relationship to manipulate him;

1        • Failing to report Defendant Officer Vazquez's abuse.

2        323.    These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a

3    network of officers that was intended to cause a person to believe that reporting would result in

4    serious harm or physical restraint.

5        324.    These acts constitute civil wrongs inflicted on Plaintiff and are actionable under 18

6    U.S.C. § 1595.

7        325.    Defendant's conduct has caused Plaintiff serious harm including, without

8    limitation, physical, psychological, emotional, financial, and reputational harm, and he has a claim

9    for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. §1592, 18 U.S.C. § 1595.

10       326.    Defendant's conduct warrants the Court's imposition of compensatory and punitive

11   damages against the Defendant.

12       327.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and

13   reasonable attorneys' fees for the Defendant's wrongful conduct.

14                          **TWELFTH CLAIM FOR RELIEF**
                 **Plaintiff G.M. Against Defendant Officers Nunley, Smith, Putnam, Shirley, Lt. Jones**
15                    *Plaintiff G.M. Against Defendant Officer Nunley*
                              (Sex Trafficking)
16

17       328.    Defendant Officer Nunley engaged or attempted to engage in sex trafficking of

18   Plaintiff G.M. as prohibited under 18 U.S.C. § 1591; § 1594(a).

19       329.    Defendant Officer Nunley forced Plaintiff G.M. to engage in commercial sex acts

20   within the meaning 18 U.S.C. § 1591.  These sex acts included rubbing his penis on Plaintiff,

21   kissing her, and other sexual touching.

22       330.    Defendant Officer Nunley knowingly recruited, enticed, and solicited Plaintiff

23   G.M. by frequently requesting sex acts, leaving instructions for where Plaintiff could commit sex

24   acts, and exchanging special benefits and things of value for sex acts.

25       331.    Defendant Officer Nunley made Plaintiff G.M. commit these sex acts through

26   force, fraud, or coercion within the meaning of 18 U.S.C. § 1591.  He did so by:

27        • Using physical force to sexually touch her;

28        • Using his power and status as a correctional officer and as Plaintiff G.M.'s

work supervisor who had the power to control and direct incarcerated persons and their movements and control access to disciplinary records, in order facilitate sexual acts;

• Offering to provide benefits and things of value for sex.

332. These methods of force, fraud, and coercion were a plan designed to make Plaintiff G.M. believe that she would suffer serious harm should she not obey his sexual advances.

333. These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a network of officers that were intended to cause a person to believe that failure to perform an act would result in serious harm or physical restraint against any person.

334. Defendant Officer Nunley exchanged offers of money and special benefits for these sex acts. In this way, Defendant Officer Nunley's conduct constitutes the attempt to engage in sex in exchange for things of value, the definition of commerciality under 18 U.S.C. § 1591.

335. These acts constitute civil wrongs inflicted on Plaintiff and actionable under 18 U.S.C. § 1595.

336. Defendant's conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm, and she has a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.

337. Defendant's conduct warrants the Court's imposition of compensatory and punitive damages against the Defendant.

338. Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendant's wrongful conduct.

**THIRTEENTH CLAIM FOR RELIEF**
*Plaintiff G.M. Against Defendant Officer Smith*
(Sex Trafficking)

339. Defendant Officer Smith engaged or attempted to engage in sex trafficking of Plaintiff G.M. as prohibited under 18 U.S.C. § 1591; § 1594(a).

340. Defendant Officer Smith forced Plaintiff G.M. to engage in commercial sex acts within the meaning 18 U.S.C. § 1591. These sex acts included forcing her to show him her naked body.

341.    Defendant Officer Smith knowingly recruited, enticed, and solicited Plaintiff G.M. by requesting sexual favors.

342.    Defendant Officer Smith made Plaintiff G.M. commit these sex acts through force, fraud, or coercion within the meaning of 18 U.S.C. § 1591.  He did so by:

- Physically coercing or restraining Plaintiff G.M. by cornering her in areas where she could not easily escape;

- Using his power and status as a correctional officer who had the power to control and direct incarcerated persons and their movements, in order facilitate sexual acts;

- Withholding basic necessities for sexual favors.

