1 | MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
2 | KARA J. JANSSEN – 274762
GINGER JACKSON-GLEICH – 324454
3 | ROSEN BIEN
GALVAN & GRUNFELD LLP
4 | 101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
5 | Telephone:    (415) 433-6830
Email:         mbien@rbgg.com
6 |                    egalvan@rbgg.com
                   kjanssen@rbgg.com
7 |                    gjackson-gleich@rbgg.com

OREN NIMNI*
  Mass. Bar No. 691821
AMARIS MONTES*
  Md. Bar No. 2112150205
D DANGARAN*
  Mass. Bar No. 708195
RIGHTS BEHIND BARS
416 Florida Avenue N.W. #26152
Washington, D.C.  20001-0506
Telephone:    (202) 455-4399
Email:   oren@rightsbehindbars.org
             amaris@rightsbehindbars.org
             d@rightsbehindbars.org

8 | SUSAN M. BEATY – 324048
CALIFORNIA COLLABORATIVE FOR
9 | IMMIGRANT JUSTICE
1999 Harrison Street, Suite 1800
10 | Oakland, California  94612-4700
Telephone:    (510) 679-3674
11 | Email:    susan@ccijustice.org

*Pro hac vice applications pending

12 | Attorneys for Plaintiffs

13 | UNITED STATES DISTRICT COURT

14 | NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

15 | CALIFORNIA COALITION FOR WOMEN
PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.; G.M.;
16 | A.S.; and L.T., individuals on behalf of themselves
and all others similarly situated,

17 |                         Plaintiffs,

18 |          v.

19 | UNITED STATES OF AMERICA FEDERAL
BUREAU OF PRISONS, a governmental entity;
20 | BUREAU OF PRISONS DIRECTOR COLETTE
PETERS, in her official capacity; FCI DUBLIN
21 | WARDEN THAHESHA JUSINO, in her official
capacity; OFFICER BELLHOUSE, in his individual
22 | capacity; OFFICER GACAD, in his individual
capacity; OFFICER JONES, in his individual
23 | capacity; LIEUTENANT JONES, in her individual
capacity; OFFICER LEWIS, in his individual
24 | capacity; OFFICER NUNLEY, in his individual
capacity; OFFICER POOL, in his individual capacity,
25 | LIEUTENANT PUTNAM, in his individual capacity;
OFFICER SERRANO, in his individual capacity;
26 | OFFICER SHIRLEY, in his individual capacity;
OFFICER SMITH, in his individual capacity; and
27 | OFFICER VASQUEZ, in her individual capacity,

                         Defendants.

Case No. 3:23-cv-04155

**PLAINTIFFS' NOTICE OF
MOTION AND MEMORANDUM
OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

Date:        October 6, 2023
Time:        9:30 am.
Crtrm.:      D, 15th Floor
Place:       450 Golden Gate Avenue
             San Francisco, CA 94102

Judge:       Hon. Joseph Spero

Trial Date:              None Set

28 |

[4340102.2]

Case No. 3:23-cv-04155

1

2

# TABLE OF CONTENTS

Page

3   NOTICE OF MOTION AND MOTION ............................................................................1

4   MEMORANDUM OF POINTS AND AUTHORITIES .........................................................3

5   I.   INTRODUCTION...........................................................................................................3

6   II.   STATEMENT OF FACTS..............................................................................................5

7          A.   BOP Has Allowed Staff to Sexually Abuse People in Their Custody,
                 Despite Being Aware of Such Abuse for Decades...........................................5
8
               B.   Individuals Incarcerated at FCI Dublin Continue to Face Sexual Assault and
9                    Harassment On An Ongoing Basis...................................................................7

10         C.   Survivors Continue to Face Severe Retaliation for Reporting Abuse,
                 Chilling Further Reporting............................................................................14
11
               D.   Survivors Have No Way To Confidentially Report Abuse. ...................................16
12
               E.   Survivors of Sexual Abuse and Retaliation at Dublin Have Experienced and
13                   Continue to Experience Grievous Physical, Mental, Dignitary, and
                     Economic Injuries ........................................................................................18
14
               F.   Survivors of Sexual Abuse and Witnesses to Abuse Are Denied Access to
15                   Mental Health Care and Medical Care to Address Their Mental and
                     Physical Injuries. .........................................................................................19
16
                    1.   Mental Health Care Is Wholly Inadequate ...........................................19
17
                    2.   Survivors Lack Access to Adequate Medical Care. ..................................20
18
     III.   ARGUMENT ...............................................................................................................21
19
               A.   Plaintiffs are likely to succeed on their Eighth Amendment claims because
20                   FCI Dublin's Policies and Practices Demonstrate Deliberate Indifference to
                     the Serious and Demonstrated Risk of Bodily Harm to those Incarcerated
21                   there. ............................................................................................................21

22         B.   Plaintiffs Satisfy the Remaining Preliminary Injunction Factors............................24

23                  1.   The Proposed Class Will Suffer Irreparable Harm Absent Immediate
                         Relief. ...................................................................................................24
24
                    2.   The Balance of Hardships Tips Decidedly in Plaintiffs' Favor. ..................24
25
                    3.   A Preliminary Injunction is in the Public Interest.......................................25
26
     CONCLUSION ....................................................................................................................25

27

28

# TABLE OF AUTHORITIES

Page

## CASES

*Amoco Prod. Co. v. Gambell*,
480 U.S. 531 (1987) ............................................................ 25

*Bearchild v. Cobban*,
947 F.3d 1130 (9th Cir. 2020) ............................................ 22

*Brown v. Plata*,
563 U.S. 493 (2011) ............................................................ 22

*D.R. v. Antelope Valley Union High Sch. Dist.*,
746 F. Supp. 2d 1132 (C.D. Cal. 2010) .............................. 24

*Harris v. Bd. of Supervisors, L.A. Cnty.*,
366 F.3d 754 (9th Cir. 2004) .............................................. 25

*Hernandez v. County of Monterey*,
305 F.R.D. 132 (N.D. Cal. 2015) ....................................... 22

*M.R. v. Dreyfus*,
663 F.3d 1100 (9th Cir. 2011) ............................................ 24

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) .............................................. 25

*United States v. Garcia*,
No. 4:21-cr-00429-YGR (N.D. Cal.) .................................... 6

*Winter v. Nat. Res. Def. Council, Inc.*
, 555 U.S. 7 (2008) ...................................................... 21, 25

## STATUTES

28 C.F.R. § 115.61 ................................................................... 23, 25

**NOTICE OF MOTION AND MOTION**

NOTICE IS HEREBY GIVEN that on October 6, 2023, or as soon thereafter as the matter may be heard by the above-entitled Court, located at Courtroom D – 15th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs California Coalition for Women Prisoners ("CCWP"), R.B.,  A.H.R., S.L., J.L., J.M., G.M., A.S., and L.T. (collectively "proposed class representatives") will and hereby do jointly move the Court for entry of an Order requiring Defendants to take the following immediate actions, and ask that the Court appoint a Special Master with sufficient resources and power to monitor and ensure Defendants' compliance:

(i)    submit to a comprehensive audit, by an outside agency mutually agreed upon by the Parties, of all policies concerning staff sexual abuse, reporting, and retaliation;

(ii)    after such audit, implement changes to policies as recommended by the outside auditor and in consultation with organizational Plaintiff California Coalition of Women Prisoners (CCWP);

(iii)    submit to quarterly site visits by the outside agency mutually agreed upon by the Parties, and provide public quarterly reports concerning: staff sexual abuse and retaliation, grievances against facility staff, and use of internal punitive measures (including use of solitary confinement, strip searches, cell searches, drug tests, and transfers);

(iv)    end the use of solitary confinement or punitive segregation at FCI Dublin until such a time that it can be ensured that such confinement will not be used as part of a practice of retaliation against those who experience and report staff sexual abuse;

(v)    develop a substantive process for the return of non-contraband items seized from individuals' cells during searches;

(vi) develop and institute policies and procedures to provide high-quality offsite medical and mental health care for all members of the class, in accordance with accepted medical standards;

(vii)    create a system to provide class members with documentation of reporting and participation in investigation of staff misconduct, and to streamline and support requests from class members for related relief (e.g. requests for release to less restrictive settings, requests for U-visa certifications); and

(viii)    ensure that all class members have consistent, timely, and confidential access to legal counsel, including providing private meeting spaces for all attorney visits.

