1   MICHAEL W. BIEN – 096891          OREN NIMNI*
2   ERNEST GALVAN – 196065             Mass. Bar No. 691821
    KARA J. JANSSEN – 274762           AMARIS MONTES*
    GINGER JACKSON-GLEICH – 324454      Md. Bar No. 2112150205
3   ROSEN BIEN                         D DANGARAN*
    GALVAN & GRUNFELD LLP               Mass. Bar No. 708195
4   101 Mission Street, Sixth Floor    RIGHTS BEHIND BARS
    San Francisco, California  94105-1738   416 Florida Avenue N.W. #26152
5   Telephone:   (415) 433-6830        Washington, D.C.  20001-0506
    Email:       mbien@rbgg.com        Telephone:   (202) 455-4399
6                egalvan@rbgg.com      Email:       oren@rightsbehindbars.org
                 kjanssen@rbgg.com                  amaris@rightsbehindbars.org
7                gjackson-gleich@rbgg.com           d@rightsbehindbars.org

8   SUSAN M. BEATY – 324048            *Pro hac vice applications pending
    CALIFORNIA COLLABORATIVE FOR
9   IMMIGRANT JUSTICE
    1999 Harrison Street, Suite 1800
10  Oakland, California  94612-4700
    Telephone:   (510) 679-3674
11  Email:       susan@ccijustice.org

12  Attorneys for Plaintiffs

13              UNITED STATES DISTRICT COURT

14      NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

15  CALIFORNIA COALITION FOR WOMEN       Case No. 4:23-cv-04155
    PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.;
16  G.M.; A.S.; and L.T., individuals on behalf of   **DECLARATION OF R▮▮▮
    themselves and all others similarly situated,    B▮▮▮  IN SUPPORT OF ▮▮▮▮▮▮**
17                                       **PLAINTIFFS' MOTIONS FOR**
                    Plaintiffs,          **PRELIMINARY INJUNCTION**
18                                       **AND PROVISIONAL CLASS**
          v.                             **CERTIFICATION**
19  UNITED STATES OF AMERICA FEDERAL
    BUREAU OF PRISONS, a governmental entity;
20  BUREAU OF PRISONS DIRECTOR COLETTE
    PETERS, in her official capacity; FCI DUBLIN
21  WARDEN THAHESHA JUSINO, in her official
    capacity; OFFICER BELLHOUSE, in his
22  individual capacity; OFFICER GACAD, in his
    individual capacity; OFFICER JONES, in his
23  individual capacity; LIEUTENANT JONES, in
    her individual capacity; OFFICER LEWIS, in his
24  individual capacity; OFFICER NUNLEY, in his
    individual capacity, OFFICER POOL, in his
25  individual capacity, LIEUTENANT PUTNAM, in
    his individual capacity; OFFICER SERRANO, in
26  his individual capacity; OFFICER SHIRLEY, in
    his individual capacity; OFFICER SMITH, in his
27  individual capacity; and OFFICER VASQUEZ, in
    her individual capacity,
28                  Defendants.

[4256580.1]

I, R██████ B███, declare:

1.     I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently so testify.  I make this declaration in support Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification.

2.     I am incarcerated in federal prison and have been incarcerated at FCI Dublin since 2013.  In the future BOP may transfer me to other BOP facilities but at any point I could be transferred back to FCI Dublin.

3.     FCI Dublin's inadequate systems for preventing, detecting, and responding to sexual abuse have caused actual harm to myself and others incarcerated at FCI Dublin and put myself and other incarcerated persons at substantial risk of imminent serious harm from sexual assault, harassment, and retaliation from staff.

4.     I have witnessed many incidents where leadership and others at FCI Dublin engaged in blatant sexual relationships with incarcerated persons and then tried to cover it up or retaliated against individuals who reported.  For an extensive period, the former Assistant Warden and later Warden, Ray Garcia, engaged in an ongoing sexual relationship with my friend at FCI Dublin, M█████.  M█████ spoke to me often about their physical relationship, I would see him go in her cell, and I observed them in multiple arguments at the facility regarding their relationship.  On one occasion around the Spring of 2020, I was at food service in the kitchen and M█████ started arguing with former Warden Garcia about cards and notes she had sent him.  Former Warden Garcia then came over to me and asked if I "could keep this one calm."  I understood Garcia was referring to M█████ because he nodded at her and that he was asking me to help prevent people from finding out more about their sexual relationship. On another occasion I saw them argue about M█████'s compassionate release denial.  Warden Garcia was yelling "What do you want me to do? You want to go to camp?  You can go to camp.  You want to go to Victorville?  You can go to Victorville." Which appeared to be offering her a transfer to keep her quiet.  I did not report anything at the time because it was the Warden himself and it was obvious to me I would only be retaliated against.  Generally, anyone who reports

sexual abuse is sent to solitary confinement in the SHU.  I saw this happen on multiple occasions and did not want it to happen to me.

