| | |
|---|---|
| MICHAEL W. BIEN – 096891<br>ERNEST GALVAN – 196065<br>KARA J. JANSSEN – 274762<br>GINGER JACKSON-GLEICH – 324454<br>ROSEN BIEN<br>GALVAN & GRUNFELD LLP<br>101 Mission Street, Sixth Floor<br>San Francisco, California  94105-1738<br>Telephone:    (415) 433-6830<br>Email:           mbien@rbgg.com<br>                     egalvan@rbgg.com<br>                     kjanssen@rbgg.com<br>                     gjackson-gleich@rbgg.com | OREN NIMNI*<br>  Mass. Bar No. 691821<br>AMARIS MONTES*<br>  Md. Bar No. 2112150205<br>D DANGARAN*<br>  Mass. Bar No. 708195<br>RIGHTS BEHIND BARS<br>416 Florida Avenue N.W. #26152<br>Washington, D.C.  20001-0506<br>Telephone:    (202) 455-4399<br>Email:           oren@rightsbehindbars.org<br>                     amaris@rightsbehindbars.org<br>                     d@rightsbehindbars.org |
| SUSAN M. BEATY – 324048<br>CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE<br>1999 Harrison Street, Suite 1800<br>Oakland, California  94612-4700<br>Telephone:    (510) 679-3674<br>Email:           susan@ccijustice.org | *Pro hac vice* applications pending |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.; G.M.; A.S.; and L.T., individuals on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>         v.<br><br>UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS, a governmental entity; BUREAU OF PRISONS DIRECTOR COLETTE PETERS, in her official capacity; FCI DUBLIN WARDEN THAHESHA JUSINO, in her official capacity; OFFICER BELLHOUSE, in his individual capacity; OFFICER GACAD, in his individual capacity; OFFICER JONES, in his individual capacity; LIEUTENANT JONES, in her individual capacity; OFFICER LEWIS, in his individual capacity; OFFICER NUNLEY, in his individual capacity, OFFICER POOL, in his individual capacity; LIEUTENANT PUTNAM, in his individual capacity; OFFICER SERRANO, in his individual capacity; OFFICER SHIRLEY, in his individual capacity; OFFICER SMITH, in his individual capacity; and OFFICER VASQUEZ, in her individual capacity,<br><br>                    Defendants. | Case No. 4:23-cv-04155<br><br>**DECLARATION OF N▓▓▓▓ A▓▓▓▓▓ IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION** |

[4317766.6]

I, N█████ A█████, declare:

1. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently so testify.

2. I am incarcerated in federal prison and have been incarcerated at FCI Dublin from October 2019 to present. My release date is currently February 2038. In the future BOP may transfer me to other BOP facilities, but at any point I could be transferred back to FCI Dublin.

3. FCI Dublin's inadequate systems for preventing, detecting, and responding to sexual abuse have caused actual harm to myself and others incarcerated at FCI Dublin and put myself and other incarcerated persons at substantial risk of imminent serious harm from sexual assault, harassment, and retaliation from staff.

4. While at FCI Dublin, I experienced sexual abuse by Officer Ramos. Within a day or two of my arrival at FCI Dublin in late 2019, Officer Ramos began harassing me, humiliating me, and touching me inappropriately. This abuse continued until he was placed on administrative leave in March 2022.

5. At first, he took my stuff, as a way to get my attention. Right after I arrived, Officer Ramos followed me to my unit. It made me uncomfortable, and I didn't know why he was following me, so I hid behind another woman and hid under a table in the unit. Officer Ramos then made me give him the shoes and clothes I was carrying. I never got them back. Later, he started he would come to my room, grab me by my arm, and kiss my ear. He would do this every time he was on my unit, or even when he wasn't on my unit. He would take my MP3 player and plug it in on the unit. He did it in the kitchen, he was open about it. I felt like I was in a whole relationship with him. He would listen to my phone calls, tell me my family wasn't going to wait for me.

6. When I got a girlfriend in spring 2020, Officer Ramos started being aggressive and jealous. He would hit my room three days in a row. If he saw me walking with my friend, he would hit my room. He would threaten me verbally while slamming the tables which made me feel unsafe. Officer Young saw this abuse and told me to hide

in the back room to avoid Officer Ramos, but I knew that the back room was not safe because there were no cameras there and other officers would take incarcerated women there. Officer Ramos would come to my room at night and harass me and acted jealous and possessive of me; he was very controlling even telling me what color I should paint my toenails. On July 4, 2020, Officer Ramos came up next to me in the cafeteria, blew a kiss in my ear, and said, "I hope you drop your tray," which I took to mean he wanted me to bend over in front of him to pick it up. I was so uncomfortable and upset that I purposely dropped my tray, did not pick it up, and walked away.

