| | |
|---|---|
| MICHAEL W. BIEN – 096891<br>ERNEST GALVAN – 196065<br>KARA J. JANSSEN – 274762<br>GINGER JACKSON-GLEICH – 324454<br>ROSEN BIEN<br>GALVAN & GRUNFELD LLP<br>101 Mission Street, Sixth Floor<br>San Francisco, California  94105-1738<br>Telephone:  (415) 433-6830<br>Email:    mbien@rbgg.com<br>          egalvan@rbgg.com<br>          kjanssen@rbgg.com<br>          gjackson-gleich@rbgg.com | OREN NIMNI*<br> Mass. Bar No. 691821<br>AMARIS MONTES*<br> Md. Bar No. 2112150205<br>D DANGARAN*<br> Mass. Bar No. 708195<br>RIGHTS BEHIND BARS<br>416 Florida Avenue N.W. #26152<br>Washington, D.C.  20001-0506<br>Telephone:  (202) 455-4399<br>Email:   oren@rightsbehindbars.org<br>         amaris@rightsbehindbars.org<br>         d@rightsbehindbars.org |
| SUSAN M. BEATY – 324048<br>CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE<br>1999 Harrison Street, Suite 1800<br>Oakland, California  94612-4700<br>Telephone:  (510) 679-3674<br>Email:    susan@ccijustice.org | *Pro hac vice* applications pending |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.; G.M.; A.S.; and L.T., individuals on behalf of themselves and all others similarly situated,<br><br>             Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS, a governmental entity; BUREAU OF PRISONS DIRECTOR COLETTE PETERS, in her official capacity; FCI DUBLIN WARDEN THAHESHA JUSINO, in her official capacity; OFFICER BELLHOUSE, in his individual capacity; OFFICER GACAD, in his individual capacity; OFFICER JONES, in his individual capacity; LIEUTENANT JONES, in her individual capacity; OFFICER LEWIS, in his individual capacity; OFFICER NUNLEY, in his individual capacity, OFFICER POOL, in his individual capacity, LIEUTENANT PUTNAM, in his individual capacity; OFFICER SERRANO, in his individual capacity; OFFICER SHIRLEY, in his individual capacity; OFFICER SMITH, in his individual capacity; and OFFICER VASQUEZ, in her individual capacity,<br><br>             Defendants. | Case No. 4:23-cv-04155<br><br>**DECLARATION OF J▓▓▓ B▓▓▓ IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION** |

[4339213.1]

DECLARATION OF J▓▓▓ B▓▓▓ IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

I, J█████ B████, declare:

1. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently so testify. I make this declaration in support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification.

2. I was incarcerated in federal prison and was incarcerated at FCI Dublin from 2016 to February 2023.

3. FCI Dublin's inadequate systems for preventing, detecting, and responding to sexual abuse have caused actual harm to myself and others incarcerated at FCI Dublin and put myself and other incarcerated persons at substantial risk of serious harm from sexual assault, harassment, and retaliation from staff.

4. I was the roommate of M█████ H███, one of Ray Garcia's "girlfriends," for about five years. During 2019 and 2020, Mr. Garcia began to have a "relationship" with Ms. H███. This relationship deeply affected me. I would have to leave my room so he could come in. I witnessed Mr. Garcia grab Ms. H███ in a sexual manner. I also witnessed Ms. H███ passing letters to him in a "cop out." At other times, I saw Mr. Garcia grab Ms. H███ in the warehouse; he was able to touch her there because there are no cameras in that area of the facility.

5. I watched Ms. H███'s mental health deteriorate due to her close relationship with Mr. Garcia; she had been incarcerated for many years before the relationship started, and he promised her a family with him after she got out; she was very vulnerable and her whole heart was set on that idea. Eventually, she noticed that he was also talking to other women and when she realized that he was not with her only, things started to deteriorate for her in terms of her wellbeing and mental health.

6. I used to work in visiting, and we would have to go and get supplies from Safety. Sometimes while I was in Safety, before Garcia got walked off, I saw Officer Klinger spending time with other incarcerated people in ways that were inappropriate. For example, A█████ R████ L███ was working in Safety and people knew that she was romantically involved with Klinger. I would notice her sitting on his lap when I went to

safety, and at one point, I believe it was when I was in one of the warehouses, I saw her engaged in oral sex with him.

