MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
KARA J. JANSSEN – 274762
GINGER JACKSON-GLEICH – 324454
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Email:        mbien@rbgg.com
              egalvan@rbgg.com
              kjanssen@rbgg.com
              gjackson-gleich@rbgg.com

SUSAN M. BEATY – 324048
CALIFORNIA COLLABORATIVE FOR
IMMIGRANT JUSTICE
1999 Harrison Street, Suite 1800
Oakland, California  94612-4700
Telephone:    (510) 679-3674
Email:        susan@ccijustice.org

OREN NIMNI*
  Mass. Bar No. 691821
AMARIS MONTES*
  Md. Bar No. 2112150205
D DANGARAN*
  Mass. Bar No. 708195
RIGHTS BEHIND BARS
416 Florida Avenue N.W. #26152
Washington, D.C.  20001-0506
Telephone:    (202) 455-4399
Email:        oren@rightsbehindbars.org
              amaris@rightsbehindbars.org
              d@rightsbehindbars.org

*Pro hac vice applications pending

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.; G.M.; A.S.; and L.T., individuals on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS, a governmental entity; BUREAU OF PRISONS DIRECTOR COLETTE PETERS, in her official capacity; FCI DUBLIN WARDEN THAHESHA JUSINO, in her official capacity; OFFICER BELLHOUSE, in his individual capacity; OFFICER GACAD, in his individual capacity; OFFICER JONES, in his individual capacity; LIEUTENANT JONES, in her individual capacity; OFFICER LEWIS, in his individual capacity; OFFICER NUNLEY, in his individual capacity; OFFICER POOL, in his individual capacity; LIEUTENANT PUTNAM, in his individual capacity; OFFICER SERRANO, in his individual capacity; OFFICER SHIRLEY, in his individual capacity; OFFICER SMITH, in his individual capacity; and OFFICER VASQUEZ, in her individual capacity, <br><br> Defendants. | Case No. 4:23-cv-04155 <br><br> **DECLARATION OF █████ M█████ C███████ IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION** |

I, F███ M███ C███, declare:

1.      I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently so testify.  I make this declaration in support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification.

2.      I was incarcerated at FCI Dublin from December 2014 to March 2023.  I am currently on supervision at a halfway house.

3.      FCI Dublin's inadequate systems for preventing, detecting, and responding to sexual abuse caused actual harm to myself and others incarcerated at FCI Dublin and put myself and other incarcerated persons at substantial risk of imminent serious harm from sexual assault, harassment, and retaliation from staff.

4.      Officer Smith began harassing me sexually when he started working at FCI Dublin in early 2016 or late 2015.  Initially Officer Smith would look at me in a way I felt was flirtatious.  Then, he began to proposition me.  While I was housed in the E Unit, I asked a question about the visiting room.  In response, he asked "What are you going to do for me?  Show me something."

5.      Once, he locked me in the hot water room just before count.  Officer Smith refused to unlock it until I flashed him.  This was a deeply humiliating experience.  Officer Smith would also follow me to the shower.  He would circle back and forth.  If I was going into the shower, he would follow me, and I would go down the hall and I would go downstairs to hide in someone's room, and once he passed, I would turn back and find a shower so he would not know where I was at.  I always wondered if the cameras worked.  If they did, nobody cared about what they were seeing.  I would literally run from my room, down the stairs, and wait for him to pass just so I could shower without being watched.

6.      On another occasion in Spring 2016, Officer Smith entered my room while I was asleep.  I awoke to him touching me in a private area, my vagina area.  I was the only one in my room, which is the reason I think he came in because he saw that there was no one else there.

7.      I woke up and could feel Officer Smith's hand under my covers touching me. He was digitally penetrating me.  I grabbed his wrist and hand to get him to stop touching me.  He smirked as I did this.  Immediately after, he stopped touching me, got up, and walked out of the room.  After, I got up, showered, and went to work out.  Upon my return to the Unit, he was sitting in the officer's station.  He put his hands up to his nose and mouth area to sniff and lick his fingers.  The sight devastated me.  It becomes a thing where you just feel like it's either okay or it's your fault.

