| | |
|---|---|
| MICHAEL W. BIEN – 096891<br>ERNEST GALVAN – 196065<br>KARA J. JANSSEN – 274762<br>GINGER JACKSON-GLEICH – 324454<br>ROSEN BIEN<br>GALVAN & GRUNFELD LLP<br>101 Mission Street, Sixth Floor<br>San Francisco, California  94105-1738<br>Telephone:   (415) 433-6830<br>Email:         mbien@rbgg.com<br>                    egalvan@rbgg.com<br>                    kjanssen@rbgg.com<br>                    gjackson-gleich@rbgg.com | OREN NIMNI*<br> Mass. Bar No. 691821<br>AMARIS MONTES*<br> Md. Bar No. 2112150205<br>D DANGARAN*<br> Mass. Bar No. 708195<br>RIGHTS BEHIND BARS<br>416 Florida Avenue N.W. #26152<br>Washington, D.C.  20001-0506<br>Telephone:   (202) 455-4399<br>Email:         oren@rightsbehindbars.org<br>                    amaris@rightsbehindbars.org<br>                    d@rightsbehindbars.org |
| SUSAN M. BEATY – 324048<br>CALIFORNIA COLLABORATIVE FOR<br>IMMIGRANT JUSTICE<br>1999 Harrison Street, Suite 1800<br>Oakland, California  94612-4700<br>Telephone:   (510) 679-3674<br>Email:         susan@ccijustice.org | *Pro hac vice* applications pending |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.; G.M.; A.S.; and L.T., individuals on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS, a governmental entity; BUREAU OF PRISONS DIRECTOR COLETTE PETERS, in her official capacity; FCI DUBLIN WARDEN THAHESHA JUSINO, in her official capacity; OFFICER BELLHOUSE, in his individual capacity; OFFICER GACAD, in his individual capacity; OFFICER JONES, in his individual capacity; LIEUTENANT JONES, in her individual capacity; OFFICER LEWIS, in his individual capacity; OFFICER NUNLEY, in his individual capacity, OFFICER POOL, in his individual capacity; LIEUTENANT PUTNAM, in his individual capacity; OFFICER SERRANO, in his individual capacity; OFFICER SHIRLEY, in his individual capacity; OFFICER SMITH, in his individual capacity; and OFFICER VASQUEZ, in her individual capacity,<br><br>        Defendants. | Case No. 4:23-cv-04155<br><br>**DECLARATION OF S█████ F█████ V█████ IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION** |

[4334017.1]

DECLARATION OF S███ F███ V████ IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

I, S███ F███ V█████, declare:

1. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently so testify. I make this declaration in support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification.

2. I was incarcerated at FCI Dublin from November 2017 until November 2021. I was incarcerated by the Bureau of Prisons (BOP) at Federal Detention Center (FDC), SeaTac from November 2021 until October 2022. I was released to my family in October 2022 and now live in Utah.

3. FCI Dublin's inadequate systems for preventing, detecting, and responding to sexual abuse have caused actual harm to myself and others incarcerated at FCI Dublin and put myself and other incarcerated persons at substantial risk of serious harm from sexual assault, harassment, and retaliation from staff.

4. While at FCI Dublin, I experienced sexual abuse and sexual harassment by Officer Nicholas Theodore Ramos. Officer Ramos groped me three times and once attempted to grab my breasts.

5. The first time Officer Ramos groped me was at the end of 2019. Officer Ramos groped me while I was cleaning the bathroom in his office, as required by my prison job. I and another woman were assigned to clean Officer Ramos's bathroom on a regular basis. As I was standing cleaning the bathroom in the office and the other woman was in another area of the office cleaning, Officer Ramos came up behind me and rubbed his genitals against my back and buttocks from side to side.

6. He did the same thing to me again in the beginning of 2020.

7. Both times he did this, he laughed, walked away, and sat right back in his chair at his desk as if nothing happened.

8. Each time this happened, I felt humiliated and violated.

9. Later in 2020, Ramos and I were returning from throwing away the trash in the back of the prison yard, which was a part of my prison job. As we were walking, Officer Ramos got very close to me and rubbed his genitals against my back and buttocks

for a prolonged period. As he did this, he also asked me, "Are your boobs real? They are nice."

