1  MICHAEL W. BIEN – 096891
   ERNEST GALVAN – 196065
2  KARA J. JANSSEN – 274762
   GINGER JACKSON-GLEICH – 324454
3  ROSEN BIEN
   GALVAN & GRUNFELD LLP
4  101 Mission Street, Sixth Floor
   San Francisco, California 94105-1738
5  Telephone:   (415) 433-6830
   Email:       mbien@rbgg.com
6                egalvan@rbgg.com
                 kjanssen@rbgg.com
7                gjackson-gleich@rbgg.com

OREN NIMNI*
  Mass. Bar No. 691821
AMARIS MONTES*
  Md. Bar No. 2112150205
D DANGARAN*
  Mass. Bar No. 708195
RIGHTS BEHIND BARS
416 Florida Avenue N.W. #26152
Washington, D.C.  20001-0506
Telephone:   (202) 455-4399
Email:       oren@rightsbehindbars.org
             amaris@rightsbehindbars.org
             d@rightsbehindbars.org

8  SUSAN M. BEATY – 324048
   CALIFORNIA COLLABORATIVE FOR
9  IMMIGRANT JUSTICE
   1999 Harrison Street, Suite 1800
10 Oakland, California  94612-4700
   Telephone:   (510) 679-3674
11 Email:       susan@ccijustice.org

*Pro hac vice applications pending

12 Attorneys for Plaintiffs

13                     UNITED STATES DISTRICT COURT

14        NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

15 CALIFORNIA COALITION FOR WOMEN
   PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.;
16 G.M.; A.S.; and L.T., individuals on behalf of
   themselves and all others similarly situated,
17
                         Plaintiffs,
18
       v.
19
   UNITED STATES OF AMERICA FEDERAL
20 BUREAU OF PRISONS, a governmental entity;
   BUREAU OF PRISONS DIRECTOR COLETTE
21 PETERS, in her official capacity; FCI DUBLIN
   WARDEN THAHESHA JUSINO, in her official
22 capacity; OFFICER BELLHOUSE, in his
   individual capacity; OFFICER GACAD, in his
23 individual capacity; OFFICER JONES, in his
   individual capacity; LIEUTENANT JONES, in
24 her individual capacity; OFFICER LEWIS, in his
   individual capacity; OFFICER NUNLEY, in his
25 individual capacity, OFFICER POOL, in his
   individual capacity; LIEUTENANT PUTNAM, in
26 his individual capacity; OFFICER SERRANO, in
   his individual capacity; OFFICER SHIRLEY, in
27 his individual capacity; OFFICER SMITH, in his
   individual capacity; and OFFICER VASQUEZ, in
   her individual capacity,
28
                         Defendants.

Case No. 4:23-cv-04155

**DECLARATION OF KARA J.
JANSSEN IN SUPPORT OF
PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION
AND PROVISIONAL CLASS
CERTIFICATION**

[4339247.1]

Case No. 3:23-cv-04155

I, Kara J. Janssen, declare:

1.    I am an attorney duly admitted to practice before this Court.  I am Senior Counsel in the law firm of Rosen Bien Galvan & Grunfeld LLP, and counsel of record for the Plaintiffs and Proposed Class.  I have personal knowledge of the facts set forth herein, and if called as a witness I could competently so testify.  I make this declaration in support of Plaintiffs' Motion for Provisional Class Certification.

2.    From its formation in 1990, RBGG has been a nationally recognized leader in civil rights, employment, consumer, and antitrust class action litigation.  The firm has specialized in large class action lawsuits seeking to improve conditions in correctional systems.  The firm has long specialized in large class action lawsuits seeking to improve conditions in correctional systems.  For example, the firm is currently lead or co-lead class counsel in the following correctional class actions: *Armstrong v. Brown* (N.D. Cal. No. C 94-2307 CW), a class action on behalf of prisoners and parolees with disabilities incarcerated in the California state prison and parole systems; *Coleman v. Brown* (E.D. Cal. No. S 90-0520 KJM-DB P), a class action on behalf of prisoners with psychiatric disabilities incarcerated in the California state prison system; *Hernandez v. County of Monterey* (N.D. Cal. No. 13-cv-2534 BLF), a class action on behalf of prisoners, including prisoners with disabilities, held at the Monterey County Jail; *Hedrick v. Grant* (E.D. Cal. No. 2:76-cv-00162-GEB-EFB), a class action on behalf of prisoners and detainees held at the Yuba County Jail; *Cole v. County of Santa Clara* (N.D. Cal. No. 5:16-cv-06594-LHK), a class action on behalf of prisoners with mobility disabilities at the Santa Clara County Jails; and *Babu v. County of Alameda* (N.D. Cal No. 5:18-cv-07677), a class action on behalf of prisoners at the Alameda County Jail.

3.    Michael Bien is a partner at RBGG and received his J.D. from Northwestern University School of Law in 1980. Mr. Bien co-founded Rosen, Bien & Asaro, which later because Rosen Bien Galvan & Grunfeld, in 1990.  Mr. Bien served as Managing Partner at Rosen Bien Galvan & Grunfeld from 1990 until December 31, 2017.  Mr. Bien has substantial experience representing incarcerated persons including in: *Armstrong v.*

DECLARATION OF KARA J. JANSSEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

*Newsom* (N.D. Cal. No. C 94-2307) (class action against CDCR on behalf of over 10,000 prisoners and parolees with certain disabilities, including mobility impairments); *Coleman v. Newsom* (E.D. Cal. No. S 90-0520 KJM-DB) (class action against CDCR regarding mental health treatment); *Sabata v. Nebraska* (D. Neb. No. 4:17-cv-03107-RFR-MDN) (action on behalf of incarcerated individuals in Nebraska state prisons); and *Hernandez v. County of Monterey* (N.D. Cal. No. 5:13-cv-2354 BLF) (class action on behalf of all prisoners and a disability sub-class in the Monterey County Jail); *L.H. v. Schwarzenegger*, 2:-06-02042-LKK-DAD (E.D. Cal.) (a class action under the 8th and 14th Amendments, the ADA, and the Rehabilitation Act on behalf of all juvenile wards and parolees in California's Department of Juvenile Justice);  *Hecker v. California Dep't of Corrections and Rehabilitation*, 2:05-cv-02441-KJM-DAD (E.D. Cal.) (ADA and Rehabilitation Act class action lawsuit against the California Department of Corrections and Rehabilitation on behalf of all prisoners with psychiatric disabilities). Mr. Bien's work is reflected in many published decisions including *Brown v. Plata*, 131 S.Ct. 1910 (2011) (upholding first disputed prison population cap order under the Prison Litigation Reform Act of 1996); *Coleman v. Brown*, 428 Fed. Appx. 743 (9th Cir. 2011) (upholding district court order against state prison system to ensure access to inpatient psychiatric hospital beds); *Valdivia v. Schwarzenegger*, 599 F.3d 984 (9th Cir. 2010), rehearing en banc denied, 623 F.3d 849, *cert. denied*, *Brown v. Valdivia*, 131 S.Ct. 1626 (2011) (addressing interaction between federal due process rights and state administrative procedures); *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. Cal. and N.D. Cal. 2009) (first successful contested trial under 1996 statute limiting federal court issuance of prison overcrowding relief).  Mr. Bien received numerous awards and instances of peer recognition for my litigation work, including but not limited to Martindale Hubble AV-rating, repeated selection for the Northern California "Super Lawyer" list in Civil Rights, First Amendment, and Business Litigation, and a 2010 CLAY Award.  Mr. Bien have been named by the San Francisco and Los Angeles Daily Journal to its list of the Top 100 Lawyers in California ten times—in 2010, 2013, and 2015–2022.  Mr. Bien has been

recognized by Best Lawyers in America for Commercial Litigation since 2013.  In 2021, the Daily Journal named Mr. Bien as one of California's Top Lawyers of the Decade.  A copy of Mr. Bien's resume is attached hereto as **Exhibit A**.

4.        Ernest Galvan is a partner at RBGG and received his J.D. from Yale Law School in 1997.  Mr. Galvan clerked in the United States District Court for the Central District of California for the Honorable Dean D. Pregerson.  Upon completing his clerkship, Mr. Galvan joined the law firm Rosen, Bien & Asaro, which later became Rosen Bien Galvan & Grunfeld, as an associate.  Mr. Galvan became a partner of the firm in 2006.  Mr. Galvan has substantial experience representing incarcerated persons including in: *Armstrong v. Newsom* (N.D. Cal. No. C 94-2307) (class action against CDCR on behalf of over 10,000 prisoners and parolees with certain disabilities, including mobility impairments); *Coleman v. Newsom* (E.D. Cal. No. S 90-0520 KJM-DB) (class action against CDCR regarding mental health treatment); *Sabata v. Nebraska* (D. Neb. No. 4:17-cv-03107-RFR-MDN) (action on behalf of incarcerated individuals in Nebraska state prisons); and *Hernandez v. County of Monterey* (N.D. Cal. No. 5:13-cv-2354 BLF) (class action on behalf of all prisoners and a disability sub-class in the Monterey County Jail). Mr. Galvan's work is reflected in many published decisions including *Brown v. Plata*, 131 S.Ct. 1910 (2011) (upholding first disputed prison population cap order under the Prison Litigation Reform Act of 1996); *Coleman v. Brown*, 428 Fed. Appx. 743 (9th Cir. 2011) (upholding district court order against state prison system to ensure access to inpatient psychiatric hospital beds); *Valdivia v. Schwarzenegger*, 599 F.3d 984 (9th Cir. 2010), rehearing en banc denied, 623 F.3d 849, *cert. denied*, *Brown v. Valdivia*, 131 S.Ct. 1626 (2011) (addressing interaction between federal due process rights and state administrative procedures); *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. Cal. and N.D. Cal. 2009) (first successful contested trial under 1996 statute limiting federal court issuance of prison overcrowding relief).  Mr. Galvan has also been recognized as California Lawyer of the Year in 2012 by the California Lawyer Magazine; as a *Best Lawyers in America* for Appellate Practice and Civil Rights from 2014 to 2021 and by

*Northern California SuperLawyers* since 2010.  A copy of Mr. Galvan's resume is attached hereto as **Exhibit B**.

5.  I am senior counsel at RBGG and a 2010 graduate of New York University School of Law, where I was a Root-Tilden-Kern Scholar.  I have substantial experience representing incarcerated individuals in litigation involving prison and jail conditions including in *Cole v. County of Santa Clara*, (N.D. Cal. No. 16-CV-06594-LHK (class action on behalf of prisoners with mobility disabilities); *Jewett v. Shasta County* (E.D. Cal. No. 2:13-cv-0882 MCE AC (PC)) (class action on behalf of prisoners with mobility disabilities); *LSPC v. Ahern* (Alameda Cnty. Sup. Ct. No. RG12656266) (taxpayer action on behalf of prisoners with mobility disabilities); *G.F. v. Contra Costa County* (N.D. Cal. No. 3:13-cv-03667-MEJ) (class action on behalf of juveniles with psychiatric disabilities); and *Babu v. County of Alameda* (N.D. Cal No. 5:18-cv-07677), a class action on behalf of prisoners at the Alameda County Jail.  I have been named a Rising Star by *Northern California SuperLawyers* for the years 2017 through present.  A copy of my resume is attached hereto as **Exhibit C**.

6.  Ginger Jackson-Gleich is an associate at RBGG and a 2018 graduate of Harvard Law School, where she graduated *cum laude* and served as an editor of the *Harvard Law Review*.  She has experience representing incarcerated individuals in litigation involving prison and jail conditions including in *Coleman v. Brown* (E.D. Cal. No. S 90-0520 KJM-DB P), a class action on behalf of prisoners with psychiatric disabilities incarcerated in the California state prison system, and she has also assisted with the creation and enforcement of federal consent decrees in the policing context.  She has represented clients in state criminal proceedings (in both Massachusetts and California) and in federal compassionate release proceedings.  A copy of Ms. Jackson-Gleich's resume is attached hereto as **Exhibit D**.

7.  RBGG has done extensive work investigating the claims in this case and has the capacity to prosecute the claims thoroughly and vigorously in this case and properly represent the plaintiff class and subclass and intends to commit all necessary resources to

1   do so.

2       8.      To my knowledge, RBGG has no conflicts of interest that would prevent the

3   firm from providing zealous representation of the named plaintiffs and the class.

4       9.      Attached as **Exhibit E** is a true and correct copy of Federal Bureau of

5   Prisons, Population Statistics, last updated August 10, 2023.

6       10.     Attached as **Exhibit F** is a true and correct copy of the United States Senate

7   Permanent Subcommittee on Investigations, Committee on Homeland Security and

8   Governmental Affairs Staff Report titled "Sexual Abuse of Female Inmates in Federal

9   Prisons" dated December 13, 2022.

10      11.     Attached as **Exhibit G** is a true and correct copy of the Principal Associate

11  Deputy Attorney General Working Group Report and Recommendations Concerning the

12  Department of Justice's Response to Sexual Misconduct by Employees of the Federal

13  Bureau of Prisons, dated  Nov. 2, 2022.

14      I declare under penalty of perjury under the laws of the State of California that the

15  foregoing is true and correct, and that this declaration is executed at San Francisco, CA

16  this 17 day of August, 2023.

17

18

19                                              */s/ Kara J. Janssen*

20                                              Kara J. Janssen

21

22

23

24

25

26

27

28

DECLARATION OF KARA J. JANSSEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

E X H I B I T   A



**Michael W. Bien**

101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T:  (415) 433-6830
F:  (415) 433-7104
E:  mbien@rbgg.com

Recognized for his significant legal work by various publications and organizations, Michael Bien has helped numerous clients resolve complex legal challenges.  Mr. Bien has served as lead counsel in numerous trial and appellate proceedings in state and federal courts.  In addition to his business practice, Mr. Bien has been at the forefront of public interest litigation on behalf of persons with limited access to the civil justice system.

## PERSONAL DATA

Born:  New York, N.Y., 1955

## EDUCATION

J.D., *cum laude*, Northwestern University School of Law, Chicago, Illinois (1980), President, Student Bar Association; President, Founder and Director, Student Funded Public Interest Fellowships, Inc.

B.A., *magna cum laude*, Brandeis University, Waltham, Massachusetts (1977), high department honors in History and American Studies

National Institute of Trial Advocacy, National Session, Boulder, Colorado (1986)

## BAR ADMISSION

California, January, 1981; member, United States Supreme Court, Seventh and Ninth Circuit Court of Appeals, and all United States District Courts in California

## LEGAL EMPLOYMENT

Rosen Bien Galvan & Grunfeld LLP; San Francisco, California                    1991–present
Founding Partner & Managing Partner (1991-2017)

Brobeck, Phleger & Harrison, LLP; San Francisco, California
Partner, Litigation Department                                                             1987–1990
Associate, Litigation Department                                                          1980–1987



**REPRESENTATIVE REPORTED CASES:**

*U.S. WeChat Users Alliance v. Trump,* 488 F. Supp. 3d 912 (N.D. Cal. 2020)(briefed and argued as lead counsel granting preliminary injunction on First Amendment grounds against Executive Order and Commerce Department banning WeChat and successfully opposing Emergency stay petition in 9th circuit)

*Brown v. Plata*, 131 S. Ct. 1910 (2011) (briefed as co-lead counsel, secured favorable ruling in United States Supreme Court affirming lower court order to reduce prison overcrowding in California)

*Hernandez v. County of Monterey*, 110 F. Supp. 3d 929 (N.D. Cal. 2015), *Hernandez v. County of Monterey*, 305 F.R.D. 132 (N.D. Cal. 2015), *Hernandez v. County of Monterey*, 70 F.Supp.3d 963 (N.D. Cal. 2014) (lead counsel in successful class action against County of Monterey and health care provider over jail conditions, ADA, mental health care, medical care, resulted in Stipulated Injunction requiring systemic changes)

*Armstrong v. Brown*, 732 F.3d 955 (9th Cir. 2013), *cert denied*, — S. Ct. —, 2014 WL 859563 (June 9, 2014) (lead counsel for plaintiff class securing favorable ruling under ADA and Rehab Act against State for parolees with disabilities housed in County Jails)

*Armstrong v. Brown*, 857 F. Supp. 2d 919 (N.D. Cal. 2012) (lead counsel for plaintiff class securing favorable ruling under ADA and Rehab Act against State for parolees with disabilities housed in County Jails)

*Armstrong v. Brown*, 805 F. Supp. 2d 918 (N.D. Cal. 2011) (awarding plaintiff class's counsel their reasonable hourly rates)

*Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010) (argued, briefed as lead counsel, secured favorable ruling regarding federal disability rights and scope of federal regulations)

*Armstrong v. Davis*, 318 F.3d 965 (9th Cir. 2003) (argued, briefed as co-lead counsel, secured favorable ruling regarding complex interaction among three separate federal statutory schemes governing remedies for disability discrimination)

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) (briefed as co-lead counsel, secured favorable rulings regarding class certification and federal court power to remedy civil rights violations by a state government)

*Bui v. I.N.S.*, 76 F.3d 268 (9th Cir. 1996) (lead counsel, secured reversal of immigration appeals ruling)

*Coleman v. Brown*, 28 F. Supp. 3d 1068 (E.D. Cal. 2014) (lead counsel for trials resulting in court finding additional Eighth Amendment violations and ordering additional affirmative relief to mentally ill prisoners subject to excessive uses of force, undue disciplinary measures, and segregated housing in California prison system)

[264599.7]



*Coleman v. Brown*, 938 F. Supp. 2d 955 (E.D. Cal. 2013) (lead counsel securing ruling that ongoing Eighth Amendment violations relating to suicide prevention, use of segregated housing, delays in access to care, and shortages in treatment space precluded termination of lawsuit under PLRA brought on behalf of mentally ill prisoners in California prison system)

*Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. Cal. and N.D. Cal. 2009) (co-lead counsel successfully litigating motion to convene a three-judge court and trial resulting in order requiring the State of California to reduce its prisoner population as the only means to remedy ongoing constitutional violations in the provision of medical and mental health care)

*Coleman v. Wilson*, 101 F.3d 705 (9th Cir. 1996) (argued, briefed as lead counsel, successfully defended favorable preliminary injunction by having appeal dismissed for lack of jurisdiction)

*Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995) (co-lead counsel for trial and briefing affirming findings of Eighth Amendment violations in the provision of mental health care to California prisoners and ordering the development and implementation of remedial plans)

*Committee to Save Mokelumne River v. East Bay Mun. Utility Dist.*, 13 F.3d 305 (9th Cir. 1993) (lead counsel, successfully defended ruling on coverage of Clean Water Act)

*Gates v. Shinn*, 98 F.3d 463 (9th Cir. 1996) (argued, briefed as co-lead counsel, ruling clarified contempt powers in complex injunction cases)

*Gates v. Gomez*, 60 F.3d 525 (9th Cir. 1995) (argued, briefed as co-lead counsel, successfully defended almost all portions of federal injunctive relief against state government agencies)

*Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir. 1992) (briefed as co-lead counsel, successfully defended core elements of district court's ruling on civil rights attorneys' fees)

*Hernandez v. County of Monterey,* 110 F. Supp. 3d 929 (N.D. Cal. 2015)

*Hernandez v. County of Monterey,* 305 F.R.D. 132 (N.D. Cal. 2015)

*Hernandez v. County of Monterey,* 70 F. Supp. 3d 963 (N.D. Cal. 2014)

*L.H. v. Brown,* 848 F. Supp. 2d 1141 (E.D. Cal. 2011)

*L.H. v. Schwarzenegger,* 519 F. Supp.2d 1072 (E.D. Cal. 2007)

*Lucas v. White,* 63 F. Supp.2d 1046 (N.D. Cal. 1999) (Lead counsel for Equal Access to Justice fees award for successful representation of three female prisoners sexually assaulted in BOP prisons who were paid damages and obtained injunctive relief)

*Estate of Prasad v. County of Sutter,* 958 F. Supp. 2d 1101 (E.D. Cal. 2013)



*Wilson v. U.S. Dist. Court*, 103 F.3d 828 (9th Cir. 1996) (argued, briefed as co-lead counsel, successfully defended favorable district court decision on statutory retroactivity)

## REPRESENTATIVE MATTERS

*Coleman/Plata v. Newsom*, (co-lead counsel representing prisoner class in successful 2009 trial before federal three-judge court, affirmed by the U.S. Supreme Court, 131 S. Ct. 1910 (2011), holding that California must reduce prison overcrowding; succeeded on multiple appeals and writs in 9th Circuit and U.S. Supreme Court)

*Azizian v. Federated Department Stores*, 499 F.3d 950 (9th Cir. 2007) (co-counsel defending lead defendant, cosmetics company, Estee Lauder in state court antitrust action which was settled as a nationwide federal consent decree completed in 2009 including trial and appeal work)

*Genencor, Inc. and Genentech, Inc. v. Pfizer, Inc. and Sonoma Foods, Inc.* (co-counsel in successful defense of Pfizer in federal patent action against action for infringement of blocking patents in biotech case involving Kosher cheese)

*Berkeley Center for Independent Living v. Oakland Coliseum* (co-lead counsel representing plaintiff class in successful federal court ADA action against the Coliseum, its public entity owners and all sports teams and entertainment companies operating at Coliseum)

*Computer Education Managers Association* (antitrust consulting)

*Equity Properties and Development Company* (lead counsel in real estate/construction litigation matters in state court including trial and a successful appeal, *McGilvray v. Rouse*, (First District Court of Appeal 1996))

*Fluor-Daniel Corporation* (lead counsel representing construction company in various commercial litigation matters in state court)

*IDG v. Diversified Data Corp., Santa County Superior Court* (lead counsel in successful representation of software company in trade secrets, right-to-compete, litigation)

*NextCard Inc.* (lead counsel in representation of internet bank in various litigation matters including securities, antitrust, intellectual property, breach of contract and employment, in state and federal court)

*Nordlin v. K Mart Corporation,* California Court of Appeal, 5th District and California Supreme Court (1996) (representation of plaintiff in successful state court post-trial and appellate employment discrimination matter)

*Primark Benefits* (lead counsel in defense of various actions in state court arising from mergers and acquisitions)

*Systron Donner v. Aerosafe International*, Contra Costa County Superior Court and First District Court of Appeal (co-lead counsel in successful representation of former employees and their new



company in state court intellectual property action alleging theft of trade secrets where inventions were patented, included appellate proceedings)

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust*, (one of key attorneys on team in successful representation of defendant Union Oil Corporation of California in multi-year antitrust proceedings concerning oil and gas pricing)

## BAR ACTIVITIES

Board Member, Disability Rights Bar Association (2016-2022)

Board Member, First District Appellate Project (2008-present)

Mediator and ENE Evaluation, United States District Court for Northern District of California (1994–present)

Bar Association of San Francisco, Judiciary Committee (Chair, 1989; Member, 1987–1989)

State Bar of California, Commission on Corrections (Member, 1987–1989)

American Bar Association, Antitrust Section, State Action and Internet Law Subcommittees; Litigation Section (1984–Present)

San Francisco Public Interest Law Foundation (Director, 1981–1983)

## TEACHING, WRITING AND LECTURING

Hastings Law School, Panel re: Solitary Confinement Claims (2022)

Economics Roundtable of San Francisco, Criminal Justice Reform (2021)

Academic and Health Policy Conference on Criminal Justice Health (2021)

McGeorge School of Law, Current Issues on Prisoner Rights (2021)

UCLA Law School, Prisoner Rights class (2021)

Presenter, "New Challenges Raised by Decarceration: Discrimination in Population Reduction Tactics" (2017)

Guest Lecturer, Disability Rights Bar Association, West Coast Conference, Uber Litigation (2016)

Presenter, American Bar Association Live Webinar, Recent Reforms in the Law of Solitary Confinement (2016)

Guest Lecturer, Jacobus TenBroek Disability Law Symposium, Baltimore (2016, 2014, 2012)

Guest Lecturer, International Conference on Solitary Confinement, University of Pittsburg Law School (2016)

Guest Lecturer, Juveniles in Adult Institutions, UC Hastings (2015)

Guest Lecturer, "De-incarceration through Civil Rights Litigation," Northwestern University School of Law, the Roderick and Solange MacArthur Justice Center (2015)



"Court Should Affirm 9th Circuit On Crisis Intervention Policing," (with Lisa Ells) (*Daily Journal*, Oct. 24, 2014)

Guest Lecturer, Sentencing & Corrections class, Stanford Law School (2014)

Guest Lecturer, "*Coleman/Plata* and Its Transformative Impact on California's Prison System," Stanford Law School, American Constitution Society (2014)

Guest Lecturer, Prisoners' Advocates, Loyola University School of Law, New Orleans (2014)

Guest Lecturer, UCI Law School (2013)

Guest Lecturer, AAJ Civil Rights Education Program (2013)

Guest Lecturer, "Health Care After *Plata*," UC Hastings Law School Conference, California Correctional Crisis:  Realignment & Reform (2013)

Guest Lecturer, Impact Fund's 11th Annual Class Action Conference (2013)

Guest Lecturer, "Impact Litigation at the Appellate Level," San Francisco Bar Association Panel(2012)

Guest Lecturer, "Realignment in California," UC Irvine Law School, Public Dialogues Conference (2012)

Guest Lecturer, "Holding the Correction System Accountable," Berkeley Law School, Caleb Foote Symposium (2012)

Guest Lecturer, "*Brown v. Plata*: The California Prison Overcrowding Crisis," Northwestern University School of Law, American Constitution Society (2011)

Guest Lecturer, Prisoner Rights Law, Northwestern University School of Law (2011)

Joshua A. Guberman Lecture (with Jane Kahn), "Representing Prisoners with Serious Mental Illness, Trapped in a Nightmare:  The California Prison Overcrowding Case," Brandeis University (2011)

Guest Lecturer, Advanced Seminar on Criminal Law and Public Policy, Stanford University (2011)

Ruth Chance Lecture, "*Brown v. Plata*, 131 S. Ct. 1910 (2011)," University of California, Berkeley, Thelton E. Henderson Center for Social Justice (2011)

Guest Lecturer, "The California Prison Overcrowding Case:  Strategic Considerations in the Representation of an Unpopular and Feared Class in the Defense of Fundamental Constitutional Rights," University of Chicago Law School, American Constitution Society (2011)

Workshop Leader, "Bridging the Gap Between the Disability Rights Movement and Other Civil Rights Movements," Jacobus tenBroek Disability Law Symposium (2011)

Guest Lecturer, Prisoners Rights, Northwestern University School of Law, American Constitution Society (2010)

Guest Lecturer, "Private – Public Interest Law," Northwestern University School of Law, Public Interest Law Group and Bluhm Legal Clinic (2010)



Guest Lecturer, "Triaging and Financing Prison Cases," Yale Law School, Prisoners' Rights Litigation: A Workshop for Advocates (2010)

Guest Lecturer, "California Prison Overcrowding and the Supreme Court," Northwestern University School of Law (2009)

Panelist, "Prison Overcrowding Decision," KQED Forum, San Francisco (2009)

Guest Lecturer, "Prisoner Release Orders and the California Litigation," George Washington University School of Law, Prison Litigation Conference (2008)

Panelist and Guest Lecturer, Symposium on Prison Crisis, University of San Francisco Law School (2008)

Guest Lecturer, "California Prison Crisis," Boalt Hall School of Law (2007)

Panelist and Guest Lecturer, "California Prison Overcrowding Crisis," UCLA School of Law, Prison Class Action Litigation Conference (2007)

Guest Lecturer, "Mental Health in Prisons," University of California, Berkeley School of Public Health, Advanced Seminar in Community Mental Health (2006, 2007, 2008, 2009)

Panelist, "Back-End Sentencing and Technical Parole Violations," Stanford Law School (2006)

Guest Lecturer, "Police Misconduct and Institutional Reform Litigation In California," Lorman Education Services, San Francisco (2005)

Panelist, "Civil Rights Litigation:  Overused or Under Siege?", Northern District of California Judicial Conference (2002)

Instructor in Trial Practice, National Institute of Trial Advocacy, Mid-West Regional at Northwestern University School of Law (1994, 1997, 1998); Mid-West Regional at Loyola University School of Law (2001); Western Regional at Golden Gate Law School (1996, 1997); Western Regional at Boalt Hall School of Law (2000); Deposition Program (2000, 2001)

Panelist, "Prisoner Civil Rights Litigation," University of California, Berkeley, Critical Resistance Conference (1998)

Co-author, ABA Antitrust Section, Monograph No. 19, The *Noerr-Pennington* Doctrine, ABA, Antitrust Section (1993)

Author, *Litigation as an Antitrust Violation:  Conflict Between the First Amendment and the Sherman Act*, 16 U.S.F. L. Rev. 41 (1981)

Panelist,  "State-Action Immunity, Recent Developments," ABA Annual Meeting, Antitrust Section (1990 and 1987)

Panelist, "Part-time Work in Law," ABA Annual Meeting, Law Practice Management Section (1990)

Author, "Judicial Selection Process," San Francisco Lawyer Magazine (1989)

Panelist, "Local Government Antitrust Immunity Act, Recent Developments," ABA Annual Meeting, Antitrust Section (1986)

Instructor, "Trial Practice," "Motion Practice," "Antitrust Law," Brobeck, Phleger & Harrison in-house programs (1985–1990)

## COMMUNITY ACTIVITIES

Reentry Council of the City and County of San Francisco (Subcommittee Member, 2009-present)

New Israel Fund (Board of Trustees Member, 2021-present, International Council Member, 2011-2021, Regional Council Member, 2006–present, Chair, Regional Council, 2011-2018)

Congregation Beth Sholom (Rabbi Search Committee, 2007)

Camp Tawonga (Director, 2003–2008)

Religious Witness With Homeless People (Member, Steering Committee, 2003–present)

Jewish Vocational Service (various, 2003–2007)

Brandeis Hillel Day School of San Francisco and Marin (President, 1998–2000; Trustee, 1990–1996, 1998–2002; Head Search Committee, 2005)

Wexner Heritage Foundation (Fellow, 2000–2002)

Jewish Community Federation (Planning & Allocations Committee, Jewish Education Subcommittee, Chair, S.F. Division of Campaign, 1995–2002)

Metropolitan YMCA of San Francisco (Director, 1985–1989)

Mission YMCA (Chairperson, Board of Managers, 1985–1989)

## HONORS

Daily Journal, Top Lawyers of the Decade (2021)

Morrison-Gitchoff Founders Award, Western Society of Criminology (2017)

Martindale Hubbell AV Rated

*The Best Lawyers in America*, in Commercial Litigation (2013-2022)

Brandeis University, Alumni Activist Award (with Jane Kahn) (2011)

Leonard E. Weinglass in Defense of Civil Liberties Award, American Association for Justice (2011)

Selected as Northern California "Super Lawyer" in Civil Rights/First Amendment, Business Litigation, Antitrust Litigation (2006, 2008-2022)

Daily Journal's Top 100 List, "California's Leading Attorneys" (2010, 2013, 2015- 2022)

California Lawyer Magazine, California Lawyer of the Year ("CLAY") Award for Constitutional Law (2010, 2020, 2022)

Northwestern University School of Law, Student Funded Public Interest Fellowships, Public Service Award (2010)



The Recorder Attorneys of the Year (2009)

Honored for work on California parole revocation reform, California Public Defender Association (2005)

Outstanding Mental Health Advocate, California Coalition for Mental Health (2003)

Lion of Judah Award, Brandeis Hillel Day School (2000)

Honoree, California Attorneys for Criminal Justice (1994)

Fellow, American Bar Foundation (1988)

Volunteer of the Year, Mission YMCA (1988)

Pro Bono Award, State Bar of California (1985)

Center for Urban Affairs Fellowship, Northwestern University (1979)

## AREAS OF SPECIALTY

| | |
|---|---|
| Antitrust Litigation and Counseling | Real Property Litigation |
| Trade Practices | Complex Litigation |
| Trade Secrets | Commercial Litigation |
| Intellectual Property | Disabilities Law |
| Class Actions | Mental Health Law |
| Attorneys' Fees | Civil Rights |
| Securities Litigation | Prisoner Rights |
| Internet Law | First Amendment |
| Constitutional Law | Appellate Practice |

## REPRESENTATIVE CLIENTS

| | |
|---|---|
| Aerosafe, Inc. | U.S. WeChat Users Association |
| Computer Education Managers Assn. | Pfizer Inc. |
| Estee Lauder, Inc. | Patient Rights Action Fund |
| | National Federation of the Blind |

E X H I B I T   B



**ROSEN BIEN**
**GALVAN & GRUNFELD** LLP

**Ernest Galvan**

101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T:  (415) 433-6830
F:  (415) 433-7104
E:  egalvan@rbgg.com

Ernest Galvan is an AV-rated attorney who represents clients in all phases of complex litigation. His cases have focused on federal-state relationships and complex constitutional law issues.

**REPRESENTATIVE CASES**

*In re Gadlin,* 10 Cal. 5th 915 (2020) (representing amicus group of social science scholars).

*California by and through Becerra v. Azar*, -- F. Supp. 3d. ---, 2020 WL 6733641 (N.D.Cal., 2020) (representing amicus group of disability rights organizations in challenge to Medicaid anti-assignment rule designed to impede unionization of home health workers).

*Access Living of Metropolitan Chicago v. Uber Technologies, Inc.,* 958 F.3d 604 (7th Cir. 2020) (representing amicus group of disability rights organizations).

*Fry v. City of Los Angeles,* 245 Cal. App. 4th 539 (2016) (addressing retirement health subsidies for firefighters and police).

*Armstrong v. Brown*, 732 F.3d 955 (9th Cir. 2013), cert denied, 134 S. Ct. 2725 (2014).

*Armstrong v. Brown*, 857 F. Supp. 2d 919 (N.D. Cal. 2012).

*Armstrong v. Brown*, 805 F. Supp. 2d 918 (N.D. Cal. 2011).

*Sterling Park, L.P v. City of Palo Alto*, 57 Cal. 4th 1193 (2013) (challenge to elements of city's housing plan).

*Degelmann v. Advanced Medical Optics, Inc.,* 659 F.3d 835 (9th Cir. 2011) (representing amicus Consumers Union against federal preemption of California consumer protection laws).

*Retired Employees Association of Orange County v. Orange County*, 52 Cal.4th 1171 (2011) (holding that California government employers are bound by implied contractual terms regarding vested retirement health benefits).

*Brown v. Plata*, 131 S.Ct. 1910 (2011) (upholding first disputed prison population cap order under the Prison Litigation Reform Act of 1996).

*Coleman v. Brown,* 938 F. Supp. 2d 955 (E.D. Cal. 2013)

*Coleman v. Brown*, 428 Fed. Appx. 743 (9th Cir. 2011) (upholding district court order against state prison system to ensure access to inpatient psychiatric hospital beds).

*Valdivia v. Schwarzenegger*, 599 F.3d 984 (9th Cir. 2010), *rehearing en banc denied*, 623 F.3d 849, *cert. denied*, *Brown v. Valdivia*, 131 S.Ct. 1626 (2011) (addressing interaction between federal due process rights and state administrative procedures).



*Prison Legal News v. Schwarzenegger*, 608 F.3d 446 (9th Cir. 2010) (addressing limits of continued federal court jurisdiction over state agency's implementation of settlement agreement regarding publisher's First Amendment rights).

*In re E.J.*, 47 Cal.4th 1258 (2010) (concerning conflicts between state constitutional rights and successful ballot initiative).

*Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. Cal. and N.D. Cal. 2009) (first successful contested trial under 1996 statute limiting federal court issuance of prison overcrowding relief).

*Valdivia v. Schwarzenegger*, 548 F. Supp. 2d 852 (E.D. Cal. 2008), *affirmed* 599 F.3d 984 (9th Cir. 2010), *rehearing en banc denied*, 623 F.3d 849, *cert. denied*, *Brown v. Valdivia*, 131 S.Ct. 1626 (2011) (affirming magistrate's order regarding interaction between federal due process guarantees and state administrative procedures, obtained relief for class clients).

*Gober v. Ralphs Grocery Co.*, 137 Cal.App.4th 204 (2006) (concerning constitutional limits on punitive damages awards, defended clients' entitlement to substantial award for workplace harassment).

## EDUCATION

**Yale Law School**                                                    **J.D., June 1997**
**University of California at Berkeley**                 **B.A., History, December 1988**
                                                                              **with highest distinction**

Phi Beta Kappa, Regents Scholar, Alumni Scholar

## PUBLICATIONS AND PRESENTATIONS

"California Supreme Court Issues Decision on Use of Private Email," The Recorder, March 8, 2017

"Cal Supreme Court Clarifies BMR [Below Market Rate Housing] Law," The Registry, November 12, 2013

"New Group Faces Disenfranchisement:  California Secretary of State Puts Criminal Justice Reform and Voting Rights on a Collision Course," The Recorder, Vol. 136, No. 11, March 2012

American Constitution Society for Law and Policy, UCLA, "The Constitution Behind Bars, The Case of California's Overcrowded Prisons," March 11, 2009

California State Assembly, Budget Subcommittee, February 24, 2009

George Washington University Law School, Prison Litigation Workshop, March 2008

"Paralegals Revisited," San Francisco Daily Journal, Aug. 29, 2007.

University of California at Berkeley, School of Law, Prisoner Reentry Seminar, 2007

University of California at Berkeley, School of Law, Seminar on Civil Rights Actions, 2007

Author and Presenter: California Police Misconduct and Institutional Reform Litigation, Systemic Equitable Relief, Lorman Continuing Legal Education Program, 2005



## AWARDS AND HONORS

California Lawyer of the Year, 2012, California Lawyer Magazine

Top Verdicts of 2011, San Francisco and Los Angeles Daily Journal

Northern California Super Lawyers, 2010-2020

Best Lawyers of America, 2013-2020, for Appellate Practice and Civil Rights

Lawdragon 500 Leading Plaintiff Employment Lawyers, 2018-2020

## BAR ADMISSIONS

State Bar of California, 1998, No. 196065
Supreme Court of the United States
U.S. Court of Appeals for the Ninth Circuit
United States District Courts for the Northern, Eastern, Central and Southern Districts of
California

## EXPERIENCE

**Rosen Bien Galvan & Grunfeld, LLP; San Francisco, California**
**Partner**                                             **January 2006 – Present**
**Associate Attorney**                          **December 1998 – December 2005**
Complex civil litigation at the trial court and appellate levels with focus on briefing and
presenting complex motions and appeals.

**United States District Court**
**for the Central District of California, Los Angeles, California**
**Law Clerk to the Honorable Dean D. Pregerson**          **August 1997 – September 1998**
Prepared bench memoranda for law and motion matters.  Drafted orders and opinions.  Analyzed
pre-trial motions and jury instructions.  Prepared bench memoranda for Ninth Circuit panel on
which Judge Pregerson sat by designation.

**Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, California**
**Law Clerk**                                              **June 1996 – August 1996**
Legal research and writing for law firm representing labor unions and public interest
organizations.

**Yale Law School, New Haven, Connecticut**
**Research Assistant to Professor Jean Koh Peters**          **September 1995 – June 1997**
Researched legal and ethical issues for the treatise REPRESENTING CHILDREN IN CHILD
PROTECTIVE PROCEEDINGS: ETHICAL & PRACTICAL DIMENSIONS (Michie Publishing 1997).

[252076.6]



**California Appellate Project, San Francisco, California**
**Legal Intern**                                  **June 1995 – August 1995**

Researched legal issues, conducted factual investigations and drafted pleadings to support habeas corpus petitions for clients on California's death row.

**Charles Schwab & Co., Inc., San Francisco, California**
**Employee Communications Editor**                **March 1992 – July 1994**

Coordinated communications strategy for senior management of nationwide brokerage firm. Managed the writing, editing and production of internal publications.  Designed and implemented an on-line newsletter.

**WBFO FM Public Radio, Buffalo, New York**
**News Director and Reporter**                    **February 1990 – March 1992**

Produced and hosted panel discussions on local and national issues for National Public Radio (NPR) affiliate station.  Reported stories for local newscasts and national programs such as All Things Considered and Morning Edition.

[252076.6]

E X H I B I T   C



101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T:  (415) 433-6830
F:  (415) 433-7104
E:  KJanssen@rbgg.com

## EXPERIENCE

**Rosen Bien Galvan & Grunfeld LLP, San Francisco, California**

| | |
|---|---|
| **Senior Counsel** | **January 2020 – Present** |
| **Associate Attorney** | **July 2016 – December 2019** |

General and complex civil litigation, with an emphasis on civil rights, employment, business, and attorneys' fees cases, at the trial court and appellate levels.

**Disability Rights Legal Center, Los Angeles, California**          **August 2015 – July 2016**
**Staff Attorney**

Class action litigation and individual representation on behalf of people with disabilities.  Lead attorney on multiple matters in charge of all communications, drafting of legal documents, management of discovery, and settlement efforts.  Responded to intakes including legal and factual research to determine viability of claims and whether further action is warranted.  Communicated with media regarding case developments and performed outreach to the community.

**Disability Rights Advocates, Berkeley, California**
**Staff Attorney**                                        **September 2012 – August 2015**
**John W. Carson/LD Access Fellow**              **September 2010 – September 2012**

Class action litigation and structured negotiations to advance the rights of people with disabilities.  Drafted pleadings and motions, handled communications with clients, opposing counsel, and courts.  Managed discovery including written discovery and depositions.  Prepared settlement conference statements and draft settlement agreements.  Handled administrative proceedings including special education due process hearings.  Prepared press releases, communicated with media regarding case developments and performed outreach to the community.

**NYU Offender Reentry Clinic, New York, New York**          **August 2009 – May 2010**
**Student Advocate**

Litigated employment discrimination cases involving individuals denied licenses by New York State.  Advocated for use of alternatives to incarceration and presented policy recommendations to the New York Secretary of State.



**Disability Rights Advocates, Berkeley, California**          **May 2009 – August 2009**
**Summer Associate**
Performed legal research and assisted with the drafting of motions, declarations, and written discovery.

**The Legal Aid Society, New York, New York**          **January 2009 – May 2009**
**Student Advocate, Immigration Law Unit**
Conducted intake interviews, performed legal research, and assisted in the representation of detained immigrants in removal proceedings.

**Bazelon Center for Mental Health Law, Washington, D.C.**          **June 2008 – August 2008**
**Legal Intern**
Conducted research and prepared memoranda of law for attorneys on issues relating to the incarceration of individuals with disabilities.

**New York University School of Law, New York, New York**          **June 2008 – August 2008**
**Research Assistant for Professor Anthony Thompson**
Conducted research regarding the constitutionality of juvenile offenders sentenced to life imprisonment without the possibility of parole.

## EDUCATION

**New York University School of Law**          **J.D., May 2010**
**New York, New York**
*Honors:*  Recipient of the Root-Tilden-Kern Scholarship: full merit scholarship for public service, academic merit and leadership.

*Activities:*  Mental Health Law Association, Co-founder and President; Law Students for Human Rights, Project Leader; Mediation Organization, Treasurer and Coach; National Lawyers Guild Detainee Working Group, Co-chair.

**University of Arizona, Tucson, Arizona**      **B.A. in Psychology, *magna cum laude*, May 2006**
*Honors:*  Recipient of Full Tuition Scholarship for Academic Excellence; Phi Beta Kappa, Alpha of Arizona Chapter.

## BAR ADMISSIONS

State Bar of California No. 274762 (2010)
U.S. District Courts for the Northern and Central Districts of California
U.S. Courts of Appeals for the Second and Ninth Circuits

## PUBLISHED CASES

*Noel v. New York City Taxi & Limousine Comm'n*, 687 F.3d 63 (2d Cir. 2012)
*Noel v. New York City Taxi & Limousine Comm'n*, 837 F. Supp. 2d 268 (S.D.N.Y. 2011)

[321337.1]



**PUBLICATIONS/PRESENTATIONS**

"Making the ADA Work for Indigent Clients" Federal Public Defender's Office for the Central District of California, July 27, 2018, Los Angeles, California

"Strategies for Litigating on behalf of Incarcerated People with Disabilities" ACLU National Prison Project Webinar, May 18, 2017

"How to Litigate the Disability Rights of Incarcerated Persons" Jacobus tenBroek Disability Law Symposium, March 30, 2017, Baltimore, MD

Co-Panelist, "Education Rights," Juvenile Law Institute, January 29, 2016, Riverside, California

"Know Your Rights! Empower Yourself!", Southern California Resource Services for Independent Living, January 8, 2015, Downey, California and February 19, 2015, Alhambra, California

Co-panelist," Legal Updates," National Federation of the Blind of California State Convention, October 11, 2014, Los Angeles, California

Co-presenter, "Education Rights: Students in the Juvenile Justice System", Contra Costa County Office of the Public Defender, March 26, 2014 Martinez, California

Co-panelist, "Cognitive Processing Deficits: Impact beyond Academic Achievement and Sensory Processing Deficits, Related Impairments, and Impacts for Litigation," California Attorneys for Criminal Justice and California Public Defenders Association Capital Case Defense Seminar, February 16, 2014, Monterey, California

Co-panelist, "Technology and Access: Leveling the Playing Field in Higher Education," Disability Rights Legal Center's First Annual Disability Rights Summit, October 22, 2013, Los Angeles, California

Co-presenter, "Recent Litigation Developments: College Students with Disabilities," Private College Disability Resource Center, October 28, 2011, Academy of Art University, San Francisco, California

**PROFESSIONAL AFFILIATIONS**

American Bar Association, Member, 2010 to present
Disability Rights Bar Association, Member, 2010 to present

E X H I B I T   D



**Ginger Jackson-Gleich**

101 Mission Street, Sixth Floor
San Francisco, California  94105-1738

T:  (415) 433-6830
F:  (415) 433-7104
E:  GJackson-Gleich@rbgg.com

## <u>EXPERIENCE</u>

**Rosen Bien Galvan & Grunfeld LLP, San Francisco, California**          2022 – Present
**Associate Attorney**

General and complex civil litigation, with an emphasis on civil rights, employment, business, and attorneys' fees cases, at the trial court and appellate levels.

**Supreme Court of California, San Francisco California**
**Law Clerk to the Honorable Joshua Groban**          November 2021 – August 2022
**Law Clerk to the Honorable Mariano-Florentino Cuéllar**          August – October 2021

**Compassionate Release Clearinghouse**          January 2021 – August 2021
***Pro Bono* Attorney**

**The Prison Policy Initiative, Easthampton, Massachusetts**          August 2020 – July 2021
**Policy Counsel**

Working remotely from California, wrote 50-state reports on jail voting and jury exclusion. Advocated for prison gerrymandering reform.

**U.S. District Court for the Northern District of California**          July 2019 – August 2020
**Law Clerk to the Honorable Edward M. Chen**

Wrote bench memos. Drafted orders and opinions.  Assisted with trials.  Supervised legal externs.

**Alameda County Public Defender's Office**          September 2018 – July 2019
**Oakland, California**
**Post-Bar Legal Assistant**

Interviewed Spanish- and English-speaking clients.  Represented clients at arraignment.  Wrote and argued motions and wrote legal memos.

**Alameda County Public Defender's Office**          May 2017 – August 2017
**Oakland, California**
**Summer Law Clerk**

Drafted appellate briefs.  Wrote legal research memos.  Assisted attorneys in preparation for trial.



**American Civil Liberties Union, New York, New York**                  **July 2016 – August 2016**
**Intern, Criminal Law Reform Project**
Wrote memoranda discussing legal theories for litigation of challenges to indigent defense
systems.  Investigated legislative history of state drug laws.  Interviewed jury venire for death
penalty appeal.

**Department of Justice, Civil Rights Division, Washington, D.C.**        **May 2016 – July 2016**
**Intern, Special Litigation Section**
Drafted compliance documents for consent decrees. Wrote legal memos on discriminatory
policing.  Collected evidence of excessive use of force by police. Wrote memo on protections for
LGBT prisoners.

**Human Rights Watch, New York, New York**                  **January 2016 – April 2016**
**Legal Intern, U.S. Program**
Conducted legal and empirical research for report on criminalization of drug possession in the
U.S.

**Harvard Defenders, Cambridge, Massachusetts**                  **2015 – 2018**
**Student Attorney & Director of Training**
Provide free representation to low-income defendants at show-cause hearings. Designed and
organized monthly trainings covering ethics, legal defense strategies, and investigation and
representation skills.

**Mount Tamalpais College, San Quentin, California**                  **2010 and 2014**
**Tutor and Teaching Assistant**

**San Francisco University High School, San Francisco, California**        **2010 – 2015**
**Director of Student Leadership, Class Dean, & Teacher**
Developed and directed student leadership program.  Led team of senior class advisors.  Taught
AP Economics.

**San Francisco Bar Association, San Francisco, California**                  **2009**
**Bilingual Legal Interviewer**
Interviewed Spanish- and English-speaking clients.  Referred clients to attorneys, legal services,
and clinics.

**Office of Mayor John Hickenlooper, Denver, Colorado**                  **2008**
**Special Assistant**
Wrote speeches.  Staffed the Mayor at events.  Communicated with constituents on behalf of the
Mayor's Office.

**EDUCATION**

**Harvard Law School, Cambridge, Massachusetts** **J.D., *cum laude*, 2018**

*Honors*: Harvard University Presidential Public Service Fellowship; James Vorenberg Equal Justice Summer Fellowship; Heyman Summer Internship for Federal Government Service

*Activities*: Editor and Outreach Chair, *Harvard Law Review*; Research Assistant to Professor Philip Heymann

**University of California, Berkeley** **M.A., Jurisprudence and Social Policy, 2010**

*Honors*: Philip Selznick Fellowship for Jurisprudence and Social Policy; Law and Economics Fellowship

*Activities*: Research Assistant to Professor Frank Zimring

**University of North Carolina, Chapel Hill** **B.A., Highest Distinction, May 2007**
**Political Science and Economics**

*Honors*: Phi Beta Kappa; John Motley Morehead Scholarship (merit scholarship—now called the Morehead-Cain Scholarship); Chancellor's L. Richardson Preyer Award for Excellence in Political Science; Undergraduate Fellow, Center for the Study of the Presidency, Washington, D.C.

*Thesis*: The Impact of Felony Disenfranchisement on Voter Turnout Among Eligible, Non-Felon Voters (Highest Honors)

**BAR ADMISSIONS**

State Bar of California, No. 324454 (2018)

EXHIBIT E

A-Z Topics    Site Map    FOIA

| Home | About Us | Inmates | Locations | Careers | Business | Resources | Contact Us |
|------|----------|---------|-----------|---------|----------|-----------|------------|

## Statistics

Statistics Overview    Inmate Statistics    Population Statistics    Staff Statistics

# Population Statistics

- Population Totals
- Population Breakdown
  - BOP Population
  - Private Population
  - Other Facility Populations
- Past Population Totals

### 158,138 Total Federal Inmates

**143,561** federal inmates in BOP Custody

**0** federal inmates in privately managed facilities

**14,577** federal inmates in other types of facilities

Last Updated August 10, 2023.
Data refreshed every Thursday at 12:00 A.M.

### Inmate Population Breakdown

| BOP Facility | State | Total |
|--------------|-------|-------|
| ALDERSON FPC | WV | 690 |
| ALICEVILLE FCI | AL | 1466 |
| ALICEVILLE-CAMP | AL | 179 |
| ALLENWOOD LOW FCI | PA | 1056 |
| ALLENWOOD MED FCI | PA | 1277 |
| ALLENWOOD USP | PA | 323 |
| ASHLAND FCI | KY | 1152 |
| ASHLAND-CAMP | KY | 154 |
| ATLANTA USP | GA | 1958 |
| ATWATER USP | CA | 1172 |
| ATWATER-CAMP | CA | 117 |

| BOP Facility | State | Total |
|---|---|---|
| BASTROP FCI | TX | 1001 |
| BASTROP-CAMP | TX | 113 |
| BEAUMONT LOW FCI-CAMP | TX | 384 |
| BEAUMONT LOW FCI | TX | 1643 |
| BEAUMONT MED FCI | TX | 1646 |
| BEAUMONT USP | TX | 1228 |
| BECKLEY FCI | WV | 1606 |
| BECKLEY-CAMP | WV | 77 |
| BENNETTSVILLE FCI | SC | 1572 |
| BENNETTSVILLE-CAMP | SC | 87 |
| BERLIN FCI | NH | 700 |
| BERLIN-CAMP | NH | 26 |
| BIG SANDY USP | KY | 1376 |
| BIG SANDY-CAMP | KY | 37 |
| BIG SPRING FCI | TX | 1003 |
| BIG SPRING-CAMP | TX | 114 |
| BROOKLYN MDC | NY | 1549 |
| BRYAN FPC | TX | 629 |
| BUTNER FMC | NC | 849 |
| BUTNER LOW FCI | NC | 958 |
| BUTNER MED I FCI | NC | 586 |
| BUTNER MED II FCI | NC | 1447 |
| BUTNER-CAMP | NC | 228 |
| CANAAN USP | PA | 1189 |
| CANAAN-CAMP | PA | 86 |
| CARSWELL FMC | TX | 849 |
| CARSWELL-CAMP | TX | 168 |
| CHICAGO MCC | IL | 481 |
| COLEMAN I USP | FL | 1407 |
| COLEMAN II USP | FL | 1219 |
| COLEMAN LOW FCI-CAMP | FL | 474 |
| COLEMAN LOW FCI | FL | 1617 |
| COLEMAN MED FCI | FL | 1569 |
| CUMBERLAND FCI | MD | 679 |
| CUMBERLAND-CAMP | MD | 224 |
| DANBURY FCI | CT | 866 |
| DANBURY-CAMP | CT | 94 |
| DEVENS FMC | MA | 840 |
| DEVENS-CAMP | MA | 72 |
| DUBLIN FCI | CA | 549 |
| DUBLIN-CAMP | CA | 125 |

| BOP Facility | State | Total |
|---|---|---|
| DULUTH FPC | MN | 401 |
| EDGEFIELD FCI | SC | 1574 |
| EDGEFIELD-CAMP | SC | 403 |
| EL RENO FCI | OK | 1083 |
| EL RENO-CAMP | OK | 144 |
| ELKTON FCI | OH | 1611 |
| ELKTON-FSL | OH | 382 |
| ENGLEWOOD FCI | CO | 888 |
| ENGLEWOOD-CAMP | CO | 82 |
| ESTILL-CAMP | SC | 69 |
| FAIRTON FCI | NJ | 764 |
| FAIRTON-CAMP | NJ | 62 |
| FLORENCE ADMAX USP | CO | 323 |
| FLORENCE FCI-CAMP | CO | 153 |
| FLORENCE FCI | CO | 1098 |
| FLORENCE HIGH USP | CO | 962 |
| FORREST CITY FCI-CAMP | AR | 207 |
| FORREST CITY FCI | AR | 1607 |
| FORREST CITY MED FCI | AR | 1687 |
| FORT DIX FCI | NJ | 3530 |
| FORT DIX-CAMP | NJ | 246 |
| FORT WORTH ADMINISTRATIVE | TX | 1520 |
| GILMER FCI | WV | 1586 |
| GILMER-CAMP | WV | 52 |
| GREENVILLE FCI | IL | 958 |
| GREENVILLE-CAMP | IL | 236 |
| GUAYNABO MDC | PR | 1158 |
| HAZELTON FCI-FEMALE | WV | 376 |
| HAZELTON FCI | WV | 1709 |
| HAZELTON USP | WV | 1618 |
| HAZELTON-CAMP | WV | 92 |
| HERLONG FCI | CA | 1462 |
| HERLONG-CAMP | CA | 83 |
| HONOLULU FDC | HI | 278 |
| HOUSTON FDC | TX | 756 |
| JESUP FCI | GA | 1079 |
| JESUP-CAMP | GA | 97 |
| JESUP-FSL | GA | 484 |
| LA TUNA FCI | TX | 625 |
| LA TUNA-CAMP | TX | 217 |
| LEAVENWORTH USP | KS | 1292 |

| BOP Facility | State | Total |
|---|---|---|
| LEAVENWORTH-CAMP | KS | 317 |
| LEE USP-CAMP | VA | 44 |
| LEE USP | VA | 1517 |
| LEWISBURG USP | PA | 715 |
| LEWISBURG-CAMP | PA | 291 |
| LEXINGTON FMC | KY | 1087 |
| LEXINGTON-CAMP | KY | 178 |
| LOMPOC FCI | CA | 875 |
| LOMPOC USP-CAMP N | CA | 123 |
| LOMPOC USP-CAMP | CA | 251 |
| LOMPOC USP | CA | 1390 |
| LORETTO FCI | PA | 761 |
| LORETTO-CAMP | PA | 56 |
| LOS ANGELES MDC | CA | 598 |
| MANCHESTER FCI | KY | 1056 |
| MANCHESTER-CAMP | KY | 50 |
| MARIANNA FCI | FL | 1012 |
| MARIANNA-CAMP | FL | 220 |
| MARION USP | IL | 1112 |
| MARION-CAMP | IL | 180 |
| MCCREARY USP | KY | 1586 |
| MCCREARY-CAMP | KY | 87 |
| MCDOWELL FCI | WV | 1562 |
| MCDOWELL-CAMP | WV | 26 |
| MCKEAN FCI | PA | 939 |
| MCKEAN-CAMP | PA | 150 |
| MEMPHIS FCI | TN | 825 |
| MEMPHIS-CAMP | TN | 75 |
| MENDOTA FCI | CA | 1078 |
| MENDOTA-CAMP | CA | 109 |
| MIAMI FCI-CAMP | FL | 157 |
| MIAMI FCI | FL | 801 |
| MIAMI FDC | FL | 938 |
| MILAN FCI | MI | 1597 |
| MONTGOMERY FPC | AL | 439 |
| MORGANTOWN FCI | WV | 517 |
| OAKDALE I FCI | LA | 842 |
| OAKDALE II FCI-CAMP | LA | 126 |
| OAKDALE II FCI | LA | 1061 |
| OKLAHOMA CITY FTC | OK | 1147 |
| OTISVILLE FCI | NY | 988 |

| BOP Facility | State | Total |
|---|---|---|
| OTISVILLE-CAMP | NY | 88 |
| OXFORD FCI | WI | 1081 |
| PEKIN FCI | IL | 1082 |
| PEKIN-CAMP F | IL | 242 |
| PENSACOLA FPC | FL | 409 |
| PETERSBURG FCI-CAMP | VA | 192 |
| PETERSBURG FCI | VA | 501 |
| PETERSBURG MED FCI | VA | 1703 |
| PHILADELPHIA FDC | PA | 909 |
| PHOENIX FCI | AZ | 944 |
| PHOENIX-CAMP | AZ | 237 |
| POLLOCK MED FCI | LA | 1577 |
| POLLOCK USP | LA | 1122 |
| POLLOCK-CAMP | LA | 160 |
| RAY BROOK FCI | NY | 690 |
| ROCHESTER FMC | MN | 584 |
| SAFFORD FCI | AZ | 664 |
| SAN DIEGO MCC | CA | 747 |
| SANDSTONE FCI | MN | 1146 |
| SCHUYLKILL FCI | PA | 1043 |
| SCHUYLKILL-CAMP | PA | 109 |
| SEAGOVILLE FCI | TX | 1706 |
| SEAGOVILLE-CAMP | TX | 112 |
| SEATAC FDC | WA | 705 |
| SHERIDAN FCI | OR | 1232 |
| SHERIDAN-CAMP | OR | 341 |
| SPRINGFIELD USMCFP | MO | 978 |
| TALLADEGA FCI | AL | 906 |
| TALLADEGA-CAMP | AL | 115 |
| TALLAHASSEE FCI | FL | 889 |
| TERMINAL ISLAND FCI | CA | 949 |
| TERRE HAUTE FCI-CAMP | IN | 239 |
| TERRE HAUTE FCI | IN | 1213 |
| TERRE HAUTE USP | IN | 1185 |
| TEXARKANA FCI | TX | 997 |
| TEXARKANA-CAMP | TX | 231 |
| THOMSON ADMIN USP | IL | 1197 |
| THOMSON AUSP-CAMP | IL | 131 |
| THREE RIVERS FCI | TX | 1108 |
| THREE RIVERS-CAMP | TX | 232 |
| TUCSON FCI | AZ | 390 |

| BOP Facility | State | Total |
|---|---|---|
| TUCSON USP | AZ | 1316 |
| TUCSON-CAMP | AZ | 129 |
| VICTORVILLE MED I FCI | CA | 1463 |
| VICTORVILLE MED I-CAMP | CA | 175 |
| VICTORVILLE MED II FCI | CA | 1449 |
| VICTORVILLE USP | CA | 1119 |
| WASECA FCI | MN | 717 |
| WILLIAMSBURG FCI | SC | 1382 |
| WILLIAMSBURG-CAMP | SC | 86 |
| YANKTON FPC | SD | 395 |
| YAZOO CITY FCI-CAMP | MS | 75 |
| YAZOO CITY FCI | MS | 1340 |
| YAZOO CITY II FCI | MS | 1492 |
| YAZOO CITY USP | MS | 1589 |

| Private Facility | State | Total |
|---|---|---|

| Other Facility Types | Total |
|---|---|
| CONTRACT JUVENILES | 17 |
| HOME CONFINEMENT | 5933 |
| JAIL/SHORT-TERM DETENTION | 574 |
| LONG-TERM BOARDERS | 83 |
| RRC*S | 7970 |

## Past Inmate Population Totals

| Year | Population | Change |
|---|---|---|
| 1980 | 24,640 | 0 |
| 1981 | 26,313 | +1,673 |
| 1982 | 30,531 | +4,218 |
| 1983 | 33,216 | +2,685 |
| 1984 | 35,795 | +2,579 |
| 1985 | 40,330 | +4,535 |
| 1986 | 46,055 | +5,725 |
| 1987 | 49,378 | +3,323 |
| 1988 | 50,513 | +1,135 |

| Year | Population | Change |
|------|-----------|--------|
| 1989 | 57,762 | +7,249 |
| 1990 | 64,936 | +7,174 |
| 1991 | 71,508 | +6,572 |
| 1992 | 79,678 | +8,170 |
| 1993 | 88,565 | +8,887 |
| 1994 | 95,162 | +6,597 |
| 1995 | 100,958 | +5,796 |
| 1996 | 105,443 | +4,485 |
| 1997 | 112,289 | +6,846 |
| 1998 | 122,316 | +10,027 |
| 1999 | 133,689 | +11,373 |
| 2000 | 145,125 | +11,436 |
| 2001 | 156,572 | +11,447 |
| 2002 | 163,436 | +6,864 |
| 2003 | 172,499 | +9,063 |
| 2004 | 179,895 | +7,396 |
| 2005 | 187,394 | +7,499 |
| 2006 | 192,584 | +5,190 |
| 2007 | 200,020 | +7,436 |
| 2008 | 201,668 | +1,648 |
| 2009 | 208,759 | +7,091 |
| 2010 | 210,227 | +1,468 |
| 2011 | 217,768 | +7,541 |
| 2012 | 218,687 | +919 |
| 2013 | 219,298 | +611 |
| 2014 | 214,149 | -5,149 |
| 2015 | 205,725 | -8,426 |
| 2016 | 192,170 | -13,553 |
| 2017 | 185,617 | -6,553 |
| 2018 | 181,698 | -3,919 |
| 2019 | 177,214 | -4,484 |
| 2020 | 155,562 | -21,652 |

**Save Past Population Totals:**

CSV | XSL | PDF

**About Us**
About Our Agency
About Our Facilities
Historical Information

**Inmates**
Find an Inmate
First Step Act
Communications

**Locations**
List of our Facilities
Map of our Locations
Search for a Facility

**Careers**
Life at the BOP
Explore Opportunities
Current Openings

**Business**
Acquisitions
Solicitations & Awards
Reentry Contracting

**Resources**
Policy & Forms
News Stories
Press Releases

**Resources For ...**
Victims & Witnesses
Employees
Volunteers

Statistics

Custody & Care
Visiting
Report a Concern

Application Process
Our Hiring Process

Publications
Research & Reports

Former Inmates
Media Reps

E X H I B I T   F

*United States Senate*
*PERMANENT SUBCOMMITTEE ON INVESTIGATIONS*
*Committee on Homeland Security and Governmental Affairs*

*Jon Ossoff, Chair*
*Ron Johnson, Ranking Member*

# SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS

## STAFF REPORT

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

## UNITED STATES SENATE



**RELEASED IN CONJUNCTION WITH THE**
**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**
**DECEMBER 13, 2022 HEARING**

**SENATOR JON OSSOFF**
**Chair**

**SENATOR RON JOHNSON**
**Ranking Minority Member**

**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**

**SARA SCHAUMBURG**
Staff Director

**CAITLIN WARNER**
Chief Counsel

**DANIEL M. EISENBERG**
Deputy Staff Director & Senior Counsel

**MEERAN AHN, BALAJI NARAIN, & LI YU**
Senior Counsels

**TAYLOR BURNETT**
Counsel

**DENNIS HEINRICH**
Detailee

**KARAZ AXAM, DANIELLE DAVIS, ISMAEL FAROOQUI, SAM KREVLIN,**
**MALLORY LEOPOLD NEEDLE, MADELYN PHINNEY,**
**AVERY SALINGER, NAILA SCOTT, & THOMAS WEAVER**
Law Clerks

**BRIAN DOWNEY**
Staff Director to the Minority

**SCOTT WITTMANN**
Deputy Staff Director to the Minority

**KYLE BROSNAN**
Chief Counsel to the Minority

**PATRICK HARTOBEY**
Senior Counsel to the Minority

**CHRISTOPHER ECKHARDT, JR, VICTORIA GARRASTACHO, JAMES PRIEST**
Law Clerks

**KATE KIELCESKI**
Subcommittee Clerk

i

## Table of Contents

EXECUTIVE SUMMARY .................................................................................................. 1

I.      Introduction ........................................................................................................... 6

    a.   Female Prisoners Are Disproportionately Vulnerable to Sexual Abuse............................ 6

    b.   Sexual Contact Between BOP Employees and Prisoners is a Federal Crime and Also
    Prohibited by BOP Policy ........................................................................................ 6

    c.   The Process for Investigating Allegations of Sexual Abuse by BOP Employees .............. 7

II.     The Subcommittee's Investigation ...................................................................... 8

III.    There Were At Least Four BOP Facilities Between 2012 and 2022 with Recurring Sexual
Abuse of Female Prisoners by Male BOP Employees .................................................... 9

    a.   MCC New York ................................................................................................. 10

    b.   MDC Brooklyn .................................................................................................. 11

    c.   FCC Coleman ..................................................................................................... 11

    d.   FCI Dublin ......................................................................................................... 15

    e.   Sexual Abuse Across Other BOP Facilities that Hold Female Prisoners ......................... 18

IV.     BOP Does Not Systematically Analyze Key Indicators of Sexual Abuse in its Facilities 19

    a.   Flawed PREA Audits Failed to Detect the Culture of Sexual Abuse of Female Prisoners
    by Employees at FCC Coleman and FCI Dublin ........................................................ 19

    b.   BOP Does Not Systematically Analyze PREA Complaint Data ...................................... 22

    c.   The Office of Internal Affairs Annual Reporting Is Confusing, Omits Relevant
    Information, and Obscures BOP's Internal Affairs Case Backlog.................................... 23

V.      BOP Fails to Hold Employees Accountable for Misconduct ............................................ 24

    a.   BOP Internal Affairs Has a Backlog of Approximately 8,000 Misconduct Cases ............ 24

    b.   BOP's Inability to Timely Investigate and Close Internal Affairs Complaints Has Failed to
    Hold Wrongdoers Accountable .................................................................................. 26

    c.   OIG Lacks Resources to Pursue Criminal Investigations of Most BOP Employees
    Accused of Crimes .................................................................................................... 27

VI.     BOP's Deficient Response to Sexual Abuse .................................................................. 28

VII.    Conclusion ........................................................................................................... 30

## Sexual Abuse of Female Inmates in Federal Prisons

**EXECUTIVE SUMMARY**

In April 2022, the Permanent Subcommittee on Investigations ("PSI" or "the Subcommittee") launched a bipartisan investigation into sexual abuse of female prisoners in custody of the Federal Bureau of Prisons ("BOP").

The Subcommittee reviewed non-public BOP and whistleblower documents, and it conducted more than two dozen interviews with senior BOP leaders, whistleblowers, and survivors of sexual abuse. The Subcommittee found:

- BOP employees sexually abused female prisoners in at least two-thirds (19 of 29 facilities) of federal prisons that have held women over the past decade.[1]

- BOP has failed to successfully implement the Prison Rape Elimination Act ("PREA"). It failed to prevent, detect, and stop recurring sexual abuse in at least four federal prisons, including abuse by senior prison officials. At FCI Dublin, for example, the former Warden and Chaplain both sexually abused female prisoners.

- BOP management failures enabled continued sexual abuse of female prisoners by BOP's own employees.

- BOP Office of Internal Affairs' ("BOP OIA" or "OIA") investigative practices are seriously flawed. There is currently a backlog of 8,000 internal affairs cases, including at least hundreds of sexual abuse cases.[2]

\* \* \*

---

[1] There are currently 27 female facilities where BOP holds women. Since 2012, there have been two BOP facilities that were used to hold women but no longer do: FCC Coleman and MCC New York. Thus, since 2012, there were 29 BOP facilities in total that have held women. *See* Exhibit 1; Bureau of Prisons, *Our Locations* (https://www.bop.gov/locations/list.jsp); Email from Congressional Research Service to PSI (Dec. 9, 2022) (on file with PSI) (confirming 29 total facilities between 2012 and 2022 held female prisoners). The Subcommittee reviewed public criminal convictions and data produced by BOP concerning substantiated sexual abuse cases of prisoners by BOP employees. *See* Exhibit 1; Staff-on-Inmate Cases by Facility (2012-2021), Production from DOJ to PSI (Nov. 4, 2022) (PSI-BOPOIA-Prod4-0001-0049). The Subcommittee found sexual abuse of female prisoners by BOP employees in 19 of 29 federal facilities that held women since 2012. Because BOP did not disclose the gender of the victim of abuse in the data that it produced to the Subcommittee, the Subcommittee did not include BOP OIA substantiated sexual abuse cases in the remaining 10 of 29 facilities holding both men and women where there was no public criminal conviction. For this reason, there were abuse cases in *at least* 19 of 29 facilities, or, two-thirds.

[2] Office of Internal Affairs, BOP, *Report for Fiscal Year 2020* (https://www.bop.gov/foia/docs/FY_2020_Annual_OIA_Report.pdf); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022); *Lawsuit settled in which 15 women alleged sexual abuse at Florida prison*, Tampa Bay Times (May 5, 2022) (https://www.tampabay.com/news/florida/2021/05/05/lawsuit-settled-in-which-15-women-alleged-sexual-abuse-at-florida-prison/).

In 2003, Congress passed PREA "to eradicate prisoner rape in all types of correctional facilities in this country" by requiring federal prisons to adopt certain policies and practices designed to mitigate the risk of sexual abuse, track allegations of sexual abuse, and protect potential victims.[3]  Yet according to the Subcommittee's review of court filings and non-public BOP data dating back to 2012, BOP employees have sexually abused women in their custody in at least 19 of 29—or two-thirds—of facilities where BOP incarcerates women.[4]

In at least four BOP facilities, multiple women endured ongoing sexual abuse for months or years.[5]  Beginning in June 2021, the Department of Justice ("DOJ") indicted five BOP employees at California's Federal Correctional Institution ("FCI") Dublin—including the Warden and the Chaplain—for repeated sexual abuse of at least eight female prisoners under their supervision.[6]  The horrific abuse at FCI Dublin was not unique among BOP's prisons.  BOP failed to detect and prevent repeated sexual abuse in at least three other facilities before FCI Dublin.

- Starting in approximately 2012, at least two officers repeatedly sexually abused at least eight female prisoners at the Metropolitan Correctional Center ("MCC") New York over the course of several years.[7]

- Starting in approximately 2016, at least two male lieutenants and one officer sexually abused at least nine female prisoners at the Metropolitan Detention Center ("MDC") Brooklyn in New York.[8]

---

[3] Bureau of Justice Assistance, *Prison Rape Elimination Act (PREA): Overview* (https://bja.ojp.gov/program/prison-rape-elimination-act-prea/overview).
[4] *See* footnote 1.  "BOP employees" in this report includes bargaining staff, mid-level managers, and supervisors.
[5] *See, e.g.*, U.S. Attorney's Office, Southern District of New York: *Correctional Officer At Metropolitan Correctional Center Sentenced To 40 Months In Prison For Engaging In Abusive Sexual Contact With Inmates* (Dec. 8, 2020) (https://www.justice.gov/usao-sdny/pr/correctional-officer-metropolitan-correctional-center-sentenced-40-months-prison); Office of Public Affairs, Department of Justice: *Jury Convicts Former Federal Prison Warden for Sexual Abuse of Three Female Inmates* (Dec. 8, 2022) (https://www.justice.gov/opa/pr/jury-convicts-former-federal-prison-warden-sexual-abuse-three-female-inmates); U.S. Attorney's Office, Eastern District of New York: *Former Federal Bureau of Prisons Lieutenant Sentenced to 25 Years in Prison for Sexual Abuse and Violation of Civil Rights Convictions* (July 31, 2019) (https://www.justice.gov/usao-edny/pr/former-federal-bureau-prisons-lieutenant-sentenced-25-years-prison-sexual-abuse-and); Affidavit of Keith Vann, Production from DOJ to PSI (Oct. 18, 2022) (PSI-BOPOIA-Prod2-0135-0144).
[6] Lisa Fernandez, *5th officer at Dublin prison charged in widening sex abuse scandal*, KTVU FOX 2 (Mar. 24, 2022) (https://www.ktvu.com/news/5th-guard-at-dublin-prison-charged-in-widening-sex-abuse-scandal).  *United States v. Highhouse*, No. 22-cr-000016-HSG (N.D. Cal. 2022); *United States. v. Klinger*, No. 4:22-CR-00031-JSW (N.D. Cal., June 25, 2021); *United States. v. Bellhouse*, No. 4:21-MJ-71905-MRGD (N.D. Cal., Nov. 30, 2021); *United States. Chavez*, No. 4:22-CR-00104-JSW (N.D. Cal., Mar. 10, 2022); *United States v. Garcia*, No. 4:21-CR-429 (N.D. Cal. 2022).
[7] Benjamin Weiser, *U.S. Pays $4.2 Million to Victims of Jail Guard's Long-Running Sex Abuse*, New York Times (July 18, 2022) (https://www.nytimes.com/2022/07/18/nyregion/mcc-officer-sex-abuse-victims-payout.html); *Herrera v. United States*, 20-cv-10206 (PKC) (S.D.N.Y. Mar. 27, 2022); U.S. Attorney's Office, Eastern District of New York: *Former Federal Correctional Officer Sentenced to Seven Years for Sexually Abusing an Inmate* (May 4, 2022) (https://oig.justice.gov/press/2016/2016-05-04.pdf).
[8] Joseph Goldstein, *Brooklyn Prison Supervisors Charged With Sexually Assaulting Inmates*, New York Times (May 25, 2017) (https://www.nytimes.com/2017/05/25/nyregion/prison-supervisors-sex-abuse-prevention-rape-

- Starting in approximately 2012 through 2020, there were at least six male BOP employees who sexually abused at least ten female prisoners at the Federal Correctional Complex ("FCC") Coleman in Florida.[9]  The Subcommittee obtained copies of non-public sworn, compelled statements from officers at FCC Coleman, wherein the officers admitted to sexual abuse of female detainees in graphic detail.[10]  DOJ's Office of the Inspector General ("OIG") declined to investigate these FCC Coleman officers for sexual abuse and they were never prosecuted.[11]

The Subcommittee found that the mechanisms that BOP employs to identify and prevent sexual abuse of female prisoners by BOP employees are ineffective.  Audits intended to assess sexual abuse in prisons (known as "PREA audits") found that FCC Coleman and FCI Dublin were compliant with every PREA standard during the time when senior BOP officials admitted to the Subcommittee that there was a "culture of abuse."[12]  Further, BOP failed to systematically analyze PREA data, missing a key opportunity to identify problematic facilities or employees.[13]

BOP OIA, the component of BOP responsible for investigating staff misconduct, has failed to timely investigate and resolve allegations of employee misconduct concerning both sexual abuse of female prisoners and other matters.  The Subcommittee's investigation uncovered that as of November 2022, BOP OIA had a backlog of approximately 8,000 cases.[14]  Some cases have been pending for more than five years.[15]  BOP OIA's failures impeded BOP's ability to hold wrongdoers accountable.

---

charges.html); *United States v. Eugenio Perez*, 1:17-cr-00280-KAM (E.D.N.Y. 2018); *United States v. Martinez*, 1:17-cr-00281-ERK (E.D.N.Y. 2019); *United States v. Armando Moronta*, 17-CR-281 (E.D.N.Y. 2017).

[9] *See* Answer at ¶ 26-29, *Beaubrun v. United States*, 5:19-CV-0615-TJC (M.D. Fl. 2020) [hereinafter *Beaubrun Answer*].

[10] 2019 Affidavit of Christopher Palomares, Production from DOJ to PSI (Oct. 18, 2022) (PSI-BOPOIA-Prod2-0101-0111) [hereinafter 2019 Palomares Aff.]; 2018 Affidavit of Christopher Palomares, Production from DOJ to PSI (Oct. 18, 2022) (PSI-BOPOIA-Prod2-0112-0123) [hereinafter 2018 Palomares Aff.]; Affidavit of Daniel Kuilan, Production from DOJ to PSI (Oct. 18, 2022) (PSI-BOPOIA-Prod2-0188-0196) [hereinafter Kuilan Aff.]; Affidavit of Keith Vann, Production from DOJ to PSI (Oct. 18, 2022) (PSI-BOPOIA-Prod2-0135-0144) [hereinafter Vann Aff.]; Affidavit of Tracy Laudenslager, Production from DOJ to PSI (Oct. 18, 2022) (PSI-BOPOIA-Prod2-0093-0100) [hereinafter Laudenslager Aff.]; Affidavit of Timothy Phillips, Production from DOJ to PSI (Oct. 18, 2022) (PSI-BOPOIA-Prod2-0124-0134) [hereinafter Phillips Aff.]; Affidavit of Scott Campbell Production from DOJ to PSI (Oct. 18, 2022) (PSI-BOPOIA-Prod2-0086-0092) [hereinafter Campbell Aff.].

[11] OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[12] 2017 FCI Dublin PREA Audit, Production from DOJ to PSI (Oct. 4, 2022); 2022 FCI Dublin PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0262-0381); 2018 FCC Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0635-0726); 2021 FCC Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0125-0261); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022); Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022).

[13] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[14] *See* Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[15] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

**Key Findings**

1. **Over the past decade, female inmates in at least two-thirds (19 of 29) of federal prisons that held women were sexually abused by male BOP employees, including senior prison officials.** Multiple BOP employees sexually abused multiple female prisoners at MCC New York, MDC Brooklyn, FCC Coleman, and FCI Dublin.[16] Between 2012 and 2020, BOP has opened 5,415 internal affairs cases alleging sexual abuse of male or female prisoners by BOP employees.[17] There were at least 134 instances across 19 female facilities where BOP employees were either prosecuted for sexual abuse of female prisoners or where BOP OIA substantiated allegations that BOP employees sexually abused female prisoners.[18]

2. **BOP failed to detect, prevent, and respond to sexual abuse of female prisoners in its custody.** BOP failed to systematically analyze PREA complaint data and relied on flawed PREA audits that missed sexual abuse of female prisoners by male BOP employees at FCC Coleman and FCI Dublin.[19] At FCC Coleman, BOP transferred all female prisoners out of the prison two days before the auditor's on-site inspection at a time when multiple women were being abused.[20] At FCI Dublin, the former PREA compliance officer, responsible for training supervisors on the PREA requirements and coordinating the PREA audit, was convicted of sexually abusing female prisoners on December 8, 2022.[21]

3. **BOP failed to hold employees accountable for misconduct.** BOP has a backlog of approximately 8,000 internal affairs cases alleging employee misconduct, some of which have been pending for more than five years.[22] OIA's failure to clear pending cases impedes BOP's ability to hold employees accountable.

4. **BOP failed to take agency-wide action to address sexual abuse of female inmates by male BOP employees.** In interviews with the Subcommittee, BOP could not identify any agency-wide actions it had undertaken in response to sexual abuse of

---

[16] *See* Exhibit 1.

[17] Staff-on-Inmate Cases by Facility (2012-2021), Production from DOJ to PSI (Nov. 4, 2022) (PSI-BOPOIA-Prod4-0001-0049).

[18] *See* footnote 1; Exhibit 1.

[19] *See* Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022); Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022); Melissa Rios, Western Regional Director, BOP, Interview with PSI (Nov. 10, 2022); Wiley Jenkins, Former Warden at FCI Dublin, BOP, Interview with PSI (Nov. 16, 2022); 2017 FCI Dublin PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (on file with PSI); 2022 FCI Dublin PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0262-0381); 2018 FCC Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0635-0726); 2021 FCC Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0125-0261).

[20] *See* FCC Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0125-0261) at PSI-BOPOIA-Prod1-000136.

[21] Office of Public Affairs, Department of Justice: *Jury Convicts Former Federal Prison Warden for Sexual Abuse of Three Female Inmates* (Dec. 8, 2022) (https://www.justice.gov/opa/pr/jury-convicts-former-federal-prison-warden-sexual-abuse-three-female-inmates); 2017 FCI Dublin PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (on file with PSI).

[22] *See* Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

numerous female inmates by multiple BOP employees at MCC New York, MDC Brooklyn, and FCC Coleman.  It was only after the abuse at FCI Dublin came to light that BOP began to institute agency-wide changes.[23]

---

[23] *See* Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022); Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022); Melissa Rios, Western Regional Director, BOP, Interview with PSI (Nov. 10, 2022); Wiley Jenkins, Former Warden at FCI Dublin, BOP, Interview with PSI (Nov. 16, 2022).

## I.   Introduction

BOP "is responsible for the custody and care of federal inmates."[24]  As of November 2022, BOP held approximately 160,000 prisoners across its 122 facilities.[25]  Approximately 11,000 were female and incarcerated in BOP's 27 "female facilities."[26]  Six of the 27 female facilities hold women exclusively, and 21 hold both men and women.[27]  Since 2012, there were two additional federal prisons that held women but no longer do: FCC Coleman and MCC New York.[28]

### a.   Female Prisoners Are Disproportionately Vulnerable to Sexual Abuse

Women entering prison are more likely to have experienced physical and/or sexual abuse as children and adults, as compared to men in prison.[29]  According to a February 2020 report by the U.S. Commission on Civil Rights, research suggests that at least 50 percent of women entering prison report that they experienced physical and/or sexual abuse before their incarceration.[30]  They are also significantly more likely to be sexually harassed and abused while incarcerated.[31]  According to *the National Standards to Prevent, Detect, and Respond to Prison Rape: Final Rule*, women with histories of sexual abuse—including women in prisons and jails—are particularly traumatized by subsequent abuse.[32]

### b.   Sexual Contact Between BOP Employees and Prisoners is a Federal Crime and Also Prohibited by BOP Policy

Sexual abuse of prisoners in BOP custody by employees is both a federal crime and subject to BOP administrative sanctions.

18 U.S.C. § 2243(b) makes it a felony—punishable by up to 15 years of imprisonment— for a BOP employee to "knowingly [engage] in a sexual act with another person who is—(1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the [BOP

---

[24] Bureau of Prisons, *About Our Agency* (https://www.bop.gov/about/agency/).

[25] Bureau of Prisons, *Statistics* (https://www.bop.gov/about/statistics/population_statistics.jsp); Bureau of Prisons, *Locations* (https://www.bop.gov/locations/).

[26] Bureau of Prisons, *Statistics* (https://www.bop.gov/about/statistics/statistics_inmate_gender.jsp).

[27] Bureau of Prisons, *Our Locations* (https://www.bop.gov/locations/list.jsp).

[28] *See* Email from Congressional Research Service to PSI (Dec. 9, 2022) (on file with PSI); Bureau of Prisons, *Our Locations* (https://www.bop.gov/locations/list.jsp).

[29] U.S. Commission on Civil Rights, *Women in Prison: Seeking Justice Behind Bars* (February 2020) (https://www.usccr.gov/files/pubs/2020/02-26-Women-in-Prison.pdf).

[30] U.S. Commission on Civil Rights, *Women in Prison: Seeking Justice Behind Bars* (February 2020), (https://www.usccr.gov/files/pubs/2020/02-26-Women-in-Prison.pdf) (citing Nancy Wolff, Jing Shi, and Jane Siegel, *Patterns of Victimization Among Male and Female Offenders and Evidence of an Enduring Legacy,* Violence Victimization, Vol. 24, No. 4 (2009) at 469-84) (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3793850).

[31] U.S. Commission on Civil Rights, *Women in Prison: Seeking Justice Behind Bars* (February 2020), https://www.usccr.gov/files/pubs/2020/02-26-Women-in-Prison.pdf.

[32] *See* Department of Justice, *National Standards to Prevent, Detect, and Respond to Prison Rape: Final Rule*, 77 Fed. Reg. 37,106, 37,132 (June 20, 2012) (the "2012 DOJ PREA Standards Final Notice") (https://www.govinfo.gov/content/pkg/FR-2012-06-20/html/2012-12427.htm) (citing BJS, unpublished data, 2004 Survey of Inmates in State and Federal Correctional Facilities and 2002 Survey of Inmates in Local Jails).

employee] so engaging."  BOP "staff sexual relations with inmates is always illegal" as there is no "consent" defense to a violation of 18 U.S.C. § 2243(b).[33]  As OIG explained in a 2005 report, this is because the "inherently unequal" relationship between BOP employees and prisoners precludes prisoners from having "the same ability as staff members to consent to a sexual relationship."[34]

BOP policy has "zero tolerance toward all forms of sexual activity, including sexual abuse and sexual harassment." [35]  Per the policy, "Termination shall be the presumptive disciplinary sanction for staff who have engaged in sexual abuse."[36]

### c. The Process for Investigating Allegations of Sexual Abuse by BOP Employees

As part of PREA's standards, BOP is required to establish reporting mechanisms for inmates to raise complaints about sexual abuse.[37]  Those standards also require prevention planning, response planning, training and education, screening for risk of sexual victimization and abusiveness, reporting, official response following an inmate report, investigation, discipline, medical and mental healthcare, data collection and review, and prison audits.[38]

Complaints of sexual abuse of female prisoners by BOP employees can be investigated by either BOP itself, through OIA, or by OIG.[39]  BOP OIA refers all complaints of sexual abuse or harassment by employees to OIG.  OIG—an independent entity with the authority to investigate criminal misconduct by DOJ employees—evaluates those complaints and decides whether to investigate or send them back to BOP, which can take two forms.[40]  First, OIG can make a "management referral" for BOP to investigate at its discretion.[41]  Second, OIG can make a "monitored referral," whereby BOP continues the investigation and reports its determination to OIG once the investigation has concluded.[42]

---

[33] Department of Justice, Office of Inspector General, *Deterring Staff Sexual Abuse of Federal Inmates* (Apr. 2005) (oig.justice.gov/sites/default/files/archive/special/0504/index.htm).  *See also, e.g.*, *United States v. Martinez*, 388 F. Supp. 3d 225, 236 (E.D.N.Y. 2019) ("consent is not relevant" for "sexual abuse of a ward" violations under 18 U.S.C. § 2243(b)).

[34] Department of Justice, Office of Inspector General, *Deterring Staff Sexual Abuse of Federal Inmates* (Apr. 2005) (oig.justice.gov/sites/default/files/archive/special/0504/index.htm).

[35] BOP Program Statement 5324.06 (preamble).

[36] BOP Program Statement 5324.06 § 115.76(b).

[37] *See* 28 C.F.R § 115.

[38] *See* 28 C.F.R § 115.

[39] OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[40] OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[41] OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[42] OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

BOP OIA does not investigate allegations of criminal misconduct referred to OIG before OIG has decided whether to retain the case.[43]  If OIG declines to pursue a criminal or administrative investigation, BOP will pursue an administrative investigation.[44]  BOP OIA has the ability to compel BOP employees, as a condition of employment, to sit for interviews about the allegations against them.[45]  BOP OIA closes cases in one of three ways: substantiation of allegations, no substantiation of allegations, or closure for administrative reasons without reaching the merits of the allegations.[46]

## II.   The Subcommittee's Investigation

In April 2022, the Subcommittee launched an eight-month bipartisan investigation of sexual abuse of female inmates in federal prisons.  Specifically, the Subcommittee evaluated whether female prisoners in the custody of BOP were safe from sexual abuse by BOP employees.  The Subcommittee did the following:

- Reviewed non-public documents and data provided by BOP, BOP whistleblowers, and OIG.

- Interviewed more than two dozen witnesses, including:
  - Four current senior officials within the BOP: Chief of BOP OIA, Beth Reese; Acting Assistant Director of Reentry Services Division, Alix McLearen, PhD; Regional Director for the Western Region with oversight of FCI Dublin, Melissa Rios; and Warden of FCI Dublin from October 2017 to November 2020, Wiley Jenkins.[47]
  - Twelve survivors of sexual abuse in BOP custody.  These women were abused by male BOP employees in eight different BOP facilities.[48]

---

[43] OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).  DOJ OIG, as with all federal Inspector General Offices, has a right of first refusal among law enforcement agencies to investigate allegations of misconduct by employees of the agency overseen by the Inspector General's Office.

[44] OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[45] OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[46] *See* Office of Internal Affairs, BOP, *Report for Fiscal Year 2020* (Jan. 6, 2021) (https://www.bop.gov/foia/docs/FY_2020_Annual_OIA_Report.pdf).

[47] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022); Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022); Melissa Rios, Western Regional Director, BOP, Interview with PSI (Nov. 10, 2022); Wiley Jenkins, Former Warden at FCI Dublin, BOP, Interview with PSI (Nov. 16, 2022).

[48] W.P., Interview with PSI (Sept. 8, 2022); C.R., Interview with PSI (Aug. 30, 2022); C.D., Interview with PSI (Oct. 14, 2022); K.D., Interview with PSI (Apr. 28, 2022); L.D., Interview with PSI (May 12, 2022); L.R., Interview with PSI (June 17, 2022); S.M.R., Interview with PSI (Sept. 7, 2022); B.M., Interview with PSI (Aug. 4, 2022); A.P., Interview with PSI (June 2, 2022); R.L., Interview with PSI (Oct. 12, 2022); R.D., Interview with PSI (July 5, 2022); V.M., Interview with PSI (June 14, 2022).

- o Eight BOP whistleblowers who came forward to report misconduct or BOP's deficient management practices.[49]
  - o Brenda V. Smith, Esq., a law professor who studies sexual abuse in custodial settings.[50]

- Received briefings from:
  - o The OIG Assistant Inspector General for Investigations and two OIG Senior Counsels to the Inspector General (collectively, "OIG") concerning OIG's investigations into allegations of sexual abuse at FCC Coleman, and the processes by which it coordinates investigative work with BOP and decides which cases to investigate itself.[51]
  - o DOJ's Office of the Deputy Attorney General concerning a November 2, 2022 report issued by a Working Group convened at the direction of the Deputy Attorney General Lisa Monaco to develop recommendations for reducing sexual abuse of prisoners by BOP employees.[52]

## III. There Were At Least Four BOP Facilities Between 2012 and 2022 with Recurring Sexual Abuse of Female Prisoners by Male BOP Employees

The Subcommittee identified four BOP facilities over the past decade where multiple male BOP employees sexually abused multiple female prisoners under their supervision. In many instances, the women at these four facilities were abused multiple times over a period of months or years. The facilities were MCC New York, MDC Brooklyn, FCC Coleman, and FCI Dublin.[53] For each of them, the Subcommittee reviewed court filings, media reports, and OIA investigative materials to better understand the extent of the sexual abuse. We discuss each facility below.

---

[49] J.R., Interview with PSI (May 24, 2022); A.M., Interview with PSI (June 7, 2022); T.K., Interview with PSI (Aug. 31, 2022); F.M., Interview with PSI (Oct. 4, 2022); S.M., Interview with PSI (Aug. 11, 2022); E.C., S.C., J.L., Interview with PSI (July 28, 2022).

[50] Brenda V. Smith, Professor of Law, American University Washington College of Law, Interview with PSI (June 10, 2022).

[51] OIG Briefing to PSI (Nov. 9, 2022).

[52] Office of the Deputy Attorney General, Department of Justice, Briefing to PSI (Nov. 21, 2022). Bipartisan staff from the Senate Judiciary Committee also attended this briefing. Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons* (Nov. 2, 2022).

[53] *See, e.g.*, U.S. Attorney's Office, Southern District of New York: *Correctional Officer At Metropolitan Correctional Center Sentenced To 40 Months In Prison For Engaging In Abusive Sexual Contact With Inmates* (Dec. 8, 2020) (https://www.justice.gov/usao-sdny/pr/correctional-officer-metropolitan-correctional-center-sentenced-40-months-prison); Office of Public Affairs, Department of Justice: *Jury Convicts Former Federal Prison Warden for Sexual Abuse of Three Female Inmates* (Dec. 8, 2022) (https://www.justice.gov/opa/pr/jury-convicts-former-federal-prison-warden-sexual-abuse-three-female-inmates); U.S. Attorney's Office, Eastern District of New York: *Former Federal Bureau of Prisons Lieutenant Sentenced to 25 Years in Prison for Sexual Abuse and Violation of Civil Rights Convictions* (July 31, 2019) (https://www.justice.gov/usao-edny/pr/former-federal-bureau-prisons-lieutenant-sentenced-25-years-prison-sexual-abuse-and); Vann Aff.

### a.  MCC New York

MCC New York, opened in 1975, was an administrative security facility primarily used to hold male and female detainees awaiting trial in the federal courthouses in the Southern District of New York.[54]  On August 26, 2021, BOP announced it would shut down this facility to address unsanitary conditions, decrepit facilities, and chronic staff shortages.[55]  Today, MCC New York is undergoing repairs and is not in use.[56]  Prior to its closure, MCC New York housed approximately 750 prisoners, both male and female.[57]

Between approximately 2012 and 2018, then-MCC New York officer Colin Akparanta sexually abused at least seven female prisoners under his supervision.[58]  On December 8, 2022, Akparanta was sentenced to 40 months imprisonment.[59]

In a civil suit filed in 2020, three of Akparanta's victims alleged that BOP staff at MCC New York "ignored warning signs [and] inmates' sex abuse allegations against [] Akparanta."[60]  Warnings included a "town hall meeting" in 2017 where a BOP supervisor "told the assembled [female prisoners], in substance or effect, 'I don't want to hear nothing about my officers touching you.'"[61]  The lawsuit further alleged that a BOP officer at MCC New York "ignored [] pleas for help" from a group of female prisoners about Akparanta's sexual advances and "quipped that [] Akparanta will 'eventually get caught.'"[62]  Between 2021 and 2022, BOP made multiple payments totaling $4.2 million to victims of sex abuse at MCC New York.[63]  BOP has temporarily shut down MCC New York.[64]

---

[54] State Courts, *New York County Jail and Prison System* (https://www.statecourts.org/inmate-search/new-york/new-york-county/new-york-mcc/).

[55] Benjamin Weiser, *Justice Dept. to Close Troubled Jail Where Jeffrey Epstein Died*, New York Times (Aug. 26, 2021) (https://www.nytimes.com/2021/08/26/nyregion/MCC-epstein-jail-closed.html).

[56] *See* Federal Bureau of Prisons, *MCC New York* (https://www.bop.gov/locations/institutions/nym/); Benjamin Weiser, *Justice Dept. to Close Troubled Jail Where Jeffrey Epstein Died*, New York Times (Aug. 26, 2021) (https://www.nytimes.com/2021/08/26/nyregion/MCC-epstein-jail-closed.html).

[57] State Courts, *New York County Jail and Prison System* (https://www.statecourts.org/inmate-search/new-york/new-york-county/new-york-mcc/).

[58] U.S. Attorney's Office, Southern District of New York: *Correctional Officer At Metropolitan Correctional Center Sentenced To 40 Months In Prison For Engaging In Abusive Sexual Contact With Inmates* (Dec. 8, 2020) (https://www.justice.gov/usao-sdny/pr/correctional-officer-metropolitan-correctional-center-sentenced-40-months-prison); *United States v. Colin Akparanta*, 19-CR-363 (S.D.N.Y.).

[59] U.S. Attorney's Office, Southern District of New York: *Correctional Officer At Metropolitan Correctional Center Sentenced To 40 Months In Prison For Engaging In Abusive Sexual Contact With Inmates* (Dec. 8, 2020) (https://www.justice.gov/usao-sdny/pr/correctional-officer-metropolitan-correctional-center-sentenced-40-months-prison); *United States v. Colin Akparanta*, 19-CR-363 (S.D.N.Y.).

[60] *See* Complaint, Dkt. 1 ¶ 4, *Herrera v. United States*, 20 Civ. 10206 (PKC) (S.D.N.Y. 2020).

[61] *See* Complaint, Dkt. 1 ¶ 100, *Herrera v. United States*, 20 Civ. 10206 (PKC) (S.D.N.Y. 2020).

[62] *See* Complaint, Dkt. 1 ¶ 107, *Herrera v. United States*, 20 Civ. 10206 (PKC) (S.D.N.Y. 2020).

[63] Benjamin Weiser, *U.S. Pays $4.2 Million to Victims of Jail Guard's Long-Running Sex Abuse*, New York Times (July 18, 2022) (https://www.nytimes.com/2022/07/18/nyregion/mcc-officer-sex-abuse-victims-payout.html).

[64] Jonathan Dienst, *MCC, Lower Manhattan Jail Where Jeffrey Epstein Died, Transfers Out All Inmates*, NBC New York (Oct. 19, 2021) (https://www.nbcnewyork.com/news/local/mcc-lower-manhattan-jail-were-jeffrey-epstein-died-transfers-out-all-inmates/3331966/).

Separately, DNA evidence confirmed that on February 14, 2015, then-MCC New York officer Rudell Mullings assaulted a female prisoner in one of the prison corridors.[65] On May 4, 2016, he was sentenced to seven years imprisonment.[66]

**b. MDC Brooklyn**

MDC Brooklyn is an administrative security metropolitan detention center located in Brooklyn, New York, which houses over 1,500 inmates, including men and women.67

In 2017, DOJ indicted two lieutenants (Carlos Martinez and Eugenio Perez) and one officer (Armando Moronta) at MDC Brooklyn for repeated sexual abuse of nine female prisoners during the night shift.[68] Martinez was convicted after a two-week jury trial, where prosecutors introduced evidence that he had brought a Plan B pill into the prison for the woman he raped.[69] Perez was convicted after a two-week jury trial and sentenced to 25 years imprisonment for sexually abusing five women held at MDC Brooklyn.[70] Moronta pleaded guilty and was sentenced to 10 years imprisonment for abusing three women held at MDC Brooklyn and smuggling narcotics into the prison.[71] *The New York Times* described these events as "one of the largest sexual assault investigations to confront [BOP] in at least a decade."[72]

**c. FCC Coleman**

FCC Coleman is currently an all-male facility with four different components: a low security federal correctional institution with an adjacent minimum-security satellite camp (FCI Coleman Low); a medium security federal correctional institution (FCI Coleman Medium); a high security penitentiary (USP Coleman I); and another high security penitentiary (USP

---

[65] U.S. Attorney's Office, Eastern District of New York: *Former Federal Correctional Officer Sentenced To Seven Years For Sexually Abusing An Inmate* (May 4, 2016) (https://www.justice.gov/usao-edny/pr/former-federal-correctional-officer-sentenced-seven-years-sexually-abusing-inmate); *See United States v. Rudell Mullings*, 15-CR-538 (E.D.N.Y.); *United States v. Colin Akparanta*, 19-CR-363 (S.D.N.Y.).
[66] U.S. Attorney's Office, Eastern District of New York: *Former Federal Correctional Officer Sentenced To Seven Years For Sexually Abusing An Inmate* (May 4, 2016) (https://www.justice.gov/usao-edny/pr/former-federal-correctional-officer-sentenced-seven-years-sexually-abusing-inmate); *See United States v. Rudell Mullings*, 15-CR-538 (E.D.N.Y.).
[67] Federal Bureau of Prisons, *MDC Brooklyn* (https://www.bop.gov/locations/institutions/bro/).
[68] U.S. Attorney's Office, Eastern District of New York: *Three Federal Correctional Officers Charged with Sexually Abusing Inmates* (May 25, 2017) (https://oig.justice.gov/press/2017/2017-05-25.pdf).
[69] Alan Feuer, *Former Lieutenant at Brooklyn Federal Jail Convicted of Raping Female Inmate*, New York Times (Jan. 19, 2018) (https://www.nytimes.com/2018/01/19/nyregion/jail-guard-convicted-rape.html).
[70] U.S. Attorney's Office, Eastern District of New York: *Former Federal Bureau of Prisons Lieutenant Sentenced to 25 Years in Prison for Sexual Abuse and Violation of Civil Rights Convictions* (July 31, 2019) (https://www.justice.gov/usao-edny/pr/former-federal-bureau-prisons-lieutenant-sentenced-25-years-prison-sexual-abuse-and).
[71] U.S. Attorney's Office, Eastern District of New York: *Former Federal Correctional Officer Sentenced to 10 Years in Prison for Sexual Abuse, Bribery and Narcotics Charges* (Oct. 24, 2018) (https://www.justice.gov/usao-edny/pr/former-federal-correctional-officer-sentenced-10-years-prison-sexual-abuse-bribery-and).
[72] Joseph Goldstein, *Federal Jail in Brooklyn Faces a String of Sexual Assault Cases*, New York Times (Aug. 1, 2017) (https://www.nytimes.com/2017/08/01/nyregion/federal-jail-in-brooklyn-faces-a-string-of-sexual-assault-cases.html).

Coleman II).[73]  There are currently over 6,000 inmates housed across the complex.[74]  Prior to April 2021, FCC Coleman housed both male and female prisoners.[75]  In April 2021, BOP transferred all female prisoners out of FCC Coleman, coinciding with public allegations of sexual abuse.[76]

On May 5, 2021, the United States Government paid at least $1.25 million to settle a civil lawsuit brought by 15 women currently and formerly incarcerated at FCC Coleman who accused eight BOP employees at that facility of years of sexual abuse.[77]  During the course of the lawsuit, the United States Government, a defendant, admitted in a court filing that six of those employees had in fact engaged in sexual conduct with at least ten of the plaintiffs.[78]  Sexual contact between BOP employees and prisoners is a federal crime and violates BOP policy.[79]  In interviews compelled by BOP OIA during administrative investigations, prior to the United States Government's court filing, all six officers had already had admitted to sexually abusing female prisoners under their supervision.[80]  None of these six officers was ever prosecuted.[81]

The Subcommittee investigated how BOP officers who admitted to crimes in sworn statements were never prosecuted.[82]  As discussed above in Section I.C., once OIG declines to pursue a criminal or administrative investigation, BOP will conduct its own administrative investigation, either through OIA or the Special Investigative Services at the facility.[83]  One of BOP OIA's investigative tools is requiring employees to answer questions under oath during what is known as a *Garrity* interview.[84]

---

[73] Federal Bureau of Prisons, *USP Coleman II* (https://www.bop.gov/locations/institutions/clp/).

[74] Federal Bureau of Prisons, *FCI Coleman Low*, (https://www.bop.gov/locations/institutions/col/) ; Federal Bureau of Prisons, *FCI Coleman Medium*, (https://www.bop.gov/locations/institutions/com/) (accessed Dec. 6, 2022); Federal Bureau of Prisons, *USP Coleman I*, (https://www.bop.gov/locations/institutions/cop/); Federal Bureau of Prisons, *USP Coleman II* (https://www.bop.gov/locations/institutions/clp/).

[75] 2021 Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0125-0261).

[76] Carl Hiassen, *Female inmates feared reprisals from prison guards who raped them*, Miami Herald (Sept. 25, 2020) (https://www.miamiherald.com/opinion/opn-columns-blogs/carl-hiaasen/article245829215.html); 2021 Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0125-0261) at PSI-BOPOIA-Prod1-000136.

[77] Romy Ellenbogen, *Lawsuit settled in which 15 women alleged sexual abuse at Florida prison*, Tampa Bay Times (May 5, 2022) (https://www.tampabay.com/news/florida/2021/05/05/lawsuit-settled-in-which-15-women-alleged-sexual-abuse-at-florida-prison/).  The settlement amount is likely much greater as eleven women did not disclose the amount of their recovery.

[78] *See Beaubrun Answer* at 6-8.  *See also* 18 U.S.C. § 2243(b).

[79] 18 U.S.C. § 2243(b); Department of Justice, Office of Inspector General, *Deterring Staff Sexual Abuse of Federal Inmates* (Apr. 2005) (http://oig.justice.gov/sites/default/files/archive/special/0504/index.htm).

[80] 2018 Palomares Aff.; 2019 Palomares Aff.; Kuilan Aff; Vann Aff.; Laudenslager Aff.; Phillips Aff.; Campbell Aff.

[81] Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022); OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[82] The Subcommittee asked BOP OIA Chief Reese this question during an interview.  She said, "I do not know." Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[83] OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[84] *Garrity v. New Jersey*, 385 U.S. 493 (1967).

In 1967, the United States Supreme Court held in *Garrity v. New Jersey* that when a government employer forces an employee to answer questions under oath as a condition of employment, that interview is considered "compelled," and any inculpatory statements made by the employee during that interview cannot be used against him in a subsequent criminal prosecution.[85]  In other words, if a BOP employee admits to sexual misconduct in a compelled interview, statements made during that interview cannot be used against him in a criminal prosecution by OIG or any other law enforcement entity.

To the extent that OIG were to pursue criminal charges after the BOP employee admitted to a crime in the BOP OIA-compelled interview, OIG would have to show that it had reasons to pursue criminal charges independent from anything disclosed in the *Garrity* interview and that none of the evidence used in the prosecution was derived from the *Garrity* interview.[86]  These are difficult thresholds to clear in most cases.[87]  The practical effect is that "if [the BOP employee] can be compelled, it's a get out of jail free card" under certain circumstances, OIG told the Subcommittee.[88]

In the case of FCC Coleman, BOP OIA received female prisoners' complaints of sexual misconduct by at least six officers.[89]  BOP OIA sent the complaints to OIG.[90]  OIG declined to investigate and referred the cases back to BOP OIA.[91]  BOP OIA compelled each of these officers to sit for interviews.[92]  In those interviews, the officers made sweeping admissions to misconduct, making subsequent criminal prosecution difficult.[93]

The following contains excerpts of affidavits that memorialize admissions from former BOP employees at FCC Coleman following BOP OIA-compelled interviews.

In an affidavit dated October 2, 2019, former BOP correctional officer, Keith Vann, admitted in his BOP OIA-compelled interview:[94]

> I had sexual intercourse and oral sex with inmate ▮▮▮▮▮ ▮▮▮▮▮ on multiple occasions while I was a staff member she an inmate at FCC Coleman. I don't know the exact number of times but it occurred on more than one occasion.

---

[85] *Garrity v. New Jersey*, 385 U.S. 493 (1967).
[86] OIG Briefing to PSI (Nov. 9, 2022).
[87] OIG Briefing to PSI (Nov. 9, 2022).
[88] OIG Briefing to PSI (Nov. 9, 2022).
[89] OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[90] OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[91] OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[92] OIG Briefing to PSI (Nov. 9, 2022); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[93] OIG Briefing to PSI (Nov. 9, 2022).  *See also* Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[94] Vann Aff.

> I was aware at the time
> that engaging in any type of sexual encounter with a federal
> inmate was a criminal act and was not lawful. I was aware at the
> time I could have been held criminally liable.

In an affidavit dated June 28, 2019, former BOP correctional officer Christopher Palomares admitted in his BOP OIA-compelled interview:[95]

> I have had a large
> number of sexual encounters with inmates when I was an officer
> at FCC Coleman. I would say there is over a 70% chance I
> received oral sex (blow job) from ███████ in the visiting room.
> I have received oral sex from a number of inmates and number of
> times.
> ██████

In an affidavit dated June 28, 2019, former BOP correctional officer Scott Campbell admitted in his BOP OIA-compelled interview:[96]

> In December 2017, during the evening watch shift, I was making
> rounds at the Camp in the female living quarters. I approached
> ████████ in her living area and no one else was around. I
> asked ████ if I could touch her "boob." I put my hand on her
> breast and squeezed it in a sexual manner for 3 seconds. Since
> that incident, when I worked at the Camp and made rounds I would
> touch and sexually squeeze ██████ breasts regularly. I have
> sexually squeezed ██████ breasts at least 8 times from December
> 2017, to March of 2018, when it stopped.

> On Sunday, March 11, 2018, I asked ████ to come with me to the F
> Unit Upper storage area and I locked me and ████ in the closet.
> ████ was aware we were going to have a sexual encounter prior to
> us going to the storage area.

In an affidavit dated October 3, 2019, former BOP correctional officer Timothy Phillips admitted in his BOP OIA-compelled interview:[97]

> Inmates ████████ and ████████ both worked for me
> on the landscape detail at FCC Coleman in 2017. I have had two
> sexual intercourse encounters with ████████ and ████████
> ████ together. The three of us had sex together while they
> were FCC Coleman inmates and I was a Coleman staff member.

---

[95] 2019 Palomares Aff.
[96] Campbell Aff.
[97] Phillips Aff.

After reviewing affidavits in these cases in response to the Subcommittee's request, OIG told the Subcommittee in a briefing:

> There is no world in which we can say this is a good outcome.
> These individuals knew they have been compelled and could retire
> and resign and spill to [BOP] OIA and basically have immunity in
> some cases for engaging in sexual activity with multiple inmates.
> It is a terrible outcome.[98]

OIG has recently reformed its complaint screening practices to mitigate the risk of overlooking widespread sexual abuse in a BOP facility by employees again.  Although OIA provided the FCC Coleman allegations to OIG on multiple occasions, OIG is also considering a written memorandum with OIA to memorialize BOP OIA's current practice, such that BOP OIA would have an affirmative, written responsibility to inform OIG of new evidence uncovered during OIA's administrative investigation, prior to *Garrity* interviews, that could support a criminal investigation.[99]

### d.  FCI Dublin

FCI Dublin is an all-female facility with two components: a low security federal correctional institution and an adjacent minimum-security satellite camp.[100]  There are currently 477 female offenders housed across the prison.[101]

In the past eighteen months, DOJ has indicted five BOP employees for sexual abuse of at least eight female detainees at FCI Dublin.

- In June 2021, the U.S. Attorney's Office for the Northern District of California filed a criminal complaint against Ross Klinger, a former BOP correctional officer and recycling technician, with sexual abuse of a ward.[102]  He pleaded guilty to three counts of sexual abuse of a ward.[103]  The criminal complaint cites sexual abuse of two female prisoners.[104]

- In November 2021, the U.S. Attorney's Office for the Northern District of California indicted Ray J. Garcia, the former Warden of FCI Dublin, on two

---

[98] OIG Briefing to PSI (Nov. 9, 2022).

[99] Email from OIG to PSI (Dec. 11, 2022) (on file with PSI).

[100] Federal Bureau of Prisons, *FCI Dublin* (https://www.bop.gov/locations/institutions/dub/).

[101] Federal Bureau of Prisons, *FCI Dublin* (https://www.bop.gov/locations/institutions/dub/).

[102] Michael R. Sisak and Michael Balsamo, *Worker pleads guilty to abusing inmates at US women's prison*, AP News (Feb. 11, 2022) (https://apnews.com/article/coronavirus-pandemic-health-california-oakland-prisons-5085536a92b12afa46bbfcf00cba46d9).

[103] U.S. Attorney's Office Northern District of California: *Bureau Of Prisons Correctional Officer Charged With Sexual Abuse Of A Ward* (June 30, 2021) (www.justice.gov/usao-ndca/pr/bureau-prisons-correctional-officer-charged-sexual-abuse-ward).

[104] *United States v. Klinger*, No. 4:22-CR-00031-JSW  (N.D. Cal., June 25, 2021).

counts of sexual abuse of a ward.[105]  According to the criminal complaint, Garcia knowingly had sexual contact with at least one female prisoner, asked at least two inmates to strip naked for him during rounds and took photos, and stored a "large volume of sexually graphic photographs" on his BOP issued cellphone.[106]  In the two years prior to his arrest, Garcia was the PREA compliance officer at FCI Dublin, responsible for ensuring that the facility was adhering to PREA policies and training other employees, including new supervisors.[107]  On December 8, 2022, Garcia was convicted by a jury of sexually abusing female prisoners.[108]

- On November 309, 2021, the United States Attorney's Office for the Northern District of California filed a criminal complaint against John Bellhouse for sexual abuse of a prison ward.[109]  Bellhouse served as a correctional officer and safety administrator at FCI Dublin before being placed on administrative leave in March 2021.[110]  In June 2020, a prisoner identified that Bellhouse and another BOP employee were engaging in sexual interactions with several prisoners, and also providing prisoners with contraband, money and personal cellphone use.[111]  Bellhouse pleaded not guilty and is currently awaiting trial, which is scheduled for the summer of 2023.[112]

---

[105] U.S. Attorney's Office, Northern District of California: *Warden Of Federal Corrections Institute In Dublin Charged With Sexual Abuse Of A Ward* (Sept. 29, 2021) (https://www.justice.gov/usao-ndca/pr/warden-federal-corrections-institute-dublin-charged-sexual-abuse-ward).  For the criminal complaint filed against Warden Garcia, *see* https://www.documentcloud.org/documents/21408685-warden-ray-j-garcia.

[106] U.S. Attorney's Office, Northern District of California: *Warden Of Federal Corrections Institute In Dublin Charged With Sexual Abuse Of A Ward* (Sept. 29, 2021) (https://www.justice.gov/usao-ndca/pr/warden-federal-corrections-institute-dublin-charged-sexual-abuse-ward).  For the criminal complaint filed against Warden Garcia, *see* https://www.documentcloud.org/documents/21408685-warden-ray-j-garcia.

[107] Michael R. Sisak and Michael Balsamo, *Abuse-clouded prison gets attention, but will things change?*, AP News (May 5, 2022) (https://apnews.com/article/business-prisons-california-sexual-abuse-only-on-ap-3a4db9ab478bfdd545ef3c7e08cd273b); Office of Public Affairs, Department of Justice: *Jury Convicts Former Federal Prison Warden for Sexual Abuse of Three Female Inmates* (Dec. 8, 2022) (https://www.justice.gov/opa/pr/jury-convicts-former-federal-prison-warden-sexual-abuse-three-female-inmates); 2017 FCI Dublin PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (on file with PSI).

[108] Office of Public Affairs, Department of Justice: *Jury Convicts Former Federal Prison Warden for Sexual Abuse of Three Female Inmates* (Dec. 8, 2022) (https://www.justice.gov/opa/pr/jury-convicts-former-federal-prison-warden-sexual-abuse-three-female-inmates).

[109] U.S. Attorney's Office, Northern District of California: *Federal Correctional Officer Charged With Sexual Abuse Of An Inmate* (Dec. 3, 2021) (https://www.justice.gov/usao-ndca/pr/federal-correctional-officer-charged-sexual-abuse-inmate).  The U.S. Attorney's Office filed a superseding indictment with additional charges against Bellhouse on September 29, 2022.  *See* Department of Justice, *FCI Dublin Officer Faces Abuse Charges Against Two Additional Incarcerated Victims* (Sept. 29, 2022) (https://www.justice.gov/opa/pr/fci-dublin-correctional-officer-faces-abuse-charges-against-two-additional-incarcerated).

[110] U.S. Attorney's Office, Northern District of California: *Federal Correctional Officer Charged With Sexual Abuse Of An Inmate* (Dec. 3, 2021) (https://www.justice.gov/usao-ndca/pr/federal-correctional-officer-charged-sexual-abuse-inmate).

[111] *See* Complaint at ¶ 114, *United States v. Bellhouse*, 4:21-mj-71905-MRGD (N.D. Cal. 2021).

[112] *Dublin prison guard faces more charges of sexual abuse of female inmates*, Bay City News Service (Oct. 2, 2022) (https://www.danvillesanramon.com/news/2022/10/02/dublin-prison-guard-faces-more-charges-of-sexual-abuse-of-female-inmates).

- In January 2022, the Criminal Section of the Civil Rights Division of DOJ filed an information against James Highhouse, a former Chaplain at FCI Dublin, on charges of sexual abuse of a ward, abusive sexual contact, and making false statements to investigators.[113]  In February 2022, Highhouse pleaded guilty to five felonies for sexually abusing a female inmate and lying to investigators about the misconduct.[114]  In August 2022, Highhouse was sentenced to 84 months in prison followed by five years of supervised released.[115]

- On March 10, 2022, Enrique Chavez, a food service foreman at FCI Dublin was indicted on two counts of abusive sexual contact with a prison inmate.[116] According to the indictment, Chavez touched the woman's breasts, buttocks and genitals on two separate occasions in October 2020.[117]  Chavez pleaded guilty on October 27, 2022, to abusive sexual contact with a female prison inmate while he was employed at FCI Dublin.[118]  The count carries a maximum statutory sentence of two years imprisonment and a $250,000 fine, with a minimum period of supervision following release from prison of five years and a maximum of a lifetime of supervision.[119]  Sentencing is scheduled for February 2, 2023.[120]

As of May 2022, OIG and/or BOP were investigating at least 17 additional current or former employees at FCI Dublin for sexual misconduct.[121]

The most recent indictments are not the only examples of repeated sexual abuse of female prisoners at FCI Dublin.  Since the 1990s, there have been at least three additional high-profile cases of sexual abuse of female prisoners involving male BOP employees.

---

[113] *United States v. James Highhouse*, 4:22-CR-16 (N.D. Cal. 2022).
[114] Department of Justice, *Former Bureau of Prisons Chaplain Pleads Guilty to Sexual Assault and Lying to Federal Agents* (Feb. 23, 2022) (https://www.justice.gov/opa/pr/former-bureau-prisons-chaplain-pleads-guilty-sexual-assault-and-lying-federal-agents).
[115] Department of Justice, *Federal Prison Chaplain Sentenced for Sexual Assault and Lying to Federal Agents* (Aug. 31, 2022) (https://www.justice.gov/opa/pr/federal-prison-chaplain-sentenced-sexual-assault-and-lying-federal-agents).
[116] Department of Justice, *Correctional Officer at FCI Dublin Charged for Abusive Sexual Contact with Female Inmate* (Mar. 23, 2022) (https://www.justice.gov/opa/pr/correctional-officer-fci-dublin-charged-abusive-sexual-contact-female-inmate).
[117] *United States v. Chavez*, 4:22cr104 (N.D. Cal. 2021) (indictment filed on Mar. 10, 2022).
[118] U.S. Attorney's Office Northern District of California: *Former Correctional Officer Admits To Abusive Sexual Contact With Inmate* (Oct. 27, 2022) (https://www.justice.gov/usao-ndca/pr/former-correctional-officer-admits-abusive-sexual-contact-inmate).
[119] U.S. Attorney's Office Northern District of California: *Former Correctional Officer Admits To Abusive Sexual Contact With Inmate* (Oct. 27, 2022) (https://www.justice.gov/usao-ndca/pr/former-correctional-officer-admits-abusive-sexual-contact-inmate).
[120] U.S. Attorney's Office Northern District of California: *Former Correctional Officer Admits To Abusive Sexual Contact With Inmate* (Oct. 27, 2022) (https://www.justice.gov/usao-ndca/pr/former-correctional-officer-admits-abusive-sexual-contact-inmate).
[121] Lisa Fernandez, *25 Dublin prison employees under investigation for sex, drug, lying abuses*, KTVU FOX 2 (May 5, 2022) (https://www.ktvu.com/news/25-dublin-prison-employees-under-investigation-for-sex-drug-lying-abuses). For the full list of investigations, *see* https://www.documentcloud.org/documents/21882894-dublin-prison-open-investigations.

- In 1996, three women were brought to a male housing unit at an adjacent facility where BOP officers opened their cell doors allowing male inmates to rape them. The United States settled in 1998 and BOP promised "to adopt and implement certain policies and procedures designed to reduce the risk to female prisoners of sexual assaults."[122]

- In the late 1990s and early 2000s, four male BOP employees at FCI Dublin were convicted or pleaded guilty to sexual abuse of female inmates at that facility.[123]

- In the early 2010s, according to media reports, approximately "a dozen Dublin employees were removed for sexually abusing inmates," including one who videotaped himself having sex with inmates and stored those tapes in a prison locker.  None were arrested.[124]

### e.  Sexual Abuse Across Other BOP Facilities that Hold Female Prisoners

In an attempt to understand the breadth of sexual abuse of female prisoners by male BOP employees, the Subcommittee analyzed court filings in criminal cases, civil cases, and BOP records concerning the number of substantiated allegations of sexual abuse by BOP employees. Through those efforts, PSI was able to identify that over the past decade BOP opened 5,415 cases of sexual abuse from male and female inmates by BOP employees.[125]  Of those cases, 586 were substantiated.[126]  There were at least 134 cases for which a BOP employee was convicted of sexually abusing a female prisoner or where BOP OIA substantiated allegations that a female prisoner was sexually abused by a BOP employee.[127]  BOP employees sexually abused women in their custody in at least two-thirds (19 of the 29) of the facilities where BOP has held incarcerated women this past decade.[128]

---

[122] *Lucas v. White*, 96-cv-2905-TEH (N.D. Cal. 1997) (settlement agreement on file with PSI).

[123] *United States v. Accursi*, 4:97-cr-40101 (N.D. Cal.); *United States v. Hyson*, 4:99-cr-40031 (N.D. Cal.); *United States v. Hawthorne*, 4:99-cr-40051 (N.D. Cal.); *United States v. Donaldson*, 4:02-cr-40153 (N.D. Cal.); *United States v. Rodarte*, 4:02-cr-40153 (N.D. Cal.).  *See also* Josh Richman, *Lawyer: Abuse of inmates rampant; Guard's indictment latest problem to surface at Dublin's Federal Correctional Institution*, Tri Valley Herald (Aug. 21, 2002) (on file with PSI); Josh Richman, *Ex-Dublin guard agrees to deal, admits to abuse; Plea bargain calls for 10-16 months in prison*, The Daily Review (May 17, 2003) (on file with PSI).

[124] Michael R. Sisak and Michael Balsamo, *Abuse-clouded prison gets attention, but will things change?*, AP News (May 5, 2022) (https://apnews.com/article/business-prisons-california-sexual-abuse-only-on-ap-3a4db9ab478bfdd545ef3c7e08cd273b).

[125] Staff-on-Inmate Cases by Facility (2012-2021), Production from DOJ to PSI (Nov. 4, 2022) (PSI-BOPOIA-Prod4-0001-0049).

[126] Staff-on-Inmate Cases by Facility (2012-2021), Production from DOJ to PSI (Nov. 4, 2022) (PSI-BOPOIA-Prod4-0001-0049).  The Subcommittee calculated the total number of substantiated cases by tabulating data produced by DOJ.

[127] *See* Exhibit 1.  The Subcommittee arrived at this number by reviewing court filings and cases where BOP OIA substantiated allegations sexual abuse of female prisoners by BOP employees at the six female-only facilities.

[128] *See* footnote 1; Exhibit 1.

IV.    **BOP Does Not Systematically Analyze Key Indicators of Sexual Abuse in its Facilities**

The Subcommittee asked BOP for the information it relies upon to monitor compliance with PREA, including the risk of BOP employees sexually abusing female prisoners.  BOP witnesses, including OIA Chief Reese, Acting Assistant Director for Reentry Services Alix McLearen, PhD, Western Regional Director Rios, and former FCI Dublin Warden Wiley Jenkins identified three categories of information used to assess risk and monitor compliance: (1) PREA audits; (2) complaints filed by inmates concerning staff-initiated sexual abuse; and (3) disposition of those complaints.[129]

The Subcommittee determined that PREA audits of FCC Coleman and FCI Dublin failed to detect the culture of BOP employees sexually abusing female detainees at those facilities before, during, and after abuse occurred.  The Subcommittee also found that BOP does not systematically analyze complaint data to detect potentially problematic employees or institutions. Finally, BOP has accrued a backlog of approximately 8,000 cases and does not report case closure rates in a way that would indicate its progress in clearing the backlog.

a.    **Flawed PREA Audits Failed to Detect the Culture of Sexual Abuse of Female Prisoners by Employees at FCC Coleman and FCI Dublin**

PREA "is intended to make confinement facilities free from sexual abuse and its threat."[130]  When Congress passed PREA in 2003, it established a National Prison Rape Elimination Commission (the "NPRE Commission") to "carry out a comprehensive legal and factual study of the penological, physical, mental, medical, social, and economic impacts of prison rape" and to issue a report with "recommended national standards for reducing prison rape[.]"[131]  The recommendations, adopted by DOJ and binding on BOP, require periodic PREA audits of all federal correctional facilities to ensure compliance with the standards put forth in the regulations.[132]  According to DOJ, PREA auditors "are responsible for conducting high quality, reliable, objective, and comprehensive audits that hold agencies and facilities accountable for keeping individuals in their custody and care safe from sexual abuse and sexual harassment."[133]

PREA audits assess whether an institution is compliant with the 45 PREA standards by reviewing policies and practices within the institution, interviewing employees and prisoners, and reviewing documentation from the audit period, such as prisoner complaints of sexual abuse

---

[129] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022); Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022); Melissa Rios, Western Regional Director, BOP, Interview with PSI (Nov. 10, 2022); Wiley Jenkins, Former Warden at FCI Dublin, BOP, Interview with PSI (Nov. 16, 2022).
[130] Bureau of Justice Assistance, *Prison Rape Elimination Act Auditors: Information and Resources* (Nov. 2021) (https://www.prearesourcecenter.org/sites/default/files/PREA-Auditors-FS.pdf).
[131] Pub. L. 108-79, § 7, codified at 34 U.S.C. § 30306.
[132] *See* 28 C.F.R § 115.
[133] Bureau of Justice Assistance, *Prison Rape Elimination Act Auditors: Information and Resources* (Nov. 2021) (https://www.prearesourcecenter.org/sites/default/files/PREA-Auditors-FS.pdf).

19

or harassment.[134]  PREA audits are one of the key tools that BOP relies upon to assess whether its facilities have implemented the standards designed to mitigate the risk of sexual abuse of prisoners.[135]  When the Subcommittee asked the BOP Regional Director for the Western Region, Melissa Rios, the BOP official responsible for oversight of FCI Dublin among other facilities, how the regional office monitored potential sex abuse in its facilities, she explained that she relies on PREA policies to mitigate the risk of sexual assault, and PREA audits to assess compliance with the PREA policies.[136]

The Subcommittee reviewed PREA audits of FCC Coleman and FCI Dublin—where there were, per BOP OIA Chief Reese, "cultural issues" concerning sexual misconduct by employees—to evaluate whether the audits detected that there was a sexual abuse problem.[137]  In other words, did the PREA audits predating and during the period of multiple BOP employees abusing multiple women find that the prison was not compliant with some or all of the PREA standards?  Did the audits covering the periods of significant sexual abuse detect the cultural issues at that prison?

The Subcommittee found that BOP failed to accomplish either outcome with its PREA audits.  PREA audits during all of the relevant periods for these facilities came back clean: these audits found that FCC Coleman and FCI Dublin were compliant with all PREA standards before, during, and after the multiple, documented instances of sexual abuse.[138]  Table 1 shows the results of these audits.

---

[134] *See, e.g.*, 2021 FCI Dublin PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (on file with PSI).

[135] Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022).

[135] 28 C.F.R. § 115 (citing BJS report); Melissa Rios, Western Regional Director, BOP, Interview with PSI (Nov. 10, 2022).

[136] Melissa Rios, Western Regional Director, BOP, Interview with PSI (Nov. 10, 2022).  *See also* Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022).

[136] Melissa Rios, Western Regional Director, BOP, Interview with PSI (Nov. 10, 2022).

[137] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[138] *Compare* 2017 FCI Dublin PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (on file with PSI); 2022 FCI Dublin PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0262-0381); 2018 FCC Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0635-0726); and 2021 FCC Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0125-0261) *with* Section III.C., *supra*.  *See also* Exhibit 1.

**Table 1: PREA Audits of FCC Coleman and FCI Dublin[139]**

| Facility | PREA Audit Date | Results (Standards) |
|---|---|---|
| **FCC Coleman** | March 22, 2015 | Exceeded: 4<br>Met: 38<br>Not Met: 0<br>Not Applicable: 1 |
| | April 19, 2018 | Exceeded: 2<br>Met: 43<br>Not Met: 0 |
| | September 7, 2021 | Exceeded: 1<br>Met: 44<br>Not Met: 0 |
| **FCI Dublin** | May 16, 2014 | Exceeded: 2<br>Met: 40<br>Not Met: 0<br>Not Applicable: 1 |
| | June 14, 2017 | Exceeded: 0<br>Met: 41<br>Not Met: 0<br>Not Applicable: 2 |
| | March 12, 2022 | Exceeded: 0<br>Met: 45<br>Not Met: 0 |

When asked in an interview with the Subcommittee whether PREA audits can help detect a culture of abuse at a facility, BOP's Acting Director of Reentry Services said, "it is clear the PREA audit did not do that at Coleman."[140]

The Subcommittee has concerns about PREA audits of FCC Coleman and FCI Dublin. PREA auditors seek to interview a representative sample of prisoners incarcerated at a facility.[141] For the FCC Coleman PREA audit of 2021, BOP transferred all female prisoners out of the prison two days before the auditor arrived for on-site interviews.[142] The auditor did not interview any female prisoners.[143]

---

[139] 2017 FCI Dublin PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (on file with PSI); 2022 FCI Dublin PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0262-0381); 2018 FCC Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0635-0726); 2021 FCC Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0125-0261).

[140] Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022).

[141] *See* 2021 FCC Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0125-0261).

[142] *See* 2021 FCC Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0125-0261).

[143] *See* 2021 FCC Coleman PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (PSI-BOPOIA-Prod1-0125-0261).

The PREA audit of FCI Dublin from 2017 identifies the then-Associate Warden, Ray J. Garcia, as the facility's PREA compliance officer—the individual responsible for ensuring that the facility was compliant with the PREA standards, training new supervisors on PREA procedures and policies, and coordinating the PREA audit.[144]  After Garcia was promoted to Warden, he was indicted for sexually abusing multiple female prisoners under his supervision for a period of years, and convicted by a jury on December 8, 2022.[145]

### b.  BOP Does Not Systematically Analyze PREA Complaint Data

In 2009, the National Prison Rape Elimination Commission (the "NPRE Commission")—a bipartisan Commission that Congress created through PREA to study policies and practices related to the prevention, detection, response, and monitoring of sexual abuse in correction and detention facilities in the United States—issued a report underscoring the importance of analyzing data trends to identify and prevent prison rape and sexual abuse.[146]  The NPRE's 2009 report noted that "data are especially useful in documenting patterns and trends and in measuring performance within facilities and throughout entire correctional systems."[147] Based on recommendations in NPRE Commission's 2009 report, DOJ finalized the National Standards to Prevent, Detect, and Respond to Prison Rape (the "National PREA Standards") in 2012.[148]  In relevant parts, the National PREA Standards promulgated by DOJ require BOP to "collect accurate, uniform data for every allegation of sexual abuse" and "review[the] data collected … [to] identify[] problem areas [and] tak[e] corrective action on an ongoing basis."[149]

Complaint data, which is collected and stored by BOP OIA, is one of the primary indicators that BOP could use to detect sexual abuse in a specific facility or by a specific staff member.[150]  During an interview with the Subcommittee, BOP OIA Chief Reese explained that

---

[144] *See* 2017 FCI Dublin PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (on file with PSI); Michael R. Sisak and Michael Balsamo, *Abuse-clouded prison gets attention, but will things change?*, AP News (May 5, 2022) (apnews.com/article/government-and-politics-prisons-california-bf66f02f8d21137461497d26c38c6ac5).

[145] Office of Public Affairs, Department of Justice: *Jury Convicts Former Federal Prison Warden for Sexual Abuse of Three Female Inmates* (Dec. 8, 2022) (https://www.justice.gov/opa/pr/jury-convicts-former-federal-prison-warden-sexual-abuse-three-female-inmates); 2017 FCI Dublin PREA Audit, Production from DOJ to PSI (Oct. 4, 2022) (on file with PSI).

[146] National Prison Rape Elimination Commission, *National Rape Elimination Commission Report* at 85 (June 2009).  The value of analyzing data trends was made clear to BOP two decades prior.  In 1999, the Government Accountability Office ("GAO") issued a report that examined BOP's policies, practices, and systems for preventing and addressing BOP employee-initiated sexual abuse of female prisoners.  *See* Government Accountability Office, *Women in Prison: Sexual Misconduct by Correctional Staff*, GAO-GGD-99-104 (1999) (https://www.gao.gov/products/ggd-99-104).  GAO identified deficiencies with BOP OIA's informational systems for "tracking . . . allegations of staff-on-inmate sexual misconduct in federal prisons" since "information on all allegations were not readily available from [that] system."  Based on that finding, GAO issued a recommendation to the BOP Director to "develop systems and procedures to monitor and analyze allegations of staff sexual misconduct in federal prisons and periodically report results to [DOJ OIG] and to appropriate BOP officials (*e.g.*, senior managers and wardens)."

[147] National Prison Rape Elimination Commission, *National Rape Elimination Commission Report* at 85 (June 2009).

[148] *See* Department of Justice, *2012 DOJ PREA Standards Final Notice*, 77 Fed. Reg. 37,106 (2021).

[149] 28 C.F.R. § 115.88.

[150] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

OIA is the entity within BOP that has primary responsibility for tracking and overseeing employee misconduct.[151]  OIA maintains a database that contains information about all of the complaints it receives, including type of misconduct, facility, identity of employee, date, and other related information.[152]

In the Subcommittee's interviews of Chief Reese, Dr. McLearen, and Regional Director Rios, these witnesses described how complaints of sexual abuse against BOP employees can suggest whether a region, group of facilities, individual facility, or employee merits additional scrutiny.[153]  The absence of complaints can also be probative: if female prisoners do not feel safe filing a complaint, the number of complaints at a particular institution may be artificially suppressed, meriting further scrutiny.[154]

Yet while BOP is required by law to collect and analyze complaint data, it does not systematically use it to prevent and/or detect sexual abuse of female prisoners by employees.[155]  In other words, it does not have a practice of analyzing this data to identify facilities with an outlier number of complaints or broader system-wide issues.[156]  Although BOP may be aware of multiple complaints against individual employees, it does not appear that BOP analyzes this data to specifically identify BOP employees accused of abusing multiple women who merit additional scrutiny.[157]  BOP OIA does not, in the ordinary course of business, report any complaint data to BOP leadership in the Central Office in Washington, D.C., the Regional Offices, or Wardens.[158]  Indeed, as DOJ acknowledged to the Subcommittee, "the system used [by BOP] to track staff-initiated incidents was designed primarily for individual case tracking and not for trend analysis of data across matters."[159]  Therefore, save for an *ad hoc* review, BOP does not ascertain whether the number of sexual abuse allegations at a specific facility or region is trending or part of a larger pattern.[160]

### c. The Office of Internal Affairs Annual Reporting Is Confusing, Omits Relevant Information, and Obscures BOP's Internal Affairs Case Backlog

BOP OIA generates an annual report for each fiscal year, intended to provide "information concerning the types and frequency of misconduct that occurs within [BOP].  The report is intended for managers and supervisors to address any trends and to identify any need for training to prevent misconduct from occurring."[161]

---

[151] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[152] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[153] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022); Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022); Melissa Rios, Western Regional Director, BOP, Interview with PSI (Nov. 10, 2022).
[154] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[155] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[156] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[157] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[158] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[159] *See* Email from DOJ to PSI (Oct. 18, 2022) (on file with PSI).
[160] *See* Email from DOJ to PSI (Oct. 18, 2022) (on file with PSI).
[161] Office of Internal Affairs, BOP, *Report for Fiscal Year 2020* (Jan. 6, 2021) (https://www.bop.gov/foia/docs/FY_2020_Annual_OIA_Report.pdf).

The report identifies how many cases BOP OIA closed by category of alleged misconduct.[162]  However, BOP OIA does not report out critical categories of information, such as the facilities where misconduct was alleged, the type of facility where misconduct was alleged (*i.e.*, whether it was a female facility), the gender of the complainant in sexual abuse cases (except for the most recent report, in FY 2020), the identity of the BOP employee accused of abuse, and whether the employee was named in other complaints over time.[163]

Additionally, its presentation of case closure data is confusing, obscuring how long cases have been pending and the total case backlog.[164]  Each year, OIA reports the total number of cases it closed according to the year that the case was opened.  In other words, cases that were opened in one fiscal year but closed in another fiscal year are reported under the fiscal year they were originally opened.  This method of presenting data obscures how long cases have been pending and the extent of the case backlog.[165]  Further, the report does not disclose what portion of the backlog is comprised of sexual abuse or any other category of case.[166]

## V.    BOP Fails to Hold Employees Accountable for Misconduct

*"Obviously there [was] a cultural issue and a sense of permissiveness with staff having too much time with inmates [at FCC Coleman].  There [was] also a belief that staff [would] engage in this behavior without repercussions."*
<div align="right">-BOP OIA Chief Reese[167]</div>

### a.  BOP Internal Affairs Has a Backlog of Approximately 8,000 Misconduct Cases

Per BOP guidelines, OIA should resolve complaints of employee misconduct within 180 days.[168]  Local investigators at each institution should resolve complaints within 120 days.[169]  The Subcommittee found that BOP's past and current practices violate these guidelines.[170]

---

[162] Office of Internal Affairs, BOP, *Report for Fiscal Year 2020* (Jan. 6, 2021) (https://www.bop.gov/foia/docs/FY_2020_Annual_OIA_Report.pdf).
[163] Office of Internal Affairs, BOP, *Report for Fiscal Year 2020* (Jan. 6, 2021) (https://www.bop.gov/foia/docs/FY_2020_Annual_OIA_Report.pdf).
[164] *See* Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022); Office of Internal Affairs, BOP, *Report for Fiscal Year 2020* (Jan. 6, 2021) (https://www.bop.gov/foia/docs/FY_2020_Annual_OIA_Report.pdf).
[165] *See* Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022); Office of Internal Affairs BOP, *Report for Fiscal Year 2020*; Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[166] *See* Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022); Office of Internal Affairs BOP, *Report for Fiscal Year 2020*.
[167] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[168] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[169] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[170] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).  Chief Reese told the Subcommittee that the Warden involved in the incident she recalled was later investigated for failure to report.

During FY 2020, the latest data that BOP OIA has analyzed and reported, BOP OIA opened 5,270 cases of allegations of employee misconduct—not limited to sexual misconduct—involving 6,593 of BOP's 37,000 employees.[171]  More than 1,100 of these cases alleged violations of Classification 1 offenses, the most serious misconduct, including sexual abuse or sexual harassment of female detainees.[172]  Yet as of March 17, 2021, BOP OIA had only closed 1,663 cases, or 31.6%.[173]  Of cases opened in FY 2020, 3,607 cases, or 68.4%, remained open.[174]

For FY 2020, there were 554 allegations of BOP employees and contractors sexually abusing prisoners reported to BOP OIA or detected during an open BOP OIA investigation.[175]  As of March 17, 2021, BOP substantiated five allegations of sexual abuse reported that year, which involved two BOP employees, two contract/residential reentry employees, and one employee working in a privatized facility.[176]  BOP did not sustain 215 allegations, and 304 were still pending.[177]

Failure to timely clear cases adds up.  During the course of its investigation, the Subcommittee uncovered that as of October 28, 2022, OIA had a backlog of approximately 8,000 cases, with some cases pending for more than five years.[178]  During an interview with the Subcommittee, BOP OIA Chief Reese said that BOP does not expect to be able to clear the backlog for another two years, at the earliest.[179]

---

[171] Office of Internal Affairs, BOP, *Report for Fiscal Year 2020* at 8 (https://www.bop.gov/foia/docs/FY_2020_Annual_OIA_Report.pdf); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[172] Office of Internal Affairs, BOP, *Report for Fiscal Year 2020* at 8 (https://www.bop.gov/foia/docs/FY_2020_Annual_OIA_Report.pdf); Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).  Classification 1 cases are defined as allegations, which, if substantiated, would constitute a prosecutable offense (other than offenses such as misdemeanor arrests). Classification 1 cases, which include sex abuse, bribery, trafficking of contraband, and inappropriate use of a firearm, must be reported to OIA immediately and referred to OIG immediately.  Bureau of Prisons, *Program Statement* (May 20, 2003) (https://www.bop.gov/policy/progstat/1210_024.pdf).

[173] Office of Internal Affairs, BOP, *Report for Fiscal Year 2020* at 11 (Jan. 6, 2021) (https://www.bop.gov/foia/docs/FY_2020_Annual_OIA_Report.pdf).

[174] Office of Internal Affairs, BOP, *Report for Fiscal Year 2020* at 11 (Jan. 6, 2021) (https://www.bop.gov/foia/docs/FY_2020_Annual_OIA_Report.pdf).

[175] Office of Internal Affairs, BOP, *Report for Fiscal Year 2020* at 32 (Jan. 6, 2021) (https://www.bop.gov/foia/docs/FY_2020_Annual_OIA_Report.pdf).

[176] Office of Internal Affairs, BOP, *Report for Fiscal Year 2020* at 12 (Jan. 6, 2021) (https://www.bop.gov/foia/docs/FY_2020_Annual_OIA_Report.pdf).

[177] Office of Internal Affairs, BOP, *Report for Fiscal Year 2020* at 32 (Jan. 6, 2021) (https://www.bop.gov/foia/docs/FY_2020_Annual_OIA_Report.pdf).  The Subcommittee took these figures directly from BOP OIA's FY 2020 annual report.  The Subcommittee notes that they do not add up.  BOP OIA reports that there were 554 allegations of BOP employees sexually abusing prisons, and that it sustained 5, did not sustain 215, and had 304 pending—a total of 524.  The report does not expressly account for 30 of these allegations (554 minus 524).  This is another example of BOP OIA's confusing presentation of data.

[178] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

[179] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).

**b.   BOP's Inability to Timely Investigate and Close Internal Affairs Complaints Has Failed to Hold Wrongdoers Accountable**

There are significant consequences to BOP OIA's failure to timely investigate and resolve allegations of staff misconduct.  First, as BOP OIA Chief Reese explained to the Subcommittee in an interview, the longer cases drag on, the harder it can be to sustain allegations of misconduct.[180]  "[E]vidence can go missing and memories are not as clear," she said.[181]  Second, Chief Reese said that BOP OIA's inability to close cases "could create a perception that staff is not being held accountable."[182]

The lack of accountability has significant consequences across the culture of BOP facilities nationwide.  As a preliminary concern, it makes prisons less safe.  As Chief Reese explained, when inmates feel that prison employees can break the rules with impunity, inmates may feel less safe, increasing the likelihood that they will break the rules themselves.[183]

In an interview with the Subcommittee, Wiley Jenkins, current Warden at the Metropolitan Detention Center Los Angeles (California) and former Warden at FCI Dublin who left his post there just prior to DOJ's indictments of five BOP employees there for sexual abuse of female prisoners, told the Subcommittee that in his view, the BOP OIA investigative process takes too long, even for sex abuse cases that can be more complicated.[184]  In his recollection, it has been this way for the entirety of his 20-plus year career with BOP.[185]  He described the consequences of lengthy delays in resolving internal affairs cases as preventing managers from holding staff accountable, staff perceiving that their concerns are not addressed, and administrative investigations are not just.[186]  "[P]eople [can] lose faith in the process," he said.[187]

Loss of faith in the internal disciplinary process is exacerbated by vulnerabilities in the design of the internal affairs system.  For example, when complaints of BOP employees' sexual abuse are submitted to the Warden, he is obligated to refer them onto BOP OIA.  However, if the Warden does not do so, there is no way for BOP OIA to know that he had received the complaints at all.  BOP OIA has no record of complaints that do not leave the Warden's office.[188]  Indeed, in an interview with the Subcommittee, the BOP OIA Chief Reese recalled at least one instance where she learned that this had happened and noted that "there may be more."[189]

---

[180] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[181] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[182] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[183] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[184] Wiley Jenkins, Former Warden at FCI Dublin, BOP, Interview with PSI (Nov. 16, 2022).
[185] Wiley Jenkins, Former Warden at FCI Dublin, BOP, Interview with PSI (Nov. 16, 2022).
[186] Wiley Jenkins, Former Warden at FCI Dublin, BOP, Interview with PSI (Nov. 16, 2022).
[187] Wiley Jenkins, Former Warden at FCI Dublin, BOP, Interview with PSI (Nov. 16, 2022).
[188] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[189] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022). Reese noted that the warden in the one instance she could recall was investigated for his failure to report.

Per Chief Reese, BOP OIA is aware of the risk that senior managers within an institution could pressure investigators to close a case prematurely.[190]  She told PSI that there are vulnerabilities in any human system, and that part of the ongoing conversation at BOP OIA is making sure that no one is working on anything where they have a personal connection.[191]

### c. OIG Lacks Resources to Pursue Criminal Investigations of Most BOP Employees Accused of Crimes

OIG has the primary responsibility for criminal investigations into allegations of misconduct by current BOP employees.  Due to capacity constraints, OIG is only able to pursue a fraction of the allegations of criminal misconduct, including sexual abuse of female prisoners by employees.

For the past decade, OIG's staff of approximately 80 non-supervisory criminal special agents reviewed approximately 700 cases per year that could implicate sexual abuse or harassment, and thousands more per year of various other employee misconduct.[192]  Last year, the OIG Special Agent in Charge ("SAC") of the Miami office reviewed 2,000 BOP complaints alone, and the SAC of the Dallas Office reviewed 2,300 complaints.[193]  Because OIG is only able to fully investigate a fraction of allegations of misconduct by BOP employees, it sends the vast majority of cases back to BOP OIA as a management referral for BOP to investigate or as a "monitored referral" by which BOP OIA conducts the investigation and then sends a report of its findings back to OIG.

The referral process triages investigations, but can reduce the deterrent of criminal sanctions, cause delay, and preclude fully independent investigations of allegations of misconduct from outside the agency.  It can also lead to perverse outcomes like the one uncovered by the Subcommittee's investigation with respect to sex abuse at FCC Coleman. There, BOP OIA investigated allegations of sexual abuse and compelled the subjects of the investigation to sit for interviews under oath; then, the subjects of the investigation admitted to crimes and were effectively immunized from criminal prosecution under the *Garrity* standard.

In the past year, OIG has taken steps to institute reforms to address the potential difficulties in investigating sexual abuse of female prisoners.  OIG has prioritized investigations of sexual misconduct cases, sought additional resources to be able to investigate a higher percentage of sexual misconduct allegations it receives, required its SACs to specifically note whether they had determined if the subject of an incoming complaint had previously been accused of misconduct, and is proactively analyzing case information in its database to identify "hot spots" by individual and institution.[194]

---

[190] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[191] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[192] OIG Briefing to PSI (Nov. 9, 2022).
[193] OIG Briefing to PSI (Nov. 9, 2022).
[194] OIG Briefing to PSI (Nov. 9, 2022).

## VI.    BOP's Deficient Response to Sexual Abuse

BOP failed to take agency-wide action to address sexual abuse of female inmates by male BOP employees.  While BOP's and DOJ's recent focus on sexual abuse prevention and deterrence represents progress, it comes years after significant incidents of abuse came to light.

During interviews with the Subcommittee, BOP articulated two opposing views concerning how it viewed BOP employees' sexual abuse of prisoners at these four facilities.  On the one hand, BOP OIA Chief Reese and Acting Assistant Director for Reentry Services, Alix McLearen, PhD, described abuse, at least with respect to FCC Coleman and FCI Dublin, as partially attributable to the culture of those institutions at the time.[195]

But Regional Director Rios and Warden Jenkins viewed abuse at these four facilities as individual misconduct, even when there were multiple employees abusing multiple female prisoners in the same facility over the same period of time.[196]  When asked in an interview with the Subcommittee whether there was a culture of abuse at FCI Dublin evidenced by the five criminal prosecutions of BOP employees there, all within a two-year period, Warden Jenkins replied, "no."[197]  In his view, sex abuse by BOP employees at FCI Dublin did not reflect broader issues at the prison.[198]  His remedy for BOP employee sexual abuse of female prisoners at the scale of FCI Dublin would be the same as his remedy to a one-off cases of sexual abuse.[199]  "It goes back to individual choices of people making poor decisions," he said.[200]

On November 4, 2022, the Subcommittee interviewed Dr. McLearen appearing on behalf of BOP to address the actions that BOP has taken in response to sexual abuse cases at MCC New York, MDC Brooklyn, FCC Coleman, and FCI Dublin.  In response to the abuse at MCC New York, MDC Brooklyn, and FCC Coleman, it does not appear that BOP took any agency-wide actions to prevent abuse from occurring at other facilities in the future.  BOP informed the Subcommittee that in response to sexual abuse by BOP employees at these three facilities, it conducted additional oversight of those facilities and changed leadership.[201]  For example, following revelations of abuse at MDC Brooklyn, BOP removed the Warden and implemented additional PREA compliance training at that facility.[202]  However, BOP appears to have made no changes to its policies or practices across its network of 122 prisons.[203]

---

[195] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022); Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022).
[196] Melissa Rios, Regional Director for the Western Region, BOP, Interview with PSI (Nov. 10, 2022); Wiley Jenkins, Former Warden at FCI Dublin, BOP, Interview with PSI (Nov. 16, 2022).
[197] Wiley Jenkins, Former Warden at FCI Dublin, BOP, Interview with PSI (Nov. 16, 2022).
[198] Wiley Jenkins, Former Warden at FCI Dublin, BOP, Interview with PSI (Nov. 16, 2022).
[199] Wiley Jenkins, Former Warden at FCI Dublin, BOP, Interview with PSI (Nov. 16, 2022).
[200] Wiley Jenkins, Former Warden at FCI Dublin, BOP, Interview with PSI (Nov. 16, 2022).
[201] Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022).
[202] Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022).
[203] Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022).

It appears BOP only reevaluated the way that it responded to BOP employee sexual abuse of female prisoners last year, following sexual abuse at FCI Dublin.[204]  Last year, BOP did the following:

- Updated language in its employee handbook pertaining to sexual abuse prevention for clarity.[205]

- Updated language in the standardized PREA poster hung in all BOP institutions that provides resources for prisoners concerning sexual abuse or harassment for clarity.[206]

- Updated and standardized the script of the orientation training for inmates upon arrival to a new facility concerning how to report sexual abuse.  BOP also created an informational video to be played at orientation where employees explained in "short, clear, and direct statements" that there is zero tolerance for sexual abuse."[207]

- Retained a contractor to train OIA investigators on how to interview inmate victims of sexual abuse.[208]

In addition to BOP implementing reforms, DOJ and BOP leadership have taken steps—coinciding with the Subcommittee's investigation—to address the issue of sexual abuse of female prisoners by male employees.

In October 2022, BOP informed the Subcommittee that it planned to reorganize the chain of command for internal affairs investigators so that those stationed to work in individual facilities report up to the OIA Chief in the Central Office in Washington D.C. instead of the facility's Warden.[209]  BOP also informed the Subcommittee that it will hire additional OIA investigators and BOP will conduct Women's Institution Cultural Assessment for facilities holding women, which include on-site inspections and interviews with detainees designed to increase BOP's awareness of conditions at those facilities.[210]

A July 14, 2022 memorandum from the Deputy Attorney General called on DOJ to convene a group of senior DOJ officials (the "Working Group") to "review the Department's approach to rooting out and preventing sexual misconduct by BOP employees."[211]  On

[204] Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022).
[205] Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022).
[206] Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022).
[207] Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022).
[208] Alix McLearen, PhD, Acting Director of Reentry Services, BOP, Interview with PSI (Nov. 4, 2022).
[209] Beth Reese, Chief of the Office of Internal Affairs, BOP, Interview with PSI (Oct. 28, 2022).
[210] Alix McLearen, PhD, Acting DirectorBeth Reese, Chief of Reentry Servicesthe Office of Internal Affairs, BOP, Interview with PSI (Nov. 4Oct. 28, 2022).
[211] Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons* (Nov. 2, 2022).

November 2, 2022, the Working Group issued its report of recommendations for both BOP and DOJ.[212]

The Working Group recommended that BOP improve reporting mechanisms for BOP employees who commit sexual misconduct; DOJ prioritize investigations of BOP employees accused of misconduct; and BOP enhance the use of administrative actions and discipline of BOP employees who are found to have committed sexual misconduct.[213]  The Subcommittee notes that it is difficult to evaluate the Working Group's recommendations because the Working Group did not establish the basis for them.  It did not discuss the scope of sexual abuse in BOP facilities, whether it viewed the problem as specific to particular institutions or systemic across BOP facilities, or how long these issues may have persisted.  The Working Group did not posit the cause of these problems or include a comprehensive analysis of historical data that it had obtained from DOJ and BOP that might identify relevant trends or patterns.[214]

## VII.    Conclusion

BOP failed to detect or prevent sexual abuse of incarcerated women by male BOP employees.  The agency's poor implementation of the audit program and reporting mechanisms required by PREA allowed serious, repeated sexual abuse in at least four facilities to go undetected.  BOP's internal affairs practices have failed to hold employees accountable, and multiple admitted sexual abusers were not criminally prosecuted as a result.  Further, for a decade, BOP failed to respond to this abuse or implement agency-wide reforms.  Moving forward, BOP should consider the Subcommittee's findings as it works to implement changes to how it handles sexual abuse of female prisoners by male BOP employees.

---

[212] Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons* (Nov. 2, 2022).

[213] Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons* (Nov. 2, 2022); Office of the Deputy Attorney General, Department of Justice, Briefing to PSI (Nov. 21, 2022).

[214] Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons* (Nov. 2, 2022); Office of the Deputy Attorney General, Department of Justice, Briefing to PSI (Nov. 21, 2022).  Such data analysis, required by the PREA standards, could inform BOP's own surveillance systems.  The Working Group planned for this work to happen in the future, recommending that BOP create a standing Advisory Group to oversee BOP data collection and analysis.

# Exhibit 1

| Sexual Abuse of Female Prisoners by BOP Employees from 2012 to 2022[1] | | |
|---|---|---|
| **Facility** | **Source** | **Number of Women Abused** |
| **FCI Alderson** | *United States v. Jeffrey Walton*, 5:14-CR-64 (S.D. W.Va.) | 1 |
| | *United States v. Richard Canterbury*, 5:14-CR-281 (S.D. W.Va.) | 1 |
| | *United States v. Jarrod Grimes*, 5:18-CR-69 (S.D. W.Va.) | 6 |
| | OIA Substantiated Cases[2] | 5 |
| **FCI Aliceville** | *United States v. Jesse Bailey*, 7:17-CR-504 (N.D. Ala.) | 1 |
| | *United States v. Adrian Stargell*, 7:20-CR-56 (N.D. Ala.) | 2 |
| | *United States v. Eric Ellis*, 7:21-CR-167 (N.D. Ala.) | 1 |
| | OIA Substantiated Cases[3] | 5 |
| **MDC Brooklyn** | *United States v. Armando Moronta*, 17-CR-281 (E.D.N.Y.) | 3 |
| | *United States v. Eugenio Perez*, 17-CR-280 (E.D.N.Y.) | 5 |
| | *United States v. Carlos Martinez*, 17-CR-2790 (E.D.N.Y.) | 1 |
| **FPC Bryan** | *United States v. James Graves*, 1:20-CR-287 (S.D. Tex.) | 2 |
| | *United States v. Marshall Thomas*, 4:15-CR-535 (S.D. Tex.) | 2 |
| | *United States v. Kendrick Brooks*, 4:15-CR-00536 (S.D. Tex.) | 1 |
| | OIA Substantiated Cases[4] | 6 |

---

[1] This table lists cases of sexual abuse of female prisoners by BOP employees.  Data from the table was derived from two sources.  First, cases where a male BOP employee pleaded guilty or was convicted of sexually abusing a female prisoner.  Second, cases where BOP OIA substantiated allegations of sexual abuse by male BOP employees at one of the six female-only BOP facilities.  The Subcommittee did not include cases where OIA substantiated cases of sexual abuse by BOP employees at any of the non-female-only facilities because the data that BOP produced to the Subcommittee did not identify the gender of the complaint(s).

[2] Staff-on-Inmate Sex Abuse Sustained Cases from 2012-Present, Production from DOJ to PSI (Nov. 10, 2022) (PSI-BOPOIA-Prod4-001-049).

[3] Staff-on-Inmate Sex Abuse Sustained Cases from 2012-Present, Production from DOJ to PSI (Nov. 10, 2022) (PSI-BOPOIA-Prod4-001-049).

[4] Staff-on-Inmate Sex Abuse Sustained Cases from 2012-Present, Production from DOJ to PSI (Nov. 10, 2022) (PSI-BOPOIA-Prod4-001-049).

| FMC Carswell | *United States v. Brady Green*[5] 4u:r1t4-cr-00145-O (N.D. Tex.) | 1 |
| | *United States v. Yvonne Marrufo*, 4:15-cr-00205-A (N.D. Tex.) | 1 |
| | *United States v. Matthew McGaugh*, 4:17-cr-00105-O (N.D. Tex.) | 1 |
| | *United States v. Luise Curiel*, 4:22-cr-00132-P (N.D. Tex.) | 3 |
| | OIA Substantiated Cases[6] | 16 |
| FCC Coleman | *Beaubrun v. United States*,[7] 5:19-cv-00615-TJC-PRL (M.D. Fla. 2022). | 10 |
| FCI Danbury | *United States v. Carlos Sanchez*, 3:18-cr-00320 | 1 |
| FCI Dublin | *Peterson v. Martinez, et al.*, 3:19-cv-01447 (N.D. Cal.) | 1 |
| | *United States v. Ray Garcia*, 4:21-CR-429 (N.D. Cal.) | 2 |
| | *United States v. John Bellhouse*, 4:21-MJ-71905 (N.D. Cal.) | 1 |
| | *United States v. James Highhouse*, 4:22-CR-16 (N.D. Cal.) | 1 |
| | *United States v. Ross Klinger*, 4:22-CR-31 (N.D. Cal.) | 3 |
| | *United States v. Enrique Chavez*, 4:22-CR-104 (N.D. Cal.) | 1 |
| | OIA Substantiated Cases[8] | 10 |
| FCI Hazelton | *United States v. Scott Born*, 1:20-CR-99 (N.D. W.Va.) | 1 |
| FDC Houston | *United States v. Samuel Hawkins*, 4:16-CR-153 (S.D. Tex.) | 1 |
| FMC Lexington | *United States v. Christopher Goodwin*, 5:21-CR-85 (E.D. Ky.) | 4 |
| | *United States v. Hosea Lee*, 5:21-CR-84 (E.D. Ky.) | 4 |

---

[5] Green was charged with and pleaded guilty to falsely denying that he had sex with a ward.
[6] Staff-on-Inmate Sex Abuse Sustained Cases from 2012-Present, Production from DOJ to PSI (Nov. 10, 2022) (PSI-BOPOIA-Prod4-001-049).
[7] Fifteen plaintiffs alleged that they were sexually abused by eight officers. Defendant United States answered plaintiffs' pleading by admitting allegations that six of the eight officers had sexual interactions with ten of the plaintiffs. *See Beaubrun Answer*.
[8] Staff-on-Inmate Sex Abuse Sustained Cases from 2012-Present, Production from DOJ to PSI (Nov. 10, 2022) (PSI-BOPOIA-Prod4-001-049).

| | | |
|---|---|---|
| **MDC Los Angeles** | *United States v. Abel Concho*, 2:21-CR-446 (C.D. Cal.) | 1 |
| | *United States v. Jose Viera*, 2:22-CR-211 (C.D. Cal.) | 1 |
| **MCC New York** | *United States v. Rudell Mullings*, 15-CR-538 (E.D.N.Y.) | 1 |
| | *United States v. Colin Akparanta*, 19-CR-363 (S.D.N.Y.) | 7 |
| **FDC Miami** | *United States v. Damon Coleman*, 3:19-CR-104 (E.D. Va.) | 1 |
| **FCI Phoenix** | *United States v. James Toadvine*, 2:15-CR-1535 (D. Ariz.) | 1 |
| | *United States v. Edward Mendoza*, 2:15-CR-1325 (D. Ariz.) | 1 |
| | *United States v. Darrell McCoy*, CR-2:17-cr-01410-DLR-1 (D. Ariz.) | 1 |
| | *United States v. Irvin Anglin*, 2020-CR-00625-JJT | 1 |
| **MDC San Diego** | *United States v. Brandon McKinney*, 3:11-CR-1020 (S.D. Cal.) | 1 |
| **FCI Tallahassee** | *United States v. Jimmy Highsmith*, 4:21-CR-008 (N.D. Fla.) | 2 |
| | *United States v. Phillip Golightly*, 4:20-cr-032 (N.D. Fla.) | |
| **FCC Victorville** | *United States v. Apolonio Gamez*, 5:18-CR-100 (C.D. Cal.) | 3 |
| **FCI-Waseca** | *United States v. Mark McShane*, 18-CR-109 (D. Minn.) | 1 |
| | OIA Substantiated Cases[9] | 8 |

---

[9] Staff-on-Inmate Sex Abuse Sustained Cases from 2012-Present, Production from DOJ to PSI (Nov. 10, 2022) (PSI-BOPOIA-Prod4-001-049).

# Exhibit 2

2012 Staff-on-Inmate
Opened Between 01/01/2012 to 12/31/2012

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Adams County Corr CTR (CI) - ACC | 1 | 0 | 1 | 0 | 0 |
| Alderson (FPC) - ALD | 4 | 0 | 4 | 0 | 0 |
| Allenwood (FCC) - ALX | 12 | 0 | 12 | 0 | 0 |
| Annapolis Junction (CCM) - CBR | 2 | 0 | 1 | 1 | 0 |
| Ashland (FCI) - ASH | 2 | 0 | 2 | 0 | 0 |
| Atlanta (CCM) - CAT | 2 | 0 | 2 | 0 | 0 |
| Atlanta (USP) - ATL | 9 | 2 | 7 | 0 | 0 |
| Atwater (USP) - ATW | 3 | 0 | 3 | 0 | 0 |
| Bastrop (FCI) - BAS | 1 | 0 | 1 | 0 | 0 |
| Beaumont (FCC) - BMX | 8 | 3 | 5 | 0 | 0 |
| Beckley (FCI) - BEC | 2 | 1 | 1 | 0 | 0 |
| Bennettsville (FCI) - BEN | 6 | 0 | 6 | 0 | 0 |
| Big Spring (CI) - BSC | 3 | 1 | 2 | 0 | 0 |
| Big Spring (FCI) - BIG | 1 | 0 | 1 | 0 | 0 |
| Brooklyn (MDC) - BRO | 7 | 2 | 5 | 0 | 0 |
| Bryan (FPC) - BRY | 3 | 1 | 2 | 0 | 0 |
| Butner (FCC) - BUX | 10 | 3 | 5 | 2 | 0 |
| Canaan (USP) - CAA | 9 | 0 | 8 | 1 | 0 |
| Carswell (FMC) - CRW | 8 | 1 | 7 | 0 | 0 |
| Chicago (CCM) - CCH | 5 | 0 | 3 | 2 | 0 |
| Chicago (MCC) - CCC | 4 | 0 | 4 | 0 | 0 |
| Cibola County (CI) - CIB | 1 | 1 | 0 | 0 | 0 |
| Cincinnati (CCM) - CCN | 2 | 0 | 2 | 0 | 0 |
| Coleman (FCC) - COX | 30 | 2 | 28 | 0 | 0 |
| Cumberland (FCI) - CUM | 1 | 0 | 1 | 0 | 0 |
| D. Ray James Correctional Fac - DRJ | 3 | 0 | 3 | 0 | 0 |
| Dalby (CI) - DAL | 1 | 0 | 1 | 0 | 0 |
| Dallas (CCM) - CDA | 7 | 0 | 5 | 2 | 0 |
| Danbury (FCI) - DAN | 6 | 0 | 3 | 3 | 0 |
| Devens (FMC) - DEV | 2 | 0 | 2 | 0 | 0 |
| Dublin (FCI) - DUB | 3 | 0 | 3 | 0 | 0 |
| Duluth (FPC) - DTH | 1 | 0 | 1 | 0 | 0 |
| Eden Dention Center (CI) - EDN | 2 | 0 | 2 | 0 | 0 |
| Edgefield (FCI) - EDG | 1 | 0 | 1 | 0 | 0 |
| El Paso (CCM) - CEP | 1 | 0 | 1 | 0 | 0 |
| El Reno (FCI) - ERE | 1 | 0 | 1 | 0 | 0 |
| Elkton (FCI) - ELK | 3 | 0 | 3 | 0 | 0 |
| Englewood (FCI) - ENG | 3 | 0 | 3 | 0 | 0 |
| Estill (FCI) - EST | 2 | 0 | 2 | 0 | 0 |
| Fairton (FCI) - FAI | 6 | 0 | 6 | 0 | 0 |
| Florence (FCC) - FLX | 24 | 1 | 22 | 1 | 0 |
| Forrest City (FCC) - FOX | 3 | 0 | 3 | 0 | 0 |
| Fort Dix (FCI) - FTD | 6 | 0 | 6 | 0 | 0 |
| Fort Worth (FCI) - FTW | 3 | 1 | 2 | 0 | 0 |
| Gilmer (FCI) - GIL | 1 | 0 | 1 | 0 | 0 |

2012 Staff-on-Inmate
Opened Between 01/01/2012 to 12/31/2012

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Greenville (FCI) - GRE | 4 | 0 | 4 | 0 | 0 |
| Guaynabo (MDC) - GUA | 2 | 2 | 0 | 0 | 0 |
| Hazelton (FCC) - HAX | 7 | 0 | 6 | 1 | 0 |
| Herlong (FCI) - HER | 3 | 1 | 2 | 0 | 0 |
| Honolulu (FDC) - HON | 3 | 1 | 2 | 0 | 0 |
| Houston (CCM) - CHN | 2 | 0 | 0 | 2 | 0 |
| Houston (FDC) - HOU | 2 | 2 | 0 | 0 | 0 |
| Jesup (FCI) - JES | 2 | 0 | 2 | 0 | 0 |
| Kansas City (CCM) - CKC | 2 | 0 | 0 | 2 | 0 |
| La Tuna (FCI) - LAT | 6 | 0 | 6 | 0 | 0 |
| Leavenworth (USP) - LVN | 4 | 2 | 2 | 0 | 0 |
| Lewisburg (USP) - LEW | 22 | 1 | 21 | 0 | 0 |
| Lexington (FMC) - LEX | 5 | 2 | 3 | 0 | 0 |
| Lompoc (FCC) - LOX | 3 | 0 | 2 | 1 | 0 |
| Long Beach (CCM) - CLB | 2 | 1 | 0 | 1 | 0 |
| Loretto (FCI) - LOR | 4 | 1 | 2 | 1 | 0 |
| Marianna (FCI) - MNA | 6 | 1 | 4 | 1 | 0 |
| Marion (USP) - MAR | 3 | 0 | 3 | 0 | 0 |
| McCreary (USP) - MCR | 12 | 0 | 12 | 0 | 0 |
| McDowell (FCI) - MCD | 2 | 0 | 2 | 0 | 0 |
| McKean (FCI) - MCK | 4 | 0 | 4 | 0 | 0 |
| McRae (CI) - MCA | 1 | 0 | 1 | 0 | 0 |
| Mendota (FCI) - MEN | 1 | 1 | 0 | 0 | 0 |
| Miami (CCM) - CMM | 4 | 0 | 1 | 0 | 0 |
| Miami (FDC) - MIM | 1 | 0 | 1 | 0 | 0 |
| Milan (FCI) - MIL | 4 | 0 | 4 | 0 | 0 |
| Montgomery (CCM) - CMY | 1 | 0 | 1 | 0 | 0 |
| Montgomery (FPC) - MON | 4 | 0 | 4 | 0 | 0 |
| Morgantown (FCI) - MRG | 3 | 0 | 3 | 0 | 0 |
| Moshannon Valley (CI) - MVC | 1 | 0 | 1 | 0 | 0 |
| Nashville (CCM) - CNV | 6 | 0 | 5 | 1 | 0 |
| NE Ohio Corr Ctr (CI) - NOC | 1 | 0 | 0 | 1 | 0 |
| New York (MCC) - NYM | 3 | 1 | 2 | 0 | 0 |
| Oakdale (FCC) - OAX | 9 | 0 | 9 | 0 | 0 |
| Oklahoma City (FTC) - OKL | 5 | 0 | 3 | 2 | 0 |
| Orlando (CCM) - COR | 1 | 0 | 1 | 0 | 0 |
| Otisville (FCI) - OTV | 3 | 1 | 2 | 0 | 0 |
| Oxford (FCI) - OXF | 1 | 0 | 0 | 1 | 0 |
| Pekin (FCI) - PEK | 3 | 1 | 1 | 1 | 0 |
| Pensacola (FPC) - PEN | 2 | 2 | 0 | 0 | 0 |
| Petersburg (FCC) - PEX | 5 | 0 | 4 | 1 | 0 |
| Philadelphia (CCM) - CPA | 2 | 0 | 0 | 2 | 0 |
| Philadelphia (FDC) - PHL | 3 | 1 | 2 | 0 | 0 |
| Phoenix (CCM) - CPH | 4 | 0 | 2 | 2 | 0 |
| Phoenix (FCI) - PHX | 6 | 2 | 3 | 1 | 0 |

2012 Staff-on-Inmate
Opened Between 01/01/2012 to 12/31/2012

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Pittsburgh (CCM) - CPG | 7 | 0 | 5 | 2 | 0 |
| Pollock (FCC) - POX | 3 | 1 | 2 | 0 | 0 |
| Raleigh (CCM) - CRL | 1 | 0 | 0 | 1 | 0 |
| Ray Brook (FCI) - RBK | 1 | 0 | 1 | 0 | 0 |
| Reeves I and II (CI) - REE | 5 | 4 | 1 | 0 | 0 |
| Rivers (CI) - RIV | 2 | 1 | 1 | 0 | 0 |
| Rochester (FMC) - RCH | 3 | 1 | 2 | 0 | 0 |
| Safford (FCI) - SAF | 3 | 0 | 3 | 0 | 0 |
| San Diego (MCC) - SDC | 2 | 0 | 2 | 0 | 0 |
| Sandstone (FCI) - SST | 2 | 0 | 2 | 0 | 0 |
| Sheridan (FCI) - SHE | 3 | 1 | 2 | 0 | 0 |
| Springfield (MCFP) - SPG | 9 | 1 | 8 | 0 | 0 |
| Taft (CI) - TAF | 2 | 0 | 1 | 1 | 0 |
| Talladega (FCI) - TDG | 8 | 0 | 7 | 1 | 0 |
| Tallahassee (FCI) - TAL | 26 | 1 | 23 | 2 | 0 |
| Terminal Island (FCI) - TRM | 2 | 0 | 2 | 0 | 0 |
| Terre Haute (FCC) - THX | 14 | 0 | 14 | 0 | 0 |
| Texarkana (FCI) - TEX | 1 | 0 | 1 | 0 | 0 |
| Tucson (FCC) - TCX | 10 | 0 | 10 | 0 | 0 |
| Victorville (FCC) - VIX | 23 | 1 | 19 | 3 | 0 |
| Waseca (FCI) - WAS | 6 | 1 | 3 | 2 | 0 |
| Willacy County Corr. Ctr (CI) - WLC | 2 | 1 | 0 | 1 | 0 |
| Williamsburg (FCI) - WIL | 3 | 1 | 1 | 1 | 0 |
| Yazoo City (FCC) - YAX | 17 | 2 | 12 | 3 | 0 |

2013 Staff-on-Inmate
Opened Between 01/01/2013 to 12/31/2013

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Adams County Corr CTR (CI) - ACC | 2 | 0 | 2 | 0 | 0 |
| Alderson (FPC) - ALD | 3 | 1 | 2 | 0 | 0 |
| Aliceville (FCI) - ALI | 1 | 0 | 1 | 0 | 0 |
| Allenwood (FCC) - ALX | 18 | 1 | 17 | 0 | 0 |
| Annapolis Junction (CCM) - CBR | 1 | 0 | 0 | 1 | 0 |
| Atlanta (CCM) - CAT | 1 | 0 | 0 | 1 | 0 |
| Atlanta (USP) - ATL | 8 | 0 | 6 | 2 | 0 |
| Atwater (USP) - ATW | 2 | 0 | 2 | 0 | 0 |
| Bastrop (FCI) - BAS | 1 | 0 | 1 | 0 | 0 |
| Beaumont (FCC) - BMX | 9 | 0 | 9 | 0 | 0 |
| Beckley (FCI) - BEC | 7 | 1 | 5 | 1 | 0 |
| Bennettsville (FCI) - BEN | 1 | 0 | 1 | 0 | 0 |
| Berlin (FCI) - BER | 2 | 0 | 2 | 0 | 0 |
| Big Sandy (USP) - BSY | 3 | 1 | 2 | 0 | 0 |
| Big Spring (CI) - BSC | 8 | 3 | 4 | 1 | 0 |
| Big Spring (FCI) - BIG | 7 | 0 | 7 | 0 | 0 |
| Brooklyn (MDC) - BRO | 6 | 1 | 5 | 0 | 0 |
| Bryan (FPC) - BRY | 3 | 1 | 2 | 0 | 0 |
| Butner (FCC) - BUX | 14 | 2 | 11 | 1 | 0 |
| Canaan (USP) - CAA | 16 | 0 | 16 | 0 | 0 |
| Carswell (FMC) - CRW | 8 | 1 | 7 | 0 | 0 |
| Chicago (MCC) - CCC | 3 | 0 | 3 | 0 | 0 |
| Cibola County (CI) - CIB | 2 | 0 | 1 | 1 | 0 |
| Cincinnati (CCM) - CCN | 1 | 0 | 0 | 1 | 0 |
| Coleman (FCC) - COX | 28 | 2 | 25 | 1 | 0 |
| Cumberland (FCI) - CUM | 1 | 0 | 0 | 1 | 0 |
| D. Ray James Correctional Fac - DRJ | 2 | 0 | 2 | 0 | 0 |
| Dalby (CI) - DAL | 4 | 1 | 2 | 1 | 0 |
| Dallas (CCM) - CDA | 9 | 1 | 2 | 6 | 0 |
| Danbury (FCI) - DAN | 3 | 1 | 1 | 1 | 0 |
| Detroit (CCM) - CDT | 1 | 0 | 1 | 0 | 0 |
| Devens (FMC) - DEV | 5 | 0 | 4 | 1 | 0 |
| Dublin (FCI) - DUB | 4 | 0 | 4 | 0 | 0 |
| Eden Dention Center (CI) - EDN | 1 | 0 | 0 | 1 | 0 |
| Edgefield (FCI) - EDG | 3 | 0 | 1 | 2 | 0 |
| El Paso (CCM) - CEP | 2 | 0 | 2 | 0 | 0 |
| El Reno (FCI) - ERE | 4 | 0 | 4 | 0 | 0 |
| Elkton (FCI) - ELK | 1 | 0 | 1 | 0 | 0 |
| Englewood (FCI) - ENG | 8 | 1 | 7 | 0 | 0 |
| Estill (FCI) - EST | 8 | 2 | 6 | 0 | 0 |
| Fairton (FCI) - FAI | 7 | 0 | 7 | 0 | 0 |
| Florence (FCC) - FLX | 42 | 1 | 40 | 1 | 0 |
| Forrest City (FCC) - FOX | 5 | 0 | 5 | 0 | 0 |
| Fort Dix (FCI) - FTD | 10 | 0 | 10 | 0 | 0 |
| Fort Worth (FCI) - FTW | 7 | 0 | 6 | 1 | 0 |

2013 Staff-on-Inmate
Opened Between 01/01/2013 to 12/31/2013

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Gilmer (FCI) - GIL | 9 | 1 | 8 | 0 | 0 |
| Greenville (FCI) - GRE | 1 | 0 | 1 | 0 | 0 |
| Guaynabo (MDC) - GUA | 2 | 1 | 1 | 0 | 0 |
| Hazelton (FCC) - HAX | 13 | 4 | 9 | 0 | 0 |
| Herlong (FCI) - HER | 11 | 3 | 8 | 0 | 0 |
| Honolulu (FDC) - HON | 1 | 1 | 0 | 0 | 0 |
| Houston (CCM) - CHN | 1 | 1 | 0 | 0 | 0 |
| Houston (FDC) - HOU | 3 | 1 | 2 | 0 | 0 |
| Jesup (FCI) - JES | 11 | 1 | 10 | 0 | 0 |
| Kansas City (CCM) - CKC | 2 | 1 | 0 | 1 | 0 |
| La Tuna (FCI) - LAT | 7 | 0 | 6 | 1 | 0 |
| Leavenworth (USP) - LVN | 2 | 0 | 2 | 0 | 0 |
| Lee (USP) - LEE | 4 | 1 | 3 | 0 | 0 |
| Lewisburg (USP) - LEW | 24 | 1 | 23 | 0 | 0 |
| Lexington (FMC) - LEX | 5 | 1 | 3 | 1 | 0 |
| Lompoc (FCC) - LOX | 6 | 0 | 4 | 2 | 0 |
| Long Beach (CCM) - CLB | 2 | 0 | 0 | 2 | 0 |
| Loretto (FCI) - LOR | 3 | 0 | 2 | 1 | 0 |
| Los Angeles (MDC) - LOS | 2 | 0 | 1 | 1 | 0 |
| Marianna (FCI) - MNA | 8 | 1 | 7 | 0 | 0 |
| Marion (USP) - MAR | 5 | 1 | 4 | 0 | 0 |
| McCreary (USP) - MCR | 14 | 1 | 13 | 0 | 0 |
| McDowell (FCI) - MCD | 5 | 0 | 5 | 0 | 0 |
| Memphis (FCI) - MEM | 2 | 0 | 2 | 0 | 0 |
| Mendota (FCI) - MEN | 6 | 0 | 5 | 1 | 0 |
| Miami (FDC) - MIM | 2 | 0 | 2 | 0 | 0 |
| Milan (FCI) - MIL | 2 | 0 | 2 | 0 | 0 |
| Minneapolis (CCM) - CMS | 3 | 0 | 2 | 1 | 0 |
| Montgomery (CCM) - CMY | 2 | 0 | 1 | 1 | 0 |
| Montgomery (FPC) - MON | 1 | 0 | 1 | 0 | 0 |
| Morgantown (FCI) - MRG | 3 | 0 | 3 | 0 | 0 |
| Moshannon Valley (CI) - MVC | 1 | 0 | 1 | 0 | 0 |
| Nashville (CCM) - CNV | 3 | 0 | 3 | 0 | 0 |
| NE Ohio Corr Ctr (CI) - NOC | 2 | 1 | 0 | 1 | 0 |
| New Orleans (CCM) - CNO | 1 | 0 | 1 | 0 | 0 |
| New York (CCM) - CNK | 3 | 1 | 0 | 2 | 0 |
| New York (MCC) - NYM | 1 | 0 | 1 | 0 | 0 |
| Oakdale (FCC) - OAX | 7 | 2 | 5 | 0 | 0 |
| Oklahoma City (FTC) - OKL | 6 | 1 | 5 | 0 | 0 |
| Otisville (FCI) - OTV | 1 | 0 | 1 | 0 | 0 |
| Oxford (FCI) - OXF | 3 | 3 | 0 | 0 | 0 |
| Pekin (FCI) - PEK | 2 | 1 | 1 | 0 | 0 |
| Pensacola (FPC) - PEN | 1 | 0 | 0 | 1 | 0 |
| Petersburg (FCC) - PEX | 4 | 0 | 3 | 1 | 0 |
| Phoenix (CCM) - CPH | 2 | 0 | 1 | 1 | 0 |

2013 Staff-on-Inmate
Opened Between 01/01/2013 to 12/31/2013

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Phoenix (FCI) - PHX | 2 | 1 | 1 | 0 | 0 |
| Pollock (FCC) - POX | 8 | 0 | 8 | 0 | 0 |
| Ray Brook (FCI) - RBK | 3 | 0 | 3 | 0 | 0 |
| Reeves I and II (CI) - REE | 1 | 1 | 0 | 0 | 0 |
| Reeves III (CI) - RVS | 2 | 0 | 2 | 0 | 0 |
| Rivers (CI) - RIV | 2 | 0 | 2 | 0 | 0 |
| Rochester (FMC) - RCH | 2 | 1 | 1 | 0 | 0 |
| Sacramento (CCM) - CSC | 1 | 0 | 0 | 1 | 0 |
| San Antonio (CCM) - CSA | 2 | 0 | 0 | 2 | 0 |
| Sandstone (FCI) - SST | 2 | 0 | 2 | 0 | 0 |
| Schuylkill (FCI) - SCH | 3 | 0 | 3 | 0 | 0 |
| Seagoville (FCI) - SEA | 3 | 1 | 2 | 0 | 0 |
| SeaTac (FDC) - SET | 1 | 0 | 1 | 0 | 0 |
| Seattle (CCM) - CSE | 1 | 0 | 0 | 1 | 0 |
| Sheridan (FCI) - SHE | 7 | 0 | 7 | 0 | 0 |
| Springfield (MCFP) - SPG | 5 | 0 | 4 | 1 | 0 |
| St Louis (CCM) - CST | 1 | 0 | 0 | 1 | 0 |
| Taft (CI) - TAF | 2 | 0 | 2 | 0 | 0 |
| Talladega (FCI) - TDG | 2 | 0 | 2 | 0 | 0 |
| Tallahassee (FCI) - TAL | 29 | 5 | 22 | 2 | 0 |
| Terminal Island (FCI) - TRM | 3 | 1 | 2 | 0 | 0 |
| Terre Haute (FCC) - THX | 9 | 0 | 9 | 0 | 0 |
| Texarkana (FCI) - TEX | 1 | 0 | 1 | 0 | 0 |
| Three Rivers (FCI) - TRV | 5 | 0 | 5 | 0 | 0 |
| Tucson (FCC) - TCX | 7 | 0 | 7 | 0 | 0 |
| Victorville (FCC) - VIX | 42 | 2 | 34 | 6 | 0 |
| Waseca (FCI) - WAS | 7 | 2 | 5 | 0 | 0 |
| Willacy County Corr. Ctr (CI) - WLC | 1 | 1 | 0 | 0 | 0 |
| Williamsburg (FCI) - WIL | 1 | 0 | 1 | 0 | 0 |
| Yazoo City (FCC) - YAX | 7 | 2 | 5 | 0 | 0 |

2014 Staff-on-Inmate
Opened Between 01/01/2014 to 12/31/2014

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Adams County Corr CTR (CI) - ACC | 1 | 0 | 1 | 0 | 0 |
| Alderson (FPC) - ALD | 3 | 2 | 0 | 1 | 0 |
| Aliceville (FCI) - ALI | 4 | 0 | 4 | 0 | 0 |
| Allenwood (FCC) - ALX | 11 | 2 | 8 | 0 | 1 |
| Annapolis Junction (CCM) - CBR | 2 | 0 | 1 | 1 | 0 |
| Ashland (FCI) - ASH | 3 | 0 | 3 | 0 | 0 |
| Atlanta (CCM) - CAT | 1 | 0 | 0 | 1 | 0 |
| Atlanta (USP) - ATL | 17 | 0 | 11 | 6 | 0 |
| Atwater (USP) - ATW | 2 | 0 | 2 | 0 | 0 |
| Beaumont (FCC) - BMX | 8 | 0 | 7 | 1 | 0 |
| Beckley (FCI) - BEC | 5 | 0 | 5 | 0 | 0 |
| Bennettsville (FCI) - BEN | 2 | 0 | 2 | 0 | 0 |
| Berlin (FCI) - BER | 5 | 1 | 4 | 0 | 0 |
| Big Sandy (USP) - BSY | 1 | 1 | 0 | 0 | 0 |
| Big Spring (CI) - BSC | 3 | 2 | 1 | 0 | 0 |
| Big Spring (FCI) - BIG | 5 | 0 | 5 | 0 | 0 |
| Brooklyn (MDC) - BRO | 8 | 0 | 7 | 1 | 0 |
| Bryan (FPC) - BRY | 4 | 2 | 2 | 0 | 0 |
| Butner (FCC) - BUX | 6 | 1 | 5 | 0 | 0 |
| Canaan (USP) - CAA | 8 | 0 | 8 | 0 | 0 |
| Carswell (FMC) - CRW | 11 | 2 | 7 | 2 | 0 |
| Chicago (CCM) - CCH | 2 | 0 | 2 | 0 | 0 |
| Chicago (MCC) - CCC | 3 | 0 | 2 | 1 | 0 |
| Cincinnati (CCM) - CCN | 1 | 0 | 0 | 1 | 0 |
| Coleman (FCC) - COX | 18 | 3 | 14 | 1 | 0 |
| Cumberland (FCI) - CUM | 1 | 0 | 0 | 1 | 0 |
| D. Ray James Correctional Fac - DRJ | 1 | 0 | 1 | 0 | 0 |
| Dalby (CI) - DAL | 2 | 1 | 1 | 0 | 0 |
| Dallas (CCM) - CDA | 5 | 0 | 1 | 4 | 0 |
| Danbury (FCI) - DAN | 3 | 0 | 3 | 0 | 0 |
| Devens (FMC) - DEV | 2 | 1 | 1 | 0 | 0 |
| Dublin (FCI) - DUB | 7 | 3 | 2 | 2 | 0 |
| Duluth (FPC) - DTH | 2 | 0 | 2 | 0 | 0 |
| Eden Dention Center (CI) - EDN | 3 | 2 | 1 | 0 | 0 |
| Edgefield (FCI) - EDG | 6 | 1 | 5 | 0 | 0 |
| El Reno (FCI) - ERE | 1 | 0 | 1 | 0 | 0 |
| Elkton (FCI) - ELK | 4 | 1 | 3 | 0 | 0 |
| Englewood (FCI) - ENG | 3 | 1 | 2 | 0 | 0 |
| Estill (FCI) - EST | 9 | 1 | 8 | 0 | 0 |
| Fairton (FCI) - FAI | 1 | 0 | 1 | 0 | 0 |
| Florence (FCC) - FLX | 46 | 0 | 44 | 2 | 0 |
| Forrest City (FCC) - FOX | 2 | 0 | 2 | 0 | 0 |
| Fort Dix (FCI) - FTD | 6 | 1 | 5 | 0 | 0 |
| Fort Worth (FCI) - FTW | 2 | 0 | 2 | 0 | 0 |
| Gilmer (FCI) - GIL | 8 | 1 | 7 | 0 | 0 |

2014 Staff-on-Inmate
Opened Between 01/01/2014 to 12/31/2014

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Hazelton (FCC) - HAX | 10 | 2 | 7 | 1 | 0 |
| Herlong (FCI) - HER | 2 | 2 | 0 | 0 | 0 |
| Honolulu (FDC) - HON | 1 | 1 | 0 | 0 | 0 |
| Houston (CCM) - CHN | 2 | 0 | 2 | 0 | 0 |
| Jesup (FCI) - JES | 6 | 1 | 5 | 0 | 0 |
| Kansas City (CCM) - CKC | 1 | 0 | 0 | 1 | 0 |
| La Tuna (FCI) - LAT | 4 | 0 | 4 | 0 | 0 |
| Leavenworth (USP) - LVN | 1 | 0 | 1 | 0 | 0 |
| Lee (USP) - LEE | 1 | 0 | 1 | 0 | 0 |
| Lewisburg (USP) - LEW | 17 | 0 | 17 | 0 | 0 |
| Lompoc (FCC) - LOX | 4 | 1 | 3 | 0 | 0 |
| Long Beach (CCM) - CLB | 1 | 0 | 0 | 1 | 0 |
| Loretto (FCI) - LOR | 4 | 0 | 2 | 2 | 0 |
| Los Angeles (MDC) - LOS | 3 | 0 | 2 | 1 | 0 |
| Marianna (FCI) - MNA | 3 | 0 | 3 | 0 | 0 |
| Marion (USP) - MAR | 4 | 0 | 2 | 2 | 0 |
| McCreary (USP) - MCR | 5 | 2 | 3 | 0 | 0 |
| McKean (FCI) - MCK | 1 | 0 | 0 | 1 | 0 |
| McRae (CI) - MCA | 1 | 1 | 0 | 0 | 0 |
| Memphis (FCI) - MEM | 2 | 0 | 2 | 0 | 0 |
| Mendota (FCI) - MEN | 2 | 0 | 2 | 0 | 0 |
| Miami (CCM) - CMM | 4 | 0 | 2 | 2 | 0 |
| Miami (FCI) - MIA | 2 | 0 | 1 | 0 | 1 |
| Miami (FDC) - MIM | 9 | 2 | 3 | 4 | 0 |
| Milan (FCI) - MIL | 1 | 0 | 1 | 0 | 0 |
| Minneapolis (CCM) - CMS | 2 | 0 | 2 | 0 | 0 |
| Montgomery (CCM) - CMY | 4 | 0 | 0 | 4 | 0 |
| Montgomery (FPC) - MON | 1 | 1 | 0 | 0 | 0 |
| Morgantown (FCI) - MRG | 2 | 1 | 1 | 0 | 0 |
| Moshannon Valley (CI) - MVC | 1 | 1 | 0 | 0 | 0 |
| Nashville (CCM) - CNV | 3 | 0 | 0 | 3 | 0 |
| NE Ohio Corr Ctr (CI) - NOC | 2 | 1 | 0 | 1 | 0 |
| New York (CCM) - CNK | 1 | 0 | 0 | 1 | 0 |
| New York (MCC) - NYM | 3 | 0 | 3 | 0 | 0 |
| Oakdale (FCC) - OAX | 1 | 0 | 1 | 0 | 0 |
| Oklahoma City (FTC) - OKL | 2 | 1 | 1 | 0 | 0 |
| Orlando (CCM) - COR | 1 | 0 | 1 | 0 | 0 |
| Otisville (FCI) - OTV | 2 | 0 | 2 | 0 | 0 |
| Oxford (FCI) - OXF | 1 | 0 | 1 | 0 | 0 |
| Pekin (FCI) - PEK | 1 | 0 | 1 | 0 | 0 |
| Petersburg (FCC) - PEX | 3 | 1 | 2 | 0 | 0 |
| Philadelphia (CCM) - CPA | 2 | 0 | 1 | 1 | 0 |
| Philadelphia (FDC) - PHL | 7 | 0 | 7 | 0 | 0 |
| Phoenix (FCI) - PHX | 1 | 0 | 0 | 0 | 1 |
| Pittsburgh (CCM) - CPG | 6 | 0 | 5 | 1 | 0 |

2014 Staff-on-Inmate
Opened Between 01/01/2014 to 12/31/2014

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Pollock (FCC) - POX | 8 | 1 | 6 | 1 | 0 |
| Raleigh (CCM) - CRL | 2 | 0 | 0 | 2 | 0 |
| Ray Brook (FCI) - RBK | 2 | 0 | 2 | 0 | 0 |
| Reeves I and II (CI) - REE | 2 | 2 | 0 | 0 | 0 |
| Reeves III (CI) - RVS | 2 | 0 | 2 | 0 | 0 |
| Rivers (CI) - RIV | 4 | 1 | 3 | 0 | 0 |
| Rochester (FMC) - RCH | 3 | 1 | 2 | 0 | 0 |
| Sacramento (CCM) - CSC | 2 | 0 | 0 | 2 | 0 |
| Safford (FCI) - SAF | 2 | 1 | 1 | 0 | 0 |
| San Antonio (CCM) - CSA | 3 | 1 | 1 | 1 | 0 |
| San Diego (MCC) - SDC | 3 | 1 | 1 | 1 | 0 |
| Sandstone (FCI) - SST | 1 | 0 | 1 | 0 | 0 |
| Schuylkill (FCI) - SCH | 2 | 0 | 2 | 0 | 0 |
| Seagoville (FCI) - SEA | 1 | 0 | 1 | 0 | 0 |
| Seattle (CCM) - CSE | 2 | 0 | 1 | 1 | 0 |
| Sheridan (FCI) - SHE | 3 | 0 | 2 | 1 | 0 |
| Springfield (MCFP) - SPG | 9 | 1 | 6 | 2 | 0 |
| St Louis (CCM) - CST | 1 | 0 | 0 | 1 | 0 |
| Taft (CI) - TAF | 2 | 0 | 2 | 0 | 0 |
| Talladega (FCI) - TDG | 2 | 0 | 2 | 0 | 0 |
| Tallahassee (FCI) - TAL | 14 | 2 | 10 | 2 | 0 |
| Terre Haute (FCC) - THX | 10 | 0 | 8 | 2 | 0 |
| Texarkana (FCI) - TEX | 4 | 2 | 2 | 0 | 0 |
| Tucson (FCC) - TCX | 9 | 1 | 7 | 1 | 0 |
| Victorville (FCC) - VIX | 14 | 0 | 11 | 0 | 3 |
| Waseca (FCI) - WAS | 7 | 3 | 4 | 0 | 0 |
| Willacy County Corr. Ctr (CI) - WLC | 2 | 1 | 0 | 1 | 0 |
| Williamsburg (FCI) - WIL | 1 | 0 | 1 | 0 | 0 |
| Yankton (FPC) - YAN | 2 | 0 | 2 | 0 | 0 |
| Yazoo City (FCC) - YAX | 6 | 2 | 4 | 0 | 0 |

2015 Staff-on-Inmate
Opened Between 01/01/2015 to 12/31/2015

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Adams County Corr CTR (CI) - ACC | 3 | 1 | 2 | 0 | 0 |
| Aliceville (FCI) - ALI | 6 | 0 | 5 | 0 | 1 |
| Allenwood (FCC) - ALX | 12 | 1 | 11 | 0 | 0 |
| Annapolis Junction (CCM) - CBR | 2 | 0 | 0 | 2 | 0 |
| Ashland (FCI) - ASH | 2 | 0 | 2 | 0 | 0 |
| Atlanta (CCM) - CAT | 1 | 0 | 0 | 1 | 0 |
| Atlanta (USP) - ATL | 5 | 1 | 3 | 1 | 0 |
| Atwater (USP) - ATW | 1 | 0 | 1 | 0 | 0 |
| Baltimore (CCM) closed - CDR | 4 | 1 | 1 | 2 | 0 |
| Bastrop (FCI) - BAS | 2 | 0 | 2 | 0 | 0 |
| Beaumont (FCC) - BMX | 7 | 1 | 6 | 0 | 0 |
| Beckley (FCI) - BEC | 2 | 1 | 1 | 0 | 0 |
| Bennettsville (FCI) - BEN | 5 | 1 | 4 | 0 | 0 |
| Berlin (FCI) - BER | 3 | 0 | 1 | 1 | 1 |
| Big Sandy (USP) - BSY | 1 | 1 | 0 | 0 | 0 |
| Big Spring (CI) - BSC | 6 | 3 | 3 | 0 | 0 |
| Big Spring (FCI) - BIG | 3 | 2 | 1 | 0 | 0 |
| Brooklyn (MDC) - BRO | 5 | 1 | 4 | 0 | 0 |
| Bryan (FPC) - BRY | 4 | 1 | 3 | 0 | 0 |
| Butner (FCC) - BUX | 3 | 0 | 3 | 0 | 0 |
| Canaan (USP) - CAA | 3 | 0 | 3 | 0 | 0 |
| Carswell (FMC) - CRW | 8 | 2 | 5 | 1 | 0 |
| Chicago (CCM) - CCH | 4 | 2 | 2 | 0 | 0 |
| Chicago (MCC) - CCC | 2 | 0 | 2 | 0 | 0 |
| Cibola County (CI) - CIB | 1 | 0 | 1 | 0 | 0 |
| Cincinnati (CCM) - CCN | 5 | 0 | 2 | 3 | 0 |
| Coleman (FCC) - COX | 16 | 5 | 10 | 1 | 0 |
| Cumberland (FCI) - CUM | 5 | 1 | 4 | 0 | 0 |
| D. Ray James Correctional Fac - DRJ | 4 | 2 | 1 | 1 | 0 |
| Dalby (CI) - DAL | 2 | 0 | 2 | 0 | 0 |
| Dallas (CCM) - CDA | 1 | 0 | 0 | 1 | 0 |
| Danbury (FCI) - DAN | 4 | 1 | 2 | 0 | 1 |
| Detroit (CCM) - CDT | 1 | 0 | 0 | 1 | 0 |
| Devens (FMC) - DEV | 1 | 0 | 1 | 0 | 0 |
| Dublin (FCI) - DUB | 5 | 1 | 4 | 0 | 0 |
| Eden Dention Center (CI) - EDN | 1 | 1 | 0 | 0 | 0 |
| El Reno (FCI) - ERE | 2 | 2 | 0 | 0 | 0 |
| Elkton (FCI) - ELK | 1 | 0 | 1 | 0 | 0 |
| Englewood (FCI) - ENG | 2 | 1 | 1 | 0 | 0 |
| Estill (FCI) - EST | 8 | 1 | 7 | 0 | 0 |
| Fairton (FCI) - FAI | 2 | 0 | 2 | 0 | 0 |
| Florence (FCC) - FLX | 44 | 1 | 42 | 1 | 0 |
| Forrest City (FCC) - FOX | 2 | 0 | 2 | 0 | 0 |
| Fort Dix (FCI) - FTD | 3 | 0 | 3 | 0 | 0 |
| Fort Worth (FCI) - FTW | 4 | 1 | 3 | 0 | 0 |

2015 Staff-on-Inmate
Opened Between 01/01/2015 to 12/31/2015

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Gilmer (FCI) - GIL | 5 | 3 | 2 | 0 | 0 |
| Great Plains Correc. Facility (GPC) | 3 | 1 | 0 | 2 | 0 |
| Greenville (FCI) - GRE | 2 | 0 | 2 | 0 | 0 |
| Guaynabo (MDC) - GUA | 2 | 1 | 1 | 0 | 0 |
| Hazelton (FCC) - HAX | 11 | 1 | 10 | 0 | 0 |
| Herlong (FCI) - HER | 4 | 0 | 3 | 1 | 0 |
| Honolulu (FDC) - HON | 1 | 0 | 1 | 0 | 0 |
| Houston (FDC) - HOU | 2 | 1 | 1 | 0 | 0 |
| Jesup (FCI) - JES | 1 | 0 | 0 | 1 | 0 |
| Kansas City (CCM) - CKC | 1 | 0 | 0 | 1 | 0 |
| La Tuna (FCI) - LAT | 5 | 1 | 4 | 0 | 0 |
| Leavenworth (USP) - LVN | 5 | 0 | 5 | 0 | 0 |
| Lewisburg (USP) - LEW | 14 | 1 | 13 | 0 | 0 |
| Lexington (FMC) - LEX | 5 | 2 | 3 | 0 | 0 |
| Lompoc (FCC) - LOX | 4 | 0 | 3 | 1 | 0 |
| Loretto (FCI) - LOR | 3 | 1 | 2 | 0 | 0 |
| Los Angeles (MDC) - LOS | 2 | 0 | 1 | 1 | 0 |
| Manchester (FCI) - MAN | 2 | 0 | 2 | 0 | 0 |
| Marianna (FCI) - MNA | 2 | 0 | 2 | 0 | 0 |
| Marion (USP) - MAR | 3 | 0 | 1 | 1 | 1 |
| McCreary (USP) - MCR | 4 | 0 | 4 | 0 | 0 |
| McDowell (FCI) - MCD | 3 | 0 | 3 | 0 | 0 |
| McKean (FCI) - MCK | 1 | 0 | 1 | 0 | 0 |
| McRae (CI) - MCA | 1 | 0 | 1 | 0 | 0 |
| Memphis (FCI) - MEM | 1 | 0 | 1 | 0 | 0 |
| Mendota (FCI) - MEN | 1 | 0 | 1 | 0 | 0 |
| Miami (FCI) - MIA | 1 | 0 | 1 | 0 | 0 |
| Miami (FDC) - MIM | 7 | 1 | 5 | 1 | 0 |
| Minneapolis (CCM) - CMS | 1 | 0 | 0 | 1 | 0 |
| Montgomery (CCM) - CMY | 2 | 0 | 0 | 2 | 0 |
| Montgomery (FPC) - MON | 2 | 1 | 1 | 0 | 0 |
| Morgantown (FCI) - MRG | 1 | 0 | 1 | 0 | 0 |
| Moshannon Valley (CI) - MVC | 5 | 0 | 5 | 0 | 0 |
| Nashville (CCM) - CNV | 1 | 0 | 1 | 0 | 0 |
| NE Ohio Corr Ctr (CI) - NOC | 1 | 0 | 0 | 1 | 0 |
| New Orleans (CCM) - CNO | 2 | 0 | 2 | 0 | 0 |
| New York (CCM) - CNK | 1 | 0 | 0 | 1 | 0 |
| New York (MCC) - NYM | 1 | 1 | 0 | 0 | 0 |
| Oakdale (FCC) - OAX | 2 | 0 | 2 | 0 | 0 |
| Oklahoma City (FTC) - OKL | 2 | 0 | 2 | 0 | 0 |
| Orlando (CCM) - COR | 1 | 0 | 1 | 0 | 0 |
| Otisville (FCI) - OTV | 4 | 1 | 3 | 0 | 0 |
| Oxford (FCI) - OXF | 1 | 0 | 1 | 0 | 0 |
| Pekin (FCI) - PEK | 1 | 0 | 1 | 0 | 0 |
| Petersburg (FCC) - PEX | 2 | 0 | 2 | 0 | 0 |

2015 Staff-on-Inmate
Opened Between 01/01/2015 to 12/31/2015

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Philadelphia (CCM) - CPA | 1 | 1 | 0 | 0 | 0 |
| Philadelphia (FDC) - PHL | 2 | 0 | 2 | 0 | 0 |
| Phoenix (FCI) - PHX | 6 | 3 | 3 | 0 | 0 |
| Pittsburgh (CCM) - CPG | 2 | 0 | 1 | 1 | 0 |
| Pollock (FCC) - POX | 5 | 0 | 4 | 1 | 0 |
| Raleigh (CCM) - CRL | 1 | 0 | 1 | 0 | 0 |
| Ray Brook (FCI) - RBK | 2 | 0 | 2 | 0 | 0 |
| Sacramento (CCM) - CSC | 1 | 0 | 1 | 0 | 0 |
| Safford (FCI) - SAF | 1 | 0 | 1 | 0 | 0 |
| San Antonio (CCM) - CSA | 2 | 1 | 0 | 1 | 0 |
| Sandstone (FCI) - SST | 2 | 0 | 2 | 0 | 0 |
| Schuylkill (FCI) - SCH | 2 | 0 | 2 | 0 | 0 |
| Seagoville (FCI) - SEA | 1 | 0 | 1 | 0 | 0 |
| SeaTac (FDC) - SET | 2 | 1 | 1 | 0 | 0 |
| Seattle (CCM) - CSE | 1 | 0 | 0 | 1 | 0 |
| Springfield (MCFP) - SPG | 5 | 1 | 3 | 1 | 0 |
| St Louis (CCM) - CST | 3 | 1 | 0 | 2 | 0 |
| Taft (CI) - TAF | 2 | 0 | 2 | 0 | 0 |
| Talladega (FCI) - TDG | 3 | 1 | 2 | 0 | 0 |
| Tallahassee (FCI) - TAL | 10 | 0 | 8 | 2 | 0 |
| Terminal Island (FCI) - TRM | 3 | 0 | 2 | 1 | 0 |
| Terre Haute (FCC) - THX | 7 | 1 | 6 | 0 | 0 |
| Texarkana (FCI) - TEX | 6 | 1 | 5 | 0 | 0 |
| Tucson (FCC) - TCX | 11 | 1 | 10 | 0 | 0 |
| Victorville (FCC) - VIX | 19 | 0 | 8 | 1 | 10 |
| Waseca (FCI) - WAS | 3 | 0 | 2 | 1 | 0 |
| Willacy County Corr. Ctr (CI) - WLC | 1 | 0 | 0 | 1 | 0 |
| Williamsburg (FCI) - WIL | 1 | 0 | 1 | 0 | 0 |
| Yazoo City (FCC) - YAX | 2 | 0 | 2 | 0 | 0 |

2016 Staff-on-Inmate
Opened Between 01/01/2016 to 12/31/2016

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Adams County Corr CTR (CI) - ACC | 3 | 1 | 1 | 1 | 0 |
| Alderson (FPC) - ALD | 1 | 1 | 0 | 0 | 0 |
| Aliceville (FCI) - ALI | 6 | 1 | 3 | 2 | 0 |
| Allenwood (FCC) - ALX | 20 | 1 | 18 | 1 | 0 |
| Annapolis Junction (CCM) - CBR | 4 | 0 | 0 | 4 | 0 |
| Ashland (FCI) - ASH | 4 | 0 | 4 | 0 | 0 |
| Atlanta (USP) - ATL | 10 | 0 | 10 | 0 | 0 |
| Atwater (USP) - ATW | 3 | 0 | 2 | 1 | 0 |
| Baltimore (CCM) closed - CDR | 1 | 0 | 0 | 1 | 0 |
| Bastrop (FCI) - BAS | 2 | 0 | 2 | 0 | 0 |
| Beaumont (FCC) - BMX | 14 | 4 | 10 | 0 | 0 |
| Beckley (FCI) - BEC | 4 | 2 | 1 | 1 | 0 |
| Bennettsville (FCI) - BEN | 8 | 1 | 6 | 0 | 1 |
| Berlin (FCI) - BER | 6 | 1 | 4 | 1 | 0 |
| Big Sandy (USP) - BSY | 2 | 0 | 2 | 0 | 0 |
| Big Spring (CI) - BSC | 7 | 0 | 5 | 2 | 0 |
| Big Spring (FCI) - BIG | 4 | 2 | 2 | 0 | 0 |
| Brooklyn (MDC) - BRO | 7 | 2 | 3 | 2 | 0 |
| Bryan (FPC) - BRY | 1 | 0 | 1 | 0 | 0 |
| Butner (FCC) - BUX | 9 | 2 | 5 | 2 | 0 |
| Canaan (USP) - CAA | 6 | 1 | 5 | 0 | 0 |
| Carswell (FMC) - CRW | 7 | 2 | 4 | 1 | 0 |
| Chicago (CCM) - CCH | 1 | 0 | 1 | 0 | 0 |
| Chicago (MCC) - CCC | 2 | 0 | 2 | 0 | 0 |
| Cibola County (CI) - CIB | 1 | 0 | 1 | 0 | 0 |
| Cincinnati (CCM) - CCN | 2 | 0 | 2 | 0 | 0 |
| Coleman (FCC) - COX | 22 | 2 | 20 | 0 | 0 |
| Cumberland (FCI) - CUM | 2 | 0 | 2 | 0 | 0 |
| D. Ray James Correctional Fac - DRJ | 1 | 0 | 0 | 1 | 0 |
| Dallas (CCM) - CDA | 6 | 1 | 3 | 2 | 0 |
| Danbury (FCI) - DAN | 4 | 0 | 2 | 1 | 1 |
| Devens (FMC) - DEV | 2 | 0 | 2 | 0 | 0 |
| Dublin (FCI) - DUB | 6 | 1 | 3 | 1 | 1 |
| Edgefield (FCI) - EDG | 3 | 0 | 3 | 0 | 0 |
| El Reno (FCI) - ERE | 3 | 0 | 3 | 0 | 0 |
| Elkton (FCI) - ELK | 5 | 1 | 4 | 0 | 0 |
| Englewood (FCI) - ENG | 3 | 1 | 2 | 0 | 0 |
| Fairton (FCI) - FAI | 3 | 0 | 3 | 0 | 0 |
| Florence (FCC) - FLX | 30 | 1 | 28 | 1 | 0 |
| Forrest City (FCC) - FOX | 10 | 2 | 8 | 0 | 0 |
| Fort Dix (FCI) - FTD | 6 | 2 | 4 | 0 | 0 |
| Fort Worth (FCI) - FTW | 9 | 0 | 7 | 2 | 0 |
| Gilmer (FCI) - GIL | 7 | 0 | 7 | 0 | 0 |
| Great Plains Correc.Facility (GPC) | 3 | 0 | 2 | 1 | 0 |
| Greenville (FCI) - GRE | 3 | 0 | 3 | 0 | 0 |

2016 Staff-on-Inmate
Opened Between 01/01/2016 to 12/31/2016

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Guaynabo (MDC) - GUA | 2 | 0 | 1 | 1 | 0 |
| Hazelton (FCC) - HAX | 16 | 2 | 12 | 2 | 0 |
| Herlong (FCI) - HER | 1 | 1 | 0 | 0 | 0 |
| Honolulu (FDC) - HON | 3 | 2 | 1 | 0 | 0 |
| Houston (FDC) - HOU | 1 | 0 | 1 | 0 | 0 |
| Jesup (FCI) - JES | 3 | 0 | 3 | 0 | 0 |
| La Tuna (FCI) - LAT | 4 | 0 | 3 | 1 | 0 |
| Leavenworth (USP) - LVN | 2 | 0 | 2 | 0 | 0 |
| Lee (USP) - LEE | 3 | 0 | 3 | 0 | 0 |
| Lewisburg (USP) - LEW | 9 | 0 | 9 | 0 | 0 |
| Lexington (FMC) - LEX | 12 | 1 | 8 | 3 | 0 |
| Lompoc (FCC) - LOX | 2 | 0 | 2 | 0 | 0 |
| Loretto (FCI) - LOR | 1 | 0 | 1 | 0 | 0 |
| Manchester (FCI) - MAN | 2 | 0 | 2 | 0 | 0 |
| Marianna (FCI) - MNA | 7 | 1 | 6 | 0 | 0 |
| Marion (USP) - MAR | 2 | 0 | 2 | 0 | 0 |
| McCreary (USP) - MCR | 5 | 0 | 4 | 1 | 0 |
| McDowell (FCI) - MCD | 1 | 1 | 0 | 0 | 0 |
| McKean (FCI) - MCK | 1 | 0 | 1 | 0 | 0 |
| Memphis (FCI) - MEM | 3 | 0 | 3 | 0 | 0 |
| Miami (CCM) - CMM | 1 | 0 | 0 | 1 | 0 |
| Miami (FCI) - MIA | 3 | 0 | 2 | 0 | 1 |
| Miami (FDC) - MIM | 11 | 7 | 4 | 0 | 0 |
| Milan (FCI) - MIL | 1 | 0 | 1 | 0 | 0 |
| Montgomery (CCM) - CMY | 3 | 1 | 0 | 2 | 0 |
| Montgomery (FPC) - MON | 3 | 0 | 3 | 0 | 0 |
| Morgantown (FCI) - MRG | 2 | 0 | 2 | 0 | 0 |
| Moshannon Valley (CI) - MVC | 6 | 0 | 4 | 2 | 0 |
| Nashville (CCM) - CNV | 3 | 0 | 1 | 2 | 0 |
| New York (CCM) - CNK | 1 | 0 | 0 | 1 | 0 |
| New York (MCC) - NYM | 3 | 0 | 3 | 0 | 0 |
| Oakdale (FCC) - OAX | 2 | 0 | 2 | 0 | 0 |
| Oklahoma City (FTC) - OKL | 4 | 0 | 4 | 0 | 0 |
| Orlando (CCM) - COR | 4 | 0 | 2 | 2 | 0 |
| Oxford (FCI) - OXF | 1 | 0 | 1 | 0 | 0 |
| Petersburg (FCC) - PEX | 11 | 2 | 8 | 0 | 1 |
| Philadelphia (CCM) - CPA | 2 | 1 | 0 | 1 | 0 |
| Philadelphia (FDC) - PHL | 1 | 0 | 1 | 0 | 0 |
| Phoenix (FCI) - PHX | 1 | 0 | 1 | 0 | 0 |
| Pittsburgh (CCM) - CPG | 5 | 0 | 5 | 0 | 0 |
| Pollock (FCC) - POX | 6 | 1 | 5 | 0 | 0 |
| Raleigh (CCM) - CRL | 3 | 1 | 1 | 1 | 0 |
| Ray Brook (FCI) - RBK | 2 | 0 | 2 | 0 | 0 |
| Reeves I and II (CI) - REE | 3 | 1 | 2 | 0 | 0 |
| Reeves III (CI) - RVS | 5 | 2 | 3 | 0 | 0 |

2016 Staff-on-Inmate
Opened Between 01/01/2016 to 12/31/2016

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Rivers (CI) - RIV | 6 | 0 | 6 | 0 | 0 |
| Rochester (FMC) - RCH | 2 | 0 | 2 | 0 | 0 |
| Sacramento (CCM) - CSC | 3 | 1 | 1 | 1 | 0 |
| Safford (FCI) - SAF | 1 | 0 | 1 | 0 | 0 |
| San Antonio (CCM) - CSA | 2 | 0 | 2 | 0 | 0 |
| San Diego (MCC) - SDC | 3 | 0 | 3 | 0 | 0 |
| Schuylkill (FCI) - SCH | 1 | 0 | 1 | 0 | 0 |
| Seagoville (FCI) - SEA | 5 | 0 | 5 | 0 | 0 |
| SeaTac (FDC) - SET | 1 | 0 | 1 | 0 | 0 |
| Sheridan (FCI) - SHE | 1 | 0 | 0 | 1 | 0 |
| Springfield (MCFP) - SPG | 3 | 0 | 2 | 1 | 0 |
| St Louis (CCM) - CST | 1 | 0 | 0 | 1 | 0 |
| Taft (CI) - TAF | 3 | 1 | 1 | 1 | 0 |
| Talladega (FCI) - TDG | 3 | 0 | 3 | 0 | 0 |
| Tallahassee (FCI) - TAL | 9 | 1 | 5 | 2 | 1 |
| Terminal Island (FCI) - TRM | 6 | 0 | 3 | 1 | 2 |
| Terre Haute (FCC) - THX | 5 | 1 | 4 | 0 | 0 |
| Texarkana (FCI) - TEX | 5 | 2 | 3 | 0 | 0 |
| Thomson (AUSP) - TOM | 1 | 1 | 0 | 0 | 0 |
| Three Rivers (FCI) - TRV | 1 | 0 | 1 | 0 | 0 |
| Tucson (FCC) - TCX | 11 | 0 | 11 | 0 | 0 |
| Victorville (FCC) - VIX | 16 | 0 | 11 | 1 | 4 |
| Waseca (FCI) - WAS | 5 | 1 | 3 | 1 | 0 |
| Williamsburg (FCI) - WIL | 1 | 0 | 1 | 0 | 0 |
| Yazoo City (FCC) - YAX | 9 | 1 | 8 | 0 | 0 |

PSI-BOPOIA-Prod4-000023

2017 Staff-on-Inmate
Opened Between 01/01/2017 to 12/31/2017

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Adams County Corr CTR (CI) - ACC | 4 | 1 | 1 | 2 | 0 |
| Alderson (FPC) - ALD | 3 | 0 | 2 | 0 | 1 |
| Aliceville (FCI) - ALI | 4 | 3 | 0 | 0 | 1 |
| Allenwood (FCC) - ALX | 12 | 0 | 11 | 1 | 0 |
| Annapolis Junction (CCM) - CBR | 2 | 1 | 0 | 1 | 0 |
| Ashland (FCI) - ASH | 3 | 0 | 3 | 0 | 0 |
| Atlanta (CCM) - CAT | 4 | 1 | 0 | 3 | 0 |
| Atlanta (USP) - ATL | 8 | 1 | 5 | 0 | 2 |
| Atwater (USP) - ATW | 3 | 0 | 3 | 0 | 0 |
| Bastrop (FCI) - BAS | 1 | 0 | 1 | 0 | 0 |
| Beaumont (FCC) - BMX | 18 | 3 | 14 | 1 | 0 |
| Beckley (FCI) - BEC | 6 | 1 | 5 | 0 | 0 |
| Bennettsville (FCI) - BEN | 4 | 0 | 3 | 1 | 0 |
| Berlin (FCI) - BER | 2 | 0 | 2 | 0 | 0 |
| Big Sandy (USP) - BSY | 5 | 1 | 4 | 0 | 0 |
| Big Spring (CI) - BSC | 7 | 2 | 5 | 0 | 0 |
| Big Spring (CI) - BSF | 1 | 0 | 1 | 0 | 0 |
| Big Spring (FCI) - BIG | 1 | 0 | 1 | 0 | 0 |
| Brooklyn (MDC) - BRO | 8 | 1 | 6 | 1 | 0 |
| Bryan (FPC) - BRY | 5 | 0 | 4 | 0 | 1 |
| Butner (FCC) - BUX | 12 | 0 | 10 | 2 | 0 |
| Canaan (USP) - CAA | 7 | 0 | 6 | 0 | 1 |
| Carswell (FMC) - CRW | 10 | 3 | 6 | 1 | 0 |
| Chicago (CCM) - CCH | 2 | 0 | 0 | 2 | 0 |
| Chicago (MCC) - CCC | 3 | 0 | 3 | 0 | 0 |
| Coleman (FCC) - COX | 28 | 3 | 21 | 4 | 0 |
| Cumberland (FCI) - CUM | 1 | 0 | 1 | 0 | 0 |
| D. Ray James Correctional Fac - DRJ | 2 | 2 | 0 | 0 | 0 |
| Dalby (CI) - DAL | 3 | 1 | 2 | 0 | 0 |
| Dallas (CCM) - CDA | 7 | 1 | 1 | 5 | 0 |
| Danbury (FCI) - DAN | 6 | 0 | 3 | 0 | 3 |
| Devens (FMC) - DEV | 5 | 0 | 5 | 0 | 0 |
| Dublin (FCI) - DUB | 3 | 2 | 1 | 0 | 0 |
| Eden Dention Center (CI) - EDN | 1 | 1 | 0 | 0 | 0 |
| Edgefield (FCI) - EDG | 2 | 0 | 2 | 0 | 0 |
| El Reno (FCI) - ERE | 5 | 0 | 4 | 1 | 0 |
| Elkton (FCI) - ELK | 3 | 1 | 2 | 0 | 0 |
| Englewood (FCI) - ENG | 4 | 3 | 1 | 0 | 0 |
| Fairton (FCI) - FAI | 4 | 0 | 4 | 0 | 0 |
| Florence (FCC) - FLX | 24 | 6 | 17 | 1 | 0 |
| Forrest City (FCC) - FOX | 5 | 2 | 3 | 0 | 0 |
| Fort Dix (FCI) - FTD | 7 | 0 | 4 | 3 | 0 |
| Gilmer (FCI) - GIL | 6 | 1 | 5 | 0 | 0 |
| Great Plains Correc.Facility (GPC) | 2 | 1 | 1 | 0 | 0 |
| Greenville (FCI) - GRE | 2 | 0 | 2 | 0 | 0 |

2017 Staff-on-Inmate
Opened Between 01/01/2017 to 12/31/2017

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Guaynabo (MDC) - GUA | 2 | 1 | 0 | 1 | 0 |
| Hazelton (FCC) - HAX | 20 | 1 | 17 | 0 | 2 |
| Herlong (FCI) - HER | 4 | 0 | 3 | 1 | 0 |
| Honolulu (FDC) - HON | 2 | 0 | 2 | 0 | 0 |
| Houston (CCM) - CHN | 2 | 0 | 1 | 1 | 0 |
| Houston (FDC) - HOU | 4 | 3 | 1 | 0 | 0 |
| Jesup (FCI) - JES | 1 | 0 | 1 | 0 | 0 |
| Kansas City (CCM) - CKC | 2 | 1 | 0 | 1 | 0 |
| La Tuna (FCI) - LAT | 3 | 1 | 2 | 0 | 0 |
| Leavenworth (USP) - LVN | 1 | 0 | 0 | 1 | 0 |
| Lee (USP) - LEE | 8 | 0 | 8 | 0 | 0 |
| Lewisburg (USP) - LEW | 6 | 0 | 6 | 0 | 0 |
| Lexington (FMC) - LEX | 20 | 2 | 9 | 7 | 2 |
| Lompoc (FCC) - LOX | 1 | 0 | 1 | 0 | 0 |
| Los Angeles (MDC) - LOS | 2 | 1 | 1 | 0 | 0 |
| Manchester (FCI) - MAN | 5 | 2 | 2 | 1 | 0 |
| Marianna (FCI) - MNA | 3 | 1 | 2 | 0 | 0 |
| Marion (USP) - MAR | 10 | 0 | 10 | 0 | 0 |
| McCreary (USP) - MCR | 9 | 0 | 9 | 0 | 0 |
| McDowell (FCI) - MCD | 4 | 1 | 3 | 0 | 0 |
| McKean (FCI) - MCK | 3 | 0 | 2 | 1 | 0 |
| Memphis (FCI) - MEM | 3 | 1 | 1 | 1 | 0 |
| Mendota (FCI) - MEN | 4 | 2 | 2 | 0 | 0 |
| Miami (CCM) - CMM | 2 | 0 | 1 | 1 | 0 |
| Miami (FCI) - MIA | 1 | 1 | 0 | 0 | 0 |
| Miami (FDC) - MIM | 5 | 0 | 5 | 0 | 0 |
| Milan (FCI) - MIL | 6 | 2 | 4 | 0 | 0 |
| Minneapolis (CCM) - CMS | 1 | 0 | 0 | 1 | 0 |
| Montgomery (CCM) - CMY | 1 | 0 | 0 | 1 | 0 |
| Montgomery (FPC) - MON | 1 | 0 | 1 | 0 | 0 |
| Morgantown (FCI) - MRG | 1 | 0 | 1 | 0 | 0 |
| Nashville (CCM) - CNV | 6 | 0 | 2 | 4 | 0 |
| New York (MCC) - NYM | 4 | 0 | 4 | 0 | 0 |
| Oakdale (FCC) - OAX | 6 | 0 | 5 | 1 | 0 |
| Oklahoma City (FTC) - OKL | 1 | 1 | 0 | 0 | 0 |
| Orlando (CCM) - COR | 3 | 0 | 1 | 2 | 0 |
| Otisville (FCI) - OTV | 5 | 1 | 4 | 0 | 0 |
| Oxford (FCI) - OXF | 4 | 0 | 2 | 2 | 0 |
| Pekin (FCI) - PEK | 3 | 0 | 3 | 0 | 0 |
| Petersburg (FCC) - PEX | 3 | 0 | 2 | 0 | 1 |
| Philadelphia (CCM) - CPA | 2 | 0 | 1 | 1 | 0 |
| Philadelphia (FDC) - PHL | 3 | 1 | 2 | 0 | 0 |
| Phoenix (FCI) - PHX | 7 | 2 | 3 | 2 | 0 |
| Pittsburgh (CCM) - CPG | 4 | 0 | 3 | 1 | 0 |
| Pollock (FCC) - POX | 7 | 0 | 7 | 0 | 0 |

2017 Staff-on-Inmate
Opened Between 01/01/2017 to 12/31/2017

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Raleigh (CCM) - CRL | 1 | 0 | 0 | 1 | 0 |
| Ray Brook (FCI) - RBK | 4 | 0 | 3 | 1 | 0 |
| Reeves I and II (CI) - REE | 1 | 1 | 0 | 0 | 0 |
| Reeves III (CI) - RVS | 4 | 4 | 0 | 0 | 0 |
| Rivers (CI) - RIV | 1 | 0 | 1 | 0 | 0 |
| Rochester (FMC) - RCH | 1 | 0 | 1 | 0 | 0 |
| Sacramento (CCM) - CSC | 2 | 1 | 0 | 1 | 0 |
| Safford (FCI) - SAF | 3 | 0 | 3 | 0 | 0 |
| San Antonio (CCM) - CSA | 4 | 0 | 1 | 3 | 0 |
| San Diego (MCC) - SDC | 1 | 0 | 0 | 1 | 0 |
| Sandstone (FCI) - SST | 2 | 1 | 1 | 0 | 0 |
| Schuylkill (FCI) - SCH | 4 | 2 | 2 | 0 | 0 |
| Seagoville (FCI) - SEA | 4 | 2 | 2 | 0 | 0 |
| Sheridan (FCI) - SHE | 3 | 0 | 3 | 0 | 0 |
| Springfield (MCFP) - SPG | 3 | 0 | 3 | 0 | 0 |
| St Louis (CCM) - CST | 2 | 1 | 0 | 1 | 0 |
| Taft (CI) - TAF | 1 | 1 | 0 | 0 | 0 |
| Talladega (FCI) - TDG | 1 | 0 | 0 | 1 | 0 |
| Tallahassee (FCI) - TAL | 11 | 1 | 6 | 2 | 2 |
| Terminal Island (FCI) - TRM | 1 | 0 | 0 | 1 | 0 |
| Terre Haute (FCC) - THX | 7 | 0 | 7 | 0 | 0 |
| Tucson (FCC) - TCX | 15 | 2 | 13 | 0 | 0 |
| Victorville (FCC) - VIX | 10 | 1 | 6 | 1 | 2 |
| Waseca (FCI) - WAS | 2 | 0 | 1 | 0 | 1 |
| Western Regional Office - WXO | 1 | 0 | 1 | 0 | 0 |
| Williamsburg (FCI) - WIL | 5 | 0 | 4 | 0 | 1 |
| Yankton (FPC) - YAN | 1 | 0 | 1 | 0 | 0 |
| Yazoo City (FCC) - YAX | 7 | 2 | 4 | 1 | 0 |

PSI-BOPOIA-Prod4-000028

2018 Staff-on-Inmate
Opened Between 01/01/2018 to 12/31/2018

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Adams County Corr CTR (CI) - ACC | 6 | 3 | 3 | 0 | 0 |
| Alderson (FPC) - ALD | 3 | 0 | 1 | 0 | 2 |
| Aliceville (FCI) - ALI | 3 | 0 | 2 | 0 | 1 |
| Allenwood (FCC) - ALX | 14 | 2 | 11 | 0 | 1 |
| Annapolis Junction (CCM) - CBR | 3 | 1 | 1 | 1 | 0 |
| Ashland (FCI) - ASH | 2 | 0 | 2 | 0 | 0 |
| Atlanta (CCM) - CAT | 1 | 1 | 0 | 0 | 0 |
| Atlanta (USP) - ATL | 9 | 0 | 5 | 1 | 3 |
| Atwater (USP) - ATW | 4 | 0 | 4 | 0 | 0 |
| Bastrop (FCI) - BAS | 2 | 0 | 2 | 0 | 0 |
| Beaumont (FCC) - BMX | 17 | 1 | 16 | 0 | 0 |
| Beckley (FCI) - BEC | 4 | 1 | 3 | 0 | 0 |
| Bennettsville (FCI) - BEN | 3 | 0 | 3 | 0 | 0 |
| Berlin (FCI) - BER | 4 | 1 | 2 | 1 | 0 |
| Big Sandy (USP) - BSY | 5 | 0 | 3 | 2 | 0 |
| Big Spring (CI) - BSC | 1 | 0 | 1 | 0 | 0 |
| Big Spring (FCI) - BIG | 5 | 0 | 4 | 1 | 0 |
| Brooklyn (MDC) - BRO | 7 | 1 | 2 | 0 | 4 |
| Bryan (FPC) - BRY | 4 | 0 | 0 | 0 | 4 |
| Butner (FCC) - BUX | 21 | 2 | 18 | 1 | 0 |
| Canaan (USP) - CAA | 16 | 1 | 14 | 0 | 1 |
| Carswell (FMC) - CRW | 8 | 1 | 6 | 1 | 0 |
| Central Office - COF | 1 | 1 | 0 | 0 | 0 |
| Chicago (MCC) - CCC | 2 | 1 | 1 | 0 | 0 |
| Coleman (FCC) - COX | 34 | 7 | 20 | 5 | 2 |
| Cumberland (FCI) - CUM | 3 | 0 | 3 | 0 | 0 |
| D. Ray James Correctional Fac - DRJ | 2 | 2 | 0 | 0 | 0 |
| Dalby (CI) - DAL | 2 | 0 | 0 | 2 | 0 |
| Dallas (CCM) - CDA | 4 | 0 | 2 | 2 | 0 |
| Danbury (FCI) - DAN | 7 | 1 | 3 | 0 | 3 |
| Detroit (CCM) - CDT | 1 | 0 | 0 | 1 | 0 |
| Devens (FMC) - DEV | 2 | 1 | 1 | 0 | 0 |
| Dublin (FCI) - DUB | 4 | 1 | 1 | 0 | 2 |
| Duluth (FPC) - DTH | 3 | 0 | 3 | 0 | 0 |
| Edgefield (FCI) - EDG | 11 | 0 | 8 | 1 | 2 |
| El Reno (FCI) - ERE | 2 | 1 | 1 | 0 | 0 |
| Elkton (FCI) - ELK | 5 | 1 | 3 | 1 | 0 |
| Estill (FCI) - EST | 1 | 0 | 0 | 0 | 1 |
| Fairton (FCI) - FAI | 3 | 2 | 1 | 0 | 0 |
| Florence (FCC) - FLX | 15 | 2 | 13 | 0 | 0 |
| Forrest City (FCC) - FOX | 7 | 2 | 4 | 0 | 1 |
| Fort Dix (FCI) - FTD | 18 | 0 | 14 | 3 | 1 |
| Fort Worth (FCI) - FTW | 1 | 0 | 0 | 1 | 0 |
| Fort Worth (FMC) - FTW | 2 | 1 | 1 | 0 | 0 |
| Gilmer (FCI) - GIL | 4 | 1 | 3 | 0 | 0 |

2018 Staff-on-Inmate
Opened Between 01/01/2018 to 12/31/2018

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Greenville (FCI) - GRE | 5 | 0 | 4 | 1 | 0 |
| Guaynabo (MDC) - GUA | 2 | 0 | 2 | 0 | 0 |
| Hazelton (FCC) - HAX | 14 | 3 | 8 | 3 | 0 |
| Herlong (FCI) - HER | 5 | 0 | 1 | 2 | 2 |
| Honolulu (FDC) - HON | 2 | 1 | 0 | 0 | 1 |
| Houston (CCM) - CHN | 3 | 0 | 2 | 1 | 0 |
| Houston (FDC) - HOU | 1 | 0 | 1 | 0 | 0 |
| Jesup (FCI) - JES | 5 | 0 | 3 | 0 | 2 |
| La Tuna (FCI) - LAT | 1 | 0 | 1 | 0 | 0 |
| Leavenworth (USP) - LVN | 8 | 0 | 8 | 0 | 0 |
| Lee (USP) - LEE | 3 | 0 | 3 | 0 | 0 |
| Lewisburg (USP) - LEW | 12 | 0 | 12 | 0 | 0 |
| Lexington (FMC) - LEX | 21 | 3 | 12 | 4 | 2 |
| Long Beach (CCM) - CLB | 1 | 0 | 0 | 1 | 0 |
| Loretto (FCI) - LOR | 1 | 0 | 1 | 0 | 0 |
| Los Angeles (MDC) - LOS | 1 | 0 | 0 | 0 | 1 |
| Manchester (FCI) - MAN | 1 | 0 | 1 | 0 | 0 |
| Marianna (FCI) - MNA | 2 | 0 | 2 | 0 | 0 |
| Marion (USP) - MAR | 7 | 0 | 7 | 0 | 0 |
| McCreary (USP) - MCR | 16 | 0 | 16 | 0 | 0 |
| McDowell (FCI) - MCD | 3 | 0 | 3 | 0 | 0 |
| McKean (FCI) - MCK | 10 | 1 | 9 | 0 | 0 |
| McRae (CI) - MCA | 2 | 0 | 1 | 1 | 0 |
| Memphis (FCI) - MEM | 9 | 1 | 6 | 0 | 2 |
| Mendota (FCI) - MEN | 1 | 0 | 0 | 1 | 0 |
| Miami (FCI) - MIA | 2 | 1 | 1 | 0 | 0 |
| Miami (FDC) - MIM | 2 | 1 | 1 | 0 | 0 |
| Minneapolis (CCM) - CMS | 3 | 0 | 2 | 1 | 0 |
| Montgomery (CCM) - CMY | 1 | 0 | 0 | 1 | 0 |
| Montgomery (FPC) - MON | 1 | 0 | 1 | 0 | 0 |
| Morgantown (FCI) - MRG | 2 | 0 | 2 | 0 | 0 |
| Moshannon Valley (CI) - MVC | 1 | 0 | 1 | 0 | 0 |
| New York (CCM) - CNK | 3 | 1 | 1 | 1 | 0 |
| New York (MCC) - NYM | 2 | 1 | 1 | 0 | 0 |
| Oakdale (FCC) - OAX | 3 | 0 | 2 | 0 | 1 |
| Oklahoma City (FTC) - OKL | 3 | 1 | 2 | 0 | 0 |
| Orlando (CCM) - COR | 2 | 0 | 1 | 1 | 0 |
| Otisville (FCI) - OTV | 4 | 1 | 0 | 2 | 1 |
| Oxford (FCI) - OXF | 3 | 0 | 3 | 0 | 0 |
| Pekin (FCI) - PEK | 8 | 0 | 6 | 2 | 0 |
| Petersburg (FCC) - PEX | 7 | 1 | 4 | 0 | 2 |
| Philadelphia (FDC) - PHL | 3 | 1 | 2 | 0 | 0 |
| Phoenix (CCM) - CPH | 5 | 0 | 4 | 1 | 0 |
| Phoenix (FCI) - PHX | 1 | 0 | 1 | 0 | 0 |
| Pittsburgh (CCM) - CPG | 2 | 0 | 1 | 1 | 0 |

2018 Staff-on-Inmate
Opened Between 01/01/2018 to 12/31/2018

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Pollock (FCC) - POX | 10 | 1 | 9 | 0 | 0 |
| Ray Brook (FCI) - RBK | 8 | 0 | 7 | 1 | 0 |
| Reeves III (CI) - RVS | 3 | 0 | 3 | 0 | 0 |
| Rivers (CI) - RIV | 4 | 0 | 3 | 1 | 0 |
| Rochester (FMC) - RCH | 6 | 1 | 4 | 1 | 0 |
| Sacramento (CCM) - CSC | 4 | 0 | 0 | 4 | 0 |
| Safford (FCI) - SAF | 5 | 0 | 4 | 1 | 0 |
| San Antonio (CCM) - CSA | 3 | 0 | 0 | 3 | 0 |
| San Diego (MCC) - SDC | 4 | 1 | 2 | 1 | 0 |
| Sandstone (FCI) - SST | 1 | 0 | 1 | 0 | 0 |
| Schuylkill (FCI) - SCH | 2 | 1 | 0 | 0 | 1 |
| Seagoville (FCI) - SEA | 3 | 1 | 2 | 0 | 0 |
| Sheridan (FCI) - SHE | 8 | 0 | 8 | 0 | 0 |
| South Central Regional Office - SCO | 1 | 0 | 1 | 0 | 0 |
| Springfield (MCFP) - SPG | 11 | 0 | 11 | 0 | 0 |
| St Louis (CCM) - CST | 1 | 0 | 0 | 1 | 0 |
| Taft (CI) - TAF | 2 | 0 | 2 | 0 | 0 |
| Talladega (FCI) - TDG | 1 | 0 | 1 | 0 | 0 |
| Tallahassee (FCI) - TAL | 11 | 0 | 6 | 1 | 4 |
| Terminal Island (FCI) - TRM | 2 | 0 | 1 | 0 | 1 |
| Terre Haute (FCC) - THX | 8 | 0 | 6 | 1 | 1 |
| Texarkana (FCI) - TEX | 5 | 1 | 4 | 0 | 0 |
| Three Rivers (FCI) - TRV | 4 | 0 | 3 | 1 | 0 |
| Tucson (FCC) - TCX | 21 | 1 | 19 | 1 | 0 |
| Victorville (FCC) - VIX | 6 | 2 | 1 | 0 | 3 |
| Waseca (FCI) - WAS | 2 | 0 | 1 | 1 | 0 |
| Williamsburg (FCI) - WIL | 2 | 0 | 2 | 0 | 0 |
| Yankton (FPC) - YAN | 1 | 1 | 0 | 0 | 0 |
| Yazoo City (FCC) - YAX | 13 | 0 | 12 | 0 | 1 |

2019 Staff-on-Inmate
Opened Between 01/01/2019 to 12/31/2019

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Adams County Corr CTR (CI) - ACC | 2 | 0 | 0 | 2 | 0 |
| Alderson (FPC) - ALD | 2 | 0 | 2 | 0 | 0 |
| Aliceville (FCI) - ALI | 8 | 0 | 0 | 0 | 8 |
| Allenwood (FCC) - ALX | 13 | 0 | 13 | 0 | 0 |
| Annapolis Junction (CCM) - CBR | 1 | 0 | 0 | 1 | 0 |
| Ashland (FCI) - ASH | 5 | 0 | 5 | 0 | 0 |
| Atlanta (CCM) - CAT | 1 | 0 | 0 | 1 | 0 |
| Atlanta (USP) - ATL | 7 | 0 | 4 | 1 | 2 |
| Atwater (USP) - ATW | 3 | 0 | 1 | 1 | 1 |
| Bastrop (FCI) - BAS | 3 | 0 | 3 | 0 | 0 |
| Beaumont (FCC) - BMX | 16 | 0 | 11 | 4 | 1 |
| Beckley (FCI) - BEC | 8 | 1 | 7 | 0 | 0 |
| Bennettsville (FCI) - BEN | 1 | 0 | 1 | 0 | 0 |
| Berlin (FCI) - BER | 6 | 0 | 4 | 0 | 2 |
| Big Sandy (USP) - BSY | 4 | 0 | 4 | 0 | 0 |
| Big Spring (CI) - BSC | 4 | 1 | 0 | 3 | 0 |
| Big Spring (CI) - BSF | 2 | 0 | 1 | 1 | 0 |
| Big Spring (FCI) - BIG | 1 | 0 | 1 | 0 | 0 |
| Brooklyn (MDC) - BRO | 13 | 1 | 4 | 1 | 7 |
| Bryan (FPC) - BRY | 2 | 0 | 2 | 0 | 0 |
| Butner (FCC) - BUX | 13 | 1 | 9 | 2 | 1 |
| Canaan (USP) - CAA | 5 | 2 | 2 | 0 | 1 |
| Carswell (FMC) - CRW | 5 | 0 | 4 | 1 | 0 |
| Central Office - COF | 1 | 1 | 0 | 0 | 0 |
| Chicago (MCC) - CCC | 1 | 1 | 0 | 0 | 0 |
| Coleman (FCC) - COX | 40 | 5 | 21 | 7 | 7 |
| Cumberland (FCI) - CUM | 1 | 0 | 1 | 0 | 0 |
| D. Ray James Correctional Fac - DRJ | 2 | 0 | 0 | 2 | 0 |
| Dallas (CCM) - CDA | 1 | 0 | 0 | 0 | 1 |
| Danbury (FCI) - DAN | 4 | 0 | 2 | 0 | 2 |
| Devens (FMC) - DEV | 4 | 0 | 1 | 2 | 1 |
| Dublin (FCI) - DUB | 3 | 0 | 1 | 0 | 2 |
| Duluth (FPC) - DTH | 1 | 0 | 1 | 0 | 0 |
| Edgefield (FCI) - EDG | 2 | 1 | 0 | 1 | 0 |
| El Reno (FCI) - ERE | 1 | 0 | 1 | 0 | 0 |
| Elkton (FCI) - ELK | 4 | 1 | 3 | 0 | 0 |
| Englewood (FCI) - ENG | 3 | 0 | 3 | 0 | 0 |
| Estill (FCI) - EST | 3 | 0 | 2 | 0 | 1 |
| Fairton (FCI) - FAI | 3 | 1 | 1 | 1 | 0 |
| Florence (FCC) - FLX | 10 | 0 | 9 | 1 | 0 |
| Forrest City (FCC) - FOX | 8 | 0 | 8 | 0 | 0 |
| Fort Dix (FCI) - FTD | 7 | 2 | 1 | 2 | 2 |
| Fort Worth (FCI) - FTW | 1 | 0 | 1 | 0 | 0 |
| Fort Worth (FMC) - FTW | 3 | 1 | 2 | 0 | 0 |
| Gilmer (FCI) - GIL | 9 | 0 | 9 | 0 | 0 |

2019 Staff-on-Inmate
Opened Between 01/01/2019 to 12/31/2019

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Great Plains Correc.Facility (GPC) | 3 | 0 | 0 | 3 | 0 |
| Greenville (FCI) - GRE | 3 | 0 | 3 | 0 | 0 |
| Guaynabo (MDC) - GUA | 1 | 0 | 0 | 0 | 1 |
| Hazelton (FCC) - HAX | 13 | 1 | 10 | 0 | 2 |
| Herlong (FCI) - HER | 3 | 0 | 0 | 2 | 1 |
| Honolulu (FDC) - HON | 2 | 0 | 2 | 0 | 0 |
| Houston (CCM) - CHN | 3 | 0 | 2 | 1 | 0 |
| Houston (FDC) - HOU | 4 | 0 | 2 | 1 | 1 |
| Jesup (FCI) - JES | 6 | 0 | 4 | 0 | 2 |
| Kansas City (CCM) - CKC | 1 | 0 | 1 | 0 | 0 |
| Lee (USP) - LEE | 8 | 0 | 7 | 0 | 1 |
| Lewisburg (USP) - LEW | 12 | 0 | 11 | 0 | 1 |
| Lexington (FMC) - LEX | 7 | 2 | 4 | 0 | 1 |
| Lompoc (FCC) - LOX | 8 | 0 | 8 | 0 | 0 |
| Long Beach (CCM) - CLB | 2 | 0 | 0 | 1 | 1 |
| Loretto (FCI) - LOR | 5 | 0 | 4 | 0 | 1 |
| Manchester (FCI) - MAN | 2 | 0 | 2 | 0 | 0 |
| Marianna (FCI) - MNA | 2 | 2 | 0 | 0 | 0 |
| Marion (USP) - MAR | 6 | 0 | 6 | 0 | 0 |
| McCreary (USP) - MCR | 20 | 0 | 12 | 1 | 7 |
| McDowell (FCI) - MCD | 1 | 1 | 0 | 0 | 0 |
| McKean (FCI) - MCK | 1 | 0 | 1 | 0 | 0 |
| Memphis (FCI) - MEM | 5 | 1 | 2 | 0 | 2 |
| Mendota (FCI) - MEN | 3 | 0 | 1 | 2 | 0 |
| Miami (FCI) - MIA | 2 | 0 | 1 | 0 | 1 |
| Miami (FDC) - MIM | 3 | 0 | 1 | 2 | 0 |
| Milan (FCI) - MIL | 1 | 0 | 0 | 0 | 1 |
| Minneapolis (CCM) - CMS | 2 | 1 | 0 | 1 | 0 |
| Montgomery (FPC) - MON | 2 | 0 | 1 | 0 | 1 |
| Morgantown (FCI) - MRG | 3 | 0 | 2 | 1 | 0 |
| New York (MCC) - NYM | 1 | 0 | 0 | 1 | 0 |
| Oakdale (FCC) - OAX | 2 | 0 | 2 | 0 | 0 |
| Oklahoma City (FTC) - OKL | 1 | 0 | 1 | 0 | 0 |
| Orlando (CCM) - COR | 4 | 0 | 1 | 3 | 0 |
| Otisville (FCI) - OTV | 1 | 0 | 1 | 0 | 0 |
| Oxford (FCI) - OXF | 5 | 2 | 2 | 1 | 0 |
| Pekin (FCI) - PEK | 3 | 1 | 2 | 0 | 0 |
| Petersburg (FCC) - PEX | 2 | 0 | 1 | 0 | 1 |
| Philadelphia (CCM) - CPA | 1 | 0 | 0 | 1 | 0 |
| Philadelphia (FDC) - PHL | 5 | 0 | 4 | 1 | 0 |
| Phoenix (CCM) - CPH | 3 | 2 | 1 | 0 | 0 |
| Phoenix (FCI) - PHX | 7 | 2 | 1 | 2 | 2 |
| Pittsburgh (CCM) - CPG | 5 | 0 | 1 | 4 | 0 |
| Pollock (FCC) - POX | 3 | 0 | 1 | 2 | 0 |
| Raleigh (CCM) - CRL | 1 | 0 | 0 | 1 | 0 |

2019 Staff-on-Inmate
Opened Between 01/01/2019 to 12/31/2019

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Ray Brook (FCI) - RBK | 4 | 0 | 3 | 0 | 1 |
| Reeves III (CI) - RVS | 3 | 1 | 2 | 0 | 0 |
| Rivers (CI) - RIV | 5 | 1 | 1 | 3 | 0 |
| Rochester (FMC) - RCH | 4 | 0 | 3 | 1 | 0 |
| Sacramento (CCM) - CSC | 2 | 0 | 1 | 1 | 0 |
| Safford (FCI) - SAF | 7 | 0 | 4 | 0 | 3 |
| San Antonio (CCM) - CSA | 1 | 0 | 0 | 1 | 0 |
| San Diego (MCC) - SDC | 2 | 1 | 1 | 0 | 0 |
| Sandstone (FCI) - SST | 1 | 0 | 1 | 0 | 0 |
| Schuylkill (FCI) - SCH | 7 | 0 | 3 | 0 | 4 |
| Seagoville (FCI) - SEA | 6 | 0 | 3 | 0 | 3 |
| SeaTac (FDC) - SET | 6 | 1 | 5 | 0 | 0 |
| Seattle (CCM) - CSE | 3 | 0 | 1 | 2 | 0 |
| Sheridan (FCI) - SHE | 4 | 0 | 4 | 0 | 0 |
| Springfield (MCFP) - SPG | 2 | 1 | 1 | 0 | 0 |
| Taft (CI) - TAF | 2 | 0 | 1 | 1 | 0 |
| Talladega (FCI) - TDG | 9 | 0 | 4 | 0 | 5 |
| Tallahassee (FCI) - TAL | 13 | 3 | 5 | 2 | 3 |
| Terminal Island (FCI) - TRM | 1 | 1 | 0 | 0 | 0 |
| Terre Haute (FCC) - THX | 5 | 1 | 2 | 0 | 2 |
| Texarkana (FCI) - TEX | 7 | 1 | 6 | 0 | 0 |
| Thomson (AUSP) - TOM | 11 | 0 | 10 | 1 | 0 |
| Three Rivers (FCI) - TRV | 2 | 0 | 1 | 1 | 0 |
| Tucson (FCC) - TCX | 15 | 0 | 14 | 1 | 0 |
| Victorville (FCC) - VIX | 15 | 1 | 2 | 1 | 11 |
| Waseca (FCI) - WAS | 2 | 0 | 2 | 0 | 0 |
| Williamsburg (FCI) - WIL | 5 | 0 | 2 | 1 | 2 |
| Yankton (FPC) - YAN | 4 | 0 | 4 | 0 | 0 |
| Yazoo City (FCC) - YAX | 9 | 1 | 6 | 2 | 0 |

PSI-BOPOIA-Prod4-000038

2020 Staff-on-Inmate

Opened Between 01/01/2020 to 12/31/2020

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Alderson (FPC) - ALD | 1 | 0 | 1 | 0 | 0 |
| Aliceville (FCI) - ALI | 10 | 0 | 3 | 0 | 7 |
| Allenwood (FCC) - ALX | 12 | 2 | 5 | 1 | 4 |
| Annapolis Junction (CCM) - CBR | 1 | 0 | 1 | 0 | 0 |
| Ashland (FCI) - ASH | 2 | 0 | 2 | 0 | 0 |
| Atlanta (CCM) - CAT | 4 | 0 | 0 | 3 | 1 |
| Atlanta (USP) - ATL | 7 | 1 | 3 | 1 | 2 |
| Atwater (USP) - ATW | 2 | 1 | 1 | 0 | 0 |
| Bastrop (FCI) - BAS | 7 | 1 | 6 | 0 | 0 |
| Beaumont (FCC) - BMX | 6 | 0 | 3 | 0 | 3 |
| Beckley (FCI) - BEC | 3 | 0 | 3 | 0 | 0 |
| Bennettsville (FCI) - BEN | 1 | 0 | 1 | 0 | 0 |
| Big Sandy (USP) - BSY | 5 | 0 | 1 | 0 | 4 |
| Big Spring (CI) - BSC | 7 | 2 | 0 | 3 | 2 |
| Big Spring (FCI) - BIG | 1 | 0 | 0 | 0 | 1 |
| Brooklyn (MDC) - BRO | 20 | 0 | 3 | 2 | 15 |
| Bryan (FPC) - BRY | 4 | 0 | 2 | 0 | 2 |
| Butner (FCC) - BUX | 6 | 1 | 3 | 0 | 2 |
| Canaan (USP) - CAA | 2 | 0 | 1 | 0 | 1 |
| Carswell (FMC) - CRW | 5 | 0 | 0 | 3 | 2 |
| Chicago (MCC) - CCC | 4 | 1 | 1 | 2 | 0 |
| Cincinnati (CCM) - CCN | 5 | 0 | 1 | 4 | 0 |
| Coleman (FCC) - COX | 43 | 1 | 23 | 3 | 16 |
| D. Ray James Correctional Fac - DRJ | 1 | 0 | 1 | 0 | 0 |
| Dalby (CI) - DAL | 5 | 0 | 4 | 1 | 0 |
| Dallas (CCM) - CDA | 7 | 0 | 1 | 3 | 3 |
| Danbury (FCI) - DAN | 7 | 0 | 1 | 0 | 6 |
| Detroit (CCM) - CDT | 2 | 1 | 0 | 0 | 1 |
| Devens (FMC) - DEV | 3 | 0 | 3 | 0 | 0 |
| Dublin (FCI) - DUB | 3 | 0 | 0 | 0 | 3 |
| Eden Dention Center (CI) - EDN | 1 | 0 | 1 | 0 | 0 |
| Edgefield (FCI) - EDG | 2 | 1 | 0 | 0 | 1 |
| El Reno (FCI) - ERE | 5 | 0 | 2 | 0 | 3 |
| Elkton (FCI) - ELK | 3 | 0 | 0 | 0 | 3 |
| Englewood (FCI) - ENG | 2 | 0 | 1 | 1 | 0 |
| Estill (FCI) - EST | 1 | 0 | 1 | 0 | 0 |
| Fairton (FCI) - FAI | 5 | 0 | 4 | 1 | 0 |
| Florence (FCC) - FLX | 17 | 0 | 14 | 1 | 2 |
| Forrest City (FCC) - FOX | 4 | 0 | 3 | 1 | 0 |
| Fort Dix (FCI) - FTD | 3 | 0 | 2 | 0 | 1 |
| Fort Worth (FCI) - FTW | 2 | 0 | 2 | 0 | 0 |
| Fort Worth (FMC) - FTW | 3 | 1 | 1 | 0 | 1 |
| Gilmer (FCI) - GIL | 2 | 0 | 1 | 0 | 1 |
| Great Plains Correc.Facility (GPC) | 4 | 1 | 0 | 3 | 0 |
| Greenville (FCI) - GRE | 9 | 2 | 5 | 1 | 1 |

2020 Staff-on-Inmate
Opened Between 01/01/2020 to 12/31/2020

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Hazelton (FCC) - HAX | 11 | 2 | 4 | 0 | 5 |
| Herlong (FCI) - HER | 3 | 2 | 0 | 1 | 0 |
| Honolulu (FDC) - HON | 2 | 1 | 0 | 0 | 1 |
| Houston (CCM) - CHN | 2 | 1 | 0 | 0 | 1 |
| Houston (FDC) - HOU | 3 | 0 | 0 | 0 | 3 |
| Jesup (FCI) - JES | 6 | 0 | 5 | 0 | 1 |
| Kansas City (CCM) - CKC | 2 | 0 | 0 | 2 | 0 |
| La Tuna (FCI) - LAT | 3 | 0 | 2 | 0 | 1 |
| Leavenworth (USP) - LVN | 3 | 0 | 3 | 0 | 0 |
| Lee (USP) - LEE | 3 | 0 | 3 | 0 | 0 |
| Lewisburg (USP) - LEW | 1 | 0 | 1 | 0 | 0 |
| Lexington (FMC) - LEX | 4 | 1 | 2 | 0 | 1 |
| Lompoc (FCC) - LOX | 2 | 0 | 2 | 0 | 0 |
| Loretto (FCI) - LOR | 3 | 0 | 3 | 0 | 0 |
| Los Angeles (MDC) - LOS | 2 | 1 | 1 | 0 | 0 |
| Manchester (FCI) - MAN | 5 | 0 | 5 | 0 | 0 |
| Marianna (FCI) - MNA | 2 | 2 | 0 | 0 | 0 |
| Marion (USP) - MAR | 8 | 0 | 6 | 0 | 2 |
| McCreary (USP) - MCR | 4 | 0 | 3 | 0 | 1 |
| McDowell (FCI) - MCD | 2 | 0 | 2 | 0 | 0 |
| McKean (FCI) - MCK | 5 | 0 | 3 | 1 | 1 |
| McRae (CI) - MCA | 3 | 1 | 1 | 0 | 1 |
| Memphis (FCI) - MEM | 5 | 0 | 1 | 0 | 4 |
| Miami (FCI) - MIA | 1 | 0 | 0 | 0 | 1 |
| Miami (FDC) - MIM | 2 | 1 | 0 | 0 | 1 |
| Minneapolis (CCM) - CMS | 4 | 0 | 1 | 3 | 0 |
| Morgantown (FCI) - MRG | 1 | 0 | 1 | 0 | 0 |
| Moshannon Valley (CI) - MVC | 4 | 1 | 2 | 1 | 0 |
| Nashville (CCM) - CNV | 3 | 0 | 0 | 3 | 0 |
| New York (CCM) - CNK | 3 | 2 | 0 | 1 | 0 |
| New York (MCC) - NYM | 2 | 0 | 0 | 1 | 1 |
| North Lake Corr. Ctr (CI) - NLK | 2 | 0 | 0 | 2 | 0 |
| Oakdale (FCC) - OAX | 3 | 0 | 2 | 0 | 1 |
| Oklahoma City (FTC) - OKL | 2 | 0 | 2 | 0 | 0 |
| Orlando (CCM) - COR | 3 | 1 | 1 | 1 | 0 |
| Otisville (FCI) - OTV | 1 | 1 | 0 | 0 | 0 |
| Oxford (FCI) - OXF | 2 | 0 | 1 | 1 | 0 |
| Pekin (FCI) - PEK | 2 | 0 | 1 | 0 | 1 |
| Petersburg (FCC) - PEX | 11 | 3 | 1 | 0 | 7 |
| Philadelphia (CCM) - CPA | 3 | 0 | 0 | 3 | 0 |
| Philadelphia (FDC) - PHL | 7 | 1 | 6 | 0 | 0 |
| Phoenix (FCI) - PHX | 2 | 2 | 0 | 0 | 0 |
| Pittsburgh (CCM) - CPG | 2 | 1 | 0 | 1 | 0 |
| Pollock (FCC) - POX | 3 | 1 | 2 | 0 | 0 |

2020 Staff-on-Inmate
Opened Between 01/01/2020 to 12/31/2020

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Raleigh (CCM) - CRL | 1 | 0 | 1 | 0 | 0 |
| Reeves I and II (CI) - REE | 2 | 1 | 0 | 1 | 0 |
| Reeves III (CI) - RVS | 4 | 0 | 3 | 1 | 0 |
| Rivers (CI) - RIV | 7 | 0 | 4 | 3 | 0 |
| Rochester (FMC) - RCH | 2 | 0 | 2 | 0 | 0 |
| Sacramento (CCM) - CSC | 2 | 2 | 0 | 0 | 0 |
| Safford (FCI) - SAF | 3 | 2 | 1 | 0 | 0 |
| San Antonio (CCM) - CSA | 1 | 0 | 0 | 0 | 1 |
| Sandstone (FCI) - SST | 2 | 0 | 0 | 2 | 0 |
| Schuylkill (FCI) - SCH | 7 | 0 | 0 | 0 | 7 |
| Seagoville (FCI) - SEA | 5 | 0 | 1 | 0 | 4 |
| SeaTac (FDC) - SET | 3 | 0 | 2 | 0 | 1 |
| Seattle (CCM) - CSE | 1 | 0 | 0 | 1 | 0 |
| Sheridan (FCI) - SHE | 3 | 0 | 0 | 2 | 1 |
| Springfield (MCFP) - SPG | 9 | 1 | 8 | 0 | 0 |
| St Louis (CCM) - CST | 1 | 0 | 0 | 1 | 0 |
| Taft (CI) - TAF | 1 | 0 | 0 | 1 | 0 |
| Talladega (FCI) - TDG | 5 | 0 | 2 | 0 | 3 |
| Tallahassee (FCI) - TAL | 6 | 0 | 0 | 2 | 4 |
| Terre Haute (FCC) - THX | 10 | 0 | 4 | 0 | 6 |
| Texarkana (FCI) - TEX | 3 | 0 | 3 | 0 | 0 |
| Thomson (AUSP) - TOM | 18 | 0 | 10 | 3 | 5 |
| Three Rivers (FCI) - TRV | 2 | 2 | 0 | 0 | 0 |
| Tucson (FCC) - TCX | 12 | 0 | 12 | 0 | 0 |
| Victorville (FCC) - VIX | 11 | 0 | 0 | 0 | 11 |
| Waseca (FCI) - WAS | 3 | 0 | 3 | 0 | 0 |
| Williamsburg (FCI) - WIL | 3 | 0 | 2 | 0 | 1 |
| Yazoo City (FCC) - YAX | 11 | 0 | 5 | 1 | 5 |

2021 Staff-on-Inmate
Opened Between 01/01/2021 to 12/31/2021

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Alderson (FPC) - ALD | 6 | 0 | 4 | 0 | 2 |
| Aliceville (FCI) - ALI | 8 | 0 | 4 | 0 | 4 |
| Allenwood (FCC) - ALX | 5 | 0 | 1 | 1 | 3 |
| Ashland (FCI) - ASH | 2 | 0 | 2 | 0 | 0 |
| Atlanta (CCM) - CAT | 1 | 0 | 1 | 0 | 0 |
| Atlanta (USP) - ATL | 26 | 0 | 7 | 1 | 18 |
| Atwater (USP) - ATW | 3 | 0 | 0 | 1 | 2 |
| Baltimore (CCM) closed - CDR | 1 | 0 | 0 | 1 | 0 |
| Bastrop (FCI) - BAS | 3 | 0 | 1 | 1 | 1 |
| Beaumont (FCC) - BMX | 14 | 1 | 1 | 1 | 11 |
| Beckley (FCI) - BEC | 7 | 1 | 5 | 0 | 1 |
| Bennettsville (FCI) - BEN | 4 | 0 | 2 | 0 | 2 |
| Berlin (FCI) - BER | 8 | 0 | 4 | 0 | 4 |
| Big Sandy (USP) - BSY | 1 | 0 | 1 | 0 | 0 |
| Big Spring (CI) - BSC | 5 | 0 | 5 | 0 | 0 |
| Big Spring (CI) - BSF | 1 | 0 | 1 | 0 | 0 |
| Big Spring (FCI) - BIG | 3 | 0 | 1 | 0 | 2 |
| Brooklyn (MDC) - BRO | 15 | 0 | 4 | 0 | 11 |
| Bryan (FPC) - BRY | 2 | 0 | 1 | 0 | 1 |
| Butner (FCC) - BUX | 5 | 0 | 2 | 0 | 3 |
| Canaan (USP) - CAA | 4 | 0 | 0 | 0 | 4 |
| Carswell (FMC) - CRW | 7 | 1 | 1 | 1 | 4 |
| Central Office - COF | 1 | 0 | 0 | 1 | 0 |
| Chicago (CCM) - CCH | 3 | 0 | 0 | 3 | 0 |
| Chicago (MCC) - CCC | 6 | 0 | 5 | 0 | 1 |
| Cincinnati (CCM) - CCN | 6 | 0 | 0 | 6 | 0 |
| Coleman (FCC) - COX | 23 | 0 | 8 | 3 | 12 |
| Dalby (CI) - DAL | 5 | 0 | 2 | 1 | 2 |
| Dallas (CCM) - CDA | 5 | 0 | 2 | 3 | 0 |
| Danbury (FCI) - DAN | 3 | 0 | 0 | 0 | 3 |
| Detroit (CCM) - CDT | 1 | 0 | 0 | 0 | 1 |
| Dublin (FCI) - DUB | 5 | 0 | 0 | 0 | 5 |
| Edgefield (FCI) - EDG | 6 | 2 | 0 | 0 | 4 |
| El Reno (FCI) - ERE | 4 | 0 | 0 | 0 | 4 |
| Englewood (FCI) - ENG | 3 | 0 | 2 | 0 | 1 |
| Fairton (FCI) - FAI | 1 | 0 | 1 | 0 | 0 |
| Florence (FCC) - FLX | 6 | 0 | 6 | 0 | 0 |
| Forrest City (FCC) - FOX | 1 | 0 | 0 | 1 | 0 |
| Fort Dix (FCI) - FTD | 6 | 1 | 0 | 0 | 5 |
| Fort Worth (FMC) - FTW | 2 | 0 | 0 | 1 | 1 |
| Gilmer (FCI) - GIL | 6 | 1 | 3 | 2 | 0 |
| Greenville (FCI) - GRE | 1 | 0 | 1 | 0 | 0 |
| Hazelton (FCC) - HAX | 5 | 0 | 4 | 0 | 1 |
| Honolulu (FDC) - HON | 2 | 0 | 2 | 0 | 0 |
| Houston (FDC) - HOU | 4 | 0 | 3 | 0 | 1 |

2021 Staff-on-Inmate
Opened Between 01/01/2021 to 12/31/2021

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| Jesup (FCI) - JES | 3 | 0 | 2 | 0 | 1 |
| Kansas City (CCM) - CKC | 2 | 0 | 0 | 2 | 0 |
| La Tuna (FCI) - LAT | 3 | 0 | 1 | 0 | 2 |
| Leavenworth (USP) - LVN | 2 | 0 | 2 | 0 | 0 |
| Lee (USP) - LEE | 2 | 0 | 1 | 0 | 1 |
| Lewisburg (USP) - LEW | 3 | 1 | 1 | 0 | 1 |
| Lexington (FMC) - LEX | 5 | 1 | 0 | 0 | 4 |
| Lompoc (FCC) - LOX | 3 | 0 | 2 | 1 | 0 |
| Long Beach (CCM) - CLB | 2 | 0 | 0 | 2 | 0 |
| Los Angeles (MDC) - LOS | 2 | 0 | 0 | 0 | 2 |
| Marianna (FCI) - MNA | 1 | 0 | 1 | 0 | 0 |
| Marion (USP) - MAR | 1 | 0 | 0 | 0 | 1 |
| McCreary (USP) - MCR | 3 | 0 | 2 | 0 | 1 |
| McKean (FCI) - MCK | 1 | 0 | 0 | 0 | 1 |
| McRae (CI) - MCA | 1 | 0 | 0 | 1 | 0 |
| Memphis (FCI) - MEM | 4 | 0 | 0 | 0 | 4 |
| Mendota (FCI) - MEN | 4 | 0 | 2 | 0 | 2 |
| Miami (FCI) - MIA | 3 | 0 | 3 | 0 | 0 |
| Miami (FDC) - MIM | 4 | 0 | 0 | 0 | 4 |
| Minneapolis (CCM) - CMS | 1 | 0 | 0 | 1 | 0 |
| Montgomery (CCM) - CMY | 8 | 0 | 2 | 6 | 0 |
| Montgomery (FPC) - MON | 1 | 0 | 1 | 0 | 0 |
| Nashville (CCM) - CNV | 1 | 0 | 0 | 1 | 0 |
| New York (CCM) - CNK | 2 | 0 | 1 | 1 | 0 |
| New York (MCC) - NYM | 3 | 0 | 1 | 0 | 2 |
| North Lake Corr. Ctr (CI) - NLK | 6 | 0 | 4 | 2 | 0 |
| Oakdale (FCC) - OAX | 1 | 0 | 1 | 0 | 0 |
| Oklahoma City (FTC) - OKL | 3 | 0 | 1 | 0 | 2 |
| Orlando (CCM) - COR | 5 | 0 | 0 | 4 | 1 |
| Otisville (FCI) - OTV | 1 | 0 | 0 | 0 | 1 |
| Oxford (FCI) - OXF | 1 | 0 | 0 | 1 | 0 |
| Pekin (FCI) - PEK | 2 | 0 | 0 | 1 | 1 |
| Pensacola (FPC) - PEN | 1 | 0 | 0 | 0 | 1 |
| Petersburg (FCC) - PEX | 7 | 0 | 1 | 0 | 6 |
| Philadelphia (FDC) - PHL | 5 | 2 | 2 | 0 | 1 |
| Phoenix (CCM) - CPH | 3 | 0 | 1 | 2 | 0 |
| Phoenix (FCI) - PHX | 3 | 1 | 1 | 0 | 1 |
| Pittsburgh (CCM) - CPG | 2 | 0 | 0 | 2 | 0 |
| Pollock (FCC) - POX | 2 | 0 | 1 | 0 | 1 |
| Raleigh (CCM) - CRL | 2 | 0 | 0 | 2 | 0 |
| Ray Brook (FCI) - RBK | 3 | 1 | 0 | 0 | 2 |
| Reeves I and II (CI) - REE | 1 | 0 | 0 | 1 | 0 |
| Sacramento (CCM) - CSC | 2 | 0 | 0 | 2 | 0 |
| Safford (FCI) - SAF | 2 | 1 | 0 | 0 | 1 |
| San Antonio (CCM) - CSA | 4 | 0 | 2 | 2 | 0 |

2021 Staff-on-Inmate
Opened Between 01/01/2021 to 12/31/2021

| Institution/Facility | Total No. Opened | Closed, Sustained | Closed, Not Sustained | Admin. Closure | Currently Open |
|---|---|---|---|---|---|
| San Diego (MCC) - SDC | 5 | 0 | 3 | 1 | 1 |
| Sandstone (FCI) - SST | 4 | 0 | 1 | 2 | 1 |
| Schuylkill (FCI) - SCH | 5 | 0 | 1 | 0 | 4 |
| Seagoville (FCI) - SEA | 6 | 0 | 1 | 0 | 5 |
| SeaTac (FDC) - SET | 3 | 0 | 0 | 1 | 2 |
| Seattle (CCM) - CSE | 3 | 1 | 0 | 2 | 0 |
| Sheridan (FCI) - SHE | 5 | 0 | 0 | 0 | 5 |
| Springfield (MCFP) - SPG | 3 | 0 | 2 | 0 | 1 |
| St Louis (CCM) - CST | 2 | 0 | 0 | 2 | 0 |
| Talladega (FCI) - TDG | 4 | 0 | 0 | 0 | 4 |
| Tallahassee (FCI) - TAL | 8 | 0 | 3 | 1 | 4 |
| Terminal Island (FCI) - TRM | 1 | 0 | 0 | 0 | 1 |
| Terre Haute (FCC) - THX | 8 | 0 | 0 | 0 | 8 |
| Texarkana (FCI) - TEX | 5 | 2 | 2 | 0 | 1 |
| Thomson (AUSP) - TOM | 13 | 0 | 4 | 0 | 9 |
| Tucson (FCC) - TCX | 6 | 0 | 4 | 0 | 2 |
| Victorville (FCC) - VIX | 14 | 0 | 1 | 1 | 12 |
| Waseca (FCI) - WAS | 1 | 0 | 0 | 1 | 0 |
| Williamsburg (FCI) - WIL | 2 | 0 | 0 | 0 | 2 |
| Yazoo City (FCC) - YAX | 4 | 0 | 1 | 0 | 3 |

E X H I B I T   G

# Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons

November 2, 2022

The Principal Associate Deputy Attorney General

Working Group of DOJ Components

## Use of this Report

This Report was drafted to provide an overview of the Department's approach to sexual misconduct perpetrated by employees of the Federal Bureau of Prison and to propose recommendations to improve that response. The Report is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing in this Report, including the policy recommendations, should be construed to impair or otherwise affect the authority granted by law to a department or agency, or the head thereof, or the functions of government officials relating to budgetary, administrative, or legislative proposals. Recommendations will be implemented only as consistent with applicable law and subject to the availability of appropriations. Both implementation and application of policy recommendations involve the exercise of judgment of relevant Department officials.

# INTRODUCTION

On July 14, 2022, Deputy Attorney General Lisa O. Monaco issued a memorandum identifying deep concerns about instances of reported and proven sexual misconduct by Federal Bureau of Prisons ("BOP") employees. The memorandum directed the Principal Associate Deputy Attorney General to chair a group of senior officials (the "Working Group") from relevant components of the Department of Justice (the "Department" or "DOJ") to review the Department's approach to rooting out and preventing sexual misconduct by BOP employees. This group was tasked with developing and proposing "recommendations and reforms to address gaps, deficiencies, and problems identified."

Over a 90-day review period, the Working Group[1] has assessed the Department's policies and practices related to preventing, reporting, investigating, prosecuting, and administratively disciplining sexual misconduct by BOP employees. During its review, the Working Group engaged with components across the Department, including BOP, the Executive Office for U.S. Attorneys ("EOUSA"), the Civil Rights Division ("CRT"), the Federal Bureau of Investigation ("FBI"), and the Office of the Inspector General ("OIG"), among others. It reviewed relevant BOP Program Statements, policies, and procedures, and collected relevant data related to the incidence of and response to sexual misconduct. The Working Group also held multiple listening sessions with external stakeholders, including formerly incarcerated persons and victim advocacy organizations. During one particularly powerful session, the Working Group heard firsthand accounts from survivors of sexual assault by corrections officers.

In this report, the Working Group outlines recommendations for immediate action—and areas for further review—to better protect the safety and wellbeing of those in BOP custody and better hold accountable those who abuse positions of trust. These recommendations center around five pillars: (1) Prevention; (2) Reporting; (3) Investigation; (4) Prosecution; and (5) Employee Discipline. The recommendations and their rationales are detailed below.

# EXECUTIVE SUMMARY

The Working Group was charged with reviewing the Department's response to allegations of sexual misconduct perpetrated by BOP personnel and identifying recommendations to improve that approach.[2] During the 90-day review period, the Working Group reviewed representative

---

[1] In addition to the PADAG, the Working Group included representatives from the following components: Access to Justice, BOP, CRT, EOUSA, FBI, Justice Management Division, Office of Legal Policy, Office of Public Affairs, Office on Violence Against Women, U.S. Attorney's Office ("USAO") for the District of Colorado, Office of the Associate Attorney General, Office of the Deputy Attorney General ("ODAG"), and Office of the Attorney General. This written report memorializes the findings and recommendations from the Working Group's review, which were previously briefed to the Deputy Attorney General at a meeting on October 12, 2022.

[2] The Working Group was asked to examine only issues of sexual misconduct by BOP personnel. Although some of our recommendations may also apply to issues of sexual misconduct by individuals in custody, we have not reviewed that issue directly.

BOP policies and practices, collected relevant data, consulted with relevant components, convened listening sessions with stakeholders, and drew from the expertise and experience of its members. This review reinforced the need for immediate actions to address the Department's approach to sexual misconduct perpetrated by BOP staff, as well as the importance of further review to consider longer-term—and more systemic—changes.

In particular, the Working Group recommends the following actions:

1. ***BOP should enhance prevention of sexual misconduct perpetrated by BOP staff.*** The Department's most basic goal is to prevent sexual misconduct before it occurs, and that begins with changing the culture and environment in BOP facilities. To do so, BOP should adopt early intervention models, promote stronger leadership at its women's facilities, and improve staff training and wellness. It should increase camera technology and coverage and consider leveraging the insights of formerly incarcerated persons in assessing the safety of its facilities. Finally, the Department should conduct a comprehensive, data-based review of BOP facilities and prevention programs, while also collecting and analyzing data on sexual misconduct cases at particular facilities and across specific time periods, and make appropriate changes based on that review.

2. ***BOP should enhance reporting of BOP staff who commit sexual misconduct.*** BOP should encourage reporting, protect the safety and wellbeing of those who report, and ensure that its response to misconduct reporting is meaningful and consequential. Victims and witnesses should have secure and readily available channels to report sexual abuse. BOP should remove barriers to reporting and create checks to ensure victims do not face negative consequences—including retaliation—for reporting abuse. Likewise, BOP should assess how to offer channels for family and friends of incarcerated persons to report abuse, including through the creation of new liaison or ombudsperson positions across the Bureau.

3. ***DOJ should enhance and prioritize investigations of BOP staff who are accused of sexual misconduct.*** The Department should ensure that investigations are purpose-driven, victim-centric, and trauma-informed and that BOP's structure and law enforcement coordination support those investigations. BOP's investigators, who often conduct initial interviews and investigations, should receive specialized training and operate independently from the leadership of the facility. The FBI, which may jointly investigate these cases with OIG, should consider establishing specially trained points of contact for investigations of staff-involved sexual assault, as well as investigations involving inmate-perpetrated sexual assaults. Consistent with the Deputy Attorney General's directive, FBI and OIG should continue to prioritize these investigations and coordinate investigative efforts with prosecutors from the U.S. Attorneys' Offices and the Civil Rights Division.

4. ***DOJ should enhance and prioritize prosecutions of BOP employees who commit sexual misconduct.*** The Department should ensure that prosecutors handling these cases have

appropriate training and experience, and it should encourage prosecutors to seek sentences that reflect the egregiousness of the conduct at issue. At the same time, the Department should pursue legislative changes to strengthen the statutes that prohibit and punish this conduct, and it should continue to urge the U.S. Sentencing Commission to strengthen the applicable sentencing guidelines. The Department's prosecution practice should be victim-centered. It should encourage the use of victim assistance specialists throughout the lifecycle of a case. On a case-by-case basis—and only at the appropriate juncture of a case and after appropriate consultations—Department prosecutors should consider filing motions to seek sentence reductions for victims, paying careful attention to the impact such a motion could have on any pending prosecution and any resulting disclosure obligations. Finally, the Department should consider creating a continuing Advisory Group to further consider and coordinate best practices for investigating and prosecuting sexual misconduct cases.

5.  ***BOP should enhance the use of administrative actions and discipline of BOP employees who commit sexual misconduct.*** Following a report of sexual misconduct, the Bureau of Prisons should take steps to (1) ensure appropriate separation between the reporting party, the alleged victim (if different than the reporting party), and the alleged perpetrator, and (2) elevate allegations and their proposed dispositions to sufficiently high levels within BOP to ensure appropriate attention to and oversight of the disciplinary action process. In the short term, BOP leadership should emphasize the importance and availability of administrative actions, while also instituting appropriate documentation and reporting requirements to allow for oversight of these decisions (including reporting up to the Director). The Director should also immediately issue guidance to relevant staff that reiterates that all allegations of misconduct must receive individualized and equitable treatment, consistent with the Prison Rape Elimination Act ("PREA").[3] In the long term, BOP should conduct a comprehensive review of its disciplinary procedures and options.

## BACKGROUND

Consistent with the Deputy Attorney General's directive, the Working Group conducted a top-to-bottom, 90-day review of the Department's approach to sexual misconduct cases involving BOP officials. Given the expedited timeframe, the Working Group's review was necessarily

---

[3] In 2003, Congress unanimously passed PREA, which has a stated purpose to "provide for the analysis of the incidence and effects of prison rape in federal, state, and local institutions and to provide information, resources, recommendations and funding to protect individuals from prison rape." PREA also created the National Prison Rape Elimination Commission and charged it with recommending standards for eliminating prison rape to the Attorney General. Following the Commission's report, in 2012, the Department of Justice issued "National Standards to Prevent, Detect, and Respond to Prison Rape" as a final rule codified at 28 C.F.R § 115.

targeted,[4] but it reinforced the view of Department leadership that the problem warrants significant and expedited attention.

As an initial matter, the Working Group collected data from BOP, OIG, CRT, and EOUSA related to the current level of misconduct cases and their dispositions.[5]  This data reflected that BOP has received hundreds of complaints of sexual abuse perpetrated by its employees over the past five years.  While not every complaint is meritorious or prosecutable, the volume alone is a strong signal of the need for attention to this problem.   Likewise, over the past five years, the Department has prosecuted 45 cases of sexual misconduct involving BOP corrections officers, and the recurrence of this egregious conduct across multiple facilities poses serious concerns.

The Working Group also heard direct reports that reinforced those concerns.  During its review period, the Working Group convened three listening sessions.  In one, the Department heard accounts from formerly incarcerated women who were survivors of sexual assault by corrections officers.[6]  Other listening sessions featured representatives from the following organizations:

- American Civil Liberties Union
- California Coalition for Women Prisoners
- Centro Legal De La Raza
- Just Detention International
- Ladies of Hope Ministries
- MacArthur Justice Center
- The Legal Defense Fund
- National Council for Incarcerated and Formerly Incarcerated Women.[7]

Each of these external stakeholders raised troubling allegations of a culture of permissiveness toward staff misconduct and retaliation against victims who report abuse.

Finally, the Working Group reviewed examples of recent cases involving sexual misconduct by BOP staff.  These revealed instances of inadequate administrative sanctions and initial prosecutorial declinations for employees ultimately convicted of egregious misconduct.[8]

---

[4] Because of the expedited timeframe, the Working Group has not obtained clearance for these recommendations from stakeholders such as the Attorney General's Advisory Committee.

[5] See **Appendix A** for the full list of data requested and policies reviewed.

[6] To protect the privacy of these individuals, their names are omitted from this report.

[7] The Working Group also reviewed correspondence to the Deputy Attorney General from FAMM.

[8] In particular, the Working Group reviewed the timeline of events related to the prosecution of BOP Correctional Officer/Recreation Specialist Jimmy Highsmith in the Northern District of Florida.  BOP first received allegations in 2012 that Mr. Highsmith had engaged in sexual abuse of inmates starting in October

Even where prosecutions were brought, the Working Group reviewed cases where applicable sentencing guidelines called for disproportionately lenient sentences when compared to the admitted or proven misconduct. For example:[9]

- In the Eastern District of Kentucky, the Department prosecuted BOP corrections officer Hosea Lee, who served as a Drug Treatment Specialist. He eventually pleaded guilty to five counts of violating 18 U.S.C. § 2243(b) for engaging in sexual acts with four different female inmates who were assigned to his drug treatment classes. Not unlike other BOP official defendants, he groomed his victims, exploiting vulnerabilities that he knew from treating them. He sought to cover up his conduct by avoiding detection on surveillance video and by directing them to destroy physical evidence. Under Section 2A3.3 of the United States Sentencing Guidelines, Lee's advisory guideline range was 18 to 24 months. As a result, the government moved for an above-guidelines sentence, and the court granted the motion, varying upward to a sentence of 80 months in prison.

- In the Northern District of California, the Department prosecuted James Highhouse, a BOP chaplain, who, like Hosea Lee, was sentenced in August 2022. Highhouse pleaded guilty to two counts of 18 U.S.C. § 2243(b), two counts of 18 U.S.C. § 2244(a)(4), and one count of 18 U.S.C. § 1001, for his repeated sexual abuse of an incarcerated woman over a nine-month period. Despite the egregious nature of the conduct and his predatory pattern of behavior towards other incarcerated women, Highhouse faced an advisory guidelines range of only 24 to 30 months. Ultimately, despite indicating that it had rarely, if ever, imposed an upward variance before, the court granted the government's motion for an above-guidelines sentence and sentenced the defendant to 84 months in prison.

## DISCUSSION

Following its review, the Working Group advanced the following recommendations:

### 1. Enhance Prevention of Sexual Misconduct by BOP Staff.

The core purpose of this review is to better protect the safety of individuals in BOP custody. While it is important to identify—and appropriately punish—misconduct when it happens, the Department's most fundamental goal is to prevent instances of sexual misconduct in the first place. During this review, internal and external stakeholders all emphasized that prevention begins with changing culture. To that end, the Working Group recommends that BOP adopt several practices to promote a safer culture and environment.

---

2010. In March 2022, Mr. Highsmith was sentenced to 48 months' imprisonment for engaging in sexual acts with one inmate.

[9] The Department also detailed these two prosecutions in its annual report to the U.S. Sentencing Commission, sent on September 12, 2022.

## 1.1     Apply early-intervention models.

BOP should adopt an early-intervention approach that identifies warning signals and enables and rewards reporting, and it should pilot innovative programs from related disciplines.[10]

1.1.1   Develop an early warning system.  BOP should train its personnel to detect and report warning signs that other staff may be engaging in misconduct and to intervene before the situation escalates.  There are several indicators that may signal problems, including, for example, a disproportionate number of complaints targeting a particular office or prison setting, officer tardiness following rounds, and routine AWOL status of officers during shifts.  BOP should equip, encourage, and support supervisors and fellow officers to recognize and report those indicators, and approach stopping wrongful conduct before it occurs as a core responsibility.

1.1.2   Pilot early intervention programs.  BOP should consider adopting on a pilot basis prevention programs used in law-enforcement settings, many of which have already proven effective in changing culture and preventing harm.  Such programs include "duty to intervene" models like the New Orleans Police Department's EPIC program and PERF's ICAT de-escalation model.[11]  Likewise, BOP should explore bystander intervention models, such as the Active Bystandership for Law Enforcement ("ABLE") program (used for incidents of law enforcement excessive force),[12] as well as models used by the Department of Defense and other federal agencies to prevent sexual assault and misconduct.[13]  BOP could consult with the experts from these projects, as well as corrections experts and formerly incarcerated people, to develop its own model.

---

[10] We recommend that BOP explore already existing PREA-related resources.  The National PREA Resource Center site highlights webinars related to PREA efforts and activities. Information about targeted training and technical assistance, BJA demonstration sites, and curricula is available in the Training & Technical Assistance section of the National PREA Resource Center site.  Also, the National Institute of Corrections ("NIC") conducts training, technical assistance, and education programs for federal, state, and local authorities responsible for the prevention, investigation, and punishment of instances of prison rape.

[11] See http://epic.nola.gov/home/; https://www.policeforum.org/icat-training-guide.

[12] See https://www.law.georgetown.edu/cics/able/.

[13] See, e.g., https://dod.defense.gov/News/Special-Reports/0417_sexual-assault-awareness-and-prevention/.

### 1.2     Examine how BOP selects, supervises, and supports wardens in women's facilities.

Leadership is essential to creating the appropriate culture in BOP facilities, but stakeholders and some BOP employees have reported a perception that wardens assigned to female facilities are less qualified than those assigned to male facilities.[14]   BOP's current pay scale compounds the problem:  BOP wardens can be classified and compensated either at the GS-15 level or at the more coveted and higher salaried Senior Executive Service ("SES") level, but BOP currently ties compensation to factors which include the security designation of the warden's facility.  Because women's facilities are designated as low- or minimum-security, wardens at all the solely women's facilities are currently at the GS-15 level.[15]

BOP should consider the following steps to improve the leadership at its women's facilities:

1.2.1   Improve compensation for wardens in women's facilities.  BOP should ensure that the wardens of women's facilities receive compensation that is equitable compared to wardens of men's facilities and appropriate to reflect the complexity of their responsibilities, notwithstanding the security designation of these facilities.  Increasing the pay scale would not only recognize the unique challenges and security risks presented at women's facilities; it would also signal that serving as warden at these facilities is a prestige post, reserved for the most talented administrators and those with genuine interest and passion for ensuring the protection of women housed in these facilities.[16]

1.2.2   Identify strong candidates to serve as wardens in women's facilities.  BOP should prioritize selection of wardens with a strong desire to work at women's facilities and the necessary skills to address the unique issues faced in such facilities.

1.2.3   Strengthen performance criteria for wardens and their supervisors.  BOP should consider an official's past approach to addressing sexual misconduct—including through implementation of innovative prevention programs, as well as prompt and appropriate responses to allegations as they arise—as part of the performance criteria for all wardens, as well as for the Regional Directors who monitor the performance of wardens in each facility.

---

[14] The Working Group recognizes that staff-perpetrated sexual assault occurs at both male and female facilities.  Moreover, there is reason to believe that male victims may be less likely to come forward as victims.  While most of our recommendations apply equally at all BOP facilities, some recommendations address issues unique to women's facilities.

[15] The only exception to this rule is FMC Fort Worth, which is primarily a female facility, but is also a medical center that includes male inmates.  The warden at that facility is an SES employee.

[16] In addition to the SES level, the Senior Level ("SL") also offers compensation above the GS schedule.

### 1.3     Promote employee wellness.

During its review, the Working Group repeatedly heard—including from formerly incarcerated individuals—the importance of promoting employee wellness, which helps improve the culture of the institution and, in turn, prevent instances of misconduct.  The Working Group understands that the new BOP Director is acutely focused on these issues, including addressing staffing shortages and considering other climate issues that might foster misconduct.  In addition to that review, the Working Group recommends that BOP consider the following steps to promote employee wellness:

1.3.1    Adopt strict policies to prevent sexual harassment of BOP staff.  Sexual harassment among staff, particularly of female corrections officials, contributes to and reflects a poor climate in BOP facilities.  "Bureau of Prisons Anti-Harassment Policy," codified at Program Statement 3713.2, prohibits "both sexual and non-sexual" harassment in the workplace, but it does not specifically distinguish between those two forms of harassment or provide recommended penalties for those who engage in sexual harassment.  BOP should continue to highlight existing policies that prohibit sexual harassment of colleagues—and emphasize the gravity of this conduct—during mandatory annual training.  It should also update those policies to specifically address the penalties of sexual harassment and impose significant disciplinary consequences on policy violators. Likewise, BOP should address sexual harassment perpetrated by inmates against staff, which can impair BOP's ability to recruit and retain staff and also contribute to a culture of acceptance of sexual harassment more generally.  BOP should establish support systems for staff who report being sexually harassed by inmates and impose meaningful consequences for such conduct.

1.3.2    Adopt training and screening specific to staff at women's facilities.  BOP should adopt measures to ensure that staff are adequately equipped to address the unique issues faced in women's facilities.  In her recent testimony before the Senate Judiciary Committee, Director Peters explained that this begins with "hir[ing] the right people," *i.e.*, those "who show a propensity to succeed in our correctional environments."  The Working Group agrees that during the hiring stage, it is critical that BOP screen for persons who understand—and are interested in addressing—the challenges posed at women's facilities.    Likewise, Director Peters testified that BOP is exploring providing "additional training, including gender responsive training, trauma-informed training, and de-escalation training."  The Working Group endorses that effort and recommends that BOP develop mandatory training that is tailored to the specific challenges presented at women's facilities, including sexual abuse and harassment.

### 1.4     Improve monitoring in BOP facilities.

Detection is critical to deterrence.  BOP should leverage both technological and human resources to better detect—and therefore prevent—sexual misconduct in its facilities, including through the following steps:[17]

1.4.1    Improve use of camera technology.  BOP should continue to upgrade camera technology and implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate "blind spots."  We understand that this work is already underway in BOP, but we recommend that BOP prioritize this effort on an accelerated time frame to be determined by the Director, including as to allocation of existing resources. BOP should review its video preservation and collection practices, with a view towards extending the time that all video footage is preserved for as long as practically possible, as well as isolating and collecting all video footage relating to incidents under investigation and preserving such footage for the pendency of all criminal and administrative investigations.

1.4.2    Collaborate with formerly incarcerated people and use the lessons learned from their experiences.  BOP Office of Internal Affairs ("OIA") and the Women and Special Population Branch co-chair the ongoing Women's Institution Cultural ("WIC") Assessment, which is responsible for regularly visiting and assessing women's facilities.  BOP should solicit the views of outside advocates and former inmates in conducting assessments; in appropriate circumstances, and consistent with security concerns and within the confines of policy, BOP may wish to include external stakeholders—including a formerly incarcerated individual—in its visits.  Formerly incarcerated individuals can provide insight into a facility's culture, help communicate with currently incarcerated individuals, identify facility-specific compliance problems, such as the physical locations of blind spots where abuse occurs, and offer suggestions for prevention and response.

### 1.5     Enhance research and data.

Consistent with the Department's increased emphasis on evidence-based practices,[18] the Department should develop enhanced data and research so that it can better target its prevention

---

[17] In addition to the steps outlined below, the Working Group recommends that BOP address the open recommendations in OIG's 2016 *Review of the Federal Bureau of Prisons' Contraband Interdiction Efforts.* OIG reported that contraband has been used to groom victims, so steps to reduce the introduction of contraband into its facilities can also reduce the opportunity for sexual exploitation.

[18] The Department's FY2022-FY2026 Strategic Plan and Learning Agenda emphasizes the importance of "rigorous evidence building, including research, evaluation, statistics, and analysis," which "will advance the Department's ability to effectively achieve its strategic goals and objectives, both in the short term and in the long term."

efforts, including the investigations and prosecutions designed to deter this misconduct.   In particular, the Working Group recommends that the Department consider the following steps:

    1.5.1   Conduct a climate study focused on sexual abuse and misconduct.  BOP should consider executing a climate study to determine the prevalence of sexual abuse and misconduct in its facilities.  This survey could be tied to efforts by the Department's Sexual Harassment Steering Committee.  BOP could also examine—and possibly replicate—the Department of Defense's approach, which recently updated its annual climate survey to include additional questions about sexual harassment and sexual assault.[19]  BOP might similarly use climate data to identify facility-specific risk and protective factors, which can be used in hiring and screening of staff and to develop targeted prevention efforts.

    1.5.2   Review and validate BOP's prevention programs. BOP should partner with the National Institute of Justice for research, development, and evaluation of its prevention programs, including its development of early-intervention models described in Recommendation 1.1.2.

    1.5.3   Use data to develop targeted, district-level recommendations to address misconduct. The Working Group compiled basic data on the incidence of complaints of sexual misconduct perpetrated by BOP officials; the number of such complaints sustained by OIG; the number of such complaints referred for prosecution; and the number of prosecutions of these cases.  As explained above, this data reinforced the Working Group's view that the problem of sexual misconduct warrants significant and expedited attention.  The Working Group, however, did not conduct an in-depth analysis of this data or compare the data across districts.   Moving forward, the Working Group recommends that the Department further analyze this data—and collect additional data, as needed—to identify trends and advance recommendations targeted to specific facilities or districts.  This project should be assigned for immediate execution to the recommended advisory group, *see* Recommendation 4.6.

## 2.  Enhance Reporting as to BOP Staff who Engage in Sexual Misconduct.

       BOP should create and foster a culture where all stakeholders—from inmates to families to BOP personnel—feel empowered to report misconduct and confident that such reporting will result in a meaningful response from BOP officials, investigators, and prosecutors.  During listening sessions, advocates and formerly incarcerated women identified several obstacles to reporting sexual abuse, including a fear of not being believed, a fear of retaliation, and a fear that

---

[19] https://media.defense.gov/2022/Mar/31/2002967307/-1/-1/1/2021-ON-SITE-INSTALLATION-EVALUATION-REPORT.PDF.  The Department of Defense also has a new function called the Violence Prevention Cell ("VPC") that resides at the Office of Force Resiliency.  The VPC is examining integrated prevention, including as to sexual assault, sexual harassment, and other problematic behaviors, and linking it to climate and culture.

reporting would not result in consequences for the perpetrator. In part, addressing these issues requires systemic changes to the culture in BOP facilities. (*See* Recommendations 1.1, 1.2, and 1.3.). We also recommend the following steps to encourage reporting, protect the safety and wellbeing of reporting parties, and ensure that reporting misconduct is meaningful and consequential.[20]

### 2.1    Improve the mechanisms and procedures for victim reporting.

During listening sessions, the Working Group heard about the barriers to reporting, and the importance of readily available and anonymous reporting channels. BOP should consider the following steps to facilitate reporting by the victims of sexual abuse or other inmates:

2.1.1    Standardize the information inmates receive about the reporting process. BOP should regularly provide each inmate with detailed information on how to report sexual misconduct, which should include specific instructions on what to include in any report (*e.g.*, details on who, what, where, when, and whether there are other potential victims). Where possible, BOP should provide additional guidance to inmates on what to expect after a report is made (*e.g.*, "You should expect to be contacted for a statement.").

2.1.2    Emphasize the availability of confidential reporting to OIG. Inmates can currently send reports of sexual abuse to a dedicated email address run by OIG, and they can request that the report remain confidential. In highlighting this reporting option consistent with Recommendation 2.1.1, BOP should stress that OIG is entirely independent of BOP and that OIG protects the identity of victims and complainants to the greatest extent possible, while still thoroughly vetting and investigating the allegations. BOP should also make it clear that both inmates and staff can make third-party reports to OIG regarding victimization of *other* inmates and encourage inmates and staff to exercise that option.

2.1.3    Expand the available channels for reporting. BOP should consider developing a hotline option for the use of inmates and their families and representatives to report sexual abuse, and this hotline should be staffed by individuals trained in working with victims of sexual assault. Indeed, in consultation with BOP staff and inmates, OVW is currently working on a blueprint for a national line that could facilitate reporting to outside entities and victim services. We recommend that a hotline option be implemented as soon as possible.

2.1.4    Install a victim liaison position at BOP headquarters and an ombudsperson in each of the Regions. BOP should establish new positions designed to facilitate and monitor victim reporting. First, BOP should consider creating a new, headquarters-level position for a "victim liaison," who would interact with victims who have reported

---

[20] Recommendations 3, 4 and 5 are all designed to promote accountability following a report of misconduct.

sexual misconduct, assure victims that reports have been received and ongoing investigations will be tracked, and provide victims with guidance about what to expect during the investigative process. Likewise, we recommend that BOP establish a cadre of ombudspersons in each Region, who can serve as a resource for both victims and their families (see Recommendation 2.3.2), while also reviewing the facility-level response to reports of sexual misconduct.

## 2.2   Ensure victims do not experience penalties for reporting.

During its review, the Working Group consistently heard that victims feared the consequences of reporting abuse perpetrated by BOP staff. During listening sessions, formerly incarcerated individuals reported that corrections officers have threatened retaliation against reporting individuals, including by restricting access to children. Furthermore, BOP policies meant to protect victims may inadvertently cause negative consequences for those who report abuse. For security reasons, well-intentioned officials may transfer a victim to another BOP facility, where they are usually more distant from their family and community, or place them into the Special Housing Unit ("SHU"), where they inevitably lose privileges—such as visits, phone calls, and commissary access—which are lifelines to those who are incarcerated. The placement of victims in SHU, even if intended for protection, can have a chilling effect on reporting.

To better encourage reporting, the Working Group recommends that BOP consider the following steps:

2.2.1   Examine BOP policy on review or appeal of privilege restrictions and access to necessity items.  To prevent retaliation, BOP should create additional review structures for any disciplinary actions relating to inmates who have made reports of sexual misconduct. It should also require reporting to the Regional Office when any individual who reports sexual abuse is placed in the SHU or transferred to another facility, with notice to and oversight from the Central Office. This report should be made to either the Regional Director or, as suggested in Recommendation 2.1.4, a regional ombudsperson.

2.2.2   Review BOP policy on restrictive housing.   As part of BOP's ongoing review of its SHU and SMU policies, BOP should address any policy or practice that results in an individual being placed in restrictive housing after a report of sexual misconduct by staff and ensure compliance with applicable PREA regulations.[21] This includes ensuring that victims are not subjected to other punitive conditions (restrictions on property, visitation, phone, etc.) while segregated. Ultimately, BOP should consider creating an area in its female facilities that is specifically designated as administrative segregation—rather than disciplinary segregation—that allows similar programming and visitation opportunities as standard housing. Where feasible, administrative segregation should be in a physically different location from disciplinary segregation;

---

[21] *See* 28 CFR § 115.43.

at minimum, BOP should emphasize that inmates on administrative segregation should not share cells with those on disciplinary segregation. In all events, we recommend that BOP make clear to both staff and incarcerated individuals that, under BOP policies, security measures like SHU placement or facility transfer will be voluntary or imposed only as an option of last resort in response to imminent threats to inmate safety, not as a measure of discipline for reporting.

### 2.3   Enhance reporting options for third parties.

BOP should improve the ability of third parties, including the family and friends of victims, to report sexual misconduct, including through the following steps:

2.3.1   Improve publicly available channels for third-party reporting. BOP should consider how to better facilitate third-party reports through its reporting website,[22] which directs parties to report abuse via a mailing address to BOP OIA. This website should include an email or web form so that families can connect directly with OIA and OIG.

2.3.2   Make regional ombudspersons available to families. Consistent with Recommendation 2.1.4, BOP should install in each of BOP's Regions an ombudsperson, who, among other responsibilities, could serve as a liaison for family members, including with respect to reports of sexual misconduct.

2.3.3   Review BOP policy as to staff reporting of misconduct by other staff members. BOP policy requires "[e]mployees [t]o immediately report any violation, or apparent violation, of standards of conduct to their Chief Executive Officer ("CEO") or another appropriate authority."[23] The Department currently has robust policies protecting staff whistleblowers from retaliation, and BOP policy likewise makes "retaliation or discrimination against those who make such a report" a removable offense.[24] BOP should review these policies to ensure they provide the maximum protection for staff reporting of other staff members' sexual misconduct and regularly remind staff, including through training, of the importance of reporting misconduct, including conduct related to sexual misconduct in particular.

---

[22] https://www.bop.gov/inmates/custody_and_care/sexual_abuse_prevention.jsp.

[23] *See* P.S. 3420.11 at 2; *see also id.* at 5-6 (requiring employees to "[a]s soon as practicable (but no later than 24 hours) report to their CEO (or other appropriate authority such as the Office of Internal Affairs or OIG) any violation, appearance of a violation, or attempted violation of these Standards or of any law, rule, or regulation").

[24] *Id.* at 34.

### 3. Enhance Investigations of BOP Staff who are Accused of Sexual Misconduct.

To a greater degree than investigations of other forms of BOP staff misconduct, sexual misconduct investigations frequently rely heavily on the victim's account. Sexual misconduct allegations often do not lend themselves to direct corroboration from law enforcement or other inmates, as such crimes typically do not occur in front of witnesses. Perpetrators of sexual misconduct often engage in behavior to avoid detection, for example by committing misconduct outside surveillance camera view, disposing of DNA evidence, threatening victims with repercussions if they report, and otherwise convincing them that no one will believe them because of their incarcerated status. As a result, these cases often rise and fall primarily based on the credibility of the victim.

Investigating these cases successfully thus requires an understanding of trauma-informed, victim-centered practices.[25] Investigators should recognize, for instance, that victims reporting a sexual assault frequently elide details or recount events out of order because of the neurobiological impact of traumatic memory.[26] Likewise, victims may minimize events during the first interview or interviews thereafter because, for example, the victim may be embarrassed, may think she will not be believed, or may be uncomfortable with the prosecutor or investigator.[27] This is especially applicable in connection with allegations of sexual misconduct at BOP, as victims may already distrust law enforcement and fear for their safety because of the roles and status of the perpetrators involved. The Working Group's recommendations are therefore meant to ensure that investigations are purpose-driven, victim-centric, and trauma-informed. Investigations should be objective, with the purposes of assessing the victim's account, developing corroboration, and protecting victims from unfair attacks on their credibility, while adhering to the Department's *Principles of Federal Prosecution.*[28]

---

[25] *See Identifying and Preventing Gender Bias in Law Enforcement Response to Sexual Assault and Domestic Violence*, Dep't of Justice (May 22, 2022), https://www.justice.gov/opa/file/799366/download; *Investigating and Prosecuting Law Enforcement Sexual Misconduct Cases,* DOJ J. OF FED. LAW & PRACTICE, Jan. 2018, at 77, https://perma.cc/9DGQ-FEPZ.

[26] *Id.* at 87.

[27] *Id.* at 86-87.

[28] See *JM* § 9-27.220 ("The attorney for the government should commence or recommend federal prosecution if he/she believes that the person's conduct constitutes a federal offense, and that the admissible evidence will probably be sufficient to obtain and sustain a conviction, unless (1) the prosecution would serve no substantial federal interest; (2) the person is subject to effective prosecution in another jurisdiction; or (3) there exists an adequate non-criminal alternative to prosecution.").

### 3.1    Assign specially trained, neutral agents to investigate allegations of sexual misconduct by BOP staff.

Given the special considerations applicable to investigations of sexual misconduct at prison facilities, it is important that those investigating such allegations are provided proper training to promote a trauma-informed, victim-centered approach.  The Working Group heard anecdotal stories of flawed investigations from a variety of components where prosecutors or agents did not fully or effectively adhere to this approach.  Additionally, the Working Group is concerned about whether investigative staff working in the BOP facility where the alleged misconduct took place can be—and can appear to victims to be—neutral and free from undue influence.  Therefore, we recommend the following steps to shift structural assignments and improve training and support provided to those investigating sexual misconduct committed by BOP staff.

3.1.1   Eliminate the use of SIS officers in initial interviews or investigations.  Historically, BOP has assigned Special Investigative Services ("SIS") lieutenants to conduct intake of allegations of sexual misconduct, which often includes taking initial statements from victims or witnesses.  This assignment prompts several concerns.  First, SIS officers are usually corrections officers who rotate in and out of that position without specialized sex-crime or trauma-informed training.  Because these officers lack specific training in this area, they may conduct or document interviews in a manner detrimental to an ensuing investigation.  Second, the nature of the SIS position and the rotation of correctional officers into and out of the SIS Unit may deter the reporting of sexual assault allegations. SIS officers may be—or appear to victims to be—friends or colleagues of the alleged perpetrators, creating at least the appearance of a conflict of interest.  As a result, victims may fear that if they report sexual misconduct, they will face retaliation from fellow inmates or from staff members who are friendly with the perpetrator.  We understand that a BOP reorganization designed, in part, to address these concerns is already underway.  To mitigate these concerns, the Working Group recommends that, as part of this reorganization, no SIS officer—or any other person who reports to institution leadership—should participate in any initial interview or investigation involving a report of sexual misconduct perpetrated by BOP staff.[29]

3.1.2   Dedicate Special Investigative Agents ("SIAs") to investigate sexual misconduct allegations.  Rather than using SIS officers, BOP should assign specially trained SIAs to these investigations.  Consistent with this recommendation, we understand that BOP plans to assign SIAs to the 29 BOP facilities that house female inmates.  BOP should ensure that these SIAs (a) have a commitment to conducting effective sex crimes investigations; and (b) are trained in conducting trauma-informed investigations. SIAs—rather than another member of the SIS staff—should further facilitate interviews by OIG, FBI, or BOP's OIA to the extent those interviews must occur in the

---

[29] Consistent with Recommendation 3.2.1, BOP should also ensure that adequate alternative staffing is available so that implementation of this recommendation does not slow down the response to misconduct.

BOP facility.  Additionally, BOP should have specially trained SIAs available for deployment to its other facilities as needed, as sexual assault and related misconduct are not limited to women's facilities.

3.1.3   Create reporting structures that promote objectivity.   To ensure objectivity, the Working Group recommends that BOP hire the requisite staff and reorganize its investigative structure to ensure that SIAs report to OIA and not the individual institution's leadership, *i.e.*, the warden.  We understand that BOP intends to implement such an approach—a change we endorse.  Likewise, BOP should ensure that all SIAs report allegations of misconduct to the Central Office, OIG, and the FBI, where appropriate, and that SIAs provide all reports and evidence gathered to date at the time of the report.  BOP's revamped reporting structure should require full and regular reporting of allegations of sexual misconduct to BOP's Central Office.

3.1.4   Publicize these changes to incarcerated individuals.  BOP should inform inmates that sexual misconduct investigations will be handled by either by independent OIG or FBI agents or investigators assigned to the Headquarters internal affairs unit, rather than by local facility personnel.  BOP should make clear that investigators and officials at the local facility, including the warden, will not participate in the investigation and will have no control over the outcomes of sexual misconduct investigations involving BOP staff.  Finally, BOP should inform reporting parties about statutes that protect the rights of crime victims and assist with victim services.

## 3.2   Employ victim-centered, trauma-informed investigative techniques during BOP investigations.

The Working Group recommends that BOP approach investigations consistently with PREA and best practices for investigations discussed above, *see supra* at 14.  In particular, the Working Group highlighted one BOP practice that caused concerns:  Until recently, SIS officers were encouraged during initial intake interviews to obtain from victims sworn declarations in writing under penalty of perjury, presumably for a later administrative investigation.  There is no legal requirement for sworn statements or affidavits, and the evidentiary value of these sworn affidavits may be limited.[30]  At the same time, requiring such sworn statements run counter to trauma-informed practices and may chill reporting, as it heightens a victim's fear that she may face prosecution if her account is not believed.  The Working Group therefore recommends that BOP discourage its SIA investigators from asking or requiring a victim of sexual misconduct to give sworn affidavits or sworn statements as a standard practice.

---

[30] For example, an intentional false statement in the affidavit could constitute a violation of 18 U.S.C. § 1001, but that statute does not require the statement to be under oath.

### 3.3 Promote expertise among FBI agents who investigate allegations of sexual misconduct perpetrated at BOP facilities, including any joint investigations into misconduct by employees where OIG has primary jurisdiction.

OIG has primary jurisdiction for all investigations of criminal conduct by DOJ employees from any component, including BOP.  At BOP facilities, the FBI primarily investigates criminal activity by and between inmates, as well as criminal activity involving non-DOJ staff.  In some circumstances, including where an investigation of employee conduct stems from an FBI inquiry into the conduct of an inmate or another individual who is not a BOP employee or contractor, or where a joint investigation is appropriate, the FBI is also involved in investigations that involve BOP staff.  The Working Group recommends that the FBI take the following steps, consistent with those investigative responsibilities:

3.3.1   Designate trained points of contact at FBI field offices.  FBI field offices with BOP facilities within their areas of responsibility should formally identify a Special Agent to serve as a BOP Point of Contact ("POC"). That POC would be responsible for engaging directly with OIG and the SIA within the facility, who could then alert the POC when sexual misconduct allegations warranting FBI attention arise.  The POC should receive appropriate and effective training on how to investigate sexual misconduct, as discussed directly below.

3.3.2   Require training for agents who investigate these cases.  We recommend that agents at all DOJ components with responsibility to investigate sexual misconduct cases at BOP receive training on effective investigation of allegations of sexual misconduct, including by corrections officers and other government actors.[31]  We also suggest broader consideration of mandatory training for all agents who investigate sex crimes.[32]

---

[31] For example, CRT has created a three-part webinar series on investigating and prosecuting law enforcement sexual misconduct. That series is currently available on FBI's Virtual Academy as an optional training, but we suggest it be assigned training for all agents responsible for sexual misconduct investigations involving BOP personnel.  To the extent additional training is necessary or appropriate, we recommend that the FBI work to develop such training or contract with outside experts.

[32] We note that many agents are assigned color of law/sexual misconduct investigations, to include BOP sexual misconduct allegations, at the outset of their careers. As a result, we would encourage review of whether the FBI and other agencies who conduct these investigations should include training on investigating sexual misconduct allegations as part of their initial training module.

### 3.4    Improve coordination and communication among investigators and prosecutors.

The Working Group recommends that investigators take several steps to improve communication and coordination among the different entities responsible for investigating and prosecuting sexual misconduct cases.

3.4.1    Provide appropriate notifications to OIA.    Currently, pursuant to OIG's internal policies, OIG notifies BOP OIA when it learns of allegations of sexual misconduct and when it declines to pursue any matter, so that BOP OIA can take administrative action as appropriate.    When the FBI learns of allegations of sexual misconduct by BOP employees, it is required to notify the OIG.    To the extent that FBI learns of an allegation of BOP sexual misconduct and notifies the OIG of such misconduct, FBI should also notify BOP OIA of having made such notification to OIG, thereby providing OIG the right of first refusal to investigate.    Upon request by OIA or OIG, we recommend that FBI turn over investigative materials, including FD-302s, so that OIA is aware of the universe of evidence and need not conduct redundant interviews, particularly of victims.

3.4.2    Provide appropriate notifications to headquarters and prosecutors.    We recommend further discussion about ways to increase communication and coordination of allegations and investigations of sexual misconduct at BOP facilities.    As of now, FBI field agents only notify FBI headquarters of assessments if they deem the allegation "significant," but it is unclear how a determination of significance is made.    FBI should explore earlier notifications to headquarters, the local USAO, and CRT.

## 4.  Enhance Prosecutions of Sexual Misconduct Perpetrated by BOP Staff.

While prosecution alone cannot solve the problem of sexual misconduct in prison, the Working Group believes that accountability and deterrence, including through criminal prosecution, are critical to any effective strategy to address this issue.    The purpose of the following subset of recommendations is to promote consistency and best practices in BOP sexual misconduct prosecutions.[33]

---

[33] These best practices might also be applied more broadly to sexual misconduct cases committed under color of law.  As noted in Recommendation 4.6, we recommend creating an Advisory Group to further explore these issues, as we recognize that sexual misconduct by BOP officials is a subset of these broader color of law prosecutions and shares similar prosecution challenges. Thus, raising competency on cases involving sexual misconduct by those acting under color of law generally will also improve the more specific response to sexual misconduct by BOP officials.

## 4.1 Designate points of contact in U.S. Attorneys' Offices with BOP facilities in their districts.

We recommend that each USAO—beginning with USAOs whose district contains a BOP facility where female inmates are housed—be directed to designate a criminal Assistant United States Attorney (AUSA) as a POC for intake of sexual misconduct prosecutions and other criminal matters involving BOP staff.[34] As a best practice, the POC should be trained and/or have experience in conducting trauma-informed investigations, should have reviewed relevant Department training for prosecuting sex crimes by government actors and other sexual misconduct cases, and should be well-versed in the federal statutes and federal rules of evidence that govern these investigations and prosecutions.[35] The POC should work with USAO leadership to ensure that any federal prosecutor assigned to a sexual misconduct case involving an incarcerated victim should be different from the prosecutor who originally prosecuted the victim for her offense of conviction.

## 4.2 Use available tools to pursue a fair and proportional sentence.

The Department of Justice has jurisdiction to prosecute BOP staff members under a variety of statutes. Prosecutors should become familiar with these options and, consistent with the *Principles of Federal Prosecution*, make appropriate, individualized charging decisions and sentencing recommendations to reflect the seriousness of the conduct. [36]

4.2.1 Consistent with the *Principles of Federal Prosecution*, prosecutors should consider the full array of statutes—including recently enacted authorities—when making charging decisions. Prosecutors handling these cases should consider the availability of all statutes—including the new substantive and penalty statutes that became effective on October 1, 2022, following the reauthorization of the Violence Against Women Act ("VAWA")—when making charging decisions.[37] These authorities include, but are not

---

[34] As previously noted, BOP sexual abuse is a subset of color of law violations involving sexual misconduct where the subjects are government actors, government contractors, or law enforcement officers. As discussed in Recommendation 4.6.3, U.S. Attorneys' Offices may also benefit from designating a POC to cover this broader group of allegations.

[35] Depending on the case, this POC may have overlapping responsibility with other coordinators and POCs in the USAO, such as the Criminal Civil Rights Coordinator, Project Safe Childhood and Human Trafficking Coordinator, or the Tribal Liaison. In some cases, USAOs may choose an AUSA to perform multiple POC/coordinator roles. But where expertise and jurisdiction of multiple coordinators overlap, the sexual misconduct POC and others in the USAO should work together.

[36] In general, cases may be declined for a variety of appropriate reasons. Nothing in these recommendations conflicts with proper and faithful application of the *Principles of Federal Prosecution*.

[37] *See* Appendix B for additional information on the new authorities set forth in VAWA 2022.

limited to, offenses for which consent is not a defense.[38]  Misconduct can also be prosecuted under other federal sexual abuse and civil rights statutes, which require proof of lack of consent or coercion, or another element that shows that the victim was an unwilling participant (*e.g.*, physical force or placing in fear of physical harm).[39]  Such statutes carry higher maximum penalties and higher recommended advisory sentencing guidelines ranges and may thus provide an alternative means to obtain more just sentences than moving for variances, as discussed below in 4.2.2.  Likewise, 18 U.S.C. § 2244(a)(1)-(2) governs cases involving sexual contact that would violate Section 2241(a) or (b) or Section 2242 had the sexual contact been a sexual act.  The POC at each USAO, *see* Recommendation 4.1, should serve as an expert resource for AUSAs on statutory authorities and available training on sexual misconduct investigation and prosecution.

4.2.2   In appropriate cases, prosecutors should move for upward departures or variances from the applicable Sentencing Guidelines range.  As described further in Recommendation 4.3, the Department has recently urged the U.S. Sentencing Commission to review— and strengthen—the guidelines applicable to sexual misconduct cases involving federal corrections officers, specifically violations of 18 U.S.C. §§ 2243(b) and 2244(a)(4). Until the guidelines are strengthened, we recommend that Department leadership encourage prosecutors to seek upward departures or variances in appropriate cases, consistent with JM § 9-27.730, to secure sentences that reflect just punishment.

## 4.3   Pursue appropriate changes to the statutes and sentencing guidelines applicable to these cases.

The Department should advocate for changes to both the United States Sentencing Guidelines and the United States Code to strengthen its response to BOP sexual abuse specifically and sexual misconduct by government actors more broadly.  In particular, the Working Group recommends that the Department:

---

[38] This includes 18 U.S.C. §§ 2243(b) and 2244(a)(4), which prohibit sexual acts and sexual contact, respectively, and apply to prosecutions of sexual abuse of inmates by BOP staff; 18 U.S.C. §2243(c), applicable to conduct that occurs on or after October 1, 2022, essentially expands the jurisdiction of Section 2243(b) beyond the prison walls to all federal law enforcement officers who engage in sexual acts with those in their custody, under their supervision, or in detention. 18 U.S.C. § 2244(a)(6) provides penalties for sexual contact that would violate Section 2243(c) had the sexual contact been a sexual act.

[39] This includes violations of 18 U.S.C. § 2241 and 2242, as well as 18 U.S.C. §§ 250 and 2242(3), which are applicable to conduct that occurs on or after October 1, 2022. Section 250 is a penalty statute for civil rights offenses involving sexual misconduct and can be charged in conjunction with violations of 18 U.S.C. § 242; Section 2243(3) expands the definition of federal sexual abuse to include knowingly engaging in nonconsensual or coercive sexual acts.

4.3.1   Continue to encourage the U.S. Sentencing Commission to strengthen applicable guidelines.   In its recent annual report to the U.S. Sentencing Commission, the Department highlighted that the current guidelines provision applicable to sexual abuse of a ward, in violation of 18 U.S.C. § 2243(b), is often insufficiently punitive to reflect the egregious conduct at issue, promote respect for the law, afford adequate deterrence, and protect the public; further, the overly lenient guidelines provision is at odds with the statutory maximum penalty provided by Congress and the guidelines provisions applicable to comparable sex offenses.[40]  The Department reiterated its concerns in a follow-up letter submitted earlier this month.[41]  We recommend continued engagement with the U.S. Sentencing Commission to urge it to review—and strengthen—these guidelines.

4.3.2   Pursue appropriate legislation to strengthen the Department's tools to prosecute sexual misconduct.   Following the enactment of 18 U.S.C. § 250 (penalties for civil rights offenses involving sexual misconduct), 18 U.S.C. § 2242(3) (sexual abuse involving lack of consent or coercion), and 18 U.S.C. §§ 2243(c) and 2244(a)(6) (sexual acts or contact with individuals in federal custody), there is a need to amend several non-substantive existing statutes and guidelines that cover sex offenses – *e.g.*, the limitation period for prosecution, pretrial release or detention, supervised release, and sentencing – to integrate these new provisions.  We therefore propose consideration of legislative language, including through expedited clearance with appropriate components, such as the Office of Legislative Affairs ("OLA"), as well as the Attorney General Advisory Committee.  In order to expedite this process, the Working Group has developed draft legislative text for a proposed bill and an accompanying analysis for submission to OLA for review, which are available to share upon request.

## 4.4   Consider seeking a reduced sentence or other benefit for qualifying sexual misconduct victims, where warranted, only at the appropriate juncture and only after thoughtful, individualized consultations.

During listening sessions and in written submissions, external stakeholders have urged BOP to seek, and federal prosecutors to file, motions for sentence reduction for victims whose allegations of sexual assault have been found credible, as well as to consider signing U-Visa certifications on behalf of non-citizen survivors.  The Working Group carefully considered these proposals and recommends an approach that balances ensuring effective criminal enforcement and overall accountability with recognizing the detrimental impact of sexual assault on victims and the potential suitability of early release.

---

[40] Letter from Assistant Attorney General Kenneth A. Polite, Jr. & Jonathan J. Wroblewski to Hon. Carlton W. Reeves, Chair, U.S. Sentencing Commission (September 12, 2022).

[41] Letter from Deputy Attorney General Lisa O. Monaco to Hon. Carlton W. Reeves, Chair, U.S. Sentencing Commission (October 17, 2022).

4.4.1   BOP and federal prosecutors should make individualized assessments as to the appropriateness of sentence reductions or U-Visa certifications, taking into account both timing and justification.   The Working Group takes seriously the trauma that victims of sexual misconduct suffer, and we recognize the ongoing harm that victims may experience while in custody.   At the same time, members of the Working Group had serious concerns that the use of these actions during the pendency of an investigation would undermine victim credibility and thus compromise the Department's ability to hold perpetrators of these offenses accountable.   The Working Group therefore encourages BOP and federal prosecutors to make individualized assessments as to the appropriateness of a Rule 35 motion or a U-Visa application on a case-by-case basis, taking into account both timing and justification.   Particularly during the pendency of an investigation or prosecution, prosecutors should carefully consider the impact that any such action may have on the credibility of the victim, with the understanding that such motions are likely best suited (and have a better chance of success on the merits) after a case or investigation is completed.   Such a decision should be made in consultation with the USAO POC, a supervisor with relevant experience, or another prosecutor experienced in sexual misconduct cases.

4.4.2   BOP should address the use of compassionate release for individuals determined to be victims of sexual assault perpetrated by BOP personnel.   At the direction of the Deputy Attorney General, the BOP Director is considering whether and how BOP policy regarding compassionate release can be implemented or modified to address circumstances where an individual in BOP custody has been determined to have been the victim of sexual assault perpetrated by BOP personnel. The Working Group supports expedited completion of this review.   The Advisory Group (discussed in Recommendation 4.6) will also assess how BOP and DOJ prosecutors are addressing the applicability of compassionate release in these circumstances on a case-by-case basis.

4.4.3   Prosecutors should provide appropriate notifications—and, as appropriate, recommendations—reflecting the victim's experience.   In cases where a Rule 35 sentence reduction, U-Visa, or compassionate release motion is under consideration, the U.S. Attorney's Office or component that prosecuted the sexual misconduct should notify and coordinate with the U.S. Attorney's Office or component that originally prosecuted the victim.  If the victim is informed or aware of the possibility of a reduced sentence or other benefit prior to any testimony or sworn statement, that fact must be disclosed to the defendant in accordance with Department policy and our constitutional obligations.   Likewise, prosecutors should consider the victims of the underlying conviction when considering sentence reductions, U-Visas, or compassionate release for those affected by misconduct, and prosecutors should act consistently with victim's rights and after appropriate notifications are made to those victims.

**4.5    Increase the availability of victim specialists through a prosecution's life cycle.**

4.5.1    Promote the use of OIG victim specialists.    We recommend that victim specialists be made available in all BOP sexual misconduct prosecutions. Under an agreement currently in place between the FBI and EOUSA, USAO victim specialists take over for FBI advocates upon indictment.    The OIG has requested funds to hire a victim advocate, but in the interim, we recommend that federal prosecutors work with OIG agents to promote access for victims to a specialist before indictment.    CRT currently employs two victim-witness specialists who work with victims from the investigative stage throughout the pendency of a case.

4.5.2    Promote continuity of victim advocacy.    We further recommend that prosecutors evaluate on a case-by-case basis whether the continuity of a victim specialist would benefit the victim, and work with the FBI, OIG, the USAO, and/or CRT to determine if there is a specialist who can work with the victim throughout the pendency of the entire case, from investigation to prosecution.[42]    This practice will further promote the principles underlying the Crime Victims' Rights Act, 18 U.S.C. § 3771.

**4.6    Create a continuing Advisory Group to further address investigations and prosecutions of sexual misconduct.**

We recommend continuing the efforts of the Working Group by creating an Advisory Group with representatives from across the Department—including OVW, CRT, the U.S. Attorney community, the FBI, and OIG—to further consider improvements to sexual misconduct investigations and prosecutions, including those that involve other government actors.    We recommend that this group report regularly to ODAG and consider at least the following areas for policy and procedure development:

4.6.1    Develop best practices for sexual misconduct cases.    We recommend that the Advisory Group develop best practices for prosecuting sexual misconduct cases involving BOP personnel or, as appropriate, other government actors.    Given the concerns discussed in connection with Recommendation 3.2, the group should consider issues related to the use of audio or video recordings during victim interviews and subject employee interviews; taking sworn statements from victims and subject employees; placing a victim before a grand jury to testify; preservation and collection of evidence, including BOP video footage; and the Department's role in and approach to representing BOP personnel accused of sexual abuse in civil proceedings.    The Advisory Group should also oversee data collection and analysis, *see* Recommendation 1.5.3, and consider

---

[42] Because of the different roles of investigative and prosecutive victim advocates, the Working Group recognizes that a single victim advocate may not be suited to handle all aspects of a case from investigation to prosecution in all cases.

ways to expand the "community of practice" that is created by the pilot group of POCs, including ways to engage and coordinate with local prosecutors responsible for sex crimes prosecutions where federal jurisdiction may overlap. The purpose of such coordination and collaboration is to determine whether federal prosecution may better remedy the violation, to ensure that federal interests are appropriately vindicated, and to facilitate the effective identification, investigation, and prosecution of such allegations.

4.6.2   Consider dedicating investigators to crimes of sexual misconduct.   We recommend that the Advisory Group consider the viability of the Department creating a specialized unit, team, or task force of sex crimes investigators.  For example, the FBI does not have a cadre of agents who are trained in best practices for sexual assault investigations, including trauma-informed interviewing.[43] This stands in contrast to many local and some federal law enforcement agencies with dedicated sex crimes units.[44] As the Group considers whether and how to adopt a specialized unit at the Department, relevant components could consider whether such agents will be from OIG, the FBI, or some combination thereof, as well as the interplay of these investigations with human trafficking and child exploitation investigations.

4.6.3   Consider identifying POCs for sexual misconduct cases across all USAOs.   In Recommendation 4.1, we proposed that USAOs with BOP facilities that house female inmates in their districts be directed to create a POC dedicated to responding to allegations of sexual misconduct.  The Advisory Group could assess the effectiveness of this POC system and consider whether it should be expanded to all USAOs whose districts contain BOP facilities—male or female—or to all USAOs across the country.

4.6.4   Assess the role of BOP's Central Office in overseeing applicable policies, procedures, and compliance.  The Advisory Group should assess whether BOP's Central Office is receiving sufficient levels of notice and conducting appropriate oversight of policies and procedures to root out sexual misconduct by BOP personnel and is sufficiently engaged in overseeing compliance therewith.

## 5.   Enhance the Use of Administrative Actions and Discipline of Sexual Misconduct by BOP Staff.

When a BOP employee is the subject of credible allegations of sexual misconduct, administrative action is critical to protect the safety of the reporter and to hold accountable the

---

[43] Agents assigned to investigate crimes in Indian Country may be the exception by default, but they are assigned to investigate violent crime in general. Moreover, it is the Subcommittee's understanding that there is no mandatory specialized sex crimes training for any FBI agent.

[44] The Department of Defense, for example, is developing Offices of Special Trial Counsel devoted entirely to the prosecuting of military sex crimes.

perpetrator.  In the view of the Working Group, supported by input from BOP, BOP's decisions on reassignment, administrative leave, and appropriate discipline require more effective and heightened levels of review.  As a result, the Working Group focused on ways to (1) ensure appropriate separation between the reporting party, the victim (if someone other than the reporting party), and the alleged perpetrator, and (2) elevate allegations and disposition of those allegations to sufficiently high levels within BOP to ensure appropriate oversight of the disciplinary action process.  Recommendations 5.1-5.4 operate in the context of BOP's current disciplinary procedures and are intended for immediate implementation.  Recommendation 5.5 is meant to supplement these recommendations as a long-term course of action to be implemented over time.

### 5.1    Issue immediate tone-from-the-top guidance from the BOP Director.

5.1.1    Issue message of gravity of misconduct and seriousness of consequences.  The Director of BOP should issue a message reiterating the gravity of sexual misconduct and expressing that sexual misconduct will not be tolerated.

5.1.2    Issue directive highlighting attention to sexual misconduct allegations from BOP leadership and the Director.  The BOP Director should issue a directive instructing Chief Executive Officers ("CEOs") of BOP facilities, including wardens, that immediately upon receiving any allegation of sexual misconduct, the CEOs must report it to their Regional Director and to BOP OIA, which will track all allegations of sexual misconduct and report them to the Director's Office.

5.1.3    Issue guidance that reiterates that all allegations of misconduct must receive individualized and equitable treatment.  In particular, the BOP Director should issue guidance to relevant staff reiterating that all administrative misconduct assessments, investigations, and disciplinary determinations must be assessed on a case-by-case basis, without any prohibition against substantiating misconduct based on inmate testimony, and that the credibility of all alleged victims, suspects, and witnesses will be assessed on a case-by-case basis and not determined solely based on the person's status as inmate or staff.  This guidance, drawn from PREA, 34 U.S.C. § 30307, and implementing regulations, 28 C.F.R. Part 115, applies to all allegations of BOP staff misconduct.

### 5.2    Promote the appropriate use of administrative actions or reassignment.

5.2.1    Issue written guidance to ensure safety following serious allegations of sexual misconduct.  BOP should circulate written guidance for CEOs to ensure they immediately leverage all available options to ensure the safety and security of the institution and its relevant populations (including the reporting party, the victim, if different than the reporting party, the overall prisoner population, and BOP staff) and to ensure that the sexual misconduct does not recur.  The written guidance should include factors for CEOs to consider when deciding, for example, whether to assign

the subject of the investigation to other responsibilities or duties, place the subject on limited duty, recommend re-assignment of the subject to another facility or assignment within BOP, or recommend placing the employee on administrative leave.  The CEO should likewise determine whether additional steps should be taken to protect victims and witnesses, which also should be documented.

5.2.2   **Require documentation and review of CEO decisions.**  Together with the Regional Director, CEOs should consider how best to continue addressing the status of the accused employee while the allegations are pending.  CEOs must document the decision they have made concerning whether to change the subject's work assignments or take other administrative actions, which should be shared with Regional Directors and the Central Office.  Regional Directors should ensure that the CEO's determination is reasonable. The Employment Law Branch of the Office of General Counsel should track all decisions so that a regular report can be made to the BOP Director regarding BOP's handling of sexual misconduct allegations and associated personnel and safety decisions.

5.2.3   **Report to the Director on a regular basis regarding these decisions.**  In order to ensure transparency, accountability, and consistency about use of administrative leave and allegations of misconduct to BOP leadership, each region should regularly provide to the Central Office and the Director's Office a summary report detailing the decisions regarding administrative and other leave resulting from allegations of sexual misconduct.

### 5.3   Promote the appropriate use of administrative discipline.

5.3.1   **Require reporting of disciplinary actions to the Director's Office.**  To better promote accountability and consistency, at the conclusion of misconduct investigations, CEOs should be required to report to their supervising Regional Director the investigative findings, as well as proposed disciplinary actions, which can include reprimand, suspension, and/or removal from federal service.  The Regional Director will then report the disposition to the Central Office and the Director's Office, who will draw on that data in regularly reviewing the policies and procedures applicable to administrative discipline in these cases.

5.3.2   **Commission a comprehensive review of employee discipline.**  In the long-term, BOP — potentially with help from outside consultants — should conduct a comprehensive and data-based review of options for discipline involving allegations of sexual misconduct.  This should include whether there are options — such as training — available when there is insufficient evidence to take legal action (administrative or prosecutorial) to force separation but it nonetheless seems likely that abuse or harassment has occurred.

APPENDICES
- Appendix A – Data Requests and Policies Reviewed
- Appendix B – Explanation of the Violence Against Women Act Reauthorization of 2022

## APPENDIX A

**Data**

- **From DOJ OIG:**
  - Number of staff-on-inmate sexual misconduct complaints (FY 2017-2022 YTD)
  - Number of DOJ prosecutions for sexual misconduct (FY 2017-2022 YTD)
  - Number of complaints of sexual misconduct or abuse at each BOP Women's Facility (January 2019-March 2022)
  - Number of BOP employees with multiple allegations of sexual misconduct (April 2017-April 2022)
  - Number of complaints of staff-on-inmate sexual misconduct or abuse at all BOP facilities (with disposition) (FY 2016-2022 YTD)
    - Of these complaints, the number which OIG substantiated
    - Of these complaints, the number which OIG referred to BOP OIA (with disposition)
    - Of these complaints, the number of which OIG referred (by entity) and the number of such referrals declined, including (by entity)
  - Number of prosecutions related to staff-on-inmate sexual misconduct (FY 2016-2022 YTD)
    - For each of these prosecutions, identify which charges were brought (*e.g.*, 18 U.S.C. § 2243, 242, etc).
    - For each of these prosecutions, identify the entity was involved (USAO or CRT or both)
  - Average length of time elapsed from (1) complaint of sexual misconduct to referral for prosecution; and (2) from referral to prosecution (2016-2022 YTD)

- **From BOP OIA:**
  - Number of complaints of staff-on-inmate sexual misconduct or abuse at female facilities (2017- 2021)
  - OIG referrals related to sexual misconduct to BOP OIA from female facilities, with disposition (January 2017 – March 2022)
  - Complaints of staff-on-inmate sexual misconduct and abuse at all facilities, including disposition (2016-2022 YTD)
    - If possible, please include a brief description of the allegation
  - Number of substantiated findings and description of discipline imposed by BOP in cases involving allegations of staff-on-inmate sexual misconduct (2016-2022 YTD)
  - Number of BOP employees who, after previous discipline for misconduct, (i) are the subject of a separate allegation of sexual misconduct (regardless of disposition); and (ii) are the subject of a separate allegation of sexual misconduct that is sustained (2016-2022 YTD).

- **From EOUSA**:
  - Identify (by case name and number) any BOP sexual misconduct cases prosecuted, including how the case was referred, what was charged, the case outcome, and the sentence imposed (2016-2022 YTD)
  - Identify any cases involving alleged sexual misconduct by BOP staff that they have declined (FY2016-FY2022 YTD)
- **From FBI**:
  - Number of sexual misconduct complaints to FBI in BOP facilities or BOP-contracted facilities where the allegations were staff-on-inmate (FY 2017-2022 YTD)
    - Number of these allegations that FBI jointly investigated with DOJ OIG
    - Number of such allegations that were marked as a potential civil rights violation.
  - Number of such allegations referred (by entity) and the number of such referrals declined (by entity)

## Policies/Guidance

- BOP Master Collective Bargaining Agreement
- BOP Program Statements
  - P.S. 1210.24 – Office of Internal Affairs
  - P.S. 1330.18 – Administrative Remedy Program
  - P.S. 1351.05 – Release of Information
  - P.S. 3420.11 – Standards of Employee Conduct
  - P.S. 3713.24 – Discrimination and Retaliation Complaints Processing
  - P.S. 3713.25 – BOP Anti-Discrimination Policy
  - P.S. 3713.26 – BOP Anti-Harassment Policy
  - P.S. 3730.05 – Workplace Violence Prevention, Staff
  - P.S. 5324.12 – Sexually Abusive Behavior Prevention and Intervention Program
- Office of Internal Affairs Annual Report for FY2020, FY2019, FY2018, FY2017, and FY2016

## Other Materials

- Combined Press Releases of Recent Prosecutions Involving Sexual Misconduct by BOP Staff
- BOP Sexual Abusive Behavior Prevention and Intervention Booklet (For Offenders)
- BOP PREA Poster (English)
- DOJ Book:  Sexual Misconduct by Law Enforcement and Other Government Actors
- Fara Gold, 2022 Update: Prosecuting Sexual Misconduct by Government Actors, DOJ Journal of Federal Law and Practice 49 (March 2022)

- Sexual Misconduct Committed by Law Enforcement & Other Government Actors (PowerPoint)

## APPENDIX B

<u>2022 VAWA Sexual Misconduct Statutes: Effective as of Oct. 1, 2022</u>

- **18 U.S.C. § 250** (Penalties for Civil Rights Offenses Involving Sexual Misconduct): This statute applies to all Chapter 13 Offenses, *i.e.*, violations of 18 U.S.C. §§ 241, 242 and hate crime statutes.

    o This new penalty statute will mostly impact violations of 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law).

    o Prior to enactment of § 250, most color of law/sexual misconduct violations were misdemeanors, absent one of the Section 242 statutory enhancements; even coerced penetration, coerced oral sex; and groping under clothes were all misdemeanors.

    o Newly enacted 18 U.S.C. § 250 makes every form of sexual assault under color of law a felony. The potential penalty varies depending on the type of sexual conduct involved (*i.e.*, sexual act or sexual contact, as defined pursuant to 18 U.S.C. § 2246(2) and (3), respectively), as well as other attendant circumstances (*e.g.*, whether the conduct was under or through clothing; whether the conduct involved coercion, physical force, or placing the victim in fear of varying degrees of physical harm; whether the victim was physically incapable of showing unwillingness or was otherwise rendered unconscious by the defendant).

    o Because 18 U.S.C. § 250 is a penalty statute, it should be charged in conjunction with substantive civil rights violations, *e.g.*, 18 U.S.C. § 242 or hate crimes.

    o For a violation of 18 U.S.C. § 242 based on sexual misconduct committed under color of law, the government must prove that the victim did not consent and that the defendant had no legitimate purpose (such as in the case of a pretextual medical procedure or a gratuitous pat search).

    o Resources for investigating and prosecuting sexual misconduct under color of law can be found here: https://dojnet.doj.gov/usao/eousa/ole/tables/subject/sexle.htm

- **New Provision Under 18 U.S.C. § 2243**, now called "Sexual Abuse of a Minor, Ward, or an Individual in Custody:"

    o The new provision, **18 U.S.C. § 2243(c)**, makes it a federal crime for a federal law enforcement officer, while acting in that capacity, to "knowingly engage in a sexual act with an individual who is under arrest, under supervision, in detention,

31

or in Federal custody." It is a felony punishable up to 15 years in prison, and consent is not a defense.

o   This applies to every federal law enforcement officer as defined by 18 U.S.C. § 115.

- **New Provision Under 18 U.S.C. § 2242 (Sexual Abuse).**

o   The new provision, **18 U.S.C. § 2242(3),** makes it a crime to "knowingly engage[] in a sexual act with another person without that other person's consent, to include doing so through coercion" where there is federal jurisdiction (*e.g.*, in SMTJ, federal prisons, etc.).

o   This provision filled a statutory gap by extending the sexual abuse statute to criminalize all nonconsensual sexual acts that occur (*e.g.*, in SMTJ, federal prisons, etc.).

**These statutes went into effect on October 1, 2022, and <u>cannot</u> be applied retroactively.**