UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA    *ORIGINAL*

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

CALIFORNIA COALITION FOR WOMEN )
PRISONERS, ET AL.,             )
                               )      **Evidentiary Hearing**
          Plaintiffs,          )
                               )
   vs                          )      **NO. CV 23-04155-YGR**
                               )
UNITED STATES OF AMERICA       )
FEDERAL BUREAU OF PRISONS,     )
ET AL.,                        )
                               )      **Volume 2**
          Defendants.          )
_____)      **Pages 283 - 547**

                                      Oakland, California
                                      Thursday, January 4, 2024

            (UNDER SEAL - Pages 414 - 489 and 491, lines 8 - 16)

                        **EVIDENTIARY HEARING**

**APPEARANCES:**

For Plaintiffs:
                        ARNOLD & PORTER KAYE SCHOLER LLP
                        250 West 55th Street
                        New York, NY 10019
                  BY:   **STEPHEN SEUNGKUN CHA-KIM, ESQUIRE**

                        ARNOLD & PORTER KAYE SCHOLER LLP
                        5 Palo Alto Square, Suite 500
                        3000 El Camino Real
                        Palo Alto, CA 94306
                  BY:   **CARSON ANDERSON, ESQUIRE**

              (Appearances continued next page)

Reported By:        Raynee H. Mercado, RMR, CRR, FCRR, CCRR
                    CSR No. 8258

      Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1    APPEARANCES CONTINUED:

 2    For Plaintiffs:
                              ROSEN BIEN GALVAN & GRUNFELD LLP
 3                            101 Mission Street, Sixth Floor
                              San Francisco, CA 94105
 4                    BY:   ERNEST JAMES GALVAN, ESQUIRE
                           KARA JANSSEN, ESQUIRE
 5

 6                            RIGHTS BEHIND BARS
                              416 Florida Avenue NW
 7                            Washington, DC 20001
                      BY:   OREN NIMNI, ESQUIRE
 8                          AMARIS MONTES, ESQUIRE

 9                            CALIFORNIA COLLABORATIVE
                              FOR IMMIGRANT JUSTICE
10                            1999 Harrison Street, Suite 1800
                              Oakland, CA 94612
11                    BY:   SUSAN M. BEATY, ESQUIRE

12    For Defendants:
                              OFFICE OF THE UNITED STATES ATTORNEY
13                            901 Front Street, Suite 110
                              Helena, MT 59626
14                    BY:   MADISON MATTIOLI
                           ABBIE CZIOK
15                         ASSISTANT UNITED STATES ATTORNEYS

16
      Also Present:         ROBERT FRANCE
17

18

19

20

21

22

23

24

25
```

1                            **I N D E X**

2

3    THURSDAY, JANUARY 4, 2024 - VOLUME 2

4    **DEFENDANTS' WITNESSES**                    **PAGE**     **VOL.**

5    REESE, BETH

6    (SWORN)                                  300        2

7    DIRECT EXAMINATION BY MS. MATTIOLI       301        2

8    CROSS-EXAMINATION BY MR. NIMNI           325        2

9    REDIRECT EXAMINATION BY MS. MATTIOLI     344        2

10    RECROSS-EXAMINATION BY MR. NIMNI         345        2

11

12    PUTNAM, STEPHEN

13    (SWORN)                                  352        2

14    DIRECT EXAMINATION BY MS. MATTIOLI       353        2

15    CROSS-EXAMINATION BY MR. GALVAN         377        2

16    REDIRECT EXAMINATION BY MS. MATTIOLI     403        2

17    FURTHER RECROSS-EXAMINATION BY MR. GALVAN    411        2

18

19    M, STEPHANIE

20    (SWORN)                                  492        2

21    DIRECT EXAMINATION BY MS. CZIOK         492        2

22

23

24

25                            --o0o-

```
 1                        I N D E X

 2

 3    DEFENDANTS' WITNESSES                    PAGE      VOL.

 4    AGOSTINI, MORGAN

 5    (SWORN)                                   518        2

 6    DIRECT EXAMINATION BY MS. MATTIOLI        519        2

 7    CROSS-EXAMINATION BY MR. ANDERSON         539        2

 8                      E X H I B I T S

 9

10    PLAINTIFFS' EXHIBITS    W/DRAWN     IDEN    EVID    VOL.

11

12    45                                        542        2

13

14

15    DEFENDANTS' EXHIBITS    W/DRAWN       IDEN EVID    VOL.

16    O                                    351              2

17    P                                    490              2

18    207                                       368         2

19    216                                       304         2

20

21

22

23                       --o0o-

24

25
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

| | |
|---|---|
| 1 | **<u>Thursday - January 4, 2024</u>**                          **<u>8:05 a.m.</u>** |

2                              **P R O C E E D I N G S**

3                                  ---oOo---

4

5          **THE CLERK:**  Calling civil case 23-cv-04155-YGR,

6    California Coalition for Women Prisoners, et al. versus United

7    States of America Federal Bureau of Prisons, et al.

8       Counsel, please state your appearance for the record,

9    starting with plaintiff counsel.

10         **MR. GALVAN:**  Ernest Galvan, Rosen Bien Galvan &

11   Grunfeld, for plaintiffs.

12         **THE COURT:**  Good morning.

13         **MS. MONTES:**  Amaris Montes with Rights Behind Bars,

14   for plaintiffs.

15         **THE COURT:**  Good morning.

16         **MS. MONTES:**  Good morning.

17         **MR. NIMNI:**  Good morning, Your Honor.  Oren Nimni

18   with Rights Behind Bars, for plaintiffs.

19         **THE COURT:**  Good morning.

20         **MR. CHA-KIM:**  Good morning, Your Honor.  Stephen

21   Cha-Kim, Arnold & Porter, for the plaintiffs.

22         **MS. JANSSEN:**  Kara Janssen, Rosen Bien Galvan &

23   Grunfeld, for plaintiffs.

24         **THE COURT:**  Okay.

25         **MR. ANDERSON:**  Good morning.  Carson Anderson, also

1   from Arnold & Porter, for plaintiffs.

2           **THE COURT:**  Good morning.

3       All right.  From the defense.

4           **MS. MATTIOLI:**  Madison Mattioli for the United

5   States.

6           **THE COURT:**  Good morning.

7           **MS. MATTIOLI:**  Good morning.

8           **MS. CZIOK:**  Abbie Cziok for the United States.

9           **THE COURT:**  Okay.  Good morning.

10      And I see we have Mr. France.

11          **MR. FRANCE:**  Yes.  Would you like me to make an

12  appearance?

13          **THE COURT:**  Good morning.  No, that's fine.

14      And that's Ms. Sutton?

15          **MS. MATTIOLI:**  This is Ms. Caselli.

16          **THE COURT:**  Caselli.

17      Okay.  Good morning.

18      Are there any witnesses in the courtroom?

19          **MS. MATTIOLI:**  No, Your Honor.

20          **THE COURT:**  Okay.  Before we get started, I have a

21  few questions.

22      Are there any changes to the schedule in terms of

23  appearances today?

24          **MS. MATTIOLI:**  Your Honor, we would like to start

25  with Beth Reese and Stephen Putnam and then bring our inmate

1    witnesses in and have them out before lunch, is the plan, so

2    that they can go back.

3           **THE COURT:**  The first person you said I didn't have

4    on my -- on my Post-it from yesterday.

5           **MS. MATTIOLI:**  Beth Reese.

6           **THE COURT:**  Beth Reese.

7           **MS. MATTIOLI:**  I'm -- if I missed her yesterday, I

8    apologize.  She is on our witness list.

9           **THE COURT:**  Okay.

10      And then Putnam?

11          **MS. MATTIOLI:**  Yes.

12          **THE COURT:**  And then the four inmates?

13          **MS. MATTIOLI:**  We've cut down to two.  And I just --

14   there was an issue I wanted to raise with respect to how we

15   address them.  Can we use initials and have them give the

16   court reporter a sticky with their name, or something like

17   that?

18          **THE COURT:**  So what we will do, it's probably best to

19   do it -- well, I have -- I'll send a note to the marshal.  I

20   don't know if they're -- if they're right here outside of my

21   lockup and if they're together or not together.

22          **MS. MATTIOLI:**  I do not believe they're together.

23          **THE COURT:**  What -- what I have been doing is

24   swearing them in by sidebar with their full name.

25          **MS. MATTIOLI:**  Okay.

1          **THE COURT:**  That portion of the transcript is ordered

2    sealed.  And then we can use first names or whatever they're

3    comfortable with.

4          **MS. MATTIOLI:**  If they're comfortable with initials,

5    is that acceptable?

6          **THE COURT:**  If they're comfortable with initials,

7    yes.  I mean --

8          **MS. MATTIOLI:**  Okay.

9          **THE COURT:**  -- during my trials, it wasn't really --

10         **MS. MATTIOLI:**  There are some unique names.  A first

11    name might be identifiable.

12         **THE COURT:**  I don't -- I don't care one way or the

13    other.

14         **MS. MATTIOLI:**  Okay.

15         **THE COURT:**  I just need their full names on the

16    record.

17         **MS. MATTIOLI:**  Right.

18         **THE COURT:**  And I don't -- I've got the plaintiffs'

19    list of names.  I don't have yours, I don't think, of the full

20    names.  Do I?

21         **MS. MATTIOLI:**  You might not.  I did provide that to

22    plaintiffs' counsel.  If you don't have it, we will get

23    your -- the courtroom deputy emailed a copy with their names.

24         **THE COURT:**  Okay.  Or just give me a piece of paper

25    with their names.

```
 1            MS. MATTIOLI:  Okay.

 2            THE COURT:  Tell me what you anticipate the scope of

 3   their testimony to be.

 4            MS. MATTIOLI:  The inmates?

 5            THE COURT:  Yes.

 6            MS. MATTIOLI:  The -- their perceptions of the

 7   current conditions at the prison.

 8            THE COURT:  Okay.  And focused on current?

 9            MS. MATTIOLI:  Correct.

10            THE COURT:  Okay.

11       Who's -- I'd like to talk to the plaintiffs' lawyer with

12   respect to the inmate testimony.

13            MR. NIMNI:  Yes, Your Honor.  Good morning.

14            THE COURT:  Good morning, Mr. Nimni.

15            MR. NIMNI:  Nimni.

16            THE COURT:  Nimni.  All right.

17       What do you anticipate the scope is of the testimony --

18   well, last -- last night you gave me a list of I think

19   15 names.  Is that still where you're --

20            MR. NIMNI:  Yes, Your Honor.

21            THE COURT:  -- headed?

22       And what is the scope that you anticipate of their

23   testimony?

24            MR. NIMNI:  Similarly our witnesses would be

25   testifying about current conditions at FCI Dublin with some
```

1    subcategories.  Some will be testifying about retaliation in

2    the SHU.  Some will be testifying about ongoing sexual

3    assault.

4        We do have one witness that might testify as a rebuttal

5    witness depending on what the government's witnesses testify

6    about.  But otherwise everyone will be confined to current

7    conditions at FCI Dublin.

8            **THE COURT:**  The 47 declarations that you provided in

9    support of your motion frequently focused on past conduct

10   before the current administration.  Are any of the individuals

11   for whom you gave me -- or are any of the individuals on this

12   list also individuals who gave one of those 47 declarations?

13           **MR. NIMNI:**  Yes.  There is some overlap between the

14   declarants and the current witnesses.  There's a few people

15   that have not given declarations and some people that have.

16   It's about half and half.

17           **THE COURT:**  All right.

18           **MR. NIMNI:**  And to the --

19           **THE COURT:**  Looking at your list that you gave me,

20   look at your list, and by number designation starting with one

21   at the top, for whom do I have declarations?

22           **MR. NIMNI:**  Can I -- can someone get me the list?

23       Apologies, Your Honor.  Just a copy of our list.

24           **THE COURT:**  And there are 16 names on here.

25                  (Off-the-record discussion.)

```
 1            MS. MATTIOLI:  Our record is that there are five
 2    declarations.
 3                      (Pause in the proceedings.)
 4            THE COURT:  Or give me the initials.
 5            MR. NIMNI:  The initials of the declarants, we
 6    have --
 7            THE COURT:  Do you have the list or not?
 8            MR. NIMNI:  Yes, I have the list right here.
 9            THE COURT:  All right.  Then --
10            MR. NIMNI:  We're just determining -- cross-checking
11    them against the declarations.
12            MS. MATTIOLI:  We've done that, Your Honor.  We could
13    tell you who they are.
14            THE COURT:  Who do you think they are?
15            MS. JANSSEN:  This is Kara Janssen for plaintiffs.
16        So going down the list as to who is a declarant and who is
17    not:  AV is a declarant.  CAH is a declarant.  ER was not a
18    declarant.  JM is a declarant.  JL is a declarant.  KC was not
19    a declarant.  KD was not a declarant.  LPR was not a
20    declarant.  MM was not a declarant.  RF was not a declarant.
21    RB was a declarant.  SL was a declarant.  And TM was a
22    declarant.
23        And the last three --
24            THE COURT:  Oh, TM.
25            MS. JANSSEN:  TM.  Sorry.
```

1              FGB may also have been referred to as FGVB --

2          **THE COURT:**  Hold on.

3          **MS. JANSSEN:**  -- was a declarant.

4          **THE COURT:**  FGB may have been referred to as...?

5          **MS. JANSSEN:**  FGVB.  Sometimes there's four initials.

6          **THE COURT:**  Okay.

7          **MS. JANSSEN:**  And that was a declarant.  MH was not a

8      declarant.  YHM was a declarant.

9          One correction.

10                    (Off-the-record discussion.)

11         **MS. JANSSEN:**  FGVB was not a declarant.

12         That is the final answer.

13         **THE COURT:**  Does the government -- the defense

14     anticipate cross-examining these individuals who provided

15     declarations on the content of their declaration with respect

16     to the allegations of misconduct prior to the current

17     administration?

18         **MS. MATTIOLI:**  No, Your Honor.

19         **THE COURT:**  Have the plaintiffs advised anyone -- any

20     lawyers in the criminal cases that these individuals are

21     testifying?

22         **MR. NIMNI:**  I believe that we have.  We've been

23     working with a number of these witnesses also in preparation

24     for their testimony in the criminal cases.

25         I -- let me confer with my co-counsel as to the full

1    extent of that.

2                   (Pause in the proceedings.)

3           MS. JANSSEN:  This is Kara Janssen.

4        Of the individuals testifying, I believe only one is

5    involved in something that is still pending, and we can advise

6    the -- I believe the USAO may know that that person is

7    testifying, but we can clearly advise --

8           THE COURT:  Well, the United States Attorney will be

9    here right before the next break.

10          MS. JANSSEN:  Great.

11          THE COURT:  That's why I'm asking these questions.  I

12   advised them, because it was not clear to me that they have

13   been kept in the loop.  Not only have they -- it's not clear

14   that they have been kept in the loop, but it's also not clear

15   to me that the defense lawyers for the individuals who are the

16   alleged perpetrators have been kept in the loop.

17       Does anybody know whether that has happened?

18          MS. JANSSEN:  So for the witnesses on our list, my

19   understanding is that defense lawyers are in the loop and have

20   been advised.

21          THE COURT:  The defense lawyers for the alleged

22   perpetrators?

23          MS. JANSSEN:  Yes.

24          THE COURT:  So anyone with a criminal indictment

25   pending --

1    MS. JANSSEN:  Yes.

2         THE COURT:  -- did their lawyers know that people may

3    be testifying about their clients in this courtroom?

4         MS. JANSSEN:  There's only one individual that that

5    applies to.  And to my knowledge, no, but we can advise that

6    person prior to.

7         THE COURT:  Which one?

8         MS. JANSSEN:  I believe that would be CAH.

9      Everybody else is -- there's no pending current --

10        THE COURT:  But you also do or do not know whether or

11   not there are investigations.

12     Are there any of these individuals who are on

13   administrative leave, who we know are -- or are -- so you

14   don't know?

15        MS. JANSSEN:  We don't know because we don't have

16   that information from the government.

17        THE COURT:  So that's why I'm asking is the -- have

18   you kept the government in the loop on the criminal side?

19        MS. JANSSEN:  We -- based on the order recusing them

20   from this case, I do not believe that we understood that we

21   were supposed to be informing them of who would testify, but

22   we can certainly do so --

23             (Simultaneous colloquy.)

24        MS. MATTIOLI:  The Northern District is handling the

25   criminal prosecutions.

```
1              MS. JANSSEN:  Yes.

2              MS. MATTIOLI:  You could not relay that -- they

3      couldn't relay that to the District of Montana --

4              THE COURT:  I --

5              MS. MATTIOLI:  -- because we're not --

6              THE COURT:  I understand that.

7              MS. MATTIOLI:  Yeah.

8              THE COURT:  That's why I'm asking the question.

9              MS. MATTIOLI:  Right.

10             THE COURT:  And you may not be required to --

11             MS. JANSSEN:  Yeah.

12             THE COURT:  But as the court, it concerns me.

13             MS. JANSSEN:  Yeah.  We will do so.  We will do so

14     immediately.

15             THE COURT:  Well, they will be here.

16             MS. JANSSEN:  Great.

17             THE COURT:  So you make sure that you've got your

18     list to give them.

19             MS. JANSSEN:  Exactly.  That's fine.

20             MS. MATTIOLI:  Your Honor, there's an additional

21     issue that many of these witnesses have pending administrative

22     or tort claims that were filed by other law firms who are not

23     present in the courtroom.

24         The government counsel is not aware that those lawyers

25     have been informed that those witnesses are testifying.
```

1          **THE COURT:**  Well, that I care less -- I care --

2     it's -- I don't -- it's not that I don't care.

3          **MS. MATTIOLI:**  Right.

4          **THE COURT:**  But my concern is less.

5          **MS. MATTIOLI:**  Right.

6          **THE COURT:**  And that is because the way that the

7     criminal actions have been prosecuted, and given the

8     Sentencing Guidelines structure for these kinds of crimes, the

9     prosecutors have chosen not to have testify every single

10    person who has made allegations against criminal defendants.

11         As a consequence and because -- well, as a consequence for

12    purposes of sentencing --

13         **MS. MATTIOLI:**  Um-hmm.

14         **THE COURT:**  -- I have not -- for due process reasons,

15    I have not considered the allegations that have been made that

16    were not subject to cross-examination.

17         And -- and the prosecutors know this.  After the very

18    first sentencing I did, with respect to the balance and with

19    respect to the pleas, it's slightly different circumstance.

20         To the extent -- and I don't -- and that's why I was

21    asking the question about what you anticipate the scope of

22    their testimony to be.  I have heard live testimony from many

23    victims, and it is very difficult for them to do what they are

24    doing on the stand.  I do not want to put them through that

25    more than once.

1          That said, if their testimony I believe is credible, I

2    would like to be able to consider it for purposes of any

3    future issue on the criminal side.  I don't think I should do

4    that, though, unless defense counsel for some future defendant

5    who appears in front of me has notice and potentially the

6    possibility of cross-examining.

7          That's why I'm trying to understand the scope of what is

8    going on and the scope of the intent of the plaintiffs.

9    Because certainly, from reading all of declarations that you

10   put in front of me and from reading the content of your

11   motion, your focus has been on the past, not on the present.

12          **MR. NIMNI:**  I understand.  Thank you for explaining,

13   Your Honor.  I understand the concern.

14          I -- I think two points.  First, our -- because this is a

15   preliminary injunction motion, our focus is on the future.

16   However --

17          **THE COURT:**  Your factual basis for your motion is the

18   past, not the current future.

19          **MR. NIMNI:**  So I think --

20          **THE COURT:**  Not -- so -- or it hasn't been so much

21   the current situation in terms of what you've provided me.

22          **MR. NIMNI:**  So I agree.  And our witnesses,

23   because -- both for sort of cohesiveness of their story and

24   because it informs their current experience, some of them will

25   discuss their past experience and how that informs what's

1    going on currently.

2        So I understand the Court's concern.  And as my co-counsel

3    said, we will notify defense counsel and the -- the

4    government.

5        Thank you.

6            **THE COURT:**  So you should have prepared the list of

7    these -- I now count eight individuals who are on your list

8    who provided declarations and have the cross-reference to the

9    docket number of their declarations so that counsel for the

10   Northern District can know, and I'll talk to Mr. Paulson when

11   he gets here, about efficiently getting information to defense

12   counsel to the extent it's appropriate.

13       All right.

14           **MR. NIMNI:**  Thank you, Your Honor.

15           **MS. MATTIOLI:**  Thank you, Your Honor.

16           **THE COURT:**  You can call your first witness.

17           **MS. MATTIOLI:**  Okay.

18           **THE CLERK:**  Please raise your right hand.

19

20                          **BETH REESE**,

21   called as a witness for the defendants, having been duly

22   sworn, testified as follows:

23           **THE WITNESS:**  I do.

24           **THE CLERK:**  Please be seated.

25       Please speak clearly into the microphone and state your

 1      full name and spell your last name for the record.

 2               THE WITNESS:  My name is Beth Reese.

 3               THE COURT:  Okay.  I can't hear you.  You're going to

 4      have to speak louder.

 5               THE WITNESS:  Okay.  My name is Beth Reese.

 6               THE COURT:  Thank you.

 7               THE WITNESS:  My last name is spelled R-E-E-S-E.

 8               THE COURT:  Good morning.

 9               THE WITNESS:  Good morning.

10               THE COURT:  You may proceed.

11                          <u>DIRECT EXAMINATION</u>

12      BY MS. MATTIOLI:

13      Q.  Thank you, Beth.

14          Beth, what is your current occupation?

15      A.  My title is chief of the Office of Internal Affairs for

16      the Bureau of Prisons.

17      Q.  And where is your office located?

18      A.  Out of DC.

19      Q.  And do you live there?

20      A.  I do, I live in the suburbs.

21      Q.  Yeah.  We appreciate you being here today.

22          How long have you held the role of OIA chief?

23      A.  I've been in this role since May of 2018.

24      Q.  Can you explain what is the Bureau of Prisons Office of

25      Internal Affairs?  What do you do?

1    **A.**    We are the internal investigative component of the Federal

2    Bureau of Prisons.  So when there are allegations of staff

3    misconduct, we oversee the classification of those

4    allegations.  We process them, record them, refer them to the

5    Office of the Inspector General as appropriate.  And if there

6    is not going to be a criminal investigation, then we undertake

7    an investigation into the allegations.

8    **Q.**    So can you explain the structure of your division for the

9    Court.  You work at the top.  Where does it go from there?

10   **A.**    Yes.  So we have approximately 145 staff throughout the

11   country.  I oversee the work of all of those staff.  Most of

12   those folks are investigators that are assigned to the local

13   institutions, and they do the kind of routine administrative

14   investigations that -- that we oversee.

15       I have ten supervisors that I work with to review those

16   investigations for thoroughness and to ensure that the -- the

17   investigations are complete.

18                **THE COURT:**  When did you start with the OIA?

19                **THE WITNESS:**  I started in May of 2018.

20                **THE COURT:**  So you weren't with OIA before 2018?

21                **THE WITNESS:**  No, Your Honor.  I was an attorney.

22   **BY MS. MATTIOLI:**

23   **Q.**    Can you explain your background prior to coming to the

24   Office of Internal Affairs?

25   **A.**    Of course.  I started with the Bureau of Prisons in

1   November of 2008 as an employment law attorney.  And I

2   practiced in some capacity as an employment law or labor

3   attorney for the next ten years until I moved into OIA.

4   **Q.**   Okay.

5        And you said there are 140...?

6   **A.**   146, technically OIA staff now.

7   **Q.**   And there are 120, roughly, institutions in the Bureau of

8   Prisons?

9   **A.**   Yes.

10  **Q.**   So is there an investigative field agent at each prison?

11  **A.**   There is not an agent at every prison, but there is an

12  agent assigned to every prison.  So there are some locations

13  where, because of -- because we just don't have enough staff,

14  that they share an investigator with a co-located institution,

15  something that's within a commuting distance.

16  **Q.**   Okay.

17       And what do you do in your role as the chief?

18  **A.**   In my role, I really oversee the operations as far as the

19  investigations go, assigning them, ensuring that they're

20  moving forward, that they're being completed.

21       I oversee communications with the Office of Inspector

22  General which is an important part of our role in the agency,

23  to ensure that the Office of the Inspector General is aware of

24  what we have coming in and that we are communicating

25  effectively with regard to what their stance is on cases, how

 1   we are handling cases, that sort of thing.

 2       I'm also the liaison for other law enforcement agencies as

 3   necessary.

 4   **Q.**  So are you involved in daily investigative work?

 5   **A.**  I am not handling investigations on a day-to-day basis,

 6   no.

 7   **Q.**  Okay.

 8           **MS. MATTIOLI:**  Can we pull up 216?

 9                   (Exhibit published.)

10   **BY MS. MATTIOLI:**

11   **Q.**  Have you seen this program statement before?

12   **A.**  Yes, I have.

13           **MS. MATTIOLI:**  Your Honor, I move to admit 216.

14           **THE COURT:**  It's admitted.

15       (Defendants' Exhibit 216 received in evidence.)

16   **BY MS. MATTIOLI:**

17   **Q.**  Can you please explain to the Court how OIA classifies

18   incoming allegations of sexual misconduct?

19   **A.**  Of course.

20   **Q.**  Or any misconduct, sorry.  Staff misconduct.

21   **A.**  Yeah.  We -- as we receive allegations, we don't do any

22   gatekeeping at the outset of -- of our referral process.  We

23   receive allegations from any number of sources to include

24   inmates, inmate families, advocacy organizations, staff,

25   oftentimes through the warden.  However they can send

1    referrals into us directly.

2        And the first part of our process is to really evaluate

3    the referral, the information that we have received to

4    determine if it makes an allegation of staff misconduct and if

5    there is sufficient information to undertake a meaningful

6    investigation.

7        If the answer to both of those questions is yes, then we

8    move forward and classify the allegations.  We have a

9    three-level classification system.

10       Category 1 or classification 1 are those allegations that,

11   if true, could be criminal behavior.  So oftentimes that would

12   include sexual misconduct, physical abuse, and introduction of

13   contraband are the most common types of criminal-type

14   allegations that we see.

15       Category 2 allegations would be those that, if true, would

16   be serious administrative misconduct.  So not criminal but

17   still serious misconduct.

18       And then category 3 is kind of your everything else, your

19   failure to follow supervisor's instructions, your inattention

20   to duty, or kind of very routine administrative misconduct.

21   **Q.**  And we've heard a lot of initials.  I know you did say

22   Office of Inspector General.  But when we hear OIG being

23   thrown around and talked about, what does that -- what does

24   that agency do?

25   **A.**  OIG is an independent component of the Department of

REESE - DIRECT / MATTIOLI

1    Justice, and they have jurisdiction over the criminal and

2    administrative misconduct of all DOJ staff.

3        So they are separate from the Bureau of Prisons, but we

4    fall under their umbrella with regard to their oversight of

5    our misconduct processes.

6    **Q.**  And can you estimate about what percentage of BOP cases

7    are retained by OIG, that is, they're criminal in nature?

8    **A.**  OIG has the ability to review all of our -- all of our

9    allegations and has kind of a right of first refusal with

10   regard to our cases.  Year over year on average, they retain

11   about one to two percent of our cases.

