**Pages 1 - 47**

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

CALIFORNIA COALITION FOR WOMEN )
PRISONERS, ET AL.,             )
                               )
          Plaintiffs,          )
                               )
  VS.                          )      **NO. CV 23-04155-YGR**
                               )
UNITED STATES OF AMERICA       )
FEDERAL BUREAU OF PRISONS,     )
ET AL.,                        )
                               )
          Defendants.          )
_____)

                          Oakland, California
                          Tuesday, January 2, 2024

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    ARNOLD & PORTER KAYE SCHOLER LLP
                    250 West 55th Street
                    New York, NY 10019
               BY:  **STEPHEN SEUNGKUN CHA-KIM, ESQUIRE**

                    ROSEN BIEN GALVAN & GRUNFELD LLP
                    101 Mission Street, Sixth Floor
                    San Francisco, CA 94105
               BY:  **ERNEST JAMES GALVAN, ESQUIRE**

                    RIGHTS BEHIND BARS
                    416 Florida Avenue NW
                    Washington, DC 20001
               BY:  **OREN NIMNI, ESQUIRE**

Reported By:        Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                    Official Reporter

**APPEARANCES CONTINUED:**

For Plaintiffs:
        CALIFORNIA COLLABORATIVE FOR IMMIGRANT
        JUSTICE
        1999 Harrison Street, Suite 1800
        Oakland, CA 94612
      BY:  **SUSAN M. BEATY, ESQUIRE**

For Defendants:
        OFFICE OF THE UNITED STATES ATTORNEY
        901 Front Street, Suite 110
        Helena, MT 59626
      BY:  **MADISON MATTIOLI**
        **ABBIE CZIOK**
        **ASSISTANT UNITED STATES ATTORNEYS**

Also Present:      **ROBERT FRANCE**
          **KRISTI SUTTON**
          **MICHELLE LO**
          **ALEXIS JAMES**

## **E X H I B I T S**

| **DEFENDANTS' EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| A | 13 | | 1 |
| B | 14 | | 1 |
| C | 14 | | 1 |
| D | 15 | | 1 |
| E | 17 | | 1 |
| F | 20 | | 1 |
| G | 22 | | 1 |
| H | 25 | | 1 |
| J | 26 | | 1 |
| K | 28 | | 1 |
| L | 43 | | 1 |

| | |
|---|---|
| 1 | <u>**Tuesday - January 2, 2024**</u>                                        **8:10 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Your Honor, we're calling CV 23-4155-YGR, |
| 5 | California Coalition for Women Prisoners, et al. vs. United |
| 6 | States of America Federal Bureau of Prisons, et al. |
| 7 | Please step forward and state your appearances for the |
| 8 | record, please, so everyone should come to the podium and state |
| 9 | their appearances. |
| 10 | **THE COURT:**  We'll start with plaintiffs. |
| 11 | **MR. CHA-KIM:**  Good morning, Your Honor.  Stephen |
| 12 | Cha-Kim, Arnold & Porter, on behalf of the organizational and |
| 13 | individual plaintiffs. |
| 14 | **THE COURT:**  Okay. |
| 15 | **MR. GALVAN:**  Good morning, Your Honor.  Ernest Galvan, |
| 16 | Rosen Bien Galvan & Grunfeld, on behalf of plaintiffs. |
| 17 | **MX. BEATY:**  Good morning, Your Honor.  Susan Beaty |
| 18 | from the California Collaborative for Immigrant Justice on |
| 19 | behalf of plaintiffs. |
| 20 | **MR. NIMNI:**  And good morning, Your Honor.  Oren Nimni |
| 21 | on behalf of plaintiffs from Rights Behind Bars. |
| 22 | **THE COURT:**  All right.  Good morning. |
| 23 | For the defense. |
| 24 | **MS. MATTIOLI:**  Good morning, Your Honor.  Madison |
| 25 | Mattioli for the United States. |

```
1           THE COURT:  Good morning.  You're from Montana?

2           MS. MATTIOLI:  Yes.

3           THE COURT:  Welcome to the Bay Area.

4           MS. MATTIOLI:  Thank you.

5           THE COURT:  We wish we had some snow.

6           MS. CZIOK:  Abbie Cziok on behalf of the

7   United States.

8           THE COURT:  Good morning.

9       I have someone here from Ismail Ramsey's office?

10          THE CLERK:  Ms. Lo.

11          MS. LO:  Good morning, Your Honor.  I'm Michelle Lo.

12  I'm with the U.S. Attorney's Office for the Northern District

13  of California here on behalf of U.S. Attorney Ramsey, and my

14  colleague --

15          MS. JAMES:  Assistant United States Attorney Alexis

16  James for the Government.

17      Good morning, Your Honor.

18      Good morning, everyone.

19          THE COURT:  Good morning.

20      The reason that -- hold on.

21      The reason that I called you here is because there --

22  well, let me ask:  Have you had an opportunity to look at

23  Docket 23-4155, which is this case, either one of you?

24          MS. LO:  I have, Your Honor.

25          THE COURT:  Okay.  So to recap on that, at about
```

1    midnight on Thursday, there was a filing by the plaintiffs

2    complaining about access to their clients in preparation for an

3    evidentiary hearing.  In that filing, allegations were made

4    that unlike -- or contrary, I would say, to prior practice,

5    inmates were being strip searched after meetings with their

6    attorneys.

7        I am concerned of potential witness tampering.  I do not

8    know whether it is there or not, but if so, it is potentially

9    criminal action.

10        So welcome to the -- I would say "party," but I don't

11    really want to say "party."  It's not quite a party.  It's

12    unfortunate.

13        So thank you for being here.  I'd just like you to be here

14    while all of this is unfolding.  I don't have anything other

15    than what's been filed.  I don't have any information, but it

16    does make me concerned given the criminal activity that has

17    happened at Dublin.

18            **MS. JAMES:**  Understood.

19            **THE COURT:**  Thank you.

20        All right.  It is unfortunate that we are here today.

21        I'd like to know who's in the audience.

22            **MS. MATTIOLI:**  Your Honor, I have with me --

23            **THE COURT:**  You need to be at the mic.

