**Volume 3**

**Pages 548 - 866**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
CALIFORNIA COALITION FOR WOMEN )
PRISONERS, ET AL.,            )
                             )
           Plaintiffs,        )
                             )
  VS.                         )    NO. CV 23-04155-YGR
                             )
UNITED STATES OF AMERICA      )
FEDERAL BUREAU OF PRISONS,    )
ET AL.,                       )
                             )
           Defendants.        )
_____)
```

Oakland, California
Friday, January 5, 2024

**EVIDENTIARY HEARING**

**APPEARANCES**:

For Plaintiffs:

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
**BY:  STEPHEN SEUNGKUN CHA-KIM, ESQUIRE**

ARNOLD & PORTER KAYE SCHOLER LLP
5 Palo Alto Square, Suite 500
3000 El Camino Real
Palo Alto, CA 94306
**BY:  CARSON ANDERSON, ESQUIRE**

Reported By:    Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                Official Reporter

**APPEARANCES CONTINUED:**

For Plaintiffs:

                        ROSEN BIEN GALVAN & GRUNFELD LLP
                        101 Mission Street, Sixth Floor
                        San Francisco, CA 94105
         BY:  **ERNEST JAMES GALVAN, ESQUIRE**
              **KARA JANSSEN, ESQUIRE**
              **ADRIENNE SPIEGEL, ESQUIRE**
              **LUMA KHABBAZ, ESQUIRE**

                        RIGHTS BEHIND BARS
                        416 Florida Avenue NW
                        Washington, DC 20001
         BY:  **OREN NIMNI, ESQUIRE**
              **AMARIS MONTES, ESQUIRE**

                        CALIFORNIA COLLABORATIVE FOR IMMIGRANT
                        JUSTICE
                        1999 Harrison Street, Suite 1800
                        Oakland, CA 94612
         BY:  **SUSAN M. BEATY, ESQUIRE**

For Defendants:

                        OFFICE OF THE UNITED STATES ATTORNEY
                        901 Front Street, Suite 110
                        Helena, MT 59626
         BY:  **MADISON MATTIOLI**
              **ABBIE CZIOK**
              **ASSISTANT UNITED STATES ATTORNEYS**

Also Present:            **ROBERT FRANCE, KRISTI SUTTON**

<u>**I N D E X**</u>

Friday, January 5, 2024 - Volume 3

<u>**PLAINTIFFS' WITNESSES**</u>                          <u>**PAGE**</u>   <u>**VOL.**</u>

<u>**L, S**</u>
(SWORN)                                         561    3
Direct Examination by Mr. Nimni                 561    3
Cross-Examination by Ms. Cziok                  605    3


<u>**B, R**</u>
(SWORN)                                         608    3
Direct Examination by Ms. Steiert              608    3
Cross-Examination by Ms. Cziok                  667    3


<u>**D, K**</u>
(SWORN)                                         674    3
Direct Examination by Ms. Montes                674    3
Cross-Examination by Ms. Mattioli              712    3


<u>**R, E**</u>
(SWORN)                                         721    3
Direct Examination by Mx. Beaty                 721    3


<u>**M, J**</u>
(SWORN)                                         745    3
Direct Examination by Ms. Janssen               745    3
Cross-Examination by Ms. Cziok                  762    3


<u>**H, C**</u>
(SWORN)                                         765    3
Direct Examination by Mx. Beaty                 766    3
Cross-Examination by Ms. Mattioli              780    3


<u>**RP, L**</u>
(SWORN)                                         781    3
Direct Examination by Ms. Khabbaz               781    3
Cross-Examination by Ms. Mattioli              796    3
Redirect Examination by Ms. Khabbaz             799    3


<u>**M, M**</u>
(SWORN)                                         803    3
Direct Examination by Ms. Spiegel               803    3

<u>**I N D E X**</u>

| **PLAINTIFFS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **F, R** | | |
| (SWORN) | 819 | 3 |
| Direct Examination by Mr. Cha-Kim | 819 | 3 |
| Cross-Examination by Ms. Mattioli | 838 | 3 |
| | | |
| <u>**V, A**</u> | | |
| (SWORN) | 846 | 3 |
| Direct Examination by Ms. Spiegel | 846 | 3 |

**E X H I B I T S**

| **PLAINTIFFS' EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 14 | | 689 | 3 |
| 16 | | 622 | 3 |
| 23 | | 830 | 3 |
| 31 | | 629 | 3 |
| 34 | | 654 | 3 |
| 345 | | 832 | 3 |
| 353 | | 826 | 3 |
| 366 | | 835 | 3 |

**E X H I B I T S**

| **DEFENDANTS' EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| Q | 712 | | 3 |
| R | 861 | | 3 |

<u>**Friday - January 5, 2024**</u>                                    <u>**8:01 a.m.**</u>

                    **P R O C E E D I N G S**

                        ---oOo---

        **THE CLERK:**  Calling the matter of 23-CV 23-4155-YGR,
California Coalition for Women Prisoners, et al. vs. United
States of America Federal Bureau of Prisons, et al.

     Parties, please step forward and state your appearances
for the record.

        **MR. GALVAN:**  Ernest Galvan, Rosen Bien Galvan &
Grunfeld, for plaintiffs.

        **THE COURT:**  Good morning.

        **MR. CHA-KIM:**  Stephen Cha-Kim, Arnold & Porter, for
the plaintiffs.

        **THE COURT:**  Good morning.

        **MR. ANDERSON:**  Good morning.  Carson Anderson, Arnold
& Porter, for the plaintiffs.

        **THE COURT:**  Good morning.

        **MS. MONTES:**  Good morning, Your Honor.  Amaris Montes
with Rights Behind Bars for the plaintiffs.

        **THE COURT:**  Good morning.

        **MS. STEIERT:**  Good morning, Your Honor.  Natalie
Steiert with Arnold & Porter, for the plaintiffs.

        **THE COURT:**  Okay.

        **MS. STEIERT:**  I have a pending motion for pro hoc vice
on the docket.

1          THE COURT:  Do I have local counsel who is supporting

2    you?

3          MS. STEIERT:  Yes.

4          MR. GALVAN:  One of us is local counsel.  Yes,

5    Your Honor.

6          THE COURT:  The application is granted.

7          MS. STEIERT:  Thank you.

8          THE COURT:  And your name again, please?

9          MS. STEIERT:  Natalie Steiert.

10         THE COURT:  How do you spell your last name?

11         MS. STEIERT:  S-T-E-I-E-R-T.

12         THE COURT:  Okay.  Welcome.

13         MS. JANSSEN:  Good morning, Your Honor.  Kara Janssen

14   from Rosen Bien Galvan & Grunfeld, for the plaintiffs.

15         THE COURT:  Good morning.

16      For the defense.

17         MS. MATTIOLI:  Madison Mattioli for the United States.

18         THE COURT:  Good morning.

19         MS. CZIOK:  Abbie Cziok for the United States.

20         THE COURT:  Okay.  Good morning.

21      And I see I have Mr. France is here.  Good morning.

22   Ms. Caselli is here, good morning.

23      I saw you back and forth.  I can't remember who you are.

24         MS. SUTTON:  My name is Kristi Sutton, Your Honor.

25         THE COURT:  Kristi Sutton.  Good morning.

1        And I see that I have in the audience Ms. Reese, is that

2    right?

3            **MS. REESE:**  Yes, Your Honor.

4            **THE COURT:**  You are welcome to come and join counsel

5    table so you can get a better view of the witnesses.

6            **MS. REESE:**  Thank you.

7            **THE COURT:**  Okay.  All right.  So at this point, I

8    understand, right, that we are having -- I don't see my

9    marshals anywhere.  Are the marshals ready to --

10           **THE MARSHAL:**  Five minutes.

11           **THE COURT:**  Five minutes?

12           **THE MARSHAL:**  They ran late.

13           **THE COURT:**  Do we know if they're in the building?

14           **THE MARSHAL:**  Not yet.

15           **THE COURT:**  They're not in the building yet.  Okay.

16       Is there anything -- well, then let's just get a lay of

17    the land.  Okay.

18       And we're ready.

19       Is there anyone -- who is the first?

20       There should be no one meeting with anybody.  Who is first

21    from the plaintiffs?

22           **MR. GALVAN:**  SL, Your Honor.  Initials SL.

23           **THE COURT:**  Okay.

24           **THE MARSHAL:**  I'll bring her.

25           **THE COURT:**  Thanks.

1    Do the marshals and does the courtroom deputy have the

2  order of call?

3         **MR. GALVAN:**  I do not believe so, Your Honor.

4         **THE COURT:**  All right.  Let me get it right -- give it

5  to me right now.

6         **MR. GALVAN:**  SL.  Initials RB.  KD --

7         **THE COURT:**  D as in --

8         **MR. GALVAN:**  KD as in delta.  ER.  JM as in Mike.

9  CAH.  LP as in papa R.  MM.  That's Mike Mike.  AV.  That's V

10  Victor.  RF.  JL.  TM as in Mike.

11         **THE COURT:**  T as in Tom?

12         **MR. GALVAN:**  T as in Tom, Your Honor.

13    And KC, C as in Charlie.

14         **MS. MATTIOLI:**  There are only 10 for today, just to

15  make that clear.

16         **THE COURT:**  Okay.  That's 13.

17    So if the plaintiffs' attorneys will give that list or

18  write one up and hand it to the...

19    Can you go make quick copies, one for me, one for you, one

20  for marshals.  So we just need two copies.

21    All right.  Any other issues before SL arrives?

22         **MR. GALVAN:**  Your Honor, I made a filing last night

23  regarding a transportation incident yesterday.  Several of our

24  witnesses were brought here and sat all day yesterday in the

25  holding cells, even after Your Honor had directed that our

1    witnesses not be brought until Friday, today.

2        We got distraught calls from the family members of the

3    witnesses and from one of the witnesses and a CorrLinks from

4    another one of the witnesses saying that -- first of all, the

5    conditions were terrible.  They weren't allowed to wear their

6    own clothes.  They were given clothes that didn't fit.  They

7    were held downstairs from 6:00 a.m. to 4:00 p.m., given a

8    peanut butter sandwich and nothing else.  They weren't allowed

9    to bring coats and it was freezing.  And they weren't supposed

10    to be transported here in the first place.

11        We are very concerned this is going to have the

12    predictable effect of discouraging our witnesses from

13    testifying.  And it -- something is not being managed with

14    regard to getting our witnesses here.

15        **THE COURT:**  Well, including the fact that you all have

16    not done a very good job in communicating.  Right?

17        **MR. GALVAN:**  I --

18        **THE COURT:**  Everything -- things were being done last

19    minute.  I even had Mr.-- I haven't memorized all your names.

20    I'm sure I will know later -- Mr. Cha-Kim making last-minute

21    requests at 4:00 yesterday afternoon.  That's a problem.

22        **MR. GALVAN:**  I understand, Your Honor.  But this issue

23    of our witnesses being held here all day in the basement

24    yesterday --

25        **THE COURT:**  Mr. Price.

1          **THE MARSHAL:**  Yes, Your Honor.

2          **THE COURT:**  Did you have an order?  Or how did it come

3     about that those witnesses were here yesterday?

4          **THE MARSHAL:**  We have USA 475s, attorney special

5     requests.  We had about 14 of them, I guess, so far.

6          **MS. MATTIOLI:**  If I could, Your Honor, I have -- we --

7     Mr. Galvan attached the emails that were sent back and forth.

8     I -- I was responsible for submitting the USA 475s, was

9     communicating with plaintiffs' counsel to get a list.

10         The list has changed several times since it was provided,

11    but all of the forms were submitted, signed and submitted by me

12    and my supervisor.  We sent an email when we got their final

13    list to the deputy marshals, and we requested only two inmates

14    yesterday, our two witnesses.

15         **THE COURT:**  Mr. Price.

16         **THE MARSHAL:**  What do you want me to say, Your Honor?

17         **THE COURT:**  Did you get the email saying only two were

18    supposed to be brought?

19         **THE MARSHAL:**  Initially we had four on the list.  We

20    brought four in.  And then I think later after we sent the

21    requests for our transport to the Bureau of Prisons, we brought

22    in two for one side and then we brought four witnesses for

23    the -- for the other side.  So two --

24         **THE COURT:**  Yeah.  But that's my question, is that how

25    did those folks get on the bus given that --

1          **THE MARSHAL:**  It was two different trips.  So we had

2     one trip for the plaintiff and one trip for the defense.

3          **MS. MATTIOLI:**  So the four plaintiff witnesses who

4     were originally scheduled to testify yesterday afternoon were

5     transported first.  And then the two witnesses -- I believe a

6     miscommunication happened.  We submitted two new USA 475s and

7     said now we only need these two witnesses tomorrow.  And I

8     don't believe the original order was canceled or disregarded.

9          **THE COURT:**  Who were the four?

10         **MR. GALVAN:**  The four included KD, JM --

11         **THE COURT:**  Hold on.  KD.

12         **MR. GALVAN:**  JM.  Those are the two I know about for

13    sure.  And I believe KP as in Peter.  And T as in Tom, M as in

14    Mike.

15         **THE COURT:**  I don't see a KP.

16         **MS. MATTIOLI:**  She also dropped off their witness

17    list.

18         **MR. GALVAN:**  I'm sorry.  She was originally listed as

19    KPR as in Romeo.

20         **THE COURT:**  And she's not on the list anymore?

21         **MR. GALVAN:**  No.  She was not on the list even as of

22    Wednesday when both counsel and I stood here and discussed how

23    the government's case was going along and how I asked for the

24    Court's help in making sure that our witnesses were not

25    transported needlessly on Thursday --

1          **THE COURT:**  Let me just say, this is the problem in

2     trials and evidentiary hearings and anything to do with people

3     who are brought in from facilities.  Mistakes happen.

4          You all are working, you're in this courtroom.  I'm doing

5     300 pages of transcript a day.  You have a dozen lawyers.  And

6     I've got two, three, maybe four on the other side.

7          You all have to do a better job at communicating.  And

8     mistakes happen.  I will apologize personally to these three,

9     and I don't know that there's anything else I could do.

10         When did you find -- did someone not find out?

11         **MR. GALVAN:**  We asked -- we found out when KD's

12    parents called us because she --

13         **THE COURT:**  When?

14         **MR. GALVAN:**  It's in our declaration --

15                    (Simultaneous colloquy.)

16         **THE COURT:**  I -- you know, I have other cases.

17         **MR. GALVAN:**  I understand, Your Honor.

18         **THE COURT:**  I'm spending all day and weekends on your

19    case.  I do have other people that I have to manage and help in

20    addition.  So I have not read this.

21         **MR. GALVAN:**  We found out after 7:00 p.m., Your Honor,

22    last night.

23         We emailed counsel for the United States to ask what had

24    happened.  Counsel for the United States informed us that --

25    that -- I don't want to speak for her but that we were informed

1   that she knew about it in the afternoon but forgot to tell the

2   Court or us about it.

3          **THE COURT:**  Ms. Mattioli.

4          **MS. MATTIOLI:**  When I went down -- I was alerted that

5   our witness needed to speak to a lawyer.  In the course of that

6   interaction, she mentioned that KD was in the holding cell next

7   to her.  I was shocked.  I was alarmed.  That was not the plan.

8       In light of what happened after that, I did not think

9   about that again.

10      And I apologized to plaintiffs' counsel for anything that

11  was not communicated.

12         **THE COURT:**  In the future, I want a list every morning

13  of who you have so I can manage this because apparently the

14  lawyers are having difficulty.  Okay?

15         **THE MARSHAL:**  Yes, Your Honor.

16         **THE COURT:**  Thank you.

17         **MR. GALVAN:**  Your Honor, may I request that this

18  function be transferred to the Northern District AUSAs?  They

19  didn't have this problem in the criminal trials.

20         **THE COURT:**  No.

21         **MR. GALVAN:**  Thank you, Your Honor.

22         **THE COURT:**  In the criminal trial, we knew what was

23  going on.  No.

24      Bring in the witness.

25         **MR. NIMNI:**  Your Honor, and Madam Court Reporter, my

```
1    name is Oren Nimni, just for the record.

2              THE COURT:  Let's get the white noise so she can be

3    sworn in.

4                        (Proceedings sealed.)

5                      DIRECT EXAMINATION

6    BY MR. NIMNI:

7    Q.   Good morning.

8    A.   Good morning.

9    Q.   Because of some of the confidentiality issues in this

10   case, we're not using people's full names.  You can either go

11   by your initials or by your first name.  What would you prefer?

12   A.   My first name.

13   Q.   Okay.  Good morning, Sheilla.

14   A.   Good morning.

15   Q.   Thanks for being here.  I know that we're going to talk

16   about some hard things, but we're going to go slow.  And if you

17   need to take a break or anything, you can tell me or the Judge.

18   A.   Okay.

19             THE COURT:  But, Ms. [name redacted], I'm going to

20   have to hear you.  In my old age, I can't hear as well so

21   please move closer to the mic.  Okay.

22   BY MR. NIMNI:

23   Q.   All right, Sheilla.  Tell me a little bit about yourself.

24   How old are you?

25   A.   Thirty.
```

1    **Q.**   Do you have children?

2    **A.**   Yes.

3    **Q.**   How many?

4    **A.**   I have two boys.

5    **Q.**   How old are they?

6    **A.**   Thirteen and 11.

7    **Q.**   Those are good ages.

8         And can you tell me, what time did you get up to come here

9    this morning?

10   **A.**   At 5:00.  They were rushing us that the marshals were

11   outside, that we had 15 minutes.

12   **Q.**   Thank you for being here and getting up so early.  I know

13   the mornings are hard for me.

14        Are you currently incarcerated?

15   **A.**   Yes.

16   **Q.**   And where are you currently incarcerated?

17   **A.**   FCI Dublin.

18   **Q.**   When did you first arrive at FCI Dublin?

19   **A.**   In March of 2016.

20   **Q.**   And are you incarcerated at the FCI prison or are you in

21   the camp?

22   **A.**   I'm in the prison.

23   **Q.**   And have you been in the prison the whole time?

24   **A.**   Yes, sir.

25   **Q.**   From 2016 until the present?

1    **A.**    Yes.

2    **Q.**    And you were there when -- were you there when Warden

3    Garcia was warden?

4    **A.**    Yes.

5    **Q.**    And during the following warden's administrations as well?

6    **A.**    Yes.

7    **Q.**    Have you ever been to any other prison during your

8    incarceration?

9    **A.**    No.

10    **Q.**    Sheilla, have you ever experienced sexual harassment at

11    FCI Dublin?

12    **A.**    Yes.

13    **Q.**    Have you personally experienced sexual assault at FCI

14    Dublin?

15    **A.**    Yes.

16    **Q.**    Can you tell me who sexually assaulted you?

17    **A.**    Officer Gacad.

18            **THE COURT:**  I'm sorry.  How do you --

19            **MR. NIMNI:**  G-A-C-A-D.

20            **THE COURT:**  Okay.  Thank you.

21    BY MR. NIMNI:

22    **Q.**    And Officer Gacad, was he an officer at FCI Dublin?

23    **A.**    Yes.

24    **Q.**    When did the harassment by Officer Gacad begin?

25    **A.**    In March of 2022.

1   **Q.**  And just so that I can put us in context, was that when

2   Warden Jusino was the warden?

3   **A.**  Yes.

4   **Q.**  And we can walk through this slowly, step by step just so

5   that we can take it easy and that the Court can understand.

6       And what happened at first with the harassment?

7   **A.**  So in March of 2022, probably about a week before my

8   birthday, my birthday is March 12th, Officer Gacad, he

9   dedicated a song to me and then he wrote me a letter.  And

10   he -- in the letter he said that the first time he set eyes on

11   me in September of 2021, he knew I was going to be his wife.

12   **Q.**  And how did things progress from there?

13   **A.**  Everything happened fairly quickly.  So for my birthday,

14   he wrote me another note and he would throw notes like during

15   4:00 count.  He would make sure to stand behind the other

16   officer counting, throw notes in my room.  Or he would like

17   search -- search my room and like leave notes or gifts.

18       And then --

19   **Q.**  Sorry.  Just if I can interrupt you.  What kind of gifts

20   would he give you?

21   **A.**  Earrings, a necklace, a watch.

22   **Q.**  And are those --

23   **A.**  A ring.

24   **Q.**  And are those things you could get easily at FCI Dublin?

25   **A.**  No.

1    **Q.**    Sorry.  Continue.  What happened after he started giving

2    you these notes and giving you these gifts in March of 2022?

3    **A.**    Everything kind of escalated quickly.  By March 23rd, he

4    asked me to go to the yard office, and he made sure that the

5    second officer on shift was doing a perimeter walk so he wasn't

6    around.  And he took me into the yard office, and that was the

7    first time he kissed me and groped me.

8    **Q.**    I know this is difficult to talk about, but did he

9    continue to have physical contact with you after that?

10   **A.**    Yes.

11   **Q.**    Can you tell me about that?

12   **A.**    So he would make sure to try to like work my unit.  There

13   was an incident where he waited until I was outside the shower

14   and came to my room when I was fully naked.

15       There were -- every weekend he would take me on trash runs

16   because there was no cameras by the dumpsters and that's where

17   he would give me notes and where he would kiss me.

18   **Q.**    How did you know that there were no cameras by the

19   dumpsters?

20   **A.**    Because I worked CMS.  And he told me that there was no

21   cameras there.  And he would tell me that like where there was

22   blind spots like even in the units.

23   **Q.**    And you talked about an instance where he came and visited

24   you right after you got out of the shower and you were

25   completely naked.  Can you tell me what happened then?

1    **A.**    He came to my door and made sure the door was at an angle

2    so that the camera couldn't see him.  And he stood at the door

3    and he kissed me and he groped me and touched my genitals.

4    **Q.**    And just so we have the timeline straight, this -- was

5    this going on in March and April of 2022 or what was -- when

6    were these physical acts happening?

7    **A.**    So in March-- on March 23rd was the very first.  And then

8    every weekend after that.  And then that happened on a weekend.

9    It was -- it was a late night.  But March, April, May, we were

10   now emailing via an alias name, Luis Acosta.

11          **THE COURT:**  What was the alias name?

12          **THE WITNESS:**  Luis Acosta.

13   **BY MR. NIMNI:**

14   **Q.**    Just to be clear, was that an alias name that Officer

15   Gacad was using to email you?

16   **A.**    Yes.

17          **THE COURT:**  Do you know how to spell that?

18          **THE WITNESS:**  Luis, L-U-I-S, and then Acosta,

19   A-C-O-S-T-A.

20   **BY MR. NIMNI:**

21   **Q.**    What was your understanding of why he was using an alias?

22   **A.**    Well, because he didn't want to get caught.

23   **Q.**    And I know it's hard to estimate these kind of things, but

24   over the course of these three months that you were talking

25   about, how many times would you say he kissed you?

1    **A.**    A lot.

2    **Q.**    And groped you?

3    **A.**    A handful of times.  Maybe a good ten.

4    **Q.**    And did you initially report Officer Gacad during this

5    three-month period?

6    **A.**    No.

7    **Q.**    And why didn't you report it?

8    **A.**    I was scared.

9    **Q.**    Scared of what?

10    **A.**    I was scared of retaliation.  I was scared that -- I've

11    seen people report PREA in the past since I was there, and they

12    would go to the SHU and then they would get shipped out and we

13    wouldn't see them again.

14    **Q.**    What kind of retaliation were you afraid of?  The SHU?  Or

15    were there other things?

16    **A.**    Well, the fact that they all are like friends on the

17    compound, like the officers, so they do like favors for each

18    other.  So I didn't know what -- you know, my room has been

19    ransacked since.  I'm honestly, like, I'm super nervous being

20    here because I don't know what I'm going to go back to when I

21    go back to my cell today.

22    **Q.**    I understand.  And we really appreciate you being here.

23    Who would you have reported to if you were to report

24    Officer Gacad during that time?

25    **A.**    There honestly wasn't anyone working there that I felt

1    like I could trust.

2    **Q.**    Uh-huh.

3        And to the best of your knowledge, was Officer Gacad ever

4    suspended for groping you?

5    **A.**    No.

6    **Q.**    To the best of your knowledge, was Officer Gacad ever

7    fired for groping you?

8    **A.**    No.

9    **Q.**    To the best of your knowledge, was Officer Gacad

10    disciplined in any way for groping and kissing you?

11    **A.**    No.

12    **Q.**    Officer Gacad eventually -- did he eventually leave FCI

13    Dublin?

14    **A.**    He left in -- he left in June.

15    **Q.**    And did you --

16        **THE COURT:**  June of what year?

17        **THE WITNESS:**  June of 2022.

18        **THE COURT:**  2022, not 2023?

19        **THE WITNESS:**  No.  2022.

20        **THE COURT:**  Okay.

21    **BY MR. NIMNI:**

22    **Q.**    And did you see Officer Gacad after --

23    **A.**    Yes.

24    **Q.**    -- he left his position at FCI Dublin?  Can you tell me

25    about seeing him?

1   **A.**   So in June I got called into Putnam's office due to

2   allegations.  And I initially denied everything because I was

3   scared.  So I was able -- Putnam told me that I had to go to

4   medical and then psychology and then I could go back to my

5   room, so I did those things.

6           **THE COURT:**  I'm sorry.  I want to stop you.

7       You said that Putnam called you in due to allegations, but

8   you didn't make the allegations?  This came from somebody --

9           **THE WITNESS:**  From other inmates.

10          **THE COURT:**  Okay.  And -- but they were about you, and

11  that's why he wanted to send you to medical?

12          **THE WITNESS:**  Uh-huh.

13          **THE COURT:**  Is that right?

14          **THE WITNESS:**  Yeah.

15          **THE COURT:**  Okay.

16  **BY MR. NIMNI:**

17  **Q.**   And so after you were sent to medical and psychology, did

18  you then go back to your room?

19  **A.**   Yeah.  So when I was in my room, 2:00, that was -- like by

20  1:20 I was back in my room.  So like -- at 2:00 shift change,

21  my room, I can oversee like the whole compound.  So I saw when

22  Gacad was leaving C unit, because that's the unit he was

23  working that day, he went to the lieutenant's office and then I

24  didn't see him in person anymore.

25  **Q.**   Did you see him over video after that?

1    **A.**    Yes.  So after he left, he showed up at my mom's house.

2    And I honestly to this day have no idea what it is he told my

3    mom and dad.  But I'm going to assume that it was like that he

4    was my friend and we were good and this, that, and the third.

5        And my parents, because I've been incarcerated for so

6    long, I feel like were grasping at anything that was close to

7    me.  And so they let him in and they were nice to this man.

8    And I, for that time, had no idea until July, I had asked --

9    because at this point now we were at his second alias name in

10    the emails because he had me delete the Luis Acosta.

11    **Q.**    What was the second alias name?

12    **A.**    Jose Delacruz.

13    **Q.**    And he -- would he email you from this other alias?

14    **A.**    Yes.

15    **Q.**    And I think before we were talking about when you saw him,

16    I think you had said that you saw him on video.  So did you

17    call your parents and then --

18    **A.**    So my -- in that incident, my dad had gone out of town.

19    And I wanted to see my mom.  So he offered to use his email so

20    my mom could just log on.

21        So I assumed that my mom was going to come on the screen,

22    and she did, at her house.  And then she handed the phone over,

23    and he was there at my mom's house.

24    **Q.**    And how did it make you feel to see Officer Gacad in your

25    family's home?

1    **A.**    Shocked, confused.

2    **Q.**    Were you scared?

3    **A.**    Yes.

4    **Q.**    What were you scared of?

5    **A.**    I don't know.  This person.

6          **THE COURT:**  So I'm going to remind all plaintiffs'

7    counsel not to lead, especially with these witnesses.

8          **MR. NIMNI:**  Understood, Your Honor.

9          **THE COURT:**  That's stricken.

10   **BY MR. NIMNI:**

11   **Q.**    And you spoke about your father, and I'm sorry to ask this

12   question.  Is your father still alive?

13   **A.**    No.

14   **Q.**    When did he pass?

15   **A.**    I'm sorry.

16         **THE COURT:**  Sheilla, is there -- do you need some

17   water, Sheilla?

18         **THE WITNESS:**  I'm okay.

19         **THE COURT:**  Can we get her some water anyway?

20       Okay.  She does have water.

21       Sheilla, you said you had been in for a long time.  How

22   long have you been in?

23         **THE WITNESS:**  I've been incarcerated since I

24   self-surrendered in November of 2015.

25         **THE COURT:**  And when -- when are you due to leave?

1              **THE WITNESS:**  In 2030.

2              **THE COURT:**  Continue.

3              **THE WITNESS:**  I'm sorry.  My dad passed away --

4    **BY MR. NIMNI:**

5    **Q.**   No need to apologize.

6    **A.**   -- April 7th of 2023.

7    **Q.**   And you can take your time.  It's okay.

8         And did you continue to communicate with your family after

9    your father passed?

10   **A.**   Yes.

11   **Q.**   And was Officer Gacad still around with your family?

12   **A.**   I never directly asked because I didn't want -- I just

13   wanted all of it to go away so I didn't ask.  And I didn't want

14   anything to be on the recorded calls because I didn't want them

15   to think that I was looking for him, because I wasn't.  But,

16   yes, he was still around because he got employed at my mom's

17   job.

18   **Q.**   And to the best of your knowledge, is he still in contact

19   with your family?

20   **A.**   Not that I'm aware of.  I know that my mom, in May for

21   Mother's Day weekend, she got my kids, and she introduced my

22   kids to him.

23             **THE COURT:**  I take it you haven't told your mom what

24   happened?

25             **THE WITNESS:**  I -- I don't have a way to tell her

1    over, like, the recorded calls because of everything is being

2    recorded.  And I asked her to come see me so I can tell her,

3    but she can't.  Now that my dad passed, she can't come see me.

4                **THE COURT:**  Where is she located?

5                **THE WITNESS:**  My mom's in Phoenix, Arizona.

6                **THE COURT:**  And you -- and the lawyers haven't told

7    her either?  You haven't authorized your lawyers to tell her?

8                **THE WITNESS:**  I authorized my compassionate release

9    attorney to talk to her, and she cut off communication as far

10   as I'm aware.

11               **THE COURT:**  Your mom cut off communication?

12               **THE WITNESS:**  Yes.  With -- with COT.

13               **THE COURT:**  With the compassionate release attorney?

14               **THE WITNESS:**  Like the compassionate release attorney

15   reached out, and so she cut off, like, everything with the COT.

16   Yes, but he still works at her job, like where she works.

17               **THE COURT:**  Is it a big company, a little company?

18               **THE WITNESS:**  At the VA hospital.

19   **BY MR. NIMNI:**

20   **Q.**   And Sheilla, you were talking about your compassionate

21   release attorney.  Are you currently putting together an

22   application for compassionate release?

23   **A.**   Yes.

24   **Q.**   Has the situation with Officer Gacad had any impact on

25   your formulation of your petition?

1    **A.**   Yes, because I don't have a release plan due to that I

2    can't go to my mom's house because he was there.

3    **Q.**   And turning back to FCI Dublin --

4            **THE COURT:**  I don't understand that.  He -- because he

5    visited your mom, you can't -- it's not -- that release plan

6    isn't -- can you -- sorry.  Can you explain that to me?

7            **THE WITNESS:**  So from my understanding is my

8    compassionate release attorney said that it wouldn't be

9    beneficial to me to go to my mom's house, my mom's address,

10   because he was there, and I had -- there was a video visit with

11   him there and he knows where she is and he moved there.  He

12   moved from here to Arizona.  So he lives there now.

13        And so my compassionate release attorney doesn't think

14   that it would be the right thing, you know, to be in the same

15   area as him or in the same space as him.  Which I understand,

16   and I'm seeking for a fresh start anyways.  This is too much.

17   So I'm okay with it, but it is difficult because -- because my

18   mom's all I have.

19            **THE COURT:**  And you don't have any other family?

20            **THE WITNESS:**  My sister's husband is in the military

21   and they're currently stationed in Germany, so that's out of

22   the question.  And my brother is currently serving in the Army

23   as well, and he is stationed in the Philippines, so that's out

24   of the question.

25            **THE COURT:**  I see.

1            **MR. NIMNI:**  And, apologies, Your Honor.  Did you have

2    another question?

3            **THE COURT:**  No.  Go ahead.

4    **BY MR. NIMNI:**

5    **Q.**  And, Sheilla, did you eventually report Officer Gacad?

6    **A.**  Yes.

7    **Q.**  When was that?

8    **A.**  I reported -- well, so after the video visit -- I'm sorry.

9    I have to -- for you to follow the timeline, I saw Putnam in

10   June.  He called me back in July.

11   **Q.**  Uh-huh.

12   **A.**  With Dena Crow from OIG, and he asked me about Delacruz on

13   my contact list.

14   **Q.**  Uh-huh.

15   **A.**  And I just looked at -- at Putnam, and I -- I didn't -- I

16   didn't know if I could trust Dena or not at that point because

17   this is the first time I've ever seen her before.

18   **Q.**  And did you trust Lieutenant Putnam?

19   **A.**  No.  And --

20           **THE COURT:**  Why?

21           **THE WITNESS:**  Because I've seen him do, like, things

22   to other people that -- like they trusted him, and he, like,

23   sent them to the SHU or he ignored them.

24       So when I went in there, I was like I didn't want to talk

25   to him.  I wanted -- at that point I wanted to speak to an

1    attorney.  And so he sent me to the SHU.

2    **BY MR. NIMNI:**

3    **Q.**  And when was this?

4    **A.**  This was in July, like the last weeks of July.  He sent me

5    to the SHU.  And this was on a Friday.  And he told me that if

6    he did not come back on Monday, that there was a good chance I

7    was going to get shipped out.

8    And he didn't come back on Monday.  So I sat there and sat

9    there.  And then he came back and he pulled me out.  He asked

10   me if I wanted to talk to him.

11   And I just told him, like, sir, I've never been a problem

12   on your compound.  Like I don't understand what the issue is.

13   Like why am I even in the SHU.  He gave me three different

14   reasons.  He told me I was there --

15   **Q.**  What were those three reasons?

16   **A.**  Under investigation.  Then he said he had to look through

17   my property.  And then he told me that it was for my safety.

18   So I asked him, I said, well, what do you mean?  Like now

19   that you're taking me to the SHU, like now people are going to

20   wonder why I'm here.  So he held me there until August 10th.

21   **Q.**  And how long was that approximately?

22   **A.**  Like two weeks I was sitting there.

23   **Q.**  And --

24   **THE COURT:**  Were you bunking with someone at the time?

25   **THE WITNESS:**  I was actually with the orderly of the

1    SHU.  And so she asked me why I was there, and I told her that

2    I was under investigation.  I didn't really want her to know my

3    business.

4        So the officers that would come on shift would ask her

5    like, hey, has she said anything to you?  Like, why is she back

6    there?  Like, why can't she use the phone?  Why do we always

7    have to ask SIS to give her anything?  Like, what happened with

8    her?

9        So my bunkie was like curious.  But by the time I got out

10   of the SHU, like, they had already -- all the inmates already

11   knew why I was there.

12   **BY MR. NIMNI:**

13   **Q.**   And were you ever informed -- to the best of your

14   knowledge, were you in the SHU for a disciplinary reason?

15   **A.**   No.  But it felt that way.

16   **Q.**   And what were the conditions like for you in the SHU?

17   **A.**   They were terrible.  The SHU is terrible.  That -- that

18   was the second time I was there, but the SHU is bad.  They --

19   they don't give you any hygiene, they don't allow you to

20   purchase any hygiene.  It's -- you ask for a roll of toilet

21   paper, they ask you to wait for the next shift.

22   **Q.**   And how did -- how was your mental health after your

23   experience in the SHU?

24   **A.**   It's deteriorating as the time goes on.

25   **Q.**   And after this reporting incident with Officer Putnam, how

1  did the other officers treat you?

2  **A.**   So there was an officer in particular that asked my

3  roommate if I was pregnant.  And so everybody started spreading

4  that rumor.  And officers started, like, making comments.

5  Officers started trying to blame me for other officers being

6  walked off.  My room was getting hit.

7       I would report it to Putnam just to make sure that I was

8  covering myself so they wouldn't turn around and say, well, you

9  didn't report it, you know.

10       So I went to Putnam in November with a mental breakdown.

11  And I --

12  **Q.**   November of...?

13  **A.**   2022.

14  **Q.**   2022.  And I want to get to where you're going, but can I

15  just ask you which officers if you're comfortable saying?

16  **A.**   Serrano and Vasquez.

17            **THE COURT:**  I didn't hear you.  Serrano?

18            **THE WITNESS:**  Yes.

19            **THE COURT:**  And the second one?

20            **THE WITNESS:**  Vasquez.  And then Lieutenant Jones, she

21  humiliated me in front of the entire unit.

22            **THE COURT:**  She did what?

23            **THE WITNESS:**  She humiliated me in front of the unit

24  on New Year's Eve.

25            **THE COURT:**  What did she do?

1          **THE WITNESS:**  She called me in front of the whole unit

2     when they locked us down to breathalyze everyone.  And she is

3     like I know about you, I know who you are.  She's like and

4     you're going to know who I am.

5     **BY MR. NIMNI:**

6     **Q.**  And this is New Year's Eve 2023?

7     **A.**  From 2022 going to 2023.

8     **Q.**  Okay.  I think before, you were talking about going to

9     Putnam and you had a mental breakdown.  Can you tell us what

10    happened there?

11    **A.**  So I asked to see Putnam.  And he was walking around at

12    the time with someone who I didn't know who the person was.  I

13    later found out that I guess he was with the FBI taking

14    pictures of the institution.

15         And I came to him and was telling him everything, telling

16    him that Vasquez was talking to Gacad on Instagram because I

17    received a letter from Gacad.  And I was telling Putnam

18    everything that I knew.  The FBI was writing everything down.

19    And then nothing came of it.

20    **Q.**  Did you experience any change as a result of your reports?

21    **A.**  No positive changes, no.

22    **Q.**  And to the best of your knowledge, the officers that you

23    were speaking about, Serrano, Vasquez and Jones, were any of

24    them disciplined for the things that you reported?

25    **A.**  No.  Serrano is still on the compound.

1          **THE COURT:**  Who is still on the compound?

2          **THE WITNESS:**  Serrano.

3    **BY MR. NIMNI:**

4    **Q.**  Does Serrano still work the same unit where you live?

5    **A.**  She works -- actually works the compound.  So she works

6    everywhere.  And Christmas from 10:00 p.m. to 6:00 a.m., she

7    worked the unit.  And New Year's she made sure to go into the

8    unit.

9         And she goes in and makes comments like, yeah, I'm still

10   here, like what's up?  To everyone, like, but she, you know,

11   indirectly tells people like don't speak to [name redacted]

12   because she just --

13         **MR. NIMNI:**  I'm sorry.  If we can strike the last

14   name.

15   **Q.**  I'm sorry.  We just want to make sure to not use --

16   **A.**  Sorry.  Sorry.

17         **THE COURT:**  Motion is granted.

18         **THE WITNESS:**  Don't speak to Sheilla.  Like she's a

19   snake, she's a bitch.  She -- watch out for her.  Like she got

20   my man walked off.

21         **THE COURT:**  When was the last time she said stuff like

22   that to you?

23         **THE WITNESS:**  On New Year's she came in and said she's

24   still here.  This New Year's as in --

25         **THE COURT:**  Last weekend?

1           THE WITNESS:  (Witness nods head.)

2    BY MR. NIMNI:

3    **Q.**    And just for the record, that was "yes"?

4    **A.**    Yes.

5    **Q.**    Do you know of other officers that have been removed

6    recently for sexual misconduct?

7    **A.**    Yes.

8    **Q.**    And what is that officer's name?

9    **A.**    Sousa --

10          MS. CZIOK:  Objection.  Foundation.

11          THE COURT:  Sustained.

12   BY MR. NIMNI:

13   **Q.**    How are you aware that they were removed for sexual

14   misconduct?

15   **A.**    When I worked at CMS, they told me that --

16          THE COURT:  When you worked at -- I'm sorry.  I don't

17   know all the acronyms.  There are so many.

18          THE WITNESS:  I'm sorry.  So I work CMS, which is

19   Central Maintenance Service, and I worked for HVAC.

20          THE COURT:  Okay.  And somebody told you something?

21          THE WITNESS:  They told me that --

22          THE COURT:  Hold on.  I don't want -- who --

23          THE WITNESS:  Who told me.

24          THE COURT:  That's what we call hearsay.

25          THE WITNESS:  Yes.

1          **THE COURT:**  And so kind of like rumors, you know.  So

2    usually if somebody told somebody told somebody doesn't mean

3    that it's true.

4          **THE WITNESS:**  Uh-huh.

5          **THE COURT:**  So somebody told you something about

6    somebody being released?

7          **THE WITNESS:**  Well, that -- it was -- they were

8    saying -- they were telling me that it was me.  I was being

9    bullied, I was being harassed at work, that I was the one

10   responsible for getting that officer walked off.

11         **THE COURT:**  I see.

12         **THE WITNESS:**  Yes.

13   BY MR. NIMNI:

14   **Q.**    And what was that officer's name?

15   **A.**    Sousa.

16   **Q.**    And to your understanding, was he walked off -- why was he

17   walked off?

18         **THE COURT:**  Well, she doesn't --

19         **MS. CZIOK:**  Objection.  Foundation.

20         **THE COURT:**  Sustained.

21      Did Sousa do anything to you?

22         **THE WITNESS:**  No.  I worked with Sousa.  And I worked

23   with Sousa side by side during the pandemic when nobody could

24   come out of their rooms.  There was like a select -- I think

25   there was about six of us that they would pull out to work and,

1    you know, to keep the institution running.  And I was one.

2         And so Sousa was like my boss.  And he was a very good

3    mentor.  And he, you know, never crossed that line.  And he

4    knew when I went to the SHU.  And he was very respectful at,

5    you know -- in every setting.  So I never had an incident with

6    Sousa.  I never reported Sousa for anything in a negative

7    light.  He's always been helpful to me.

8         But because of Gacad, I was being bullied for --

9              **THE COURT:**  So somebody thought that those things were

10   related?

11             **THE WITNESS:**  Yes.

12             **THE COURT:**  But Sousa actually never did anything to

13   you?

14             **THE WITNESS:**  Nothing.

15             **THE COURT:**  Okay.  Proceed.

16   **BY MR. NIMNI:**

17   **Q.**   Sousa never did anything to you, just to be clear?

18   **A.**   Yes.

19   **Q.**   And the things that you're talking about when you said

20   they told you, do you mean BOP employees?

21             **THE COURT:**  Or who do you mean?

22   **BY MR. NIMNI:**

23   **Q.**   Or who do you mean?

24   **A.**   So it was BOP employees as well as inmates.

25   **Q.**   And to the best of your knowledge, when was Officer Sousa

```
1   walked off?
2           MS. CZIOK:  Objection.  Foundation.
3           THE COURT:  Did you see him walked off?
4   BY MR. NIMNI:
5   Q.   When did you observe Officer Sousa --
6           THE COURT:  Did you see?
7   BY MR. NIMNI:
8   Q.   Or did you see --
9   A.   Did I see him?
10          MR. NIMNI:  Apologies, Your Honor.
11          THE COURT:  Did you see him walked off?
12          THE WITNESS:  No, ma'am.
13          THE COURT:  Foundation.  It's important.
14          MR. NIMNI:  Yes, Your Honor.
15  Q.   Does Officer Sousa still work there?
16  A.   Not that I'm aware of.
17  Q.   What happened to you after Officer Sousa no longer worked
18  at CMS with you?
19          THE COURT:  Well, I need timing.  When did you notice
20  that he didn't work there?
21          THE WITNESS:  So it was fairly quickly.  I went to
22  work -- I showed up to work at -- we would go to work at 6:15
23  and --
24          THE COURT:  Month, year?
25          THE WITNESS:  This was in August, September of 2023.
```

1          **THE COURT:**  Okay.  August or September of 2023.

2          **THE WITNESS:**  Uh-huh.

3          **THE COURT:**  And you go to work.  You're still working

4     with him, and then you go --

5          **THE WITNESS:**  Yeah.  Okay.  So he got a promotion.  He

6     would work the tool room, and he got a promotion as a general

7     maintenance foreman.  So because I was HVAC, my boss was in the

8     process of retiring.  So my boss would always tell me like if

9     Sousa needs you, like, help him out, you know.

10         And I knew the tool room because of COVID.  So I worked

11    side by side -- Mayhood which was from HVAC, and Sousa from

12    tool room and general maintenance.  And they had asked me to

13    take -- when my boss left, they asked me if I wanted to stay on

14    HVAC or I wanted to take over the tool room position.

15         And so I was in the process of deciding what I wanted to

16    do, but when I showed up to work to train for the tool room,

17    that's when I found out, because they told me, like, he's not

18    here anymore, he got walked off, and you're the reason why, so

19    we don't want you in the tool room anymore.

20         **THE COURT:**  I see.

21    **BY MR. NIMNI:**

22    **Q.**   And what else did you experience after this?

23    **A.**   There was just a lot of, like, comments and a lot of,

24    like, bullying.  So --

25         **THE COURT:**  By the way, who told you that, that you

1    couldn't have that job?

2              **THE WITNESS:**  Padilla, Officer Padilla.

3              **THE COURT:**  And is Padilla still there?

4              **THE WITNESS:**  He is the tool room officer.

5              **THE COURT:**  Okay.  And is Padilla male or female?

6              **THE WITNESS:**  Male.

7              **THE COURT:**  Is Vasquez male or female?

8              **THE WITNESS:**  Female.

9              **THE COURT:**  Okay.  Continue.

10   **BY MR. NIMNI:**

11   **Q.**   And do you still work at CMS?

12   **A.**   No.  I quit after -- like two weeks after Sousa was gone.

13   It was -- it was too much for my mental, so I ended up quitting

14   my job.

15   **Q.**   Did you like that job?

16   **A.**   I loved that job.

17   **Q.**   Were you good at that job?

18   **A.**   Yes.

19   **Q.**   Why did you quit?

20   **A.**   It all became too much.  Like my mental health, it's not

21   okay.  And so there was days that before everything with --

22   when Sousa -- before Sousa, I would go to CMS to get away from

23   my situation with, like, Gacad, with my dad passing.  I would

24   go to work and I would distract myself from my reality.  But

25   then it followed me there.

1      So it was just easier to hide in the unit.  So that's what

2  I've been doing.

3  **Q.**   I understand.

4      And when we were speaking before about Officer Serrano,

5  have you reported Officer Serrano for misconduct?

6  **A.**   Yes.

7  **Q.**   And --

8          **THE COURT:**  What mechanism did you use to report?

9          **THE WITNESS:**  Putnam.  So after -- after I got out of

10  the SHU and I spoke to Putnam, they do at the institution what

11  they call I guess like a 90-day follow-up.  So they call us

12  into the SIS office, which is very embarrassing because the

13  whole compound can see you going there.  And now they know

14  like, oh, she's going to go talk to SIS, which is like

15  investigation people.  And so --

16          **THE COURT:**  So they have their own separate

17  building --

18          **THE WITNESS:**  No.  It's at the lieutenant's office.

19          **THE COURT:**  But that -- it -- would there be any other

20  reason to go there?  No?

21          **THE WITNESS:**  No.

22          **THE COURT:**  Okay.

23          **THE WITNESS:**  So I told Putnam in one of the -- oh, I

24  would tell him at every night, like, she's still harassing me.

25  Now she is going to people and now, you know, it's affecting my

1    job.  Or like Vasquez is showing up at my job, and she doesn't

2    even work at CMS so there would be no reason for her to be at

3    my job.  And she would --

4            **MS. CZIOK:**  Objection.  Foundation.

5            **THE COURT:**  Overruled.

6            **THE WITNESS:**  And --

7            **THE COURT:**  This is -- I'll let you talk about your

8    perception, but we'll move on.  But keep --

9            **THE WITNESS:**  Yeah.  So I just -- I would report it

10   like if I saw Putnam on the compound.  Like during main line,

11   I'd be like, hey, Putnam, like, Serrano just searched my room

12   and left a mess and pulled everything out of my locker.

13        And he would be like oh, yeah, yeah, yeah, okay.  I have

14   something to do, and he'd walk off.  So, I mean, nothing was

15   coming of it.

16   **BY MR. NIMNI:**

17   **Q.**  And --

18           **THE COURT:**  Was it one of these -- was there a form

19   you had to fill out or anything --

20           **THE WITNESS:**  No.

21           **THE COURT:**  -- when you reported?

22           **THE WITNESS:**  No.

23           **THE COURT:**  You just reported directly to Putnam?

24           **THE WITNESS:**  Yes.

25   / / /

1    **BY MR. NIMNI:**

2    **Q.**    And, Sheilla, you were talking a little bit more about

3    your mental health after the SHU and after your job.  How is

4    your mental health currently?

5    **A.**    It's not -- it's not at its best, absolutely not.

6            **THE COURT:**  I could not hear you.

7            **THE WITNESS:**  It's not good.  It's not at its best, I

8    said.

9    **BY MR. NIMNI:**

10   **Q.**    And have you tried to seek mental health services?

11   **A.**    Yes.

12   **Q.**    What did you do to seek those services?

13   **A.**    So after the incident in May with Gacad and my mom -- like

14   my mom introducing my children to Gacad, my roommate, who is a

15   companion, suicide companion, went to Mulcahy, because she saw

16   how distraught I was, and told her like you should probably

17   check on -- on Sheilla.  Like she's not okay, you know.

18          So she put me on the call-out, and I went to see her.  And

19   I told her.  And she's like, well, I have to report this to

20   Putnam.  And I said okay.  So she did.

21          And she asked me if I wanted to speak to Tri-Valley which

22   is like outside people.  And I -- I had been trying to see

23   Tri-Valley, so I told her yeah, I was like I've been trying to

24   see them.

25   **Q.**    What had you been doing to try to see them?

1    **A.**    I got put on like this wait list but was never called.

2    And I had --

3    **Q.**    How long had you been trying to see them for?

4    **A.**    Months.

5        And so she's like, well, why -- she's like it's so weird

6    that I didn't know.  And, well, I'm going to get you to see

7    them next week.  They come on Thursdays.

8        I said okay.

9        She said, well, you get five sessions and they're

10   30 minutes long.

11       I said, okay, you know, I want to try it.

12       So I went.  The lady was very nice the first time I went.

13   And so then I didn't go the following week.  And so I stopped

14   Mulcahy at main line and I said, hey, you know, I -- she was

15   like, oh, yeah, by the way, the other thing I forgot to tell

16   you is you have to request to see them again.

17       And I said, oh, I thought we got the five sessions, you

18   know.

19       And she's like no, no, no, misunderstanding.

20       I said okay.  I said, well, I would like to see them.  And

21   so she put me on the call-out again.

22       Well, then it was different people.  And Mulcahy was in a

23   rush because I think they had to go to the camp.  So she's like

24   knocking on the door and telling them to cut.  So it was just

25   not a really good experience.

1          And the fact that I had to, like, repeat my whole story to

2     these -- a new set of people, like, I felt like I wasn't

3     healing from everything that I had going on.  So then I just

4     didn't -- I didn't go back.

5     **Q.**    And only a few more questions, Sheilla.  I really

6     appreciate you talking about all of this.

7          Have you experienced increased harassment since filing

8     this lawsuit?

9     **A.**    Absolutely.

10    **Q.**    And do you believe that it's in response to filing this

11    lawsuit?

12    **A.**    I believe so.

13    **Q.**    And how do you come to believe this?

14    **A.**    The fact that I can't leave my room without feeling a

15    sense of fear and the fact that my room gets hit or that I get

16    stopped for something extremely, like, small compared to other

17    people, I know that -- I feel as if I'm being singled out.

18    **Q.**    And I think the Judge was asking you before how long

19    you've been -- since when you've been at FCI Dublin.  How long

20    have you been at FCI Dublin?

21    **A.**    Eight years.

22    **Q.**    And in your eight years there, have you had contact visits

23    from family members?

24    **A.**    Yes.

25    **Q.**    And have you had visits from lawyers?

1    **A.**    Yes.

2    **Q.**    And have you ever been strip searched following a visit

3    from your lawyer?

4    **A.**    Recently, yes.  But not in the beginning.

5    **Q.**    When did those start?

6    **A.**    They started after we filed the lawsuit.

7         **THE COURT:**  Has anyone explained to you that that's

8    BOP policy?

9         **THE WITNESS:**  Now they do.

10   **BY MR. NIMNI:**

11   **Q.**    And did that happen to you before in the eight years that

12   you've been at FCI Dublin?

13   **A.**    No.

14   **Q.**    In your eight years at FCI Dublin -- strike that.

15        Have you experienced a significant reduction in sexual

16   harassment personally since January of 2022?

17   **A.**    No, because mine started in March of 2022.

18   **Q.**    And have you experienced personally an increase or

19   decrease in use of the SHU --

20   **A.**    An increase.

21        **THE COURT:**  So that doesn't -- okay.  Explain what you

22   mean by that because he hadn't finished his question.

23        **THE WITNESS:**  I see people go to the SHU every day

24   now, and I didn't see that before.

25        **THE COURT:**  Okay.  That wasn't his question.

1   **BY MR. NIMNI:**

2   **Q.**   My question was about your personal experience, but we

3   can -- have you observed an increase or de-

4           **THE COURT:**  So wait.

5       You've gone to the SHU twice the entire time?

6           **THE WITNESS:**  Uh-huh.

7           **THE COURT:**  Is that right?

8           **THE WITNESS:**  Yes.

9           **THE COURT:**  Okay.  The first time -- I took notes

10  about the time you went when they were investigating Gacad.  Is

11  that how I say his name?

12          **THE WITNESS:**  Gacad.

13          **THE COURT:**  Gacad.

14          **THE WITNESS:**  Yes.

15          **THE COURT:**  The second time was for what?

16          **THE WITNESS:**  I went before then in 2019.  And it was

17  for an incident report.  It was not anything to do with the --

18  with the situation.

19          **THE COURT:**  Okay.  So -- so since that happened, since

20  the sexual assault investigation, you've not ever yourself been

21  back to the SHU?

22          **THE WITNESS:**  No.

23          **THE COURT:**  Okay.

24  **BY MR. NIMNI:**

25  **Q.**   Have you observed an increase or decrease in the use of

1  the SHU since January of 2022?

2          **MS. CZIOK:**  Objection.  Foundation.

3          **THE COURT:**  Sustained.  There are obviously records

4  that show that.  I don't need some personal reflection of

5  someone.  I can get records.

6          **MR. NIMNI:**  Understood, Your Honor.

7  **Q.**    After being at FCI Dublin for eight years, have you

8  observed any significant changes between the Garcia

9  administration and the Jusino administration?

10 **A.**    I have, but it's not in a positive light.  It's definitely

11 in a negative light.

12         **THE COURT:**  Between Jusino -- all right.  Jusino is

13 not there anymore.  So we're taking one step.

14         **MR. NIMNI:**  Yes.

15         **THE COURT:**  Okay.  Go ahead.

16 **BY MR. NIMNI:**

17 **Q.**    And what about with the new administration, the most

18 recent administration?

19 **A.**    It's not good.  It's not good there.

20 **Q.**    And are you afraid that you will be retaliated against for

21 testifying here today?

22         **THE COURT:**  I don't know what you mean by that.  Can

23 you tell me what you mean by that?

24         **THE WITNESS:**  By how it's not good there?

25         **THE COURT:**  Yeah.

1      **THE WITNESS:** So when I first arrived at FCI Dublin in

2    2016, I was seeing a psychologist once a month. Now I don't

3    even think we have psychologists. I don't even know how to get

4    to one besides Mulcahy and she's so busy.

5      **THE COURT:** Okay.

6      **THE WITNESS:** And the officers are so mean. They make

7    very degrading comments. Like I don't even -- sometimes I'm

8    like, well, maybe they know. But then I'm like no, they

9    don't -- they haven't even been here.

10     So they, like, say things to, like, transgender people.

11   My roommate is transgender. And one officer in particular was

12   like, oh, you want to -- you want to look like a man, you

13   better start acting like a man now. And, like, my roommate

14   didn't even -- he had a bad encounter with a different

15   transgender and then has it out for everybody.

16     And I make sure to report those things because I don't

17   want them to think that like, oh, she's just now saying

18   something, you know. So I've -- I've been reporting it. I've

19   been saying things. I've been, you know, seeking help. But

20   it's not getting any better. They're just putting the officer

21   in a different unit.

22     **THE COURT:** Okay. What else?

23     **THE WITNESS:** The executive staff came into the unit

24   and told us they were going to decrease our spending limit to

25   $20 if they found contraband in a common area. That -- that

1    hasn't happened.  Like, I -- I don't know -- like why would I

2    be getting in trouble for somebody else's mistakes?  Like I

3    feel as if I was sentenced to my sentence and I'm doing my

4    time, and I don't think that I should be getting in trouble for

5    other people.

6              THE COURT:  Okay.  What other things?

7              THE WITNESS:  The -- so this is probably very small to

8    you, you know, but we got any extra linen taken from us --

9              THE COURT:  We got extra --

10              THE WITNESS:  Linen, like blankets taken from us.  And

11    so there's an area in all the units that doesn't receive any

12    heat or AC.  So in the winter it is cold, and in the summer it

13    is extremely hot.  And so we purchase blankets, and they are

14    taken from us.

15         And I -- I've told the new SIS man, Mr. B, and he said

16    well, I'm working on it, I'm working on it, I'm trying to get a

17    memo out so that you guys -- you know, so you're warm.  Because

18    I live in that area where it's extremely cold in the winter.

19              THE COURT:  Which unit is extremely cold?

20              THE WITNESS:  It's all the units, but it's in the wing

21    area which is like -- I work HVAC so -- well, I used to work

22    HVAC.  The end of the run, it gets nothing, which is where it's

23    located.  It's called the -- they call it the wing.  It's the

24    end of the -- so the AC unit is on one end, and we're at the

25    end of that run.  So we don't ever get any air, whether hot or

1    cold.

2        And they told us this two months ago, that they were

3    trying to get a memo out.  And we still have seen nothing.

4            **THE COURT:**  How many -- how many beds are involved?

5            **THE WITNESS:**  There's eight rooms total, just on

6    F unit where I live.  So it's eight rooms, 16 beds.  16 more

7    beds on E side.  16 more beds on D side.  16 more beds on

8    C side.  16 beds on B side.  And 16 beds on A side.

9            **THE COURT:**  So the units, as I recall, are all

10   lettered.

11           **THE WITNESS:**  Yes.

12           **THE COURT:**  But it's one wing per unit?

13           **THE WITNESS:**  Yes.

14           **THE COURT:**  And its units are A through --

15           **THE WITNESS:**  F.

16           **THE COURT:**  F.

17       So one wing in A through F, 16 beds, need extra blankets

18   because it's too cold.  Okay.

19       What else?

20           **THE WITNESS:**  In my personal experience, ma'am, I feel

21   like it has a lot to do with training the staff before they

22   come and interact with us.

23           **THE COURT:**  Was there a time when you were

24   experiencing the sexual harassment when officers -- or staff, I

25   should say, would -- were making lots of sexual innuendo

1    comments, or anything like that?  Did you experience that

2    beyond the one person?

3            **THE WITNESS:**  No, ma'am.

4            **THE COURT:**  All right.  Proceed.

5    **BY MR. NIMNI:**

6    **Q.**   Just one more question, Sheilla.

7         Why did you bring this lawsuit?

8    **A.**   I'm -- because I feel like I've stayed quiet for so long,

9    and I feel like with my experience, I don't want anyone else to

10   go through what I went through.

11        So I would like for there to be a stop to the mistreatment

12   and for us to be treated as humans.  Like, just this morning

13   when the marshals came to get us, the man asked me how are you,

14   and I didn't even know how to answer him, I cried in the van.

15           **THE COURT:**  The man being the marshal?

16           **THE WITNESS:**  Yes.

17        I cried in the van because they told us in R&D, right when

18   we were getting dressed out, that we couldn't have jackets

19   because the marshals didn't allow it.  But the marshals said

20   that they didn't mind if we were wearing coats when we left.

21   And it was dark out and it was cold.

22        So those are the things like even when we're coming here,

23   like just treat us like we're humans, you know.  And they did.

24   And I said it to the marshal.  I said thank you, sir, for

25   treating us like we're humans.

1          **MR. NIMNI:**  Thank you, Sheilla.

2          **THE COURT:**  Let me -- you're going to get examined by

3    the other attorney, but I have a couple more questions I want

4    to ask you.

5          If you want today, if you want to report something, tell

6    me, from your perspective how you can report.  Tell me the ways

7    that you can report.

8          **THE WITNESS:**  The ways that you can report are on your

9    computer.  But it's kind of hard because it's not -- there's no

10   privacy.

11         **THE COURT:**  Okay.  So when you say on your computer,

12   what does that mean?

13         **THE WITNESS:**  So we have computer stations where we

14   can send emails to like our family members or like our

15   attorneys.  And on those computers, there is a tab for request

16   to staff.  And you can send it to who you want to send it to on

17   there.  And it -- there's like categories like SIS, trust fund,

18   unit team.  And so you could reach out to SIS on your

19   computer -- on the computer to them.

20         **THE COURT:**  Okay.

21         **THE WITNESS:**  And then there's a phone number that

22   they just put -- well, that's posted on the wall with red

23   paint.  It's a Crime Stoppers.

24         **THE COURT:**  And you were saying that it's hard on the

25   email.  Why is that?

1          **THE WITNESS:**  Because it's not -- you're not in a

2     private location.  It's in a very open area, so the next person

3     can read your email.

4          **THE COURT:**  Are there always people at the computers?

5          **THE WITNESS:**  Yes.

6          **THE COURT:**  When are the computers available?

7          **THE WITNESS:**  They are available at 6:00 a.m. until

8     3:30.  And then they turn back on at 4:30 until 8:30 Monday

9     through Friday.  And on the weekends, they're available from

10    6:00 a.m. until 9:30 because there's 10:00 count.  And then

11    they turn back on at 10:30 until 3:30, and then from 4:30 to

12    8:30 p.m.

13         **THE COURT:**  How many computers are there?

14         **THE WITNESS:**  In F unit, there is five computers for

15    approximately 200 inmates.

16         **THE COURT:**  Are they timed?

17         **THE WITNESS:**  Yes.  I think you're allowed to be on

18    them, if I'm not mistaken, for 30 minutes at a time.  And you

19    can log on every 30 minutes.

20         **THE COURT:**  And the -- do they have privacy screens?

21         **THE WITNESS:**  Yes, but the setting is -- on the screen

22    is so bright that you can see past the privacy screen.  And

23    we -- we're not allowed to touch -- like to adjust any of that.

24         **THE COURT:**  Has anybody -- have you told people that

25    if they change the brightness, that would allow it to be more

1    private?  Has anybody made that comment?  Well, not anybody.

2    Have you?

3         **THE WITNESS:**  Have I?  Have I made that comment?  I

4    personally have not because when I tried to speak to the lady

5    from Trust Fund about my voice on the telephone that I can't

6    get through, she's like, well, you know that I'm just going to

7    check how many times you have gotten through, and I'm just not

8    going to redo your voice.  So like they don't care.

9         **THE COURT:**  I don't understand -- okay.  So now you're

10   talking about the phone.

11        **THE WITNESS:**  Well, what I'm saying is that when I

12   have an issue, when I approach, they're not -- they don't --

13   they're not responsive.  They don't -- you can address an

14   issue, but that doesn't mean anything to them.

15        **THE COURT:**  When you make the -- the phone -- tell me

16   about the phone.

17        **THE WITNESS:**  So when you make a phone call, instead

18   of saying your name, you have to say "United States of

19   America," and if it doesn't take your voice, you can't get

20   through so you can't use the phone.

21        **THE COURT:**  And when you do get through, then what?

22        **THE WITNESS:**  Well, then you're allowed -- you can use

23   the phone.  But it's -- it's rare -- like I have to use one

24   phone in the whole unit.  I can't just -- there's three phones,

25   and I can't just pick one up and use it.  Like I have to use a

phone that's like the furthest from my room.  I can't use the
one that's closest to my room because it doesn't take my voice.

       **THE COURT:**  So there are three phones in the unit?

       **THE WITNESS:**  Uh-huh.

       **THE COURT:**  Yes?

       **THE WITNESS:**  Yes.  Sorry.

       **THE COURT:**  And what is your understanding of whether
or not they're private or not?

       **THE WITNESS:**  The phone calls?

       **THE COURT:**  The phone calls.

       **THE WITNESS:**  The phone calls are not private because
actually with my experience with Gacad, when I was released
from the SHU, Serrano and Vasquez took my roommate to the yard
office and allowed her to listen to my phone calls, read my
emails, and watch my video visits.

       **THE COURT:**  I was under the impression that there were
new phones that allowed you to make phone calls to lawyers.

       **THE WITNESS:**  Oh, yes.  Those are new.

       **THE COURT:**  Okay.  So when did that happen?

       **THE WITNESS:**  I don't -- I've --

       **THE COURT:**  Was it with the newest administration that
put that in?

       **THE WITNESS:**  Yes.

       **THE COURT:**  Was that positive?

       **THE WITNESS:**  Yes.

1       **THE COURT:**  Okay.  Tell me about how that works.

2       **THE WITNESS:**  Okay.  Initially we had like a paper

3    posted with time slots.  And then if you caught the room open,

4    then you could use it.

5       **THE COURT:**  Right.

6       **THE WITNESS:**  Now as of like two weeks ago, they took

7    the time slots off and now they're allowing us to use them

8    when -- whenever.

9       **THE COURT:**  Okay.

10      **THE WITNESS:**  Which is -- which is nice.

11      **THE COURT:**  Okay.  And do you understand those to be

12   private calls?

13      **THE WITNESS:**  Yes.

14      **THE COURT:**  Okay.  Have they done anything else like

15   that where, in terms of making sure you've got access to

16   report, access to your attorneys?

17      **THE WITNESS:**  I think the -- that legal line is

18   probably the one positive thing.  But that's it.  Like...

19      **THE COURT:**  Okay.  And when you have that legal line,

20   you can -- you have the ability not only to call your lawyers,

21   as I understand it, or your advocates, but who else can you

22   contact?

23      **THE WITNESS:**  No one.  And so the number of your

24   attorney -- you can't just pick up the phone and call your

25   attorney.

1          **THE COURT:**  Of course.

2          **THE WITNESS:**  You have to make sure --

3          **THE COURT:**  Because you don't -- and you understand

4     why that is?

5          **THE WITNESS:**  No.  Yeah.  And I completely understand.

6     You just have to make sure that they get put on the pilot line,

7     which also was a headache.  I haven't attempted again to put

8     anyone else on because I have everybody that I need on the

9     pilot line.  But it was very difficult in the beginning to add

10    your attorney's number to the pilot line.  They weren't being

11    responsive.

12         **THE COURT:**  What about are there other reporting phone

13    numbers that you can use with those lines?

14         **THE WITNESS:**  Not that I'm aware of, no.

15         **THE COURT:**  Are you aware that there's a crisis

16    center?

17         **THE WITNESS:**  No.

18         **THE COURT:**  Bay Area Women Against Rape?

19         **THE WITNESS:**  No idea.

20         **THE COURT:**  Family Violence Law Center?

21         **THE WITNESS:**  No.

22         **THE COURT:**  Okay.

23       Cross.

24         **MR. NIMNI:**  Thank you, Sheilla.

25    / / /

1                          <u>**CROSS-EXAMINATION**</u>

2    **BY MS. CZIOK:**

3    **Q.**    Good morning.

4    **A.**    Good morning.

5    **Q.**    My name is Abbie Cziok.  I'm counsel for the

6    United States.  I just have a few questions for you.

7          Is Officer Vasquez still working at Dublin?

8    **A.**    Not that I'm aware of.

9    **Q.**    Is Lieutenant Jones still working at Dublin?

10   **A.**    Not that I'm aware of.

11   **Q.**    Before this case, were you meeting with attorneys?

12          **THE COURT:**  Before this case, what?

13   **BY MS. CZIOK:**

14   **Q.**    Before this case started, were you working with attorneys?

15   **A.**    No.

16   **Q.**    I want to talk a little bit about the computers in the

17   housing unit.

18          So in the housing units, there are two floors, aren't

19   there?

20   **A.**    Yes.

21   **Q.**    And the housing unit officers' office is on the first

22   floor; is that right?

23   **A.**    Yes.

24   **Q.**    And the computers in the housing units are on the second

25   floor; isn't that right?

1   **A.**   Yes.

2   **Q.**   Has anyone -- let me start that again.

3        Has any member of the staff personally looked over your

4   shoulder while you were writing an email at one of those

5   computers?

6   **A.**   Yes.

7   **Q.**   How many times has that occurred?

8   **A.**   A good amount.

9   **Q.**   What does a good amount mean to you?

10  **A.**   So the officer does walk-throughs depending on who was on

11  shift.  They do 20 minutes, 30 minutes, they're walking by.

12  And they walk right by and they make sure to -- if they feel

13  like you -- I'm going to assume I feel like if they want to,

14  they can.  So they walk right by the computers and stand by the

15  computers.

16  **Q.**   On June 1st, 2023, at 10:35 a.m., you sent an email to

17  Dr. Mulcahy about a work assignment; isn't that right?

18  **A.**   A work assignment?  No.

19  **Q.**   And she responded that same day at 5:48 p.m.; isn't that

20  right?

21  **A.**   I mean, I -- I don't know what email you're talking about,

22  but I know that I have emailed her that I wanted to speak to

23  her.  But is that the email you're talking about?

24  **Q.**   We can move on.

25       Have you seen new cameras installed in the housing units?

1    **A.**    Yes.

2    **Q.**    Okay.  Thank you.  No further questions.

3            **THE COURT:**  Reexam on those topics only?

4            **MR. NIMNI:**  Nothing further from plaintiffs.  Thank

5    you, Sheilla.

6            **THE COURT:**  Okay.

7        Is there anything else you want to tell me since you're

8    here?

9            **THE WITNESS:**  I want to thank you.  I want to thank

10   you because I wanted this moment for a long time.

11           **THE COURT:**  I have to tell you I I am sorry that

12   things -- I'm sorry about what happened out at Dublin.  And I

13   am working to try to make things better.  They will not be

14   perfect.

15           **THE WITNESS:**  And that's okay because we're not

16   perfect.

17           **THE COURT:**  Okay.  All right.  Thank you for coming

18   in.

19           **THE WITNESS:**  Thank you.

20           **THE COURT:**  Do you all want to just take the first

21   break at this point?  I think it makes sense.  It's only

22   10 minutes before, and that way it's not interrupted.

23       We will stand in recess for 20 minutes, until 9:50.

24           **THE CLERK:**  Court is in recess.

25                       (Recess taken at 9:27 a.m.)

```
 1              (Proceedings resumed at 9:53 a.m.)

 2         THE COURT:  All right.  We'll call our next witness.

 3         MS. STEIERT:  Plaintiffs call RB.

 4                   (Proceedings sealed.)

 5         THE COURT:  Good morning.

 6         THE WITNESS:  Good morning.

 7         THE COURT:  You may proceed.

 8                    DIRECT EXAMINATION

 9  BY MS. STEIERT:

10  Q.   Good morning.  For privacy reasons, I can use your first

11  name --

12  A.   Yes.

13  Q.   -- or I can use your initials, whichever you prefer.

14  A.   Okay.  My first name is fine.

15  Q.   Thank you, Roberta.  Where are you from?

16  A.   Rockford, Illinois.

17         THE COURT:  So, Roberta, we're using your first name?

18         THE WITNESS:  Yes.

19         THE COURT:  I can't hear very well.  Can you move

20  closer to the mic, please?

21         THE WITNESS:  Yes, ma'am.

22         THE COURT:  Great.  Thank you so much.  I will try to

23  talk louder to you.

24  BY MS. STEIERT:

25  Q.   I'm also going to remind you please try not to use the
```

1    names of any other inmates and please remember to only use your

2    first name.

3    **A.**    Okay.

4    **Q.**    Roberta, do you have any kids?

5    **A.**    Yes.

6    **Q.**    How many?

7    **A.**    Three.

8    **Q.**    Are they boys or girls?

9    **A.**    I have two daughters and one son and four granddaughters.

10   **Q.**    That's a lot of granddaughters.

11   **A.**    Yeah.

12   **Q.**    Are you currently incarcerated?

13   **A.**    Yes.

14   **Q.**    Where are you currently incarcerated?

15   **A.**    FCI Dublin.

16   **Q.**    When did you arrive at FCI Dublin?

17   **A.**    March 12, 2013.

18   **Q.**    Are you incarcerated at the FCI prison or camp facility?

19   **A.**    Yes.  I'm at the prison.

20   **Q.**    Have you been there the whole time you have been at

21   Dublin?

22   **A.**    Yes.

23   **Q.**    Roberta, how long are you incarcerated for?

24   **A.**    I have a life sentence.

25   **Q.**    How do you feel about testifying in court today?

1    **A.**    I'm not excited to be here.

2    **Q.**    Why is that?

3    **A.**    It's a lot.  It's heavy.

4    **Q.**    I understand.  I know it can be difficult.

5    Why are you here testifying anyways?

6    **A.**    Because something has to be done.

7    **Q.**    Can you explain what you mean by that?

8    **A.**    The way things are right now, it's not good.  And somebody

9    has to do something because the people there in charge are not.

10    **Q.**    Well, thank you for being here with us.

11    I'm going to start by asking you some questions about what

12    it's like at Dublin.  Are you aware of an Officer Cooper?

13    **A.**    Yes.

14    **Q.**    And are you personally aware of complaints that have been

15    made against him?

16    **A.**    Yes.

17    **Q.**    Is Officer Cooper still in contact with inmates?

18    **A.**    Yes.

19    **Q.**    Have you seen him personally?

20    **A.**    Yes.

21    **Q.**    When was the last time you saw Officer Cooper?

22    **A.**    Wednesday night.

23    **Q.**    And do you mean this Wednesday?

24    **A.**    Yes.  Day before yesterday.

25    **THE COURT:**  Is Cooper male or female?

1            **THE WITNESS:**  A male.

2            **THE COURT:**  Male?

3            **THE WITNESS:**  Yes.

4    **BY MS. STEIERT:**

5    **Q.**    Where did you see Officer Cooper?

6    **A.**    He was the officer working my unit.

7    **Q.**    Do you ever have concerns about Officer Cooper's behavior?

8    **A.**    Yes.

9    **Q.**    Can you please explain those to the Court.

10   **A.**    He's angry.  And he's -- I like to call him a rabble

11   rouser.  He likes to start stuff, antagonize, take shower

12   privileges away.  And he would consider giving them back if

13   other people stop talking shit about him.

14          Ma'am, I'm sorry about my language, but that is what

15   happened.

16   **Q.**    You said he's a rabble rouser.  Can you explain what you

17   mean by that?

18   **A.**    There are officers, new officers under him, and he will

19   get them to do the dirty work, like he'll push them up to do

20   stuff and start trouble in the unit.  So when there's an

21   uprising and the people want a lieutenant in, then he'll leave

22   and go back to his side of the unit like he didn't do anything.

23   And then he'll come back.

24   **Q.**    Roberta, can I just ask you to explain to the Court, are

25   there more than one side of a unit?

1    **A.**    Yeah.  Like I live in EF, but I'm housed on the F side of

2    the unit.

3    **Q.**    And is Officer Cooper assigned to your unit?

4    **A.**    Sometimes.  But he's on E side.  In the evening, there are

5    two officers.  We have one on each side.  And he will be -- he

6    will come to F side to walk around with his hands stuffed in

7    his vest, just giving people a hard time, provoking.  He will

8    do stuff.

9        And then when the lieutenant comes to calm everything down

10    or see what's going on, he will go away and he won't stand up

11    and say, hey, I told them to do that, or it's my fault.  He

12    won't do it.

13    **Q.**    Is there a particular officer you have seen him talking

14    to?

15    **A.**    Yes.  I've seen him do it to Mr. Henry, a new officer, a

16    couple of times.

17    **Q.**    Roberta, have you reported what's been going on to staff

18    members?

19    **A.**    Yes.

20    **Q.**    Who have you told?

21    **A.**    About Mr. Cooper?

22    **Q.**    Yes.

23    **A.**    I told Lieutenant Baudizzon.

24    **Q.**    When did you tell him?

25    **A.**    I told him that he was out of control and that it

1    needed -- he needed to do something.  He said that he was going

2    to talk to him.  And I said because I don't get it.  He cleared

3    the investigation, you got your job back.  So why are you

4    messing with people?  Why are you antagonizing?  Because

5    they'll tell.

6        And he said, yeah, when I talked to him, I talked to him

7    about it, and he said, oh, they want to fuck with me, they want

8    to fuck with me.  He told him calm down, you got your job back.

9    You're working.  Chill out.  And he said don't worry about it,

10   I will take care of it.

11   **Q.**   When did you say this to Lieutenant Baudizzon?

12   **A.**   I would have to check the date of when we had the job fair

13   because he came to check on me after.  Lieutenant Baudizzon

14   came -- well, he saw me taking pictures for the job fair, and

15   he asked me if I was okay.

16   **Q.**   Can you give us an approximate time?  Was it in 2023?

17   **A.**   Yes.

18   **Q.**   Okay.

19   **A.**   Just a couple months ago, a few months ago.

20   **Q.**   Okay.  And to confirm, you still see Officer Cooper in

21   your unit?

22   **A.**   Yes.  I just saw him Wednesday.

23   **Q.**   Have you personally heard Officer Cooper say anything

24   related to reporting harassment?

25   **A.**   Yes.

1    **Q.**    Can you tell us what happened?

2    **A.**    I was taking my laundry bag to the laundry room, and he

3    was there by the -- I can't say the person's name, but he was

4    talking to a person.  And they were like, well, we need to take

5    a shower.  We just came from rec.  And he was like, oh, that's

6    just the way it is.  Tell -- I can't say their names either.

7    Tell them to quit talking shit about me and I'll give the

8    15 minutes back.  But in the meantime, he trained Mr. Henry to

9    be harassing and do that, too, and tell us he can do it

10   whenever he feels like it.

11   **Q.**    I understand.

12        Roberta, do you feel comfortable going to psych for mental

13   healthcare?

14   **A.**    No.

15   **Q.**    Why not?

16   **A.**    Because I don't want to talk to Dr. Mulcahy.

17   **Q.**    Why don't you want to talk to Dr. Mulcahy?

18   **A.**    Because Mr. Craig, I'm told, is her husband.  And I've

19   seen --

20        **MS. CZIOK:**  Objection, Your Honor.  Relevance.  And

21   this is about a relationship --

22        **THE COURT:**  So I can't hear you.

23        **MS. CZIOK:**  Yep.

24        **THE COURT:**  And it's hearsay.  So what's your response

25   to a hearsay objection?

1          **MS. STEIERT:**  It goes to Roberta's state of mind as to

2    whether she feels comfortable to go to psych.

3          **THE COURT:**  Okay.  So I'm going to allow it.  And I'm

4    not -- I'm not accepting it for its truth, just for her own

5    perception and why she's doing something.

6          **MS. CZIOK:**  Your Honor, can I add one more objection?

7    And it's just to the safety of the staff because personal

8    relationships are something that they've tried to not have

9    inmates know about so that they can -- the staff can remain

10   safe, their personal information.

11         **THE COURT:**  There's no -- there's no secret here.

12         **MS. CZIOK:**  Okay.

13         **THE COURT:**  Go ahead.

14         **THE WITNESS:**  At main line, waiting to like talk to

15   the AWs or somebody, I have been in line and saw people talking

16   about not having access to the unit manager, who is Mr. Craig,

17   and her stop talking to who she's talking to.  When I say her,

18   Dr. Mulcahy.

19         **THE COURT:**  I'm not following you.  Can you -- can you

20   start at the beginning?

21         **THE WITNESS:**  Okay.  Part of my concern comes that

22   Mr. Craig at the time was my unit manager.

23         **THE COURT:**  Okay.

24         **THE WITNESS:**  When you go to main line, like during a

25   meal, and your outside administrative staff are there for you

1    to talk to if you have a concern.  And I have been in line

2    waiting to see someone and saw the chief psychologist stop

3    talking to who she is talking to when she hears a complaint

4    about Mr. Craig, to say, hey, he does his job.  Give him a

5    chance.

6         I don't want that for myself.  So if I'm talking to her

7    and he's my unit manager and I have an issue with him, I'm not

8    going to talk to her.

9         **THE COURT:**  Correct.  Okay, I understand.  Thank you.

10   **BY MS. STEIERT:**

11   **Q.**  I'm going to follow up on that in a moment, Roberta.  But

12   are you worried about confidentiality concerns?

13   **A.**  Yes.

14   **Q.**  Why is that?

15   **A.**  Because sometimes Mr. Craig will say things that have been

16   said in confidentiality to one of the in-unit psychs --

17        **MS. CZIOK:**  Objection.

18        **THE WITNESS:**  -- my own business.

19        **THE COURT:**  So you need to -- are those mics open over

20   there?

21        **MS. CZIOK:**  Can you hear me?

22        **THE COURT:**  No.  We need to make sure -- I heard that

23   you objected.

24        **MS. CZIOK:**  Okay.

25        **THE COURT:**  But, Mr. Cuenco, can we make sure to get

1    those mics operational, please.

2              **THE CLERK:**  Yes, Your Honor.

3              **THE COURT:**  All right.  We need to take this step by

4    step.  The statement is stricken.

5         Go back.  And we need -- I can't have her just blurting

6    stuff out.  You need to set a foundation for anything she says.

7    Do you understand?

8              **MS. STEIERT:**  I understand.

9              **THE COURT:**  All right.  Go ahead.

10   **BY MS. STEIERT:**

11   **Q.**   Roberta, have you had a negative experience with officer

12   Craig?

13   **A.**   Yes.

14   **Q.**   When was one experience?

15   **A.**   After a legal visit, the next day we had a town hall.

16   **Q.**   Roberta, can you explain what a town hall is?

17   **A.**   It's a unit meeting with like -- it might be

18   administrative staff, a counselor, a staff -- a staff wants to

19   talk to everybody in the unit.

20   **Q.**   Okay.  Can you tell us when this town hall meeting

21   occurred?

22   **A.**   It was recently.  It was in the last three months, three,

23   four months.

24   **Q.**   And what happened at the town hall?

25   **A.**   Mr. Craig was very angry.  He was yelling, he was cussing

1    us out, saying if you guys want to go to main line and talk

2    shit about me, you want to go over there and complain about

3    what's not getting done in the unit, I'm not the counselor, I

4    don't have to do that.  Well, I tell you how it's going to be

5    around here.  And he started threatening us with the mass

6    punishment.  And --

7    **Q.**    How did you respond?

8    **A.**    I raised my hand to speak.

9          And he said, yeah, what is it?

10         And I said, well, Mr. Craig, I'm concerned.  I don't

11   understand.  Who are you guys?  Who did it, and what did they

12   do at main line?

13         And he waved me off.  He was like get out of here with

14   that shit.  That's what I'm talking about right there.  I can't

15   even say anything without you guys getting all sensitive and in

16   your feelings because you want to use your keywords and go to

17   psychology because you know what to say and you know what to do

18   to get attention.

19   **Q.**    Do you believe he said that because of his relationship

20   with Dr. Mulcahy?

21              **MS. CZIOK:**  Objection.

22              **THE COURT:**  It's totally leading.

23              **MS. STEIERT:**  I apologize, Your Honor.

24              **THE COURT:**  I have warned you all multiple times not

25   to lead.  I don't want to hear from you.  I want to hear from

1    them.

2            **MS. STEIERT:**  I understand.  It won't happen again.

3    **Q.**   Roberta, are there policies at Dublin that you are

4    concerned about?

5    **A.**   Yes.

6            **MS. STEIERT:**  I would like to show PIX016.  I have

7    paper copies as well.

8    **Q.**   Roberta, do you recognize this document?

9    **A.**   Yes.

10   **Q.**   What is the date on this document?

11   **A.**   October 26th, 2023.

12   **Q.**   Can you explain to us what is in the bottom right-hand

13   corner?

14   **A.**   My name and my reg number.  It's blacked out.

15   **Q.**   What does it mean that your name is on that document?

16   **A.**   It means that on the computer in my unit, I went on to

17   TRULINCS and I matched print and went to the print station in

18   education and printed it out.

19   **Q.**   What does this document describe?

20   **A.**   The possession of hard contraband, drugs, and if they

21   continue -- if they find drugs in open areas, that it will

22   result in a reduced commissary spending limit of $20 for the

23   entire unit.

24   **Q.**   Roberta, is $20 a month enough for commissary?

25   **A.**   No.

1    **Q.**   Why not?

2    **A.**   A box of soap, washing powder, is $12.55.  A cup is $4.  A

3    bar of soap is 2.  If you want to buy sweatpants because it's

4    cold, they're $22.

5    **Q.**   What kinds of items --

6              **THE COURT:**  So is drugs a problem?  Are drugs a

7    problem at Dublin right now?

8              **THE WITNESS:**  I would say yes.

9              **THE COURT:**  What?

10             **THE WITNESS:**  I would say yes.

11             **THE COURT:**  And how long has -- have drugs been a

12    problem there?

13             **THE WITNESS:**  For a while, but now it's like the worst

14    ever.

15             **THE COURT:**  Now it's the worst you've ever seen?

16             **THE WITNESS:**  Yes.

17             **THE COURT:**  All right.  Go ahead.

18    **BY MS. STEIERT:**

19    **Q.**   Roberta, are inmates required to purchase items from

20    commissary?

21    **A.**   Yes.

22    **Q.**   What kinds of items need to be purchased from commissary?

23    **A.**   Hygienes, medicine, clothing, food.  You need to buy food.

24    **Q.**   If -- what happens if inmates do not have enough money to

25    purchase those items from commissary?

1    **A.**    Okay.   Then they turn to desperate measures.   People feel

2    like they do what they need to do to survive.

3    **Q.**    What do you mean by that?

4    **A.**    I got told -- like I said, they buy their own problems at

5    Dublin.

6                **THE COURT:**  They buy their own?

7                **THE WITNESS:**   They buy their own problems at Dublin.

8    And when I say like buy their own problems, you create a

9    problem.   You make a situation worse.

10        So when instinct survival kicks in and people feel like

11   they do what they need to do in order to survive, so for a bar

12   of soap or extra food out of the kitchen, then you got people

13   putting on sex shows, dancing, twerking, doing whatever to get

14   extra.

15        And if they don't have it, they are going to bring it back

16   and sell it to somebody who can't shop at commissary to get

17   them what they need.   Nothing is given to you.

18        If you want to mail out your letters in some certain

19   circumstances, you got to show somebody something.

20   **BY MS. STEIERT:**

21   **Q.**    Are you worried about this policy?

22   **A.**    Very.

23                **MS. STEIERT:**  I move to admit PIX --

24                **THE COURT:**  I cannot hear you.

25                **MS. STEIERT:**   Sorry. I would like to admit PIX016.

1          **THE COURT:**  You would like to offer.

2          **MS. STEIERT:**  I would like to offer.

3          **THE COURT:**  It's admitted.

4          (Plaintiffs' Exhibit 16 received in evidence)

5  **BY MS. STEIERT:**

6  **Q.**    Roberta, have you participated in legal meetings before at

7  FCI Dublin?

8  **A.**    Yes.

9  **Q.**    Did you meet with attorneys for plaintiff in this matter?

10  **A.**    Yes.

11  **Q.**    When was that?

12  **A.**    It's been for -- going on for a while, a long time.

13  **Q.**    Did you meet with attorneys for plaintiffs on or about

14  December 19th, 2019?

15  **A.**    Yes.

16  **Q.**    -- or 2023?

17  **A.**    Yes.

18  **Q.**    And where did that meeting take place?

19  **A.**    In the FCI visiting room.

20  **Q.**    Is that an area observable to FCI Dublin staff?

21  **A.**    Yes.

22  **Q.**    Was there anything unusual about what happened after that

23  meeting?

24  **A.**    After, we were strip searched, visual searched, strip

25  searched.

1    **Q.**    Roberta, can you explain to the Court what that involves?

2    **A.**    Two officers go, you take off all your clothes, wiggle

3    your toes, squat, cough.

4    **Q.**    How does it feel?

5    **A.**    Well, it's embarrassing but...

6    **Q.**    Have you had other legal visits since the December 19th,

7    2023 visit?

8    **A.**    Yes.

9    **Q.**    Did strip searches occur after those visits?

10   **A.**    One.

11   **Q.**    Roberta, before those recent legal visits, had you ever

12   experienced strip searches after a legal visit?

13   **A.**    Only one time they stripped us going in and coming out.

14   **Q.**    And when was that?

15   **A.**    It's been a few months back.  It was last year.  But a

16   complaint was made.  We -- it was questioned, and a lieutenant

17   came and they stopped.

18   **Q.**    Roberta --

19            **THE COURT:**  Do you understand that it's BOP policy at

20   all facilities to do that?

21            **THE WITNESS:**  To be stripped?

22            **THE COURT:**  Yes.

23            **THE WITNESS:**  Leaving -- strip searches, I'm -- I

24   understand that I could be stripped at any time.

25            **THE COURT:**  Do you understand that it is BOP policy at

1    all facilities when people meet with the public that they are

2    strip searched?

3              **THE WITNESS:**  No.  I haven't had very many visits.

4              **THE COURT:**  Okay.  So no one -- your lawyers didn't

5    explain to you that that's policy at all facilities?

6              **THE WITNESS:**  They -- it never happened before so --

7              **THE COURT:**  I understand.  There are a lot of things

8    at Dublin that weren't done according to policy.  You agree

9    with me on that?

10             **THE WITNESS:**  Yes.

11             **THE COURT:**  Okay.  Did anybody tell you that that's

12   policy?

13             **THE WITNESS:**  No.

14             **THE COURT:**  All right.  Proceed.

15   **BY MS. STEIERT:**

16   **Q.**  Roberta, how many legal visits have you had in your time

17   at FCI Dublin?

18   **A.**  A lot.  I can't count them for you.

19   **Q.**  Other than the example you just gave and the recent

20   visits, was it usual for you to be strip searched after those

21   legal visits?

22   **A.**  No.

23   **Q.**  Was there anything else --

24             **THE COURT:**  How long did it take, the one you did

25   recently?

1          **THE WITNESS:** I'm sorry?

2          **THE COURT:** How long did it take, the one that you did

3   recently?

4          **THE WITNESS:** About three or four -- once I got in and

5   was undressed, like three minutes, three, four minutes.

6          **THE COURT:** Thank you.

7   **BY MS. STEIERT:**

8   **Q.** Has there been anything else unusual about your legal

9   visits recently?

10  **A.** Well, we can't use the little visiting boxes anymore.

11  **Q.** Why not?

12  **A.** I asked and I was told that it was a life and safety issue

13  because there is no fire suppression inside and they weren't

14  authorized and we should have never been using them.

15  **Q.** Have you recently used those legal visit areas?

16  **A.** Yes. Last -- this week. I'm sorry. This week.

17  **Q.** But prior to this week, you were not able to?

18  **A.** I went for a visit in December, and after having been

19  using them for months, I was told -- we were told we could not

20  use them, that they were not authorized.

21  **Q.** Roberta, I want to go back to what we were talking about

22  with the strip searches. Which officers were involved in the

23  strip searches?

24  **A.** Oh, from way back, I can't remember.

25          **THE COURT:** Were they women?

1          **THE WITNESS:**  Women, yes.  Female.

2          **THE COURT:**  Okay.  So no men?

3          **THE WITNESS:**  No.

4    **BY MS. STEIERT:**

5    **Q.**    What was the most recent time you were strip searched

6    after a legal visit?

7    **A.**    Tuesday.  Monday or Tuesday.  I'm sorry.

8    **Q.**    Do you remember which officers were involved in that

9    search?

10   **A.**    That day, Ms.-- the second day this week, one day this

11   week, it was Ms. Ortega and Ms. Coucher.  And the day before,

12   it was Ms. Valdez and Ms. Williams.

13   **Q.**    Thank you, Roberta.

14         Roberta, how long have you been at FCI Dublin?

15   **A.**    More than a decade.

16   **Q.**    Are you familiar with the different ways to report sexual

17   misconduct at Dublin?

18   **A.**    Yes.

19   **Q.**    Can you please walk us through one option you have to

20   report?

21         **THE COURT:**  We're talking about current, not before;

22   is that right?

23         **MS. STEIERT:**  That's right.

24         **THE COURT:**  Or what are we talking about?

25         **MS. STEIERT:**  A current way to report misconduct at

1    Dublin.

2        **THE COURT:**  Actually I'd like you to tell me all the

3    ways that you can do it.

4        **THE WITNESS:**  Okay.  You can get onto the computer,

5    you can log on to the computer, and you can write the DOJ

6    sexual abuse mailbox.  It says -- and then there is another

7    bulletin that says we can report it to any staff member.  Or we

8    can write a letter.

9        And there's also a bulletin that we can go to Mr. Deveney,

10   the PREA person in charge, I think.

11       **THE COURT:**  Okay.  Go ahead.

12   **BY MS. STEIERT:**

13   **Q.**  Roberta, you mentioned you can use the computers to report

14   to DOJ.  Is that method of reporting confidential?

15   **A.**  No.  It's supposed to be.  It's not.

16   **Q.**  What do you mean by it's supposed to be?

17   **A.**  Well, when you're on the computer, you can see whatever

18   anybody is typing, you can just see their business.

19       **THE COURT:**  So have you seen other people's business?

20       **THE WITNESS:**  Yes.

21   **BY MS. STEIERT:**

22   **Q.**  Can you explain where the computers are located?

23   **A.**  At the top of the stairwell, there's like an alcove, kind

24   of like the corner where this lady is sitting right here.  And

25   they're just lined up right there.

1   **Q.**   Are the computers lined up directly next to each other?

2   **A.**   Yes.  They're side by side.

3   **Q.**   Is there anything around the alcove where the computers

4   sit?

5   **A.**   Rooms, a trash can, and a recycling bin.

6   **Q.**   Are there usually others around when the computers are

7   being used?

8   **A.**   Yes.  We're in line waiting.

9   **Q.**   Roberta, I'd like to show you another document now.

10  **A.**   Okay.

11  **Q.**   This is PIX031.

12          **THE COURT:**  So you say there are people in line

13  waiting.  If there was -- if there were lines that, say, you

14  know, stand back 20 feet or something like that while someone

15  is using the computer, would that help?

16          **THE WITNESS:**  No, ma'am, because there's not 20 feet

17  of space.  Like if the computers are where you are, like one,

18  two, three where you are, there's the hallway, the walkway

19  right there, there's rooms right here.  There are rooms right

20  there.  So you can be in a room and actually have -- seeing it.

21          **THE COURT:**  But if you're -- if you're sitting -- if

22  you're that far away, how can you read what's on a computer?

23          **THE WITNESS:**  Because it's dark.  You can see straight

24  through the screen.  I don't know if maybe they took a picture

25  for you, you can see it.  If you're back, it appears -- you can

1    be standing there, you can be against the wall because the wall

2    is right -- it's right there.  People are standing there

3    waiting to get in the line.

4        Or the corner right here where the trash can and the

5    recycler are, if you go right there to drop something in and

6    you're just like you're waiting, you can read.  This is how

7    people know who's telling what on who, you know, what people

8    are writing to their pen pals.  You know who is sending emails

9    to SIS and what they're saying.  You can see it.

10            **THE COURT:**  All right.  Thank you.

11   **BY MS. STEIERT:**

12   **Q.**   Roberta, do you recognize this document?

13   **A.**   Oh, yes.

14   **Q.**   What is written in the bottom right-hand corner?

15   **A.**   Written it says posted 4/5/23.

16   **Q.**   What does that mean?

17   **A.**   I wrote that on there.  It means that that's the day that

18   this was posted on CorrLinks or TRULINCS for us to see.

19            **MS. STEIERT:**  I would like to offer Exhibit 031.

20            **THE COURT:**  Admitted.

21        (Plaintiffs' Exhibit 31 received in evidence.)

22   **BY MS. STEIERT:**

23   **Q.**   Roberta, what is this document?

24   **A.**   It's about the privacy screen protectors.  It says, "In a

25   continued effort to support privacy when messaging SIS or the

1    DOJ sexual abuse mailbox, FCI Dublin has purchased and placed

2    privacy screen protectors on all inmate TRULINCS monitors."

3    **Q.**    Did the computers always have privacy protectors?

4    **A.**    No.

5    **Q.**    When did they install the protectors?

6    **A.**    Around the days of this, right in this time frame.  Within

7    days they were up all over.

8    **Q.**    And in your experience, do they actually provide privacy?

9    **A.**    No.

10   **Q.**    Why not?

11   **A.**    Because I -- you can see.  Anybody can see.

12   **Q.**    Have you told staff about this problem?

13   **A.**    Yes.

14   **Q.**    Who?

15   **A.**    I told Ms. Gonzalez when she was putting them up.  And she

16   said they should do the trick because they paid over a hundred

17   dollars, they cost a lot of money, and that they should do the

18   trick.

19        I told Lieutenant Putnam.

20   **Q.**    What did you tell Lieutenant Putnam?

21   **A.**    I told him that that was a waste, why bother?  You can't

22   see -- I mean, you can see right through them.  The only way is

23   if a person manipulates the screen and goes like this.  Or if

24   I'm standing right here, I for sure, I for sure see screen 1,

25   screen 2.  I may not be able to see the third one.  It might be

1    a little distorted, but if I move, I can see it.

2         And he said he was --

3         THE COURT:  That is if you're -- these are inmates who

4    want to get into other people's business?

5         THE WITNESS:  Maybe not.

6         THE COURT:  They're trying to see the screens by

7    moving around?

8         THE WITNESS:  No, no, no.  You -- you move like -- as

9    the line moves, people move.  People come and they have a

10   conversation.

11        Now, there are some people that are nosy that just want to

12   be in people's business.  But you can be there just waiting in

13   the line, and you can see what somebody has on their screen.

14   People's family business, about their kids.  It's just

15   different stuff.  You can see it.

16        THE COURT:  And this is -- these are inmates, other

17   inmates, and/or staff?  Or who is it?

18        THE WITNESS:  Inmates in the area.  Because staff can

19   access it.  So I mean we can't hide it from them.

20        THE COURT:  Well, in terms of the four ways that you

21   gave me, staff -- is it your understanding that staff can

22   access the DOJ emails?

23        THE WITNESS:  No.  I was told they can't.

24        THE COURT:  And how about can staff access -- well,

25   other than Deveney, no one -- do you think that anybody is

1    accessing his stuff other than him?

2            THE WITNESS:  I don't know.

3            THE COURT:  Okay.  So DOJ, it's your belief that

4    that's not accessible; is that right?

5            THE WITNESS:  That's what I was told, yes.

6            THE COURT:  And that's your belief?

7            THE WITNESS:  That's my understanding, yes, ma'am.

8            THE COURT:  Okay.  Go ahead.

9    BY MS. STEIERT:

10   Q.    Roberta, did you speak to any other staff members about

11   the confidentiality issue at the computers?

12   A.    I did.  I have -- so because when you type -- when you

13   write an email and then they don't answer, it's like they talk

14   to the person that you're reporting and everybody knows.  So

15   somebody's telling if -- if you're not.

16   Q.    Do you mean when you write an email to staff members?

17   A.    Yes.

18   Q.    Okay.  So is reporting to staff directly confidential?

19   A.    No, I don't believe so.

20   Q.    Can you explain why not?

21           MS. CZIOK:  Objection.  Foundation.

22           THE COURT:  You can -- well, do you have an instance

23   where you reported something to staff -- can you give me --

24   I'm -- you said that you don't think that reporting to staff is

25   confidential.

1              THE WITNESS:  No.

2              THE COURT:  That's correct?

3              THE WITNESS:  That is correct.  I'm sorry.  Yes.

4              THE COURT:  And why do you think that?

5              THE WITNESS:  Because me personally, I've had a

6    conversation with Lieutenant Putnam, and what I shared with him

7    came back to me.  And he later asked me if my conscience was

8    bothering me.  So how did it -- I don't -- there are a number

9    of staff that I don't -- that I don't trust.

10             THE COURT:  Yep.

11             THE WITNESS:  And I did tell Mr. Deveney that.

12             THE COURT:  Yep.

13             THE WITNESS:  And he told me that they had all been

14   vetted and they know what they're doing.

15        I said, sir, I hear what you're saying, but I saw Colette

16   Peters on the C-SPAN, I watched it.  I said it might look good

17   in black and white, but when the boots are on the ground and

18   we're here and we're experiencing this, what you're doing is

19   not working.

20             THE COURT:  So you trusted Putnam enough to talk to

21   him or not?

22             THE WITNESS:  I did and then I didn't.  At first I

23   did.

24             THE COURT:  So what's interesting to me is that there

25   is both a concern that there's not enough information and that

1    there is too much information.  So -- well, that's all right.

2         Next question.

3    **BY MS. STEIERT:**

4    **Q.**   Roberta, are you aware of another way to report misconduct

5    at Dublin?

6    **A.**   I don't know who you would tell outside.  You have to get

7    ahold of somebody outside.

8    **Q.**   Was there ever another group of people you could report to

9    at Dublin?

10   **A.**   The task force, the Dublin task force.

11   **Q.**   What was the Dublin task force?

12   **A.**   They came with Mr. Carbahal when he was the BOP director.

13   They came and he introduced them as the group that was coming

14   to restore order and help get things back on track.

15   **Q.**   Did you feel that the task force was helpful?

16   **A.**   Initially I believed that they were, but they were not.

17   Because as soon as we talked to them, they'd go have a meeting,

18   and then staff would come back about what we told them.  Or all

19   you had to do was ask me, you didn't have to tell them.

20        So they did go right back and tell them.  So then people

21   didn't want to talk to them.

22   **Q.**   Roberta, have you personally experienced harassment at

23   Dublin?

24   **A.**   Yes.

25   **Q.**   By who?

1    **A.**    Mr. O'Connor.  I have been harassed by medical.

2    **Q.**    Let's start with Mr. O'Connor.

3         **THE COURT:**  No.  Let's get the list.

4    **BY MS. STEIERT:**

5    **Q.**    Go ahead, Roberta.

6    **A.**    Mr. O'Connor.  Medical.  While I was --

7         **THE COURT:**  Anybody else?  I want to know how many

8    we're going to go through.  Is it just those two?

9         **THE WITNESS:**  There's more.

10        **THE COURT:**  Okay.

11        **THE WITNESS:**  But they're -- they're -- Mr. Shirley.

12   I -- right now, like my mind is racing, racing, racing.  I'm

13   sorry.

14        **THE COURT:**  I didn't hear that.

15        **THE WITNESS:**  I said my mind is like racing right now

16   to generate the list for you.  But there are staff that I've

17   had encounters with that it's because of all of this.

18        **THE COURT:**  Okay.  Go ahead.

19   **BY MS. STEIERT:**

20   **Q.**    When did you experience harassment from Officer O'Connor?

21   **A.**    After I yelled at him for watching someone who just got

22   out of the shower.  He was standing there staring at her.  And

23   I asked him what the hell, are you just going to stand there

24   and look at her?  And ever since that incident.

25   **Q.**    When was that incident?

**A.**    It was at a time early on in COVID.  I can't give you the exact date.  But I can tell you what was happening at that time so you can research if you needed to.

He was working overtime in our unit.  We could move about in the unit, but we were separated.  Do you -- like we weren't restricted to our rooms.  We could move freely about the unit.

**THE COURT:**  And this was during COVID, you said?

**THE WITNESS:**  Yeah.  Early on or just before, it was in that time.

**THE COURT:**  Remind me, is O'Connor still there?

**THE WITNESS:**  No.

**THE COURT:**  He's not there?

**THE WITNESS:**  No.

**THE COURT:**  I'm correct?

**THE WITNESS:**  Yes, correct.  I'm sorry.  Yes.

**THE COURT:**  That's okay.

**THE WITNESS:**  Thank you.

**BY MS. STEIERT:**

**Q.**   What happened after that incident where you spoke to O'Connor?

**A.**   He didn't shut the door immediately.  He was looking at me with the dirtiest look on his face.  And he held it for a second or two.  And he shut the door and he just walked off. And he was looking at me like, yeah, okay.

And after that, anytime I would go into food service or

1    when he would work my unit -- he was working a lot of overtime

2    there -- he would give me dirty looks.

3    **Q.**   Is there a particular incident you remember?

4    **A.**   After I was in food service --

5           **THE COURT:**  Did you report that event with respect to

6    that other inmate that he was looking at?

7           **THE WITNESS:**  At the time, no, I did not.

8           **THE COURT:**  Okay.  Do you remember who the inmate was?

9           **THE WITNESS:**  Yes.

10          **THE COURT:**  Could you give me her initials?

11          **THE WITNESS:**  MH.

12          **THE COURT:**  MH.  Thank you.

13         Proceed.

14   **BY MS. STEIERT:**

15   **Q.**   Was there a particular incident with Officer O'Connor?

16   **A.**   Yes.  Myself and my co-worker, we went into food service

17   to eat.  We weren't at the end of the line.  We were towards

18   the back, but we were not at the end of the line.

19         And when we sat down to eat, well, he was doing the death

20   stare.  I get that all the time.  Then he would -- he walked

21   over to us and he leaned -- he pushed his midsection right here

22   on me.  And I leaned forward and I said what the hell?  You

23   just got to get it in, don't you.

24   **Q.**   What did you mean by that?

25   **A.**   Because his nickname -- he's a pervert.  That's what we

1    call him.  He's "Pervy Mcgerv."  Everybody knows that.  Lurch.

2    Pervert.  They know that.  Staff, inmates.

3            **THE COURT:**  What is his nickname?

4            **THE WITNESS:**  Perv, Pervy Mcgervy, Lurch.

5    **BY MS. STEIERT:**

6    **Q.**   What happened after you spoke to Officer O'Connor?

7    **A.**   And he told me he's -- he told me that I needed to get out

8    of the kitchen, you're going to get a shot, we're closed.

9        And the person with me said, well, we just sat down.

10       And I said he's not talking to you, he's talking to me.

11   Just eat.

12       But then we're frustrated.  But there was a bar attaching

13   the seat to the table so I couldn't get up.  I would have to

14   step over the bar.

15       So I'm still looking at him, and I said, you know what?  I

16   don't know why you keep messing with me.  It's not like I told

17   on you.

18       And he was like, just go.

19       So we got up to leave.  And he's walking behind us.  And I

20   said, you know what?  I haven't told on you, but I'm going to

21   tell.

22       And he said, don't take it personal.  It's not personal.

23   You understand.

24   **Q.**   Did it feel personal to you?

25   **A.**   It was.

1    **Q.**   When was the first time a staff member became aware of

2    that incident with O'Connor?

3    **A.**   Of that particular incident?  When we went back to work,

4    we were working in education and we were talking about it,

5    venting, you know.

6        And the officer came and called me out.  She asked me, she

7    said, oh, can you come here and I need you to help me with

8    something.

9        So when I went out, she said I just wanted to make sure

10   you're okay.  I couldn't help but overhear what you all were

11   talking about.  And it shouldn't be that way.  I want to let

12   you know that --

13               **MS. CZIOK:**  Objection.  Hearsay.

14               **THE COURT:**  Who was the officer?

15               **THE WITNESS:**  Ms. Doyle.

16               **THE COURT:**  Doyle?

17               **THE WITNESS:**  Yes, ma'am.

18               **THE COURT:**  And is Doyle still there?

19               **THE WITNESS:**  No.  She took some kind of leave.  And

20   then they took her stuff out.  So I don't know where she is.  I

21   haven't seen her.

22               **THE COURT:**  When did she leave?

23               **THE WITNESS:**  They came to get her stuff a few months

24   ago.  They cleaned her office out.  But I don't know where she

25   is.

1          **THE COURT:**  And she was in education?

2          **THE WITNESS:**  Yeah.  She was an instructor.  She was a

3   teacher.

4          **THE COURT:**  So she wasn't correctional staff, she was

5   a teacher?

6          **THE WITNESS:**  I mean, she did both.  She worked the

7   units.

8          **THE COURT:**  Okay.  So she was BOP?

9          **THE WITNESS:**  Yes.

10         **THE COURT:**  And she talked to you about the incident

11  that she observed between you and O'Connor?

12         **THE WITNESS:**  She talked about the incident that she

13  heard me and my co-worker discussing our experience.  And she

14  sent an email.  She told me that she sent an email to SIS.

15         **THE COURT:**  I see.  And you didn't report it

16  independently?

17         **THE WITNESS:**  No.

18         **THE COURT:**  Okay.

19  **BY MS. STEIERT:**

20  **Q.**  Did you hear back from that staff member after she sent

21  the email?

22  **A.**  Like a week later, Ms. Doyle asked me if I had heard

23  anything, and I told her no.  She hadn't either.

24      But I just told her it didn't matter.  I'm just not going

25  to go in the kitchen when he's there, and I didn't.  But I --

1    he would be working overtime, and if I saw him, I would leave.

2    **Q.**    Did you ever report that incident directly to a staff

3    member?

4    **A.**    Yes, I did.  I talked to Mr. Putnam about it.

5    **Q.**    When was that?

6    **A.**    I was talking to him about some -- somebody else --

7        **THE COURT:**    Roberta, can you tell me, I have seen

8    forms that get filled out that Putnam used to track things,

9    just a form that he had.

10       Are you aware of forms that inmates fill out?  Or is -- is

11   all of this oral?  Can you explain to me how reports -- like --

12   like when is there an official report and when is it informal,

13   if there is a difference?

14       **THE WITNESS:**    If you get on the computer and you send

15   an email to SIS, it is my understanding that only SIS gets to

16   see those emails.

17       **THE COURT:**    Yep.  But if you say something to

18   Putnam --

19       **THE WITNESS:**    Yes.

20       **THE COURT:**    -- then what happens with -- what is that

21   classified as?

22       **THE WITNESS:**    He will call you to his office.  He will

23   come to the unit and pull you outside.  Or he'll call you to

24   his office and turn the little noise machine on and talk to you

25   at the lieutenant's office.  He'll send for you to go to the

1    lieutenant's office.

2            THE COURT:  Okay.  And then do you ever -- how does

3    that differ from an administrative remedy?

4            THE WITNESS:  Because he -- there's supposed to --

5    SIS -- it's my understanding if there is an investigation that

6    can be done, they're going to nip it in the bud.  They're going

7    to get to the bottom of it.

8            THE COURT:  And administrative remedy then is what?

9            THE WITNESS:  An administrative -- administrative --

10   excuse me.  An administrative remedy is if I want to write up

11   an incident that happened, like, first is your eight-and-a-half

12   where you try for an informal resolution.  The counselor will

13   pick up the phone and call the person involved and see if they

14   can get it resolved.  And you sign off on it, and then that

15   goes to the unit manager.

16           THE COURT:  Okay.

17           THE WITNESS:  And then the next step is a nine, is an

18   administrative remedy which goes to the warden.

19       And then the ten goes to the region.

20       And an eleven goes to central office in D.C.

21           THE COURT:  And what's the first step if -- what's

22   before nine?

23           THE WITNESS:  A BP eight-and-a-half.

24           THE COURT:  BP eight-and-a-half?

25           THE WITNESS:  Yes, ma'am.  Correct.

1          **THE COURT:** And what kind of things -- have you ever

2    filed one of those?

3          **THE WITNESS:** Yes.

4          **THE COURT:** And for -- what would be the nature of --

5    of the incident that led to the filing of a BP8.5?

6          **THE WITNESS:** For myself?

7          **THE COURT:** So -- yes, let's start with you, yes.

8    What would you file it for?

9          **THE WITNESS:** So if I tried to talk to a staff member

10   and it wasn't going well or I couldn't get an answer, then I'm

11   going to put it on paper because now I need to track it.  It's

12   not going to work with me and that individual, so I need to go

13   get outside help.

14         **THE COURT:** Okay.  So how would that differ -- like if

15   you tried to talk to a staff member and couldn't resolve it and

16   you wanted help, you could -- you could file a BP8.5 or -- or

17   you could talk to Putnam?

18         **THE WITNESS:** No.  You can do both.

19         **THE COURT:** So you can do both?

20         **THE WITNESS:** Yes.

21         **THE COURT:** But one has a paper trail and like -- I'm

22   trying to understand the difference between the two avenues.

23         **THE WITNESS:** Yeah.  One -- I'm sorry.  One, there is

24   a paper trail, I guess.  Yes.  There is a paper trail.

25         And the other one, I don't know -- I never left with a

1    paper.  When you send an SIS an email, you don't get a

2    response.  And even if you give them a paper cop-out, you don't

3    get it back.  So I don't know how that works.

4                **THE COURT:**  Okay.  Thank you.

5    **BY MS. STEIERT:**

6    **Q.**    Roberta, what did you say to Officer Putnam?

7                **THE COURT:**  I could not hear you.

8    **BY MS. STEIERT:**

9    **Q.**    Roberta, what did you say to Officer Putnam?

10                **MS. CZIOK:**  Objection.  Vague as to time.

11                **THE COURT:**  Yes, agreed.  When?

12    **BY MS. STEIERT:**

13    **Q.**    When you reported the incident with O'Connor.

14    **A.**    It was when Mr. O'Connor was still there.  So it was in

15    the -- in the spring or summer month.  It was in that time.  I

16    went to his office.  I was called by the officer to go to his

17    office.

18    **Q.**    Were you called to the office because of the O'Connor

19    incident?

20    **A.**    No.

21    **Q.**    And what did you say while you were at the office?

22    **A.**    While I was talking to him, he was telling -- he asked me

23    what do people say about me.

24        I said, well, for one, they don't trust you.  They think

25    you pick and choose who you want to go after.

1        And he kind of laughed.

2        I said you don't answer.  I was telling him about not

3    answering me and telling me that he was coming to talk to me

4    and he did not.

5        And he said, well, I do my job.  I'm just busy.  There's a

6    lot going on.  And I was going to get back to you.

7        I said, you say that you're getting rid of everybody but

8    you're still talking to Vasquez.  I still see him.  And

9    O'Connor is here.  He's a pervert.

10       And he was like, now, listen, about O'Connor, what did you

11   see him do?

12       What did I see him do?  I said, well, I know if this

13   person told on the warden, they don't have a problem.  I'm

14   not -- I didn't make it up.  There were other people there.

15   The roommate was in the room.  The lady was naked from the

16   waist down.  I called him on it.  And every since then, he's

17   been harassing me.  I said, he pushed --

18       I'm sorry.  I'm going to ask the Judge a question.

19       Please, ma'am, can I ask you a question?

20           THE COURT:  You can ask.  I don't know that I'm going

21   to answer.

22           THE WITNESS:  Okay.  But like there are certain words

23   that were said.  Can I just say them exactly like that?

24           THE COURT:  You can.

25           THE WITNESS:  Okay.  So I just asked -- I told him, I

1    said, I just told you he just smashed my head with his dick and

2    you didn't do anything.  Nobody -- nobody did anything.  And

3    Ms. Doyle told me she sent you an email.

4        And he was like, but did he touch anybody?

5        So, look, you want me to change what I'm saying.  This is

6    what happened.  People were there.  It was in food service.

7    Her roommate was in the room.  And she's standing there with

8    her boobs out, just a towel wrapped around her waist.  I was

9    waiting to talk to her when she came out of the shower.

10       She said, I need to talk to you.  So I was waiting for her

11   to get dressed.  You watched her.  I watched you.  Everybody

12   watches you.

13       When I say "you," I'm referring to Mr. O'Connor.

14       So you know -- he went up there, held the door open and

15   looked at her like that.  And he has been harassing me, and you

16   want me to change what I'm saying?  Nope.

17   **BY MS. STEIERT:**

18   **Q.**   What happened after the meeting with Lieutenant Putnam?

19   **A.**   That I can't recall -- oh, I told him -- he said, well,

20   what did he do?

21       I said, look, they say he looks just like his penis.  I

22   don't know, but I felt it on my back.  Do something about it.

23       He said, well, [name redacted], I'm going to take care of

24   it.

25       I said okay.

1          **MS. STEIERT:**  Oh, my gosh.  Your Honor, I would like

2    to strike that last name from the record.

3          **THE WITNESS:**  I said my name.  I'm sorry.

4          **THE COURT:**  I missed what you said, and it's not on

5    the record.

6          **THE WITNESS:**  Okay.  Whew, okay.  I'm sorry.

7    BY MS. STEIERT:

8    **Q.**   Roberta, did you continue do see Officer O'Connor after

9    that meeting with Lieutenant Putnam?

10   **A.**   Yes.

11   **Q.**   Did you ever report the incident with Officer O'Connor to

12   anyone else?

13   **A.**   To the task force.

14   **Q.**   Who did you speak to at the task force?

15   **A.**   I have their names written down somewhere, but like three

16   different people.  But when people didn't want to talk to them

17   anymore and they were like what should we do, I sat down with

18   one of the ladies right in the middle of the lobby in the unit

19   for like an hour.

20   **Q.**   What did you say in that conversation?

21   **A.**   I told her that -- why are people that get high with

22   people still here?  Why are -- when I say people, I'm referring

23   to staff.  Why are they here?  If they need rehab, you don't

24   have a drug program here for people.  Why is that happening?

25          And I asked the lady why is Mr. O'Connor still here?  He's

1   a pervert and I know he's a pervert.  He looks like a pervert.

2       And she laughed.  She said, well, just looking like a

3   pervert doesn't make them a pervert.

4       And I said, well, in his case it does because he is.

5       I pulled out a clipboard that had a label that came off

6   the box of ground turkey that said not for human consumption.

7   And she took a picture of it.  And then they didn't give us the

8   ground turkey anymore.  So I guess I could say that, yes, the

9   task force did that.

10  **Q.**  Did you feel like the task force was helpful?

11  **A.**   No.  I asked all three people that I spoke to at length,

12  we all know that Mr. Carbahal is a lame duck.  Are you all here

13  just to say that you came here for the sake of coming here?

14      Because at the town hall that was videoed, the conference

15  that he had with the whole compound, it sounded like he's the

16  warden's friend and he's defending him.  He's telling us hold

17  up, give him a chance.

18      Nobody came to check on me.  No psychology, nobody.

19      But when an AW got booed at graduation, we got locked

20  down.  Every staff, all hands on deck came around to ask and

21  see if we were okay, if we saw or heard anything.  And all this

22  is happening on the compound and nobody came.

23      I asked psychology, and I was told that --

24          **MS. CZIOK:**  Objection.  Narrative.

25          **THE COURT:**  Next question.

1    BY MS. STEIERT:

2    Q.    Thank you for explaining what happened to us, Roberta.

3    A.    Okay.

4    Q.    I'd like to move on to another topic.

5    A.    Okay.

6    Q.    And it's a little bit sensitive.

7          Have you ever experienced privacy issues related to

8    medical care at Dublin?

9    A.    Yes.

10   Q.    Can you explain why?

11   A.    I had a surgery while I was in BOP custody, and there was

12   nerve damage done to my intestines.  So whenever I have to go

13   to the bathroom, I have to use like a two-liter soap suds

14   enema.  And so I need to put gloves on and stick two fingers in

15   my vagina while I'm on my hands and knees or on my side, and to

16   press down in order to try to get the water in.  And then I

17   have to sit and push on different parts of my stomach to get

18   the water or any matter out.

19   Q.    Is that difficult for you to accomplish at Dublin?

20   A.    Yes.

21   Q.    Why is that?

22   A.    Because I'm -- I have a lot of different roommates.

23   Q.    Have you always had roommates?

24   A.    No.

25   Q.    When did that change?

1    **A.**    When Ms. Groover became my unit manager.

2    **Q.**    Do you remember when that was?

3    **A.**    I don't --

4          **THE COURT:**  Who is your unit manager?

5          **THE WITNESS:**  Ms. Groover.

6          **THE COURT:**  Groover.

7    **BY MS. STEIERT:**

8    **Q.**    Can you explain to the Court why having a roommate would

9    be a problem?

10    **A.**    It's a problem because it's a shared space.  I don't get

11    to ask the person can you leave the room.  I don't get to ask

12    that their visitors not look in the room.  I can't stop them

13    from going in and out while I'm doing what I'm doing.

14          **THE COURT:**  So there's -- do you not have kind of a

15    working relationship with your roommate?

16          **THE WITNESS:**  I don't know them.  For years I haven't

17    had one because the previous administration, even before

18    Mr. Garcia, they said I deserved a better quality of life.

19          The AW was the health services administrator when I had

20    the surgery.  So they said what we will do -- and this was PREA

21    before it blew up to what it is now.  They're like, we can put

22    you in a single cell to give you privacy.  You let the officer

23    know what you are doing before and after.  We won't put anybody

24    in the room with you.  Or if space becomes a problem, you will

25    be the last one, and we will try to move them around for that

1    purpose because there's no place for me to go in medical.

2            **THE COURT:**  Okay.

3    **BY MS. STEIERT:**

4    **Q.**    What happened after you learned you would be receiving a

5    roommate?

6    **A.**    I spoke to Mr. Obian, the case manager.  I was called to

7    his office.  And he told me that I was going to be getting a

8    roommate.

9            And I asked him, well, how are we going to work this when

10    I need privacy.

11            And he said, well, I'm going to try to explain it to her.

12            And I said, now, Mr. Obian, by law medical can't explain

13    my medical business.  So what are you going to tell this lady

14    so that it doesn't become lobby fodder, conversation, and all

15    over the compound for me to have to start going through that

16    all over again?

17            He said, well, you know what?  It wasn't my decision.  He

18    said, I tried to talk to Ms. Groover.  Go talk to her.

19    **Q.**    Did you go talk to Ms. Groover?

20    **A.**    Yes.

21    **Q.**    And what happened then?

22    **A.**    Well, I went to her office and knocked.  And when I went

23    in, she said what?

24            And I was like, well, excuse me.  I said, well, maybe I

25    don't understand that so I'm going to come back.  I'm going to

1    leave and I'm going to come back.

2          And she said, no.  What's up?  What do you a want?

3          And I said, I'm inmate so-and-so.  I have a roommate, and

4    I wanted to talk to you about the situation for privacy.  What

5    can we do?

6          And she said, well, we don't do favors.  Like I've been

7    getting a favor for a very long time.

8          And I said, ma'am, nobody is doing me any favors.  I was

9    explaining my process just like I did here, what I need to do.

10          And she said so you mean to tell me for 30 years you

11    didn't have a roommate.

12          I said, no, I haven't had this issue for 30 years, ma'am.

13          And she said, well, tell them to turn their head.  Why --

14    she said, why do you need privacy?  You don't get privacy in

15    prison.  So why do you need that?  Tell them to turn their

16    head.

17          **THE COURT:**  When was this?

18          **THE WITNESS:**  This was in November.

19          **THE COURT:**  Of this year?

20          **THE WITNESS:**  November of '22.

21    **BY MS. STEIERT:**

22    **Q.**    Roberta, I'd like to show you a document.  It's PIX34.

23          **THE COURT:**  And you're giving me two copies or just

24    one?

25          **MS. STEIERT:**  Just one.  I have a second.

1          **THE COURT:**  So on all of these, as I've told you

2     before, I need a copy for me and a copy for the courtroom

3     deputy who's holding on to the main copy so that I can write on

4     my copies.  Thank you.

5          **MS. STEIERT:**  Understood.

6     **Q.**   Roberta, can you turn to the second page of that document.

7     What is the date of the message -- of the last message on that

8     page?

9     **A.**   The very bottom --

10    **Q.**   Uh-huh.

11    **A.**   -- the date is -- it was November 25th, 2022.

12    **Q.**   And do you recognize that document?

13    **A.**   Yes.

14    **Q.**   What is it?

15    **A.**   It is the original email that I wrote to Mr. Singh.

16    Mr. Singh was the acting health services administrator.

17    **Q.**   What does the message describe?

18    **A.**   It starts, I wanted to speak to you on Wednesday,

19    11/23/22, but Mr. Obian told me that you were extremely busy

20    and that I should send an email.

21         And I was asking, I'm requesting that medical provide a

22    space for me to be able to do my enema process.  I have a

23    roommate now.  I tried to ask the unit manager, Ms. Groover,

24    for a memo to let the officers know that my roommate would have

25    to leave the room at times to allow me privacy.  Ms. Groover

1    first asked me why I needed privacy.  I told her it was

2    humiliating and embarrassing and that by law medical cannot

3    disclose my medical issues and that I should not be put in

4    positions of having to explain sticking two fingers in my

5    vagina while the enema hose was in my butt.  Her response was

6    that I should just ask the roommate to turn her head.

7    **Q.**    Did you continue to raise this issue with staff?

8    **A.**    I did.

9    **Q.**    Can you turn back to the first page of this document.

10            **MS. STEIERT:**  I would like to offer PIX34.

11            **THE COURT:**  It's admitted.

12            (Plaintiffs' Exhibit 34 received in evidence.)

13    **BY MS. STEIERT:**

14    **Q.**    Can you look at the second message on that page?

15    **A.**    I'm sorry.  From the bottom or the top?

16    **Q.**    From the top.  What is the date?

17            **THE COURT:**  The message, what I read quickly, was that

18    medical -- why didn't medical approve a single cell?

19            **THE WITNESS:**  The -- Mr. Singh, who was acting health

20    services administrator at the time, he told me the warden told

21    me not to give it to you.  He said they told me no.  He said I

22    don't have a problem with it, but they told me no.  Go talk to

23    AW Buckner.  If she tells me to give it to you -- he had a

24    little smile on his face.  He said --

25            **THE COURT:**  Who is the head of medical now?

1          THE WITNESS:  Mr. Wilson, and Mr. Singh is assistant

2     health services administrator.

3          THE COURT:  So Mr. Wilson is the head of medical now?

4          THE WITNESS:  Now.

5          THE COURT:  And was Wilson there at the time of the

6     request last year -- or in 2022?

7          THE WITNESS:  Yes.  He was not -- he was like a

8     physician's assistant or nurse prac -- he was not -- he wasn't

9     the position he's in now.

10          THE COURT:  I want to get the names straight.  So you

11     were communicating with whom?

12          THE WITNESS:  My --

13          THE COURT:  Go ahead.

14          THE WITNESS:  My initial -- after speaking to

15     Ms. Groover --

16          THE COURT:  Right.  No, no, no.  I mean in medical.

17          THE WITNESS:  I went to Mr. Singh.

18          THE COURT:  S-I-N-G-H?

19          THE WITNESS:  Yes.  S-I-N-G-H.

20          THE COURT:  And he was the medical assistant?

21          THE WITNESS:  No.  He was acting health services

22     administrator.

23          THE COURT:  Okay.  And he's the one who told you he

24     had no issues with it?

25          THE WITNESS:  He told me that.  He said I don't have

1    an issue with it.  That's what they told me.

2         And then when I went back to main line, I spoke to Captain

3    Valero, I spoke to AW Buckner, I spoke to Mr. Deveney.  And the

4    warden told me just let them -- they'll figure it out.

5         **THE COURT:**  And then the hearsay, I have to strike.  I

6    mean, I --

7         **THE WITNESS:**  Okay.

8         **THE COURT:**  I understand it's your perspective, but

9    it's hearsay.

10        All right.  Go ahead.

11   **BY MS. STEIERT:**

12   **Q.**   Roberta, what is the date of that second message?

13   **A.**   You said from the top, right?

14   **Q.**   Yes.

15   **A.**   Okay.  Monday, December 5th, 2022.

16   **Q.**   And who did you write that message to?

17   **A.**   AW Deveney.

18   **Q.**   What did you say in the message?

19   **A.**   I just spoke to you on main line as advised in your

20   response below.  It didn't seem as if you knew why I was there.

21   However, you advised me that you will speak with Captain Valero

22   and I will hear something by the end of the day.  I'm

23   overwhelmed and stressed.  I don't understand why this is

24   taking so long to resolve.  I'm struggling both mentally and

25   physically.

1    **Q.**    Did you receive a response email?

2    **A.**    Yes.

3    **Q.**    And what is the date of that response?

4    **A.**    12/5/2022.

5    **Q.**    Who is it from?

6    **A.**    Mr. Deveney.

7    **Q.**    What does that message say?

8    **A.**    As discussed, guidance was put out to staff on 12/5/22 to

9    afford you the opportunity to address your matter in private.

10    According to medical, single cell status is not warranted as we

11    are able to meet your accommodations as requested.

12    **Q.**    Roberta, when you received this message, had you seen the

13    guidance referred to?

14    **A.**    No.

15    **Q.**    Did you feel that your matter was addressed?

16    **A.**    No.

17    **Q.**    Why not?

18    **A.**    Because staff kept bouncing me back and forth.  And I

19    would talk to AW Buckner, and she'd say what?  They didn't take

20    care of it yet?

21        I would go to Katherine Valero.  I'm sorry, they told me

22    that should be taken care of.

23        I went go to Lieutenant Putnam.  What?  I'm going right

24    now.  And I wouldn't see him again.

25            **THE COURT:**  What happened after December 5th?

1          **THE WITNESS:**  After December 5th, one occasion the

2     roommate was sleeping in the room, and my stomach was really

3     distended so I asked the -- I was in tears.  I asked the AW.

4     And so she came, pulled the lady out and spoke to her to

5     just -- to give me some time, and she told the officer just let

6     her sit right here on the steps until she's -- until she's

7     done.

8          **THE COURT:**  So are you currently still having the

9     issue or has it resolved?

10          **THE WITNESS:**  No.  I still have the same issue.  I'm

11     on my 8th roommate now.

12     **BY MS. STEIERT:**

13     **Q.**    Roberta, are you only worried about having a roommate

14     while conducting this procedure?

15     **A.**    No.

16     **Q.**    What else are you worried about?

17     **A.**    Staff see me, too.

18     **Q.**    How do staff see you?

19     **A.**    When they walk by, they do their rounds, I'm not allowed

20     to cover the window.  When before I was.  So they changed that.

21     **Q.**    Is there a particular incident with staff that you

22     remember?

23     **A.**    Just --

24          **THE COURT:**  You understand that there are protocols

25     and there have been problems with those windows closed; right?

1          **THE WITNESS:** I do.

2          **THE COURT:** Go ahead.

3  **BY MS. STEIERT:**

4  **Q.** Is there a particular incident with staff that you

5  remember?

6  **A.** Yes. It was at night, and it was the 10:00 to 6:00 shift.

7  My roommate was sleeping so I try to wait. My roommate was

8  asleep.

9          I was on my hands and knees doing the procedure and there

10  was a bright light that just shined on me for a long time. It

11  was stuck like a deer in headlights as I was.

12          Because I turned around and I said, what the hell. But I

13  couldn't see anything because the light was in my face now.

14  And by the time I could clip the hose off and get myself

15  together to get up, I could hear the officer walking next door

16  back and forth in the vacant room, like they were shift 2.

17  That was how I felt.

18          And by the time I got up to stick my head out the door to

19  see who it was and why they would be looking in that room,

20  because now my roommate is staring at me, and I looked out and

21  I saw that it was Mr. Cortez.

22  **Q.** Does Officer Cortez still work there?

23  **A.** Yes.

24  **Q.** And when you complete this procedure, are you uncovered?

25  **A.** Yes.

1    **Q.**   Is that visible from your cell window?

2    **A.**   Yes.

3       **THE COURT:**   I guess the issue, though, is that it

4   would be -- that's the case whether or not you've got a

5   roommate?   Right?

6       **THE WITNESS:**   Yes.

7       **THE COURT:**   Okay.

8       **THE WITNESS:**   But what changed was that the unit

9   manager before and the AWs like before, they gave me a paper

10   that I had to report to the officer first, let the -- I didn't

11   have -- there was nobody -- let them know I'm doing this right

12   now.   Because the way that I needed to -- I need to dispose of

13   the enema bag when I'm finished so it's not abused or whatever.

14       I was told.   I let them know before.   And it was a -- a

15   paper like maybe a small paper like this (indicating) that they

16   had put on there "Medical Procedure in Process," and as soon as

17   I'm finished, I need to report to the officer so then they

18   know.

19       **THE COURT:**   Okay.

20       **THE WITNESS:**   That was the understanding.   But then

21   that changed with this administration.

22   **BY MS. STEIERT:**

23    **Q.**   Roberta, how often do you require an enema?

24    **A.**   I should be doing it on a daily basis to make sure that --

25   to remove gas or to try to keep things moving or else it will

1    just sit there.  But I don't.

2    **Q.**   Why not?

3    **A.**   I can't.

4    **Q.**   Have you raised this issue again with staff recently?

5    **A.**   I have.  But nothing happens, so I stopped.

6    **Q.**   Do you believe that staff members are willing to help you

7    if you --

8                **MS. CZIOK:**  Objection.  Leading.

9                **THE COURT:**  Sustained.

10   **BY MS. STEIERT:**

11   **Q.**   Roberta, do you feel safer now than under the last

12   administration?

13   **A.**   No.

14   **Q.**   Why not?

15   **A.**   It's different.  It's -- it's very different.  Even before

16   the last administration, the administration, and the

17   administration before that.

18             **THE COURT:**  I need you to be specific.  There has been

19   multiple administrations.  So what are you talking about?

20             **THE WITNESS:**  I'm talking about even under Warden

21   Garcia, even under Warden Jenkins, and a while before that.

22   What we have right now, outside of the big stuff, this is the

23   worst by far.

24             **THE COURT:**  This is the worst by far.  Are there

25   sexual assaults happening right now?

1              **THE WITNESS:**  Not as much, and if so --

2              **THE COURT:**  So what's worse than that?

3              **THE WITNESS:**  What's worse than that?

4          **THE COURT:**  Yes.

5              **THE WITNESS:**  The repercussions for those of us that

6     are left behind because for all that has happened, we're paying

7     for it now.

8          **THE COURT:**  In what way?  So I -- I -- I'm not being

9     facetious.

10             **THE WITNESS:**  No.  I understand.

11         **THE COURT:**  Right?  The number of convictions that

12    have happened is significant.  So something has to change.

13    Agreed?

14             **THE WITNESS:**  Agreed.

15         **THE COURT:**  So you tell me, you list for me what's

16    worse given the fact that I had so many women sexually

17    assaulted.

18         **THE WITNESS:**  Worse than the sexual assault, there's

19    nothing that compares to that.  But a majority of those

20    people -- some of them are gone.  Either they're gone home or

21    they're shipped to other places.

22        And so the concern is for the people that are left behind,

23    people are angry.  They're angry about their jobs.  They're

24    angry about how the new administration looks at -- when I see

25    the new administration looking at staff that's left behind, and

1    when I see them looking at that, I don't want that for myself.

2           THE COURT:  Who's angry?  Staff or inmates or both?

3           THE WITNESS:  I would say both.  But staff are really

4    angry.  People -- they are really angry.  And we are paying for

5    that, Your Honor.

6           THE COURT:  I see.  So staff is angry, and a

7    consequence of the staff being angry, you believe they're

8    taking it out on the inmates?

9           THE WITNESS:  Yes.

10          THE COURT:  Okay.  Anything else?

11          THE WITNESS:  The mass punishment, the retaliation.

12          THE COURT:  I missed the word.  The mass punishment,

13   you said?

14          THE WITNESS:  Yes.

15          THE COURT:  And what do you mean by mass punishment?

16          THE WITNESS:  I mean that there's -- for somebody like

17   me that's been incarcerated for a long time, I make it my

18   business to treat people the way I want somebody to treat my

19   kids, my granddaughters in my absence.  So when I'm trying to

20   encourage somebody to do the right thing --

21          THE COURT:  Yep.

22          THE WITNESS:  -- don't do what's expected, don't be --

23   defy the stereotype.  When I'm showing somebody that and I'm

24   trying to lead by example, that's hard to do when you are doing

25   what needs to be done for an institution, for the institution

1    to run smoothly.  When I get the same punishment, I have to pay

2    for whoever wants to get high.  I have to pay for --

3            **THE COURT:**  It goes back to the drug issue?

4            **THE WITNESS:**  Not just the drugs.  I don't care if

5    they fight, I don't care if they get smart, if they get caught

6    out of bounds, everybody pays.

7        There's a difference in the way we're treated.  Me

8    personally, Your Honor, I've had a target on my back ever since

9    the FBI and the OIG came to speak to me about the warden.

10           **THE COURT:**  Which warden?

11           **THE WITNESS:**  Warden Garcia.

12           **THE COURT:**  Did you talk to the FBI?

13           **THE WITNESS:**  I did.  I did not call them.  They

14   called me.

15           **THE COURT:**  Because you didn't testify.  So they did

16   talk to you, the FBI?

17           **THE WITNESS:**  They did.

18           **THE COURT:**  Okay.  Anything else you want to tell me

19   since you're here?

20           **THE WITNESS:**  I -- I needed you to know that and that

21   the retaliation, it is real.

22       I got fired from a job working in the warden's complex

23   where you needed to be vetted to work there.  My counselor came

24   to me and told me they want another person to work in the

25   warden's complex and I picked you.  I went to work.

1    Normally I'm tutoring, working anywhere, I'm always busy.

2  I went there, and even though I was going to be cleaning the

3  bathrooms, it was during COVID, I was happy to get out.  And I

4  was going to do that job just as well as any other.  I worked

5  up there for months.

6    To go down the hall in the beginning, even though I knew I

7  wasn't wanted, because I heard Ms. Valdez, the warden's

8  secretary, Warden Garcia's secretary, say to Mr. Decarry, are

9  you sure you want up here.

10    He said, I don't see why not.  Miner vetted her.  She

11  works.

12    She said, well, just keep her over there in the business

13  office.

14    So I still went to work even though I knew that I wasn't

15  wanted there.  And I did the best job I could.  Only for my --

16  months later, my counselor to come back from vacation and say

17  hey, what happened up front?  I said nothing.  It's great.

18  It's okay.  I like it.

19    And she said, well, they told me they don't want you to

20  come back.

21        **MS. CZIOK:**  Objection.  Hearsay.

22        **THE COURT:**  And you weren't -- and at some point, I

23  take it, you weren't called back to work up front?

24        **THE WITNESS:**  No.  My counselor told me not to go.

25  She received an email.  She told me not to go.  The other one

1  can still go but --

2          **THE COURT:**  But that was all under Garcia?

3          **THE WITNESS:**  No.  Mr. Garcia was gone.  Mr. Garcia

4  was gone.

5          **THE COURT:**  When was that?

6          **THE WITNESS:**  This was during COVID.  This was in the

7  last year.  I was working in the warden's complex helping

8  because Mr. Decarry, one of the administrative people that got

9  resigned or whatever, they were there.  I was working there.

10         I went to Warden Jusino.  I went to Mr. Deveney.  Well,

11 she sent me to Deveney.  She sent me to Agostini.  I went to

12 Ms. Robles.  All the AWs and everything.  I asked them what

13 happened.  I was embarrassed.  My feelings were hurt because in

14 30 years, I've never been fired from a job.  Always asked to

15 stay, invited back to help come volunteer.  They never -- what

16 never -- like in certain situations.

17         So I was offended.  I felt some type of way.  And nobody

18 could tell me anything.

19         Yet the person that was part of the investigation and

20 referred to as "Ms. Garcia" and was angry because people told

21 on him because he was a good man, still works there today, I

22 don't understand that.

23         If they had said to me you can't work anymore because we

24 can't have lifers up here, it's a security thing, not one

25 person.  And I knew I couldn't go up there and ask the business

1    office staff because I had been told I couldn't go back up

2    there, it was out of bounds.

3          THE COURT:  And you believe -- what do you believe is

4    the reason?

5          THE WITNESS:  Ever since I told -- I didn't call them.

6    They called me.  I didn't tell --

7          THE COURT:  You think this is because you talked to

8    the FBI?

9          THE WITNESS:  That's -- that's the only difference.

10         THE COURT:  Okay.

11         THE WITNESS:  After speaking to them, after talking

12   to --

13         THE COURT:  But -- but didn't you speak to the FBI

14   like a long time ago?  When did you talk to the FBI?

15         THE WITNESS:  More -- it was more than once.  It was

16   several times.  Even right when they -- when they came to give

17   me the subpoena.  But I ended up not coming in the end.

18         THE COURT:  Okay.  We're going to have cross.  And

19   plaintiffs are going to have to make sure that you're more

20   efficient.  You've got eight witnesses to go and you've already

21   used up half your day.

22         Proceed.

23                        **CROSS-EXAMINATION**

24   BY MS. CZIOK:

25   **Q.**   Good morning.

1    **A.**    Good morning.

2    **Q.**    My name is Abbie Cziok.  I represent the United States.

3          How long do your enemas take?

4    **A.**    It all depends.  Sometimes if my hemorrhoids are out or in

5    a crisis mode, it takes time to even get the water to go in.

6    Because you have to start and stop.  It can take up to an hour

7    to even get the water in.  Then I need to get everything out.

8    **Q.**    So in total, how long can the enemas take?

9    **A.**    An hour or two.

10    **Q.**    You discussed an incident, I believe it was with Officer

11    O'Connor.  And you said an inmate was naked from the waist

12    down, and then you said her boobs were out.  Which was it?

13    **A.**    No, no, no, no, no.

14          With Mr. O'Connor, with Mr. O'Connor, [name redacted] was

15    wrapped -- oh, shit, I'm sorry.  Give me a minute.  I'm sorry.

16    I'm sorry.

17          **THE COURT:**  That's okay.  There's some water there for

18    you.

19          **THE WITNESS:**  Okay.

20          On that day that Mr. O'Connor was standing in front of the

21    door on the person, she was wrapped in a towel and her breasts

22    were out.

23    **BY MS. CZIOK:**

24    **Q.**    Officer O'Connor no longer works at Dublin; is that right?

25    **A.**    I haven't seen him for a long time.

1   **Q.**   You spoke -- again, I'm going to remind you not to use

2   last names -- you spoke to an inmate named Stephanie M three

3   days ago, didn't you?

4   **A.**   I did not speak to her, no.

5   **Q.**   And you encouraged her not to testify on behalf of the

6   United States; is that right?

7   **A.**   No.  I think you have the wrong person.  No, I did not.

8   **Q.**   Isn't it true that you were convicted of intimidating a

9   witness?

10          **MS. STEIERT:**  Objection.  Prejudice.

11          **THE COURT:**  Overruled.

12  **BY MS. CZIOK:**

13  **Q.**   Isn't it true that you were convicted of intimidating a

14  witness?

15  **A.**   Yes.

16  **Q.**   Is it also true that you were convicted of killing a

17  witness?

18  **A.**   Conspiracy to, yes.

19  **Q.**   With the computers, there are dividers between the

20  computer screens; is that right?

21  **A.**   When you say a divider?

22  **Q.**   Isn't it true that there are pieces of wood that come out

23  of the sides of the computer stations between each computer?

24  **A.**   Yes.

25  **Q.**   How close do you have to be standing behind a computer

1    screen to be able to read it if you are not the one sitting

2    there?

3    **A.**    Just feet.

4    **Q.**    Is that one foot?

5        **THE COURT:**  Actually, why don't you use a space here

6    in the courtroom.  Don't -- don't -- no, no.

7        **THE WITNESS:**  Just right here.

8        **THE COURT:**  Stand right there and tell me where.

9        **THE WITNESS:**  So if this is the little cubicle that

10    the computer is and the wood that you're talking about is the

11    little cubicle itself, you would have to look over to look at

12    the person next to you.

13        **THE COURT:**  No.  Don't leave.

14        **THE WITNESS:**  I'm sorry.  But if you're right here, if

15    I'm on the computer right here, the person standing just feet

16    away, up to four or five feet away, you can see it, every

17    bulletin they read, every bulletin a person puts on.

18        And if you're really interested in what they're writing,

19    then just lean on the trash can.  Just lean.  Those first two,

20    from either direction when you're on the side, you can see

21    everything that they -- everything.

22    **BY MS. CZIOK:**

23    **Q.**    So you said that you can see it from four feet away?

24    **A.**    Three, four.  I mean, you can be in a room.  It's not that

25    many feet.  The tiles on the floor are 12 by 12, and there's

1  only a few of those from the stairwell to the hallway -- to the

2  rooms right there.  There's not that much space.  It's not that

3  much big.  I'm not very good with the measurement, but it's not

4  that far.

5  **Q.**  So isn't it true that people could only stand about one

6  person deep behind the computer because there's not much room?

7  **A.**  No.  If you look on the cameras you can see sometimes

8  there is two and three people around the computers looking at a

9  person's computer, whether they invited them there or not.

10      But especially if somebody thinks you are trying to jump

11  them in line, there's more people there.  You can see it.

12  **Q.**  Are you aware of where your friends and the people that

13  you know that you live with work?

14  **A.**  What do you mean?  I'm sorry.

15          **MS. STEIERT:**  Objection.  Vague.  Foundation.

16          **THE COURT:**  I agree.  It is vague.  But I cannot hear

17  you or I can barely hear you.  Make sure those mics are working

18  and you're speaking into it.

19  **BY MS. CZIOK:**

20  **Q.**  Do you discuss with your friends where you all work?

21  **A.**  Discuss -- discuss where we -- like if I'm on the job,

22  discuss the job?

23  **Q.**  Yes.  Do you know where other people work?

24  **A.**  On the -- you mean in the institution?  Yes.

25  **Q.**  Do you know what departments they work in in the

1    institution?

2    **A.**    Maybe.  I don't know who you're talking about.

3    **Q.**    You're aware that other people's jobs in 2023 have all

4    rotated, aren't you?

5    **A.**    Yes.  Are you talking about staff?

6    **Q.**    Pardon me.  Inmates.  Are you aware that other inmates'

7    jobs in 2023 have all rotated?

8    **A.**    All rotated where?

9    **Q.**    Into new departments.

10    **A.**    No, I'm not.

11    **Q.**    Did you -- did you testify earlier that you believe

12    psychology is not responsive?

13    **A.**    To me, no.

14    **Q.**    Isn't it true that on March 13th, 2023, at 10:06 a.m., you

15    wrote to Dr. Mulcahy to ask for an appointment with Tri-Valley?

16    **A.**    Yes.  I'm not sure of the exact date, but I have an email.

17    I emailed.

18    **Q.**    Isn't it true that she responded on that same date to get

19    you on their schedule?

20    **A.**    She responded that day that the list was full and when she

21    could add me, I would be notified.

22    **Q.**    Isn't it true that you had an appointment with psychology

23    on March 22nd, 2023?

24    **A.**    With who?

25    **Q.**    Do you recall?

1    **A.**    No.

2          **MS. CZIOK:**    No further questions.    Thank you,

3    Your Honor.

4          **THE COURT:**    Any redirect limited to the scope of that

5    cross?

6          **MS. STEIERT:**    No, Your Honor.

7          **THE COURT:**    Okay.    Roberta?

8          **THE WITNESS:**    Yes.

9          **THE COURT:**    Anything else you want to tell me before

10    you leave?

11          **THE WITNESS:**    I don't know.    I'm sorry.    I'm right

12    now -- I don't know.

13          **THE COURT:**    Okay.    That's fine.

14       I understand.    Were you -- I understand it was a little

15    cool in lockup.    The marshals did request, and I did issue an

16    urgent follow-up so GSA has increased the heat down there.    So

17    we'll try to make sure you all are relatively comfortable.    I

18    know it's not fun to be in lockup.

19          **THE WITNESS:**    Thank you.    It was okay.

20          **THE COURT:**    Let's go ahead.    She's excused.

21       We'll continue with the next witness.    We have about half

22    an hour.

23          **MS. MONTES:**    We would like to call KD.

24          **THE COURT:**    Is that a nickname for KD?

25          **MS. MONTES:**    The first initial of the first name and

1    first initial of the last name.

2            THE COURT:  I thought you said Katie, K-A-T-I-E.  .

3                (Proceedings sealed.)

4            THE COURT:  Good morning.  I need you to move closer

5    to the mic.

6        And before we get started, I want to apologize to you for

7    the mishap that happened yesterday.

8            THE WITNESS:  Okay.  Thank you.

9            THE COURT:  The marshals are not used to opposing

10   parties telling them what to do with another parties' witness,

11   and there were writs issued for your appearance yesterday.

12           THE WITNESS:  Okay.

13           THE COURT:  And what happened was an email was sent

14   saying we only need a couple of the witnesses, but it came from

15   opposing counsel.  And the marshals had writs where they

16   believed that your attorneys still expected you to be here.

17           THE WITNESS:  I see.

18           THE COURT:  So it was a miscommunication, and I

19   apologize for that.

20           THE WITNESS:  No problem.

21           THE COURT:  All right.  You may proceed.

22                   <u>**DIRECT EXAMINATION**</u>

23   BY MS. MONTES:

24   **Q.**   Thank you for being here.  Just so you know, for

25   confidentiality reasons we will be using the initials of names.

1    If could you refrain from using other people's names.

2        Would you like me to refer to you by your initials or by

3    your first name?

4    **A.**    My initials preferably.

5    **Q.**    Okay.

6        **THE COURT:**  So KD, I need a little bit -- I'm a little

7    bit older and I can't hear as well.  So if you can please speak

8    into the mic.  You can pull it down if that's better, but I

9    need to make sure to hear you.

10       **THE WITNESS:**  Okay.  No problem.

11       **THE COURT:**  Proceed.

12   **BY MS. MONTES:**

13   **Q.**    So not taking up too much time, but I want the Judge to

14   know a little bit about you.  Can you tell me how old are you?

15   **A.**    I just turned 50.

16   **Q.**    And KD, are you a mother?

17   **A.**    Yes.  I have a 22-year-old daughter.

18   **Q.**    And what did you do for work prior to your time in being

19   incarcerated?

20   **A.**    More recently I was a freelance web designer.  Before that

21   I was president of a public software company.

22   **Q.**    Are you currently incarcerated?

23   **A.**    Yes.

24   **Q.**    How long have you been incarcerated?

25   **A.**    Since 2019.

1   **Q.**   Where are you currently incarcerated?

2   **A.**   At Dublin camp.

3   **Q.**   And where were you incarcerated prior to arriving at

4   Dublin?

5   **A.**   At FMC Carswell.

6   **Q.**   Can you tell me what the difference is between the camp

7   and the FCI?

8   **A.**   The Carswell FCI you mean?

9   **Q.**   I'm sorry.  FCI Dublin.

10          **THE COURT:**  Wait a minute.  She's never been at FCI

11  Dublin.

12       Have you been at FCI Dublin?

13          **THE WITNESS:**  No.

14          **THE COURT:**  Okay.  We have to fix the sound.  So she

15  can't tell me the difference if she's never been there.

16  **BY MS. MONTES:**

17  **Q.**   Are you incarcerated at FCI Dublin?

18  **A.**   No.  The camp.

19          **THE COURT:**  The camp.

20  **BY MS. MONTES:**

21  **Q.**   So can you tell me your understanding of the difference of

22  individuals who are placed in the camp versus the FCI?

23  **A.**   Okay.  So we are lower security.  We're supposed to be

24  minimum security.  We lower our points in order to get there.

25  That's how I got there from being in an FCI in Carswell, was I

1  lowered my points.

2      So we're supposed to have more freedoms.  I can't really

3  say we do, but we are supposed to.

4  **Q.**  And in your experience, do pat-downs happen often?

5  **A.**  I did work at the commissary warehouse, and so they used

6  to happen daily in and out as we went to work.

7  **Q.**  Have you ever experienced an inappropriate pat-down by a

8  guard?

9  **A.**  Just -- not until more recently.  One was Campos,

10  counselor Campos, yes.

11      **THE COURT:**  Okay, KD, I'm really sorry.  You are going

12  to have to move closer to that mic.

13      **THE WITNESS:**  So just in the last few months, I did

14  with counselor Campos.  Prior to that, no, I had not.

15  **BY MS. MONTES:**

16  **Q.**  When did that inappropriate pat-down occur?

17  **A.**  In September.

18  **Q.**  September of what year?

19  **A.**  Of this year -- I'm sorry.  Last year, 2023.

20  **Q.**  And I'm sorry to ask you this, but can you describe a

21  little bit about that pat-down.  How did it occur?

22  **A.**  Yes.  So she was just -- her demeanor was more aggressive

23  than I've ever had someone be during a pat-down, and she --

24  when she went to, I guess, search my breasts, she used her

25  hands and went up and over my breasts, sort of like this, and I

1    just have never had anyone do that before.  I've never had

2    anyone touch my breasts.  And I felt like it was just more I

3    guess maybe she was being overly thorough.  I don't know.  But

4    it just felt demeaning and aggressive.

5    **Q.**   I'm sorry to put -- to ask you to describe this, but did

6    she touch your -- what parts of your breasts did she touch?

7    **A.**   She went over my breasts, so from the bottom up over.

8    **Q.**   Did she touch your nipples?

9    **A.**   Yes.  Her hands went over my nipples.

10   **Q.**   And have you ever experienced a pat-down like this before

11   in the entire time that you were at FCI Dublin?

12   **A.**   Never.

13   **Q.**   What about your entire time of incarceration?

14   **A.**   Never.

15   **Q.**   In your experience and understanding, can you describe a

16   usual pat-down?

17   **A.**   Yes.  Normally they go underneath your breasts here and

18   then up through the middle here, usually just one finger or

19   hand through there.  I've never had anyone go near my breasts

20   or over my breasts before.

21   **Q.**   And how did it make you feel when counselor Campos patted

22   you down in this way?

23   **A.**   I just didn't understand the point.  I just felt like she

24   was, again, being maybe overly thorough, doing her job a little

25   bit too much.  But she just -- it just felt demeaning, like she

1    was -- I felt violated, I felt uncomfortable.

2    **Q.**    Are you aware of counselor Campos touching other people's

3    breasts in the same way during the same pat-down?

4    **A.**    Yes.  I just recently had people tell me that she's still

5    doing it.

6              **MS. MATTIOLI:**  Objection.  Hearsay.

7              **THE COURT:**  So the objection is sustained.

8         Let's get the -- Mr. Cuenco, we've got to fix this.

9         So here's the problem.  He turned it up louder because we

10   can't hear you.  And as a consequence, the rest of us are used

11   to talking --

12             **THE WITNESS:**  Okay.  Sorry.

13             **THE COURT:**  Once I was presiding over a mock trial of

14   high school students, and the student did what Ms. Mattioli

15   did, and I screamed and apparently traumatized her for her

16   life.  So let's try to avoid that.

17        But you said you had been a president of a software

18   company?

19             **THE WITNESS:**  At one point, yes.

20                  (Simultaneous colloquy.)

21             **THE COURT:**  So I expect you could speak a little

22   louder.

23             **THE WITNESS:**  I can.  I can.  I'm just a little

24   nervous.

25             **THE COURT:**  I know you're nervous.  Right.

1          **THE WITNESS:**  Yeah.

2          **THE COURT:**  Let's keep going.

3    **BY MS. MONTES:**

4    **Q.**  So during the same pat-down search, how many people are

5    you aware of that were touched in the same way?

6          **THE COURT:**  How many people did you see?

7          So this is the problem.  The hearsay objection is

8    sustained.

9          I'm interested in what you personally saw.

10         **THE WITNESS:**  Okay.

11         **THE COURT:**  Or know.

12         **THE WITNESS:**  I did not see anyone else.  We only --

13   it was just me.  I was up against the wall at one point.  There

14   was other people being searched at the same time.  And then I

15   went outside.  So I don't know.

16         **THE COURT:**  Being searched by other officers?

17         **THE WITNESS:**  Right.

18         **THE COURT:**  Did you see Campos search anyone else?

19         **THE WITNESS:**  She would have done that before or after

20   me, and I would have been either not there yet or outside, so

21   we didn't see each other get searched.

22         **THE COURT:**  Okay.

23         **THE WITNESS:**  So no one would have seen me get

24   searched by Campos, and I wouldn't have seen anyone else get

25   searched by Campos either.

1          **THE COURT:**  Okay.  Continue.

2       And by the way, what was the context -- what were you

3  doing that led to the search?  Was it routine?

4          **THE WITNESS:**  It was a shakedown for the whole unit.

5  They woke us up at 6:00 in the morning and pulled us out of our

6  room.

7          **THE COURT:**  How many in that unit?

8          **THE WITNESS:**  It varies but probably -- I want to say

9  about 60.

10          **THE COURT:**  Sixty.

11          **THE WITNESS:**  Uh-huh.

12          **THE COURT:**  And how many officers were doing this?

13          **THE WITNESS:**  I think there was three females that

14  were doing the pat searches.

15          **THE COURT:**  Thank you.

16       Proceed.

17  **BY MS. MONTES:**

18  **Q.**   Immediately after this pat-down, did you want to report

19  counselor Campos?

20  **A.**   Pretty much, yeah.  Like especially after talking to other

21  people and finding out that it also happened to them.  I just

22  felt like it was -- it's not okay, you know.

23       Her behavior is very bullying all the time.  And this just

24  made me feel like something that was, I felt, very, very, like

25  I said, violated by it and I felt like I needed to report it.

1        I was told not to.  I was told that I would be retaliated

2    against if I did.

3            MS. MATTIOLI:  Objection.  Hearsay.

4            THE COURT:  It's not -- I mean, I'm not going to

5    accept it for its truth.  I'm going to accept it just in terms

6    of your -- of why you acted as you did.  I don't know if it's

7    true or not.

8            THE WITNESS:  Okay.

9            THE COURT:  But you did something, I take it, or you

10   didn't do something because you heard these things; is that

11   right?

12           THE WITNESS:  No, I didn't do it because of that.  I

13   did it because of how it made me feel.

14           THE COURT:  Did you report it or not?

15           THE WITNESS:  Yes.  I reported it immediately within a

16   few hours of it happening.  Uh-huh.

17           THE COURT:  Despite the fact that people told you not

18   to?

19           THE WITNESS:  Yes.

20           THE COURT:  Okay.  Well, then it is stricken because

21   she didn't respond in light of everything she heard.

22   BY MS. MONTES:

23   Q.  How did you report counselor Campos?

24   A.  I reported it to the DOJ because I was told that it's

25   anonymous and that way I would be safe.

1          **THE COURT:**  Anonymous or confidential?

2          **THE WITNESS:**  I guess confidential.  Yeah, I guess

3     confidential would be the correct word, yes.

4          **THE COURT:**  That is, do you --

5          **THE WITNESS:**  Yes.

6          **THE COURT:**  -- did you understand it to be anonymous,

7     that it wasn't --

8          **THE WITNESS:**  No.  I'm sorry.  Confidential would be

9     the correct word, yes, there.

10    **BY MS. MONTES:**

11    **Q.**  And what happened after you emailed the DOJ about this

12    incident?

13    **A.**  I was immediately called to see our psychologist or

14    psych -- someone from the psych department, Ms. Mulcahy.

15    **Q.**  And what did you tell Dr. Mulcahy?

16    **A.**  I told her exactly what happened and -- well, first I

17    asked her if I was going to be safe in telling her that I -- if

18    I did, would it get back to my unit team because I didn't trust

19    them, and that I didn't want to report anything that would go

20    back to them.  I didn't even think that the DOJ would report it

21    inside the BOP.  And so the fact that she was coming to me had

22    me very concerned that that had already happened.

23         **THE COURT:**  Do you have any reason to distrust her?

24         **THE WITNESS:**  Ms. Mulcahy?  I didn't know her.  I had

25    never met her before.

1          **THE COURT:**  As you sit here today, do you have any

2    reason to distrust her?

3          **THE WITNESS:**  Well, yes.  What she told me turned out

4    to not be true.  She told me I could feel safe in telling her

5    and that it would not get back to my unit team, and it

6    immediately got back to my unit team.

7    **BY MS. MONTES:**

8    **Q.**    Did Dr. Mulcahy provide you with any additional follow-up

9    services after this meeting?

10   **A.**    No.

11   **Q.**    Did you see medical after this meeting?

12   **A.**    No.  She told me I would, but I did not.

13   **Q.**    What happened after you spoke to Dr. Mulcahy?

14   **A.**    I was immediately seen by -- she said that what I was

15   reporting was called a PREA.  I -- I was confused.  I didn't

16   feel like it was -- again, I -- I told her I didn't feel like

17   it was in a sexual manner at all, that I never felt like it was

18   an sexual advancement of any kind.  I just felt like she was

19   being overly aggressive.  So to me it felt like I was reporting

20   misconduct, not what I would feel would be considered a PREA,

21   so to say.

22         But she said that what I was reporting was a PREA.  And

23   she next had me see I think SIA Officer Baudizzon.  And again I

24   went through the same thing with him.  Can I feel safe in

25   talking to you and telling you what happened with me?  Is it

1    not going to be, you know, used against me?  I have to live in

2    the same unit.  Like they live literally 20 feet -- Campos's

3    office is 20 feet from my cell.

4        So I live -- I'm intimidated by her on a daily basis as it

5    is, but to have her know that I'm reporting her and then live

6    like that is extremely scary.

7        And so I asked them could I feel safe in him telling, and

8    he said yes.  He said you're going to see medical and you will

9    be talking to us again.

10       I said okay.  And then he left.  I never saw medical.  And

11   then the next day, I was served with an incident report.

12   **Q.**   And what was that incident report for?

13   **A.**   It said something about they watched the cameras, they

14   felt that I was not being truthful in my statement, that I was

15   trying to file a false PREA, which I never said it was a PREA.

16   They did.  And that -- and they put a statement in there that I

17   said she used her back of her hands, not the front of her

18   hands, which they never asked me that at all.  I don't even see

19   how that's relevant.  But -- and they said that she -- they

20   felt she was within her duties.

21       Again, I didn't feel how that was relevant.  Even if that

22   is what the officers feel is within her duties, it still made

23   me uncomfortable and I still feel like I should have a right to

24   say what makes me feel uncomfortable.

25       And that's what I was telling the psychologist, is that if

1    something makes me uncomfortable, like you don't know my past

2    traumas so if something in this place makes me feel

3    uncomfortable, even if it's a -- something like a strip search

4    that they're allowed to do, I should be able to go to someone

5    and say it makes me feel uncomfortable and not be punished for

6    it.

7        And I was extremely punished for this.

8    **Q.** Can you tell me about what consequences you received after

9    the disciplinary?

10   **A.** So when the officers saw me in Campos's office, they asked

11   me what's the one thing you want to keep?  And I said my phone.

12   I need to talk to my daughter.  She lost her dad.  She doesn't

13   have any other family.  Can I please keep my phone to talk to

14   her?

15       And they said we're taking your phone, we're taking your

16   email, we're taking your video visits, we're taking your

17   in-person visits.  So my aunt and uncle who are here today

18   couldn't come see me either.  They cut off all outside contact

19   with family members.  And then they took my commissary.  I

20   haven't been able to shop.  And I can't shop until almost May.

21   So that was September.

22   **Q.** Did they give you any other consequences?

23   **A.** I think -- I don't think there was any left -- oh, well,

24   they also raised my points.  So I lost my FSA credits.  So I

25   would have been long gone home by now if I had gotten my FSA

1    credits.  But when I was teamed by Campos, they raised my

2    points and --

3    **Q.**    Sorry.  Can I stop you there.

4          Can you explain to the Court what the FSA credits are?

5    **A.**    Okay.  So we earn credits by doing classes.  I've done, I

6    don't even know how many classes.  I think over 20-something

7    classes since I've been incarcerated in order to -- and done

8    everything I could to lower my points and to earn FSA credits.

9          And so this incident report raised my points to where I

10   can -- even though I've earned the credits, I don't get them

11   any longer.

12   **Q.**    So how did this raising of your FSA credits affect your

13   expected release date?

14   **A.**    Probably about 10 months.

15   **Q.**    And in your opinion, why is access to commissary so

16   important?

17   **A.**    Well, I can't buy bottled water, I can't buy snacks, food,

18   clothing.  I mean, shoes.  Everything.  Coffee.  Nothing.

19   **Q.**    Did you ever appeal the disciplinary action?

20   **A.**    No.  I've honestly been scared to because my appeal goes

21   to my unit team.  And if they're saying -- I -- I have no

22   control over what they say and do.  So if they say I'm lying

23   the first time and I know there's no video that says it didn't

24   happen because it happened, and so if they're going to say that

25   the first time and I try and appeal it and say it really

1   happened, and then they're just going to -- they'll put me in

2   the SHU.  They've already threatened that the first time.

3        So they've put people in the SHU for long periods of time

4   here.  I don't want to do the rest of my time in the SHU.  And

5   they've already told me my points are at a 14 right now.  One

6   more incident report, and I go to the SHU.

7   **Q.**   Did you ever reach out to Dr. Mulcahy about this

8   disciplinary?

9   **A.**   Yes, I did.  I sent her an email immediately.

10  **Q.**   I'd like to show you a document.

11  **A.**   Okay.

12       **MS. MONTES:**  If I can approach.

13  **Q.**   Do you recognize this document?

14  **A.**   Yes.

15  **Q.**   What is it?

16       **THE COURT:**  Hold on just a minute.

17       **MS. MONTES:**  Oh, I'm sorry.

18       **THE COURT:**  Is this from you?

19       **THE WITNESS:**  Yes.

20  **BY MS. MONTES:**

21  **Q.**   How did you --

22       **THE COURT:**  I asked you to wait.

23       **MS. MONTES:**  Oh, I'm sorry.

24            (Court reviewing document.)

25       **THE COURT:**  Okay.  Proceed.

1          **MS. MONTES:**  For the record, this is PIX14.

2     **Q.**    How did you send this email?

3     **A.**    Through the TRULINCS system, request to staff.

4          **MS. MONTES:**  With the Court's permission, I would like

5     to offer Plaintiffs' 14 into evidence.

6          **THE COURT:**  It's admitted.

7          (Plaintiffs' Exhibit 14 received in evidence.)

8     **BY MS. MONTES:**

9     **Q.**    How soon after the incident with Campos did you send this?

10    **A.**    I believe it was the following day, as soon as I got the

11    incident report.

12         **THE COURT:**  So this says that you thought that this

13    was on video, and you testified it wasn't on video.

14         **THE WITNESS:**  No.  What I'm saying, Your Honor, is

15    that if it is on video, it shows that it did happen.

16         **THE COURT:**  I see.  Okay.  Thank you.

17    **BY MS. MONTES:**

18    **Q.**    Can you please read the email you sent.

19    **A.**    Okay.

20        Ms. Mulcahy, yesterday when I met with you, I told you

21    what happened with --

22         **THE COURT:**  I'm going to stop you.  Is there a reason

23    why you want her to read this into the record given your

24    limitation on time?  I've read it.

25         **MS. MONTES:**  Understood, Your Honor.

1    **Q.**    Can you summarize what you said to Ms. -- Dr. Mulcahy in

2    this email?

3    **A.**    Yeah.  Basically I was just letting her know that I -- I

4    felt that she had promised me that if I reported it, I could

5    feel safe and protected and that it would never get back to the

6    officer I was reporting or used to retaliate against me, and I

7    no longer felt safe.

8    **Q.**    Did Dr. Mulcahy address your concerns after you sent this

9    email?

10              **THE COURT:**  Did she respond?

11   **BY MS. MONTES:**

12   **Q.**    Did she respond?  That could be the first question.

13   **A.**    A few weeks later I got a response that said it was out of

14   her control.

15              **THE COURT:**  That's all -- did she do that in writing

16   or orally?

17              **THE WITNESS:**  In writing.

18              **THE COURT:**  Do I have that email?

19              **MS. MONTES:**  We do not have that email.

20              **THE COURT:**  Do you have that email?

21              **THE WITNESS:**  I do.  I'm sure in my system.

22              **THE COURT:**  Did you give it to the lawyers?

23              **THE WITNESS:**  I did not, no.  I can.  I did not.

24              **THE COURT:**  Okay.  So she said what in this email?

25              **THE WITNESS:**  I believe it was something to say that

1    it was -- once it was turned over to SIA, it was out of her

2    control basically.

3            THE COURT:  Did she respond to the other things that

4    you say in here?

5            THE WITNESS:  No, not at all.

6    BY MS. MONTES:

7    Q.    Did you contact anyone else about your concerns?

8    A.    I did.  I talked in person to Ms. Enriquez, who is our

9    DTS.  She is the one person who we see in psych alone.  I saw

10   her in the psych office so I stopped her and talked to her and

11   asked her if she could help me.

12           THE COURT:  What was her name again?

13           THE WITNESS:  Ms. Enriquez.  And Dr. Phelps as well.

14           THE COURT:  Dr.?

15           THE WITNESS:  Phelps.  He is a psychologist there.

16   And they both told me they would look into it and see what they

17   could do and never responded.

18   BY MS. MONTES:

19   Q.    Did you inform SIS about your concerns?

20   A.    I did.  I also sent a very similar email to this one to

21   both Baudizzon immediately and to the DOJ as well.

22   Q.    Did you receive a response to your messages?

23   A.    No.

24   Q.    At the time of reporting counselor Campos, what was your

25   job?

1    **A.**    At the time, I was -- worked for commissary, the

2    commissary warehouse.

3    **Q.**    And about how much did you make working for commissary?

4    **A.**    On average, probably, I think, 20 to $30 a month.

5    **Q.**    Did you enjoy your job working for commissary?

6    **A.**    Yes.

7    **Q.**    Were you fired after reporting counselor Campos?

8    **A.**    Yes.

9    **Q.**    How soon after?

10   **A.**    Very soon.  I think it was part of the -- it was changed

11   the same day.

12   **Q.**    And now who do you work for?

13   **A.**    Campos.

14   **Q.**    And this is the same person -- is this the same person who

15   touched you inappropriately?

16   **A.**    Yes.

17   **Q.**    How does it make you feel to work for counselor Campos?

18   **A.**    Intimidated.

19           **THE COURT:**  Do you have to work at -- is that a choice

20   or not?

21           **THE WITNESS:**  No.  It's not by choice.  I've asked not

22   to -- I've requested to -- any other employment.

23   **BY MS. MONTES:**

24   **Q.**    And now how much do you make working for counselor Campos?

25   **A.**    Like $5 a month, maybe 6.

1    **Q.**    Do you feel that being fired was in retaliation for

2    reporting counselor Campos?

3    **A.**    Absolutely.

4    **Q.**    Who approves your visit requests?

5    **A.**    Campos.

6          **THE COURT:**  I don't understand that question.

7    **BY MS. MONTES:**

8    **Q.**    Is there a process to approve visitation?

9    **A.**    Yes.  Counselor Campos is -- that's one of her duties, is

10   to approve our visitors.  So I have been trying to get my

11   daughter approved to come see me for the last few months, and

12   she keeps saying she doesn't have the visitor --

13         **THE COURT:**  She said what?

14         **THE WITNESS:**  She keeps saying she doesn't have the

15   visitor forms.  Same with my aunt and uncle who live right here

16   in Dublin and would happily come see me.  She doesn't have

17   those either, even though they've sent them multiple times.

18         **THE COURT:**  I don't understand what that means, they

19   don't have -- she doesn't have visitor forms.

20         **THE WITNESS:**  Well, so my family mails them in.  She

21   says she doesn't get them.

22         **THE COURT:**  And they live in Dublin?

23         **THE WITNESS:**  Yes.

24         **THE COURT:**  Are they here in the courtroom?

25         **THE WITNESS:**  I have another aunt and uncle that are.

1    **BY MS. MONTES:**

2    **Q.**  Have you been able to be visited by your family in the

3    last few months?

4    **A.**  Since -- just recently, yes.

5    **Q.**  Have any staff made comments to you --

6          **THE COURT:**  Okay.  I'm sorry.  I want to understand

7    this visitor issue.

8          **THE WITNESS:**  Okay.

9          **THE COURT:**  So you do have visitors or you don't --

10         **THE WITNESS:**  Okay.  So I have two aunts and one uncle

11   that were approved when I first got to Dublin back in

12   January of 2023.  But since this incident, I have not been able

13   to get anyone approved.

14         **THE COURT:**  So because they were approved, they can

15   still see you?

16         **THE WITNESS:**  They couldn't for, I guess -- I don't

17   know the determination of the time.  There was the -- so the

18   phone, email, video visits and in-person visits were part of my

19   punishment for this incident report, and I don't know for how

20   long.

21       I do know after I met with the attorneys 32 days in, they

22   came back on.  I got those rights back.  And I don't know if

23   that had anything to do with it or if it was supposed to have,

24   but it was -- it was 32 days after I lost them, I was able to

25   get those back.

1          THE COURT:  So those -- so you now -- that consequence

2    has been withdrawn?

3          THE WITNESS:  Right.  Right.  But the commissary

4    continues.

5          THE COURT:  So the two aunts and uncles now can visit,

6    but you haven't been able --

7          THE WITNESS:  Get anyone else added, correct.

8          THE COURT:  -- to get anyone else authorized.

9          THE WITNESS:  Uh-huh.

10          THE COURT:  And the other people you want authorized

11    are who?

12          THE WITNESS:  My daughter.

13          THE COURT:  Is she local or not?

14          THE WITNESS:  She lives in San Diego, San Clemente.

15          THE COURT:  And you said other people who live in

16    Dublin?

17          THE WITNESS:  Yes.  I have an aunt and uncle right

18    here in Dublin.

19          THE COURT:  Okay.  Thank you.

20    BY MS. MONTES:

21    Q.   Can you tell me --

22          THE COURT:  Can I have you write down for me their

23    names --

24          THE WITNESS:  Sure.

25          THE COURT:  -- on a --

1          Mr. Cuenco, give her a piece of paper.  Thank you.

2          Do your aunts and uncle work full-time?

3              **THE WITNESS:**  I believe so.

4              **THE COURT:**  Thank you.

5          Okay.  Proceed.

6     **BY MS. MONTES:**

7     **Q.**    Can you tell me how this disciplinary has affected your

8     mental health?

9     **A.**    It's been traumatizing.  It's retriggered a lot of stuff

10    that I've been through before.  So having people that I thought

11    were in a place of protection, you know, that I thought were

12    authority figures that were supposed to protect me not only

13    violate me but put me in a place where I can't go to other

14    authority figures and -- for help has really made me

15    frightened.

16        I never felt frightened before like this while I've been

17    incarcerated, but these days I'm very -- extremely frightened.

18    And I've -- I feel like I have, you know, just -- I live in an

19    extremely hostile environment, and it shouldn't have to be that

20    way.

21    **Q.**    Are you a survivor of sexual assault from prior to your

22    time in incarceration?

23    **A.**    Yes.

24    **Q.**    Do you have any mental health diagnoses?

25    **A.**    Yes.

**Q.**   What are those, to the best of your understanding?

**A.**   Bipolar 2 and PTSD, chronic addiction.

        **THE COURT:**  Chronic addiction of what?

        **THE WITNESS:**  Heroin and methamphetamines.

**BY MS. MONTES:**

**Q.**   Have you sought out mental health support while you've

been at FCI Dublin?

**A.**   There's no support to be sought out.  I mean, I -- I've

tried.  When I was at Carswell, I saw a psychologist regularly

and a therapist regularly.  But there's never been anything --

there's no such thing to be had at -- or seen at Carswell

[sic].

**Q.**   Have you been able to obtain any support from therapists

while at FCI Dublin?

**A.**   No.  I've seen our -- we do have a -- like I said,

Dr. Phelps.  He teaches a seeking safety class.  He was my

teacher in that class.  But other than that, no.

**Q.**   So outside of those specific classes?

**A.**   No.

**Q.**   Are you aware of Tri-Valley Haven providing mental

healthcare?

**A.**   I've been told that they do, but I've never had access to

it.

**Q.**   Do you know how to contact Tri-Valley care?

**A.**   No.

1          **THE COURT:**  Do you know how to get on the list to see

2     them?

3          **THE WITNESS:**  I don't know.

4     **BY MS. MONTES:**

5     **Q.**   Would you feel more comfortable talking to medical or

6     psychiatrists who are not employed by the BOP?

7     **A.**   Absolutely.

8     **Q.**   When you arrived at Dublin, were you provided any

9     information about PREA?

10    **A.**   No.  I believe I was during my orientation.  That was a

11    few months later.

12    **Q.**   And how were you told to report?

13    **A.**   Talk to a staff member.

14    **Q.**   Were you ever told by a BOP staff you could report to

15    anyone else other than other BOP staff?

16    **A.**   Not that I know of.  Not that I recall.

17    **Q.**   Are you aware of any new bulletins posted at FCI Dublin in

18    December regarding stolen property?

19    **A.**   Yes.  They just recently posted a bulletin to all of us

20    that said that pretty much any item in our cells as of the 7th

21    of this month can be considered stolen or nuisance contraband.

22         I feel -- I'm very scared that it's going to be a way

23    of -- of retaliation for especially those of us here today

24    because what it says --

25         **MS. MATTIOLI:**  Objection.  Foundation.

1          **THE COURT:**  Overruled.

2          **THE WITNESS:**  What it says is that any item no longer

3     sold on commissary can be considered nuisance contraband.

4          So I transferred originally from MC San Diego and then

5     from FMC Carswell, so my -- all of my clothing and shoes and a

6     lot of my hygiene items, different items I have, have never

7     been sold on commissary at Dublin and so those, according to

8     this bulletin, are considered nuisance contraband and I can get

9     an incident.  It says that it can give me a 200 series incident

10    report.

11         The incident report I received recently was a 300 series

12    and I lost every single right that I had.  So I definitely

13    would go to the SHU over this --

14         **MS. MATTIOLI:**  Objection.  Foundation.

15         **THE COURT:**  She's telling me what she thinks.  And

16    that perception, you all need to be listening to.  Overruled.

17    Whether or not it's true, I don't know.  But it certainly is

18    her perception.

19         Proceed.

20    **BY MS. MONTES:**

21    **Q.**   And is this a new practice at FCI Dublin?

22    **A.**   I have never heard of it before.  I mean, it says that I

23    can get a 200 series shot for graffiti on the chairs in my

24    room.  There's chairs in every -- there's graffiti in every

25    room.  I don't have control over that.  I don't have a way to

1    remove it.  It's permanent marker.

2        So it says for the screws in our wall, we're supposed to

3    turn those in.  I don't have a screwdriver.  I can't get access

4    to a screwdriver.  So I don't know how I'm supposed to turn in

5    the screws in my wall.

6        It basically just feels like a complete setup to me, that

7    they're going to retaliate.  I've never seen anything like

8    this.  And I'm super disappointed that it's the new warden that

9    issued this because I was hoping he was going to be a little

10   more protective.

11   **Q.**  Would you need to buy a substantial part of your property

12   if they are stolen out -- if they are taken away?  I'm sorry.

13   **A.**  I can't.  I can't buy anything until May.  But, yes, I

14   would have to replace everything.

15   **Q.**  And, again, how much are you paid in your current job?

16       **THE COURT:**  I already have that.

17       **MS. MONTES:**  Understood.

18       **THE COURT:**  It's already -- keep moving.  Stop

19   repeating.

20       **MS. MONTES:**  There's not many more questions.

21   **Q.**  Have you tried to access medical care at FCI Dublin?

22   **A.**  Yes.

23   **Q.**  For -- when was that?

24   **A.**  Multiple times.  I've been seen for -- I have chronic

25   urinary track infections, kidney infections.  I was taken out

1    in July to see a doctor who ordered a procedure.  It took

2    months, but I finally got the doctor at Carswell -- not

3    Carswell -- well, it was originally approved at Carswell.  And

4    then we had to go through it again at Dublin.  And I got it

5    approved again because I never had the procedure there.  So we

6    got it approved here.  And it was approved by Dr. Fish in

7    July for me to have the surgery, and I have not had it yet.

8    **Q.**    And Dr. Fish, is he a --

9    **A.**    She, yes.  She's a --

10   **Q.**    A doctor at FCI Dublin?

11   **A.**    Right.  So they just have me on permanent antibiotics

12   instead.  So I take antibiotics every day now for, I think, six

13   months.

14   **Q.**    Are you afraid of facing retaliation from staff for

15   testifying here?

16   **A.**    Extremely.

17   **Q.**    And why are you deciding to testify anyway?

18   **A.**    Because something's got to stop.  I mean, my case is very

19   small in comparison to what's really going on at Dublin.

20   There's too many people scared to speak out.

21       But something's got to stop.  It's not okay for us to be

22   treated this way.  I've been in other prisons, and it's not

23   this way.

24       The staff there covers up for each other and bullies us,

25   and it's just -- I'm leaving, no matter what, in a few months,

1    so I -- you know, my daughter did not want me to do this.  She

2    feels like I'm risking being away from her for longer for doing

3    this.  But I feel like it's the right thing to do because I

4    don't feel like women should have to suffer this much.  I

5    believe we should be rehabilitated.

6         Most of those women are drug addicts and need help, and

7    they don't need to be treated in the manner they're treated.

8    And they certainly don't need officers bringing them drugs to

9    keep them addicted to drugs.  And that's what's happening.

10        So I want to speak out because I want to help make

11   changes.  I -- while I was incarcerated, I became a drug

12   treatment specialist.  I got my degree.  And that's what I want

13   to do when I get out.  And I want to do everything I can to

14   help women.  I do everything I can while I'm in there, even

15   though I see it on a daily basis.  I see them struggle.  And I

16   get it because there's no help.

17            THE COURT:  So what I hear you saying is there's still

18   a measure of retaliation happening by some officers.

19            THE WITNESS:  Absolutely.

20            THE COURT:  There are drug issues.

21            THE WITNESS:  Absolutely.

22            THE COURT:  And there's no counseling.

23            THE WITNESS:  Absolutely.

24            THE COURT:  Okay.  To your -- have you -- have you

25   seen -- and the incident that happened to you, you told me was

1    not sexual, it was aggressive.

2            THE WITNESS:  Right.

3            THE COURT:  Have you personally seen any sexual

4    issues, sexual abuse, sexual touching?

5            THE WITNESS:  Yes.

6            THE COURT:  Okay.  What have you seen?

7            THE WITNESS:  I'd rather -- I don't feel safe talking

8    about it.

9            THE COURT:  Have you reported it?

10           THE WITNESS:  What I've seen other people do?  No.

11           THE COURT:  Is it officer-on-inmate or

12   inmate-on-inmate?

13           THE WITNESS:  Officer-on-inmate.

14           THE COURT:  How many incidents have you seen?

15           THE WITNESS:  At least a few.  I mean, like four or

16   five probably.

17           THE COURT:  And when did you see them?

18           THE WITNESS:  I mean, over the past year.

19           THE COURT:  So in 2023?

20           THE WITNESS:  Uh-huh.

21           THE COURT:  That's a "yes"?

22           THE WITNESS:  Yes.

23           THE COURT:  And at the camp or somewhere else?

24           THE WITNESS:  At the camp.

25           THE COURT:  Did they involve one officer or many?

1          **THE WITNESS:**  One officer.

2          **THE COURT:**  One or more?

3          **THE WITNESS:**  Am I talking about different officers,

4    are you saying?  Yeah.  Different officers.

5          **THE COURT:**  How many?

6          **THE WITNESS:**  Three.

7          **THE COURT:**  All right.  It's way past our lunch break.

8       During this break, you're ordered not to talk to anybody,

9    including your lawyers, about anything.  Okay?

10          **THE WITNESS:**  Okay.

11          **THE COURT:**  All right.  We'll stand in recess until

12   12:45.

13       All right, Mr. Galvan, Ms. Mattioli, I will see you at

14   sidebar.  We will stand in recess until 12:45.

15          (Sidebar conference held without the reporter.)

16          (Luncheon recess was taken at 12:07 p.m.)

17   **AFTERNOON SESSION**                                **12:47 p.m.**

18          **THE COURT:**  We're back on the record.

19       The record will reflect that the witness is here.  And

20   counsel is present.

21       So do you recall when your family sent in those visitation

22   requests?

23          **THE WITNESS:**  I would have to ask them the exact

24   dates.  I don't -- I don't know.  I -- I told them to send them

25   again certified mail so I would have proof that they were

1    actually delivered here.  But I don't have the dates on me, no.

2    Sorry.

3              THE COURT:  Do you have a sense, any --

4              THE WITNESS:  I believe my daughter started sending

5    hers in late July, August.  She probably sent them again in

6    October.

7              THE COURT:  And then --

8              THE WITNESS:  My uncle, even earlier than that.  He

9    sent them at least twice.  He even showed up -- he lives in

10   Dublin so he didn't know.  He just wanted to visit me.  He

11   showed up at the visitation just asking if he could see me.  He

12   didn't know that he had to wait a process for my counselor to

13   approve me.

14             THE COURT:  Mr. France.

15             MR. FRANCE:  Yes, Your Honor.

16             THE COURT:  I am ordering you to have available at the

17   front desk at Dublin an envelope with a name that I am going to

18   provide you that has those forms for her family.

19             MR. FRANCE:  Okay.

20             THE COURT:  They are going to fill them out there so

21   that they can be processed.  I am ordering you personally to

22   get back to me.

23             MR. FRANCE:  Understood, Your Honor.

24             THE COURT:  I want them there no later than this

25   weekend.

1          **MR. FRANCE:**  Yes, Your Honor.

2          **THE COURT:**  So beginning on Monday --

3          **THE WITNESS:**  Thank you, Your Honor.

4          **THE COURT:**  -- those forms will be there.  I believe

5    I've got family members in the audience.

6          **THE WITNESS:**  Yes.

7          **THE COURT:**  Are these the family members that have

8    access or not?

9          **THE WITNESS:**  Yes, they do.  Uh-huh.

10          **THE COURT:**  So I will ask the family members to advise

11    the other family members that after -- beginning Monday

12    morning, they can go by there, pick up the forms, fill them

13    out, give them back, and I want notice within 24 hours that

14    this has been done.

15          **MR. FRANCE:**  Okay.

16          **THE COURT:**  Ms. Mattioli.

17          **MS. MATTIOLI:**  Yes, Your Honor.

18          **THE COURT:**  You're instructed to check the logs to see

19    whether this stuff was received.

20          **MS. MATTIOLI:**  Yes, ma'am.

21          **THE COURT:**  If it is, then the warden has yet another

22    problem to address.  Okay?

23        What is the drug problem -- well, is there a drug problem

24    right now at the camp?

25          **THE WITNESS:**  At this very moment right now, no.

1    Thank God.

2         **THE COURT:**  And when you say it that way, that leads

3    me to ask whether there was a drug problem before.

4         **THE WITNESS:**  Yes.  Absolutely.

5         **THE COURT:**  And when did you -- when did you observe

6    there being a drug problem?

7         **THE WITNESS:**  It's sort of an off-and-on thing.

8         **THE COURT:**  And you say no now, but you had a sense

9    that it -- that -- where you observed it before.  When -- is

10   there any kind of time frame that you can give me in terms of

11   when you saw it less?

12        **THE WITNESS:**  I guess within months, I guess.  Within

13   the last month, I suppose.

14        **THE COURT:**  Do you have any information about how

15   drugs were getting into the facility?

16        **THE WITNESS:**  I don't feel safe.

17        **THE COURT:**  So I'm not going to ask you what.  Do you

18   have any information, yes or no?

19        **THE WITNESS:**  Yes.

20        **THE COURT:**  Okay.

21      Were drugs entering the facility in any way related to --

22   or to your work at the commissary?

23        **THE WITNESS:**  I don't know.

24        **THE COURT:**  Is it possible?

25        **THE WITNESS:**  I don't know.  I suppose.

1          **THE COURT:**  You said that you've been through many pat

2     searches.

3          **THE WITNESS:**  Yes.

4          **THE COURT:**  Okay.  If somebody had drugs in their bra,

5     how would a pat search that you've experienced before reveal

6     drugs in the bra?

7          **THE WITNESS:**  Okay.  So from other institutions I've

8     been in, they would hold the bra at the bottom and lift it out,

9     directly lift it out, so anything that's in the bra would fall

10    out.

11         **THE COURT:**  So they'd have to hold it out pretty --

12         **THE WITNESS:**  They just take the band and they sort of

13    shake it and so anything that you were keeping in there would

14    fall out.

15         **THE COURT:**  The difference between having an exam on

16    one's breast palm up versus palm down seems to me to be an

17    obvious issue of wanting information in terms of -- with palms

18    down, obviously you can do things with your fingers that you

19    couldn't do if palms were up; right?

20         **THE WITNESS:**  Okay.

21         **THE COURT:**  Do you agree with that?

22         **THE WITNESS:**  I understand what you're saying, yes.

23         **THE COURT:**  Okay.  Is there some concern -- you -- you

24    indicated to me that you didn't understand why they would be

25    asking that.  That seems to me to be an obvious reason why

someone would ask that.

Is there some other thing that I'm missing?

THE WITNESS:  No.  I just -- I was confused why it was in the report because they didn't ask me that.

THE COURT:  I see.

THE WITNESS:  And so I felt like they were saying that if she had used sort -- maybe the back of her hands, that made it okay as opposed to if it was the front of her hands, it wasn't okay.

And so if they put a statement saying that I said it was the back of her hands, I don't honestly recall which one they said I said because it wasn't ever asked of me.  But that's what I felt.

The only other reason I could think of, of why they put that statement in there was to make it so there had to be some sort of a lie.  Because I never lied.  What happened happened.

And so they had to put something in there to say, oh, well, she said she used the back of her hands and we saw the video and she actually used the front, is what I originally thought happened.

THE COURT:  Do you have that exhibit in front of you, your email?

THE WITNESS:  Oh, I don't.

THE COURT:  Is it still there?

THE WITNESS:  I brought it upstairs.  Sorry.

1          **THE COURT:**  I didn't hear you.

2          **THE WITNESS:**  I brought it upstairs.  I'm sorry.  I

3     had it in my hand.

4          **THE COURT:**  We'll have to get that back.

5       Do you have another exhibit?

6          **MS. MONTES:**  Your Honor, I have an unredacted version.

7     If she could just see that.

8          **THE COURT:**  Give her that one.

9       I just want to make sure again that I'm clear because I --

10    I've heard some going back and forth.

11      Here it says I was the one who told SIS to watch the

12    cameras.

13         **THE WITNESS:**  Correct.

14         **THE COURT:**  So you wrote that; right?

15         **THE WITNESS:**  Right, uh-huh.  What --

16         **THE COURT:**  I thought you testified you knew there

17    were no cameras?

18         **THE WITNESS:**  No.  What I -- okay, so again, what I

19    said to him was if there's cameras, you'll see what happened,

20    right?  And because he said we have cameras.  And I said okay,

21    perfect, then you'll see what happened.  You will definitely

22    see it.

23      What I testified to later and what I'm saying to you is

24    that what they're stating in the incident report is that the

25    cameras show that it didn't happen.

1          **THE COURT:**  Okay.  And I don't have the incident

2     report.

3          **THE WITNESS:**  Okay.  So that's where it states that

4     they saw -- they found me to be lying by watching the camera

5     footage.

6          So one of two things had to occur there.  Which I've been

7     told by two officers that there was no working cameras.  They

8     installed a camera in that hallway, I think, a week and a half

9     to two weeks later.  So I don't know why they would put an

10    additional camera right next to a working camera if it did

11    work.

12         But so that's why my belief now is that maybe there was

13    never footage of it at all.

14         **THE COURT:**  I see.  Okay.

15         **THE WITNESS:**  But if it was footage, it should show

16    exactly what I said happened.

17         **THE COURT:**  I see.

18         All right.  The other attorneys are going to ask you

19    questions.

20         **THE WITNESS:**  Okay.

21         **THE COURT:**  All right.  Cross.

22         **MS. MATTIOLI:**  Thank you, Your Honor.

23         Just for the record, Your Honor, I have the incident

24    report.  It's an SIS memo.  So I have it marked for in camera.

25         **MS. MONTES:**  Objection, Your Honor.  Why is this

1  incident report in camera?

2        **THE COURT:**  Response.

3        **MS. MATTIOLI:**  It's a sensitive BOP document that I

4  just received.  It has not been redacted.

5        **MS. MONTES:**  It's -- Your Honor, this incident report

6  may be given to inmates at times.

7        **MS. MATTIOLI:**  It is an SIS memorandum.

8        **THE COURT:**  So give a copy just to her attorney.  I

9  need any other attorney to move away from her attorney.  This

10  is only -- for single eyes only.  And only for these

11  proceedings.  We need to get redactions.

12      I believe we're at, Mr. Cuenco?  P?  What do you have

13  left?  So I think we're at Q.

14        **THE CLERK:**  We stopped at O, Your Honor.  H, M, N, P

15  and O.

16        **THE COURT:**  No.  We had something under seal and in

17  camera which was P, and then this will be Q.

18        (Defense Exhibit Q marked for identification.)

19        **THE COURT:**  All right.  Go ahead.

20                    **CROSS-EXAMINATION**

21  BY MS. MATTIOLI:

22  **Q.**  Good afternoon.

23  **A.**  Hi.

24  **Q.**  So I just want to make sure that I understand what your

25  testimony is.  Okay?

1    **A.**    Okay.

2    **Q.**    I heard you say that when you reported the pat search --

3    **A.**    Uh-huh.

4    **Q.**    -- you said that it made you feel uncomfortable.

5    **A.**    Correct.

6    **Q.**    And at some point you told them to review the videos.

7    **A.**    I believe I said if there was video, that it would show

8    it, yes.  Because he -- Mr. Baudizzon told me there was video

9    of it.  And I said okay, good, then from my understanding your

10    videos are pretty clear so it should show it.  Uh-huh.

11    **Q.**    And then after they reviewed the videos, you said it was

12    aggressive.

13    **A.**    I still said it made me uncomfortable, even in my emails

14    to Baudizzon and to Mulcahy.  I said it made me uncomfortable.

15    That never changed.

16    **Q.**    But you didn't say it was aggressive until after they

17    reviewed the video; right?

18    **A.**    I don't remember the wording I used to the DOJ, but I

19    believe --

20            **MS. MONTES:**  That misstates prior testimony.

21            **THE COURT:**  Overruled.

22            **THE WITNESS:**  I believe I might have even used the

23    word "violent."  I may not have used the word "aggressive," but

24    I may have used the word "violent."  So I didn't say sexual, is

25    what I know.  I was trying to express how it made me feel, that

1    she was being bullying and overly aggressive.

2         I told every one of them that I felt she was being overly

3    thorough, which I told them also that I understood at the time

4    considering the current climate at the camp but --

5    **BY MS. MATTIOLI:**

6    **Q.**    By current climate, you meant drugs?

7    **A.**    Correct, yes.

8    **Q.**    You understand the current climate of sexual abuse

9    allegations at Dublin?

10   **A.**    I do, yes, a hundred percent, yes.

11   **Q.**    Is it your testimony that if you complain about a staff

12   member touching your breasts, that the prison shouldn't

13   investigate that?  Should not.

14   **A.**    Of course they should.  I expected them to, yes.  I didn't

15   know they were going to call it a PREA.  I didn't call it a

16   PREA.  But I didn't expect to be punished for saying that it

17   made me uncomfortable, which she did.

18        They had every right to say that it was within her duties,

19   if it is.  I still don't know how it is because no one else has

20   ever done that to me.  But I still -- what she did still made

21   me feel uncomfortable, and I don't feel like I should be

22   punished for it for saying so.

23   **Q.**    And after you told someone that an officer touched your

24   breasts in a way that made you feel uncomfortable, you were

25   interviewed by the SIA?

1    **A.**    Correct.

2    **Q.**    And you were interviewed --

3    **A.**    I didn't tell an officer, no.  I told the psychologist.

4    **Q.**    Okay.  And you were interviewed by psychology?

5    **A.**    Right.

6    **Q.**    And they reviewed videotape?

7    **A.**    I don't know if psychology did.  I -- again --

8    **Q.**    Somebody at the prison reviewed the videotape of the pat

9    search; is that what they told you?

10   **A.**    That's what the incident report says.

11   **Q.**    Did anybody tell you that?

12   **A.**    No.  I asked if I could see the video when they -- when

13   the DHO, and they said no.

14   **Q.**    Okay.  And you talked about the punishment for the

15   incident report.

16   **A.**    Correct.

17   **Q.**    Your commissary privileges have been restored, haven't

18   they?

19   **A.**    No.

20   **Q.**    Yes, they --

21   **A.**    No, they have not.

22          **MS. MATTIOLI:**  I'm sorry.  I apologize.  I have an

23   exhibit.  If could pull up 300.

24          **THE WITNESS:**  I just tried to shop this week and

25   couldn't shop anything but stamps and hygiene.  So unless it

1    were restored yesterday, then I'm unaware of it.

2            **MS. MATTIOLI:**  Can we pull it up?

3    **Q.**   Well, while we're waiting, I have a disciplinary --

4    chronological disciplinary record.

5            **THE COURT:**  Does her lawyer have this?

6            **MS. MATTIOLI:**  Yes.

7            **THE COURT:**  Did you get a copy?

8            **MS. MONTES:**  Yes, I just received a copy.

9            **THE COURT:**  LP COM, what does that refer to?  That

10   says through April 22nd, 2024.

11           **THE WITNESS:**  Right.  That means that it's restricted

12   through April 24th.

13   **BY MS. MATTIOLI:**

14   **Q.**   I misspoke.  Your phone privileges and your visiting

15   privileges --

16           **MS. MONTES:**  Objection.  She is testifying.

17           **THE COURT:**  She's cross-examining.

18        What's the question?

19           **MS. MONTES:**  Your Honor, the witness does not have

20   this in front of her.

21           **MS. MATTIOLI:**  We're trying to pull it up on the

22   screen.  I can -- I have a copy for her --

23           **THE COURT:**  You can't.  You can't -- first of all, you

24   cannot give the court reporter the exhibit.  You can ask to

25   approach and you may approach.

1          **MS. MATTIOLI:**  May I approach?

2          **THE COURT:**  Yes.

3          **MS. MATTIOLI:**  Thank you.

4   **Q.**   So do you see on this discipline report where it says --

5   and you are correct, your commissary will be restored on

6   April 22nd, 2024.  Do you see that?

7   **A.**   Yes.

8   **Q.**   But your phone privileges were restored on November 1st of

9   2023.

10  **A.**   Correct.  That's -- that's what I testified to before,

11  yes.

12  **Q.**   And your visiting privileges were restored.

13         I didn't hear you testify to that.

14  **A.**   Yes, I did.  That's what I said, that right after I saw

15  the attorneys, it came back on.  I don't know why.  They never

16  told me how long it was going to be.  I thought it was the same

17  as my commissary.

18         But it came back on.  So I don't know if they changed it

19  or -- it was actually about 32 days that it was off.  So I

20  don't know how it got back on.  But it came back on.  That's

21  what I testified to.

22  **Q.**   So is it your testimony that the incident report you

23  received on October 3rd imposing a disciplinary sanction of

24  30 days was somehow --

25  **A.**   I don't know.  I never get -- I don't get this.  They

1  don't tell me.  They just told me they were taking my phone, my

2  email, my -- so they don't tell me the length of time.  So I

3  didn't know at the time until it came back on.

4  **Q.**    Okay.

5  **A.**    That's what I'm saying.

6  **Q.**    I understand.

7  **A.**    Okay.

8  **Q.**    You testified that there's not currently a drug problem at

9  the camp?

10  **A.**    I'm saying there is no drugs at the camp currently that I

11  know of.

12  **Q.**    But there is a drug problem?

13  **A.**    Of course.  There is a bunch of drug addicts with no

14  treatment and no help.

15  **Q.**    You also testified that staff are bringing drugs into the

16  compound?

17  **A.**    Yes.  That's what I've been made aware of, yes.

18  **Q.**    Have you reported that?

19  **A.**    No.  I am in fear of my life.  No, I could not do that.

20  **Q.**    But you came here and testified at a public court hearing

21  about it?

22  **A.**    Because I'm not saying any details.  That's why.  Because

23  I'm not -- I'm scared.  I shouldn't --

24          **MS. MONTES:**  Objection.  Argumentative.

25          **THE COURT:**  It is not argumentative.

**BY MS. MATTIOLI:**

**Q.**  Are you aware of confidential ways to report things like that?

**A.**  No.

**Q.**  Are you aware --

**A.**  I mean, it's not --

        **THE COURT:**  Ms. Mattioli, let her finish.

        **THE WITNESS:**  It's not my place to do their job.  They are aware of it.  Let me tell you that.  They are very aware of it.  They know exactly everything that's going on.

**BY MS. MATTIOLI:**

**Q.**  By "they," who do you mean?

**A.**  I'm talking about the staff that runs Dublin.  I'm talking about my unit team.  They know who has phones.  They know who has drugs.  They know who does drugs.  They know how they come in.  They are aware of all of it and they don't stop it.

    So why would I tell them?  Just so I can be retaliated against more?

**Q.**  You just said that they know.

**A.**  They do know.  That's what I'm saying.  So for me to go and tell them anything is for me to get retaliated against more.  Because they already know.  I'm not telling them -- I'm not telling them that -- anything that inmates have not already told them.

**Q.**  You have to stop and let me ask a question.

1    **A.**   Okay.

2          **THE COURT:**  You were interrupting her.

3          **MS. MATTIOLI:**  I thought she was done speaking.

4          **THE COURT:**  She was not.

5    Ask your next question.

6    **BY MS. MATTIOLI:**

7    **Q.**   My question was are you aware of how you could report that

8    to someone outside of BOP?

9          **THE COURT:**  She's answered the question.  She doesn't

10   trust the process.  Next question.

11         **MS. MATTIOLI:**  She said she doesn't trust the people

12   in her unit or the people at BOP -- at Dublin, I meant.

13         **THE WITNESS:**  I tried that with the DOJ about this,

14   and look what happened.  Of course I don't trust the process.

15   **BY MS. MATTIOLI:**

16   **Q.**   What do you mean by DOJ?

17   **A.**   The Department of Justice.  That's who I reported this

18   incident to.  And it came right back to --

19   **Q.**   How?

20   **A.**   By email.

21   **Q.**   To what email?

22   **A.**   To the one on our inmate to staff.  It says that's how

23   we're supposed to report confidentiality -- confidentially to

24   the Department of Justice in order to avoid being punished by

25   the BOP.

1    And that did not happen for me.  I got punished badly by

2    saying something that happened to me.  So, no, I am not going

3    to do their job for them at all and be punished more.  You

4    think these officers want -- if they cover that -- this stuff

5    up for themselves, you think they're going to let other

6    officers go down for bringing in drugs?

7        **MS. MATTIOLI:**  I have no further questions.

8        **THE WITNESS:**  Absolutely.

9        **THE COURT:**  Any redirect limited to the scope of

10   cross?

11       **MS. MONTES:**  Your Honor, I just -- no more questions

12   on redirect.

13       **THE COURT:**  Okay.  Before you leave, is there anything

14   else you want to tell me while you are here?

15       **THE WITNESS:**  No, Your Honor.

16       **THE COURT:**  No?

17       **THE WITNESS:**  No.

18       **THE COURT:**  All right.  She's excused.

19       **MX. BEATY:**  Your Honor, the plaintiffs call V, is the

20   name she is going by.

21                    (Proceedings sealed.)

22                  <u>**DIRECT EXAMINATION**</u>

23   **BY MX. BEATY:**

24   **Q.**   Good afternoon.

25       Ma'am, what name would you like me to call you during the

1    hearing today?

2    **A.**    V.

3            **THE COURT:**  I cannot hear you.

4            **THE WITNESS:**  V.

5            **THE COURT:**  You need to move closer to the microphone.

6    And you can pull that microphone down.

7        All right.  Try again.

8            **THE WITNESS:**  V.

9    **BY MX. BEATY:**

10   **Q.**    Thanks, V.  And before we start, I just wanted to ask that

11   if you talk about any other incarcerated people during your

12   testimony today that you refer to them only by their first name

13   or their initial.  Okay?

14   **A.**    Correct.

15   **Q.**    So, V, where are you currently incarcerated?

16   **A.**    At the Dublin camp.

17   **Q.**    How long have you been at the Dublin camp?

18   **A.**    A year.

19   **Q.**    Have you been incarcerated at other BOP facilities?

20   **A.**    Yes, I have.

21   **Q.**    How do you feel about being in court to testify today?

22   **A.**    Scared, terrified.

23   **Q.**    What are you scared of?

24   **A.**    The retaliation.

25   **Q.**    Why did you decide to testify today?

1    **A.**    Because I want it to stop.

2    **Q.**    Since you arrived at the camp in January 2023, have you

3    personally witnessed staff sexual misconduct?

4    **A.**    Yes, I have.

5    **Q.**    And where did this staff sexual misconduct take place?

6    **A.**    At the commissary warehouse.

7    **Q.**    And how did you come to witness staff sexual misconduct in

8    the commissary warehouse?

9    **A.**    Well, I was working laundry within the warehouse

10    commissary.

11    **Q.**    Okay.  And just to clarify, what's the relationship

12    between commissary and warehouse?

13    **A.**    Well, the commissary and the warehouse, we get our

14    commissary from the warehouse.  That's where it gets delivered.

15    **Q.**    So commissary workers work alongside warehouse workers?

16    **A.**    Yes.

17    **Q.**    When did you start working in the commissary warehouse?

18    **A.**    I worked like the beginning of February.

19    **Q.**    2023.

20    **A.**    2023.

21    **Q.**    And when did you witness staff sexual misconduct in the

22    warehouse?

23    **A.**    Like about two weeks after I had already been there.

24    **Q.**    By which staff member?

25    **A.**    By Officer Celestial.

1            THE COURT:  Officer who?

2            THE WITNESS:  Celestial.

3            THE COURT:  I can't hear her.

4            THE WITNESS:  Celestial.

5            THE COURT:  Do you know how to spell that?

6            MX. BEATY:  We believe, although BOP could correct us,

7     C-E-L-E-S-T-I-A-L.

8            THE COURT:  Okay.  Thank you.

9     BY MX. BEATY:

10    Q.   What is Officer Celestial's role in the commissary

11    warehouse?

12    A.   He's one of the officers in charge.

13    Q.   Can you tell the Court what did you see Officer Celestial

14    do?

15    A.   I've seen Officer Celestial grabbing B's breasts.  They

16    were playing around, and he grabbed her.

17    Q.   And you said B?

18    A.   B.

19    Q.   Is B an incarcerated woman?

20    A.   Yes, she is.

21           THE COURT:  V as in Victor, or B as in Bonnie?

22           THE WITNESS:  B as in Bonnie.

23    BY MX. BEATY:

24    Q.   Where were you in the warehouse when you saw this?

25    A.   I was behind the tubs, the laundry.  There is like these

1    clothes that they keep in the tubs, and I was behind it mopping

2    the floor.

3    **Q.**    And where were Celestial and B?

4    **A.**    About 20 feet from where I was standing.

5    **Q.**    Did they see you?

6    **A.**    No.  They didn't know I was back there.

7    **Q.**    What, if anything, did Officer Celestial say while this

8    was happening?

9    **A.**    She kind of like said like, oh, stop.  And he was like,

10   oh, quit tripping, you know, there's no cameras back here.

11   **Q.**    To your knowledge, were there cameras in that area of the

12   warehouse at the time?

13   **A.**    I don't think so.  They are now.  But at the time, I don't

14   think it was any cameras.  I don't remember seeing any.

15   **Q.**    How did you feel after you saw Officer Celestial grope B's

16   breasts?

17   **A.**    I mean, I was scared because it had happened to me in a

18   different facility years back.  I was scared so I decided to

19   quit, quit my job.

20   **Q.**    And after you witnessed this, did you report it to any FCI

21   Dublin staff?

22   **A.**    Not at the time.

23   **Q.**    Why didn't you at the time?

24   **A.**    Because I didn't think it had anything to do with me.

25   And, you know, PREA, I didn't think that was considered PREA at

1    the time.

2    **Q.**    So when you arrived at Dublin in January 2023, do you

3    recall being provided any training about staff sexual

4    misconduct?

5    **A.**    No.

6    **Q.**    Do you recall being provided any training about PREA?

7    **A.**    I mean, they just tell you do -- they will ask you in your

8    interview do you know about PREA.  But that's all they tell

9    you.  And that they have the manual, the rule book which

10    explains a little bit more about it.  But no, other than that,

11    no.

12    **Q.**    Besides this incident with Officer Celestial, have you

13    seen warehouse workers act inappropriately on other occasions?

14    **A.**    Yes, I have.

15    **Q.**    Which warehouse workers?

16    **A.**    Just the ones -- the old ones because they don't work

17    there anymore because they did the change.

18    **Q.**    And I'm sorry.  Let me make myself clear.  BOP employees

19    in the warehouse, officers.

20    **A.**    Officers.  Well, they're still there.

21    **Q.**    Which warehouse officers have you seen engage in

22    inappropriate conduct?

23    **A.**    Narayan, Celestial, Lopez.

24    **Q.**    You mentioned Narayan.  Who is Officer Narayan?

25    **A.**    He's the supervisor there at the warehouse.

1    **Q.**    How have you seen him acting inappropriately?

2    **A.**    He just jokes around and plays around with certain

3    inmates.

4    **Q.**    Did you have a friend named Carla at the camp?

5    **A.**    Yes, I did.

6    **Q.**    What, if anything, did Carla share with you about her

7    experiences with Officer Narayan?

8    **A.**    She told us that --

9        **MS. CZIOK:**    Objection.  Hearsay.

10        **MX. BEATY:**    I'm not offering --

11        **THE COURT:**    Sustained.

12        **MX. BEATY:**    -- it for the truth of the matter.  She's

13    going to testify -- she testified that she left her job, and

14    this conversation with Carla informed her choice to leave her

15    job.  It goes to her state of mind.

16        **THE COURT:**    All right.  Set foundation first.

17    **BY MX. BEATY:**

18    **Q.**    Did the conversation you had -- did anything that Carla

19    told you -- sorry.  Strike that.

20        Did you have conversations with Carla about the warehouse

21    staff?

22    **A.**    No, never.  Not with -- not at -- not at the time.

23    **Q.**    Not while you were working there?

24    **A.**    Not while I was working there.

25    **Q.**    What about after you were working there?

1    **A.**   After she opened up and told me what was going on with

2    her --

3          **THE COURT:**  Hold on.  Hold on.  I need to take this

4    one step at a time.

5       So you didn't have conversations with Carla while you were

6    working there?

7          **THE WITNESS:**  No, because she wasn't there yet.

8          **THE COURT:**  Okay.

9          **THE WITNESS:**  She had just gotten there.  She had

10   gotten there when I quit.

11         **THE WITNESS:**  Okay.  So you already quit, and then you

12   had conversations with her?

13         **THE WITNESS:**  Yeah.  We were in the same pod.

14         **THE COURT:**  Okay.

15      The objection is sustained.

16         **MX. BEATY:**  Apologies, Your Honor.  We'll come back to

17   it.

18   **Q.**   Are you aware of a Ms. Gonzalez who works in the

19   warehouse?

20   **A.**   Yes.

21   **Q.**   What's her role?

22   **A.**   She's the supervisor, the head supervisors.  She's -- knew

23   Narayan's and Celestial and Lopez's boss.

24         **THE COURT:**  I am not hearing properly the name.  Is it

25   Ryan?

1          THE WITNESS:  Narayan.

2          THE COURT:  Do you know how to spell it?

3          THE WITNESS:  I think it's N-A-Y-A-N -- no.

4    N-A-R-A-Y-A-N.

5          MX. BEATY:  And we aren't sure on the spelling,

6    Your Honor.  Apologies.

7          THE COURT:  Thank you.

8          THE WITNESS:  You're welcome.

9    BY MX. BEATY:

10   Q.   What, if anything, have you heard warehouse officers say

11   about their boss, Ms. Gonzalez?

12         MS. CZIOK:  Objection, hearsay.

13         MX. BEATY:  Admission of a party opponent.  I'm asking

14   if she has heard the warehouse officers speak to her about

15   their boss.

16         THE COURT:  That is -- that is not a party admission.

17   All employees of a company are not parties.  It's pretty

18   fundamental evidentiary rules.  So they have to be managing

19   directors.

20         MX. BEATY:  Okay.

21         THE COURT:  Unless they're a defendant, and I don't

22   see that name.

23         MX. BEATY:  Sure, Your Honor.

24   Q.   Have you ever heard the phrase "what happens in the

25   warehouse stays in the warehouse"?

1    **A.**    Yes.

2    **Q.**    Who have you heard that from?

3            **MS. CZIOK:**  Objection.  Hearsay.

4            **THE COURT:**  Sustained.  And leading.

5    **BY MX. BEATY:**

6    **Q.**    What does the phrase "sexualized environment" mean to you?

7    **A.**    I don't understand that question.

8    **Q.**    If someone said this is a sexualized environment, what do

9    you think that would mean?

10           **THE COURT:**  Counsel, you've got to use words and ask

11   her questions so that I can hear from her.

12           **MX. BEATY:**  Apologies, Your Honor.

13           **THE COURT:**  Not legalese that you've created.

14           **MX. BEATY:**  Apologies, Your Honor.

15   **Q.**    Are you aware of an Officer Lopez who works in commissary?

16   **A.**    Yes.

17   **Q.**    Who is Officer Lopez?

18   **A.**    She's my boss now.

19   **Q.**    And have you witnessed Officer Lopez interact with

20   Officers Narayan and Celestial?

21   **A.**    Yes.

22   **Q.**    And in your experience, what's the relationship between

23   Officer Lopez and Officers Narayan and Celestial?

24           **MS. CZIOK:**  Objection.  Calls for speculation,

25   foundation.

1            **THE COURT:**  Okay.

2        How often do you work at commissary?

3            **THE WITNESS:**  Monday through Friday.

4            **THE COURT:**  Monday through Friday.  What are your

5    hours?

6            **THE WITNESS:**  From like 6:45 -- 6:45 to like 2:30.

7            **THE COURT:**  And when you're there, how many

8    supervisors do you have?

9            **THE WITNESS:**  Well, sometimes it's two or three.  It

10   just depends.

11           **THE COURT:**  Okay.  And what are your primary duties?

12           **THE WITNESS:**  I am the number one there so I do the

13   pulls for the whole camp.  And --

14           **THE COURT:**  The what for the whole camp?

15           **THE WITNESS:**  The pull for the whole commissary.  Like

16   what we're selling in commissary that week.  So whatever we

17   need, I go to the warehouse and I pull whatever I need to sell

18   at the camp.

19           **THE COURT:**  I take it people, like, do orders in

20   advance and you're supposed to pull those?  How does that work?

21           **THE WITNESS:**  Well, we pretty much keep the store

22   stocked.  And I have to make sure that we don't run out of

23   stuff while we're shopping.  So we go two days before and start

24   pulling stuff to take it to the -- to the camp.

25           **THE COURT:**  So you're stocking the camp from --

```
1    from --

2              THE WITNESS:  From the warehouse.

3              THE COURT:  From the FCI --

4              THE WITNESS:  From the warehouse.

5              THE COURT:  And the warehouse is at the correctional

6    facility?

7              THE WITNESS:  That's outside the FCI.  So the

8    warehouse also supplies the FCI.

9              THE COURT:  But you're going to that warehouse?

10             THE WITNESS:  I'm going -- I'm walking to that

11   warehouse, yes.

12             THE COURT:  And you've got BOP folks with you?

13             THE WITNESS:  It's just us inmates in the morning.  We

14   walk from the camp to the warehouse.

15             THE COURT:  So do you ever see the -- have you seen

16   any inappropriate action by BOP facilities -- I mean,

17   personnel?

18             THE WITNESS:  Yes.

19             THE COURT:  Okay.  Generally speaking, what do you

20   see?

21             THE WITNESS:  Like the way they treat certain inmates,

22   they play around, you know, the way they talk to them.

23             THE COURT:  Anything else?

24             THE WITNESS:  No.

25             THE COURT:  And when you say that, who do you have in
```

1    your mind?

2             **THE WITNESS:**  Celestial.

3             **THE COURT:**  Okay.

4             **THE WITNESS:**  Narayan.

5             **THE COURT:**  Okay.  And do you see Gonzalez do that?

6             **THE WITNESS:**  No.  Actually, Gonzalez is -- I mean,

7    she's the one that makes me feel safe.

8             **THE COURT:**  Okay.  When you've seen the other two, are

9    they men?

10            **THE WITNESS:**  Yes, they are.

11            **THE COURT:**  When you've seen them act or play around,

12   as you say it, inappropriately, is it aggressive or is it

13   sexual?

14            **THE WITNESS:**  Sexual.

15            **THE COURT:**  With respect to Celestial, how many times?

16   Can you estimate how many --

17            **THE WITNESS:**  I've only seen that one time.

18            **THE COURT:**  One time.  And how about with Narayan?

19            **THE WITNESS:**  I didn't see it.  My friend told me

20   about it.

21            **THE COURT:**  Okay.  So you have no personal knowledge

22   of --

23            **THE WITNESS:**  No, I have no personal knowledge of

24   that.  I didn't see it with my eyes.  I just heard of it.

25            **THE COURT:**  Okay.  So now tell me about the one time

1    that you saw.

2                **THE WITNESS:**  I seen -- I seen Officer Celestial

3    playing with B.

4                **THE COURT:**  Is this the one where you were mopping?

5                **THE WITNESS:**  Yes.

6                **THE COURT:**  Okay.

7         Now back to you.

8                **MX. BEATY:**  Thank you, Your Honor.

9    **Q.**   I want to go back to Officer Lopez.  You said Officer

10   Lopez is another commissary supervisor?

11   **A.**   Yes, that is correct.

12   **Q.**   And you work regularly with Officer Lopez?

13   **A.**   Yes.

14   **Q.**   Where do you work with her?

15   **A.**   At the store and at the warehouse.

16   **Q.**   And have you witnessed misconduct by Officer Lopez at the

17   store or in the warehouse?

18   **A.**   Yes.  At the -- at the laundry, yeah.  Because we dress

19   out the girls, so we also have a part in that.

20   **Q.**   What did you witness Officer Lopez do in the laundry?

21   **A.**   Well, she -- somebody had came and told her that Carla was

22   looking in the bin.  And she told us that she was going to wait

23   to see the cameras so that she can catch her so she can send

24   her back to the SHU.

25   **Q.**   Send Carla back to the SHU?

**A.**    Send Carla back to the SHU.

        **THE COURT:**  Okay.  And I -- so Lopez is a supervisor?

        **THE WITNESS:**  Yeah.  She's my boss.

        **THE COURT:**  And she was watching the video of an inmate and someone else?

        **THE WITNESS:**  So Carla is an inmate at the camp.

        **THE COURT:**  Yeah.

        **THE WITNESS:**  She had went to the SHU and came back. So my job is also to dress the girls that come out of the SHU and the new inmates that come to the -- to the camp.  We dress them out, give them their clothes and everything that they need.

    So Carla was going to come get her clothes.  But another inmate came and told Lopez, oh, she's in the laundry bin getting stuff.  So she was like that's all right, just leave her there because I'm going to make sure I catch her so I can send her back to the SHU.

        **THE COURT:**  She was in the laundry room doing what?

        **THE WITNESS:**  Dressing out some girls.

        **THE COURT:**  I'm sorry.  I'm having a hard time hearing you.  Dressing out --

        **THE WITNESS:**  Dressing up some girls.  We were dressing them out.  We were giving their -- issuing their new clothes.

        **THE COURT:**  Okay.  And what's wrong with that?

1          **THE WITNESS:**  Somebody came and told her that.  So

2     there's a bin outside the laundry where when the girls --

3     whenever the girls get released, they throw their clothes in

4     those bins.

5          **THE COURT:**  Okay.

6          **THE WITNESS:**  Because they're getting ready to leave.

7     So Carla, I guess, was in there.  We're not supposed to go in

8     there to get extra clothes because it's considered contraband.

9          **THE COURT:**  Okay.  So that was the issue.

10         **THE WITNESS:**  So that was the issue.

11         But she said I'm not going to check the cameras right now.

12    I'm going to wait a couple of days, and then I'm going to check

13    it, but I'm going to put her back in the SHU.

14         **THE COURT:**  And Lopez told you that?

15         **THE WITNESS:**  Told us -- all of us that.  It was me

16    and three -- and four other girls that work for commissary.

17         **THE COURT:**  Okay.  Go ahead.

18    **BY MX. BEATY:**

19    **Q.**   Have you worked in the commissary warehouse the whole time

20    you've been at the camp?

21    **A.**   No.

22    **Q.**   Where else have you worked?

23    **A.**   I've worked in recreation and as a unit orderly.

24    **Q.**   You said you started in the commissary warehouse in

25    February?

1    **A.**    In February.

2    **Q.**    For how long did you work there?

3    **A.**    For like six weeks.

4    **Q.**    And then you went to...?

5    **A.**    Unit orderly.

6    **Q.**    Did you request to leave your job in commissary or did

7    Dublin assign you that new job?

8    **A.**    No.  I requested to leave the warehouse to go to unit

9    orderly.

10   **Q.**    When did you request to leave your job?

11   **A.**    I think it was like the end of March, beginning of April.

12   **Q.**    Why?

13   **A.**    After I seen that, I was uncomfortable.  I just didn't

14   want to work there anymore.

15   **Q.**    When you say that, what are you referring to?

16   **A.**    What I witnessed with Celestial and B.

17   **Q.**    So you worked in orderly next?

18   **A.**    Yes.  I worked in orderly next.

19   **Q.**    Did you like that job?

20   **A.**    It was okay.

21   **Q.**    What did you like about it?

22   **A.**    That I was inside the camp and I didn't have to deal with

23   any officers.  I just went out, did my job, and went about my

24   day.

25   **Q.**    And where do you work now?

1    **A.**    Right now I work in commissary store.

2    **Q.**    And when did you come back to the commissary warehouse

3    department?

4    **A.**    When Agostini made all the changes in November 15th.

5    **Q.**    And how did you feel when you learned you were going to be

6    transferred back to commissary warehouse?

7    **A.**    I was not happy about it.

8    **Q.**    When you were transferred back, who became your

9    supervisor?

10    **A.**    Celestial and Narayan and Lopez.  I was back where I had

11    left.

12    **Q.**    Did you tell any of those officers you didn't want to work

13    in commissary?

14    **A.**    I did tell Officer Lopez that I didn't want to be there.

15    **Q.**    Did you explain why you didn't want to be there?

16    **A.**    Yes, I did.  I told her that I didn't want to be there

17    because I didn't want to be left alone with none of the

18    officers, the male officers there.  And she said why.

19         I told her that I had past trauma and that it scares me.

20         She said why are you telling me this?

21         I said because I don't want to work there.

22         And she said, oh, you'll be fine.

23    **Q.**    Besides Officer Lopez, did you tell any other BOP staff

24    that you did not want to go back to work at commissary?

25    **A.**    I did.  I told Agostini.

1    **Q.**    When did you tell Ms. Agostini?

2    **A.**    I think I had already been there like three or four days.

3    **Q.**    What did you tell her?

4    **A.**    I told her that I didn't want -- I didn't feel comfortable

5    working there.

6    **Q.**    What, if anything, did Ms. Agostini do to help you work

7    somewhere else?

8    **A.**    Nothing.  She told me that I was stuck there.

9    **Q.**    Did you ever file a complaint about what you witnessed in

10    the commissary warehouse?

11    **A.**    I did.

12    **Q.**    And when did you do that?

13    **A.**    When -- after they did the change.

14    **Q.**    So November 2023?

15    **A.**    Uh-huh.

16    **Q.**    And what was that complaint about?

17    **A.**    About what I had seen and how I felt.

18    **Q.**    What you had seen in the commissary warehouse?

19    **A.**    Commissary warehouse with Celestial and B.

20    **Q.**    And who did you submit that grievance to?

21    **A.**    To Putnam and Mr. B.

22    **Q.**    When did you submit it?

23    **A.**    Around November.  Like the last week of November.

24    **Q.**    And after you submitted it, did you talk to Mr. Putnam or

25    Mr. B?

1    **A.**    Yes, I did.

2    **Q.**    Were you interviewed by them?

3    **A.**    Yes, I was.

4    **Q.**    More than once?

5    **A.**    More than once.

6    **Q.**    What, if anything, did you tell them in those interviews?

7    **A.**    I mean, I told them that I was scared because I'm working

8    with the people I reported.  And he told me that I was not the

9    first one --

10            **MS. CZIOK:**  Objection.  Hearsay.

11            **THE COURT:**  I'll -- I'll sustain it unless there's

12    something specific --

13            **MX. BEATY:**  Excuse me.  Lieutenant Putnam is an

14    individual defendant, Your Honor.

15            **THE COURT:**  All right.  Overruled.

16    **BY MX. BEATY:**

17    **Q.**    What, if anything, did Lieutenant Putnam say to you?

18    **A.**    He told me that I was not the first one that had reported

19    an incident and that it was a tangled web that they needed to

20    untangle.

21    **Q.**    And after those interviews in November 2023, did SIS help

22    you change your job?

23    **A.**    No.  I'm still there.

24    **Q.**    Since you spoke with SIS, have you received an appointment

25    with psych services?

1    **A.**    No.

2    **Q.**    Have you been interviewed by any outside law enforcement

3    agencies?

4    **A.**    No.

5    **Q.**    Do you still work with Officer Celestial?

6    **A.**    Yes, I do.

7    **Q.**    Officer Narayan?

8    **A.**    Yes.

9    **Q.**    Officer Lopez?

10    **A.**    Yes.

11    **Q.**    How do you feel about returning to your job after this

12    hearing?

13    **A.**    I'm scared.

14    **Q.**    Why?

15    **A.**    Retaliation.

16    **Q.**    What, if anything, has Officer Lopez said to you about

17    this hearing?

18    **A.**    Well, yesterday she --

19            **MS. CZIOK:**  Objection.  Hearsay.

20            **MX. BEATY:**  I'm not offering it for the truth of the

21    matter.  I'm offering it for the impact on V.

22            **THE COURT:**  All right.  I will allow it for that

23    limited purpose.

24        You can tell me.

25            **THE WITNESS:**  She said that she knew that Carla was

1    here to snitch her out.

2           **THE COURT:**  She knew that Carla -- well, that -- I

3    don't see how that is --

4           **MX. BEATY:**  I can move on, Your Honor.

5           **THE COURT:**  All right.

6           **MX. BEATY:**  I'm trying to be conscious of time.  I can

7    move on.

8           **THE COURT:**  That's stricken.

9       You're not required to work, are you?

10          **THE WITNESS:**  Yes.  We are required to work.  We have

11   to keep a job.

12          **THE COURT:**  Okay.

13   **BY MX. BEATY:**

14   **Q.**  V, do you have any mental health conditions?

15          **THE COURT:**  Do you have any what?

16   **BY MX. BEATY:**

17   **Q.**  Mental health conditions?

18   **A.**  I mean, I got PTSD and depression.

19   **Q.**  Do you have any medical conditions?

20   **A.**  Just my thyroid, and I'm supposed to be having a

21   hysterectomy.

22   **Q.**  When you say you're supposed to be having a hysterectomy?

23   **A.**  I've been waiting for three years on a hysterectomy.

24   **Q.**  Since you got to Dublin?

25   **A.**  Yes.

**Q.**   Do you feel you've received adequate mental and medical healthcare for those conditions?

**A.**   No.

      THE COURT:   You said you came to this facility just about a year ago?

      THE WITNESS:   A year ago.

      THE COURT:   And the facility you were in before that was what?

      THE WITNESS:   I was at a detention center in El Dorado, Kansas.

      THE COURT:   Were you receiving counseling there?

      THE WITNESS:   No.

      THE COURT:   What about -- was the hysterectomy need identified there?

      THE WITNESS:   Yes.

      THE COURT:   And they obviously didn't do it there either?

      THE WITNESS:   Because at the time, I was waiting to be sentenced.  And they kept waiting for the marshals to approve it.  And then by the time it got approved, then they moved me to a different jail.  And then I had to start all over again.

    And then I got here.  So they just been moving me throughout the time.  So then I got here last year.  And I had been putting all these sick calls and been getting sick, and they haven't done a thing.

1          **THE COURT:**  Okay.  Go ahead.

2     **BY MX. BEATY:**

3     **Q.**   What symptoms have you been experiencing for which you've

4     been putting in these sick calls?

5     **A.**   Like anxiety, panic attacks, just dizziness from all the

6     bleeding that I've been having, and just really bad depression.

7     **Q.**   Do you feel safe at FCI Dublin?

8     **A.**   No, I do not.

9          **MX. BEATY:**  No further questions, Your Honor.

10         **THE COURT:**  When did you arrive?

11         **THE WITNESS:**  Last year, January 5th.

12         **THE COURT:**  So January 5th of 2023?

13         **THE WITNESS:**  That's correct.

14         **THE COURT:**  Gonzalez, you said, made you feel safe?

15         **THE WITNESS:**  Yes.

16         **THE COURT:**  Are there others at Dublin that make you

17    feel safe?

18         **THE WITNESS:**  Just her.  Just her at my job, yeah.

19    And when I was working at reg, my bosses there made me feel

20    safe, too.  I was okay in reg until they moved me back to the

21    warehouse.

22         **THE COURT:**  Cross.

23         **MS. CZIOK:**  No cross, Your Honor.

24         **THE COURT:**  Anything else?

25         **MX. BEATY:**  No, Your Honor.

1      **THE COURT:**  Okay.  Is there anything else you want to

2  tell me while you're here?

3      **THE WITNESS:**  That I'm scared to go back.  I'm scared

4  to go back.

5      **THE COURT:**  Well, you have to go back.  And I'm seeing

6  what I can do.  All right?

7      **THE WITNESS:**  Okay.  Thank you.

8      **THE COURT:**  All right.  Next witness.

9      **MS. JANSSEN:**  We call JM.

10      **THE COURT:**  While we are waiting for that person,

11  Mr. France, come on up.  I have a piece of paper with the

12  names.  I'll hand a copy to plaintiffs' counsel.    .

13                    (Proceedings sealed.)

14                  **DIRECT EXAMINATION**

15  **BY MS. JANSSEN:**

16  **Q.**   Good afternoon.  Would you prefer that I refer to you by

17  your initials or your first name?

18  **A.**   Initial.

19  **Q.**   Initials.  And if in answering any of my questions it

20  involves another incarcerated person, please remember to use

21  either their initials or you can just refer to them as "another

22  incarcerated person," but please do not use their names.

23  **A.**   Okay.

24  **Q.**   Are you currently incarcerated?

25  **A.**   Yes, ma'am.

1   **Q.**   Where are you currently incarcerated?

2   **A.**   FCI Dublin.

3   **Q.**   When did you first arrive at FCI Dublin?

4   **A.**   2018.

5   **Q.**   And are you incarcerated at the FCI prison or the camp

6   facility?

7   **A.**   Prison.

8   **Q.**   And have you been at the prison the whole time?

9   **A.**   Yes, ma'am.

10          **THE COURT:**   Have you been at another facility before

11   this one?

12          **THE WITNESS:**   No, ma'am.

13   **BY MS. JANSSEN:**

14   **Q.**   Did you process into Dublin through any other facilities?

15   **A.**   No.   I just was at Pahrump.

16   **Q.**   Have you experienced a sexual assault while at FCI Dublin?

17   **A.**   Yes, ma'am.

18   **Q.**   Who was the staff person involved?

19   **A.**   Cowan.

20   **Q.**   What was Mr. Cowan's job at the facility?

21   **A.**   Pharmacy nurse.

22   **Q.**   And before the incident, which we'll get to in a minute,

23   had you seen him around the facility?

24   **A.**   Yes, ma'am.

25   **Q.**   In what context?

1    **A.**    At the medical for pill line.

2    **Q.**    Was he handing out pills?

3    **A.**    Yes, ma'am.

4    **Q.**    So when did the incident occur with Mr. Cowan?

5    **A.**    This was like fall of '21.

6    **Q.**    And where in the facility did this happen?

7    **A.**    In the medical, in the back.

8    **Q.**    And I'm just going to go kind of step by step through

9    this.

10        So --

11            **THE COURT:**  And counsel should recall, I do have her

12    declaration at docket 10-4.

13            **MS. JANSSEN:**  Yes.

14    **Q.**    So were you -- how did you end up in medical on that day?

15    **A.**    He came and picked me up from the unit, Saturday.

16    **Q.**    And was that odd to you?

17    **A.**    Yes.

18    **Q.**    Okay.  And what happened, if you can kind of briefly

19    summarize the issue.  As the Court noted, we do have your

20    declaration already in evidence.  But if you could just briefly

21    go over what happened on this day with Mr. Cowan.

22    **A.**    He came and picked me up from the unit, took me back to

23    medical and said that he was doing an EKG on me, and told me

24    that I would have to remove my shirt and my bra so he could do

25    the EKG on me.

1      Once he removed -- once I removed my shirt and my bra, he

2   told me to lay down.  I laid down on the bed that was back

3   there.  He then lifted my breasts.  Once he lifted my breasts,

4   he stuck like this sticky little patches on my breasts.  Once

5   he stuck a sticky patch on my breast, he removed the patch off

6   my breast and like fondled my breast and stuck it like further

7   over to the side.

8   **Q.**   And how long did this go on for?

9   **A.**   For about -- I stayed in there for about 20, 25 minutes.

10  **Q.**   And did he ever explain to you why he was doing this?

11  **A.**   No, ma'am.

12  **Q.**   Did you ever get any results from this EKG?

13  **A.**   No, ma'am.

14  **Q.**   Had you ever had an EKG before?

15  **A.**   Yes.

16  **Q.**   And where was that?  Was that at Dublin or someplace else?

17  **A.**   No.  It was at a hospital.

18  **Q.**   And was there any differences in how that EKG was done

19  compared to this one?

20  **A.**   Yes.

21  **Q.**   In what manner were they different?

22  **A.**   The -- they didn't fondle my breasts.  They just stuck the

23  little sticky things to my side, to my chest, to my, like,

24  side, stomach area.  They never went to my breasts area.

25  **Q.**   Have you had any other encounters -- actually, I'll get

1    back to that in just a moment.

2          Did you report what happened with Mr. Cowan?

3    **A.**    No, ma'am.

4    **Q.**    And why not?

5    **A.**    I was afraid.

6    **Q.**    At the time of that incident, did you know how to report?

7    **A.**    No, ma'am.

8    **Q.**    But if you had known how to report, would you have?

9    **A.**    No.  I wasn't comfortable saying anything about it.

10   **Q.**    What were you afraid of?

11   **A.**    I was going to get in trouble.

12   **Q.**    Do you recall -- have you met with attorneys since you

13   have been at FCI Dublin?

14   **A.**    Yes, ma'am.

15   **Q.**    Do you recall when you began meeting with attorneys at FCI

16   Dublin?

17   **A.**    Oh, no.

18   **Q.**    Approximately.

19   **A.**    Like -- like in 20 -- this was like in '22 I started

20   meeting with attorneys.

21   **Q.**    And --

22          **THE COURT:**  Your own attorney or prosecutors?

23          **THE WITNESS:**  No.  I met with my own attorney.

24          **THE COURT:**  Okay.  In 2022?

25          **THE WITNESS:**  Yes, ma'am.

1          **THE COURT:**  Is Cowan still there?

2          **THE WITNESS:**  No, ma'am.

3    **BY MS. JANSSEN:**

4    **Q.**   When you first started meeting with legal counsel -- let

5    me back up.

6          To your knowledge, is staff at FCI Dublin aware when you

7    meet with legal counsel?

8    **A.**   Yes, ma'am.

9    **Q.**   How do you know that?

10   **A.**   Because they put us on a call-out or they call us out over

11   the intercom and let us know that we need to meet at the

12   visiting room.

13   **Q.**   And --

14         **THE COURT:**  Is the call-out different if it's just

15   like family versus lawyers?

16         **THE WITNESS:**  No, ma'am.  They don't put us on

17   call-out when we get visits from our family.

18         **THE COURT:**  How do you know to go to the visitor room?

19         **THE WITNESS:**  They call us over the loudspeaker.

20         **THE COURT:**  To go to the visitor room?

21         **THE WITNESS:**  Yes, ma'am.

22         **THE COURT:**  And call-out is done when?

23         **THE WITNESS:**  The night before.

24         **THE COURT:**  I see.

25   / / /

**BY MS. JANSSEN:**

**Q.**    When you first started meeting with legal counsel, did you experience anything that you felt was retaliation in those first few meetings?

**A.**    Yes, ma'am.

**Q.**    What happened?  Or what are you referring to?

**A.**    I went to the SHU.

**Q.**    Can you explain to the Court how you ended up in the SHU and what happened?

**A.**    Well, I -- I -- the officer came.  He searched my room. When he searched my room, they had two officers to come pick me up.  They picked me up.  They took me to the lieutenant office. Once they took me to the lieutenant office, it was one lieutenant talking, and he said that he's going to put me in the SHU pending an investigation until further notice.  So I would be housed in Special Housing until the investigation is over.

**Q.**    Did -- did staff explain to you why they were putting you in the SHU?

**A.**    Because he said that no way that I could have ended up with a stereo like that unless a staff member gave it to me or it was brung in from a staff for me to even receive or have anything like that.

**Q.**    And where did you get that stereo?

**A.**    From the visiting room where I worked at.

1    **Q.**    And --

2            **THE COURT:**  A stereo or a cereal?

3            **THE WITNESS:**  No.  Stereo.  A stereo like a boombox.

4            **THE COURT:**  Okay.  Go ahead.

5    **BY MS. JANSSEN:**

6    **Q.**    And this was -- was this shortly after you had met with

7    legal counsel?

8    **A.**    Yes, ma'am.

9    **Q.**    And how long had that stereo been in visiting?

10   **A.**    It had been there for a long time.  When I started working

11   there, it was there.

12   **Q.**    How long had you had it in your room prior to this?

13   **A.**    Months.

14           **THE COURT:**  Why did -- why did you have it in your

15   room?

16           **THE WITNESS:**  When I come back from visiting, I used

17   to take the supplies and all the stuff that I had at visiting

18   back to the room with me because the storage closet that they

19   had our stuff in never -- they didn't never lock it.

20       So when we come back to work to visiting, we be missing

21   our stuff, like our supplies and all our stuff would be missing

22   out of the closet.

23           **THE COURT:**  Okay.  So was it yours or not?

24           **THE WITNESS:**  Was the stereo?

25           **THE COURT:**  Was the stereo yours or not?

1          **THE WITNESS:**  No.  It was -- well, it was in the

2     visiting -- it wasn't mine.  It was in visiting.

3          **THE COURT:**  So I'm not sure then -- I don't understand

4     why it was in your room if it was supposed to be in visiting.

5          **THE WITNESS:**  Well, it was left in visiting.  It was

6     always left in visiting.  But when I take the supplies back,

7     because I only work visiting Friday, Saturday, Sunday.  So on

8     the rest of the days when I go back on that Sunday, I take

9     everything back with me.

10         So when we go to visiting, that's the stereo we would

11    listen to while we was in visiting.  It only was me and another

12    inmate working in there.

13         **THE COURT:**  Okay.  Go ahead.

14    **BY MS. JANSSEN:**

15    **Q.**   And the -- when they give you these disciplinary reports,

16    my understanding is that there is a series number attached to

17    those; is that correct?

18    **A.**   Yes, ma'am.

19    **Q.**   Do you recall what the series number was for this incident

20    report?

21    **A.**   A 305.

22    **Q.**   Is that something that would normally get you sent to the

23    SHU?

24    **A.**   No.

25    **Q.**   And how long were you in the SHU for?

1    **A.**   Like 15 days.

2    **Q.**   And did your -- did that impact your mental health?

3    **A.**   Yes.

4    **Q.**   Did you become -- in what ways did that impact your mental

5    health?

6    **A.**   I kind of was having thoughts of hurting myself.

7    **Q.**   Were you put on suicide watch?

8    **A.**   Yes.

9    **Q.**   When you were put on suicide watch, did that involve

10   moving you between any locations?

11   **A.**   Yeah.  They took me to a room.

12   **Q.**   And did they have to -- when they moved you, what were you

13   wearing?

14   **A.**   A smock.

15   **Q.**   Were there any -- can you describe to the Court what that

16   means when you're wearing a smock?

17   **A.**   It was like a strap up, like a strap up thing that just

18   strap up around me like that go like a little bit below my

19   behind.

20   **Q.**   Were you able to wear anything underneath?

21   **A.**   No.

22            **THE COURT:**  Like when you go to a doctor's office?

23            **THE WITNESS:**  Yeah.  But it was like a heavy -- like a

24   heavy vest.  It was like a vest.

25            **THE COURT:**  Okay.

BY MS. JANSSEN:

**Q.**   And when they were having you moved between locations in the smock, were you in view of other people?

**A.**   Yeah.  They walked me across the compound.

**Q.**   And after -- did they offer you any mental health services?

**A.**   No.

**Q.**   When you came off suicide watch, did they offer you any mental health services?

**A.**   No.

            THE COURT:  When was this?

            THE WITNESS:  When I was in the SHU.

            THE COURT:  No.  But do you know when?

            THE WITNESS:  October of '22.

BY MS. JANSSEN:

**Q.**   Have you tried to access mental health services at FCI Dublin?

**A.**   I done been there before.

**Q.**   What do you mean by that, when you say --

**A.**   Well, I been to the mental health before over at the facility.  But I just don't go back.  I'm just not comfortable. I'd rather deal with it myself.

**Q.**   Why aren't you comfortable speaking to mental health?

**A.**   Because I just feel that I didn't want everybody to know what's going on with me.

1          **THE COURT:**  Have you ever had -- have you ever had

2    mental health treatment?

3          **THE WITNESS:**  Yes, ma'am.

4          **THE COURT:**  But even if they offered it, you wouldn't

5    accept it?

6          **THE WITNESS:**  From the outside, yes.

7          **THE COURT:**  Well, there's Tri-Valley.  Have you tried

8    to get in with them?

9          **THE WITNESS:**  Yeah.  They say we have to sign up and

10   wait on a waiting list.

11         **THE COURT:**  And are you on the waiting list?

12         **THE WITNESS:**  No, ma'am.  They said we would be able

13   to call them.  But we don't have the -- the assistance from the

14   phone.

15         **THE COURT:**  Okay.

16      Continue.

17   **BY MS. JANSSEN:**

18   **Q.**   Have you been -- have you felt retaliated against in any

19   other way for participating in this lawsuit in any way?

20   **A.**   Yes, ma'am.

21         **MS. CZIOK:**  Objection.  Leading.

22         **THE COURT:**  Overruled.

23   **BY MS. JANSSEN:**

24   **Q.**   In what way?  Or what happened that made you feel

25   retaliated against?

1    **A.**    Because I got -- I been getting shots.

2    **Q.**    And prior to August 16th, did you have a job in the

3    facility?

4    **A.**    Yes, ma'am.

5    **Q.**    And what was that job?

6    **A.**    Visiting orderly and unit orderly.

7    **Q.**    And do you still have that job?

8    **A.**    No, ma'am.

9    **Q.**    And when -- when did you lose that job?

10   **A.**    They took the job from me from going to see -- get the

11   legal visits.  Because I was going to talk to the attorneys at

12   the legal visit, and all of a sudden, they told me I couldn't

13   work over there no more.

14   **Q.**    Did they explain why?

15   **A.**    No.  I asked the lieutenant why.  And she said I have to

16   take that up with SIS.  And I emailed SIS, and they never

17   responded back to me.

18        **THE COURT:**  Do you have an individual lawsuit?  The

19   lawsuit that we're dealing with today is not an individual

20   lawsuit.  Do you have your own lawsuit?

21        **MS. JANSSEN:**  So JM is a named plaintiff in this

22   lawsuit.

23        **THE COURT:**  Okay.  I'm asking whether she has an

24   individual lawsuit.

25        Do you know?

          **MS. JANSSEN:**  Only through -- through this lawsuit,

not separate from this, beyond, I believe, compassionate

release.

          **THE COURT:**  And when was the original complaint filed?

          **MS. JANSSEN:**  In this matter, August 16th.

          **THE COURT:**  Okay.  Go ahead.

**BY MS. JANSSEN:**

**Q.**   This may sound odd, but in recent visits in December, have

you -- have you gone to a legal visit recently?

**A.**   Yes.

**Q.**   Was that -- when was that?

**A.**   I just had one last week.

**Q.**   And this may sound odd, but during those visits, did you

have to use the restroom?

**A.**   Yes.

**Q.**   What happened when you went to go use the restroom?

**A.**   They took us to the restroom and stood there and watched

us while we go.

**Q.**   Had they done that at any time prior to this?

**A.**   No.

          **THE COURT:**  How many times have you met with legal

counsel before that time?

          **THE WITNESS:**  A lot.

          **THE COURT:**  And did you go to the bathroom any of

those times?

1          **THE WITNESS:**  Yes, ma'am.

2          **THE COURT:**  And that didn't happen?

3          **THE WITNESS:**  No, ma'am.

4  **BY MS. JANSSEN:**

5  **Q.**  Do you feel you will be retaliated against after

6  testifying here today?

7  **A.**  I hope not.

8  **Q.**  I hope not as well.

9     Do you feel safe at FCI Dublin?

10  **A.**  No, not really.  I just stay in my room now.

11          **THE COURT:**  I just what?

12          **THE WITNESS:**  I stay in my room.

13          **THE COURT:**  There's some water there for you, if that

14  will help.

15          **MS. JANSSEN:**  I have no further questions.  Thank you.

16          **THE COURT:**  I've read your declaration about what

17  happened to you.  Has anything happened to you since the most

18  current associate warden -- well, has anything happened to you

19  like that this fall?

20          **THE WITNESS:**  No, ma'am.

21          **THE COURT:**  Okay.  Is there anyone there who you

22  trust?

23          **THE WITNESS:**  Well, I talk to Ms. Miner.  I talk to

24  Ms. Miner.

25          **THE COURT:**  We're not getting that.  Take a deep

1    breath.  And when you're ready, try to say what you're going to

2    say a little more clearly.

3              **THE WITNESS:**  Okay.  I talk to Ms. Miner.

4              **THE COURT:**  You talk to your --

5              **THE WITNESS:**  Ms. Miner, the counselor.

6              **THE COURT:**  Ms. Meyer?

7              **THE WITNESS:**  Yes, ma'am.

8              **THE COURT:**  So you trust Ms. Meyer?

9              **THE WITNESS:**  Yes, ma'am.

10             **THE COURT:**  Anybody else?

11             **THE WITNESS:**  No.

12             **THE COURT:**  Is there -- and Ms. Meyer is your

13   counselor?

14             **THE WITNESS:**  Well, she is AB counselor.

15             **THE COURT:**  She's what kind of counselor?

16             **THE WITNESS:**  She's for unit AB counselor.

17             **THE COURT:**  Okay.  So she works for BOP?

18             **THE WITNESS:**  Yes, ma'am.

19             **THE COURT:**  Okay.  Do you believe that there's a -- or

20   have you observed any drug problem right now at Dublin?

21             **THE WITNESS:**  You said who?

22             **THE COURT:**  Drug problem at Dublin?  Is there one?

23             **THE WITNESS:**  Yeah.

24             **THE COURT:**  What makes you tell me that there's a drug

25   problem?  What have you observed?

1          **THE WITNESS:**  Because they take -- they say they been

2     taking them to the SHU because the people -- well, we -- they

3     punish us because they say that people get in trouble.  So I

4     guess they want to cut our commissary to $20 -- I don't know if

5     it was supposed to be for a week or a month.  Because they

6     was -- too many people was getting in trouble for using drugs.

7     But they was putting them in the SHU.

8          **THE COURT:**  And is it -- is that your sense, that

9     there are a lot of people using drugs there?

10          **THE WITNESS:**  Well, I see people, yeah.

11          **THE COURT:**  What kind of drugs are you seeing?

12          **THE WITNESS:**  I don't know what kind of drugs they

13     using, but I know they said they had a big old problem with

14     them of using drugs.

15          **THE COURT:**  And are you observing people that you

16     think are under the influence?

17          **THE WITNESS:**  No.  I never, like, physically, like,

18     seen myself of them using.

19          **THE COURT:**  All right.

20       Cross.

21       So the attorneys from the other side are going to ask you

22     some questions.  All right?

23          **THE WITNESS:**  Okay.

24     / / /

25     / / /

1              <u>**CROSS-EXAMINATION**</u>

2    **BY MS. CZIOK:**

3    **Q.**    Good afternoon.

4    **A.**    Good afternoon.

5    **Q.**    My name is Abbie Cziok.  I'm an attorney for the

6    United States.  I just have a couple questions for you here.

7         You filed an administrative tort claim; isn't that right?

8    **A.**    Yes, ma'am.

9    **Q.**    And that is based on the incident with Nurse Cohen?

10   **A.**    Yes, ma'am.

11   **Q.**    That occurred in 2021; is that right?

12   **A.**    Yes, ma'am.

13   **Q.**    Thank you.  No further questions.

14        **THE COURT:**  Anything related to that question?

15        **MS. JANSSEN:**  Nothing further.

16        **THE COURT:**  All right.  Before you leave, is there

17   anything else you want to tell me while you're sitting here?

18        **THE WITNESS:**  No.  Huh-uh.  It's just a medical

19   situation that I been going through there, and I've been asking

20   them to see -- can I be put back on my medicine.

21        **THE COURT:**  And you've been asking if you can be put

22   back on your medicine.  Do you have -- are you concerned about

23   the doctors there?

24        **THE WITNESS:**  Yeah.

25        **THE COURT:**  Do you have an appointment to go see the

1    doctors about your medicine?

2          **THE WITNESS:**  No, ma'am.  The last I been seeing, they

3    see me at the window and gave me medicine because I had

4    H.pylori, but I went like six days.  And it got all the way to

5    the sixth day where I couldn't even get up.  And I didn't know

6    what was wrong with me.  So finally the guy Mr. Warren had the

7    officer had me to come to medical, and he had helped me.

8        And that Monday when they did, I guess, a test, a breath

9    test on me, I didn't find out until that Friday that they said

10   I had H.pylori, but I thought it was from them taking me off my

11   medication.  Because Dr. Fish had just took me off all my

12   medication.

13         **THE COURT:**  So you don't know why it's happening then?

14         **THE WITNESS:**  I don't know why she took me off.  She

15   was saying something about the levels, something about my

16   levels.  And then when I went back to get my medicine like a

17   few weeks later, they told me my medicine was discontinued,

18   that Dr. Fish had discontinued all my medicine.

19       So I went to Dr. M, I think the psychologist lady, and she

20   told me that I would have to file a grievance.  Because she see

21   that I have been taking my medicine and she don't know why that

22   they would discontinue it.  So I filed a grievance and still

23   nothing.

24         **THE COURT:**  When did you file your grievance?

25         **THE WITNESS:**  I think this was like in September.

1          **THE COURT:**  And do you have a copy of that grievance?

2          **THE WITNESS:**  Yes, ma'am.

3          **THE COURT:**  And so this is like an administrative

4    remedy form?

5          **THE WITNESS:**  Yes, ma'am.  I been filing them, but I

6    guess they just been ignoring them.

7          **THE COURT:**  Okay.  All right.  Anything else?

8          **THE WITNESS:**  As far as with the staff, like

9    Mr. Cooper, I have filed a grievance on him.  But I talked to

10   Mr.-- I think his name -- I just know it start with a B, Mr. B,

11   the SIS guy, and he said that he was going to take care of it.

12         **THE COURT:**  And is Mr. Cooper still there?

13         **THE WITNESS:**  Yes, ma'am.

14         **THE COURT:**  Okay.  So the next time you meet with your

15   lawyer, make sure to take your grievance forms so they can take

16   a look at them.  Okay?

17         **THE WITNESS:**  Well, I gave it to them.

18         **THE COURT:**  You did?

19         **THE WITNESS:**  The grievance for the medical?

20         **THE COURT:**  Yes.  You did?

21         **THE WITNESS:**  Yes, ma'am.  I have them.

22         **THE COURT:**  And they have them?

23         **THE WITNESS:**  I don't know.  I -- I think.  I don't

24   know.  If they don't, I have them.  I do have them.

25         **THE COURT:**  Next time you take it to them.  Okay?

1          THE WITNESS:  Okay.

2          THE COURT:  Thank you.  You're excused.

3     Next one.

4     We're at our break time.  Okay.  We will stand in recess

5     then for 20 minutes, 2:25.

6                    (Recess taken at 2:07 p.m.)

7                  (Proceedings resumed at 2:26 p.m.)

8                      (Proceedings sealed.)

9          THE COURT:  Before we get started, you are being

10    assisted by a Spanish interpreter.

11    Do you speak any English whatsoever?

12         THE WITNESS:  Yes.  I do understand it.

13         THE COURT:  Okay.  Even though you speak some English,

14    because you've asked for an interpreter, we need to make sure

15    that the interpreter has a chance to interpret.

16         THE WITNESS:  Of course.

17         THE COURT:  It's her job to interpret the English into

18    Spanish and your Spanish into English.

19         THE WITNESS:  Okay.

20         THE COURT:  She cannot explain things to you.  If

21    you're confused or don't understand, just say so, and we'll

22    explain or rephrase.

23         THE WITNESS:  Okay.

24         THE COURT:  You may proceed.

25    / / /

1                          <u>**DIRECT EXAMINATION**</u>

2     **BY MX. BEATY:**

3     **Q.**    Good afternoon.   What's your first name?

4     **A.**    Claudia.

5     **Q.**    I'm going to call you by your first name today for your

6     privacy.

7     **A.**    Okay.

8     **Q.**    Are you incarcerated at FCI Dublin?

9     **A.**    Yes.

10    **Q.**    At the FCI or the camp?

11    **A.**    FCI.

12    **Q.**    For how long have you been at FCI Dublin?

13    **A.**    It's been like five or six years.

14    **Q.**    How do you feel about being in court to testify today?

15    **A.**    Nervous, scared.   I have no words.

16    **Q.**    Why did you decide to testify today?

17    **A.**    Because I deserve -- or rather we deserve to be listened

18    to.   It's a very heavy weight that we're carrying on our backs.

19    And it's really very good that there's someone on whom we

20    can -- who we can trust since we have no one around us we can.

21    **Q.**    Claudia, have you personally experienced staff sexual

22    abuse at FCI Dublin?

23    **A.**    Yes.

24    **Q.**    I'm going to ask you a few questions about your

25    experiences, and I know it's difficult to talk about, but I'm

1  not going to ask you to go into any detail.

2  **A.**  Okay.

3  **Q.**  Which FCI Dublin staff member sexually abused you?

4  **A.**  Officer Smith.

5  **Q.**  And around when did Officer Smith begin abusing you?

6  **A.**  I'm bad with dates, but approximately it was in 2021.

7  **Q.**  And for how long did he abuse you?

8  **A.**  Almost a year.

9  **Q.**  And, again, I don't need you to go into any detail, but

10  generally how did he sexually abuse you?

11  **A.**  Physically, mentally.  He raped me and he penetrated me.

12  And he manipulated me.

13       **THE COURT:**  And I want to remind counsel that I do

14  have her declaration with me.  It is already part of the

15  record.  And I have reviewed that.

16       **THE INTERPRETER:**  I'm sorry.  And --

17       **THE COURT:**  I have reviewed it.

18  **BY MX. BEATY:**

19  **Q.**  To your knowledge, is Officer Smith currently facing

20  criminal charges for sexually abusing incarcerated women?

21  **A.**  Yes.

22  **Q.**  Are you a named victim in that case?

23  **A.**  Yes.

24  **Q.**  Besides Officer Smith, have you ever witnessed other FCI

25  Dublin staff sexually abusing incarcerated people?

1    **A.**    Yes.

2    **Q.**    Which staff?

3    **A.**    Official -- Officer Sinclair.

4    **Q.**    What did you witness Officer Sinclair do?

5    **A.**    I was guarding the door -- I was guarding the door while

6    he was with a fellow woman prisoner.

7    **Q.**    I won't ask you any more questions about that now,

8    Claudia.

9        Claudia, did you report Officer Smith or Officer Sinclair

10    at the time that this abuse occurred?

11    **A.**    No.

12    **Q.**    Why not?

13    **A.**    Fear.

14    **Q.**    Fear of what?

15    **A.**    Fear of the power that they had.

16    **Q.**    Who's they?

17    **A.**    The officers.

18           **THE COURT:**  Claudia, when -- the Sinclair event --

19    when did you see that?  When were you the lookout?

20           **THE WITNESS:**  It was approximately in 2020, the year.

21           **THE COURT:**  Is Sinclair still there?

22           **THE WITNESS:**  No.

23           **THE COURT:**  Have you seen anything like that happen

24    since then?

25           **THE WITNESS:**  Not like that, but like they are more

1    aggressive.  They treat us differently.  They make us feel

2    belittled.

3            **THE COURT:**  Okay.

4        Proceed.

5    **BY MX. BEATY:**

6    **Q.**   Claudia, have you reported Officer Smith's abuse since it

7    occurred?

8    **A.**   Yes.

9    **Q.**   Did you do that yourself or did someone help you?

10   **A.**   I was helped.

11   **Q.**   Who helped you?

12   **A.**   One of the female victims, and I spoke with the female

13   attorney.

14   **Q.**   And what's your attorney's name?

15   **A.**   Jacob.  Yeah, Jacob firm.

16   **Q.**   Did that attorney help you file a grievance against Smith?

17   **A.**   Yes.

18   **Q.**   Around when?

19   **A.**   December.  Around December.

20   **Q.**   Of what year?

21   **A.**   The year '22.

22   **Q.**   And after that, were you interviewed by federal

23   investigators?

24   **A.**   Yes.

25   **Q.**   Do you feel that since you began working with your

1    attorney, staff have treated you differently?

2    **A.**    Yes.  The change was noticeable instantly.

3    **Q.**    How so?

4    **A.**    For starters, my medications were taken away from one day

5    to the next.  And the medication for my convulsions got

6    reduced.  I -- I --

7            **THE INTERPRETER:**  The interpreter needs to ask for

8    repetition.

9            **THE WITNESS:**  I started getting threatened, telling me

10   that if I started to speak or report, they were going to file

11   an incident report against me, or I was going to be sent to the

12   SHU.

13   **BY MX. BEATY:**

14   **Q.**    You just said a lot so I want to break it down a little

15   bit.

16        When you say you were threatened, who threatened you?

17   **A.**    Depending which officer was there at the moment.

18   **Q.**    So staff?

19   **A.**    Yes.

20   **Q.**    Different staff.

21        And you mentioned shots.  What's a shot?

22   **A.**    It's an incident report.

23   **Q.**    You received shots at FCI Dublin?

24   **A.**    Yes.

25   **Q.**    Do you know about how many?

1   **A.**   A whole bunch.

2   **Q.**   And in your experience, how, if at all, did the number of

3   shots that you received change after you reported Smith?

4   **A.**   That's the time when my shots increased.

5   **Q.**   Can you give examples of things you've received shots for

6   since reporting Smith?

7   **A.**   For out of bounds, for using tight clothing, for being

8   insolent, and for talking back.

9   **Q.**   What kinds of punishments have you received for those

10  shots?

11  **A.**   Telephone was taken away from me as well as video calls

12  and the emails.  And commissary as well.

13  **Q.**   How did the -- how does the loss of phone, video, emails

14  impact you?

15  **A.**   Very much so.

16  **Q.**   How so?

17  **A.**   I was unable to see my children.  The fact of not being

18  able to see them.  I live very far away from them, and no one

19  comes to see me, so that's my only opportunity.  The fact of

20  listening to them and speaking with them.

21  **Q.**   Claudia, have you had your cell searched at FCI Dublin?

22  **A.**   Yes.

23  **Q.**   How many times?

24  **A.**   After the incident, many times.

25  **Q.**   And what do you mean by "the incident"?

**A.**    After I reported Smith, they started coming often

regularly to my cell.

**Q.**    Have you participated in in-person legal visits at FCI

Dublin?

**A.**    Yes.

**Q.**    About how many?

**A.**    Six.

**Q.**    Would you say those visits have been private?

**A.**    No.

**Q.**    Have you attended any legal visits in the last month?

**A.**    Yes.

**Q.**    Did staff strip search you following those visits?

**A.**    Yes.

        **THE COURT:**  How long did they take?  How long did they

take?

        **THE WITNESS:**  You could say 10 minutes because I

was -- I had to get absolutely naked.

**BY MX. BEATY:**

**Q.**    Had staff ever strip searched you before after a legal

visit before September?

**A.**    No.

**Q.**    Did you go to the bathroom during any of those legal

visits?

**A.**    Yes.

**Q.**    Did staff at any point watch you in the bathroom during

1  those legal visits?

2  **A.**   Yes.  The last two visits -- or the last visit.  And they

3  were right in front of me.  I mean, they didn't take their eyes

4  off me.  Even when you're wiping yourself, they're still

5  staring at me.

6  **Q.**   Had that ever happened before at a legal visit?

7  **A.**   No.

8  **Q.**   Do you receive legal mail at Dublin?

9  **A.**   Yes.

10  **Q.**   Do you know how Dublin staff are supposed to deliver legal

11  mail?

12  **A.**   My understanding is that they must open it right in front

13  of you.

14  **Q.**   Have staff ever delivered legal mail already opened?

15  **A.**   Yes.

16  **Q.**   How many times?

17  **A.**   Many.  Most of the time.

18  **Q.**   When was the last time?

19  **A.**   In fact, two or three days ago.

20  **Q.**   What was in that legal mail?

21  **A.**   My BP-11 was there.

22  **Q.**   What's a BP-11?

23  **A.**   It's the remedies and it's what contains all the things

24  about my case.

25  **Q.**   I want to switch gears a little bit and talk about mental

1   and medical healthcare at Dublin.

2       Do you have any mental health conditions?

3   **A.**   Yes.

4   **Q.**   How, if at all, did the sexual abuse that you suffered by

5   Smith impact your mental health?

6   **A.**   Quite a bit.

7   **Q.**   How so?

8   **A.**   I felt broken, unsure of myself, depressed.  And I was

9   afraid and lacking confidence in just about everyone.

10  **Q.**   How would you describe your mental health in the last

11  year?

12  **A.**   It worsened.  I started getting convulsions more often.  I

13  started getting depression and panic attacks and anxiety

14  attacks, flashbacks.  And the worst of all, I started blacking

15  out.

16  **Q.**   At any time in the last year, have you felt suicidal?

17  **A.**   Yes.

18  **Q.**   And in the last year, have you attempted suicide?

19  **A.**   Yes.

20  **Q.**   How many times?

21  **A.**   Two.

22  **Q.**   When was the first time?

23  **A.**   It was like in July.

24  **Q.**   Of 2023?

25  **A.**   Yes.

1    **Q.**   And I don't need you to go into detail, but how did you

2    attempt suicide in July 2023?

3    **A.**   I cut myself.

4    **Q.**   And after you cut yourself, how did staff respond?

5    **A.**   I was attacked.

6    **Q.**   What do you mean by that?

7    **A.**   They arrived and they pepper sprayed me.  I was dragged to

8    the hallway while I was bleeding.  I was thrown to a face down

9    position.  They put their knee on my head and they threw me on

10   the ground and I got handcuffed.

11   **Q.**   For how long were you handcuffed after you cut your

12   wrists?

13   **A.**   Until I was placed on suicidal watch.

14   **Q.**   How long was that?

15   **A.**   It lasted a long time because not until I was healed,

16   that's when they removed the handcuffs from me.  Not even while

17   they were healing would they take off my handcuffs.

18   **Q.**   What, if any, disciplinary action were you subjected to

19   for attempting suicide?

20   **A.**   My calls were taken away from me.  And I was given a shot

21   for 200 or something which is -- has to do with tattooing.  I

22   don't know.

23            **THE COURT:**  When did this happen?

24            **THE WITNESS:**  This happened around June.

25            **THE COURT:**  June 2023?

1          **THE WITNESS:**  Yes.

2    **BY MX. BEATY:**

3    **Q.**   You said you've attempted suicide twice at Dublin?

4    **A.**   Yes.

5    **Q.**   When was the second time?

6    **A.**   In December.

7          **THE COURT:**  Did they take you to the hospital?  Did

8    they take you to the hospital?

9          **THE WITNESS:**  Not the first time.

10         **THE COURT:**  The second time?

11         **THE WITNESS:**  Yes.

12         **THE COURT:**  Go ahead.

13   **BY MX. BEATY:**

14   **Q.**   You said you attempted suicide in December 2023.

15   **A.**   Yes.

16   **Q.**   Prior to attempting suicide, did you tell any FCI Dublin

17   staff that you were feeling suicidal?

18   **A.**   Yes.

19   **Q.**   Who did you tell?

20   **A.**   I went to the psychologist, the woman psychologist, to

21   tell her because previously she told me that I could trust her

22   and you could come -- I could go to her to talk.

23         But at the time that I arrived to see her asking for help,

24   she asked me whether I had any urge to harm myself or to harm

25   someone else.  At that moment I said whatever is near me, I

1    think I might harm it, whatever it is, and that I needed help.

2    **Q.**    Did you get help?

3    **A.**    No.  She told me to go back to my room.  And then she gave

4    me a little mask to cover my eyes and told me that that would

5    help me sleep.

6    **Q.**    How did you attempt suicide in December?

7    **A.**    I cut myself.  And I was -- I got blocked.  I don't know

8    what else happened to me.  I only know that I had some sort of

9    vision, and it always happens to me when I block myself, I

10    faint.  They came to -- to assist me.  I was unconscious, and I

11    did not recover consciousness until I arrived at the

12    lieutenant's office.

13    **Q.**    Do you believe that you've received adequate mental health

14    treatment at FCI Dublin?

15    **A.**    No.

16    **Q.**    Have you complained to staff about the adequacy of your

17    mental health treatment?

18    **A.**    Many times.

19    **Q.**    How many times?

20    **A.**    I would go to a physician even three to four times per

21    week because you have to file some paperwork in order for them

22    to see you.  And we would never get called.

23          And when we -- we would go in an urgency situation because

24    I would get a convulsion or I needed help, I was told that I

25    was fine, that don't go there to bother them unless I was dead.

1    **Q.**    You have mentioned your convulsions.

2    **A.**    Yes.

3    **Q.**    Do you have a diagnosis related to those?

4    **A.**    When I was younger, starting at age 13, I -- that's when

5    my convulsions began, and I was diagnosed as epileptic.

6    **Q.**    About how many seizures have you had at FCI Dublin?

7    **A.**    When I first arrived, I had several convulsions or

8    seizures while they found the right level of my medication.

9    For a while they were trying to find the right level.  And when

10   they were able to stabilize me, I lasted almost a whole year

11   without any convulsions or seizures.

12        And then when they took my medication, everything started

13   all over again.

14   **Q.**    You said that was when?

15   **A.**    In December.

16   **Q.**    How about how many seizures have you had since December?

17   **A.**    Every month I've gotten about two to three per week.

18   **Q.**    You reported those to Dublin staff?

19   **A.**    Yes.

20   **Q.**    What impact have those seizures had on your health?

21   **A.**    A lot.  Very much so.  Mainly my memory.  My migraines.  I

22   have lost my teeth.  I have -- and I have gotten injured myself

23   when I get the seizures.

24   **Q.**    Claudia, do you feel safe at FCI Dublin?

25   **A.**    No.

1    **Q.**   Do you feel safer now than you did a year ago?

2    **A.**   No.

3    **Q.**   Are you worried about facing retaliation for testifying

4    today?

5    **A.**   Yes.  In fact, that's already started.

6              **MX. BEATY:**  No more questions.

7              **THE COURT:**  How has it started?

8              **THE WITNESS:**  They were checking the cells.  And they

9    were asking why are you checking the cells so strictly.  I was

10   going by, and I got looked at and the officer said to me those

11   who are hanging themselves right now, I have to have an eye on

12   them, I have to be on the alert about them.

13             **THE COURT:**  Who said that?

14             **THE WITNESS:**  Officer Solorio.

15             **THE COURT:**  Anybody else?

16             **THE WITNESS:**  When some months ago, okay, another

17   officer asked me are you part of the lawsuit that's going on,

18   and that embarrassed me quite a bit and made me feel ashamed of

19   myself.  And he -- he -- and that made me realize why those

20   changes had happened with the officers against us.

21             **THE COURT:**  Is Solorio male or female?

22             **THE WITNESS:**  Male.

23             **THE COURT:**  When did he say this?

24             **THE WITNESS:**  Some weeks ago.

25             **THE COURT:**  Before or after -- well, how -- in

1    December or before that?

2            THE WITNESS:  In December.

3            THE COURT:  Cross.

4                    **CROSS-EXAMINATION**

5    BY MS. MATTIOLI:

6    **Q.**    I just have one question.  Do you always take all of the

7    medications that are prescribed to you?

8    **A.**    Most of the times.

9    **Q.**    Are there any times you don't take them?

10   **A.**    Yes.  There's been some -- a few times when I get the

11   seizures, and that's been in the mornings --

12           **THE INTERPRETER:**  Interpreter needs to clarify.

13           **THE WITNESS:**  I get the seizures at nighttime, and I

14   end up all losing my strength, totally weakened.  And after I

15   feel a little better, that's when I go and get my medication.

16   And that's when it's denied.  They refuse to give it to me

17   because it's too late, the time has gone by.

18           **MS. MATTIOLI:**  Nothing further.

19           **THE COURT:**  Anything on that question?

20           **MX. BEATY:**  No, Your Honor.

21           **THE COURT:**  Okay.  How long have you been at FCI

22   Dublin?

23           **THE WITNESS:**  I think five or six years.  I believe

24   six years.

25           **THE COURT:**  And when are you due for release?

1          **THE WITNESS:**  In the year 2035.

2          **THE COURT:**  While you're here in the courtroom, is

3     there anything else you want to tell me about what's going on

4     in Dublin?

5          **THE WITNESS:**  Only thank you for listening to me.  I

6     really would like that something could be done because there's

7     a lot of suffering going on there.  And it's something like we

8     need someone or we need some -- feel safe because practically

9     the situation is such that we have lost a lot of hope.

10         **THE COURT:**  Okay.  Thank you.  You're excused.

11    I have LP.  Is that correct?

12         **MX. BEATY:**  Yes, Your Honor.

13         **MS. KHABBAZ:**  Good afternoon, Your Honor.  I haven't

14    spoken yet --

15         **THE COURT:**  Hold on.  Wait until we get her out. .

16              (Proceedings sealed.)

17         **MS. KHABBAZ:**  Good afternoon, Your Honor.  Luma

18    Khabbaz for plaintiffs.

19    Nice to see you, Latrice.

20                     **DIRECT EXAMINATION**

21    BY MS. KHABBAZ:

22    **Q.**  You are comfortable with using Latrice, I think we

23    discussed.

24    Latrice, where are you currently incarcerated?

25    **A.**  FCI Dublin.

1    **Q.**    How long have you been at FCI Dublin?

2    **A.**    I've been there since April of 23rd.

3         **THE COURT:**  So I need you to move the mic in front of

4    you so that we can actually hear you.

5         **THE WITNESS:**  Can you hear me?

6         **THE COURT:**  That's much better.  Thank you.

7    Proceed.

8    **BY MS. KHABBAZ:**

9    **Q.**    Can you repeat how long you've been at FCI Dublin?

10   **A.**    Since April of '23.

11   **Q.**    And were you incarcerated somewhere else before FCI

12   Dublin?

13   **A.**    For this case, no.

14   **Q.**    And just for the sake of time, I'm going to jump right

15   into it.

16        Latrice, have you experienced sexual harassment at FCI

17   Dublin?

18   **A.**    I believe, yes.

19   **Q.**    And when did this happen?

20   **A.**    This happened the middle of August of '23.

21   **Q.**    And where did this happen?

22   **A.**    In my unit.

23   **Q.**    Can you describe what happened?

24   **A.**    Basically I went to the shower.  It was ten minutes prior

25   to count.  So our officer came and yelled at me to get out the

1    shower --

2    **Q.**    Latrice, could you just explain for the Court what count

3    is?

4    **A.**    Oh, count is when we have to stand up and be accounted

5    for, all the inmates.

6    **Q.**    And when does that happen?

7    **A.**    It happens at 10:00 a.m.

8    **Q.**    And can you -- what time were you in the shower?

9    **A.**    I was in the shower about 9:50 -- about 9:50.

10   **Q.**    So go ahead.  What happened while were in the shower?

11   **A.**    So I was in the shower.  And then I heard our officer yell

12   to get out the shower.  So I got out the shower.  And I just

13   had on my robe, my nightgown.  And I went to the -- I went to

14   my room to get dressed.  He -- the officer said give me your

15   ID.

16   **Q.**    Sorry.  Just to back up, what time did you get to your

17   room?

18   **A.**    It was about 9:55.

19   **Q.**    Okay.  And do you know who -- who was the officer that

20   told you to get your ID?

21   **A.**    It was Officer Singh.

22   **Q.**    Okay.  And what happened after Officer Singh told you to

23   get your ID?

24   **A.**    I went to my room, closed the door, and was in the process

25   of putting on my clothes, and he came to my window.

1    **Q.**   And just to back up a little bit, do you know if there was

2    anyone else in the shower at the same time as you?

3    **A.**   There was.

4    **Q.**   And you can identify them just with initial, if you

5    remember who it was?

6    **A.**   M.

7    **Q.**   Okay.  And so after you went back to your room and you

8    were putting on your clothes, what happened next?

9    **A.**   Officer Singh came to my door.  He looked through the

10   door.  I only had on my bra, and I was putting on my underwear,

11   and he looked in.  We made eye contact.  He looked away.  And

12   Ms. Miner Groover was standing next to him, and I heard her say

13   I don't care, and she opened up my door.

14   **Q.**   And who was Ms. Miner groover in the facility?

15   **A.**   Ms. Groover is our unit team.

16   **Q.**   Okay.  Is she a unit manager --

17   **A.**   The manager.

18   **Q.**   So what happened after Officer Groover opened the door?

19   **A.**   She asked me to give her my ID.  And I told her hold on,

20   let me put on some clothes.  And she said I don't care, give me

21   your ID.  I'm giving you a direct order to give me your ID.

22   **Q.**   And were you -- what clothes were you wearing or not

23   wearing at the time?

24   **A.**   I had on my bra.  When she opened up the door, I was

25   pulling up my underwear.  So at this point I had on my bra and

1    my underwear.

2    **Q.**   And do you know if -- what time that was when she opened

3    the door, or approximately?

4    **A.**   It was -- it was before 10:00 a.m.

5    **Q.**   And did she eventually shut the door when you asked her?

6    **A.**   No.

7    **Q.**   And so how did this experience make you feel?

8         I'll rephrase.  Her opening the door on you, how did that

9    make you feel in that moment?

10   **A.**   It made me feel violated.  It brought up memories for me

11   of a previous situation.

12   **Q.**   And when you say previous situation, I don't need you to

13   get into it, but is that a previous sexual situation?

14   **A.**   Yes.

15   **Q.**   And does what happened in August with Officer Groover

16   still impact you?

17   **A.**   Yes.

18   **Q.**   Did you have any prior contact with Officer Groover before

19   that day?

20   **A.**   I have.  The day before.

21   **Q.**   And what was that contact like?

22   **A.**   Again, I was in my room after work.  I was working

23   electrical at the time.  I was taking a nap.

24        Our officer of the unit at the time allowed me to put a

25   sheet across the window to stop the sun from coming in.  I was

asleep.  And I was woke up by Ms. Groover at my door.  She

opened up my door, started yelling at me, telling me to take my

curtain down.  But she came in my room and snatched my curtain

down and said that if I did it again, she was going to give me

a shot.

**Q.**    Latrice, does this curtain -- does this cover an outside

window or a window into the unit?

**A.**    Outside.

**Q.**    Thank you for clarifying.

        **THE COURT:**  So are there curtains generally?  Are they

allowed generally or not?

        **THE WITNESS:**  Honestly it depends on the officer.  So

we -- we make our own curtains.  It depends on the officer if

we can have them up or not.

    That day our officer, Mr. B, allowed me to have it up.

        **THE COURT:**  Mr. B as in boy?

        **THE WITNESS:**  Yes.

**BY MS. KHABBAZ:**

**Q.**    And so that happened the day before her walking into your

room; right?

**A.**    Yes.

**Q.**    So I want to fast-forward back to the day that she walked

in.  What happened after count was cleared?

**A.**    They called my name over the intercom to go to the

officer's station.

1    **Q.**    And what happened when you were at the officer's station?

2    **A.**    The officer just asked for my ID.  I gave him my ID.  I

3    turned around to the door to exit the unit.  Well, that's where

4    we exit the unit.  And there was the lieutenant, Officer

5    Groover, another officer there.  And the lieutenant told me to

6    turn around and hand over my cup to another inmate because I'm

7    not allowed to have it in the SHU.

8    **Q.**    So at that point, you were taken to the SHU?

9    **A.**    Yes.

10    **Q.**    And who took you to the SHU?

11    **A.**    Officer Groover and the lieutenant.

12    **Q.**    And what was -- for -- what was the reason you were going

13    to the SHU that you understood?

14    **A.**    At that moment, I wasn't sure why I was being taken to the

15    SHU.

16    **Q.**    Did you ever find out?

17    **A.**    Yes.

18    **Q.**    And what was the reason they told you?

19    **A.**    So once I was in the SHU, they came to give me an incident

20    report for disrupting count.

21    **Q.**    Okay.  Did you -- and I'll go back and talk about your

22    experience in the SHU, but did you ever plan on or -- reporting

23    Officer Groover after you felt violated?

24    **A.**    Yes, I did.

25    **Q.**    And did you tell her or anyone?

**A.**    Yes.  I told her -- I told her and the lieutenant as I was walking to the SHU, I asked the lieutenant why I was going to the SHU, and he did not answer me.

And I looked over at Groover, and I said and just so you know, I'm reporting you because I feel like you violated me and I'm going to put a PREA on you.

And she said thank you for telling me that.  And she said nothing else.

I went to the SHU.  And the next day, I was presented with another shot for threatening staff with bodily harm.  But they -- that -- because I told her I was going to put a PREA on her.

**Q.**    Did you end up reporting her for PREA?

**A.**    At that time I did not.

**Q.**    So while you were in the SHU, did you try to report her for PREA?

**A.**    I did try to, yes.

**Q.**    And how did that go?

**A.**    The captain -- anytime the unit team did their walks on Wednesdays, they just said that it wasn't considered PREA.  I tried to explain my situation.  They said it wasn't a PREA situation.

**Q.**    Did they say why it wasn't considered PREA?

**A.**    Yeah.  They said because she was a female officer, it wasn't PREA and I had on my -- my bra and my underwear, so she

1  was just doing her job basically.

2  Q.   Did they give you any other reasons as to why it's not a

3  PREA?

4  A.   No.

5  Q.   Okay.  And what happened after you came out of the SHU?

6  A.   When I came out of the SHU, I was placed back in

7  Ms. Groover's unit.

8  Q.   How long were you in the SHU?

9  A.   For three weeks.

10  Q.   And did you lose any privileges after this incident

11  report?

12  A.   Yes.  I lost 27 good days from my release date.  And I

13  lost three months -- yeah -- three months of commissary

14  restriction, three months of personal visits from my family.

15  Q.   And do you have any idea of what the status of your PREA

16  report is?

17  A.   It's still pending investigation.

18  Q.   Earlier you mentioned that there was someone else in

19  the -- at the shower --

20  A.   Yes.

21  Q.   -- at the same time as you.  To the best of your

22  knowledge, do you know if M got sent to the SHU?

23  A.   No, she did not.

24  Q.   To the best of your knowledge, do you know if M received a

25  writeup?

1    **A.**    No, she did not.

2    **Q.**    And generally when you arrived at Dublin, were you given

3    information on how to respond to sexual abuse at Dublin?

4    **A.**    When I arrived at Dublin, I was given a handbook, an

5    inmate handbook, that says something about PREA in it.

6    **Q.**    Were you told how to report PREA?

7    **A.**    Yeah.  They say that we could do it from the computers,

8    like send an email or tell another staff member or use the

9    phone.

10    **Q.**    To the best of your knowledge, do you know if those ways

11    are confidential?

12    **A.**    I'm sure.  They say that it's confidential.  But do I

13    believe that?  No.

14    **Q.**    And I just want to shift over and talk about medical care.

15    Have you tried to access medical care at FCI Dublin?

16    **A.**    Yes.

17    **Q.**    And when was this?

18    **A.**    The first time was around September of 2023.

19    **Q.**    And what -- what was the reason you accessed medical care?

20    **A.**    I went in.  I was just having dizziness and different

21    little situations where I felt like I needed to get checked.

22    **Q.**    And what was the result of that?

23    **A.**    Dr. Fischer said that I had a heart -- a heart murmur and

24    that I needed to be scheduled with the heart doctor.

25    **Q.**    Did they ever take you to do an EKG?

1    **A.**    They did.

2    **Q.**    And what was the result of that EKG?

3    **A.**    So I don't remember the exact words, but basically I had a

4    leakage in my heart and something was enlarged.

5    **Q.**    And did they recommend any next steps at that visit?  Or

6    did they recommend you to see anyone else?

7    **A.**    Another doctor, yes.

8    **Q.**    And this was in September.  Did you ever see the other

9    doctor?

10    **A.**    I did see the doctor yesterday.

11    **Q.**    Yesterday.

12    **A.**    I was sent out to see a doctor.

13    **Q.**    And the final few questions I want to talk about meeting

14    with attorneys.

15          Have you attended any legal visits in the last few months?

16    **A.**    Yes.

17    **Q.**    And have you ever been strip searched at those legal

18    visits?

19              **THE COURT:**  At the legal visits or after.

20              **MS. KHABBAZ:**  Sorry.

21    **Q.**    After these legal visits?

22    **A.**    Yes.

23    **Q.**    Do you remember on which dates this happened?

24    **A.**    I think the last three visits with the attorneys I was

25    strip searched.  And when it was time to use the restroom, I

1    was watched by the officers.

2    **Q.**    And can you explain --

3    **A.**    Not I.  We.

4    **Q.**    Can you explain what that looked like when you were being

5    watched?

6    **A.**    So there's two small rooms towards the back of the

7    visitation, and they're side by side.  The doors are open.

8    When we need to go to the restroom, two female officers escort

9    us back there, and one stands in the doorway while we use the

10   restroom.

11   **Q.**    And final question, Latrice.  Are you afraid you will be

12   retaliated against for testifying today?

13   **A.**    I am a little afraid that I will be retaliated against.

14   If it's worth it, yes.

15   **Q.**    We really appreciate you being here today.

16   **A.**    Thank you.

17            **MS. KHABBAZ:**  No further questions.

18            **THE COURT:**  Latrice, why?

19            **THE WITNESS:**  Huh?

20            **THE COURT:**  Why are you afraid?

21            **THE WITNESS:**  The only time I've been to the SHU was

22   when this incident happened.  And I'm still Ms. Groover's unit

23   and I definitely feel like she is capable of doing whatever she

24   feels like doing.

25            **THE COURT:**  That particular officer?

1                THE WITNESS:  Uh-huh.

2                THE COURT:  That's a yes?

3                THE WITNESS:  Yes.

4                THE COURT:  I need my record to be clear.

5                THE WITNESS:  Yes.

6                THE COURT:  Who are the officers that you trust?

7                THE WITNESS:  I trust Ms. Miner.  She's our counselor.

8                THE COURT:  Anybody else?

9                THE WITNESS:  That's about it.

10               THE COURT:  Are there -- when you use the computers,

11   is there anything to indicate that when you send emails to

12   particular places, that staff can -- I mean, that they're

13   confidential, staff don't have access?

14               THE WITNESS:  There is one specific one.  It's to like

15   a sexual abuse -- or there's one category that we can select

16   and it says that it won't be read by the officers.

17               THE COURT:  Okay.  And is that a new invention?  How

18   did that -- I mean, when did that happen?

19               THE WITNESS:  I'm not sure.

20               THE COURT:  Have you ever used it?

21               THE WITNESS:  No.

22               THE COURT:  Why not?  Did it -- was it there at the

23   time this incident happened with Grover -- Groover?

24               THE WITNESS:  Yes, it was there.

25               THE COURT:  Did you use it?

1              THE WITNESS:  No.

2              THE COURT:  Did you think about using it?

3              THE WITNESS:  Yes.

4              THE COURT:  And why didn't you use it?

5              THE WITNESS:  I -- I believe that I did not have time

6     to write an email or contact anybody.

7              THE COURT:  When you went -- there are phones now

8     available with direct contact to lawyers, et cetera; right?

9              THE WITNESS:  In the SHU?

10             THE COURT:  Yes.  Even in the SHU.

11             THE WITNESS:  No.

12             THE COURT:  So it wasn't -- do you know the phone

13    lines that I'm talking about?  Every unit has a phone line

14    available where the pilot program -- where --

15             THE WITNESS:  Our units, yes.

16             THE COURT:  That exists now in the SHU.  Was it there

17    when you were there?

18             THE WITNESS:  No.

19             THE COURT:  Was it there when this event happened to

20    you?

21             THE WITNESS:  No.

22             THE COURT:  So that happened after, that is, the phone

23    lines became available after the event?

24             THE WITNESS:  Yes, ma'am.

25             THE COURT:  Had the phone line been there, would you

1    have used it to call your lawyer?

2            THE WITNESS:  Yes.

3            THE COURT:  Okay.  So that's a positive thing.  Have

4    you used the line?

5            THE WITNESS:  Yes.

6            THE COURT:  And is it working?

7            THE WITNESS:  Yes.  The pilot line, yes.

8            THE COURT:  Okay.

9        When people are using the computers, are other people --

10   well, tell me, when people are using the computers that you

11   observe or when you're using it, are people watching you?

12           THE WITNESS:  Yes.

13           THE COURT:  Who is watching you?

14           THE WITNESS:  Inmates can see.  When the officers do

15   their rounds, they can see.

16           THE COURT:  Can they read what's on the computer?

17           THE WITNESS:  Yes.

18           THE COURT:  How?

19           THE WITNESS:  Just looking at the computer.  They can

20   stand on the side of you or behind you and read the computer.

21           THE COURT:  Aren't there privacy screens?

22           THE WITNESS:  There is a little privacy screen that's

23   attached to the computer, yes.

24           THE COURT:  Have you ever been able to read something

25   that someone else wrote?

1          **THE WITNESS:**  Yes.

2          **THE COURT:**  How do you do that when there's a privacy

3   screen?

4          **THE WITNESS:**  Because I don't feel that it's pretty

5   private at all.  It doesn't block anything.  It doesn't make it

6   dark.  On the iPhone there is privacy screens where I can't see

7   this.  But that's not the case on the privacy screens that are

8   on the computers.

9          **THE COURT:**  Okay.

10      Cross.

11      The attorneys on the other side will get to ask you

12   questions.

13          **THE COURT:**  Ms. Mattioli.

14          **MS. MATTIOLI:**  Thank you, Your Honor.

15                      <u>**CROSS-EXAMINATION**</u>

16   BY MS. MATTIOLI:

17   **Q.**   Good afternoon.

18   **A.**   Hello.

19          **MS. MATTIOLI:**  I would just like to publish a photo

20   and not admit it.  It is 419 -- 420.

21      I guess it's just to identify it.

22          **THE COURT:**  The other side has it.  Go ahead.

23   BY MS. MATTIOLI:

24   **Q.**   Can you tell me what this is a photo of?

25   **A.**   Of someone on a computer.

1          **MS. KHABBAZ:**  Objection, Your Honor.  I don't believe

2    we have this photo.

3          **THE COURT:**  Okay.  Well, you've got it in front of

4    you.  We will provide a copy.

5          **MS. MATTIOLI:**  I don't have it printed.

6          **THE COURT:**  Do you recognize what this is?

7          **THE WITNESS:**  You say what?

8          **THE COURT:**  Can you recognize it?

9          **THE WITNESS:**  Yeah.  It's a computer.  Somebody on a

10   computer.

11         **THE COURT:**  Is that what it looks like --

12         **THE WITNESS:**  Yes.

13         **THE COURT:**  -- in your units?

14         **THE WITNESS:**  Yes.

15   **BY MS. MATTIOLI:**

16   **Q.**   Can you read what is on the computer screen?

17   **A.**   Can I read it?  No.

18   **Q.**   Okay.  Can you remind me when you went to SHU and the

19   pilot phone wasn't there?

20   **A.**   There was no pilot phone when I was in the SHU.

21   **Q.**   What was the date that you were in the SHU --

22   **A.**   August 19, 2023.

23   **Q.**   Okay.  Thank you.

24         **MS. KHABBAZ:**  Your Honor, just for the record, there

25   is no foundation for who took this photo or if this photo was

1    even taken at FCI Dublin.

2        THE COURT:  She just said it looked like something

3    from her unit.  Are you telling me that she's lying about what

4    she just saw?

5        MS. KHABBAZ:  No, Your Honor.  I don't believe they

6    said when it was taken.  I believe she said it looks like a

7    person on a computer like the one at FCI Dublin.

8        THE COURT:  So do you have some reason to believe that

9    that's not how things look at FCI Dublin?

10        MR. CHA-KIM:  I'm sorry, Your Honor.  The objection to

11    note is there was a photo that wasn't disclosed to us prior

12    that was shown to the witness, and that's fine, but there

13    was --

14        THE COURT:  You're not the lawyer on this.

15        MR. CHA-KIM:  I'm sorry.

16        THE COURT:  Okay.  No double dipping.  She's got to

17    learn how to make an objection.  Right?  This isn't a trial.

18    This is an evidentiary hearing.  And I'm trying to understand

19    what's going on at Dublin.

20      Now, does that look like it looks out there or not?

21        THE WITNESS:  Yes.

22        THE COURT:  Okay.  So your client has said it looks

23    like it.  Have you all seen these things?

24        MS. KHABBAZ:  I have not seen it personally,

25    Your Honor.  That's why I was little taken aback --

1          **THE COURT:**  Well, then, come up to the stand and ask

2     her questions if you don't think it looks like what she just

3     told me it looks like.

4          **MS. KHABBAZ:**  Your Honor --

5          **THE COURT:**  Come up.  It's your witness.  You have to

6     learn how to do these things.  It doesn't -- you know, if it

7     doesn't look like it, that's great.  Let me know.

8          **MS. KHABBAZ:**  Thank you, Your Honor.

9                          <u>REDIRECT EXAMINATION</u>

10    BY MS. KHABBAZ:

11    **Q.**   I just have one brief question.  Opposing counsel just

12    showed you a photo of a computer that appears to be at FCI

13    Dublin.  When you are at the room with the computers, can you

14    see the screens that people are on?

15    **A.**   Yes.

16    **Q.**   Can you see what is written on the screens if you look?

17    **A.**   Yes.

18         **MS. KHABBAZ:**  Thank you, Your Honor.  No further

19    questions.

20         **THE COURT:**  Okay.

21         How many different units have you lived in?

22         **THE WITNESS:**  Two.

23         **THE COURT:**  Two.  And can you bring that picture up.

24         It looks to me when I look at this picture that it's

25    upstairs.  Are they on all floors or is it just upstairs?

1          **THE WITNESS:**  They're upstairs.

2          **THE COURT:**  Okay.  So none of these things are

3    downstairs?

4          **THE WITNESS:**  In a different unit, they are

5    downstairs.  But in my unit, they're upstairs.

6          **THE COURT:**  It's upstairs.

7       And how much space is -- that looks like it's up against a

8    wall.  How much space is behind the person, in your unit?  How

9    much space is behind that person?

10          **THE WITNESS:**  Is behind the person?  It's about four

11    feet, I believe.

12          **THE COURT:**  Okay.  So there's another wall like four

13    feet behind?

14          **THE WITNESS:**  Yes.

15          **THE COURT:**  So is it like in a hallway or something?

16          **THE WITNESS:**  So it's in a hallway.  For example, this

17    is a computer right here, and there will be another one right

18    here, and there's one right here facing this way.  There's a

19    hallway that we can walk back and forth.

20          **THE COURT:**  Okay.  But that's --

21          **THE WITNESS:**  This picture looks like it was taken

22    from somebody that is really tall because if I stand up in next

23    to -- if I stand up in front of this computer, the -- the

24    boards that they have is about the same height as me.

25          **THE COURT:**  Okay.  All right.  Great.  Thank you.

1      Okay.  While I have you here, is there anything else you

2  want to tell me about what's going on out there?

3          THE WITNESS:  I would like to say that I know of

4  multiple people that have medical issues that are not being

5  seen.  I know someone that has had an IUD in for over seven

6  years and she has not been able to get it out.

7      I know that there is a lot of drugs in FCI Dublin.  And I

8  feel like even if I wanted to tell staff who had it or how is

9  it coming in, they do this thing where it's mass punishment.

10  So if I tell you that somebody's getting high, the whole unit

11  is going to be in trouble if they find drugs in their

12  possession.

13      I just feel like -- I feel like it's a lot going on there,

14  and I feel like that there's definitely officers that cannot be

15  trusted.  I definitely feel like that a lot of things go unsaid

16  and a lot of people -- a lot of inmates are afraid to say

17  things in confidentiality because there is none there.

18          THE COURT:  And is that -- is that a function of the

19  fact that both inmates and staff talk a lot?

20          THE WITNESS:  Absolutely.

21          THE COURT:  So it's not just officers doing the

22  talking, it's inmates doing the talking?

23          THE WITNESS:  Yes.

24          THE COURT:  You told me -- you told me you got there

25  in April of last year.

1          **THE WITNESS:**  This -- oh, last year, yes.

2          **THE COURT:**  2023?

3          **THE WITNESS:**  Yes.

4          **THE COURT:**  Were you somewhere else before in another

5     facility?

6          **THE WITNESS:**  No.

7          **THE COURT:**  So you were sentenced when?

8          **THE WITNESS:**  February 28th of '23.

9          **THE COURT:**  Okay.  And were you in pretrial detention?

10         **THE WITNESS:**  No.  I was -- once I was sentenced, I

11    was in detention until I made it to FCI Dublin.

12         **THE COURT:**  Okay.  So you self-surrendered --

13         **THE WITNESS:**  Yes.

14         **THE COURT:**  -- to FCI Dublin?  Okay.

15    Do you have any information about how drugs are getting

16    into the facility?  Yes or no?

17         **THE WITNESS:**  Yes.

18         **THE COURT:**  Okay.  Anything else?

19         **THE WITNESS:**  Yes.  I would also like to say that I

20    have been extremely sick for over a month, and I went up to

21    medical to try to get help.  And I told them my symptoms and

22    told them that I was having COVID-like symptoms, and they just

23    gave me a Benadryl shot in my arm.  And I have been sick ever

24    since.

25    And I've not been seen by medical up until yesterday.

They took me and gave me a COVID test, which was negative.  But
I'm still sick and I have a very horrible cough that I cannot
get rid of.

        **THE COURT:**  Okay.  Anything else you'd like me to
know?

        **THE WITNESS:**  No, ma'am.

        **THE COURT:**  Are you sure?

        **THE WITNESS:**  Yes.

        **THE COURT:**  Okay.  You're excused.

              (Proceedings sealed.)

        **THE COURT:**  You may proceed.

        **MS. SPIEGEL:**  Adrienne Spiegel from Rosen Bien
Galvan & Grunfeld, for plaintiffs.

**DIRECT EXAMINATION**

**BY MS. SPIEGEL:**

**Q.**  Hi, Mayra.  Thanks for coming this afternoon.  I know
we're tight on time so I'm going to try to get through this
quickly.

    Are you currently incarcerated?

**A.**  Yes, ma'am.

**Q.**  Where are you incarcerated?

**A.**  FCI prison.

**Q.**  When did you first arrive there?

**A.**  March of this last year.

**Q.**  And where were you housed before then?

1    **A.**    In Goodyear, Arizona at Perryville prison.

2    **Q.**    And how long had you been there?

3    **A.**    Since 2013.

4    **Q.**    Are you at the FCI prison or the camp facility?

5    **A.**    Prison, ma'am.

6    **Q.**    Thank you.

7    Have you ever experienced sexual harassment at FCI Dublin?

8    **A.**    Yes.

9    **Q.**    When was that?

10    **A.**    This past August.

11    **Q.**    And can you tell me what happened?

12    **A.**    During count, right after count actually, they conducted

13    count.  After count, I closed my door, which means that count

14    was terminated and we were fine in our room.

15    As I closed my door, I went and used the toilet.  And a

16    few seconds later, my door swang completely open without being

17    announced or count being announced as recount or knocked or

18    anything like that.  There was two male officers who stood in

19    front of me and pretended that --

20    **THE COURT:**  So I know you're nervous.

21    **THE WITNESS:**  Sorry.

22    **THE COURT:**  But you really have to slow down.  Okay?

23    **THE WITNESS:**  Okay.

24    **THE COURT:**  Thank you.

25    **THE WITNESS:**  There was two male officers there who

1    saw me half naked.  And as I screamed, hey, they looked at me

2    and looked at my roommate and then back at me and continued to

3    pretend that everything was okay, and said one, two, and then

4    they continued to close the door and walked away.

5    **BY MS. SPIEGEL:**

6    **Q.**   And how did you feel when that happened?

7    **A.**   Hurt.  Hurt.

8    **Q.**   Did you report the incident?

9    **A.**   Yes.

10   **Q.**   How did you report it?

11   **A.**   I emailed Deveney.

12   **Q.**   And did you file a formal grievance?

13   **A.**   Yes, ma'am.  After that, yes, I did.

14   **Q.**   And who does that go to when you file it?

15   **A.**   I gave it to Ms. Miner, my counselor.

16   **Q.**   After filing this report, did anyone follow up with you

17   about it?

18   **A.**   Yeah.  A psychologist named Ms. Miner M.

19   **Q.**   Okay.  And did you meet with her?

20   **A.**   Yes.

21   **Q.**   And what happened in that conversation?

22   **A.**   Well, she asked the details of what happened, and then

23   said that medical would call me to ask more questions, but they

24   never did.

25   **Q.**   When you filed that complaint, did you have a job at FCI

1    Dublin?

2    **A.**    Yes.

3    **Q.**    Where did you work?

4    **A.**    CMS.

5    **Q.**    And what were some of the work that you did on that job?

6    **A.**    Drywall, painting, tile, floors.

7    **Q.**    And are people who have that job ever given additional

8    special privileges?

9    **A.**    Yes.

10    **Q.**    Like what?

11    **A.**    Like we get to repair our own bedrooms to make things more

12    comfortable for ourselves.

13    **Q.**    And had you been given any of those privileges?

14    **A.**    Yes.

15    **Q.**    Were they ever taken away?

16    **A.**    Yes.

17    **Q.**    When were those privileges removed?

18    **A.**    The day after I reported to Deveney that I had been walked

19    in while using the restroom.

20    **Q.**    And how did you find out that those privileges were taken

21    away?

22    **A.**    By another foreman because my -- my own foreman wouldn't

23    even tell me.  He told another foreman to cancel all my

24    projects.

25    **Q.**    And did you believe it was directly related to having

1    filed the complaint?

2    **A.**    Yes.

3    **Q.**    Other than the information you have told us already, is

4    there any other reason that made you believe that?

5    **A.**    No.

6    **Q.**    Okay.

7         I'm going to switch gears a little bit.  Have you ever

8    personally witnessed staff at FCI Dublin retaliate against

9    other people who had reported sexual harassment?

10   **A.**    Yes.

11   **Q.**    When was the most recent time you witnessed that?

12        **MS. CZIOK:**  Objection.  Foundation.

13        **THE COURT:**  Sustained.

14        Just lay a foundation, if you can.

15   **BY MS. SPIEGEL:**

16   **Q.**    So are you aware of other people who had been sexually

17   harassed at the prison?

18   **A.**    Yes.

19   **Q.**    How did you know?

20   **A.**    How did I know?

21        **THE COURT:**  Did you see anybody harassed?

22        **THE WITNESS:**  No.

23        **THE COURT:**  So how would you know?

24        **THE WITNESS:**  I've heard a foreman of speaking of

25   wishing to fire SL -- I believe that's her initials -- SL

1    inmate from CMS because she was --

2           **THE COURT:**  Hold on.  But this was all stuff you

3    heard?

4           **THE WITNESS:**  The officer speaking, yes.

5           **THE COURT:**  Okay.  That's not foundation.

6           **MS. SPIEGEL:**  I would like to introduce it for motive.

7           **THE COURT:**  Motive for what?

8    **BY MS. SPIEGEL:**

9    **Q.**   So you -- did you have a job when you filed your

10   complaint?

11   **A.**   Yes.

12   **Q.**   And were you intending to keep that job?

13   **A.**   Absolutely, yes.

14   **Q.**   Did anything happen that made you no longer want to work

15   there?

16   **A.**   Yeah.  I felt scared.

17   **Q.**   Can you tell me about what made you feel scared?

18          **THE COURT:**  Which job was this?

19          **THE WITNESS:**  The CMS job.  I worked general

20   maintenance.  That was my job.

21          **THE COURT:**  Who was your supervisor there?

22          **THE WITNESS:**  Eddings.

23          **THE COURT:**  How do you spell that?

24          **THE WITNESS:**  E-D-D-I-N-G-S.

25          **THE COURT:**  That's the last name?

1          **THE WITNESS:**  Yes.

2     **BY MS. SPIEGEL:**

3     **Q.**   Did anything else happen at work that made you feel

4     scared?

5     **A.**   No.

6     **Q.**   I'm going to ask a few questions about your mental health,

7     and I know that this can be difficult to talk about so thank

8     you in advance for sharing a little bit with the Court.

9          Have you ever been diagnosed with a mental health

10    condition?

11    **A.**   Yes.

12    **Q.**   What were the diagnoses?

13    **A.**   Bipolar disorder, ADD, anxiety, PTSD.

14    **Q.**   And what was the PTSD from?

15    **A.**   Being assaulted by a sheriff officer.

16    **Q.**   Have you ever been prescribed psychiatric medication for

17    those conditions?

18    **A.**   Yes, ma'am.

19    **Q.**   What were the medications you were prescribed?

20    **A.**   Trileptal, lithium, and clonidine.

21    **Q.**   When were those first prescribed?

22    **A.**   2014.

23    **Q.**   Have you been able to obtain any of those medications

24    since arriving at FCI Dublin?

25    **A.**   No.

1    **Q.**    What happened when you -- have you tried to get those

2    medications?

3    **A.**    I have.

4    **Q.**    And what happened when you tried?

5    **A.**    Dr. Fisch said to get a job or go out and walk in nature

6    which is very beautiful and that will fix the problem.

7    **Q.**    When you are on your medications, what impact do they have

8    on you?

9    **A.**    It stabilizes my mood so my bipolar mainly -- like my ups

10    aren't so high and my lows aren't so low so I don't really harm

11    myself.

12    **Q.**    And for the past almost a year now that you haven't been

13    on your medications, what impact has that had on you?

14    **A.**    Bad.  It's been terribly bad.

15    **Q.**    And I know this is hard, but can you describe some of the

16    symptoms?

17    **A.**    Yeah.  Cutting myself, self-harming.  Yeah.

18    **Q.**    Have you tried to access any counseling for those

19    symptoms?

20    **A.**    Yes, I have.

21    **Q.**    When was that?

22    **A.**    On and off since I've arrived and I haven't had my

23    medications.

24    **Q.**    And did you speak to anyone at the prison about the

25    symptoms you were experiencing?

1    **A.**    Yes.

2    **Q.**    Who did you speak to?

3    **A.**    Ms. Miner M.

4    **Q.**    Do you remember the full name?

5    **A.**    Maca -- I don't know how to pronounce it.  Mahooney,

6    Macooty?

7    **Q.**    Mulcahy?

8    **A.**    Yeah.

9    **Q.**    And what was your conversation with her like?

10   **A.**    I was begging her to help me get back on my medications,

11   literally in tears begging.

12   **Q.**    And did you receive a response?

13   **A.**    That she would try but...

14   **Q.**    Did you ever reach out to her outside of a counseling

15   session?

16   **A.**    I've emailed her.

17   **Q.**    What did you say?

18   **A.**    That I was extremely depressed and that I wanted to die

19   more than usual, and that I needed help and I was very

20   suicidal.

21       And her response to me was only reach out via that email

22   if it was an emergency.

23   **Q.**    And have you reached out since then?

24   **A.**    No.

25   **Q.**    And are you still experiencing those symptoms?

1      **A.**    Yes, ma'am.

2              **MS. SPIEGEL:**  Thank you.

3              **THE WITNESS:**  You're welcome.

4              **THE COURT:**  Cross.

5              **MS. CZIOK:**  No cross, Your Honor.

6              **THE COURT:**  Okay.  It's been a long day for me, too.

7      I'm trying to -- and I have a transcript of everything that was

8      said.

9          The incident -- remind me again, you arrived on what day?

10             **THE WITNESS:**  March of 2000 -- of last year.

11             **THE COURT:**  And were you in a facility before you

12     arrived at Dublin?

13             **THE WITNESS:**  Yes.

14             **THE COURT:**  Which facility?

15             **THE WITNESS:**  It's called Perryville prison from

16     Goodyear, Arizona.  It's a state prison.

17             **THE COURT:**  And that's -- you were sentenced in

18     Arizona?

19             **THE WITNESS:**  Yeah.

20             **THE COURT:**  Okay.  And they transferred you to Dublin?

21             **THE WITNESS:**  Oh, no.  That prison transferred me to

22     the Core Civic in Florence, Arizona, which is a detention

23     pending to be transferred here.  Just to wait there to here.

24             **THE COURT:**  So it's a transfer hub.

25             **THE WITNESS:**  Yeah.

1          **THE COURT:**  I've been to them.

2      And they sent you through the x-ray machines and

3  everything there?

4          **THE WITNESS:**  Yes.

5          **THE COURT:**  And then they transferred you here?

6          **THE WITNESS:**  Yes.

7          **THE COURT:**  And when are you due for release?

8          **THE WITNESS:**  2029.

9          **THE COURT:**  Have you used the pilot project telephones

10  that are now available?

11          **THE WITNESS:**  For legal phone calls?

12          **THE COURT:**  Yes.

13          **THE WITNESS:**  Yes.

14          **THE COURT:**  Are those working for you?

15          **THE WITNESS:**  Yes.  Whenever the visiting room isn't

16  being used.  Because it's in a room where only video visiting

17  rooms are being conducted.  So as long as another inmate isn't

18  using that room, we're able to use it.  But sometimes if

19  they're busy, then we can't use that phone at all.

20          **THE COURT:**  Right.  But they're available as long as

21  the unit is open, as I understand it; is that right?

22          **THE WITNESS:**  Yeah.

23          **THE COURT:**  Are there -- in terms of reporting events,

24  do you have an understanding as to the various ways that you

25  can report events that might happen?

1                   **THE WITNESS:**  Yes.

2                   **THE COURT:**  Okay.  And what is your understanding?

3                   **THE WITNESS:**  That I can email SIS or the warden if

4      it's necessary.  In this case -- well, I don't know if it's the

5      warden, but Deveney, whoever he is.  I know that I can email

6      him and let him know what's going on, yeah.

7                   **THE COURT:**  And do you have an understanding about

8      whether or not these things are confidential or not?

9                   **THE WITNESS:**  No.  I really don't.

10                  **THE COURT:**  Okay.  Any other ways to report that

11     you're aware of?

12                  **THE WITNESS:**  (Shakes head.)

13                  **THE COURT:**  That's a no?

14                  **THE WITNESS:**  That's a no, ma'am.  Sorry.

15                  **THE COURT:**  When you -- do you use the computers that

16     are available?

17                  **THE WITNESS:**  Yes, ma'am.

18                  **THE COURT:**  And on the computers, are there privacy

19     screens?

20                  **THE WITNESS:**  Yeah.

21                  **THE COURT:**  And have you ever been behind someone when

22     they're using the computer?

23                  **THE WITNESS:**  Yes, ma'am.

24                  **THE COURT:**  And can you read what's on their computer?

25                  **THE WITNESS:**  Absolutely.

1          **THE COURT:**  Okay.  While I have you here, I didn't

2     write down the name of the two individuals who saw you.  Who

3     were those?

4          **THE WITNESS:**  Oh, Officer Torres.  And the other one

5     was a trainee.  I've never seen him again.  He was training

6     somebody.

7          **THE COURT:**  Okay.  Is Torres male?

8          **THE WITNESS:**  Yes.

9          **THE COURT:**  Okay.  These special privileges that you

10    had, do you use the word special privileges, or was that -- how

11    did that phrase come about?  I've not heard that phrase.

12         **THE WITNESS:**  I just came up with it because I mean it

13    is special.  There weren't actual work orders.  They were just

14    allowing us to do those things for working hard on other

15    projects.

16         **THE COURT:**  And those were -- those were taken away

17    when?

18         **THE WITNESS:**  The day after I emailed Deveney saying

19    that people had walked in on me.

20         **THE COURT:**  Okay.  While I have you here, is there

21    anything else you want me -- you want to tell me about what's

22    going on at Dublin?

23         **THE WITNESS:**  Other than -- other than that we're

24    constantly getting yelled at.  And it's -- it's terrifying

25    living here.  Coming from a state facility where we don't have

1    much funds, coming here and knowing that there is really

2    nothing for us to do.  It's boring.  There is no materials at

3    work so even if we want to go to work, we were expected to be

4    at work, six, seven hours a day with nothing to do because we

5    don't have the budget or the money for the materials to do

6    much.

7         **THE COURT:**  So I heard about a number of programs that

8    they're offering.

9         **THE WITNESS:**  I've been in a women's relationship

10   class, ma'am, and it's -- our class has gotten canceled for the

11   last almost two months.

12       And so unless we present ourselves to that class and

13   there's actually a staff member to conduct it, it doesn't count

14   towards it.

15       I mean we're still enrolled for an FSA class the way it

16   shows on the computer or, you know, for transcripts.  But if

17   we're not going -- we're not having the actual class, then it

18   doesn't do -- it doesn't benefit us in any way.

19       **THE COURT:**  But just in terms of activities, are

20   they --

21       **THE WITNESS:**  Rec is constantly closed due to short

22   staff.

23       I haven't been able to mail out anything for the last

24   month as far as arts and crafts because we're expected to use

25   express big huge box that it's like 20 -- I believe $24.  So if

```
1   you can't afford to pay for that, if you are sending one pair

2   of little socks because they wouldn't give you a little box, a

3   smaller one because they just don't want to do it, you have to

4   save up the money to pay for that, and that's when you can

5   afford it.

6           THE COURT:  Is there a drug problem out there?

7           THE WITNESS:  Yeah.

8           THE COURT:  And describe that for me.

9           THE WITNESS:  Well, half the inmates are walking

10  around looking like zombies.  And it's scary.

11          THE COURT:  Have you -- have you ever seen someone

12  taking drugs?

13          THE WITNESS:  No, ma'am.

14          THE COURT:  Do you have any information about how the

15  drugs are getting into the prison?

16          THE WITNESS:  No, ma'am.

17          THE COURT:  Is there anyone out there that you trust?

18          THE WITNESS:  In the prison?

19          THE COURT:  Uh-huh.

20          THE WITNESS:  My counselor, Ms. Miner.

21          THE COURT:  The other inmates who have been testifying

22  today who are in lockup, are you all in the same unit?

23          THE WITNESS:  Some of us are, yes.

24          THE COURT:  How many of you are?

25          THE WITNESS:  Two other gals that were here today are
```

1    in my same unit.

2          **THE COURT:**  So there's a set of three of you who are.

3      Okay.  Last opportunity before I release you.  Anything

4    else you want to tell me?

5          **THE WITNESS:**  Thank you for your time, ma'am.  I hope

6    you can make a change for us.  I really do.  Thank you.

7          **THE COURT:**  Okay.  Thank you.  You're excused.

8      Next.  This is JM, right?

9      I just forgot to tell you something.  Everybody can be

10   seated.

11     You were here yesterday, and I just wanted to personally

12   apologize to you for the mess-up in communication.  The

13   marshals are not used to having attorneys for one side control

14   witnesses for the other side, and there was a writ to bring you

15   here.  And I get very upset when writs are issued and people

16   don't show up.

17     So there was a very late, last-minute email that got

18   misread or just misunderstood in terms of who was supposed to

19   come.  And that's why you were brought.

20     So I just wanted to apologize for the miscommunication

21   which led you to sit there all day.

22     But I wanted you to know that.

23         **THE WITNESS:**  Okay.  Thank you so much.

24         **THE COURT:**  You're welcome.

25         **THE WITNESS:**  I appreciate you.

1          **THE COURT:**  Okay.  Do I have -- RF is next?

2          **MR. GALVAN:**  If AV is also ready, we were prepared for

3     AV next.  But we can do RF now as well, whoever is ready to go.

4          **THE COURT:**  You're right.  AV is next. .

5               (Proceedings sealed.)

6               **DIRECT EXAMINATION**

7     BY MR. CHA-KIM:

8     **Q.**    Good afternoon.

9     **A.**    Good afternoon.

10    **Q.**    Is it okay if I call you by your first name only?

11    **A.**    Yes, sir.

12    **Q.**    Rhonda, when did you first arrive at Dublin?

13    **A.**    June 2022.

14    **Q.**    Do you live in the camp or the FCI?

15    **A.**    At the FCI.

16    **Q.**    Have you been there the whole time?

17    **A.**    Yes, sir.

18    **Q.**    Rhonda, did you ever provide assistance to criminal

19    investigators after your arrival at FCI Dublin in June of 2022?

20    **A.**    Yes, sir.

21    **Q.**    What did do you?

22    **A.**    I was called out by the FBI, the U.S. Attorney's Office,

23    and I believe OIG for some information regarding a former

24    roommate.

25    **Q.**    Okay.  And do you have an understanding of -- in

1    connection to what investigation?

2    **A.**    It was in reference to her having sex with the warden.

3    **Q.**    And which warden that was that?

4    **A.**    Warden Garcia.

5    **Q.**    How did you become familiar with the existence of a

6    Complaint in this case?

7    **A.**    When I arrived, I had been incarcerated a long time, and

8    many inmates knew me from other facilities, and they began

9    asking me for help, assistance.

10    **Q.**    Any kind of specific assistance?

11    **A.**    Specific assistance was with connecting them with an

12    attorney that could help them.

13    **Q.**    Okay.  And did there come -- did there come a time when

14    you read or saw the specific Complaint that was filed in this

15    matter?

16    **A.**    Yes, sir.  In August-- maybe two or three days after it

17    was filed.

18    **Q.**    Okay.  And how did you come to see that Complaint?

19    **A.**    I contacted a reporter, Lisa Fernandez, and I asked her

20    where I could find the Complaint.  And she gave me a website.

21    And my family downloaded it and sent it through the inmate

22    email system, the entire Complaint.

23    **Q.**    And did you do anything in particular with that Complaint

24    once you had it through the email?

25    **A.**    Sir, several of the lead plaintiffs asked me for copies of

1  it.  They tried to read it, but it was too lengthy to be

2  reading it on the email.  And so I went to the law library and

3  I printed it all off and I made copies.  And I gave it to

4  people that requested it that were lead plaintiffs in the suit.

5  **Q.**    Okay.  Are you familiar with someone known as Special

6  Investigations Lieutenant Baudizzon or Baudizzon?

7  **A.**    Yes, sir.

8  **Q.**    Who is he?

9  **A.**    He is the lead investigator that I know of at Dublin right

10  now.

11  **Q.**    Okay.  Was there ever an instance in which Lieutenant

12  Baudizzon in particular took any kind of action against you

13  that you perceived to be retaliatory?

14  **A.**    He called me in on the day that I printed those off.  I

15  believe it was August the 20th or 21st, and he told me that I

16  was in danger and that inmates were complaining about me

17  handing out the Complaint.

18  **Q.**    Okay.  So if you could walk the Court through step by step

19  exactly how the interaction with Lieutenant Baudizzon went.  So

20  let's start at the beginning.  You said he called you in?

21  **A.**    I was in the unit.  And the officer said the lieutenant

22  wants you at the lieutenant's office.

23        So I reported to the lieutenant's office.  Normally when I

24  spoke to this gentleman, he took me in his office and he put

25  this white noise thing on so that the other employees can't

1   hear what's being said.

2       This time he did something different.  He took me in this

3   other area of the lieutenant's office where there are some

4   cells.  And he -- he kind of maneuvered me with his body like

5   towards the cells and he started telling me that he was going

6   to have to put me in protective custody if I didn't start

7   handing out those Complaints.

8   **Q.**   Okay.  I think you said he maneuvered you somehow by the

9   cells.  Could you just tell what you mean by that --

10   **A.**   His body language was such that I believe he was about to

11   lock me up?

12   **Q.**   What do you mean by that?

13   **A.**   Because I had never been taken by those cells before.  And

14   those cells -- I've been taken to the SHU before at other

15   facilities.  So I know what it feels like when -- when you're

16   about to get locked up.  And he was emphatic about not -- that

17   I should not give anyone else those Complaints.

18   **Q.**   So let me stop you there.  So you said there are some

19   cells in this part of the lieutenant's office.

20   **A.**   Yes, sir.

21   **Q.**   Had you ever been taken to this particular area before?

22   **A.**   No, sir.

23   **Q.**   Did you have any awareness of its existence prior to you

24   being taken there?

25   **A.**   No, sir.

1    **Q.**    Okay.  How did you feel when you were taken to this new

2    part of the lieutenant's office?

3    **A.**    I was afraid because I don't want to go to the SHU.

4    **Q.**    Okay.  Did you file a report about this incident?

5    **A.**    Yes.  I filed a grievance.

6    **Q.**    Okay.  What's a grievance?

7    **A.**    Administrative remedy.  I filed a BP-9 and said that --

8    and explained briefly that he had interfered with my right to

9    discuss and assist other inmates with legal issues.

10            **MR. CHA-KIM:**  Okay.  Can we briefly put up

11   Exhibit 353, the second page.

12            **THE COURT:**  Do I have a copy?

13            **MR. CHA-KIM:**  It is included in the master set of

14   documents, Your Honor.

15   **Q.**    Rhonda, do you recognize this document?

16   **A.**    It's not on my screen.

17   **Q.**    Oh, I'm sorry.

18   **A.**    Yes.  That is my handwriting.

19   **Q.**    Okay.

20            **THE COURT:**  What is the number?

21            **THE CLERK:**  353, Your Honor.

22            **MR. GALVAN:**  Here is a separate copy.

23   BY MR. CHA-KIM:

24   **Q.**    Rhonda, the Judge has a copy of this exhibit so I'm not

25   going to ask you too many questions about it.  I just want to

1    talk to you very briefly about some quick points.

2          What is the date that's referenced here?

3    **A.**    8/23, sir, August 23rd.

4    **Q.**    What's the date of the activity that you're complaining

5    about on this --

6    **A.**    On August 21st.

7    **Q.**    Okay.  At the very end, it says I -- did you write this?

8    **A.**    Yes, sir, I did.

9    **Q.**    "I agreed with him not to give anyone else a copy of the

10    lawsuit.  I only agreed to prevent being," and then if we can

11    turn to page 4 of this same exhibit.  And if we can -- we don't

12    have to zoom in -- "only agreed so as not to be placed in the

13    SHU."

14          Did you write that?

15    **A.**    Yes, sir.

16    **Q.**    What did you mean by that?

17    **A.**    I believed that he was about to place me in the SHU unless

18    I agreed not to give anyone else a copy of the Complaint.

19    **Q.**    Did you agree to do so?

20    **A.**    Yes, I did.

21    **Q.**    And what happened afterwards?

22    **A.**    He let me go.

23    **Q.**    And then it says, "The next day an officer stated the

24    lieutenant was going to put me in the SHU because officers did

25    not want any inmates with a copy of the lawsuit, specifically

1    those named in the Complaint yet still working around sex abuse

2    victims."

3        What did you mean by that?

4    **A.**    When I went back to the unit, Officer Williams was

5    working, and she said, oh, you thought you were going to the

6    SHU, huh, [name redacted]?

7        And I said yes, ma'am.

8        And she stated that he had gave her basically a heads-up

9    that I might be going to the SHU.

10   **Q.**    What impression, if any, did that statement have on you?

11   **A.**    I was afraid.

12   **Q.**    Why were you afraid?

13   **A.**    Because the SHU is a very uncomfortable and punitive

14   place.  It's where a lot of bad things happen to people.  And

15   it's just a -- not a place that anyone wants to be.

16       **MR. CHA-KIM:**  Very quickly, Your Honor, for the record

17   we would move to strike an inadvertent mention of a last name.

18       **THE COURT:**  The motion is granted.  It's stricken.

19       **MR. CHA-KIM:**  Thank you, Your Honor.

20   **Q.**    Is Lieutenant Baudizzon still on staff at Dublin?

21   **A.**    Yes, sir.

22   **Q.**    Do you know what his role is now?

23   **A.**    He is still the lead investigative officer, sir.  He calls

24   us when there's -- all sex abuse of victims are called about

25   every 90 days or 30 days for monitoring to make sure we're not

1    being retaliated against, and he does that.

2    **Q.**    Okay.  Can you tell the Court what -- I think it's custody

3    status is at the -- at Dublin?

4              **THE COURT:**  I don't understand your question.

5              **MR. CHA-KIM:**  I'm laying a foundation for the next

6    document I'd like to show as an exhibit, Your Honor.  There's a

7    concept called custody status that was affected by an active

8    retaliation, and so I would like the Court to understand what

9    that is.  I can just go to the document if that would be

10   easier.

11             **THE COURT:**  Okay.

12             **MR. CHA-KIM:**  Should I go to the document?

13             **THE COURT:**  You should.

14             **MR. CHA-KIM:**  Thank you, ma'am.

15        Can we put up -- I'm sorry.  Can we -- we would move to

16   admit Exhibit 353.

17             **THE COURT:**  It's admitted.

18             (Plaintiffs' Exhibit 353 received in evidence)

19             **MR. CHA-KIM:**  Can we please publish Exhibit 23,

20   page 1.

21   **Q.**    There is some water there for you, Rhonda, if you need it.

22        Rhonda, what is this document?

23   **A.**    This is the female custody classification form.

24   **Q.**    What is that?

25   **A.**    It tells you what your custody classification is.  Most

1    inmates at FCI Dublin are in-custody inmates.  I was an

2    out-custody inmate.

3    **Q.**    What does that mean to be an out-custody inmate?

4    **A.**    What it means to be an out-custody inmate is that if you

5    have to go to a community medical appointment, you do not have

6    to be handcuffed.  Normally out-custody inmates are held at

7    prison camps.

8         I have two parents that are elderly.  If something would

9    happen to them that I had to go to the hospital or God save

10   like they passed, I would be able to go to a funeral as an

11   out-custody inmate.  If you're an in-custody inmate, it's

12   unheard of to go to a funeral or hospital visit for your

13   family.

14   **Q.**    Turning your attention to the date at the top right corner

15   there, what is that date, to your understanding?

16   **A.**    It's July 10th of 2023, sir.

17   **Q.**    And what does that reflect on this document?

18   **A.**    It reflects that on that date, my custody was out-custody

19   and it also said to decrease, which means that I should be

20   removed from the facility that I was at.

21   **Q.**    Okay.  So let me stop you for a second there.  So July 10,

22   2023 --

23             **THE COURT:**  Okay.  You have got to slow down again.

24             **MR. CHA-KIM:**  I apologize.

25             **THE COURT:**  I'm trying to follow here and you're not

1    helping.

2          **MR. CHA-KIM:**  Understood, ma'am.

3          **THE COURT:**  Okay.  So I've got the out-custody status.

4    I have the date.  Okay.  Now what's the next step?

5    **BY MR. CHA-KIM:**

6    **Q.**  So, [name redacted] --

7          **MR. CHA-KIM:**  Excuse me.  Move to strike my use of the

8    last name.

9          **THE COURT:**  Granted.

10   **BY MR. CHA-KIM:**

11   **Q.**  Rhonda, there's a different date under something that says

12   identifying data, and it says form date, March 7th, 2023.  Do

13   you see that?

14   **A.**  Yes, sir.

15   **Q.**  Okay.

16         **THE COURT:**  I don't -- okay.  All right.  Go ahead.

17   **BY MR. CHA-KIM:**

18   **Q.**  Now, to your understanding, what date or what information

19   does that date reflect?

20   **A.**  That was the date that my case manager, Mr. Stanfield, did

21   a calculation, his calculation.  And based on these points, he

22   calculated that my security -- total security level was a 14

23   and custody level was out-custody.

24   **Q.**  Okay.  And where do you see that information reflected on

25   this document?

1    **A.**    It's on the bottom where it says level and custody

2    summary.

3    **Q.**    Okay.  Could we turn to page 2.

4         Rhonda, back to where it says form date.

5    **A.**    Yes, sir.

6    **Q.**    So this is a different document; correct?

7    **A.**    It's a data for a different day.  It still is the custody

8    classification form.

9    **Q.**    So can you tell from this document what date it says the

10   calculation for your status was supposedly made?

11   **A.**    On 9/28/23, I asked for my -- for this form.

12   **Q.**    Okay.  And does it still reflect, according to where it

13   says form date, the same meeting you had with Mr. Stanfield

14   that you were just referring to?

15   **A.**    Correct.

16   **Q.**    Is there anything different now about the information on

17   your sheet versus the one from July?

18   **A.**    They changed my custody to in-custody.

19   **Q.**    Is any of the point information you were just describing

20   elsewhere on this line different?

21   **A.**    No, sir.

22   **Q.**    Are you aware of any reason why your custody status should

23   suddenly change from out to in, in this manner?

24   **A.**    They changed the custody status to retaliate against me

25   for my activities in assisting inmates in this matter, in this

1  case.

2  **Q.**  Do you recall what date you filed that report against

3  Mr. Baudizzon?

4  **A.**  In August, sir.

5  **Q.**  Of what year?

6  **A.**  Of '23.

7  **Q.**  And what's the date that you pulled this document?

8  **A.**  On September 28th, sir.

9  **Q.**  Of what year?

10  **A.**  2023.

11       **MR. CHA-KIM:**  Could we put up Exhibit 345.

12       We move to admit Exhibit 23, Your Honor.

13       **THE COURT:**  Admitted.

14       (Plaintiffs' Exhibit 23 received in evidence.)

15  **BY MR. CHA-KIM:**

16  **Q.**  Rhonda, do you recognize this document?

17  **A.**  Yes, sir.

18  **Q.**  Quick summary, what is this document?

19  **A.**  This is a BP-10 that we sent to the regional director.

20       **THE COURT:**  Hold on.  What number are we talking about

21  now?

22       **MR. CHA-KIM:**  This is Exhibit 345, Your Honor.

23       **THE COURT:**  Hold on.

24       Proceed.

25  / / /

**BY MR. CHA-KIM:**

**Q.**    Rhonda, did you write this document?

**A.**    Yes, sir, I did.

**Q.**    Okay.  You write, starting the second line down, "BOP employee can hold a grievance form for weeks and months before it is entered into the administrative remedy index."

Do you see that?

**A.**    Yes, sir.

**Q.**    What did you mean by that?

**A.**    This grievance had been turned in and it was almost a month before they began the processing of it.  I submitted it to a counselor, Counselor Miner, and I kept asking about the grievance.  There was some physical intimidation about me asking about the grievance.  And, again, I was afraid of them.

**Q.**    Sorry.  So when you say there was physical intimidation about asking about the grievance, from whom?

**A.**    From Ms. Miner Groover, the unit manager.

**Q.**    Anyone else?

**A.**    Ms. Miner Smith, who was also a unit manager, Mr. Singh, who was in medical.

There is a anger towards us when we ask for grievance or administrative remedy forms because they know that once you file these forms, you have to file these forms to get before a court.  And so they do everything they can to intimidate us. And at one time I asked for a grievance, and I was hit so --

1    not at this institution, but it happened.

2    Q.    Okay.  You also wrote, "Please refer to Internal Affairs."

3    Do you see that?

4    A.    Yes, sir.

5    Q.    To your knowledge, did Internal Affairs ever contact you

6    about this?

7    A.    No, sir.

8              MR. CHA-KIM:  I would like to move to admit 345,

9    Your Honor.

10             THE COURT:  Admitted.

11             (Plaintiffs' Exhibit 345 received in evidence)

12   BY MR. CHA-KIM:

13   Q.    Rhonda, around this time, June, July, August, 2023, did

14   you experience any issues with receiving your legal and other

15   mail?

16   A.    Yes, sir, I did.

17   Q.    What kind of issues?

18   A.    There were probably four to six weeks without receiving

19   mail.  And I kept asking about mail because I communicated with

20   attorneys and family members that were emailing me and telling

21   me they had sent things in the mail.

22             MR. CHA-KIM:  Can we put up Exhibit 366.

23   Q.    Rhonda, do you recognize this document?

24   A.    Yes, sir.

25   Q.    Okay.  Is it a similar administrative remedy request form

1  as before?

2  **A.**    Well, this was a BP-9.

3             **MR. CHA-KIM:**  Hold on one second.

4             **THE COURT:**  All right.  I have it.

5             **MR. CHA-KIM:**  Thank you, Your Honor.

6  **Q.**    Does this document reflect complaints you made about the

7  subject we were just talking about?

8  **A.**    Yes, sir.

9  **Q.**    Okay.  Rhonda, around this time, did you experience issues

10  accessing medicines?

11  **A.**    I'm sorry.  Would you repeat that, please?

12  **Q.**    Around this time, did you experience any issues accessing

13  medicines from Dr. Fisch?

14  **A.**    Yes, I did.

15  **Q.**    What kind of issues?

16  **A.**    I was denied my medications.

17  **Q.**    Around this time, did you experience issues about access

18  to the commissary?

19  **A.**    Yes, I did.  I emailed California Coalition for Women

20  Prisoners for help.  I also emailed the U.S. Attorney and other

21  prisoner advocates because they were intentionally shutting

22  down the commissary to punish us.

23  **Q.**    Did you file administrative or other grievances about

24  these issues?

25  **A.**    Yes, sir, I did.

1    **Q.**    Did you ever receive any kind of substantive resolution

2    about what you complained about?

3    **A.**    Not within the time limits.  I moved on to the BP-10.  I'm

4    at the BP-11 stage at this time.

5    **Q.**    Let me switch topics.  You testified that you assisted

6    criminal law enforcement with respect to the Garcia

7    investigation.  Are you familiar with Lieutenant Williams?

8    **A.**    Officer Williams.

9    **Q.**    Yes.  Who is he?

10    **A.**    He is a regular correctional officer.

11    **Q.**    Okay.  Did you ever have an interaction with Mr. Williams

12    concerning your speaking with criminal investigators?

13    **A.**    Yes, sir.  When I came from speaking to the investigators

14    and U.S. Attorney's Office representatives, at the time we were

15    picking up our trays because of the pandemic, and I asked them

16    could I go to the kitchen to pick up my tray.  And he says

17    snitches don't eat.

18        And so I looked at him and I said are you joking, sir?

19        And he said, do I look like I'm joking?  Snitches don't

20    eat.

21        So there was another inmate waiting to go and speak -- be

22    interviewed by the same people, [name redacted], and she ran to

23    the phone.

24            **THE COURT:**  Okay.  Hold --

25            **MR. CHA-KIM:**  Just follow my --

1          **THE COURT:**  We're just using --

2          **THE WITNESS:**  Yes, ma'am.

3          **THE COURT:**  So that is stricken.  We will call her LB.

4          **THE WITNESS:**  Yes, ma'am.  I'm sorry.

5  **BY MR. CHA-KIM:**

6  **Q.**   Let's move on.  I apologize, but in interests of the late

7  hour.

8  **A.**   Yes, sir.

9  **Q.**   Rhonda, around that time that you were speaking with

10 investigators and had this interaction with Mr. Williams, were

11 you taking any steps to get a transfer to home confinement?

12 **A.**   Yes, sir, I was.

13 **Q.**   Okay.  And why were you doing that?

14 **A.**   I qualified one hundred percent for home confinement.  I

15 have a provisional diagnosis for COPD, coughing spasms and many

16 other medical problems.  And I -- and I qualified for it.  And

17 my case manager was trying to send me to home confinement.

18 **Q.**   Okay.

19         **THE COURT:**  Who is your case manager?

20         **THE WITNESS:**  Mr. Shirley, Your Honor.

21         **MR. CHA-KIM:**  Can we quickly put up Exhibit 19,

22 page 15, please.

23         **THE COURT:**  To the extent, it's not been offered, 345

24 and 366 are admitted.

25         (Plaintiffs' Exhibits 366 received in evidence)

1          THE COURT:  Who is the judge who sentenced you?

2          THE WITNESS:  Judge Gray H. Miller in Houston, Texas,

3    ma'am.

4          THE COURT:  Male or female?

5          THE WITNESS:  He is a man, ma'am.

6          MR. CHA-KIM:  May I proceed?

7          THE COURT:  I've got to get the exhibit.  You said the

8    next one is 19?

9          MR. CHA-KIM:  Yes, ma'am.  Exhibit 19, page 15.

10   Q.   Rhonda, do you recognize this document?

11   A.   Yes, sir.

12   Q.   Okay.  What do you understand this document to be?

13   A.   I was approved for transfer to home confinement.

14   Q.   Okay.  And how do you know that it shows you were approved

15   for transfer to home confinement?

16   A.   Because that's what the document says, transfer to home

17   confinement, Houston, Texas, transfer date, November 1st, 2022,

18   sir.

19   Q.   Were you in fact ever allowed to be transferred to home

20   confinement?

21   A.   No, sir.

22   Q.   Lieutenant Williams that you mentioned, is he still on

23   staff?

24   A.   Yes, sir.

25   Q.   Okay.  Have you had occasion to interact with him since

1    the last time we spoke about him?

2    **A.**    Yes, sir.  He -- in October, he told another officer to

3    write an incident report against me, and -- yes, sir.

4    **Q.**    Okay.  Have you ever communicated about some of the issues

5    you're talking about with Assistant Warden Deveney?

6    **A.**    Yes, sir.

7    **Q.**    Okay.  And what kind of issues have you raised with him?

8    **A.**    I -- I have pleaded with him, because of the environmental

9    conditions at the prison, to transfer me away from there.  I

10    have reported to him ongoing sexual misconduct at the prison.

11    I have reported to him about the showers and not being able to

12    shower privately without being exposed to men.  I have reported

13    to him the abuse of suicide victims, ladies that are on suicide

14    watch and them being abused by the staff.

15            **MS. MATTIOLI:**  Objection, foundation.

16            **THE COURT:**  Overruled.  She just told me what she

17    reported.

18        Who made the objection?

19            **MS. MATTIOLI:**  Me.

20            **THE COURT:**  Overruled.

21    **BY MR. CHA-KIM:**

22    **Q.**    Rhonda, what has been your experience in terms of

23    Mr. Deveney's responsiveness to -- first of all, how would you

24    typically communicate with him?

25    **A.**    Normally there's main line where you can see him at

1   lunchtime or I send -- most of the time I send emails to

2   Mr. Deveney.

3   **Q.**   Okay.  And how would you characterize, in your experience,

4   his level of responsiveness in terms of time and substance?

5   **A.**   Mr. Deveney told me that the squeaky wheel does not get

6   the grease with him.

7           **MR. CHA-KIM:**  I've got nothing further.  Thank you,

8   Rhonda.

9           **THE WITNESS:**  Thank you.

10          **THE COURT:**  Cross.

11      The other side gets to ask you questions.

12          **THE WITNESS:**  Yes, ma'am, Your Honor.

13                          <u>**CROSS-EXAMINATION**</u>

14  **BY MS. MATTIOLI:**

15  **Q.**   Good evening.

16  **A.**   Hello, ma'am.

17  **Q.**   Would you have any reason to disagree with me if I

18  represented that you have filed 409 administrative grievances

19  during your time of incarceration?

20  **A.**   I would dispute that.

21  **Q.**   Why?

22  **A.**   Because it doesn't represent the true fact of it.  Because

23  you file one, a grievance, a BP-9 on one issue, and you have to

24  file two more to appeal it.  So for -- so really it may have

25  been 100 different issues, but it shows 400.

1    **Q.**    Are there three levels per grievance --

2    **A.**    Yes, ma'am.

3    **Q.**    Okay.

4    **A.**    Yes, ma'am.

5    **Q.**    Would you disagree with me if I represented to you that

6    since you've been at Dublin, you've filed at least two

7    administrative remedies per month?

8    **A.**    After they started giving them to me, yes, ma'am.

9    **Q.**    When was that?

10            **THE COURT:**  You agree or disagree?

11            **THE WITNESS:**  I agree.

12    **BY MS. MATTIOLI:**

13    **Q.**    And isn't it true that you charge inmates to provide legal

14    advice to them?

15    **A.**    I do not.  If they choose to bless me, I accept gifts.

16    **Q.**    And are some of those gifts a thousand dollars?

17    **A.**    If they choose to bless me, yes, ma'am.

18    **Q.**    Are some of those gifts $1500?

19    **A.**    No, ma'am.

20    **Q.**    But a thousand?

21    **A.**    Someone has blessed me with that, yes, ma'am.

22    **Q.**    And what did you help that inmate do?

23    **A.**    Filed their motion for compassionate release.

24    **Q.**    And are you aware of whether that inmate has an attorney?

25    **A.**    They had one after we filed their documents.

1           **MS. MATTIOLI:**  No further questions.

2           **THE COURT:**  On this Exhibit 19, the last one that was

3     shown, this multiple-page document --

4           **THE WITNESS:**  Yes, ma'am.

5           **THE COURT:**  -- there's a lot of handwriting on it.

6     Whose handwriting is that?

7           **THE WITNESS:**  That's my handwriting, ma'am,

8     Your Honor.

9           **THE COURT:**  A thousand dollars is a lot of money for

10    some people.

11          **THE WITNESS:**  Yes, ma'am.

12          **THE COURT:**  Who was the person, the initials of the

13    person, who gave you that thousand dollars?

14          **THE WITNESS:**  I don't know who she is speaking of,

15    Your Honor.

16          **THE COURT:**  Do you remember someone giving you a

17    thousand dollars?

18          **THE WITNESS:**  Yes, ma'am.

19          **THE COURT:**  Okay.  What is the person's initials?

20          **THE WITNESS:**  Oh, you want their initials?

21          **THE COURT:**  I do.

22          **THE WITNESS:**  Okay.  The last name is S.

23          **THE COURT:**  And the first?

24          **THE WITNESS:**  I can't remember -- we just call her by

25    her last name.

1          **THE COURT:**  All right.  Will you give her a piece of

2    paper, please, Edwin.  Write the last name down for me.

3        Is this person a rich person?

4          **THE WITNESS:**  Well, she left last month, Your Honor.

5        Here you go, sir.

6        She left on the 18th, Your Honor.

7          **THE COURT:**  Okay.  Did she speak English?

8          **THE WITNESS:**  Yes, ma'am.

9          **THE COURT:**  Do you know whether -- just given the last

10   name, is she American?

11         **THE WITNESS:**  No, ma'am.

12         **THE COURT:**  Okay.

13         **THE WITNESS:**  She was released, though.

14         **THE COURT:**  Okay.  I obviously haven't read all of

15   this.

16         **THE WITNESS:**  Yes, ma'am.

17         **THE COURT:**  But I will.

18       The issue with Williams, when did that happen?  His -- so

19   Garcia, the investigation for Garcia happened a while ago.

20         **THE WITNESS:**  Yes, ma'am.

21         **THE COURT:**  And so I take it you talked to folks a

22   while ago with respect to that.

23         **THE WITNESS:**  It was in '22, yes, ma'am.

24         **THE COURT:**  So when Williams -- by the way, is

25   Williams still there?

1          **THE WITNESS:**  Yes, ma'am.

2          **THE COURT:**  When did he say that relative to when you

3     were talking to the FBI?

4          **THE WITNESS:**  As soon as I got back from speaking to

5     them.

6          **THE COURT:**  Okay.  So that would have been somewhere

7     in 2022?

8          **THE WITNESS:**  Yes.  In August, ma'am.

9          **THE COURT:**  And has there been any other situation

10    that was, you know, kind of so stark that's happened like that

11    since let's say in 2023?

12         **THE WITNESS:**  Another situation is that he had an

13    officer write me an incident report in October.  And when I

14    explained to the officer about my past interaction with

15    Mr. Williams, the officer who is being trained by Mr. Williams,

16    Your Honor, stated that he had to do it because Mr. Williams

17    told him to.

18         **THE COURT:**  Who was that?  What officer?

19         **THE WITNESS:**  Officer Singh.

20         **THE COURT:**  There a number of officers who I have

21    heard repeated comments about.  Are you in the same unit with

22    some of the other women who have testified today?

23         **THE WITNESS:**  Yes, Your Honor.  The majority of us are

24    in F unit.

25         **THE COURT:**  Before coming here today, did you all talk

 1    about your testimony?

 2            THE WITNESS:  No, ma'am.

 3            THE COURT:  Did your attorneys warn you not to talk

 4    about your testimony to each other?

 5            THE WITNESS:  I believe they did.

 6            THE COURT:  In terms of -- so I have this -- I have

 7    this thing about Singh, trained by Williams 2023.

 8        Anything else in 2023 like that?

 9            THE WITNESS:  The denial of my transfer to home

10    confinement, my custody.

11            THE COURT:  Yes.  Anything else?

12            THE WITNESS:  No, ma'am.

13            THE COURT:  Have you been able to use the pilot

14    program to allow you to phone your attorneys without -- yeah.

15    To allow you to phone your attorneys?

16            THE WITNESS:  I provided my attorneys with proof that

17    I'm represented on another case by an attorney that requested a

18    call with me on November 16th of '23.  She was not -- she

19    was -- she made the request -- I made the request to speak to

20    her on November 12th.  I said the 16th, but it's the 12th.  And

21    I provided the email to my attorneys.

22        It was not approved until late December.

23            THE COURT:  And which attorney is that?

24            THE WITNESS:  Her name is Kristen Bromberek,

25    B-R-O-M-B-E-R-E-K.

1        **THE COURT:**  B-R-O-M-B-E --

2        **THE WITNESS:**  -- R-E-K.

3        **THE COURT:**  -- R-E-K.

4        **THE WITNESS:**  Yes, ma'am.

5        **THE COURT:**  Okay.  The attorneys in this matter, have

6  you -- have you used that pilot phone project to be able to

7  talk to them?

8        **THE WITNESS:**  Yes, ma'am.

9        **THE COURT:**  And the phone project is working, that is,

10  it's accessible to you?

11        **THE WITNESS:**  It is accessible at this time.

12        **THE COURT:**  And I am under the understanding that it's

13  available any time the unit is open.  Is that accurate?

14        **THE WITNESS:**  It became that way this week,

15  Your Honor.  There was a bulletin posted that we could use it

16  at any time this week.

17        **THE COURT:**  What was it before?

18        **THE WITNESS:**  Before it was Monday through Friday,

19  Your Honor, from 8:00 to 2:00.

20        **THE COURT:**  Okay.

21    There are issues with the showers?

22        **THE WITNESS:**  Yes, ma'am.

23        **THE COURT:**  Any other issues of a -- that would have

24  sexual overtones?

25        **THE WITNESS:**  When we report sexual misconduct or

```
 1    potential sexual misconduct, it is ignored.  And I have

 2    reported it through the email system to the wardens, and no

 3    action was taken.

 4            THE COURT:  So have you -- I mean, you don't seem to

 5    me to be very shy about reporting.

 6            THE WITNESS:  No, ma'am.

 7            THE COURT:  One of the emails that's listed is to go

 8    to the DOJ directly.

 9            THE WITNESS:  Yes, ma'am.

10            THE COURT:  And it bypasses the warden.  Have you

11    made -- have you sent emails on that line?

12            THE WITNESS:  Yes, ma'am, I have.

13            THE COURT:  And with respect to the sexual misconduct?

14            THE WITNESS:  Yes, ma'am, I have.

15            THE COURT:  And in 2023, how many of those would you

16    say you've made to the DOJ directly?

17            THE WITNESS:  Three.

18            THE COURT:  And what did those concern?

19            THE WITNESS:  They concerned misconduct, sexual

20    misconduct, and retaliation due to this pending litigation.

21            THE COURT:  Due to this case?

22            THE WITNESS:  Yes, ma'am.

23            THE COURT:  So when did those get sent?

24            THE WITNESS:  I cannot honestly tell you the specific

25    date, but I know that they were sent in '23.
```

1          THE COURT:  After the lawsuit was filed?

2          THE WITNESS:  Before and after.

3          THE COURT:  Okay.  All right.  Anything else you want

4    me to hear while you're here?

5          THE WITNESS:  No, ma'am.  I believe that you've

6    covered it, that we appreciate you hearing these things.

7          THE COURT:  Okay.  You're excused.  Thank you.

8          THE WITNESS:  Thank you.

9          MS. SPIEGEL:  Your Honor, plaintiffs would like to

10   call witness AV.  She was supposed to go before the witness who

11   just went.

12                  (Proceedings sealed )

13         THE COURT:  You may proceed.

14                    **DIRECT EXAMINATION**

15   BY MS. SPIEGEL:

16   Q.   Good afternoon, Anabel.  Thanks for your patience.

17        I know that you filed a declaration in this case, and the

18   Judge has heard you testify in other matters about FCI Dublin

19   as well.  So I'm just going to ask you about a few specific

20   topics.

21        Just to start, how long have you been incarcerated at FCI

22   Dublin?

23   A.   I have been at FCI Dublin since March of 2009.

24   Q.   Okay.

25   A.   Approximately 15 years.

1    **Q.**    Are you familiar with the Dublin task force?

2    **A.**    Yes.

3    **Q.**    How did you come to learn of them?

4    **A.**    They came to the institution maybe in -- sometime in the

5    spring of -- I don't remember if it was maybe 2021.

6    **Q.**    And what happened when they came?

7    **A.**    When they came, it was the director at the time,

8    Mr. Carbahal, and he brought a team of maybe like executive

9    staff from other institutions.  And he did kind of like an

10    assembly or open forum where we did like questions and answers.

11    And then he explained about some of the things that -- or

12    complaints that he had got about Dublin.  And he just talked to

13    us and told us how he wanted to make changes.

14    **Q.**    And what was your reaction to that presentation?

15    **A.**    I thought it was nice that the director came to Dublin.

16    **Q.**    And after that meeting, did you take any action?

17    **A.**    Yes.  After that meeting, I felt like kind of empowered or

18    encouraged to kind of talk to the task force about some of the

19    experiences that I had while being in Dublin.

20    **Q.**    And so did you -- did you file any formal reports?

21    **A.**    Yes.  I sent an email to the Dublin task force and I just

22    let them know that I was working in a department where some

23    things were going on, and I just felt like I had never got --

24    gotten an opportunity to, like, process some of the things that

25    I witnessed.

1  **Q.**   And just very briefly, can you describe what you had

2  witnessed?

3  **A.**   I witnessed two of the correctional officers having sexual

4  relations with two of the inmates that worked with me in the

5  office.

6  **Q.**   And when did that happen?

7  **A.**   Between 2019 and 2020.

8  **Q.**   Okay.  And what happened after you filed your report of

9  witnessing those things?

10  **A.**   Maybe like the next day or that week, someone from

11  psychology came to talk to me or interview me.

12  **Q.**   So let me back up.  Who did you file the report to?

13  **A.**   It was an email.  I sent an email to -- it was like on

14  the -- we have like a computer system.  And it had like a

15  special, like, you could -- it was like a tab or something

16  where you can put an email or a message straight to the Dublin

17  task force.

18  **Q.**   Okay.  And is that email still available to you?

19  **A.**   No.

20  **Q.**   Can you describe the reporting mechanisms that you're

21  personally aware of being in place right now at Dublin?

22  **A.**   For sexual conduct?

23  **Q.**   Yes.

24  **A.**   You can use the telephone, you can use the computer

25  system, you can talk to a staff member.

1    **Q.**   And do you believe that any of those are confidential?

2    **A.**   No.

3    **Q.**   Why not?

4    **A.**   Well, for instance, when there was a Dublin task force, it

5    went straight to someone I guess in central office, and it just

6    got rerouted right back to the institution.

7         **THE COURT:**  By rerouted, you mean because someone from

8    psychology spoke to you?

9         **THE WITNESS:**  Yes.

10        **THE COURT:**  And who were the two officers who you were

11   reporting to them?

12        **MS. SPIEGEL:**  Your Honor, could I -- may I approach

13   the bench before she answers?

14        **THE COURT:**  Okay.

15      You can stay there, Pam.

16      Ms. Mattioli.

17           (Sidebar conference without the reporter.)

18        **THE COURT:**  When you -- I just talked to your

19   attorney.  When you sent the email to DOJ, this was recent,

20   right, because the task force was more -- I don't remember when

21   it was implemented.

22        **THE WITNESS:**  It was like maybe spring of '21, 2021.

23        **THE COURT:**  And -- but you were already -- but you had

24   already talked to the FBI or other --

25        **THE WITNESS:**  No.

1          **THE COURT:**  So you hadn't talked to anybody about the

2     two officers?  This was the first?

3          **THE WITNESS:**  I had -- I had spoke to my boss directly

4     at the time, my supervisor, about one of the officers.

5          **THE COURT:**  Okay.  And -- and not about the other?

6          **THE WITNESS:**  Not about the other.

7          **THE COURT:**  Okay.  Go ahead.

8     BY MS. SPIEGEL:

9     **Q.**    You mentioned that the email you sent was, in your words,

10    you said routed back?

11    **A.**    Yes.

12    **Q.**    Can you explain what made you think that?

13    **A.**    When we originally went to the meeting, I thought that I

14    was going to be seen by someone from central office, not like

15    necessarily someone from Dublin.

16    **Q.**    And that was your impression based on the --

17    **A.**    That was my impression.

18    **Q.**    Okay.  I'm going to switch gears.

19         Are you familiar with the privacy screens on computers at

20    Dublin?

21    **A.**    Yes.

22    **Q.**    Have you used computers with those screens on them?

23    **A.**    Yes.

24    **Q.**    And have you watched other people use the computer with

25    those screens on them?

1    **A.**    Yes.

2    **Q.**    Can you please, for the Court, just describe how the

3    screen works.  And you can use the screen --

4    **A.**    It's like a plastic screen protector that goes over the

5    screen, and it has like some kind of tint.

6    **Q.**    And so if you were sitting where you are right now, would

7    you be able to see everything on the screen?

8    **A.**    Yes.

9    **Q.**    What if you were sitting -- you were standing against that

10    marble wall?

11    **A.**    Yes.

12    **Q.**    And how can that be if the screen is a privacy screen?

13    **A.**    I think because the tint or the quality of the screen is,

14    in my words I would say cheap.  So it's not doing, I think,

15    what the intended purpose was, was to protect people from

16    reading or seeing what you are doing on the computer.

17    **Q.**    So would you feel comfortable writing an email that you

18    didn't want others to see at the computer --

19    **A.**    No.

20    **Q.**    And just one last question about reporting.  What would it

21    take for you to feel like you could confidentially report

22    sexual harassment or abuse that you had witnessed or

23    experienced?

24    **A.**    I think if we had some kind of third-party agency or

25    third-party reporting that had nothing to do with the BOP or

1    any of the staff members that work there.  Maybe a separate

2    agency that could handle these things or oversee them without

3    it being a person that it has any relation to any employee or

4    person that is being either complained about or wanting to be

5    investigated.

6    **Q.**    And to the best of your knowledge, is there any such

7    mechanism available to you today?

8    **A.**    I don't think so.

9    **Q.**    I have just a few questions about commissary.

10   **A.**    Yes.

11   **Q.**    Are there items that you regularly buy at commissary?

12   **A.**    Yes.

13   **Q.**    What are they?

14   **A.**    Hygiene, food, clothing.

15   **Q.**    Do you take any medications?

16   **A.**    Yes.

17   **Q.**    Do you have to purchase any of those?

18   **A.**    Yes.

19   **Q.**    What's an example?

20   **A.**    An example would be like I have acid reflux or

21   gastrointestinal problems and I have to purchase medication

22   from the commissary.

23   **Q.**    Any other medications that you purchase?

24   **A.**    Just regular like Tylenol or Excedrin for headaches.

25   **Q.**    And have you always had to purchase those medications?

1    **A.**    Not all of them.  For instance, for my gastrointestinal, I

2    have what they call chronic care.  So in the past, I didn't

3    have to pay for that medication.  I would get it from the

4    institution for free from medical.

5    **Q.**    When did that change?

6    **A.**    Maybe about four months ago.

7    **Q.**    Okay.  And how much does it cost you per month to buy that

8    medication now?

9    **A.**    Each bottle is about 20 tablets.  It's like -- a little

10   under $5.  So it's probably about $10 a month.

11   **Q.**    And you said you've been at FCI Dublin for about 15 years.

12   In that time, have the prices at commissary gone up?

13   **A.**    Yes.

14   **Q.**    And in that time, have wages gone up?

15   **A.**    No.

16   **Q.**    Okay.  And in your time at FCI Dublin, have you had visits

17   from lawyers?

18   **A.**    Yes.

19   **Q.**    When did you most recently meet with lawyers?

20   **A.**    Like two days ago, maybe.

21   **Q.**    And were you strip searched after that visit?

22   **A.**    Yes.

23   **Q.**    Before -- was that with lawyers regarding this lawsuit?

24   **A.**    Yes.

25   **Q.**    In your time at Dublin, before anything related to this

1    lawsuit, had you met with lawyers?

2    **A.**    Yes.

3    **Q.**    Do you recall when?

4    **A.**    Maybe sometime beginning last -- last year.

5    **Q.**    Okay.  And were you strip searched after meeting with

6    them?

7    **A.**    No.

8    **Q.**    And do you personally know of anyone who has decided not

9    to meet with a lawyer because they knew they would be strip

10   searched afterward?

11   **A.**    Yes.

12   **Q.**    How do you know that?

13   **A.**    Because I talked to the person in the unit and I seen how

14   when we were waiting for the attorneys and she came in, because

15   we were being pat searched as soon as we got there, she was

16   discouraged.  She's like no, I'd rather not do this.  And she

17   turned away and didn't have her visit.

18   **Q.**    In your time at FCI Dublin, do you feel that you're any

19   safer now than you've been in the past?

20   **A.**    No.

21          **THE COURT:**  Really?  I have sentenced five people, and

22   I've got more under indictment, and you don't feel safer?

23          **THE WITNESS:**  No.

24          **THE COURT:**  Okay.  So what other sexual abuse have you

25   seen since I started sentencing?

1          THE WITNESS:  I personally haven't witnessed any after

2     that.

3          THE COURT:  Okay.  Isn't that a good thing?

4          THE WITNESS:  Yes.  Absolutely.

5          THE COURT:  And did those sentences have an effect on

6     helping stop what's going on out there?

7          THE WITNESS:  As far as the sexual misconduct, I would

8     think so.

9          THE COURT:  Doesn't that help?

10          THE WITNESS:  Yes.

11          THE COURT:  But it doesn't make you feel safer, even

12     though it helps?

13          THE WITNESS:  No.

14          THE COURT:  Why?

15          THE WITNESS:  Can I give you an example?

16          THE COURT:  Sure.

17          THE WITNESS:  Just the other day in the recreation

18     department, somebody committed some kind of vandalism.  So I

19     asked the officer what exactly was the vandalism because they

20     shut down the rec -- a certain classroom because something

21     happened in that classroom.

22          And the officer told me, oh, well, they cut a cord.

23          And I said, well, why don't we run the cameras.  If we

24     have cameras now, why can't we run the cameras and find out who

25     committed this.

1          And the -- the officer's response was, well, what about if

2     it happened three weeks ago?

3          And the first thing that came to my mind was, well, if we

4     have cameras now, isn't that the point of the cameras?  So it

5     made me feel uneasy because if you're telling me that we can't

6     run the cameras for an incident that happened three weeks ago,

7     who is to say that if someone was raped in that same classroom

8     three weeks ago, we wouldn't be able to run the cameras?  I

9     understand they're different spectrums, but that's the first

10    thing that came to my mind.

11         **THE COURT:**  Okay.  What -- what other -- what other

12    incidents are occurring that -- that make you feel unsafe?

13         **THE WITNESS:**  I believe the overall demeanor of some

14    of the newer staff.

15         **THE COURT:**  The what of --

16         **THE WITNESS:**  Like maybe their demeanor or their

17    treatment or the way they talk to us kind of makes me feel

18    uneasy.

19         **THE COURT:**  In what way?

20         **THE WITNESS:**  They're not -- they're not professional.

21    I feel that they're not properly trained.  I feel that they

22    come to work at the institution with maybe a pre- -- maybe a

23    preconceived notion of what happened there, maybe because of

24    the media, I don't know, and they just treat us, I would say,

25    differently because of that.

1           **THE COURT:**  Yeah.  But people were treating -- there

2      was a whole set of people acting inappropriately --

3           **THE WITNESS:**  Yes.

4           **THE COURT:**  -- right?  And that's not going on, is it?

5      Now it's a different kind of thing, is what I'm hearing.

6           **THE WITNESS:**  Yes.

7           **THE COURT:**  And so you think training is important,

8      that they're not getting enough training?

9           **THE WITNESS:**  Absolutely.

10           **THE COURT:**  Okay.  What else would be important?

11           **THE WITNESS:**  I would think if you would court order

12      some of these things to force the institution to make the

13      changes.  I think that just by complaining or doing grievances

14      is not enough.  I think that there needs to be a court order

15      that's -- and that they follow through with it.  That's the

16      only way that things will get better.

17           **THE COURT:**  Like what?  What do you want me to order?

18      What do you think I should order?

19           **THE WITNESS:**  I think you should order someone outside

20      of the BOP to come to the institution but for them not to be

21      aware that they're coming.

22           **THE COURT:**  Well, that's -- that would never happen.

23      This is a public institution.  So think again.  What else?

24      That would never happen.

25           **MS. SPIEGEL:**  If I may, can I --

1          **THE COURT:**  No.

2          **THE WITNESS:**  Just better reporting mechanisms.  That

3     would help.  That's -- I really believe in third-party

4     reporting that has nothing to do with the BOP because during

5     the time that these things were going on, I personally

6     approached different staff members about the situations that

7     were happening, and I felt like nothing was done.

8          **THE COURT:**  But the things that you reported,

9     indictments happened.

10          **THE WITNESS:**  It took two years for these things to

11     happen, but, yes.

12          **THE COURT:**  Right.  I mean you reported something, and

13     indictments happened.

14          **THE WITNESS:**  Yes.

15          **THE COURT:**  People went or are going to prison.

16          **THE WITNESS:**  Yes.

17          **THE COURT:**  Isn't that positive?

18          **THE WITNESS:**  Yes, that is positive.

19          **THE COURT:**  So you didn't have any problem when you

20     talked to the FBI; right?  I mean, the FBI -- you don't think

21     the FBI is a problem, do you?

22          **THE WITNESS:**  No.

23          **THE COURT:**  And when you interacted with the

24     United States Attorneys, was that also positive?

25          **THE WITNESS:**  Yes.

1          **THE COURT:**  Okay.

2      Ms. Miner Priedeman and Mr. Paulson?

3          **THE WITNESS:**  Yes.

4          **THE COURT:**  How about OIG?

5          **THE WITNESS:**  Yes.

6          **THE COURT:**  All of those government folks were

7  prosecuting those individuals; right?

8          **THE WITNESS:**  Yes.

9          **THE COURT:**  So that's all government.

10         **THE WITNESS:**  Yes.

11         **THE COURT:**  I mean it's government on government.

12         **THE WITNESS:**  Yes.

13         **THE COURT:**  So all government is not bad?

14         **THE WITNESS:**  No.  Absolutely not.

15         **THE COURT:**  So now the question is -- I have heard

16  some complaints that the officers out there are just angry and

17  they're taking it out on you.

18         **THE WITNESS:**  Yes.

19         **THE COURT:**  Would you agree with that?

20         **THE WITNESS:**  I agree.

21         **THE COURT:**  I've also heard that inmates are taking it

22  out on other inmates.  That is, that there are inmates who are

23  kind of not happy with the change and are complaining that

24  there are some inmates that are kind of creating issues.  It's

25  not right or wrong, but there are complaints by inmates on

1    inmates.  Have you heard any rumblings to that effect?

2         THE WITNESS:  About what kind of issues?

3         THE COURT:  About making waves in terms of this

4    lawsuit or other lawsuits.

5         THE WITNESS:  Well, I believe -- everybody is entitled

6    to their own opinion, but I don't know -- I don't know which

7    ones are mad about it.

8         THE COURT:  Okay.  So no -- you haven't heard any

9    expression of that.  And you're in the same -- what unit?

10         THE WITNESS:  I'm in F unit.

11         THE COURT:  F unit.  A lot of solidarity in F unit, it

12    sounds like.

13         THE WITNESS:  It's -- the F unit is the majority of

14    the people that have, I would say, like the essential jobs in

15    the institution.  And a lot of us that are in that unit have

16    been at the institution for many years.

17         THE COURT:  And is that just the way it's structured,

18    that there are many in the F unit who have been there for a

19    long time?

20         THE WITNESS:  I think it happened during COVID, kind

21    of like by default.  The inmates that were at the certain jobs

22    for longer, we kind of became like the essential workers, so we

23    ended up in that unit.

24         THE COURT:  Okay.  So we have issues of reporting.  We

25    have issues of training.  Other issues you can think about?

1        **THE WITNESS:**  I think that -- that would -- that would

2   help a lot.

3        **THE COURT:**  Okay.  Now you may proceed.

4        **MS. SPIEGEL:**  I have no further questions.  Thank you,

5   Anabel.

6        **THE COURT:**  The other side gets to cross-examine.  You

7   may.

8        **MS. MATTIOLI:**  No cross, Your Honor.

9        **THE COURT:**  Okay.  I know I kept you all long, but I

10  didn't want to have to bring you back again.  So while I have

11  you here, anything else you want me to know or anything else

12  you want to tell me while you're here?

13       **THE WITNESS:**  No.  I think -- I think we covered

14  pretty much everything.

15       **THE COURT:**  Okay.  Thanks, Anabel.

16       **THE WITNESS:**  Thank you.

17       **THE COURT:**  All right.  For purposes of the record, I

18  did get an item which I shared with Mr. Galvan and Ms. Mattioli

19  that will be marked as next in order, Exhibit R.

20       (Defense Exhibit R marked for identification.)

21       **THE COURT:**  Okay.  I have run my court reporter dry.

22  It's way past our time.  But I did not want to bring those

23  individuals in and then not let them say what they needed to

24  say.

25    I can put the rest of this on FTR, Pam.

```
 1                  (Discussion held off the record.)

 2            THE COURT:  All right.  In terms of Monday, Ms. Reese.

 3            MS. REESE:  Yes, Your Honor.

 4            THE COURT:  Come on forward.  I'm going to want to

 5    hear from you in terms -- and I'm not going to put you on the

 6    spot today.  It's already late.  I'm going to want to know from

 7    you whether you think things are working as well as you thought

 8    they were working after what you heard today.

 9        You know, witnesses have credibility issues.  All

10    witnesses do on both sides.  But there are some concerns that I

11    have about your assumption that everybody seems to still trust

12    the process and so a mechanism that you put in place to address

13    issues, whether that was prematurely stopped.

14            MS. REESE:  Are you referring to the email,

15    Your Honor?

16            THE COURT:  To the task force --

17            MS. REESE:  The task force email?

18            THE COURT:  -- email.

19            MS. REESE:  Okay.

20            THE COURT:  There is also quite a bit, I think, of

21    miscommunication in terms of confidentiality.  And I will be

22    going over my notes and likely ordering some very easy-to-fix

23    communication notices that will, in my view, need to be put up

24    everywhere in that facility.

25        We are not done, but I think I've got concerns.  So I'm
```

1    going to want some kind of response from you.

2         **MS. REESE:**  Yes, Your Honor.

3         **THE COURT:**  There were also some things that came out

4    today that Dublin needs to respond to.  And I am concerned

5    about issues in terms of logging information, in terms of

6    logging legal mail, in terms of opening legal mail in an

7    appropriate way, in terms of changing classification.  Lots of

8    questions, all of which are going to need answers.

9         **MS. MATTIOLI:**  Is there a specific witness you'd like

10   to hear from?

11       Ms. Agostini is still under cross.  I was planning to

12   bring her back.  Would you like Mr. Deveney?

13        **THE COURT:**  Well, I don't know that she's going to be

14   able to answer everything.  I had on my list that you were

15   still intending to call -- she's got to finish up:  Mulcahy

16   he --

17        **MS. MATTIOLI:**  Mulcahy.

18        **THE COURT:**  Mulcahy who has played large.

19        **MS. MATTIOLI:**  Yes.

20        **THE COURT:**  And then Wilson and Newman.

21        **MS. MATTIOLI:**  Yes.

22        **THE COURT:**  You were going to call them as well.

23       And then am I still getting three more inmates on Monday?

24        **MR. GALVAN:**  Yes, Your Honor.

25        **MS. MATTIOLI:**  Is it four?

1          **MR. GALVAN:**  I am going to strike one.  Just three.

2          **MS. MATTIOLI:**  Okay.

3          **THE COURT:**  Okay.  Was that -- I don't want another

4     screw-up again.  So --

5          **MS. MATTIOLI:**  He communicated to me earlier four, so

6     now I know that there are three.  And I will resubmit the forms

7     for the correct date.  They'll be here Monday.

8          **THE COURT:**  I need you to also email the correct

9     people.  The main person who is in charge was not on that

10    email.  So send it to the two, and we will give you the email

11    for the third, and copy me.

12         **MS. MATTIOLI:**  Yes, Your Honor.

13         **THE COURT:**  So we've got more inmates.  And then

14    anybody else from the plaintiffs' side?

15         **MR. GALVAN:**  No, Your Honor.

16      I spoke too soon.

17         **MR. CHA-KIM:**  Your Honor, there was just the issue

18    that we discussed at sidebar of potential new witnesses, but we

19    can take the Court's guidance on that from yesterday.

20         **THE COURT:**  As I said to you, the answer is no.

21         **MR. CHA-KIM:**  The Court did grant or request certain

22    others yesterday at sidebar.

23         **THE COURT:**  And do we have their names?

24         **MR. CHA-KIM:**  Your Honor just gave us a -- we could

25    discuss it at sidebar or -- it was a certain of person that we

1    were instructed to call if we wished.  If that's still the

2    Court's intent, we can discuss that.

3         **THE COURT:**  Again, remember, I am not the advocate in

4    the room.  If you are going to call them, you need to

5    communicate that so that they can appear.

6         **MR. CHA-KIM:**  Understood.

7         The Court just alluded to certain conditions for their

8    testimony that were special.  So I just wanted to make sure

9    that those were still the intent before moving forward.

10   Because there was a suggestion of in camera further testimony

11   for those witnesses that we discussed at sidebar at the very

12   end of yesterday.

13        **THE COURT:**  Well, it's not clear to me that they need

14   to be in camera.  What I need you to do is talk to Ms. Mattioli

15   and see if there's anything that needs to be in camera.

16        **MR. CHA-KIM:**  We will consult with her, Your Honor.

17        **THE COURT:**  We will talk about it again on Monday.

18   Anything else?

19        **MR. GALVAN:**  There was -- I wanted to request one

20   other sidebar to close out an Exhibit R question, Your Honor.

21        **THE COURT:**  Anything else?

22        **MR. GALVAN:**  Nothing, Your Honor.

23        **THE COURT:**  Nothing from the plaintiffs.

24        Anything else from the defense?

25        **MS. MATTIOLI:**  No, Your Honor.

1          **THE COURT:**  All right.  Then we will stand in recess

2    until 8:00 a.m.

3              (Proceedings concluded at 5:14 p.m.)

<u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, January 5, 2024

_Pamela Batalo Hebel_
_____
Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter