**Volume 5**

**Pages 1136 - 1317**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

CALIFORNIA COALITION FOR WOMEN )
PRISONERS, ET AL.,            )
                              )
          Plaintiffs,         )
                              )
  VS.                         )        **NO. CV 23-04155-YGR**
                              )
UNITED STATES OF AMERICA      )
FEDERAL BUREAU OF PRISONS,    )
ET AL.,                       )
                              )
          Defendants.         )
_____)

Oakland, California
Tuesday, January 9, 2024

**EVIDENTIARY HEARING**

**APPEARANCES**:

For Plaintiffs:

                    ARNOLD & PORTER KAYE SCHOLER LLP
                    250 West 55th Street
                    New York, NY 10019
              BY:   **STEPHEN SEUNGKUN CHA-KIM, ESQUIRE**

                    ARNOLD & PORTER KAYE SCHOLER LLP
                    5 Palo Alto Square, Suite 500
                    3000 El Camino Real
                    Palo Alto, CA 94306
              BY:   **CARSON ANDERSON, ESQUIRE**

Reported By:        Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                    Official Reporter

**APPEARANCES CONTINUED:**

For Plaintiffs:

        ROSEN BIEN GALVAN & GRUNFELD LLP
        101 Mission Street, Sixth Floor
        San Francisco, CA 94105
    BY: **ERNEST JAMES GALVAN, ESQUIRE**
      **KARA JANSSEN, ESQUIRE**
      **ADRIENNE SPIEGEL, ESQUIRE**
      **LUMA KHABBAZ, ESQUIRE**

        RIGHTS BEHIND BARS
        416 Florida Avenue NW
        Washington, DC 20001
    BY: **OREN NIMNI, ESQUIRE**
      **AMARIS MONTES, ESQUIRE**

        CALIFORNIA COLLABORATIVE FOR IMMIGRANT
        JUSTICE
        1999 Harrison Street, Suite 1800
        Oakland, CA 94612
    BY: **SUSAN M. BEATY, ESQUIRE**

For Defendants:

        OFFICE OF THE UNITED STATES ATTORNEY
        901 Front Street, Suite 110
        Helena, MT 59626
    BY: **MADISON MATTIOLI**
      **ABBIE CZIOK**
      **ASSISTANT UNITED STATES ATTORNEYS**

Also Present:      **ROBERT FRANCE, KRISTI SUTTON**

# I N D E X

Tuesday, January 9, 2024 - Volume 5

| DEFENDANTS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **DEVENEY, PATRICK (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 1143 | 5 |
| Cross-Examination resumed by Mr. Cha-Kim | 1144 | 5 |
| Redirect Examination by Ms. Mattioli | 1199 | 5 |
| Recross Examination by Mr. Cha-Kim | 1211 | 5 |
| Examination by The Court | 1212 | 5 |
| Further Recross Examination by Mr. Cha-Kim | 1227 | 5 |
| Further Redirect Examination by Ms. Mattioli | 1227 | 5 |
| | | |
| **CAMPOS, CONSTANCE** | | |
| (SWORN) | 1236 | 5 |
| Direct Examination by Ms. Mattioli | 1237 | 5 |
| Cross-Examination by MR. Nimni | 1245 | 5 |
| | | |
| **DULGOV, ARTHUR** | | |
| (SWORN) | 1247 | 5 |
| Direct Examination by Ms. Mattioli | 1248 | 5 |
| Cross-Examination by Mr. Galvan | 1271 | 5 |
| Redirect Examination by Ms. Mattioli | 1281 | 5 |
| Examination by The Court | 1282 | 5 |
| Further Redirect Examination by Ms. Mattioli | 1285 | 5 |
| Further Examination by The Court | 1286 | 5 |
| Recross-Examination by Mr. Galvan | 1287 | 5 |
| Further Recross-Examination by Mr. Galvan | 1288 | 5 |
| | | |
| **CAMPOS, CONSTANCE (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 1290 | 5 |
| Direct Examination (Resumed) by Ms. Mattioli | 1290 | 5 |
| Cross-Examination by Mr. Nimni | 1293 | 5 |
| Examination by the Court | 1294 | 5. |
| Recross-Examination by Mr. Nimni | 1295 | 5 |
| Redirect Examination by Ms. Mattioli | 1295 | 5 |

# E X H I B I T S

| PLAINTIFFS' EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 13 | | 1296 | 5 |
| 19 | | 1184 | 5 |

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>**PLAINTIFFS' EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 20 | | 1187 | 5 |
| 208 | | 1169 | 5 |

<u>**E X H I B I T S**</u>

| <u>**DEFENDANTS' EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| S | 1200 | 1200 | 5 |
| T | 1222 | | 5 |
| U | 1297 | | 5 |
| V | 1317 | | 5 |
| 245 | | 1143 | 5 |
| 268 | | 1143 | 5 |
| 287 | | 1143 | 5 |
| 297 | | 1143 | 5 |
| 299 | | 1143 | 5 |
| 322 | | 1143 | 5 |
| 337 | | 1143 | 5 |
| 367 | | 1143 | 5 |
| 375 | | 1143 | 5 |
| 376 | | 1143 | 5 |
| 377 | | 1143 | 5 |
| 378 | | 1143 | 5 |
| 397 | | 1143 | 5 |

## I N D E X

## E X H I B I T S

| DEFENDANTS' EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 423 | 1260 | | 5 |
| 426 | | 1226 | 5 |

<u>**Tuesday - January 9, 2024**</u>                                    **8:01 a.m.**

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:**  Calling the matter of CV 23-4155-YGR,

California Coalition for Women Prisoners, et al. vs. United

States of America Federal Bureau of Prisons, et al.

Parties, please step forward and state your appearances

for the record.

**MR. GALVAN:**  Good morning, Your Honor.

**THE COURT:**  Mr. Galvan, good morning.

**MR. GALVAN:**  Ernest Galvan, Rosen Bien Galvan &

Grunfeld, for plaintiffs.

**THE COURT:**  Mr. Nimni, good morning.

**MR. NIMNI:**  Good morning again, Your Honor.  Oren

Nimni, Rights Behind Bars, for plaintiffs.

**THE COURT:**  Mr. Cha-Kim, good morning.

**MR. CHA-KIM:**  Good morning, Your Honor.  Stephen

Cha-Kim, Arnold & Porter, for the plaintiffs.

**THE COURT:**  Mx. Beaty, good morning.

**MX. BEATY:**  Good morning.  Susan Beaty, California

Collaborative for Immigrant Justice, for the plaintiffs.

**THE COURT:**  And Ms. Montes, good morning.

**MS. MONTES:**  Good morning.  Amaris Montes with Rights

Behind Bars, for plaintiffs.

**THE COURT:**  Ms. Mattioli, good morning.

1          **MS. MATTIOLI:**  Good morning, Your Honor.  Madison

2     Mattioli for the United States.

3          **THE COURT:**  Ms. Cziok.

4          **MS. CZIOK:**  Good morning, Your Honor.  Abbie Cziok for

5     the United States.

6          **THE COURT:**  Mr. France, good morning.

7          **MR. FRANCE:**  Good morning, Your Honor.

8          **THE COURT:**  Good morning.

9          **MS. CASELLI-GROSS:**  Joan Caselli-Gross.

10         **THE COURT:**  Good morning.

11         **MS. SUTTON:**  Good morning, Your Honor.  Kristi Sutton.

12         **THE COURT:**  Okay.  So I think it was the plaintiffs

13    who provided me with a number of psychological reports

14    yesterday.

15         **MR. CHA-KIM:**  That was the defendants, Your Honor.

16         **THE COURT:**  Okay.  All right.  So these are Exhibits

17    245, 268, 287, 297, 299, 322, 337, 367, 375, 376, 377, 378,

18    397.  I'll admit all of them under seal, although, again, I

19    don't know that they have any probative value.

20         And I want to confirm, plaintiffs have all of this

21    information, correct?

22         **MR. CHA-KIM:**  Just one point of clarification on that,

23    Your Honor.  The government took back our hard copy yesterday.

24    So we have these exhibit numbers.  We just don't know if the

25    versions that were submitted are the same as the versions of

1    the exhibits that were previously produced to us under those

2    numbers, meaning are they the entire set or are they a subset.

3    We just need to know that information.

4              **MS. CZIOK:**  They're the entire set.

5              **MR. CHA-KIM:**  Thank you.

6              **MS. CZIOK:**  And I just handed a hard copy to

7    plaintiffs' counsel.

8          (Defense Exhibit 245, 268, 287, 297, 299, 322, 337, 367,

9    375, 376, 377, 378, 397 received in evidence, under seal.)

10             **THE COURT:**  The other thing that I will admit, and

11   this -- just so that the record is clear, I understand the

12   plaintiffs don't have copies of the lettered exhibits that have

13   been proffered during these proceedings.  I think it is A

14   through P.

15             **MR. CHA-KIM:**  R at this point, I think, Your Honor.

16             **THE COURT:**  A through R.  A couple of those the record

17   shows that they have -- that the plaintiffs do have them, but

18   that's only a couple.

19        Okay.  Who do we have?

20             **MR. CHA-KIM:**  We are completing the cross and doing

21   the redirect of Associate Warden Deveney, Your Honor.

22             **THE COURT:**  All right.  Call him in.

23                        **PATRICK DEVENEY**,

24   called as a witness for the defendants, having been previously

25   duly sworn, testified further as follows:

1    THE COURT:  Mr. Deveney, good morning.

2    THE WITNESS:  Good morning, Your Honor.

3    THE COURT:  Have a seat.  You're still under oath,

4    sir.  Do you understand?

5    THE WITNESS:  Yes, Your Honor.

6    THE COURT:  Mr. Cha-Kim, you may proceed.

7    MR. CHA-KIM:  Thank you, Your Honor.

8                    CROSS-EXAMINATION    (resumed)

9    BY MR. CHA-KIM:

10   Q.    Good morning.

11   A.    Good morning.

12   Q.    Thank you for coming back.

13        The Judge has admonished us to stay very, very focused and

14   move quickly, so I'll try my best to ask very focused

15   questions.  And if you could just respond to the best of your

16   ability --

17   THE COURT:  But Mr. Cha-Kim is not going to speak any

18   more quickly even though he is going to be more efficient.

19        Right, Mr. Cha-Kim?

20   MR. CHA-KIM:  That is correct, ma'am.  Even though I

21   just had coffee, I am going to take a breath after every word

22   and speak very slowly.

23   THE COURT:  Proceed.

24   MR. CHA-KIM:  Thank you, ma'am.

25   Q.    So, Mr. Deveney, the Judge, when you were on the stand

1    last week, requested certain DOJ task force recommendations.

2    Do you recall that?

3    **A.**    I do.

4    **Q.**    Okay.  And have those been provided to the Court?

5    **A.**    I do not know at this time.

6              **THE COURT:**  They have.

7    **BY MR. CHA-KIM:**

8    **Q.**    And the Judge also directed you to give, for the Court's

9    review, the working plan document that I think you referred to,

10   which is where you keep track of progress or lack of progress

11   on The Moss Group recommendations.

12         Do you recall that?

13   **A.**    That is accurate.

14   **Q.**    Have you had a chance to find that document?

15   **A.**    That document was provided to our legal team.

16             **THE COURT:**  So I don't think I have that.

17             **MS. MATTIOLI:**  Your Honor, Ms. Cziok is on her way to

18   print it off.  We received it late last night.

19             **THE COURT:**  Okay.

20   **BY MR. CHA-KIM:**

21   **Q.**    Aside from conversations with counsel about the mechanics

22   of finding those records, have you discussed your testimony

23   with anyone since you left the stand on Friday?

24   **A.**    No.  No.

25   **Q.**    Very quickly, you testified that among the additional

1  oversight requirements or recommendations that the task force

2  recommended was the addition of a third associate warden and a

3  second captain.  Do you recall that?

4  **A.**    I do.

5  **Q.**    Who is the third associate warden currently, sir?

6  **A.**    We do not have a third associate warden currently.

7  **Q.**    How long has that recommended post been vacant?

8  **A.**    The third associate warden retired in August.

9  **Q.**    Okay.  And how long had that person been in that third

10  associate warden position?

11  **A.**    Approximately a year.

12          **THE COURT:**  Who was that?

13          **THE WITNESS:**  That was AW -- Associate Warden Beth

14  Buckner.

15  **BY MR. CHA-KIM:**

16  **Q.**    Was that the first person to hold that role?

17  **A.**    For the third associate warden position, yes.

18  **Q.**    Okay.  And is there currently a posting out to fill the

19  third associate warden position?

20  **A.**    There is not.

21          **THE COURT:**  Why not?

22          **THE WITNESS:**  Your Honor, at this time, the initial

23  response for what was required or needed for Dublin was

24  administrative, the extreme oversight.  With the process or

25  implementation of the working plan, the progress that we've

1  made, we didn't feel that the third associate warden position

2  was -- was -- was required any further.  We actually replaced

3  it with an attorney.

4        THE COURT:  You mean you replaced it with in-house

5  counsel?

6        THE WITNESS:  Yes, Your Honor.

7        THE COURT:  Proceed.

8  BY MR. CHA-KIM:

9  Q.  The in-house counsel position that replaced the third

10 associate warden, when did that person start?

11 A.  That person started approximately three weeks ago.

12 Q.  And is that person located on staff or on site at Dublin?

13 A.  Yes.

14 Q.  Who is that person?

15 A.  She's actually sitting at the table.

16 Q.  Could you identify her by name, please.

17 A.  I'm sorry.  I'm drawing a blank right now.  Kristi Sutton.

18 Q.  That's okay.  It's early.

19 A.  Yeah.

20 Q.  Is it your understanding that this new counsel position's

21 responsibilities are similar to what the third associate warden

22 was carrying out?

23 A.  No.  The third associate warden position was more focused

24 on correctional services and responsibilities and oversight of

25 correctional services and UNICOR.

1    With the litigation that's going -- ongoing with the

2    institution, with what's -- our current process is, having

3    onsite legal counsel was recommended at the time.

4    **Q.**    Okay.  Who is the second captain that The Moss -- or the

5    task force recommended be hired?

6    **A.**    So with the task force, it was recommended that we have a

7    captain and a deputy captain.  The GS-13 captain was Jesse

8    Valero.  He retired last month.

9    **Q.**    So that position is vacant right now?

10   **A.**    That position is vacant.

11         **THE COURT:**  Last month meaning the end of the month,

12   the beginning of the month?  What exact day?

13         **THE WITNESS:**  December 30 -- 31st was his retirement

14   date.

15   **BY MR. CHA-KIM:**

16   **Q.**    Have you posted for his replacement?

17   **A.**    No, sir.  That position is going to return to the -- to

18   the region, so we're not going to fill that position.

19   **Q.**    So on the subject of retirements, Lieutenant Putnam

20   retired at the end of December, as I understand it.  When did

21   you become aware of his plans to retire?

22   **A.**    Roughly six months ago.

23   **Q.**    And where are you in the process of replacing him?

24   **A.**    Again, that position was -- was at the institution level,

25   but then the position is now with central office and with OIA,

```
1   or Office of Internal Affairs.  So it would be their

2   responsibility to fill that position.  And I -- that position

3   is currently open, and they are actively working to make that

4   selection.

5           THE COURT:  But you cannot fill it?

6           THE WITNESS:  No, Your Honor.  We are not responsible

7   for filling that position.

8   BY MR. CHA-KIM:

9   Q.  Is it fair to say that in the interim until that position

10  is finally filled, individuals like Lieutenant Baudizzon who

11  are on your staff are temporarily helping out with those

12  responsibilities?

13  A.  That's accurate.

14  Q.  And those people don't report to OIA?

15  A.  They do report to OIA.

16  Q.  They also report to you?

17  A.  They would report to me in the terms of as an SIA would,

18  not in the -- any other term outside of that.

19  Q.  You testified that you are tracking 160 PREA violations

20  currently.  Do you recall that?

21  A.  160 -- we're tracking 160 PREA allegations.

22  Q.  And of those -- of those that you're tracking and indeed

23  of those that you've tracked in the past, in how many

24  instances, to your knowledge, has Dublin preserved any relevant

25  videotape?
```

1    **A.**    I don't have the numbers off the top of my head.

2    **Q.**    Is that logged somewhere?

3    **A.**    Yes.  That would be logged in a share file with the SIA.

4    **Q.**    Do you have any kind of written protocol governing chain

5    of custody issues for preserving evidence like videotape?

6    **A.**    We do.

7    **Q.**    Where is that located?

8    **A.**    The -- the written protocols would be in policy.  I can't

9    name them off the top of my head.

10   **Q.**    You're talking about the nationwide program statement-type

11   policies?

12   **A.**    Yes.

13   **Q.**    Anything specific to the institution?

14   **A.**    No, not that I'm aware of.

15   **Q.**    Do you preserve videotape in cases where you don't refer

16   the matter to OIA?

17   **A.**    Can you repeat the question?

18   **Q.**    Sure.  Do you preserve the videotape in cases where you

19   end up not referring the matter to OIA?

20   **A.**    We absolutely do.

21   **Q.**    Okay.  And how many instances have you done that?

22   **A.**    I don't have the number off the top of my head.

23   **Q.**    Do you have a rough idea?

24   **A.**    Five, maybe ten.  Again, I'd have to check.

25   **Q.**    And those are cases where you didn't end up referring to

1    OIA?

2    **A.**   I -- I have to check again.   But in certain cases, if it's

3    not a PREA allegation or full PREA protocols are warranted, we

4    would preserve the -- the documentation.

5    **Q.**   And to the best of your knowledge, that was about five to

6    ten times in your tenure?

7    **A.**   That could be accurate, yes.

8    **Q.**   What about cases where you did end up referring to OIA,

9    and how many times -- well, do you preserve video in that

10   situation?

11   **A.**   Every time it would be preserved.

12   **Q.**   Okay.   And how many times has that happened in your

13   tenure?

14   **A.**   I couldn't -- I couldn't give you a number off the top of

15   my head.

16   **Q.**   Do you have a rough guess?

17   **A.**   I do not.

18   **Q.**   Do you know where the videotape is kept?

19   **A.**   The -- the copied camera footage?

20   **Q.**   The preserved camera footage, yes.

21   **A.**   With the SIA's office.

22   **Q.**   So that would be Baudizzon?

23   **A.**   Baudizzon or Lieutenant Putnam or SIA Brown.   He's our

24   onsite -- I'm sorry -- OIA Brown.   He's the Office of Internal

25   Affairs agent that's on site.

1    Q.   So you understand, sir, that there have been allegations

2    of malfeasance, negligence, also retaliation, against Baudizzon

3    and Putnam?

4    A.   In what regard?

5    Q.   Well, so the allegations in the case are that there may be

6    issues with the way that they handle investigations.  You're

7    aware of that; right?

8    A.   I'm aware of Mr. Putnam.

9    Q.   Okay.  But not Mr. Baudizzon?

10   A.   No.

11   Q.   Have you taken any steps to ensure the -- well, scratch

12   that.  Let's move on.

13        What's the total number of staff when at full capacity at

14   Dublin?

15   A.   Full capacity meaning every position is filled?

16   Q.   Yes.

17   A.   To include UNICOR, which are our central office positions,

18   approximately 270.

19   Q.   Okay.  And you testified currently you have 207 filled

20   positions?

21   A.   Approximately.  I'd have to check the staffing report.

22   Q.   And are all of the remaining 60 or 70 or so positions,

23   have they been posted?

24   A.   All positions have actively been posted.  Again, UNICOR

25   positions, that falls under prison industries division in

1    central office.  We don't have control over those positions.

2         So actively, according to our salaries and expenses

3    report, it would be more along the lines of 237 positions that

4    we would actively fill at the institutional level.  And all

5    those positions, if they're vacant, are actively trying to be

6    filled.

7    **Q.**   So there has been testimony about staffing levels being

8    below what's required in certain departments.  You're aware of

9    that need at your facility?

10   **A.**   I am.

11   **Q.**   Okay.  And what steps, if any, have you taken to work with

12   BOP or anyone else in D.C., or wherever, to take additional

13   steps to try to fill the outstanding positions?

14   **A.**   So we -- we run a monthly recruiting event locally to try

15   to bring in more staff.  We -- we utilize our affirmative

16   employment program, which we have currently four recruits that

17   actively go into the community to try to recruit more -- more

18   staff.

19        We work with central office on a national recruiting level

20   to try to recruit people at the national level and anyone that

21   might be interested in coming to the -- coming to Dublin.  And

22   then they will refer them to us, and we work with central

23   office in that regard.

24        We work with the regional office in that regard as well.

25        It's a -- it's something that we look at the staffing

1    report and we review it and we get updates on a weekly basis

2    from our HR department.  Whenever we need to seek out

3    additional guidance from the regional human resources

4    department, we do, or central office.

5         But it's a -- staffing is a problem not only at Dublin,

6    agency wide and in corrections in general.  And it's something

7    that -- it is a priority to us to try to fill these positions.

8    But also reassure our staff that we're trying to fill the

9    positions as well.

10   **Q.**   Those 30 or so -- 30 to 40 positions that have been

11   unfilled, how long have they been unfilled for?

12   **A.**   They rotate.  We may -- obviously we may lose positions to

13   retirement or attrition, and we actively try to fill those

14   positions.  So every position -- depending on the difficulty of

15   how to fill it, some positions may be vacant for six months,

16   some positions may be vacant for over a year.  But actively we

17   try to fill positions as quickly as possible.

18        So I can't give you a specific number of how long a

19   position is open.

20   **Q.**   Is the current vacancy reflective of the general vacancy

21   rate you've been experiencing over your time?

22   **A.**   We are trending -- I'd like to think that we're trending

23   upwards.  We're trying to fill the positions as quickly as

24   possible.

25        From when I first started in July of '22, a rough estimate

1    of where, like, health services for an example, we were at

2    34 percent staffing.  We're above that now.

3         But, again, it fluctuates.  It all depends on whether

4    staff move on to better positions or they retire, and then

5    actively trying to fill those positions.

6    **Q.**    So you testified about the Moss report making additional

7    oversight, new personnel --

8              **THE COURT:**  Hold on before you move to that.

9         You said in July of 2022, medical was at 34 percent

10   staffing?

11             **THE WITNESS:**  Yes, Your Honor, approximately.

12             **THE COURT:**  What is it now?

13             **THE WITNESS:**  I'd say it's around 50 percent.  Not --

14   not the best.  And we're still -- still hurting.  But we do

15   have a couple of positions that are -- should be starting here

16   in the next month or so.

17             **THE COURT:**  And psychology?

18             **THE WITNESS:**  Psychology we're --

19             **THE COURT:**  Where was it in July 2022?

20             **THE WITNESS:**  I don't have the numbers off the top of

21   my head, Your Honor.  We have lost a -- a handful of

22   psychologists since I started.  They've moved on to other

23   positions.

24             **THE COURT:**  Your best memory.

25             **THE WITNESS:**  As far as how many psychologists we've

had?

          **THE COURT:**  In terms of percentage of staffing.

          **THE WITNESS:**  Psychology, my best guesstimate would be 70 percent, 80 percent in psychology.

          **THE COURT:**  Today or before?

          **THE WITNESS:**  When we started.

   Today, 50, 60 percent.

          **THE COURT:**  Thank you.

**BY MR. CHA-KIM:**

**Q.**   So on this topic, the Moss report, I believe you testified specifically recommended additional staffing and oversight.  Do you recall testifying to that?

**A.**   I believe so.

**Q.**   Do you recall in terms of specifics, number of roles and positions, just total number of positions that The Moss Group recommended you hire in addition to the baseline?

**A.**   I think off the top of my -- from my knowledge, I don't believe they gave us a specific number.  It was more making recommendations for -- for example, having a female working in every housing unit.

   So it wasn't necessarily a specific number.  It was mostly recommendations for how to meet the needs of working in -- with female offenders.

**Q.**   Okay, so the Moss report recommendations weren't more staff.  It was just how to use your existing staff?

1    **A.**    No.  Obviously the goal was always to increase staffing.

2    Every institution is -- is not at maximum capacity.  Or -- so

3    to increase staffing is always going to be recommendation.  And

4    in The Moss Group, a goal to increase staffing is -- is

5    warranted.  It would be warranted.

6    **Q.**    The staffing numbers that we've just been talking about,

7    including in response to the Judge's questions, those trend

8    lines, are those meeting the recommendations of The Moss Group?

9    **A.**    I would say yes.  But, again, we can't guess how you're

10   going to lose a position or how you're going to gain it.

11   You're actively trying to fill positions as quickly as

12   possible.

13        You can have a recommendation.  We always make

14   recommendations to fill positions.  Whether you start with at a

15   hundred percent and you lose positions over the course of time

16   based on attrition, based on staff being promoted to other

17   positions, or they lateral out to other positions, it's -- it's

18   a -- it's something you're always trying to work towards.

19   **Q.**    Did The Moss Group recommendation state certain temporal

20   times by which certain benchmarks with regard to staffing

21   should be met?

22   **A.**    We -- the last conversation we had, we tried to put things

23   in phases, phase one, phase two, phase three.  When you're

24   dealing with an institution that is in -- in need of a lot of

25   situations, we have to prioritize things.

1      To put benchmarks on things, yeah, you try to put

2  benchmarks on things, and then you have to reevaluate, similar

3  to what we talked about with our survey for the inmate

4  population.  You do put -- put benchmarks on things and if you

5  can't meet it, then you try to set a new goal.

6  **Q.**   So the Court will review the Moss recommendations, but as

7  you sit here today, is it your testimony that Dublin met the

8  phase one recommendations for The Moss Group?

9  **A.**   It's a work in progress.  That's why we're calling it a

10  working plan.  To meet it, we're -- we're making progress

11  towards it.  We've met a lot of our initial phase one goals.

12  And we're working into phase two.

13      So we are making progress in those regards.  But to say

14  that we met all of them, I would say we haven't met all of them

15  yet.

16  **Q.**   What percentage of them have you met?

17  **A.**   Again, a rough estimate, would that be okay to give you a

18  rough estimate?

19  **Q.**   Whatever you can testify to from your knowledge as the

20  associate warden, sir.

21  **A.**   I'd say 70 percent, Your Honor.

22  **Q.**   When is phase one?

23  **A.**   When is phase one.

24  **Q.**   Yes.

25  **A.**   Can you clarify a little bit for me?

1    **Q.**    Sure.  You just spoke about there is a phase one, there's

2    a phase two, and I think you might have mentioned a phase

3    three, but correct me if you didn't.  When is phase one?

