ERNEST GALVAN – 196065
KARA J. JANSSEN – 274762
ADRIENNE SPIEGEL – 330482
LUMA KHABBAZ – 351492
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:      (415) 433-6830
Email:           egalvan@rbgg.com
                 kjanssen@rbgg.com
                 aspiegel@rbgg.com
                 lkhabbaz@rbgg.com

SUSAN M. BEATY – 324048
CALIFORNIA COLLABORATIVE FOR
IMMIGRANT JUSTICE
1999 Harrison Street, Suite 1800
Oakland, California  94612-4700
Telephone:      (510) 679-3674
Email:           susan@ccijustice.org

OREN NIMNI[*]
  Mass. Bar No. 691821
AMARIS MONTES[*]
  Md. Bar No. 2112150205
RIGHTS BEHIND BARS
416 Florida Avenue N.W. #26152
Washington, D.C.  20001-0506
Telephone:      (202) 455-4399
Email:           oren@rightsbehindbars.org
                 amaris@rightsbehindbars.org

STEPHEN S. CHA-KIM[*]
  N.Y. Bar No. 4979357
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone:      (212) 836-8000
Email:           stephen.cha-kim@arnoldporter.com

CARSON D. ANDERSON – 317308
ARNOLD & PORTER KAYE SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, California 94306-3807
Telephone:  (650) 319-4500
Email: carson.anderson@arnoldporter.com

[*] Admitted *pro hac vice*

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS et al., <br><br> Defendants. | Case No. 4:23-cv-04155-YGR <br><br> **PLAINTIFFS' POST EVIDENTIARY HEARING OPENING BRIEF** <br><br> Date:        February 27, 2024 <br> Time:       9:30 AM <br> Crtrm.:     4th Floor <br><br> Judge:     Hon. Yvonne Gonzalez Rogers <br><br> Trial Date:      None Set |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION...................................................................................................1

II.    RELEVANT LEGAL STANDARDS....................................................................2

III.   ARGUMENT .........................................................................................................3

    A.     The Testimonial and Declaration Evidence Makes Clear That Individuals
          Incarcerated at Dublin Remain at Serious Risk of Sexual Abuse. ...........................3

    B.     Retaliation Against People Who Report Abuse in FCI Dublin Remains
          Rampant and Places People Further at Risk of Substantial Harm. An
          Injunction is Necessary to Stop Ongoing Retaliation for Engaging in
          Constitutionally Protected Activity. ........................................................................6

        1.     Witness Testimony and Supporting Declarations Show that
              Incarcerated People Cannot Confidentially Report Sexual
              Misconduct Without Facing Ongoing Retaliation .........................................7

        2.     BOP's Actions Even in the Lead-Up to the Evidentiary Hearing
              Demonstrate that It Will Not Stop Retaliating Absent Immediate
              Relief ............................................................................................................9

    C.     BOP's Inadequate Response to the Dublin Crisis Constitutes Deliberate
          Indifference and Continues to Place Incarcerated Persons at Serious Risk of
          Ongoing Constitutional Harms................................................................................11

        1.     Dublin Has Failed to Implement a Minimal Review of Applicable
               Policies and Still Lacks a Written PREA Response Plan.............................11

        2.     Dublin Has Failed to Meaningfully Implement the Moss Group
               Recommendations, Even Assuming Those Are Sufficient .........................13

        3.     The Court Should Draw Adverse Inferences From BOP's Refusal to
               Stand By Its TMG "Working Plan" and the DOJ Task Force Report..........15

         4.     Dublin Continues to Respond to Abuse and Retaliation Allegations
               Inadequately and Without Any Accountability............................................16

             (a)     Continuing Deficiencies in Investigating Abuse Allegations. .........16

             (b)     Lack of Material Benefit From Cameras..........................................18

              (c)     Continuing Deficiencies in Treatment of Complainants................19

              (d)     Purported Staff Changes Unfulfilled or Immaterial. .......................19

    D.     Plaintiffs' Requested Relief Is Appropriate ............................................................20

        1.     Plaintiffs Requested Relief is Tailored to the Harms at Issue.....................20

        2.     A Special Master Is Ideally Suited to Oversee Changes the

Evidentiary Hearing Made Clear Will be Required. ...................................21

3.   Absent Court-Supervised Monitoring, Defendants Will Fail To
Implement The Preliminary Injunction. .......................................23

4.   Administrative Efficiency Favors Appointing A Neutral Third Party .........24

IV.   CONCLUSION .................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*A & M Records, Inc. v. Napster, Inc.*,
    284 F.3d 1091 (9th Cir.2002) ............................................................................. 23

*Armstrong v. Brown*,
    768 F.3d 975 (9th Cir. 2014) ....................................................................... 22, 23

*Armstrong v. Newsom*,
    No. 94-cv-02307 CW, 2021 WL 930454 (N.D. Cal. Mar. 11, 2021) .............................. 27

*Balla v. Idaho State Bd. of Correction*,
    No. 1:81-CV-1165-BLW, 2011 WL 108727 (D. Idaho Jan. 6, 2011) .............................. 26

*Bearchild v. Cobban*,
    947 F.3d 1130 (9th Cir. 2020) ................................................................................... 2

*Brown v. Plata*,
    563 U.S. 493 (2011) ......................................................................................... 2, 7

*Coleman v. Brown*,
    938 F. Supp. 2d 955 (E.D. Cal. 2013) ..................................................................... 11

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ...................................................................................... 3, 11

*Gayle v. Meade*,
    No. 20-21553-Civ-COOKE/GOODMAN, 2020 WL 4047334 (S.D. Fla. July 17,
    2020) .................................................................................................................... 24

*Gonzales v. Martinez*, 403 F.3d 1179 (10th Cir. 2005) ...................................................... 3

*Hernandez v. Cnty of Monterey*,
    110 F. Supp. 3d 929 (N.D. Cal 2015) ..................................................................... 21

*Hernandez v. Cnty. of Monterey*,
    305 F.R.D. 132 (N.D. Cal. 2015) ............................................................................ 2

*Hook v. State of Arizona*,
    120 F.3d 921 (9th Cir. 1997) .................................................................................. 24

*Int'l Union, U.A.W. v. N.L.R.B.*,
    459 F.2d 1329 (D.C. Cir. 1972) ............................................................................. 16

*Madrid v. Gomez*,
    889 F. Supp. 1146 (N.D. Cal. 1995) ...................................................................... 24

*Monroe v. Meeks*,
    No. 3:18-CV-00156-NJR, 2021 WL 5882129 (S.D. Ill. Dec. 13, 2021) .............. 24, 25, 26

*Plata v. Schwarzenegger,*
    603 F.3d 1088 (9th Cir. 2010) ........................................................................... 23

*Poore v. Glanz*, 46 F. Supp. 1191 (N.D. Okla. 2014), aff'd, 724 Fed. Appx. 635 (10th Cir.
    2018) ...................................................................................................................... 3

*Riley v. Olk-Long*, 282 F.3d 592 (8th Cir. 2002) ...................................................... 3, 12

*Roman v. Wolf,*
    No. 5:20-cv-00768-TJH-PVC, Order Appointing Special Master, ECF No. 726
    (C.D. Cal. October 20, 2020) ............................................................... 24, 25, 27

*Singh v. Gonzales,*
    491 F.3d 1019 (9th Cir. 2007) ........................................................................... 16

*Stone #1 v. Annucci,* 2021 WL 4463033 (S.D.N.Y. Sept. 28, 2021) ........................ 3, 19

*Stone v. City & Cnty. of S.F.,*
    968 F.2d 850 (9th Cir. 1992) ............................................................................. 23

*United States v. Bardell,*
    No. 6:11-cr-401-RBD-EJK, 2022 WL 16921698 (M.D. Fla. June 6, 2022), report
    and recommendation adopted, 634 F. Supp. 3d 1083 (M.D. Fla. 2022) ............. 27

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................ 2


## **STATUTES**

18 U.S.C. § 3626 ................................................................................................... 22, 24

28 C.F.R. § 115.6 ........................................................................................................ 13

28 C.F.R. § 115.65 ...................................................................................................... 13

28 CFR § 115.52 ......................................................................................................... 18


## **RULES**

Fed R. Evid 706 ..................................................................................................... 22, 25

Fed. R. Civ. P. 53 ........................................................................................................ 22

1    **I.      INTRODUCTION**

2          When Plaintiffs moved for preliminary injunction in August 2023, they came armed with

3    evidence to support their request for preliminary relief.  Plaintiffs submitted forty-seven

4    declarations from individuals who had been raped, assaulted, harassed, and retaliated against at

5    FCI Dublin.  The evidence showed that FCI Dublin had a serious problem under the Warden

6    Garcia administration, and that, in the intervening period, across administrations, little had

7    changed substantively—people in FCI Dublin still face a substantial likelihood of assaults and

8    harassment and a substantial likelihood of retaliation for reporting staff misconduct.  The evidence

9    also showed that these system-wide conditions are not the result of a few bad officers and cannot

10   be fixed with a few good ones.  These deep-seated problems of culture and practice require strong,

11   affirmative changes that Federal Defendants have failed to enact.