343.    These methods of force, fraud, and coercion were a plan designed to make Plaintiff G.M. believe that she would suffer serious harm if she did not obey his sexual advances.

344.    These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a network of officers that was intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person.

345.    Defendant Officer Smith exchanged special benefits and things of value in exchange for sexual acts.

346.    In this way, Defendant Officer Smith's conduct constitutes the attempt to engage in sex in exchange for things of value, the definition of commerciality under 18 U.S.C. § 1591.

347.    These acts constitute civil wrongs inflicted on Plaintiff and actionable under 18 U.S.C. § 1595.

348.    Defendant's conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm, and she has a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.

349.    Defendant's conduct warrants the Court's imposition of compensatory and punitive damages against the Defendant.

350.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendant's wrongful conduct.

**FOURTEENTH CLAIM FOR RELIEF**

*Plaintiff G.M. Against Defendants Lt. Putnam, Officer Shirley, and Lt. Jones*
(Obstruction)

351.    Defendant Officers Putnam and Shirley and Defendant Lt. Jones together and individually obstructed or attempted to obstruct enforcement efforts or investigations into the sex trafficking of Plaintiff G.M. under 18 U.S.C. § 1591(d), 18 U.S.C. §1592.  They did so in the following ways:

- Defendant Lt. Putnam failed to further investigate the abuse by Defendants Nunley and Smith after G.M. reported it to him;

- Defendant Officer Shirley threatened and intimidated G.M. by questioning her about her reporting;

- Defendant Lt. Jones individually threatened Plaintiff and threatened to engage in collective punishment.

352.    These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a network of officers that was intended to cause a person to believe that reporting would result in serious harm or physical restraint against any person.

353.    These acts constitute civil wrongs inflicted on Plaintiff and actionable under 18 U.S.C. § 1595.

354.    Defendants' conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm, and she has a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. §1592, 18 U.S.C. § 1595.

355.    Defendants' conduct warrants the Court's imposition of compensatory and punitive damages against the Defendants.

356.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendants' wrongful conduct.

**FIFTEENTH CLAIM FOR RELIEF**
**Plaintiff A.S. Against Defendant Officers Smith and Lt. Jones**
*Plaintiff A.S. Against Defendant Officer Smith*
(Sex Trafficking)

357.    Defendant Officer Smith engaged or attempted to engage in sex trafficking of Plaintiff A.S. as prohibited under 18 U.S.C. § 1591; § 1594(a).

358.    Defendant Officer Smith forced Plaintiff A.S. to engage in commercial sex acts

within the meaning 18 U.S.C. § 1591.  These sex acts included forcing her to strip, stand naked, and watch him as he masturbated.

359.    Defendant Officer Smith knowingly recruited, enticed, and solicited Plaintiff A.S. by requesting sexual favors and using his power as a correctional officer to lead her into locations where he directed her to show him her body.

360.    Defendant Officer Smith made Plaintiff A.S. commit these sex acts through force, fraud, or coercion within the meaning of 18 U.S.C. § 1591.  He did so by:

- Harassing and abusing Plaintiff A.S. in areas where she could not easily escape;

- Using his power and status as a correctional officer who had the power to control and direct incarcerated persons and their movements, control access to disciplinary records, and conduct searches, in order facilitate sexual acts;

- Threatening abuse of process in the form of disciplinary actions;

- Restricting access to basic necessities.

361.    These methods of force, fraud, and coercion were a plan designed to make Plaintiff A.S. believe that she would suffer serious harm should she not obey his sexual advances.

362.    These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a network of officers that were intended to cause a person to believe that failure to perform an act would result in serious harm or physical restraint against any person.

363.    Defendant Officer Smith exchanged basic necessities and things of value for sexual acts.

364.    In this way, Defendant Officer Smith's conduct constitutes the attempt to engage in sex in exchange for things of value, the definition of commerciality under 18 U.S.C. § 1591.

365.    These acts constitute civil wrongs inflicted on Plaintiff and actionable under 18 U.S.C. § 1595.

366.    Defendant's conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm, and she has a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.

367.    Defendant's conduct warrants the Court's imposition of compensatory and punitive

1    damages against the Defendant.