This motion is based on the Complaint filed August 16, 2023 (Dkt. 1), the concurrently filed Motion for Provisional Class Certification, this Notice of Motion and Motion, the

Memorandum of Points and Authorities, and the Declarations of C.B. (Dkt 10-1); R.B. (Dkt. 10-2); J.L. (Dkt. 10-3); J.M. (Dkt. 10-4); G.M. (Dkt. 10-5); A.S. (Dkt. 10-6); J.D. (Dkt. 10-7); C.F.B. (Dkt. 10-8); S.S. (Dkt. 10-9); N.A. (Dkt. 10-10); L.T. (Dkt. 10-11); S.M. (Dkt. 10-12); T.T. (Dkt. 10-13); A.H.R. (Dkt. 10-14); S.L. (Dkt. 10-15); B.F. (Dkt. 10-16); J.L.H. (Dkt. 10-17); E.A. (Dkt. 10-18); Y.M. (Dkt. 10-19); B.S. (Dkt. 10-20); M.R. (Dkt. 10-21); J.T. (Dkt. 10-22); C.H. (Dkt. 10-23); A.T. (Dkt. 10-24); T.M. (Dkt. 10-25); C.D. (Dkt. 10-26); A.V. (Dkt. 10-27); M.M. (Dkt. 10-28); A.S.H. (Dkt. 10-29); C.A.H. (Dkt. 10-30); M.S. (Dkt. 10-31); Z.T.S. (Dkt. 10-32); M.D. (Dkt. 10-33); C.C. (Dkt. 10-34); K.D. (Dkt. 10-35) A.J.F. (Dkt 10-36); N.S. (Dkt 10-37); S.T. (Dkt 10-38); M.V.R. (Dkt 10-39); J.B.(Dkt 10-40) ; L.B. (Dkt 10-41); F.M.C.(Dkt 10-42); A.R. (Dkt. 10-43); F.G.A. (Dkt. 10-44); H.G. (Dkt. 10-45); S.Y. (Dkt. 10-46); S.F.V. (Dkt. 10-47) and associated documents, filed and served concurrently herewith.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

When a person is sentenced to time in prison they are deprived of certain liberty interests for a term of years.  This deprivation is constitutionally circumscribed, in part, so that when a criminal defendant pleads or is found guilty, they are aware of what the ensuing punishment will entail.  Categorically, across all state and federal systems, the punishment for a conviction is not, and cannot be, sexual abuse.  But at the Federal Correctional Institute in Dublin, California ("FCI Dublin"), it is.

Those incarcerated at FCI Dublin have been and continue to be subject to a systemic campaign of staff sexual assault, harassment, and retaliation which makes sexual abuse a fact of incarceration at the facility.  Dozens of people have been raped or otherwise assaulted by officers and supervisors at FCI Dublin, and hundreds have been sexually harassed, forcibly conscripted as "lookouts", coerced into performing sexual favors, and/or punished if they do not acquiesce. It is hard to overstate how pervasive the sexual misconduct and retaliation at FCI Dublin is, and how well aware officials at every level were and are of this ongoing problem.

The past and ongoing harms to those incarcerated at FCI Dublin include physical harm, psychological harm, and damage to their well-being and relationships in every way imaginable. All those incarcerated at the facility remain subject to extremely high risk of substantial injury from sexual assault while they remain at FCI Dublin.  But the Constitution does not allow guards and supervisors to sexually abuse people in their care and custody.  It does not allow the deliberate indifference of FCI Dublin and Bureau of Prison ("BOP") officials.  And it does not allow incarcerated people  in FCI Dublin to remain at a substantial risk of serious bodily injury.  It is for these reasons that Plaintiffs, as proposed representatives of a putative class of those incarcerated at FCI Dublin, turn to this Court for immediate relief to halt the ongoing constitutional violations at FCI Dublin that have already caused so much harm.

The declarations of those incarcerated and the well-pleaded allegations in the Complaint (Dkt. 1) demonstrate that Plaintiffs are substantially likely to succeed on their claims that conditions at FCI Dublin violate the Eighth Amendment.  Other factors also counsel in favor of

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION

1  preliminary relief here, where FCI Dublin and BOP officials have been deliberately indifferent to

2  the substantial likelihood of serious harm; these harms are imminent and ongoing; and preliminary

3  relief is not just warranted, but fundamentally necessary to protect those in FCI Dublin.

4          As detailed below, Plaintiffs are highly likely to succeed on the merits of their claims that

5  the BOP and FCI Dublin, through its officials, are deliberately indifferent to a substantial

6  likelihood of serious harm, and that their policies and practices violate the Eighth Amendment by

7  constituting deliberate indifference to a substantial risk of harm.  Moreover, Plaintiffs can show

8  that, absent emergency relief, the substantial risk of sexual abuse and retaliation constitutes an

9  irreparable harm as Plaintiffs' and other peoples' physical and mental well-being hang in the

10 balance.  Given that Defendants have the almost unfettered ability to control the housing,

11 practices, personnel and care at FCI Dublin and no legitimate interest in the ongoing sexual assault

12 of people imprisoned there, the balance of equities tips sharply in favor of Plaintiffs.  Finally,

13 eliminating sexual violence in a carceral setting is inarguably in the public interest, as Congress

14 identified when it passed the Prison Rape Elimination Act (PREA).

15         Accordingly, Defendants must be ordered to take immediate measures to protect people

16 inside FCI Dublin, or to seek the alternatives to confinement if a safe environment cannot be

17 engineered.  On behalf of a class of people currently incarcerated at FCI Dublin and subject to

18 their ongoing practices, Plaintiffs seek a preliminary injunction requiring Defendants to take the

19 following immediate actions, and ask that the Court appoint a Special Master with sufficient

20 resources and power to monitor and ensure Defendants' compliance:

21         (i)     submit to a comprehensive audit, by an outside agency mutually agreed
            upon by the Parties, of all policies concerning staff sexual abuse, reporting, and
22          retaliation;

23         (ii)    after such audit, implement changes to policies as recommended by the
            outside auditor and in consultation with organizational Plaintiff California
24          Coalition of Women Prisoners (CCWP);

25         (iii)   submit to quarterly site visits by the outside agency mutually agreed upon
            by the Parties, and provide public quarterly reports concerning: staff sexual abuse
26          and retaliation, grievances against facility staff, and use of internal punitive
            measures (including use of solitary confinement, strip searches, cell searches, drug
27          tests, and transfers);

28         (iv)    end the use of solitary confinement or punitive segregation at FCI Dublin

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION

until such a time that it can be ensured that such confinement will not be used as part of a practice of retaliation against those who experience and report staff sexual abuse;

(v)     develop a substantive process for the return of non-contraband items seized from individuals' cells during searches;

(vi)    develop and institute policies and procedures to provide high-quality offsite medical and mental health care for all members of the class, in accordance with accepted medical standards;

(vii)   create a system to provide class members with documentation of reporting and participation in investigation of staff misconduct, and to streamline and support requests from class members for related relief (e.g. requests for release to less restrictive settings, requests for U-visa certifications); and

(viii)  ensure that all class members have consistent, timely, and confidential access to legal counsel, including providing private meeting spaces for all attorney visits.

## II.    STATEMENT OF FACTS

### A.     BOP Has Allowed Staff to Sexually Abuse People in Their Custody, Despite Being Aware of Such Abuse for Decades.

Sexual assault and harassment have been ongoing systemic problems in BOP facilities generally—and at FCI Dublin in particular—for decades.  Dkt. 1 ¶¶ 57-62.  The modern era at FCI Dublin has been no different.  Dkt. 1. ¶¶ 63-90 (investigations, criminal indictments, convictions, and plea agreements).

In around 2020, the U.S. Attorney's Office began a criminal investigation that has led to charges against eight former FCI Dublin officials, including the former warden and chaplain. Seven officials have now been convicted of, or pleaded guilty to, sexually abusing a total of at least 20 incarcerated women, and court records indicate that all seven of these men committed additional, uncharged abuse of other incarcerated women.  *See, e.g.,* Dec. H.G. ¶¶ 11-18 (Officer Chavez repeatedly sexually assaulted her).  A significant number of additional correctional officers have been placed on administrative leave pending further criminal investigations, including as recently as August 2023.  *See* Decs. A.H.R. ¶ 4; S.L. ¶ 19.  One former officer, Nicholas Ramos, died by suicide while on administrative leave and under investigation.  Many currently and formerly incarcerated women have reported that Ramos subjected them to abuse including sexual assault, forcing them to strip, and relentless retaliation.  *See* Decs S.F.V. ¶¶ 4-14;

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION

N.A. ¶¶ 4-8.

Notably, former Warden Ray Garcia was convicted of sexually abusing three incarcerated women following a jury trial.  *See United States v. Garcia*, No. 4:21-cr-00429-YGR (N.D. Cal.). Prior to his arrest, Garcia had served as the PREA compliance officer at FCI Dublin, where he was responsible for ensuring compliance with PREA policies and training other employees.  Warden Garcia's sexual misconduct at FCI Dublin was brazen—in addition to his multiple "girlfriends," he also sexually harassed and abused several other women.  *See, e.g.,* Decs. M.M. ¶ 4 (Garcia forced her to strip and dance naked for him); K.D. ¶ 8 (Garcia forced her to strip and dance naked for him) Y.M. ¶ 4  (witnessed Garcia sexually harass and grope three of her friends); S.Y. ¶¶ 24-32 (Garcia subjected her to repeated sexual harassment and voyeurism); T.T. ¶ 5 (witnessed Garcia harassment); Dec. J.B. ¶¶ 4-5 (witnessed Garcia sexually abuse her friend over years); L.T. ¶ 10.