5.      Sometime during the winter of 2020 or potentially the spring of 2021, I was on my unit waiting for my friend M████ H███ to finish dressing after showering and come out of her cell.  As I stood there, I saw Officer O'Connor open the door to Ms. H██'s cell and stare at Ms. H███ while Ms. H███ was topless from the waist up and wrapped only in a towel from the waist down.  Officer O'Connor stared at her for approximately a minute.  He saw me watching him and I said, "what the hell are you going to do just stand there and look at her."  In response, Officer O'Connor gave me a dirty look and closed the door to Ms. H███'s room.  From that point on Officer O'Connor would constantly harass me.  Officer O'Connor would make a point of following me anytime he saw me, glaring at me, and generally making me feel uncomfortable.

6.      Around approximately July or August of 2021, I was in the kitchen sitting at the table for dinner and Officer O'Connor came up and stood directly behind me with his genitals pushed up against my shoulder.  I had to lean over to look up at him because he was so close, and I said "you just gotta get it in dontcha" referring to him pressing up against me and harassing me.  Officer O'Connor told me the kitchen was closing and I had to leave right away, or I would get a shot or go to the SHU.  I was confused because I had just sat down to eat, and people were still moving through the line getting food, but Officer O'Connor kept insisting I had to leave.  Throughout this interaction another incarcerated person, S████ W███████, was sitting across from me at the table and became nervous so we got up and left.  As we walked out Officer O'Connor followed us.  I asked him why he was always screwing with me, and he responded, "you understand, don't take it personal."

7.      The next day I was talking in education with Ms. Weischedel regarding Officer O'Connor's actions and how rude and perverted he was acting.  Staff member Ms. Doyle overheard us talking and came in to ask whether we felt safe and said she would make a report to SIS about the fact that I no longer felt comfortable going to the kitchen.  I continued to try to avoid Officer O'Connor where I could, but I did not see any action

taken in response to the report from Ms. Doyle. In March of 2022, I reported the incident involving Officer O'Connor to at least three different members of the Task Force but did not see any actions taken in response to that report either.

8.     Throughout this time Officer O'Connor continued to glare at me in an intimidating manner each time he saw me and made me feel uncomfortable and unsafe. Sometime between April and June 2022, I went to the Kitchen from my Unit to get a tray because I had not been able to go through the line initially with everyone else.  Officer O'Connor was there and yelled at me that they weren't giving out seconds.  When I explained I had not gone through the first time, Assistant Food Service Director Barajas gave me a tray, but I left because I was tired of dealing with Officer O'Connor's harassment.

9.     I also have a medical condition that requires me to give myself enemas on a regular basis, which involves having to get naked from below the waist and insert my fingers into my vagina to press down in order to administer the enema into my rectum.  It is an awkward and uncomfortable process where my private areas are visible as I administer the enema.  Up until recently, I had been told the facility would house me alone to prevent PREA issues and to give me a better quality of life.  In November of 2022 this changed, and I was called into Case Manager O'Bien's office, and he told me I was getting a roommate and told me to talk to my Unit Manager about my concerns.  When I spoke to my Unit Manager Officer Groover, she told me to just tell my roommate to turn their head. I submitted an administrative remedy regarding this issue, but the only action taken in response by the facility was to ask my roommate to leave the room when I administer the enema.  This is difficult because the facility only gives me twenty minutes or so of time to administer the enema before my roommate comes back.  This creates a humiliating and dangerous situation for me due to how exposed I have to be and an awkward and uncomfortable situation for my roommate.  I have had one roommate who couldn't take it and asked to move out, but I was given a new roommate the following day.

10.     I have to administer the enema at least once per day but sometimes more

1   often.  Depending on the severity of my symptoms, the process can take up to two hours.

2   Officers walk by my window while I am giving myself the enema.  While some look away,

3   staffing is constantly changing and sometimes staff stop, stare, and question what I am

4   doing.  Staff will also not allow me to cover my window while I do it.  As recently as

5   March of 2023, Officer Cortez shined a flashlight on me while I was in my room doing it.

6   Each time this happens I feel degraded, humiliated, and as if I am being targeted because

7   of what I have seen and experienced at FCI Dublin.