7. Officer Ramos would also flirt with my roommate, make a mess in our room, and then throw my property away. Officer Ramos would pass by me while he was driving the trash cart and would try to get me to bend over to pick up the trash so he could watch. I felt like I had no choice but to do what he said, or he would have written me up for disobeying staff.

8. Officer Saucedo knew of Officer Ramos's abuse and on a few occasions took my property with Officer Ramos or would knock on the window of my room in a way that made me nervous and uncomfortable. He came into the Kitchen with Officer Saucedo and demanded that I take off my top shirt, or my pants, one time even my shoes. Other incarcerated women, including my roommate, witnessed the abuse.

9. Towards the end of 2020, I was under so much stress from Ramos' abuse that I had to leave my job in kitchen. I didn't go to rec. I became antisocial, not wanting to leave my room. Until this day, it's hard for me to feel comfortable when I leave my room and I do not feel safe at FCI Dublin.

10. I first reported the abuse to my counselor, Ms. Minor. If she was there, Ramos wouldn't mess with me in my unit, but nothing stopped the abuse outside my unit or when Ms. Minor was not around, so for a period of time I stopped leaving my room, even for meals. After an incident with Officer Ramos in the kitchen, I went to see the psychiatrist Dr. Hong, who basically said, "out of sight, out of mind" And refused to help me. I knew my counselor didn't want to lose her job, and she tried to protect me as much

as she could.

11. When moved out of B Unit, Officer Mendoza was working there in C-Unit. Ramos came by again. When I was in C Unit, I asked the officers there, including Officer Mendoza not to let Officer Ramos into the unit, but instead of offering any real help, Officer Mendoza said, "don't put me in this predicament with my coworkers." Officer Mendoza asked me to write down what was happening, but nothing came of that. I was afraid to put anything in writing because I knew Ramos or other officers working with him would see it and retaliate against me.

12. Then, Ms. Minor advised me to report to Warden Garcia, which I did, verbally in front of C-Side, he said Officer Ramos's behavior was like when a boy in elementary school pulls your hair because he likes you. When I didn't laugh or respond positively, Warden Garcia said that as long as Officer Ramos is not penetrating you or doing anything physical, there is nothing the Warden could do. Later, I found out that Warden Garcia was also abusing incarcerated women.

13. After I told Ms. Minor what the Warden said, she advised me to write it to OIG. She was clearly worried about retaliation and said that I shouldn't say that she advised me to do so. I sent OIG that email right after I talked to Garcia in 2020, but I never heard back from OIG after emailing. Officer Ramos' abuse slowed down and stopped briefly after I emailed OIG, but then he became aggressive again and also started hitting my room repeatedly, ultimately leaving me with only what I had on. Since experiencing Officer Ramos's abuse and retaliation, and the continuing retaliation of officers he was close to, I stopped coming out of my room as much as I can avoid it. I still feel afraid now I will face further retaliation for meeting with counsel.

14. When I arrived at FCI Dublin in 2019 I was not provided adequate training and information about how to respond to sexual abuse. I was provided barely any information about PREA or how to report sexual assault. When I arrived, I did not know who to call to report my abuse, and I didn't know what OIG was or that you could contact them. Once someone told me about the OIG email, I sent in a message about Officer

Ramos, but I never received a response. Now there are numbers posted on the phone, supposedly for us to call to report abuse, but I know of other incarcerated people at FCI Dublin who have talked on the phone about their abuse just to their families and have been sent to the SHU as retaliation for reporting.

15. There is no effective way to confidentially report sexual assault and abuse by staff at FCI Dublin. I emailed OIG when my counselor suggested it, but I never heard anything back and I believe Officer Ramos knew I had emailed OIG to report his abuse. I know of other incarcerated women who have been afraid to report abuse to anyone at BOP or FCI Dublin and have told their families, and then been retaliated against with SHU placements. I do not believe that what I would tell psych would be kept confidential because the officers all talk to each other and that makes me uncomfortable sharing with mental health staff.

16. Staff at FCI Dublin prevent people from reporting sexual assault and abuse by staff and retaliate against people who do report. Even though Officer Ramos is gone, as is Officer Saucedo, with whom he collaborated in harassing me and others, Officer Mengra, who was close with them, has recently singled me out for retaliation. For example, I was recently walking back to my room after work with other incarcerated women, and Officer Mengra told me to sweep up goose poop. Even though that is not my job, and I was the only one she told to do it, I did what she said because I thought I would get a disciplinary write-up if I didn't. It felt like retaliation for reporting Officer Ramos's abuse because I know Officer Mengra was close with him. I reported this incident to Captain Valero, who told me there was no problem with it.