7. During Covid, Officer Bellhouse used to knock on our window. I knew that he was soliciting women to flash him in exchange for hand sanitizer. When he knocked on our window, I did not want to engage with him and just ignored him. I hated the feeling of him going around like that.

8. When I arrived at FCI Dublin in 2016, I do not believe we were shown a video about PREA. I think they did some type of orientation, but they did not give us any meaningful resources or tell people how to get help, and they never talked about that stuff again after orientation. I remember that Warden Garcia started promoting PREA-protection stuff likely crazy just before he got walked off; I thought that was crazy given what he was doing with women at FCI Dublin.

9. As far as I know, staff at FCI Dublin have never worn body-worn cameras in the facility and despite ongoing sexual abuse and assault at the facility staff still do not use body-worn cameras. There are some cameras installed in fixed locations in the facility, but it is well known that there are no cameras in certain areas, such as the warehouse or the freezers in the kitchens or in some of the rec areas. I have been in those areas myself and saw there were no cameras there. The cameras that are installed are enclosed in dark colored glass and it is impossible to tell where they are pointing or whether they are working. Sometimes I would hear from other people that officers had told them that certain cameras were not working.

10. There is no effective way to confidentially report sexual assault and abuse by staff at FCI Dublin. I did report what I saw between Mr. Garcia and Ms. H▇ to another correctional officer. The officer I told knew about my subpoena for Mr. Garcia's criminal trial, and told me to not say anything. Other incarcerated people also told me to not say anything. I had to move out of the unit I was in because both staff and other incarcerated people were harassing me in regard to the subpoena. I was being ridiculed and having papers and trash thrown at me.

11. Initially, I wanted to go to a halfway house upon release, but I declined to go due to fears of more retaliation by the people running the facility; my experience at Dublin made me think that the next facility would be just as corrupt, and I would not be safe there. My faith that a correctional facility could keep me safe was shattered by FCI Dublin. I had no faith in any of that, so I decided to stick with what I knew.

12. I spoke to the FBI/USAO about four times between late 2021 and early 2022. I believe it was all with respect to the Garcia trial, and I believe I was mostly asked about what was happening in the kitchen. Initially, I did not want to talk to anyone because people were already giving me a hard time. Once officers knew that someone was one of the ones being called up to Lieutenant Putnam's office, they would search your room and give you a really hard time, or tell their inmate friends to treat you badly. In general, I found that staff at FCI Dublin prevent people from reporting sexual assault and abuse by staff and retaliate against people who do report.

13. When incarcerated persons report sexual assault and abuse by staff, FCI Dublin and BOP do not seriously investigate the reports. Investigations are frequently delayed and overseen by staff who know and work with the offending staff member. Generally nothing happens as a result. In my experience, you would report stuff and you would never hear anything back about it. Eventually, Lieutenant Putnam did follow up with me about the report I made, but it took a very long time.

14. There is no confidential mental health care available to survivors of sexual abuse and assault at FCI Dublin. Toward the end of my time at FCI Dublin, I was able to see a mental health clinician. I was sexually abused as a young child and this experience has been incredibly retraumatizing. At the end of last year (or maybe the beginning of this year), when I was still at FCI Dublin, I had something like a panic attack or mild heart attack from all of the stress. I felt a sharp pain in my chest while I was in the lobby (which is kind of like the dayroom). I have had these sharp pains before, but they usually go away. This time, I went to the hot water room and then passed out. I woke up flopping with my mouth open. Above me there were a bunch of correctional officers grilling me

about why I fell down and if I had gotten into a fight.  The officers then took me to the Lieutenant's Office, not to medical.  All I wanted to do was lie down.  One of the officers asked if he should "strip me down." Then the officers and the Lieutenant discussed looking at the cameras and confirming my age, which I did not understand.  Eventually, I spoke to a nurse there, but I believe it was several weeks before I was seen by the medical staff. It used to take forever to be seen by medical at Dublin; your symptoms would resolve before you could ever be seen.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Case 3:23-cv-04155-YGR   Document 10-40   Filed 08/17/23   Page 6 of 6

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at Dublin, California this 14th day of August, 2023.