8.      I think he knew he had gone too far.  He was eventually demoted, but I am unsure if it was related to his harassment of me.  However, even after he was demoted, he would still work on the unit and constantly did overtime.  I would watch him run towards the showers to see who was at the showers.  I always watched him and would peek around corners just to see if he was still stalking the new, young girls.  He seemed to target them most of all.  Some other incarcerated people would say "he would help me."  Officer Smith participated in trading favors.  If someone did what he wanted, he would make sure their room was moved, that you got visitation, and other privileges.

9.      When I wanted to shower, I would take the long way around and hide at various points so that he could not follow me.  It never worked.  He would always find me. I was afraid to wash my hair and I'd still have to covertly check that he was not hiding around my room waiting for me to get back.

10.     When I arrived at FCI Dublin in December 2014 they said PREA was important to them and they try to prevent issues, but they focused on assaults by incarcerated people, not staff, and I felt like they would just cover for each other.  If you told one staff person about something they would tell other staff, you go to the SHU and get transferred.  It felt like you were being punished for being a victim and for reporting it. Officers would constantly retaliate and harass you.  I felt like I had to smile and go with it and keep your head down.  Because if you didn't, then it would get worse.

11.     Staff at FCI Dublin have never worn body-worn cameras in the facility and despite ongoing sexual abuse and assault at the facility staff still do not use body-worn

2

DECLARATION OF █████ M████ C████ IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

cameras.  There are some cameras installed in fixed locations in the facility, but it is well known that there are no cameras in the lobby, the TV rooms.  A lot of the time, to my understanding, they did not work, or if they worked, the tape would already be cleared out.  This is a prison; they should be responsible and more proactive.  I have been in the lobby and TV rooms myself and saw there were no cameras there.  Most of the time, the harassment happened in areas with cameras, but no one did anything.  We assumed the cameras worked, but we were not sure.  The only incident that happened in an area with no cameras was the hot water room incident in the lobby.  The cameras that are installed are enclosed in dark colored glass and it is impossible to tell where they are pointing or whether they are working.

12.     Reporting sexual assault and abuse at FCI Dublin was pointless.  You would get placed in the SHU and transferred or be interviewed and nothing would be done about it.  It was the culture to just go with it.

13.     Staff at FCI Dublin prevent people from reporting sexual assault and abuse by staff and retaliate against people who do report.  I was scared to report, as all the officers stick together.  I just wanted to keep my head down and do my time.  I did not want to make any enemies.  The sexual harassment at Dublin was well known.  It was the culture there.  Officer Klinger would always try to get me to the officer's station in the compound at night.  He would make lewd comments at me.  If I ran out of something that I got at the Officer's Station, like trash bags, I would rather run out than go see Klinger, or really any officer.  I did not want to be around them.  All of these small things make the bigger issue really come to life.  It was every department.  It was the way of life.  All of them against us.  If you reported anything, they would say they would "look into it," but nothing ever happened.  They have each other's backs.

14.     When incarcerated persons report sexual assault and abuse by staff, FCI Dublin and BOP do not seriously investigate the reports.  Investigations are frequently delayed and overseen by staff who know and work with the offending staff member.  Generally nothing happens as a result.  I waited over a few years to report to psychology.  I

DECLARATION OF F███ M███ C████ IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

went through something else in my life that was even more traumatic, and I saw that the other girls speaking up were being listened to.  I wanted a clear conscience, I wanted it out, I wanted my story to be told and story to be heard.  I saw people were starting to be believed and things were being done.  So that's why I ended up speaking out.  I worked in the Captain's complex for many years.  All the officers and lieutenants are there.  I so badly wanted to say something, but I kept my head down.  The abuse I suffered by Officer Smith affects me to this day.  I felt disgusted and disturbed by his actions, it made everything harder than it had to be and I did not deserve to be treated like that.

15.     When I was there, there was no confidential mental health care available to survivors of sexual abuse and assault at FCI Dublin.  I heard about TriValley care when they started coming in early 2023, but I did not know about it in 2015.  We had never heard of it then.  I heard about them about a month before my transfer in March 2023, it was not until attorneys got involved that we heard about them.  It seemed that the attorneys brought out TriValley care with them.  I put a staff request to psychology, but I was transferred before I heard anything.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

DECLARATION OF F███ M██ C███████ IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1  I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct to the best of my knowledge, and that this declaration

3  is executed at Dublin, California this ⊥⊥ day of _August_, 2023.