10. I froze with fear, got extremely anxious, and did not respond because I was extremely uncomfortable. I began to dissociate. I felt humiliated, embarrassed and degraded.

11. Finally, in 2020 Officer Ramos attempted to assault me by grabbing my breasts. I was attempting to clean Officer Ramos's bathroom. I walked from the bathroom I was cleaning to another part of his office and passed by Officer Ramos, who was sitting in the chair at his desk. As I walked by, he reached his hand out to grab my breasts. I turned my body away so that he was not able to fully grasp them. Again, Ramos laughed like it was a joke.

12. I panicked and felt my heart race. My face got red from embarrassment and anxiety, but I felt powerless to say or do anything because of the culture of intimidation at FCI Dublin and the retaliation that would likely result.

13. On a number of occasions, Officer Ramos told me that he had explicit sexual dreams about me. He would tell me about the dreams and described us doing graphic sexual acts or he would taunt me by saying he had "another one of those good dreams" about me, meaning another explicit sexual fantasy. One was especially graphic. Officer Ramos described to me in detail a dream in which he went to Las Vegas with me. He described that he dreamed he had me bent over the bed in a hotel room in Las Vegas, where he was penetrating me from behind. He said, "it felt so real and felt *so* good."

14. I identify as Lesbian or Bisexual. When Officer Ramos discovered that I was interested in women, he began calling me derogatory terms, including "*sucia*" (dirty in Spanish), "*cochina*" (another term for dirty in Spanish), and "freak."

15. Additionally, Officer Ramos discovered that I was undocumented when he picked me up from an immigration appearance. After he discovered this, he began to taunt me by telling other officers in the prison, "Hey, you know she is going to get deported?" and "You know she is illegal?" He would often laugh as he mocked me to others in the

facility.

16. Other officers, such as Officer Sergio Saucedo, often laughed with Officer Ramos and added mocking comments about me. I also heard them do this to other women in the prison.

17. These comments made me feel self-conscious and ashamed. This felt like it placed me, and other women in immigration proceedings housed at FCI Dublin, in a separate class who had to be afraid for our safety. These taunts by both Officer Ramos and Officer Saucedo also reinforced for me that I could not report Officer Ramos' behavior lest he find some way to expedite my removal.

18. Officer Ramos also subjected me to emotional abuse. Ramos forced me to be in a toxic environment where he often vacillated from acting with malicious cruelty to sporadically treating me in a special way because of his sexual interest in me.

19. For example, some days he ridiculed me for my sexual orientation, or my immigration status as mentioned previously. He screamed obscenities at me including calling me a "dumbass." He also recruited his friend and colleague, Officer Saucedo, to join in the retaliation. Officer Saucedo joined in the verbal abuse and often took me off my work roster to do menial tasks for him personally.

20. Officers Ramos and Saucedo also incessantly searched my room—they searched my room two to three times a week without justification. Each time the officers searched my room, they took a number of my very limited possessions—items such as shirts, sweatpants, make-up, containers, or anything else they could find. In particular, they would regularly take my underwear.

21. The officers were required to fill out confiscation forms to state what exactly they were taking and why, yet they never completed this form, meaning I was left without recourse.

22. I only had a few possessions I could call my own while I was incarcerated so each time they searched and stole my things, I was left with nothing in life. The taking of my underwear only worsened the sexual harassment and intimidation I felt.

23. On other days, Officer Ramos gave me excessive positive attention and gave me special gifts as a form of manipulation. He gave me things such as make-up, sweaters, and special food which were usually things he took from people when he searched their room.

24. He also often asked me to walk his daily rounds with him and would often tell me deeply personal things about his relationship with his girlfriend and family. On these walks he would say complimentary things like that he loved my big eyes and loved my tan.

25. I often felt confused and on edge because I never knew if he was going to be cruel and abusive or provide me with special favors because of his sexual interest in me.

26. Officer Ramos used his role as a prison officer to impermissibly control and punish me. Officer Ramos indicated that he was extremely jealous whenever I spoke to anyone else, including both staff and other prisoners. He often told people to stay away from me and to not talk to me. If they did continue to speak to me, he would conduct a "hit" of their room, meaning he would search the person's room and take or throw things away as retaliation.