12   **Q.**  And what happens to the case if OIG declines to take it

13   and investigate?

14   **A.**  If we refer a case to OIG and they decline to investigate,

15   it is deferred back to my office, and we make a determination

16   as to how best to move the case forward.

17   **Q.**  And what are the options?

18   **A.**  Oftentimes, it will get deferred to the local

19   investigators that we discussed earlier.  At the

20   122 institutions, they have -- each of them has an assigned

21   investigator.

22       I also have a staff that work more directly for me of

23   approximately 30 investigators who will do some of the more

24   complicated cases, some of the cases that involve higher

25   profile allegations or subjects.

REESE - DIRECT / MATTIOLI

1          So we'll make a determination basically between those two

2     options.

3     Q.   And has OIG or has there been any guidance as to which --

4     well, does OIG want to see all allegations of staff

5     misconduct?

6     A.   OIG requires that we submit to them all of our

7     classification 1 and classification 2 cases.  So they review

8     each of those on an individualized basis and make a

9     determination as to whether they have an interest in taking

10    jurisdiction over the case.

11    Q.   So if an allegation of sexual misconduct comes out, what

12    category would that be?

13    A.   That's generally a category 1 because it's criminal

14    behavior.

15    Q.   And so can you explain then the process, the local

16    institution receives information?

17    A.   Right.  So if an allegation is made locally, it will be

18    referred to our office, usually through the office of the

19    warden, although it can come from any number of other sources.

20         We will review it, classify it, kind of upload it into our

21    system so it's being tracked.  And we will refer it to the --

22    the OIG field office that has jurisdiction over the area.  So

23    depending on where they are in the country, there's a number

24    of field offices.

25    Q.   Okay.

1            And how does the FBI, the Federal Bureau of Investigation,

2      interact with OIG?

3      **A.**   So the FBI can share jurisdiction over -- over Bureau of

4      Prisons cases sometimes.  I am not usually involved in that

5      interaction so I don't really know at what time they -- they

6      determine that they're going to participate with -- in

7      conjunction with OIG, but they are involved in cases from time

8      to time.

9      **Q.**   Was this program statement, Exhibit 216, updated in August

10     of 2023?

11     **A.**   Yes, it was.

12     **Q.**   And can you explain to the Court what the nature of that

13     update was.

14     **A.**   Well, the program statement -- statement had not been

15     updated for about 20 years.  So there were a number of

16     procedural issues that needed to be -- to be brought up to

17     date.

18          In particular, my office has undergone, over the last

19     year, has undergone a reorganization where the local -- the

20     local investigators that we discussed earlier now work

21     directly for us and they fall under our operational control.

22     Historically that was not the case.  So we --

23            **THE COURT:**  Who did they used to work for?

24            **THE WITNESS:**  For the warden.

25          So we needed to update our program statement to reflect

 1     that chain of command and to ensure that our expectations with

 2     regard to the credibility of -- of witness statements and

 3     whatnot were -- were appropriately recognized by all

 4     investigators.

 5     **BY MS. MATTIOLI:**

 6     **Q.**  Beth, do you know Stephen Putnam?

 7     **A.**  I do, yes.

 8     **Q.**  And how do you know him?

 9     **A.**  He was -- was the local investigator at FCI Dublin.  He

10     was an -- an SIS Lieutenant was his title when I first met

11     him.  That's a Special Investigative Services Lieutenant.

12          So he did not work for me when I first met him, but I

13     first met him in -- in March of 2022.

14     **Q.**  And because he was formerly an SIS Lieutenant, would it be

15     fair to say that he reported directly to leadership at

16     Dublin --

17     **A.**  Yes.

18     **Q.**  -- to include the warden?

19     **A.**  Yes, he did.  He worked for the local leadership at

20     Dublin.

21     **Q.**  And beginning in August of 2023, did -- was his position

22     reorganized pursuant to this change?

23     **A.**  Yes.  He came to work for us.

24     **Q.**  At the Office of Internal Affairs?

25     **A.**  With the Office of Internal Affairs, yes.

**Q.** And so for the past four months that he was with the Bureau -- I understand he's now retired -- but he reported directly to OIA?

**A.** Yes, he did.

**Q.** And will that practice continue with Putnam's replacement when that person is hired?

**A.** Yes.

**Q.** Has that position been posted?

**A.** It has. It was posted in December.

**Q.** So I want to talk very briefly about the staff sexual misconduct at Dublin occurring between 2019, 2022.

How did your office first become aware of the allegations of staff sexual misconduct at Dublin?

**A.** Through our interactions, probably mainly with Putnam. We were aware that there had been a few allegations of sexual misconduct that had been -- that had been picked up by the Office of the Inspector General.

Obviously those -- the cases that are maintained by the Office of Inspector General are cases that we pay more attention to. We want to know how the case is proceeding because obviously we're not handling the investigation so it's something that we have to kind of track and make sure that we're aware of -- of where the case is going to the extent possible.

**Q.** And what is your understanding of how those cases came to

1    the attention of OIG?

2    **A.**   Through my conversations with -- with IG agents, they --

3    they actually noted that Putnam was instrumental in bringing

4    their attention to -- to an ongoing issue at Dublin and

5    concerns that he had with regard to the activities of -- of a

6    small number of staff.

7        And he was -- he -- a local investigator will act in a

8    kind of role of -- as an assistant, if you will, in an ongoing

9    IG investigation.  They will collect documents at the request

10   of IG.  They will collect videos.

11       They're not self-directed in that role, but they are

12   acting at the behest of IG.  And IG has noted on several

13   occasions that Lieutenant Putnam was very helpful in that

14   regard as far as building early cases out of Dublin.

15   **Q.**   And when you say helpful in building cases, what sorts of

16   things would he have been doing?

17   **A.**   He would have been helping them find video, pull video,

18   that he would have been helping them find records of -- of

19   movements through the institution, records of -- of -- of

20   meetings, of departures from, you know, a normal movement

21   through the institution that may indicate that there was

22   something going on that was inappropriate.

23   **Q.**   Would that include witness interviews?

24   **A.**   He may have sat in on witness interviews from time to

25   time, but he would not generally be conducting witness

1   interviews other than the very early intake interviews of a --

2   of an allegation.

3   **Q.**  Are you aware of whether OIG or your office ever

4   investigated Stephen Putnam to determine if he had a role in

5   the sexual misconduct allegations?

6   **A.**  To best of my knowledge, IG has conducted a series of

7   interviews, but I really haven't been involved.  I -- to the

8   best of my knowledge, IG has no concerns that he was directly

9   involved in any malfeasance with regard to the sexual

10  misconduct at Dublin.

11  **Q.**  Was there ever a concern that you are aware of that he was

12  covering up for malfeasance or not collecting evidence

13  intentionally?

14  **A.**  To the contrary.  I would say that IG has indicated to me

15  that they have continued to have full confidence in Lieutenant

16  Putnam's activities.

17          **MR. NIMNI:**  Objection, Your Honor.  Hearsay.

18          **THE COURT:**  Sustained.

19  BY MS. MATTIOLI:

20  **Q.**  But you have no knowledge of concerns?

21  **A.**  No.

22  **Q.**  Can you tell me about the creation of the former

23  director's task force?

24  **A.**  So in early 2022, in March of 2022, there was an

25  increasing awareness that because of ongoing issues at Dublin

1    that perhaps the situation needed more attention.  "Boots on

2    the ground" was the phrase that was being used.  Just the

3    folks in DC felt like they needed to see what was happening

4    and -- and meet with the population and speak with folks who

5    were continuing to raise issues so that we have a better sense

6    of -- of ongoing concerns at Dublin.

7    **Q.**  And were you a member of that task force?

8    **A.**  I was, yes.

9    **Q.**  Did you visit Dublin?

10   **A.**  I did.

11   **Q.**  When was that visit?

12   **A.**  That was in early March of 2022.  I want to say the first

13   day was on the 8th, but I'm not great with dates.

14   **Q.**  And did -- was it -- were you there for one day?  How long

15   were you there?

16   **A.**  We were there for a full week.  We traveled on Sunday.  We

17   traveled home on Saturday.  And we were there -- some member

18   of the task force was there consistently throughout the week

19   to include the off shifts, overnights.  We were -- we were --

20   the point of being there was to get a full sense of everything

21   that was happening throughout the days and nights at -- at

22   Dublin.

23   **Q.**  And why was it important that someone was there during the

24   off shifts?

25   **A.**  Well, the off shifts are times when there's a lower number

1    of staff and there's more of an opportunity for -- for, you

2    know, staff and the population to engage in inappropriate

3    behavior.

4    **Q.**  And when you walked into Dublin in March of 2022, what did

5    you see?

6    **A.**  I saw a population of inmates who were very in need of

7    time and attention.  They were just -- felt like they weren't

8    being listened to, they felt like they weren't being heard.

9    And they were very interested in -- in talking to literally

10   anyone that they could find.

11   **Q.**  Do you know how many members were on the task force?

12   **A.**  I want to say it was between 20 and 30.

13   **Q.**  And did -- if you know, did each member of the task force

14   have that experience of inmates wanting to talk to them?

15   **A.**  Yes.

16          **THE COURT:**  The entire task force was there?  All 20

17   to 30?

18          **THE WITNESS:**  Your Honor, what we ended up doing

19   after the first day was splitting up into -- everyone had a

20   schedule and so that we could cover all the shifts, cover --

21   so we weren't all there together all of the time, but we were

22   all there throughout the week, yes, Your Honor.

23   **BY MS. MATTIOLI:**

24   **Q.**  And did inmates talk to you personally?

25   **A.**  Yes.

1    **Q.**  And generally, without saying statements or names, what

2    were some of the concerns they raised to you?

3    **A.**  There was -- early in the week there was a -- you know,

4    a -- a wide variety of concerns.  They were concerned about

5    what was happening at the institution, whether the institution

6    was going to get shut down.  There was some number of the

7    population who were very interested in staying at Dublin, and

8    they were concerned that because we were there, we were

9    planning on shutting it down.  And they didn't want to be

10   moved further from their families.

11        There was also some who were concerned about the

12   activities of staff.  They felt that there were staff that

13   were being allowed to mistreat them and were not being held

14   accountable.  So they were concerned about that.

15        They also had a number of concerns, and as the week went

16   on, it evolved probably more into First Step Act concerns

17   and -- and sentencing issues and kind of more routine prison

18   issues.

19             **THE COURT:**  How did they know you were there and that

20   they could talk to you?

21             **THE WITNESS:**  Your Honor, we had a what's called a

22   town hall with the director of the agency at the time the

23   first day that we were there.

24        So all of the population -- I think we had two or three

25   different town halls.  But all of the population were given

1    the opportunity to attend the town halls, listen to what he

2    had to say.  He explained why he was there and why we were all

3    there and what we were interested in -- in talking to them

4    about and -- and just kind of left the door open for -- for

5    conversations, formal and informal.

6    **BY MS. MATTIOLI:**

7    **Q.**  Did any staff members approach you to discuss concerns in

8    the institution or --

9    **A.**  Yeah, a number of them did.  We had conversations with

10   both inmates and staff.  We weren't there exclusively to talk

11   to inmates.

12   **Q.**  And are you aware of any changes that took place at Dublin

13   following that meeting?

14   **A.**  There were a number of changes.  And obviously, you know,

15   some of this is tied up in -- in the prosecutions and the

16   realization of how broad the problem was going back.

17       But there have been staffing changes.  There have been

18   organizational changes.  We have more independent staff there

19   now than we've ever had before as far as staff who don't

20   work -- don't fall under the operational control of -- of the

21   warden and of the leadership there.

22       We've also created wholly new positions, ombudsman-type

23   positions that -- that we've never had within our agency

24   before, to ensure that the -- that the issue that we had there

25   is -- is never replicated.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   **Q.**  And have you been back to Dublin since that first initial

2   visit?

3   **A.**  I have.  I was there in March of 2023.  I think it was

4   later in the month.

5   **Q.**  And what was the occasion that you -- was it related to

6   the task force or --

7   **A.**  It was -- the Deputy Attorney General was visiting with a

8   number of her staff.  And our director, our newly placed

9   director at that time, was visiting to kind of audit the

10  changes that had been made at Dublin and to gauge our

11  progress.

12          **THE COURT:**  Was Stephanie Hinds there with her?

13          **THE WITNESS:**  I'm sorry, Your Honor.  I'm not

14  familiar with Stephanie Hinds.

15          **THE COURT:**  Which Deputy AG was visiting?

16          **THE WITNESS:**  It was --

17          **THE COURT:**  Was it Ms. Monaco?

18          **THE WITNESS:**  Yes, ma'am.  Thank you.  Lisa Monaco.

19  Thank you.

20          **THE COURT:**  And did she have staff with her?

21          **THE WITNESS:**  Yes, Your Honor, she did.

22          **THE COURT:**  Do you recall an individual who was there

23  who is about five-two, black, female?

24          **THE WITNESS:**  Your Honor, she probably had eight

25  staff, and I -- I don't want to tell you that I recall all of

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    them, but I don't recall anyone who fits that description.

2          THE COURT:  Deputy AG Monaco hired the former

3    U.S. Attorney from this district whose name is Stephanie

4    Hinds.

5          THE WITNESS:  I see.

6          THE COURT:  That's why I was asking.

7          THE WITNESS:  Thank you.  I don't recall her being

8    there, but there have been a number of visits so there may

9    have been other opportunities for her to --

10         THE COURT:  And what was the -- what was she -- the

11   Deputy AG doing there?

12         THE WITNESS:  She was, you know, the -- in the Bureau

13   parlance, she was walking and talking.  She did a tour of the

14   institution.  She talked to staff.  She talked to -- her staff

15   talked to some of the population there.  And she was kind of

16   checking in.

17      She wanted to know about cameras that had been installed.

18   She wanted to know about security measures that were being

19   implemented.  And she wanted to know is this the same

20   institution that we found when we visited in March of 2022.

21   BY MS. MATTIOLI:

22   Q.  And was it?

23   A.  In my opinion, it -- it wasn't.  The -- that feeling of

24   the population wanting someone to -- to talk to and not having

25   avenues to reach out was just not there.

1          There were inmates who wanted to speak to us, and they

2     had, you know, various concerns, but it was not that same

3     feeling of -- of heightened emotionality.  It was more

4     routine.

5          You know, they were displeased with their First Step Act.

6     They didn't think they were getting credited appropriately.

7     Their points were -- were being calculated wrong.  It was that

8     sort of routine administrative issues.

9     **Q.**  Because OIG takes cases that, if true, could be criminal,

10    would it be fair to say that OIA would handle most

11    investigations of staff retaliation, or are those a local

12    issue?

13    **A.**  It really depends on how the allegation of retaliation is

14    raised.  If the allegation of retaliation is raised, as it

15    often is, in connection with -- with potential criminal

16    behavior, it may -- that piece of the case would be handled

17    holistically with the rest of the -- of the allegations.

18         If a freestanding allegation of retaliation was raised and

19    it didn't rise to the level of criminality, it would likely be

20    deferred to my office, and we would make a determination as to

21    whether to have a local investigator handle it or to -- to

22    send someone from my office to -- to do the case.

23    **Q.**  And once a case is accepted by OIG, do you have any

24    control over the timeline of the investigation or any

25    oversight of that process?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

REESE - DIRECT / MATTIOLI

1    **A.**  I do not.  We act in a supportive role.  We provide them

2    documents.  We provide them other -- other records that they

3    may need from us, but I don't have any ability to impact the

4    timeline of those cases.

5    **Q.**  Do they take a long time to process?

6    **A.**  They often do.  Criminal investigations are complicated

7    and -- and, you know, yes, oftentimes they take a long time.

8    **Q.**  So then would it be fair to say if the complaint is -- if

9    a complaint is raised that visual or strip searches are being

10   employed in a retaliatory way, and what I mean by that is only

11   against certain inmates but not others, would that come to

12   your office?

13   **A.**  It would likely be referred -- yes, to our office, and we

14   would refer it depending on the -- the whatever the connecting

15   activity is, we would likely refer it to OIG.

16   **Q.**  Is it likely that they would retain that case for

17   investigation, in your experience?

18   **A.**  In my experience, because of the -- because of their

19   experience at Dublin, they've been very sensitive to closely

20   examining all issues that have arisen at Dublin.  But unless

21   it was connected to sexual misconduct, it's unlikely that they

22   would retain that case in the long term.

23   **Q.**  If a policy dictated the practice that was being

24   complained of, does that factor?

25   **A.**  Yes.  I -- I would be hard-pressed to find a reason to

REESE - DIRECT / MATTIOLI

1  open a case based on an allegation that staff were engaging in

2  behavior that is supported by policy, that's actually called

3  for by policy.

4  **Q.**  Has OIA sustained a staff retaliation case at Dublin?

5  **A.**  We have not recently sustained a retaliation case at

6  Dublin, no.

7  **Q.**  What do you mean by "recent"?

8  **A.**  I mean our records retention is -- is 30 years.  So it's

9  possible that at some point we have, but nothing in the last

10 five years.

11 **Q.**  How many cases of sexual misconduct referred from Dublin

12 in 2023 relate to contemporaneous activity?

13 **A.**  Out of the approximately a hundred cases that we opened in

14 2023, only two of them spoke to activities that were close in

15 time to -- to the allegation, to activity that allegedly

16 happened within 2023.

17 **Q.**  And were those cases referred to OIG?

18 **A.**  Of course, yes, they were.

19 **Q.**  And is that where they are now?

20 **A.**  Yes.

21 **Q.**  In your review of the nature of the claims, do you have

22 any reason to believe that widespread, rampant sexual

23 misconduct is occurring at Dublin?

24 **A.**  I do not have reason to believe that there are currently

25 the same issues going on at Dublin that there were in 2020.

REESE - DIRECT / MATTIOLI

1   **Q.** What if somebody said, well, the investigations of staff

2   misconduct are still ongoing?

3   **A.** Of course they are, yeah.

4   **Q.** Does your office always have investigations of staff

5   misconduct ongoing?

6   **A.** Yes.  There's been no time where we have no cases open.

7   We have plenty of work.

8   **Q.** About how many cases of staff misconduct does OIA receive

9   annually?

10  **A.** In a year, we open between 5- and 6,000 cases on average.

11  **Q.** Do you know Associate Warden Pat Deveney?

12  **A.** I'm family with him, yeah.

13  **Q.** Do you have any reason to believe that he is ignoring

14  reports of sexual misconduct occurring at Dublin?

15  **A.** No.

16  **Q.** Can you give me some examples of contemporaneous

17  allegations your office has received that might suggest the

18  culture at Dublin has changed?

19  **A.** What I can tell you is the types of allegations that we're

20  receiving out of Dublin now are very consistent with the types

21  of allegations that we're receiving from other institutions as

22  opposed to what we were receiving, you know, shortly after

23  this -- the -- these issues were uncovered where the

24  allegations were very serious and very troubling.

25       The types of allegations that we're receiving now are more

1    along the lines of very routine administrative prison

2    misconduct.

3    **Q.**  Did the task force create an email box at some point?

4    **A.**  Yes, we did.  After -- after our visit to the institution

5    in March of 2022, we established a -- an email that was

6    provided to the population at Dublin so that they could reach

7    out directly to -- to us in DC to ensure that if there was --

8    because while we were there during the visit, there was issues

9    raised that they were concerned about retaliation.

10       So we set up the email to ensure that they had a direct

11   line to communicate with us in DC, and we could monitor if

12   there was any -- any issues with regard to retaliation after

13   we left.

14   **Q.**  So just to explore that a little bit, then did inmates use

15   the task force email?

16   **A.**  They did.

17   **Q.**  And when you or your office or the task force received

18   that information, what did you do with it?

19   **A.**  Well, it depends on the issues that were raised, right?

20   As I noted, as we kind of wrapped up our visit there, many of

21   the complaints that were being raised were regarding First

22   Step Act credits and that sort of thing.

23       Many of the emails that we received consistent with --

24   with that were related to First Step Act.  So those would be

25   sent to the office that had oversight of First Step Act

1    credits and the appropriate calculation of those.

2        If they -- if the email gave rise to allegations of

3    misconduct, we would review it just like we receive any

4    referral and we would open a case as appropriate.

5    **Q.**  And so if a case were opened and referred to OIG, is it

6    possible then that an allegation that came through the task

7    force email box could be investigated by a local agent at the

8    direction of OIG?

9    **A.**  So the local agents don't work for OIG.  So, no, the local

10   agent would not be -- would not be handling an investigation

11   unless it was deferred by OIG and then released by my office

12   to the local agent specifically.

13   **Q.**  And maybe I misspoke.  Not handling the investigation, but

14   assisting in the collection of evidence and other information

15   for OIG to investigate or build a case?

16   **A.**  Of course, yes.  In that kind of assisting role, yes, the

17   local investigator could be involved.

18   **Q.**  And what happened with that task force email box?

19   **A.**  We kept the email box active for, I believe it was seven

20   to eight months after our visit to Dublin.  And we

21   discontinued it when it became apparent through the pattern of

22   emails that -- that there were not emergent issues, that there

23   was -- there was not widespread retaliation allegations, there

24   was not allegations of mistreatment, and most of the

25   complaints that we were receiving, as I mentioned, they were

1  First Step Act issues, they were points calculations issues,

2  and they were issues that needed to be handled through

3  communication with local staff.

4      And the email box at some point became a bit of an

5  impediment to good communication between the population and

6  the leadership at the local level.

7  **Q.**  Was the closing of the task force email box communicated

8  to the inmates?

9  **A.**  Yes.  To the best of my knowledge, it was.

10      **MS. MATTIOLI:**  I have no further questions.

11      **THE COURT:**  Cross.

12                  **CROSS-EXAMINATION**

13  **BY MR. NIMNI:**

14  **Q.**  Good morning, Ms. Reese.

15      **MR. NIMNI:**  Also I think you might have left your

16  phone up here.

17  **Q.**  Good morning, Ms. Reese.  My name is or Oren Nimni.  I

18  represent the plaintiffs.

19  **A.**  Good morning.

20  **Q.**  I'm just going to ask you a few questions.

21      Who is the OIA officer assigned to FCI Dublin?

22  **A.**  We have two special agents that are assigned to -- to FCI

23  Dublin.  Is that what you mean?

24  **Q.**  Sure.

25  **A.**  Okay.  Right now one of those positions is vacant and is

1    pending a report date from a newly selected agent.  And the

2    other one is Agent Joshua Brown.

3    **Q.**  Joshua Brown?

4    **A.**  Yes.

5    **Q.**  And how long has that first position been vacant?

6    **A.**  I believe -- I believe the previous agent departed in

7    November.

8    **Q.**  And who was that previous agent?

9    **A.**  His name was Carl Kuznecow.

10   **Q.**  And are those special agents on site at FCI Dublin?

11   **A.**  Yes, they are.

12   **Q.**  On -- at the facility?

13   **A.**  Yes.

14              **THE COURT:**  You said Carl...?

15              **THE WITNESS:**  Yes, Your Honor.  Carl Kuznecow.

16              **THE COURT:**  How do you spell that?  Your best guess.

17              **THE WITNESS:**  K-U-Z-N-E-C-O-W.

18   **BY MR. NIMNI:**

19   **Q.**  And how long has OIA had on-site special agents at FCI

20   Dublin?

21   **A.**  Those special agents were newly created positions after

22   the -- after the task force visit in March of 2022.  So at

23   that point, in March of 2022, we started the process of

24   creating the positions, posting them, filling them.

25   **Q.**  And is there -- who is the on-site OIA investigator at FCI

1    Dublin?

2    **A.**   I'm sorry.  I'm not sure what -- they are investigators.

3    **Q.**   They are the investigators?

4    **A.**   Yes.

5    **Q.**   Previously you testified that Lieutenant Putnam went from

6    being an SIS Agent to working for OIA.  And now -- and what is

7    his position title in the OIA framework?

8    **A.**   He's -- when I first met him in March of 2022, he was an

9    SIS Lieutenant.  So he worked for local leadership.

10       He was subsequently selected as a Special Investigative

11   Agent, an SIA.  I know it's confusing because they have a lot

12   of the same letters.  That was again a selection by local

13   leadership.

14       And then in August of this year -- of 2023, he was

15   reorganized into working for the Office of Internal Affairs.

16   **Q.**   And did his title remain the same?

17   **A.**   Yes.  His title remained SIA.

18   **Q.**   SIA.  And now SIAs at Dublin work for OIA?

19   **A.**   SIAs across the country now work for OIA.  That was not

20   previously the case.

21   **Q.**   And who is the current SIA at FCI Dublin?

22   **A.**   The position is vacant and posted.

23   **Q.**   And how long has that position been vacant?

24   **A.**   I believe that Putnam retired at the end of December.  So

25   four days.

1   Q.   How long were you aware of his plans to retire?

2   A.   I believe that his -- I knew that he planned to retire at

3   some point in this next year.  But I just became aware that he

4   was retiring in December, I believe in November.

5   Q.   In November.

6        And when did the agents that you were speaking about

7   previously, the special agents, when did they actively start

8   working at FCI Dublin?

9   A.   Joshua Brown reported, I believe, in March of 2023.  And

10  Carl Kuznecow was there before Agent Brown.  I couldn't say

11  with certainty when he started.  He was our first selection to

12  Dublin, but he relocated from across the country so I think it

13  took him some time to report.  But I couldn't tell you when.

14  Q.   When did the task force make the recommendation to appoint

15  special agents to individual BOP facilities?

16  A.   It actually wasn't a task force recommendation.  It was a

17  determination by the director of the agency at the time.

18  Q.   And when was that determination made?

19  A.   When we left Dublin.

20  Q.   In 2022?

21  A.   In -- in March of 2022, yes.

22  Q.   So you left Dublin in March of 2022, and then the Special

23  Agent was appointed in March of 2023?

24  A.   No.  We left Dublin in March of 2022.  The director

25  instructed me to create two new positions there.  We posted

1   those positions, filled them through federal selections.  The

2   second one reported in March of 2023.

3           **THE COURT:**  So it took a year to fill.

4           **THE WITNESS:**  It took -- it took a year to fill one

5   of the positions.  The first position, I believe he was

6   already in place, had been there for about six months.

7   September of 2022 I want to say is when he reported, but I

8   could be off.

9   **BY MR. NIMNI:**

10   **Q.**  And how long does it take on average for OIA to make a

11   determination whether to refer a case to OIG or keep it in

12   OIA?

13   **A.**  We -- so as I explained, we classify the -- the first step

14   of the process is to classify the case.  If the case is

15   classified -- if the allegation is classified as a 1 or a 2,

16   it goes to OIG without question.  There's not really a

17   determination.  Those all go to OIG.

18   **Q.**  Do any category 3 cases go to OIG?

19   **A.**  If there was a case that would normally be categorized as

20   a 3 that we believe that OIG should look at, then we'll just

21   categorize it as a 2.

22      There's a fair amount of flexibility.  These are not, you

23   know, strict rules about what goes in what category, and we'll

24   make it a 2 and send it up.

25   **Q.**  And how long on average -- I believe you were discussing

 1    with Ms. Mattioli that it can sometimes take quite a bit of

 2    time.  How long on average does OIG take to investigate these

 3    category 1, category 2 cases?