24            **MS. MATTIOLI:**  I have with me at counsel table Rob

25    France.  He is a lawyer for the BOP.

```
1            THE COURT:  How do you spell his last name?

2            MS. MATTIOLI:  F-R-A-N-C-E.

3            THE COURT:  F-R-A-N-C-E as in the country.  And he is

4    a BOP attorney?

5            MS. MATTIOLI:  Correct.

6            THE COURT:  Internal to BOP?

7            MS. MATTIOLI:  Correct.

8            MR. FRANCE:  Yes.

9            THE COURT:  All right.  Who else?

10           MS. MATTIOLI:  And also with us at counsel table is

11   Kristi Sutton, S-U-T-T-O-N.  She is also an attorney for BOP.

12           THE COURT:  Where is the warden?

13           MS. MATTIOLI:  I haven't got there yet.

14           THE COURT:  Okay.  How do you spell "Kristi"?

15           MS. MATTIOLI:  K-R-I-S-T-I.

16       So I have with me the acting warden of Dublin, Pat

17   Deveney, D-E-V-E-N-E-Y.

18           THE CLERK:  I'm sorry.  What was the first name?

19           MS. MATTIOLI:  Pat.

20           THE COURT:  D-E-V-E-N-E-Y?

21           MS. MATTIOLI:  Correct.

22           THE COURT:  Is that the gentleman standing?

23           MS. MATTIOLI:  Yes.

24           THE COURT:  When did he become acting?

25           MS. MATTIOLI:  He has been rotating acting.  They just
```

```
 1   named an interim warden last week.
 2            THE COURT:  Okay.  I don't know what you mean by that.
 3        So when did he begin?
 4            MS. MATTIOLI:  When did he start at the prison?
 5            THE COURT:  No.  When did he begin as acting warden?
 6            MS. MATTIOLI:  Warden Hosuno retired in September of
 7   2023.  He and Associate Warden Nash have been rotating acting
 8   warden duties.
 9            THE COURT:  Okay.
10        Who else do have you?
11            MS. MATTIOLI:  I have also with me the executive
12   assistant and satellite camp administrator, Morgan Agostini,
13   A-G-O-S-T-I-N-I.
14            THE COURT:  Okay.
15            MS. MATTIOLI:  The correctional captain, Ericka
16   Quezada, Q-U-E-Z-A-D-A.
17            THE COURT:  Ericka. E-R --
18            MS. MATTIOLI:  E-R-I-C-K-A.
19            THE COURT:  C-K-A.
20            MS. MATTIOLI:  Correct.
21            THE COURT:  R-U-E-S-A-D-A?
22            MS. MATTIOLI:  Q-U-E-Z-A-D-A.  Quezada.
23            THE COURT:  Okay.
24            MS. MATTIOLI:  And I have with me also Lieutenant
25   Angela Hardy, H-A-R-D-Y.
```

1          **THE COURT:**  What is her role?

2          **MS. MATTIOLI:**  She's the correctional lieutenant.

3          **THE COURT:**  So I thought Ericka Quezada was the

4    correctional captain.

5          **MS. MATTIOLI:**  Correct.

6          **THE COURT:**  And Angela Hardy's role is what?

7          **MS. MATTIOLI:**  She reports to Ericka, and plaintiffs

8    have made specific allegations against her that she is prepared

9    to talk about if you would like.

10         **THE COURT:**  All right.  Okay.

11      Who is in charge of the negotiations with providing access

12   of the plaintiffs to their lawyers?

13         **MS. MATTIOLI:**  For the government or for BOP?  I mean,

14   I -- I have been responsible exclusively for communicating with

15   Ms. Agostini and Mr. Deveney regarding what access is feasible

16   within the facility.

17         **THE COURT:**  Have you ever been to the facility?

18         **MS. MATTIOLI:**  I have.

19         **THE COURT:**  Before you were negotiating?

20         **MS. MATTIOLI:**  No.  But they have.

21         **THE COURT:**  Oh, I have, too.  That's why --

22         **MS. MATTIOLI:**  Have you been to the visiting room?

23         **THE COURT:**  I have.  And there's a lot of space there.

24         **MS. MATTIOLI:**  There is.

25         **THE COURT:**  There is a considerable amount of space.

1      **MS. MATTIOLI:**  Correct.

2      **THE COURT:**  And the -- not -- I'm not talking about

3   the visiting room.  I'm talking about the facility.

4      **MS. MATTIOLI:**  And, Your Honor, if I could ask, before

5   we begin argument, if you would like to see the evidence that

6   we have brought with us today.  I have also have witnesses

7   prepared to discuss specifics.  My -- my statements are not

8   evidence.  The evidence that I have is here with me in the

9   courtroom.

10      **THE COURT:**  All right.

11      **MS. MATTIOLI:**  You have not heard it yet.

12      **THE COURT:**  I agree.  I have not made any rulings yet.

13      **MS. MATTIOLI:**  Okay.

14      **THE COURT:**  I'm not happy that I'm here at 8:00 trying

15   to deal with and micromanage something that you all should have

16   figured out on your own.

17      **MS. MATTIOLI:**  I agree.

18      **THE COURT:**  So what do you have for me?

19      **MS. MATTIOLI:**  Several of these documents are for

20   in camera review, if that's appropriate.  We didn't have

21   sufficient time to redact, but I could tell you what they are,

22   and I can hand them to you.

23      **THE COURT:**  Before I get started with that, your

24   meetings happening in Dublin per my order as we speak?

25      **MS. MATTIOLI:**  Yes.

1          **THE COURT:**  All right.  Go ahead.

2          **MS. MATTIOLI:**  The first document I have, Your Honor,

3    are a stack of attorney entrance memos for legal visits.  These

4    were when attorneys are approved to visit the institution, a

5    memo is prepared by the executive staff detailing their

6    entrance.

7        The reason those are for in camera is they don't only

8    relate to plaintiffs' counsel.  It illustrates visits happening

9    with a number of different firms on several days.

10       I only went back two months prior to today.  And that --

11   the next document for in camera is also a printout of the

12   call-outs for the inmates when they have a legal visit.  This

13   spreadsheet is only Tuesdays and Thursdays.  Those are the only

14   days that legal visitation happens at Dublin.  So if an inmate

15   is being called out for visitation on this list, it is for a

16   legal visit.

17       The highlighted names are named plaintiffs or plaintiffs'

18   witnesses.

19          **MR. CHA-KIM:**  Your Honor, may we be afforded copies of

20   these documents?

21          **MS. MATTIOLI:**  No.

22          **THE COURT:**  They are for in camera review.  Didn't you

23   hear her say that?

24          **MR. CHA-KIM:**  I heard "ex parte," not "in camera."

25          **THE COURT:**  We cannot hear you without a mic.  So I

1    don't know.  Did the court reporter get what you said?

2                    (Record Read.)

3            **MR. CHA-KIM:**  I wasn't sure if it was --

4            **THE CLERK:**  You should come to the podium and speak

5    into the mic.

6            **MR. CHA-KIM:**  I apologize.  I wasn't sure if she meant

7    ex parte and in camera, so just making sure.  I apologize,

8    Your Honor.

9            **MS. MATTIOLI:**  So the entrance memos that you have,

10    Your Honor, also illustrate that not only are plaintiffs'

11    counsel not the only firms visiting Dublin on a regular basis

12    but also that they have not taken advantage of all of the

13    available visiting hours from the time they filed their

14    Complaint to now, and including the week of Christmas,

15    December 26th and 28th, they had 8 hours of in-person legal

16    visitation that they did not take advantage of.

17            **THE COURT:**  And where do I see that?

18            **MS. MATTIOLI:**  It's just the absence of an entrance

19    memo.

20            **THE COURT:**  So I'm looking -- let's call -- because I

21    have a transcript, the first document -- the first set of

22    documents you gave me, we'll call that Exhibit A, and that's

23    the memo that you were saying.

24            **MS. MATTIOLI:**  Correct.

25            **THE COURT:**  The collection of memos.

1       **MS. MATTIOLI:**  It is all of the memos that exist going

2   back, I believe -- I don't recall off the top of my head what

3   the first date is.

4       **THE COURT:**  Well, the first date for purposes of the

5   record is August 7th.

6       **MS. MATTIOLI:**  Okay.  So from August 7th to

7   December 20th, those are the legal entrance memos that are

8   prepared, and there aren't any for December 26th or

9   December 28th.

10      **THE COURT:**  Well, through December 30th, not 20th.