4    **A.**    There isn't a necessary time frame.  It all depends on how

5    the course of naturally making progress at an institution can

6    happen.  So there isn't necessarily when is phase one, when is

7    phase two.  It's when you start to meet those -- those goals or

8    recommendations, then you start to transition into the next

9    phase.

10   **Q.**    I see.  And are you still currently in phase one?

11   **A.**    I'd say we're in between phase one and phase two.  We're

12   working into phase two.

13   **Q.**    All of that would be reflected in the working plan

14   document that the Judge is going to get later?

15   **A.**    I would say that that's reflective.

16   **Q.**    Okay.  When is the last time you looked at that document?

17   **A.**    It's been about three weeks.

18   **Q.**    Who -- just so the Judge has context when she gets that

19   document, who edits that document?

20   **A.**    It's a collaborative effort between central office, the

21   regional office, and locally at the -- at the institutional

22   level.

23   **Q.**    At the institutional level, to your knowledge, who edits

24   that document?

25   **A.**    That would be the executive assistant, myself, the -- the

```
1   captain has input on that, the other associate wardens, the

2   warden.  So we all collectively work on that document.

3   Q.   And, again --

4            THE COURT:  Which captain?

5            THE WITNESS:  Captain Quezada.

6            THE COURT:  And how do you spell that?

7            THE WITNESS:  Q-U-E --

8            THE COURT:  Oh, okay.  I know who you're...

9   BY MR. CHA-KIM:

10  Q.   Just to orient the Judge when she gets that document, is

11  this a document that is iterative in the sense that it's

12  constantly being changed?  Or are prior versions of it saved

13  somewhere?

14  A.   It's an active live document, so we're constantly updating

15  it.  So we don't change the recommendations.  We -- we just

16  make --

17           THE COURT:  But the question is a little bit

18  different.  Let's say you change it once a month.  If I asked

19  you for each version every month, are you writing over it, or

20  are you saving each version of it?

21           THE WITNESS:  We're writing over it, but we --

22  obviously we have emailed out the working plan back to central

23  office.  So we would have -- we could backtrack and go back and

24  say okay, well, this is -- this is the last document that we

25  sent out to you.  But we -- we do write over it.
```

1          **THE COURT:**  Stop writing over it.

2          **THE WITNESS:**  Yes, Your Honor.

3          **THE COURT:**  Keep going.

4          **MR. CHA-KIM:**  Thank you, ma'am.

5    **Q.**   Now, the -- 19 individuals are currently on administrative

6    leave for some sort of sexual misconduct; is that right?

7    **A.**   That's -- that's correct.

8    **Q.**   Okay --

9    **A.**   No, I'm sorry.  Let me rephrase.  Not all 19 are for

10   sexual misconduct.

11   **Q.**   If the Agostini declaration stated that the 19 were for

12   sexual misconduct, would that be incorrect, then?

13   **A.**   I would have to -- I would have to check.

14         **THE COURT:**  So can I -- I thought that they were on

15   leave immediately upon allegations.  So is it -- so explain

16   that to me.

17         **THE WITNESS:**  Your Honor --

18         **THE COURT:**  Because confirmation and allegations are

19   two different things.

20         **THE WITNESS:**  Yes.

21       So we receive an allegation.  We confirm the allegation.

22   If we can't confirm the allegation, if there's some type of

23   touching and we can't confirm the allegation, then we

24   immediately start the process for removal.  So that will happen

25   immediately.

1    If we can confirm that there was no touching, there wasn't

2    any -- it doesn't raise to the level of a referral, then at

3    that point, then we wouldn't refer it or we wouldn't have to

4    remove a staff member from the institution.

5    **THE COURT:**  Okay.  Give me a paragraph number.

6    **MR. CHA-KIM:**  Thirty-three, Your Honor, and there's

7    heading -- sub-heading 6.

8    **THE COURT:**  Okay.  Thank you.

9    **MR. CHA-KIM:**  And actually this was the section that

10   last night is part of the Agostini proffer we referred to.  It

11   has a list of individuals.

12   **THE COURT:**  Right.  But it says -- it says concerning

13   sexual abuse allegations, not sexual abuse.

14   **MR. CHA-KIM:**  I apologize.  I should clarify.

15   **Q.**   So the 19 that are on leave, those 19 are related to, as I

16   understand it -- correct me if I'm wrong -- are related to

17   allegations of sexual misconduct?

18   **A.**   To the -- to the best of my knowledge, I believe one may

19   not.  But, yes, 18 or 19 of them are sexual -- sexual

20   allegations.

21   **Q.**   Those individuals are still being paid?

22   **A.**   Yes.

23   **Q.**   Now, are you -- are those 19 part of the 207 filled

24   positions currently?

25   **A.**   Yes.

1    **Q.**    Okay.  So of the 207 filled positions, 19, or about 10

2    percent, are currently on administrative leave?

3    **A.**    Yes.

4    **Q.**    Were these individuals placed on leave before or after

5    referral to OIA?

6    **A.**    They would be -- they would work consecutively.  So in a

7    case of a PREA allegation, if you -- if you could confirm a

8    case, you're referring the case immediately and you're also,

9    depending if the staff member is on leave, you have to have

10   a -- you have to have a -- they have to be presented the

11   explanation of why they're being placed on administrative

12   leave.

13   **Q.**    Okay.  So my question is a little more specific.

14       You testified there are referrals made to OIA.  So I'm

15   asking about these 19 individuals.  Were they placed on

16   leave -- so were these 19 cases referred to OIA, to your

17   knowledge?

18   **A.**    Yes.

19   **Q.**    All of them?

20   **A.**    Yes.

21   **Q.**    Okay.

22   **A.**    OIG.

23   **Q.**    They were referred to OIG, not OIA?

24   **A.**    Yes.  Yes.

25   **Q.**    Okay.  There is OIG, OIA, SIS, SIA.  I get it.  It's a

1  little confusing.

2  **A.**    Yeah.  So for clarity, Office of Inspector General is for

3  criminal matters.  Office of Internal Affairs is for staff

4  investigations.  So when we deal with criminal matters, we

5  obviously want to refer them to OIG.

6  **Q.**    I see.

7      These matters -- so you testified, though, that current

8  practice is to refer to OIA?

9  **A.**    No.  OIG.

10  **Q.**    Okay.  So each time you mentioned that you're referring to

11  OIA, you meant you're actually sending it to OIG?

12  **A.**    We talked about this during my original testimony.  It's

13  OIG.  We send them to both, it's OIG, OIA.  But if it's a

14  criminal matter, we send it to OIG.

15  **Q.**    And who determines if it's a criminal matter?

16  **A.**    OIG.

17  **Q.**    Okay.  But if you send it to OIG and if -- if it's a

18  criminal matter, but OIG determines if it's a criminal matter?

19  **A.**    If they -- if they don't -- if they don't determine it's a

20  sustained criminal matter, then it would get released to OIA,

21  Office of Internal Affairs, for investigation.

22      **THE COURT:**  I think the question is, in the first

23  instance, are you making a determination that it is criminal

24  and therefore choosing to go to OIG?

25      **THE WITNESS:**  No, Your Honor.  We're -- when we have

1    the allegation, we're referring it to them for the

2    investigation.  And if we can't determine -- if we don't know

3    whether it's criminal or not, it's for their -- they determine

4    whether it's criminal or not.

5         **THE COURT:**  If you've put someone on administrative

6    leave, are you -- do you always send it to OIG?  Or do you

7    sometimes send it to OIA?

8         **THE WITNESS:**  We -- one hundred percent of the time we

9    send it to OIG.

10        **THE COURT:**  Proceed.

11        **MR. CHA-KIM:**  Thank you, Your Honor.

12   **Q.**   So these 19 individuals, when -- when were they placed on

13   leave relative to any kind of external referral being made?

14   **A.**   So that is before I actually arrived.  So I can't really

15   speak to that.

16   **Q.**   Okay.  So none of the 19 were placed on leave while you've

17   been at the facility?

18   **A.**   Some of them have.

19   **Q.**   Okay.  So for those, to your knowledge, if you know, when

20   were they placed on leave relative to some referral to either

21   OIG, OIA, or DOJ or anyone?

22   **A.**   Within 24 hours.  So, and a majority of the times when we

23   receive the allegation and we know we're going to be referring

24   it to OIG, we have to notify the staff member that they're

25   being placed on administrative leave.

1    And, again, it happens consecutively.  We send the

2    referral and we have to notify the -- the staff member that

3    they're being placed on administrative leave.

4         **THE COURT:**  Is there a -- is this process that you're

5    referring to, is it documented and is the union in agreement

6    with it?

7         **THE WITNESS:**  Yes, Your Honor.  It's documented in a

8    memo that they receive.  And the union is present.  So it's a

9    coordinated effort.

10        **THE COURT:**  And the process itself, union has agreed

11   to the process?

12        **THE WITNESS:**  They don't have to agree to the process.

13   They just have to be present for a representation.

14        **THE COURT:**  I'm just asking whether the union has

15   agreed to -- that is, to the general protocol?

16        **THE WITNESS:**  Yes, Your Honor.

17        **THE COURT:**  They have?

18        **THE WITNESS:**  Yes.

19        **MR. CHA-KIM:**  May I proceed, Your Honor?

20        **THE COURT:**  You may.  Sorry.

21   BY MR. CHA-KIM:

22   **Q.**   Just so there's clarity on this, so 24 hours, you mean the

23   referral -- sorry.  They are placed on administrative leave

24   24 hours after a referral is made; is that right?

25   **A.**   Within 24 hours or whenever the staff member returns to

1   work.  And if they're on -- if they're on workmen's comp or

2   they're out of the institution, we have to establish that

3   meeting immediately once they return to the facility.

4   **Q.**   Am I correct in understanding, then, sir, that placement

5   on administrative leave only occurs in the event of a referral

6   out to an external agency?

7   **A.**   Can you repeat the question?

8   **Q.**   Sure.  You say there's a referral -- sorry -- placement on

9   administrative leave within 24 hours of a referral.  So I'm

10  asking is it your understanding that someone is placed on

11  administrative leave for this type of accusation only in the

12  event of a referral made out to an external agency?

13  **A.**   That would be consistent.

14  **Q.**   Meaning you never put someone in administrative leave

15  while you look into matters internally, as you testified about?

16  **A.**   I wouldn't be aware of that.

17  **Q.**   Is there anything that prevents you from doing something

18  like that?

19  **A.**   From doing something -- from what?

20  **Q.**   From placing someone on administrative leave while you

21  look into whether there should be a referral made.

22  **A.**   Not that I'm aware of.

23  **Q.**   I want to ask quickly about your testimony about instances

24  of non-touching allegations.

25       So you would agree that under PREA, certain violations can

```
1    violate -- can be unlawful without involving actual physical

2    contact?

3    A.   PREA protocols, when it deals with non-touching, so, say,

4    Your Honor, if you had an allegation of sexual harassment, in

5    order to safeguard the individual, the alleged victim, PREA

6    protocols would establish that we would reassign the staff

7    member out of that working condition or away from that -- that

8    alleged victim.

9         They can be reassigned to another housing unit.  They

10   could be reassigned -- just away from the individual.

11        And in that case, we also notify the union in those

12   matters as well.

13   Q.   Your testimony is in that kind of case, you would take the

14   staff member who is alleged and take them out of the situation?

15   A.   That is accurate.

16   Q.   Let me turn your attention to Exhibit 208.

17            MR. CHA-KIM:  If we could put that up.  It's one page.

18   Q.   Are you familiar with this document?

19   A.   This is a safeguarding form.

20   Q.   And I believe you testified to this checklist in your

21   original testimony.  Do you recall that?

22   A.   This is one part of a safeguarding form for safeguarding

23   alleged victims.

24   Q.   So you're familiar with this form?

25   A.   I am.
```

1    **Q.**    And this is a form that you testified you use to determine

2    what to do with -- how to safeguard an inmate in the case of a

3    PREA allegation?

4    **A.**    No.    This form would be utilized -- in policy this form is

5    utilized if you have to utilize restrictive housing for an

6    alleged victim.    If you can't -- if you can't -- if you can't

7    allow the victim to remain in general population, you utilize

8    this form.

9        Again, another step that we take at the institutional

10    level is we utilize these forms for every alleged victim.    And

11    we -- we document that.    So it is one part of the process.

12        But that isn't to say that we're utilizing this form and

13    then we're placing anyone in restrictive housing.

14    **Q.**    I will ask you, sir, some questions about it.

15        **MR. CHA-KIM:**    Your Honor, we move to admit

16    Exhibit 208.

17        **THE COURT:**    It's admitted.

18        (Plaintiffs' Exhibit 208 received in evidence.)

19        **MR. CHA-KIM:**    If we can just zoom in on the paragraph

20    that has the instructions for how to use it at the top of this

21    form.

22    **Q.**    Sir, do you see where it says this program requires staff

23    to immediately safeguard an inmate victim.    Do you see that

24    language at the very top, the top two lines?

25    **A.**    Safeguard -- yes.

1  **Q.**   Right.  And I think this discusses what you're talking

2  about, you know, how to properly safeguard an inmate in terms

3  of setting.

4       And do you see the third line up from the top, it says,

5  "However, staff must first consider all the other alternatives

6  based on the circumstances of the allegation."

7       Do you see that?

8  **A.**   Yes.

9  **Q.**   And then it gives specific instructions.  You're aware of

10  those, I'm sure?

11  **A.**   Yes.

12  **Q.**   And it says, "Answer all of the questions below and if

13  'no' is selected, write in a justification for not utilizing

14  the alternative."

15       Do you see that?

16  **A.**   I do.

17  **Q.**   I take it you're familiar with this from having used this

18  form before; is that right?

19  **A.**   I am.

20  **Q.**   Okay.  So let's take a look at this particular person's

21  checklist.

22       **MR. CHA-KIM:**  And the first -- and let's zoom in on

23  the bottom half, if we could.

24       **THE WITNESS:**  If we can just note --

25  / / /

**BY MR. CHA-KIM:**

**Q.**   Sir, there is no question pending.  I'll ask you questions.  Sorry.  That's just the way it works.

All right.  So this is a checklist, and you go sequentially through them; is that right?

**A.**   That is accurate.

**Q.**   Okay.  So the first checklist option, "Was the alleged victim reassigned to another housing unit within the institution?"  And it was checked "no"; right?

**A.**   Yes.

**Q.**   Okay.  And then it says, "If the staff is the alleged perpetrator and sufficient basis exists, was he or she reassigned to another post at the institution or complex?"  And "no" was checked; right?

**A.**   That's accurate.

**Q.**   Not NA, which is "not applicable"?

**A.**   That's accurate.

**Q.**   Okay.  So this question is applicable, you just answered "no"?

**A.**   That would be accurate.

**Q.**   Okay.  And then it says, "If staff is the alleged perpetrator and sufficient basis exists, was he/she placed on administrative leave?"  Do you see that?

**A.**   I do.

**Q.**   And once again, "no" was checked; right?  Not "not

1    applicable"?

2    **A.**    I do.

3    **Q.**    Okay.  Can you read in the justification section what

4    was -- what was written down?

5    **A.**    "Alleged victim was removed from work detail being

6    supervised by the alleged staff perpetrator."

7    **Q.**    Okay.  Now, you just testified that your practice is to

8    remove the alleged staff member from the situation; right?

9    Right?

10    **A.**    That's accurate.

11    **Q.**    But here it was the victim that was removed; right?

12    **A.**    This form was -- is also dated from February of 2022,

13    before my time.

14    **Q.**    This is the only form we were given by the government so

15    I'm asking you about it.

16        Here the victim was -- it was the victim that was taken

17    out; right?

18    **A.**    In this case, I don't know who the perpetrator was.

19    **Q.**    So Ms. Mattioli can ask you questions when she gets up

20    here.  If you'd just answer my questions.  Okay?

21        So was -- to the question, "If staff is the alleged

22    perpetrator, was he or she reassigned to another post?" It

23    checked "no."  Is there any explanation or justification as to

24    why that was not selected -- provided here?

25    **A.**    Sir, I can't -- I can't really answer to any of the

1  questions on this form because I didn't -- I didn't generate

2  this form, I didn't establish this form.

3  **Q.**  You just testified that this is the form that you use all

4  the time.  I'm just asking you in general terms here.

5        **THE COURT:**  Mr. Cha-Kim, I don't have a jury.  I get

6  it.  I get your point, that they dealt with the victim as

7  opposed to the perpetrator.  I also get his point that it was

8  done before July of 2022.  Let's move on.

9        **MR. CHA-KIM:**  Understood, Your Honor.

10  **Q.**  Your testimony earlier or last week was that, quote, any

11  type of touching would result in a staff member being placed on

12  administrative leave, unquote.  Do you recall that?

13  **A.**  I do.

14  **Q.**  Okay.  You're aware that complaint was filed against an

15  Officer Celestial who was observed groping an incarcerated

16  person's breasts?  Are you aware of that?

17  **A.**  I am aware of that.

18  **Q.**  Okay.  Officer Celestial is still on duty?

19        **THE COURT:**  Can I double-check?  On this 208, I did

20  not hear from this inmate; correct?  SJ?  I'm not seeing those

21  initials.

22        **MS. MATTIOLI:**  That is correct, Your Honor.

23        **THE COURT:**  Okay.  Proceed.

24        **THE WITNESS:**  Can you repeat the question?

25  / / /

BY MR. CHA-KIM:

**Q.**   Officer Celestial, is he still on duty?  Or she?  I'm

sorry, I'm not sure of the person's gender.

**A.**   They are.

**Q.**   Okay.  Has that person ever -- Celestial ever been placed

on administrative leave?

        **THE WITNESS:**  Your Honor, I have a difficult problem

in answering some of these questions regarding this specific

incident.

        **THE COURT:**  Okay.  And why is that?

        **THE WITNESS:**  There's an open investigation on that.

        **THE COURT:**  Okay.  I'll figure out what I'm going to

do with that.  Move on at this point.

        **MR. CHA-KIM:**  Thank you, Your Honor.

**Q.**   You're aware that a complaint was filed about an Officer

Narayan inappropriately touching an incarcerated person's back,

I'm sure?

        **THE WITNESS:**  Your Honor, same -- same situation.

        **THE COURT:**  All right.

BY MR. CHA-KIM:

**Q.**   Okay.  Officer Campos?

**A.**   I am aware.

**Q.**   Are you able to talk about Officer Campos?

**A.**   I -- I can speak about Officer Campos.

**Q.**   Okay.  You're aware that a complaint was made about a

1    touching of breasts that an incarcerated person felt was

2    inappropriate?

3    **A.**    Yes, sir.

4    **Q.**    Do have you familiarity with what was done to investigate

5    that situation?

6    **A.**    I do have familiarity of it.

7    **Q.**    Okay.  And Campos, has that person ever been placed on

8    administrative leave?

9    **A.**    No, sir.

10   **Q.**    Okay.  Is that person still under investigation?

11   **A.**    That person was never placed under investigation.

12   **Q.**    Okay.  Were you -- how involved were you in the

13   investigation into that allegation against Campos?

14   **A.**    Well, to my knowledge, I was -- it was a PREA allegation

15   that was brought to my attention.  Again, when we're going

16   about confirmation of those things, I review camera footage.  I

17   determine whether it's a PREA -- PREA protocol should be

18   established or warranted, and then we proceed from there.

19        In this specific case, review of the camera footage showed

20   that the staff member was in the scope of their employment and

21   it was not considered a PREA -- I didn't determine PREA

22   protocols were warranted.

23   **Q.**    Did you ever speak with the -- do you recall who the

24   complainant is in that particular allegation?

25   **A.**    I do.

1    **Q.**    Did you ever speak with her?

2              **THE COURT:**  The initials?

3              **THE WITNESS:**  I don't recall the first initial, but

4    the last initial would be D.

5    **BY MR. CHA-KIM:**

6    **Q.**    Did you ever speak with her specifically as part of your

7    investigation into that allegation?

8    **A.**    Staff would.  Not me directly.

9    **Q.**    Did anyone -- did you ever ask for a report of what was

10   said in that conversation?

11   **A.**    It was -- I can't recall off the top of my head.

12   **Q.**    Do you recall -- typically how long does an investigation

13   into that kind of allegation take to see if it's, in your view,

14   credible or not?

15   **A.**    In -- the investigation happens immediately.  Once I'm

16   aware of it, we have fact-findings that if it's a staff case,

17   the SIA will then interview alleged victims, alleged

18   perpetrators.  And we can move forward in that direction if

19   it's an inmate-on-inmate case.

20   **Q.**    Okay.  Were you aware of that -- that particular

21   allegation's investigations as it was ongoing, or were you

22   filled in about it afterwards?

23   **A.**    As it was ongoing.

24   **Q.**    Okay.  Did you preserve the videotape from that

25   allegation?

1    **A.**    We did.

2    **Q.**    Okay.  Do you still have it?

3    **A.**    We do.

4    **Q.**    Okay.  Are you able to talk about an Officer Cooper?

5         **THE WITNESS:**  Your Honor, I'm not able to talk about

6    Officer Cooper.

7    **BY MR. CHA-KIM:**

8    **Q.**    Are you able to talk about an Officer Groover?

9    **A.**    To my knowledge, I'm not -- I am not authorized to talk

10    about Officer Groover.

11    **Q.**    Okay.

12         **THE COURT:**  Hold on.

13         I understand, and while it was not shared with you,

14    Mr. Cha-Kim, that OIA has opened investigations with respect to

15    all allegations made during this evidentiary hearing.  So

16    there's no need to go through all those names as OIA has opened

17    up investigations.

18         **MR. CHA-KIM:**  Understood, Your Honor.

19         Am I allowed to ask the associate warden about actions he

20    may have been aware of prior to that OIA opening it up

21    recently?

22         **THE COURT:**  At this point they're under investigation.

23         **MR. CHA-KIM:**  Understood.

24         **THE COURT:**  Let's move on to something else.

25    / / /

1    BY MR. CHA-KIM:

2    **Q.**    Let's switch tracks a little bit and tackle a bit of a big

3    problem, I think you'd agree.

4          You testified that you can't rule out the possibility of

5    staff involvement in the introduction of illicit drugs into the

6    facility.  Do you recall that?

7    **A.**    I do.

8    **Q.**    Okay.  And I'm sure you're aware that in the criminal

9    matters before the Judge, she has heard accounts of how now

10   convicted staff members brought in contraband to use as part of

11   their schemes with respect to abuse victims.  You're aware of

12   that?

13   **A.**    I am.

14   **Q.**    Okay.  What steps, if any, have you or the facility, to

15   your knowledge, taken since those facts came to light to

16   investigate the root cause of how staff members are bringing in

17   contraband?

18   **A.**    That's a difficult question, sir.  We train at least on an

19   annual basis.  You're constantly trying to remind and educate

20   staff of the consequences or the -- the threat of being

21   compromised or -- or bringing in contraband into the

22   institution.

23         Unfortunately, when you're talking about all the things

24   that happen inside of a correctional setting, you're -- that's

25   where the constant oversight and being visible and being

1    present and showing people that you're -- you're available and

2    you're there, it really plays an intricate part.  It's

3    intangible.

4        You can't really put anything on it outside of formal

5    training and having oversight and educating staff and educating

6    our inmate population and -- and trying to monitor to the best

7    of your abilities.

8    **Q.**   So you mentioned training, but that training existed even

9    before that conduct came to light; right?

10   **A.**   That's -- that's accurate.  It's -- training happens in

11   every single Bureau of Prisons facility.  And unfortunately

12   contraband is an issue in every single Bureau of Prisons

13   facility.

14   **Q.**   So we're a little short on time so I'm just going to ask

15   you specifically since that conduct came to light, give me

16   specific examples of any new practice or policy the institution

17   has implemented to try to find out how it is that we now know

18   staff is bringing in contraband.

19           **MS. MATTIOLI:**  Your Honor, I'm going to object.  That

20   misstates his testimony.  He said he couldn't rule it out.

21           **THE COURT:**  Well, to be clear, all of the contraband

22   that was addressed in the criminal cases, none of it was drugs,

23   right, so these are -- this is food and other things that were

24   brought in.

25        The objection, though, is overruled.

1    Answer it to the extent that you can.  I mean, understand,

2    people were bringing in pizzas.  I take it you're not seeing

3    pizzas in the rooms anymore.

4        **THE WITNESS:**  No, Your Honor.

5        **THE COURT:**  If someone brings in jewelry, how would

6    you -- what steps are you taking to deal with something --

7    well --

8        **THE WITNESS:**  I can answer that a little bit,

9    Your Honor.

10        **THE COURT:**  Go ahead.

11        **THE WITNESS:**  For the -- the Bureau of Prisons has --

12    we established a policy, anything over a hundred dollars.  So

13    if you see an inmate with a Rolex, that's a telltale sign that

14    something wrong is going on.

15    To answer your question, sir, it's -- really, you know,

16    you have to shake things up, if you will.  You have to reassign

17    work details.  You have to -- you have to try to -- try to --

18    not make things uncomfortable.  You have to try to establish --

19    establish a program for the institution that -- understanding

20    that you can be reassigned at any time.

21    Having people work different areas and not be working in

22    the same area as far as staff are concerned.  You have to --

23    you're trying to mitigate the risk of complacency.  That's one

24    of the ultimate concerns in a correctional setting, is

25    complacency.

**BY MR. CHA-KIM:**

**Q.**   Let me be more specific then.  You said that, in your

testimony, you can't rule out drugs being introduced via the

warehouse.  Do you recall that?

**A.**   I do.

**Q.**   So both staff and inmates work in the warehouse?

**A.**   They do.

**Q.**   And, for instance, one example you gave was the outside

food vendor is something you looked into with -- you said

established new procedures.  Do you recall that?

**A.**   I don't recall saying anything about a food vendor.

**Q.**   You testified about, you know -- the facility is, quote,

being fed from the outside.  Do you recall that?

**A.**   We -- we make the food inside the FCI, and it's delivered

to the camp.

**Q.**   Okay.  You gave a specific example of that being a

possible introduction point for things from outside the camp.

**A.**   So, yes.

       Your Honor, we're talking about minimum security camp.

Camp inmates have access to the public.  There's been times

where staff have observed, coming to work, someone throwing

something outside their window outside of the institution.  We

go back and look at it and we find out that it's

methamphetamine.  I mean, those things -- and camp inmates have

access to that.

1    So when you're making food and you're -- you're providing

2    that to the inmate population at the camp and you're bringing

3    those trays back in, camp inmates have a -- have a -- an

4    availability to try to introduce drugs into the institution.