12         The testimony elicited at the evidentiary hearing only further underscored the urgency of

13   Plaintiffs' claims.  Plaintiffs' witnesses presented unrebutted testimony of a sexualized

14   environment that persists long after the Garcia administration and which has led to continued,

15   ongoing staff sexual assault and harassment.  Incarcerated witnesses also testified that confidential

16   reporting mechanisms are unavailable to people at FCI Dublin and that, when they do report

17   abuse, they are subject to harsh punishments including segregation in the SHU, loss of privileges,

18   and cell searches.  The hearing evidence also demonstrated that, after multiple leadership changes,

19   they are now suddenly subject to strip searches after legal visits, and that these searches further

20   chill their ability to report and pursue litigation.

21         Defendants' witnesses on the other hand left Plaintiffs' evidence materially  unrebutted.

22   Defendants' witnesses largely offered platitudes and good intentions, without concrete follow

23   through.  To the extent they spoke about attempted changes at a high level, that testimony was

24   rebutted by clear statements about what happens on the ground by the witnesses who experience it.

25   The evidentiary hearing and record evidence made one thing clear: despite Defendants'

26   protestations, the requisite changes at FCI Dublin have not been made, and people incarcerated

27   there are still subject to an unconstitutional risk of sexual abuse and unconstitutional retaliation.

28         As Plaintiffs demonstrate below, they are likely to succeed on the merits of their Eighth

1   and First Amendment claims, and the preliminary injunction should be granted. The requested

2   relief is narrowly tailored and necessary to protect Plaintiffs' rights, and the evidence elicited at

3   the evidentiary hearing only bolstered Plaintiffs' substantive claims and requests for relief.

**II.      RELEVANT LEGAL STANDARDS**

5         Courts should grant preliminary injunctions when: plaintiffs are likely to succeed on the

6   merits of their claim; plaintiffs will suffer irreparable harm absent the injunction; the balance of

7   the equities tips in plaintiffs' favor; and an injunction would be in the public interest.  *Winter v.*

8   *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  People in prison establish an Eighth

9   Amendment violation warranting injunctive relief by showing that Defendants' policies and

10  practices concerning sexual abuse and retaliation for reporting such assault—in their totality—

11  constitute deliberate indifference to a substantial risk of suffering serious harm.  Specifically,

12  prison staff sexual abuse of incarcerated people constitutes a form of torture that violates the

13  Eighth Amendment.  *See Bearchild v. Cobban*, 947 F.3d 1130, 1144 (9th Cir. 2020).  In systemic

14  cases, such as here, deliberate indifference can be shown by, inter alia, evidence of "systematic or

15  gross deficiencies in staffing, facilities, equipment, or procedures." *Hernandez v. Cnty. of*

16  *Monterey*, 305 F.R.D. 132, 152-53, 155 n. 138 (N.D. Cal. 2015).  Importantly, the key question in

17  systemic cases focuses not on individual circumstances but rather on whether systemic

18  deficiencies "taken as whole" subject people to a "substantial risk of serious harm." *See Brown v.*

19  *Plata*, 563 U.S. 493, 505 n.3 (2011).

20        Where Plaintiffs seek "injunctive relief to prevent a substantial risk of serious injury from

21  ripening into actual harm, the subjective factor, deliberate indifference, should be determined in

22  light of the prison authorities' current attitudes and conduct, their attitudes and conduct at the time

23  suit is brought and persisting thereafter." *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (allowing

24  injunctive and damages claims to proceed in a failure to protect from sexual assault case in a

25  federal prison) (internal citations and quotations omitted).  This standard does not require

26  incarcerated individuals to wait to be assaulted more than once or even to be assaulted at all before

27  seeking relief.  *Id.* at 845 ("[A] subjective approach to deliberate indifference does not require a

28  prisoner seeking a remedy for unsafe conditions to await a tragic event such as an actual assault

1  before obtaining relief.") (internal citations omitted).  Upper corrections management that is aware

2  of prior patterns of sexual abuse yet fails to mitigate the risks is deliberately indifferent.  *See Riley*

3  *v. Olk-Long*, 282 F.3d 592, 595-597 (8th Cir. 2002) (Warden's knowledge of prior incidents and

4  lack of action to protect inmates from sexual abuse established deliberate indifference), *Gonzales*

5  *v. Martinez*, 403 F.3d 1179, 1183 (10th Cir. 2005) (sheriff's knowledge of prior incidents of

6  sexual abuse in jail and lack of response thereto establish deliberate indifference), *Poore v. Glanz*,

7  46 F. Supp. 1191, 1196-1200 (N.D. Okla. 2014), aff'd, 724 Fed. Appx. 635 (10th Cir. 2018)

8  (unpublished) (supervisor's knowledge regarding practices such as lack of shower privacy,

9  understaffing, blind spots, and lack of action in response supported finding of deliberate

10  indifference to risk of sexual assault in detention facility); *Stone #1 v. Annucci,* 2021 WL

11  4463033, at *10 (S.D.N.Y. Sept. 28, 2021) (knowledge by corrections commissioner and PREA

12  PREA coordinator gained from criminal prosecution of staff abusers sufficient to establish

13  deliberate indifference).

14  **III.    ARGUMENT**

15      **A.    The Testimonial and Declaration Evidence Makes Clear That Individuals
             Incarcerated at Dublin Remain at Serious Risk of Sexual Abuse.**
16

17          Incarcerated witnesses demonstrated that conditions at FCI Dublin perpetuate a culture of

18  sexual assault and harassment, leaving them at substantial risk of harm.  Multiple individuals

19  testified regarding recent and ongoing staff sexual misconduct at Dublin, including incidents that

20  occurred in the five months since this action and preliminary injunction motion were filed.

21          R.B. testified to the ongoing culture at Dublin where "you got people putting on sex

22  shows, dancing, twerking, doing whatever to get extra … you got to show somebody something."

23  Tr., 621:7-19.  E.R. testified she saw Officer Celestial grope an incarcerated woman's breasts in

24  the warehouse at the Camp facility in March of 2023.  Tr. 723:21-724:20. When E.R. reported

25  Celestial to SIS Putnam in November 2023, Putnam told her she was not the first to complain

26  about Celestial, stating "it's a tangled web" (Tr. 739:9-740:20), but, despite these reports, Celestial

27  was still on staff at the time of the hearing (Tr. 741:5-6)  Even though E.R. told Putnam,

28  Baudizzon, and Agostini that she did not feel comfortable working in the warehouse where she

1   witnessed someone be assaulted, staff did not move her to a different job.  Tr. 739:9-740:23.  K.C.