2        368.      Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and

3    reasonable attorneys' fees for the Defendant's wrongful conduct.

**SIXTEENTH CLAIM FOR RELIEF**
4
*Plaintiff A.S. Against Defendant Officer Smith*
(Forced Labor)
5

6        369.      Defendant Officer Smith obtained or attempted to obtain the forced labor of

7    Plaintiff A.S. as prohibited under 18 U.S.C. § 1589.

8        370.      Defendant Officer Smith knowingly forced Plaintiff A.S. to perform sex acts

9    including stripping and other sexual acts. As such this constitutes sex work as labor that was part

10    of under 18 U.S.C. § 1589(a). In exchange for this forced work, Defendant Officer Smith paid

11    Plaintiff A.S. with basic necessities and special benefits.

12        371.      Defendant Officer Smith made Plaintiff A.S. commit labor by force, restraint, or

13    abuse of law or process within the meaning of 18 U.S.C. § 1589. He did so by:

14               •    Forcing Plaintiff to perform these acts in areas where she could not easily escape;

15

16               •    Using his power and status as a correctional officer who had the power to control and direct incarcerated persons and their movements, control access to disciplinary records, and conduct searches, in order facilitate sexual acts;

17

18               •    Threatening abuse of process in the form of disciplinary actions if she did not perform this labor;

19               •    Restricting access to basic necessities if she did not perform this labor.

20        372.      Defendant Officer Smith forced Plaintiff A.S. into performing this service by a

21    scheme, plan, or pattern of retaliatory actions that was intended to cause Plaintiff A.S. to believe

22    that if she did not perform such services, she would suffer serious harm or physical restraint.

23        373.      These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a

24    network of officers that was intended to cause a person to believe that failure to perform labor

25    would result in serious harm or physical restraint against any person.

26        374.      These acts constitute civil wrongs inflicted on Plaintiff and are actionable under 18

27    U.S.C. § 1595.

28        375.      Defendant's conduct has caused Plaintiff serious harm including, without

1   limitation, physical, psychological, emotional, financial, and reputational harm, and she has a

2   claim for damages for such violations under 18 U.S.C. § 1589, 18 U.S.C. § 1595.

3      376.    Defendant's conduct warrants the Court's imposition of punitive damages against

4   the Defendant.

5      377.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and

6   reasonable attorneys' fees for the Defendant's wrongful conduct.

7                          **SEVENTEENTH CLAIM FOR RELIEF**
                    ***Plaintiff A.S. Against Defendants Officer Lewis and Lt. Jones***
8                                        (Obstruction)

9      378.    Defendants Officer Lewis and Lt. Jones obstructed or attempted to obstruct

10  enforcement efforts or investigations into the sex trafficking and labor trafficking of Plaintiff A.S.

11  under 18 U.S.C. § 1591(d), 18 U.S.C. §1592.  She did so in the following ways:

12           •    Defendant Lt. Jones directly threatened Plaintiff A.S. through abuse of
                  process by directly stating she was retaliating against A.S. and others who
13                reported abuse.

14           •    Defendant Officer Lewis forced A.S. to unzip her sweatshirt everyday as a
                  form of intimidation while threatening her to "keep running her mouth."
15

16     379.    These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a

17  network of officers that was intended to cause a person to believe that reporting would result in

18  serious harm or physical restraint against any person.

19     380.    These acts constitute civil wrongs inflicted on Plaintiff and actionable under 18

20  U.S.C. § 1595.

21     381.    Defendants' conduct has caused Plaintiff serious harm including, without

22  limitation, physical, psychological, emotional, financial, and reputational harm, and she has a

23  claim for damages for such violations under 18 U.S.C. § 1589, 18 U.S.C. § 1591, 18 U.S.C.

24  §1592, 18 U.S.C. § 1595.

25     382.    Defendants' conduct warrants the Court's imposition of compensatory and punitive

26  damages against the Defendants.

27     383.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and

28  reasonable attorneys' fees for the Defendants' wrongful conduct.