The ongoing investigation has made clear that FCI Dublin staff explicitly target immigrant women for abuse, leveraging the threat of deportation.  *See, e.g.,* Decs. S.F.V. ¶¶ 15-17; H.G. ¶ 13; S.Y. ¶ 1; Z.T.S. ¶ 17; E.M.A. ¶¶ 6-7; B.S. ¶¶ 6, 12; A.S.¶ 2.  Officers told survivors that they "looked in their files" and knew that they were subject to immigration detainers, or threatened to notify immigration authorities if survivors reported their abuse.  *See, e.g.,* Dec. H.G. ¶ 13.  For example, Officer Chavez sexually abused multiple Mexican immigrant women– he even proposed to one woman in front of the entire kitchen staff, then traveled to Mexico to visit her after she was deported.  Decs. E.M.A.¶¶ 6-7; B.S. ¶ 6.  Defendant Officer Smith also bragged about traveling to Mexico to visit a woman he abused at Dublin who was later deported.  Dec. A.S. ¶ 2.  At least a dozen women who were sexually assaulted by FCI Dublin staff have been deported, and dozens more are currently facing deportation.

FCI Dublin staff continue to sexually abuse people in their custody.  *See, e.g.,* Decs R.B. ¶¶ 6, 10; A.R. ¶¶ 5–9.  Officers continue to exchange goods or privileges for sexual favors and threaten people with punishment or hardship if they do not engage in sexual conduct.  *See, e.g.,* Decs. G.M. ¶¶ 5–6, 8–10; M.D. ¶ 21; A.S. ¶ 12.  Widespread harassment continues.  *See, e.g.,* Dec. A.S. ¶¶20–23.  Officers continue to subject incarcerated people to retaliation in the form of

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION

solitary confinement, threats and harassment, and wanton and unwarranted cell searches.  *See, e.g.,* Dec. G.M. ¶¶ 8, 14–16; C.B. ¶¶ 4–7; J.D. ¶¶ 8–11; J.L. ¶ 6.  Investigations and accountability are almost non-existent, and to the extent there ever is an investigation it often comes from agencies outside Defendants' control.  Despite the BOP's awareness of these long-running conditions and problems, the BOP has failed to act; the same conditions that created the cesspool of sexual abuse at Dublin persist today.

**B.     Individuals Incarcerated at FCI Dublin Continue to Face Sexual Assault and Harassment On An Ongoing Basis.**

As recently as August 2023, officers at FCI Dublin have been placed on administrative leave pending investigation of allegations of sexual misconduct.  Dec. A.S. ¶¶ 14, 16, 21; M.R. ¶ 6; A.H.R. ¶ 4; S.L. ¶ 19.  Plaintiffs and other putative class members continue to report ongoing sexual harassment, abuse, and retaliation.  *See, e.g.,* Decs. G.M. ¶¶ 15–16, S.L. ¶¶ 4–7, 9–11, 14, 17–18, J.L. ¶¶ 4–9, C.H. ¶ 5; C.B. ¶¶ 4–7; J.D. ¶¶ 8–11; A.S. ¶¶ 20–23; C.D. ¶¶ 4-5; A.V. ¶¶ 4-7; T.B.M ¶ 5.

Countless other declarants report that they have directly experienced abuse and/or witnessed this pervasive culture.  *See, e.g.* Decs. H.G. ¶¶ 11-19 (Officer Chavez forced her to endure repeated digital penetration through threats of the SHU, immigration consequences, and loss of time credits); F.G.A. ¶¶ 6-15 (Medical Officer Cohen groped her when she sought medical attention); S.F.V. ¶¶ 4-14 (Officer Ramos groped her, told her his explicit sex dreams about her, and discriminated against her based on sexual orientation and noncitizen status); A.S.H. ¶ 4 (Officer Nunley groped her and forced her to perform oral sex, Officer Highouse abused and harassed her); S.Y. ¶¶ 7-32 (Officer Bellhouse and Warden Garcia sexually harassed her); E.A. ¶ 5 (when she refused Officer Ramos' advances, he stated: "Change your attitude, or I will make your life here impossible" ); B.F. ¶ 5 (Officer O'Connor groped her, Officer Caston rubbed his erection on her while saying "you've been in prison for a long time, I bet you'd love to be fucked"); N.A. ¶¶ 4-8 (Officer Ramos harassed, kissed, and assaulted her); S.S. ¶¶ 7-8 (Officer Hendrix watched her in the shower, Captain Valera walked in on her naked as recently as April 2023); M.V.R. ¶ 11-21(Officer Glassier asked her to pay for hair nets with sex, rubbed his penis on her, and pinched

1   her breasts; Officer O'Connor watched her in the shower); A.T. ¶¶ 4-5 (Officer Cooper entered the

2   shower and watched her naked and changing); T.M. ¶ 5 (Officer Cooper watched in shower and

3   while changing); S.M. ¶ 6 ("I once saw Lt. Putnam enter a room where a young Latina woman

4   was in a suicide smock where she was naked underneath. She dropped the smock, so she was

5   naked and put her arms around him to give him a big hug and "fix me, daddy"); J.B. ¶¶ 6-7

6   (Officer Bellhouse forced women to flash him in exchange for hand sanitizer during the COVID-

7   19 pandemic); M.R. ¶ 5; Z.T.S. ¶¶ 4–23; M.D. ¶¶ 5–13; N.S. ¶ 8; B. S. ¶¶ 4-6; C.C. ¶¶ 5-7.

8          Defendant Officer Smith is a paradigmatic example both of the recent harms at the facility

9   and the long-term indifference to staff sexual abuse at FCI Dublin.  Defendant Smith–known

10   throughout the prison as "Dirty Dick Smith"–sexually harassed and assaulted countless

11   incarcerated people at FCI Dublin for years.  *See, e.g.,* Decs. L.T.. ¶¶ 5–7; F.M.C. ¶¶ 5-7; A.S.

12   ¶¶ 5-14; Z.T.S. ¶ 23; J.D. ¶¶ 4–5; C.F.B. ¶¶ 7–8; L.B. ¶¶ 5-6; C.A.H. ¶ 4.  For example, Smith

13   locked F.MC. in a room and refused to let her out until she flashed him.  Dec. F.M.C. ¶ 5.  Once,

14   in late 2015, F.M.C. woke to find Defendant Smith in her room, digitally penetrating her.  *Id*. ¶¶ 6-

15   7.  When Plaintiff G.M. was housed in quarantine in around August 2020, Defendant Smith would

16   regularly watch G.M. and other women shower, and would refuse to give her a towel unless she

17   walked over to him naked.  Dec. G.M. ¶ 9.  Smith also made incarcerated women perform sexual

18   acts in order to receive basic privileges, such as sending mail out, or to receive food or hygiene

19   products.  *Id*. ¶10.  While working the night shift, Defendant Smith would often turn on music and

20   expect women to dance for him, including L.T., in exchange for privileges and time outside of

21   their cells.  Dec. L.T. ¶¶ 5-7.  On one occasion, in around June 2021, Officer Smith instructed L.T.

22   to undress, and he groped her bare breast.  *Id*. ¶ 6.

23          Plaintiff A.S. also endured extensive sexual harassment by Defendant Officer Smith, from

24   October 2020 until August 2021, including up to multiple times a week from November 2020

25   through March 2021 when the facility was under COVID lockdown.  Dec. A.S ¶ 10.  Defendant

26   Officer Smith would frequently ask Plaintiff A.S. to "show him something," and comment on how

27   pretty her breasts looked.  *Id*. ¶ 5.  In exchange, he would trade her a drink from his office.  *Id*.  If

28   she took an extra shower during lockdown, or left her room to get hot water, Defendant Officer

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION

1    Smith would demand to view Plaintiff A.S. naked before he would unlock her room and allow her

2    to return inside.  *Id*. ¶ 11.  Sometimes, Defendant Officer Smith would threaten Plaintiff A.S. with

3    disciplinary actions if she did not show him her body.  *Id*.  On two occasions, Defendant Officer

4    Smith called Plaintiff A.S. into his office, once using the intercom, where he asked to see her

5    breasts while he masturbated himself over his pants.  *Id*. ¶ 13.  At other times, Officer Smith

6    would pull off the shower curtain and watch Plaintiff A.S. and other women shower.  *Id*. ¶¶ 8-9.

7    On one occasion in October 2020, Plaintiff A.S. refused to let Defendant Officer Smith see her

8    breasts, and Defendant Officer Smith went into her cell and searched through her possessions in

9    retaliation, stealing some items and leaving the room in disarray.  *Id*. ¶ 12.  He told Plaintiff A.S.