8         11.    When I arrived at FCI Dublin in 2013 I was shown a short, about 30-minute

9   video on PREA.  Several years later they showed an updated 30-minute video about PREA

10  but that was it.  They just tell you to contact staff if you see misconduct but that is not

11  effective when staff and leadership are the ones engaging in the misconduct.

12        12.    There is no effective way to confidentially report sexual assault and abuse by

13  staff at FCI Dublin.  The only methods I am aware of to report sexual assault and abuse by

14  staff are to tell staff, report to SIS, or to send an email to DOJ using the facilities

15  computers.  While these messages are not supposed to be read by BOP staff the computers

16  in the facility do not have privacy screens and are positioned so that staff and other

17  incarcerated persons can see what I am typing and who I am sending it to.  All other forms

18  of communication, including mail, video calls, phone calls, and email are heavily

19  monitored by BOP staff.  It is also difficult to report to counsel because staff at FCI Dublin

20  limit access to legal calls and if you are placed in the SHU do not allow access to phone

21  calls or emails to be able to tell people what is happening.  For a period, we could also

22  report to a BOP taskforce but that ended months ago.

23        13.    Staff at FCI Dublin prevent people from reporting sexual assault and abuse

24  by staff and retaliate against people who do report.  You become an instant target.  Officers

25  make comments about you, will come to your room, tear up your stuff, put you in the SHU

26  or move you to different units.  I lost a job after engaging with attorneys and being

27  subpoenaed for the former Warden's trial.  I had been working at the Warden's Complex

28  for approximately 4-6 months without any issues.  Suddenly, my counselor told me she

received an email saying I should no longer go to work there without any explanation.  I have never been fired from a position in prison before and believe this was done in retaliation because it happened after I began engaging with attorneys and was subpoenaed to testify at the former Warden's trial.  No one has ever been able to give me a reason for why I was fired.  I had also previously helped in Education, but the facility recently took away my clerk duties saying I did "too much", and staff needed to do those tasks instead.

14.     When incarcerated persons report sexual assault and abuse by staff, FCI Dublin and BOP do not seriously investigate the reports.  Investigations are frequently delayed and overseen by staff who know and work with the offending staff member.  Generally nothing happens as a result.  Individuals who meet with attorneys are targeted for retaliation. After I and others on my unit met with attorneys on June 29, 2023, our Unit Manager Craig called the whole unit to a Town Hall, when we all have to come out to listen to staff.  Unit Manager Craig appeared to be losing it, yelling at myself and others and it made me feel afraid of what he might do.

15.     There is no confidential mental health care available to survivors of sexual abuse and assault at FCI Dublin.  There are very few mental health workers and I do not feel comfortable speaking with them because the psychiatrist is married to Unit Manager Craig.  I need mental health care badly and have been diagnosed with clinical depression and prescribed Effexor due to the stress and depression I experience due to what I have seen in this facility and what I am afraid could happen to me and others in the future. My hair was falling out for a while, I couldn't sleep, and I was losing weight.  I put in a request to speak to providers with Tri-Valley Care but was told the list is full.

16.     There is little to no medical care available to survivors of sexual abuse and assault at FCI Dublin.  Up until recently there was no medical doctor at the facility.   While the facility now has a part-time doctor, until this person came medical care was done through telehealth which does not allow for actual physical examinations.  When the prior doctor was still on site, they wrote an order for me to have an ultrasound on one of my breasts.  By the time my appointment came, there was no doctor at FCI Dublin anymore

[4256580.1]                                                    5

DECLARATION OF R██████ B███ IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

and they figured out the order was accidentally written for the wrong breast.  FCI could not change the order because no doctor was available to change it, so they did the ultrasound on the wrong breast.  I was sent to a telehealth appointment but that doctor obviously could not effectively assess my breast.  I am still waiting on the facility to send me for an ultrasound on the correct breast.  There is also no dental hygienist.  It took me 4 years to get my teeth cleaned.  There are a very limited number of nurse practitioners/non-doctors but sometimes there is only one on-site, so it is extremely hard to get any care.

17.     Staff at FCI Dublin do not wear body-worn cameras in the facility and while the facility is now beginning to install cameras, the cameras that are installed are enclosed in dark colored glass and it is impossible to tell where they are pointing or whether they are working.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1    I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct to the best of my knowledge, and that this declaration

3  is executed at _Dublin_____, _California_ this _29_ day of _June_____, 2023.

4

5

6  

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28