17. I have also recently been verbally harassed by Lt. Ramirez, a female officer. After I was placed in the SHU the first time this spring in March 2023, within the month after I was let out, Lt. Ramirez repeatedly singled me out in front of other officers and incarcerated people. She told me to get my clothing altered, telling me my FCI-Dublin-issued shirt is too light, and yelled across the compound that she's going to fix my wardrobe. Soon after, Lt. Ramirez called me in for a urinalysis. It was my first, and I am

not on any medications or drugs, but my test was dirty; the CDHO said it was 10 mg suboxone, and I did not know how that could have happened. I was put in the SHU again in May because of the positive test and had another urinalysis in the SHU that came out clean, so I believe Lt. Ramirez tampered with my test so that I would be punished. SIS Lt. Putnum tried to talk to me when I was in the SHU but I do not trust him because he has been here the whole time while BOP staff has been abusing incarcerated women.

18. In March 2023, I was placed in the SHU for having green clothing, which is issued by FCI Dublin and was never a punishable offense before. They called having the green clothing an escape attempt and a dangerous instrument. I know that only one other incarcerated woman and myself were punished with a SHU placement for this, and I feel targeted because I feel that staff know that I reported Ramos. I reported this to SIS Lt. Putnam and reported to the regional office, but nothing has happened yet. Because of that placement, I lost 41 good days and six months of privileges including being able to see my family; I lost the same with my other SHU placement, so I have now lost 82 good days and a full year of privileges. They said they are investigating it but I haven't received my good days back yet. I was already having trouble getting to see my family, as my visitation forms were never approved, and now I am very worried that I will have to wait another year because of the ongoing retaliation.

19. When incarcerated persons report sexual assault and abuse by staff, FCI Dublin and BOP do not seriously investigate the reports. Investigations are frequently delayed and overseen by staff who know and work with the offending staff member. Generally nothing happens as a result. When I reported Officer Ramos's abuse to Officer Mendoza in C Unit and asked her to keep Officer Ramos from coming into the unit to harass me, he said not to put her in a predicament with her coworkers. My understanding from that exchange was that the officer cared more about the consequences helping me would have for her than about my safety. Reporting to Warden Garcia and OIG resulted in nothing except that soon after, Officer Ramos's behavior toward me became more aggressive.

20.     I have not been able to access confidential mental health care at FCI Dublin. I have anxiety when they come, I feel like they're coming for me, I can't come out of my room. I'm very antisocial. I just don't want to talk to people. I can't go out to rec. I feel like it's going to be something that's targeted. I don't feel normal. I already have enough with my time. Lt. Putnam recently sent me to the psych unit. But I know that the medical officers and abusive officers all work together, and I know that I can't trust them. The psych unit said that they'd send someone from outside FCI Dublin to provide mental health care for me, Tri Valley Care, but that has not happened. I have not been told anything else about Tri Valley Care or how to access it.

21.     There is little to no medical care available to survivors of sexual abuse and assault at FCI Dublin. There is currently no medical doctor at the facility. I was sent to the medical unit for a PREA check after I talked to Putnam after I got out of the SHU, that's when he said they'd send me to psychology, but I did not feel safe to tell them anything about what I have experienced. I have had trouble getting adequate medical care unrelated to abuse, so I avoid going to medical. For example, I recently hit my leg on a locker and got a huge bruise that made my leg purple and swollen, and I could not walk. When I went to medical in September, they just told me to put ice on it, and the Mr. Williams argued with me and thought I was making up my symptoms. I have scoliosis, but FCI Dublin only gave me an extra pillow to put between my legs, which is not really helpful. Before being incarcerated at FCI Dublin, I would go to therapy for scoliosis, but I have been unable to get that care here.

22.     The camera system at FCI Dublin is inadequate. There are some cameras installed in fixed locations in the facility, but it is well known that there are no cameras in many areas. There were no cameras until now, or there were only cameras that did not work. The cameras were only recently put up, and the officers always know which cameras did and didn't work. I know that this is how officers, including Warden Garcia, could abuse people for so long so I do not feel safe even with the new cameras. I just want to be left alone. That's all I ask. I want to do my time and be left alone.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at Dublin GA, this 8 day of Agust, 2023.

[Signature]
N█████ A█████