27. For example, on one occasion I was attempting to sit with two fellow inmates. They both tried to sit with me or talk to me, but I heard him tell them, "If you sit with her, I will hit your room." This isolated me from others at Dublin and led to deleterious psychological effects.

28. On another occasion, I smiled at another officer in the facility. Officer Ramos saw that I smiled at this officer and Officer Ramos gave me a threatening look. When I was later cleaning Ramos's office, he told me, "Never smile to another officer again—if you do I will hit your room," referring again to his practice of searching rooms and stealing the few precious things that I had stored in my cell.

29. Officer Ramos retaliated against my friend and roommate, for spending time with me. After she and I formed a friendship, Officer Ramos repeatedly "hit" her cell, searching her room without cause and impermissibly seizing her possessions. When she or

I asked him what basis he had for searching her cell, he said, "Because I fucking want to and because I fucking can."

30. Officers Ramos and Saucedo both retaliated against her for having a relationship with me by repeatedly forcing her to get out of her wheelchair (which she was in after dislocating her ankle) and forcing her use crutches. They also forced her to go the long way around on the yard to the cafeteria when they saw us together on the yard. They stopped us nearly every time we went to the yard to get our meals and took her wheelchair at least three times.

31. We reported this to the assistant warden and told the warden that Officer Ramos and Saucedo were not allowing her to use the wheelchair. The warden told them that they should not have done this and that she should use the wheelchair. When she attempted to use the wheelchair, they again told her that she needed to use the crutches.

32. Officer Hung was present during one of these instances and I asked him, "Are you going to let him do this?" Yet, Officer Hung turned around and did nothing.

33. In order to avoid this harassment, we skipped meals when we saw either Officer Saucedo or Officer Ramos in the yard.

34. This all had the effect of causing me deep emotional hardship because of the regularized retaliation and loss of relationships with other people incarcerated, or working, at Dublin.

35. When I arrived at FCI Dublin in November 2017 I was not provided adequate training and information about how to respond to sexual abuse.

36. There is no effective way to confidentially report sexual assault and abuse by staff at FCI Dublin. When incarcerated persons report sexual abuse by staff, FCI Dublin and BOP do not seriously investigate the reports. Investigations are frequently delayed and overseen by staff who know and work with the offending staff member. Generally nothing happens as a result.

37. I was afraid to report the abuses committed by Officer Ramos because I was afraid of being retaliated against. Staff at FCI Dublin prevent people from reporting sexual

assault and abuse by staff and retaliate against people who do report.

38. I witnessed people that were immediately transferred to the Special Housing Unit (SHU) after reporting abuse. The SHU functionally served as solitary confinement in the facility where individuals are confined 24 hours a day, seven days a week without time for recreation. I know that when individuals are confined in the SHU, they are also not able to access basic resources such as commissary.

39. I remember in particular that two other women were put in the SHU for two months after they reported being abused by staff. Even when they were released, they were put right back in the unit where their abusers worked. After they were out the SHU, I saw officers regularly verbally abuse and scream at them for reporting.

40. Because I saw these women were mistreated and retaliated against for reporting, I was terrified to report my experience and just tried to survive through Officer Ramos's abuse.

41. Though I was terrified, I did attempt to report what had happened at Dublin after I was moved to FDC SeaTac. I emailed my counselor, Mr. Joyce, asking to speak with him and reported my experience. On September 7, 2022, Mr. Joyce referred me to a medical provider and a case manager on the same day. The Special Investigative Supervisor (SIS) said they would call me back, but they never got in touch with me again.

42. There is little to no confidential mental health care available to survivors of sexual abuse and assault at FCI Dublin or other BOP facilities. After reporting the abuse to Mr. Joyce, I spoke to the psychology department on September 8, 2022. The SIS said they would call psychology to set up another appointment, but I never received another appointment.

43. The camera system at FCI Dublin is inadequate. There are some cameras installed in fixed locations in the facility, but it is well known that there are no cameras in certain areas. Staff at FCI Dublin have never worn body-worn cameras in the facility.

/ / /

/ / /

1  I declare under penalty of perjury under the laws of the United States of America
2  that the foregoing is true and correct to the best of my knowledge, and that this declaration
3  is executed at Dublin, California this 15th day of August, 2023.



S█████ P█████ V█████