 4    **A.**  It really -- it can vary wildly.  Right.  There are some

 5    cases that move forward very, very quickly and they arrive at

 6    an indictment or an information within a couple of months.

 7    And there are some cases that can take years.

 8    **Q.**  During your tenure at OIA -- you started in 2018; that's

 9    correct?

10    **A.**  Yes.

11    **Q.**  During your tenure at OIA, did you -- how many category 1

12    cases did you refer -- did you receive out of FCI Dublin in

13    2019?

14    **A.**  I'm sorry.  I don't have that number in front of me.

15    **Q.**  Do you know approximately?

16    **A.**  No.

17    **Q.**  Do you know approximately in 2020?

18    **A.**  No.

19    **Q.**  2021?

20    **A.**  No.

21    **Q.**  2022?

22    **A.**  No.

23    **Q.**  2023?

24    **A.**  No.

25    **Q.**  Okay.

1          And the same for category 2, through those years?

2     **A.**   Yes.  No, I couldn't tell you off the top of my head.

3     **Q.**   Did you see a significant drop in category 1 cases out of

4     FCI Dublin at any point over the past five years?

5     **A.**   What I have seen in the past year is a significant drop in

6     contemporaneous allegations, allegations that speak to

7     activities that allegedly happened close in time to when the

8     allegation came to us.

9     **Q.**   You spoke with Ms. Mattioli about the task force coming in

10    2022.

11    **A.**   Yes.

12    **Q.**   And you spent a week at FCI Dublin talking to people.

13    What recommendations came out of that task force?

14    **A.**   There was a number of recommendations.  And the task force

15    visit led to a number of other undertakings to include the

16    women's institution tours and similar.  So I couldn't say

17    specifically what came out of the task force and what came out

18    of other initiatives.  There have been a number of changes.

19    **Q.**   Is there a document --

20         **THE WITNESS:**  Speaking of which document, I thought

21    this was raised yesterday.  Do you have that for me?

22         **MS. MATTIOLI:**  What she is referring to is a

23    different document.  We -- she has not seen the task force

24    written findings.  She wouldn't be able to lay a foundation

25    for it.

1          **THE COURT:**  Okay.  Which were we talking about

2     yesterday?

3          **MS. MATTIOLI:**  We were talking about the Moss Group,

4     the cultural assessment and Dublin's working plan to implement

5     those recommendations.

6          **THE COURT:**  Okay.  Do you have those for me?

7          **MS. MATTIOLI:**  We do.

8          **THE COURT:**  Okay.

9       All right.  So there were recommendations, and you wrote

10    those down?

11         **THE WITNESS:**  I believe that there was a task force

12    report generated based on the input of all of the members of

13    the task force.  But I did not review the report.

14         **THE COURT:**  Why not?

15         **THE WITNESS:**  Because once I provided my recommen- --

16    my -- my contributions, I would not be involved in

17    implementing the -- the recommendations.

18         **THE COURT:**  To whom did it go?

19         **THE WITNESS:**  I assume it went to the regional office

20    that oversees FCI Dublin and the institution.

21    **BY MR. NIMNI:**

22    **Q.**  How are you able to determine whether FCI Dublin has met

23    the goals of the -- the recommendations of the task force if

24    you haven't reviewed the --

25    **A.**  I was --

REESE - CROSS / NIMNI

1    **Q.**  -- plan?

2    **A.**  -- a participant on the task force, but it wasn't my role

3    to ensure that they followed up on the -- on the

4    recommendations of the task force.  I have a wholly separate

5    role in the agency.

6    **Q.**  Aren't some of the recommendations made by the task force

7    in regards to how reports come from FCI Dublin to OIA and how

8    OIA investigates misconduct at FCI Dublin?

9    **A.**  There was no -- there were no recommendations with regard

10   to how OIA investigates.  No, there were no changes.

11   **Q.**  So there were no changes recommended by the task force as

12   to how FCI Dublin reports to OIA?

13   **A.**  I'm sorry.  I don't know what you mean.

14   **Q.**  Did the task force make any recommendations for changes

15   that FCI Dublin should make in how they report misconduct to

16   OIA?

17   **A.**  Policy is quite clear that misconduct must be reported to

18   OIA.  So that wouldn't have been different.

19   **Q.**  Was that policy clear in 2019, 2020, and 2021?

20   **A.**  Yes.

21   **Q.**  But misconduct wasn't reported.

22   **A.**  It was.  That's why we have prosecutions now.

23   **Q.**  When did you become aware of the misconduct at FCI Dublin

24   that led to the prosecutions?

25   **A.**  The very first prosecution, I believe the first report

1    came to us in 2019.

2    **Q.**  Are you aware of allegations that Lieutenant Putnam

3    covered up allegations of sexual misconduct and did not report

4    or did not follow up on those allegations?

5    **A.**  I'm aware that there have been complaints that Lieutenant

6    Putnam was not -- was not following up on those allegations,

7    but that's not been my observation and experience.

8         **THE COURT:**  Really?  You didn't understand that his

9    backlog was in the hundreds?  How did you not know that?

10        **THE WITNESS:**  His backlog was not in the hundreds.

11   We oversee all of his cases.  So we knew how many -- how many

12   cases he had active, and it was not in the hundreds.

13        **THE COURT:**  What was it?

14        **THE WITNESS:**  I believe it reached 60 to 70.

15        **THE COURT:**  And you don't find that concerning?

16        **THE WITNESS:**  I -- yes, I do find it concerning.  But

17   those were not -- to be clear, those were not sexual

18   misconduct cases.  Those were generally, "I dropped my keys."

19   "I was inattentive and I didn't lock a door."  Those were not

20   sexual misconduct cases.

21        By and large, since at least 2021, all of the sexual

22   misconduct allegations that have been sent up through -- from

23   Dublin had been maintained by OIG.  So Lieutenant Putnam was

24   not directly working on -- was not directly assigned and

25   responsible for any of those cases.

1    BY MR. NIMNI:

2    Q.   But Lieutenant Putnam was responsible for reporting cases

3    of sexual assault to OIA; that's correct?

4    A.   Yes.  He is -- he is a participant in referring cases.

5    He's not solely responsible.  No one is solely responsible.

6    But certainly he participated in that process.

7    Q.   And OIA doesn't review cases that it doesn't get, of

8    course.

9    A.   Yes.

10   Q.   And so if Lieutenant Putnam had not been reporting cases

11   to OIA, OIA never would have reviewed them, correct?

12   A.   Yes, but we knew that he was reporting cases to OIA

13   because we were receiving them.

14   Q.   Well, you knew that he was reporting some cases, correct?

15            THE COURT:   Do you have evidence to suggest he wasn't

16   reporting something that he had on his docket?

17            MR. NIMNI:   We have testimony from our witnesses that

18   will go to that, Your Honor.

19            THE COURT:   Continue.

20   BY MR. NIMNI:

21   Q.   So you were aware of the complaints that Lieutenant Putnam

22   was not reporting or was not investigating some claims of

23   sexual misconduct; is that correct?

24   A.   I am currently aware that there are complaints that

25   Lieutenant was not reporting something.  I don't know what it

1  is that he wasn't reporting.  No one has identified that for

2  me.

3      In my observation and experience, he was sending in a

4  steady flow of referrals.  And he was actively supporting IG

5  in their investigation into many of these cases.

6  **Q.**  When did you become aware of those concerns?

7  **A.**  I believe the first allegation specific to Lieutenant --

8  the first suggestions that Lieutenant Putnam had participated

9  in other than a positive sense were brought forward by

10  advocacy organizations probably in the last six or nine

11  months.  I'm sorry, I -- I couldn't tell you.

12  **Q.**  As a member of the task force, do you get updates from FCI

13  Dublin to the task force about their progress after your

14  meeting there?

15  **A.**  No one reports updates to me specifically, no.

16  **Q.**  Does anyone report -- in your knowledge, does anyone

17  report -- anyone at FCI Dublin report updates after the task

18  force to anyone on the task force?

19  **A.**  I'm sure they do.  It's not -- it doesn't come to me.

20  **Q.**  Have you ever requested an update from FCI Dublin?

21  **A.**  No.

22  **Q.**  Have you ever conducted an audit of FCI Dublin's reporting

23  procedures?

24  **A.**  We have conducted, you know, in connection with our

25  expansion of staffing there, we have been very involved in

1   training the new staff that are placed there, ongoing training

2   of all of our investigators to ensure that they're -- that our

3   reporting procedures are clear and that we're getting -- that

4   we're receiving allegations as they arise.

5   **Q.** Now that the task force inbox is closed, where do -- if an

6   email were sent to that inbox, where would it get routed?

7   **A.** It's not available to be sent.

8        **THE COURT:** Are you saying that that's the automatic

9   response?

10        **THE WITNESS:** No, Your Honor.  I'm saying that

11   inmates only have access to certain email addresses to send

12   something.  So they would not have access to send anything to

13   that -- to that email box at all.

14   **BY MR. NIMNI:**

15   **Q.** And I believe with Ms. Mattioli you discussed that

16   freestanding retaliation claims are referred to OIA; is that

17   correct?

18   **A.** To the extent that they give rise to allegations of

19   misconduct, yes.

20   **Q.** And but that determination of whether they're -- they rise

21   to the level of misconduct is made at the facility level; is

22   that correct?

23   **A.** Or it could be made by my office.  It's -- I'm -- it

24   really depends on what we receive.

25   **Q.** Do you know approximately -- I believe you -- you

1  discussed with Ms. Mattioli that you hadn't recently received

2  any reports of freestanding retaliation; is that correct?  I

3  don't want to misstate your testimony.

4  **A.**  No, I didn't say that.

5  **Q.**  Have you received recent reports of freestanding

6  retaliation out of FCI Dublin?

7  **A.**  We have some small number of open cases into allegations

8  of retaliation, yes.

9  **Q.**  And how many would you say?

10  **A.**  Fewer than five.

11  **Q.**  And what types of retaliation?

12  **A.**  I couldn't say with certainty.

13  **Q.**  And how many of those similar cases did you have in 2022?

14  **A.**  I -- I really couldn't say.

15  **Q.**  And I believe you stated to Ms. Mattioli that if the

16  behavior complained about in a complaint of retaliation was

17  allowed by policy, that that would not rise to the level of

18  misconduct categorically; is that correct?

19  **A.**  Generally speaking, yes.  I mean it's -- it really depends

20  on -- an allegation can come in in a thousand different ways

21  and capture it and described in a thousand different ways.  So

22  we are tied to the information that we receive.

23      If what we receive is an allegation that something

24  happened that is consistent with policy, but the complainant

25  is alleging that what is consistent with policy was done for a

1    retaliatory reason, there's nothing for us to investigate

2    because what happened is consistent with policy.

3    **Q.**  But you would agree that things can happen that are

4    consistent with policy and be retaliatory, correct?

5    **A.**  I -- anything is possible.

6    **Q.**  For example, if it's policy to strip search someone after

7    a visitation but only some people are strip searched and some

8    people aren't, even though the strip search is consistent with

9    policy, that could still be retaliation, correct?

10   **A.**  Anything is possible, but I -- I don't know how we would

11   identify that this behavior that is consistent with policy and

12   in fact required by policy is -- is somehow improper.

13   **Q.**  So OIA would not investigate those cases?

14   **A.**  It's unlikely.

15          **THE COURT:**  Well, you've heard the term -- you're an

16   employment lawyer, right?

17          **THE WITNESS:**  Yes, Your Honor.

18          **THE COURT:**  So you know that policies can exist and

19   be enforced in an inconsistent way which could be retaliatory.

20          **THE WITNESS:**  Yes, Your Honor.

21          **THE COURT:**  And that's -- that's the point.

22          **THE WITNESS:**  Yes.

23          **THE COURT:**  And there are, in fact, documents that

24   could be looked at to determine whether or not a policy is

25   being enforced against some but not others.  And you chose not

```
 1        to investigate as an employment lawyer?

 2              THE WITNESS:  We've not received allegations that

 3        some are being searched and some are not.  What I was speaking

 4        to was would we open a case where the allegation was this

 5        is -- this thing that is consistent with policy, this search

 6        that is consistent with policy is happening for an improper

 7        reason.

 8              THE COURT:  You understand those are the allegations

 9        here?

10              THE WITNESS:  I understand that they're being raised

11        now.  We've not -- to the best of my knowledge, my office has

12        not received any such allegations.

13              THE COURT:  And these allegations were raised back in

14        August.  Have you done anything to look at it since August?

15              THE WITNESS:  I didn't receive anything in August.

16              THE COURT:  When did you learn -- the allegations in

17        this case were filed on the docket in August.  When did you

18        learn about them?

19              THE WITNESS:  During discussions with the attorneys

20        this week.

21              THE COURT:  So no one bothered to tell you that those

22        allegations had been raised back in August?

23              THE WITNESS:  I was unaware that these proceedings

24        were ongoing in August, Your Honor.  I oversee all of our

25        institutions across the country.
```

```
 1              THE COURT:  Proceed.

 2    BY MR. NIMNI:

 3    Q.  So you were not informed by any of your staff that there

 4    was a pending case against FCI Dublin concerning current

 5    conditions and retaliation?

 6    A.  I was aware that there was numerous ongoing cases out of

 7    FCI Dublin.  I -- don't involve myself in the -- in the

 8    details.

 9    Q.  Does OIA investigate any of the allegations made in cases

10    filed in courts?

11    A.  If new allegations of sexual misconduct come in in

12    connection with -- with any proceeding in which the BOP is

13    involved, it's referred to my office, yes.

14    Q.  Are you aware of anyone at OIA reviewing the declarations

15    of the plaintiffs and putative class members in this case?

16    A.  I -- we wouldn't -- what we review is in connection with

17    new claims.  So I don't know if that involves your

18    declarations or not.  We're not seeking out -- obviously we're

19    not seeking out declarations of anyone who's represented.

20    Q.  Do you or anyone in OIA review the trial testimony in the

21    criminal trials in -- concerning FCI Dublin to determine if

22    there are further investigations that OIA should undertake?

23    A.  The criminal trials -- I'm sorry.  Explain to me what you

24    mean.

25    Q.  So there are criminal trials ongoing concerning --
```

1    **A.**    Prosecutions of our staff?

2    **Q.**    Yes.

3    **A.**    Yes.

4    **Q.**    And does -- do you or anyone on your -- in OIA's staff

5    review the trial transcripts or attend the trial and to

6    determine whether there need to be additional investigations

7    into people or situations at FCI Dublin?

8    **A.**    Those prosecutions are based on investigations of the

9    Office of the Inspector General.  That is the investigation.

10    **Q.**    So you don't review anything to determine if there are new

11    investigations that need to be undertaken?

12        **THE COURT:**  Why would you even ask that question?

13    There was nothing in those trials that related to anything

14    that -- other than what related to the trial.

15        **MR. NIMNI:**  Understood, Your Honor.

16        **THE COURT:**  Move on.

17    BY MR. NIMNI:

18    **Q.**    Did you make any further recommendations for changes at

19    FCI Dublin after your visit in March of 2023?

20    **A.**    The practices within my office, because of our -- the

21    reorganization that I -- that I spoke about have continued to

22    evolve.

23        With regard to our investigative practices, our training

24    practices, we have not reached a point of stasis since --

25    since these allegations became -- became apparent to us.

REESE - CROSS / NIMNI

1   **Q.**  Are there any other -- other than what you've discussed

2   with Ms. Mattioli and myself, are there any other specific

3   measures that OIA has taken that are unique to FCI Dublin to

4   ensure accurate and timely reporting of misconduct?

5   **A.**  We wouldn't create procedures that would be specific to an

6   institution.  But we have done a great deal of training and

7   development on our ability to handle and support sexual

8   misconduct allegations.

9        We've engaged in extensive training on trauma-informed and

10  gender-responsive investigative techniques that are cutting

11  edge in the law enforcement community and I think give us much

12  more -- a much greater ability to -- to identify and bring

13  forward good and supported victim testimony in these sorts of

14  cases.

15       We wouldn't restrict that.  Obviously it's very useful at

16  FCI Dublin.  But we would not restrict that to FCI Dublin

17  because we want to uncover that behavior regardless of where

18  it occurs.

19  **Q.**  And those trainings are conducted for the two special

20  agents that -- at FCI Dublin for the two special agents that

21  are on site?

22  **A.**  They're created for all of our staff, so including those

23  two agents, yes.

24  **Q.**  And who else at FCI Dublin?

25  **A.**  The -- the SIA.

1   **Q.**  So those two agents and formerly Lieutenant Putnam, now no

2   one?

3   **A.**  Now it's a vacant position, yes.  But the person who's

4   selected for that position will be given the same training.

5   **Q.**  Okay.

6           **MR. NIMNI:**  Let me just confer with co-counsel for

7   one moment.

8                   (Pause in the proceedings.)

9           **MR. NIMNI:**  Thank you, Ms. Reese.  I appreciate your

10  time.

11          **THE WITNESS:**  Thank you.

12          **THE COURT:**  Redirect limited to cross.

13          **MS. MATTIOLI:**  I -- also, Your Honor, we have the

14  task force report for in camera.

15                  **REDIRECT EXAMINATION**

16  BY MS. MATTIOLI:

17  **Q.**  Is an SIA the only way that your office would become aware

18  of an allegation of criminal misconduct?

19  **A.**  Absolutely not.  As I mentioned earlier, we really don't

20  do any gatekeeping with regard to who we receive referrals

21  from.  So we receive referrals from line staff, other

22  supervisors.  Wardens obviously participate in the process.

23      But it's not inclusive to that office or to the SIA.  We

24  will receive information from inmates, inmate family members,

25  advocacy organizations, the press, Congress.  The list

 1   continues.

 2   Q.  So if an advocacy group received information in the course

 3   of providing support to an incarcerated person or a lawyer

 4   receiving information to draft a declaration, could those

 5   individuals refer that information to your office for a

 6   potential case to be opened?

 7   A.  Of course.

 8          MS. MATTIOLI:  Thank you.

 9          THE COURT:  Anything on that question?

10                      RECROSS-EXAMINATION

11   BY MR. NIMNI:

12   Q.  Just one question on redirect [sic].

13       You just spoke to Ms. Mattioli that there are a number of

14   ways that people can contact you other than through the SIA

15   and that inmates can also contact you.

16   A.  Yes.

17   Q.  How do they contact you now the email inbox is closed?

18   A.  We receive letters every single day.  Old school, postage

19   attached letters.  We also receive emails through the --

20   there's an OIG PREA email box that all of the population have

21   access to.  And once OIG has reviewed it, if they are

22   declining to -- to keep the matter, then it gets referred to

23   my office.

24   Q.  And are you aware at FCI Dublin if your office's address

25   or that information about contacting you is posted anywhere?

```
 1    Are you personally aware?
 2    A.   It's posted in multiple locations throughout the
 3    institution, yes.
 4              MR. NIMNI:  Thank you.
 5              THE WITNESS:  Thank you.
 6              THE COURT:  So if there are multiple means of getting
 7    information, why did the situation at Dublin -- why did all of
 8    that sexual misconduct leading to many criminal indictments go
 9    on for as long as it did?
10              THE WITNESS:  Your Honor, victims of sexual
11    misconduct, as you know, in the free world are often reticent
12    to come forward and report that they've been assaulted or --
13              THE COURT:  There were reports made by staff members
14    who were then transferred out of Dublin.  Why weren't their
15    reports taken seriously and investigated?
16              THE WITNESS:  They were taken seriously and
17    investigated.  If they came to my office, they were absolutely
18    taken seriously and investigated.  And I have no reason to
19    believe that Lieutenant Putnam was interfering with that
20    process.
21              THE COURT:  I'm not just talking about Putnam.
22              THE WITNESS:  I understand.
23              THE COURT:  There were officers at Dublin --
24              THE WITNESS:  Uh-huh.
25              THE COURT:  -- female officers who reported the
```

REESE - RECROSS / NIMNI

```
 1   misconduct --
 2              THE WITNESS:  Yes.
 3              THE COURT:  -- who were transferred out of Dublin
 4   and, at least in one case, demoted.
 5              THE WITNESS:  Well --
 6              MS. MATTIOLI:  Well, Your Honor --
 7              THE COURT:  Do you have any memory of that happening?
 8              THE WITNESS:  I don't have any awareness of anyone
 9   being transferred out against their will or being demoted.
10        I do know that after the -- the task force visit in March
11   of 2022, a decision was made that the environment at Dublin
12   was so far from anything that would normally be acceptable
13   within the agency, that a dramatic change in -- in leadership
14   and management needed to occur.
15        And the way that -- it was not a decision obviously that I
16   was involved in, but the decision was made that the best way
17   to accommodate that change was to move all of the supervisory
18   staff out of Dublin.
19        Because what we saw when we visited there was that the --
20   their Overton window of acceptable behavior had shifted so far
21   off of what should have been acceptable, not just with regard
22   to sexual misconduct.  This is just with regard to day-to-day
23   interactions with the population.  They just had really, on
24   the whole, without pointing fingers at any individual, on the
25   whole had lost sense of what was appropriate interactions,
```

1   what was professional, what was acceptable communication.

2       So the decision was made to move all management and not --

3   it was in no way targeted.

4           THE COURT:  So I don't know what your plans were, but

5   you are ordered to be here all day tomorrow with me.  And you

6   are going to listen, as I do, to all the complaints under oath

7   of these individuals.  And then you and I are going to have

8   another discussion.

9       Today you can step down, do what you need to do, but I'll

10  see you back here at 8:00 a.m. tomorrow.

11          THE WITNESS:  Thank you, Your Honor.

12          MS. MATTIOLI:  Thank you, Your Honor.

13  I'd like to call Stephen Putnam.

14          THE COURT:  Hold on.  Do I have Mr. Paulson here?

15          MS. MATTIOLI:  I don't believe so.

16          THE COURT:  Larry, can you see if Paulson is right

17  outside?

18          COURT SECURITY OFFICER:  There's no one, Your Honor.

19          THE COURT:  Okay.  Let's call in Putnam.

20                  (Pause in the proceedings.)

21          THE COURT:  Ah, they are here.  Come on forward,

22  Mr. Paulson, Ms. Priedeman.

23      Good morning.

24          MS. PRIEDEMAN:  Good morning, Your Honor.

25          MR. PAULSON:  Good morning, Your Honor.

1          **THE COURT:**  Happy New Year.

2          **MR. PAULSON:**  You too.

3          **THE COURT:**  So I was concerned, and I talked to the

4    lawyers this morning, because I have tomorrow, all day, I've

5    got a list of 15 inmates from Dublin who are testifying.

6          As I went through with the lawyers, eight of them have

7    provided declarations in support of the motions that are

8    pending in this civil action.

9          And as I reviewed again the declarations last night, many

10   of the declarations -- and I have got a very

11   back-of-the-envelope spreadsheet -- referenced sexual

12   assaults.

13         Most of them -- and I have 47 that were filed on the

14   docket.  Most of them related to past conduct.  And many of

15   the defendants who were referenced have been sentenced.  But

16   many people who are referenced I have not seen as defendants,

17   I've not sentenced them.  I don't know if there are ongoing

18   investigations or not.

19         And so I have asked that the plaintiffs' lawyers identify

20   for you which of those individuals who are testifying tomorrow

21   have provided declarations in this case so that you can look

22   at them.

23         As you know, you and I have gone back and forth about the

24   extent to which I take under consideration testimony by

25   individuals who may be credible or were credible with the FBI

1    but who I hadn't seen and who were not subject to

2    cross-examination by a defense lawyer in terms of considering

3    that evidence for purposes of sentencing.

4        I am trying to get ahead of that issue.  And so I would

5    like you to take a look at those declarations, determine

6    whether defense counsel for any individual needs to know about

7    it, whether someone needs to make a special appearance.  I

8    don't know.

9        But I certainly don't want people to have to go through

10   the trauma of testifying in federal court multiple times.  Or

11   if they go through it once, then not having the ability to

12   consider that information for purposes of maybe some future

13   sentencing because they weren't subject to cross-examination.

14       So I don't know the full picture, at least on the criminal

15   side, since there are investigations, but I'm not aware of

16   who's under investigation.  So I would like you to take a look

17   at those issues so that we don't find ourselves, you know,

18   behind the eight ball somewhere down in the future.

19       Okay?

20           **MR. PAULSON:**  Yes, Your Honor.

21           **THE COURT:**  Any questions?

22           **MR. PAULSON:**  How would you like us to inform the

23   Court sort of our resolution of this?

24           **THE COURT:**  You -- I'm here all day.  I'm here all

25   day tomorrow.  You can come and tell me.  Or you can send me

```
 1   an email, that's fine.  I can share it with the parties to the

 2   extent that it's shareable information.

 3          MR. PAULSON:  Yes, Your Honor.

 4          MS. PRIEDEMAN:  Thank you, Your Honor.

 5          THE COURT:  Okay.  Thank you.

 6      Ms. Mattioli, it may make sense just to go ahead and take

 7   our break now.

 8          MS. MATTIOLI:  Okay.

 9          THE COURT:  Because we only have eight minutes before

10   the break.  And then we'll start fresh with Lieutenant Putnam.

11      We'll stand in recess.  Thank you.

12          MS. MATTIOLI:  What time, Your Honor?

13          THE COURT:  Twenty-minute break.

14      (Recess taken at 9:33 A.M.; proceedings resumed at 9:54

15   A.M.)

16          THE COURT:  I believe with respect to this latest

17   submission for in camera review, we'll -- I think I'm at N, so

18   Exhibit N is what I will identify it as.

19      (Defendants' Exhibit O marked for identification)

20          THE COURT:  Okay.  Next witness.

21          MR. CHA-KIM:  I'm sorry.  For the record, could we

22   justify a encryption so far in a N is?

23          THE COURT:  It's what we were talking about before,

24   which was the Dublin task force report.

25          MR. CHA-KIM:  Okay.  Not the Moss -- Moss findings.
```

 1          **MS. MATTIOLI:**  It is not the Moss Group findings.

 2          **MR. CHA-KIM:**  And I apologize, Your Honor, but before

 3     we proceed, there's an issue we wanted to raise following

 4     conversations with the NDCal AUSAs who were here.  It relates

 5     to retaliation issues, some of which I raised with

 6     Ms. Mattioli last night.

 7          This may be something, given the Court's order on the zone

 8     of confidentiality, that may need to happen in camera, but I'm

 9     not exactly sure, so we could do that to err on the side of

10     caution, or I could proceed and Your Honor can stop me if you

11     think I should -- we should do so.

12          **THE COURT:**  Okay.  Well, let's go to sidebar for now.

13          And I'll -- we'll turn on the white noise, and I'll have

14     one from each side.

15               (Sidebar conference; not reported.)

16          **THE COURT:**  Okay.

17          **MS. MATTIOLI:**  The government would call Stephen

18     Putnam --

19          **THE CLERK:**  Please raise your right hand.

20

21                         **STEPHEN PUTNAM,**

22     called as a witness for the defendants, having been duly

23     sworn, testified as follows:

24          **THE WITNESS:**  Yes, I do.

25          **THE CLERK:**  Please be seated.

1           Please speak clearly into the microphone.  State your full

2     name and spell your last name for the record.

3           **THE WITNESS:**  Stephen Chandler Putnam, P-U-T-N-A-M.