11      **MS. MATTIOLI:**  Your Honor, so that was the legal

12  entrance memo that was prepared in anticipation of the visits

13  that were to occur on the 30th and 31st, but plaintiffs'

14  counsel again did not show up.

15      **THE COURT:**  I see.

16      (Defense Exhibit A marked for identification)

17      **THE COURT:**  All right.  And so with respect to that,

18  that's where you're saying there was an absence of

19  visitation --

20      **MS. MATTIOLI:**  Correct.

21      **THE COURT:**  -- on December--

22      **MS. MATTIOLI:**  26th and 28th.

23      **THE COURT:**  All right.

24      And then the second one we'll call Exhibit B, and this is

25  the call-outs?

1    **MS. MATTIOLI:**  Correct.

2         **THE COURT:**  And what is that?

3         **MS. MATTIOLI:**  Those are rosters of inmates.  Those

4    are prepared by the unit teams, and they designate inmates who

5    are scheduled for movement that day, so if an inmate has a

6    legal visit scheduled, their name will appear on the call-out,

7    and it will say "visiting room."

8         **THE COURT:**  All right.  And the point of this is?

9         **MS. MATTIOLI:**  The point of that is to illustrate that

10   there is a process at Dublin for requesting in-person legal

11   visitation that is being utilized.  It is available.  The

12   inmates are being called out by unit team and sent to legal

13   visits.

14        **THE COURT:**  Okay.

15        (Defense Exhibit B marked for identification)

16        **THE COURT:**  What do you have next?

17        **MS. MATTIOLI:**  The next stack, the second stack,

18   Your Honor, is for in camera review.

19        **THE COURT:**  All right.  So I will call this next one

20   Exhibit C, and your Post-it says "emails showing accommodations

21   for legal access."

22        **MS. MATTIOLI:**  Correct.

23        (Defense Exhibit C marked for identification)

24        **MS. MATTIOLI:**  And these are emails from Dublin

25   executive staff to various legal organizations, not just

1   plaintiffs.  They demonstrate executive staff's responsiveness

2   in accommodating legal visits, including when they are canceled

3   with very little notice, as well as this next email, which we

4   do have a copy for plaintiffs' counsel.

5           **THE COURT:**  I'm going to call this one Exhibit D.

6       (Defense Exhibit D marked for identification)

7           **MS. MATTIOLI:**  This is a redacted email from executive

8   staff to another legal organization limiting their legal visits

9   to 20 inmates, and it was sent in July of 2023.  July 13th,

10  correct.

11      This is directly contrary to the position plaintiffs'

12  counsel have held that their clients are being arbitrarily

13  restricted from seeing them in numbers larger than 20 or that

14  the restriction has anything to do with the class action

15  because this email was sent before the class action was filed.

16      Legal visitation hours are set in a way to accommodate all

17  of the programming and movement schedules in the institution.

18  That doesn't just include legal visitation.  And legal visits

19  happen during core hours to ensure adequate staffing in the

20  event of a critical incident.  Balancing reasonable access with

21  safety and security is the reason they have been limited.

22      We also have photos, Your Honor, of the visiting room.  I

23  don't have copies with me somehow, but we have an electronic

24  version that we can pull up if you would like to see that

25  exhibit.

1          **THE COURT:**  I think you should send it.  I believe

2     I've seen that room.

3          **MS. MATTIOLI:**  Would you like an email copy, or we can

4     pull it up so everyone can see.

5          **THE COURT:**  If you can pull it up so everyone can see.

6          **MS. MATTIOLI:**  Perfect.

7          **THE COURT:**  The CRD will work with you on that.

8          What else do you have, if anything?

9          **MS. MATTIOLI:**  So I intended to say this while the

10    photos were up, but Dublin has attempted to accommodate

11    plaintiffs' request to come in on the weekend and on a holiday.

12    They've offered the children's visiting area.  I've been -- I

13    have learned that co-opting a children's space is common

14    practice among institutions when it is required to accommodate

15    visitation, and there remains a large outdoor children's play

16    area that you will see depicted in the photos for any children

17    who may have happened to have attended visit -- visits on

18    Sunday, December 30th, and Monday, January 1st.  Those days

19    were -- the legal entrance memo was prepared, the door was

20    opened at 7:30 a.m., and no plaintiffs' counsel showed up.

21         The photos also illustrate the size of the room, and where

22    the correctional officer stands to observe visits is roughly to

23    the back of the courtroom from the back of the children's room.

24    There is absolutely no physical possible way that a

25    correctional officer sitting at the command table could

1    overhear a conversation taking place in normal hushed tones in

2    a room.

3        There are also four large vending machines that hum loudly

4    in the room, and if people are having intentional quiet

5    conversations, they would not be overheard.

6        There is also only one staff member present monitoring all

7    of the visits which include everybody who's there, not just the

8    people plaintiffs' counsel are meeting with.

9        We can move on while that's being pulled up.

10        The next exhibit I have for in camera review --

11            **THE COURT:**  I'll call this Exhibit E.

12        (Defense Exhibit E marked for identification)

13            **THE CLERK:**  I'm sorry.  E, Your Honor?

14            **THE COURT:**  E.

15            **MS. MATTIOLI:**  And the reason this is for in camera is

16    it is a list of all 375 phone numbers that are programmed in

17    the pilot phone, and some of them include descriptions of the

18    advocate and the organization they represent, along with their

19    phone number.  We will redact as appropriate and produce in the

20    normal course.

21        This spreadsheet also shows the individual staff member

22    who put the request in to have the pilot -- the number added to

23    the pilot phone.

24            **THE COURT:**  Where's that?

25            **MS. MATTIOLI:**  It's the first column where it says

1    "from."  The first one says Pat Deveney.  That means he was the

2    first person to program a number in the phone.  Groover did the

3    next batch.  Campos, Strack.

4        Many of these individuals plaintiffs have allegations

5    against that they have retaliated or otherwise restricted legal

6    access, and they have taken requests from inmates and

7    programmed their phone numbers into the phones.

8            **THE COURT:**  There some of these that are highlighted.

9        **MS. MATTIOLI:**  If they are highlighted, Your Honor,

10   they must be -- that's the only copy that I have that's in

11   color.  I apologize.

12           **THE COURT:**  So the number is highlighted in pink.

13       **MS. MATTIOLI:**  So that's unique -- that came original

14   in the spreadsheet, and I'm not sure why those are highlighted.

15   We will find that out.

16           **THE COURT:**  Okay.  And your point with respect to

17   this?

18       **MS. MATTIOLI:**  So there are 375 numbers of attorneys

19   and advocates added to the phone lines.  The phones are

20   contained in each of the housing units.  They're in enclosed

21   rooms with doors that close.  There's one phone at the camp and

22   one phone in SHU for a total of 8 phones.  An inmate submits a

23   request to their unit team or any staff member to have a number

24   added to the phone line.

25       Ms. Agostini has even accommodated attorneys emailing her

1    directly, even though the process encourages inmate

2    participation and that that's the point of the program.  The

3    point of the program is for inmates to have access to their

4    counsel, not the other way around.