5    It doesn't necessarily mean it's staff.

6    **Q.**    Okay.  No, I get that.  But you said you looked into that

7    as a possible source?

8    **A.**    It -- yes.

9    **Q.**    Okay.  Have you ever looked into, in a similar way, the

10    warehouse, if that could be a source, whether it's inmate or

11    staff?

12    **A.**    Yeah.  We're actively trying to rule out all

13    possibilities.

14    **Q.**    What step -- specific steps have you taken with respect to

15    looking into the warehouse?

16    **A.**    The reassignment of work details.

17    **Q.**    Anything else?

18    **A.**    I can't recall anything off the top of my head.

19    **Q.**    Okay.  Are any staff currently on -- under investigation

20    for contraband-related misconduct?

21    **A.**    Yes.

22    **Q.**    How many?

23    **A.**    I don't have the number off the top of my head.

24    **THE COURT:**  Ballpark.  What's a ballpark?

25    **THE WITNESS:**  Ballpark would be three.

**BY MR. CHA-KIM:**

**Q.**   Are those individuals on leave?

**A.**   Not all -- no.  Not all of them.

**Q.**   How many of them?

**A.**   One that I can recall off the top of my head.

**Q.**   Switching gears, there's been some testimony about showers.

    And, sir, you also testified about your responsiveness to certain emails brought by inmates.  Do you recall that?

**A.**   I do.

**Q.**   Okay.  So you recall then a series of emails sent to you specifically at the associate warden of programs inbox.  Do you check that inbox?

**A.**   The associate warden of programs, I don't have oversight over the associate warden of programs box.  Showers would fall under facilities which would be AW of operations mailbox.

        **MR. CHA-KIM:**  Can we put up Exhibit 19, page 18, please.

**Q.**   This is an email dated September 28th, 2023 at 9:10 a.m. forwarding an email to Ms. Smith, and it's addressed to Associate Warden Deveney.  That's you; correct?

**A.**   It's -- it's addressed to me, Your Honor, but I'm the associate warden of operations.

**Q.**   Is it possible that at any time -- well, do you recall receiving emails like this about the shower situation in

1    September or anytime earlier?

2    **A.**    I do not.

3    **Q.**    So the email states, "I have spoke to you about the

4    situation with the shower curtains."  That doesn't ring a bell

5    to you?

6    **A.**    To be clear, they could be speaking to the other AW in

7    regard to this.  If you give me a moment, I can read it --

8    **Q.**    Sure.  Take all the time you need with it.

9          **MR. CHA-KIM:**  In the meantime, I'd like to move this

10    into evidence, Your Honor.

11          **THE COURT:**  I thought it was already in, but it's

12    admitted if not.

13          (Plaintiffs' Exhibit 19 received in evidence.)

14        **MS. MATTIOLI:**  Your Honor, I would also just object.

15    This statement that is highlighted says "why no action has been

16    taken by you or" --

17          **THE COURT:**  I don't understand that that's a legal

18    objection.

19          **MS. MATTIOLI:**  Foundation, Your Honor.  The objection

20    is foundation.

21          **THE COURT:**  So perhaps he can't ask him questions

22    about it.  But all of this stuff is coming in.  They're

23    business records.  Overruled.

24          **MS. MATTIOLI:**  Thank you, Your Honor.

25          **THE WITNESS:**  Okay.  To my knowledge, shower curtains

1    were -- were brought to my attention, and we addressed -- there

2    was -- there was a concern that there was a gap in that the

3    shower curtains weren't large enough, Your Honor, to cover from

4    wall-to-wall as an individual would be showering.

5        This matter has been addressed.

6    **BY MR. CHA-KIM:**

7    **Q.**    Do you know when it was addressed?

8    **A.**    I would say approximately a week after this -- this --

9    this email.  Or in December.

10   **Q.**    Let me direct your attention to Exhibit 20.

11   **A.**    The bottom of that note said it was changed by AW Nash.

12   **Q.**    So let me ask you some questions.

13       So this is another -- a similar business record, correct,

14   as the one we just saw?

15   **A.**    Yes.

16   **Q.**    Okay.  This one is addressed to Associate Warden Nash.

17   And you see it says -- and the date is December 18th, 2023 --

18       **THE COURT:**  You have not given me copies so you need

19   to give me a minute to get there.

20       **MR. CHA-KIM:**  I apologize, ma'am.

21       **THE COURT:**  I'm not sure I have that number.  It's not

22   in my binders.

23       **MR. CHA-KIM:**  It should be in the plaintiffs' binder,

24   Your Honor.  It's relatively thin.

25   **Q.**    What's the date of this email?

1   **A.**   This is December 18th.

2   **Q.**   Okay.  Of 2023?

3   **A.**   Yes.

4   **Q.**   Okay.  So four months after, roughly, since the last one

5   we saw, or three months?  Strike that.

6        And you see it says, "You came to take pictures of the

7   shower curtains" --

8            **THE COURT:**  Hold on.

9        This wasn't addressed to him.

10           **MR. CHA-KIM:**  No, ma'am.

11           **THE COURT:**  So what's your question with respect to

12  him?

13           **MR. CHA-KIM:**  He just testified that the shower

14  situation was finished a week after the last email.  And I want

15  to ask him if this email changes his recollection about whether

16  the problem was solved back in September.

17           **THE WITNESS:**  To -- to talk about --

18           **MR. CHA-KIM:**  She has to rule on -- on...

19           **THE COURT:**  Okay.  All right.  Proceed.

20           **MR. CHA-KIM:**  Thank you, Your Honor.

21       May I offer this exhibit?

22           **THE COURT:**  I'm going to enter it.  Let me just say,

23  if I ever have a trial in this matter, there's a lot of

24  hearsay.  I have admitted tons of hearsay.  You'd have to

25  address all the hearsay issues.

1          **MR. CHA-KIM:**  Of course.

2          **THE COURT:**  Proceed.

3          (Plaintiffs' Exhibit 20 received in evidence.)

4   BY MR. CHA-KIM:

5   **Q.**   Were you aware of any complaints since September or any

6   other time in 2023 up until December of the -- or up until

7   today of the showers still being an issue?

8   **A.**   Sir, it was December when I became aware that there was an

9   issue.  So to clarify my previous testimony, when I said a week

10  later, I saw the date of December, and that's what I was

11  recalling, was that it was addressed a week after the

12  December date.

13  **Q.**   I see.

14  **A.**   So to my knowledge this was addressed in December and I

15  became aware in December.

16  **Q.**   I see.  So when you said it was addressed, you meant

17  recently, not back in September?

18  **A.**   Yeah, that would be accurate.

19  **Q.**   Okay.  Are you aware of any issues where the showers --

20  well, okay.  Let's move on.

21          Is there any reason why you or leadership couldn't

22  consider alternative protective housing for PREA -- folks

23  raising PREA allegations, much like we've heard testimony about

24  diversion for drug issues?  Is there any reason why you can't

25  consider that?

1    **A.**    So we have considered it every single time.  We've -- to

2    my knowledge, we've never utilized restrictive housing for PREA

3    allegations solely.  To be more specific --

4            **THE COURT:**  So do you understand that it was in fact

5    used for PREA allegations?

6            **THE WITNESS:**  Previous to my arrival, Your Honor?

7            **THE COURT:**  Yes.

8            **THE WITNESS:**  I'm not aware of that.

9            **THE COURT:**  Well, it was, and it's created a cultural

10    problem.

11        Proceed.

12    **BY MR. CHA-KIM:**

13    **Q.**    You say you consider it every single time.  What does that

14    mean?

15    **A.**    Meaning as you saw that form, we are reviewing it.  So

16    when you're talking about least restrictive housing, you're

17    trying to afford the alleged victim to remain in their -- their

18    current living conditions.  You don't want to disrupt that.

19        When you -- when you receive a PREA allegation, you're

20    trying to ensure that their safety is going to be okay in

21    general population.

22        If you can't guarantee that their safety is going to be

23    okay in general population, then you have to find other means

24    to protect their -- safeguard them, if you will.  You have to

25    safeguard that individual.  And in every case that I've been

1    involved in at -- at FCI Dublin, every individual has remained

2    in general population.

3        We have received allegations while individuals were

4    already placed in SHU and under investigation, and -- but that

5    doesn't mean that they were placed in restrictive housing for

6    the PREA allegation.

7        There is a misnomer -- if I'm speaking on it, there is a

8    misnomer that if an inmate makes a PREA allegation in SHU, that

9    we have to release them from SHU and put them in general

10    population, then that wouldn't be accurate.

11    **Q.**    So let me just break that down a little bit.  I understand

12    you do this checklist and assessment.  We looked at an example

13    of one.

14        But I'm saying more structurally, have you looked into, as

15    a possible option, something in between general population and

16    SHU where you can put someone for protective custody for

17    PREA-related issues?  Have you looked into that ever?

18    **A.**    We -- we utilize general population as a means for -- for

19    placing individuals or alleged victims.  That's -- we're

20    constantly allowing them to stay in general population.  That's

21    not -- that's not a concern.

22    **Q.**    So it's just more specific than that.  So is there any

23    reason that you can think of why the facility couldn't assess

24    whether a third option between SHU and general population could

25    be set up for the purpose of protective custody where necessary

1  in the case of PREA allegations?

2  **A.**    Logistically, there is no other options.  It's you're

3  either going to be -- you can maintain in general population

4  because your safety is not at risk, or you have to look at

5  means to ensure the safety of that individual.

6      We don't have any -- we don't have a -- any -- many middle

7  ground, Your Honor, on putting them in another, say, housing

8  unit.  Every -- all the inmates in general population at the

9  FCI have access to each other.

10      So if there's a concern or if there's animosity or there's

11  a threat to that individual, we -- we unfortunately would have

12  to utilize restrictive housing.  But --

13          **THE COURT:**  So, and the problem with that is the level

14  of restriction that is programmed for anyone in the SHU.  And

15  so it's not at all clear to me why you couldn't move them into

16  the housing unit where the SHU is located without the

17  restrictions that are set there for punishing someone who has

18  violated the rules or is being put in the SHU for -- for a

19  punitive reason.  That is not at all clear to me.

20          **THE WITNESS:**  Utilizing restrictive housing, you have

21  administrative detention and then you have disciplinary

22  segregation.  You do have -- there's a separate entity while

23  you're placed in SHU.

24      While you're under investigation or you're under --

25          **THE COURT:**  But these people aren't under

1    investigation.  And those people work for you.

2            **THE WITNESS:**  That's accurate.

3        Your Honor --

4            **THE COURT:**  Let me tell you something.  You're going

5    to have to figure it out because I'm not going to tolerate it.

6    So start thinking.

7            **THE WITNESS:**  Yes, Your Honor.

8            **THE COURT:**  Go ahead.

9            **MR. CHA-KIM:**  Thank you, Judge.

10   **Q.**   Sir, you testified that the legal pilot line was the

11   result of a DOJ collaboration.  Do you recall that?

12   **A.**   It was a collaborative effort.

13   **Q.**   Okay.  So you started in 2022?

14   **A.**   Yes.

15   **Q.**   Okay.  So you weren't aware of the fact that the pilot

16   line came about after a line of correspondence back and forth

17   between legal advocates and BOP lawyers starting in 2018; were

18   you aware of that fact?

19   **A.**   No.

20   **Q.**   Okay.

21   **A.**   The way it was brought to my attention was trying to find

22   confidential ways for our individuals in our care to be able to

23   contact their -- their attorneys or their legal advocates.

24   **Q.**   You testified -- you were asked if you're aware of a

25   member of your staff conducting a visual search to retaliate,

1  and you said, "I'm not aware."  Do you recall that?

2  **A.**   Yes.

3  **Q.**   Okay.  Are you aware of instances in which that

4  possibility was brought to your attention?  Not substantiated,

5  but the possibility.

6  **A.**   To retaliate against an individual?

7  **Q.**   Yes.

8  **A.**   By doing a visual -- conducting a visual search?

9  **Q.**   Yes.

10  **A.**   No.

11  **Q.**   So you don't recall the subject of visual searches coming

12  up to your attention in some form in the past few months with

13  respect to --

14  **A.**   Well --

15  **Q.**   -- retaliation issues --

16  **A.**   -- yes.  Yes, they did come up.

17  **Q.**   -- retaliation issues?

18  **A.**   Yes.

19  **Q.**   Okay.  When was that brought to your attention?

20  **A.**   I'd say almost six months ago, nine months ago.  I can't

21  give you a specific date.

22  **Q.**   Okay.  What exactly was brought to your attention?

23  **A.**   Legal visitation -- during legal visitation, individuals

24  were concerned that they were being -- they were being visually

25  searched, and that didn't occur prior to our arrival.

1    **Q.**    Okay.  And your testimony is that that was brought to your

2    attention six to nine months ago?

3    **A.**    Approximately.

4    **Q.**    Okay.  Was that brought to your attention by

5    Captain Quezada?

6    **A.**    Quezada?

7    **Q.**    Quezada?

8    **A.**    Associate Warden Buckner at the time.

9    **Q.**    Okay.  Did anyone else bring this issue up to your

10   attention?

11   **A.**    Captain Quezada was also involved in that conversation.

12   **Q.**    Okay.  And when did that occur?

13   **A.**    Off the top of my head, again, I'm just estimating, six to

14   nine months ago.

15   **Q.**    Did you communicate with her by email?

16   **A.**    I believe if there was any correspondence, it would have

17   been between Associate Warden Buckner and Captain Quezada

18   because Associate Warden Buckner had oversight of correctional

19   services which would be the visitation room.

20   **Q.**    Do you recall having any conversations about this topic

21   more recently?

22   **A.**    More recently as in preparing for -- for -- for this

23   hearing, yes.

24   **Q.**    Well, aside from preparing for this hearing, when is the

25   last time this issue was brought to your attention?

1    **A.**    Approximately two weeks ago.

2    **Q.**    Okay.  So your testimony is Captain Quezada was aware of

3    the situation six to nine months ago or thereabouts?

4    **A.**    Yes.

5    **Q.**    Okay.  Do you know what, if anything, she did to address

6    that issue six to nine months ago?

7    **A.**    Well, we -- you review policy.  You make sure that you're

8    being compliant to what our standards of practice are supposed

9    to be.  According to where we're -- where we're at, were --

10   that policy -- policy requires us to conduct visual searches.

11   **Q.**    And I assume, to your knowledge, Captain Quezada took

12   corrective measures as soon as she found out that there was a

13   possible violation?

14   **A.**    To my knowledge.

15           **MR. CHA-KIM:**  May I approach, Your Honor?

16           **THE COURT:**  You may.

17           **MR. CHA-KIM:**  Your Honor, and Mr. Deveney, this is

18   what I believe has been marked as Exhibit K.  And it's an email

19   dated December 18th, 2023.

20   **Q.**    And, Mr. Deveney, do you see that you're one of the

21   recipients of this email?

22   **A.**    I do.

23   **Q.**    Okay.  Take your time to read it, if you need to.

24   **A.**    Okay.

25   **Q.**    So, Mr. Deveney, is it fair to say that this is an email

1    that on December 18th alerts certain staff, including yourself,

2    of, quote, multiple complaints with respect to strip searches

3    after visits?

4    **A.**    Yes.

5    **Q.**    Okay.  Would it surprise you that Captain Quezada

6    testified that she became aware of this issue sometime not six

7    to nine months ago, but October and then maybe before

8    Thanksgiving?

9    **A.**    I -- I don't know if I can answer that.

10   **Q.**    That's fine.

11       Have you had conversations with Captain Quezada or anyone

12   else about the issue of whether the strip search policy for

13   after legal visits was being followed or not, aside from that

14   instance you talked about six to nine months ago and this

15   email?

16   **A.**    I want to say that this email is in regard to the

17   consistency of -- of visual searches that are conducted and a

18   reminder to ensure that we're following the policy on that.

19       It happens -- mistakes do happen, and it happens in every

20   facet working in a correctional setting.  And you have to, as a

21   supervisor and as the -- the chief of security, you have to

22   ensure that everyone is aware that if we're making a mistake

23   and we're not consistent, that we have to -- we have to ensure

24   compliance to policy and that there is -- we are consistent in

25   what we're doing.

1    **Q.**    Okay.  So what is your understanding of how you're

2    supposed to check that a policy as important as nationwide

3    mandatory searches after all legal visits is being carried out?

4    What's your understanding of how you verify that that takes

5    place?

6    **A.**    You could cross-reference the -- the logs, making sure

7    that -- that they're accurate with the visitation that's

8    occurring.

9    **Q.**    Did you ever do that?

10   **A.**    Me specifically?

11   **Q.**    Yes.

12   **A.**    No, I have not.

13   **Q.**    Did you ever task anyone to do that?

14   **A.**    No.

15   **Q.**    When Lieutenant Quezada -- or Captain Quezada raised this

16   issue, did you ever ask to see the logs in question?

17   **A.**    No.

18   **Q.**    Did you ask to speak with any of the individual officers

19   who conducted the searches to figure out what was going on?

20   **A.**    No.

21   **Q.**    This email also says, quote, we cannot allow this to be

22   viewed as retaliation, unquote.  Do you see that?

23   **A.**    Yes.

24   **Q.**    Okay.  So what action, if any, did you take in response to

25   getting this email?

1    **A.**    Well, you discuss it.  You have to ensure that there is

2    consistency on the matter.  As the chief of security -- and

3    Captain Quezada, it is a responsibility to make sure that we --

4    we're managing and we're monitoring policy and -- and that

5    we're consistent with what we do.

6         At Dublin, unfortunately anytime we may make a mistake,

7    it's retaliation.  Anytime that we may fall short of an

8    inmate's expectation, it's -- it's retaliation.  It doesn't

9    matter if we're following policy or if we're trying to just

10   establish a rapport, if it's something that they don't like to

11   hear, it's retaliation.

12        Every time you -- we turn around, we're trying to

13   establish things or we're trying to make sure that the

14   institution is running correctly, we're trying to communicate

15   with the -- with the individuals in our -- in our care.  And if

16   it's not what they like to hear, it's retaliation.

17        And in this regard, we want to -- we're trying to ensure

18   that the -- the individuals in our care know that we're --

19   we're trying to protect them.

20        Again, when we're talking about introduction of

21   contraband, unfortunately it has happened through legal

22   visitation in the past.  So we have to ensure security is --

23   safety and security is still utmost importance.

24             **THE COURT:**  What do you mean by that?

25             **THE WITNESS:**  Your Honor?

1        **THE COURT:**  What do you mean by that, that it's

2   happened through legal visitation?

3        **THE WITNESS:**  In -- in general in other institutions,

4   there's introduction through legal visitation.  So you have

5   to -- we have to ensure that policies are adhered to.

6        **THE COURT:**  Do you understand that you haven't found

7   anything -- there's only been one instance of potential

8   contraband in about a year and a half.  Do you understand that?

9        **THE WITNESS:**  Yes, Your Honor.  One -- one instance is

10  one too many.  And I completely understand that inconsistencies

11  can lead to the appearance of retaliation, but we still have

12  to -- we have to maintain the safety and security of the

13  individuals in our care and our staff.

14  BY MR. CHA-KIM:

15  **Q.**  So my question was very specific.  What did you do in

16  response to getting this email, if anything?  Just walk me

17  through the steps you took.

18  **A.**  We monitor, we discuss, we try to ensure consistency in --

19  in establishing that -- that policy.

20  **Q.**  Who is "we"?

21  **A.**  We as in the captain, the executive staff as we review it.

22  **Q.**  So you had a conversation with the staff about this email?

23  **A.**  Outside of the captain discussing it through -- via this

24  email and maybe in-person conversations, I'm -- I'm not -- I

25  can't recall anything else.

1  **Q.**   Okay.  To your knowledge, do you know when strip searches

2  after legal visitations resumed?

3  **A.**   I -- no, not to my knowledge.

4  **Q.**   Have you -- given the allegations here, have you taken any

5  steps in the past few weeks to try to figure that out?

6  **A.**   Outside of trying to manage -- manage consistency in

7  policy compliance, I -- I can't -- I can't say no.

8  **Q.**   Specifically about here.  So have you taken any steps to

9  try to figure out when the --

10 **A.**   No.

11 **Q.**   -- strip searches resumed?

12 **A.**   No.

13         **MR. CHA-KIM:**  Thank you very much for coming back.

14         **THE WITNESS:**  Thank you.

15         **THE COURT:**  Redirect?

16         **MS. MATTIOLI:**  Thank you, Your Honor.  I'm going to

17 try to be brief.

18                    **REDIRECT EXAMINATION**

19 **BY MS. MATTIOLI:**

20 **Q.**   So Mr. Cha-Kim just asked you to your knowledge when did

21 the policy or practice of visual searches resume.  To your

22 knowledge, had it ever stopped?

23 **A.**   No.  No, it has not.

24 **Q.**   And are you the AW over corrections?

25 **A.**   No, I'm not.

1    **Q.**    Can you explain what that means?

2         **THE COURT:**  So I was supposed to get an org chart, and

3    I never got one.

4         **MS. MATTIOLI:**  We do not have that document yet.  We

5    have a PowerPoint that is the most condensed version we can

6    access at this point.  And I can get that to you.

7         **THE COURT:**  Okay.  That would be helpful.

8         **MS. MATTIOLI:**  Your Honor, just briefly, I also have

9    the working plan that I'd like to introduce in camera through

10   this witness.

11        **THE COURT:**  All right.  So S.

12        (Defense Exhibit S marked for identification.)

13        **MR. CHA-KIM:**  Your Honor, may I be allowed to look at

14   a copy in advance of any redirect?

15        **MS. MATTIOLI:**  I'm not going to ask him any questions

16   about it.

17        **THE COURT:**  Okay.  I'm dealing with this one like I've

18   dealt with all the others, so I'm admitting S.  It's in camera,

19   and we're getting no questions.

20             (Defense Exhibit S received in evidence.)

21        **MS. MATTIOLI:**  Correct.

22        **THE COURT:**  Proceed.

23   BY MS. MATTIOLI:

24   **Q.**   Can you explain what it means that you are not the AW over

25   corrections?

1  **A.**  My direct oversight would be, as I was stating in my

2  previous testimony, health services, facilities, food service,

3  human resources.  But correctional services wasn't one of the

4  departments that falls under my scope.

5          **THE COURT:**  But it is in your role as warden, isn't

6  it?

7          **THE WITNESS:**  As acting warden, yes.

8  **BY MS. MATTIOLI:**

9  **Q.**  Are you still the acting warden?

10  **A.**  I am not.

11          **THE COURT:**  As of Friday?

12          **THE WITNESS:**  Yes, Your Honor.

13          **THE COURT:**  Okay.  So it's not as if you didn't have

14  some measure of control over corrections for a period of time;

15  right?

16          **THE WITNESS:**  For a brief period of time, yes,

17  Your Honor.

18          **THE COURT:**  And remind me how long you were warden --

19          **THE WITNESS:**  Approximately --

20          **THE COURT:**  -- acting warden.

21          **THE WITNESS:**  Approximately -- I was acting warden

22  approximately August until then Warden Dulgov was announced.

23          **THE COURT:**  Well, his first day on the job was

24  yesterday, wasn't it?

25          **THE WITNESS:**  No, Your Honor.  He -- he was on the

```
 1    job -- I don't know the date but three weeks ago.
 2              THE COURT:  He was on the job three weeks ago, but
 3    then he left?
 4              THE WITNESS:  Yes, Your Honor.
 5              THE COURT:  Took a vacation?
 6              THE WITNESS:  He had -- well, he had preplanned leave,
 7    Your Honor.  And then he also -- he was representing the
 8    facility that he was the warden at -- that he is the warden at.
 9    And they had an American Correctional Association conference
10    that was planned well in advance that he attended.
11              THE COURT:  And that's all fine.  It's just that you
12    were in fact the acting warden for a series of months?
13              THE WITNESS:  Yes, Your Honor.
14    BY MS. MATTIOLI:
15    Q.   Did you rotate that position at all, or was it you the
16    whole time?
17    A.   We rotated that position every two weeks.
18    Q.   And you rotated it with who?
19    A.   With Associate Warden Nash.
20    Q.   And what does she normally oversee?  What departments?
21    A.   Associate Warden Nash would oversee -- she oversees
22    correctional services, she oversees unit team, religious
23    services, psychology, education, the program side of the house.
24    Q.   And I just wanted to clear up, there was some testimony
25    and question about the shower curtains.  Do you recall that?
```

1    **A.**    Yes.

2    **Q.**    Were you ever made aware personally that somebody had an

3    issue with the shower rods?

4    **A.**    No.

5    **Q.**    If that issue did come to your attention, would you take a

6    look at it?

7    **A.**    Yes.

8    **Q.**    And that's because you oversee facilities?

9    **A.**    Yes.

10    **Q.**    I just --

11            **THE COURT:**  Why don't you have Nash on your list,

12    given the allegations with respect to the showers?

13            **MS. MATTIOLI:**    That -- Your Honor, that did not come

14    up in the briefing.  That came up as we were preparing for this

15    hearing.

16    **Q.**    I have a question about the purpose of the visual search

17    policy.  To your knowledge, is the policy designed to detect

18    contraband or to deter the introduction?

19    **A.**    Deter and prevent.

20            **THE COURT:**  So same admonishment to you.  Stop

21    leading.

22    **BY MS. MATTIOLI:**

23    **Q.**    Are you aware of the purpose of the visual search policy?

24    **A.**    I am aware.

25    **Q.**    And what is the purpose?

**A.**    To prevent contraband into the -- into a security setting,

into a confined area.  To protect inmate and staff safety.

**Q.**    With respect to PREA, I believe Mr. Cha-Kim used the terms

"investigation" and "fact-finding" sort of interchangeably.

Are those different things in terms of what you are responsible

for?

**A.**    They are.  I'm not responsible for investigations.  I'm

responsible for trying to do fact-finding and confirm whether

there's a PREA allegation and we have to establish or initiate

full PREA protocols.

**Q.**    Do you conduct interviews as part of your fact-finding?

**A.**    The SIA does conduct interviews during fact-findings.

**Q.**    Do you personally?

**A.**    I do not.

**Q.**    You testified that you could not rule out that staff could

be introducing illicit drugs into the facility.  Do you in fact

have knowledge that staff are introducing illicit drugs?

**A.**    I do not.

**Q.**    And you testified that the reassignment of work detail is

one response.  Can you explain why that helps address that

issue?

**A.**    It goes back to the -- the risk of complacency.  When

you're talking about the -- even trying to compromise staff,

reassigning work details, it -- when inmates get too familiar

with one area, it can -- it does create a concern for

1   compromising somebody or a department.