2   testified that Officer Narayan touched her lower back while they were alone in a training for her

3   warehouse job in November 2023, and commented that she "was really lucky that there were

4   cameras in the room."  Tr. 927:3-928:16. After the incident with Officer Narayan, K.C. was told

5   by another officer that K.C., not the officer, was being inappropriate, and K.C. was fired from her

6   job in the food service warehouse, and moved to a job cleaning showers, cutting her monthly pay

7   from $44 to $5.  Tr. 928:20-929:10; 929:19-931:14. K.D. testified that she has personally

8   witnessed three officers sexually touch or have sexual relationships with incarcerated people in the

9   Camp in the year of 2023, but feels fearful to report because of retaliation.  Tr. 703:3-704:6.

10      Other witnesses testified about recent and ongoing incidences of staff sexual misconduct.

11   L.P.R. testified that in August 2023 Officers Singh and Groover watched her while she was

12   changing and naked, opened her door while she was partly naked, and would not allow her to put

13   on her clothes before coming in.  Tr. 784:7-785:1.   T.M. testified that in June 2023 Officer

14   Cooper opened the shower curtain and watched her while she was showering. Tr. 638:3-4; 896:14-

15   897:18. When T.M. reported her concerns to SIS Baudizzon, he told her to simply avoid Cooper.

16   Tr. 902:23-903:10. Though BOP acknowledges an allegation "[s]ubstantiated as sexual contact"

17   against Cooper, he was still employed at Dublin and working in the housing units at the time of

18   the hearing. Tr. 897:16-18.   T.M. also shared that in December 2023 another one of the newer

19   officers, Officer Henry, stood close to her while telling her she "owed him" for getting her out of a

20   disciplinary report, which she interpreted as asking for sexual favors. Tr. 897:23-899:6. T.M. also

21   witnessed Officer Singh walk through the shower area as incarcerated people were naked and

22   stood there until people got out.  Tr. 899:19-900:5.

23      This evidence adds to the forty-seven declarations filed with Plaintiffs' Motion and Exhibit

24   E filed with Plaintiffs Reply, which identified 16 alleged incidents of staff sexual misconduct

25   since Warden Jusino took over in 2022, including four incidents in 2023.  This recent misconduct

26   includes: Officer Gacad engaging in sex acts with S.L. at least ten times throughout the year 2022,

27   and then after he was allowed to resign without disciplinary action, moving to the city where

28   S.L.'s family lives and interacting with her parents and children, affecting her ability to be

released to her mother's house (ECF 10-15 at 4-8; Tr. 573:20-574:25); Officer Poole having

sexual relations with  J.M.'s friend in February 2022, and choking and threatening her not to tell

anyone about their relationship (ECF 10-4 at 6); Officer Vazquez kissing and sexually harassing

A.H.R. in July 2022 (ECF 10-14 at 9-10); Officer Caston groping A.R.'s breasts, rubbing his penis

on her, and telling another officer to look at her "big ass titties" when she was in the SHU in

January 2023 (ECF 10-43 at 5-8); medical officers groping incarcerated people (ECF 10-31 at 4,

7; ECF 10-44 at 6-16); and a number of officers harassing or staring at individuals while they are

in the shower throughout 2023 (ECF 10-9 at 7; ECF 10-24 at 4-5; ECF 10-43 at 8; 10-25 at 5).

Plaintiffs have disclosed the identities of forty-one out of the forty-seven declarants to

Defendants, including seven declarants who testified at the hearings—S.L., C.A.H., J.L., J.M.,

T.M., R.B., and A.V.  Additionally, at the hearing Putnam testified he previously identified all

forty-seven declarants for BOP Counsel based on his files and discussions with staff, including Dr.

Mulcahy.  Tr. 366:9-22, 402:16-403:10.  Despite this knowledge, Federal Defendants have offered

no evidence to rebut the testimony of Plaintiffs' witnesses, or to rebut the incidents alleged in the

underlying 47 declarations.  Though they had the opportunity to do so at the hearing, Federal

Defendants chose to challenge only the testimony of K.D. regarding the pat down she experienced,

and even then did not explain why she was harshly punished merely for reporting that the pat

down made her feel uncomfortable, a report she had been urged to make at the direction of Dr.

Mulcahy.  *See* PIX-14 (Stating in email to Dr. Mulcahey "You promised me if I reported it I could

feel safe and protected and it would never get back to the officer I was reporting or be used to

retaliate against me….Now I completely understand why other inmates told me to let it go and

why no one wants to say anything about what the staff does to them.")

Federal Defendants argue that the "bad actors" have been removed, and thanks to a

"change in leadership" and new staff, people incarcerated at FCI Dublin are no longer at risk of

sexual assault and abuse.  But the evidence shows that staff sexual misconduct has persisted

despite staffing changes.  S.L. put it clearly when asked if sexual harassment has decreased since

new leadership arrived in 2022: she responded "No" because that is when her experience with

harassment began.  Tr. 592:15-17.  Many line staff have remained the same across multiple

1   leadership changes, and many new staff brought in to reform the facility have since retired,

2   resigned, or been placed on leave.  *See* Tr. 528:15-16; 529:2-13; 34:8-25; January 26, 2024 Status

3   Conference, Tr. 12:14–13:1.  Indeed, BOP acknowledged that at least 11 staff members were

4   placed on leave pending sexual abuse allegations in 2022 and 2023, and a total of 19 staff (out of

5   207 filled positions) were out on leave at the start of the evidentiary hearing.  ECF No. 46-1, para.

6   36 & 38(i), (iv), (vi), (x); Tr. 188:25-189:8. One individual who was placed on administrative

7   leave in July 2022 due to "allegations of a sexual nature" was allowed to transfer "to another

8   federal facility." ECF No 46-1 para. 38(i).  Another officer who was found to have engaged in

9   "sexual contact" with an incarcerated person was merely reassigned to another post within Dublin.

10   *Id.* at para. 38(iii).  While Federal Defendants claim he no longer has contact with the victim, the

11   victim testified at the hearing that is not the case.  Tr. 899:8-18 (T.M.).

12       At least seven additional staff have been placed on leave since the start of the evidentiary

13   hearing.  Two officers were walked off following allegations of sexual misconduct, January 26,

14   2024 Status Conference, Tr. 4:14-22, and five female managers were placed on administrative

15   leave, including Captain Quezada who testified before the Court representing the Dublin's "new

16   leadership." *Id.*  at  12:14-13:1. Continued removal of these officers makes clear that widespread

17   violations continue and that removal of a few actors is not enough to change a system.  All of FCI

18   Dublin's actions speak of a facility still in crisis, not one that has an ability to adequately reform

19   its culture or protect the population as constitutionally required without judicial intervention.

20   Without court intervention Plaintiffs will continue to suffer irreparable harm because Federal

21   Defendants systems, or lack thereof, "taken as a whole" subject those incarcerated there to a

22   "substantial risk of serious harm."  *Brown v. Plata,* 563 U.S. 493, 505 n. 3 (2011).

23       **B.**    **Retaliation Against People Who Report Abuse in FCI Dublin Remains**
              **Rampant and Places People Further at Risk of Substantial Harm. An**

24              **Injunction is Necessary to Stop Ongoing Retaliation for Engaging in**
              **Constitutionally Protected Activity.**

25

26       There are consistent and widespread practices at FCI Dublin that punish those who report

27   staff sexual abuse and harassment.  This retaliation takes many forms: placement in the SHU, cell

28   searches, limitation on phone or visitation privileges, and other limitations.  These practices are

ongoing, and in fact worsened in the weeks leading up to the hearing, as staff began to strip search people after legal visits and watching them while they urinate and defecate in the bathrooms during legal visits.  This escalating retaliation requires court intervention to protect those at FCI Dublin who seek to report sexual misconduct and access counsel and the courts.