**EIGHTEENTH CLAIM FOR RELIEF**
**Plaintiff J.L. Against Defendants Officers Jones, Pool, and Lt. Putnam**
*Plaintiff J.L. Against Defendant Officer Jones*
(Sex trafficking)

384.   Defendant Officer Jones engaged or attempted to engage in sex trafficking of Plaintiff J.L. as prohibited under 18 U.S.C. § 1591; § 1594(a).

385.   Defendant Officer Jones forced Plaintiff J.L. to engage in commercial sex acts within the meaning 18 U.S.C. § 1591.  These sex acts included forcing her to engage in vaginal and oral sex, groping her body, and sucking on her breast.

386.   Defendant Officer Jones knowingly recruited, enticed, and solicited Plaintiff J.L. by flirting with her, and using his authority as a correctional officer to direct her into locations where he could be alone with her and force her to commit sex acts.

387.   Defendant Officer Jones made Plaintiff J.L. commit these sex acts through force, fraud, or coercion within the meaning of 18 U.S.C. § 1591.  He did so by:

- Locking Plaintiff J.L. into areas without an ability to escape if she did not perform sexual acts;

- Using his power and status as a correctional officer and as her work supervisor, who had the power to control and direct prisoners and their movement or acts, in order facilitate sexual acts;

- Using physical force to make Plaintiff J.L. commit these acts;

- Using threats of harm to make Plaintiff J.L. believe she would be seriously harmed if she did not perform these sex acts or if she reported;

- Using threats of abuse of process by making Plaintiff J.L. believe she would have negative consequences for reporting.

388.   These methods of force, fraud, and coercion were a plan designed to make Plaintiff J.L. believe that she would suffer serious harm should she not obey his sexual advances.

389.   These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a network of officers that were intended to cause a person to believe that failure to perform an act would result in serious harm or physical restraint against any person.

390.   Defendant Officer Jones exchanged special benefits and things of value for sexual acts.

391.    In this way, Defendant Officer Jones' conduct constitutes an attempt to engage in sex in exchange for things of value, the definition of commerciality under 18 U.S.C. § 1591.

392.    These acts constitute civil wrongs inflicted on Plaintiff J.L. and actionable under 18 U.S.C. § 1595.

393.    Defendant's conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm, and she has a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.

394.    Defendant's conduct warrants the Court's imposition of compensatory and punitive damages against the Defendant.

395.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendant's wrongful conduct.

## NINETEENTH CLAIM FOR RELIEF
### *Plaintiff J.L. Against Defendant Officer Jones*
(Forced Labor)

396.    Defendant Officer Jones knowingly obtained or attempted to obtain forced labor from Plaintiff J.L. as prohibited under 18 U.S.C. § 1589.

397.    Defendant Officer Jones forced Plaintiff J.L. to perform sex acts as sex work which constitutes as labor under 18 U.S.C. § 1589.

398.    Defendant Officer Jones knowingly forced Plaintiff J.L. to perform sex acts including groping, sexual touching, and vaginal sex on a number of occasions.  This often happened while J.L. was working in her job while Defendant Officer Jones supervised her. During her shift hours, he would order her into spaces where she was cornered in order to force her to perform sex acts.  As such, this conduct constitutes sex work as labor that was part of her job under 18 U.S.C. § 1589 (a).

399.    Defendant Officer Jones made Plaintiff J.L. commit labor by force, restraint, or abuse of law or process within the meaning of 18 U.S.C. § 1589.  He did so by:

- Locking Plaintiff in areas without an ability to escape if she did not perform sexual acts;

- Using his power and status as a correctional officer and as her work supervisor, who had the power to control and direct incarcerated persons

and their movement or acts, in order facilitate sexual acts;

- Using physical force to make Plaintiff J.L. commit these acts;

- Using threats to make Plaintiff J.L. believe she would be seriously harmed if she did not perform this labor;

- Threats of abuse of process by making Plaintiff J.L. believe she would have negative consequences for reporting;

400.     Defendant Officer Jones forced Plaintiff J.L. into performing this service by a scheme, plan, or pattern of retaliatory actions that intended to cause Plaintiff J.L. to believe that if she did not perform such services, she would suffer serious harm or physical restraint.