10   that if she did not do what he said, another officer would "hit" her room again.  *Id*.  "Hit" meant

11   that someone would search her cell without reason and take Plaintiff A.S.'s possessions.  *Id*.

12         Plaintiffs L.T., G.M., and A.S. are just three of the *dozens* of people incarcerated at FCI

13   Dublin who have been sexually abused and relentlessly harassed by Defendant Officer Smith.  *See*

14   *e.g.,* Decs. N.S. ¶ 8 (Smith entered N.S.'s cell with his genitals exposed); C.A.H. ¶ 4 (Smith

15   groped and raped her); B.S. ¶ 5 (Smith sexually harassed her cellmate, and her cellmate reported

16   that "Officer Smith touched her between her legs, and told her that he could do anything for her if

17   she slept with him"); J.H.L. ¶ 6 (Smith told her "I'll give you gloves if you dance for me"); Y.M.

18   ¶ 5 (Smith brought in lingerie and bikinis for incarcerated people to wear for him); A.J.F. ¶ 5-6

19   (Smith watched her while she was naked and on the toilet); M.R.V. ¶ 15 (Smith told a women to

20   show him her breasts or else receive disciplinary charges); T.T. ¶4; J.D. ¶¶ 4–5; A.J.F. ¶¶ 4–8.

21   Countless more witnessed his abuse of others—especially Mexican immigrant women whom he

22   targeted for extended abuse. *See, e.g.,* Decs. N.S. ¶ 6 (Smith particularly targeted "young, petite

23   Mexican women and forced them to expose themselves to shower"); J.L.H ¶¶ 5-8 (witnessed

24   Smith sexually harass multiple women, especially Latina women who could not speak English);

25   Z.T.S ¶ 23; C.F.B. ¶¶7–8; T.T. ¶ 4; A.J.F. ¶ 8.  In May 2023, Officer Smith was criminally

26   indicted for sexual abuse and is awaiting adjudication.

27         Another FCI Dublin official—Defendant Officer Nunley—subjected numerous

28   incarcerated women to sexual abuse for months after Warden Garcia was removed.  *See, e.g.,* Dec.

G.M. ¶ 4.  Plaintiff G.M. worked as a telemarketer for Unicor.  *Id*.  Defendant Officer Nunley

supervised her in this position.  *Id*.  From approximately January 2021 until September 2021,

Defendant Officer Nunley relentlessly sexually harassed G.M in the call center.  He threw notes at

her and told her that he wanted to meet her in the back for sex.  *Id*. ¶ 5.  He would tell her that he

wanted to have sex with her, and that he would write her letters of recommendation and send

money to her kids in exchange.  *Id*. ¶ 7.  While at her workstation, in view of others, he would

come up behind her, pull her hair and rub her shoulders.  *Id*. ¶ 5.  On one occasion, while showing

G.M. pictures of himself at a Raiders game on his computer, Defendant Officer Nunley came up

behind her, rubbed his penis against her backside and attempted to kiss her neck.  *Id*. ¶ 6.  Plaintiff

G.M. reported her abuse to SIS in July 2022, and spoke to the FBI in August 2022.  *Id*. ¶ 14.

Plaintiff G.M. was not the only one abused by Defendant Officer Nunley.  Indeed, he sexually

assaulted and harassed numerous other people.  *See, e.g,*. Decs. T.T. ¶ 6 (T.T.'s friend was

sexually assaulted by Nunley and was sent a letter with his semen on it); C.H. ¶ 5.

Other officers were also engaging in sexual misconduct at this time.  Beginning in

July 2021, Plaintiff J.L's supervisor, Defendant Officer Jones, began to sexually harass her while

she was working in the kitchen.  Dec. J.L. ¶ 4.  At first, he would flirt with her.  As time went on,

his behavior became assaultive.  *Id*.  One day, Jones asked J.L to go into the walk-in fridge to get

him something for his meal.  *Id*.  Once inside, he grabbed J.L., bent her over, and rubbed his penis

against her buttocks over their clothing.  *Id*.  A few days later, he forcibly pulled up her shirt,

sucked on her right breast, and tried to kiss her.  *Id*.  The next day, he took J.L. into the warehouse,

where they entered a smaller room with a door.  *Id*. ¶ 5.  Both of these locations were places where

it was well known there were no security cameras.  *Id*. ¶ 5.  He pulled down her pants, bent her

over, and vaginally raped her without a condom, banging her head against the wall, then ejaculated

on her face and torso.  *Id*.  A few days after her rape, Defendant Officer Poole, who also worked in

the kitchen with Officer Jones, began calling J.L "Becky the Slave."  *Id*.  Plaintiff J.L understood

"Becky" to be slang for a person who performs oral intercourse.  *Id*.

Plaintiff J.L. is not the only woman at FCI Dublin who Defendant Officer Jones raped—or

who other officers working in the kitchen at FCI Dublin sexually abused.  *See e.g.,* Dec. A.H.R.

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION

¶ 5; Z.T.S. ¶¶ 5–10; M.D. ¶¶ 23–28; C.B. ¶ 5; C.F.B. ¶¶ 4–5; R.B. ¶¶ 5–8; V.C. ¶¶ 4-5; J.T. ¶¶ 4-9 (Officer Jones repeatedly tricked her to see pictures of his penis on his smartwatch and asked if she wanted him to "stick it in" and when she said she was only interested in women, he said "You just haven't been with the right man"); M.R.V. ¶¶ 4-9, 13 (Officer O'Connor harassed her, Officer Jones retaliated against her when she refused to flirt with him).  Several other members of the kitchen staff, including Defendant Officer Poole, Officer Kinlaw, Officer O'Connor, and Officer St. Clair remain on administrative leave pending investigation into sexual abuse allegations.  *See, e.g.,.* Dec C.B. ¶ 7; C.F.B. ¶ 11; C.D ¶ 6.  Indeed, combined, these kitchen officers have victimized dozens of additional putative class members at FCI Dublin—raping them, groping them, harassing them, threatening them, and ordering others to assist with their abuse.

K.D., a survivor of Warden Garcia's sexual abuse, was also sexually assaulted by kitchen staff in summer 2021.  Dec. K.D. ¶ 12.  Warden Garcia would instruct K.D. to be undressed for him and touch herself while he came by her room while he walked the rounds of the facility.  *Id.* ¶ 8.  After K.D. reported Warden Garcia's abuse and he was placed on administrative leave, Officer Chavez began to sexually harass K.D., asking her if she would "play for them" as she did with the Warden.  *Id.* ¶ 12.  She refused his advances and his behavior became assaultive.  On multiple occasions beginning in the summer of 2021 and continuing into the fall, Officer Chavez would follow K.D. into the freezer, and grab her buttocks and breasts through her clothes.  *Id.* ¶ 12.

K.D. is just one of the many people who were abused by Officer Chavez.  *See, e.g.,* Dec. H.G. ¶ 11-19 (Chavez repeatedly sexually assaulted her, and threatened to have her deported or placed in the SHU if she reported); B.S. ¶ 6 (Chavez sexually assaulted her friend in the kitchen refrigerator); E.A. ¶ 5 (Chavez forced her to act as a lookout while he had sex with her friend; Chavez also proposed to this friend in front of everyone that worked in the kitchen); Z.T.S. ¶¶ 13–14; M.R.V. ¶¶ 16-21 (Officer Chavez had a sexual relationship with her friend, and transferred women who he thought was going to report their relationship).

Beginning in March 2022, nearly a year after the Warden was placed on administrative leave, Defendant Officer Gacad began to sexually harass Plaintiff S.L. Dec. S.L. ¶ 4.  Defendant

Officer Gacad dropped her notes in her cell during rounds, telling her that she was beautiful, that he was in love with her, and that she was his "future wife." *Id*. ¶ 4.  He brought her gifts, and using a pseudonym, began sending her electronic messages.  After several weeks, their relationship became sexual. *Id*. ¶¶ 4-5.  During a trash run, Defendant Officer Gacad pulled S.L. into the yard office, groped her body, and kissed her. *Id*. ¶ 5.  He groped and kissed her on three additional occasions. *Id*. ¶ 5-7.  After SIS staff confronted Gacad with allegations of abuse, he quit.  In early July 2022, Plaintiff S.L. was shocked to see Defendant Officer Gacad in her parents' home during a video visit. *Id*. ¶ 9.  Defendant Officer Gacad told S.L's parents that he loved her and stayed with them for several weeks. *Id*.  He now works with her mother at the same workplace. *Id*.  Plaintiff S.L. is now terrified of being transferred to a facility near home or returning to her home, where her abuser resides. *Id*. ¶¶ 9, 14.