4           **THE COURT:**  And, Mr. Putnam, let's make sure that we

5     get the spelling of your first name correct, which Stephen can

6     be spelled many different ways.

7           **THE WITNESS:**  Yes.

8           **THE COURT:**  If you'll state the correct spelling.

9           **THE WITNESS:**  Okay.  Stephen, S-T-E-P-H-E-N.

10          **THE COURT:**  Okay.  Thank you.  Good morning.

11          **THE WITNESS:**  Yes, ma'am.

12                         **DIRECT EXAMINATION**

13    **BY MS. MATTIOLI:**

14    **Q.**  Thank you, Stephen.  Before we begin, I want to thank you

15    for being here today.

16          I understand that you are now retired from the Bureau of

17    Prisons; is that correct?

18    **A.**  Yes.

19    **Q.**  How long have you been retired?

20    **A.**  Since Friday.

21    **Q.**  So your last day in the office was December 29th of 2023?

22    **A.**  Yes.

23    **Q.**  And how long had you been with the Bureau of Prisons prior

24    to your retirement?

25    **A.**  Twenty-two years.

PUTNAM - DIRECT / MATTIOLI

1    **Q.** I also understand that you had prearranged travel for this

2    week that you rearranged to be here today.

3    **A.** Yes.

4    **Q.** And we appreciate that.

5        Can you please tell the Court about your background prior

6    to coming to work at Dublin.

7    **A.** Prior to coming to work at Dublin, spent 14 years at

8    U.S. Penitentiary in Atwater, California.  And prior to that,

9    I was with the State of North Carolina Department of

10   Corrections for 14-1/2 years.

11   **Q.** What year did you start working at Dublin?

12   **A.** January 13th, 2000 -- January 25th, 2016.

13   **Q.** And what was your position title when you started?

14   **A.** Lieutenant.

15   **Q.** Because I think it would be helpful for the Court, can

16   you -- do lieutenants work in correctional services?

17   **A.** Yes.

18   **Q.** So would it be fair to say that your title, your full

19   title then, would be Correctional Services Special

20   Investigative Specialist Lieutenant, an SIS Lieutenant?

21   **A.** My position was as a Lieutenant, and my assignment was in

22   SIS.

23   **Q.** So you were --

24                      (Simultaneous colloquy.)

25            **THE WITNESS:** -- Lieutenant.

PUTNAM - DIRECT / MATTIOLI

1   BY MS. MATTIOLI:

2   Q.  Okay.  Thank you.

3       So can you tell me what an SIS does?

4   A.  We're responsible -- SIS is responsible for a -- all

5   inmate investigations for inmate-on-inmate incidents.  And

6   institutions like Dublin where there was not an SIA at the

7   time, SIS Lieutenant is the one who does the referrals for all

8   staff misconduct investigations, and then conducts the

9   investigations on any investigations that are deferred back to

10  the local level for investigation.

11  Q.  So at the time that you were an SIS, you were responsible

12  for both inmate and staff investigations; is that correct?

13  A.  Yes.

14  Q.  And is it your understanding that that is no longer the

15  case with SIS Agents?

16  A.  That is correct.

17  Q.  Or Lieutenants.  Excuse me.

18  A.  That is correct.

19  Q.  So what do SIS Lieutenants do now?

20  A.  The SIS Lieutenant still falls under the correctional

21  services of -- which the captain is responsible for.  And the

22  SIS Lieutenant that is assigned to SIS, he will supervise the

23  SIS technicians.

24      And they are responsible for interviewing incoming

25  inmates, putting inmates on posted picture file if they meet

PUTNAM - DIRECT / MATTIOLI

1    the requirements.  And assigning -- assigning any STGs,

2    security threat group assignments that they may need to have

3    assigned.

4        And also doing the investigations, interviewing any

5    inmates who have been involved in any kind of incidents.

6    **Q.**  And who did you report to?

7    **A.**  During when I was SIS Lieutenant, I reported to the

8    Captain and then AW and the Warden.

9    **Q.**  So you reported directly to the leadership at Dublin?

10   **A.**  Yes.

11   **Q.**  And when did that structure change?

12   **A.**  That changed in August of 2023 when the Special

13   Investigative Agents were all transferred to the central

14   office to be under the Office of Internal Affairs.

15   **Q.**  And did you -- did your position change in August of 2023?

16   **A.**  Yes.

17   **Q.**  And how did it change?

18   **A.**  It went from being assigned to the institution to being

19   assigned to the central office.

20   **Q.**  So you reported directly to OIA?

21   **A.**  Yes.

22   **Q.**  I want to talk briefly about the staff sexual misconduct

23   at Dublin occurring between 2019 and 2022.

24   **A.**  Okay.

25   **Q.**  Did you know that staff sexual misconduct was occurring

PUTNAM - DIRECT / MATTIOLI

1    when it was occurring?

2    **A.**   No, I did not.

3    **Q.**   And how is it that you were in charge of investigating

4    staff misconduct during that time and you did not know?

5    **A.**   The same -- the same applies to the sexual misconduct as

6    would apply to, we'll say narcotics introductions.  Inmates

7    are not going to tell me everything all the time.  I can ask.

8    I can inquire of inmates and ask them to, you know, if there's

9    something going on that I need to know about, and they

10   sometimes have told me, sometimes they have not.

11        Anytime that I have become aware of any sexual misconduct,

12   it has been reported immediately.

13   **Q.**   What procedures did SIS have at the time as far as what to

14   do when you received a PREA allegation?

15   **A.**   You safe -- the first thing you do is safeguard the

16   inmate.

17   **Q.**   And how do you do that?

18   **A.**   That is dependent on the circumstances that you're faced

19   with the situation.  If the alleged perp -- let's say if it's

20   an inmate-on-inmate, for example, and an inmate comes up and

21   makes allegations towards another inmate that they were housed

22   with, then you have an alleged vic, you have an alleged perp.

23        You will immediately have medical assessments, psychology

24   assessments.  SIS will conduct their interviews.  And in most

25   cases, the perpetrator will be placed in Special Housing.  The

PUTNAM - DIRECT / MATTIOLI

1   alleged vic will stay in their assigned unit.

2        If it's staff-and-inmate related, if the -- I've had

3   different situations like that.  I'm going to use one whereby

4   inmate came to me with the allegation, also had in her

5   possession DNA evidence.

6   **Q.**  How did she have DNA in her position?

7   **A.**  She had it in a envelope.

8   **Q.**  And did she give it to you?

9   **A.**  And she stated -- once she explained the allegations

10  against the staff member, she pulled it out of her pocket and

11  handed it to me and said this is DNA.  And I told her hold on.

12  So we immediately carried her to the SART center for exam.

13  **Q.**  What is the SART center?

14  **A.**  Sexual abuse treatment center.

15  **Q.**  And where is that?

16  **A.**  Highland Hospital in Oakland.

17  **Q.**  So you had her transported to Oakland for the exam?

18  **A.**  I went on -- I went on that trip myself with my SIS tech.

19  **Q.**  And what did you do with the evidence she produced?

20  **A.**  Some was sent back to be kept refrigerated.  The rest was

21  sent to FBI and OIG.

22  **Q.**  And so we got off track a little bit.  We were talking

23  about the PREA procedure.  The first step is to safeguard the

24  inmate.

25  **A.**  Yes.

1    **Q.**  Would that involve a housing reassignment if it was

2    inmate-on-inmate?

3    **A.**  If it's inmate-on-inmate, the alleged perp would be

4    reassigned.  The alleged vic would not be reassigned.

5    **Q.**  And how do you safeguard an inmate if it's

6    staff-on-inmate?

7    **A.**  If the staff member is still working and inside the

8    facility, if it's -- whether it's correctional officer or

9    another department, we would look at the allegations.  And if

10   it is something especially of sexual contact, physical sexual

11   contact, the staff member would be placed on admin leave.  The

12   inmate's job assignment or housing assignment would not

13   change.

14   **Q.**  And once the staff member is placed on admin leave, then

15   what would you do with the report?  Where does it go?

16   **A.**  The referrals -- all referrals for staff misconduct, I

17   prepare them.  The Warden will sign them.  And then I will

18   send them to Office of Internal Affairs and to OIG.

19   **Q.**  Can you send referrals -- or could you as an SIS send

20   referrals without the Warden's signature?

21   **A.**  Yes.

22   **Q.**  So you said that you were not aware that the staff sexual

23   abuse was occurring when it was occurring?

24   **A.**  No.  I was not.  I -- I had no idea what was going on.

25   **Q.**  Did you have a feeling something was going on?

1    **A.**  I felt like something weren't right just because of little

2    things that I would see or little things that I would hear,

3    but not enough to be able to act upon anything.

4        That is -- that is what resulted in me calling the inmates

5    up and asking and inquiring as to what -- you know, if there

6    was anything that I needed to know about, if they needed to

7    report anything.

8    **Q.**  And were you making referrals to OIA at the time of

9    anything that you felt you should have?

10   **A.**  Yes.  I constantly -- anytime -- even -- even prior to

11   2019, there were situations where I would communicate with OIA

12   and OIG in reference to staff allegations.  So, yes, anytime I

13   found out about any kind of sexual abuse allegations, I

14   reported it.

15           **THE COURT:**  To whom?

16           **THE WITNESS:**  To OIA and OIG.

17           **THE COURT:**  So you bypassed the chain of command.

18           **THE WITNESS:**  No.  The Warden would sign it.  I -- I

19   have all the referrals I've ever submitted, the Warden was --

20   would sign them.  I would prepare the referral and attach the

21   other documentation with it.  And once the Warden signed it, I

22   would send it to OIA and OIG.

23           **THE COURT:**  Proceed.

24   **BY MS. MATTIOLI:**

25   **Q.**  I think the question probably is what if you, in the

1    course of investigating staff misconduct, learned that the

2    Warden himself was engaging in inappropriate conduct?  You --

3    would you have him sign that referral?

4    **A.**   No.  And that actually occurred with a previous Warden,

5    and that was reported by means other than him.

6    **Q.**   So did you suspect at any time prior to Mr. Garcia's

7    indictment that he was engaged in the activity?

8    **A.**   No, I did not.

9    **Q.**   Were you friends with Garcia?

10   **A.**   Not what I would call friends.  Garcia was the same as a

11   lot of other people.  I've worked with a lot of people since

12   I've been with the Bureau.  A lot of the people I've known for

13   20 years.

14       Friends, according to what -- what I consider friends, is

15   somebody that you also hang out with after work.  They know

16   your personal life.  You know some of their personal life and

17   those kind of things.

18       Garcia never went to my house.  I never went to his house.

19   So, no, we were not close friends.  And that is the same with

20   all but maybe two Bureau staff.  I've never associated with

21   staff outside of work.  I've never done that, with the

22   exception of maybe a couple people.

23   **Q.**   Could that potentially place you in a tricky situation as

24   the person responsible for investing [sic] staff misconduct if

25   you became friends with a staff member?

PUTNAM - DIRECT / MATTIOLI

1  **A.**   Yes.  I learned when I was working with the State of

2  North Carolina as a lieutenant and I was doing staff

3  investigations as well, and I learned very early when staff --

4  when allegations get reported against staff, you see a whole

5  different side to these people.

6      So I have chosen not to be associated real heavily with

7  people outside of work.

8  **Q.**   There have been allegations made in this case that you had

9  possibly an inappropriate friendly relationship with the

10  Warden -- well, the former Warden, now inmate Garcia.  Would

11  those allegations be accurate?

12  **A.**   No.  We were cordial work relationship only.  I mean, and

13  that's the same as I am with every staff member.  I -- I try

14  to be approachable.  My communications with staff and inmates

15  is professional.  And I'm there to do a job.

16  **Q.**   Were you ever questioned by a law enforcement agency about

17  your relationship with the former Warden?

18  **A.**   Yes.

19  **Q.**   And by who?

20  **A.**   OIG and FBI.

21  **Q.**   Did you voluntarily sit for those interviews?

22  **A.**   Yes.

23  **Q.**   Has anyone, during the course -- or had anyone, during the

24  course of those interviews, suggest they were investigating

25  you for withholding information --

PUTNAM - DIRECT / MATTIOLI

1    **A.**   No.

2    **Q.**   -- related to the sexual misconduct?

3    **A.**   No.  I've -- I'm not withholding and have never been

4    suspected of withholding information.

5    **Q.**   Putnam, would it be appropriate for you to share

6    information about an ongoing investigation with the alleged

7    victim?

8    **A.**   No.

9    **Q.**   Why?

10   **A.**   Once the -- once the allegations have been referred and I

11   know it's a ongoing investigation, I'm out of it.  I'm not

12   going to jeopardize the integrity of the investigation.  I'm

13   not going to do anything that will potentially interfere with

14   the investigation.

15   **Q.**   Could you understand an inmate's concern if -- if the way

16   that OIG became aware of facts that they were investigating

17   was through an inmate who came to you and reported "Something

18   happened to me," and then you referred it, and they came to

19   you and said, "Hey, what's the update?" and you said, "I'm

20   not -- I can't talk to you about that"?  Do you understand how

21   they could be concerned?

22   **A.**   Yes.  And in those cases, I would say somebody will be

23   talking to you, that that is being handled by another agency.

24   It's -- I'm not going to be handling it.

25   **Q.**   And did you assist in collecting the evidence or some

1    evidence to build the cases against all the former Dublin

2    staff members who have been criminally prosecuted?

3    **A.**    Yes, ma'am.  And a lot of them I have had inmates report

4    to me which resulted in the referrals being initiated on those

5    staff.

6    **Q.**    Did you attempt at any point to elevate a particular

7    referral or bring to the attention of OIG outside of the

8    normal process?

9              **THE COURT:**  I don't understand that question.

10   **BY MS. MATTIOLI:**

11   **Q.**    Did -- so the process of submitting a referral, I

12   understand -- is that electronic?

13   **A.**    Yes.  I -- I would -- once I completed a referral, I

14   would -- and the Warden would sign it, I would sign it, and

15   then I would attach the supporting documentation and scan it

16   in and send the referral along with the supporting

17   documentation to OIA and to OIG.

18   **Q.**    So my question is did you ever reach out in a way other

19   than that to say, hey, you should take a look at this, I think

20   something's going on?

21   **A.**    Yes.  If there was some extenuating circumstances that

22   needed to be communicated in reference to any of the cases at

23   any given time during the course of that investigation, I

24   would let OIA and OIG know.

25   **Q.**    And who at OIG would you let know?

PUTNAM - DIRECT / MATTIOLI

1   **A.**   That was the investigating officer who was handling the

2   case.  Man, that's been several agents and FBI agents as well.

3   **Q.**   Would you reach out to those individuals directly?

4   **A.**   Yes.

5   **Q.**   Did you testify on behalf of the government at the former

6   warden's trial?

7   **A.**   Yes.

8   **Q.**   There's an allegation in this case that you entered an

9   inmate's cell while she was wearing a SHU smock.  Are you

10  familiar with that allegation?

11  **A.**   Yes.  I read that.

12  **Q.**   And the allegation is that the inmate dropped the smock so

13  that she was naked and came up to you and said, "Hug me,

14  daddy," and then you hugged her.  Do you remember reading

15  that?

16  **A.**   Yes.

17  **Q.**   Did that incident occur?

18  **A.**   No, it did not.

19  **Q.**   Have you ever touched an inmate inappropriately?

20  **A.**   No, I have not.

21  **Q.**   And I understand these topics are sensitive, and I

22  apologize for probing.

23       What has it been like for you to read these allegations

24  being raised against you in public court filings?

25  **A.**   For me, after having processed and talked to as many

 1  inmates as I have and trying to elicit the information from

 2  them to address possible sexual abuse that has been going on,

 3  knowing what I've done personally to try to address the staff

 4  misconduct as a whole, it is rather alarming to read

 5  allegations of that nature.  And I also referred that to OIG

 6  and OIA as well.

 7          **THE COURT:**  What did you refer?

 8          **THE WITNESS:**  The allegations she just mentioned.

 9          **THE COURT:**  So when you -- when did you read those?

10          **THE WITNESS:**  Two to three weeks ago, Your Honor.

11          **THE COURT:**  Okay.  So you read them a couple weeks

12  ago and then you sent those to...?

13          **THE WITNESS:**  OIA and OIG.

14          **THE COURT:**  Okay.

15  **BY MS. MATTIOLI:**

16  **Q.**  And when you said you read them, what did you read?

17  **A.**  I was reading the declarations as a whole.  The primary

18  purpose at the time was to identify the inmates who were

19  involved and mentioned, and that's what my part was in

20  identifying.  And I also provided information as to who those

21  particular inmates actually reported the initial allegations

22  to as well.

23  **Q.**  So you took the -- the declarations and sent them to OIA

24  and OIG?  Or passed them along, forwarded them in some way?

25  **A.**  Yes.

1    **THE COURT:**  Well, how?  How did you do that?

2    **THE WITNESS:**  It was electronic, I believe, through

3    the -- through email.  I know -- I know for a fact that it was

4    email of the declaration specific to the allegations on

5    myself.

6    **BY MS. MATTIOLI:**

7    **Q.**  What did you do at Dublin to help ensure that an inmate

8    would feel safe from any potential retaliation for reporting

9    sexual abuse to you?

10   **A.**  Anytime and -- and I recall one specific incident where it

11   was inmate-on-inmate allegations that had been substantiated.

12   And once the STG assignment had been updated and the alleged

13   perp got word out to one of her friends, her -- one of her

14   friends actually retaliated against the reporting inmate and

15   assaulted her.

16   And we addressed that issue.  She received an incident

17   report for her retaliation and was -- that went through the

18   inmate disciplinary process.

19   So anytime there's been retaliation like that with on the

20   inmate's side of the house, it's been addressed.  And I've

21   also submitted several referrals for retaliation concerns on

22   staff.

23   **Q.**  I'd like to show you one exhibit.

24   **MS. MATTIOLI:**  If we could pull up 207.

25   (Exhibit published.)

PUTNAM - DIRECT / MATTIOLI

1   **BY MS. MATTIOLI:**

2   **Q.**  Can you read that?

3   **A.**  Yes.

4   **Q.**  Have you seen this document before?

5   **A.**  Yes.

6   **Q.**  What is this?

7   **A.**  This is a protection against retaliation form and policy.

8   The Prison Rape Elimination Act policy requires that

9   retaliation monitoring be done at 90-day mark to address any

10  concerns.

11      As far as my use of this document and following up with

12  inmates, throughout the entire time frame since all this

13  sexual abuse has -- has come out, I had been seeing the

14  alleged vics around every 60 days and definitely within the

15  90-day time frame.  And that's across the board, whether --

16  whether they were -- whether they're alleged perps were at

17  Dublin or the alleged perps were at another institution, I

18  would also -- I would see them.

19          **MS. MATTIOLI:**  I'd move for the admission of 207.

20          **THE COURT:**  Granted.  It's admitted.

21      (Defendants' Exhibit 207 received in evidence.)

22  **BY MS. MATTIOLI:**

23  **Q.**  So the form and the policy looks like it requires the

24  monitoring to occur every 90 days.  You said you did it

25  60 days but --

1    **A.**  I tried to -- I tried to go over and above what was

2    required by policy for the simple fact of the -- all the

3    problems that had been going on at Dublin.

4            **THE COURT:**  And is there a log that --

5            **THE WITNESS:**  Yes.  Each --

6                    (Simultaneous colloquy.)

7            **THE COURT:**  -- confirms that?

8            **THE WITNESS:**  Each inmate who has filed sexual abuse

9    allegations, it is in their folder that I created upon the

10   allegations being submitted.

11      Also have their sexual abuse intervention medical

12   assessment, quarters assignment, and other information

13   specific to that inmate's allegations.  And the retaliation

14   monitoring that has been done chronologically throughout the

15   time until they either released or the case was deemed closed.

16           **THE COURT:**  So you have an electronic folder with --

17   with all of the pending -- all of the pending -- is there a

18   number for this form?  Or do you call this form a particular

19   thing?

20           **THE WITNESS:**  It's a retaliation monitoring form.

21   And that is the one that is taken from the program statement

22   that is provided by the Bureau.  I did change it to a PDF that

23   I could enter -- you know, type the information on it.  And as

24   I'm interviewing the inmate, I can complete the form and

25   maintain it electronically in the folder that is set up for

1    each of these inmates.

2          **THE COURT:**  Did you have a log or some way of

3    managing all of the pending forms, all of the pending

4    complaints?

5          **THE WITNESS:**  Yes.  Multiple -- multiple ways of

6    tracking.  There's a PREA tracking log.  There's also the

7    staff case log.  And I maintained the -- I maintained very

8    good records as to when the initial allegation was reported.

9       And then down the road as -- as time progressed, if there

10   was an emergency administrative remedy, a tort claim or

11   whatever, I would also add that information to that particular

12   inmate's folder so that all that information is -- is

13   maintained and accessible as quickly as possible.

14   **BY MS. MATTIOLI:**

15   **Q.**  Could an inmate have ever reported something directly to

16   SIS or SIA in a confidential way at Dublin?

17   **A.**  Yes.

18          **MR. GALVAN:**  Calls for speculation.

19   **BY MS. MATTIOLI:**

20   **Q.**  Do you have knowledge of the ways that inmates can

21   confidentially report directly to SIS or SIA at Dublin?

22   **A.**  Yes.

23   **Q.**  What are those ways?

24   **A.**  They -- when I was there, they could report straight to me

25   if I was standing main line or whatever.  They also had the

1    Crime Stoppers telephone number that they could call.  That

2    number is posted in all the housing units.  It goes directly

3    to SIS.

4        And I had -- I would explain to the inmates, you can call

5    this number.  You don't have to add it to your phone list.  It

6    does not take your minutes.  And it will not show up on your

7    numbers dialed.  Because those things are important to the

8    inmates.  Because also heard complaints that other inmates

9    would be watching them and listening to who they're calling.

10       So what I would tell the inmates, if they use the

11   telephone line, they don't even have to say anything, dial the

12   number, let the answering machine pick up.  That's also in the

13   TRUFONES recorded phone logs.  They could call a number, just

14   let the answering machine pick up a couple seconds, they don't

15   have to say anything and hang up.  I would know they called.

16   And I would get -- make arrangements to talk to them.

17       The inmate to SIS email system goes straight to SIS.  The

18   only staff who have access to that email system is SIS staff

19   only.  They could use that to report.

20       And again, when they -- you know, because of the concern

21   that had been expressed of inmates -- other inmates watching

22   them do their emails, fine, you don't have to -- you don't

23   have to be descriptive in your email, you don't have to sit

24   there and type everything you want to type.  You just put

25   Putnam or Lieutenant Baudizzon or whichever SIS staff member

1    you had been dealing with on your -- whatever your concern is,

2    and we'll know you want to talk to us.  And we will call you

3    up.

4        So those are the two ways that they could, you know, call

5    SIS.

6    **Q.**  How would you know that a particular inmate made a call

7    from an SIS phone?  If they didn't say anything, how would you

8    know which inmate to pull?

9    **A.**  It would show up on the TRUFONE, the call logs for the

10   what we -- the Crime Stoppers number.  If they call it, their

11   information, their register number, name, the time of the call

12   all would show up.

13   **Q.**  And you could access that information?

14   **A.**  Yes.

15   **Q.**  And then call that inmate into your office and say

16   something to them?

17   **A.**  Yes.

18   **Q.**  Okay.

19       Have you ever done that?

20   **A.**  Yes.

21   **Q.**  And do the inmates -- how do they receive that information

22   from you?  Do they appreciate --

23   **A.**  Yes.

24           **MR. GALVAN:**  Objection.  No personal knowledge of

25   inmates' feelings.

```
 1              THE COURT:  Well, he can testify as to what he
 2    observed.  But not generally.
 3    BY MS. MATTIOLI:
 4    Q.  In the specific situation you're thinking of, did the
 5    inmate express appreciation for the ability to communicate
 6    that without the risk of others seeing the information?
 7    A.  Yes, they did.
 8    Q.  Have you ever retaliated against an inmate?
 9    A.  No.
10    Q.  Have you ever placed an inmate in SHU because they made a
11    PREA allegation, as a form of retaliation or punishment?
12    A.  No, I have not.
13              MR. GALVAN:  Objection, compound and vague.
14              THE COURT:  I didn't hear what the objection was.
15              MR. GALVAN:  The objection was compound and vague,
16    Your Honor.
17              THE COURT:  Overruled.
18    BY MS. MATTIOLI:
19    Q.  Have you ever placed a PREA victim in SHU for protection?
20    A.  Throughout my entire time at Dublin, other than
21    inmate-alleged perps, I think the number of inmates who were
22    placed in Special Housing as a result of the PREA -- a PREA
23    allegation, which there was not enough -- not quite enough to
24    do anything with the staff member, I think that number is less
25    than -- less than five.  Since 2016.
```

1    **Q.**  So in that situation, what would be the purpose of placing

2    the inmate in Special Housing?

3    **A.**  Two that I'm going to specifically reference are --

4    **Q.**  And if I could, we -- initials only if you're going to

5    refer to anybody by name.

6    **A.**  Okay.  I won't even --

7    **Q.**  Okay.

8    **A.**  I won't even do that.

9    **Q.**  Okay.

10   **A.**  Two specific inmates, we had started experiencing some

11   assaults and some people trying to get out of their job

12   assignments and things like that.  And some of the information

13   I was getting was that a couple inmates were serving as

14   lookouts and/or enforcers and/or involved with a staff member.

15        So in gathering the information and speaking to the

16   inmates in question, they denied any kind of sexual abuse

17   going on.  So I did put them in SHU.  I did look through their

18   property.  I also started talking to other inmates on the yard

19   and on certain job assignments, trying to gather more

20   information.

21        The inmates that I placed in Special Housing were not

22   victims.  They were denying everything.  However, I did the

23   safeguarding-the-inmate forms, I had them screened by

24   psychology and medical.  And that is well-documented.  And

25   that is also on the safeguarding-the-inmate form which is

PUTNAM - DIRECT / MATTIOLI

1   completed on every inmate when they file sexual abuse

2   allegations.

3        So all of that is -- is well-documented.

4        And, yes, they did go to Special Housing.  And in some of

5   the mail that we read going out, it confirmed that there was

6   some -- something going on on their job assignment.

7        So I then requested that those two inmates be transferred.

8   And as soon as they got to their next institution, they both

9   filed PREA allegations on staff.

10       So I did -- I did take action on things that I -- that

11  came to my attention.  And if they were placed in SHU, it is

12  well-documented.

13       I have never retaliated against an inmate for filing

14  sexual abuse allegations.  Because before they're inmates,

15  they're somebody's mother, sister, child, they're human beings

16  just like we are.

17  **Q.**  Have you ever encouraged an inmate not to report sexual

18  abuse?

19  **A.**  No, I have not.

20  **Q.**  Have you ever encouraged an inmate not to talk to their

21  lawyers about sexual abuse?

22  **A.**  No, I have not.

23  **Q.**  Have you ever instructed them not to talk to other inmates

24  about sexual abuse?

25  **A.**  Yes, I have.

PUTNAM - DIRECT / MATTIOLI

1    Q.  And why is that?

2    A.  For their own -- for their own safety and for the

3    integrity of the investigation.

4        Even in any interview, that is one of the standard things

5    I tell inmates.  What we discuss is nobody else's business.

6    No other inmates need to know.  They don't have a need to

7    know, nor does any other staff.