5        I have with me the correctional captain, the lieutenant,

6    and Ms. Agostini and Mr. Deveney who can all testify to the

7    fact that those phones are not restricted to a sign-up sheet.

8    The inmates do not need to involve staff when they want to use

9    the phones.  As long as there is nobody on the phone, they are

10   free to walk into the room and make a call to a number on that

11   list.  The lines are unmonitored.  They're unrecorded.  The

12   only document that exists is the log of the numbers that are

13   programmed and the calls themselves, which the fact of

14   communication between an attorney and a client is not a

15   privileged communication.  The content of the calls are private

16   and confidential.  They're not monitored.  They're not listened

17   to.

18       **THE COURT:**  So you have a separate document that

19   indicates the fact of a call?

20       **MS. MATTIOLI:**  Correct.

21       **THE COURT:**  And also its length?

22       **MS. MATTIOLI:**  Correct.  And the phone number it was

23   dialed out to and the time of day that it was placed.

24       **THE COURT:**  But I don't have that.

25       **MS. MATTIOLI:**  You do -- you will.

1      **THE COURT:**  Okay.

2      **MS. MATTIOLI:**  So the next document in this stack, if

3  I just go in order, is a legal memo.  This is sensitive -- or

4  it's not a legal memo.  Excuse me, Your Honor.  It's a memo

5  prepared by the captain.  It's sensitive but unclassified, and

6  it is not redacted.

7      **THE COURT:**  All right.  I'll calling this Exhibit F.

8      (Defense Exhibit F marked for identification)

9      **MS. MATTIOLI:**  And this memo simply demonstrates that

10  legal phone calls are available to inmates while they are in

11  SHU.  They are not restricted to a single phone call every 30

12  days.  If they want to use the pilot phone to call out to a

13  number that has been programmed on the pilot phone, they're

14  free to do that when staff are available to walk them down the

15  hall into the room where the phone is.

16      **UNIDENTIFIED SPEAKER:**  Are we able to use the --

17      **THE CLERK:**  It's saying "searching," so it's not

18  coming up so I asked her to email it to ygr_crd so I can print

19  it up.  If you have anything else, email it, and I'll print it.

20      **THE COURT:**  Nikki, if they email it to you, maybe you

21  can pull it up on your screen so people can see it.

22      **THE CLERK:**  The concern is it's saying "searching"

23  because -- so I don't think it will publish anywhere.  Mine is

24  saying "searching."

25      **THE COURT:**  I don't even see those on.

1          **MR. CHA-KIM:**  This one does.

2          **THE CLERK:**  Says "searching"?

3          **MR. CHA-KIM:**  Yes.

4          **THE CLERK:**  Yeah.  I'm not really sure what's going

5    on.  Your printer is not that loud.  I can print a copy for

6    everybody.

7          **MS. MATTIOLI:**  The next exhibit I was going to

8    introduce, Your Honor, is an email from plaintiffs' counsel,

9    Mx. Beaty, on December 31 saying they've previously outlined to

10   government counsel the limitations of the pilot phone line

11   saying there is only one perm dorm.

12        The phone shares a space with the video setup in at least

13   one dorm and that is true, and the inmates need to take turns

14   and are very respectful with one another, and they do take

15   turns, and they prioritize video calls with family members, and

16   the person wanting to make a legal call will wait their turn

17   and then use the phone.

18        She also indicates that the phones are only operational

19   Monday through Friday, 8:00 to 2:00, and that staff involvement

20   is required to access the phones which has resulted in

21   retaliation.  Both of those last two statements are false.  And

22   each of the Dublin staff I have with me here today are prepared

23   to testify regarding the inaccuracy of those descriptions and

24   the pilot phones.

25        We thought it would be more helpful for you to just review

1    in camera six weeks of legal phone calls.

2              **THE COURT:**  I'll call this Exhibit G.

3         (Defense Exhibit G marked for identification)

4              **MS. MATTIOLI:**  These are excerpts, Your Honor, from

5    the log that we had pulled of all 1328 calls made from the

6    pilot phones in the two months leading up to today, including

7    yesterday.  These are called "Connected Call Detail Records."

8    They will only pull calls that are actually connected and they

9    remain on the line for more than a second.

10        So as I said, that stack is not the entire log, but we do

11   have a PDF of the entire log that we can get to you, which is

12   searchable.  You can search by phone number.  You can search by

13   date.  You can search by call duration.

14        With respect to this hearing, the same day that Mx. Beaty

15   sent the email saying the phones are only operation Monday

16   through Friday from 8:00 a.m. to 2:00 p.m., one of her

17   colleagues, Natalie Steiert, used a legal phone or an inmate --

18   excuse me -- an inmate contacting Ms. Steiert from the camp

19   took a legal call on December 31st, which was a Sunday, and the

20   call lasted for an hour and started at 2:00 p.m. and ended the

21   3:00 p.m.

22        Another example, if you look at record No. 878, shows a

23   phone called made to Mx. Beaty from an inmate at 7:45 p.m., and

24   there are dozens of examples of those in that stack.  Between

25   Mx. Beaty and Ms. Janssen, 150 individual phone calls were made

1   in the last six weeks from the pilot phones.

2           **THE COURT:**  The last point you made is -- say that

3   again.

4           **MS. MATTIOLI:**  On December 8th, 2023, record No. 878

5   shows a 5-minute phone call made from an inmate to the number

6   associated with Mx. Beaty, and her phone numbers are published

7   in docs 79-3 and 79-2.  We did a search for that phone number

8   and found this 5-minute phone call that was made at 7:45 p.m.

9   on a Friday evening.

10          The log also shows that at least 13 calls were placed from

11  the phone located in SHU as well as countless other calls

12  taking place seven days a week and at virtually all hours.  If

13  the legal phone room is open, the inmates can use the phones to

14  dial preprogrammed numbers without staff involvement.

15          Their claims of being denied access is disingenuous at

16  best.  The only reason that they are not prepared to proceed

17  with the evidentiary hearing tomorrow is because they declined

18  to exercise all of the available means to meet with their

19  clients both over the phone and in person.  Government counsel

20  was in Montana until yesterday.  I conducted every single one

21  of my witness preparation interviews over the phone.  They have

22  access to phones.

23          It is unclear how the access that we just explained is

24  insufficient for plaintiffs' counsel to do the same, and they

25  have provided no reason why they should be afforded the access

1    that they're asking for.  The constitutional right of access

2    applies to the inmates, not the lawyers.  The inmates know how

3    to get ahold of their lawyers, and they do.  These call logs

4    demonstrate the success of this program and the commitment by

5    FCI Dublin staff to provide that access and stand out of the

6    way.  They do not require the inmates to sign up to use the

7    phones.

8        We could also find no case supporting an expanded right of

9    access to attorneys in preparation for a civil case, especially

10   for a fact witness who is not a party.  And we found no cases

11   because they don't exist.

12       The simple fact is, and each of these witnesses will

13   testify, that Dublin administrators have bent over backwards to

14   accommodate the inmates' access to their lawyers in the

15   facility.  We disagree with their characterizations, and we are

16   prepared to begin the evidentiary hearing at 8:00 a.m.

17   tomorrow.

18           **THE COURT:**  All right.