2       So reassigning them to another area creates some sort of

3   unfamiliarity and they have to reestablish themselves.  It's a

4   part of the safety and security.

5   **Q.**   And I apologize if I missed this.  Are staff reassigned as

6   well?

7   **A.**   No, they're not.

8   **Q.**   So just inmates?

9   **A.**   Just inmates.

10  **Q.**   Can a staff member be reassigned?

11  **A.**   If they're under investigation, yes.

12  **Q.**   And I have one final question if you have an opinion.

13  Mr. Cha-Kim asked if there was any reason that you couldn't

14  create a third sort of PREA housing option.  And I'm curious if

15  there are reasons why the prison wouldn't advertise that

16  someone is in protective custody?

17  **A.**   Again, safety --

18          **THE COURT:**  I don't even understand that question.

19  What does one have to do with the other?  And to whom would

20  they be advertising?  It makes no sense.  It's stricken.

21      Try again.

22  **BY MS. MATTIOLI:**

23  **Q.**   When inmates are placed in SHU, are they walked through

24  the compound in view of other inmates?

25  **A.**   They -- yes, they would have to be.

1   **Q.**   So if an inmate was being placed in SHU for protective

2   reasons, they would be walked there in plain view of other

3   inmates?

4   **A.**   Yes.

5   **Q.**   Would the inmates who see them going to SHU be able to

6   distinguish the reason that they were being place in SHU?

7           **MR. CHA-KIM:**  Objection.

8           **THE COURT:**  That makes no sense either.  What do you

9   mean the reason that they were being placed in SHU?

10          **MS. MATTIOLI:**  Whether it was for protective custody

11   or as a disciplinary sanction.

12          **THE COURT:**  Okay.  I think that's pretty obvious,

13   given that they don't publicize anything.

14       So what's your point?

15   **BY MS. MATTIOLI:**

16   **Q.**   So the question is, if there were a third housing

17   option --

18          **THE COURT:**  What if it was located at the SHU?

19   **BY MS. MATTIOLI:**

20   **Q.**   How many -- how many cells are in the SHU at Dublin?

21   **A.**   There's 16 cells.

22   **Q.**   And are they always full?

23   **A.**   We're -- unfortunately we're running -- we have

24   approximately 24, 25 inmates at a time, max occupancy of 32.

25   **Q.**   And given that it is a small unit, do you prioritize which

1    inmates you place there?

2    **A.**    We have to prioritize.

3    **Q.**    And which inmates do you place there?

4    **A.**    Ones that jeopardize the safety and security to the

5    institution or that would warrant restrictive housing for

6    investigative purposes.

7    **Q.**    Is there another location on the compound that you could

8    place additional inmates?

9    **A.**    No.  Unfortunately, the logistics of an institution that's

10   50 years old, there's -- there really is no other -- no other

11   areas.

12        **THE COURT:**  Well, you could if you reduced your

13   population; right?

14        **THE WITNESS:**  Yes, Your Honor.

15   **BY MS. MATTIOLI:**

16   **Q.**    So my question remains then.  If they could not be placed

17   in SHU because it is at capacity with inmates who pose a threat

18   to security and there is a third option, would there be a

19   reason that you would not want them walked through general

20   population to that area?

21   **A.**    It would further jeopardize their safety to be in general

22   population.

23   **Q.**    And why is that?

24   **A.**    It would paint a target on their back.  It would create a

25   concern for being able to actually house them in general

1    population if upon conclusion of that investigation they

2    were -- they were safe to be in general population.

3            THE COURT:  Aren't PREA -- well, that's for PREA

4    allegations against inmates.

5            THE WITNESS:  It would be --

6            THE COURT:  Are you concerned that people who have

7    reported a PREA violation against staff are in jeopardy of harm

8    by staff?

9            THE WITNESS:  Your Honor, it is my belief they are not

10    in jeopardy by staff.

11            THE COURT:  And if they are reporting against staff,

12    are you concerned that they are in harm -- in jeopardy of harm

13    by other inmates?

14            THE WITNESS:  Not at this time, Your Honor.

15        When we -- when we monitor for retaliation on a 30-day

16    basis, those -- through the SIA's office, we're able to -- to

17    establish that rapport with the individuals that make the PREA

18    allegations, and we can further look into any of the concerns

19    they have.

20            THE COURT:  My understanding for why people were being

21    placed in SHU under the prior regimes, given the -- the

22    criminal conduct that was happening out there, was to protect

23    those individuals from engagement by the actual staff members

24    because they wouldn't have access to them anymore without

25    every -- without them being at the SHU and going through the

1    protocols that the SHU requires so that there could be an

2    investigation.  That was my understanding.

3         **THE WITNESS:**  Your Honor, in cases like that when

4    you're dealing with staff, staff allegations that are that

5    severe, in my opinion, I would probably want to transfer them

6    to another -- another institution where they could actually be

7    in general population.

8         And in cases in the Bureau of Prisons, we have done that.

9         If we -- if there's a serious assault against a staff

10   member by an inmate, it's called a Trans Seg, or we Transition

11   Seg them to another institution.

12        **THE COURT:**  So I'm talking about something slightly

13   different.

14        It is new protocol, as I understand it, that where there

15   is a -- a substantiated allegation of sexual -- sexual conduct,

16   inappropriate conduct, you let OIG know, who conducts the

17   investigation; right?

18        **THE WITNESS:**  Yes.

19        **THE COURT:**  And that staff member gets put on

20   administrative leave.

21        **THE WITNESS:**  Yes.

22        **THE COURT:**  Okay.  That's new; correct?

23        **THE WITNESS:**  That's not --

24        **THE COURT:**  That's new to the institution?

25        **THE WITNESS:**  Based on the previous culture, I could

1    say that that's new to the institution.

2            **THE COURT:**  Right.  Because the previous

3    institution -- the previous culture -- or the previous

4    administration, that wasn't happening, obviously.  The warden

5    himself was one of the -- was one of the problems.

6        So it was my understanding that Putnam was putting those

7    victims into the SHU so that investigations could happen.

8            **THE WITNESS:**  No, Your Honor.  We have currently,

9    without just knowing the numbers off the top of my head -- we

10   have roughly 23 verified victims -- I'm sorry.  We're tracking

11   unverified victims at the institution that currently are still

12   there.  And they're all in general population.

13           **THE COURT:**  Now they are.  Now they are.  I understand

14   that.  What I'm telling you is that before, they were not.

15       Every person who testified or virtually -- maybe I

16   shouldn't say every.  I've heard from a lot of victims.  But

17   many of them were placed in SHU for protective reasons even

18   though it's punitive.  But that was the option.

19           **THE WITNESS:**  So, Your Honor, to my knowledge, I know

20   of one case where -- again, when we're dealing with a culture

21   that doesn't trust you and they don't think that you have their

22   best interests at heart, they're not very cooperative.

23       And in certain cases, they're not -- I wouldn't say -- and

24   again I can't -- I can't say that they were placed in SHU for

25   investigative purposes, but to remove them from -- from general

1  population to inspect their property --

2          **THE COURT:**  I'm not suggesting that this is happening

3  now.  I had Putnam testify.  That in fact was happening.

4          **MS. MATTIOLI:**  If I could, Your Honor.

5  **Q.**  Do the initials SL mean anything to you?

6  **A.**  I know of one L.  I know -- I'm aware of one L.

7  **Q.**  And what are you aware of?

8  **A.**  They work in food service.  That they had -- they're a

9  verified victim.  And that there's been some -- some

10 allegations that she's reported through retaliation monitoring.

11      We've -- we've worked with her on a number of occasions to

12 keep her out of restrictive housing.  She's maintained her --

13 she's maintained her position in food service.  And we -- we

14 monitor closely to make sure that she's -- she's protected.

15 Yeah.

16          **MS. MATTIOLI:**  I have no further questions,

17 Your Honor.

18          **THE COURT:**  Mr. Cha-Kim?

19                    **RECROSS-EXAMINATION**

20 BY MR. CHA-KIM:

21 **Q.**  Just very narrowly on the SHU question, so you're aware,

22 sir, that the Court has been provided -- and that's Exhibit 407

23 and 412 -- for two weeks' worth of the SHU logs?

24 **A.**  I wasn't aware.

25 **Q.**  And you know what I'm referring to when I talk about the

1    SHU logs, the documents that reflects notes about --

2    **A.**    So the SHU weekly reviews?

3    **Q.**    Yes.

4    **A.**    Yes.  I'm aware of those.

5    **Q.**    And those SHU weekly reviews exist for every other week

6    for the past year, let's say.

7    **A.**    Every week.  It's a weekly review.

8    **Q.**    Those records are kept?

9    **A.**    Yes.

10   **Q.**    Okay.  Are you aware of any particular reason why those

11   are the two weeks in 407 or 412 were submitted for the Court's

12   review as opposed to any other week?

13   **A.**    No.

14            **MR. CHA-KIM:**  Nothing further, Your Honor.

15            **THE COURT:**  All right.  I have a few more questions.

16   **BY THE COURT:**

17   **Q.**    I obviously haven't had a chance to look at this

18   Exhibit S, this tracking document, but I can say that on that

19   far right column, it indicates an estimated completion date.

20   **A.**    Yes, Your Honor.

21   **Q.**    And for most of these, there are no estimates.

22   **A.**    That's where we were working in phases and then trying to

23   prioritize.  So our last meeting with The Moss Group in April,

24   I believe, we were trying to work on, okay, what do we want to

25   establish as phase one, what do we want to establish as phase

1  two.

2  **Q.**   All right.  This document doesn't tell me what's phase one

3  or phase two, does it?

4  **A.**   I don't believe so.

5  **Q.**   So how am I supposed to know that?

6  **A.**   I can take a look at it again, Your Honor, and try to

7  establish that.

8  **Q.**   Okay.  So what I'm going to have you do is I'm going to

9  have you take this document back.  We've got an attorney

10  lounge.  It's comfortable.  And you sit there and you annotate

11  it so I know.  And then we'll make copies and that's the one

12  I'll accept.

13       **THE COURT:**  Can you hand this to him.

14  **Q.**   The Moss report -- well, tell me about the training that

15  they're supposed to be doing next week.

16  **A.**   The training, 17th to the 19th, is gender-informed care,

17  learning to work with individuals in our care --

18  trauma-informed care.  I'm sorry, Your Honor.  Learning to work

19  with individuals in our care that deal with trauma.

20  **Q.**   And who are they training?

21  **A.**   Non-bargaining staff, department heads, managers.

22  **Q.**   So non-union staff?

23  **A.**   Non-union, yes, Your Honor.

24  **Q.**   But wouldn't the -- isn't it the union staff that deal

25  directly with the population?

1    **A.**    We all do, but they deal more directly with the

2    population, yes.

3    **Q.**    So management is getting three days of training and union

4    staff is getting none?

5    **A.**    We are working in that direction.  Working with the

6    central office, we are establishing our trauma-informed care

7    for our bargaining unit staff.

8    **Q.**    Is that in there, in that plan?

9    **A.**    I'd have to check, Your Honor.

10    **Q.**    And when is that supposed to happen, the training of the

11    union staff?

12    **A.**    We are still trying to establish that date.

13        We have conducted other trainings, like deescalation

14    training, which is working on communication with our inmate

15    population, understanding the types of individuals that we're

16    trying to work with.

17    **Q.**    When did that training happen?

18    **A.**    Deescalation training was roughly April, May of '23.

19    **Q.**    How long did it last?

20    **A.**    It was three or four days, and all staff were trained, I

21    believe.

22    **Q.**    Onsite?

23    **A.**    Onsite by a contractor.

24    **Q.**    Was that The Moss Group?

25    **A.**    No.  That was separate.

1  **Q.**   Who was it?

2  **A.**   Off the top of my head, I don't recall their names, but I

3  can get that for you.

4  **Q.**   It appears to me that you've got a -- continue to have a

5  communication problem with the population.  Is there some

6  reason why you don't have, you know, bulletin boards in the

7  units where you post information that is kind of fundamental

8  and critical so that people can see it in their leisure?

9  **A.**   Your Honor, we do.  We have bulletin boards in all the

10  housing units.  We try to ensure that it's consistent message

11  in every single housing unit.  We make sure that it's updated

12  on a consistent basis.

13      In my opinion and my belief, the best way to communicate

14  with inmates to make sure that they have the knowledge and

15  we're communicating with the most is through the TRULINCS

16  messaging system.

17      That way we can absolutely know for a fact that it can

18  reach them and it's reached to them on an individual basis, and

19  they can review it at any time.

20      I can't verify or confirm whether they will actually

21  review the bulletin boards and they're actually reviewing that.

22  **Q.**   What's the problem with doing both?

23  **A.**   We do, Your Honor.

24  **Q.**   People learn in different ways.

25  **A.**   You're -- you're correct, Your Honor.

1  **Q.**   And there are complaints about the amount of time that

2  people have on the computers and the privacy that they get as

3  part of that.  Are you aware of that?

4  **A.**   I am aware, Your Honor.  The -- the computer systems,

5  they're in a general area for safety reasons also.

6      When you have to make sure that you have access to them,

7  putting them in a small confined area where three individuals

8  can be on there at once or two or three individuals can be on

9  there at once, logistically it's difficult, especially when

10  we're trying to establish the pilot program and we have video

11  visits where the video visits have to be in a small room so

12  they can have a comfortable setting with their loved ones.

13      So logistically it's tough to be able to put computers in

14  areas that give them more -- more privacy.  We --

15  **Q.**   So let me ask, though, why is it that -- why is it that

16  the computers need to be facing the public as opposed to

17  turning the desks around so that they're not -- so that they're

18  facing the wall?

19  **A.**   That's a good question, Your Honor.  And if I can respond

20  on that, it would be probably if you were -- if you face them

21  the other way, they'd be out in the -- in the walking area of

22  the housing units because they're tucked away in the corners.

23  If you have an emergency and someone has to respond or you're

24  trying to evacuate if you have -- if you have a fire or

25  something in the institution, that could create a concern, a

1    safety concern, and it isn't a -- it wouldn't be a streamlined

2    process to evacuate the -- the area.

3        To tuck them up against the wall, it creates more of an

4    opportunity to evacuate the areas for safety and security

5    reasons.

6    **Q.**   Is there any reason why you haven't, you know, posted

7    signs that say no loitering, no stopping, no, you know -- just

8    to again address, at least be viewed as trying to address

9    concerns that people are watching over inmates' shoulders what

10   they're doing?

11   **A.**   We can post signs, Your Honor.

12       I do my rounds almost daily.  I try my best.  I've never

13   seen inmates standing behind -- or even staff.  There's just --

14   there's just not enough resources to -- there is one housing --

15   during the day watch, there is one housing officer for two

16   housing units.  The reality of them standing over an inmate

17   while they're on the computer isn't -- it isn't very realistic

18   to me, Your Honor.

19       For another inmate to be standing over their shoulder in

20   that process as well, every time I've gone around the

21   computers, it's -- one individual is sitting down or they're

22   both sitting down at the computers.  And there's a -- there's a

23   mutual respect there where no one is standing over your

24   shoulder.

25       Because if there were, I could promise you, Your Honor,

1    that there would probably be a fight because inmates want their

2    privacy as well and they want that respect.

3    **Q.**    I understand and have seen a document that shows that the

4    strip search is mandatory policy.  I have not seen the same

5    with respect to watching, in addition to the strip search,

6    individuals going to the bathroom.

7    **A.**    As far as the policy on that is?

8    **Q.**    Yes.

9    **A.**    There -- there is policy on it.  We actually -- we -- we

10   received a complaint about the bathroom.  It got -- it came to

11   our attention through a staff member who was complaining.

12   They -- they wanted to continue observing the individuals

13   utilizing the bathroom.  The policy was reviewed and

14   Captain Quezada did address that --

15         **THE COURT:**  Sit down, Ms. Mattioli.

16      Say that again.

17         **THE WITNESS:**  There is policy on that --

18   **BY THE COURT:**

19   **Q.**    I understand that there may be policy.  There's policy on

20   the strip search.  I've seen two policies.  One that says it's

21   discretionary and one that says that it's mandatory.  So are

22   there also two policies on the other?

23   **A.**    Not that I -- I can recall, Your Honor.

24   **Q.**    And is the policy that exists discretionary or mandatory?

25   **A.**    To my knowledge, it's mandatory.

1  **Q.**   All right.  I want that policy.

2       And why was the staff member complaining?

3  **A.**   We were discussing them not -- staff not observing them

4  utilizing the bathroom, and they were complaining that they

5  wanted to continue because they felt that there was a safety

6  concern.

7  **Q.**   Why?

8  **A.**   Introduction.  Introduction of contraband.  It goes back

9  to safety and security.  I understand it's a low-security

10 female institution --

11 **Q.**   It's not only low-security.  You don't actually have

12 evidence to suggest that that is a mechanism that will lead to

13 contraband.  You don't have any evidence, do you?

14 **A.**   In my -- in my experiences as a -- I started as an

15 officer, I have found -- I have found drugs in the cavity of

16 toilets before.  There is contraband that comes through the

17 visiting room.

18 **Q.**   I am not suggesting that there isn't, that that can in

19 fact happen.  The question is whether you have evidence in this

20 institution at this time that would suggest that you need to

21 take that extra step when it's never been taken?

22 **A.**   That's where it goes back to the broader scope of

23 agencies' expectations and not specific to Dublin.

24 **Q.**   And what expectation has been communicated to you from the

25 central office that this should be required?

1    **A.**    It's not something that we've discussed at that level.

2    **Q.**    Right.  It's only been internal; correct?

3    **A.**    At this moment, yes.

4    **Q.**    There seems to be issues with respect to legal mail.  What

5    have you done or looked into with respect to processes for

6    timely management of legal mail?

7    **A.**    So to speak on that, Your Honor, that is actually one of

8    the largest means to introduce drugs into the -- into a secure

9    setting.  That is one of the main concerns that we have at

10   Dublin, and we have evidence on that.

11       A number of times we're receiving what is considered -- it

12   comes in as legal mail.  And in those cases, it's handled

13   separately.  It has to be in the presence of the inmate, they

14   have to sign for it, it has to be delivered within 24 hours.

15   This is all policy.  But in a lot of cases, they're soaking it

16   in K2 or they're trying to introduce drugs that way.  And it

17   has been one of our major concerns for introduction.

18       We have implemented procedures to try to mitigate that.

19   The special investigative services staff, they review it to

20   make sure that it's -- that it's accurate, that the individual

21   is supposed to receive it.

22       And there has been a number of times where we will contact

23   the attorney's office and they're not aware that anything came

24   out.  And we have found drugs that way, and that is one of the

25   higher risks and concerns that we have at the institution.

1    That is ongoing, but we are trying to mitigate

2    introduction through, unfortunately, legal mail process.

3    **Q.**    Do you have a -- does a list exist of all programming at

4    Dublin, attendance at the programming, and wait lists for

5    programming?

6    **A.**    Yes, Your Honor.

7    **Q.**    And are there -- are they computer-generated metrics that

8    do that?  What kind of documents are there?

9    **A.**    The programs offered is a calendar through the special

10   populations program coordinator.  That's offered through -- to

11   the inmate population through TRULINCS so they know what they

12   can sign up for.

13       As far as a wait list, that is generated through the --

14   through the computer.  And as far as who is participating, that

15   is generated through the computer.  So it would be three

16   separate -- three separate documents.

17   **Q.**    Okay.  I'd like information on that as well for the last

18   six months.

19   **A.**    Yes, Your Honor.

20       **THE COURT:**  Any questions before he leaves to go

21   annotate that document for me?  Ms. Mattioli?

22       **MS. MATTIOLI:**  I don't have a question, Your Honor,

23   but I have the correctional manual policy that you were just

24   talking about.  It is another sensitive but unclassified

25   document.

1          **THE CLERK:**  Is this several copies?

2          **MS. MATTIOLI:**  Several copies, yes.  Those are all for

3     you.

4          **THE COURT:**  Which one is that, Mr. Cuenco?

5          **THE CLERK:**  404, Your Honor.

6          **MS. MATTIOLI:**  It hasn't been marked because it will

7     have a letter.

8          **THE COURT:**  No.  It will have a letter.

9          **THE CLERK:**  We stopped at S.  That will be T.

10         **THE COURT:**  T?

11         **THE CLERK:**  Yes.

12         (Defense Exhibit T marked for identification.)

13         **MR. CHA-KIM:**  Your Honor, we would just note for the

14    record that this -- other documents that have been labeled

15    sensitive but unclassified had been produced without an issue.

16         **THE COURT:**  You know what?  You're going to get all of

17    this in the normal course.

18         **MR. CHA-KIM:**  Understood, ma'am.

19         **THE COURT:**  I don't even know if there is a protective

20    order in this case yet.

21         **MR. CHA-KIM:**  We have been reaching out to get one in

22    place, and we'll work on that, Your Honor.

23         **MS. MATTIOLI:**  The documents that we received in

24    advance of the hearing we had time to redact and make

25    appropriate accommodations for.  These documents we received

1    during the course of the hearing and have not been able to

2    redact yet.

3        The protective order that was sent by plaintiffs' counsel

4    came in late one evening during the course of this.  It is a

5    model protective order that doesn't contain language for

6    law-enforcement-specific documents, so we would need more time

7    to work on that document and appropriate language.

8            THE COURT:  Just a reminder, any issues with respect

9    to that, you take to Magistrate Judge Tse.

10           MS. MATTIOLI:  Thank you.

11           THE COURT:  This doesn't say that at the end of a

12   visit, inmates use -- inmates must be forced to go to the

13   restroom and watched.

14           THE WITNESS:  I can look into that, Your Honor.  I

15   don't have direct knowledge on the top of my head about the

16   policy.

17           THE COURT:  Well, it's one page.  Look at it.

18       Am I wrong?  It says if they need to go, they should be

19   watched.

20           THE WITNESS:  Must be -- must be escorted and remain

21   under constant visual staff supervision.

22           THE COURT:  So let me ask the parties.

23       I'll take that back.

24       I was under the impression that in addition to being strip

25   searched, some inmates were being forced to go to the bathroom

1    and were being watched.  Did I misunderstand that?

2            **MR. CHA-KIM:**  No, Your Honor.  That is the assertion

3    and you heard testimony to that effect.

4            **THE COURT:**  Do you agree?

5            **MS. MATTIOLI:**  I do not agree.  I did not hear that

6    testimony.

7            **THE COURT:**  That -- that was what I was asking about

8    and that's what I heard.

9            **MR. CHA-KIM:**  So what happened was the cell searches

10   began on the 18th or thereabouts.

11           **MS. MATTIOLI:**  Cell searches?

12           **MR. CHA-KIM:**  I'm sorry.  Well, the --

13           **THE COURT:**  I am not talking about cell searches.

14      I am talking about meetings with lawyers after which there

15   were strip searches.  But I was under the impression that there

16   was an allegation that in addition to being strip searched,

17   they were being forced to go to the bathroom and they were

18   being watched.

19           **MR. CHA-KIM:**  Correct, ma'am.  And so that started

20   after -- a week later.  And the allegations that we were told

21   and I think there were testimony was that --

22           **MS. JANSSEN:**  May I clarify?

23           **MR. CHA-KIM:**  Yes, please.

24           **MS. JANSSEN:**  I'm sorry.

25           **THE COURT:**  Remember to state your name.

1          **MS. JANSSEN:**  Yes.  Kara Janssen from Rosen Bien

2     Galvan & Grunfeld.

3          To clarify for the Court the allegations, and I believe

4     the transcript and testimony should show this, is that prior to

5     this time people went to the bathroom normally, were not

6     watched.

7          In December, if they needed to go to the bathroom, they

8     had to be watched completely, including wiping, everything.

9     And one individual did not go to the bathroom because of that.

10    But I am not aware of anyone being forced to go to the

11    bathroom.

12          **THE COURT:**  All right.  Thank you.

13          **THE WITNESS:**  Can I -- Your Honor, can I make a point

14    also?  Is that most of the times in legal visitation, typically

15    it was only an hour, two hours, three hours.

16          So I know recently with our litigation, we've been going

17    eight hours, longer.  So it's more consistent with how we do

18    social visiting and what our policies stipulate.

19          So that's probably why the plaintiffs just became aware of

20    it is because the legal team has been staying longer.  And in

21    case now our policies are being --

22          **MR. CHA-KIM:**  Your Honor, members -- the witnesses

23    have been going to the bathroom for months at this facility

24    during legal visitations, and it is our understanding that

25    never has anyone on the occasion that they've had to go to the

1    bathroom been forced to be watched by someone while they go

2    through the entire thing.

3        **THE COURT:**  Okay.  Ms. Mattioli, other questions?

4        **MS. MATTIOLI:**  I don't have any other questions,

5    Your Honor, but we do have the organization chart that we could

6    introduce through this witness.  And this is a public document.

7       There's three.

8        **THE COURT:**  So that will be a numbered exhibit,

9    whatever is next in order.

10       **MS. MATTIOLI:**  Is it 425?

11       **MS. CZIOK:**  426.

12       **MS. MATTIOLI:**  426.

13       **THE COURT:**  Exhibit 426 is admitted.

14          (Defense Exhibit 426 received in evidence.)

15       **THE WITNESS:**  Your Honor, for clarification on this

16    report, we have another one that has actual phases.

17       **THE COURT:**  You have another one that what?

18       **THE WITNESS:**  It has -- it has phases on it.

19       **THE COURT:**  Okay.  Well, that would save you work,

20    wouldn't it?

21       **THE WITNESS:**  Yes, Your Honor.

22       **THE COURT:**  All right.  You can talk to the lawyers

23    about that when you step down.

24       **THE WITNESS:**  Thank you.

25       **MR. CHA-KIM:**  One question, Your Honor.

1    **FURTHER RECROSS-EXAMINATION**

2    **BY MR. CHA-KIM:**

3    **Q.**   This confusion about a policy that says strip searches can

4    occur after legal visitations and one that suggests that it

5    must occur, are you able to speak with anyone at central to

6    inquire about how other institutions are applying this policy?

7    **A.**   I haven't.

8    **Q.**   Have you made such an inquiry?

9    **A.**   Now that we're addressing it, I would be more than happy

10   to have those discussions now.

11   **Q.**   Can you tell the Judge what you find out?

12   **A.**   Absolutely.

13            **MR. CHA-KIM:**  Nothing further.

14            **FURTHER REDIRECT EXAMINATION**

15   **BY MS. MATTIOLI:**

16   **Q.**   Just one follow-up question on that.  Is there a reason

17   that a public version of a correctional policy might be

18   different from an internal version?