      **1.**      **Witness Testimony and Supporting Declarations Show that Incarcerated People Cannot Confidentially Report Sexual Misconduct Without Facing Ongoing Retaliation**

When individuals have summoned the courage to report staff sexual misconduct, they have consistently faced punishment and retaliation.  For example, K.D. testified that after she reported an inappropriate pat down from Officer Campos (which she did not herself identify as a PREA violation), she was punished with a disciplinary action for falsifying a statement.  As a result, K.D. lost good time credit (adding months to her sentence), communication with her family, and commissary access, which still has not been restored.  Tr. 686:8-687:18.  She was also fired from her job and is now forced to work for her unit manager, Campos, the same officer who conducted pat search, and has continuously denied her family visitation requests.  Tr. 691:24-695:19.  She attempted to raise her concerns to SIS Baudizzon, the DOJ, Dr. Mulcahy (the psychiatrist who instructed her to report her incident), Officer Enriquez, and Dr. Phelps, but received no response.  Tr. 688:7-691:23. After T.M. reported Cooper for watching incarcerated people shower, she was similarly written up for falsifying a statement and not obeying orders and continues to face ongoing retaliation for reporting Cooper, including write-ups, room searches, and denying access to SIS.  Tr. 902:12-15.  When L.P.R. told officers that she was going to report the PREA incident with Officers Groover and Singh, she was put in the SHU for "threatening staff", which led to loss of good time credits, and removal of commissary and visits for three months.  Tr.787:21-788:12. Additionally, after filing this action as a named Plaintiff on August 16, 2023,  J.M. was fired from her job in visiting.  Tr. 757:2-17.

Other incarcerated people testified to similar experiences with retaliation.  After S.L.'s friend reported her extensive abuse by Gacad, S.L. was placed in the SHU for weeks for non-disciplinary reasons.  Tr. 575:5-577:24.  In Fall 2023, S.L. lost a skill-building job in the Central Maintenance Services Heating Ventilation and Air Conditioning department when the staff there

1  decided that she was responsible for one of their colleagues being walked off.  Tr. 584:17-586:9;

2  *see also* 1232:4-1233:2.  After reporting horrific abuse by Officer Smith, C.A.H. faced immediate

3  retaliation when officers removed her psychiatric medication, gave her a number of disciplinary

4  actions, and constantly searched her cell.  Tr. 769:25-772:2. M.M. testified that an officer walked

5  in while she was using the restroom; she lost privileges at her job the day after reporting the

6  incident to Deveney.  Tr. 805:25-807:2, 815:9-815:19.   R.F. faced retaliation for assisting DOJ

7  investigators and for sharing copies of the complaint in this matter: administrators refused to

8  honor her approved transfer to home confinement (Tr. 835:9-836:24; PIX 19 at p.15); Lt.

9  Bauddizon threatened her next to a cell in his office with SHU in August 2023 (Tr. 821:11-825:15;

10  PIX353); her mail was stopped for six weeks (Tr. 832:13-833:8; PIX 366); and, her custody status

11  inexplicably changed also at the same time from "out" to the more restrictive "in" status.  Tr.

12  826:21-830:1; PIX23 at pp.1-2.  Officers have threatened mass retaliation for reporting issues

13  including sexual assault during "town halls," one of the purported solutions BOP leadership touted

14  as facilitating better communication.  Tr. 617:11-618:18 (R.B.).  J.L faced retaliation including

15  comments ands searches of her legal papers prior to meeting with a Victim Advocate regarding a

16  statement J.L. prepared regarding the impact of her abuse.  Tr. 883:4-883:13, 888:20-890:23.

17      Many others testified that they are afraid to report staff misconduct, and afraid of staff

18  retaliation.  *See, e.g.*, Tr. 632:22-633:23, 644:9-647:10 (R.B. does not trust staff enough to report

19  issues because she does not feel like reporting is confidential, and when she reported harassment

20  by O'Connor to Putnam her reports went nowhere); Tr. 851:20-852:8 (A.V. stating she does not

21  know of any way to confidentially report abuse at Dublin); Tr. 703: 3-704:6, 718:15-721:6 (K.D.

22  disclosing nervously that she is aware of three officers in inappropriate sexual relationships in the

23  camp in 2023 and is aware of officers bringing in drugs but is in "fear for her life" if she reports).

24      There are also practical issues that make it difficult to report.  As multiple individuals

25  independently testified to, each unit has approximately five computers for the entire unit and while

26  privacy screens have been installed they do not adequately prevent others, including staff, from

27  observing what is being reported.  *See* Tr. 600:13-23; 630:3-25; 795:9-796:1-8; 814:15-25;

28  850:19-851:19.  There is also only one confidential legal phone per unit and in at least one unit

1    that phone shares space with video visiting.  As a result, the over 200 individuals on each unit

2    must compete with each other for access to the five computers as well as to the one room with a

3    legal phone that may also be used for other purposes. *See* Tr. 600:13-15; 909:5-16.  It is not overly

4    burdensome or unreasonable to add more computers, additional unrecorded phones, or to apply

5    improved privacy screens, yet BOP has failed to do so.

6           **2.      BOP's Actions Even in the Lead-Up to the Evidentiary Hearing**
                      **Demonstrate that It Will Not Stop Retaliating Absent Immediate Relief**
7

8           Plaintiffs and witnesses described how staff retaliate against them for reporting misconduct

9    by placing them in the SHU or cutting off phone or commissary access--the exact same practices

10   that fostered wide-spread sexual misconduct at FCI Dublin for years.  FCI Dublin staff have

11   enacted new retaliatory practices since Plaintiffs filed this case.  Beginning in December, staff

12   began to conduct strip searches after legal visits, and began to monitor people while they used the

13   bathroom during legal visits.  Witnesses--including people have resided at FCI Dublin for years--

14   were clear that neither of these practices had ever been a regular feature of life at FCI Dublin until

15   the month before the evidentiary hearing.  *See, e.g.,* Tr. 592:2- 592:6; (S.L); 909:21-911:9 (T.M.);

16   853:16-854:7 (A.V.); Tr. 624:16-22 (R.B.).  Witnesses were also clear as to the impact of these

17   new practices: they chilled desire to speak with counsel and, on some occasions, were enough of a

18   barrier to prevent people from meeting with counsel altogether.  Tr. 853:16-854:17.

19          In response to testimony regarding strip searches, Defendants only parroted that strip

20   searches are policy.  But this defense misses the point.  As Beth Reese acknowledged, something

21   can both be policy, and be retaliatory, Tr. 339:15-340:1, and there is ample temporal and

22   testimonial evidence that the newly implemented strip searches are, in fact, retaliatory.

23   Defendants' evidence shows that the searches were not implemented during the leadership

24   transitions in 2022.  Defendants' own logbook shows a dramatic increase in strip searches in the

25   weeks leading up to the evidentiary hearing.  *See* Tr. 27:10-12. ███████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████

28   ███████████████████████████████████████████ Though

1    Defendants may claim a security need for such strip searches, their own evidence demonstrates the

2    opposite: in the past one and a half years, across all legal and social visitation, only one piece of

3    contraband was discovered after a strip search in the visiting room.  Tr. 27:9-28:1.

4          The inference of retaliation only grows stronger when these new strip searches are viewed

5    in the context of other new practices at FCI Dublin.  Witnesses testified that in the weeks leading

6    up to the evidentiary hearing, staff began to monitor the bathrooms during legal visits, watching

7    incarcerated persons defecate and urinate.  *See, e.g.,* Tr. 758:8-759:3 (J.M.).  This practice has led

8    individuals to choose between going to the bathroom in private and seeing legal counsel.  Tr.

9    883:20-885:13 (J.L. describing forgoing the bathroom despite being ill because she would be

10   observed defecating).  This practice is all occurring by choice of the leadership.  The new interim

11   Warden even testified that he was unsure if such observation in the bathroom was required at a

12   facility like Dublin.  Tr. 1284:19-24.  The combination of new strip searches following legal visits

13   and a new bathroom observation policy during legal visits paint a disturbing picture: that, since the

14   inception of the instant litigation, people who see their attorneys to complain about the facility

15   must pay a price.  These practices are both retaliation themselves and evidence that, absent court

16   intervention, FCI Dublin is unable to curb retaliatory practices, and continues to enact new ones.

17         These practices build on ongoing retaliation at FCI Dublin, which now target not only

18   those who complain internally, but also those litigating this case.  The testimony of C.A.H. is

19   particularly instructive.  Subsequent to the filing of the litigation C.A.H had her necessary

20   medication confiscated was threatened with discipline, given discipline for minor infractions such

21   as insolence and had her cell searched on a frequent basis.  Tr. 769:25-772:2.  And her experience

22   is not unique.  *See, e.g*., Tr. 821:11-823:3; 824:7-20 (R.F. testifies about Officer Baudizzon

23   threatening her with placement in the SHU if she did not stop filing complaints).