401.     These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a network of officers that was intended to cause a person to believe that failure to perform labor would result in serious harm or physical restraint against any person.

402.     These acts constitute civil wrongs inflicted on Plaintiff and are actionable under 18 U.S.C. § 1595.

403.     Defendant's conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm, and she has a claim for damages for such violations under 18 U.S.C. § 1589, 18 U.S.C. § 1595.

404.     Defendant's conduct warrants the Court's imposition of compensatory and punitive damages against the Defendants.

405.     Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendant's wrongful conduct.

### TWENTIETH CLAIM FOR RELIEF
*Plaintiff J.L. Against Defendant Officers Jones, Pool, and Lt. Putnam*
(Obstruction)

406.     Defendants Officer Jones, Officer Pool, and Lt. Putnam together and individually obstructed or attempted to obstruct enforcement efforts or investigations into the labor trafficking of Plaintiff J.L. under 18 U.S.C. § 1591(d), 18 U.S.C. §1592.  They did so in the following ways:

- Defendant Officer Jones directly threatened Plaintiff J.L. with serious risk of harm if she reported his abuse;

- Defendant Officer Pool taunted and failed to report Defendant Andrew

Jones's exploitation when he was present in the exploitation;

- Defendant Lt. Putnam failed to further investigate Defendant Andrew Jones's abuse and exploitation of Plaintiff J.L. after she reported it.

407.    These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a network of officers that were intended to cause a person to believe that reporting would result in serious harm or physical restraint against any person.

408.    These acts constitute civil wrongs inflicted on Plaintiff and are actionable under 18 U.S.C. § 1595.

409.    Defendants' conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm, and she has a claim for damages for such violations under 18 U.S.C. § 1589, 18 U.S.C. §1592, 18 U.S.C. § 1595.

410.    Defendants' conduct warrants the Court's imposition of compensatory and punitive damages against the Defendants.

411.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendants' wrongful conduct.

## TWENTY-FIRST CLAIM FOR RELIEF

### *Plaintiff L.T. Against Defendant Officer Smith*
(Sex Trafficking)

412.    Defendant Officer Smith engaged or attempted to engage in sex trafficking of Plaintiff L.T. as prohibited under 18 U.S.C. § 1591; § 1594(a).

413.    Defendant Officer Smith forced Plaintiff L.T. to engage in commercial sex acts within the meaning 18 U.S.C. § 1591.  These sex acts included strip shows and sexual touching.

414.    Defendant Officer Smith knowingly recruited, enticed, and solicited Plaintiff L.T. by propositioning her to allow him to touch her, and requesting her to dance for him.

415.    Defendant Officer Smith made Plaintiff L.T. commit these sex acts through force, fraud, or coercion within the meaning of 18 U.S.C. § 1591.  He did so by:

- Using his power and status as a correctional officer who had the power to control and direct prisoners and their movement or acts in order facilitate sexual acts;

- Cornering her in her cell where she had no way to escape to coerce her to strip;

1          • Using special benefits to coerce her into performing these sex acts.

2          416.    These methods of force, fraud, and coercion were a plan designed to make Plaintiff

3    L.T.  believe that she would suffer serious harm should she not obey his sexual advances.

4          417.    These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a

5    network of officers that were intended to cause a person to believe that failure to perform an act

6    would result in serious harm or physical restraint against any person.

7          418.    Defendant Officer Smith exchanged special benefits and things of value for sexual

8    acts.

9          419.    In this way, Defendant Officer Smith's conduct constitutes an attempt to engage in

10   sex in exchange for things of value, the definition of commerciality under 18 U.S.C. § 1591.

11         420.    These acts constitute civil wrongs inflicted on Plaintiff L.T. and actionable under

12   18 U.S.C. § 1595.

13         421.    Defendant's conduct has caused Plaintiff serious harm including, without

14   limitation, physical, psychological, emotional, financial, and reputational harm, and she has a

15   claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.

16         422.    Defendant's conduct warrants the Court's imposition of compensatory and punitive

17   damages against the Defendant.

18         423.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and

19   reasonable attorneys' fees for the Defendant's wrongful conduct.