The same is true of Plaintiff A.H.R. Beginning in July 2022, Defendant Officer Vazquez also began to sexually harass Plaintiff A.H.R.. Dec. A.H.R ¶ 9.  From July until November 2022, Defendant Officer Vazquez would flirt with Plaintiff A.H. R., provide him with contraband, hugged him three times, and on one occasion, kissed him on the lips. *Id*.  Defendant Officer Vazquez took A.H.R. into staff offices and allowed him to listen to the calls that his girlfriend, Plaintiff S.L., was exchanging with Defendant Officer Gacad, in an attempt to interfere with his relationship. *Id*. ¶ 10.  Vazquez was recently placed on administrative leave.

More recently, on January 5, 2023, A.R. was assaulted at Dublin during a short, yearlong sentence. Dec. A.R. ¶ 2.  After being attacked by several other incarcerated people on January 17, 2023, A.R. was placed in the SHU. *Id*. ¶ 4.  While in a holding cell, Officer Caston began to sexually harass A.R.  He told other officers to look at A.R.'s "big-ass titties." *Id*. ¶ 5.  He refused to provide A.R. with feminine hygiene products, causing A.R. to menstruate through their clothing. *Id*. ¶ 6.  Several days later, Officer Caston told A.R. to step out of the shower, and while walking them back to their cell, he grabbed their breast. *Id*. ¶ 7.  After sexually assaulting A.R., Officer Caston continued to harass them, taunting them to write to SIS, banging on their door at night to deprive them of sleep, slapping handcuffs on their wrist, interfering with their outgoing mail, and denying them pencils. *Id*. ¶¶ 9-10.  A.R. reported some of Officer Caston's harassment

1  to SIS at the end of January 2023, but not his physical assault, fearing retaliation.  *Id.* ¶ 11.  Caston

2  has sexually assaulted other declarants.  Dec. B.F. ¶ 5.

3         Defendant Lt. Jones, a female officer, who began working at FCI Dublin in the wake of the

4  sex abuse scandal, was well known for screaming at people incarcerated there, including Plaintiff

5  A.S.—blaming them for the staff walk offs and sexual abuse, and threatening collective

6  punishment.  Decs.  G.M ¶ 16; A.S. ¶ 11, J.H.L ¶ 17; J.D. ¶ 11.  When she first came to Dublin,

7  she told people incarcerated there that she was retaliating against them for the things that were

8  being said about officers there.  She told Plaintiff A.S. and her roommates: "I came here because

9  of everything that's going on, you can go ahead and write me up, it's not gonna go anywhere."

10  Dec. A.S. ¶ 20.  Defendant Jones was placed on administrative leave in March 2023 following

11  sexual misconduct allegations.

12         These examples are but a few of the reported incidents.  The culture of sexual abuse and

13  harassment persists—threatening everyone.  Plaintiffs and other putative class members report

14  continuing to endure degrading sexual comments and invasions of privacy on a regular basis.  *See,*

15  *e.g.,* Decs.  A.S. ¶ 22; J.H.L. ¶ 17 (reporting that retaliation and invasive strip searches have gotten

16  even worse in the last few months); C.H. ¶ 4–5.  For example, Plaintiff R.B. has a medical

17  condition following a surgery that requires her to give herself enemas in her cell while naked from

18  below the waist at least once per day.  Dec. R.B. ¶ 9.  Previously, she was housed alone to protect

19  her privacy, but in November 2022 Case Manager O'Brien and Unit Manager Groover told R.B.

20  that she would be getting a roommate.  *Id.* ¶ 9.  Plaintiff R.B. enema process can take up to two

21  hours, but FCI Dublin only requires her roommate to leave for twenty minutes.  In addition, staff

22  refuse to allow R.B. to cover her window while she administers the enema.  *Id.* ¶ 9.  In

23  March 2023, Officer Cortez went so far as to shine a flashlight on Plaintiff R.B. while she was

24  administering an enema in her room, causing her intense humiliation and fear.  *Id.* ¶ 10.  As a

25  result of this and previous sexual harassment and retaliation she has faced at FCI Dublin, Plaintiff

26  R.B. has been diagnosed with clinical depression, her hair began to fall out, she lost her ability to

27  sleep, and had unexplained weight loss.  *Id.* ¶ 15.

28  / / /

**C.** **Survivors Continue to Face Severe Retaliation for Reporting Abuse, Chilling Further Reporting.**

Sexual abuse at FCI Dublin continues in part because there is a widespread, entrenched practice of severe retaliation against survivors who report staff misconduct.  Many people incarcerated at FCI Dublin are scared to report the abuse they experience out of fear of retaliation.  This retaliation is not subtle.  Survivors who report sexual abuse are verbally threatened, physically assaulted, sent to solitary confinement, given false disciplinary tickets, have their cells tossed and property destroyed, have their mail (including legal mail) interfered with, strip searched, and transferred to other BOP institutions away from their families—and are even targeted for further sexual abuse.  *See, e.g.,* Decs. A.S. ¶ 17-20; G.M. ¶ 15-16,20; A.H.R. ¶ 17; S.L. ¶ 18, F.G.A. ¶ 29; S.F.V. ¶¶ 20-34; S.Y.  ¶¶ 40-44; M.R. ¶¶ 9-11; B.S. ¶¶ 11-14; E.A. ¶ 8; J.H.L ¶¶ 16-19; A.J.F ¶ 7; M.S. ¶¶ 6, 10, 13; N.A. ¶¶ 8,13, 16-18; C.H. ¶¶ 4, 7–10; Z.T.S. ¶¶ 12–32; M.D. ¶¶ 69–73; C.B. ¶¶ 6–7; J.D. ¶ 8;  C.C. ¶ 8, 10; F.M.C. ¶ 11; T.B.M. ¶¶ 6; L.B. ¶8; C.D. ¶¶ 9-10; A.V. ¶¶ 11-13; A.S.H. ¶¶ 5-6; M.M. ¶¶ 7-8; C.A.H. ¶ 8; M.R.V. ¶¶ 4-7, 23-24; J.T.¶¶ 6, 13-14.

For example, Plaintiffs J.M. and G.M. were both placed in the SHU for extended periods as retaliation for reporting their abuse. Decs J.M. ¶¶ 12-13; G.M ¶ 8.  In October 2022, soon after making a legal call regarding abuse at FCI Dublin, Plaintiff J.M. was placed in the SHU for over two weeks, and during that period was prevented from calling her lawyer.  Dec J.M. ¶¶ 12-13.  After filing a PREA complaint about Officers Nunley and Smith and speaking with an FBI officer, Plaintiff G.M. was placed in the SHU for four and a half months on a false ticket.  Dec. G.M ¶ 8.  Since her retaliatory SHU placement, Plaintiff G.M's confidential legal mail has been opened, and her room has been repeatedly searched, as recently as March 2023.  *Id.* ¶ 15.  *See also* N.M. ¶¶ 17-18 (detailing repeatedly being placed in the SHU as retaliation for reporting abuse from March to May 2023); S.S. ¶¶ 8, 11 (being placed in the SHU in April 2023 and had her time extended in the SHU after she reported sexual harassment and she received repeated disciplinary tickets in retaliation).

In addition, beginning in January 2023, Defendants Officer Shirley and Lt. Jones have

been retaliating against Plaintiff G.M. and other incarcerated people for reporting their sexual abuse. Dec. G.M. ¶ 16; J.D. ¶ 11. Officer Shirley asked Plaintiff G.M. if she was "working for them" and going to "report me to the FBI." Dec. G.M. ¶ 16. Lt. Jones has threatened to punish entire units if someone reported an officer. Dec. G.M. ¶ 16; *See also* B.S. ¶ 12 (witnessing Defendant Officer Shirley and Lt. Jones force women to work in the rain without shoes, stating "This is my prison, you'll do what I want"); J.H.L. ¶ 17; M.V.R. ¶ 10 (detailing Lt. Jones screaming at people and conducting searches of people without cause, and specifically in the rain); J.T. ¶ 13 (describing retaliation for reporting from Lt. Jones, detailing that Lt. Jones has entered into the unit and yelled they were "going to learn" if they "wanted to play the write up game.")