8        Inmates -- some of the inmates don't know how to manage

9    information.  Same as likewise for staff.  Some of the staff

10   don't know how to manage information.

11       Whenever I told the inmates do not discuss this with

12   anybody outside me or another agency, that is the reasons why.

13   And I would also give them the option, if they don't want to

14   talk to me, they don't have to.  If they want to talk to

15   somebody and wanted to report something, they can just tell me

16   they want to report something and don't want to tell me, and

17   I'll put them in touch with somebody.

18   Q.  Who would you put them in touch with?

19   A.  OIG, OIA.

20   Q.  For them to interview --

21   A.  Yes.

22   Q.  -- the inmate directly?

23   A.  Yes.

24   Q.  And the last question I have for you is have you ever

25   covered for -- in your career or protected a staff member who

1    you knew was committing misconduct?

2    **A.**  No, ma'am.

3          **MS. MATTIOLI:**  Thank you.

4          **THE COURT:**  Cross.

5                     **CROSS-EXAMINATION**

6    BY MR. GALVAN:

7    **Q.**  Good morning, Lieutenant Putnam.  I'm Ernie Galvan, Ernest

8    Galvan.  I'm representing the plaintiffs.

9    **A.**  All right.  Nice to meet you, sir.

10   **Q.**  I'm going to ask you some questions focusing on a time

11   frame, August 2023 until now.

12       It's correct you were -- you were promoted and received a

13   new assignment in August 2023; is that right?

14   **A.**  No.  My position converted from a BOP position assigned to

15   FCI Dublin to a central office position that is assigned to

16   central office and Office of Internal Affairs.

17   **Q.**  And so your -- you had no reporting relationship within

18   Dublin after that moment; is that correct?

19   **A.**  As far as my chain of command, my chain of command was

20   through the regional SIA and to OIA, Office of Internal

21   Affairs in DC.

22   **Q.**  And who performed your performance review during that

23   period?

24   **A.**  Since August of this year?

25   **Q.**  Yes, sir.

PUTNAM - CROSS / GALVAN

1    **A.**   That would have been Tom Miller.  He was in the regional

2    office.  But I've -- since August, I didn't -- I didn't get a

3    complete yearly eval.

4    **Q.**   Who is the ombudsman at Dublin?

5        **THE COURT:**  What's the time frame?

6    **BY MR. GALVAN:**

7    **Q.**   As of Friday when -- your last day at work.

8        **MS. MATTIOLI:**  Your Honor, I'm going to object to the

9    assumption in the question that there is an ombudsman at

10   Dublin.

11       **THE COURT:**  Is there one?

12       **MS. MATTIOLI:**  I don't think he understands the

13   question.

14       **THE COURT:**  Is there an ombudsman?

15       **THE WITNESS:**  Is there another title that it may be?

16   **BY MR. GALVAN:**

17   **Q.**   The only title that I'm asking about is ombudsman.  Is

18   there an ombudsman now at Dublin, or on Friday when you left?

19       **THE WITNESS:**  I do -- I do not know.

20       **THE COURT:**  You're not aware of someone with that

21   title?

22       **THE WITNESS:**  No, ma'am.

23   **BY MR. GALVAN:**

24   **Q.**   When I refer to Dublin, can we agree that I'm referring to

25   the prison and the camp together?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

PUTNAM - CROSS / GALVAN

1    **A.**    Yes.  Yes.

2    **Q.**    Thank you.

3         As of Friday, on your last day, who was your team?  Who

4    was the team in SIS?  Can you tell me their positions and

5    their names?

6    **A.**    In -- in my office, I'm -- I was the sole SIA at FCI

7    Dublin once my position converted to Office of Internal

8    Affairs.  In SIS, that's assigned to the institution.

9    **Q.**    If I could stop you for a moment.  Just focusing for a

10   moment on SIA in your -- your position, who reported to you as

11   SIA?

12   **A.**    Nobody reported to me.

13   **Q.**    Okay.  So in order -- the SIA had no technicians?

14   **A.**    No.

15   **Q.**    Okay.

16        So the -- you -- to get your work done, there was just

17   you.  Is that right?

18   **A.**    Yes.

19   **Q.**    As of Friday, did you have a backlog of cases to

20   investigate as SIA?

21   **A.**    Yes.

22   **Q.**    And what was the size of that backlog?

23   **A.**    I think it was somewhere around 45 cases maybe.

24   **Q.**    Now shifting to the SIS, when you left on Friday, who was

25   the SIS Lieutenant?

1    **A.**  Lieutenant Hardy was covering SIS, if I'm not badly

2    mistaken.

3    **Q.**  And who reported to Lieutenant Hardy?

4    **A.**  There's one SIS tech who is full-time.  And then we just

5    had a second one added on in the past couple weeks.  So three

6    techs would be reporting to the SIS Lieutenant.

7    **Q.**  The -- you testified that the -- in the new post

8    August 2023 arrangement, SIS investigates inmate-on-inmate

9    sexual abuse; is that correct?

10   **A.**  SIS, yes.

11   **Q.**  And SIA investigates staff-on-inmate sexual abuse; is that

12   correct?

13   **A.**  No, sir, I never said that.

14   **Q.**  I'm sorry.  What's SIA's role with regard to

15   staff-on-inmate sexual abuse?

16   **A.**  The SIA's role is to report it, refer it, and then assist

17   in any investigation -- in any investigative needs required by

18   OIG or FBI.  As a criminal matter, SIA does not do.

19   **Q.**  Does the SIA, or did the SIA when you were working last

20   week, have a role in determining whether a staff member

21   accused of sexual abuse of an inmate would be put on

22   administrative leave?

23   **A.**  In the past, when I would go forward with a referral of

24   sexual abuse, I would make my recommendation based on the

25   allegation itself.  And ultimately, that would be the decision

1    of the Warden and the exec staff.

2    **Q.**   When you say in the past, do you mean before August 2023?

3    **A.**   Yes.  Throughout -- throughout my entire time at FCI

4    Dublin.

5    **Q.**   Did that change after August 2023?

6    **A.**   No.  I -- I would still make those recommendations.

7    **Q.**   So do I understand you correctly it was within -- it's --

8    as of last week it was in your discretion to make a

9    recommendation as to whether a staff member accused of sexual

10   abuse would be or would not be put on administrative leave; is

11   that correct?

12   **A.**   I would -- I would make my recommendations.

13   **Q.**   And then who would act on your recommendation?

14   **A.**   The decision to place a staff member on admin leave would

15   ultimately be the Warden and the exec staff.

16   **Q.**   And during the period from August 2023 until you finished

17   last week, were any staff members put on administrative leave

18   due to being accused of sexual abuse?

19   **A.**   I want to say yes, there was one.  However, I would like

20   to explain to you that I -- from August or -- or I'm going to

21   back it all the way up.  From July 16th through the first week

22   in November, I was not at work.  I only was back on premises

23   from around, I think, November 10th until my retirement date

24   last Friday.

25   **Q.**   Who performed the duties of SIA from July 16th, 2023, to

PUTNAM - CROSS / GALVAN

1    November 10th?

2    **A.**  The -- that would have been Lieutenant Baudizzon.

3    **Q.**  And what is Lieutenant Baudizzon's regular assignment?

4    **A.**  He has been the SIS Lieutenant.

5    **Q.**  Was he replaced by Lieutenant Hardy?

6    **A.**  Yes.  She went in there when Baudizzon was placed in -- in

7    my position for me to teach him and work with him.

8    **Q.**  Is Baudizzon now the SIA?

9    **A.**  He's acting.

10   **Q.**  And to your knowledge, how long has Lieutenant Baudizzon

11   worked at Dublin?

12   **A.**  Close to two years.

13   **Q.**  Was Lieutenant Baudizzon part of your team when you were

14   in charge of SIS?

15   **A.**  No.  My office had already been moved when he came into

16   SIS.  But I still communicated with him and was trying to show

17   him and teach him about Dublin.

18   **Q.**  So if he started two years ago and this is the beginning

19   of 2024, he started in the beginning of 2022; is that right?

20   **A.**  I think.  I'm not -- please don't hold me to that.  I

21   don't know his exact report date.

22   **Q.**  During 2022, did you work with Lieutenant Baudizzon?

23   **A.**  We worked together here and there.

24   **Q.**  Going back to the time frame -- the current time as of

25   last week, you testified about a Crime Stoppers number

1    that's -- that's painted on the walls?

2    **A.**   Yes.

3    **Q.**   And you testified that that number goes to SIS; is that

4    correct?

5    **A.**   Yes.

6    **Q.**   That number does not go to SIA, correct?

7    **A.**   No.  It goes to the SIS office.

8    **Q.**   So an inmate could not use that number to report staff

9    sexual abuse, could she?

10   **A.**   If she -- an inmate would not have to put anything in a

11   message on that line.  The fact that the inmate calls that

12   number, we will see it.  And if the inmate, let's say -- let's

13   say I -- one of the SIS techs pulls that inmate up because he

14   saw that she made the call on the weekend and wanted to see if

15   there was something pressing that needed to be addressed.  He

16   calls the inmate up.  Inmate says, I don't feel comfortable

17   talking to you, I want to talk to Putnam, Baudizzon, the

18   Captain, then that would be how we handled it.

19   **Q.**   You also testified about an SIS email system --

20   **A.**   Yes.

21   **Q.**   -- that the inmates could use.

22   **A.**   Yes.

23   **Q.**   Does that email system go to SIA?

24   **A.**   That goes to SIS.  And the same would apply to that as did

25   with the phone.  Both for their -- their comfort and who

1    they're reporting it to, as well as their comfort in being

2    able to get in contact with us without inmates seeing

3    everything that they're typing.

4    **Q.**   What is the most recent instance in which you received a

5    report of staff sexual misconduct at Dublin?

6    **A.**   I would -- sir, I would have to look back at the

7    referrals.  There -- there has been so much I -- the last one,

8    I would have to look at my records.

9    **Q.**   In your recollection as you sit here today, would the last

10   one, the most recent one, have occurred after August 2023?

11   **A.**   There have been some allegations received and referred,

12   but the referral was not completed by me.  It was -- would

13   have been completed by Baudizzon because I been training him

14   and working with him.

15             **THE COURT:**  Referred to whom?

16             **THE WITNESS:**  Referred to OIA and OIG.  I'm -- I've

17   been training him in the process as required by policy to --

18   to refer the very same way, reporting to OIA and OIG.

19   **BY MR. GALVAN:**

20   **Q.**   When was the most recent time you sent a referral for

21   sexual abuse to OIG or OIA?

22   **A.**   Sir, I can -- I can look at my records and tell you a

23   specific date, but I do not recall a specific date right here.

24   **Q.**   In the time from August 2023 to now, have you put anyone

25   in the SHU for -- for nondisciplinary reasons?

PUTNAM – CROSS / GALVAN

1    **A.**  No, sir.

2    **Q.**  During that time period, August 2023 until now, have you

3    put anyone in the SHU for -- for their own protection?

4    **A.**  No, sir.

5    **Q.**  At any time in your time at Dublin, have you ever issued a

6    shot or the disciplinary write-up for a PREA report that you

7    thought was unfounded?

8    **A.**  No, I have -- I have not.  There was one incident -- one

9    incident that I remember.  I do not know -- I do not remember

10   the inmate or -- or the date, but there was one allegation

11   that was completely unfounded by which the inmate did get an

12   incident report for making a false report.  But that's once.

13   **Q.**  Were you involved in that?

14   **A.**  No.  I -- that was while I was out.

15   **Q.**  Who is Lieutenant Kuznecow?

16   **A.**  He is not a lieutenant.  He's a special agent.

17   **Q.**  As of last week, what was his title at Dublin?

18   **A.**  He is assigned to Office of Internal Affairs.  He's a

19   special agent with the Office of Internal Affairs assigned to

20   Dublin.

21   **Q.**  When he's working his shift, whatever it may be, is he at

22   Dublin the entire time all day?

23   **A.**  On the days he works on site, yes.

24   **Q.**  How many days a week does he work on site?

25   **A.**  That varies.

1   Q.  Last week, how many days was he on site?

2   A.  Last week I believe he was on annual leave.

3   Q.  You testified that you were interviewed at some point by

4   the -- by another agency, I believe it was the OIG, regarding

5   your relationship with Warden Garcia; is that correct?

6   A.  Yes.

7   Q.  How many times were you interviewed?

8   A.  Twice.

9   Q.  How long were the interviews?

10  A.  They were -- they lasted for a while.  I don't know -- I

11  don't remember specifically how long each one lasted, but I

12  was in there for what I considered a considerable amount of

13  time.

14  Q.  Going back to before August 2023 when the Warden Garcia

15  was being investigated, did you pull video about Garcia?

16  A.  Yes.

17  Q.  Did you assist the OIG with the investigation of Garcia?

18  A.  The only thing I assisted with was providing any

19  information that they needed as far as like quarters

20  assignments, work assignments, things of that nature that

21  would be considered in the realm of SIS -- in the SIS area.

22  As for -- as for the investigative part, that was OIG and FBI.

23          **MR. GALVAN:**  Mr. Gonzalez, could you pull up PIX-207?

24                  (Exhibit published.)

25

1   BY MR. GALVAN:

2   **Q.**  Sir, do you see the Exhibit PIX-207?

3   **A.**  (Reviewing document.)

4       **THE COURT:**  Is it on the screen?

5       **THE WITNESS:**  No, ma'am.

6       **THE COURT:**  Can we check that screen.

7       **THE WITNESS:**  Oh, it's up now.

8       Well, it's got the PREA retaliation form on here.

9   BY MR. GALVAN:

10  **Q.**  Did you create this form?

11  **A.**  No, sir.  That form is in the program statement.

12  **Q.**  Thank you.

13      **MR. GALVAN:**  We can put down 207.

14      Mr. Gonzalez, could we show 209, page 45.

15      Mr. Gonzalez, could we show the first page?  Sorry.

16                  (Exhibit published.)

17  BY MR. GALVAN:

18  **Q.**  Sir, do you see Exhibit 209 on your screen?

19  **A.**  Yes.

20  **Q.**  Are you familiar with this document?

21  **A.**  Yes, sir.

22  **Q.**  What is this document?

23  **A.**  The Central Abuse Behavior Prevention and Intervention

24  Program Statement.

25      **MR. GALVAN:**  Mr. Gonzalez, could you turn to page 45,

1    please.

2                        (Exhibit published.)

3    **BY MR. GALVAN:**

4    **Q.**  At the very bottom of page 45 where there's a section

5    115.73, Reporting To Inmates.  Are you familiar with that

6    provision?

7    **A.**  Reporting to inmates, yes.

8    **Q.**  Yes, sir.

9    **A.**  Yes.

10   **Q.**  Under that provision, would you agree that the inmate had

11   a right to receive a report from the staff regarding whether

12   an allegation had been determined to be substantiated,

13   unsubstantiated, or unfounded?

14   **A.**  Yes, sir.

15   **Q.**  Were there occasions where you received sexual abuse

16   complaints from inmates but did not provide them with the

17   report required here?

18   **A.**  Not to my knowledge, sir.  I -- every -- I know every

19   inmate-on-inmate allegation, we maintained that in TRUINTEL,

20   and there should be copies of the notification inmate as to

21   whether or not that case was substantiated, unsubstantiated,

22   or unfounded.

23       The criminal proceedings which are completed -- conducted

24   by OIG and FBI, they -- they are also notified once that case

25   has been done and completed.

1    **Q.**  So you testified that for inmate-on-inmate sexual abuse,

2    you had -- there was a method of tracking.

3         For staff-on-inmate sexual abuse, did you always report

4    back to the inmate as to whether the allegation had been

5    determined to be substantiated, unsubstantiated --

6              **THE COURT:**  Can you tell me --

7    **BY MR. GALVAN:**

8    **Q.**  -- or unfounded?

9              **THE COURT:**  -- because I haven't looked at this

10   document to the extent you have -- to whom is this document

11   addressed?

12             **MR. GALVAN:**  Mr. Gonzalez, could we show the first

13   page?

14                       (Exhibit published.)

15             **MR. GALVAN:**  I will make a professional

16   representation that it's a program statement which is the --

17   it's the manner in which the BOP memorializes central office

18   policies for the public and for people who work in the

19   prisons.  Although --

20             **THE COURT:**  So my question is, and maybe yours, if

21   the U.S. Attorney is investigating something or the FBI is

22   investigating something or OIG is investigating something,

23   does this apply?

24             **MR. GALVAN:**  I don't know, Your Honor.

25             **THE COURT:**  Okay.  Go ahead.

1  BY MR. GALVAN:

2  **Q.**  To your knowledge, sir, Lieutenant Putnam, if the

3  U.S. Attorney or FBI is investigating something, does this --

4  does the program statement requirement of a report back to the

5  reporting inmate apply?

6  **A.**  Yes.  And in circumstances -- in some circumstances

7  whereby the inmates have gone to -- the staff member has gone

8  to trial and found guilty, then I have been present when those

9  inmates were told what the outcome of the trial was.

10      And they were provided also a call to their advocate,

11  whoever that may be who's been assigned to them.  I've been a

12  part of that process, making sure they got ahold of their

13  advocate to see if there's any other -- any needs that they

14  have at the time.

15  **Q.**  In your experience, are there also instances where an

16  inmate makes a sexual abuse allegation against a staff member,

17  but the -- and the -- either you or the Associate Warden or

18  someone on the team pulls video and determines, oh, that staff

19  member wasn't even there, and determines that that allegation

20  was unfounded.  In that instance, who reports back to the

21  inmate?

22  **A.**  Then the person preparing the fact-finding memo would be

23  the one that did the inmate notification once the fact-finding

24  was complete and it was determined that no further action was

25  necessary as far as any referral being done.

1    **Q.** Is it your understanding that in every instance where a no

2    referral decision is made, a fact-finding memo is written?

3    **A.** Ones that I'm aware of, yes, there have been fact-finding

4    memos written.

5    **Q.** Is that a matter of -- to your knowledge, is it a matter

6    of policy that a fact-finding memo must be written when no

7    referral is made?

8    **A.** Myself -- myself, I would rather refer it and refer the

9    video and let it go through the whole process rather than the

10   fact-finding memo.

11              **THE COURT:** Does this document have a time frame

12   within which you must report back?

13              **THE WITNESS:** No, ma'am. With the inmate-on-inmate

14   allegations, SIS is required to have those investigations

15   completed within 30 days. And if they can't get them done in

16   30 days, we have to request an extension on the investigation.

17       So those are usually done within that time frame. And at

18   the conclusion of it and upon the case being closed, the

19   inmate would be notified. And then all documentation from the

20   initial allegation on the safeguarding of inmate, all the way

21   to the institution exec staff review would be put into

22   TRUINTEL in that inmate's file pertaining to that particular

23   case.

24              **THE COURT:** Do you track how many complaints are made

25   about a particular individual, whether inmates or staff? So

1  for instance, very difficult sometimes to prove, cases where

2  there's just he said, you know, she said/she said, or

3  whatever.

4            THE WITNESS:  Yes.

5            THE COURT:  With oral testimony.

6            THE WITNESS:  Yes.

7            THE COURT:  But if you've got 15 people complaining

8  about the same person, perhaps that's helpful information.

9            THE WITNESS:  Yes, it is.

10           THE COURT:  Do you track the number of complaints

11 about particular individuals?

12           THE WITNESS:  Yes.  On my staff tracking log, part of

13 the information that I put on there, I'm going to use -- I'm

14 going to use the cases that have already been to -- to trial.

15 On each of those and for each other ones that are not -- that

16 have not gone to trial, I have the allegations that have been

17 submitted initially, the date that the initial one was

18 submitted.  And then over to the right, I have every inmate

19 who has made an allegation of that nature toward that one

20 staff member.

21    So that it --

22           THE COURT:  And what do you call this?

23           THE WITNESS:  This is the -- it's the -- local

24 staff -- staff case status report for FCI Dublin.

25           THE COURT:  Okay.

 1           **THE WITNESS:**  And that's where I also track whether

 2    or not -- because sometimes the initial allegations -- let's

 3    say an inmate reports something to me today.  And then the

 4    inmate later files an emergency admin remedy or tort claim,

 5    the initial allegations, whenever I receive that emergency

 6    admin remedy or receive the tort claim, or the warden-warden,

 7    I will look at the initial referral and determine whether or

 8    not the allegations that are in that emergency admin remedy,

 9    tort claim, or warden-warden, I will see if all those

10    allegations are the same as what's already been reported.

11        If it's not the same and there are additional allegations

12    towards additional staff members, I will create a whole new

13    referral and -- and break it down, staff member and

14    allegation, staff member allegation.

15           **THE COURT:**  You referenced -- I couldn't understand

16    the word you kept saying after "warden."

17           **THE WITNESS:**  Warden to warden.  That's -- that's --

18    that's a method of identification from one institution to

19    another whereby inmate -- if an inmate arrives to Dublin and

20    wants to report allegations towards FDC SeaTac, then SIS at

21    the receiving institution would do their interview.  We would

22    also have the inmate sexual abuse intervention done and the

23    medical assessment.  We would also do a warden-to-warden memo

24    and send it to the institution that the allegations are from.