19       Talk to me about the strip-search issue.

20           **MS. MATTIOLI:**  Okay.  So --

21           **THE COURT:**  I have to tell you, I appreciate all this

22   evidence, and I will look at it and appreciate that you

23   understand that evidence speaks louder than accusations and

24   words.

25       It concerns me -- the strip-search issue concerns me.

1          MS. MATTIOLI:  Okay.  And I am prepared to proceed on

2     that.

3          THE COURT:  All right.

4          MS. MATTIOLI:  This document for in camera review is

5     sensitive but unclassified.

6          THE COURT:  I'll identify this as Exhibit H.

7          (Defense Exhibit H marked for identification)

8          THE COURT:  Which appears to be just a part of a

9     manual.

10          MS. MATTIOLI:  Correct.  It's the Correctional

11     Services Manual, Your Honor.  It's not available to the public

12     because that would compromise safety.  This policy dictates --

13          THE COURT:  Do you have evidence?

14          MS. MATTIOLI:  Yes.

15          THE COURT:  I understand that it may be part of the

16     policy.  The concern is --

17          MS. MATTIOLI:  Yes.

18          THE COURT:  -- that the policy was not implemented

19     until recently.

20          MS. MATTIOLI:  Okay.

21          THE COURT:  And that kind of action is concerning.

22          MS. MATTIOLI:  So the next document I have is an email

23     sent Friday, April 14th, 2023, from the correctional services

24     captain implementing a two-person visual search procedure,

25     meaning even though it is policy that only same gender visual

1    searches occur, Dublin has implemented that those searches

2    occur with two staff members wherever possible to safeguard

3    against wrongdoing and being falsely accused.

4              THE COURT:  Do you document when these searches occur?

5              MS. MATTIOLI:  The next document that I have is a

6    physical logbook, Your Honor.  This is for in camera review

7    only.

8              THE COURT:  That's Exhibit J.

9         (Defense Exhibit J marked for identification)

10             MS. MATTIOLI:  This logbook was opened March 19th,

11   2022, and has five full pages of legal size detailing visual

12   searches logged between March 19th, 2022, and December 4th of

13   2022.

14        The following eight pages log visual searches taking place

15   between March 2023 --

16             THE COURT:  Hold on.  Where does this indicate -- and

17   it doesn't seem that it indicates -- that they are conducted

18   after legal visits?

19             MS. MATTIOLI:  That logbook is kept in the visiting

20   room, and that is only a log of visits that occur following

21   contact visits with -- with inmates or lawyers.  They are not

22   separated.  All visual searches from the visitation room are

23   documented in that book.

24             THE COURT:  So there is no evidence then to suggest

25   that you were doing this -- the allegation is that these

1    searches started happening with respect to attorney visits

2    specifically.

3         MS. MATTIOLI:  I understand that that's the

4    allegation.  We would have to -- we simply didn't have enough

5    time last night.  We could pull and match the dates of the

6    visitation to only pull Tuesday and Thursday dates, and if

7    Your Honor wants to pull up a calendar from 2022, we could --

8    we could select a few Tuesdays and a few Thursdays and see if

9    the searches were conducted those days.

10        THE COURT:  So I'm looking at -- it appears, just at

11   glancing, that the number of strip searches or searches

12   increased significantly in December.  Almost doubled.

13        MS. MATTIOLI:  The explanation for that, Your Honor,

14   is it's a holiday month, and the number -- the actual volume of

15   visitation increased.

16        THE COURT:  That wasn't the case the prior year.

17        MS. MATTIOLI:  The searches --

18        THE COURT:  The searches the prior year were a tiny

19   fraction as compared to December of this year.

20        MS. MATTIOLI:  I have the correctional captain

21   prepared to testify about the practice if you are concerned

22   about the document -- the evidence there doesn't provide

23   sufficient distinction.  We also have an email that she sent --

24   this is from Captain Quezada, December 18th, 2023.  She became

25   aware that a unit manager who was supervising legal visitation

1    did not conduct a visual search of inmates following a legal

2    visit, and she sent out a memo to all staff saying please be

3    advised and understand that visual searches are required for

4    every inmate leaving the FCI visiting room after any type of

5    visit to include legal visits, and they counseled with the

6    staff member who didn't conduct the search --

7            **THE COURT:**  They weren't doing them.  That's my point.

8            **MS. MATTIOLI:**  That's what they say.

9            **THE COURT:**  Well, we'll see.  And it -- certainly this

10   whole issue with December is not consistent with prior

11   practice.  I'll take that memo.  That will be --

12           **THE CLERK:**  K.

13           **THE COURT:**  Yes.

14       (Defense Exhibit K marked for identification)

15           **THE COURT:**  Okay.  Keep going.

16           **MS. MATTIOLI:**  The one thing I will point out,

17   Your Honor, about prior practice is this institution suffered a

18   huge blow with the criminal activity that was going on and the

19   staff changes that they have undergone.  These individuals,

20   they -- they are adhering to policy the best that they can.

21   They are attempting to issue corrective action for employees

22   who are not following the policy.

23       The policy is that visual searches are to occur any time a

24   contact visit occurs.

25           **THE COURT:**  You understand, though, that there is a

1  fine line between doing that and acting in a way that may --

2  that may interfere with witness testimony.

3      **MS. MATTIOLI:**  And their witnesses' testimony is

4  interfering with correctional practice.  Their -- their clients

5  and their fact witnesses are not the only inmates being

6  searched.  The searches are being conducted in a hallway in

7  plain view of a very large camera.  The staff member stands

8  outside of the room where the inmate is stripped.  They take

9  their clothes off themselves behind a curtain.  They do the

10  visual inspection in full view of the camera and two staff

11  members.

12      If there are allegations of retaliation that rise to a

13  criminal level, they should be referred and not brought to you.

14  They are disingenuous.

15      **THE COURT:**  Well, that's why I have the U.S. Attorney

16  here.

17      **MS. MATTIOLI:**  And I -- I mean -- I agree.  But we

18  have witnesses and evidence that they are not.

19      And the cameras don't show the inmates, obviously.  The

20  camera shows the staff member standing facing the area where

21  the inmate strips and then dresses in private.

22      There is a contraband issue at the prison.  There is a

23  drug problem at the prison.  There have been more positive UAs

24  in the last two months than in the previous eight combined.

25  The policy --

1      **THE COURT:**  UAs?

2      **MS. MATTIOLI:**  Urine analysis tests.

3         The policy of doing a visual search is to ensure safety of

4    inmates and staff.  Plaintiffs' counsel seem to characterize

5    legal visits as being somehow special or exempt.  They are

6    provided access.  They have never once been told that they

7    cannot come into the facility to meet with their clients.  They

8    don't like the access that's being provided, but that doesn't

9    make it insufficient.

10     **THE COURT:**  Okay.  What else do you have?

11     **MS. MATTIOLI:**  If those are the only issues the Court

12   would like to hear from the government on, that's what I have.

13     **THE COURT:**  I need you to sit down.

14        Ms. Beaty, come to the stand or come to the mic.

15     **MX. BEATY:**  Good morning, Your Honor.

16     **THE COURT:**  So, Ms. Mattioli, I'm looking at her

17   declaration.

18     **MS. MATTIOLI:**  Which one, Your Honor?

19     **THE COURT:**  Well, which is the one that you were

20   referring to?