19   **A.**   It's safety and security.  So you're -- obviously people

20   are going to try to find ways to circumvent the system and try

21   to introduce drugs into an institution, or weapons or anything.

22   So that's why it's a sensitive matter, and we do keep that

23   internal.

24            **MS. MATTIOLI:**  Thank you.

25            **THE COURT:**  Okay.

1      There are -- now that the examination is over, I'm

2    ordering you to read the transcript of the testimony of all of

3    the inmates.  I heard things that I found were disturbing, and

4    I'd like some follow-up.

5            THE WITNESS:  Yes, Your Honor.

6            THE COURT:  There is one person in particular, and the

7    plaintiffs' attorneys will provide the initials -- because it's

8    a lot of people and I don't have them all memorized -- who has

9    a medical issue.  Apparently -- and apparently she's been --

10   she has to give herself enemas.

11           THE WITNESS:  I know who -- I'm aware of.

12           THE COURT:  I guess there are two questions with

13   respect to that.

14      One is that she's made an allegation of retaliation

15   because she used to have a -- she's a lifer.

16           THE WITNESS:  Yes.

17           THE COURT:  Used to have a single cell so that she

18   could perform these very uncomfortable messy procedures in

19   private and is now forced not to and believes that the doctor

20   was instructed not to authorize it.

21      Do you have any response to that allegation?

22           THE WITNESS:  I do.  I've spoken to this individual on

23   occasion about her -- her situation.  At the end of the day,

24   what it comes down to is we've had an increased rate of

25   suicides at the institution -- I'm sorry.  Not the institution.

1    At the agency level.  Inmates are committing suicides.

2        We've created another protective measure by ensuring

3    that -- a lot of the times in previous cases, they were

4    single-celled.  So in order to mitigate that, we have to make

5    sure that everyone has a cellmate or a bunkie.

6        In cases like this, that was one of the first things we

7    worked on to try to mitigate -- and that's the last thing we

8    would want after dealing with everything with the public

9    notoriety of Dublin, is to now have an inmate suicide.  We

10   obviously already had that on the staff side.

11       So we have to mitigate those -- those concerns.  And in

12   order to do that, we send a weekly report to the regional

13   office of all the -- of the individuals that may be

14   single-celled in institution.  But the goal is to have everyone

15   have a cellmate.  And that's to prevent or mitigate any -- any

16   suicides at the institution.

17       In her case, she has -- she has established a unique

18   situation.  But, again, you could look at it from both sides,

19   Your Honor.  She -- she is a lifer.  Would that put her at risk

20   to commit suicide?  I'm not saying or I'm not trying to allude

21   to the fact that she has any type of --

22       **THE COURT:**  She doesn't seem to me to be the kind of

23   person who would be at risk.

24       **THE WITNESS:**  No.  No, she's not.  But when we start

25   creating exceptions to the rule, it could -- it could be a

```
1    slippery slope.
2              THE COURT:  Yeah, but when you have someone who has
3    that kind of medical condition, that is a basis for an
4    exception.  I mean, how many people have to do that on a daily
5    basis?
6         And by the way, just doing some back-of-the-envelope
7    internet research, it seems to me to be an issue that she has
8    to do it on a daily basis.  And it's not clear to me why she
9    isn't getting the medical care that she needs to figure out how
10   to resolve the issue so this doesn't have to happen.
11             THE WITNESS:  I can't -- can't speak on the medical
12   issue.  But as far as the housing goes, we -- we can work on --
13   on -- on trying to establish a better procedure for her.
14        We have -- we have discussed it.  And I addressed it
15   months ago with her.  And she never really brought it back to
16   my attention.  And to be honest, I never got a chance to follow
17   up with her.
18        Being that I know that it's still an issue, I will look
19   into it and address it.
20             THE COURT:  Well, it is apparent.  It is still an
21   issue, and I do want you to look at it again.  I do think --
22   judges, we have to make exceptions to the rules all the time.
23   All the time.
24        And the question is, you know, is it, in fact, an
25   exception.  And it seems to me you could easily say to anyone
```

```
 1    unless you need to do this once a day or twice a day, you are

 2    not that person.  And that's not a hard -- that's not a hard

 3    position, in my view, to justify.

 4         There was also a situation about an inmate who alleges

 5    that she was physically attacked while either convulsing or

 6    after a suicide attempt, but something happened.  And who was

 7    that person?

 8              MR. NIMNI:  Your Honor, that's CAH.

 9              THE COURT:  CAH.  Do you know what I'm talking about

10    with that person?

11              THE WITNESS:  I know of the individual.  But

12    physically attacked, I'm not aware of any --

13              THE COURT:  Pepper-sprayed.

14              THE WITNESS:  I'd have to -- I can recall -- I could

15    probably recall an incident, if I'm able to look into it.

16              THE COURT:  Again, I don't know how someone who is

17    having a medical emergency, how they can be pepper-sprayed.

18              THE WITNESS:  I'd have to look into the incident,

19    Your Honor.

20              THE COURT:  I'd like you to.  Those are the two big

21    issues that come to mind.

22         The third issue -- and I understand why -- I understand

23    your desire to move people around so that they don't get too

24    comfortable in terms of inappropriate things happening, whether

25    it's contraband or other stuff, but what about those
```

1    individuals who are serving in jobs and in serving in those

2    jobs are building skills?

3            **THE WITNESS:**  We --

4            **THE COURT:**  So how do you deal with them?  Because it

5    seems to me part of the goal is to give skills to these

6    individuals.  And if somebody is becoming expert in HVAC,

7    right, that's a really positive thing.  But if you're

8    constantly shifting people around, then they're not going to be

9    able to build skills.

10           **THE WITNESS:**  You're right, Your Honor.  And then in

11   those cases, they do stay on for a longer period of time, and

12   that's where it would be wanted.

13       UNICOR would be another area where they would stay on that

14   job longer so they could get their 500 hours for FSA, or First

15   Step Act, credits to -- for early release.

16       So we do work with the inmate population when it's -- when

17   it's in areas that we can identify that there's a greater need

18   to help them reenter into society.

19       But for the overall case, someone working in the food

20   service warehouse or trust fund warehouse where they're moving

21   pallets, there really isn't -- there isn't an exception there

22   to warrant them to stay on that position for longer than is

23   needed.  And there is an increased concern with complacency or

24   getting too familiar with that -- that area.

25       So in certain cases, yes, we do -- we have identified

1    certain positions that warrant placement for longer periods of

2    time.

3        **THE COURT:**  There's also a concern, and this was

4    testified to by the person who is expert in these HVAC systems

5    there, that the facilities, if you are very far away, if you're

6    on the wings, and I don't have -- I've got some memory of how

7    the institution is set up, but it's not -- I don't have it

8    memorized -- that those rooms that are far away are very cold.

9    It is winter.  Temperatures are dropping.  And they don't have

10   sufficient blankets.

11       **THE WITNESS:**  So I am aware of the heating issues that

12   we have.  Our HVAC systems aren't the best.  When I'm aware

13   that there's an issue, I address it immediately to the point

14   that I put in a corrective action that I want staff to do

15   temperature checks on a daily basis to make sure that they stay

16   at -- that they're within policy.

17       **THE COURT:**  But are those temperature checks being

18   done in the middle of the night?

19       **THE WITNESS:**  No, Your Honor.

20       **THE COURT:**  And, see, that's the problem.  Because

21   during the day, it could be a lovely day.  But temperatures can

22   drop 20, 25 degrees at night.

23       So how are you -- so it doesn't sound like you're getting

24   information on the actual issue that they're raising.  And in

25   the United States, people should not have to be in their cells

1    cold to sleep.

2          **THE WITNESS:**  No.  We can address -- they can have

3    extra blankets.  That has never been a request that's gotten to

4    me.  It's just been the complaint that it's cold.  And I am

5    actively working on addressing that.

6          The heating elements, I can identify -- it was alpha bravo

7    unit, one of the units on the left-hand side of the compound.

8    I received complaints from them.  We needed heating elements.

9    We had to purchase them.  We brought them into the institution.

10   It took us two days to address.

11        Is that a permanent fix?  Not all the time.  You can hope.

12   We cross our fingers that it can be.  But we're constantly

13   having issues.  Every single year we have issues with HVAC,

14   with -- with the water.

15        We're currently working through a water issue right now

16   where, as we speak, we had to shut down in the water in F unit

17   because we had a water leak that was growing over the weekend.

18   I tried to push it off, but if we push it off any further, it

19   could lead to more detrimental concerns.

20        Your Honor, the institution is 50 years old.  We're trying

21   to work with the infrastructure.  It's a -- it's not an easy

22   task.  But I can assure you that we do address the issues as

23   they come up.

24        And that's where we're constantly trying to battle

25   addressing the inmates' needs with the infrastructure, with

1  funding, and making sure that we can meet in the middle, if you

2  will, on trying to make sure that their needs are being met.

3       In my belief, we are meeting their needs.  I don't know

4  what they're testifying in regard to --

5           THE COURT:  Well, that's why I'm going to have you

6  read --

7           THE WITNESS:  Yes, Your Honor.

8           THE COURT:  -- because I've heard it.

9       Now, and I understand, you've got 700 over there,

10  700-plus, and I've heard from a fraction.

11      But I can't -- I can't ignore it, especially when we're

12  talking about fundamental issues like being able to be warm at

13  night.

14          THE WITNESS:  I agree with Your Honor.  And that goes

15  back to my testimony about building trust with staff and with

16  the inmate population, and I believe we are establishing that.

17          THE COURT:  I still think there's room for

18  improvement.

19          THE WITNESS:  I agree, Your Honor.

20          THE COURT:  Okay.  We're going to go ahead and take a

21  20-minute break.

22      You are excused at this point.  Now you can talk to the

23  lawyers.  Now you can read that testimony.

24      You're ordered to return to me on January 26.  It's a

25  Friday at 9:00 a.m.  And I want an update on issues.  And if I

```
 1   need something else, it will be in writing so that you can be
 2   advised.  All right?
 3              THE WITNESS:  Yes, Your Honor.
 4              THE COURT:  Okay.  We'll stand in recess for
 5   20 minutes.
 6                      (Recess taken at 10:17 a.m.)
 7                  (Proceedings resumed at 10:37 a.m.)
 8              THE COURT:  Okay.  We're back on the record.  The
 9   record will reflect all the parties are with me.
10       Ms. Mattioli, next witness.
11              MS. MATTIOLI:  Your Honor, the United States calls
12   Constance Campos.
13              THE CLERK:  Please raise your right hand.
14                      CONSTANCE CAMPOS,
15   called as a witness for the defendants, having been duly sworn,
16   testified as follows:
17              THE WITNESS:  Yes, I do.
18              THE CLERK:  Please be seated and speak clearly into
19   the microphone.
20              THE WITNESS:  Yes, I do.
21              THE CLERK:  Please state your full name and spell out
22   your last name.
23              THE WITNESS:  Constance Campos.  C-A-M-P-O-S.
24              THE COURT:  Good morning.  You may proceed.
25   / / /
```

1                    **<u>DIRECT EXAMINATION</u>**

2   **BY MS. MATTIOLI:**

3   **Q.**   Ms. Campos, can you please tell us briefly about your

4   background?

5   **A.**   I've been with the agency going on 25 years this March,

6   2024.  Dublin is my fourth institution.  I've -- since 2004, I

7   have a collateral duty as a bus officer.  That's

8   transportation.  And in 19 -- correction, in 2007, I was

9   selected as a counselor, correctional counselor, and that's my

10   current position right now.

11   **Q.**   When did you get to Dublin?

12   **A.**   July of -- July 20, 2020.

13   **Q.**   Can you please restate your current job title?

14   **A.**   Correctional counselor.

15   **Q.**   And what does a correctional counselor do?

16   **A.**   You're assigned to a unit.  You're responsible for the

17   sanitation of that unit to include cell assignments,

18   sanitation, work assignments.

19       Also assist the inmates with legal visits approval, to

20   include inmate-to-inmate correspondence, legal calls with

21   either attorneys, court pertaining to child custody or

22   mediation, the consulate to include visits, legal and consulate

23   visits.

24   **Q.**   And where do you work at the facility?  At the FCI or the

25   camp?

1    **A.**    I'm currently assigned at the camp.

2    **Q.**    When did you move to the camp?

3    **A.**    I believe in February of 2023.

4    **Q.**    And why did you move to the camp?

5    **A.**    I was asked if I would be willing to reassign to the camp.

6    **Q.**    Were you given a reason?

7    **A.**    They needed a seasoned correctional counselor.

8    **Q.**    Did they not have one?

9    **A.**    The one that was there before, she retired.

10   **Q.**    Okay.  Have you ever had any employment discipline?

11   **A.**    No, ma'am.

12   **Q.**    Are you familiar with a pat search?

13   **A.**    Yes, ma'am.

14   **Q.**    What is the purpose of a pat search?

15   **A.**    To deter contraband or find contraband on a person.

16   **Q.**    And how do you conduct a pat search?

17   **A.**    Checking the -- the neck area, the -- the front, like

18   this.

19   **Q.**    When you say the front --

20   **A.**    The front.

21            **MS. MATTIOLI:**  Can she stand, Your Honor?

22            **THE COURT:**  Would you like to stand?

23            **THE WITNESS:**  It's with the back of your hands like

24   this around the area like this.

25   / / /

**BY MS. MATTIOLI:**

**Q.**   Around the area of the breasts?

**A.**   The breasts, yeah.  And check the -- the -- all the sides right here.  And then the back to include the waist area, both legs -- I'm sorry, I'm trying to sit.  Both legs.

And then ask the inmates to remove their shoes.  You check the bottom of their feet, check the shoes.  And then have the inmates open their mouth and check both ears.

**Q.**   Do you check their hair?

**A.**   Yes.  You have them remove their -- any type of braids or hair ties that they have.

**Q.**   And why do you use the back of your hand?

**THE COURT:**  So it's -- when I heard "back of the hand," I thought we were talking about --

**THE WITNESS:**  Yes.

**THE COURT:**  We are talking about that, so not the palm?

**THE WITNESS:**  No, not the palm.

**THE COURT:**  Okay.  Go ahead.

**BY MS. MATTIOLI:**

**Q.**   And why is that?

**A.**   That's how we were trained to do it by policy.  And you're not physically touching.

**Q.**   And just so the record will reflect there was a -- I don't want to mischaracterize it -- a grabbing motion?

1    **A.**    No.

2              **THE COURT:**  No, that's not what I saw.

3              **THE WITNESS:**  No, you don't grab.

4    **BY MS. MATTIOLI:**

5    **Q.**    I'm just trying to clarify.  You use the back of the hand

6    as opposed to the palm?

7    **A.**    Yes, ma'am.

8    **Q.**    Can you tell us about the training that instructs you on

9    that procedure?

10   **A.**    It goes step by step, the video.  I mean, they use an

11   inmate, you know, telling you how to do it with a female

12   inmate, to include also the male inmates.

13   **Q.**    And how often do you have that training?

14   **A.**    Once a year.

15   **Q.**    Is there any reason during a pat search that you would

16   touch an inmate's nipples?

17   **A.**    No.

18   **Q.**    How many pat searches have you performed in the last

19   25 years?

20   **A.**    I would say hundreds.

21   **Q.**    Do you remember conducting pat searches prior to a

22   shakedown of the Dublin camp on September 27, 2023?

23   **A.**    Yes, ma'am.

24   **Q.**    What is a shakedown?

25   **A.**    A shakedown is where staff go and search areas to include

1   the inmates' cells or the common areas.

2   **Q.**   And what was your role in the shakedown?

3   **A.**   Conducting the pat searches.

4   **Q.**   Before or after this event that I just asked you about,

5   have you ever had an inmate complain that you have conducted a

6   pat search inappropriately?

7   **A.**   No, ma'am.

8   **Q.**   Has an inmate ever complained that you have conducted a

9   pat search violently or aggressively?

10  **A.**   No.

11  **Q.**   Do you remember conducting pat searches that day?

12  **A.**   Yes.

13  **Q.**   Do you know of a camp inmate with the initials KD?

14  **A.**   Yes.

15  **Q.**   And how do you know her?

16  **A.**   I conducted the pat search, and also during open house or

17  during teams.

18  **Q.**   So this sounds redundant, but do you remember conducting a

19  pat search of KD that day?

20  **A.**   Yes, ma'am.

21  **Q.**   What do you remember about it?

22  **A.**   Just that I conducted the pat search.  That's it.

23  **Q.**   Did you cup or grope her breasts while lifting them up

24  during the search?

25  **A.**   No, ma'am.

1  **Q.**   Would you disagree with her statement to Special

2  Investigative Agent Baudizzon that you touched her nipples that

3  day?

4  **A.**   I disagree.

5  **Q.**   Would you disagree with her statement to SIA Baudizzon

6  that you used the front of your hands to pat search the area

7  around her breasts?

8  **A.**   I disagree.

9          **MR. NIMNI:**  Objection.  I don't believe that statement

10  is in the record.

11  **BY MS. MATTIOLI:**

12  **Q.**   Are you aware that that statement was made --

13          **THE COURT:**  Hold on.  Are you reading from a

14  transcript?

15          **MS. MATTIOLI:**  I am recalling testimony.

16          **MR. NIMNI:**  I believe the question from Ms. Mattioli

17  was the statement from KD to Baudizzon, and I don't think we

18  have a record of KD to Baudizzon.  If that's from some

19  document, we don't have it.

20          **THE COURT:**  Sustained.  It's stricken.

21  **BY MS. MATTIOLI:**

22  **Q.**   Are you aware that she made any statements regarding the

23  pat search?

24          **MR. NIMNI:**  Objection.  Hearsay.

25          **THE COURT:**  That's -- that calls for a "yes" or "no."

1    Overruled.

2            **THE WITNESS:**  Yes.

3    **BY MS. MATTIOLI:**

4    **Q.**    Did she say anything to you during or after the pat

5    search?

6    **A.**    No, ma'am.

7    **Q.**    Did she seem agitated?

8    **A.**    Not at all.

9    **Q.**    When did you first learn that she made a PREA allegation

10    against you for an inappropriate pat search?

11            **MR. NIMNI:**  Objection.  Misstates the record.

12    **BY MS. MATTIOLI:**

13    **Q.**    Did you learn -- sorry.

14            **THE COURT:**  So there is a dispute over the nature of

15    the allegation.  So rephrase your question.

16    **BY MS. MATTIOLI:**

17    **Q.**    At any point, did you learn that it was interpreted that

18    she was making a PREA allegation against you?

19    **A.**    Yes.

20    **Q.**    Have you ever seen the video of that pat search?

21    **A.**    Yes, ma'am.

22    **Q.**    When did you see it?

23    **A.**    Sunday.

24    **Q.**    And what was the context of viewing the video?

25    **A.**    The pat search that I conducted.

1  **Q.**   Who did you view it with?

2  **A.**   With my attorneys.

3         **MS. MATTIOLI:**  I'd like to play the video from

4  September 27 --

5         **MR. NIMNI:**  Objection.

6         **MS. MATTIOLI:**  -- 2023 for the Court.

7         **MR. NIMNI:**  Objection.  We haven't been provided this

8  video.

9         **MS. MATTIOLI:**  We will provide a copy.  We just

10  obtained it.

11         **THE COURT:**  When -- well, you obviously obtained it on

12  Sunday.

13         **MS. MATTIOLI:**  Correct.  That's when I obtained it.

14         **THE COURT:**  So why didn't you give it to them Sunday?

15         **MS. MATTIOLI:**  I wasn't provided a physical copy of

16  the pat search until Ms. Agostini arrived on Monday.  It came

17  in the form of a CD.  I have the CD, which is the original, and

18  the only copy that I have.  We can make copies for everybody

19  and provide them.

20         **THE COURT:**  Okay.  It's too late.  You should have

21  provided it.  I don't need it right now.  Provide it.  If I

22  need to ask additional questions, I can ask them on the 26th.

23  You should have provided it to them.  If you had, we wouldn't

24  have an issue today.

25         **MS. MATTIOLI:**  The purpose is for this witness to view

1    the video.  It wouldn't be to introduce it as an exhibit.  It

2    would be for her to --

3              THE COURT:  If I'm going to see it, then I -- if I

4    don't need to consider it, then what's the point?

5              MS. MATTIOLI:  Can we provide it right now?  Can we

6    get a copy of it and provide -- not the disk.  But you burned a

7    copy.  Can we provide it to them?

8              MS. CASELLI-GROSS:  Sure.

9              THE COURT:  All right.  Keep going.

10             MS. MATTIOLI:  Well, the next questions I have,

11   Your Honor, are about the video.

12             THE COURT:  Anything else?

13   BY MS. MATTIOLI:

14   Q.   Have you ever refused to process KD's visitation forms?

15             MR. NIMNI:  Objection, Your Honor.  Goes outside the

16   scope of the rebuttal witness.

17             THE COURT:  Overruled.

18   BY MS. MATTIOLI:

19   Q.   You can answer.

20   A.   Negative, no.

21             MS. MATTIOLI:  Those are all the questions I have.

22             THE COURT:  All right.  Cross.

23                       CROSS-EXAMINATION

24   BY MR. NIMNI:

25   Q.   Good morning, Counselor Campos.

1    **A.**    Good morning.

2    **Q.**    My name is Oren Nimni.  I represent the plaintiffs.  I'm

3    just going to ask you a few questions.

4        To the best of your knowledge in the investigation of this

5    pat search, are you aware if KD was offered the opportunity to

6    see the video?

7    **A.**    Not to my knowledge.  I don't know.

8    **Q.**    At the time of the pat search or immediately following it,

9    were you interviewed by a supervisor concerning that pat

10   search?

11   **A.**    No.

12   **Q.**    Were you interviewed by anyone concerning that pat search?

13   **A.**    No.

14          **MR. NIMNI:**  One moment, Your Honor.

15       No further questions.

16          **THE COURT:**  Okay.  I'm going to have you go wait in

17   the attorney lounge.  You're not released at this point.

18          **THE WITNESS:**  Yes, ma'am.

19          **THE COURT:**  Who is doing the cross on the next

20   witness?

21          **MR. GALVAN:**  If that's Warden Dulgov, I am.

22          **THE COURT:**  All right, Mr. Nimni.  Take a look at that

23   video.

24          **MR. NIMNI:**  All right.  Thank you, Your Honor.

25          **THE COURT:**  Next witness.

1           MS. MATTIOLI:  The United States would call Arthur

2     Dulgov, D-U-L-G-O-V.

3           THE WITNESS:  Am I going the right way?

4           MS. MATTIOLI:  Yes.  Right over here and up there.

5           THE WITNESS:  Good morning.

6           THE COURT:  Remain standing.  Swear him in.

7           THE CLERK:  Please raise your right hand.

8                        ARTHUR DULGOV,

9     called as a witness for the defendants, having been duly sworn,

10    testified as follows:

11          THE WITNESS:  I do.

12          THE CLERK:  Thank you.

13          THE WITNESS:  You're welcome.

14          THE CLERK:  Please be seated and speak clearly into

15    the microphone.

16          THE WITNESS:  Will do.

17          THE CLERK:  Please state your full name and spell out

18    your last name.

19          THE WITNESS:  Arthur Hoyer Dulgov, D-U-L-G-O-V.

20    H-O-Y-E-R.

21          THE COURT:  Good morning.

22          THE WITNESS:  Good morning.

23          THE COURT:  You may proceed.

24    / / /

25    / / /

1    <u>**DIRECT EXAMINATION**</u>

2    **BY MS. MATTIOLI:**

3    **Q.**    Good morning, Warden.

4    **A.**    Good morning.

5    **Q.**    Can you please tell the Court about your background prior

6    to coming to Dublin?

7    **A.**    Sure.  My route in general has been very untraditional as

8    far as to the Bureau of Prisons.  I received a bachelor's

9    degree in business administration from Northern Arizona

10    University.  I worked in business for two Fortune 500 companies

11    for several years before working for the State of Arizona at

12    the Motor Vehicle Division.

13        After -- while -- while at Motor Vehicles, I went

14    post bac, post baccalaureate, and earned my education

15    certificate, teaching certificate.

16        I wound up teaching middle school, well, mostly middle

17    school, mostly math and science for about a decade before

18    accepting a position as a teacher, a GED teacher, with the

19    Bureau of Prisons in 2008 at the Federal Correctional Complex

20    in Tucson, Arizona.  I was there from 2008 until 2011.

21        While there, Tucson received the Golden Apple award for

22    the western region for being an outstanding education

23    department.  That was in 2010.

24        In 2011 I went to New York.  I was the supervisor of

25    education while I was there.  In 2012, New York received the

1    Golden Apple award as well in that education department for,

2    again, just being an outstanding -- most outstanding for the

3    northeast region.

4        While in New York, I did some work -- I worked closely

5    with the courts.  I introduced some new programming because

6    there was a lack of programming when I arrived.  And we started

7    classes.

8        And I worked with the Federal Defender's Office where they

9    offered programming, as well as with the Innocence Project.

10   There were two attorneys from there that came and taught

11   classes with us.

12       And then as part of the work at the Federal Defenders,

13   they had me -- the United States Attorney, AUSA for the

14   Southern District of New York asked me to present to the CJA

15   panel.  And essentially I guess instruct or teach the attorneys

16   about prison records like how -- the education transcripts so

17   the defendants could use them in court to demonstrate to the

18   judge that they have bean taking classes inside the

19   institution.

20       In 2015, I was promoted back to FCC Tucson as the

21   executive assistant camp administrator.  That was a role like

22   Ms. Agostini.  You saw her earlier.  Like her, I was over --

23   had oversight of the camp, about 120 male, as well as the

24   executive -- as well as the executive assistant role there.

25       After that I was promoted to MCC San Diego --

1    **THE COURT:**  You said 120 male relates to the inmate

2    population?

3    **THE WITNESS:**  Correct.  At the camp, yes, ma'am.

4    Approximately.  Obviously the population fluctuated.

5    After that, I was promoted to MCC, Metropolitan

6    Correctional Center San Diego, where again I wound up working

7    with the courts and the U.S. Attorney's Office.  Because Rob

8    Rosenstein, the Deputy Attorney General, had asked us along

9    with all the alphabet soup of law enforcement to work on the

10    border project, the border initiative under President Trump.

11    In 2000 -- probably '18 -- no, I'm sorry, '19 or '20 -- I

12    forget the year.

13    **THE COURT:**  When did you go to San Diego?