24         Court intervention is necessary here in particular because, OIA, as a matter of practice,

25   categorically does not investigate allegations of retaliation where the underlying act is also

26   consistent with policy.  Tr. 338:15-339:2.  Put another way, the main investigative body at BOP

27   does not investigate, and chooses not to remedy, certain allegations of retaliation without even

28   determining the validity or merits of the claim.  This practice, coupled with the widespread

1  ongoing retaliation, virtually ensure that some forms of unconstitutional retaliation will continue at

2  FCI Dublin absent court intervention.  "To avoid entry of an injunction, defendants may prove

3  either that they were unaware of the risk of harm or that they have responded reasonably to it."

4  *Coleman v. Brown*, 938 F. Supp. 2d 955, 988 (E.D. Cal. 2013) (citing *Farmer*, 511 U.S. at 846).

5  Plaintiffs have met their burden to show ongoing objectively intolerable risk of harm, including

6  retaliation and Federal Defendants, who are clearly aware, have failed to respond reasonably to

7  prevent that risk as shown by the evidence.

8        **C.       BOP's Inadequate Response to the Dublin Crisis Constitutes Deliberate
                    Indifference and Continues to Place Incarcerated Persons at Serious Risk of
9                   Ongoing Constitutional Harms**

10             Where a plaintiff "seeks injunctive relief to prevent a substantial risk of serious injury from

11 ripening into actual harm, the subjective factor, deliberate indifference, should be determined in

12 light of the prison authorities' current attitudes and conduct, their attitudes and conduct at the time

13 suit is brought and persisting thereafter."  *Farmer,* 511 at 845.  To prevail, plaintiffs "must come

14 forward with evidence from which it can be inferred that the defendant-officials were at the time

15 suit was filed, and are at the [the injunction is sought], knowingly and unreasonably disregarding

16 an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish

17 eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during

18 the remainder of the litigation and into the future.  *Id*. 845–46 (further noting "the inmate may

19 rely, in the district court's discretion, on developments that postdate the pleadings and pretrial

20 motions, as the defendants may rely on such developments to establish that the inmate is not

21 entitled to an injunction.)  Courts have found deliberate indifference, where as here, the

22 administration knows of prior sexual abuse but fails to take steps to prevent future abuse.  *See,*

23 *e.g., Riley v. Olk-Long*, 282 F.3d 592, 595-597 (8th Cir. 2002).  Plaintiffs have met this standard

24 and Dublin has failed to implement meaningful reforms in response to the ongoing misconduct.

25             **1.       Dublin Has Failed to Implement a Minimal Review of Applicable
                          Policies and Still Lacks a Written PREA Response Plan**

26

27             BOP claims that since the wave of criminal indictments and formation of the FCI Dublin

28 Task Force in early 2022, it has "instituted policies to deter and address staff misconduct," Federal

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF 46) at 6, but the documentary evidence and testimony presented to the Court tell a different story.  Following a wave of criminal indictments for staff sexual abuse, any reasonable prison leadership would have taken proactive actions to understand and repair the obvious breakdown in policy that led to what Deveney acknowledged was, even in July 2022, still an "institution . . . in shambles."  Tr. 174:16-175:8 (referring to "policy compliance standards").  Yet rather than examine the procedures, or lack thereof, that led to unprecedented staff abuse, BOP officials conceded that they "haven't reformulated policies" regarding the use of SHU for PREA complainants, Tr. 50:5-8, or bothered to create a single new document addressing how allegations of staff sexual misconduct should be handled at the institutional level, Tr. 257:24-258:2.  Instead, Deveney conceded that high-level agency program statements remain the only guidance, Tr. 257:17-23, even though these were the same policies that have been in place, and routinely ignored and circumvented, for years.

After years of malicious misuse of the SHU and failure to timely investigate sexual misconduct, BOP's refusal to undertake even a rudimentary review of Dublin's relevant policies is astonishing although consistent with the denialist attitude of the BOP witnesses, whom the Court had to repeatedly remind that SHU and failure-to-investigate abuses had not just been "reported" but "found to have been done." Tr. 49:19-50:2; *see also, e.g.*, Tr. 1190:13-1191:6  (correcting Deveney that housing PREA complainants in SHU *does* place them under punitive restrictions and that the Court would not "tolerate" it).

Dublin can implement "institution supplements" to craft more specific policies beyond those set forth in agency program statements.  Tr. 114:25-115:4.  Yet not Wardens Jusino, Deveney, Dulgov nor any other post-Garcia leader brought in to "clean house" made a single specific facility-level policy to strengthen, clarify, or otherwise address the obvious shortcomings in Dublin's SHU and investigation procedures.  Even though, as just one example raised by the Court, leadership could easily consider changes to PREA-related protective housing practices, by studying (as the prison already has for drug treatment, Tr. 52:25-53:20) other available housing options or by simply refraining from needlessly subjecting PREA victims to "restrictions that are set [in SHU] for punishing someone who has violated the rules."  Tr. 1190:13-19.

Moreover, this pattern of inaction has meant that Dublin lacks even the basic policies required to prevent sexual abuse. Deveney acknowledged that Dublin still does not have in place a written PREA institutional plan to coordinate actions in response to sexual abuse; although as the PREA compliance manager, he admitted that he had no idea that each facility is required to institute one under agency PREA policy and regulations. Tr. 272:16-274:11; *see also* PIX 209 p. 40; 28 C.F.R. § 115.65. He also consistently misstated the definition of staff sexual misconduct, stating that sexual touching is required, Tr. 189:11-14, when many non-touching actions qualify as staff sexual abuse in the prison setting, such as voyeurism, display of genitalia, and invasion of privacy. PIX209 at 11; *see also* 28 C.F.R. § 115.6.

## 2. Dublin Has Failed to Meaningfully Implement the Moss Group Recommendations, Even Assuming Those Are Sufficient

Deveney revealed that decisionmakers in D.C. commissioned the Moss Group ("TMG") to conduct a "cultural assessment" of Dublin in summer 2022. Tr. 229:11-17. BOP never explained why it had previously omitted this fact and the existence of TMG's post-assessment draft report [Ex. N] from its opposition brief. Moreover, because Plaintiffs were never afforded an opportunity to cross-examine BOP witnesses about the specific contents of Ex. N, its probative value is limited. For example, Plaintiffs were unable to ask critical questions about assumptions built into TMG's analysis, BOP's influence as the commissioning party over TMG's work, and details of how the assessment was actually carried out on the ground. Plaintiffs would have probed why the draft report adopted an almost-entirely staff-centric analysis of morale, communication, and other issues. ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

1    In any event, even taken at face value, the TMG report is instructive: it is the only record

2    evidence relating to any kind of frank assessment of underlying problems at Dublin (as the BOP

3    refuses to stand by its working plan in response to the report or the findings of the DOJ Task

4    Force, *see infra*), yet it is clear that Dublin has done little to act on TMG's recommendations over

5    the past 18 months.  Indeed, Deveney's testimony revealed that he lacks even a high-level

6    understanding of the report's actual contents.  He was unaware of any specific recommendation

7    made by TMG with respect to reducing the risk of sexual abuse aside from "additional staffing"

8    and "additional training."  Tr. 232:9-23.  ████████████████████████████████

9    ████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████

21   ████████████████████████████████████

22   The record is devoid of evidence that Dublin has advanced any of these recommendations.

23   ████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25                                                                    Tr. 324:18-325:8

26   (Reese confirming central email discontinued); Tr. 532:10-533:4 (Agostini asserting  "we no

27   longer needed the oversight").  The Court noted its "concerns" about why a "mechanism . . . put in

28   place to address issues" may have been "prematurely stopped."  Tr. 862:10-18.