20
                        ***Plaintiff L.T. Against Defendant Officer Smith***
21                                        **(Forced Labor)**

22         424.    Defendant Officer Smith knowingly obtained or attempted to obtain forced labor

23   from Plaintiff L.T as prohibited under 18 U.S.C. § 1589.

24         425.    Defendant Officer Smith forced Plaintiff L.T. to perform stripping as sex work

25   which constitutes as labor under 18 U.S.C. § 1589.

26         426.    Defendant Officer Smith made Plaintiff L.T. commit labor by force, restraint, or

27   abuse of law or process within the meaning of 18 U.S.C. § 1589.  He did so by:

28          • Using his power and status as a correctional officer who had the power to

control and direct prisoners and their movement or acts in order facilitate sexual acts;

- Cornering her in her cell where she had no way to escape to coerce her to strip.

427.   Defendant Officer Smith forced Plaintiff L.T. into performing this service by a scheme, plan, or pattern of retaliatory actions that intended to cause Plaintiff L.T. to believe that if she did not perform such services, she would suffer serious harm or physical restraint.

428.   These tactics are part of a well-known scheme, plan, or pattern at FCI Dublin by a network of officers that was intended to cause a person to believe that failure to perform labor would result in serious harm or physical restraint against any person.

429.   These acts constitute civil wrongs inflicted on Plaintiff and are actionable under 18 U.S.C. § 1595.

430.   Defendant's conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm, and she has a claim for damages for such violations under 18 U.S.C. § 1589, 18 U.S.C. § 1595.

431.   Defendant's conduct warrants the Court's imposition of compensatory and punitive damages against the Defendants.

432.   Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendant's wrongful conduct.

### TWENTY-SECOND CLAIM FOR RELIEF
### All Plaintiffs Against All Individual Capacity Defendants
### (Conspiracy to Violate the Trafficking Victims and Protection Act, 18 U.S.C. § 1584)

433.   Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if set forth fully herein.

434.   The Trafficking Victims Protection Act establishes that "[w]hoever conspires with another to violate section 1581, 1583, 1589, 1590, or 1592 shall be punished in the same manner as a completed violation of such section; . . . [and w]hoever conspires with another to violate section 1591 shall be fined under this title, imprisoned for any term of years or for life, or both." 18 U.S.C. § 1594 (b), (c).

435.    The TVPA allows "[an] individual who is a victim of a violation of this chapter [to] bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees." 18 U.S.C. § 1595(a).

436.    Congress grants a plaintiff up to ten years in which to bring a civil action under 18 U.S.C. § 1595(c).

437.    At all relevant times, Defendants knowingly agreed, contrived, confederated, acted in concert, aided and abetted, and/or conspired to continue their longstanding practice of exchanging sex for valuable goods or special benefits as defined in 18 U.S.C. § 1591, or obtaining forced labor as defined in 18 U.S.C. § 1589 by coercing incarcerated people to perform sexual acts or to act as lookouts as the Defendants engaged in sexual acts.

438.    All Defendants conspired to recruit, entice, harbor, transport, provide, obtain, maintain, patronize, solicit, or benefit from participation in the sex and/or labor trafficking of Plaintiffs as defined by 18 U.S.C. § 1581 et. seq.

439.    Defendants committed overt acts in furtherance of the agreement or understanding by committing one or more of the following acts:

- Directly receiving or attempting to receive sexual acts or labor in exchange for valuable goods or benefits;

- Directly working as lookouts themselves while perpetrating officers engaged or attempted to engage in sexual acts;

- Forcing or coercing other incarcerated people to act as lookouts while perpetuating officers engaged or attempted to engage in sexual acts in exchange for valuable goods or benefits;

- Transporting or directing incarcerated people into locations where principal perpetrating officers could engage or attempt in engage in sexual acts;

- Engaging in a range of retaliatory tactics to threaten and silence survivors or witnesses of sexual abuse or trafficking including but not limited to threats of physical abuse and/or restraint, threats of law or process, indiscriminate searches, taunting, and humiliation;

- Knowingly refusing to report abuse or trafficking occurring at FCI Dublin

and/or obstructing investigation into abuse or trafficking;

- Ensuring confidential means of reporting abuse is not possible by indiscriminately opening legal mail, monitoring confidential or private communications, interfering with confidential or private communications, and intentionally preventing access to reporting mechanisms such as grievances and other reporting lines;

- Maintaining practices, policies, and procedures that allowed Defendants to benefit from unlawful commercial sex ventures and human trafficking.