Survivors and witnesses of abuse also experienced preemptive retaliation from officers who suspected they would report their abuse. For example, Defendant Officer Jones, who abused Plaintiff J.L. threatened her with physical violence after she told another incarcerated person of the abuse, telling her "to keep her mouth shut," though she had at the time made no official report. Dec. J.L ¶ 6. Others incarcerated at FCI Dublin similarly experienced anticipatory retaliation, such as physical violence and threats of additional violence; sexual assault; verbal abuse and epithets; threats of retaliatory SHU placements; and being fired from a job because an abusive officer suspected a survivor would report him. *See e.g.,* Dec. G.M.; E.S. ¶ 13; N.S. ¶¶ 12-14 (officer told her mother that they would hurt N.S. for reporting and stated to N.S. that "If you have a seizure, I'll let you die"); B.S. ¶ 12 (officer stated "You can report me all you want. I'll be here until the day you get out, you'll never get rid of me"); Y.M. ¶ 5 (Defendant Officer Smith told Y.M. if she reported his relationship with her cellmate, her son who was in federal prison "would get hurt"); C.C. ¶¶ 7-8 (Officer Klinger forcing her to work as lookout and stated "better not fucking say anything, you'll get fucked up"); J.T. ¶ 6-7, (Officer Jones yelled that she was worthless and looked like "raw chicken" when she refused his advances, and was later fired from her kitchen job so that she would not report); S.M. ¶ 7; C.H. ¶¶ 4, 7–10; Z.T.S. ¶¶ 12–28; M.D. ¶¶ 25–28; C.B. ¶¶ 4–6, 11; A.J.F ¶ 10. Others were placed in the SHU in what they understood to be an effort to suppress individual reports of abuse, or a threat of "collective punishment" if they reported officers' abuse. *See* Decs. N.S. ¶ 17; Z.T.S. ¶¶ 20–22; M.D. ¶¶ 27, 30–31; J.T. ¶ 13.

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION

1    A significant number of survivors who witnessed retaliation against others for reporting

2  their abuse were deterred from reporting their own, fearing they would suffer similar retaliation.

3  *See, e.g.,* M.M. ¶ 5; B.S. ¶¶ 11, 13 (saw that people who reported were placed in SHU, had their

4  cells searched, and were consistently yelled at); J.L.H ¶¶ 9, 16 (did not report staff sexual

5  harassment because she knew others who were put in solitary, were transferred or were further

6  harassed); B.F. ¶ 7 (did not report her abuse because she witnessed people be thrown in the SHU

7  and knew Defendant Lt. Putnam does not keep reports confidential); M.R.V. ¶¶ 23-24 (did not

8  report harassment because she saw that people were searched and put in the SHU for a year and a

9  half); C.C. ¶ 12; S.T. ¶ 8; V.C. ¶ 14; R.B. ¶¶ 4, 12–13.  For example, Plaintiff A.S. knew that

10 officers retaliated against individuals who reported abuse by placing them in the SHU or searching

11 their cells and damaging their belongings; because she knew that reporting to SIS "would lead to

12 retaliation," she did not report her abuse.  Dec. A.S. ¶ 18.  Other survivors, like A.R., fearing

13 retaliation, initially reported only some details of their abuse to SIS because they believed that

14 implicated officers would receive the details and engage in retaliation.  A.R. ¶ 11.

15    **D.    Survivors Have No Way To Confidentially Report Abuse.**

16    Even when survivors at FCI Dublin muster the courage to report sexual abuse despite the

17 very real and continuing risk of retaliation, they face immense hurdles to ensuring that their abuse

18 is effectively addressed by BOP.  *See, e.g.,* Dec. A.S. ¶¶ 19–20, 23–24; Z.T.S. ¶¶ 28–29; J.D. ¶ 7;

19 C.F.B. ¶ 10; M.S. ¶ 12 (to report abuse, she had to send messages to the DOJ via computer screens

20 that could be seen by staff and other incarcerated people).  There is no effective way to

21 confidentially report sexual assault and abuse by staff at FCI Dublin.  *See, e.g.,* Dec. A.S. ¶¶ 15,

22 18; Z.T.S. ¶ 25; M.D. ¶¶ 69–71; C.B. ¶ 9; J.D. ¶ 7; C.F.B. ¶ 10.  For example, officers failed to

23 explain the process of reporting sexual abuse and harassment when people arrived at FCI Dublin

24 (or at any point thereafter).  *See* Dec. A.S. ¶ 15; C.H. ¶ 6; Z.T.S. ¶ 24; M.D. ¶ 68; C.B. ¶ 8; J.D.

25 ¶ 6; C.F.B. ¶ 9.  Officers either refused to take allegations seriously or were friends of those

26 against whom allegations were made.  Dec. C.H. ¶ 7 (when discussing sexual misconduct reports,

27 Defendant Lt. Putnam dismissively said, "These are my buds"); J.T. ¶ 11 (she attempted to report

28 sexual harassment from Officer Jones to her work supervisor, but then Officer Jones physically

1  threatened that person so nothing was done); Z.T.S. ¶¶ 29, 31; M.D. ¶ 29.

2       Staff also often open mail, including legal mail, or make legal calls difficult for survivors

3  wishing to report their abuse or get legal help.  *See, e.g.,* Dec. B.S. ¶ 10 (staff do not provide

4  confidential attorney meeting spaces, and when she attempted to make a legal call, her counselor

5  told her, "You trying to report me, huh?"); E.A. ¶ 12 (officers monitor all forms of

6  communication, delay legal visits for months, and retaliate against people after attorney visits);

7  J.H.L. ¶ 15 (it's difficult to get attorney visits and legal mail is often already opened or not

8  delivered at all); C.A.H. ¶ 8. When incarcerated persons at FCI Dublin report abuse to staff, their

9  experiences are often not kept confidential, and are instead shared among staff and even other

10  incarcerated people.  *See* Decs. A.J.F. ¶ 14; A.H.R ¶ 10.; B.S.¶ 13 (an officer told her that two

11  other incarcerated people reported abuse to SIS, even though those reports should be confidential);

12  J.H.L. ¶ 14.  For example, after Plaintiff A.H.R. reported Defendant Officer Gacad's ongoing

13  sexual abuse of plaintiff S.L. in 2022, female officers, including Defendants Lt. Jones and Officer

14  Serrano, taunted and embarrassed her, including telling others "don't speak to S.L.," and reading

15  her mail to others.  Dec. A.H.R. ¶ 10.  Defendant Officer Serrano called S.L.  a "bitch," blaming

16  her for Officer Serrano's boyfriend being walked off for allegations of misconduct.  Dec. S.L.

17  ¶ 17.

18       Even when incarcerated people attempt to report their abuse, officers tasked with

19  investigating those claims either ignore their reports or tell them to keep quiet.  *See, e.g.,* Dec. N.S.

20  ¶ 10 (Defendant Lt. Putnam recognized that N.S. was abused by Defendant Officer Smith but told

21  N.S. that he "should keep quiet, do your time, and don't make problems"); F.G.A. ¶¶ 19-25 (she

22  attempted to report abuse many times, but no one responded to her reports); Y.M. ¶ 7 (she

23  attempted to report her friend's abuse by Defendant Warden Garcia but never receiving a

24  response); E.A. ¶¶ 9, 13 (she reported her harassment by Chavez, but Defendant Lt. Putnam told

25  her not to speak about it with anyone else and no one followed up with her); M.S. ¶¶ 10-14 (she

26  never received a response after filing her abuse six months prior, and that when she informed her

27  attorney about  her abuse, Defendant Lt. Putnam said he read her messages, and interrogated and

28  intimidated her to prevent her from reporting); N.A. ¶¶ 10-12 (the officers she reported to said

PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION

1  things like "out of sight, out of mind" and "don't put me in this predicament with my coworkers"

2  and that Officer Ramos's behavior was "like when a boy in elementary school pulls you hair

3  because he likes you"); S.S. ¶¶ 8, 12 (received no response after reporting sexual harassment);

4  S.M ¶ 5 (reported harassment of one incarcerated person to Officer Lt. Putnam, overheard him tell

5  her to "just give [the guard] some");  J.T. ¶¶ 11-12, 15 (reported her abuse to multiple officers

6  including her work supervisors, SIS, and individuals from BOP regional office but nothing was

7  done); J.H.L. ¶¶ 11-15; A.J.F. ¶ 11; C.H. ¶¶ 4, 7–10; J.D. ¶ 7; C.F.B. ¶ 11; M.R.V. ¶ 25.

8       **E.    Survivors of Sexual Abuse and Retaliation at Dublin Have Experienced and
             Continue to Experience Grievous Physical, Mental, Dignitary, and Economic
9            Injuries**

10        As a result of the BOP's failure to prevent officers' sexual violence, survivors of sexual

11  abuse and retaliation at FCI Dublin suffered grievous harm, with ongoing effects.  The injuries

12  inflicted upon them by abusive officers include physical pain of rape, mental anguish, extreme

13  emotional distress and resulting physical symptoms, economic damages, dignitary harms,

14  profound social isolation, and undue invasion of privacy.  These effects continue and are likely to

15  be exacerbated or recur in the FCI Dublin environment.  *See e.g.* Decs. S.L. ¶¶ 13–14, 18, 20; J.L.

16  ¶¶ 11–12; G.M. ¶¶ 18–20.; J.H.L. ¶ 10 (sexual harassment from Defendant Officer Smith

17  exacerbated childhood trauma and caused panic attacks and insomnia); J.B. ¶ 14 (witnessing

18  sexual abuse at FCI Dublin retraumatized past child sexual abuse trauma); M.M. ¶ 9 (sexual abuse

19  exacerbated childhood sexual trauma); C.A.H ¶¶ 4-5 (sexual assault by Smith caused PTSD,

20  depression and mood swings).