25           **THE COURT:**  I see.  Okay.

```
 1          You may proceed.

 2                  THE WITNESS:  And --

 3                  THE COURT:  No, let him ask you a question.  Thank

 4     you.

 5     BY MR. GALVAN:

 6     Q.  Are you aware now of any individual staff members at

 7     Dublin with more than one sexual abuse allegation against

 8     them?

 9     A.  Yes.  We have -- we still have a few that are -- that are

10     pending in -- pending investigation and trial, yes.

11     Q.  Are you aware of any individuals, staff members now

12     currently working and not on leave with more than one

13     allegation against them at Dublin?

14     A.  No.

15                  MR. GALVAN:  Mr. Gonzalez, could we show 407, please.

16                      (Exhibit published.)

17     BY MR. GALVAN:

18     Q.  Sir, do you recognize this document, 407?

19     A.  Yes.

20     Q.  What is it?

21     A.  This is a weekly review from Special Housing Unit.

22                  MR. GALVAN:  Mr. Gonzalez, could we focus in on the

23     second record.

24          Mr. Gonzalez, could you extend the zoom down a little to

25     the bottom because I think there's an SIS entry for this
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    record as well.  Yeah, it looks like it's almost merged with

2    the next entry there above the black bar.  You'll have to get

3    some of the black bar of the next entry in order to see it.

4    There you go.

5                        (Exhibit published.)

6    **BY MR. GALVAN:**

7    **Q.**  Sir, does this -- this reflect the -- the documentation of

8    a weekly SHU review of a person?

9    **A.**  Yes.

10   **Q.**  Do you -- did you personally participate in such reviews?

11   **A.**  Yes, I have participated in those in the past.

12   **Q.**  When did you stop?

13   **A.**  It's -- it's been -- it's been a while.  But I can -- I

14   can answer any questions you have.

15   **Q.**  Okay.  The question I have about this record is that under

16   "Psychology Services Comments," it says "alleged PREA victim."

17   Can you tell from looking at this document whether that person

18   is alleged to be a PREA victim of a staff perpetrator or

19   another inmate perpetrator?

20   **A.**  Just by looking at what is on the screen with everything

21   redacted as far as their name, I cannot tell specifically what

22   that is for, whether it be inmate-on-inmate or

23   inmate-on-staff.

24       As for the specific time frame that this came from and

25   while they were in SHU, it appears that they were seen by DHO

1  for a 115, which is disposing of evidence, and they got

2  60 days of disciplinary segregation time from the DHO.

3      And also the remaining under the correctional services

4  comments is the additional loss of privileges that the DHO

5  sanctioned.

6      And in that particular situation, where it has SIS

7  comments, no SIS concerns, SIS has no concerns because there's

8  not a SIS investigation ongoing.  This particular situation

9  was violation of Bureau regulations which was handled through

10  the inmate disciplinary process.

11  **Q.**  If this person had been a victim -- alleged victim of

12  staff abuse, would there be anything in the SIS comments

13  section?

14  **A.**  If -- if there would be, it would be -- it would be -- it

15  would be very vague.  It would be something to the effect

16  that -- I now am just going -- I'm just going out there and --

17  and let's say -- let's say we have an inmate like the two I

18  referenced earlier that were placed in SHU that were not --

19  not yet victims, however we did have concerns.

20      I do recall having put comments in that SIS section saying

21  please do not -- do not pull inmate out of cell without first

22  contacting SIS.

23      And that -- that would be simply so we could make sure

24  we're monitoring who's going down there trying to pull this

25  inmate.  It wouldn't be -- it wouldn't be punitive toward the

1    inmate.  It would be strictly for is the alleged perp going to

2    go and try to pull the inmate.

3       Other than that, it would -- it would not be.  There would

4    be no specifics of any allegations towards staff.

5    **Q.**  If I wanted to find the weekly review for those

6    individuals, would I find them in their -- in that -- in those

7    persons' files or in some central log of weekly reviews?

8    Where would I look?  And if you don't know, that's fine.

9    **A.**  Going back on the history that far, that would be a

10   central office question.  As far as the program goes, I

11   don't -- I don't know the specifics on the data storage for

12   that particular program.

13   **Q.**  Okay.  My next question I'm going to ask leave of court to

14   ask, which is you've testified a couple of times about two

15   people placed in SHU recently, and properly without

16   identifying them.

17          **MR. GALVAN:**  May I ask, Your Honor, the witness to

18   identify them by initial if he can.

19          **THE WITNESS:**  And they were not recent, sir.

20          **THE COURT:**  That will not what?

21          **THE WITNESS:**  They were not recent.  That's not

22   recent.

23          **THE COURT:**  Okay.  Remind me again who the two are --

24          **MR. GALVAN:**  The --

25          **THE COURT:**  -- that you want to know information

1    about?

2          MR. GALVAN:  The two are the -- the people about whom

3    Lieutenant Putnam has testified that they are examples of

4    people who were placed in the SHU, I believe, for their own

5    protection after -- after making a sexual abuse allegation.

6          THE COURT:  Yes, you can identify them by -- by

7    initial.

8          THE WITNESS:  Okay.  IW.  The second one, her -- the

9    last name is Ian [phonetic].

10         THE COURT:  Do you have a basic -- and you -- are

11   they still there, to your knowledge?

12         THE WITNESS:  No.  No.  They were transferred.  Those

13   are the ones I've -- when I was referenced that once they got

14   to their receiving institution, they both filed there.

15         THE COURT:  All right.

16         THE WITNESS:  And I can -- if I can -- I can find out

17   the first name and I can get that information through the BOP

18   attorney.

19   BY MR. GALVAN:

20   Q.  Thank you, sir.

21       These weekly reviews that are documented here in 407, is

22   this an in-person meeting that happens between all these

23   participants who make comments here?

24   A.  Yes.  Yes, sir.

25   Q.  And do you meet -- do you meet once a week?  How often do

1    you meet?

2    **A.**    Once a week.

3    **Q.**    How long does the meeting last?

4    **A.**    Usually 30 minutes to an hour.

5    **Q.**    And how long do you spend on average with each --

6    discussing each case that you document here?

7    **A.**    That depends on the situation with the inmate.

8    **Q.**    Is the inmate ever present in the meeting?

9    **A.**    The SHU -- the seg review officer is the one who updates

10    the inmates on -- on their status weekly.  The inmate is not

11    present for the meeting with all the -- all the staff.

12    **Q.**    And are these meetings -- when you have these meetings, do

13    you only go over the disciplinary cases in SHU?

14    **A.**    Any -- any cases in SHU, whether it's admin detention,

15    disciplinary seg, whatever the case is.

16          **MR. GALVAN:**    Mr. Gonzalez, you could take down 407.

17    Thank you.

18    **Q.**    You testified earlier about some work you did to identify

19    the people who gave the declarations in this litigation.

20          Can you describe what you did to identify them?

21    **A.**    SIS has -- I would -- I would -- basically I would read

22    the declaration, and based on the time that the inmate stated

23    that she was at Dublin and other things that may have been

24    mentioned in that declaration, I could narrow it down and look

25    through the -- through the programs that SIS has to identify

PUTNAM - CROSS / GALVAN

1    the inmates.

2       And then just my knowledge of the background of -- of all

3    the cases and my knowledge of all the referrals, all the tort

4    claims, all the emergency admin remedies, all the

5    warden-warden memos, all that, you know, I was already very

6    familiar with a lot of it.

7    **Q.**  And when did you complete the work of identifying them?

8    **A.**  Maybe a week and a half, two weeks ago.

9          **THE COURT:**  Other than sending the information to SIS

10   or to -- you said you sent it to...?

11         **THE WITNESS:**  OIG.

12         **THE COURT:**  OIG.

13         **THE WITNESS:**  And OIA.

14         **THE COURT:**  -- did you tell anyone else?

15         **THE WITNESS:**  About...?

16         **THE COURT:**  The identification of those individuals,

17   did you tell anyone else?

18         **THE WITNESS:**  My -- my attorneys at the BOP.

19         **THE COURT:**  Okay.

20   **BY MR. GALVAN:**

21   **Q.**  You testified that you started at Dublin in 2016.  When

22   did you take on the post of SIS -- well, when did you take on

23   any post in SIS?

24   **A.**  It was approximately three weeks after I started.  I

25   started doing -- I would work in SIS and cover some of the

PUTNAM - CROSS / GALVAN

1   shifts.

2   Q.  So in 2016?

3   A.  Yes.

4   Q.  Okay.  And -- and were you at first in one of the

5   technician posts, or were you already a Lieutenant?

6   A.  I was already a Lieutenant.  I had previously worked in

7   SIS at Atwater.

8   Q.  During the time from 2016 until August 2023 when you were

9   an SIS Lieutenant, was it part of your job to receive PREA

10  reports about staff abuse from the incarcerated people?

11  A.  I would accept allegations of any kind.

12  Q.  Because it was your job?

13  A.  Yes.

14  Q.  Okay.

15      To your knowledge, how were the inmates informed that you

16  were the person to whom they should report staff sexual abuse?

17  A.  When -- that's how -- I would identify myself as the SIS

18  Lieutenant.  And in conducting interviews for inmates who were

19  involved in incidents and things, they -- they also knew I was

20  the SIS Lieutenant.

21  Q.  When you say you identified yourself, was that at a big

22  meeting?  Or did the -- when the inmates -- well, I'll --

23  I'll -- let me start another question.

24      When you say you identified yourself to the inmates as the

25  SIS lieutenant, how did you do that?

1    **A.**   I would -- if a -- when the held A and O.

2    **Q.**   What's A and O, sir?

3    **A.**   Admission and orientation, which is set up by the

4    counselors to -- for all the new inmates to be advised of the

5    institution expectations and correctional services, that the

6    Captain sometimes would have me go in there and sometimes he

7    would just explain who SIS is.  So they -- that's the first

8    way they would get it.

9        And then it would be followed up by when I would make

10   rounds in the units, when I would stand main line and when I

11   would communicate with inmates.

12         **THE COURT:**  How much more do you have?  This is not a

13   deposition, I will remind the plaintiffs.

14         **MR. GALVAN:**  I can wrap up in two questions, Your

15   Honor, which would take five minutes.

16   **Q.**  Going back to the -- your work determining the identities

17   of the people who gave declarations in this case, did you ever

18   receive confirmation back of the full names to confirm that

19   your identifications were correct?

20         **THE COURT:**  From whom?  From his attorneys --

21         **MR. GALVAN:**  From anyone.

22         **THE COURT:**  -- which may be covered by the

23   attorney-client privilege.

24   **BY MR. GALVAN:**

25   **Q.**  From anyone other than your attorneys.

1   **A.**  I discussed some of it with the chief psychologist who was

2   also in the loop with -- with all of it.

3   **Q.**  The chief psychologist is Dr. Mulcahey?

4   **A.**  Yes.

5   **Q.**  And did Dr. Mulcahey confirm to you that your

6   identifications were correct?

7   **A.**  She -- I sent -- I just let her know that, you know, I

8   think there was one that had been given the wrong name that I

9   had addressed.  And that was basically it.  I just sent the

10  list back with the names.

11          **MR. GALVAN:**  No further questions, Your Honor.  Thank

12  you.

13          **THE COURT:**  Redirect?

14          **MS. MATTIOLI:**  Very briefly, Your Honor.

15      And if I could put on the record for the deputy clerk and

16  the marshals, we're ready for our first inmate.  If that's

17  going to take a few minutes, we could start --

18          **THE COURT:**  We've already been communicating on that.

19          **MS. MATTIOLI:**  Okay.  Thank you.

20                  <u>**REDIRECT EXAMINATION**</u>

21  BY MS. MATTIOLI:

22  **Q.**  Mr. Putnam, if you did not make a recommendation that a

23  staff member be placed on leave, could the executive team

24  still place that person on -- on administrative leave?

25  **A.**  Yes.

1    **Q.**   If an investigation is ongoing, would you be able to

2    inform the inmate as to whether a report was substantiated,

3    unsubstantiated, or unfounded?

4    **A.**   No.  I would simply tell all the inmate that it was still

5    ongoing and somebody would be in touch with her.

6    **Q.**   And once OIG has taken a case for investigation, do you

7    have any involvement in developing any independent evidence

8    collection?

9    **A.**   No.  I do not.  I -- I strictly gather and assist in ways

10   that are requested by OIG and/or FBI.  Other than that, I stay

11   out of it.  I do not ask questions.  I do not try to interfere

12   in any way whatsoever.

13   **Q.**   And we pulled up an Exhibit 407, the weekly SHU review --

14   **A.**   Yes.

15   **Q.**   -- where it identified an inmate as being a PREA victim.

16   Are PREA victims never allowed to be placed in SHU for

17   disciplinary reasons?

18   **A.**   No.  Disciplinary -- disciplinary infractions and PREA is

19   two different -- two separate things.

20   **Q.**   Okay.

21   **A.**   Completely separate issues.

22   **Q.**   And that's all I have.  Thank you.

23          **THE COURT:**  Any cross -- recross on those topics?

24          **MR. GALVAN:**  No, Your Honor.

25          **THE COURT:**  Lieutenant Putnam, you said that when

1  you -- well, let me ask this.  Why did you decide to retire?

2          **THE WITNESS:**  I didn't decide to, ma'am.  I -- I

3  was -- I was supposed to mandatory retire in February of 2022.

4  I had -- I initially requested an age waiver to stay, but it

5  got denied initially by the Bureau.

6      And with all the events at FCI Dublin, they asked, after

7  the denial, if I could stay, and I told them I would and I

8  felt it was the right thing to do because of my knowledge of

9  the back history of all these things going on.

10     And then the following year, they approved another

11 extension.  So I'm actually on my second age waiver.  I could

12 have gone until February 28th of '24, but I elected to retire

13 at the 30th.

14         **THE COURT:**  Any particular reason?

15         **THE WITNESS:**  Because I will be going on Sunday -- I

16 have my mom passed recently, and I'll be going to go deal with

17 her estate stuff.  And I'm the executor on the estate and the

18 trust over the trustee.  So I've got those obligations in

19 February -- I mean the January.  And then I want to visit my

20 son before he goes off to training.

21         **THE COURT:**  My condolences.

22         **THE WITNESS:**  Yes, thank you.

23         **THE COURT:**  There -- you said that at the end of

24 December, you still had outstanding a backlog of 45 cases.

25 How many of those cases, if any, related to complaints of

```
 1    sexual assault or sexual misconduct of any nature?
 2              THE WITNESS:  None of the local investigations that
 3    have been deferred by OIG and OIA and sent back to the
 4    institution for local investigation, none of those are in any
 5    way, shape, form or fashion associated with sexual abuse.
 6    Those are completely different allegations.
 7              THE COURT:  So this backlog of 45 cases, they've been
 8    to OIG and then they've come back to you?
 9              THE WITNESS:  OIA.
10              THE COURT:  OIA.
11              THE WITNESS:  OIG and OIA in some cases.
12              THE COURT:  So the 45 cases that you had, they've
13    already been sent out to OIA or OIG --
14              THE WITNESS:  Yes, ma'am.
15              THE COURT:  -- for review and then sent back --
16              THE WITNESS:  Yes.  They --
17              THE COURT:  -- to the local.
18              THE WITNESS:  They have all been deferred back to the
19    local level, yes.
20              THE COURT:  Is that a new process, that is, if there
21    is something -- is there now some loop that happens where
22    anything that gets filed gets sent out, back to someone else,
23    and then returned locally?
24              THE WITNESS:  No.  It's always been that way.
25    However, depending on the severity.  Okay.  All these sexual
```

1    abuse cases are criminal.  So they're OIG.  OIG will take

2    those and they'll do the investigation.

3       If it's not criminal, OIG will normally kick it back to

4    OIA, and OIA can then make a determination whether they want

5    one of their OIA agents to do the investigation or if they

6    want to defer it back to the local level for investigation.

7              THE COURT:  Okay.  So the nature of that backlog,

8    is -- the nature of those cases --

9              THE WITNESS:  Noncriminal.

10             THE COURT:  Noncriminal but give me topics.  What do

11   those --

12             THE WITNESS:  They could range in anywhere from

13   unprofessional conduct, some of the retaliation, the DWIs, use

14   or abuse of illegal drugs, failure to follow supervisor's

15   instructions, failure to follow policy, misuse of government

16   credit card, misuse of government travel card, things like

17   that that are a lower, what we consider class 3 offenses.

18             THE COURT:  One of the complaints that has been made

19   or concerns that have been made, as you read in the

20   declarations, was a reluctance on the part of inmates to tell

21   you their concerns.

22             THE WITNESS:  Yes.

23             THE COURT:  What, if anything -- I mean you had been

24   there since 2016.

25             THE WITNESS:  Right.

 1          **THE COURT:**  So did you do anything to establish a

 2    rapport with the inmates so that they felt comfortable talking

 3    to you?  Because a number of them said that they're not.

 4          **THE WITNESS:**  Right.  And -- and that's -- that's

 5    pretty standard in -- in that environment to -- yes, I did

 6    have a rapport with the inmates.  And some of them did feel

 7    comfortable coming to me and talking to me and letting me know

 8    what was going on.  Even had some CI's that were really good

 9    about giving me information which were used in some of the

10    proceedings.

11          But sometimes other factors come into play as far as

12    making inmates reluctant to report.  And I tried to express

13    that when I talked to them, you know, as well.  The fact that

14    I understand -- I understand where I work.  These are female

15    inmates.  A lot of them have very traumatic histories.  I

16    understand that.

17          I also understand that they're not -- they may not want to

18    talk to me.  That's why I don't -- I don't get upset with

19    that.  I can't tell them to talk to me.  But I will give them

20    options and ask them, you know, if there's something you want

21    to report and you don't want to talk to me, let me know, I

22    will -- I will pass it on and have somebody see you.

23          Some of the other factors that come into play is the

24    inmates are scared other inmates are going to see them going

25    up to SIS.  Inmates -- inmates watch that kind of thing.  They

1    watch where other inmates go.

2        And this is the same at mental institutions, female

3    institutions.  It don't matter the custody level.  The inmates

4    are going to pay attention to what's going on.  And if

5    somebody's coming to talk to SIS, the first thing that they're

6    going to be told when they walk back in that union, you're

7    telling, you're telling, you're a snitch.  So.

8            **THE COURT:**  Snitch on -- on conduct with respect to

9    other inmates?

10           **THE WITNESS:**  Snitch across the board.  If they come

11   to see SIS, they're going to be questioned.

12       There's times I've told the inmates, okay, tell them you

13   came up here for a UA.  I've gone so far as to have a female

14   Lieutenant and/or staff member walk with the inmate out onto

15   the yard and call them back to the unit so they wouldn't see

16   me walking with the inmate.  So I've tried to be very

17   cognizant of where I'm at.

18       And some of the -- some of the inmates, even in the

19   declarations they even say, I -- yes, I did call them up there

20   try to talk to them and they didn't want to say anything.

21       So I was trying my best to do my due diligence to get

22   information concerning these things, especially 'cause it's

23   like the best way I can describe it, Your Honor, is it's like

24   I'm picking up breadcrumbs, little bits of information here

25   and there.  And some of those, you know, you eventually have

 1    enough, you have a whole slice of bread and you roll with it.

 2        It's -- it's just some of these -- some of the inmates,

 3    like the ones I referenced that were on the job assignment and

 4    were enforcers, some of the pressure comes from the other

 5    inmates.  Don't tell because I'm benefiting from this, I'm

 6    getting this, this, this, and this, and you don't need to tell

 7    and ruin it.

 8        **THE COURT:**  Let me ask you to switch topics.

 9        Were you ever part of any discussion with leadership

10    regarding visual searches of inmates after visits with the

11    public including lawyers?

12        **THE WITNESS:**  That's -- that's required by policy if

13    it's a contact with the public.  And, yes, I did mention and

14    bring it to their attention some inconsistencies with the

15    staff that need to be addressed.  And --

16        **THE COURT:**  So beginning back as far as you knew when

17    you started in 2016, are you aware whether it was Dublin's

18    custom to comply with that policy?

19        **THE WITNESS:**  Every -- every prison should be

20    complying with that policy.

21        **THE COURT:**  That's not my question.  Was it Dublin's

22    custom to comply with that policy?

23        **THE WITNESS:**  Yes.  And anytime I have heard that it

24    was not being followed, I would -- I would address it with the

25    Captain or let somebody know.  Same with any other

1    inconsistencies because consistency is very important in a

2    prison environment.

3        Consistency can make you have a good day or a bad day.

4    Whether it's the -- the strip search after the contact with

5    the general public or consistency on following a schedule for

6    calling the units to main line, consistency is critical.

7            **THE COURT:**  All right.  Any follow-up on my

8    questions, by Ms. Mattioli?

9            **MS. MATTIOLI:**  Nothing from me, Your Honor.

10           **THE WITNESS:**  Okay.

11                    **FURTHER RECROSS-EXAMINATION**

12   **BY MR. GALVAN:**

13   **Q.**  Sir, the Judge asked you about comfort and rapport with

14   the -- with the inmates.  Before Lieutenant Hardy arrived,

15   were there any women on the SIS team?

16   **A.**  I had a SIS tech that was a female, yes.  Two, as a matter

17   of fact, before Lieutenant Hardy.

18           **MR. GALVAN:**  Thank you, sir.  No further questions.

19           **THE COURT:**  All right.  You're excused.

20           **THE WITNESS:**  Okay.

21           **THE COURT:**  Thank you.

22       All right.  It's 11:40 so we'll go ahead and take our

23   break until 12:30.  And then we will go directly to the

24   inmates so they can be returned to the facility.

25       All right.  We'll stand in recess.  Thank you.

1      Oh, I should mention one other thing.  The document I

2   received from Ms. Mattioli this morning should have been

3   marked Exhibit O, not N.

4          **MS. MATTIOLI:**  Thank you.

5          **THE COURT:**  Thank you.

6      (Recess taken at 11:41 A.M.; proceedings resumed at

7   12:32 P.M.)

8          **THE COURT:**  Okay.  Do we have anything before we go

9   on the record?

10         **MR. CHA-KIM:**  Yes, Your Honor.  We had a short

11  request for a sidebar to follow up on some of the discussions

12  from this morning at sidebar.

13     I understand the government might also have something to

14  discuss at sidebar.

15         **THE COURT:**  And do we need to do that before the

16  testimony of the inmates?

17         **MR. CHA-KIM:**  I think we can wait until after if

18  that's more convenient for the government.

19         **MS. MATTIOLI:**  I would like to request an ex parte

20  sidebar.

21         **THE COURT:**  Before we --

22         **MS. MATTIOLI:**  Yes.

23         **THE COURT:**  -- take the testimony?

24         **MS. MATTIOLI:**  Yes.

25         **THE COURT:**  Okay.

1          Can I get some white noise.

2               (Sidebar off the record; not reported.)

3          (The following proceedings were heard at the in camera:)

4

5

6                    *      *      *      *      *

7

8               (The transcript of proceedings at pages 414 through

9     489 are under seal and bound separately.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The transcript of the proceedings at pages 490

2     through 491, line 4.)

3                    *      *      *      *      *

4     (The following proceedings were heard in open court:)

5          **THE COURT:**  Okay.  For purposes of the record, the

6     Court conducted an in-chambers session with counsel identified

7     on the record.

8          The Court also obtained a one-page document which it marks

9     as Exhibit P.

10          (Defendants' Exhibit P marked for identification.)

11          **THE COURT:**  All right.  Ms. Mattioli.

12          **MS. MATTIOLI:**  Your Honor, just for purposes of the

13     record, the government had intended to call an inmate witness

14     with the initials IA.  She was transported to the courthouse

15     this afternoon and requested to speak with an attorney before

16     she took the stand.

17          I went downstairs and spoke with her.  She indicated to me

18     she was in fear for her safety if she testified.  And I

19     informed her her testimony was not needed, and she will be

20     transported back to FCI Dublin.

21          So we would call [name stricken] -- SM to the stand.

22          **THE COURT:**  Okay.  The name is stricken.

23          Is she --

24                    (Off-the-record discussion.)

25          **THE COURT:**  Okay.  Come on forward, and what we're

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    going to do is --

2        Okay.  Under seal.

3            **THE CLERK:**  Please raise your right hand.

4

5

6                    *       *       *       *       *

7

8        (The transcript at pages 492 through 547 were held in open

9    court and are bound separately.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (The transcript of proceedings at pages 491, lines

 2       8 through 16, are under seal and bound separately.)

 3                   *     *     *     *     *

 4          (The proceedings in open court continue as follows:)

 5

 6                          STEPHANIE M.,

 7       called as a witness for the DEFENDANTS, having been duly

 8       sworn, testified as follows:

 9              THE WITNESS:  SM.

10              THE COURT:  All right.  Good afternoon.

11              THE WITNESS:  Good afternoon.

12              THE COURT:  You may proceed.

13              MS. CZIOK:  Thank you.

14                      DIRECT EXAMINATION

15       BY MS. CZIOK:

16       Q.  My name is Abbie Cziok.  I'm counsel for the United

17       States.  Thank you for being here today.

18       A.  You're welcome.  Thank you for having me.

19       Q.  Do you prefer to be referred to as your first name or SM?

20       A.  Stephanie is fine.

21       Q.  Okay.  We'll refer to you just at Stephanie and don't say

22       your last name.

23       A.  Okay.

24              THE COURT:  And I'm going to have to have you closer

25       to the mic.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1            THE WITNESS:  Is that better?
 2            THE COURT:  Yes, thank you.
 3    BY MS. CZIOK:
 4    Q.  And before we get going, I just want to encourage you not
 5    to say names of other inmates at Dublin.  Okay?
 6    A.  Yes, ma'am.
 7    Q.  So be very careful not to say first names, last names on
 8    the record.
 9    A.  Yes, ma'am.
10    Q.  If you know initials, if that comes up, that's how we need
11    to talk about other folks.  Okay?
12    A.  Yes, ma'am.
13    Q.  Stephanie, are you an inmate at FCI Dublin?
14    A.  Yes, ma'am.
15    Q.  Did you speak with my colleague government counsel last
16    week?
17    A.  Yes, ma'am.
18    Q.  Were you promised anything in exchange for testifying here
19    today?
20    A.  No, ma'am.
21    Q.  Did you feel pressured into talking to the government
22    attorney?
23    A.  No, not at all, ma'am.
24    Q.  How did it come about that you ended up speaking with
25    government counsel?
```

**A.**  I actually went to Lieutenant's office and spoke to
Lieutenant.  And Lieutenant then called me back and asked if I
would be -- if I would feel comfortable speaking to the
lawyers.

**Q.**  Why did you initially go to the Lieutenant's office?

**A.**  I had overheard in my unit a girl come in and talk about
how she had gone down to the Lieutenant's office and spoke to
her about a couple things that were going on as far as the
court hearing and that sort of thing.

     And I felt that I needed to go there as well.  Slept on
it.  Felt like I needed to go there as well to make sure that
the right things were being said for the prison, you know.

**Q.**  Okay.  And so you went to the Lieutenant's office?

**A.**  Yes.  I went to Lieutenant's office.

**Q.**  And how did it come about that you ended up getting into a
conversation with government counsel?

**A.**  I talked to Lieutenant Hardy, and I just shared with her
my experience at Dublin.  And I voiced a few concerns that I
had with some of the other inmates that I had spoken to and
their -- I -- their reasoning behind saying what they were
saying.  And I felt really concerned about that so then I went
to her and gave her my -- my opinion and my experience.

     And I told her I would be more than happy to share that
experience with the court or with lawyers or whoever I can
to -- to help.

1   **Q.**  Thank you, Stephanie.

2   **A.**  You're welcome.

3   **Q.**  So let's talk about those experiences now.  When did you

4   arrive at Dublin?

5   **A.**  I arrived in the -- at the end of June of 2023.

6   **Q.**  Generally speaking, how has your experience been there

7   since summer of 2023?

8   **A.**  I've had a great experience at Dublin.  I mean as great as

9   any, you know, you can't really say prison is great.  But

10  since I've been there, I've -- I don't have any complaints at

11  all.  I actually have -- I felt it was a better experience

12  than I had originally anticipated prison to be, as with the

13  programs.

14      And I -- I suffer from high blood pressure.  And when I

15  voiced that concern, I was seen right away, put on my

16  medication right away.  My blood pressure has lowered since

17  being there.  The program that I've -- that I've been in, the

18  classes --

19  **Q.**  So I'm going to cut you off.  You said --

20  **A.**  Sure.

21  **Q.**  -- a couple things and so I'm going to break it down --

22  **A.**  Sorry.

23  **Q.**  -- so it's clear for the record.  No problem.

24  **A.**  Thank you.

25  **Q.**  So first you discussed, you mentioned programming.  What

1    do you mean by programming?

2    **A.**    The classes.    There are a variety of different classes

3    that I was able to take so far.    And they've helped me both,

4    you know, mentally, emotionally.    That's the programming that

5    I mean.

6        Also we have like peer programs where we can go and

7    interact with other inmates.    And a couple of the counselors

8    will throw like a Halloween party sort of thing, karaoke sort

9    of stuff.    And that's always really nice.

10       And then we had, you know, for Christmas, we had programs

11   for that where we would play musical instruments and -- and

12   that sort of thing.

13   **Q.**    So let's talk about the classes that you mentioned.    What

14   classes have you taken since you've been at FCI Dublin?

15   **A.**    I've taken house of healing.    Or -- yeah, house of --

16   houses of healing.    I've taken anger management.    Lifespan.

17   I've taken critical thinking or -- critical thinking.

18       And I believe that's -- that's all I've had so far.

19   That's all I've had so far.

20   **Q.**    So how many classes are generally involved in a program

21   course like that?

22   **A.**    It's about six to 12.

23   **Q.**    And so you've done four classes since you were there last

24   summer; is that right?

25   **A.**    Yes.

```
1    Q.   Then you talked about peer programs.  Can you explain for
2    the Court what a peer program?
3    A.   Sure.  It's where we gather as program as a compound.  So
4    generally we call the prison a compound.  Where all the units
5    are invited to -- to come.  And we can do dance -- dance stuff
6    like karaoke and -- and dance and musical instruments.  And
7    some people do interpretive dancing, like their own little
8    thing, you know.
9        And it really helps us, I think.  I think it really helps
10   us kind of disassociate ourselves from the reality of prison
11   and feel very human, you know, and -- and able to -- when
12   we're able to interact like that.
13   Q.   So you've just talked about programming and -- and the
14   peer programs.  And then you also had mentioned medical.
15       And so tell me about that interaction where you discussed
16   something about your blood pressure medication.
17   A.   Sure.  So I developed high blood pressure obviously going
18   through what I've been through here in the judicial system,
19   going to -- to court and stuff.
20       When I -- when I got to Dublin, my blood pressure I felt
21   was so high.  My nose was bleeding and I had, you know,
22   flushed cheeks.  I was getting really hot headaches.
23       And I talked to Dr. Singh in -- on my way to lunch.
24   Because they usually -- all of the administration will stand
25   outside of the cafeteria and we're able to interact with them
```

 1    or ask them questions at any time.  So I talked to Dr. Singh.
 2    And I -- the very next day I was called in and put back on to
 3    my blood pressure medication.
 4    **Q.**  So in that interaction with Dr. Singh, did you feel like
 5    you were forced to have that out in the open because it was
 6    near lunch or -- or?
 7    **A.**  Oh, no.  No, no.  Not at all.  He actually took me to the
 8    side when I -- when I went to approach him.  He wanted to know
 9    what was going on.  And I started to tell him, and then he cut
10    me off, took me more to the side and asked me about what was
11    going on, and then wrote my name down and had a call-out for
12    me the next day.
13    **Q.**  And so you mentioned you'd been prescribed medication --
14    **A.**  Yes.
15    **Q.**  -- is that right?
16       Is that medication that you are able to take back with
17    you, or do you have to pick that up?
18    **A.**  I'm able to take it back with me.
19    **Q.**  Okay.
20       So we discussed programming and medical.  I want to talk a
21    little bit about psychology.  Have you had interactions with
22    the psychology unit?
23    **A.**  I have.  More intake.  We -- they came to see me twice
24    just to see how I was.  Ask the generalized questions.  I did
25    talk about my anxiety, and then they offered different classes

```
1    to take for anxiety and made sure that I was on different wait
2    lists to -- to take those classes.
3        They offered me to go see them as well if I ever needed
4    to.  I just don't feel my anxiety is that bad.  But if I ever
5    did need to, I could reach out to them.  I reached out one
6    time before I went on a writ to a different county just --
7    just recently.  And the doctor asked me to go see her, to sit
8    down with her.
9        Unfortunately I was taken out like two days later and I
10   didn't have the time to go see her, but that was a possibility
11   for me to go.  And if I didn't leave to San Diego, I would
12   have definitely gone.
13   Q.  Have you had a reason to use any of the legal lines,
14   the -- the confidential phone booths?
15   A.  Yes.
16   Q.  You have?
17   A.  Yes.
18   Q.  And how is that experience using that pilot program phone
19   line been?
20   A.  It's been great.  It's been great.  I've had no issues
21   with it.  I was able to call my lawyer.  I was able to get the
22   numbers put into the system right away with my counselor,
23   Ms. Miner.  Right away it was available.  She -- I guess she
24   had to verify to make sure that was actually a legal office
25   that I was calling.  She did that and it was available the
```

1    next day.