21     **MS. MATTIOLI:**  That was an email that I was going to

22   introduce as an exhibit.  The December 30th email?

23     **THE COURT:**  The one that you were referencing during

24   your presentation.

25     **MS. MATTIOLI:**  Yes.  Can my co-counsel forward it --

1          **THE COURT:**  So it's not on the -- it's not on the

2    docket?

3          **MS. MATTIOLI:**  I'm sure it is, Your Honor.  They filed

4    several strings of emails.

5          **MR. GALVAN:**  If I may, Your Honor, it's Mr. Galvan.

6       It's Exhibit H.  It's Document No. 93-2, page 8.

7          **THE COURT:**  93-2, page 8.

8          **MX. BEATY:**  A December 31st email, Your Honor.

9          **THE COURT:**  All right.  So in this email, you do say

10   phones are only operational Monday through Friday, 8:00 a.m. to

11   12:00 p.m.

12      What is the basis for you saying that?

13         **MX. BEATY:**  So that's the stated policy of the

14   institution, Your Honor.  I can pull up the exhibit that the

15   government actually filed, the policy, the notice that is

16   posted at every phone which states the phone lines are

17   operational Monday through Friday 8:00 a.m. to 2:00 p.m.

18      We understand that sometimes the booths are left open such

19   that our clients can enter and call us outside of that time

20   frame; however, many of our clients rightfully believe that

21   that is against policy and that they will face retaliatory

22   action or disciplinary action --

23         **THE COURT:**  All right.  Stop.

24      Is that accurate?

25         **MS. MATTIOLI:**  Her characterization is disputed by the

1    call logs that show --

2         **THE COURT:**  I didn't ask that question.  Is there

3    something posted that says it's only operational Monday through

4    Friday --

5         **MS. MATTIOLI:**  Yes.

6         **THE COURT:**  -- 8:00 a.m. to 2:00 p.m.?

7         **MS. MATTIOLI:**  Yes.  But Mr. Deveney --

8         **THE COURT:**  Mr. Deveney --

9         **MS. MATTIOLI:**  Mr. Pat Deveney.  Would you like to

10   hear from him?

11        **THE COURT:**  No.  So that's not the policy -- I'd like

12   it to be removed today.  Any problem with that?

13        **MR. DEVENEY:**  No, Your Honor.

14        **THE COURT:**  All right.  Ordered.

15      And they apparently must know that because they're using

16   it.

17      It next says, "Staff involvement is required to access the

18   phones."  What is the basis for that statement?

19        **MX. BEATY:**  So that was also the original policy of

20   the phone lines, Your Honor --

21        **THE COURT:**  And every time you have been called, did

22   they tell you they had to get access by the staff?

23        **MX. BEATY:**  Not every time.  Sometimes.

24        **THE COURT:**  Mr. Deveney, is that -- is that required?

25        **MR. DEVENEY:**  I'm sorry.  Could we repeat the

1    question, Your Honor?

2              **THE COURT:**  Come on forward.

3              **MX. BEATY:**  If I can clarify, Your Honor, part of what

4    I intended to say there is --

5              **THE COURT:**  Stop.

6         Is there a notice where these phones are that indicates

7    that staff involvement is required to access the phones?

8              **MR. DEVENEY:**  No, Your Honor.

9              **MX. BEATY:**  So the original policy, the booths were

10   left locked and a staff member needed to come with a key to

11   open them in order for a person to use the phone.  And also

12   what I mean by that statement is that in order -- as

13   Ms. Mattioli just explained to the Court, in order to have your

14   attorney's phone number added to the line if you're an

15   incarcerated person, you have to go to a staff person and say,

16   *Here's my attorney's name and number* --

17             **THE COURT:**  So -- seriously?  That's what you meant by

18   that statement?

19             **MX. BEATY:**  No.  I meant both, Your Honor.  That we

20   know of instances in the last several months where our clients

21   have had to ask for a staff person to open the booth in order

22   to call us.

23             **MR. DEVENEY:**  That's not accurate, Your Honor.

24             **MX. BEATY:**  Our clients will testify otherwise at the

25   evidentiary hearing, Your Honor.

1      **THE COURT:**  Okay.  Get a piece of paper -- get a

2  piece -- put a notice on the booth that says, "These doors

3  shall remain unlocked."  This is not -- this is not tough

4  stuff.  So every booth, 24 by 7 access, "These doors shall

5  remain unlocked."

6      Agreed?

7      **MR. DEVENEY:**  Yes, Your Honor.

8      **THE COURT:**  All right.  You can sit down.

9      Why wasn't anybody from the plaintiffs' team there on

10  December 26?

11      **MX. BEATY:**  I think my colleague is prepared to speak

12  to that, but I can just say, Your Honor, that we, as we

13  explained in our meet and confer on the 15th and our follow-up

14  email on the 15th to the government -- we wanted access this

15  previous weekend so that we could review with our -- with our

16  witnesses evidence, the exhibits filed by plaintiffs and by the

17  government ahead of their testimony.  We wanted access after

18  the witness lists and exhibits had been finalized and close in

19  time to the evidentiary hearing in person with our clients.

20      **MS. MATTIOLI:**  We did exchange provisional witness

21  lists the week before.

22      **MR. CHA-KIM:**  Your Honor, they named by name their

23  five or four witnesses that they would call from -- among the

24  incarcerated population.  They revealed that to us only on

25  Friday afternoon, on top of which the issues with, we think,

1    improper contact with members of the population were occurring

2    late last week, all of which suggests that we needed time to

3    meet with our clients, to discuss those issues in person,

4    particularly given the sensitive nature of the allegations

5    involved and the suspected problems with the phone line.  It

6    was imperative to have --

7         **THE COURT:**  What suspected issues with the phone line?

8    Was there a single call made -- when I check the logs, am I

9    going to find a single call made between Monday through Friday

10   from 8:00 to 2:00?

11        **MR. CHA-KIM:**  Yes.

12        **THE COURT:**  On all of those days?

13        **MX. BEATY:**  I'm not sure if on all of those days, but

14   certainly during that week.  And part of -- I'm not sure if

15   this is what you are getting at, but as Ms. Mattioli also just

16   explained to the Court, there is one phone per dorm so every

17   single person in the dorm shares one phone.

18        **THE COURT:**  How many hours were you on the phone with

19   your clients on Monday, the -- Tuesday the 26th?  How many

20   hours?

21        **MX. BEATY:**  I don't recall, Your Honor.  One or two.

22        **THE COURT:**  Do you have more than one or two clients?

23        **MX. BEATY:**  Our putative class is the entire

24   institution, but, yeah, we have dozens of clients.

25        **MR. CHA-KIM:**  We have a number of people on our team

1    who have been trying to make calls.

2         I will also note that the pilot line for the phone use

3    that Ms. Mattioli is talking about requires us to be added, and

4    Exhibit 1 to her declaration or to her notice on Friday

5    attaches an email internally to BOP asking them to add us only

6    on the 29th.  So before then, it was impossible for us to speak

7    with --

8              **THE COURT:**  This line has been in existence for

9    months; right?  So why -- why did you not have your phone

10   numbers added to these lines months ago?