14    **THE WITNESS:**  Like December 24th, 2017.  Basically

15    2018.  So --

16    **BY MS. MATTIOLI:**

17    **Q.**   I'm going to remind you to slow down.

18    **A.**   Thank you.  I appreciate that.

19    **THE COURT:**  But you didn't say what your role was at

20    San Diego MCC.

21    **THE WITNESS:**  Oh, excuse me.  Yes.  I was the

22    associate warden at MCC San Diego.

23    **THE COURT:**  And the population there?

24    **THE WITNESS:**  Around a thousand.

25    **THE COURT:**  Male and female?

1        **THE WITNESS:** Male and female. Every institution I've

2   been at, except for Safford where I just came from, had a

3   female population.

4        **THE COURT:** Okay. Keep going.

5        **THE WITNESS:** So at San Diego, like I said, I worked

6   with the U.S. Attorney's Office and the courts to process the

7   President's border initiative. I was awarded in -- this was

8   probably 2019, maybe 2020, with the Southern District of

9   California Excellence in the Pursuit of Justice award, and that

10  was given to our team for our work with the courts during the

11  previous year and a half or so.

12       And then in 2020, I moved over to the Federal Correctional

13  Complex in Victorville, California, also as associate warden.

14  And that was a lot through COVID times so it was a little

15  different at that point in time.

16       I worked at all three facilities there, both the mediums

17  and the penitentiary. And I had oversight of the camp almost

18  the entire time I was there because the camp had changed

19  oversight between institutions while I was there. That was

20  more coincidental than with me individually.

21       And then in May of 2023, I was promoted to be the warden

22  at the Federal Correctional Institute in Safford, Arizona.

23       And then on November 5th, the regional director called me

24  and asked if I would consider going to Dublin for a period of

25  time. I told her that I would.

1      And then on December 14th, I was told to report on

2   December 18th.  And I worked in Dublin the week of

3   December 18th to the 22nd.  I had preplanned personal leave the

4   week of Christmas, and I had to be in D.C. for -- we had our

5   accreditation process in Safford last year.  So I had to go

6   before the panel in D.C. and defend the institution for the

7   panel hearing, which we were accredited last week.  And here I

8   am today.

9   **BY MS. MATTIOLI:**

10  **Q.**   Do you intend on applying for the permanent warden

11  position?

12  **A.**   Can I give you a short answer and a long answer?

13  **Q.**   Short, please.

14  **A.**   So the short answer is yes.

15  **Q.**   What is the long answer?

16  **A.**   So the long answer would be this job originally had come

17  open sometime last summer, maybe June or May, I can't remember

18  exactly.  And I didn't apply, and I didn't apply because --

19  I'll back up a little bit if you'll allow me.

20       My wife grew up very poor in a very poor school,

21  underserved community.  And she raised four children the same

22  way in which she went to school.  And now that she's a school

23  teacher, she will only work in those communities.  She won't

24  work anywhere else.

25       And we made an agreement years ago, more than a decade

ago, that no matter when I leave, when I get transferred,
promoted, at any time during the school year, she'll complete
the contract to the end.

     So for me to have applied for Dublin in, whatever, May or
June, whatever it was, of 2023 would have meant that we would
have been apart for basically 12 months or pretty close to it.
So at that point in time I was not prepared to apply.  But if
the job comes open now as we sit in the spring of 2024, that
would be a relatively easy ask.

**Q.**   Can you please tell the Court --

          **THE COURT:**  So I'm not -- I'm not sure I understand.
You're already here.  Are you not here -- does that mean you're
not working here full-time, that you're going back and forth to
Arizona?

          **THE WITNESS:**  Incorrect.  I'm full-time in Dublin.  I
have a long-term, 30-night stay at the Marriott.  I just have
another vacation scheduled for February, preplanned, and I
expect I will be coming back after that.  I've already booked
another 30 days after that.

     The Bureau needs -- so the Bureau needs to announce the
position before they can have an applicant, obviously.

          **THE COURT:**  But your wife's contract is through the
end of the spring 2024?

          **THE WITNESS:**  Correct.  She's in Tucson now and she
will remain there through the end of May.

1          **THE COURT:**  Okay.

2          **THE WITNESS:**  Yeah.  Her last day of school was the

3   Friday prior to Memorial Day.  And we already understand that's

4   how that's going to be.

5       I'll also just add a piece, since you're kind of inquiring

6   a little bit.  Director Peters, she is the director of the

7   Bureau of Prisons, she wrote a letter of recommendation for me

8   to participate in a class that's offered by the National

9   Institute of Corrections in Denver, Colorado called executive

10  excellence.

11      The only way to get into that class, into that program is

12  to have the chief of your agency write you a letter of

13  recommendation.  So I'm in a class with 30 -- well, 29 other

14  people.  And all of us are in that class on the same letter.

15  They work with various states, counties, jails, probation,

16  juvenile justice.

17      So I say all that to say that when I applied for the job

18  in Dublin, Ms. Peters is also the selecting official, you know,

19  for that job.  So I'll leave it at that.

20          **THE COURT:**  Okay.

21          **THE WITNESS:**  Do you have any other questions?

22          **THE COURT:**  I'm sure I will.

23          **THE WITNESS:**  Okay.  Fair enough.

24  BY MS. MATTIOLI:

25  **Q.**   I empathize.  My kids want their mom back, too.

1    Can you please tell the Court what you experienced during

2    your first full week at Dublin?

3    **A.**    Sure.  So I'm the type of person that is out and about a

4    lot.  I knew I only had five days before I left for the next

5    ten.  So I wanted to make sure that I visited as many employees

6    and inmates as I could that first week that I was there.

7    So I was getting to work at, you know, 5:00 or before in

8    the morning most every day -- well, every day -- and staying

9    until between 4:00 and 5:00 in the evening to make sure I could

10    see everybody on all three shifts because obviously we have

11    shift work.

12    So as I did that, you know, I visited every area of the

13    institution.  The areas that were open, morning watch, day

14    watch, evening watch, I would visit.  I kind of worked left to

15    right through the institution.

16    You know, I went into education, and the inmates -- I was

17    going there just as they were kind of transitioning out to go

18    to lunch, I think.  But I stopped by the library.  There were

19    three or four library clerks in there, and they kind of

20    escorted me around and showed me the library.

21    They seemed very happy with their job.  I asked them if

22    they liked it, and they said they did.  I met the tutor for the

23    vocational training course for the culinary program --

24    **THE COURT REPORTER:**  You're going to have to slow

25    down.

1          **THE WITNESS:**  Oh, thank you for saying that.  I'm

2     sorry.

3          I met the tutor for the vocational training class.  She

4     told me what she did, and she seemed very happy and proud of

5     her work there.

6          There were still a group of inmates in the hallway so I

7     spoke to them, asked them how their classes were going, how

8     their instructors were.  A lot of positive feedback from that

9     large group.

10          I went into both the other two classrooms in the back.  I

11     spoke with the three tutors that were back there.  They were

12     excited to see, you know, a warden there.  One of them brought

13     me to her little work area in the back and showed me around.

14          I met the staff that were over there.  I went to the

15     UNICOR area.  And I -- there were quite a few workers there,

16     I'm going to estimate 70 just looking around.

17          And the staff that were there kind of explained what they

18     do there.  They answer phones, and it sounds like they do like

19     magazine renewals of some type, like they call you to renew

20     your magazine.

21                    (Discussion off the record.)

22          **THE WITNESS:**  Thank you.

23          They call you to renew your magazine subscription.

24          And the inmates saw me there, and one of the inmates --

25     the inmates are in long, long rows making phone calls.  Well,

at the end of the row there is like a high chair, high table,

and that inmate listens in to the calls that the other inmates

are making and, like, has like a grading sheet to make sure

they're asking and answering the questions properly, the ones

that are on the phone in front of them.

And, you know, she invited me over to put the little

ear -- she kept an earpiece in, I kept an earpiece in, and we

just -- you know, she showed me what she was doing monitoring

the call.

And of course after she did that, the one next door to her

wanted me to do the same, but I said no, I understand, you

know, the process.  You know, thank you.

I've been in food service numerous times.  I've always

liked to walk around in food service because in a prison, if

your food or your medical is a problem, you probably have a

problem.

So I spend a lot of time in food service during the

mealtimes both in the dining area where the inmates eat and in

the kitchen, in the back, and in the pot and pan room, in the

dish room, in the veg prep room, in the meat prep room, in the

warehouse area.

I just -- if things in the kitchen are not sanitary or not

running well, it's going to be a problem.  So that's important

to me.

All the workers there, both staff and inmate, all seemed

1    very pleasant, happy.  Even the ones in -- the veg prep room we

2    keep locked because there is knives in there.  The meat prep

3    room we keep locked because there is knives in there.  But I

4    would just go to the window and kind of say hi to them and

5    introduce myself.  And everything seemed good.

6              MR. GALVAN:  Objection.  Not rebuttal.

7              THE COURT:  Overruled.  It's narrative at this point,

8    though.

9    BY MS. MATTIOLI:

10   Q.   Did you visit any housing units?

11   A.   Yes.  That was the next place.  I kind of walked around

12   the institution.  I visited all three housing units.  Well, AB

13   is kind of one, but C, D, E, F.

14        I went there on all three shifts.  Walked around, talked

15   to the staff and the inmates.  Everyone seemed pleasant and

16   relatively happy, you know, given the circumstances.

17        I was in facilities.  I was in recreation on all three

18   shifts.  I was at the non-residential -- I just happened to

19   walk into the non-residential drug program on Friday before I

20   left.

21        I made my way to the camp.  I was there on morning watch

22   one day and on day watch another day.  We passed out Christmas

23   bags I think the Thursday before I left, both at the FCI and at

24   the camp.  And all the inmates got a chance to see me there

25   because every single inmate got a Christmas bag.

1   **Q.**   Did you introduce yourself as the interim warden as you

2   were walking around?

3   **A.**   Many, many times, yes.  At the outside warehouses

4   included.

5   **Q.**   Are you generally aware of the substance of the testimony

6   that the inmates provided in this Court?

7   **A.**   Generally, yes.

8   **Q.**   What, if any, themes did you pick up on in their

9   testimony?

10  **A.**   So I -- I get the sense that the inmates would like more

11  information as far as maybe how to report confidentiality --

12  confidentially wrongdoing or whatever.

13      I think the inmates expect or would appreciate better

14  communication between the prison staff and to them.  And I get

15  the sense that they would expect the staff there to be more

16  professional than they are.

17  **Q.**   In your time at Dublin so far -- I acknowledge it has not

18  been extensive -- have you personally seen staff acting

19  unprofessionally?

20  **A.**   Never.

21          **THE COURT:**  Well, they're usually on good behavior,

22  right, when the warden is walking around?

23          **THE WITNESS:**  Usually, but not always.  I have been

24  the warden at Safford for 18 or 19 months, and I've observed

25  bad behavior.  And I give a memo to my department heads when I

1    first meet them all.  And one of the topics --

2           **THE COURT REPORTER:**  I'm sorry.  I couldn't even

3    understand you.

4           **THE WITNESS:**  Excuse me.

5      I give a memo to all my department heads when I meet them

6    in our first one-on-one meeting, and one of the items in there

7    is don't defend bad behavior.  And there has been some bad

8    behavior at times even in front of the warden and the associate

9    warden.

10   **BY MS. MATTIOLI:**

11   **Q.**  We heard testimony about an inmate bulletin or a notice

12   that is signed by you.

13          **MS. MATTIOLI:**  I'd like to introduce this notice as

14   Exhibit 423.

15          (Defense Exhibit 423 marked for identification.)

16          **THE WITNESS:**  Okay.

17          **MS. MATTIOLI:**  May I approach, Your Honor?

18          **THE COURT:**  You may.

19          **THE WITNESS:**  Thank you.

20   **BY MS. MATTIOLI:**

21   **Q.**  Have you seen this document before?

22   **A.**  Yes.

23   **Q.**  What is this?

24   **A.**  So this is a notice to the inmate population informing

25   them that if they're essentially in possession of stolen

1  property from primarily where -- what I've observed is

2  facilities and food service, that they will be receiving an

3  incident report for possession of stolen property.

4  **Q.**  And I need you to articulate.  They will receive --

5  **A.**  An incident report.

6  **Q.**  Why did you issue this notice to the population?

7  **A.**  So -- so in speaking with the staff, walking around and

8  doing conference calls that first week, it was -- it is evident

9  that the staff are afraid to do their job sometimes because

10  they're afraid of accusations.

11      And I made the determination that in order to help staff

12  be less afraid to do a cell search, that I would do cell

13  searches with them one on one together.

14      So I -- my -- on Wednesday, I believe, I searched two

15  cells with an officer in C unit.  And both of those cells had

16  stolen food from food service, stolen screws, dowels, nails

17  from facilities, black electrical tape.  The second cell we

18  searched, I found what looked like a glass crack pipe.

19      The next day on Thursday I searched I think A unit, maybe

20  B, I forget, and it was a lot of the same stuff.  One of the

21  cells had an entire mop bucket full of stolen food, spices,

22  vegetables, fruit from food service, along with the same type

23  of facility stuff, tape, nails, screws, hardware, essentially.

24      When I left A unit, I was a little irritated, and I went

25  to go to food service and I stood outside with the officer.

1    And he -- one of the inmates had a jacket over her arm, and I

2    asked her to -- if I could please have the jacket, and when she

3    handed -- well, first her friend -- sorry.  Let me back up.

4        Her friend said that's my jacket.  I said that's fine.

5    Let me have it for a second.  She handed me the jacket.  There

6    was an apple inside the pocket.

7        And at that point, I determined that we've got a problem

8    with people that are stealing things from the institution,

9    which is -- it's unsanitary, it's a loss to the taxpayers, it

10    costs us money as an institution.  Our food service budget is

11    already not amazing, and I believe that is some of the reason

12    as to why.

13        So I wanted to put this up so the inmates understand that

14    the theft and possession of property that somebody else may

15    have stolen is not okay.

16        **THE COURT:**  If an apple is on someone's tray and they

17    can't take it back to their cell?

18        **THE WITNESS:**  Correct.  So you can consume your entire

19    meal in food service.  You may not remove any food items from

20    food service.  We have a commissary that you may purchase items

21    from, and those you may keep in your locker.

22        **THE COURT:**  Proceed.

23    BY MS. MATTIOLI:

24    **Q.**   There's a provision in the notice that says chairs will

25    not be defaced or marked in any manner by the inmate.  Do you

1  see that?

2  **A.**    Yes.

3  **Q.**    Is there a process by which an inmate can report damage to

4  their cell, for example, if they move into a cell that already

5  has graffiti on the wall or the chair so that they're not

6  punished for that?

7  **A.**    Yes.  So typically an inmate, when they're assigned a new

8  cell, normally the counselor would walk the inmate and say this

9  is your new cell.  And if there's any damage, the counselor is

10  right there and you would report it, you know, kind of on

11  sight.

12      I did see several chairs that already had graffiti on them

13  and although that is in there, the graffiti is not a huge

14  concern.  I mean I walked yesterday with the officer -- the

15  counselor, excuse me, through all of C unit.  We went to every

16  cell, and there's no graffiti on any walls.

17  **Q.**    What if an inmate has screws in the wall of their cell,

18  how do they go about seeking assistance to have those removed?

19  **A.**    The ones that are already there and kind of drilled in for

20  whatever -- however purpose they did that, I'm not concerned

21  about.  The ones I'm concerned about are the ones that are

22  looks inside their locker, the ones that are in secondary

23  containers inside their locker.  Those are the ones.

24      And yesterday when I made rounds, there is one that had a

25  calendar.  The only way to get the calendar onto the door with

1  the screw is to unscrew the screw.  I just asked her to remove

2  the screw from the door and she did.  Handed it to me and I

3  threw it in my little trash bag that I carried.  And she put

4  the calendar somewhere else in her cell.

5  **Q.**   In your experience at other institutions, are policies

6  like this common practice?

7  **A.**   Yes.  This is -- this is straight from the inmate

8  handbook.  And this is all extremely common.  In Safford,

9  exactly the same thing.  Notices like this would go -- I will

10  do notices like this from time to time.

11      You know, I'm the kind of person that when I observe an

12  issue, whether it's with staff or with inmates, I'm going to

13  address it directly.

14      And I find that notices are the best way to communicate to

15  the entire population, and emails for my staff are the best way

16  top communicate with them.

17          **THE COURT:**  So when you say notices are the best way

18  to communicate, how was this particular notice 423

19  disseminated?

20          **THE WITNESS:**  So we have -- are you familiar with our

21  electronic bulletin board that we have?

22          **THE COURT:**  I've heard about it.

23          **THE WITNESS:**  Okay.  So the way that works is several

24  department heads, typically education, recreation, the warden's

25  office, a couple others, are able to put information onto,

1    like, the same computer system the inmates use for their email.

2    And when the inmates log in, they kind of have a couple of

3    choices.  One is to look at email and one is to look at the

4    public notices that are put up.

5         Sometimes the notices are put up through central office,

6    and it tells the inmates when they log in like it's from

7    central office, it's from the warden's office, it's from

8    recreation.

9         So the inmates can see the notices.  And these are free,

10   by the way.  There is -- sometimes before -- pre-COVID, emails

11   cost the inmates money.  But they don't.  And the notices are

12   always free.  But the inmates can see where the notice came

13   from, and then they can read the notice and they stay up for

14   typically a year or so.

15             **THE COURT:**  Can they print it for free?

16             **THE WITNESS:**  The printing, I believe there's a

17   charge.  But with COVID, I don't know for sure.

18             **THE COURT:**  Do you physically -- as I understand it,

19   in a unit how many inmates are there typically?

20             **THE WITNESS:**  A hundredish.

21             **THE COURT:**  And how many computers are there to access

22   these things?

23             **THE WITNESS:**  Oh, boy.  I've not looked around close

24   enough to tell you.

25             **THE COURT:**  There aren't a hundred computers, are

1    there?

2          **THE WITNESS:**  Oh, no, no.  Okay.  I can answer that

3    differently then.

4          Trust Fund, who runs that system, they have an

5    inmate-to-computer ratio and inmate-to-phone ratio that is

6    strictly adhered to at all institutions, at all housing units.

7    I don't know the ratio.

8          **THE COURT:**  Do they just post it physically so that

9    people who may not have gotten to the computer could have seen

10   it?

11         **THE WITNESS:**  I believe -- I believe this is only

12   posted electronically.  That's all that I asked for.  It would

13   have been posted for the two-week period.

14         There are additional computers outside the housing units

15   in the education department.  So the ones that don't want to

16   access it or can't access it in their housing units may go to

17   education to access the computers.

18         **THE COURT:**  Was it done in Spanish?

19         **THE WITNESS:**  I would have to check.  I don't know.

20         **THE COURT:**  How do you expect people who are not

21   fluent in English to read it?

22         **THE WITNESS:**  I don't know if it was put out in

23   Spanish.  If it wasn't, we could do that in the future to help

24   enhance communication.

25         **THE COURT:**  How many inmates are Spanish-speaking at

1   Dublin?

2              **THE WITNESS:** I don't know.

3              **THE COURT:** You might want to find out.

4              **THE WITNESS:** Yes.

5              **THE COURT:** Proceed.

6   **BY MS. MATTIOLI:**

7   **Q.**   Do you know how many inmates are currently at Dublin?

8   **A.**   Today? 693.

9   **Q.**   Okay. And that's between the FCI and the camp?

10  **A.**   Correct.

11  **Q.**   Just one more question on the notice. If an inmate

12  receives items that are sold at a commissary in another

13  location and then transferred to Dublin, what happens to those

14  items?

15  **A.**   So when an inmate is at an institution somewhere else and

16  they transfer to, in this case, Dublin, their property is run

17  through the receiving and distribution department. They make

18  sure there is no contraband in there, and then all the property

19  is returned to the inmate.

20       As a matter of fact, there is a form that the inmate

21  filled out at their last institution. And when they receive it

22  at the new institution, Dublin in this case, they would sign,

23  acknowledging that all their property has been delivered to

24  them.

25  **Q.**   If an inmate did transfer with an item that they were not

1    allowed to have at Dublin, what would happen to that item?

2    **A.**    Well, the only item that would be -- would be like

3    contraband, like drugs, cell phones, things like that, weapons.

4    But nothing -- if they bought something in a commissary

5    somewhere else, it's almost always allowed in Dublin.  I can

6    give you an example of a time when that might not be the case.

7         So when I was at FCI Safford, inmates were allowed to buy

8    those headphones you kind of put over your ears.  They had two

9    types, the inner ear type and the outer ear type.  And I had

10   allowed that for most -- a lot of the time that I was there.

11        But we began discovering at the end of 2022, inmates were

12   disassembling the over the ear headphones and they were taking

13   the magnets out of where the speakers are and they were

14   stealing tape from education and facilities and taping the

15   magnets to their cell phones and then magnetizing the cell

16   phones to metal objects that were vertical or kind of upside

17   down so they were more difficult for staff to detect.

18        At that point, I told the population that I -- a notice,

19   very similar to this, that they have 30 days to turn in all of

20   their headphones.  At the government's expense they would be

21   mailed back to their home or whatever address they wanted them

22   mailed to.

23        So at that point, to get to your question, at that point

24   in time, if an inmate transferred in from somewhere else and

25   they had the headphones, the inmate could either opt to destroy

1    those headphones or have them sent home at the government

2    expense.  But that is something that is very unusual.

3    **Q.**    And we talked a little bit about the computers.  There has

4    been a lot of testimony about the privacy screens on the

5    computers.  Are you aware of that being an issue?

6    **A.**    I did kind of hear that.  I walked around yesterday, and

7    the computers had privacy screens.  I didn't look at all of

8    them obviously, but I saw a few.  And I asked the inmates about

9    them and they showed me, and they had privacy screens in C and

10   D units.

11   **Q.**    As the warden, would you have the ability to -- how could

12   you determine if the computers are being used?

13   **A.**    Well, we're required to monitor I think five percent of

14   all inmate email.  So I get a report at the end of the month of

15   what percentage -- percentage of the emails we did monitor.  So

16   through that method, I guess.

17   **Q.**    And how does that method inform how they're being used or

18   how often they're being used?

19   **A.**    Oh, so in order to get a percentage, you have to know the

20   total count.  So if I know that we monitored six or eight or

21   twelve percent of the emails in a given month, then we would

22   have to know the precise total of emails that were sent.  So we

23   track the number of emails and phone calls made in a typical

24   month -- or every month.

25   **Q.**    Are you aware of how many emails were sent in December of

1    2023?

2    **A.**    I am.

3    **Q.**    And how many emails were sent?

4    **A.**    Sorry.  Well over a hundred thousand.  Sent and received

5    combined off of the TRULINCS.

6    **Q.**    And are you aware of how many phone calls were made?

7    **A.**    I believe it's in the neighborhood of 20,000 calls

8    outgoing.  We don't have incoming.

9            **MR. GALVAN:**  Objection.  Not rebuttal.

10            **THE COURT:**  With respect to the -- well, move on.

11    I've already heard it.  Let's get to it, Ms. Mattioli.

12            **MS. MATTIOLI:**  This is my last question, Your Honor.

13    **Q.**    After hearing the substance of the testimony that this

14    Court has heard over the last couple days, what are your plans

15    for the institution moving forward?

16            **THE COURT:**  So I don't understand that.  Has he

17    been -- he hasn't been in here, has he?

18            **MS. MATTIOLI:**  He testified that he's generally aware

19    of the substance based on his knowledge of the substance.

20            **THE COURT:**  Well, that's not your question.  Your

21    question talked about -- well, rephrase your question then.

22    **BY MS. MATTIOLI:**

23    **Q.**    Based on your personal knowledge of the substance of the

24    testimony and the issues that have been raised, what are your

25    plans for the institution as its interim warden?

1    **MR. GALVAN:**  Objection.  No one testified about his

2    plans.  There is nothing to rebut.

3         **THE COURT:**  Response.

4         **MS. MATTIOLI:**  The individual who was here this

5    morning is not in charge of making the changes that he

6    testified about.  This individual is.  His testimony --

7         **THE COURT:**  Sustained.  Let me get some cross.

8                    <u>**CROSS-EXAMINATION**</u>

9    BY MR. GALVAN:

10   **Q.**   Good morning, Mr. Dulgov.

11   **A.**   Good morning.

12   **Q.**   My name is Ernest Galvan.  I represent the plaintiffs.

13       Did you have any contact with Warden Jusino at any point?

14   **A.**   Yes.  I worked with her in Tucson when I was executive

15   assistant there.  She was the associate warden.  When I was in

16   Victorville, I was the associate warden and she was the warden.

17   And I called her once or twice while she was the warden at FCI

18   Dublin.

19   **Q.**   What did you learn from her when you called her about her

20   time at FCI Dublin?

21   **A.**   I don't -- I remember I called from the airport.  What I

22   learned on that phone call, I remember specifically she was

23   concerned about -- well, we were talking about staff housing.

24       I think this was -- I'm trying to remember why.  Either

25   way, she was concerned about the staff housing that's on site.

1    She had some vacant lots that she wanted to purpose into usable

2    lots, and she was, at that time, very frustrated by the

3    inability to convert those vacant lots into usable lots for

4    staff to use.

5              **THE COURT:**  I don't understand what that means.

6              **THE WITNESS:**  Oh, I'm sorry.  So we have a staff

7    housing on the back side of the institution, and those --

8    there's like mobile home lots.  And the Bureau owns the

9    property, but the individual staff members own the actual

10   mobile home that's on the property.

11      I don't know how many there are.  But there are a few

12   vacant lots there where there's a plot but there's no mobile

13   home on it.

14      And buying a mobile home and putting it on the Bureau's

15   land and paying rent is far cheaper than buying property in the

16   community.  So she had staff who wanted to transfer to Dublin

17   and live on one of those mobile homes, but the rules had

18   changed regarding how to convert the vacant land into a mobile

19   home.  And it was --

20             **THE COURT:**  The BOP rules or the county rules?

21             **THE WITNESS:**  Neither.  I think it's OPM's rules or

22   the -- the agency that oversees all the staff housing, which is

23   not the Bureau of Prisons.

24      Basically they want like a foundation put in place and

25   some other stuff.  I don't remember all the details, but it was

1    going to take more time and money than was even plausibly

2    imaginable for her.

3            **THE COURT:**  Okay.  Proceed.

4    **BY MR. GALVAN:**

5    **Q.**    You testified earlier that you were part of a border

6    initiative in the Trump administration.

7    **A.**    Correct.

8    **Q.**    Do you know what percentage of the incarcerated women at

9    Dublin are in there for immigration charges?

10   **A.**    I do not.