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 ███████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████

8 ████████████████████   The entirety of the "additional" training that BOP has introduced is a single,

9 30-minute annual PREA training.  PIX 212 at 2; Tr. 89:3-12.  And while BOP evidently scheduled

10 additional training to follow the hearing, Deveney conceded that it would not be for unionized

11 staff that actually interact with the population, and that there were no plans for training for that

12 staff.  Tr. 1213:14-1214:23.

13      **3.**       **The Court Should Draw Adverse Inferences From BOP's Refusal to**

14             **Stand By Its TMG "Working Plan" and the DOJ Task Force Report**

15 Rather than attempt to show that it has addressed TMG's recommendations, which it

16 cannot, BOP now seeks to preclude from the record Dublin's TMG "working plan" [Ex. S], as

17 well as the DOJ Task Force Report [Ex. O].  ECF No. 135.  The Court should draw adverse

18 inferences from BOP's post-hearing refusal to disclose these two exhibits that it initially submitted

19 *ex parte* and *in camera* at the hearing.

20 "When a party has relevant evidence in his control which he fails to produce, that failure

21 gives rise to an inference that the evidence is unfavorable to him."  *Singh v. Gonzales*, 491 F.3d

22 1019, 1024 (9th Cir. 2007) (quoting *Int'l Union, U.A.W. v. N.L.R.B.*, 459 F.2d 1329, 1336 (D.C.

23 Cir. 1972)).  Here, both exhibits are without question documents within BOP's control and ability

24 to produce.  Moreover, the relevance of both documents is beyond dispute.  Deveney testified that

25 the working plan is "a contemporary reflection of the Dublin facility keeping track of how it's

26 doing to meet the [TMG] goals."  Tr. 236:9-14; ████████████████████████████

27 ████████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████

He conceded that the Task Force report contained DOJ's "findings and recommendations" for structural changes required at Dublin.  Tr. 237:8-11.  Thus, both records speak directly on what steps, if any, BOP's parent agency and outside consultant identified to protect incarcerated people from continued harm.  Accordingly, the only legal "presumption" that the Court can make is that BOP now refuses to stand by these records because "if produced the evidence would be unfavorable."  *Int'l Union, U.A.W.*, 459 F.2d at 1336 (citation omitted).

What is more, Deveney affirmatively invoked the contents of both exhibits to support BOP's contention that adequate reforms have taken place at Dublin.  *See, e.g.*, Tr. 176:8-177:12 (claiming Dublin followed Task Force recommendations, including creation of third associate warden, camp administrator, GS-13 captain, family planning coordinator roles); 235:24-236:2 (suggesting the working plan shows how Dublin has "completed the recommendations" and made "progress").  Notably, the additional positions recommended by the Task Force are either unfilled or have been phased out, and Dublin officials have generally failed to create and maintain a concrete timeline for completing the timeline.  *See* Tr. 1159:1-1161:1 (testifying that there is not a clear timeline to complete phases and each version gets written over).

It is axiomatic that a party may not rely on its self-serving description of the purported contents of a document while at the same time refusing to make it part of the record.  *See Int'l Union, U.A.W.*, 459 F.2d at 1336 ("[The Respondent's] failure to support and substantiate [its justification with] production of probative and material documentary records . . . renders the purported reasons dubious.").  Thus, at a minimum, even if the Court does not draw an adverse inference, it should strike any self-serving BOP testimony about these exhibits and their contents.

### 4.   Dublin Continues to Respond to Abuse and Retaliation Allegations Inadequately and Without Any Accountability

#### (a)   Continuing Deficiencies in Investigating Abuse Allegations.

Prior to the hearing, BOP asserted that agency level policy "was revised to reflect that all investigations of mismanagement and employee misconduct will be conducted and overseen by OIA," and that "BOP refers all allegations of sexual abuse at FCI Dublin to OIA."  ECF No. 45-5 at 4 (citing August 2023 changes to Program Statement 1210.25).  The evidence presented at the

1  hearing showed that these are bald mischaracterizations.  Deveney, after initially suggesting that

2  any allegation of inappropriate touching now automatically results in placement of the staff

3  member on administrative leave, Tr. 225:7-13, conceded that this step actually only occurs after

4  *Dublin* undergoes *its own* "factfinding" and determines that the case is substantial enough to refer

5  to OIA.  Tr. 255:13-256:9, 1167:8-13.  And, in the absence of a facility response plan and other

6  institution-specific policy setting any governing standards as discussed above, this referral process

7  is entirely arbitrary, as examples like the cases of K.D. and E.R. (after reporting an officer, Putnam

8  told her it was a "tangled web" and the officer still works there) amply show, *see infra*.  Moreover,

9  Dublin's decisions about whether to refer allegations of staff misconduct to OIA are essentially

10  unreviewable–Deveney testified that Dublin does not even bother to memorialize its decision-

11  making for cases involving non-touching allegations, Tr. 263:6-12, while Lt. Putnam testified that

12  in the instances he is aware of, there have been fact-finding memos written when no referral was

13  made, but could not answer whether this was a matter of policy, Tr. 391:1-10.  Regardless, neither

14  OIA nor any other external agency is ever informed of cases that Dublin declines to refer out,

15  inappropriately making the gatekeeper for investigating allegations against its own staff and

16  shirking the very purpose of OIA.  Tr. 261:2-9.

17          In other words, far from "conduct[ing]" and "oversee[ing]" anything, OIA is unaware of

18  any but the few cases Dublin bothers to refer -- a number that remains suspiciously low not

19  because of any positive changes to staff culture at Dublin, but because the facility refuses to treat

20  investigations into staff misconduct with appropriate urgency: Putnam, the same investigator on

21  whose watch criminal conduct went on for years, and who trained Dublin's current internal

22  investigators, acknowledged that Dublin's SIA is unsupported by any technicians and still has a

23  backlog of dozens of cases. Tr. 379:9-23.  Although Putnam's retirement had been supposedly

24  planned for months, BOP testified that it just posted for his replacement in December.  Tr. 310:5-

25  9.  Unsurprisingly, then, it was only as a result of the hearing itself that BOP was finally directed

26  to place an additional group of officers under administrative leave and refer them to OIA.  Tr.

27  1177:13-17; January 26, 2024 Status Conference Tr. 4:14-22.  Simply put, without judicial

28  intervention, BOP will not do its job.

1    The hearing also raised serious doubts about BOP's assumption that increased OIA

2  involvement in itself, without further scrutiny, is enough to address the specific types of abuses so

3  far brought to light at Dublin.  For instance, astonishingly, it is OIA's practice to simply refer back

4  without any investigation cases concerning allegations of retaliation so long as the facility alleged

5  that the inmate violated a facially valid policy, Tr. 338:15-339:2 (Reese) -- notwithstanding that

6  most if not all retaliation claims will require discerning pretext from motive.  Tr. 339:15-25 (the

7  Court noting that "policies can exist and be enforced in an inconsistent way which could be

8  retaliatory . . . and that's the point").  Indeed, retaliation cases are among the list of allegations

9  that OIA simply does not deem important.  Tr. 406:20-25, 407:1-17 (Putnam listing types of cases

10  that are sent "back for to the local level for investigation".)  Moreover, even in the cases that OIA

11  does take seriously, its resources are highly limited and Dublin overstates OIA's ability, acting

12  alone, to address the Dublin crisis: ████████████████████████████████████████

13  ████████████████████████████████  OIA has not been able to consistently staff officers

14  at Dublin, Tr. 325:21–326:7, and its non-Dublin staff each have oversight over multiple facilities.

15  Tr. 303:10-15.  OIG's involvement in these cases has also been limited.  *See* Tr. 306:6-11 (Reese

16  explaining that OIG takes at most 1-2 percent of OIA cases).

17  **(b)    Lack of Material Benefit From Cameras.**

18    BOP has cited the installation of additional cameras, procured as a result of the DOJ Task

19  Force, to suggest that Dublin residents are now safer than before.  ECF No. 45-5 at 6.  Not so.

20  The hearing established that the impact of these cameras is highly dubious.  First, Dublin declined

21  to install any cameras in the staff offices, despite their knowledge of past sexual abuse in there.