440.    Defendants' participation and assistance in the furtherance of an illegal sex trafficking plan and/or purpose was intentional and/or willful and, therefore, Defendants intentionally and/or willfully caused the facilitation of the sex acts in support of their trafficking venture.

441.    Defendants knew or should have known that their acts supported and facilitated a trafficking venture.

442.    Defendants' conspiracy kept Plaintiffs and other witnesses of the trafficking from taking meaningful action, resulting in significant injuries to Plaintiffs and additional victims.

443.    Defendants' conduct caused Plaintiffs serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm, and Plaintiffs have claims for damages for such violations under 18 U.S.C. § 1584; 18 U.S.C. § 1589, 18 U.S.C. § 1591; 18 U.S.C. § 1595.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants, and each of them, as follows:

444.    An order certifying that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23;

445.    A declaratory judgment that the conditions, acts, omissions, policies, and practices described above are in violation of the rights of Plaintiffs and the class they represent under the United States Constitution;

446.    An order requiring Defendants, their agents, officials, employees, and all persons

acting in concert with them or otherwise to (1) adequately, hire, train and supervise its employees to prevent their ongoing sexual misconduct and abuse of power;  (2) implement a confidential and reliably available method for individuals to report abuse to fully independent outside authorities who are not employed by the BOP; (3) properly investigate claims of abuse; (4) immediately cease the practice of placing individuals who report sexual abuse into solitary confinement in the SHU; (5) address rampant retaliation against survivors, including but not limited to placement in solitary confinement, punitive cell and strip searches, and punitive transfers, which harm survivors and deter others from reporting; (6) ensure that officers who have substantiated claims of sexual abuse and harassment against them are promptly fired and not permitted to return to BOP employment; (7) provide constitutionally adequate medical and mental health care to survivors of sexual abuse; (8) provide timely and consistent access to confidential attorney calls and visits; (9) provide survivors with documentation of reports of staff misconduct and promptly facilitate the U-visa certification process for noncitizen survivors who report and assist in the investigation of sexual abuse; (10) create a process to assist survivors of abuse with compassionate release petitions; (11) install fixed cameras in areas where abuse is known to occur and properly monitor and maintain the fixed cameras that do exist; and (12) address increasingly dire living conditions that contribute to the ongoing sexual exploitation of incarcerated persons.

447.   An order enjoining Defendants, their agents, officials, employees, and all persons acting in concert from continuing the unlawful acts, conditions, and practices described in this Complaint;

448.   An award of compensatory, punitive, and nominal damages to each named Plaintiff in an amount to be determined at trial;

449.   An award to Plaintiffs, pursuant to 42 U.S.C. §§ 1988 and 12205 of the costs of this suit and reasonable attorneys' fees and litigation expenses;

450.   An order retaining jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and

451.   For such other and further relief as this Court may deem just and proper.

1

2                                    Respectfully submitted,

3    DATED:  August 15, 2023          ROSEN BIEN GALVAN & GRUNFELD LLP

4                                    By:   */s/ Kara Janssen*
                                     _____
5                                          Ms. Kara Janssen (she/her)
                                           Mr. Michael Bien (he/him)
6                                          Mr. Ernest Galvan (he/him)
                                           Ms. Ginger Jackson-Gleich (she/her)
7

8    DATED:  August 15, 2023          CALIFORNIA COLLABORATIVE FOR
                                     IMMIGRANT JUSTICE
9
                                     By:   */s/ Susan Beatty*
10                                    _____
                                           Mx. Susan Beaty (they/them)
11

12   DATED:  August 15, 2023          RIGHTS BEHIND BARS

13                                    By:   */s/ Oren Nimni*
                                     _____
14                                         Ms. Amaris Montes (she/her)
                                           Mr. Oren Nimni (he/him)
15                                         Mx. D Dangaran (they/them)

16                                    Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28