21        The Plaintiffs in this case have all suffered serious injuries following sexual abuse and

22  retaliation at FCI Dublin.  For example, Plaintiff R.B was recently diagnosed with clinical

23  depression, and stress and anxiety has caused her hair to fall out, her to lose weight, and interfered

24  with her ability to sleep.  Dec. R.B. ¶ 20.  Plaintiff A.H.R. was forced to quit his job in Food

25  Service to avoid witnessing former Officer Jones' rapes of incarcerated women.  Dec. A.H.R.

26  ¶¶ 5-6.  Plaintiff S.L. has suffered extreme emotional distress as a result of her abuse and is under

27  such chronic stress that it has interfered with her menstrual cycle.  Dec. S.L  ¶ 20.  Plaintiff J.L.

28  was diagnosed with PTSD as a result of her abuse by Officer Jones.  Dec. J.L  ¶ 11.

**F.    Survivors of Sexual Abuse and Witnesses to Abuse Are Denied Access to Mental Health Care and Medical Care to Address Their Mental and Physical Injuries.**

After suffering grievous mental and physical injury, survivors continue to be denied basic mental health and medical care.  See e.g. Dec. M.D. ¶¶ 46-53.

### 1.    Mental Health Care Is Wholly Inadequate

Survivors of sexual abuse at FCI Dublin suffered and continue to suffer severe emotional distress resulting from their abuse.  For example, many survivors have suffered depression, suicidality, intense anxiety, panic attacks, post-traumatic stress disorder, and paranoia.  *See, e.g.,* Decs. A.J.F. ¶ 15; J.L.H. ¶ 15; V.C. ¶6; C.H. ¶¶ 5, 12; C.F.B. ¶ 12; A.S. ¶ 26; A.T. ¶ 8.  Others have been unable to obtain adequate mental health care, prolonging or worsening their emotional distress.  *See, e.g.,* Decs. J.L.H. ¶ 19; G.M. ¶ 18–19;  T.T. ¶ 14; C.B. ¶ 12; J.D. ¶ 13; C.F.B. ¶ 12; J.B. ¶ 14; M.R.V. ¶ 26.

Survivors are not provided with adequate mental health care at FCI Dublin to address the psychological trauma that officers' abuse and retaliation has caused.  *See, e.g.,* Decs. J.H.L. ¶ 19 (denied treatment for her insomnia and panic attacks); N.A. ¶ 20; S.S. ¶ 13 (involuntarily withdrawn from mood stabilizer medication leading to serious depression and placement on suicide watch) F.G.A. ¶¶ 19–20, 36–37; J.D. ¶ 13; M.M. ¶¶ 11-12 (involuntarily withdrawn from necessary psychotropic medication); C.A.H. ¶¶ 5-7 (involuntarily withdrawn from psychotropic medication, has since become suicidal, and engaged in various acts of self-harm, was punished for harming self with disciplinary reports and pepper spray); Y.M. ¶ 9 (friend who was a survivor of sexual assault did not receive any mental health care for months and recently began cutting herself as a result); E.A. ¶ 14 (suffers anxiety and panic attacks yet she never received any mental health treatment is has been denied prescribed medication); C.H. ¶ 12, M.R. ¶ 12.

Though FCI Dublin recently re-established an agreement with an outside agency, Tri-Valley Haven, to provide mental health services to survivors of sexual abuse at the facility, these services were not available at the facility for over a year.  Dec. C.H. ¶ 12; C.B. ¶ 12.  Even now, there is no direct way for survivors to confidentially contact the outside mental health agency, Tri-Valley Haven, to request mental health services.  Survivors must first put in a request to FCI

Dublin staff, who then contact Tri-Valley Haven on their behalf.  Dec. C.H. ¶ 12; E.A. ¶ 14   Even

once contacted, very few survivors at FCI Dublin have been able to see a counselor from Tri-

Valley Haven in-person or able to speak with them on a confidential line.  Dec. B.S. ¶ 14; N.A.

¶ 20.  Those lucky few are only permitted five, thirty-minute sessions with unlicensed counselors.

Dec. J.L. ¶ 11.  Survivors of abuse at Dublin who BOP subsequently transferred to other facilities

do not have any access to outside specialized support services from Tri-Valley Haven or other

analogous organizations.

### 2.  Survivors Lack Access to Adequate Medical Care.

Survivors have experienced many physical symptoms of emotional distress, including the

loss of a menstrual cycle, partial vision loss, hair loss, weight loss.  *See, e.g.,*  Decs S.L. ¶ 20; R.B.

¶ 15; G.M. ¶ 20.  Some have also experienced direct physical symptoms of their assaults. *See, e.g.,*

Dec. A.S.H. ¶ 8 (contracting potential STI from Officer Nunley assault, unable to receive

necessary treatment).  Accessing medical care to address these concerns is next to impossible due

to both lack of staff and the fact that medical staff have abused individuals in their care, deterring

others from seeking care or going back for additional care.  *See, e.g.,* Dec. T.T. ¶ 15; M.R. ¶¶ 11-

13; S.T. ¶ 11; F.G.A. ¶¶ 28–29; M.D. ¶¶ 46–53; G.M. ¶ 20; A.S.H. ¶8.

Many people incarcerated at FCI Dublin have also been denied access to basic medical

care after reporting sexual abuse.  *See, e.g.,* Dec. M.S. ¶¶ 6, 13 (medical retaliation after reporting

sexual harassment by a medical technician including intentionally delaying care).  For example,

R.B. required an ultrasound of her breast according to a medical doctor, but when the time for her

appointment came, there was no doctor at FCI Dublin anymore and they figured out the order was

accidentally written for the wrong breast.  Dec. R.B. ¶ 16.  FCI could not change the order because

no doctor was available to change it, so they did the ultrasound on the wrong breast.  She is still

waiting on the facility to send her out for an ultrasound on the correct breast.  Dec. R.B. ¶ 17.

Others have also experienced significant lack of treatment or delay in treatment.  *See, e.g.,*

Decs. G.M. ¶¶ 19–20; K.D. ¶¶ 15–16; B.S. ¶ 15 (refused anti-seizure medication for weeks); Y.M.

¶ 9; E.A. ¶ 15 (denied necessary cancer screenings); J.H.L. ¶ 20 (fell down the stairs and injured

her ankle, was told "just wait and it will get better"); A.J.F. ¶ 16 (denied care for cyst for two

years); M.S. ¶¶ 18-19 (refused treatment for skin boils, and COVID test or medication); C.A.H ¶ 9 (involuntarily taken off epilepsy medication leading to regular violent seizures causing further injury); F.G.A. ¶¶ 33–34, 39–45; M.D. ¶¶ 63–66; C.B. ¶12; J.D. ¶ 14; N.A. ¶ 21; T.B.M. ¶ 13; L.B. ¶ 15; A.V. ¶ 14; J.T. ¶ 16.

Additionally, medical officers themselves use their status as medical providers to sexually abuse incarcerated people.  As a result, incarcerated people have no trust in the medical professionals in the facility.  Y.M. ¶ 9.  For example, Medical Officer Cohen groped F.G.A.'s breasts when she was dizzy and unable to walk.  Dec. F.G.A. ¶¶7-16.  When she reported this, she faced medical retaliation and medical staff identified her as the one who "put a PREA on [Cohen]" and to "be careful" with her.  F.G.A. ¶¶29-45.  Medical Officer Cohen abused other declarants, as well.  *See* M.D. ¶¶ 46-53.  Other medical professionals commit similar sexual harassment or abuse.  *See, e.g.,* Dec M.S. ¶¶4-8 (describing repeated sexual harassment by a medical technician, including her smacking M.S.'s buttocks, forcing her to take her pants off when it was unnecessary for the appointment, and refusing to provide her with a blanket to cover up while she was naked)

## III.    ARGUMENT

Courts should grant preliminary injunctions when: plaintiffs are likely to succeed on the merits of their claim; plaintiffs will suffer irreparable harm absent the injunction; the balance of the equities tips in plaintiffs' favor; and an injunction would be in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Plaintiffs meet each of these requirements.

> **A.    Plaintiffs are likely to succeed on their Eighth Amendment claims because FCI Dublin's Policies and Practices Demonstrate Deliberate Indifference to the Serious and Demonstrated Risk of Bodily Harm to those Incarcerated there.**

People in prison establish an Eighth Amendment violation warranting injunctive relief by showing that Defendants' policies and practices concerning sexual abuse and retaliation for reporting such assault—in their totality—constitute deliberate indifference to a substantial risk of suffering serious harm.  Specifically, prison staff sexual abuse of incarcerated people constitutes a form of torture that violates the Eighth Amendment.  *See Bearchild v. Cobban*, 947 F.3d 1130, 1144 (9th Cir. 2020).  Such abusive sexual contact also violates federal criminal law.  *See, e.g.*, 18 U.S.C. §§ 2243, 2244.  In systemic cases, such as here, deliberate indifference can be shown by,

1   inter alia, evidence of "systematic or gross deficiencies in staffing, facilities, equipment, or

2   procedures." *Hernandez v. County of Monterey*, 305 F.R.D. 132, 152-53, 155 n. 138 (N.D. Cal.