2    **Q.**  Do you feel that anybody has treated you differently after

3    you used that phone booth?

4    **A.**  No.  No, not at all.

5    **Q.**  And -- and that includes both staff and inmates?

6    **A.**  No.

7    **Q.**  Sorry.  I -- I asked a bad question.

8         Have you felt that you've had any negative reactions from

9    staff or inmates as a result of you using the phone booth for

10   legal lines?

11   **A.**  No, not at all.

12   **Q.**  Okay.

13   **A.**  No.

14   **Q.**  Have you had any interactions with the chaplains?

15   **A.**  Yes.

16   **Q.**  And is that something you feel comfortable talking about?

17   **A.**  Yes, ma'am.

18   **Q.**  Tell me about what that interaction with the chaplains

19   have been like.

20   **A.**  Oh, it's been great.  Mr. Beck is the -- is the chaplain

21   that I -- that I know of.  He's been wonderful.  He sat me

22   down, talked to me about my faith because I was struggling

23   with it, you know, with everything going on.  Definitely

24   struggling with it.

25        He helped me to understand God's perspective.  And I don't

```
 1    know if I can bring that up in court, but to understand

 2    God's -- God's word better.  He really helped me implement it

 3    back into my life, which is something we're still kind of

 4    working on.  So we're still working on that.  But I do attend

 5    his -- his weekly service every Sunday, and it's been

 6    wonderful.  It's been wonderful.

 7    Q.  I didn't mean to interrupt.

 8    A.  Sorry.  That's okay.

 9    Q.  Sorry.

10    A.  That's okay.

11    Q.  Did you approach him for that?

12    A.  I did.

13              THE COURT:  How many people go to the weekly service?

14              THE WITNESS:  It varies anywhere between ten -- well,

15    for Christmas there was -- it was packed.  But I would say

16    about ten or 12.

17    BY MS. CZIOK:

18    Q.  Is the room big enough to support more people than ten or

19    12 people?

20    A.  Yes.

21    Q.  And do you interact with employees at the prison?

22    A.  Yes.

23    Q.  How often would you say you interact with people who are

24    employed?

25    A.  Every day.
```

1    **Q.**  And what are those -- what have those interactions been

2    like generally?

3    **A.**  They've been -- they've been good, professional,

4    helping -- helpful, not -- pretty good, very good.

5    **Q.**  Do you feel comfortable raising issues that you have to

6    staff at FCI Dublin?

7    **A.**  I do.  I do.  There's maybe one or two I don't, but, yes,

8    for the majority, yes.

9    **Q.**  For those one or two that you don't feel comfortable

10   approaching, if you approach somebody else to talk to someone

11   else, do you feel --

12           **THE COURT:**  I don't understand that question.

13           **MS. CZIOK:**  Pardon me?

14           **THE COURT:**  Rephrase your question.

15           **MS. CZIOK:**  Absolutely.  Thanks, Judge.

16   **Q.**  Do you feel when you talk to staff some other members of

17   staff treat you differently?

18   **A.**  No.  Not at all.

19   **Q.**  If you need to get in touch with someone specific at the

20   prison, do you know how to do so?

21   **A.**  Yes.

22   **Q.**  So if you wanted to get in touch with, for example,

23   Dr. Mulcahey, the psychologist, how would you go about getting

24   in touch with her?

25   **A.**  Two ways.  We could use our -- I don't -- it's TRULINCS

1    or -- the computer system.  We can send her a direct cop-out

2    through the email.

3    **Q.**   I'm going to stop you.  What is a cop-out?

4    **A.**   It's an email directly to the -- the staff member that you

5    want to reach to.

6    **Q.**   Thank you.

7    **A.**   You're welcome.

8        Or we could go directly to psychology and if -- if she's

9    available, because she might be seeing other inmates, we

10   would -- we would just be told maybe send a electronic cop-out

11   or a written cop-out to her.

12   **Q.**   Have you had a reason to ever contact a member of the

13   staff by email?

14   **A.**   I have contacted a couple of them, yes.

15   **Q.**   How long -- who have you contacted?

16   **A.**   I've contacted Beck, Mr. Beck.  He -- I contacted him.

17   I've contacted Mr. Cortez in education.  And I've contacted --

18   oh, gosh, I forgot their name.  Psychology.  It's Dr. M, but I

19   forget her full name, her full last name.

20   **Q.**   Is it Mulcahey?

21   **A.**   Yes.

22   **Q.**   So who is Mr. Beck?

23   **A.**   Mr. Beck is the chaplain.

24   **Q.**   And was Mr. Beck responsive when you emailed him?

25   **A.**   Yes.

```
1    Q.   How long did it take Mr. Beck to respond?

2    A.   Just a couple of days.  But it did involve a weekend so it

3    was just a few days.

4    Q.   And then you mentioned Cortez in education.

5    A.   Yes.  That was within a day.  Yeah.

6    Q.   A response was within a day?

7    A.   Yeah, sorry.  A response was within a day.  Sorry.

8    Q.   And then Dr. M, Dr. Mulcahey, how long did it take to

9    receive a response from her?

10   A.   About two days.

11   Q.   Did you feel that those responses responded to the

12   questions or requests you had?

13   A.   A hundred percent, yes.

14   Q.   Do any of your close acquaintances or friends at the

15   prison make use of these services?

16   A.   Yes.

17   Q.   Generally what is their opinion of the different services

18   you've described?

19   A.   I have -- nobody's ever complained with me.

20           UNIDENTIFIED SPEAKER:  Speculation.

21           THE COURT:  Well, the question as framed calls for

22   speculation.  The answer was not without personal knowledge.

23       Next question.

24       So it's not stricken.

25           MS. CZIOK:  You can continue to answer.
```

```
 1                THE COURT:  No, she can't.  You need to ask a new
 2     question.
 3                MS. CZIOK:  Thank you, Judge.
 4                THE COURT:  But I'm not striking what she said.
 5                MS. CZIOK:  Oh, thank you, Judge.
 6     Q.  Have any of your friends or acquaintances talked to you
 7     about their experiences with these different services?
 8     A.  Yes.  They're the ones who actually -- so --
 9                THE COURT:  So that question is just a "yes" or "no"
10     question.
11                THE WITNESS:  Yes.
12     BY MS. CZIOK:
13     Q.  And what have they said?
14     A.  They've -- sorry.  They've --
15                THE COURT:  So that is objectionable.
16                THE WITNESS:  Okay.
17                THE COURT:  Hearsay is sustained.
18     BY MS. CZIOK:
19     Q.  Have you, while you've been in Dublin, been sexually
20     assaulted by a member of the staff?
21     A.  No.
22     Q.  Have you witnessed any incidences of sexual assault of the
23     staff on another inmate?
24     A.  No.
25     Q.  If that were to occur, do you know who you could -- what
```

```
 1    you could do to bring that up with somebody?

 2    A.   Absolutely, yes.

 3    Q.   And what are the different options of what you could do?

 4    A.   We can go directly to our floor officer, their unit

 5    officer.  We can go directly to any staff member at all,

 6    Warden, or Assistant Wardens, counselors, case managers,

 7    anybody that is there.

 8    Q.   Have you received any negative feedback from other inmates

 9    about your decision to come here today?

10    A.   Yes.

11              UNIDENTIFIED SPEAKER:  (inaudible).

12              THE COURT:  Yeah, you need to speak with more

13    confidence and more loudly.

14              UNIDENTIFIED SPEAKER:  Hearsay, Your Honor.

15              THE COURT:  Overruled.  And there's a mic there.  You

16    should use it.

17         So the question has been answered.  What's your next

18    question?

19    BY MS. CZIOK:

20    Q.   Who -- without using names, only using initials, who has

21    approached you or spoken to you about your testimony here

22    today?

23    A.   RF.

24              THE COURT:  That's an inmate?

25              THE WITNESS:  Yes, ma'am.
```

```
 1            TM, an inmate.

 2            I don't know the full initials of -- one is S, inmate.

 3   BY MS. CZIOK:

 4   Q.   Is S first or last name?

 5   A.   First name.

 6            And B, last name, also inmate.

 7            MS. CZIOK:  Your Honor, what would be the best way to

 8   get you those names not on the public record?

 9            THE COURT:  Well, let's -- let me come back to that.

10   I don't know that I need them but --

11            MS. CZIOK:  Okay.

12            THE COURT:  -- let's see.

13            MS. CZIOK:  Thank you, Your Honor.

14   Q.   And when did you interact with -- did you interact with

15   these individuals separately or together?

16   A.   One was separate.  The rest was together.

17            THE COURT:  Which was separate?

18            THE WITNESS:  TM was separate.

19            THE COURT:  That was separate, and the other three

20   were a group?

21            THE WITNESS:  Yes, ma'am.

22            THE COURT:  Okay.

23   BY MS. CZIOK:

24   Q.   And where did you interact with that group of individuals?

25   A.   In the visiting room two days ago.
```

```
 1    Q.  Why did you go to the visiting room two days ago?

 2    A.  I had a call-out to go to the visiting room to talk to

 3    legal.  When I -- when I showed up there, that's when the

 4    other women were there, the other inmates.

 5    Q.  So did they approach you?  Did you go to them?  How did

 6    you interact?

 7    A.  I was told to sit down, and I went to sit down, and they

 8    were -- they were grouped at a table.

 9              THE COURT:  So this is on Monday?

10              THE WITNESS:  This was on Monday, yes, ma'am.

11              THE COURT:  Okay.

12              THE WITNESS:  I believe, yeah, Monday.

13    BY MS. CZIOK:

14    Q.  Who told you to sit down?

15    A.  The staff members there.  There was a -- two really nice

16    ladies that were in by the front door.  I don't know who they

17    were.  And then a -- one of the officers behind a desk.

18    Q.  And then so you sat down.  What happened next?

19    A.  When I sat down -- when I sat down, RF just kind of like

20    attacked verbally, asking what I was doing there and asking me

21    how could I be for the government and --

22              UNIDENTIFIED SPEAKER:  Hearsay, Your Honor.

23              THE WITNESS:  Sorry.

24              THE COURT:  I'm not -- well, what's the response on

25    the hearsay objection?
```

```
1            MS. CZIOK:  This is not being offered for the truth

2    of the matter asserted but the effect on the listener.

3            THE COURT:  All right.  I'll accept it for that

4    limited purpose.

5            THE WITNESS:  They were -- she specifically told me

6    that other inmates -- if I was aware that other inmates would

7    feel some type of way about me testifying for the government.

8    BY MS. CZIOK:

9    Q.  So just to clear that up, you said two days ago.  Was

10   that -- today is Thursday.  Was that Tuesday or Monday?

11   A.  It was Monday -- oh, I can't remember.

12           THE COURT:  Was it the first day -- was it

13   January 1st?

14           THE WITNESS:  No.

15           THE COURT:  Okay.

16           THE WITNESS:  No.

17   BY MS. CZIOK:

18   Q.  Tuesday, January 2nd then?

19   A.  Tuesday -- yes.

20   Q.  What else in this conversation -- was -- pardon me.  Let

21   me back up.

22       Who was in this group of other inmates that approached you

23   again?

24   A.  It was RF, S, first name S, last name B.

25       There were other inmates there also, but they didn't
```

```
 1    really say anything.

 2    Q.   So who was the first one who spoke to you?

 3    A.   RF.

 4    Q.   What did RF say?

 5    A.   She --

 6              UNIDENTIFIED SPEAKER:  Objection, Your Honor.

 7    Hearsay.

 8              MS. CZIOK:  Same response.

 9              THE COURT:  I'll accept it for the limited purpose.

10              THE WITNESS:  She -- she asked me why -- why would I

11    testify for the government.

12         She said that there was a list.  When I ask her how do you

13    even know?  And she said there was a snitch list and that I

14    was on a snitch list.

15         And she said that other inmates would feel some type of

16    way to know that I was on the stand testifying for the

17    government, that I wasn't -- I hadn't been there long enough

18    to know what's been going on, what I have to say doesn't

19    really matter because she's been there much longer as have the

20    other girls.

21    Q.   Did S say anything to you?

22    A.   Yes.

23    Q.   And what did S say to you?

24              UNIDENTIFIED SPEAKER:  Objection, Your Honor.

25    Hearsay.
```

```
 1              THE COURT:  Same --
 2              MS. CZIOK:  Same response.
 3              THE COURT:  Same issue.  So I'll accept it for its
 4    limited purpose.
 5              THE WITNESS:  S said the same thing, that if I
 6    testify for the government, then I would be considered a
 7    snitch.
 8    BY MS. CZIOK:
 9    Q.  And how about B, did B say anything to you?
10    A.  Yes.  Nothing -- nothing like that.  She -- she just was
11    saying I wouldn't -- how dare I -- how dare I testify for the
12    government when I haven't been there as long as they've been
13    there and I didn't experience what they experienced.
14    Q.  Did you get to see the snitch list that they talked about?
15    A.  No.
16    Q.  Do you know if that was a written list or just a verbal
17    list?
18    A.  I don't know for sure.
19        I don't know.  It just -- it sounded like it was -- it was
20    a written list.
21    Q.  Did -- then you mentioned there was one other interaction
22    with, I believe, RF; is that right?
23    A.  RF, there was one other interaction the next day in the
24    library.
25    Q.  Was that yesterday?
```

1    **A.**  That was yesterday.

2    **Q.**  And what happened during that interaction?

3    **A.**  That was interesting because she -- it seemed like she

4    knew everything that I was going to say.  And just basically

5    told me that I was betraying --

6          **UNIDENTIFIED SPEAKER:**  Objection, hearsay.

7          **MS. CZIOK:**  Same response.

8          **THE COURT:**  I'll allow it.  Go ahead.

9          **THE WITNESS:**  Okay.  That I was betraying my friends

10   and my fellow inmates.

11         **THE COURT:**  What did you say?

12         **THE WITNESS:**  I was betraying my friends and my

13   fellow inmates.

14         **THE COURT:**  Okay.  Thanks.

15   **BY MS. CZIOK:**

16   **Q.**  How did these interactions make you feel?

17   **A.**  I was very nervous.  I felt intimidated by her.  I felt --

18   I've had a little -- I felt a little scared, as much as I hate

19   to admit it, but I did feel a little bit nervous, a little

20   scared.

21        But then as I was walking back to my unit, it -- it faded

22   because of the person I know she is, the kind of person I know

23   that she is.  And then it just made me want to come here even

24   more.

25   **Q.**  Okay.  And why did it make you want to come here even

1    more?

2    **A.**  Because what's right -- in my opinion, what's right is

3    right and what's wrong is very wrong.  And a lot of the things

4    in my opinion that she's doing is very wrong.  A lot of things

5    that are being said are very, very wrong.  And I think the

6    majority of my friends there or the other inmates feel the

7    same way.

8        But they're intimidated by this particular person because

9    of the way that she comes --

10            **UNIDENTIFIED SPEAKER:**  Objection, speculation.

11   **BY MS. CZIOK:**

12   **Q.**  Have they expressed to you --

13            **MS. CZIOK:**  Oh, I'm sorry, Your Honor.

14            **THE COURT:**  I'll allow her to tell me what her

15   perceptions are.

16            **THE WITNESS:**  She goes to a lot of the inmates, and

17   they've told me --

18            **THE COURT:**  No.  That's -- that's too far.

19            **THE WITNESS:**  Okay.

20            **THE COURT:**  Just tell me what you observe.

21            **THE WITNESS:**  She intimidates a lot of us.

22            **MS. CZIOK:**  Thank you so much for your time today.

23            **THE WITNESS:**  You're welcome.

24            **MS. CZIOK:**  I appreciate you coming here.

25            **THE WITNESS:**  Thank you.

```
 1              MS. CZIOK:  Thanks, Stephanie.

 2         Before I go, Your Honor, would you like to get those

 3    individual initials on the record?

 4              THE COURT:  Are they testifying?

 5              MS. CZIOK:  I think they are, yes, Your Honor.

 6              THE COURT:  All right.  We'll come back to it.

 7         Cross.

 8              MS. CZIOK:  Thank you, Your Honor.

 9              UNIDENTIFIED SPEAKER:  Nothing further from

10    plaintiffs, Your Honor.

11              THE COURT:  So no cross.  All right.

12         Hold on.

13                    (Pause in the proceedings.)

14         THE COURT:  Given the list, there's only one person

15    who fits each of those descriptions.

16         Okay.  Have you, since your time in at -- at FCI Dublin,

17    have you had contact visits?

18              THE WITNESS:  No, ma'am.

19              THE COURT:  After you had the visit this week, were

20    you subject to a visual search?

21              THE WITNESS:  Yes, ma'am.

22              THE COURT:  And could you describe generally what

23    that visual search entailed?

24              THE WITNESS:  Sure.  There were two guards that

25    escorted me to a back room where we were -- where myself and
```

1    another inmate were put into individual little cubby areas.

2    And we were asked to strip so they could perform the search.

3    And that's about it.

4          **THE COURT:**  How long did it take?

5          **THE WITNESS:**  It was quick.  It was less -- maybe two

6    minutes.  Maybe less.  It was very quick.

7          **THE COURT:**  Okay.  Did you -- were you required to go

8    to the restroom and be watched while you were doing that?

9          **THE WITNESS:**  While I was being searched?

10         **THE COURT:**  After.

11         **THE WITNESS:**  No.  No.

12         **THE COURT:**  Okay.  That's all I have.  Anything on

13   that topic?  No?

14         **MS. CZIOK:**  No, Your Honor.

15         **THE COURT:**  All right.  You're excused.

16         **THE WITNESS:**  Thank you.

17         **MS. MATTIOLI:**  Your Honor, if I could inquire for

18   just witness management purposes, will the government be cut

19   off at 4:00 p.m. and not allowed to put on any testimony

20   tomorrow, given the interruption in the afternoon?  I'd like

21   to prioritize witnesses accordingly.

22         **THE COURT:**  So I don't -- look, this witness took

23   30 minutes.

24         **MS. MATTIOLI:**  Um-hmm.

25         **THE COURT:**  If -- how many witnesses are -- have the

1    plaintiffs decided on for tomorrow?

2          **MR. NIMNI:**  Your Honor, we put a call-out sheet for

3    five in the morning and five in the afternoon, which we

4    understand is the maximum the marshals transport at one time.

5    So ten for tomorrow and then the rest of our list for some

6    future day if there is one.

7          **THE COURT:**  If it's five in the morning and they go

8    as quickly, I would like you to have a witness available for

9    the -- for whatever break we have between morning witnesses

10   and afternoon witnesses.  I'd like not to waste time.

11         **MS. MATTIOLI:**  Yeah.

12         **THE COURT:**  So we have an hour.

13         **MS. MATTIOLI:**  Okay.  In that case, Your Honor, I'd

14   like to call Morgan Agostini.

15         **THE COURT:**  Okay.

16         **MS. MATTIOLI:**  Your Honor, the witness stepped into

17   the restroom.  She should be very quick.

18         **MR. GALVAN:**  Your Honor, may I be heard on one

19   housekeeping item while we're waiting?

20         **THE COURT:**  Sure.

21         **MR. GALVAN:**  The plaintiffs would like leave to add

22   one more incarcerated witness to our list for Monday so that

23   the government has time to transport her.  It's in rebuttal --

24         **THE COURT:**  Why?

25         **MR. GALVAN:**  -- to what we just heard.

1    **THE COURT:**  And that person is not testifying

2    tomorrow?

3    **MR. GALVAN:**  She is not on the list for tomorrow,

4    Your Honor.

5    **THE COURT:**  Which person, with which initials?

6    **MR. GALVAN:**  Her initials are NR.  I don't believe

7    she's been on any of the lists before.  She is a rebuttal

8    witness.

9    **THE COURT:**  There was no testimony about a person NR.

10    **MR. GALVAN:**  No, but there was a testimony about the

11    conditions under which witnesses were solicited to testify for

12    the government.  That's the subject of what NR will testify

13    about.

14    **THE COURT:**  And there's no other witness who's going

15    to testify to that topic?

16    **MR. GALVAN:**  Not to my knowledge, Your Honor.

17    **THE COURT:**  How is that a rebuttal to someone's

18    individual -- I don't see how that's a rebuttal.

19    **MR. GALVAN:**  It goes to the -- the credibility of the

20    witness who just testified regarding the manner in which

21    inmates were solicited to testify for the government.

22    **THE COURT:**  This person only testified as to the

23    manner in which she was contacted, not into the manner in

24    which everyone was contacted.

25    **MR. GALVAN:**  This witness has firsthand knowledge of

| | |
|---|---|
| 1 | what happened in the interviews with government's counsel. |
| 2 | **MS. MATTIOLI:**  Your Honor, they chose not to |
| 3 | cross-examine her. |
| 4 | **THE COURT:**  I still fail to see how it's rebuttal. |
| 5 | And if you knew someone had been -- and why it wasn't on the |
| 6 | list to begin with. |
| 7 | **MR. GALVAN:**  Well, Your Honor, this person contacted |
| 8 | us very recently.  She -- |
| 9 | **THE COURT:**  Well, that's different than saying it's |
| 10 | rebuttal. |
| 11 | **MR. GALVAN:**  I understand, Your Honor. |
| 12 | **THE COURT:**  So what's the answer?  Is it rebuttal or |
| 13 | is it a new witness? |
| 14 | **MR. GALVAN:**  Well, it's a new witness.  I had |
| 15 | considered it rebuttal, but it's also a new witness. |
| 16 | **THE COURT:**  It's not rebuttal.  Denied.  It's |
| 17 | already -- and I've got ten tomorrow so at this point, no. |
| 18 | **MR. GALVAN:**  Thank you, Your Honor. |
| 19 | **THE CLERK:**  Please raise your right hand. |
| 20 | |
| 21 | **MORGAN AGOSTINI**, |
| 22 | called as a witness for the defendants, having been duly |
| 23 | sworn, testified as follows: |
| 24 | **THE WITNESS:**  Yes.  Thank you. |
| 25 | **THE CLERK:**  Please be seated. |

```
 1              THE WITNESS:  Thank you.

 2              THE CLERK:  Please speak clearly into the microphone.

 3         Please state your full name and spell your last name for

 4    the record.

 5              THE WITNESS:  Okay.  My name is Morgan Agostini.

 6    Agostini is spelled A-G-O-S- as in Sam, T- as in Tom, I-N- as

 7    in Nancy, I.

 8              THE COURT:  Okay.  Good afternoon.

 9              THE WITNESS:  Good afternoon --

10              THE COURT:  You may proceed.

11              THE WITNESS:  -- Your Honor.

12              MS. MATTIOLI:  Thank you, Your Honor.

13                          DIRECT EXAMINATION

14    BY MS. MATTIOLI:

15    Q.  Good afternoon.

16    A.  Good afternoon.

17    Q.  Thank you for being flexible and hanging around.  We

18    appreciate it.

19    A.  No problem.

20    Q.  Can you please tell the Court about your background prior

21    to coming to FCI Dublin?

22    A.  Sure.

23         This coming January 6th marks 16 years in the Bureau of

24    Prisons.  I started in January 2008 as a correctional officer.

25         About three and a half years later, I promoted to case
```

1    manager.  I was a case manager for approximately four years.

2        And then I promoted again to unit manager.  From unit

3    manager, in that role for approximately five years, I then

4    took on the role as employee development manager at FC --

5            **THE COURT:**  What kind of development manager?

6            **THE WITNESS:**  Employee development manager at FCC

7    Victorville where I was responsible for the training of

8    approximately 1,000 staff.

9    **BY MS. MATTIOLI:**

10   **Q.**  How long were you -- something going around.

11       How long did you work at FCC Victorville?

12   **A.**  I was at FCC Victorville for 14 years.  During that time

13   as well, I picked up collateral duties where I was part of the

14   crisis negotiation team.  I was then moved up to the crisis

15   negotiation team leader where I led that team for

16   approximately ten years.

17       Because of my leadership abilities and skills, I was also

18   selected as a regional crisis negotiation team cadre member.

19       I was then moved on to the national crisis negotiation

20   team for the Bureau of Prisons.

21       And also I'm an incident command system instructor for the

22   region.

23           **THE COURT:**  Okay.  Hold on a second.

24               (Off-the-record discussion.)

25

1   **BY MS. MATTIOLI:**

2   **Q.**   So, Morgan, when you started at FCI Dublin, what was your

3   position?

4   **A.**   Executive assistant in satellite operations administrator.

5   **Q.**   Is an executive assistant in the corrections context a

6   secretary?

7   **A.**   No.  It's not a secretary.  It's its own role in the

8   executive ranks of the administration.

9   **Q.**   So can you tell us about all of the job duties that you

10  have?

11  **A.**   Sure.  As the executive assistant and satellite operations

12  administrator, it's a -- it's a dual role and a very important

13  role.

14      The executive assistant essentially is the warden's

15  right-hand person, where I am informing the Warden, Acting

16  Warden now, Mr. Deveney, of any recommendations,

17  implementation of policies, supplements, right-hand man of

18  decision making.

19      As a satellite operations administrator, I am responsible

20  for the satellite camp as a whole.

21      While the Warden is still the ranking official at the

22  overall institution, it's my responsibility to maintain the

23  safe and orderly running of the satellite camp.

24  **Q.**   Do you have any other duties with respect to records or

25  any other duties?

1     **A.**   Sure.   I'm also -- handle everything with the American

2     Correctional Association.   So that's our ACA compliance that

3     we're preparing for.

4          Also institution character profile, that's ICP.

5          Also community service projects which recently we

6     participated in during the holidays.   Angel Tree is generally

7     what we participate in.

8          You know, in quite a few other responsibilities as it

9     relates to having oversight of unit management specifically

10     related to the camp.

11     **Q.**   If somebody had a records request or a question about

12     something going on at FCI Dublin, who would respond to that?

13     **A.**   If -- generally the request will come into my dub

14     executive assistant-S box.   And it would depend on what's

15     being requested and where I would then refer that to.

16          For example, if it's medical records, there's a specific

17     path that they would take for that, or if it's a records

18     request or related to staff.   It would just depend on what the

19     request is relating to.

20     **Q.**   So if somebody requested something in relation to a

21     lawsuit, if we wanted information, where would we get that?