11             **MR. CHA-KIM:**  Well, for people who were on the team

12   months ago, they have been added.  Ms. Beaty, for instance, can

13   speak to the conversations that she's been having for months,

14   for years, really, with these -- with these clients.

15        As new members have been added, we've been working with

16   BOP over confidentiality issues because we have to reveal the

17   name of the people involved, and as you know, the proceeding

18   has been going pseudonymously working through those issues.

19        We have been trying to confer with the government about

20   these issues.  In fact, you know, on the 15th, we raised a lot

21   of these issues during our one meet and confer by phone.  The

22   following week, we requested to speak by phone with

23   Ms. Mattioli.  She declined.  Over this weekend we requested to

24   speak with Ms. Mattioli over the phone, and she declined.

25   These are all documented in the emails --

1          **THE COURT:**  Ms. Mattioli, the week of December 18th,

2     you declined to speak with them?

3          **MS. MATTIOLI:**  We had a meet and confer.

4          **THE COURT:**  On the 15th.

5          **MS. MATTIOLI:**  On the 15th.

6          **THE COURT:**  And then you declined to speak with them

7     the week of the 18th?

8          **MS. MATTIOLI:**  I don't recall that specifically,

9     Your Honor.  What I do recall is that every member of their

10    legal team has sent me personally an email raising issues that

11    are to be addressed in -- at the evidentiary hearing.

12        Arguing with them over the phone is an inefficient use of

13    time when we are preparing to bring evidence and testimony to

14    this Court.  I -- I have responded to every single email that

15    they have sent me.  I prefer to communicate with them over

16    email.

17         **THE COURT:**  Email can be inefficient.

18         **MS. MATTIOLI:**  It can be, but speaking on the phone

19    with people who do not hear you is also inefficient.  They have

20    been dissatisfied with every response I've provided.  There is

21    no evidence to suggest that speaking to them on the phone would

22    have resolved any of these issues.  Every concession that we

23    have made working closely with the facility, which has taken

24    time away from the merits of their case which they should be

25    interested in pursuing, is an inefficient use of time.

1    I've responded to their issues in writing so that it

2    cannot be misconstrued.

3        **THE COURT:**  Why weren't any of your people there on

4    December 23rd -- I mean, December 26th and December 28th?  Why

5    should I provide you with additional time when you didn't use

6    that time?

7        **MR. CHA-KIM:**  Certainly, Your Honor.  So to put this

8    in context, Ms. Beaty and our colleagues have been meeting with

9    these clients on -- sometimes twice a week for months now.  And

10    as you know, we've met with them sufficiently to prepare 47

11    declarations.

12        We had sufficient access to -- there are -- there are

13    insufficiencies with the nature of the access, but a lot of

14    work has already gone into contact time with our witnesses.

15        This request was always in the context of the evidentiary

16    hearing coming up.  As early as December 15th during our one

17    meet and confer that only occurred because the Court ordered it

18    by phone and by email afterwards, we flagged the issue.

19        This particular weekend before the hearing starts is

20    important to us because the witness lists we finalized the

21    Friday before, the exhibits we finalized the Friday before.

22    Obviously the days leading into any kind of evidentiary hearing

23    are very important to get the latest news and prepare

24    witnesses.  These were crucial days.  That's what we were

25    focused on.

1    On top of which these issues with the strip searches, the

2    issues with one of our witnesses having her cell searched while

3    she was meeting with us and her legal papers taken, these

4    issues are obviously going to impact the ability or the -- our

5    decision-making as to do we want to put our witnesses through

6    that before we get assurances from the government and the Court

7    that that's not going to happen.

8    And, in fact, if you look at emails -- and Ms. Mattioli

9    prefers to communicate by email -- in the emails, we repeatedly

10   ask her please give us assurances this will not happen so we

11   can meet with our witnesses.  That's why this weekend was

12   important, Your Honor.  But I will state --

13   **THE COURT:**  You didn't even go to the weekend access

14   that was provided.

15   **MR. CHA-KIM:**  This weekend, Your Honor?

16   **THE COURT:**  Yeah.

17   **MR. CHA-KIM:**  So the context of that is Your Honor

18   issued an order that recognized that there was a need for

19   increased visitation between the hearing being set and the

20   start of the hearing and that we should work towards that.  As

21   the documentation showed, the offer that the -- the government

22   made was you can come during the general visitation hours.

23   Your Honor's order specifically said this hearing will be

24   vacated should the government agree to the specific relief that

25   we had asked for which was, I think, a reasonable sum of one

1    business day between days that doesn't interfere with social

2    visitation.

3         Their proposal -- their unilateral notice --

4         **THE COURT:**  If I had thought your proposal was

5    reasonable, I would have issued the order granting your

6    request, and I did not.

7         **MR. CHA-KIM:**  I understand, Your Honor.

8         **THE COURT:**  And yet you still didn't take advantage of

9    the time that was provided.

10        **MR. CHA-KIM:**  The problem with that, Your Honor, is

11   you've seen, I think -- the Court has seen the visitation room

12   at issue.  What they were saying is you -- we can meet with our

13   clients in the children's play room which, you know, doesn't

14   have adult-size chairs, doesn't have tables really, in full

15   view of the general population who is having regular social

16   visitation hours, all in the context of a prison where we think

17   retaliatory and pressure tactics are being used to pit certain

18   members of the population against the other.

19        There is -- we just could not reasonably agree to that as

20   a basis to adequately prepare our clients, and, in fact, we

21   thought we may even put them at further risk of retaliation

22   should we accept that.

23        **THE COURT:**  The search of the cell and the taking of

24   legal documentation.

25        **MR. CHA-KIM:**  Two cell searches, Your Honor.

1          **THE COURT:**  A response.

2          **MS. MATTIOLI:**  The only situation I am aware of that a

3    cell search would occur is upon reasonable suspicion, and that

4    occurs for SIS investigative purposes.  Occasionally inmates

5    who have made allegations that come to light, whether through a

6    lawyer or a tort claim or an administrative remedy, they will

7    be placed in SHU for protective reasons, and their belongings

8    will be searched.  There is also a policy that random cell

9    searches occur on every shift.

10         If they would like to identify the inmate by name and the

11   date that the search happened, we can provide witness testimony

12   and a log of why the search was conducted and what was taken.

13   I don't have that offhand because they're referring to general

14   anonymous allegations.

15         **MR. CHA-KIM:**  Well, one of the things we could have

16   done in a phone setting is discussed these issues in more

17   candor and detail than we can in email, obviously.

18         **THE COURT:**  The three of you go into that room right

19   now.  Go into that room and discuss it right now.  We'll stand

20   in recess.

21         No.  The three of you go in that room.

22         We will stand in recess for 10 minutes.

23                 (Recess taken at 9:07 a.m.)

24              (Proceedings resumed at 10:04 a.m.)

25         **THE CLERK:**  Your Honor, we are recalling the matter of

1    CV 23-4155-YGR, California Coalition for Women Prisoners,

2    et al. vs. United States of America Federal Bureau of Prisons,

3    et al.

4        All parties previously identified are back in court.

5        **THE COURT:**  All right.  The record will reflect we

6    took a slightly long break.  There are a couple things I want

7    to put on the record.