11   **Q.**    You testified that you have another vacation coming.  How

12   long will that be?

13   **A.**    I will be gone for five days.  Well, seven total.  Five

14   business days.

15   **Q.**    Do you know who will be the acting warden then?

16   **A.**    I have not made that determination yet.

17   **Q.**    Do you -- do you choose the rotation of acting wardens

18   when you're away?  I mean, during this last couple weeks that

19   you've been in -- in your position?

20   **A.**    Yes.  The warden will typically select their acting.

21   **Q.**    You testified about what's now been admitted as

22   Exhibit 423.  Is this your only communication so far to the

23   population of incarcerated women at Dublin?

24   **A.**    This is the only written bulletin that I've put out, I

25   believe.  I can't remember anything else.  But I've had a lot

1  of verbal communication with a lot of people, a lot --

2  **Q.**    Let me rephrase my question.

3  **A.**    -- a lot incarcerated individuals.

4         **THE COURT:**  One at a time.

5  **BY MR. GALVAN:**

6  **Q.**    Please finish your answer.

7  **A.**    I have had a lot of verbal communication with a lot of the

8  incarcerated at FCI Dublin.

9  **Q.**    This is your first and only written communication;

10  correct?

11  **A.**    Yes.

12  **Q.**    So you decided when you took the job on December 18th that

13  the most important thing to communicate with the inmates about

14  in writing in a bulletin was this -- this contraband notice,

15  423; correct?

16  **A.**    After going through four different cells and all of them

17  having stolen property to include drug contraband,

18  paraphernalia, that was the first notice I put out.

19  **Q.**    You said that you're generally aware of the testimony

20  received in this proceeding; is that correct?

21  **A.**    I'm generally aware of the testimony in this proceeding,

22  correct.

23  **Q.**    Are you aware that your facility has no written PREA

24  compliance plan?

25  **A.**    I am not.

**Q.**   You testified about a person that you caught with an apple in her pocket.

**A.**   Uh-huh.

**Q.**   Are you aware of whether or not inmate workers whose jobs prevent them from returning to the dining hall for the next meal are given bag lunches?

**A.**   Repeat the question.

**Q.**   Are you aware of whether or not inmate workers whose job prevents them from returning to the dining hall for their next meal are given bag lunches?

**A.**   I don't know of any inmates that do that, but that would not be an uncommon practice.  That does happen from time to time.

**Q.**   Does that happen at Dublin?

**A.**   I don't know.

**Q.**   You testified that there's a process for an incarcerated person --

        **THE COURT:**   Let me just ask, did they tell you it was part of a bagged lunch, the apple?

        **THE WITNESS:**   No.  That individual came to the dining hall, ate her meal and left with the apple.  If it was a bag lunch, what would typically happen is it would be on their job duty.  Typically in an outside warehouse area, somebody at the camp.  This happened at the FCI.

        And maybe like there's a delivery coming in that day.  The

1    foreman in the warehouse would call food service and say we

2    have a delivery coming in during noon meal.  Can you deliver

3    X number of lunches for my workers today.

4         And then they would deliver out the number of bagged meals

5    that they need.

6              **THE COURT:**  All right.  Proceed.

7              **THE WITNESS:**  Am I answering the question properly?

8              **THE COURT:**  Proceed.

9    **BY MR. GALVAN:**

10   **Q.**   You testified that when a person is assigned to a new

11   cell, they have an opportunity to notify the officer regarding

12   any graffiti or damage; is that correct?

13   **A.**   Yes.  Typically the counselor, sometimes the correctional

14   officer will -- they'll walk with them and here's your new

15   cell, and, yes.

16   **Q.**   You issued this bulletin on December 18th with a deadline

17   of January 7th.  So about three weeks; is that right?

18   **A.**   Yeah.  About two weeks, I believe.  Two and a half weeks.

19   **Q.**   It's not true, is it, that every inmate at Dublin was

20   assigned a new cell during those three weeks; right?

21   **A.**   I -- I can't imagine that would have happened, no.

22   **Q.**   So this process for notifying people about a new cell has

23   nothing to do with whether a person would have an opportunity

24   to deal with the graffiti during this three-week period,

25   correct?

```
 1   A.   Say it again.
 2        MR. GALVAN:   I'll withdraw the question.
 3   Q.   It's -- it's not true, is it, that commissary is uniform
 4   across every institution, every BOP institution in the
 5   United States; correct?
 6   A.   You mean the items sold in commissary?
 7   Q.   Correct.
 8   A.   Correct.  Those items vary.
 9   Q.   They vary by region or by facility?
10   A.   By facility.
11   Q.   Okay.  You're an expert in the tricky ways that
12   incarcerated people might use, like, headphones or devices
13   to -- to get contraband; correct?
14   A.   No.  But I have an SIS department that is.
15   Q.   You know a lot about it?
16   A.   When they tell me and inform me, I do.
17   Q.   Okay.  And in your experience, do inmates have tricks in
18   order to take a blanket and turn it into something dangerous?
19   A.   I'm certain they could.
20   Q.   Are the blankets sold in the Dublin commissary exactly the
21   same blankets sold in other commissaries around the country?
22   A.   I can't even say for certain that Dublin sells blankets.
23   I'm not aware of every item on the commissary list in Dublin.
24   Q.   How about jackets?  How about jackets?
25   A.   And what about the jackets?
```

1    **Q.**    Are they -- the jackets sold in the Dublin commissary, are

2    they the same as the jackets sold in the commissaries in BOP

3    facilities around the country?

4    **A.**    I've never seen a jacket sold in a commissary.

5    **Q.**    How about shoes?

6    **A.**    The shoes vary widely, as I mentioned earlier.  All the

7    commissaries in the Bureau sell a wide variety of products.

8    **Q.**    So under your notice, a person who came to Dublin with

9    items from the commissary of another institution that are no

10    longer sold in Dublin's commissary would have to turn those in

11    by January 7th; correct?

12    **A.**    Incorrect.

13    **Q.**    Do you have 423 in front of you?

14    **A.**    I do.

15    **Q.**    Okay.  If you could turn to it --

16    **A.**    Okay.

17    **Q.**    -- to the paragraph under contraband, the second sentence

18    reads, "Examples of nuisance contraband, personal property no

19    longer permitted in the institution or sold in the commissary."

20    What does that mean to you?

21    **A.**    So I'll go back to my example with the headphones.  We no

22    longer allow those -- in Safford, we no longer allow those

23    over-ear headphones inside the institution.  And we no longer

24    sell those over-ear headphones in the commissary.

25         So if an inmate were to transfer from another institution

1    to FCI Safford, they would have the opportunity to either send

2    those home at the government's expense or they could dispose of

3    them.

4    **Q.**    So during this three weeks, the task to which you set

5    every inmate at Dublin is to go through their property, try to

6    identify the things no longer sold in the Dublin commissary and

7    turn those in; is that right?

8    **A.**    That could have been worded better.  That's incorrect.

9    **Q.**    I'm sorry.  What about what I said was incorrect?

10    **A.**    It sounds to me like what you're asking is that if

11    somebody bought something, a jacket in the example you gave, in

12    a commissary somewhere else and we don't sell that jacket in

13    Dublin, they must turn it in.  And that would be an incorrect

14    interpretation.

15    **Q.**    Tell me which words in Exhibit 423 would support what you

16    just said.

17    **A.**    It could have been worded better.

18    **Q.**    And the penalty for violating 423 is a code 226 incident

19    report; is that correct?

20    **A.**    Yes.  But I will also say --

21    **Q.**    I'm sorry.  No question pending.

22         And what are the penalties for a 226 incident report?

23    What are the range of penalties that the hearing officer may

24    impose?

25    **A.**    So the discipline hearing officer has a wide range of

1    consequences.  Number one, the hearing officer works for the

2    Bureau of Prisons.  And they understand that if an inmate

3    transferred with property --

4           **MR. GALVAN:**  I'm sorry.  Move to strike,

5    nonresponsive.

6    **Q.**   I'm asking in general --

7           **THE COURT:**  Do you want me to strike it or not?

8           **MR. GALVAN:**  Yes, please.  I'm sorry, Your Honor.

9           **THE COURT:**  Yes, then you need to stop.

10    Motion is granted.

11   **BY MR. GALVAN:**

12   **Q.**   I'm asking a different question.  My question is in

13   general for any code 226 incident report, what is the range of

14   penalties available to the district hearing officer?

15   **A.**   So the discipline hearing officer could remove good

16   conduct time, could take away, I don't know, phone minutes,

17   email privileges, things along those lines.

18   **Q.**   Visiting?

19   **A.**   Electronics.  Visiting, correct.  But I --

20          **MR. GALVAN:**  Your Honor -- I'm sorry.

21          **THE COURT:**  Just wait.  The way this works, it's an

22   adversarial system.  Answer his questions.  Ms. Mattioli is

23   plenty able to ask you follow-up.

24          **THE WITNESS:**  Understood.  Thank you for the

25   clarification.

1   BY MR. GALVAN:

2   **Q.**   In your background, you went through a lot of posts that

3   you've held.  Have you ever worked in women's low security?

4   **A.**   No.  I've had women at all of my institutions that I've

5   worked at, but never at a hundred percent female institution.

6   Except for Safford, excuse me.  Safford is all male.

7          **MR. GALVAN:**  No further questions.  Thank you.

8          **THE WITNESS:**  Uh-huh.

9          **THE COURT:**  Follow-up?  Redirect.

10                    <u>**REDIRECT EXAMINATION**</u>

11  BY MS. MATTIOLI:

12  **Q.**   I just have one question just to make -- clear something

13  up.  If an inmate transfers from another institution with an

14  item they bought at that institution's commissary, what happens

15  to that item when they get to Dublin?

16  **A.**   It's allowed to remain in their possession.  And I'll

17  clarify that by adding that the staff, and in particular even

18  if the staff don't know and write the incident report, the DHO,

19  of all people, is extremely clear about what inmates are

20  allowed and not allowed to possess.

21       And if an inmate transferred in with this jacket, for

22  example, and an officer or somebody wrote the inmate up for --

23  for something, the DHO would throw that away immediately.

24  It's -- that would be nonsense.

25          **MS. MATTIOLI:**  Thank you.  No further questions.

1      **THE COURT:**  Mr. Galvan?

2          **MR. GALVAN:**  No follow-up.

3          **THE COURT:**  All right.

4  **BY THE COURT:**

5  **Q.**   At FCI in Tucson, that was your first placement, right?

6  **A.**   Yes.  The Federal Correctional Complex in Tucson.

7  **Q.**   Do you have any knowledge as to whether inmates are strip

8  searched after visitation?

9  **A.**   Yes.  I know for a fact they are.  I've been in -- yes.

10  **Q.**   A hundred percent?

11  **A.**   A hundred percent.

12  **Q.**   What -- what's the security classification of that

13  institution?

14  **A.**   There's a penitentiary, a prison camp, and an FCI.

15  There's three security classifications.

16  **Q.**   So FCI is what we have here?

17  **A.**   Correct.

18  **Q.**   And they are strip searched in the FCI?

19  **A.**   Correct.  We call it visual searches, because connotation,

20  just -- just for awareness.

21  **Q.**   It is a visual search with no clothes on; correct?

22  **A.**   Correct.

23  **Q.**   Yeah.

24      What about are they, in Tucson, forced to use the -- at

25  the FCI forced to use the restroom after a visit and watched?

1    **A.**    I don't know.  I've never been a visitation officer.

2    **Q.**    So you -- how do you know one and not the other?

3    **A.**    Well, you asked about the restroom in particular.  I know

4    that policy requires us to conduct a visual search after a

5    contact visit.  And I know that happens in Tucson and

6    everywhere else that I've been.  What you asked -- you asked

7    about the bathroom.

8    **Q.**    What about using the restroom?  Are -- in that

9    institution, are people -- are people watched while using the

10   restroom after being in a -- in a visitation?

11   **A.**    So can I clarify?  So they go to visitation, they meet

12   with their family member or attorney, whoever.  And then they

13   go to the bathroom.  And then were they going to go back to

14   their family again?  Or were they going to go back to their

15   housing unit?

16   **Q.**    Under either circumstance, what happens?

17   **A.**    Well, if they're going to go back to their housing unit, I

18   presume they do the visual search and let them use the restroom

19   elsewhere without being monitored while using the restroom.

20        If they're going to go back into visitation, they would be

21   monitored during their restroom visit because there's the

22   ability to hide contraband in the restroom that you received

23   during your visitation.  So -- am I answering that question

24   properly or in a way you intend?

25   **Q.**    Is the -- is the visual supervision of using the restroom

1    while in a visitation area mandatory for minimum security

2    institutions?

3    **A.**    Yes.  Again, so they don't hide contraband.

4    **Q.**    And you believe there's a policy that says that?

5    **A.**    I do.  I have not seen it, but I'm certain that's what

6    we -- that makes the most logical sense to me.

7    **Q.**    Okay.  I was handed a document today, Exhibit T, that

8    seems to suggest that's not the case.  Take a look at that.

9    Read the second paragraph.

10        Doesn't that exclude minimum security facilities from the

11    policy?

12    **A.**    It does.

13    **Q.**    So the policy of the BOP does not make it mandatory.

14        I'll take it back.

15        Is that right?  According to this document that was handed

16    to me, Exhibit T?

17    **A.**    Yes.  According to that policy supplement -- policy

18    statement, rather, that would be correct.

19    **Q.**    Do you have any information about whether other minimum

20    institution facilities that you've been at are keeping people

21    under visual search while they're in the restroom?

22    **A.**    This is the first time I've been posed with that question.

23    **Q.**    So the answer is no?

24    **A.**    Correct.

25    **Q.**    With respect to your notice, document 423, was anything

1   turned in by January 7th, 2024?

2   **A.**   I don't know.  I know yesterday I pulled a handful of

3   screws off of doors that were loose and just threw them in the

4   trash.  But I don't know what was turned in.  I know a lot of

5   times when something like this will go up, the inmates will

6   typically just throw it inside the trash.

7   **Q.**   Were any code 226 incident reports issued as a result of

8   your notice?

9   **A.**   Not that I'm aware of.

10  **Q.**   And if they were issued, would you be aware of them?

11  **A.**   Sometimes.  People may tell me along the way, but as part

12  of my routine duties, no.

13  **Q.**   You're ordered to revise this to accurately reflect the

14  policy by no later than tomorrow.

15  **A.**   Understood.

16       **MS. MATTIOLI:**  Your Honor, if I may ask a clarifying

17  follow-up question.

18                   **FURTHER REDIRECT EXAMINATION**

19  **BY MS. MATTIOLI:**

20  **Q.**   Is FCI Dublin a minimum security facility?

21  **A.**   We're a medium -- minimum security facility.  Medium --

22  sorry.  We're a medium -- medium security facility.

23       **THE COURT:**  And the camp, though, is minimum?

24       **THE WITNESS:**  The camp is minimum.

25       **THE COURT:**  All right.  But as I understand it, are

1    the visual inspections at the restaurant being done at the camp

2    as well?

3            **THE WITNESS:**  The camp is a low security -- God dang.

4            **MS. MATTIOLI:**  I think there is a mis --

5            **THE WITNESS:**  Yes.  The camp is low security

6    institution because they're outside.

7    **BY MS. MATTIOLI:**

8    **Q.**   If I represented to you that FCI Dublin is a low security

9    facility, would you disagree with that?

10           **THE COURT:**  So you can't do that.  You're not

11   testifying.

12           **THE WITNESS:**  Let me go backward.  I'm sorry.

13                         **FURTHER EXAMINATION**

14   **BY THE COURT:**

15   **Q.**   One would hope the warden would know what security level

16   this is.

17        So what is the difference -- so the website says that FCI

18   Dublin is a low security federal correction institution.

19        Is there a difference between low security and minimum

20   institution?

21   **A.**   Yes.  The FCI is low security so it has a fence around it.

22   The camp is a minimum security and has no fence around it.

23   **Q.**   So back to my other question:  In terms of constantly

24   surveying inmates who are using the restroom, is that happening

25   at the camp?

1   **A.**   I couldn't say with certainty.

2   **Q.**   And you'll find out today.

3   **A.**   Yes.

4   **Q.**   And you'll review this policy.

5   **A.**   Uh-huh.

6   **Q.**   That's a "yes"?

7   **A.**   Yes.  Excuse me.

8   **Q.**   And plan on reporting back to me.

9   **A.**   Yes.

10          **THE COURT:**  Any questions -- any further follow-up

11  questions on my questions?

12          **MR. GALVAN:**  Yes, Your Honor.

13                    <u>**RECROSS-EXAMINATION**</u>

14  **BY MR. GALVAN:**

15  **Q.**   You testified, when the Judge asked you about whether you

16  knew about visual searches I believe in an Arizona facility,

17  that it was one hundred percent.  Did you mean that's the

18  policy, that it's one hundred percent or that you have personal

19  knowledge that it's always done one hundred percent?

20  **A.**   The policy is we're doing visual searches a hundred

21  percent of the time after a contact visit.

22  **Q.**   So the -- so it's a no to the second part, you don't have

23  personal knowledge that it's actually done one hundred percent;

24  correct?

25  **A.**   Of course not.

1          **MR. GALVAN:**  Thank you.  No further questions,

2     Your Honor.

3          **THE COURT:**  Do you have any information that any of

4     these facilities that you've worked at conduct those searches a

5     hundred percent of the time?

6          **THE WITNESS:**  I'm not there to observe so I guess I

7     don't have any firsthand observational knowledge, but I know

8     that, yes, that's what the Bureau does.  We do a hundred

9     percent searches after contact visits all the time.  That's

10    what we do.

11         **THE COURT:**  Ms. Mattioli, anything?

12         **MS. MATTIOLI:**  No further questions, Your Honor.

13         **THE COURT:**  Okay, Warden.

14       Mr. Galvan.

15         **MR. GALVAN:**  Yes, I'm sorry.  I had one other.

16                    **FURTHER RECROSS-EXAMINATION**

17    BY MR. GALVAN:

18    **Q.**   And it's to follow up on the last question the Judge asked

19    you.  It's one hundred percent for contact visits that there

20    should be a visual search.  Is there an option at Dublin for a

21    person to meet with their attorney in a non-contact visit?

22    **A.**   I don't know.  I've only been in the visiting room one

23    time -- well, twice in Dublin, excuse me.  I don't recall if

24    they have non-contact visitation rooms at the FCI.

25    **Q.**   And if they did have non-contact, no visual search would

1  be necessary, correct?

2  **A.**   I would have to read the policy.

3          **MR. GALVAN:**  Thank you.  No further questions.

4          **THE COURT:**  So he is correct.

5          **THE WITNESS:**  Excuse me?

6          **THE COURT:**  He is correct?

7          **THE WITNESS:**  I believe so.  But I would have to read

8  the policy to give an answer with certainty for the non-contact

9  visit.

10         **THE COURT:**  Okay.  All right.  Warden, welcome.

11         **THE WITNESS:**  Thank you.

12         **THE COURT:**  You're excused.

13     Mr. Nimni, are you ready for your cross?

14         **MR. NIMNI:**  I am, Your Honor.

15         **THE COURT:**  All right.  Let's bring her back.

16         **MR. NIMNI:**  Your Honor, before we bring the witness

17  up, I would renew our objection as to the foundation of this

18  video.  We don't know when it was pulled, who pulled the video,

19  the chain of custody, anything about the video.

20     I've seen it, though.

21         **THE COURT:**  Is your client on there?

22         **MR. NIMNI:**  That's somewhat unclear to me, but counsel

23  has represented to me that that's the case.

24         **THE COURT:**  Okay.  Objection is noted and overruled.

25         **MS. MATTIOLI:**  Your Honor, just for clarity, is the

1    video coming in -- am I -- is he starting on cross?  Or would

2    you like me to introduce the video and ask questions?

3        **THE COURT:**  You need to enter -- I'm reopening that

4    line.

5        **MS. MATTIOLI:**  Okay.

6        **MR. GALVAN:**  Your Honor, may I ask the court reporter

7    to restart her device?

8                    **CONSTANCE CAMPOS**,

9    called as a witness for the defendants, having been previously

10   duly sworn, testified further as follows:

11       **THE COURT:**  Ms. Campos, you're still -- you're still

12   under oath.

13       **THE WITNESS:**  Yes, ma'am.

14       **MS. MATTIOLI:**  Thank you.

15     So I'd like to play the video from September 27th, 2023,

16   if we could pull that up, please.

17     Can you pause the video, please.

18       **THE COURT:**  Okay.  The interactive portion of this

19   should be working so that means that she can touch the screen

20   and identify things.

21                   (Whereupon, the video was played.)

22       **MS. MATTIOLI:**  Thank you.

23                   **DIRECT EXAMINATION**  (Resumed)

24   BY MS. MATTIOLI:

25   **Q.**  Does the image on this screen appear to fairly and

1    accurately depict the area that you conducted pat searches on

2    September 27th, 2023?

3    **A.**    Yes.

4    **Q.**    And where is this area?

5    **A.**    It's in front -- your question is where I did it?

6    **Q.**    Where is the camera located?

7    **A.**    Right outside of J1 unit.

8    **Q.**    And is that in the camp?

9    **A.**    Yes, in the camp.

10   **Q.**    And can you please explain to the Court, she's just

11   indicated that you can touch the screen to show where you are

12   on the video.

13   **A.**    Right here.

14          **THE COURT:**  Edwin, it's not working.

15          **THE CLERK:**  No, Your Honor.  It's not.  We reset it.

16   It's been escalated to San Francisco.  Sorry, Your Honor.

17          **THE COURT:**  I see.  They weren't able to fix it.

18          **THE WITNESS:**  So I'm in front of where those two

19   inmates are, the ones with the -- the yellow and orange vest.

20          **THE COURT:**  Okay.  So you're the person -- if I see

21   the two inmates -- or I don't know if they're inmates or not.

22          **THE WITNESS:**  They're inmates.

23          **THE COURT:**  The two people with the vests on, you're

24   the person to the right?

25          **THE WITNESS:**  Yes, ma'am.

1        **THE COURT:**  Okay.  Go ahead.

2        **MS. MATTIOLI:**  Can we play.

3            (Whereupon, the video was played.)

4        **MS. MATTIOLI:**  If we could just pause it again very

5  briefly.

6  **Q.**   Can you explain where in this frame inmate KD is?

7  **A.**   Right in front of the education office.

8  **Q.**   And where is she in relation to you?

9  **A.**   In front.  In front of me.

10 **Q.**   And what did she hand you?

11 **A.**   Her jacket.

12 **Q.**   And what are you doing with it?

13 **A.**   Searching it.

14        **MS. MATTIOLI:**  Okay.  Go ahead and play.

15            (Whereupon, the video was played.)

16        **MS. MATTIOLI:**  Okay.  You can pause the video.

17 **Q.**   Do you remember the questions I asked you before we

18 watched the video?

19 **A.**   Yes, ma'am.

20 **Q.**   Now after having watched this video, would any of your

21 answers to my previous questions change?

22 **A.**   No, ma'am.

23        **MS. MATTIOLI:**  Thank you.

24        **THE COURT:**  Cross.

25 / / /

1

**CROSS-EXAMINATION**

2    **BY MR. NIMNI:**

3    **Q.**    Hello again, Counselor Campos.

4    **A.**    Hello.

5    **Q.**    Are you aware of the distinctions in the disciplinary

6    findings when an incident report is made, when a PREA incident

7    report is made between substantiated, unsubstantiated, and

8    unfounded?  Are you aware of those distinctions?

9    **A.**    I believe so.

10   **Q.**    And we've heard prior testimony that an allegation is

11   unfounded, for example, when video shows that the two people

12   mentioned in the allegation aren't even in that place and those

13   actions didn't even occur.

14        Is that your understanding?

15   **A.**    I don't -- I don't know what you're talking about.

16   **Q.**    Okay.  Are you aware that KD received an incident report

17   after complaining of this pat search?

18   **A.**    Yes.

19   **Q.**    Are you aware that she lost access to her video visits,

20   family visits, and phone?

21   **A.**    I believe so.

22   **Q.**    And that she lost access to her good time credits?

23   **A.**    I believe so.

24   **Q.**    And you're still KD's supervisor at her job; is that

25   correct?

1    **A.**    I'm her counselor, and she also works for me as an

2    orderly, yes.

3                **MR. NIMNI:**  No further questions.

4                **THE COURT:**  Okay.  Can you zoom in on that or no?

5                **MS. MATTIOLI:**  I don't believe so, Your Honor.

6                **THE COURT:**  All right.  Could you play it for me just

7    one more time.

8                        (Whereupon, the video was played.)

9                **THE COURT:**  So at that point, could you stop it.

10      So when you start, you're using the palms of your hands;

11   right?

12               **THE WITNESS:**  Yes.  Yes.

13               **THE COURT:**  Okay.  Rewind again right before she goes

14   to the front or as she starts that pat search.

15                       (Whereupon, the video was played.)

16               **THE COURT:**  Can you slow the speed or not?  No?

17                       (Whereupon, the video was played).

18               **MS. MATTIOLI:**  Did you want that paused?

19               **THE COURT:**  I was just seeing if you could slow it

20   down.  It's hard to see the shift.  But keep going.  That's

21   fine.

22                       (Whereupon, the video was played.)

23               **THE COURT:**  Okay.

24   / / /

25   / / /

1

<u>**EXAMINATION**</u>

2

**BY THE COURT:**

3

**Q.**   Ms. Campos, had you had negative interactions with this

4

inmate before this event?

5

**A.**   No.

6

**Q.**   Had you ever written her up before this event?

7

**A.**   No.

8

**Q.**   Okay.  Thank you.

9

    **THE COURT:**  Any other questions?

10

    **MR. NIMNI:**  Just one follow-up on your questions,

11

Your Honor.

12

<u>**RECROSS-EXAMINATION**</u>

13

**BY MR. NIMNI:**

14

**Q.**   Counselor Campos, because you're KD's counselor, are you

15

aware of her disciplinary record generally?

16

**A.**   Yes.  We have access to it.

17

**Q.**   Are you aware if she has really any other write-ups

18

besides this making a false PREA report write-up?

19

**A.**   Making a false PREA?  Are you talking about this right

20

now?

21

**Q.**   Yes.

22

**A.**   No.

23

    **MR. NIMNI:**  Thank you.

24

<u>**REDIRECT EXAMINATION**</u>

25

**BY MS. MATTIOLI:**

1  **Q.**  Just one follow-up question.  Did you write KD an incident

2  report for the false -- for making a false report?