22  Tr., 541:8-542:6.  Second, staff are acutely aware of where cameras are placed, and where blind

23  spots persist.  *See* Tr. 83:5-21, 565:15-22, 725:9-10, 927:10-13.  Third, apparently one individual

24  is charged with monitoring the live feed from 386 cameras at once.  Tr. 540:2-17.  And finally,

25  recorded video is overridden after only 14 days (ECF No. 45-4, ¶58), limiting any evidentiary

26  value, particularly as PREA places no "time limit on when an inmate may submit a grievance

27  regarding an allegation of sexual abuse." 28 CFR § 115.52. *See Stone #1 v. Annucci,* 2021 WL

28  4463033, at *11 (S.D.N.Y. Sept. 28, 2021) (failure to install and monitor cameras shows

1   deliberate indifference to risk of sexual assault).

2   **(c)     Continuing Deficiencies in Treatment of Complainants.**

3   The exhibits that BOP affirmatively submitted to demonstrate its purported compliance

4   with PREA standards for the treatment of complainants show precisely the opposite.  For instance,

5   Defendants' chosen example of the agency checklist for safeguarding PREA complainants shows

6   Dublin's bald non-compliance: rather than remove the alleged perpetrator from the work detail in

7   which the abuse occurred, Dublin removed the complainant and failed to provide any justification

8   for the departure from policy as required.  *See* PIX 208 ("Alleged victim was removed from the

9   work detail"); *contra* Putnam at Tr. 359:5-13 (Putnam testifying that alleged victim "inmate's job

10  assignment or housing assignment would not change).  The examples of the weekly SHU review

11  logs submitted by BOP similarly show a failure by Dublin administrators to ensure that PREA

12  complainants are properly protected rather than placed in punitive conditions in SHU.  *See* PIX412

13  at 4 (showing individual placed in SHU for "protective custody" subsequent to making a PREA

14  allegation).  Moreover, under the adverse inference rule, the Court should reject any effort by BOP

15  to dismiss these particular exhibits and suggest that other examples of these records not introduced

16  as evidence would better bolster its defenses.  BOP has in its possession a full range of PREA

17  checklists and weekly SHU review logs up to the present, yet these are the examples that BOP

18  itself chose to place into the record, presumably as best reflective of its practices.  *See U.A.W.*, 459

19  F.2d at 1338 ("[A]ll other things being equal, a party will of his own volition introduce the

20  strongest evidence available to prove his case.  If evidence within the party's control would in fact

21  strengthen his case, he can be expected to introduce it . . . .").

22  **(d)     Purported Staff Changes Unfulfilled or Immaterial.**

23  To the extent BOP seeks to rely on non-stricken evidence of purported remedial staffing

24  changes, that evidence is unavailing.  First, Deveney conceded that the third associate warden

25  position recommended by the DOJ Task Force has been empty for months and that BOP has

26  decided to abolish it, hiring an additional lawyer instead.  Tr. 1146:5-1147:3. Second, although

27  Reese suggested the institution of an ombudsman at Dublin, Putnam testified he had never heard

28  of such a position.  Tr. 378:4-22.  To the extent that this role refers to Newman's family planning

coordinator role, her testimony made clear that she has limited if any influence over the specific

abuses at issue: spending most of her day in her office dealing with problems at the 40 BOP

institutions across the country under her remit.  Tr. 956:1-957:9.  She also testified that she has no

knowledge about any of the allegations at issue in this matter, Tr. 957:16-958:2, has been involved

tangentially (walking an individual to psychology) in only one PREA case, Tr. 958:14-25, and in

any event has no authority to materially influence PREA-related decisions, Tr. 960:25-961:1.

Although Newman suggested she had information about the state of the Dublin showers, she

conceded that she has never actually observed the showers in use and that she lacks any personal

knowledge of the complaints that have been made about residents' lack of safety in the shower

facilities.  Tr. 961:6-13, 961:22-962:10.

### D.   Plaintiffs' Requested Relief Is Appropriate

#### 1.   Plaintiffs Requested Relief is Tailored to the Harms at Issue

Plaintiffs requested specific, narrowly tailored, relief in their Motion for Preliminary

injunction.  The evidence from the evidentiary hearing underscores that such relief is both

necessary and appropriate.  Plaintiffs request for appointment of a Special Master or other neutral

is intended to facilitate, monitor, and ensure Federal Defendants implement the underlying relief

requested by Plaintiffs which includes (1) a comprehensive audit followed by implementing

changes recommended by that audit in consultation with Plaintiffs; (2) quarterly site visits to

assess progress; (3) ceasing use of the SHU until the concerns regarding its use as a tool of

retaliation are addressed; (4) providing consistent, timely, and confidential access to legal counsel;

and (5) developing and implementing systems, policies, and procedures to (a) provide individuals

with documentation of reporting and participation in staff misconduct investigations and

streamline processes for related relief; (b) provide quality offsite medical and mental health care;

and (c) return non-contraband items seized during cell searches.  *See* ECF No. 10.  This relief is

directly tailored to the harms at issue and is of the type of relief Courts have awarded in the past

regarding ongoing harms in the jail and prison context.  *See Hernandez v. Cnty of Monterey*, 110

F. Supp. 3d 929, 939–40 & 941 (N.D. Cal 2015) (granting plaintiffs' motion for preliminary

injunction requesting 16 remedial elements ranging from medical care, disability accommodations,

and mental health care because it "hews to the specific conditions challenged").  Further, the Court can give specific instructions to the BOP, leaving them less discretion in instances based on the history of the case.  *Armstrong v. Brown*, 768 F.3d 975, 985–86 (9th Cir. 2014) (finding specific instructions appropriate where the "State's prior accountability system had failed.").

The evidence presented with Plaintiffs' Motion and at the Evidentiary Hearings support the need for this relief.  Despite receiving recommendations from TMG, Dublin has yet to conduct or implement a comprehensive survey or audit.  *See supra* Section III.C.  Testimony and documentary evidence demonstrates that the SHU is still used as a method of chilling reporting and as retaliation against those who report.  *See supra* Section III.B.  (Testimony of L.P.R., S.L.). Evidence also shows that alternatives to the SHU are available, and have been used in other circumstances, but that Defendants have refused to consider alternatives for those who report PREA violations.  *See supra* Section III.C.1. (discussion of alternative housing for drug treatment).  As such, the proposed remedy is adequately tailored to the unconstitutional retaliation problem that the current use of the SHU poses.

The Court also heard ample testimony about the failures in reporting mechanisms, retaliation against people who are visited by counsel, gross deficiencies in mental and medical health care, and a general lack of organization, transparency, and follow through from Defendants. Incarcerated people at Dublin, many of whom are survivors of sexual abuse whether at Dublin or from before, cannot access adequate mental health care or medical care, at times outright ignored while suicidal.  *See* Tr. 776:23-777:5; 811:14-22.  Medical care at Dublin is inadequate, due in part by the dearth of staff as testified to by Dublin's health care administrator.  *See* Tr. 971:23-25. All of these problems at FCI Dublin have led to the increased and ongoing threat of sexual misconduct and retaliation at the facility and require the specific remedies requested by Plaintiffs and oversight from a neutral.

**2.      A Special Master Is Ideally Suited to Oversee Changes the Evidentiary Hearing Made Clear Will be Required.**

It is appropriate to appoint a neutral monitor or special master to ensure Defendants' compliance with any injunctive relief ordered by the Court.  Rule 53 provides that a court may

1   appoint a special master to "address pretrial . . . matters that cannot be effectively and timely

2   addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P.