3   2015).  Importantly, the key question in systemic cases focuses not on individual circumstances

4   but rather on whether systemic deficiencies "taken as whole" subject people to a "substantial risk

5   of serious harm."  *See Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011).

6          Here, evidence, including numerous assaults, complaints, indictments, and convictions,

7   establish not only that FCI Dublin's practices concerning sexual abuse pose a substantial risk of

8   serious harm to the class but also that Defendants' response to that imminent risk—viewed in its

9   totality and in relation to Defendants' already inadequate policies concerning reporting,

10  grievances, medical care, mental health care, and attorney access—constitutes objective deliberate

11  indifference.

12         First, there is no serious dispute that people within FCI Dublin have been assaulted and

13  harassed at staggering rates.  Even setting aside all of the cases that have gone unreported because

14  of the well-known retaliation at the facility and inadequate means of reporting, there are still

15  dozens of grievances, PREA complaints, FTCA claims concerning assault, and other pieces of

16  civil litigation seeking to address the ongoing crisis at FCI Dublin.  Dkt. 1 ¶ 6 (listing civil cases).

17         The declarations of putative class members bear out the same.  This is to say nothing of the

18  numerous investigations, indictments, prosecutions and convictions of the former Warden,

19  Chaplain, and numerous other officers that have been initiated by the Department of Justice.  Eight

20  former officers have been charged with sexual misconduct for incidents spanning from 2019 into

21  2021 with more charges likely forthcoming.  Dkt 1 ¶ 5 (listing criminal cases).

22         Second, the evidence overwhelmingly shows that—on a systematic scale—Defendants

23  have been objectively and subjectively deliberately indifferent to the safety of those incarcerated

24  at FCI Dublin.  That evidence shows that Defendants knew and know of the sexual assaults and

25  harassment in the facility, have failed to promulgate and implement necessary protocols and

26  practices to protect people they know to vulnerable; have allowed—either explicitly or through

27  intentional neglect—retaliation  against those who might report abuse, and have systematically

28  underprovided for mental health and medical treatment in the wake of such assaults.  *See, e.g.,*

1   Decs R.B. 12–16; K.D. ¶¶ 15–16; C.H. ¶¶ 4, 7–10; S.L. ¶¶ 10–11, 13, 17–18; G.M. ¶¶ 19–20;

2   ¶¶ A.S. 18–25; F.G.A. ¶ 17-26; Z.T.S. ¶¶ 25–32; M.D. ¶¶ 69–73; C.A.H. ¶¶ 5, 8-9.  As detailed in

3   the description above and the attached declarations of numerous current and former residents of

4   FCI Dublin, the facility's response to learning of the pervasive practices concerning sexual abuse

5   have been seriously deficient.  High level officers tasked with investigating complaints of abuse

6   either ignore such allegations or participate in retaliation against complainants, and no substantive

7   safeguards have been established to protect against sexual abuse despite the rampant nature of the

8   problem and explicit requests from plaintiffs and advocacy groups.  Further, Dublin's response to

9   the past and ongoing practices around sexual abuse contradicts important provisions of PREA

10  which were meant as a guide for facilities to prevent and ameliorate sexual violence in carceral

11  facilities.  For example, contrary to PREA Guidelines, Dublin officials sexually assault and harass

12  people incarcerated there, *see, e.g.,* Decs. A.H.R. ¶¶ 5–10; S.L. ¶¶ 4–7; J.L. ¶¶ 4–6; A.S. ¶¶ 4–14,

13  22–23; fail to report such harassment and assault, *see, e.g.*, Dec J.L. ¶¶ 5, 10; M.D. ¶¶ 13–16, 29

14  (detailing that a staff member was transferred after reporting an incident of sexual abuse); J.D. ¶ 7;

15  28 C.F.R. § 115.61(a); and purposely have people undress in front of them, *see* Decs. G.M. ¶ 10 ,

16  A.S. ¶¶ 5–6, 8–11, 13; 28 C.F.R. § 115, 77 Fed. Reg. No. 119 (June 20, 2012).

17       The evidence further establishes that the abuse and the response of Dublin officials are not

18  aberrations or a few bad apples, but rather systemic in nature.  Indeed, the attached declarations

19  paint an alarming picture of Dublin's inadequate responses to staff sexual abuse for years,

20  including failures to investigate reports, failures to discipline officers, and widespread retaliation

21  in the form of placement in restrictive housing, unnecessary searches of rooms and destruction of

22  property, and removal of other privileges.  *See, e.g.,* Decs. C.H. ¶¶ 4, 7–10; G.M. ¶¶ 8, 14–17; A.S

23  ¶¶ 12, 17–23; F.G.A. ¶ 17-26; Z.T.S. ¶¶ 12–32; M.D. ¶¶ 69-73.

24       All of these systems establish a consistent and pervasive environment where no person at

25  FCI Dublin can be safe.  The harms are further exacerbated by the lack of available mental health

26  or medical care and the lack of confidential reporting mechanisms all of which prevent people

27  from seeking or receiving adequate care for their injuries.

28       Together, these conditions clearly establish violations of the Eighth Amendment surpass

the "likelihood of success on the merits" standard needed for this element of a preliminary injunction.

**B.      Plaintiffs Satisfy the Remaining Preliminary Injunction Factors**

        **1.      The Proposed Class Will Suffer Irreparable Harm Absent Immediate Relief.**

Plaintiffs will suffer irreparable harm absent an injunction.  The allegations here are that absent Court intervention, Plaintiffs and the putative class they represent will continue to be assaulted and retaliated against and that these will cause further physical and psychological injuries.  See Dkt. 1 ¶¶ 93-213.  Such harms far outweigh the injuries that courts have found to constitute irreparable harm.  *See, e.g., D.R. v. Antelope Valley Union High Sch. Dist.*, 746 F. Supp. 2d 1132, 1145–46 (C.D. Cal. 2010) (student suffered irreparable harm by missing minutes of education classes per day because of structural barriers) and the Ninth Circuit recognizes that a risk of a more restrictive placement, like solitary confinement, "inflicts cognizable irreparable injury for purposes of a preliminary injunction."  *See, e.g., M.R. v. Dreyfus*, 663 F.3d 1100, 1111 (9th Cir. 2011).

        **2.      The Balance of Hardships Tips Decidedly in Plaintiffs' Favor.**

The balance of equities favors Plaintiffs.  Courts "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (*quoting Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).  The Ninth Circuit has held that the interest in protecting individuals from physical harm outweighs monetary costs to government entities.  *See Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004).  Plaintiffs' interests in preventing sexual assault, its attendant harms, and retaliation is essentially an interest in prevention of physical injury and the preservation of their bodily autonomy.  In sharp contrast to Plaintiffs' hardships, Defendants will merely be required to devise plans, submit reports, and change some internal policies and procedures.  These are all well within their legal and financial capabilities and, although important, should present no significant burden on Defendants.  Moreover, requiring Defendants to change their practices may result in reducing future costs as it

1   may guard against future litigation stemming from individual cases of sexual assault and injury.

2          **3.**        **A Preliminary Injunction is in the Public Interest**

3        "[I]t is always in the public interest to prevent the violation of a party's constitutional

4   rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).  The dangerous conditions

5   described above violate the constitutional rights of Plaintiffs and the class.  Protecting people from

6   sexual abuse is inarguably in the public interest.  Immediately implementing measures to protect

7   the class from further abuse and ensuring that they are free from retaliation inures to the public

8   benefit in two ways.  First, as outlined in PREA, there is an inherent public benefit in stopping

9   sexual assault and increasing the safety of all people. *See generally* 28 C.F.R. § 115, 77 Fed. Reg.

10  No. 119 (June 20, 2012).  Second, eliminating sexual assault will reduce the significant cost the

11  public bears in providing medical and mental health treatment for survivors both inside and

12  outside facilities.  These costs continue beyond the walls of FCI Dublin when people are

13  transferred or released.

14                                **CONCLUSION**

15       For these reasons, Plaintiffs respectfully request that the Court grant the requested

16  preliminary injunction to abate the imminent harm of Defendants current sexual assault and

17  retaliation regime.

18

19  DATED:  August 17, 2023         Respectfully submitted,

20                               RIGHTS BEHIND BARS

21                               CALIFORNIA COLLABORATIVE FOR
                                 IMMIGRANT JUSTICE

22                               ROSEN BIEN GALVAN & GRUNFELD LLP

23                               By:  */s/ Kara J. Janssen*

24                                   Kara J. Janssen

25                               Attorneys for Plaintiffs

26

27

28