22     **A.**   So that's going to come from FOIA.   That's going to be the

23     Freedom of Information Act.

24     **Q.**   And that was a really bad question.   Specifically with

25     request to this lawsuit, when I wanted information about the

```
 1    prison, where did I get it?
 2    A.   Sure.  I was able to produce that.  As I am the person who
 3    sends all data really on behalf of the prison to the regional
 4    office, central office or what have you, the director's office
 5    as well.
 6    Q.   How do you, in your role, interact with the community if
 7    at all?
 8    A.   So as the public information officer for the institution
 9    as well, I'm also participating in external meetings.  For
10    example, we have quarterly community relations board meetings
11    for FCI Dublin specifically.
12        Also external meetings for the military and federal
13    community meetings with City of Dublin and our partners at
14    Camp Parks nextdoor, the Army Reserve base.
15    Q.   Have you ever had to step into the role of an Acting
16    Associate Warden at Dublin?
17    A.   Yes.  And not just at Dublin.  I was called upon often to
18    act as an Associate Warden at FCC Victorville.
19    Q.   Are you familiar with the declaration that you provided in
20    this case?
21    A.   Yes.
22    Q.   Is there anything in the declaration that you don't have
23    personal knowledge of?
24    A.   No.  That declaration was produced by all documentation
25    that I retain based upon all of my required reporting or
```

```
 1    special inquiries that may come in through the director's
 2    office or Office of Legislative Affairs, Office of Public
 3    Information.
 4    Q.  Thank you.
 5        I want to back up just a little bit and ask you a really
 6    important question.  Why did you decide to come to work at
 7    Dublin?
 8    A.  Thank you.  Thank you for asking that question.
 9        Coming to work at Dublin was not a promotion for me.  It
10    was a lateral move but an important move.  It was necessary
11    for me to come here because of my leadership abilities, my
12    ability to communicate with both staff and inmates.
13        During my 16 years of service with the Bureau of Prisons,
14    I have always treated everybody, whether it's a staff or an
15    adult in custody, with kindness and respect because I
16    absolutely believe that's what is required of all of us.
17              THE COURT:  Who asked you to come?
18              THE WITNESS:  Well, Your Honor, I applied for the
19    job.  It was posted.  I applied for the job opening.
20              THE COURT:  So it was posted nationwide?
21              THE WITNESS:  Yes, ma'am.  Yes, Your Honor.
22              THE COURT:  And did you know at the time that there
23    were issues at Dublin?
24              THE WITNESS:  Not to the scale of which I arrived.  I
25    arrived to Dublin in July of 2022.  So I knew there were
```

1    problems noted, but I didn't know to the degree.

2    **BY MS. MATTIOLI:**

3    **Q.**  When you arrived at Dublin in July of 2022, what did you

4    see?

5    **A.**  I saw staff that needed guidance.  Staff were needing

6    extra training and assistance really.

7        I've always prided myself on being a supervisor.  I've

8    been a supervisor in my career longer than I've been a line

9    staff.  But I've never been above ever doing the basics

10   because I'm a correctional officer and worker first.

11       And so even if that means I need to show somebody how to

12   pack property and inventory it, even if that means that they

13   might need assistance with a document like how do I write a

14   memo, I've never written one before, I'm always -- I'm always

15   all about training.

16       And so when I got to Dublin, I saw that some people just

17   didn't know certain basics.

18   **Q.**  When you first walked through the satellite camp your

19   first day on the job, what was that like?

20   **A.**  My first day at the satellite camp, it showed that there

21   was maybe a lack supervision because there was only a

22   department head assigned there, you know, half of a day at a

23   time.

24       And so while I was doing my rounds, which I'm very

25   diligent about, there was an inmate utilizing a cellular phone

```
 1    in her bunk.

 2    Q.   Is that allowed?

 3    A.   That's not allowed.  That's considered a 100-series-level

 4    incident report, which is the highest level.  So that's

 5    considered hard contraband.

 6    Q.   How did you address that?

 7    A.   So, you know, just respectfully.  Right?  Because you're

 8    not -- I'm new to the institution, don't yet have a rapport

 9    with inmates or staff.  So I just advised the individual to

10    hand me the cell phone.  She knew and understood that wasn't

11    okay to have.  She also turned over cigarettes and vape pens

12    as well.

13            THE COURT:  She -- I'm sorry.  She turned over what?

14            THE WITNESS:  Cigarettes.  Cigarettes and vape,

15    vaping device.

16            THE COURT:  Yeah.

17            THE WITNESS:  Yeah.

18        And so I called another staff member for safety.  And we

19    then escorted her out, and then I escorted her over to the FCI

20    where she was then placed in the Special Housing Unit for the

21    contraband.

22    BY MS. MATTIOLI:

23    Q.   So, Morgan, are you aware of The Moss Group report?

24    A.   Yes, I am.

25    Q.   And how are you aware of it?
```

1    **A.**    I'm aware of it.  I am privy to it because I'm an

2    executive staff member.

3    **Q.**    And what is your understanding of that report, if you

4    could explain it?

5    **A.**    Sure.  The Moss Group assessment, I was not there when The

6    Moss Group initially came.  I didn't report until July of

7    2022.  But The Moss Group assessment was a cultural assessment

8    where it -- it showed that training needed to take place at

9    FCI Dublin, that we needed to work on, you know, the specific

10   training for female offenders, things like that.

11        And so we took their recommendations very seriously,

12   and -- and worked to ensure during annual training of 2023

13   that these started to take place.

14        And they were in-person trainings.  And that was another

15   great shift for us, is coming out of COVID.  We were in red

16   and yellow.  And as we all know, during red, in-person

17   training for many agencies was prohibited.

18        So when we came out of the red and yellow and we got into

19   green, COVID level green, we were able to do in-person

20   training for annual training this past year.

21   **Q.**    Did you implement or are you aware of the implementation

22   of any of the other recommendations?

23   **A.**    Specifically relating to?

24   **Q.**    Or not even related to recommendations from the report

25   necessarily, but other changes that were made at Dublin after

```
 1    you arrived.
 2    A.   One of the implementations was me specifically.  My -- my
 3    direct oversight of the satellite camp.  So one of the
 4    assessments was the lack of supervision at the satellite camp.
 5    So my specific role and place was that, and that was
 6    implemented, and here -- here I am with you all today.
 7    Q.   Lucky you.
 8    A.   Yes.
 9    Q.   So, Morgan, I want to switch topics.
10    A.   Okay.
11    Q.   So you were brought on as part of a wave of new staff at
12    Dublin in 2022; is that right?
13    A.   That's correct.
14    Q.   Who else started in 2022?
15    A.   So I can speak for July of 2022 specifically.  I mean
16    Warden Jusino, now retired, came to Dublin in February of '22.
17    But in July of 2022, I onboarded.  Captain Quezada was on
18    board.  Captain Valero was on board maybe at the end of June
19    of '22.  And also Acting Warden Deveney.
20    Q.   So those are members of the executive team; is that
21    correct?
22    A.   That's correct.
23    Q.   Were other department heads also replaced.
24    A.   Yes.  So August of '22 is when essentially the mass shift
25    of department heads out of FCI Dublin took place, August 14th
```

1     2022.

2          Also on board Associate Warden, now retired, Tammy Robles

3     was on board in May of '22.  And now retired Associate Warden

4     Beth Buckner was on board in August of 2022.

5     **Q.**  And what is your understanding of why all of those

6     positions were changed?

7     **A.**  All of the positions for the executive staff?

8     **Q.**  And the department heads?

9     **A.**  And the department heads?  To help with the -- the work of

10    the cultural change.  They wanted to have a new fresh set of

11    oversight.  And the wealth of knowledge and experience that

12    each of us provides was significant for the staff training

13    that was necessary and the -- the oversight.

14    **Q.**  Are you the administrative remedy coordinator?

15    **A.**  Yes, I am.

16    **Q.**  Is that another collateral duty?

17    **A.**  That is another collateral duty, yes.  I apologize for

18    forgetting that.

19    **Q.**  So what -- so in that role, do you also process -- what

20    else do you process in that role?

21    **A.**  Sure.  So administrative remedies are, you know, an

22    integral part of every institution BOP-wide.  And it's not

23    just at the institution level.  It goes regional and all the

24    way to central office.

25         And so as the administrative remedy coordinator, I am the

1    person that has eyes on all of the remedies before and after

2    the Warden signs, whether the remedy is recommended approved

3    or denied, what have you.  I'm the reviewer essentially.

4    **Q.**  Would it be fair to say then that you -- all of the

5    administrative remedies that are processed go through you?

6    **A.**  That's correct.

7    **Q.**  Do you read them?

8    **A.**  Yes.

9    **Q.**  What about the tort claims?

10   **A.**  Tort claims as well.  Yes.

11   **Q.**  What is the status of the backlog, if any, in processing

12   either of those things?

13   **A.**  There is no backlog in administrative remedies currently.

14   And there is no backlog in tort claims currently.

15       When I arrived, it's unfortunate to have to come in

16   knowing that administrative remedies were not responded to.

17   When I arrived, we were working to answer administrative

18   remedies that had been open since 2020.

19       We, from July to November, July 22 to November 22, we

20   cleared up the entire backlog of administrative remedies

21   dating back to 2020, '21, and everything that was unanswered

22   in 2022 up to that time.

23       Moving forward from November, we've remained timely.

24   **Q.**  So you would be in a unique position --

25            **THE COURT:**  Can you remind me who was in charge of

1    dealing with that -- those administrative remedies before you

2    arrived?

3          THE WITNESS:  Before I arrived?  I am unsure, Your

4    Honor, who the administrative remedy coordinator was before I

5    arrived.

6          THE COURT:  So you don't know who was responsible for

7    the backlog?

8          THE WITNESS:  It -- the administrative remedy

9    coordinator is assigned by the Warden, usually a department

10   head or above.  And I -- I am not sure who that person was.

11   BY MS. MATTIOLI:

12   Q.  Is that a collateral duty and not a standalone role?

13   A.  It's not a standalone role.  But at the warden's

14   discretion, duties are assigned to executive staff.  And that

15   is a duty that now retired Warden Jusino assigned to me

16   specifically.  And I've maintained that because of my ability

17   to be efficient and timely with those.

18   Q.  And just based on your experience having cleared that

19   backlog and read all of the administrative remedies that have

20   been filed between July of '22 and now, generally what has

21   your -- what is your opinion of the nature of those complaints

22   and how they've changed, if at all?

23   A.  Well, the nature of the administrative remedies vary.  So

24   for example, in 2023, we had 230 maybe -- no, strike that --

25   about 220 admin remedies.  And they range anywhere from

1    specifically PREA or staff misconduct or food service or

2    medical programming, there would be a range of complaints.

3        As far as a trend is concerned, I don't really think there

4    has been a specific shift other than, you know, an increase, I

5    suppose, because they're being responded to.  And they know

6    that they're being responded to.

7        So I mean it even goes to discipline, inmate discipline.

8    If they want to appeal a sanction, they can utilize that

9    system.

10   **Q.**  So what would be the most appropriate way for an inmate to

11   report a PREA allegation?  Do they use the administrative

12   remedy process for that?

13   **A.**  Absolutely.  There are many ways an individual can report

14   a PREA allegation or staff misconduct.

15       I'd like to -- to make a very -- a good point about my

16   arrival and how there was formerly a task force email.  The

17   task force email was one that was monitored by central office

18   because they too during their visit to Dublin found that

19   inmates were not being responded to.  They weren't being

20   responded to timely.

21       So the task force email box was created in approximately

22   March of '22.  But right around the time we became caught up

23   with all the administrative remedies, the task force mailbox

24   was closed the first week of November.

25       And I'm getting excited about talking about that because

1   that showed our hard work from July to November was already

2   paying dividends.  People in custody were seeing that they

3   were being responded to and they were being responded to

4   timely.

5        And so we no longer needed the oversight.  Central office

6   said, hey, FCI Dublin, you're doing a great job responding.

7   They were no longer getting allegations about staff misconduct

8   or PREA.

9        The -- the mailbox essentially was getting questions about

10  how do I get my FSA.  And they then deferred that to the local

11  facility, you know, for response.

12  **Q.**  And just for the record, what is FSA?

13  **A.**  First Step Act.

14  **Q.**  And why would an inmate be inquiring about that?

15  **A.**  First Step Act is great for them because they can earn

16  credit toward early release essentially.

17  **Q.**  And what sorts of things can they do to earn this credit?

18  **A.**  Their programming for one.  Absolutely.  EBBRs, evidence

19  based, you know, programming.  RDAP, Resilient Drug Abuse

20  Program.

21       Unfortunately we don't have RDAP at FCI Dublin, but that

22  doesn't preclude any inmate who's eligible for RDAP for

23  participating.  We just simply prepare their transfer to

24  another facility like Phoenix, for example.  That's another

25  camp.  Or, you know, any FCI facility that has RDAP.

```
 1            I wanted to circle back, if I could, about PREA reporting.
 2   Q.   Sure.
 3   A.   So --
 4            THE COURT:   What's the question?
 5   BY MS. MATTIOLI:
 6   Q.   I think the question that brought that up was what would
 7   be the most effective way for an inmate to report a PREA
 8   violation.  I asked if they could use the administrative
 9   remedy procedure.
10   A.   Yes.
11   Q.   And you said there were other ways.
12   A.   I did.  And I apologize.  I -- I wanted to make a note
13   because it was related to the task force mailbox how an inmate
14   could email them.  I wanted to also mention that on their
15   inmate's TRULINCS system for email, they could email OIG
16   directly.
17   Q.   Can they also email you directly?
18   A.   They can.  They can -- they can email any main staff box.
19   They can write to the regional director.  They can write
20   anything like a cop-out.  They can talk to a staff member.
21   They can also report it on Crime Stoppers.
22   Q.   Can you tell the Court how the satellite camp has changed
23   under your supervision?
24   A.   Yes.  Thank you.
25            So I get emotional.
```

1          I'm sorry.

2    **Q.**  Take your time.

3    **A.**  I pride myself.  I pride myself in the work that I have

4    done.  And it takes a village so I can't take credit solely.

5    My staff at the camp have done a wonderful job doing their

6    jobs.

7          The satellite camp has an 86 percent residential reentry

8    center utilization rating which is above and beyond.

9               **THE COURT:**  I don't -- so 86 percent what?

10              **THE WITNESS:**  Residential reentry center utilization.

11              **THE COURT:**  Residential reentry utilization?

12              **THE WITNESS:**  Yes, Your Honor.

13              **THE COURT:**  And what is that?

14              **THE WITNESS:**  So that is essentially a measure of the

15   offenders in our custody getting out to halfway houses or home

16   confinement.

17              **THE COURT:**  And -- okay.  So they leave.  Everybody

18   leaves at some point.

19              **THE WITNESS:**  Yes.

20              **THE COURT:**  So I still don't understand what the rate

21   refers to.

22              **THE WITNESS:**  The rate refers to these individuals

23   not releasing on their full term date.  This is -- this is a

24   measure of inmates going to halfway houses or home confinement

25   before their actual release date.

1          **THE COURT:**  And -- and not reoffending, being

2     successful?  Or is it just the fact of early release?

3          **THE WITNESS:**  It's the fact of early release.  The

4     measure of recidivism, I don't have.

5          **THE COURT:**  Okay.

6     **BY MS. MATTIOLI:**

7     **Q.**  How -- how would an inmate be released early from their

8     sentence?

9     **A.**  So they're -- they're not released early from their

10    sentence.  They simply get to participate in residential

11    reentry environment.  So that could mean if they go to a

12    residential reentry center, they could participate in drug

13    programming in the community that they might need.  It gives

14    them the opportunity to obtain a job, a real job in society,

15    get their -- get their -- their house in order, so to speak.

16    Make sure that they're able to provide for themselves and

17    their family.  Essentially a way to transition into the

18    community.

19    **Q.**  Are all inmates eligible for reentry programs in the

20    community?

21    **A.**  All inmates are reviewed for reentry.  You know, RRC and

22    home confinement.  But not all inmates are eligible

23    unfortunately.

24         And the individuals who wouldn't be eligible are non-U.S.

25    citizens.  Okay?

1          Also, any inmate that might have a detainer with another

2     agency or who might be serving another sentence maybe with

3     a -- a state department of correction.

4     **Q.**   Can BOP sign U visas?

5     **A.**   No.

6     **Q.**   And one question I didn't ask about the administrative

7     remedy process.  If you became aware through the

8     administrative remedy process that an inmate was complaining

9     about staff sexual abuse, what would you do?

10    **A.**   That would be reported immediately.

11    **Q.**   And who would you report it to?

12    **A.**   So that's going to be reported to the Special

13    Investigative Agent who currently is acting Allen Baudizzon.

14    And then of course the PREA compliance manager, Acting Warden

15    Deveney.

16    **Q.**   Are you aware of how the Special Housing Unit is utilized

17    at Dublin?

18    **A.**   Yes.

19    **Q.**   And how are you aware?

20    **A.**   Well, I'm aware because as an executive staff member, for

21    one, and as the satellite camp administrator, sometimes

22    inmates from the satellite camp are housed in SHU.

23         Regardless, if -- if there are inmates from the camp

24    housed in SHU, I'm part of the weekly Special Housing Unit

25    meetings.

1      I also go to SHU weekly to do rounds and talk to the

2   inmates.

3   Q.   And even though you administer the satellite camp, do you

4   do rounds in the FCI as well?

5   A.   Yes, I do.

6   Q.   And how often do you do that?

7   A.   I go with the executive staff.  You know, we'll stand main

8   lines together or we'll just do rounds in the unit.  I'm

9   pretty often at the FCI.

10  Q.   Why are rounds in the unit important?

11  A.   We want to show the inmate population that they can speak

12  to us.  But it's also very serving to the staff.  We want to

13  make the staff know that we're accessible for any questions or

14  anything that they need.

15  Q.   Do you feel when you do rounds, based on the experiences

16  of people coming up to you, that they feel comfortable

17  approaching you?

18  A.   Yes.  So I pride myself on being a person of trust, being

19  a person who has been used for, you know, mitigating any

20  unnecessary gripes, so to speak.  And that's both staff and

21  inmates.

22  Q.   Are you aware of an inmate being placed in SHU in

23  retaliation for reporting staff sexual misconduct?

24  A.   I am not aware.

25  Q.   Have you ever placed an inmate in SHU or recommended

1    placement in SHU to retaliate against them?

2    **A.**  Never.

3             **MS. MATTIOLI:**  I think that's all I have, Your Honor.

4             **THE COURT:**  All right.  We'll start with cross.

5             **MR. ANDERSON:**  Your Honor, may we approach with

6    binders.  It's only going to be one exhibit.  It's a thick

7    binder but only one exhibit that we'll use.

8             **THE COURT:**  Yes.

9             **MR. ANDERSON:**  Carson Anderson from Arnold & Porter.

10   My apologies.

11            **THE COURT:**  You may proceed.

12                          <u>CROSS-EXAMINATION</u>

13   BY MR. ANDERSON:

14   **Q.**  My name is Carson Anderson.  I'm an attorney from the law

15   firm Arnold & Porter, on behalf of the plaintiffs.

16       Thank you for joining us here this afternoon.

17   **A.**  Thank you.

18   **Q.**  I'm going to try and keep this short.

19   **A.**  Okay.

20   **Q.**  Especially, you know, time is a factor here.

21       During your direct testimony, Ms. Mattioli mentioned a

22   declaration that you had submitted in this case.  Do you

23   recall that?

24   **A.**  Yes.

25   **Q.**  I'm happy to pull up the declaration if you want, but I

1    just have some -- some questions.

2        I read in your declaration that FCI Dublin now has

3    385 cameras online and recording.  Is that true?

4    **A.**  Yes.

5    **Q.**  Are the video feeds from those cameras monitored in real

6    time?

7    **A.**  Yes.

8    **Q.**  So there's -- there's a person sitting at a desk watching

9    those video feeds?

10   **A.**  It's recording in real time.

11   **Q.**  But is a person watching it in real time?

12   **A.**  All 385 cameras?

13   **Q.**  That's my question.

14   **A.**  I wouldn't be able to answer that.  The control center

15   officer monitors cameras in the control center.

16   **Q.**  That's one person?

17   **A.**  Yes.

18   **Q.**  Okay.

19           **THE COURT:**  Well, there aren't 385 screens.

20           **THE WITNESS:**  Right.

21           **THE COURT:**  Are there?

22           **THE WITNESS:**  No, ma'am.  No, Your Honor.

23           **THE COURT:**  So how many screens are there?

24           **THE WITNESS:**  I --

25           **THE COURT:**  Approximately?

```
 1              THE WITNESS:  Maybe three to four screens.
 2              THE COURT:  And how does it cycle through the
 3  385 cameras?
 4              THE WITNESS:  I can't answer that question, Your
 5  Honor.
 6              THE COURT:  Okay.
 7  BY MR. ANDERSON:
 8  Q.  You stated in your declaration that there are no cameras
 9  inside the Dublin staff offices; is that right?
10  A.  Correct.
11  Q.  Are you aware that at least two of the plaintiffs in this
12  case are alleging that they were sexually abused inside of the
13  FCI staff offices?
14  A.  Can you repeat your question?
15  Q.  Are you aware that at least two of the plaintiffs in this
16  case are alleging that they were sexually abused in the Dublin
17  staff offices?
18  A.  No.  I am -- I wouldn't -- I'm not privy to certain
19  complaints if I'm not aware of it myself.
20  Q.  You didn't read that in the declarations that they
21  submitted in this case?
22  A.  The individual -- if this is what you're asking as far as
23  the compound office; is that what you're asking?
24  Q.  That's right.
25  A.  That one?  That's what I'm aware of, yes.
```

1    **Q.**  So I'm unclear on your answer.  You are aware of those

2    allegations?

3    **A.**  Yes.

4    **Q.**  Despite your awareness of those allegations, you have not

5    installed any cameras in the Dublin offices, correct?

6    **A.**  Correct.

7    **Q.**  I'd like to pull up your -- your declaration.  That's at

8    Exhibit 45 if you want to turn to it in your binder, or we

9    will have it on the screen for you.

10   **A.**  Whatever's easier.

11                         (Exhibit published.)

12   **BY MR. ANDERSON:**

13   **Q.**  So specifically just first, do you recognize this as your

14   declaration, Ms. Agostini?

15   **A.**  Yes.

16          **MR. ANDERSON:**  Your Honor, we would move to admit

17   Exhibit 45.

18          **THE COURT:**  Forty-five is admitted.  It's already

19   part of the docket.  But I'll admit it here.

20          (Plaintiffs' Exhibit 45 received in evidence.)

21          **MR. ANDERSON:**  Thank you, Your Honor.

22   **Q.**  I'd like to turn to page 13 of your declaration.

23   **A.**  Okay.

24        (Reviewing document.)

25        Okay.  Yes.

```
1    Q.   Towards the bottom of the page above paragraph 33, do you
2    see the bolded statement marked number 6 that reads "BOP
3    ensures that officers who have substantiated claims of sexual
4    abuse and harassment are promptly fired and are not permitted
5    to return to BOP employment."  Do you see that?
6    A.   Yes.
7    Q.   Is that a true statement?
8    A.   Substantiated claims, yes.  But this would be coming from
9    the office of OIA.
10   Q.   If you go to paragraph 38 of your declaration, that is on
11   page 15.
12   A.   Okay.  Yes.
13            THE COURT:  And I can't tell from what you've
14   provided to me.  Was some of this done under seal?
15            MR. ANDERSON:  If you -- your copy has redactions?
16            THE COURT:  No.  I'm asking whether this was filed
17   under seal.
18            MR. ANDERSON:  Yes, it was.
19            THE COURT:  And I don't see in what you've provided
20   to me highlighted what was under seal and what wasn't.
21            MR. ANDERSON:  This is the copy that we got from the
22   docket when downloading the sealed version so....
23            THE COURT:  Do you know what part of this was filed
24   under seal?
25            MR. ANDERSON:  Based on the highlighting in this -- I
```

1  don't think there is any highlighting in this.  So I think the

2  answer is no, I don't know.

3          **THE COURT:**  You -- look.  I can't have you asking

4  questions from a document that is filed under seal.

5          **MR. ANDERSON:**  Understood, Your Honor.  If I could

6  just take a moment to take a look at the redacted version.

7          **THE COURT:**  Okay.

8                  (Pause in the proceedings.)

9          **THE COURT:**  And BOP counsel, under our rules these

10  things needed to be highlighted so that I can --

11          **MS. MATTIOLI:**  We sent a chambers copy with the

12  highlighted.  I didn't introduce that as an exhibit here

13  today.  But when we --

14          **THE COURT:**  On the docket, it should be highlighted.

15  I should be able to go to the docket and see --

16          **MS. MATTIOLI:**  In the publicly filed version?

17          **THE COURT:**  No.  In the version that's available to

18  me as the judge, I should be able to look at an electronic

19  copy that shows what is highlighted which matches what is

20  redacted.

21          **MS. MATTIOLI:**  Understood.

22          **THE COURT:**  And that didn't happen, I take it?

23          **MS. MATTIOLI:**  It did.

24          **THE COURT:**  It did happen?

25          **MS. MATTIOLI:**  Double-checking.

**MR. ANDERSON:** So, Your Honor, that may -- this is the copy we downloaded from the docket, that we were sent, and it doesn't have any highlights so....

**THE COURT:** Could you give me a docket number?

**MR. ANDERSON:** 46-1 is the redacted version. And the paragraphs that I intend --

**THE COURT:** I'm not looking -- I'm asking about --

**MS. MATTIOLI:** Forty-seven.

**THE COURT:** Okay.

**MS. MATTIOLI:** Nope, sorry.

**THE COURT:** No. It looks like 45-4.

**MS. MATTIOLI:** That's right.

**THE COURT:** Right?

**MS. MATTIOLI:** Yes, Your Honor.

**THE COURT:** All right. Now what paragraph do you want to ask about?

**MR. ANDERSON:** Paragraph 38, Your Honor, and it looks like it is redacted.

**MR. GALVAN:** But it's not highlighted.

**THE COURT:** Okay. I'm looking at 45-4. It is not compliant with local rules. There's a reason we have that rule. So I can look at it and see what you're asking be redacted. I can't tell from this document.

**MS. MATTIOLI:** We have an electronic highlighted version that we can send you.

```
 1              THE COURT:  That would be helpful.

 2         I'm assuming paragraph 38 is a redacted paragraph.

 3              MS. MATTIOLI:  It is.

 4              THE COURT:  Yeah, it's a little bit obvious.

 5         All right.  You need to get your -- yourself better

 6    organized.

 7         We're going to end for today.  It's three minutes till

 8    4:00.

 9         Please send me that highlighted version.

10              MS. MATTIOLI:  Yes, Your Honor.

11              THE COURT:  Copy the other side.

12              MR. CHA-KIM:  Your Honor, may we be heard briefly at

13    sidebar?  We've requested that prior to all the afternoon's

14    conversations, but there's a small matter to discuss.

15              THE COURT:  Okay.  Is there anything to discuss on

16    the record before tomorrow?

17              MR. ANDERSON:  No, Your Honor.

18              MS. MATTIOLI:  No, Your Honor.

19              THE COURT:  Ms. Agostini, you're currently under

20    cross-examination.  Accordingly, you may talk to no one about

21    your testimony, including the lawyers for the defense.

22         Do you understand?

23              THE WITNESS:  Understand.

24              THE COURT:  "No one" means no one.

25              THE WITNESS:  I understand, Your Honor.
```

1    **THE COURT:**  Okay.

2        You're not released.  Tomorrow, we're going to have all

3    the inmates so someone will tell you whether or not you're

4    going to be on standby.  Okay.

5    **THE WITNESS:**  Yes, Your Honor.  Thank you.

6    **THE COURT:**  You can step down.

7        All right.  We're adjourned for the day.  I'll talk to you

8    at sidebar.

9        (Proceedings were concluded at 3:59 P.M.)

10                        --o0o--

11

12

13                **CERTIFICATE OF REPORTER**

14

15        I certify that the foregoing is a correct transcript

16    from the record of proceedings in the above-entitled matter.

17    I further certify that I am neither counsel for, related to,

18    nor employed by any of the parties to the action in which this

19    hearing was taken, and further that I am not financially nor

20    otherwise interested in the outcome of the action.

21

22    _____

23    Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

24                Thursday, January 4, 2024

25

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**