8        First, I have, in order to make some headway on these

9    claims of retaliation, ordered that plaintiffs' counsel provide

10   the two individuals' names to Ms. Mattioli, which they did.  In

11   camera, I have ordered that communications with respect to this

12   topic can only occur between the two lawyers on the plaintiffs'

13   side and two lawyers on the defense side and no one else:  No

14   client, no other lawyers.

15       Have you chosen a second person, Ms. Mattioli?

16       **MS. MATTIOLI:**  I have, Your Honor.  Rob France.

17       **THE CLERK:**  What you want to do is always come to the

18   podium.

19       **MS. MATTIOLI:**  Rob France with BOP.

20       **THE COURT:**  So, Mr. France, I will tell you what I

21   told them, which is that you answer to me.

22       **MR. FRANCE:**  Yes, ma'am.

23       **THE COURT:**  All right.  There shall be no breach of

24   this order or breach of this protocol in order to try to get

25   some unvarnished information regarding the claims.  So that's

1  one.

2      Two, during the break, we received a copy of the email

3  with the photos of the visitation rooms.  I will identify that,

4  Ms. Riley, as Exhibit L.

5          **THE CLERK:**  Yes, ma'am.

6      (Defense Exhibit L marked for identification)

7          **THE COURT:**  I believe you printed multiple copies.

8          **THE CLERK:**  I did.

9          **THE COURT:**  If you will give one copy to the

10  plaintiffs.  So they're just pictures.  Plaintiffs understand

11  that place better than I do, and I have personally seen the

12  space once.

13      Okay.  Ms. Mattioli -- am I saying your name right?

14          **MS. MATTIOLI:**  Yes.

15          **THE COURT:**  Okay.  Did you talk to your clients about

16  whether there will be attorney access to inmates tomorrow on

17  Wednesday at the facility?

18          **MS. MATTIOLI:**  Yes.

19          **THE COURT:**  And the answer is?

20          **MS. MATTIOLI:**  Yes.

21          **THE COURT:**  Okay.  So 9:00 to 4:00.

22          **MS. MATTIOLI:**  Yes.  We would, Your Honor, like an

23  order from the Court if plaintiffs' counsel can just identify

24  the attorneys who will be present.  BOP needs that information

25  in order to call the inmates out.  We don't need their names in

| | |
|---|---|
| 1 | the order.  They can provide the names to us directly or to BOP |
| 2 | directly, but the order should specify the list of attorneys |
| 3 | who will be present.  And as long as they have been previously |
| 4 | cleared to enter the facility, they will be allowed in for |
| 5 | visitation tomorrow from 9:00 to 4:00. |
| 6 | **THE COURT:**  Okay.  So someone will give me that list |
| 7 | so I can put it in an order. |
| 8 | **MR. GALVAN:**  It's Mr. Galvan. |
| 9 | In order to provide that list, we would need to know which |
| 10 | witnesses the government is calling tomorrow because attorneys |
| 11 | have prepped different witnesses. |
| 12 | **THE COURT:**  All right.  So who's on tomorrow? |
| 13 | **MS. MATTIOLI:**  Mr. Deveney, Ms. Agostini, Ms. Quezada, |
| 14 | Amberly Newman. |
| 15 | **THE COURT:**  Some of these I had today.  So Deveney, |
| 16 | Agostini, Quezada. |
| 17 | **MS. MATTIOLI:**  Amberly Newman is not present today. |
| 18 | **THE COURT:**  Amber Lee.  Those are two words? |
| 19 | **MS. MATTIOLI:**  A-M-B-E-R-L-Y. |
| 20 | **THE COURT:**  Okay.  And the last name? |
| 21 | **MS. MATTIOLI:**  Newman, N-E-W-M-A-N. |
| 22 | And then our four inmate witnesses who we have identified |
| 23 | by initials in the docket, but plaintiffs' counsel is aware of |
| 24 | who they are. |
| 25 | **THE COURT:**  Okay. |

```
1           MR. GALVAN:  Your Honor, we would like an opportunity

2    to talk -- to meet with those witnesses first --

3           THE COURT:  Well, they may not want to talk to you.

4           MR. GALVAN:  That's true.  We would at least like to

5    give them the chance to talk to us.  We are trying to do that

6    today, but I don't know that that's going to happen today.

7           THE COURT:  Well, has --

8           MS. MATTIOLI:  They are being transferred in the

9    afternoon, if that makes a difference.

10          THE COURT:  They are being transferred where?

11          MS. MATTIOLI:  Here.

12          THE COURT:  No.  We can transfer them in the morning.

13          MS. MATTIOLI:  But the transfer order that my office

14   signed was for the afternoon because we have only staff

15   witnesses in the morning, and I didn't want them to sit around.

16   They were going to be transferred after lunch.

17          THE COURT:  Okay.

18          MS. MATTIOLI:  Meaning they will be in the facility in

19   the morning.

20          THE COURT:  Hold on.  Hold on.  Hold on a minute.

21                       (Pause in proceedings.)

22          MS. MATTIOLI:  And, Your Honor, just the four

23   witnesses that we intend to call tomorrow are on their

24   visitation --

25          THE COURT:  Wait.
```

1          **MS. MATTIOLI:**  Sorry.

2                         (Pause in proceedings.)

3          **THE COURT:**  Say that again.

4          **MS. MATTIOLI:**  The four inmates that we have listed to

5    testify tomorrow, Your Honor, are on their visitation list for

6    today.

7          **THE COURT:**  Okay.

8          **MS. MATTIOLI:**  So if those inmates wish to speak to

9    them, they will have an opportunity to do that today.

10         **THE COURT:**  All right.

11         **MR. GALVAN:**  Your Honor, if -- I wasn't sure they were

12   actually going to be pulled.  If that's true, they're going to

13   be pulled today for the visits, then we're fine.

14         **THE COURT:**  Okay.  Great.

15      Standard order for an evidentiary hearing, all witnesses,

16   until released by the Court, will be excluded from the

17   courtroom unless they are testifying.

18         **MS. MATTIOLI:**  Thank you.

19         **THE COURT:**  Okay.  So all I need then in order to

20   issue an order is the name of the lawyers, so do you have that

21   now or do you want to send that to me by email?

22         **MR. GALVAN:**  If we could send that to you by email,

23   we'll do it quickly, Your Honor.

24         **THE COURT:**  Okay.

25         **MR. GALVAN:**  Even while we're here.

1      **MS. MATTIOLI:**  That would be appreciated.  They've

2  indicated the call-out occurs for the following day by noon,

3  so...

4      **THE COURT:**  Okay.  So if we can do that before you

5  leave the courtroom.

6      **THE CLERK:**  If could send it to the ygr_crd box.

7  Thank you.

8      **THE COURT:**  And make sure to copy opposing counsel.

9      Is there anything else we need to do today?

10      **MS. MATTIOLI:**  Nothing from the government,

11  Your Honor.

12      **THE COURT:**  Is there anything else the plaintiffs need

13  today?

14      **MR. NIMNI:**  Nothing else from plaintiffs, Your Honor.

15      **THE COURT:**  All right.  We stand adjourned until

16  tomorrow morning.

17              (Proceedings adjourned at 10:12 a.m.)

18

19

20

21

22

23

24

25

1

2

3                        <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Tuesday, January 2, 2024

8

9    *Pamela Batalo Hebel*

10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
     U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25