3  **A.**  No, ma'am.

4       **MS. MATTIOLI:**  Thank you.

5       **THE COURT:**  Okay, Ms. Campos.  You're excused.

6       **THE WITNESS:**  Thank you.

7       **THE COURT:**  Okay.

8    Mr. Galvan?

9       **MR. GALVAN:**  Before the evidence closes, Your Honor,

10 the KD incident report has been discussed a lot, but it was

11 never offered or admitted.  It's PIX-13 so I would like to

12 offer it and admit it -- offer it and move it into admission.

13      **THE COURT:**  Thirteen is admitted.

14      (Plaintiffs' Exhibit 13 received in evidence.)

15      **THE COURT:**  You can keep this one.  I think I have it.

16      **MS. MATTIOLI:**  Your Honor, we have one other

17 housekeeping item for in camera.  These are the psychology

18 staffing guidelines that you requested yesterday.

19      **THE COURT:**  I asked for metrics.  Is that what you're

20 giving me?

21      **MS. MATTIOLI:**  Metrics, ratios, the type of staff.

22      **THE COURT:**  Okay.

23    Mr. Cuenco, where are we?

24      **THE CLERK:**  That's letter U, Your Honor, for uniform.

25      **THE COURT:**  All right.

1        (Defense Exhibit U marked for identification.)

2        **THE COURT:**  So one observation is that a lot of

3   information has come out over the course of the last week that

4   plaintiffs did not have access to and still do not have

5   complete access to.

6        So I have more -- I mean, I have to look at things

7   obviously closely.

8        What, if anything, do the plaintiffs -- well, do you want

9   to say anything at this point?  Or provide any argument or what

10  is it -- what, if anything, do you want to say?

11       **MR. CHA-KIM:**  Just to note, Your Honor, that there is

12  a presumption of access to judicial documents that's quite

13  strong.  We understand that there are law enforcement

14  sensitivities to a lot --

15       **THE COURT:**  And no protective order.

16       **MR. CHA-KIM:**  Correct.  And so we have reached out

17  about a protective order.  I would suggest -- and we can work

18  with the government to go through the list to see what falls

19  under what level of protection.

20       I would say -- and I'm sure as we sort through this, we

21  can come to some sort of consistency about how certain types of

22  documents are treated.

23       We do want to take a look at these documents, of course,

24  before we make our final -- as part of our application for

25  relief from the Court.

1    I think the Court actually has asked a lot of questions

2    already that, you know, we probably would have asked ourselves.

3    That said, we do need, I think, a proffer from the government

4    for any that they believe need to remain under seal and

5    ex parte, and we'll consider their proffer on that.

6        For any other types of documents, I think we can negotiate

7    a protective order, including attorneys' eyes only provisions.

8    Those are common for law enforcement sensitive records in civil

9    litigation.

10       In fact, we have our own reasons for wanting such

11   conditions, as Your Honor knows.  We can work over the next

12   couple days to get that sorted using the model protective order

13   as a base.  I believe Mr. Galvan has already started the draft

14   that we shared with the government over the weekend.

15       So our proposal would be we'll get that entered, we'll go

16   through with the government exhibit by exhibit, and we'll only

17   come to the Court or to the Magistrate Judge if there are any

18   exhibits that there are disputes over.

19       But I think we should get a look at those and then we can

20   make our presentation to the Court.

21       **THE COURT:**  And what kind of presentation do you

22   anticipate?  As you recall, you brought this motion and thought

23   you were entitled to relief in the form that you provided based

24   upon the declarations of those individuals.

25       **MR. CHA-KIM:**  Yes, ma'am.  So obviously whatever is

most helpful to the Court.  As we were talking about this,
obviously there is a lot of information that came in that we
did not necessarily anticipate.  We've been adjusting to that.
There has been a lot of testimony and specific allegations
made.

     If the Court finds it useful, we think proposed findings
of fact laying all this out and exactly where in the evidence
the fact comes from for the Court's reference, we're prepared
to do that.

          **THE COURT:**  So I can tell you right now, the law that
you have provided to me does not provide a legal basis for all
of the relief that you are asking for.

          **MR. CHA-KIM:**  So my response, Your Honor, is we
understand that the factual record has come in.  Specifically
now we would like an opportunity to address any potential
shortfalls that Your Honor thinks exist in the legal support.

     We'll make that fulsome presentation for Your Honor so
that we can specifically address why we think the law does
support the relief.  And I can make a representation that
whatever relief we ask for from the Court is going to be
specifically tailored to the facts that came out during the
hearing.

          **THE COURT:**  So you have already asked for relief.  So
is what you're saying that you would like an opportunity to
revise your request?

1        **MR. CHA-KIM:**  To be more specific, Your Honor,

2   correct.  So, for instance, Your Honor is aware that one of the

3   requests that we made was for the appointment of a special

4   master.  That's obviously, on paper, a very large ask.  We

5   would like the opportunity to explain to the Court why there's

6   precedent for such an ask and what role specifically such a

7   person would play, tied exactly to the kinds of specific issues

8   that the factual record presented.

9        So we didn't know how that would come in yet so our

10  request in the beginning was more generally for this type of

11  relief.  But I think, you know, we would like the opportunity

12  to explain to the Court based on prior uses of such a mechanism

13  how that would work specifically to the issues that Your Honor

14  addressed and raise and that the witnesses on both sides of the

15  case raised over the last few days.

16       **THE COURT:**  How much time do you want?

17       **MR. CHA-KIM:**  Two weeks, Your Honor, but we will also

18  go by whatever Your Honor thinks is appropriate.

19       **MS. MATTIOLI:**  If I may.

20       **THE COURT:**  Go ahead.

21       **MS. MATTIOLI:**  The government would object to any

22  lengthening of time to bolster the original motion.  The

23  request for a special master was made back in August.  The

24  precedent for that appointment was known to plaintiffs then and

25  could have been raised in the original motion.

1    It would -- it seems unfair that they would be allowed to

2    listen to testimony and revise a motion that they filed in good

3    faith saying that they were entitled to relief back in August.

4        We responded to that motion in good faith based on the

5    evidence that was available to us at the time.  We have since

6    come to California.  Based on the Court's questions we have --

7        **THE COURT:**  You have come to California.  We have all

8    been here --

9        **MS. MATTIOLI:**  Correct.  I apologize.

10        **THE COURT:**  -- as has the facility.

11        **MS. MATTIOLI:**  I apologize.  The government, in its

12    role as counsel, has just learned all of this information as

13    well.

14        **THE COURT:**  The problem is that -- I agree with you to

15    the extent that -- and I said it.  They made this motion before

16    and believed that they were entitled to this relief based upon

17    the proffer that was made.

18        I have accepted numerous documents which I think should be

19    considered, but in an adversarial system, I have not had the

20    benefit of plaintiffs' view of those documents, which are

21    material, probative, and which you would like me to consider.

22        **MS. MATTIOLI:**  Correct.

23        **THE COURT:**  So it's appropriate for me to hear from

24    them on that issue.

25        **MR. CHA-KIM:**  Your Honor, may I be heard briefly?  We

1    have no objection to the government also filing proposed

2    findings to the extent that --

3         **THE COURT:**  I don't know that I want your proposed

4    findings.  You know, what I certainly don't want is the tail

5    wagging the dog in this sense.  There are so many lawyers on

6    the plaintiffs' side that --

7         **MR. CHA-KIM:**  I will clarify, Your Honor.  If the

8    Court would like to rule, we are also happy to make arguments.

9    This is mainly for whatever the Court feels is at the

10   Court's -- for the Court's reference.

11        I mean, the point about the documents, I do think we need

12   a little time at least to look at them before we make some sort

13   of presentation.  But really we take our cue from the Court.

14   We're confident in our motion.

15        To the extent the Court has questions about how the scope

16   of the relief will work in practice, we're happy to answer

17   them.  But, you know, we don't want to do any unnecessary work

18   than -- for anybody than is necessary.

19        **MS. MATTIOLI:**  The other option, Your Honor, that I

20   haven't heard presented is proceeding to the merits on an

21   expedited basis.  There is no procedure under the law to

22   exchange discovery prior to hearing a preliminary injunction

23   motion.

24        **THE COURT:**  I understand.  I'm not suggesting that it

25   was inappropriate, that is -- and that's why I said multiple

times this was not discovery.  This was a hearing that I
believed I needed to have in light of the -- in light of the
record that was in front of me at the time.

Brown vs. Plata, that case concerned a prison population
which was 137.5 percent of design capacity.  That case is not
similar to this case.  Why should it be considered?

MR. GALVAN:  We cited Brown vs. Plata in support of
the class certification and preliminary injunction, and I think
we cited Justice Kennedy's statement that the court has the
power and duty to act in the face of violations of federal
rights in prisons, despite the deference that is due to prison
administrators.  That's why we cited Brown vs. Plata.

THE COURT:  So general principles then, not specific,
correct?

MR. GALVAN:  We're not moving for a prisoner release
order here, that's correct, Your Honor.

THE COURT:  All right.  Clement vs. California
Department of Corporations [sic].

MR. GALVAN:  Corrections, I believe.

THE COURT:  Corrections.

MR. GALVAN:  Clement vs. California Department of
Corrections --

THE COURT:  Involved internet content.

MR. GALVAN:  Correct, Your Honor.  And in that case,
the injunction applied statewide to all California state

1    prisons in order to address a uniform policy, even though there

2    was only evidence as to one prisoner in that case.

3        And I think we cited that because we don't have a class

4    certified yet.  We have eight plaintiffs.  And the import of

5    that is even in a case with one plaintiff, a system-wide

6    injunction can be issued.

7        **THE COURT:**  But, again, on the specifics, that case is

8    not -- this case doesn't involve an internet mail policy.  And

9    so on the specific relief granted, it doesn't -- it doesn't

10   provide me a constitutional basis for doing -- that is, it

11   doesn't reflect a constitutional precedent for the relief

12   suggested here.

13       **MR. GALVAN:**  I think it reflects a Rule 65 precedent,

14   that it's within the Court's injunctive powers.

15       **THE COURT:**  *Parsons vs. Ryan*.

16       **MR. GALVAN:**  *Parsons vs. Ryan* involved -- involves

17   medical and mental healthcare, still ongoing.  And we cited

18   that case chiefly to address the anticipated and, in fact,

19   offered defense in the opposition that really one has to have

20   a -- that this is just the agglomeration of individual

21   complaints.

22       The issue in *Parsons*, the reason the class was certified

23   and that injunctive relief has issued, is that there is such a

24   thing as a systemic Eighth Amendment violation.  It doesn't

25   require adjudication of every event that happened on every day.

1   If the evidence shows that the -- that an institution's

2   leadership is deliberately indifferent to the measures

3   necessary to protect people from a risk of imminent harm, then

4   system-wide relief can issue.

5           **THE COURT:**  But --

6           **MR. GALVAN:**  *Brown vs. Plata* also says that.

7           **THE COURT:**  Deliberate indifference is a very high

8   standard.  And it's not clear to me that you've amassed any

9   evidence with respect to the requirements of deliberate

10  indifference regarding the current administration.  With

11  respect to the last, I totally understand.  Totally understand.

12  But the BOP has come in and cleaned house.

13          **MR. GALVAN:**  I believe that there is evidence of

14  deliberate indifference as to the pattern of retaliation that

15  our clients have suffered.

16      For example, there was testimony, I believe -- I don't

17  remember if it was Putnam or Deveney -- but there was testimony

18  about how complaints go up to the OIG and they come back, and

19  just the low-level ones came back -- come back.

20      And I believe Your Honor or counsel for the government

21  elicited from the witness a list of what those low-level

22  violations were that came back.  And retaliation was on the

23  list.  It was, you know, things like, you know, complaints

24  about commissary, this, that, retaliation.

25      They are deliberately indifferent in their policies and --

their uniform policies and practices.  They don't treat
retaliation against our clients as a criminal issue.
Your Honor, at the beginning of the proceeding, had to bring in
the Northern District U.S. Attorneys.

    They treat it as a low-level violation, like not getting
your mail on time.  They are deliberately indifferent to what's
happening to our clients.  And I could go through example after
example from the record.

    They don't even bother to track the follow-up on intake
screenings where someone is shown to be a victim of sexual
abuse.  They brought in colored graphs of all the other things
they track.  And then when I asked them, well, do you track
this thing that PREA requires you to do?  No.  They don't care.
They don't bother.  They are deliberately indifferent.

    **THE COURT:**  I don't see how you can say they don't
care when there is a zero tolerance and they are removing --
it -- I was surprised that they were automatically removing
people from their job even when allegations had not been
confirmed.

    **MR. GALVAN:**  Deveney walked back automatic.  He said
automatic, and then when Your Honor pressed him for details, he
said no, I have a special fact-finding committee and we meet
and we filter the allegations and we do our investigation,
non-investigation.  They sit in a dark room and decide which
ones to pass on to OIA or OIG.  There is nothing automatic.

1    It's just like it was before.

2              **THE COURT:**  I disagree.  I disagree.

3              **MR. GALVAN:**  I understand, Your Honor.

4        The other evidence of deliberate indifference came -- more

5    evidence came in just this morning.  The new warden is five

6    days on the job.  He's talked to Jusino.  He's got to know,

7    unless he lives in a cave, what's been happening here.  And

8    what does he decide is the most important communication to the

9    staff and the inmates?  It's we're going to get you if there's

10   graffiti or screws on the wall.  It's nothing about I'm here

11   for a new start, I'm here for cultural change, I'm here to

12   protect you.  I know what you've gone through.  Nothing.

13       And he found an apple in someone's pocket.  That's

14   deliberate indifference.  To not make some communication?  This

15   is just what I can think of on my feet.

16             **THE COURT:**  *Armstrong vs. Brown*, that concerned an ADA

17   issue.

18             **MR. GALVAN:**  Again, it goes to the Court's powers

19   to -- to issue injunctive relief on a systemic basis.

20       Again, the government defended in *Armstrong vs. Brown* on

21   the basis that this is just a bunch of individual complaints --

22             **THE COURT:**  There are thousands of cases, thousands of

23   cases for constitutional torts.  Thousands.  And thousands of

24   cases that talk about what is required for deliberate

25   indifference.  And you haven't provided cases to support the

1  specific relief you're requesting other than broad

2  generalities.

3      **MR. GALVAN:**  As everyone has testified, there's never

4  been a place like Dublin before.  There's never been a place

5  where the warden rapes the prisoners and allows a culture of

6  this kind of free-for-all of sexual abuse.

7                  (Simultaneous colloquy.)

8      **THE COURT:**  And there's never been a place where you

9  had a hundred percent turnaround.  You asked that they bring a

10  third party in.  They actually brought a third party in, and

11  you didn't know it.  Are you familiar with The Moss Group?

12      **MR. GALVAN:**  No, Your Honor.  If that was the basis of

13  their defense to the PI motion, they should have put it in

14  their opposition.  They referred to it, but where's the report?

15  Where is what The Moss Group did?

16      **THE COURT:**  I'm asking whether you are familiar

17  with --

18      **MR. GALVAN:**  No, I'm sorry, Your Honor.  I personally

19  have never heard of The Moss Group.

20      **THE COURT:**  *Plata vs. Schwarzenegger*, also an ADA

21  case.

22      **MR. GALVAN:**  Your Honor, if I may, *Plata vs.*

23  *Schwarzenegger* is an Eighth Amendment failure to provide

24  medical care case.  It has ADA claim, but it's principally

25  about failure to provide medical care.  And so it again is for

1    the principle that there is such a thing as a system-wide

2    Eighth Amendment violation and that it can be remedied --

3            **THE COURT:**  With respect to the healthcare.

4            **MR. GALVAN:**  Yes.  With respect to health care.  But

5    they all flow from *Farmer vs. Brennan* which is a failure to

6    protect from sexual violence case.  The Supreme Court defined

7    the deliberate indifference standard most clearly and for the

8    first time really in a clear way in *Farmer vs. Brennan*.  And

9    that was a failure to protect a vulnerable incarcerated person

10   from sexual violence.  This is where the deliberate

11   indifference standard comes from.  It can be applied here

12   faithfully to the Supreme Court precedent.  It should be.

13       And also, Your Honor, for retaliation, deliberate

14   indifference is not required.  Retaliation against someone for

15   exercising their First Amendment right to petition the

16   government or to speak with counsel does not require deliberate

17   indifference.

18           **THE COURT:**  And what other institutions are you aware

19   of that have the kind of access to lawyers, again, something

20   that -- I mean, I assume you knew about it because your

21   attorneys have been called on that pilot program, but that was

22   news to me.

23       Again, this is a positive innovation.  Look, I don't think

24   everything is -- there's a lot still to be done out there.

25   Whether it requires the massive kind of relief that you're

1    asking for is highly doubtful.

2         MR. GALVAN:  Addressing your question, Your Honor,

3    about what other -- what other institutions do I know about

4    that provide attorney access --

5         THE COURT:  No.  I'm talking about that phone line.

6    That's what I asked.

7         MR. GALVAN:  The phone line.  There are many

8    institutions that my office receives phone calls from

9    constantly.  We receive phone calls from institutions -- jails

10   and prisons around the state.  And we can arrange confidential

11   calls on fairly short notice in jails and prisons around the

12   state.  I don't think Dublin invented that.

13        THE COURT:  Is it not a good innovation?

14        MR. GALVAN:  The provision of a phone line with a

15   phone number list?  I think most --

16        THE COURT:  Available -- it's available as long as the

17   unit is available, 24/7 in effect?

18        MR. GALVAN:  The only thing that's innovative about

19   it, Your Honor, is that it's in a prison facility versus a

20   pretrial detention facility.  I think it would probably be

21   pretty common if we looked at jails and federal detention

22   facilities to provide something similar.  They extended --

23        THE COURT:  This is not Santa Rita.  I don't know of

24   any facility around here that allows it.  It's not at Atwater,

25   it's not at Santa Rita.  It's not at any of the local CDC

1  facilities.

2          **MR. GALVAN:**  It is true you cannot walk into a phone

3  booth at a CDC facility or Santa Rita and make a confidential

4  call.  You can, however, with the tablets.  I mean, most --

5  what's happening now in jails and prisons is tablets where --

6  and it answers the confidentiality problem.  And on the tablets

7  you can make a confidential call and you can send confidential

8  email without someone looking over your shoulder because you

9  just have it in your hand.

10          And so I think Dublin is going a little overboard taking

11  credit for this stuff as if it's revolutionary.

12          **THE COURT:**  They -- well, they said it was a pilot.

13          BOP is difficult, and I understand it's difficult.  I

14  would like them -- it would make some of my criminal cases much

15  easier if BOP had tablets.  And that's so that defendants can

16  actually review their discovery.  Here there is no discovery to

17  be reviewed.  They're already convicted.

18          **MR. GALVAN:**  Well, here there were 47 declarations to

19  be reviewed.  In order to bring this case, we needed to be able

20  to take their accounts, put them in writing, review them

21  extremely carefully with the clients so that they could sign

22  them under penalty of perjury.

23          So to bring a civil action like this one does require

24  reviewing documents and reviewing what records we had for them

25  and their appeals and their cop-outs that they have copies of.

1            THE COURT:  I understand.  But it's different from

2    pretrial.

3            MR. GALVAN:  Certainly, Your Honor.

4            THE COURT:  Do you do criminal work?

5            MR. GALVAN:  I do not, Your Honor.

6            THE COURT:  It's different.

7        As I said, I think it is at a minimum appropriate for

8    plaintiffs to have access to the documents that have been

9    provided to me for my review and consideration.

10       If they are not provided a document, it will not be

11   reviewed and it will not be considered.

12           MS. MATTIOLI:  Understood, Your Honor.

13           THE COURT:  How much time do you want to meet and

14   confer in terms of letting me know which documents they have

15   been provided?

16           MS. MATTIOLI:  I will defer to plaintiffs on that.

17           MR. GALVAN:  We're available round the clock.

18           THE COURT:  Well, that I doubt.

19           MS. MATTIOLI:  They originally asked for two weeks.

20   Is that sufficient?

21           MR. GALVAN:  I withdraw the two weeks.  We can meet

22   and confer today, tomorrow, the next day.

23           MS. MATTIOLI:  The government would need time to just

24   talk about the protective order.  Once that is -- I mean a

25   week, seven days.

1         Your Honor, there is also the issue of one of the

2    exhibits, the physical logbook, the institution -- that's the

3    only copy, and I cannot take that back with me.  The facility

4    also needs that for recordkeeping at some point.

5         **THE COURT:**  I don't know what you mean you can't take

6    it back with you.

7         **MS. MATTIOLI:**  To Montana.  I apologize.

8         **THE COURT:**  Well, I will return it to -- my list

9    doesn't have everybody's name.  Either Mr. France or Ms. --

10        **MS. MATTIOLI:**  Sutton.

11        **THE COURT:**  Sutton.  You will get it back before you

12   leave.

13        **MS. MATTIOLI:**  And if plaintiffs' counsel would like

14   to view the book, that can happen before they leave also.  I

15   believe we actually need a protective order in place before it

16   can be viewed because it is unredacted.

17        **THE COURT:**  You have the week to get a protective

18   order in place.  So noon on Friday, file a status report

19   regarding the protective order.  If you get it done before that

20   time, obviously just send it to me so I can review it and issue

21   it.

22        I want you to file a joint status in terms of how much

23   time plaintiffs need to review the documents.  And I will allow

24   you one brief not to exceed 20 pages with respect to your

25   response regarding that information and anything else you want

1  to put in there.

2          MR. GALVAN:  In the brief, Your Honor?

3          THE COURT:  Twenty pages, that's what you get.

4      The government can respond in equal measure.  Plaintiffs

5  get a 10-page reply.  You can work out a briefing schedule.

6      If I need argument, I'll ask for it.

7          MS. MATTIOLI:  Would you like the briefing schedule in

8  the status update?

9          THE COURT:  Yes.

10     All right.  Anything else?

11         MS. MATTIOLI:  Nothing from the government,

12 Your Honor.

13         MR. GALVAN:  Nothing from plaintiffs, Your Honor.

14         THE COURT:  Mr. Cha-Kim is not sure he agrees with

15 you, Mr. Galvan.

16         MR. CHA-KIM:  This is just a sidebar matter, I think,

17 Your Honor, for continuing from our conversations last week, I

18 just wanted some clarification about moving forward.

19         THE COURT:  I had -- Ms. Mattioli, I asked you for

20 some reports, for some additional information.

21         MS. MATTIOLI:  I believe the only thing we're waiting

22 for are the medical staffing positions.  I also can report to

23 the Court that inmate KD's visitation forms have been picked up

24 and filled out.

25     Are you referring to the working plan, Your Honor?

1          **THE COURT:**  I'm still missing that document.

2          **MS. MATTIOLI:**  That is coming, I'm told momentarily.

3      The programs offered, Your Honor, with the wait list and

4   the participants for programming options offered at Dublin.

5          **THE COURT:**  I'll have to check my notes in terms of

6   what else is out there.

7          **MS. MATTIOLI:**  Thank you.

8          **THE COURT:**  As I said to you at sidebar, Mr. Cha-Kim,

9   you're welcome to file under seal claims of retaliation.  I am

10  not an investigator and I will not investigate them.  They are

11  there for notice.  There are avenues that are not affiliated

12  with the BOP staff that should be used.  Failure to use one of

13  those avenues I will take as evidence that they're not

14  substantial.

15         **MR. CHA-KIM:**  I understand, Your Honor.  I was

16  actually referring to a different matter that pertained just to

17  me and one other person on my team.

18         **THE COURT:**  So with respect to that issue, as I said

19  to both of you, one, I am not taking any action; two, the U.S.

20  Attorney isn't taking any action.

21         **MR. CHA-KIM:**  There was a gag order about discussions.

22  Is that still in place?  Just so we know moving forward since

23  we're leaving the courtroom, I just wanted to clarify that.

24         **THE COURT:**  That's withdrawn.  There is no issue.  You

25  can talk about it.

1        **MR. CHA-KIM:**  Thank you, ma'am.

2        **THE COURT:**  Anything else?

3        **MS. MATTIOLI:**  Nothing further, Your Honor.

4        **MR. GALVAN:**  Nothing from plaintiffs, Your Honor.

5        **THE COURT:**  All right.  Just give me a minute to

6   check.  I'll see if I have anything else.

7        **MS. MATTIOLI:**  So, Your Honor, we do have the medical

8   positions.  I don't believe at this point that one needs to be

9   in camera.

10       I believe we are at 427.

11       Your Honor, I've just been provided the working plan

12  document with an estimated finish date column for in camera at

13  this point.

14       **THE COURT:**  Okay.

15       Mr. Nimni, did you see anything wrong on that video?

16       **MR. NIMNI:**  Wrong as to what, Your Honor?

17       **THE COURT:**  Did you see anything wrong in terms of the

18  pat-down with the video?

19       **MR. NIMNI:**  Honestly, I couldn't quite make out what

20  was going on with the hands.  It might just be my eyes or the

21  distance from the camera.

22       **THE COURT:**  Was there anything that you saw that you

23  are concerned about?

24       **MR. NIMNI:**  Nothing in the video changed my opinion

25  one way or the other.  I listened to the testimony from both

1  the witnesses.  I couldn't really make out what was going on in

2  the video.  I think I remain concerned that KD got such intense

3  discipline for reporting that she felt uncomfortable.

4           MS. MATTIOLI:  Your Honor, we have a disk of the

5  video.  I've marked it as 421.  And we will get an electronic

6  version dropped in the file exchange box to plaintiffs today.

7           THE COURT:  That's fine.  You can't -- it is not clear

8  as I would like.

9        This -- the working plan is V?

10          THE CLERK:  Yes, Your Honor.

11          (Defense Exhibit V marked for identification.)

12          THE COURT:  Did the plaintiffs' lawyers know that

13  Tri-Valley Haven was a rape crisis center?

14          MR. NIMNI:  We did, Your Honor.

15          THE COURT:  I'll revise each opening brief to 25.  The

16  reply to 15.

17          MR. NIMNI:  Understood, Your Honor.

18          THE COURT:  There's a lot of information there.

19  Anything further?

20          MR. NIMNI:  Nothing from plaintiffs.

21          MS. MATTIOLI:  No, Your Honor.

22          THE COURT:  Then we will stand adjourned.

23

24          (Proceedings adjourned at 12:48 p.m.)

25

1

2

3                     <u>CERTIFICATE OF REPORTER</u>

4           I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Tuesday, January 9, 2024

8

9    *Pamela Batalo Hebel*

10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25