3   53(a)(1)(c). Likewise, the Prison Litigation Reform Act (PLRA) explicitly allows the

4   appointment of a special master "to assist in the development of remedial plans" where the remedy

5   is "sufficiently complex to warrant the appointment." 18 U.S.C. § 3626(f); *see Plata v.*

6   *Schwarzenegger*, 603 F.3d 1088, 1094 (9th Cir. 2010) ("These provisions clearly authorize the

7   appointment of a special master in prison litigation to hold hearings, make recommended findings,

8   and perform certain other related functions."). This is in addition to the Court's power under Rule

9   706 of the Federal Rules of Evidence to appoint an expert to make recommendations subject to

10  review by the court. Fed R. Evid 706(a); Advisory notes to Fed. R. Evid. 706 ("The inherent

11  power of a trial judge to appoint an expert of his own choosing is virtually unquestioned.");

12  *Armstrong v. Brown*, 768 F.3d 975, 987 (9th Cir. 2014) (Non-judicial officers may be appointed to

13  assist the court although recommendations must be subject to review by the district court) (*citing*

14  *A & M Records, Inc. v. Napster, Inc*., 284 F.3d 1091, 1096 (9th Cir.2002) (approving the

15  appointment of a technical advisor to assist the district court in monitoring compliance)); *Stone v.*

16  *City & Cnty. of S.F.*, 968 F.2d 850, 852, 863 (9th Cir. 1992) (approving the appointment of a

17  special master to investigate, report, and make recommendations to the city and the court).

18      Courts in the Ninth Circuit have approved the use of special masters. *See Hook v. State of*

19  *Arizona*, 120 F.3d 921, 926 (9th Cir. 1997) (affirming appointment of special master where the

20  district court "lacked the resources to constantly monitor compliance with the [consent] decree"

21  and where "a special master was needed due to the complexity of the underlying litigation");

22  *Madrid v. Gomez*, 889 F. Supp. 1146, 1282, 1198-99 (N.D. Cal. 1995) (finding  a special master

23  "clearly appropriate" to assist with developing a remedy for Eighth Amendment violations where

24  monitoring "will require a substantial expenditure of time and the expertise of someone

25  experienced in prison administration" and the court was not persuaded that changes that "were

26  likely motivated by this litigation, and . . . had not been cemented in any formal written policy"

27  would be permanent). Further, special masters have also been appointed specifically in the

28  connection with preliminary injunctions. *See, e.g.*, *Monroe v. Meeks*, No. 3:18-CV-00156-NJR,

2021 WL 5882129, at *3 (S.D. Ill. Dec. 13, 2021) ("The Court does not possess the resources or expertise to effectively and timely evaluate this complex material or the additional information that will be required to monitor compliance with the [two preliminary injunction orders], including implementation of new policies, procedures, and programs, and concludes the appointment of a Monitor is warranted."); *Roman v. Wolf*, No. 5:20-cv-00768-TJH-PVC, Order Appointing Special Master, ECF No. 726, at 1-2 (C.D. Cal. October 20, 2020) (appointing special master to "[m]onitor and enforce the Government's compliance with the Court's Modified Preliminary Injunction" after the Government failed to provide the Court with "timely and accurate information"); *Gayle v. Meade*, No. 20-21553-Civ-COOKE/GOODMAN, 2020 WL 4047334, at *2–3 (S.D. Fla. July 17, 2020) (appointing special master to determine compliance with a preliminary injunction, ordering the special master to conduct inspections of three detention facilities, and requiring a written report on conditions).

### 3.   Absent Court-Supervised Monitoring, Defendants Will Fail To Implement The Preliminary Injunction.

The Hearing demonstrated Defendants complete inability to meet even their own objectives and goals to repair Dublin.  Court-supervised monitoring is necessary to oversee Defendants' implementation of preliminary injunction.

For example, as demonstrated above, Defendants have failed to implement the Moss Group and DOJ Task Force's recommendations, raising serious concerns with Defendants' ability to effectuate change at Dublin without supervision.  *See supra,* Section III.C..; *Monroe*, 2021 WL 5882129, at *3 ("Defendants' past track record on implementation of policy revisions raises concern over when and how effectively these changes will be fully put into practice to produce tangible results and improve conditions for the Plaintiff class.").

As another example, despite having a November 2023 "target date of trying to complete the survey" "to provide feedback from the inmate population and what their needs are," Defendants did not meet that deadline, and in fact have not taken a single step towards execution of the survey, and don't even have a draft or anyone "tasked with trying to come up with what a survey would look like."  Tr., 248:17-249:6; 266:19-267:4 (Deveney).  *See Monroe*, 2021 WL

5882129 at *2 ("Defendants had not made or implemented the changes necessary to comply with the December 2019 injunction, despite having an additional eight months to do so.  This record underscores the need for a Monitor to provide more intensive and regular oversight of Defendants' actions to comply with the Court's Orders."); *Roman*, No. 5:20-cv-00768-TJH-PVC, Order Appointing Special Master, ECF No. 726, at 2 ("The conduct of the Government, in this case, and its inability to provide the Court with the timely and accurate information that the Court requires in this case presents a clear example of an exceptional circumstance, contemplated by Rule 53, that justifies the appointment of a Special Master.").  Simply put, if left to their own devices Defendants will not timely or adequately implement any preliminary relief granted by this Court.

### 4.    Administrative Efficiency Favors Appointing A Neutral Third Party

Monitoring Defendants' implementation and compliance with the Court's ordered preliminary relief will be a time consuming and fact intensive process well suited for a special master.  *See, e.g.*, *Balla v. Idaho State Bd. of Correction*, No. 1:81-CV-1165-BLW, 2011 WL 108727, at *2 (D. Idaho Jan. 6, 2011) ("the most cost-effective and efficient route to resolving the unique challenges posed by this difficult case is through the appointment of a special master."); *Monroe*, 2021 WL 5882129 at *3 ("[T]he Court does not possess the resources or expertise to effectively and timely evaluate this complex material or the additional information that will be required to monitor compliance with the ordered injunctive relief.").

For example, improving mechanisms for reporting staff misconduct and revising Defendants' misconduct investigation procedures will both require in depth evaluation of the existing systems/procedures, "development of remedial plans" to effectuate revisions, and monitoring post-implementation compliance, which warrants appointing a neutral third party with reporting obligations to the Court.. 18 U.S.C. § 3626(f)(6)(C); *see Monroe*, 2021 WL 5882129 at, *e.g.* *6 ("The Monitor shall assist and facilitate the parties' efforts to develop remedial plans, which may include further revisions/modifications to IDOC's Administrative Directives, policies and procedures regarding medical and mental health treatment for transgender prisoners."); *3 ("The Monitor will review IDOC's records … to assess whether Defendants are conducting blood tests at the intervals ordered in the Preliminary Injunction."); *5 ("The Monitor shall assess

whether Defendants have complied with the ordered relief and report any noncompliance to the parties and to the Court.").

Moreover, while Plaintiffs are hopeful that the instances of retaliation and constitutional violations leading up to, during, and after the Hearing (*see supra* Section III.B.) will cease, a neutral third party with reporting obligations the Court can evaluate such allegations going forward to help alleviate the Court's engrossment with these issues. *See, e.g.*, *Armstrong v. Newsom*, No. 94-cv-02307 CW, 2021 WL 930454, at *3 (N.D. Cal. Mar. 11, 2021) (delegating Fed. R. Evid. 706 court appointed expert to "monitor Defendants' implementation" of remedial plan, including on "develop[ing] mechanisms to end and prevent any retaliation against disabled inmates"); *United States v. Bardell*, No. 6:11-cr-401-RBD-EJK, 2022 WL 16921698, at *26 (M.D. Fla. June 6, 2022), report and recommendation adopted, 634 F. Supp. 3d 1083 (M.D. Fla. 2022) (advising the court on "impropriety of such practices" and recommending "to hold BOP and Warden Zook in civil contempt for violation of the Court's Release Order."); *Roman*, No. 5:20-cv-00768-TJH-PVC, Order Appointing Special Master, ECF No. 726 at 3-4 (deputizing special master to "[c]onduct any investigations, interviews, and site visits as the Special Master deems necessary to achieve the goals of monitoring and enforcement" and "[a]dvise and update the Court on the status of the Government's compliance, or failure to comply, with the Court's Orders.").

# IV.    CONCLUSION

For the reasons stated herein and in Plaintiffs' Motion for Preliminary Injunction and Reply in support thereof, Plaintiffs' Motion for Preliminary Injunction should be granted.

DATED:  February 2, 2024              Respectfully submitted,


By:  */s/ Kara Janssen*
_____
Kara Janssen

Attorneys for Plaintiffs