**Pages 1 - 47**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
CALIFORNIA COALITION FOR WOMEN )
PRISONERS, ET AL.,            )
                              )
          Plaintiffs,         )
                              )
  VS.                         )     NO. CV 23-04155-YGR
                              )
UNITED STATES OF AMERICA      )
FEDERAL BUREAU OF PRISONS,    )
ET AL.,                       )
                              )
          Defendants.         )
_____)
```

Oakland, California
Tuesday, January 2, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
**BY: STEPHEN SEUNGKUN CHA-KIM, ESQUIRE**

ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
**BY: ERNEST JAMES GALVAN, ESQUIRE**

RIGHTS BEHIND BARS
416 Florida Avenue NW
Washington, DC 20001
**BY: OREN NIMNI, ESQUIRE**

Reported By:        Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                    Official Reporter

1  searches started happening with respect to attorney visits

2  specifically.

3       MS. MATTIOLI:  I understand that that's the

4  allegation.  We would have to -- we simply didn't have enough

5  time last night.  We could pull and match the dates of the

6  visitation to only pull Tuesday and Thursday dates, and if

7  Your Honor wants to pull up a calendar from 2022, we could --

8  we could select a few Tuesdays and a few Thursdays and see if

9  the searches were conducted those days.

10       THE COURT:  So I'm looking at -- it appears, just at

11  glancing, that the number of strip searches or searches

12  increased significantly in December.  Almost doubled.

13       MS. MATTIOLI:  The explanation for that, Your Honor,

14  is it's a holiday month, and the number -- the actual volume of

15  visitation increased.

16       THE COURT:  That wasn't the case the prior year.

17       MS. MATTIOLI:  The searches --

18       THE COURT:  The searches the prior year were a tiny

19  fraction as compared to December of this year.

20       MS. MATTIOLI:  I have the correctional captain

21  prepared to testify about the practice if you are concerned

22  about the document -- the evidence there doesn't provide

23  sufficient distinction.  We also have an email that she sent --

24  this is from Captain Quezada, December 18th, 2023.  She became

25  aware that a unit manager who was supervising legal visitation

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Tuesday, January 2, 2024

8

9    *Pamela Batalo Hebel*

10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Volume 1**

**Pages 1 - 282**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

CALIFORNIA COALITION FOR WOMEN )
PRISONERS, ET AL.,            )
                             )
          Plaintiffs,         )
                             )
  VS.                         )      **NO. CV 23-04155-YGR**
                             )
UNITED STATES OF AMERICA      )
FEDERAL BUREAU OF PRISONS,    )
ET AL.,                       )
                             )
          Defendants.         )
_____)

Oakland, California
Wednesday, January 3, 2024
**EVIDENTIARY HEARING**

**APPEARANCES**:

For Plaintiffs:

        ARNOLD & PORTER KAYE SCHOLER LLP
        250 West 55th Street
        New York, NY 10019
   BY: **STEPHEN SEUNGKUN CHA-KIM, ESQUIRE**

        ARNOLD & PORTER KAYE SCHOLER LLP
        5 Palo Alto Square, Suite 500
        3000 El Camino Real
        Palo Alto, CA 94306
   BY: **CARSON ANDERSON, ESQUIRE**

        ROSEN BIEN GALVAN & GRUNFELD LLP
        101 Mission Street, Sixth Floor
        San Francisco, CA 94105
   BY: **ERNEST JAMES GALVAN, ESQUIRE**
        **KARA JANSSEN, ESQUIRE**

Reported By:    Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
              Official Reporter

```
1                      (Witness examines document.)
2              THE COURT:  You can sit down and look at it.  That's
3    fine.
4              THE WITNESS:  So there's different categories -- or
5    different columns in here.  One is the date, the inmate, the
6    inmate's name, the inmate's registration number, the
7    contraband, if there was any, the disposition, and then the
8    staff.
9              THE COURT:  Right.  So could you show me an example of
10   one time where it was found.
11             THE WITNESS:  Well, I'll look through.
12                      (Witness examines document.)
13             THE WITNESS:  There's one right here.
14             THE COURT:  Can you give me the date, please.
15             THE WITNESS:  Excuse me.  November 5th of 2023.
16             THE COURT:  All right.  Do you see any other time?
17             THE WITNESS:  No, ma'am.
18             THE COURT:  So only one time in the year and a half
19   that this book was -- where you would log that contraband was
20   actually found?
21             THE WITNESS:  Correct.
22             THE COURT:  Proceed.
23   BY MS. MATTIOLI:
24   Q.  And is that book a log of all visual searches conducted at
25   Dublin?
```

1   **A.**    No.   That's just the visiting room.

2   **Q.**    Where are the other logs of visual searches kept?

3   **A.**    The Special Housing Unit has an electronic program.   So

4   any inmate entering the Special Housing Unit, it's logged in

5   what's called our -- our True Scope Program.   And that's --

6   it's obviously in the computer.

7        There's also a visual search logbook for any outside

8   escort trip.   So anytime an inmate is taken outside of the

9   facility, for med trips, furloughs, et cetera, there's a visual

10  search logbook for that as well.

11  **Q.**    And I'm sorry, did you say that is electronic or that

12  is --

13  **A.**    No.   That's an actual book as well.

14  **Q.**    Okay.   And where is that kept in the institution?

15  **A.**    That is kept in the lobby.

16  **Q.**    Okay.

17            **THE COURT:**   That's kept where?

18            **THE WITNESS:**   In the lobby area.   The staff pass

19  through there on their way out of the institution.

20            **THE COURT:**   Okay.   So I have one book.   There's

21  another book that's in the lobby.

22            **THE WITNESS:**   Correct.

23            **THE COURT:**   And you said there's an electronic --

24            **THE WITNESS:**   Correct.   Visual searches in and out of

25  the Special Housing Unit.

1    and myself.  We each reported things that had happened to our

2    vehicles.

3            THE COURT:  So -- I just want my record to be clear.

4    You live out there in a sense.  I don't.

5            THE WITNESS:  Okay.

6            THE COURT:  So give me names.  When you say that, who

7    do you mean specifically?

8            THE WITNESS:  Oh, okay.  Warden Jusino, Associate

9    Warden Patrick Deveney.  At the time, Associate Warden Tammy

10   Robles.  And at the time as well, Associate Warden Beth

11   Buckner, Captain Jesse Valero, and myself, we all arrived

12   roughly -- with the exception of Warden Jusino, the rest of us

13   arrived sometime between June and July of 2022.

14           THE COURT:  Okay.  Many of those people aren't on my

15   list of --

16           THE WITNESS:  They are no longer there.  Yeah.

17           THE COURT:  Okay.  So Deveney.

18           THE WITNESS:  Correct.

19           THE COURT:  Agostini?

20           THE WITNESS:  Correct, yes.  That's...

21           THE COURT:  You said Buckner?

22           THE WITNESS:  Associate Warden Buckner.  Yes.  She is

23   retired.

24           THE COURT:  Valero?

25           THE WITNESS:  He has since retired.

1          **THE COURT:**  When you say it's not punitive, but the

2    inmates don't agree with that, given -- and objectively --

3          **THE WITNESS:**  Yeah.

4          **THE COURT:**  -- it's hard to say it's not punitive when

5    you're restricted to an hour, maybe an hour and 15 outside,

6    which is vastly different from general population.

7          **THE WITNESS:**  Yes, it is.

8          **THE COURT:**  And there is no other, it appears to me,

9    no other housing situation where maybe you put someone there

10   for protection but they aren't as limited as those who are put

11   there for disciplinary reasons.  I mean, you're treating them

12   just like someone who is being disciplined, which suggests it's

13   punitive.

14         **THE WITNESS:**  I suppose so.  Disciplinary segregation

15   does have more restrictions to it as far as what is -- what

16   they're allowed to receive like from their own property.  Now

17   we have kind of a standardized commissary list.  So I can

18   understand that -- that point of view for sure.

19         **THE COURT:**  And you also understand that numerous

20   inmates were put in SHU after reporting assaults that happened

21   which led to the criminal indictments?  Do you understand that?

22         **THE WITNESS:**  I -- I understand that was what was

23   reported, yes.

24         **THE COURT:**  Do you understand that's what was found to

25   have been done?

1    **THE WITNESS:**  Okay.  Yeah.  Yes.  Yes.  That was all
2    before I got there.

3             **THE COURT:**  I understand that.

4             **THE WITNESS:**  Okay.

5             **THE COURT:**  Did you and -- and the executive staff
6    consider that history when you were reformulating policies?

7             **THE WITNESS:**  We haven't reformulated policies.  I'm
8    not sure I understand that.

9    BY MS. MATTIOLI:

10   **Q.**   If I could.  Do you have authority at Dublin to change

11   BOP's national SHU policy?

12   **A.**   No.

13            **THE COURT:**  Is there anything other than -- I mean, it

14   seems to me that there should be something that is not SHU that

15   protects the inmates but is not general population.  Is there

16   anything in between?

17            **THE WITNESS:**  There's not.  However, since I have

18   arrived there, there are a lot of things that inmates will not

19   go to SHU for.  We've -- we've changed that.

20   BY MS. MATTIOLI:

21   **Q.**   That they could --

22   **A.**   That they could.  That they probably would have prior to

23   going to the Special Housing Unit.

24            **THE COURT:**  Like what?

25            **THE WITNESS:**  So I'm not sure if you're familiar with

1              **THE COURT:**  No?

2              **THE WITNESS:**  Not necessarily.

3              **THE COURT:**  So is 400 the worst or 100 the worst?

4              **THE WITNESS:**  Oh, I'm sorry.  100 is the worst.  Yes.

5              **THE COURT:**  So for 100 they go in, a violation.

6              **THE WITNESS:**  Depending on what it is.  Depending on

7    what it is.  If -- so this is one of the things that I'm sure

8    AW Deveney will touch on later.  It was kind of agreed upon

9    that we had begun having an increased problem with Suboxone use

10   that was not prescribed to inmates.

11        So we decided to -- if an inmate appeared to be actively

12   under the influence and was acting erratic, they would have to

13   have a medical evaluation and be placed in the Special Housing

14   Unit under observation before actually being placed in the

15   Special Housing Unit, like in a cell and housed.  Sorry.

16        However, if an inmate receives a urinalysis test and it

17   comes back positive, they do not -- and that's -- that's a 112,

18   okay, a 112 -- they do not go to the Special Housing Unit

19   unless the DHO assigns them disciplinary segregation time.

20             **THE COURT:**  DHO means?

21             **THE WITNESS:**  Discipline hearing officer.  Sorry.

22             **THE COURT:**  Okay.

23        Proceed.

24   BY MS. MATTIOLI:

25   **Q.**    Would it be fair to say that you and the executive staff

1  try to come up with alternatives to placement in SHU?

2  **A.**   Yes.   So because of the increased narcotic use that we

3  have discovered that had been happening, psychology kind of

4  pitched a diversionary program, so to speak.   And in

5  conjunction with the disciplinary hearing officer and myself,

6  kind of came up with a solution to instead of automatically

7  putting these -- these women in SHU, allow them -- we kind of

8  have an empty cell or an empty housing unit in GP right now --

9  allow them a restricted kind of program, so to speak, where

10  they would have to be programming and going to, like, drug

11  treatment.   Throughout the day they would have minimum, like,

12  television access and kind of -- kind of restricted movement,

13  and then have more freedom in the evening.   They have more --

14  more oversight because our drug treatment specialists have

15  offices in there.

16       So we started that program, and it seems to be working.

17  We've only had kind of one group of females, and it was a

18  six-week-long program.   But it was well received and it was

19  definitely kind of an a -- an alternative to -- to going to the

20  Special Housing Unit.

21  **Q.**   And using only initials, if you can give me an example of

22  a situation where you could place an inmate in SHU for a

23  non-drug-related issue and you have chosen not to.   For

24  example, the things you listed were tattooing or anything

25  non-drug-related.

1   **Q.**   Can anyone in the institution be placed in SHU without you

2   knowing?

3   **A.**   No.

4   **Q.**   And how are you -- how and when are you notified that an

5   inmate is being placed in SHU?

6   **A.**   My lieutenants are required to call me, even if it's the

7   middle of the night.  I get phone calls all hours of the day at

8   times when things happen.

9         But, yes, they are required to call me and give me an

10   example or -- I'm sorry -- give me the exact reason why the

11   inmate is being placed in the Special Housing Unit.

12         So and there have been times when my lieutenants now know

13   my expectations.  They will, if they have any questions,

14   obviously call me and give me an example of what happened or

15   describe -- I'm sorry, not example -- describe what happened

16   with the inmate.  And ultimately it would be my decision

17   whether they're placed in the Special Housing Unit or not.

18         So I've had lieutenants call me and explain that, you

19   know, a staff member was listening to a phone call.  The inmate

20   was making a three-way call.  Nothing egregious, you know, was

21   said.  And I make the choice to not put them in the Special

22   Housing Unit.

23   **Q.**   Are three-way calls allowed?

24   **A.**   No, they're not.

25   **Q.**   And could an inmate be placed in Special Housing for that

```
 1          Your Honor, can I push this to the screen before it's

 2    admitted so she can look at it?

 3               THE COURT:  Yes.  And I should -- I need a copy.

 4    BY MS. MATTIOLI:

 5    Q.   Captain, have you seen this document before?

 6    A.   Oh, very familiar with this.  Yes.

 7    Q.   And can you just tell me generally what it is?

 8               THE COURT:  Ms. Mattioli, do you have two copies for

 9    me or just one?

10               MS. CZIOK:  Two.

11               THE COURT:  The courtroom deputy will hold on to one,

12    and I've got my copy here.

13               MS. MATTIOLI:  We have them electronically also and

14    plan to file them afterwards, just so -- if it gets admitted.

15    Q.   So you said you have seen this document before?

16    A.   Yes.

17    Q.   What is it?

18    A.   So this is a Special Housing Unit weekly review and it's

19    just a review -- I'm sorry.

20    Q.   Special Housing Unit weekly review.

21    A.   Uh-huh.

22    Q.   I'd like to move for the admission of this document, 407,

23    Exhibit 407, and have you explain what it is.

24    A.   Okay.

25               THE COURT:  So this is a standard business record, do
```

```
1    I take it?

2              THE WITNESS:  Yes.   It's a standard record.

3              THE COURT:  Okay.  I'll admit it.  407.

4                   (Defense Exhibit 407 received in evidence.)

5    BY MS. MATTIOLI:

6    Q.   And it -- is it fair to say that the document you've seen

7    before doesn't have black lines or boxes on it?

8    A.   Correct.

9    Q.   Okay.  So can you explain to us what this SHU report is?

10   A.   Absolutely.

11        It's -- it's a summary of many things.

12        Up at the top, it would have the housing -- where it says

13   "Quarter Assignment" under there, that would be the housing

14   assignment that the inmate is assigned to in the Special

15   Housing Unit.

16        The next box just under "Inmate Name" obviously would be

17   their full name, the registration number, the unit that they

18   are basically assigned to as far as their case manager.  Case

19   manager, unit manager, etc.

20        The IA date would be the initial placement date in the

21   Special Housing Unit.

22        Oh, I can't even read that.

23   Q.   It's a little blurry.  We don't need every single

24   detail --

25   A.   No?  Okay.
```

```
 1   A.   I feel like a message has been sent, not just by

 2   everything that happened before we got there, but everything

 3   that we've enforced since being there.

 4   Q.   And I'd like to talk about that.

 5        Do you feel -- well, let me ask you this.   What was the

 6   camera system like when you arrived?

 7   A.   I want to say Dublin had approximately 170ish, -80ish

 8   cameras.   We currently have 386 cameras.   There are cameras

 9   everywhere.

10   Q.   Have the cameras helped?

11   A.   I believe so.   Absolutely.   I think they've helped both

12   the staff and inmates feel a lot safer.

13   Q.   And how do the cameras help the staff feel safer?

14   A.   I think the staff are aware of their placement, and I

15   think there's -- there's this -- been this inherent fear that

16   every staff member at Dublin is involved and accused and kind

17   of put into that same category as the ones who were there doing

18   all of this.

19        And so I -- I -- I believe it has helped them feel a

20   little more protected that they're on camera and people can see

21   that they're doing their job right, the right way.

22   Q.   Captain, have you ever sexually harassed an inmate?

23   A.   No.

24   Q.   Have you ever sexually abused an inmate?

25   A.   No.
```

1    hour, yeah, or hour and a half or whatever it was.  I don't

2    remember the exact time, but, yeah.

3    **Q.**    So if we flip to page 2 of Exhibit 212, if we look at the

4    very top time slot, it's from 6:00 a.m. to 6:30, sexual abusive

5    behavior and intervention, and the topics include Prison Rape

6    Elimination Act?

7    **A.**    Uh-huh.

8    **Q.**    So during this annual training, the only time that was

9    allotted in this -- in this agenda was a 30-minute slot at

10   6:00 a.m. in the morning for PREA?

11   **A.**    That was part of it.

12   **Q.**    That was part of that 30-minute slot?

13   **A.**    That's part of the PREA training.

14        **MR. ANDERSON:**  You can set that exhibit aside.

15   **Q.**   You said that sometimes inmates know -- know the policies

16   better than staff.  What did you mean by that?

17   **A.**   There are a lot of inmates there that actually take the

18   time to research the policy.  And there are a lot of newer

19   staff that -- that don't know all of the policies and

20   everything it encompasses.

21        So, yes, there are times when inmates are more versed in

22   policy than a lot of the newer staff that we have.

23   **Q.**   I'd like to talk about visual searches.  You said that a

24   visual search, you know, it's mandatory for it to be performed

25   anytime there's a suspicion of contraband potentially after a

```
1    Repeat the question -- that question one more time.

2    Q.   Sure.  So I -- just help me out here, and if I'm being

3    confusing or if I'm misunderstanding your testimony --

4    A.   Uh-huh.

5    Q.   -- please let me know.

6         I think you said that policy is black and white, you don't

7    change policy, but you work on enforcing the policy; is that

8    right?

9    A.   Correct.

10   Q.   Have you made changes to how policies are enforced since

11   you arrived at FCI Dublin?

12   A.   I -- I believe by educating staff and following up and

13   making sure there's a system of accountability to make sure

14   that people are doing what they're supposed to be doing, if

15   that's what you're getting at, yes.

16   Q.   And while -- while you are determining how to revise

17   enforcement of these policies, did you consider the prior

18   culture at FCI Dublin before you arrived?

19   A.   Of course.  I think what went on prior to us arriving had

20   an impact on how -- how we manage a lot -- everything.

21        MR. ANDERSON:  Could we pull up Exhibit 405, which was

22   already admitted.

23   Q.   Do you recall discussing this document?

24   A.   Yes.

25   Q.   And before we move on, outside of the policies that you
```

| | |
|---|---|
| 1 | are not in control of, does FCI Dublin have its own operating |
| 2 | procedures that are specific to Dublin? |
| 3 | A.   Each institution would have an institution supplement that |
| 4 | manages kind of within the scope of policy. |
| 5 | Q.   So going back to Exhibit 405, I think you testified this |
| 6 | is a SHU visitation log. |
| 7 | A.   Correct. |
| 8 | Q.   Is that right? |
| 9 | A.   Yeah. |
| 10 | Q.   So my question is, is this the whole thing or, you know, |
| 11 | do you have a log of what was discussed or what was observed |
| 12 | during each one of these visits? |
| 13 | A.   No.  This is a log of who visited. |
| 14 | Q.   And do you have a log that describes what happened at each |
| 15 | of these visits? |
| 16 | A.   No. |
| 17 | Q.   Let's turn to -- before I move on, if an inmate -- if an |
| 18 | incarcerated person raised an issue with someone during one of |
| 19 | these visits, where would that be reflected? |
| 20 | A.   Depending on what it is, the staff member would write a |
| 21 | memo or email to someone who would need to know.  It just |
| 22 | depends on what the issue or concern would be. |
| 23 | Q.   And where would we find those notes, those logs? |
| 24 | A.   I -- I -- I'm not sure what you're getting at there. |
| 25 | Q.   I just want to know how I would find out what happened |

1    I moved on to taking over the operations side of the house

2    which is the health services side, food service, facilities,

3    safety, human resources, and also the labor relations manager,

4    chairperson for the institution dealing with union, union

5    issues for the institution.

6    I have direct oversight of essentially half of the

7    institution where I oversee the departments and I report

8    directly to the warden.

9    Q.  And have you taken on the role of acting warden for a

10   period of time?

11   A.  Yes.  Since Warden Jusino's retirement in August, I have

12   been acting as acting warden taking on that role, as well as

13   the Prison Rape Elimination Act, the PREA compliance manager;

14   LMR chair, labor management relations; and a number of other

15   disciplines to oversee the institution.

16   Q.  Okay.  So I'm going to back up just a little bit.  I'm

17   going to orient you in time to July of 2022.  That's when -- is

18   that when you started at Dublin?

19   A.  Correct.

20   Q.  As an associate warden?

21   A.  Correct.

22   Q.  Can you please tell the Court your impression of the

23   institution's functioning when you arrived?

24   A.  To start, I would have to say as taking my time as a -- as

25   an agency liaison and traveling the country, seeing

1    approximately 45 to 50 federal institutions, I understood that

2    every institution is not ran the same.  I've done six tours in

3    the agency, this Dublin being my sixth.  It was by far one of

4    the -- one of the worst institutions that I've come across.

5        Just from the policy compliance standards, the morale, the

6    lack of trust, it was -- it was a tall task to try to come in

7    and restore the culture, restore the confidence.  It was, for

8    lack of a better term, the institution was in shambles.

9        **THE COURT:**  What do you mean when you say lack of

10   trust?  Who are you talking about?

11       **THE WITNESS:**  The staff and the inmate population.

12       **THE COURT:**  And how about the morale?

13       **THE WITNESS:**  The morale was the lowest I've seen in

14   the agency.

15       **THE COURT:**  Staff and inmates?

16       **THE WITNESS:**  Correct, Judge.

17       **THE COURT:**  Or just staff?

18       **THE WITNESS:**  Both.

19       In July of 2022, my first week on the job was we had a --

20   a cultural assessment conducted by The Moss Group which was a

21   third-party contractor based on our task force findings from

22   central office.

23       So originally -- I don't know the exact date, but there

24   was a task force initiated from central office that entailed

25   the assistant directors, the director, a number of their staff

```
1    that came into the institution, and they -- they made multiple
2    findings of what needed to be addressed and what needed to be
3    fixed.
4         A number of those things that were identified were
5    coverage on off-shift hours by management, additional training
6    for staff, additional oversight of the inmate population.
7    BY MS. MATTIOLI:
8    Q.   Can I just stop you briefly.  When you say coverage on all
9    shift hours by department heads, what do you mean by that?
10   A.   So typically with management, you have -- you typically
11   work Monday through Friday.  It's a 6:00 to 2:00 institution.
12   At Dublin, there was a lack of oversight when we originally
13   arrived.  So we immediately implemented a coverage on off-shift
14   hours.
15            THE COURT:  When you say 6:00 to 2:00, 6:00 to
16   2:00 a.m. -- I mean 6:00 a.m. to 2:00 p.m. or 2:00 a.m.?
17            THE WITNESS:  6:00 a.m. to 2:00 p.m.
18        So we implemented off-shift coverage by the department
19   heads.  We implemented a late night coverage, if you will, for
20   every -- every manager in the institution to include the
21   executive staff.  I would work weekends and I would work late
22   nights, as well as my counterparts.
23        From the task force findings, they implemented an
24   additional few jobs for the institution or few job positions to
25   help remedy the -- the concerns that we had.  That would be to
```

1   include, as I originally stated, there were two associate

2   wardens at a typical FCI.  They implemented a third associate

3   warden to oversee the institution or help assist in overseeing

4   the institution.

5       We also reimplemented the camp administrator executive

6   assistant position that was abolished years prior.

7       We implemented a GS-13 captain.  And then the captain role

8   turned into a deputy captain role, a GS-12 deputy captain role.

9       To include in that, central office also implemented a

10  family planning coordinator position as a neutral party to

11  assist the institution in any issues they may have with outside

12  stakeholders.

13  **BY MS. MATTIOLI:**

14  **Q.**   Can you explain what the executive assistant position is?

15  **A.**   The executive assistant position is essentially the

16  right-hand person to the warden.  They would assist the warden.

17  They report directly to the warden.  And they assist the warden

18  in any -- any duties or administrative tasks that need to be

19  completed at the institution.

20      In most cases, for the federal government and the Bureau

21  of Prisons, you'll have an executive assistant who also plays a

22  dual role as a camp administrator if there is a satellite camp

23  on site.

24  **Q.**   When you say camp administrator, what do you mean by that?

25  **A.**   A camp administrator is essentially increased oversight.

1  PREA audit, internal audit.

2      As an agent's liaison in a previous role, you help educate

3  institutions and executive staff on what we could be doing

4  better.  In Dublin's case, a majority of the cases that I began

5  tracking weren't reported locally.  So that means I have to

6  communicate with the internal -- Office of Internal Affairs,

7  Office of Inspector General, regional office, central office,

8  any -- any outside entities, our rape crisis center with

9  Tri-Valley to see if they got any reportable incidents of

10  sexual abuse, of sexual harassment.

11      And in my findings, even though they may not have reported

12  to be a victim to me as the PREA compliance manager, if they

13  filed a tort claim or they filed any other type of complaint

14  that dealt with sexual abuse or sexual harassment, I wanted to

15  ensure that I was tracking them so there wasn't any retaliation

16  on their behalf.

17      If you're going to claim to be a victim and if you are a

18  victim, I -- I surely want to ensure that you're safe,

19  especially in our facility.

20  **BY MS. MATTIOLI:**

21  **Q.**   And when you say PREA cases, are those only staff cases,

22  staff on inmate?

23  **A.**   Both.  That would be staff-on-inmate and inmate-on-inmate

24  cases.

25  **Q.**   Okay.   Can you please tell the Court about the current

1   practice Dublin has regarding placing staff on administrative
2   leave?
3   A.   Judge, this one -- this one has been a sensitive subject
4   for Dublin specifically.   To start, as -- as a PREA compliance
5   manager and the acting warden, I am familiar with the process.
6   We're currently tracking -- we currently have around 19 staff
7   on administrative leave out of approximately 207 filled
8   positions.
9        Now, with -- with the institution and with tracking of the
10  cases, administrative leave, we go above and beyond when we're
11  talking about PREA allegations.   If I receive a report of -- of
12  sexual abuse at the institution, PREA protocols establish that
13  it has to be some type of physical touching of the genitalia or
14  breasts when you're dealing with female offenders.   In our
15  case, any type of touching would result in a -- in a staff
16  member being placed on administrative leave.
17  Q.   And just to unpack that, is that a -- is that dictated by
18  a local supplement, or is that something that you have just
19  decided to do?
20  A.   That's something that we've decided to do locally, Judge.
21  And again it also -- it is in line with what the -- what
22  Director Peters has testified to Congress with -- I don't know
23  the date on the top of my mind.   I believe it may be in
24  February or March of 2023, saying that there are no staff
25  working behind a fence that have any type of PREA allegation

1   **A.**   Physical -- a PREA allegation involving physical touching

2   will result in a staff member being placed on administrative

3   leave.

4   **Q.**   Okay.  Is that a reported allegation or a substantiated

5   allegation?

6   **A.**   Reported.

7   **Q.**   Okay.  So just to be clear, any report of a -- in your

8   view, any report of a unlawful touching under PREA, allegation

9   of it will result in the person being put on administrative

10  leave?  That's how it should work?

11  **A.**   That's how it has been working.

12  **Q.**   That's how it should work moving forward?

13  **A.**   That is how it has been working.

14  **Q.**   Okay.  Now, you talked just a minute ago about, you know,

15  there's always, quote, a risk of sexual victimization, unquote.

16  Do you recall that, sir?

17  **A.**   I do.

18  **Q.**   You'd agree as a PREA compliance manager that since 2003,

19  the policy under zero -- under PREA has been zero tolerance for

20  sexual abuse or harassment; right?

21  **A.**   That is accurate.

22  **Q.**   Okay.  So even a risk of any -- above zero is inconsistent

23  with what PREA requires; right?

24  **A.**   Two different things, sir.  You're talking about zero

25  tolerance for -- for PREA, but still the risk that a PREA

1          **MR. CHA-KIM:**  And, Your Honor, at this moment I would

2     renew my request to have a look at the Moss-related documents

3     prior to continuing.

4          **THE COURT:**  Well, I don't know that I'm going to --

5     well, the answer to that is no.  Let's see how far you get.

6     We've got an hour left.

7          **MR. CHA-KIM:**  Understood.

8          **THE COURT:**  You didn't know that it was going to come

9     up, so I suspect you've got some questions.

10         **MR. CHA-KIM:**  Yes, ma'am.  Thank you.

11    **Q.**   The Moss report that you discussed with Ms. Mattioli, I

12    take it, it was commissioned to improve agency operations?

13    **A.**   It was to identify -- it was a cultural assessment

14    specific to Dublin.

15    **Q.**   Okay.  And who was it commissioned by?  DOJ, BOP, Dublin?

16    **A.**   The director's office commissioned the contract for

17    that -- that assessment.

18    **Q.**   And where is the director located?

19    **A.**   In Washington, D.C.

20    **Q.**   Okay.  So it was commissioned by folks in Washington, D.C.

21    for it to occur at Dublin?

22    **A.**   That is accurate.

23    **Q.**   Aside from that purpose we talked about, any other reason

24    that you're aware of that the Moss report was commissioned?

25    **A.**   For a previous sexual abuse at the institution, and

1  this Moss report specific to the issue of preventing the risk

2  of sexual abuse?

3          **MS. MATTIOLI:**  Your Honor, I'm going to object.  The

4  question has been asked and answered.

5          **THE COURT:**  Overruled.

6          **THE WITNESS:**  Can you repeat the question?

7  **BY MR. CHA-KIM:**

8  **Q.**  Yes.  And I'll just read it back to you, if that's okay.

9      Keeping us on track to the issue of additional oversight

10  specifically, you mentioned additional staffing of supervisors.

11  Any other specific recommendation that you can recall from the

12  Moss report specific to the issue of preventing -- it should be

13  serious risk of sexual abuse?

14  **A.**  Serious risk of sexual abuse when you have oversight on

15  off-shift hours, it minimizes that risk.

16  **Q.**  Okay.  So just to get a clean record, there was nothing

17  else aside from the additional staffing?

18  **A.**  In regard to -- to sexual abuse?  Not that I'm aware of

19  off the top of my head.

20  **Q.**  Okay.  Now, you -- the other thing you mentioned about

21  this Moss report is that it specified additional training.  Is

22  that right?

23  **A.**  Yes.

24  **Q.**  And that's specific to the issue of, like, annual PREA

25  trainings, things of that nature?

**A.**   From the return visit?  Have they memorialized it?

**Q.**   Yes.

**A.**   Not that I'm aware of.

**Q.**   Okay.  What, if any, documentation is generated by your facility in response to the aftermath of the Moss report?

**A.**   As far as training?  Can you be more specific?

**Q.**   Sure.  Let's start with most general.  The Moss report made several recommendations, adding supervisors and having more training, it sounds like, maybe some other things.

Is there any documentation that you or your colleagues generated at FCI Dublin to, let's say, track progress specifically on meeting the goals as set forth by the Moss report?

**A.**   The Moss Group working plan is something that we've -- we track.

**Q.**   Okay.  That's not quite my question.  Any documents that you -- your facility generated, like status report under a Moss plan, something of that nature, do you generate things like that?

**A.**   Yes.

**Q.**   Okay.  What do you generate to track compliance with the Moss report?

**A.**   The working plan.

**Q.**   What is the working plan?

**A.**   It's The Moss Group working plan to give us -- it's a

1   phase of how -- where we've completed the recommendations and

2   where we're at as far as the progress in those recommendations.

3   **Q.**   Now, that document is just as readily available as the

4   Moss report itself, in your view, from your records?

5   **A.**   Readily available to whom?

6   **Q.**   Like you can pull it from your records just like you

7   pulled the Moss report?

8   **A.**   I could.

9   **Q.**   Okay.  So would you -- would it be fair to say that you

10  would agree the Moss working plan that you're talking about

11  would be a contemporary reflection of the Dublin facility

12  keeping track of how it's doing to meet the goals in that

13  report?

14  **A.**   That's accurate.

15  **Q.**   Okay.  So would it be helpful, do you think -- would it be

16  a document then that that would show exactly the steps that you

17  would take or have taken?

18  **A.**   It would show progress.

19  **Q.**   Okay.  Is that a document you can share with the Judge?

20  **A.**   Yes.

21  **Q.**   Okay.  Can you pull it in the next few days?  Is that

22  possible?

23          **MS. MATTIOLI:**  I'm going to object to the witness

24  agreeing to do things without involving the lawyer.

25          **THE COURT:**  Let me get the report.

1          MS. MATTIOLI:  Okay.  I can do that.

2          THE COURT:  Thank you.  Or the follow-up tracking of

3  the working plan.

4  BY MR. CHA-KIM:

5  Q.   Have there been any follow-up visits by the DOJ task force

6  since they came by in 2022?

7  A.   Nothing specific.

8  Q.   Did the task force, after its visit in 2022, did it issue

9  any kind of written documentation of its findings or

10  recommendations specific to Dublin?

11  A.   Yes.

12  Q.   Is that a document that you can provide the Judge?

13          THE COURT:  I'll take that one, too.

14          MS. MATTIOLI:  We will find out.  That is a sensitive

15  document.  If we can provide it for in camera, we will.

16  BY MR. CHA-KIM:

17  Q.   Now, that document presumably set forth certain steps that

18  Dublin could take in response to its visit?

19  A.   Yes.

20  Q.   Is that fair to say?

21       Is there any document akin to the working plan we just

22  talked about that tracks progress made or not made by your

23  facility in response to the tasks force's visit?

24  A.   Not in response to the task force visit.

25  Q.   Okay.  Mr. Deveney, I think you would agree that turning

1  actions and other things, that's does take away from my time

2  with the inmate population.

3  **Q.**   What steps have you taken towards the survey you were

4  talking about earlier to get feedback on how the executive

5  assistant role has played out?

6  **A.**   Can you rephrase that question?

7  **Q.**   Sure.  We were talking about evaluating how the executive

8  assistant role, which has a lot of contact with inmates, we

9  were talking about how you said you were working on a survey to

10  get incarcerated person feedback on how that's going.

11      I just want to know -- I'm sure the Judge wants to know --

12  what steps you've taken to get that survey in motion.  You said

13  you were starting to; right?

14  **A.**   Well, you're talking about a survey.  What's more

15  important is actually having in-person contact with the -- with

16  our population.

17          **THE COURT:**  No.  He is asking you about your testimony

18  that you were taking steps, some kind of steps with respect to

19  surveys.  So you either are or you're not.  If you are, what

20  have you done?

21          **THE WITNESS:**  Yeah, we set a target date of trying to

22  complete the survey.  Now, there's times where you can't meet

23  that target date and you have to push it.

24          **THE COURT:**  What's the target date?

25          **THE WITNESS:**  The -- the target date that we last had,

1    I believe, was November of '23.

2             THE COURT:   And you did not make that?

3             THE WITNESS:   Not that I can recall.

4             THE COURT:   Did you do any draft?   Is anybody tasked

5    with trying to come up with what a survey would look like?

6             THE WITNESS:   No, Your Honor.

7    BY MR. CHA-KIM:

8    Q.   Is that something you could do?

9    A.   I think with the -- with collaboration with central office

10   and the regional office, that's something that we can work on.

11   Q.   You mentioned during your testimony people with, quote,

12   ulterior motives, unquote.   Who are you referring to?

13   A.   The bad actors.   The individuals that have, for the lack

14   of a better term -- have -- aren't following the proper

15   procedures, aren't following law, could be abusing inmates.

16   There's a number of implications there.

17   Q.   Okay.   And until the investigations that you said are

18   still ongoing are resolved, you can't be fully sure, can you,

19   that certain -- those types of people are still employed at FCI

20   Dublin?

21   A.   Can you repeat the question?

22   Q.   Sure.   You acknowledge that there are investigations still

23   ongoing.   There are cases still ongoing.   People are on

24   administrative leave.   They may come back.   OIG has cases.

25   Things are still in motion.   So wouldn't you agree with me --

1    **A.**   You're talking about if we receive a PREA allegation that

2    deals with physical touching and I don't have any camera

3    footage to suggest otherwise, then it will be referred to OIA,

4    OIG.

5    **Q.**   Okay.  So it's if you do get one for touching and you

6    refer it to OIA, and you're out of it --

7         **THE COURT:**  OIG.  OIG.

8         **MR. CHA-KIM:**  OIG.  I apologize.

9    **Q.**   Do you look at the video camera once you've sent it to

10   OIA -- G?

11   **A.**   No.  We would look at the video camera first to determine

12   that it is factual.

13   **Q.**   I thought you said you would refer it when it was an

14   allegation.  So you do do some investigating before you

15   determine --

16   **A.**   Fact-finding.  There would be fact-finding to determine

17   whether it could be a substantiated case, whether it's an

18   actual -- it's a factual allegation.  I can tell you on a

19   number of occasions that we do receive false -- false reports.

20   **Q.**   Okay.  So as I understand it now, it's not just the

21   allegation.  There is some level of determination made by

22   someone at Dublin or some people at Dublin as to whether

23   it's -- I forget -- it could be -- it could be a substantiated

24   case, and in that event, you send it to OIA; is that right?

25   **A.**   If full PREA protocols are warranted, it would be referred

1    to OIG.

2         So, in other words, if I have a PREA allegation,

3    Your Honor, and it deals with physical touching, let's say an

4    individual says that they were groped, they were groped, their

5    breasts were groped in a pat search, something along those

6    lines, if I can determine that that's not factual based on

7    camera footage, I would not refer it to OIG at that point.  If

8    it's within the scope of employment.  There is a scope of

9    employment that we have to -- we have to determine here.

10   **Q.**   So that there are -- so at bottom, there are some PREA

11   allegations made by residents that's not sent to OIA --

12   sorry -- OIG?

13   **A.**   If there is a PREA allegation against staff that we can

14   determine is not a factual PREA allegation, it would not be

15   referred.

16   **Q.**   Okay.  Someone determines whether that is factually

17   satisfied to send it to OIA -- or OIG; is that right?

18   **A.**   That would be consistent.

19   **Q.**   Okay.  And so tell me about how that determination is

20   made?  Who is involved?

21   **A.**   The PREA compliance manager.

22   **Q.**   That's you?

23   **A.**   The -- the SIA, and working on the camera footage.  Now we

24   can also do -- the chief psychologist could be involved, and we

25   could do a sex abuse intervention encounter.

1      And in certain cases, if it's a third-party report,

2   there's been times where we receive an allegation that an

3   individual was groped by a -- it would be a third-party report

4   that somebody else was -- was groped by a staff member.  We

5   could -- we could interview that alleged victim.  And if they

6   absolutely declined that that incident occurred, at that point,

7   we would still refer it to OIA/OIG to make sure that there's an

8   appropriate investigation, but that doesn't mean that we would

9   need to be -- we would need to continue moving forward.

10  Q.   Okay.  A few things here.  This is important which is why

11  I'm asking these questions.

12       You would still send it to OIA/OIG.  So even -- you're

13  saying even if you found that there wasn't that factual basis,

14  now you're saying you would send it to OIA/OIG?

15  A.   If that was abundance of caution that's necessary, then we

16  would send it to OIG.

17  Q.   Is the protocol for this written down anywhere?

18  A.   It goes above and beyond the policy.

19  Q.   Which policy?

20  A.   Staff misconduct.

21  Q.   The -- the main Bureau of Prisons Federal Regs, that

22  policy?

23  A.   Yes.  And 5324.12.

24  Q.   Is there any institutional-level document, I forget what

25  they were called earlier, but institutional-level policy or

1   practice document that outlines the steps you're talking about?

2   **A.**   No, there is not.

3   **Q.**   Okay.  You think maybe it's a good idea to have one so you

4   ensure that everyone is following the same steps each time?

5   **A.**   Well, who would you be -- who would you say would need to

6   be -- would need that document?

7   **Q.**   The people you just mentioned.  So it sounded like, and

8   correct me if I'm wrong, you said a whole number of people,

9   yourself, the psychologist, and that psychologist is married to

10  one of the correctional officers, right?  Mulcahy, the SIA, and

11  others are involved in this deliberation to determine whether

12  or not to send factual allegations to OIG, which the government

13  touts as a big advance, or OIA.

14      So my question to you is given all that deliberation

15  that's going on, let me ask you the question, what paper trail

16  is generated in each of those cases that you deliberate about

17  whether someone's allegations are going to get sent to be

18  investigated?  What paper trail?

19  **A.**   You have a sex abuse intervention encounter.  You would

20  have documents from the supervisor investigative agent.  You

21  could have email trails.  But you would -- you would

22  determine -- you -- as a -- as a team, you would determine

23  whether that warrants full PREA protocols.

24  **Q.**   Is a memo written?

25  **A.**   In the case of something being sent to OIG?

1    acting warden, I may notify the regional director.

2    **Q.**    Is OIA or OIG or anyone at BOP or DOJ informed of the

3    number of allegations that you in fact deliberate about in this

4    fashion but don't send to OIA and OIG?

5    **A.**    No.   But they are also aware of other reporting

6    mechanisms, too.   So if I receive an allegation and if you're

7    alluding to some type of mistrust or -- or me making a mistake

8    as a human or us as a group making mistakes, there are still

9    other avenues that they can report these allegations.

10   **Q.**   To be clear, sir, I'm not accusing you of anything.   I'm

11   just trying to help the Court get to the factual basis for

12   understanding the extent of what you agree is a problem at the

13   facility.   That's all I'm trying to do.   So we are trying to

14   find out how the Court can assure itself that you are, you

15   know, checking yourselves and doing things right.

16        So I'm not impugning not -- I'm not, you know, impugning

17   you and I want you to understand that.   Okay.

18        So you said, well, there are other reporting mechanisms.

19   But by definition if it's in this point, the person has already

20   reported; right?

21   **A.**   I'm -- I'm not really understanding your question.

22   **Q.**   Let's move on.

23        PREA can be violated without physical touching; right?

24   **A.**   Can you repeat that question?

25   **Q.**   It can be a violation of PREA to have, you know,

1   A.   Yes.

2   Q.   Where?

3   A.   Same as before.  Whether it would be an encounter through

4   psychology, a document through the SIA if it deals with staff.

5   If it's inmate on inmate, it could be through SIS.

6   Q.   I'm talking about the deliberation of your staff that you

7   were just talking about, just like we were talking for the

8   instances of physical touching, not physical touching.  Is

9   there a memo, just like the memo you said exists for the first

10  category, is there a memo that is generated for this category

11  where it's PREA allegation but no physical touching?

12  A.   There is not a memo generated.

13  Q.   How do you keep track of the number of complaints that are

14  happening in that category?

15  A.   There's a PREA tracking log for PREA allegations.  But

16  there's also a file shared with SIS or the SIA regarding other

17  allegations as well.

18  Q.   So, you know, you spoke at length about things like,

19  quote, increased communication, unquote, quote, line of

20  communication, unquote, open them up, quote, let them know

21  we're here, unquote.  And we've seen your very nice photo

22  posted up.

23       Can you tell us specific things that, if you can recall,

24  going back to Warden Garcia leaving the facility -- specific

25  things -- specific things that -- actions, meetings, whatever,

1   environment for other individuals to provide suggestions about

2   PREA.

3   **Q.**   Yeah, and the only reason I'm asking about town halls is

4   because you said it's the one thing that you've been doing to

5   build the communication about this subject.  But you're

6   saying -- so my question is, I guess, all right, that's town

7   halls.  Is there anything else that you have taken any kind of

8   concrete step towards doing in order to hear feedback from

9   inmates?

10  **A.**   That's not the only thing.  Town halls is one, one

11  example.  You can -- as we were providing information regarding

12  the pilot phone program, you can provide information on

13  TRULINCS which is extremely helpful.  That is historical

14  documentation.

15      You can provide feedback in emails through the mailboxes

16  that I monitor.  There -- like I said, there's other avenues

17  you can address these -- these concerns in or aspects that

18  you're discussing.

19  **Q.**   Okay.  How about a survey?  You said that you were looking

20  into and actually taking steps towards a survey to evaluate the

21  executive assistant position and how that's working out.  You

22  could in theory do the same to get general feedback on

23  PREA-related changes or lack of changes; right?

24  **A.**   To clarify, we wouldn't do a survey to -- to suggest

25  the -- the accuracy of a camp administrator executive assistant

1   role.  It would be to provide feedback from the inmate

2   population and what their needs are, not specific to a current

3   position.  That position has been identified as a needed and

4   required position.

5   Q.   Okay.  So can you take steps to create a survey, just like

6   you already did to try to do in November this year, apparently,

7   to get feedback from -- just like the same way?  Can you do it

8   to get feedback on PREA-related issues?

9   A.   I believe we can.

10  Q.   Is there any structural or penological reason why you

11  couldn't?

12  A.   Outside of time and resources, I would have to consult

13  with the regional office and central office to make sure that

14  they concur with it.  If it goes outside of policy or the law.

15  There's a number of things that I would have to consider in

16  making sure that we have full concurrence and support from --

17  from the regional office and central office.

18  Q.   Okay.  Aside from that concurrence, is there any other

19  reason why it couldn't happen?

20  A.   Not that I can recall.

21  Q.   You've read the declarations from the -- that have been

22  filed in this lawsuit, either with the complaint or the motion

23  for preliminary injunction?

24  A.   I'm familiar with them.

25  Q.   How are you familiar with them?

1  a 583 or an investigative case internally to then determine

2  whether it's a substantiated or unsubstantiated case.  And you

3  continue in that manner.

4      But you're also continuing to monitor and -- for

5  retaliation, for alleged victims that you're tracking.

6      You're talking about finding or educating staff on

7  protocols of how to report PREA.

8      It doesn't take much.  If you receive a PREA allegation,

9  we have zero tolerance, you're going to report it to the

10  operations lieutenant, and then we can continue with the PREA

11  protocols at that point.

12      It's not very elaborate.  It's just a matter of having

13  the -- the training and the confidence in knowing that those

14  reports are going to go to the right people and they're going

15  to be investigated.

16  Q.  Well, so and the protocol itself, everything you described

17  in a sense, that needs to be written down somewhere; right?

18  A.  Yes.

19  Q.  And where is that written down at the facility?

20  A.  It would be in policy, in 5324.12 or a one source policy

21  for PREA protocols.

22  Q.  Nowhere else specific to the facility?

23  A.  Are you talking about for staff?

24  Q.  Yeah.  For the facility.

25  A.  It would be in a share file.  It would be in annual

1   training document.

2   **Q.**   But no separate written plan?

3   **A.**   A separate plan?  Again, I think it would be redundant.

4          **MR. CHA-KIM:**  Can we put up really quickly plaintiffs'

5   exhibit -- or PI Exhibit 209 and go to page 40, please.

6          Or I'm sorry.

7   **Q.**   Do you have a binder in front of you, or no?

8   **A.**   No, I do not.

9   **Q.**   So there will be a screen coming up in front of you.

10          You're familiar, sir, with the PREA regulations or the

11   sexually abusive behavior prevention and intervention program?

12   **A.**   That looks like the statement for 5324.12.

13   **Q.**   Okay.  I'm going to direct your attention to the bottom of

14   the page, section 115.65.

15          **MR. CHA-KIM:**  If we blow up -- yeah, thank you.

16   **Q.**   And follow along with me.  It says, "The facility shall

17   develop a written institutional plan to coordinate actions

18   taken in response to an incident of sexual abuse among staff

19   first responders, medical and mental health practitioners,

20   investigators, and facility leadership."

21          Did I read that correctly?

22   **A.**   Yes.

23   **Q.**   You just said that you don't have a plan like that?

24   **A.**   Well, if I -- I would have to familiarize myself a little

25   bit more, but I believe you're talking about the incident, the

```
1    executive staff incident review.
2    Q.   I'm talking about the written institutional plan that in
3    bold blue says the facility shall develop.  Do you have that?
4    A.   I don't -- I don't see where it says it needs to be
5    written down anywhere.
6    Q.   "A written institutional plan."
7    A.   Oh.
8         I do not recall.
9    Q.   Okay.  If you don't have one, is that something you think
10   you should maybe put together for the facility?
11   A.   That's something we can work on.
12   Q.   Okay.  This might be a good time to stop, Your Honor.  It
13   is 4:00.
14        THE COURT:  How much more do you have?
15        MR. CHA-KIM:  A bit more, Your Honor.  Meaning not
16   quite 15 minutes or 20 minutes, but a little bit longer, is my
17   best guess.  Half an hour.
18        THE COURT:  That tells me nothing.  One of the
19   problems with not putting attorneys on time restrictions is
20   that you don't then be efficient with your time.  I have not
21   done that and perhaps I should have.  We have gone one full day
22   and I've heard from two witnesses.
23        MR. CHA-KIM:  We do not anticipate the sort of
24   fullness of the topics, for instance, that Captain Quezada
25   would focus on.  We thought that they would be -- we surmised
```

1

2

3                    CERTIFICATE OF REPORTER

4            I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Wednesday, January 3, 2024

8

9     *Pamela Batalo Hebel*

10    _____
      Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11    U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

*CERTIFIED COPY*

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN ) PRISONERS, ET AL., ) ) Plaintiffs, ) ) vs ) ) UNITED STATES OF AMERICA ) FEDERAL BUREAU OF PRISONS, ) ET AL., ) ) Defendants. ) _____) | **Evidentiary Hearing** **NO. CV 23-04155-YGR** **Volume 2** **Pages 283 - 547** Oakland, California Thursday, January 4, 2024 |

(UNDER SEAL - Pages 414 - 489 and 491, lines 8 - 16)

**EVIDENTIARY HEARING**

**APPEARANCES:**

For Plaintiffs:

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
BY:  **STEPHEN SEUNGKUN CHA-KIM, ESQUIRE**

ARNOLD & PORTER KAYE SCHOLER LLP
5 Palo Alto Square, Suite 500
3000 El Camino Real
Palo Alto, CA 94306
BY:  **CARSON ANDERSON, ESQUIRE**

(Appearances continued next page)

Reported By:      Raynee H. Mercado, RMR, CRR, FCRR, CCRR
CSR No. 8258

Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

REESE - DIRECT / MATTIOLI

```
 1    November of 2008 as an employment law attorney.  And I
 2    practiced in some capacity as an employment law or labor
 3    attorney for the next ten years until I moved into OIA.
 4  Q.  Okay.
 5       And you said there are 140...?
 6  A.  146, technically OIA staff now.
 7  Q.  And there are 120, roughly, institutions in the Bureau of
 8    Prisons?
 9  A.  Yes.
10  Q.  So is there an investigative field agent at each prison?
11  A.  There is not an agent at every prison, but there is an
12    agent assigned to every prison.  So there are some locations
13    where, because of -- because we just don't have enough staff,
14    that they share an investigator with a co-located institution,
15    something that's within a commuting distance.
16  Q.  Okay.
17       And what do you do in your role as the chief?
18  A.  In my role, I really oversee the operations as far as the
19    investigations go, assigning them, ensuring that they're
20    moving forward, that they're being completed.
21       I oversee communications with the Office of Inspector
22    General which is an important part of our role in the agency,
23    to ensure that the Office of the Inspector General is aware of
24    what we have coming in and that we are communicating
25    effectively with regard to what their stance is on cases, how
```

REESE - DIRECT / MATTIOLI

1  Justice, and they have jurisdiction over the criminal and

2  administrative misconduct of all DOJ staff.

3      So they are separate from the Bureau of Prisons, but we

4  fall under their umbrella with regard to their oversight of

5  our misconduct processes.

6  **Q.** And can you estimate about what percentage of BOP cases

7  are retained by OIG, that is, they're criminal in nature?

8  **A.** OIG has the ability to review all of our -- all of our

9  allegations and has kind of a right of first refusal with

10 regard to our cases.  Year over year on average, they retain

11 about one to two percent of our cases.

12 **Q.** And what happens to the case if OIG declines to take it

13 and investigate?

14 **A.** If we refer a case to OIG and they decline to investigate,

15 it is deferred back to my office, and we make a determination

16 as to how best to move the case forward.

17 **Q.** And what are the options?

18 **A.** Oftentimes, it will get deferred to the local

19 investigators that we discussed earlier.  At the

20 122 institutions, they have -- each of them has an assigned

21 investigator.

22     I also have a staff that work more directly for me of

23 approximately 30 investigators who will do some of the more

24 complicated cases, some of the cases that involve higher

25 profile allegations or subjects.

1   Q.   And so for the past four months that he was with the

2   Bureau -- I understand he's now retired -- but he reported

3   directly to OIA?

4   A.   Yes, he did.

5   Q.   And will that practice continue with Putnam's replacement

6   when that person is hired?

7   A.   Yes.

8   Q.   Has that position been posted?

9   A.   It has.   It was posted in December.

10  Q.   So I want to talk very briefly about the staff sexual

11  misconduct at Dublin occurring between 2019, 2022.

12       How did your office first become aware of the allegations

13  of staff sexual misconduct at Dublin?

14  A.   Through our interactions, probably mainly with Putnam.  We

15  were aware that there had been a few allegations of sexual

16  misconduct that had been -- that had been picked up by the

17  Office of the Inspector General.

18       Obviously those -- the cases that are maintained by the

19  Office of Inspector General are cases that we pay more

20  attention to.  We want to know how the case is proceeding

21  because obviously we're not handling the investigation so it's

22  something that we have to kind of track and make sure that

23  we're aware of -- of where the case is going to the extent

24  possible.

25  Q.   And what is your understanding of how those cases came to

1    credits and the appropriate calculation of those.

2         If they -- if the email gave rise to allegations of

3    misconduct, we would review it just like we receive any

4    referral and we would open a case as appropriate.

5    **Q.**  And so if a case were opened and referred to OIG, is it

6    possible then that an allegation that came through the task

7    force email box could be investigated by a local agent at the

8    direction of OIG?

9    **A.**  So the local agents don't work for OIG.  So, no, the local

10   agent would not be -- would not be handling an investigation

11   unless it was deferred by OIG and then released by my office

12   to the local agent specifically.

13   **Q.**  And maybe I misspoke.  Not handling the investigation, but

14   assisting in the collection of evidence and other information

15   for OIG to investigate or build a case?

16   **A.**  Of course, yes.  In that kind of assisting role, yes, the

17   local investigator could be involved.

18   **Q.**  And what happened with that task force email box?

19   **A.**  We kept the email box active for, I believe it was seven

20   to eight months after our visit to Dublin.  And we

21   discontinued it when it became apparent through the pattern of

22   emails that -- that there were not emergent issues, that there

23   was -- there was not widespread retaliation allegations, there

24   was not allegations of mistreatment, and most of the

25   complaints that we were receiving, as I mentioned, they were

REESE – CROSS / NIMNI

 1   First Step Act issues, they were points calculations issues,

 2   and they were issues that needed to be handled through

 3   communication with local staff.

 4       And the email box at some point became a bit of an

 5   impediment to good communication between the population and

 6   the leadership at the local level.

 7   Q.  Was the closing of the task force email box communicated

 8   to the inmates?

 9   A.  Yes.  To the best of my knowledge, it was.

10           MS. MATTIOLI:  I have no further questions.

11           THE COURT:  Cross.

12                     CROSS-EXAMINATION

13   BY MR. NIMNI:

14   Q.  Good morning, Ms. Reese.

15           MR. NIMNI:  Also I think you might have left your

16   phone up here.

17   Q.  Good morning, Ms. Reese.  My name is or Oren Nimni.  I

18   represent the plaintiffs.

19   A.  Good morning.

20   Q.  I'm just going to ask you a few questions.

21       Who is the OIA officer assigned to FCI Dublin?

22   A.  We have two special agents that are assigned to -- to FCI

23   Dublin.  Is that what you mean?

24   Q.  Sure.

25   A.  Okay.  Right now one of those positions is vacant and is

```
 1    pending a report date from a newly selected agent.  And the

 2    other one is Agent Joshua Brown.

 3    Q.   Joshua Brown?

 4    A.   Yes.

 5    Q.   And how long has that first position been vacant?

 6    A.   I believe -- I believe the previous agent departed in

 7    November.

 8    Q.   And who was that previous agent?

 9    A.   His name was Carl Kuznecow.

10    Q.   And are those special agents on site at FCI Dublin?

11    A.   Yes, they are.

12    Q.   On -- at the facility?

13    A.   Yes.

14            THE COURT:  You said Carl...?

15            THE WITNESS:  Yes, Your Honor.  Carl Kuznecow.

16            THE COURT:  How do you spell that?  Your best guess.

17            THE WITNESS:  K-U-Z-N-E-C-O-W.

18    BY MR. NIMNI:

19    Q.   And how long has OIA had on-site special agents at FCI

20    Dublin?

21    A.   Those special agents were newly created positions after

22    the -- after the task force visit in March of 2022.  So at

23    that point, in March of 2022, we started the process of

24    creating the positions, posting them, filling them.

25    Q.   And is there -- who is the on-site OIA investigator at FCI
```

1  discussed with Ms. Mattioli that you hadn't recently received

2  any reports of freestanding retaliation; is that correct?  I

3  don't want to misstate your testimony.

4  **A.**  No, I didn't say that.

5  **Q.**  Have you received recent reports of freestanding

6  retaliation out of FCI Dublin?

7  **A.**  We have some small number of open cases into allegations

8  of retaliation, yes.

9  **Q.**  And how many would you say?

10  **A.**  Fewer than five.

11  **Q.**  And what types of retaliation?

12  **A.**  I couldn't say with certainty.

13  **Q.**  And how many of those similar cases did you have in 2022?

14  **A.**  I -- I really couldn't say.

15  **Q.**  And I believe you stated to Ms. Mattioli that if the

16  behavior complained about in a complaint of retaliation was

17  allowed by policy, that that would not rise to the level of

18  misconduct categorically; is that correct?

19  **A.**  Generally speaking, yes.  I mean it's -- it really depends

20  on -- an allegation can come in in a thousand different ways

21  and capture it and described in a thousand different ways.  So

22  we are tied to the information that we receive.

23       If what we receive is an allegation that something

24  happened that is consistent with policy, but the complainant

25  is alleging that what is consistent with policy was done for a

1   retaliatory reason, there's nothing for us to investigate

2   because what happened is consistent with policy.

3   **Q.**  But you would agree that things can happen that are

4   consistent with policy and be retaliatory, correct?

5   **A.**  I -- anything is possible.

6   **Q.**  For example, if it's policy to strip search someone after

7   a visitation but only some people are strip searched and some

8   people aren't, even though the strip search is consistent with

9   policy, that could still be retaliation, correct?

10  **A.**  Anything is possible, but I -- I don't know how we would

11  identify that this behavior that is consistent with policy and

12  in fact required by policy is -- is somehow improper.

13  **Q.**  So OIA would not investigate those cases?

14  **A.**  It's unlikely.

15          **THE COURT:**  Well, you've heard the term -- you're an

16  employment lawyer, right?

17          **THE WITNESS:**  Yes, Your Honor.

18          **THE COURT:**  So you know that policies can exist and

19  be enforced in an inconsistent way which could be retaliatory.

20          **THE WITNESS:**  Yes, Your Honor.

21          **THE COURT:**  And that's -- that's the point.

22          **THE WITNESS:**  Yes.

23          **THE COURT:**  And there are, in fact, documents that

24  could be looked at to determine whether or not a policy is

25  being enforced against some but not others.  And you chose not

REESE - CROSS / NIMNI

1    to investigate as an employment lawyer?

2           THE WITNESS:  We've not received allegations that

3    some are being searched and some are not.  What I was speaking

4    to was would we open a case where the allegation was this

5    is -- this thing that is consistent with policy, this search

6    that is consistent with policy is happening for an improper

7    reason.

8           THE COURT:  You understand those are the allegations

9    here?

10          THE WITNESS:  I understand that they're being raised

11   now.  We've not -- to the best of my knowledge, my office has

12   not received any such allegations.

13          THE COURT:  And these allegations were raised back in

14   August.  Have you done anything to look at it since August?

15          THE WITNESS:  I didn't receive anything in August.

16          THE COURT:  When did you learn -- the allegations in

17   this case were filed on the docket in August.  When did you

18   learn about them?

19          THE WITNESS:  During discussions with the attorneys

20   this week.

21          THE COURT:  So no one bothered to tell you that those

22   allegations had been raised back in August?

23          THE WITNESS:  I was unaware that these proceedings

24   were ongoing in August, Your Honor.  I oversee all of our

25   institutions across the country.

1   Q.  Would that involve a housing reassignment if it was

2   inmate-on-inmate?

3   A.  If it's inmate-on-inmate, the alleged perp would be

4   reassigned.  The alleged vic would not be reassigned.

5   Q.  And how do you safeguard an inmate if it's

6   staff-on-inmate?

7   A.  If the staff member is still working and inside the

8   facility, if it's -- whether it's correctional officer or

9   another department, we would look at the allegations.  And if

10  it is something especially of sexual contact, physical sexual

11  contact, the staff member would be placed on admin leave.  The

12  inmate's job assignment or housing assignment would not

13  change.

14  Q.  And once the staff member is placed on admin leave, then

15  what would you do with the report?  Where does it go?

16  A.  The referrals -- all referrals for staff misconduct, I

17  prepare them.  The Warden will sign them.  And then I will

18  send them to Office of Internal Affairs and to OIG.

19  Q.  Can you send referrals -- or could you as an SIS send

20  referrals without the Warden's signature?

21  A.  Yes.

22  Q.  So you said that you were not aware that the staff sexual

23  abuse was occurring when it was occurring?

24  A.  No.  I was not.  I -- I had no idea what was going on.

25  Q.  Did you have a feeling something was going on?

```
 1    inmates as I have and trying to elicit the information from

 2    them to address possible sexual abuse that has been going on,

 3    knowing what I've done personally to try to address the staff

 4    misconduct as a whole, it is rather alarming to read

 5    allegations of that nature.  And I also referred that to OIG

 6    and OIA as well.

 7              THE COURT:  What did you refer?

 8              THE WITNESS:  The allegations she just mentioned.

 9              THE COURT:  So when you -- when did you read those?

10              THE WITNESS:  Two to three weeks ago, Your Honor.

11              THE COURT:  Okay.  So you read them a couple weeks

12    ago and then you sent those to...?

13              THE WITNESS:  OIA and OIG.

14              THE COURT:  Okay.

15    BY MS. MATTIOLI:

16    Q.  And when you said you read them, what did you read?

17    A.  I was reading the declarations as a whole.  The primary

18    purpose at the time was to identify the inmates who were

19    involved and mentioned, and that's what my part was in

20    identifying.  And I also provided information as to who those

21    particular inmates actually reported the initial allegations

22    to as well.

23    Q.  So you took the -- the declarations and sent them to OIA

24    and OIG?  Or passed them along, forwarded them in some way?

25    A.  Yes.
```

1   **A.**   That would have been Tom Miller.   He was in the regional

2   office.   But I've -- since August, I didn't -- I didn't get a

3   complete yearly eval.

4   **Q.**   Who is the ombudsman at Dublin?

5           **THE COURT:**   What's the time frame?

6   **BY MR. GALVAN:**

7   **Q.**   As of Friday when -- your last day at work.

8           **MS. MATTIOLI:**   Your Honor, I'm going to object to the

9   assumption in the question that there is an ombudsman at

10  Dublin.

11          **THE COURT:**   Is there one?

12          **MS. MATTIOLI:**   I don't think he understands the

13  question.

14          **THE COURT:**   Is there an ombudsman?

15          **THE WITNESS:**   Is there another title that it may be?

16  **BY MR. GALVAN:**

17  **Q.**   The only title that I'm asking about is ombudsman.   Is

18  there an ombudsman now at Dublin, or on Friday when you left?

19          **THE WITNESS:**   I do -- I do not know.

20          **THE COURT:**   You're not aware of someone with that

21  title?

22          **THE WITNESS:**   No, ma'am.

23  **BY MR. GALVAN:**

24  **Q.**   When I refer to Dublin, can we agree that I'm referring to

25  the prison and the camp together?

PUTNAM - CROSS / GALVAN

1    **A.**   Yes.  Yes.

2    **Q.**   Thank you.

3         As of Friday, on your last day, who was your team?  Who

4    was the team in SIS?  Can you tell me their positions and

5    their names?

6    **A.**   In -- in my office, I'm -- I was the sole SIA at FCI

7    Dublin once my position converted to Office of Internal

8    Affairs.  In SIS, that's assigned to the institution.

9    **Q.**   If I could stop you for a moment.  Just focusing for a

10   moment on SIA in your -- your position, who reported to you as

11   SIA?

12   **A.**   Nobody reported to me.

13   **Q.**   Okay.  So in order -- the SIA had no technicians?

14   **A.**   No.

15   **Q.**   Okay.

16        So the -- you -- to get your work done, there was just

17   you.  Is that right?

18   **A.**   Yes.

19   **Q.**   As of Friday, did you have a backlog of cases to

20   investigate as SIA?

21   **A.**   Yes.

22   **Q.**   And what was the size of that backlog?

23   **A.**   I think it was somewhere around 45 cases maybe.

24   **Q.**   Now shifting to the SIS, when you left on Friday, who was

25   the SIS Lieutenant?

PUTNAM - CROSS / GALVAN

1    Q.  Is it your understanding that in every instance where a no

2    referral decision is made, a fact-finding memo is written?

3    A.  Ones that I'm aware of, yes, there have been fact-finding

4    memos written.

5    Q.  Is that a matter of -- to your knowledge, is it a matter

6    of policy that a fact-finding memo must be written when no

7    referral is made?

8    A.  Myself -- myself, I would rather refer it and refer the

9    video and let it go through the whole process rather than the

10   fact-finding memo.

11            THE COURT:  Does this document have a time frame

12   within which you must report back?

13            THE WITNESS:  No, ma'am.  With the inmate-on-inmate

14   allegations, SIS is required to have those investigations

15   completed within 30 days.  And if they can't get them done in

16   30 days, we have to request an extension on the investigation.

17       So those are usually done within that time frame.  And at

18   the conclusion of it and upon the case being closed, the

19   inmate would be notified.  And then all documentation from the

20   initial allegation on the safeguarding of inmate, all the way

21   to the institution exec staff review would be put into

22   TRUINTEL in that inmate's file pertaining to that particular

23   case.

24            THE COURT:  Do you track how many complaints are made

25   about a particular individual, whether inmates or staff?  So

1    **A.**   I would -- if a -- when the held A and O.

2    **Q.**   What's A and O, sir?

3    **A.**   Admission and orientation, which is set up by the

4    counselors to -- for all the new inmates to be advised of the

5    institution expectations and correctional services, that the

6    Captain sometimes would have me go in there and sometimes he

7    would just explain who SIS is.  So they -- that's the first

8    way they would get it.

9        And then it would be followed up by when I would make

10   rounds in the units, when I would stand main line and when I

11   would communicate with inmates.

12           **THE COURT:**  How much more do you have?  This is not a

13   deposition, I will remind the plaintiffs.

14           **MR. GALVAN:**   I can wrap up in two questions, Your

15   Honor, which would take five minutes.

16   **Q.**  Going back to the -- your work determining the identities

17   of the people who gave declarations in this case, did you ever

18   receive confirmation back of the full names to confirm that

19   your identifications were correct?

20           **THE COURT:**  From whom?  From his attorneys --

21           **MR. GALVAN:**  From anyone.

22           **THE COURT:**  -- which may be covered by the

23   attorney-client privilege.

24   **BY MR. GALVAN:**

25   **Q.**  From anyone other than your attorneys.

1    **A.**  I discussed some of it with the chief psychologist who was

2    also in the loop with -- with all of it.

3    **Q.**  The chief psychologist is Dr. Mulcahey?

4    **A.**  Yes.

5    **Q.**  And did Dr. Mulcahey confirm to you that your

6    identifications were correct?

7    **A.**  She -- I sent -- I just let her know that, you know, I

8    think there was one that had been given the wrong name that I

9    had addressed.  And that was basically it.  I just sent the

10   list back with the names.

11           **MR. GALVAN:**  No further questions, Your Honor.  Thank

12   you.

13           **THE COURT:**  Redirect?

14           **MS. MATTIOLI:**  Very briefly, Your Honor.

15      And if I could put on the record for the deputy clerk and

16   the marshals, we're ready for our first inmate.  If that's

17   going to take a few minutes, we could start --

18           **THE COURT:**  We've already been communicating on that.

19           **MS. MATTIOLI:**  Okay.  Thank you.

20                       <u>REDIRECT EXAMINATION</u>

21   BY MS. MATTIOLI:

22   **Q.**  Mr. Putnam, if you did not make a recommendation that a

23   staff member be placed on leave, could the executive team

24   still place that person on -- on administrative leave?

25   **A.**  Yes.

1    sexual assault or sexual misconduct of any nature?

2            THE WITNESS:  None of the local investigations that

3    have been deferred by OIG and OIA and sent back to the

4    institution for local investigation, none of those are in any

5    way, shape, form or fashion associated with sexual abuse.

6    Those are completely different allegations.

7            THE COURT:  So this backlog of 45 cases, they've been

8    to OIG and then they've come back to you?

9            THE WITNESS:  OIA.

10           THE COURT:  OIA.

11           THE WITNESS:  OIG and OIA in some cases.

12           THE COURT:  So the 45 cases that you had, they've

13   already been sent out to OIA or OIG --

14           THE WITNESS:  Yes, ma'am.

15           THE COURT:  -- for review and then sent back --

16           THE WITNESS:  Yes.  They --

17           THE COURT:  -- to the local.

18           THE WITNESS:  They have all been deferred back to the

19   local level, yes.

20           THE COURT:  Is that a new process, that is, if there

21   is something -- is there now some loop that happens where

22   anything that gets filed gets sent out, back to someone else,

23   and then returned locally?

24           THE WITNESS:  No.  It's always been that way.

25   However, depending on the severity.  Okay.  All these sexual

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

PUTNAM - REDIRECT / MATTIOLI

1    abuse cases are criminal.  So they're OIG.  OIG will take

2    those and they'll do the investigation.

3        If it's not criminal, OIG will normally kick it back to

4    OIA, and OIA can then make a determination whether they want

5    one of their OIA agents to do the investigation or if they

6    want to defer it back to the local level for investigation.

7            **THE COURT:**  Okay.  So the nature of that backlog,

8    is -- the nature of those cases --

9            **THE WITNESS:**  Noncriminal.

10           **THE COURT:**  Noncriminal but give me topics.  What do

11   those --

12           **THE WITNESS:**  They could range in anywhere from

13   unprofessional conduct, some of the retaliation, the DWIs, use

14   or abuse of illegal drugs, failure to follow supervisor's

15   instructions, failure to follow policy, misuse of government

16   credit card, misuse of government travel card, things like

17   that that are a lower, what we consider class 3 offenses.

18           **THE COURT:**  One of the complaints that has been made

19   or concerns that have been made, as you read in the

20   declarations, was a reluctance on the part of inmates to tell

21   you their concerns.

22           **THE WITNESS:**  Yes.

23           **THE COURT:**  What, if anything -- I mean you had been

24   there since 2016.

25           **THE WITNESS:**  Right.

```
 1    you arrived.

 2    A.  One of the implementations was me specifically.  My -- my

 3    direct oversight of the satellite camp.  So one of the

 4    assessments was the lack of supervision at the satellite camp.

 5    So my specific role and place was that, and that was

 6    implemented, and here -- here I am with you all today.

 7    Q.  Lucky you.

 8    A.  Yes.

 9    Q.  So, Morgan, I want to switch topics.

10    A.  Okay.

11    Q.  So you were brought on as part of a wave of new staff at

12    Dublin in 2022; is that right?

13    A.  That's correct.

14    Q.  Who else started in 2022?

15    A.  So I can speak for July of 2022 specifically.  I mean

16    Warden Jusino, now retired, came to Dublin in February of '22.

17    But in July of 2022, I onboarded.  Captain Quezada was on

18    board.  Captain Valero was on board maybe at the end of June

19    of '22.  And also Acting Warden Deveney.

20    Q.  So those are members of the executive team; is that

21    correct?

22    A.  That's correct.

23    Q.  Were other department heads also replaced.

24    A.  Yes.  So August of '22 is when essentially the mass shift

25    of department heads out of FCI Dublin took place, August 14th
```

```
 1    2022.
 2         Also on board Associate Warden, now retired, Tammy Robles
 3    was on board in May of '22.  And now retired Associate Warden
 4    Beth Buckner was on board in August of 2022.
 5    Q.  And what is your understanding of why all of those
 6    positions were changed?
 7    A.  All of the positions for the executive staff?
 8    Q.  And the department heads?
 9    A.  And the department heads?  To help with the -- the work of
10    the cultural change.  They wanted to have a new fresh set of
11    oversight.  And the wealth of knowledge and experience that
12    each of us provides was significant for the staff training
13    that was necessary and the -- the oversight.
14    Q.  Are you the administrative remedy coordinator?
15    A.  Yes, I am.
16    Q.  Is that another collateral duty?
17    A.  That is another collateral duty, yes.  I apologize for
18    forgetting that.
19    Q.  So what -- so in that role, do you also process -- what
20    else do you process in that role?
21    A.  Sure.  So administrative remedies are, you know, an
22    integral part of every institution BOP-wide.  And it's not
23    just at the institution level.  It goes regional and all the
24    way to central office.
25         And so as the administrative remedy coordinator, I am the
```

1    specifically PREA or staff misconduct or food service or

2    medical programming, there would be a range of complaints.

3        As far as a trend is concerned, I don't really think there

4    has been a specific shift other than, you know, an increase, I

5    suppose, because they're being responded to.  And they know

6    that they're being responded to.

7        So I mean it even goes to discipline, inmate discipline.

8    If they want to appeal a sanction, they can utilize that

9    system.

10   Q.  So what would be the most appropriate way for an inmate to

11   report a PREA allegation?  Do they use the administrative

12   remedy process for that?

13   A.  Absolutely.  There are many ways an individual can report

14   a PREA allegation or staff misconduct.

15       I'd like to -- to make a very -- a good point about my

16   arrival and how there was formerly a task force email.  The

17   task force email was one that was monitored by central office

18   because they too during their visit to Dublin found that

19   inmates were not being responded to.  They weren't being

20   responded to timely.

21       So the task force email box was created in approximately

22   March of '22.  But right around the time we became caught up

23   with all the administrative remedies, the task force mailbox

24   was closed the first week of November.

25       And I'm getting excited about talking about that because

1   that showed our hard work from July to November was already

2   paying dividends.  People in custody were seeing that they

3   were being responded to and they were being responded to

4   timely.

5        And so we no longer needed the oversight.  Central office

6   said, hey, FCI Dublin, you're doing a great job responding.

7   They were no longer getting allegations about staff misconduct

8   or PREA.

9        The -- the mailbox essentially was getting questions about

10  how do I get my FSA.  And they then deferred that to the local

11  facility, you know, for response.

12  **Q.**  And just for the record, what is FSA?

13  **A.**  First Step Act.

14  **Q.**  And why would an inmate be inquiring about that?

15  **A.**  First Step Act is great for them because they can earn

16  credit toward early release essentially.

17  **Q.**  And what sorts of things can they do to earn this credit?

18  **A.**  Their programming for one.  Absolutely.  EBBRs, evidence

19  based, you know, programming.  RDAP, Resilient Drug Abuse

20  Program.

21       Unfortunately we don't have RDAP at FCI Dublin, but that

22  doesn't preclude any inmate who's eligible for RDAP for

23  participating.  We just simply prepare their transfer to

24  another facility like Phoenix, for example.  That's another

25  camp.  Or, you know, any FCI facility that has RDAP.

```
 1      just have some -- some questions.

 2          I read in your declaration that FCI Dublin now has

 3      385 cameras online and recording.  Is that true?

 4  A.  Yes.

 5  Q.  Are the video feeds from those cameras monitored in real

 6      time?

 7  A.  Yes.

 8  Q.  So there's -- there's a person sitting at a desk watching

 9      those video feeds?

10  A.  It's recording in real time.

11  Q.  But is a person watching it in real time?

12  A.  All 385 cameras?

13  Q.  That's my question.

14  A.  I wouldn't be able to answer that.  The control center

15      officer monitors cameras in the control center.

16  Q.  That's one person?

17  A.  Yes.

18  Q.  Okay.

19          THE COURT:  Well, there aren't 385 screens.

20          THE WITNESS:  Right.

21          THE COURT:  Are there?

22          THE WITNESS:  No, ma'am.  No, Your Honor.

23          THE COURT:  So how many screens are there?

24          THE WITNESS:  I --

25          THE COURT:  Approximately?
```

```
1              THE WITNESS:  Maybe three to four screens.
2              THE COURT:  And how does it cycle through the
3    385 cameras?
4              THE WITNESS:  I can't answer that question, Your
5    Honor.
6              THE COURT:  Okay.
7    BY MR. ANDERSON:
8    Q.  You stated in your declaration that there are no cameras
9    inside the Dublin staff offices; is that right?
10   A.  Correct.
11   Q.  Are you aware that at least two of the plaintiffs in this
12   case are alleging that they were sexually abused inside of the
13   FCI staff offices?
14   A.  Can you repeat your question?
15   Q.  Are you aware that at least two of the plaintiffs in this
16   case are alleging that they were sexually abused in the Dublin
17   staff offices?
18   A.  No.  I am -- I wouldn't -- I'm not privy to certain
19   complaints if I'm not aware of it myself.
20   Q.  You didn't read that in the declarations that they
21   submitted in this case?
22   A.  The individual -- if this is what you're asking as far as
23   the compound office; is that what you're asking?
24   Q.  That's right.
25   A.  That one?  That's what I'm aware of, yes.
```

```
 1    Q.  So I'm unclear on your answer.  You are aware of those
 2    allegations?
 3    A.  Yes.
 4    Q.  Despite your awareness of those allegations, you have not
 5    installed any cameras in the Dublin offices, correct?
 6    A.  Correct.
 7    Q.  I'd like to pull up your -- your declaration.  That's at
 8    Exhibit 45 if you want to turn to it in your binder, or we
 9    will have it on the screen for you.
10    A.  Whatever's easier.
11                     (Exhibit published.)
12    BY MR. ANDERSON:
13    Q.  So specifically just first, do you recognize this as your
14    declaration, Ms. Agostini?
15    A.  Yes.
16         MR. ANDERSON:  Your Honor, we would move to admit
17    Exhibit 45.
18         THE COURT:  Forty-five is admitted.  It's already
19    part of the docket.  But I'll admit it here.
20         (Plaintiffs' Exhibit 45 received in evidence.)
21         MR. ANDERSON:  Thank you, Your Honor.
22    Q.  I'd like to turn to page 13 of your declaration.
23    A.  Okay.
24         (Reviewing document.)
25         Okay.  Yes.
```

1              **THE COURT:**  Okay.

2       You're not released.  Tomorrow, we're going to have all

3   the inmates so someone will tell you whether or not you're

4   going to be on standby.  Okay.

5              **THE WITNESS:**  Yes, Your Honor.  Thank you.

6              **THE COURT:**  You can step down.

7       All right.  We're adjourned for the day.  I'll talk to you

8   at sidebar.

9              (Proceedings were concluded at 3:59 P.M.)

10                          --o0o--

11

12

13                  **CERTIFICATE OF REPORTER**

14

15              I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17   I further certify that I am neither counsel for, related to,

18   nor employed by any of the parties to the action in which this

19   hearing was taken, and further that I am not financially nor

20   otherwise interested in the outcome of the action.

21

22   _____

23   Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

24              Thursday, January 4, 2024

25

**Volume 3**

**Pages 548 - 866**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
CALIFORNIA COALITION FOR WOMEN )
PRISONERS, ET AL.,            )
                             )
          Plaintiffs,         )
                             )
  VS.                         )      NO. CV 23-04155-YGR
                             )
UNITED STATES OF AMERICA      )
FEDERAL BUREAU OF PRISONS,    )
ET AL.,                       )
                             )
          Defendants.         )
_____)
```

Oakland, California
Friday, January 5, 2024

**EVIDENTIARY HEARING**

**APPEARANCES**:

For Plaintiffs:

        ARNOLD & PORTER KAYE SCHOLER LLP
        250 West 55th Street
        New York, NY 10019
    BY:  **STEPHEN SEUNGKUN CHA-KIM, ESQUIRE**

        ARNOLD & PORTER KAYE SCHOLER LLP
        5 Palo Alto Square, Suite 500
        3000 El Camino Real
        Palo Alto, CA 94306
    BY:  **CARSON ANDERSON, ESQUIRE**

Reported By:     Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                Official Reporter

1    **Q.**   Sorry.  Continue.  What happened after he started giving

2    you these notes and giving you these gifts in March of 2022?

3    **A.**   Everything kind of escalated quickly.  By March 23rd, he

4    asked me to go to the yard office, and he made sure that the

5    second officer on shift was doing a perimeter walk so he wasn't

6    around.  And he took me into the yard office, and that was the

7    first time he kissed me and groped me.

8    **Q.**   I know this is difficult to talk about, but did he

9    continue to have physical contact with you after that?

10   **A.**   Yes.

11   **Q.**   Can you tell me about that?

12   **A.**   So he would make sure to try to like work my unit.  There

13   was an incident where he waited until I was outside the shower

14   and came to my room when I was fully naked.

15        There were -- every weekend he would take me on trash runs

16   because there was no cameras by the dumpsters and that's where

17   he would give me notes and where he would kiss me.

18   **Q.**   How did you know that there were no cameras by the

19   dumpsters?

20   **A.**   Because I worked CMS.  And he told me that there was no

21   cameras there.  And he would tell me that like where there was

22   blind spots like even in the units.

23   **Q.**   And you talked about an instance where he came and visited

24   you right after you got out of the shower and you were

25   completely naked.  Can you tell me what happened then?

1   over, like, the recorded calls because of everything is being

2   recorded.  And I asked her to come see me so I can tell her,

3   but she can't.  Now that my dad passed, she can't come see me.

4            THE COURT:  Where is she located?

5            THE WITNESS:  My mom's in Phoenix, Arizona.

6            THE COURT:  And you -- and the lawyers haven't told

7   her either?  You haven't authorized your lawyers to tell her?

8            THE WITNESS:  I authorized my compassionate release

9   attorney to talk to her, and she cut off communication as far

10  as I'm aware.

11           THE COURT:  Your mom cut off communication?

12           THE WITNESS:  Yes.  With -- with COT.

13           THE COURT:  With the compassionate release attorney?

14           THE WITNESS:  Like the compassionate release attorney

15  reached out, and so she cut off, like, everything with the COT.

16  Yes, but he still works at her job, like where she works.

17           THE COURT:  Is it a big company, a little company?

18           THE WITNESS:  At the VA hospital.

19  BY MR. NIMNI:

20  **Q.**  And Sheilla, you were talking about your compassionate

21  release attorney.  Are you currently putting together an

22  application for compassionate release?

23  **A.**  Yes.

24  **Q.**  Has the situation with Officer Gacad had any impact on

25  your formulation of your petition?

1  **A.**   Yes, because I don't have a release plan due to that I

2  can't go to my mom's house because he was there.

3  **Q.**   And turning back to FCI Dublin --

4          **THE COURT:**  I don't understand that.  He -- because he

5  visited your mom, you can't -- it's not -- that release plan

6  isn't -- can you -- sorry.  Can you explain that to me?

7          **THE WITNESS:**  So from my understanding is my

8  compassionate release attorney said that it wouldn't be

9  beneficial to me to go to my mom's house, my mom's address,

10 because he was there, and I had -- there was a video visit with

11 him there and he knows where she is and he moved there.  He

12 moved from here to Arizona.  So he lives there now.

13    And so my compassionate release attorney doesn't think

14 that it would be the right thing, you know, to be in the same

15 area as him or in the same space as him.  Which I understand,

16 and I'm seeking for a fresh start anyways.  This is too much.

17 So I'm okay with it, but it is difficult because -- because my

18 mom's all I have.

19         **THE COURT:**  And you don't have any other family?

20         **THE WITNESS:**  My sister's husband is in the military

21 and they're currently stationed in Germany, so that's out of

22 the question.  And my brother is currently serving in the Army

23 as well, and he is stationed in the Philippines, so that's out

24 of the question.

25         **THE COURT:**  I see.

1          **MR. NIMNI:**  And, apologies, Your Honor.  Did you have

2     another question?

3          **THE COURT:**  No.  Go ahead.

4     BY MR. NIMNI:

5     **Q.**   And, Sheilla, did you eventually report Officer Gacad?

6     **A.**   Yes.

7     **Q.**   When was that?

8     **A.**   I reported -- well, so after the video visit -- I'm sorry.

9     I have to -- for you to follow the timeline, I saw Putnam in

10    June.  He called me back in July.

11    **Q.**   Uh-huh.

12    **A.**   With Dena Crow from OIG, and he asked me about Delacruz on

13    my contact list.

14    **Q.**   Uh-huh.

15    **A.**   And I just looked at -- at Putnam, and I -- I didn't -- I

16    didn't know if I could trust Dena or not at that point because

17    this is the first time I've ever seen her before.

18    **Q.**   And did you trust Lieutenant Putnam?

19    **A.**   No.  And --

20              **THE COURT:**  Why?

21              **THE WITNESS:**  Because I've seen him do, like, things

22    to other people that -- like they trusted him, and he, like,

23    sent them to the SHU or he ignored them.

24         So when I went in there, I was like I didn't want to talk

25    to him.  I wanted -- at that point I wanted to speak to an

1    attorney.  And so he sent me to the SHU.

2    BY MR. NIMNI:

3    Q.    And when was this?

4    A.    This was in July, like the last weeks of July.  He sent me

5    to the SHU.  And this was on a Friday.  And he told me that if

6    he did not come back on Monday, that there was a good chance I

7    was going to get shipped out.

8         And he didn't come back on Monday.  So I sat there and sat

9    there.  And then he came back and he pulled me out.  He asked

10   me if I wanted to talk to him.

11        And I just told him, like, sir, I've never been a problem

12   on your compound.  Like I don't understand what the issue is.

13   Like why am I even in the SHU.  He gave me three different

14   reasons.  He told me I was there --

15   Q.    What were those three reasons?

16   A.    Under investigation.  Then he said he had to look through

17   my property.  And then he told me that it was for my safety.

18        So I asked him, I said, well, what do you mean?  Like now

19   that you're taking me to the SHU, like now people are going to

20   wonder why I'm here.  So he held me there until August 10th.

21   Q.    And how long was that approximately?

22   A.    Like two weeks I was sitting there.

23   Q.    And --

24           THE COURT:  Were you bunking with someone at the time?

25           THE WITNESS:  I was actually with the orderly of the

1    SHU.  And so she asked me why I was there, and I told her that

2    I was under investigation.  I didn't really want her to know my

3    business.

4         So the officers that would come on shift would ask her

5    like, hey, has she said anything to you?  Like, why is she back

6    there?  Like, why can't she use the phone?  Why do we always

7    have to ask SIS to give her anything?  Like, what happened with

8    her?

9         So my bunkie was like curious.  But by the time I got out

10   of the SHU, like, they had already -- all the inmates already

11   knew why I was there.

12   BY MR. NIMNI:

13   Q.   And were you ever informed -- to the best of your

14   knowledge, were you in the SHU for a disciplinary reason?

15   A.   No.  But it felt that way.

16   Q.   And what were the conditions like for you in the SHU?

17   A.   They were terrible.  The SHU is terrible.  That -- that

18   was the second time I was there, but the SHU is bad.  They --

19   they don't give you any hygiene, they don't allow you to

20   purchase any hygiene.  It's -- you ask for a roll of toilet

21   paper, they ask you to wait for the next shift.

22   Q.   And how did -- how was your mental health after your

23   experience in the SHU?

24   A.   It's deteriorating as the time goes on.

25   Q.   And after this reporting incident with Officer Putnam, how

```
 1   walked off?
 2              MS. CZIOK:  Objection.  Foundation.
 3              THE COURT:  Did you see him walked off?
 4   BY MR. NIMNI:
 5   Q.   When did you observe Officer Sousa --
 6              THE COURT:  Did you see?
 7   BY MR. NIMNI:
 8   Q.   Or did you see --
 9   A.   Did I see him?
10              MR. NIMNI:  Apologies, Your Honor.
11              THE COURT:  Did you see him walked off?
12              THE WITNESS:  No, ma'am.
13              THE COURT:  Foundation.  It's important.
14              MR. NIMNI:  Yes, Your Honor.
15   Q.   Does Officer Sousa still work there?
16   A.   Not that I'm aware of.
17   Q.   What happened to you after Officer Sousa no longer worked
18   at CMS with you?
19              THE COURT:  Well, I need timing.  When did you notice
20   that he didn't work there?
21              THE WITNESS:  So it was fairly quickly.  I went to
22   work -- I showed up to work at -- we would go to work at 6:15
23   and --
24              THE COURT:  Month, year?
25              THE WITNESS:  This was in August, September of 2023.
```

1          **THE COURT:**  Okay.  August or September of 2023.

2          **THE WITNESS:**  Uh-huh.

3          **THE COURT:**  And you go to work.  You're still working

4     with him, and then you go --

5          **THE WITNESS:**  Yeah.  Okay.  So he got a promotion.  He

6     would work the tool room, and he got a promotion as a general

7     maintenance foreman.  So because I was HVAC, my boss was in the

8     process of retiring.  So my boss would always tell me like if

9     Sousa needs you, like, help him out, you know.

10          And I knew the tool room because of COVID.  So I worked

11     side by side -- Mayhood which was from HVAC, and Sousa from

12     tool room and general maintenance.  And they had asked me to

13     take -- when my boss left, they asked me if I wanted to stay on

14     HVAC or I wanted to take over the tool room position.

15          And so I was in the process of deciding what I wanted to

16     do, but when I showed up to work to train for the tool room,

17     that's when I found out, because they told me, like, he's not

18     here anymore, he got walked off, and you're the reason why, so

19     we don't want you in the tool room anymore.

20          **THE COURT:**  I see.

21     **BY MR. NIMNI:**

22     **Q.**   And what else did you experience after this?

23     **A.**   There was just a lot of, like, comments and a lot of,

24     like, bullying.  So --

25          **THE COURT:**  By the way, who told you that, that you

```
 1    couldn't have that job?
 2              THE WITNESS:  Padilla, Officer Padilla.
 3              THE COURT:  And is Padilla still there?
 4              THE WITNESS:  He is the tool room officer.
 5              THE COURT:  Okay.  And is Padilla male or female?
 6              THE WITNESS:  Male.
 7              THE COURT:  Is Vasquez male or female?
 8              THE WITNESS:  Female.
 9              THE COURT:  Okay.  Continue.
10    BY MR. NIMNI:
11    Q.   And do you still work at CMS?
12    A.   No.  I quit after -- like two weeks after Sousa was gone.
13    It was -- it was too much for my mental, so I ended up quitting
14    my job.
15    Q.   Did you like that job?
16    A.   I loved that job.
17    Q.   Were you good at that job?
18    A.   Yes.
19    Q.   Why did you quit?
20    A.   It all became too much.  Like my mental health, it's not
21    okay.  And so there was days that before everything with --
22    when Sousa -- before Sousa, I would go to CMS to get away from
23    my situation with, like, Gacad, with my dad passing.  I would
24    go to work and I would distract myself from my reality.  But
25    then it followed me there.
```

1  **A.**   Yes.

2  **Q.**   And have you ever been strip searched following a visit

3  from your lawyer?

4  **A.**   Recently, yes.   But not in the beginning.

5  **Q.**   When did those start?

6  **A.**   They started after we filed the lawsuit.

7          **THE COURT:**  Has anyone explained to you that that's

8  BOP policy?

9          **THE WITNESS:**  Now they do.

10 **BY MR. NIMNI:**

11 **Q.**   And did that happen to you before in the eight years that

12 you've been at FCI Dublin?

13 **A.**   No.

14 **Q.**   In your eight years at FCI Dublin -- strike that.

15        Have you experienced a significant reduction in sexual

16 harassment personally since January of 2022?

17 **A.**   No, because mine started in March of 2022.

18 **Q.**   And have you experienced personally an increase or

19 decrease in use of the SHU --

20 **A.**   An increase.

21        **THE COURT:**  So that doesn't -- okay.  Explain what you

22 mean by that because he hadn't finished his question.

23        **THE WITNESS:**  I see people go to the SHU every day

24 now, and I didn't see that before.

25        **THE COURT:**  Okay.  That wasn't his question.

1          **THE WITNESS:**  Because it's not -- you're not in a

2     private location.  It's in a very open area, so the next person

3     can read your email.

4          **THE COURT:**  Are there always people at the computers?

5          **THE WITNESS:**  Yes.

6          **THE COURT:**  When are the computers available?

7          **THE WITNESS:**  They are available at 6:00 a.m. until

8     3:30.  And then they turn back on at 4:30 until 8:30 Monday

9     through Friday.  And on the weekends, they're available from

10    6:00 a.m. until 9:30 because there's 10:00 count.  And then

11    they turn back on at 10:30 until 3:30, and then from 4:30 to

12    8:30 p.m.

13         **THE COURT:**  How many computers are there?

14         **THE WITNESS:**  In F unit, there is five computers for

15    approximately 200 inmates.

16         **THE COURT:**  Are they timed?

17         **THE WITNESS:**  Yes.  I think you're allowed to be on

18    them, if I'm not mistaken, for 30 minutes at a time.  And you

19    can log on every 30 minutes.

20         **THE COURT:**  And the -- do they have privacy screens?

21         **THE WITNESS:**  Yes, but the setting is -- on the screen

22    is so bright that you can see past the privacy screen.  And

23    we -- we're not allowed to touch -- like to adjust any of that.

24         **THE COURT:**  Has anybody -- have you told people that

25    if they change the brightness, that would allow it to be more

```
 1    those mics operational, please.
 2              THE CLERK:  Yes, Your Honor.
 3              THE COURT:  All right.  We need to take this step by
 4    step.  The statement is stricken.
 5         Go back.  And we need -- I can't have her just blurting
 6    stuff out.  You need to set a foundation for anything she says.
 7    Do you understand?
 8              MS. STEIERT:  I understand.
 9              THE COURT:  All right.  Go ahead.
10    BY MS. STEIERT:
11    Q.    Roberta, have you had a negative experience with officer
12    Craig?
13    A.    Yes.
14    Q.    When was one experience?
15    A.    After a legal visit, the next day we had a town hall.
16    Q.    Roberta, can you explain what a town hall is?
17    A.    It's a unit meeting with like -- it might be
18    administrative staff, a counselor, a staff -- a staff wants to
19    talk to everybody in the unit.
20    Q.    Okay.  Can you tell us when this town hall meeting
21    occurred?
22    A.    It was recently.  It was in the last three months, three,
23    four months.
24    Q.    And what happened at the town hall?
25    A.    Mr. Craig was very angry.  He was yelling, he was cussing
```

1    us out, saying if you guys want to go to main line and talk

2    shit about me, you want to go over there and complain about

3    what's not getting done in the unit, I'm not the counselor, I

4    don't have to do that.  Well, I tell you how it's going to be

5    around here.  And he started threatening us with the mass

6    punishment.  And --

7    **Q.**    How did you respond?

8    **A.**    I raised my hand to speak.

9          And he said, yeah, what is it?

10          And I said, well, Mr. Craig, I'm concerned.  I don't

11   understand.  Who are you guys?  Who did it, and what did they

12   do at main line?

13          And he waved me off.  He was like get out of here with

14   that shit.  That's what I'm talking about right there.  I can't

15   even say anything without you guys getting all sensitive and in

16   your feelings because you want to use your keywords and go to

17   psychology because you know what to say and you know what to do

18   to get attention.

19   Q.    Do you believe he said that because of his relationship

20   with Dr. Mulcahy?

21          **MS. CZIOK:**  Objection.

22          **THE COURT:**  It's totally leading.

23          **MS. STEIERT:**  I apologize, Your Honor.

24          **THE COURT:**  I have warned you all multiple times not

25   to lead.  I don't want to hear from you.  I want to hear from

1   **A.**   Okay.   Then they turn to desperate measures.   People feel

2   like they do what they need to do to survive.

3   **Q.**   What do you mean by that?

4   **A.**   I got told -- like I said, they buy their own problems at

5   Dublin.

6            **THE COURT:**  They buy their own?

7            **THE WITNESS:**  They buy their own problems at Dublin.

8   And when I say like buy their own problems, you create a

9   problem.   You make a situation worse.

10       So when instinct survival kicks in and people feel like

11   they do what they need to do in order to survive, so for a bar

12   of soap or extra food out of the kitchen, then you got people

13   putting on sex shows, dancing, twerking, doing whatever to get

14   extra.

15       And if they don't have it, they are going to bring it back

16   and sell it to somebody who can't shop at commissary to get

17   them what they need.   Nothing is given to you.

18       If you want to mail out your letters in some certain

19   circumstances, you got to show somebody something.

20   BY MS. STEIERT:

21   **Q.**   Are you worried about this policy?

22   **A.**   Very.

23            **MS. STEIERT:**  I move to admit PIX --

24            **THE COURT:**  I cannot hear you.

25            **MS. STEIERT:**  Sorry. I would like to admit PIX016.

1   all facilities when people meet with the public that they are

2   strip searched?

3           THE WITNESS:  No.  I haven't had very many visits.

4           THE COURT:  Okay.  So no one -- your lawyers didn't

5   explain to you that that's policy at all facilities?

6           THE WITNESS:  They -- it never happened before so --

7           THE COURT:  I understand.  There are a lot of things

8   at Dublin that weren't done according to policy.  You agree

9   with me on that?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.  Did anybody tell you that that's

12  policy?

13          THE WITNESS:  No.

14          THE COURT:  All right.  Proceed.

15  BY MS. STEIERT:

16  Q.   Roberta, how many legal visits have you had in your time

17  at FCI Dublin?

18  A.   A lot.  I can't count them for you.

19  Q.   Other than the example you just gave and the recent

20  visits, was it usual for you to be strip searched after those

21  legal visits?

22  A.   No.

23  Q.   Was there anything else --

24          THE COURT:  How long did it take, the one you did

25  recently?

1   DOJ sexual abuse mailbox, FCI Dublin has purchased and placed

2   privacy screen protectors on all inmate TRULINCS monitors."

3   **Q.**   Did the computers always have privacy protectors?

4   **A.**   No.

5   **Q.**   When did they install the protectors?

6   **A.**   Around the days of this, right in this time frame.  Within

7   days they were up all over.

8   **Q.**   And in your experience, do they actually provide privacy?

9   **A.**   No.

10   **Q.**   Why not?

11   **A.**   Because I -- you can see.  Anybody can see.

12   **Q.**   Have you told staff about this problem?

13   **A.**   Yes.

14   **Q.**   Who?

15   **A.**   I told Ms. Gonzalez when she was putting them up.  And she

16   said they should do the trick because they paid over a hundred

17   dollars, they cost a lot of money, and that they should do the

18   trick.

19        I told Lieutenant Putnam.

20   **Q.**   What did you tell Lieutenant Putnam?

21   **A.**   I told him that that was a waste, why bother?  You can't

22   see -- I mean, you can see right through them.  The only way is

23   if a person manipulates the screen and goes like this.  Or if

24   I'm standing right here, I for sure, I for sure see screen 1,

25   screen 2.  I may not be able to see the third one.  It might be

```
 1   accessing his stuff other than him?
 2            THE WITNESS:  I don't know.
 3            THE COURT:  Okay.  So DOJ, it's your belief that
 4   that's not accessible; is that right?
 5            THE WITNESS:  That's what I was told, yes.
 6            THE COURT:  And that's your belief?
 7            THE WITNESS:  That's my understanding, yes, ma'am.
 8            THE COURT:  Okay.  Go ahead.
 9   BY MS. STEIERT:
10   Q.    Roberta, did you speak to any other staff members about
11   the confidentiality issue at the computers?
12   A.    I did.  I have -- so because when you type -- when you
13   write an email and then they don't answer, it's like they talk
14   to the person that you're reporting and everybody knows.  So
15   somebody's telling if -- if you're not.
16   Q.    Do you mean when you write an email to staff members?
17   A.    Yes.
18   Q.    Okay.  So is reporting to staff directly confidential?
19   A.    No, I don't believe so.
20   Q.    Can you explain why not?
21            MS. CZIOK:  Objection.  Foundation.
22            THE COURT:  You can -- well, do you have an instance
23   where you reported something to staff -- can you give me --
24   I'm -- you said that you don't think that reporting to staff is
25   confidential.
```

1            **THE WITNESS:**  No.

2            **THE COURT:**  That's correct?

3            **THE WITNESS:**  That is correct.  I'm sorry.  Yes.

4            **THE COURT:**  And why do you think that?

5            **THE WITNESS:**  Because me personally, I've had a

6     conversation with Lieutenant Putnam, and what I shared with him

7     came back to me.  And he later asked me if my conscience was

8     bothering me.  So how did it -- I don't -- there are a number

9     of staff that I don't -- that I don't trust.

10            **THE COURT:**  Yep.

11            **THE WITNESS:**  And I did tell Mr. Deveney that.

12            **THE COURT:**  Yep.

13            **THE WITNESS:**  And he told me that they had all been

14     vetted and they know what they're doing.

15        I said, sir, I hear what you're saying, but I saw Colette

16     Peters on the C-SPAN, I watched it.  I said it might look good

17     in black and white, but when the boots are on the ground and

18     we're here and we're experiencing this, what you're doing is

19     not working.

20            **THE COURT:**  So you trusted Putnam enough to talk to

21     him or not?

22            **THE WITNESS:**  I did and then I didn't.  At first I

23     did.

24            **THE COURT:**  So what's interesting to me is that there

25     is both a concern that there's not enough information and that

```
1    call him.  He's "Pervy Mcgerv."  Everybody knows that.  Lurch.

2    Pervert.  They know that.  Staff, inmates.

3              THE COURT:  What is his nickname?

4              THE WITNESS:  Perv, Pervy Mcgervy, Lurch.

5    BY MS. STEIERT:

6    Q.   What happened after you spoke to Officer O'Connor?

7    A.   And he told me he's -- he told me that I needed to get out

8    of the kitchen, you're going to get a shot, we're closed.

9         And the person with me said, well, we just sat down.

10        And I said he's not talking to you, he's talking to me.

11   Just eat.

12        But then we're frustrated.  But there was a bar attaching

13   the seat to the table so I couldn't get up.  I would have to

14   step over the bar.

15        So I'm still looking at him, and I said, you know what?  I

16   don't know why you keep messing with me.  It's not like I told

17   on you.

18        And he was like, just go.

19        So we got up to leave.  And he's walking behind us.  And I

20   said, you know what?  I haven't told on you, but I'm going to

21   tell.

22        And he said, don't take it personal.  It's not personal.

23   You understand.

24   Q.   Did it feel personal to you?

25   A.   It was.
```

```
 1   paper.  When you send an SIS an email, you don't get a

 2   response.  And even if you give them a paper cop-out, you don't

 3   get it back.  So I don't know how that works.

 4              THE COURT:  Okay.  Thank you.

 5   BY MS. STEIERT:

 6   Q.   Roberta, what did you say to Officer Putnam?

 7              THE COURT:  I could not hear you.

 8   BY MS. STEIERT:

 9   Q.   Roberta, what did you say to Officer Putnam?

10              MS. CZIOK:  Objection.  Vague as to time.

11              THE COURT:  Yes, agreed.  When?

12   BY MS. STEIERT:

13   Q.   When you reported the incident with O'Connor.

14   A.   It was when Mr. O'Connor was still there.  So it was in

15   the -- in the spring or summer month.  It was in that time.  I

16   went to his office.  I was called by the officer to go to his

17   office.

18   Q.   Were you called to the office because of the O'Connor

19   incident?

20   A.   No.

21   Q.   And what did you say while you were at the office?

22   A.   While I was talking to him, he was telling -- he asked me

23   what do people say about me.

24        I said, well, for one, they don't trust you.  They think

25   you pick and choose who you want to go after.
```

645

1        And he kind of laughed.

2        I said you don't answer.  I was telling him about not

3   answering me and telling me that he was coming to talk to me

4   and he did not.

5        And he said, well, I do my job.  I'm just busy.  There's a

6   lot going on.  And I was going to get back to you.

7        I said, you say that you're getting rid of everybody but

8   you're still talking to Vasquez.  I still see him.  And

9   O'Connor is here.  He's a pervert.

10        And he was like, now, listen, about O'Connor, what did you

11   see him do?

12        What did I see him do?  I said, well, I know if this

13   person told on the warden, they don't have a problem.  I'm

14   not -- I didn't make it up.  There were other people there.

15   The roommate was in the room.  The lady was naked from the

16   waist down.  I called him on it.  And every since then, he's

17   been harassing me.  I said, he pushed --

18        I'm sorry.  I'm going to ask the Judge a question.

19        Please, ma'am, can I ask you a question?

20            THE COURT:  You can ask.  I don't know that I'm going

21   to answer.

22            THE WITNESS:  Okay.  But like there are certain words

23   that were said.  Can I just say them exactly like that?

24            THE COURT:  You can.

25            THE WITNESS:  Okay.  So I just asked -- I told him, I

1   said, I just told you he just smashed my head with his dick and

2   you didn't do anything.  Nobody -- nobody did anything.  And

3   Ms. Doyle told me she sent you an email.

4        And he was like, but did he touch anybody?

5        So, look, you want me to change what I'm saying.  This is

6   what happened.  People were there.  It was in food service.

7   Her roommate was in the room.  And she's standing there with

8   her boobs out, just a towel wrapped around her waist.  I was

9   waiting to talk to her when she came out of the shower.

10        She said, I need to talk to you.  So I was waiting for her

11   to get dressed.  You watched her.  I watched you.  Everybody

12   watches you.

13        When I say "you," I'm referring to Mr. O'Connor.

14        So you know -- he went up there, held the door open and

15   looked at her like that.  And he has been harassing me, and you

16   want me to change what I'm saying?  Nope.

17   BY MS. STEIERT:

18   Q.   What happened after the meeting with Lieutenant Putnam?

19   A.   That I can't recall -- oh, I told him -- he said, well,

20   what did he do?

21        I said, look, they say he looks just like his penis.  I

22   don't know, but I felt it on my back.  Do something about it.

23        He said, well, [name redacted], I'm going to take care of

24   it.

25        I said okay.

1            **MS. STEIERT:**  Oh, my gosh.   Your Honor, I would like

2   to strike that last name from the record.

3            **THE WITNESS:**  I said my name.   I'm sorry.

4            **THE COURT:**   I missed what you said, and it's not on

5   the record.

6            **THE WITNESS:**  Okay.   Whew, okay.   I'm sorry.

7   **BY MS. STEIERT:**

8   **Q.**    Roberta, did you continue do see Officer O'Connor after

9   that meeting with Lieutenant Putnam?

10  **A.**    Yes.

11  Q.    Did you ever report the incident with Officer O'Connor to

12  anyone else?

13  A.    To the task force.

14  Q.    Who did you speak to at the task force?

15  A.    I have their names written down somewhere, but like three

16  different people.   But when people didn't want to talk to them

17  anymore and they were like what should we do, I sat down with

18  one of the ladies right in the middle of the lobby in the unit

19  for like an hour.

20  Q.    What did you say in that conversation?

21  A.    I told her that -- why are people that get high with

22  people still here?   Why are -- when I say people, I'm referring

23  to staff.   Why are they here?   If they need rehab, you don't

24  have a drug program here for people.   Why is that happening?

25         And I asked the lady why is Mr. O'Connor still here?   He's

1          **THE COURT:**  Okay.  Continue.

2      And by the way, what was the context -- what were you

3  doing that led to the search?  Was it routine?

4          **THE WITNESS:**  It was a shakedown for the whole unit.

5  They woke us up at 6:00 in the morning and pulled us out of our

6  room.

7          **THE COURT:**  How many in that unit?

8          **THE WITNESS:**  It varies but probably -- I want to say

9  about 60.

10          **THE COURT:**  Sixty.

11          **THE WITNESS:**  Uh-huh.

12          **THE COURT:**  And how many officers were doing this?

13          **THE WITNESS:**  I think there was three females that

14  were doing the pat searches.

15          **THE COURT:**  Thank you.

16      Proceed.

17  **BY MS. MONTES:**

18  **Q.**  Immediately after this pat-down, did you want to report

19  counselor Campos?

20  **A.**  Pretty much, yeah.  Like especially after talking to other

21  people and finding out that it also happened to them.  I just

22  felt like it was -- it's not okay, you know.

23      Her behavior is very bullying all the time.  And this just

24  made me feel like something that was, I felt, very, very, like

25  I said, violated by it and I felt like I needed to report it.

1      I was told not to.  I was told that I would be retaliated
2  against if I did.
3          MS. MATTIOLI:  Objection.  Hearsay.
4          THE COURT:  It's not -- I mean, I'm not going to
5  accept it for its truth.  I'm going to accept it just in terms
6  of your -- of why you acted as you did.  I don't know if it's
7  true or not.
8          THE WITNESS:  Okay.
9          THE COURT:  But you did something, I take it, or you
10 didn't do something because you heard these things; is that
11 right?
12         THE WITNESS:  No, I didn't do it because of that.  I
13 did it because of how it made me feel.
14         THE COURT:  Did you report it or not?
15         THE WITNESS:  Yes.  I reported it immediately within a
16 few hours of it happening.  Uh-huh.
17         THE COURT:  Despite the fact that people told you not
18 to?
19         THE WITNESS:  Yes.
20         THE COURT:  Okay.  Well, then it is stricken because
21 she didn't respond in light of everything she heard.
22 BY MS. MONTES:
23 Q.   How did you report counselor Campos?
24 A.   I reported it to the DOJ because I was told that it's
25 anonymous and that way I would be safe.

683

1          **THE COURT:**  Anonymous or confidential?

2          **THE WITNESS:**  I guess confidential.  Yeah, I guess

3   confidential would be the correct word, yes.

4          **THE COURT:**  That is, do you --

5          **THE WITNESS:**  Yes.

6          **THE COURT:**  -- did you understand it to be anonymous,

7   that it wasn't --

8          **THE WITNESS:**  No.  I'm sorry.  Confidential would be

9   the correct word, yes, there.

10  **BY MS. MONTES:**

11  **Q.**   And what happened after you emailed the DOJ about this

12  incident?

13  **A.**   I was immediately called to see our psychologist or

14  psych -- someone from the psych department, Ms. Mulcahy.

15  **Q.**   And what did you tell Dr. Mulcahy?

16  **A.**   I told her exactly what happened and -- well, first I

17  asked her if I was going to be safe in telling her that I -- if

18  I did, would it get back to my unit team because I didn't trust

19  them, and that I didn't want to report anything that would go

20  back to them.  I didn't even think that the DOJ would report it

21  inside the BOP.  And so the fact that she was coming to me had

22  me very concerned that that had already happened.

23         **THE COURT:**  Do you have any reason to distrust her?

24         **THE WITNESS:**  Ms. Mulcahy?  I didn't know her.  I had

25  never met her before.

1          **THE COURT:**  As you sit here today, do you have any
2    reason to distrust her?
3          **THE WITNESS:**  Well, yes.  What she told me turned out
4    to not be true.  She told me I could feel safe in telling her
5    and that it would not get back to my unit team, and it
6    immediately got back to my unit team.
7    **BY MS. MONTES:**
8    **Q.**   Did Dr. Mulcahy provide you with any additional follow-up
9    services after this meeting?
10   **A.**   No.
11   **Q.**   Did you see medical after this meeting?
12   **A.**   No.  She told me I would, but I did not.
13   **Q.**   What happened after you spoke to Dr. Mulcahy?
14   **A.**   I was immediately seen by -- she said that what I was
15   reporting was called a PREA.  I -- I was confused.  I didn't
16   feel like it was -- again, I -- I told her I didn't feel like
17   it was in a sexual manner at all, that I never felt like it was
18   an sexual advancement of any kind.  I just felt like she was
19   being overly aggressive.  So to me it felt like I was reporting
20   misconduct, not what I would feel would be considered a PREA,
21   so to say.
22        But she said that what I was reporting was a PREA.  And
23   she next had me see I think SIA Officer Baudizzon.  And again I
24   went through the same thing with him.  Can I feel safe in
25   talking to you and telling you what happened with me?  Is it

```
 1    not going to be, you know, used against me?  I have to live in

 2    the same unit.  Like they live literally 20 feet -- Campos's

 3    office is 20 feet from my cell.

 4         So I live -- I'm intimidated by her on a daily basis as it

 5    is, but to have her know that I'm reporting her and then live

 6    like that is extremely scary.

 7         And so I asked them could I feel safe in him telling, and

 8    he said yes.  He said you're going to see medical and you will

 9    be talking to us again.

10         I said okay.  And then he left.  I never saw medical.  And

11    then the next day, I was served with an incident report.

12    Q.   And what was that incident report for?

13    A.   It said something about they watched the cameras, they

14    felt that I was not being truthful in my statement, that I was

15    trying to file a false PREA, which I never said it was a PREA.

16    They did.  And that -- and they put a statement in there that I

17    said she used her back of her hands, not the front of her

18    hands, which they never asked me that at all.  I don't even see

19    how that's relevant.  But -- and they said that she -- they

20    felt she was within her duties.

21         Again, I didn't feel how that was relevant.  Even if that

22    is what the officers feel is within her duties, it still made

23    me uncomfortable and I still feel like I should have a right to

24    say what makes me feel uncomfortable.

25         And that's what I was telling the psychologist, is that if
```

```
1    something makes me uncomfortable, like you don't know my past

2    traumas so if something in this place makes me feel

3    uncomfortable, even if it's a -- something like a strip search

4    that they're allowed to do, I should be able to go to someone

5    and say it makes me feel uncomfortable and not be punished for

6    it.

7        And I was extremely punished for this.

8    Q.   Can you tell me about what consequences you received after

9    the disciplinary?

10   A.   So when the officers saw me in Campos's office, they asked

11   me what's the one thing you want to keep?  And I said my phone.

12   I need to talk to my daughter.  She lost her dad.  She doesn't

13   have any other family.  Can I please keep my phone to talk to

14   her?

15       And they said we're taking your phone, we're taking your

16   email, we're taking your video visits, we're taking your

17   in-person visits.  So my aunt and uncle who are here today

18   couldn't come see me either.  They cut off all outside contact

19   with family members.  And then they took my commissary.  I

20   haven't been able to shop.  And I can't shop until almost May.

21   So that was September.

22   Q.   Did they give you any other consequences?

23   A.   I think -- I don't think there was any left -- oh, well,

24   they also raised my points.  So I lost my FSA credits.  So I

25   would have been long gone home by now if I had gotten my FSA
```

1    credits.  But when I was teamed by Campos, they raised my

2    points and --

3    **Q.**    Sorry.  Can I stop you there.

4         Can you explain to the Court what the FSA credits are?

5    **A.**    Okay.  So we earn credits by doing classes.  I've done, I

6    don't even know how many classes.  I think over 20-something

7    classes since I've been incarcerated in order to -- and done

8    everything I could to lower my points and to earn FSA credits.

9         And so this incident report raised my points to where I

10   can -- even though I've earned the credits, I don't get them

11   any longer.

12   **Q.**   So how did this raising of your FSA credits affect your

13   expected release date?

14   **A.**   Probably about 10 months.

15   **Q.**   And in your opinion, why is access to commissary so

16   important?

17   **A.**   Well, I can't buy bottled water, I can't buy snacks, food,

18   clothing.  I mean, shoes.  Everything.  Coffee.  Nothing.

19   Q.    Did you ever appeal the disciplinary action?

20   A.    No.  I've honestly been scared to because my appeal goes

21   to my unit team.  And if they're saying -- I -- I have no

22   control over what they say and do.  So if they say I'm lying

23   the first time and I know there's no video that says it didn't

24   happen because it happened, and so if they're going to say that

25   the first time and I try and appeal it and say it really

```
 1   happened, and then they're just going to -- they'll put me in
 2   the SHU.  They've already threatened that the first time.
 3        So they've put people in the SHU for long periods of time
 4   here.  I don't want to do the rest of my time in the SHU.  And
 5   they've already told me my points are at a 14 right now.  One
 6   more incident report, and I go to the SHU.
 7   Q.  Did you ever reach out to Dr. Mulcahy about this
 8   disciplinary?
 9   A.  Yes, I did.  I sent her an email immediately.
10   Q.  I'd like to show you a document.
11   A.  Okay.
12           MS. MONTES:  If I can approach.
13   Q.  Do you recognize this document?
14   A.  Yes.
15   Q.  What is it?
16           THE COURT:  Hold on just a minute.
17           MS. MONTES:  Oh, I'm sorry.
18           THE COURT:  Is this from you?
19           THE WITNESS:  Yes.
20   BY MS. MONTES:
21   Q.   How did you --
22           THE COURT:  I asked you to wait.
23           MS. MONTES:  Oh, I'm sorry.
24               (Court reviewing document.)
25           THE COURT:  Okay.  Proceed.
```

1          **MS. MONTES:**  For the record, this is PIX14.

2   **Q.**   How did you send this email?

3   **A.**   Through the TRULINCS system, request to staff.

4          **MS. MONTES:**  With the Court's permission, I would like

5   to offer Plaintiffs' 14 into evidence.

6          **THE COURT:**  It's admitted.

7          (Plaintiffs' Exhibit 14 received in evidence.)

8   **BY MS. MONTES:**

9   **Q.**   How soon after the incident with Campos did you send this?

10   **A.**   I believe it was the following day, as soon as I got the

11   incident report.

12          **THE COURT:**  So this says that you thought that this

13   was on video, and you testified it wasn't on video.

14          **THE WITNESS:**  No.  What I'm saying, Your Honor, is

15   that if it is on video, it shows that it did happen.

16          **THE COURT:**  I see.  Okay.  Thank you.

17   **BY MS. MONTES:**

18   **Q.**   Can you please read the email you sent.

19   **A.**   Okay.

20      Ms. Mulcahy, yesterday when I met with you, I told you

21   what happened with --

22          **THE COURT:**  I'm going to stop you.  Is there a reason

23   why you want her to read this into the record given your

24   limitation on time?  I've read it.

25          **MS. MONTES:**  Understood, Your Honor.

1  **Q.**  Can you summarize what you said to Ms. -- Dr. Mulcahy in

2  this email?

3  **A.**  Yeah.  Basically I was just letting her know that I -- I

4  felt that she had promised me that if I reported it, I could

5  feel safe and protected and that it would never get back to the

6  officer I was reporting or used to retaliate against me, and I

7  no longer felt safe.

8  **Q.**  Did Dr. Mulcahy address your concerns after you sent this

9  email?

10  **THE COURT:**  Did she respond?

11  **BY MS. MONTES:**

12  **Q.**  Did she respond?  That could be the first question.

13  **A.**  A few weeks later I got a response that said it was out of

14  her control.

15  **THE COURT:**  That's all -- did she do that in writing

16  or orally?

17  **THE WITNESS:**  In writing.

18  **THE COURT:**  Do I have that email?

19  **MS. MONTES:**  We do not have that email.

20  **THE COURT:**  Do you have that email?

21  **THE WITNESS:**  I do.  I'm sure in my system.

22  **THE COURT:**  Did you give it to the lawyers?

23  **THE WITNESS:**  I did not, no.  I can.  I did not.

24  **THE COURT:**  Okay.  So she said what in this email?

25  **THE WITNESS:**  I believe it was something to say that

1   it was -- once it was turned over to SIA, it was out of her

2   control basically.

3           THE COURT:  Did she respond to the other things that

4   you say in here?

5           THE WITNESS:  No, not at all.

6   BY MS. MONTES:

7   Q.   Did you contact anyone else about your concerns?

8   A.   I did.  I talked in person to Ms. Enriquez, who is our

9   DTS.  She is the one person who we see in psych alone.  I saw

10  her in the psych office so I stopped her and talked to her and

11  asked her if she could help me.

12          THE COURT:  What was her name again?

13          THE WITNESS:  Ms. Enriquez.  And Dr. Phelps as well.

14          THE COURT:  Dr.?

15          THE WITNESS:  Phelps.  He is a psychologist there.

16  And they both told me they would look into it and see what they

17  could do and never responded.

18  BY MS. MONTES:

19  Q.   Did you inform SIS about your concerns?

20  A.   I did.  I also sent a very similar email to this one to

21  both Baudizzon immediately and to the DOJ as well.

22  Q.   Did you receive a response to your messages?

23  A.   No.

24  Q.   At the time of reporting counselor Campos, what was your

25  job?

1   **A.**   At the time, I was -- worked for commissary, the

2   commissary warehouse.

3   **Q.**   And about how much did you make working for commissary?

4   **A.**   On average, probably, I think, 20 to $30 a month.

5   **Q.**   Did you enjoy your job working for commissary?

6   **A.**   Yes.

7   **Q.**   Were you fired after reporting counselor Campos?

8   **A.**   Yes.

9   **Q.**   How soon after?

10  **A.**   Very soon.  I think it was part of the -- it was changed

11  the same day.

12  **Q.**   And now who do you work for?

13  **A.**   Campos.

14  **Q.**   And this is the same person -- is this the same person who

15  touched you inappropriately?

16  **A.**   Yes.

17  **Q.**   How does it make you feel to work for counselor Campos?

18  **A.**   Intimidated.

19          **THE COURT:**   Do you have to work at -- is that a choice

20  or not?

21          **THE WITNESS:**   No.  It's not by choice.  I've asked not

22  to -- I've requested to -- any other employment.

23  **BY MS. MONTES:**

24  **Q.**   And now how much do you make working for counselor Campos?

25  **A.**   Like $5 a month, maybe 6.

1  Q.   Do you feel that being fired was in retaliation for

2  reporting counselor Campos?

3  A.   Absolutely.

4  Q.   Who approves your visit requests?

5  A.   Campos.

6          THE COURT:   I don't understand that question.

7  BY MS. MONTES:

8  Q.   Is there a process to approve visitation?

9  A.   Yes.   Counselor Campos is -- that's one of her duties, is

10  to approve our visitors.   So I have been trying to get my

11  daughter approved to come see me for the last few months, and

12  she keeps saying she doesn't have the visitor --

13          THE COURT:   She said what?

14          THE WITNESS:   She keeps saying she doesn't have the

15  visitor forms.   Same with my aunt and uncle who live right here

16  in Dublin and would happily come see me.   She doesn't have

17  those either, even though they've sent them multiple times.

18          THE COURT:   I don't understand what that means, they

19  don't have -- she doesn't have visitor forms.

20          THE WITNESS:   Well, so my family mails them in.   She

21  says she doesn't get them.

22          THE COURT:   And they live in Dublin?

23          THE WITNESS:   Yes.

24          THE COURT:   Are they here in the courtroom?

25          THE WITNESS:   I have another aunt and uncle that are.

**BY MS. MONTES:**

**Q.**   Have you been able to be visited by your family in the last few months?

**A.**   Since -- just recently, yes.

**Q.**   Have any staff made comments to you --

      **THE COURT:**  Okay.  I'm sorry.  I want to understand this visitor issue.

      **THE WITNESS:**  Okay.

      **THE COURT:**  So you do have visitors or you don't --

      **THE WITNESS:**  Okay.  So I have two aunts and one uncle that were approved when I first got to Dublin back in January of 2023.  But since this incident, I have not been able to get anyone approved.

      **THE COURT:**  So because they were approved, they can still see you?

      **THE WITNESS:**  They couldn't for, I guess -- I don't know the determination of the time.  There was the -- so the phone, email, video visits and in-person visits were part of my punishment for this incident report, and I don't know for how long.

   I do know after I met with the attorneys 32 days in, they came back on.  I got those rights back.  And I don't know if that had anything to do with it or if it was supposed to have, but it was -- it was 32 days after I lost them, I was able to get those back.

1        **THE COURT:**  So those -- so you now -- that consequence

2  has been withdrawn?

3        **THE WITNESS:**  Right.  Right.  But the commissary

4  continues.

5        **THE COURT:**  So the two aunts and uncles now can visit,

6  but you haven't been able --

7        **THE WITNESS:**  Get anyone else added, correct.

8        **THE COURT:**  -- to get anyone else authorized.

9        **THE WITNESS:**  Uh-huh.

10        **THE COURT:**  And the other people you want authorized

11  are who?

12        **THE WITNESS:**  My daughter.

13        **THE COURT:**  Is she local or not?

14        **THE WITNESS:**  She lives in San Diego, San Clemente.

15        **THE COURT:**  And you said other people who live in

16  Dublin?

17        **THE WITNESS:**  Yes.  I have an aunt and uncle right

18  here in Dublin.

19        **THE COURT:**  Okay.  Thank you.

20  BY MS. MONTES:

21  **Q.**  Can you tell me --

22        THE COURT:  Can I have you write down for me their

23  names --

24        THE WITNESS:  Sure.

25        THE COURT:  -- on a --

1    not sexual, it was aggressive.

2              THE WITNESS:  Right.

3              THE COURT:  Have you personally seen any sexual

4    issues, sexual abuse, sexual touching?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  What have you seen?

7              THE WITNESS:  I'd rather -- I don't feel safe talking

8    about it.

9              THE COURT:  Have you reported it?

10             THE WITNESS:  What I've seen other people do?  No.

11             THE COURT:  Is it officer-on-inmate or

12   inmate-on-inmate?

13             THE WITNESS:  Officer-on-inmate.

14             THE COURT:  How many incidents have you seen?

15             THE WITNESS:  At least a few.  I mean, like four or

16   five probably.

17             THE COURT:  And when did you see them?

18             THE WITNESS:  I mean, over the past year.

19             THE COURT:  So in 2023?

20             THE WITNESS:  Uh-huh.

21             THE COURT:  That's a "yes"?

22             THE WITNESS:  Yes.

23             THE COURT:  And at the camp or somewhere else?

24             THE WITNESS:  At the camp.

25             THE COURT:  Did they involve one officer or many?

1        **THE WITNESS:**  One officer.

2        **THE COURT:**  One or more?

3        **THE WITNESS:**  Am I talking about different officers,

4   are you saying?  Yeah.  Different officers.

5        **THE COURT:**  How many?

6        **THE WITNESS:**  Three.

7        THE COURT:  All right.  It's way past our lunch break.

8   During this break, you're ordered not to talk to anybody,

9   including your lawyers, about anything.  Okay?

10       THE WITNESS:  Okay.

11       THE COURT:  All right.  We'll stand in recess until

12   12:45.

13   All right, Mr. Galvan, Ms. Mattioli, I will see you at

14   sidebar.  We will stand in recess until 12:45.

15       (Sidebar conference held without the reporter.)

16       (Luncheon recess was taken at 12:07 p.m.)

17   **AFTERNOON SESSION**                               **12:47 p.m.**

18       THE COURT:  We're back on the record.

19   The record will reflect that the witness is here.  And

20   counsel is present.

21   So do you recall when your family sent in those visitation

22   requests?

23       **THE WITNESS:**  I would have to ask them the exact

24   dates.  I don't -- I don't know.  I -- I told them to send them

25   again certified mail so I would have proof that they were

1    don't tell me.  They just told me they were taking my phone, my

2    email, my -- so they don't tell me the length of time.  So I

3    didn't know at the time until it came back on.

4    Q.   Okay.

5    A.   That's what I'm saying.

6    Q.   I understand.

7    A.   Okay.

8    Q.   You testified that there's not currently a drug problem at

9    the camp?

10   A.   I'm saying there is no drugs at the camp currently that I

11   know of.

12   Q.   But there is a drug problem?

13   A.   Of course.  There is a bunch of drug addicts with no

14   treatment and no help.

15   Q.   You also testified that staff are bringing drugs into the

16   compound?

17   A.   Yes.  That's what I've been made aware of, yes.

18   Q.   Have you reported that?

19   A.   No.  I am in fear of my life.  No, I could not do that.

20   Q.   But you came here and testified at a public court hearing

21   about it?

22   A.   Because I'm not saying any details.  That's why.  Because

23   I'm not -- I'm scared.  I shouldn't --

24            MS. MONTES:  Objection.  Argumentive.

25            THE COURT:  It is not argumentive.

**BY MS. MATTIOLI:**

**Q.**   Are you aware of confidential ways to report things like that?

**A.**   No.

**Q.**   Are you aware --

**A.**   I mean, it's not --

       **THE COURT:**  Ms. Mattioli, let her finish.

       **THE WITNESS:**  It's not my place to do their job.  They are aware of it.  Let me tell you that.  They are very aware of it.  They know exactly everything that's going on.

**BY MS. MATTIOLI:**

**Q.**   By "they," who do you mean?

**A.**   I'm talking about the staff that runs Dublin.  I'm talking about my unit team.  They know who has phones.  They know who has drugs.  They know who does drugs.  They know how they come in.  They are aware of all of it and they don't stop it.

    So why would I tell them?  Just so I can be retaliated against more?

**Q.**   You just said that they know.

**A.**   They do know.  That's what I'm saying.  So for me to go and tell them anything is for me to get retaliated against more.  Because they already know.  I'm not telling them -- I'm not telling them that -- anything that inmates have not already told them.

**Q.**   You have to stop and let me ask a question.

1   A.   Okay.

2           THE COURT:   You were interrupting her.

3           MS. MATTIOLI:   I thought she was done speaking.

4           THE COURT:   She was not.

5       Ask your next question.

6   BY MS. MATTIOLI:

7   Q.   My question was are you aware of how you could report that

8   to someone outside of BOP?

9           THE COURT:   She's answered the question.   She doesn't

10  trust the process.   Next question.

11          MS. MATTIOLI:   She said she doesn't trust the people

12  in her unit or the people at BOP -- at Dublin, I meant.

13          THE WITNESS:   I tried that with the DOJ about this,

14  and look what happened.   Of course I don't trust the process.

15  BY MS. MATTIOLI:

16  Q.   What do you mean by DOJ?

17  A.   The Department of Justice.   That's who I reported this

18  incident to.   And it came right back to --

19  Q.   How?

20  A.   By email.

21  Q.   To what email?

22  A.   To the one on our inmate to staff.   It says that's how

23  we're supposed to report confidentiality -- confidentially to

24  the Department of Justice in order to avoid being punished by

25  the BOP.

1        And that did not happen for me.  I got punished badly by

2   saying something that happened to me.  So, no, I am not going

3   to do their job for them at all and be punished more.  You

4   think these officers want -- if they cover that -- this stuff

5   up for themselves, you think they're going to let other

6   officers go down for bringing in drugs?

7            **MS. MATTIOLI:**  I have no further questions.

8            **THE WITNESS:**  Absolutely.

9            **THE COURT:**  Any redirect limited to the scope of

10   cross?

11            **MS. MONTES:**  Your Honor, I just -- no more questions

12   on redirect.

13            **THE COURT:**  Okay.  Before you leave, is there anything

14   else you want to tell me while you are here?

15            **THE WITNESS:**  No, Your Honor.

16            **THE COURT:**  No?

17            **THE WITNESS:**  No.

18            **THE COURT:**  All right.  She's excused.

19            **MX. BEATY:**  Your Honor, the plaintiffs call V, is the

20   name she is going by.

21                    (Proceedings sealed.)

22                  <u>**DIRECT EXAMINATION**</u>

23   **BY MX. BEATY:**

24   **Q.**   Good afternoon.

25        Ma'am, what name would you like me to call you during the

1   **A.**   Because I want it to stop.

2   **Q.**   Since you arrived at the camp in January 2023, have you

3   personally witnessed staff sexual misconduct?

4   **A.**   Yes, I have.

5   **Q.**   And where did this staff sexual misconduct take place?

6   **A.**   At the commissary warehouse.

7   **Q.**   And how did you come to witness staff sexual misconduct in

8   the commissary warehouse?

9   **A.**   Well, I was working laundry within the warehouse

10  commissary.

11  **Q.**   Okay.  And just to clarify, what's the relationship

12  between commissary and warehouse?

13  **A.**   Well, the commissary and the warehouse, we get our

14  commissary from the warehouse.  That's where it gets delivered.

15  **Q.**   So commissary workers work alongside warehouse workers?

16  **A.**   Yes.

17  **Q.**   When did you start working in the commissary warehouse?

18  **A.**   I worked like the beginning of February.

19  **Q.**   2023.

20  **A.**   2023.

21  **Q.**   And when did you witness staff sexual misconduct in the

22  warehouse?

23  **A.**   Like about two weeks after I had already been there.

24  **Q.**   By which staff member?

25  **A.**   By Officer Celestial.

1        **THE COURT:**  Officer who?

2        **THE WITNESS:**  Celestial.

3        **THE COURT:**  I can't hear her.

4        **THE WITNESS:**  Celestial.

5        **THE COURT:**  Do you know how to spell that?

6        **MX. BEATY:**  We believe, although BOP could correct us,

7    C-E-L-E-S-T-I-A-L.

8        **THE COURT:**  Okay.  Thank you.

9    **BY MX. BEATY:**

10   **Q.**   What is Officer Celestial's role in the commissary

11   warehouse?

12   **A.**   He's one of the officers in charge.

13   **Q.**   Can you tell the Court what did you see Officer Celestial

14   do?

15   **A.**   I've seen Officer Celestial grabbing B's breasts.  They

16   were playing around, and he grabbed her.

17   **Q.**   And you said B?

18   **A.**   B.

19   **Q.**   Is B an incarcerated woman?

20   **A.**   Yes, she is.

21       THE COURT:  V as in Victor, or B as in Bonnie?

22       THE WITNESS:  B as in Bonnie.

23   BY MX. BEATY:

24   Q.   Where were you in the warehouse when you saw this?

25   A.   I was behind the tubs, the laundry.  There is like these

1    clothes that they keep in the tubs, and I was behind it mopping

2    the floor.

3    Q.    And where were Celestial and B?

4    A.    About 20 feet from where I was standing.

5    Q.    Did they see you?

6    A.    No.  They didn't know I was back there.

7    Q.    What, if anything, did Officer Celestial say while this

8    was happening?

9    A.    She kind of like said like, oh, stop.  And he was like,

10   oh, quit tripping, you know, there's no cameras back here.

11   Q.    To your knowledge, were there cameras in that area of the

12   warehouse at the time?

13   A.    I don't think so.  They are now.  But at the time, I don't

14   think it was any cameras.  I don't remember seeing any.

15   Q.    How did you feel after you saw Officer Celestial grope B's

16   breasts?

17   A.    I mean, I was scared because it had happened to me in a

18   different facility years back.  I was scared so I decided to

19   quit, quit my job.

20   Q.    And after you witnessed this, did you report it to any FCI

21   Dublin staff?

22   A.    Not at the time.

23   Q.    Why didn't you at the time?

24   A.    Because I didn't think it had anything to do with me.

25   And, you know, PREA, I didn't think that was considered PREA at

1   Q.   When did you tell Ms. Agostini?

2   A.   I think I had already been there like three or four days.

3   Q.   What did you tell her?

4   A.   I told her that I didn't want -- I didn't feel comfortable

5   working there.

6   Q.   What, if anything, did Ms. Agostini do to help you work

7   somewhere else?

8   A.   Nothing.  She told me that I was stuck there.

9   Q.   Did you ever file a complaint about what you witnessed in

10  the commissary warehouse?

11  A.   I did.

12  Q.   And when did you do that?

13  A.   When -- after they did the change.

14  Q.   So November 2023?

15  A.   Uh-huh.

16  Q.   And what was that complaint about?

17  A.   About what I had seen and how I felt.

18  Q.   What you had seen in the commissary warehouse?

19  A.   Commissary warehouse with Celestial and B.

20  Q.   And who did you submit that grievance to?

21  A.   To Putnam and Mr. B.

22  Q.   When did you submit it?

23  A.   Around November.  Like the last week of November.

24  Q.   And after you submitted it, did you talk to Mr. Putnam or

25  Mr. B?

1    **A.**    Yes, I did.

2    **Q.**    Were you interviewed by them?

3    **A.**    Yes, I was.

4    **Q.**    More than once?

5    **A.**    More than once.

6    **Q.**    What, if anything, did you tell them in those interviews?

7    **A.**    I mean, I told them that I was scared because I'm working

8    with the people I reported.   And he told me that I was not the

9    first one --

10            **MS. CZIOK:**   Objection.   Hearsay.

11            **THE COURT:**   I'll -- I'll sustain it unless there's

12   something specific --

13            **MX. BEATY:**   Excuse me.   Lieutenant Putnam is an

14   individual defendant, Your Honor.

15            **THE COURT:**   All right.   Overruled.

16   BY **MX. BEATY:**

17   **Q.**    What, if anything, did Lieutenant Putnam say to you?

18   **A.**    He told me that I was not the first one that had reported

19   an incident and that it was a tangled web that they needed to

20   untangle.

21   **Q.**    And after those interviews in November 2023, did SIS help

22   you change your job?

23   **A.**    No.   I'm still there.

24   **Q.**    Since you spoke with SIS, have you received an appointment

25   with psych services?

1    **A.**    No.

2    **Q.**    Have you been interviewed by any outside law enforcement

3    agencies?

4    **A.**    No.

5    **Q.**    Do you still work with Officer Celestial?

6    **A.**    Yes, I do.

7    **Q.**    Officer Narayan?

8    **A.**    Yes.

9    **Q.**    Officer Lopez?

10   **A.**    Yes.

11   **Q.**    How do you feel about returning to your job after this

12   hearing?

13   **A.**    I'm scared.

14   **Q.**    Why?

15   **A.**    Retaliation.

16   **Q.**    What, if anything, has Officer Lopez said to you about

17   this hearing?

18   **A.**    Well, yesterday she --

19           **MS. CZIOK:**  Objection.  Hearsay.

20           **MX. BEATY:**  I'm not offering it for the truth of the

21   matter.  I'm offering it for the impact on V.

22           **THE COURT:**  All right.  I will allow it for that

23   limited purpose.

24        You can tell me.

25           **THE WITNESS:**  She said that she knew that Carla was

1    **A.**    Because I got -- I been getting shots.

2    **Q.**    And prior to August 16th, did you have a job in the

3    facility?

4    **A.**    Yes, ma'am.

5    **Q.**    And what was that job?

6    **A.**    Visiting orderly and unit orderly.

7    **Q.**    And do you still have that job?

8    **A.**    No, ma'am.

9    **Q.**    And when -- when did you lose that job?

10   **A.**    They took the job from me from going to see -- get the

11   legal visits.  Because I was going to talk to the attorneys at

12   the legal visit, and all of a sudden, they told me I couldn't

13   work over there no more.

14   **Q.**    Did they explain why?

15   **A.**    No.  I asked the lieutenant why.  And she said I have to

16   take that up with SIS.  And I emailed SIS, and they never

17   responded back to me.

18          **THE COURT:**  Do you have an individual lawsuit?  The

19   lawsuit that we're dealing with today is not an individual

20   lawsuit.  Do you have your own lawsuit?

21          **MS. JANSSEN:**  So JM is a named plaintiff in this

22   lawsuit.

23          **THE COURT:**  Okay.  I'm asking whether she has an

24   individual lawsuit.

25          Do you know?

```
 1              MS. JANSSEN:  Only through -- through this lawsuit,

 2    not separate from this, beyond, I believe, compassionate

 3    release.

 4              THE COURT:  And when was the original complaint filed?

 5              MS. JANSSEN:  In this matter, August 16th.

 6              THE COURT:  Okay.  Go ahead.

 7    BY MS. JANSSEN:

 8    Q.   This may sound odd, but in recent visits in December, have

 9    you -- have you gone to a legal visit recently?

10    A.   Yes.

11    Q.   Was that -- when was that?

12    A.   I just had one last week.

13    Q.   And this may sound odd, but during those visits, did you

14    have to use the restroom?

15    A.   Yes.

16    Q.   What happened when you went to go use the restroom?

17    A.   They took us to the restroom and stood there and watched

18    us while we go.

19    Q.   Had they done that at any time prior to this?

20    A.   No.

21              THE COURT:  How many times have you met with legal

22    counsel before that time?

23              THE WITNESS:  A lot.

24              THE COURT:  And did you go to the bathroom any of

25    those times?
```

1          **THE WITNESS:**  Yes, ma'am.

2          **THE COURT:**  And that didn't happen?

3          **THE WITNESS:**  No, ma'am.

4    BY MS. JANSSEN:

5    **Q.**   Do you feel you will be retaliated against after

6    testifying here today?

7    **A.**   I hope not.

8    **Q.**   I hope not as well.

9         Do you feel safe at FCI Dublin?

10   **A.**   No, not really.  I just stay in my room now.

11         THE COURT:  I just what?

12         THE WITNESS:  I stay in my room.

13         THE COURT:  There's some water there for you, if that

14   will help.

15         MS. JANSSEN:  I have no further questions.  Thank you.

16         THE COURT:  I've read your declaration about what

17   happened to you.  Has anything happened to you since the most

18   current associate warden -- well, has anything happened to you

19   like that this fall?

20         THE WITNESS:  No, ma'am.

21         THE COURT:  Okay.  Is there anyone there who you

22   trust?

23         THE WITNESS:  Well, I talk to Ms. Miner.  I talk to

24   Ms. Miner.

25         THE COURT:  We're not getting that.  Take a deep

1    aggressive.  They treat us differently.  They make us feel

2    belittled.

3              **THE COURT:**  Okay.

4         Proceed.

5    **BY MX. BEATY:**

6    **Q.**   Claudia, have you reported Officer Smith's abuse since it

7    occurred?

8    **A.**   Yes.

9    **Q.**   Did you do that yourself or did someone help you?

10   **A.**   I was helped.

11   **Q.**   Who helped you?

12   **A.**   One of the female victims, and I spoke with the female

13   attorney.

14   **Q.**   And what's your attorney's name?

15   **A.**   Jacob.  Yeah, Jacob firm.

16   **Q.**   Did that attorney help you file a grievance against Smith?

17   **A.**   Yes.

18   **Q.**   Around when?

19   **A.**   December.  Around December.

20   **Q.**   Of what year?

21   **A.**   The year '22.

22   **Q.**   And after that, were you interviewed by federal

23   investigators?

24   **A.**   Yes.

25   **Q.**   Do you feel that since you began working with your

1    attorney, staff have treated you differently?

2    **A.**   Yes.   The change was noticeable instantly.

3    **Q.**   How so?

4    **A.**   For starters, my medications were taken away from one day

5    to the next.   And the medication for my convulsions got

6    reduced.   I -- I --

7             **THE INTERPRETER:**   The interpreter needs to ask for

8    repetition.

9             **THE WITNESS:**   I started getting threatened, telling me

10   that if I started to speak or report, they were going to file

11   an incident report against me, or I was going to be sent to the

12   SHU.

13   **BY MX. BEATY:**

14   **Q.**   You just said a lot so I want to break it down a little

15   bit.

16        When you say you were threatened, who threatened you?

17   **A.**   Depending which officer was there at the moment.

18   **Q.**   So staff?

19   **A.**   Yes.

20   **Q.**   Different staff.

21        And you mentioned shots.   What's a shot?

22   **A.**   It's an incident report.

23   **Q.**   You received shots at FCI Dublin?

24   **A.**   Yes.

25   **Q.**   Do you know about how many?

1    **A.**   A whole bunch.

2    **Q.**   And in your experience, how, if at all, did the number of

3    shots that you received change after you reported Smith?

4    **A.**   That's the time when my shots increased.

5    **Q.**   Can you give examples of things you've received shots for

6    since reporting Smith?

7    **A.**   For out of bounds, for using tight clothing, for being

8    insolent, and for talking back.

9    **Q.**   What kinds of punishments have you received for those

10   shots?

11   **A.**   Telephone was taken away from me as well as video calls

12   and the emails.   And commissary as well.

13   **Q.**   How did the -- how does the loss of phone, video, emails

14   impact you?

15   **A.**   Very much so.

16   **Q.**   How so?

17   **A.**   I was unable to see my children.   The fact of not being

18   able to see them.   I live very far away from them, and no one

19   comes to see me, so that's my only opportunity.   The fact of

20   listening to them and speaking with them.

21   **Q.**   Claudia, have you had your cell searched at FCI Dublin?

22   **A.**   Yes.

23   **Q.**   How many times?

24   **A.**   After the incident, many times.

25   **Q.**   And what do you mean by "the incident"?

1    **A.**    After I reported Smith, they started coming often

2    regularly to my cell.

3    **Q.**    Have you participated in in-person legal visits at FCI

4    Dublin?

5    **A.**    Yes.

6    **Q.**    About how many?

7    **A.**    Six.

8    **Q.**    Would you say those visits have been private?

9    **A.**    No.

10   **Q.**    Have you attended any legal visits in the last month?

11   **A.**    Yes.

12   **Q.**    Did staff strip search you following those visits?

13   **A.**    Yes.

14         **THE COURT:**  How long did they take?  How long did they

15   take?

16         **THE WITNESS:**  You could say 10 minutes because I

17   was -- I had to get absolutely naked.

18   **BY MX. BEATY:**

19   **Q.**    Had staff ever strip searched you before after a legal

20   visit before September?

21   **A.**    No.

22   **Q.**    Did you go to the bathroom during any of those legal

23   visits?

24   **A.**    Yes.

25   **Q.**    Did staff at any point watch you in the bathroom during

```
 1              THE WITNESS:  Yes.

 2    BY MX. BEATY:

 3    Q.    You said you've attempted suicide twice at Dublin?

 4    A.    Yes.

 5    Q.    When was the second time?

 6    A.    In December.

 7              THE COURT:  Did they take you to the hospital?  Did

 8    they take you to the hospital?

 9              THE WITNESS:  Not the first time.

10              THE COURT:  The second time?

11              THE WITNESS:  Yes.

12              THE COURT:  Go ahead.

13    BY MX. BEATY:

14    Q.    You said you attempted suicide in December 2023.

15    A.    Yes.

16    Q.    Prior to attempting suicide, did you tell any FCI Dublin

17    staff that you were feeling suicidal?

18    A.    Yes.

19    Q.    Who did you tell?

20    A.    I went to the psychologist, the woman psychologist, to

21    tell her because previously she told me that I could trust her

22    and you could come -- I could go to her to talk.

23          But at the time that I arrived to see her asking for help,

24    she asked me whether I had any urge to harm myself or to harm

25    someone else.  At that moment I said whatever is near me, I
```

1   think I might harm it, whatever it is, and that I needed help.
2   **Q.**   Did you get help?
3   **A.**   No.   She told me to go back to my room.   And then she gave
4   me a little mask to cover my eyes and told me that that would
5   help me sleep.
6   **Q.**   How did you attempt suicide in December?
7   **A.**   I cut myself.   And I was -- I got blocked.   I don't know
8   what else happened to me.   I only know that I had some sort of
9   vision, and it always happens to me when I block myself, I
10  faint.   They came to -- to assist me.   I was unconscious, and I
11  did not recover consciousness until I arrived at the
12  lieutenant's office.
13  **Q.**   Do you believe that you've received adequate mental health
14  treatment at FCI Dublin?
15  **A.**   No.
16  **Q.**   Have you complained to staff about the adequacy of your
17  mental health treatment?
18  **A.**   Many times.
19  **Q.**   How many times?
20  **A.**   I would go to a physician even three to four times per
21  week because you have to file some paperwork in order for them
22  to see you.   And we would never get called.
23       And when we -- we would go in an urgency situation because
24  I would get a convulsion or I needed help, I was told that I
25  was fine, that don't go there to bother them unless I was dead.

**Q.**    And just to back up a little bit, do you know if there was

anyone else in the shower at the same time as you?

**A.**    There was.

**Q.**    And you can identify them just with initial, if you

remember who it was?

**A.**    M.

**Q.**    Okay.  And so after you went back to your room and you

were putting on your clothes, what happened next?

**A.**    Officer Singh came to my door.  He looked through the

door.  I only had on my bra, and I was putting on my underwear,

and he looked in.  We made eye contact.  He looked away.  And

Ms. Miner Groover was standing next to him, and I heard her say

I don't care, and she opened up my door.

**Q.**    And who was Ms. Miner groover in the facility?

**A.**    Ms. Groover is our unit team.

**Q.**    Okay.  Is she a unit manager --

**A.**    The manager.

**Q.**    So what happened after Officer Groover opened the door?

**A.**    She asked me to give her my ID.  And I told her hold on,

let me put on some clothes.  And she said I don't care, give me

your ID.  I'm giving you a direct order to give me your ID.

**Q.**    And were you -- what clothes were you wearing or not

wearing at the time?

**A.**    I had on my bra.  When she opened up the door, I was

pulling up my underwear.  So at this point I had on my bra and

1    my underwear.

2    **Q.**   And do you know if -- what time that was when she opened

3    the door, or approximately?

4    **A.**   It was -- it was before 10:00 a.m.

5    **Q.**   And did she eventually shut the door when you asked her?

6    **A.**   No.

7    **Q.**   And so how did this experience make you feel?

8         I'll rephrase.  Her opening the door on you, how did that

9    make you feel in that moment?

10   **A.**   It made me feel violated.  It brought up memories for me

11   of a previous situation.

12   **Q.**   And when you say previous situation, I don't need you to

13   get into it, but is that a previous sexual situation?

14   **A.**   Yes.

15   **Q.**   And does what happened in August with Officer Groover

16   still impact you?

17   **A.**   Yes.

18   **Q.**   Did you have any prior contact with Officer Groover before

19   that day?

20   **A.**   I have.  The day before.

21   **Q.**   And what was that contact like?

22   **A.**   Again, I was in my room after work.  I was working

23   electrical at the time.  I was taking a nap.

24        Our officer of the unit at the time allowed me to put a

25   sheet across the window to stop the sun from coming in.  I was

1   Q.   And what happened when you were at the officer's station?

2   A.   The officer just asked for my ID.  I gave him my ID.  I

3   turned around to the door to exit the unit.  Well, that's where

4   we exit the unit.  And there was the lieutenant, Officer

5   Groover, another officer there.  And the lieutenant told me to

6   turn around and hand over my cup to another inmate because I'm

7   not allowed to have it in the SHU.

8   Q.   So at that point, you were taken to the SHU?

9   A.   Yes.

10  Q.   And who took you to the SHU?

11  A.   Officer Groover and the lieutenant.

12  Q.   And what was -- for -- what was the reason you were going

13  to the SHU that you understood?

14  A.   At that moment, I wasn't sure why I was being taken to the

15  SHU.

16  Q.   Did you ever find out?

17  A.   Yes.

18  Q.   And what was the reason they told you?

19  A.   So once I was in the SHU, they came to give me an incident

20  report for disrupting count.

21  Q.   Okay.  Did you -- and I'll go back and talk about your

22  experience in the SHU, but did you ever plan on or -- reporting

23  Officer Groover after you felt violated?

24  A.   Yes, I did.

25  Q.   And did you tell her or anyone?

1    **A.**   Yes.   I told her -- I told her and the lieutenant as I was

2    walking to the SHU, I asked the lieutenant why I was going to

3    the SHU, and he did not answer me.

4         And I looked over at Groover, and I said and just so you

5    know, I'm reporting you because I feel like you violated me and

6    I'm going to put a PREA on you.

7         And she said thank you for telling me that.   And she said

8    nothing else.

9         I went to the SHU.   And the next day, I was presented with

10   another shot for threatening staff with bodily harm.   But

11   they -- that -- because I told her I was going to put a PREA on

12   her.

13   **Q.**   Did you end up reporting her for PREA?

14   **A.**   At that time I did not.

15   **Q.**   So while you were in the SHU, did you try to report her

16   for PREA?

17   **A.**   I did try to, yes.

18   **Q.**   And how did that go?

19   **A.**   The captain -- anytime the unit team did their walks on

20   Wednesdays, they just said that it wasn't considered PREA.   I

21   tried to explain my situation.   They said it wasn't a PREA

22   situation.

23   **Q.**   Did they say why it wasn't considered PREA?

24   **A.**   Yeah.   They said because she was a female officer, it

25   wasn't PREA and I had on my -- my bra and my underwear, so she

```
1    have used it to call your lawyer?

2              THE WITNESS:  Yes.

3              THE COURT:  Okay.  So that's a positive thing.  Have

4    you used the line?

5              THE WITNESS:  Yes.

6              THE COURT:  And is it working?

7              THE WITNESS:  Yes.  The pilot line, yes.

8              THE COURT:  Okay.

9         When people are using the computers, are other people --

10   well, tell me, when people are using the computers that you

11   observe or when you're using it, are people watching you?

12             THE WITNESS:  Yes.

13             THE COURT:  Who is watching you?

14             THE WITNESS:  Inmates can see.  When the officers do

15   their rounds, they can see.

16             THE COURT:  Can they read what's on the computer?

17             THE WITNESS:  Yes.

18             THE COURT:  How?

19             THE WITNESS:  Just looking at the computer.  They can

20   stand on the side of you or behind you and read the computer.

21             THE COURT:  Aren't there privacy screens?

22             THE WITNESS:  There is a little privacy screen that's

23   attached to the computer, yes.

24             THE COURT:  Have you ever been able to read something

25   that someone else wrote?
```

| | |
|---|---|
| 1 | **THE WITNESS:** Yes. |
| 2 | **THE COURT:** How do you do that when there's a privacy |
| 3 | screen? |
| 4 | **THE WITNESS:** Because I don't feel that it's pretty |
| 5 | private at all. It doesn't block anything. It doesn't make it |
| 6 | dark. On the iPhone there is privacy screens where I can't see |
| 7 | this. But that's not the case on the privacy screens that are |
| 8 | on the computers. |
| 9 | **THE COURT:** Okay. |
| 10 | Cross. |
| 11 | The attorneys on the other side will get to ask you |
| 12 | questions. |
| 13 | **THE COURT:** Ms. Mattioli. |
| 14 | **MS. MATTIOLI:** Thank you, Your Honor. |
| 15 | <u>**CROSS-EXAMINATION**</u> |
| 16 | **BY MS. MATTIOLI:** |
| 17 | **Q.** Good afternoon. |
| 18 | **A.** Hello. |
| 19 | **MS. MATTIOLI:** I would just like to publish a photo |
| 20 | and not admit it. It is 419 -- 420. |
| 21 | I guess it's just to identify it. |
| 22 | **THE COURT:** The other side has it. Go ahead. |
| 23 | **BY MS. MATTIOLI:** |
| 24 | **Q.** Can you tell me what this is a photo of? |
| 25 | **A.** Of someone on a computer. |

1   saw me half naked.  And as I screamed, hey, they looked at me

2   and looked at my roommate and then back at me and continued to

3   pretend that everything was okay, and said one, two, and then

4   they continued to close the door and walked away.

5   **BY MS. SPIEGEL:**

6   **Q.**   And how did you feel when that happened?

7   **A.**   Hurt.  Hurt.

8   **Q.**   Did you report the incident?

9   **A.**   Yes.

10  **Q.**   How did you report it?

11  **A.**   I emailed Deveney.

12  **Q.**   And did you file a formal grievance?

13  **A.**   Yes, ma'am.  After that, yes, I did.

14  **Q.**   And who does that go to when you file it?

15  **A.**   I gave it to Ms. Miner, my counselor.

16  **Q.**   After filing this report, did anyone follow up with you

17  about it?

18  **A.**   Yeah.  A psychologist named Ms. Miner M.

19  **Q.**   Okay.  And did you meet with her?

20  **A.**   Yes.

21  **Q.**   And what happened in that conversation?

22  **A.**   Well, she asked the details of what happened, and then

23  said that medical would call me to ask more questions, but they

24  never did.

25  **Q.**   When you filed that complaint, did you have a job at FCI

1  Dublin?

2  **A.**    Yes.

3  **Q.**    Where did you work?

4  **A.**    CMS.

5  **Q.**    And what were some of the work that you did on that job?

6  **A.**    Drywall, painting, tile, floors.

7  **Q.**    And are people who have that job ever given additional

8  special privileges?

9  **A.**    Yes.

10  **Q.**    Like what?

11  **A.**    Like we get to repair our own bedrooms to make things more

12  comfortable for ourselves.

13  **Q.**    And had you been given any of those privileges?

14  **A.**    Yes.

15  **Q.**    Were they ever taken away?

16  **A.**    Yes.

17  **Q.**    When were those privileges removed?

18  **A.**    The day after I reported to Deveney that I had been walked

19  in while using the restroom.

20  **Q.**    And how did you find out that those privileges were taken

21  away?

22  **A.**    By another foreman because my -- my own foreman wouldn't

23  even tell me.  He told another foreman to cancel all my

24  projects.

25  **Q.**    And did you believe it was directly related to having

1   filed the complaint?

2   **A.**   Yes.

3   **Q.**   Other than the information you have told us already, is

4   there any other reason that made you believe that?

5   **A.**   No.

6   **Q.**   Okay.

7       I'm going to switch gears a little bit.  Have you ever

8   personally witnessed staff at FCI Dublin retaliate against

9   other people who had reported sexual harassment?

10  **A.**   Yes.

11  **Q.**   When was the most recent time you witnessed that?

12          **MS. CZIOK:**  Objection.  Foundation.

13          **THE COURT:**  Sustained.

14      Just lay a foundation, if you can.

15  **BY MS. SPIEGEL:**

16  **Q.**   So are you aware of other people who had been sexually

17  harassed at the prison?

18  **A.**   Yes.

19  **Q.**   How did you know?

20  **A.**   How did I know?

21          **THE COURT:**  Did you see anybody harassed?

22          **THE WITNESS:**  No.

23          **THE COURT:**  So how would you know?

24          **THE WITNESS:**  I've heard a foreman of speaking of

25  wishing to fire SL -- I believe that's her initials -- SL

**A.**   Yes.

**Q.**   Who did you speak to?

**A.**   Ms. Miner M.

**Q.**   Do you remember the full name?

**A.**   Maca -- I don't know how to pronounce it.   Mahooney,
Macooty?

**Q.**   Mulcahy?

**A.**   Yeah.

**Q.**   And what was your conversation with her like?

**A.**   I was begging her to help me get back on my medications,
literally in tears begging.

**Q.**   And did you receive a response?

**A.**   That she would try but...

**Q.**   Did you ever reach out to her outside of a counseling
session?

**A.**   I've emailed her.

**Q.**   What did you say?

**A.**   That I was extremely depressed and that I wanted to die
more than usual, and that I needed help and I was very
suicidal.

    And her response to me was only reach out via that email
if it was an emergency.

**Q.**   And have you reached out since then?

**A.**   No.

**Q.**   And are you still experiencing those symptoms?

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  And what is your understanding?

3          THE WITNESS:  That I can email SIS or the warden if

4   it's necessary.  In this case -- well, I don't know if it's the

5   warden, but Deveney, whoever he is.  I know that I can email

6   him and let him know what's going on, yeah.

7          THE COURT:  And do you have an understanding about

8   whether or not these things are confidential or not?

9          THE WITNESS:  No.  I really don't.

10          THE COURT:  Okay.  Any other ways to report that

11   you're aware of?

12          THE WITNESS:  (Shakes head.)

13          THE COURT:  That's a no?

14          THE WITNESS:  That's a no, ma'am.  Sorry.

15          THE COURT:  When you -- do you use the computers that

16   are available?

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  And on the computers, are there privacy

19   screens?

20          THE WITNESS:  Yeah.

21          THE COURT:  And have you ever been behind someone when

22   they're using the computer?

23          THE WITNESS:  Yes, ma'am.

24          THE COURT:  And can you read what's on their computer?

25          THE WITNESS:  Absolutely.

1          **THE COURT:**  Okay.  While I have you here, I didn't

2      write down the name of the two individuals who saw you.  Who

3      were those?

4          **THE WITNESS:**  Oh, Officer Torres.  And the other one

5      was a trainee.  I've never seen him again.  He was training

6      somebody.

7          **THE COURT:**  Okay.  Is Torres male?

8          **THE WITNESS:**  Yes.

9          **THE COURT:**  Okay.  These special privileges that you

10     had, do you use the word special privileges, or was that -- how

11     did that phrase come about?  I've not heard that phrase.

12         **THE WITNESS:**  I just came up with it because I mean it

13     is special.  There weren't actual work orders.  They were just

14     allowing us to do those things for working hard on other

15     projects.

16         **THE COURT:**  And those were -- those were taken away

17     when?

18         **THE WITNESS:**  The day after I emailed Deveney saying

19     that people had walked in on me.

20         **THE COURT:**  Okay.  While I have you here, is there

21     anything else you want me -- you want to tell me about what's

22     going on at Dublin?

23         **THE WITNESS:**  Other than -- other than that we're

24     constantly getting yelled at.  And it's -- it's terrifying

25     living here.  Coming from a state facility where we don't have

1   it.  They tried to read it, but it was too lengthy to be

2   reading it on the email.  And so I went to the law library and

3   I printed it all off and I made copies.  And I gave it to

4   people that requested it that were lead plaintiffs in the suit.

5   **Q.**   Okay.  Are you familiar with someone known as Special

6   Investigations Lieutenant Baudizzon or Baudizzon?

7   **A.**   Yes, sir.

8   **Q.**   Who is he?

9   **A.**   He is the lead investigator that I know of at Dublin right

10  now.

11  **Q.**   Okay.  Was there ever an instance in which Lieutenant

12  Baudizzon in particular took any kind of action against you

13  that you perceived to be retaliatory?

14  **A.**   He called me in on the day that I printed those off.  I

15  believe it was August the 20th or 21st, and he told me that I

16  was in danger and that inmates were complaining about me

17  handing out the Complaint.

18  **Q.**   Okay.  So if you could walk the Court through step by step

19  exactly how the interaction with Lieutenant Baudizzon went.  So

20  let's start at the beginning.  You said he called you in?

21  **A.**   I was in the unit.  And the officer said the lieutenant

22  wants you at the lieutenant's office.

23      So I reported to the lieutenant's office.  Normally when I

24  spoke to this gentleman, he took me in his office and he put

25  this white noise thing on so that the other employees can't

1    hear what's being said.

2         This time he did something different.  He took me in this

3    other area of the lieutenant's office where there are some

4    cells.  And he -- he kind of maneuvered me with his body like

5    towards the cells and he started telling me that he was going

6    to have to put me in protective custody if I didn't start

7    handing out those Complaints.

8    **Q.**   Okay.  I think you said he maneuvered you somehow by the

9    cells.  Could you just tell what you mean by that --

10   **A.**   His body language was such that I believe he was about to

11   lock me up?

12   **Q.**   What do you mean by that?

13   **A.**   Because I had never been taken by those cells before.  And

14   those cells -- I've been taken to the SHU before at other

15   facilities.  So I know what it feels like when -- when you're

16   about to get locked up.  And he was emphatic about not -- that

17   I should not give anyone else those Complaints.

18   **Q.**   So let me stop you there.  So you said there are some

19   cells in this part of the lieutenant's office.

20   **A.**   Yes, sir.

21   **Q.**   Had you ever been taken to this particular area before?

22   **A.**   No, sir.

23   **Q.**   Did you have any awareness of its existence prior to you

24   being taken there?

25   **A.**   No, sir.

1  **Q.**   Okay.   How did you feel when you were taken to this new

2  part of the lieutenant's office?

3  **A.**   I was afraid because I don't want to go to the SHU.

4  **Q.**   Okay.   Did you file a report about this incident?

5  **A.**   Yes.   I filed a grievance.

6  **Q.**   Okay.   What's a grievance?

7  **A.**   Administrative remedy.   I filed a BP-9 and said that --

8  and explained briefly that he had interfered with my right to

9  discuss and assist other inmates with legal issues.

10          **MR. CHA-KIM:**   Okay.   Can we briefly put up

11 Exhibit 353, the second page.

12          **THE COURT:**   Do I have a copy?

13          **MR. CHA-KIM:**   It is included in the master set of

14 documents, Your Honor.

15 **Q.**   Rhonda, do you recognize this document?

16 **A.**   It's not on my screen.

17 **Q.**   Oh, I'm sorry.

18 **A.**   Yes.   That is my handwriting.

19 **Q.**   Okay.

20          **THE COURT:**   What is the number?

21          **THE CLERK:**   353, Your Honor.

22          **MR. GALVAN:**   Here is a separate copy.

23 BY MR. CHA-KIM:

24 **Q.**   Rhonda, the Judge has a copy of this exhibit so I'm not

25 going to ask you too many questions about it.   I just want to

```
1   talk to you very briefly about some quick points.

2        What is the date that's referenced here?

3   A.   8/23, sir, August 23rd.

4   Q.   What's the date of the activity that you're complaining

5   about on this --

6   A.   On August 21st.

7   Q.   Okay.  At the very end, it says I -- did you write this?

8   A.   Yes, sir, I did.

9   Q.   "I agreed with him not to give anyone else a copy of the

10  lawsuit.  I only agreed to prevent being," and then if we can

11  turn to page 4 of this same exhibit.  And if we can -- we don't

12  have to zoom in -- "only agreed so as not to be placed in the

13  SHU."

14       Did you write that?

15  A.   Yes, sir.

16  Q.   What did you mean by that?

17  A.   I believed that he was about to place me in the SHU unless

18  I agreed not to give anyone else a copy of the Complaint.

19  Q.   Did you agree to do so?

20  A.   Yes, I did.

21  Q.   And what happened afterwards?

22  A.   He let me go.

23  Q.   And then it says, "The next day an officer stated the

24  lieutenant was going to put me in the SHU because officers did

25  not want any inmates with a copy of the lawsuit, specifically
```

1    those named in the Complaint yet still working around sex abuse

2    victims."

3         What did you mean by that?

4    A.   When I went back to the unit, Officer Williams was

5    working, and she said, oh, you thought you were going to the

6    SHU, huh, [name redacted]?

7         And I said yes, ma'am.

8         And she stated that he had gave her basically a heads-up

9    that I might be going to the SHU.

10   Q.   What impression, if any, did that statement have on you?

11   A.   I was afraid.

12   Q.   Why were you afraid?

13   A.   Because the SHU is a very uncomfortable and punitive

14   place.   It's where a lot of bad things happen to people.   And

15   it's just a -- not a place that anyone wants to be.

16             MR. CHA-KIM:   Very quickly, Your Honor, for the record

17   we would move to strike an inadvertent mention of a last name.

18             THE COURT:   The motion is granted.   It's stricken.

19             MR. CHA-KIM:   Thank you, Your Honor.

20   Q.   Is Lieutenant Baudizzon still on staff at Dublin?

21   A.   Yes, sir.

22   Q.   Do you know what his role is now?

23   A.   He is still the lead investigative officer, sir.   He calls

24   us when there's -- all sex abuse of victims are called about

25   every 90 days or 30 days for monitoring to make sure we're not

```
1   being retaliated against, and he does that.
2   Q.   Okay.  Can you tell the Court what -- I think it's custody
3   status is at the -- at Dublin?
4            THE COURT:  I don't understand your question.
5            MR. CHA-KIM:  I'm laying a foundation for the next
6   document I'd like to show as an exhibit, Your Honor.  There's a
7   concept called custody status that was affected by an active
8   retaliation, and so I would like the Court to understand what
9   that is.  I can just go to the document if that would be
10  easier.
11           THE COURT:  Okay.
12           MR. CHA-KIM:  Should I go to the document?
13           THE COURT:  You should.
14           MR. CHA-KIM:  Thank you, ma'am.
15       Can we put up -- I'm sorry.  Can we -- we would move to
16  admit Exhibit 353.
17           THE COURT:  It's admitted.
18           (Plaintiffs' Exhibit 353 received in evidence)
19           MR. CHA-KIM:  Can we please publish Exhibit 23,
20  page 1.
21  Q.   There is some water there for you, Rhonda, if you need it.
22       Rhonda, what is this document?
23  A.   This is the female custody classification form.
24  Q.   What is that?
25  A.   It tells you what your custody classification is.  Most
```

1  inmates at FCI Dublin are in-custody inmates.  I was an

2  out-custody inmate.

3  Q.   What does that mean to be an out-custody inmate?

4  A.   What it means to be an out-custody inmate is that if you

5  have to go to a community medical appointment, you do not have

6  to be handcuffed.  Normally out-custody inmates are held at

7  prison camps.

8       I have two parents that are elderly.  If something would

9  happen to them that I had to go to the hospital or God save

10  like they passed, I would be able to go to a funeral as an

11  out-custody inmate.  If you're an in-custody inmate, it's

12  unheard of to go to a funeral or hospital visit for your

13  family.

14  Q.   Turning your attention to the date at the top right corner

15  there, what is that date, to your understanding?

16  A.   It's July 10th of 2023, sir.

17  Q.   And what does that reflect on this document?

18  A.   It reflects that on that date, my custody was out-custody

19  and it also said to decrease, which means that I should be

20  removed from the facility that I was at.

21  Q.   Okay.  So let me stop you for a second there.  So July 10,

22  2023 --

23          **THE COURT:**  Okay.  You have got to slow down again.

24          **MR. CHA-KIM:**  I apologize.

25          **THE COURT:**  I'm trying to follow here and you're not

1   helping.

2            MR. CHA-KIM:  Understood, ma'am.

3            THE COURT:  Okay.  So I've got the out-custody status.

4   I have the date.  Okay.  Now what's the next step?

5   BY MR. CHA-KIM:

6   Q.   So, [name redacted] --

7            MR. CHA-KIM:  Excuse me.  Move to strike my use of the

8   last name.

9            THE COURT:  Granted.

10  BY MR. CHA-KIM:

11  Q.   Rhonda, there's a different date under something that says

12  identifying data, and it says form date, March 7th, 2023.  Do

13  you see that?

14  A.   Yes, sir.

15  Q.   Okay.

16           THE COURT:  I don't -- okay.  All right.  Go ahead.

17  BY MR. CHA-KIM:

18  Q.   Now, to your understanding, what date or what information

19  does that date reflect?

20  A.   That was the date that my case manager, Mr. Stanfield, did

21  a calculation, his calculation.  And based on these points, he

22  calculated that my security -- total security level was a 14

23  and custody level was out-custody.

24  Q.   Okay.  And where do you see that information reflected on

25  this document?

1  **A.**   It's on the bottom where it says level and custody

2  summary.

3  **Q.**   Okay.   Could we turn to page 2.

4       Rhonda, back to where it says form date.

5  **A.**   Yes, sir.

6  **Q.**   So this is a different document; correct?

7  **A.**   It's a data for a different day.   It still is the custody

8  classification form.

9  **Q.**   So can you tell from this document what date it says the

10  calculation for your status was supposedly made?

11  **A.**   On 9/28/23, I asked for my -- for this form.

12  **Q.**   Okay.   And does it still reflect, according to where it

13  says form date, the same meeting you had with Mr. Stanfield

14  that you were just referring to?

15  **A.**   Correct.

16  **Q.**   Is there anything different now about the information on

17  your sheet versus the one from July?

18  **A.**   They changed my custody to in-custody.

19  **Q.**   Is any of the point information you were just describing

20  elsewhere on this line different?

21  **A.**   No, sir.

22  **Q.**   Are you aware of any reason why your custody status should

23  suddenly change from out to in, in this manner?

24  **A.**   They changed the custody status to retaliate against me

25  for my activities in assisting inmates in this matter, in this

1    case.

2    **Q.**   Do you recall what date you filed that report against

3    Mr. Baudizzon?

4    **A.**   In August, sir.

5    **Q.**   Of what year?

6    **A.**   Of '23.

7    **Q.**   And what's the date that you pulled this document?

8    **A.**   On September 28th, sir.

9    **Q.**   Of what year?

10   **A.**   2023.

11          **MR. CHA-KIM:**   Could we put up Exhibit 345.

12          We move to admit Exhibit 23, Your Honor.

13          **THE COURT:**   Admitted.

14          (Plaintiffs' Exhibit 23 received in evidence.)

15   **BY MR. CHA-KIM:**

16   **Q.**   Rhonda, do you recognize this document?

17   **A.**   Yes, sir.

18   **Q.**   Quick summary, what is this document?

19   **A.**   This is a BP-10 that we sent to the regional director.

20          **THE COURT:**   Hold on.   What number are we talking about

21   now?

22          **MR. CHA-KIM:**   This is Exhibit 345, Your Honor.

23          **THE COURT:**   Hold on.

24          Proceed.

25   / / /

1    not at this institution, but it happened.

2    Q.   Okay.  You also wrote, "Please refer to Internal Affairs."

3    Do you see that?

4    A.   Yes, sir.

5    Q.   To your knowledge, did Internal Affairs ever contact you

6    about this?

7    A.   No, sir.

8         MR. CHA-KIM:  I would like to move to admit 345,

9    Your Honor.

10        THE COURT:  Admitted.

11        (Plaintiffs' Exhibit 345 received in evidence)

12   BY MR. CHA-KIM:

13   Q.   Rhonda, around this time, June, July, August, 2023, did

14   you experience any issues with receiving your legal and other

15   mail?

16   A.   Yes, sir, I did.

17   Q.   What kind of issues?

18   A.   There were probably four to six weeks without receiving

19   mail.  And I kept asking about mail because I communicated with

20   attorneys and family members that were emailing me and telling

21   me they had sent things in the mail.

22        MR. CHA-KIM:  Can we put up Exhibit 366.

23   Q.   Rhonda, do you recognize this document?

24   A.   Yes, sir.

25   Q.   Okay.  Is it a similar administrative remedy request form

1   as before?

2   **A.**   Well, this was a BP-9.

3        **MR. CHA-KIM:**  Hold on one second.

4        **THE COURT:**  All right.  I have it.

5        **MR. CHA-KIM:**  Thank you, Your Honor.

6   **Q.**   Does this document reflect complaints you made about the

7   subject we were just talking about?

8   **A.**   Yes, sir.

9   **Q.**   Okay.  Rhonda, around this time, did you experience issues

10  accessing medicines?

11  **A.**   I'm sorry.  Would you repeat that, please?

12  **Q.**   Around this time, did you experience any issues accessing

13  medicines from Dr. Fisch?

14  **A.**   Yes, I did.

15  **Q.**   What kind of issues?

16  **A.**   I was denied my medications.

17  **Q.**   Around this time, did you experience issues about access

18  to the commissary?

19  **A.**   Yes, I did.  I emailed California Coalition for Women

20  Prisoners for help.  I also emailed the U.S. Attorney and other

21  prisoner advocates because they were intentionally shutting

22  down the commissary to punish us.

23  **Q.**   Did you file administrative or other grievances about

24  these issues?

25  **A.**   Yes, sir, I did.

1    THE COURT:  We're just using --

2    THE WITNESS:  Yes, ma'am.

3    THE COURT:  So that is stricken.  We will call her LB.

4    THE WITNESS:  Yes, ma'am.  I'm sorry.

5  BY MR. CHA-KIM:

6  Q.   Let's move on.  I apologize, but in interests of the late

7  hour.

8  A.   Yes, sir.

9  Q.   Rhonda, around that time that you were speaking with

10  investigators and had this interaction with Mr. Williams, were

11  you taking any steps to get a transfer to home confinement?

12  A.   Yes, sir, I was.

13  Q.   Okay.  And why were you doing that?

14  A.   I qualified one hundred percent for home confinement.  I

15  have a provisional diagnosis for COPD, coughing spasms and many

16  other medical problems.  And I -- and I qualified for it.  And

17  my case manager was trying to send me to home confinement.

18  Q.   Okay.

19    THE COURT:  Who is your case manager?

20    THE WITNESS:  Mr. Shirley, Your Honor.

21    MR. CHA-KIM:  Can we quickly put up Exhibit 19,

22  page 15, please.

23    THE COURT:  To the extent, it's not been offered, 345

24  and 366 are admitted.

25    (Plaintiffs' Exhibits 366 received in evidence)

1    THE COURT:  Who is the judge who sentenced you?

2    THE WITNESS:  Judge Gray H. Miller in Houston, Texas,

3    ma'am.

4    THE COURT:  Male or female?

5    THE WITNESS:  He is a man, ma'am.

6    MR. CHA-KIM:  May I proceed?

7    THE COURT:  I've got to get the exhibit.  You said the

8    next one is 19?

9    MR. CHA-KIM:  Yes, ma'am.  Exhibit 19, page 15.

10   Q.  Rhonda, do you recognize this document?

11   A.  Yes, sir.

12   Q.  Okay.  What do you understand this document to be?

13   A.  I was approved for transfer to home confinement.

14   Q.  Okay.  And how do you know that it shows you were approved

15   for transfer to home confinement?

16   A.  Because that's what the document says, transfer to home

17   confinement, Houston, Texas, transfer date, November 1st, 2022,

18   sir.

19   Q.  Were you in fact ever allowed to be transferred to home

20   confinement?

21   A.  No, sir.

22   Q.  Lieutenant Williams that you mentioned, is he still on

23   staff?

24   A.  Yes, sir.

25   Q.  Okay.  Have you had occasion to interact with him since

| | |
|---|---|
| 1 | **THE COURT:**  So you hadn't talked to anybody about the |
| 2 | two officers?  This was the first? |
| 3 | **THE WITNESS:**  I had -- I had spoke to my boss directly |
| 4 | at the time, my supervisor, about one of the officers. |
| 5 | **THE COURT:**  Okay.  And -- and not about the other? |
| 6 | **THE WITNESS:**  Not about the other. |
| 7 | **THE COURT:**  Okay.  Go ahead. |
| 8 | **BY MS. SPIEGEL:** |
| 9 | **Q.**  You mentioned that the email you sent was, in your words, |
| 10 | you said routed back? |
| 11 | **A.**  Yes. |
| 12 | **Q.**  Can you explain what made you think that? |
| 13 | **A.**  When we originally went to the meeting, I thought that I |
| 14 | was going to be seen by someone from central office, not like |
| 15 | necessarily someone from Dublin. |
| 16 | **Q.**  And that was your impression based on the -- |
| 17 | **A.**  That was my impression. |
| 18 | **Q.**  Okay.  I'm going to switch gears. |
| 19 | Are you familiar with the privacy screens on computers at |
| 20 | Dublin? |
| 21 | **A.**  Yes. |
| 22 | **Q.**  Have you used computers with those screens on them? |
| 23 | **A.**  Yes. |
| 24 | **Q.**  And have you watched other people use the computer with |
| 25 | those screens on them? |

1    A.   Yes.

2    Q.   Can you please, for the Court, just describe how the

3    screen works.   And you can use the screen --

4    A.   It's like a plastic screen protector that goes over the

5    screen, and it has like some kind of tint.

6    Q.   And so if you were sitting where you are right now, would

7    you be able to see everything on the screen?

8    A.   Yes.

9    Q.   What if you were sitting -- you were standing against that

10   marble wall?

11   A.   Yes.

12   Q.   And how can that be if the screen is a privacy screen?

13   A.   I think because the tint or the quality of the screen is,

14   in my words I would say cheap.   So it's not doing, I think,

15   what the intended purpose was, was to protect people from

16   reading or seeing what you are doing on the computer.

17   Q.   So would you feel comfortable writing an email that you

18   didn't want others to see at the computer --

19   A.   No.

20   Q.   And just one last question about reporting.   What would it

21   take for you to feel like you could confidentially report

22   sexual harassment or abuse that you had witnessed or

23   experienced?

24   A.   I think if we had some kind of third-party agency or

25   third-party reporting that had nothing to do with the BOP or

1    any of the staff members that work there.  Maybe a separate

2    agency that could handle these things or oversee them without

3    it being a person that it has any relation to any employee or

4    person that is being either complained about or wanting to be

5    investigated.

6    Q.   And to the best of your knowledge, is there any such

7    mechanism available to you today?

8    A.   I don't think so.

9    Q.   I have just a few questions about commissary.

10   A.   Yes.

11   Q.   Are there items that you regularly buy at commissary?

12   A.   Yes.

13   Q.   What are they?

14   A.   Hygiene, food, clothing.

15   Q.   Do you take any medications?

16   A.   Yes.

17   Q.   Do you have to purchase any of those?

18   A.   Yes.

19   Q.   What's an example?

20   A.   An example would be like I have acid reflux or

21   gastrointestinal problems and I have to purchase medication

22   from the commissary.

23   Q.   Any other medications that you purchase?

24   A.   Just regular like Tylenol or Excedrin for headaches.

25   Q.   And have you always had to purchase those medications?

1    **A.**   Not all of them.  For instance, for my gastrointestinal, I

2    have what they call chronic care.  So in the past, I didn't

3    have to pay for that medication.  I would get it from the

4    institution for free from medical.

5    **Q.**   When did that change?

6    **A.**   Maybe about four months ago.

7    **Q.**   Okay.  And how much does it cost you per month to buy that

8    medication now?

9    **A.**   Each bottle is about 20 tablets.  It's like -- a little

10   under $5.  So it's probably about $10 a month.

11   **Q.**   And you said you've been at FCI Dublin for about 15 years.

12   In that time, have the prices at commissary gone up?

13   **A.**   Yes.

14   **Q.**   And in that time, have wages gone up?

15   **A.**   No.

16   **Q.**   Okay.  And in your time at FCI Dublin, have you had visits

17   from lawyers?

18   **A.**   Yes.

19   **Q.**   When did you most recently meet with lawyers?

20   **A.**   Like two days ago, maybe.

21   **Q.**   And were you strip searched after that visit?

22   **A.**   Yes.

23   **Q.**   Before -- was that with lawyers regarding this lawsuit?

24   **A.**   Yes.

25   **Q.**   In your time at Dublin, before anything related to this

1    lawsuit, had you met with lawyers?

2    **A.**    Yes.

3    **Q.**    Do you recall when?

4    **A.**    Maybe sometime beginning last -- last year.

5    **Q.**    Okay.   And were you strip searched after meeting with

6    them?

7    **A.**    No.

8    **Q.**    And do you personally know of anyone who has decided not

9    to meet with a lawyer because they knew they would be strip

10   searched afterward?

11   **A.**    Yes.

12   **Q.**    How do you know that?

13   **A.**    Because I talked to the person in the unit and I seen how

14   when we were waiting for the attorneys and she came in, because

15   we were being pat searched as soon as we got there, she was

16   discouraged.   She's like no, I'd rather not do this.   And she

17   turned away and didn't have her visit.

18   **Q.**   In your time at FCI Dublin, do you feel that you're any

19   safer now than you've been in the past?

20   **A.**   No.

21          **THE COURT:**  Really?  I have sentenced five people, and

22   I've got more under indictment, and you don't feel safer?

23          **THE WITNESS:**  No.

24          **THE COURT:**  Okay.  So what other sexual abuse have you

25   seen since I started sentencing?

```
 1                    (Discussion held off the record.)

 2              THE COURT:  All right.  In terms of Monday, Ms. Reese.

 3              MS. REESE:  Yes, Your Honor.

 4              THE COURT:  Come on forward.  I'm going to want to

 5    hear from you in terms -- and I'm not going to put you on the

 6    spot today.  It's already late.  I'm going to want to know from

 7    you whether you think things are working as well as you thought

 8    they were working after what you heard today.

 9         You know, witnesses have credibility issues.  All

10    witnesses do on both sides.  But there are some concerns that I

11    have about your assumption that everybody seems to still trust

12    the process and so a mechanism that you put in place to address

13    issues, whether that was prematurely stopped.

14              MS. REESE:  Are you referring to the email,

15    Your Honor?

16              THE COURT:  To the task force --

17              MS. REESE:  The task force email?

18              THE COURT:  -- email.

19              MS. REESE:  Okay.

20              THE COURT:  There is also quite a bit, I think, of

21    miscommunication in terms of confidentiality.  And I will be

22    going over my notes and likely ordering some very easy-to-fix

23    communication notices that will, in my view, need to be put up

24    everywhere in that facility.

25         We are not done, but I think I've got concerns.  So I'm
```

1

2

3                      <u>CERTIFICATE OF REPORTER</u>

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Friday, January 5, 2024

8

9    *Pamela Batalo Hebel*

10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Volume 4**

**Pages 867 - 1135**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

CALIFORNIA COALITION FOR WOMEN )
PRISONERS, ET AL.,            )
                             )
         Plaintiffs,         )
                             )
  VS.                        )     **NO. CV 23-04155-YGR**
                             )
UNITED STATES OF AMERICA     )
FEDERAL BUREAU OF PRISONS,   )
ET AL.,                      )
                             )
         Defendants.         )
_____)

Oakland, California
Monday, January 8, 2024

**EVIDENTIARY HEARING**

**APPEARANCES**:

For Plaintiffs:

        ARNOLD & PORTER KAYE SCHOLER LLP
        250 West 55th Street
        New York, NY 10019
   **BY:  STEPHEN SEUNGKUN CHA-KIM, ESQUIRE**

        ARNOLD & PORTER KAYE SCHOLER LLP
        5 Palo Alto Square, Suite 500
        3000 El Camino Real
        Palo Alto, CA 94306
   **BY:  CARSON ANDERSON, ESQUIRE**

Reported By:    Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                Official Reporter

1    **THE COURT:**  I'm going to strike that question.  Don't

2    put words in her mouth.

3        **MS. JANSSEN:**  Of course.

4    **Q.**  Have you felt that you've experienced retaliation due to

5    accessing counsel or coming to this court?

6    **A.**  Yes, Your Honor -- yes, ma'am.

7    **Q.**  In what ways?

8    **A.**  The way that I'm treated in my work assignment.  I have

9    experienced multiple different staff talk to me and tell me

10   things like we all know what happened to you here.

11       Or say, for example, my boss told me that -- my boss told

12   me you don't want -- because I have a goal of wanting to own a

13   butcher shop.  And my boss told me you don't want to own a

14   butcher shop.  You want to sell drugs for the rest of your

15   life.  You came to prison to learn how to sell drugs better.

16   That was a comment that was made to me.

17       But I go to college five days a week.  So I think it's a

18   little strange that I'm trying to learn how to sell drugs

19   better, but I'm getting a college education every day.

20   **Q.**  Have you felt retaliated against in any other ways?

21   **A.**  Yes.

22   **Q.**  And in what ways?

23   **A.**  When we go to our legal visits, there's a constant -- a

24   new policy or a new rule that they want to start to follow.

25   You know, we've been coming to these legal visits for quite

1    some time, and it's just a new thing to me every time we go

2    visit.

3    **Q.**    And what rule is that?

4    **A.**    Having to be watched while urinating in the visitation

5    room with two officers have to watch us while we're going to

6    the bathroom while our attorneys are 20 feet away from us.

7    **Q.**    I'm going to pause you for a second.   Did you have a legal

8    visit in December of 2023?

9    **A.**    Yes.

10   **Q.**    Did have you to go to the bathroom during that legal

11   visit?

12   **A.**    Yes.

13   **Q.**    Were you able to go to the bathroom?

14   **A.**    My stomach hurt really bad.   And they were making it seem

15   like either I have to go talk to my attorney or go to the

16   bathroom.   Or it -- they were making it seem like I wasn't

17   going to be able to talk to you if I had to go use the

18   bathroom.

19   **Q.**    And on that occasion, were they going to watch you in the

20   bathroom?

21   **A.**    And they were going to watch me go to the bathroom, and I

22   expressed that that was going to make me extremely

23   uncomfortable because I'm sick -- I was sick.

24        And they were like, well, it's either you go back to the

25   housing unit and use the bathroom or you see your attorney.

1    And so that's --

2    **Q.**   What did you decide to do?

3    **A.**   I said I'm going to see my attorney.

4    **Q.**   So you just didn't go to the bathroom?

5    **A.**   I just didn't go to the bathroom.

6    **Q.**   And after that visit, were you also strip searched?

7    **A.**   Yes, ma'am.

8    **Q.**   Prior to December of 2023, had you ever had to go to the

9    bathroom during a legal visit?

10   **A.**   Yes.

11   **Q.**   And on those occasions prior to December 2023, did staff

12   ever watch you?

13   **A.**   No, Your Honor -- no, ma'am.

14          THE COURT:  Jennifer, have you been advised that strip

15   searches are BOP policy nationwide for visits -- after every

16   visit with the public?

17          THE WITNESS:  So that's what they were just -- one of

18   our lieutenants were explaining that to us at the visit.  And

19   he's like I -- he said that I understand you guys aren't used

20   to this, but this is policy.  And our policy hasn't really been

21   clear on what -- what is supposed to be happening to us.  In

22   the beginning, we never even --

23          THE COURT:  But they did tell you it's nationwide

24   policy?

25          THE WITNESS:  Yeah.  Mr. -- Lieutenant Sanchez was

```
1   that I've been through.
2         And it's five sessions.  The lady listens to you.  And
3   that's it.  And I don't even really remember her talking much.
4   And then it was do you want another session?
5         And I said, well, since I only get five, let's spread it
6   out.  And then I didn't reach out to see them again.
7              THE COURT:  These were in person, though?
8              THE WITNESS:  Yes, ma'am.
9              THE COURT:  Okay.  Thank you.
10  BY MS. JANSSEN:
11  Q.   And why didn't you reach out again to Tri-Valley?
12  A.   I felt like I didn't get what I needed.  It wasn't helpful
13  to me, just telling somebody all my deepest, darkest secrets,
14  and I didn't get no -- any -- I didn't get like a response or
15  some tools or anything like that.  It was just like a vent
16  session and then, bye, that was it.
17        So I just told a stranger my deepest, darkest secrets, and
18  then they just gotta leave and go on about their way.  It left
19  me empty.
20  Q.   And I just I have, I think, one other question.
21        Are you typically searched before you have visits with
22  attorneys or victim advocates?
23  A.   No.
24  Q.   Have you ever been searched prior to a meeting with an
25  attorney or a victim advocate?
```

1   **A.**   Yes.

2   **Q.**   And to be clear, was that meeting with an attorney or a

3   victim advocate?

4   **A.**   A victim advocate.

5   **Q.**   And what happened?

6   **A.**   One morning I was reporting to food service to let them

7   know that I had a -- a call-out or to meet with my victim -- my

8   victim support advocate.

9       And I'm a college student, so I have a very big college

10   bag that I take with me everywhere I go.   And it's the same

11   routine I do every day.   I take my college bag to food service,

12   because I have to go from food service to education.

13       And for some reason, the same morning that I was reporting

14   to work, my bag got searched that morning.   And I do the same

15   routine every day, so to me it was a little off.   A food

16   service employee continued to search my bag.   And when I got to

17   my notebook, I said will you please be careful with that.   That

18   was my victim impact letter.   So I'm very cautious about it.

19       I told the officer, I said, will you please be very

20   careful with that notebook.   I feel highly uncomfortable with

21   you touching it.   There is nothing to hide, but you need to

22   have somebody else there while you're touching that.

23       She proceeded to continue to touch my notebook.   And I

24   told her to look at it upside down.   I feel like you're reading

25   my stuff.   And I -- I became very hysterical because that was

1   my privacy of what I was reading and writing to the Judge about

2   my victim impact.

3        She proceeded like as if I was hiding something and called

4   another officer, which when he got there, he started to go

5   through my belongings and that notebook as well, kind of like

6   antagonizing me with that notebook.

7        And I just was extremely uncomfortable.  And they searched

8   my stuff and took three sticky notes to the lieutenant's office

9   to have them tested for substances, where that -- and then they

10  proceeded to tell me I can go.

11       Where later on that day, they brought me my sticky notes

12  back and said thank you because it was nothing on it so...

13  **Q.**  And are you afraid you will be retaliated against after

14  testifying today?

15  **A.**  Yes.

16  **Q.**  Why?

17  **A.**  Because it's happened before.

18  **Q.**  When you say it's happened before, what do you mean?

19  **A.**  When I came to the court hearing for Jones, I feel like

20  they target me.  Oh, did you go where you need to go?  Or are

21  you ready for your -- are you ready for your meeting with your

22  attorneys or your interview?  Or weird comments like that all

23  the time.

24  **Q.**  Thank you.  No further questions.

25           **THE COURT:**  Cross?

1        **MS. KHABBAZ:**  Luma Khabbaz for the plaintiffs.

2   **Q.**   And just for the sake of this questioning, when I ask you

3   questions, please try to do your best to answer with things

4   that you've personally observed and seen.

5   **A.**   Okay.

6   **Q.**   Tyra, are you currently incarcerated?

7   **A.**   Yes, I am.

8   **Q.**   Where are you currently incarcerated?

9   **A.**   FCI Dublin.

10  **Q.**   Is that at the prison or the camp facility?

11  **A.**   Prison.

12  **Q.**   Have you been at the FCI portion your whole time?

13  **A.**   Yes, I have.

14  **Q.**   And, Tyra, have you experienced recent staff sexual

15  harassment at FCI Dublin?

16  **A.**   Yes.

17  **Q.**   And when did this happen?

18  **A.**   It happened for the first time in June.

19  **Q.**   June of which year?

20  **A.**   2023.

21  **Q.**   And where did it happen?

22          **THE COURT:**  Well, I have a declaration from her.

23          **MS. KHABBAZ:**  Sure.  You do have a declaration.

24  **Q.**   So the Judge has your declaration and she has read it so

25  we can be brief when we discuss these incidents.

1      So where did this happen?

2   A.   In the shower.

3   Q.   And can you just briefly tell us what happened and who it

4   was with?

5   A.   It was with a correctional officer there at the prison,

6   and he --

7   Q.   What's his name?

8   A.   Officer Cooper.  And he opened my shower curtain while I

9   was showering.

10  Q.   And how did that make you feel?

11  A.   It made me feel really scared and confused.

12  Q.   Did he open it and close it quickly, or how did that

13  happen?

14  A.   No.  He opened it and I had to close it back myself, but

15  he opened it and stood there and stared at me.

16  Q.   And to your knowledge, does Officer Cooper still work

17  there?

18  A.   He does.

19  Q.   Does he work in your unit?

20  A.   No.

21  Q.   Do you ever see him?

22  A.   If I go to rec, yes.

23  Q.   And have you been recently harassed by any other officers

24  at FCI Dublin?

25  A.   Yes, I have.

1    Q.   Which officer?

2    A.   Officer Henry.

3    Q.   And when did this happen?

4    A.   This happened...

5    Q.   Approximately?

6    A.   Approximately December.

7    Q.   Of which year?

8    A.   2023.

9    Q.   And what happened?

10   A.   He was at my door after lockdown and was saying that he

11   got me out of a shot, that I owe him.

12   Q.   And just -- did he do anything else that made you

13   uncomfortable?

14   A.   Yeah.  His body language, he was just like pretty much

15   really just up on me, like really close to me.  And I had to

16   push him away from my door so that we can be in the hallway and

17   be under a camera.  And...

18   Q.   And how did it make you feel hearing him say that you owed

19   him for not giving you a shot?

20   A.   It -- I was exhausted and just -- just livid.

21   Q.   Can you explain a little bit why?

22   A.   Because I -- I knew what he was insinuating.

23   Q.   And what did you believe he was insinuating?

24   A.   For me to repay him in sexual favors.

25   Q.   And to your knowledge, is Officer Henry a new officer?

1    **A.**   Yes, he is.

2    **Q.**   And is he still working at the facility?

3    **A.**   At the moment, I am not sure because I had went to talk to

4    psychology, and I haven't seen him.

5    **Q.**   Okay.  When was the last time you saw him?

6    **A.**   January 3rd -- I mean, January 2nd.

7    **Q.**   And have you experienced -- sorry.  Strike that.

8           You mentioned that you still see Officer Cooper even

9    though he doesn't work in your unit.  Can you describe those

10   encounters?

11   **A.**   Yes.  When I'm walking to rec, when I'm going to rec.

12   **Q.**   And does he do anything when you see him?

13   **A.**   He just stares at me until I look up at him.

14   **Q.**   How does that make you feel?

15   **A.**   It makes me feel really just like -- I'm sorry.  I can't

16   really -- I'm trying to find the right word to use how he makes

17   me feel.  Because he makes me really feel emotional every time

18   I see him, and weak and controlled.

19   **Q.**   Now, shifting a little bit, have you ever witnessed staff

20   sexually abuse or harass other incarcerated people recently?

21   **A.**   Yes.

22   **Q.**   And can you explain what you saw?

23   **A.**   One of our officers -- our staff in medical, he came in

24   and immediately started saying who's in the shower, who's ever

25   in the shower, and went to every shower to see if an inmate was

1    in the shower, and was telling them like you have to get out of

2    the shower, it's time to get out the shower, you need to get

3    out the shower and would stand there until they get out.

4    **Q.**   Do you know this officer's name?

5    **A.**   Yes.  Officer Singh.

6    **Q.**   Now, shifting a little bit, when you arrived at Dublin,

7    were you provided information about how to respond to sexual

8    abuse?

9    **A.**   No.

10   **Q.**   Were you provided information after the point when you had

11   arrived, more recently?

12   **A.**   Well, from just like the posters we seen but like from

13   staff, no.

14   **Q.**   What do the posters describe?

15   **A.**   Ways to report a PREA through emailing or calling or

16   writing or telling a staff member.

17   **Q.**   And have you ever reported a PREA?

18   **A.**   I have.

19   **Q.**   And can you tell us about that?

20   **A.**   I had emailed SIS and the OIG and I -- when I seen the

21   lieutenant, I immediately told the lieutenant.

22   **Q.**   And which officer was this about, this report?

23   **A.**   Officer Cooper.

24   **Q.**   And what happened after you emailed SIS and reported

25   Officer Cooper?

```
1            THE COURT:  Putnam?

2            THE WITNESS:  No.  No.  He's -- no.  I can't remember

3   his name.  I'm sorry.

4            THE COURT:  What did he look like?

5            THE WITNESS:  He was Hispanic and he had like a short

6   fade bald head and it was balding like right here.  I haven't

7   seen him actually since last year, around that time.  So I

8   don't know if he had left or -- but I know he wasn't like one

9   that's always, always there.  Like every now and then he would

10  come to fill in.

11  BY MS. KHABBAZ:

12  Q.   You said that you saw Lieutenant Hardy when she served you

13  your shot.  Can you explain what that shot was for?

14  A.   The shot was for -- for saying that I was falsifying and

15  not obeying a direct order.

16  Q.   And still talking about reporting, have you ever heard of

17  an OIA representative in the prison?

18  A.   No.

19  Q.   Have you ever tried calling Crime Stoppers?

20  A.   I did and they didn't answer.

21  Q.   When was this?

22  A.   When I had reported Officer Cooper.

23  Q.   And have you ever tried to report Cooper to Lieutenant B?

24  A.   I did.

25  Q.   And how did that go?
```

1    **A.**   Well, when I had -- when I was walking to rec one day, and
2    he smirked at me --
3              **THE COURT:**   Who is he?
4              **THE WITNESS:**   Officer Cooper smirked at me, and I went
5    to the lieutenant's office to tell Lieutenant Calderon, and she
6    told me, well, just walk -- walk the other way when you see him
7    or don't go to rec, pretty much.
8         And when Mr. B -- when he came back, I asked to speak to
9    him.  He was like when he -- when he get a chance.  But he did
10   come see me like -- like way later on, like down the line.
11   BY MS. KHABBAZ:
12   **Q.**   And have you ever been prevented from reporting by any
13   officer or felt --
14   **A.**   Yeah.  Because we would ask them like can we go to the
15   lieutenant's office or can you call SIS Ferguson so I can speak
16   to them.  And they would pretty much try to stall.
17        And one time I did ask can I speak to Mr. Ferguson, and
18   the Captain Quezada she told me no and that I was pretty much
19   forced to talk to her.
20   **Q.**   And after reporting Officer Cooper, did you ever face any
21   retaliation?
22   **A.**   Yes.
23   **Q.**   Can you explain what that was?
24   **A.**   Immediately a week after I reported, I received a shot
25   from a CO.  And then another officer, Cooter, she came and did

1    whenever they come to see me.  And I haven't been on any

2    call-out.

3    Q.   When was this that you reached out?

4    A.   In June, July.

5    Q.   Shifting to access to your lawyers, have you used the

6    pilot phone line in the unit to talk to lawyers?

7    A.   Yes, I have.

8    Q.   What's your experience with that phone?

9    A.   The phone, the whole system is really good.  They just

10   have one phone in each unit.  And in our unit, that phone

11   happens to be in our video visiting room.

12        And so we have access to it, but a lack of it because a

13   lot of people are visiting every 30 minutes, every hour.  So if

14   we want to -- if we're in the middle of a conversation and it's

15   someone's video visit, we have to hang up with our lawyer and

16   allow the girls to do their video visit.

17   Q.   And what's your experience been adding in phone numbers to

18   the phone line?

19   A.   When I had asked to get my public defender's number put

20   in, it took about four weeks to a month.

21   Q.   Tyra, have you attended any in-person legal visits

22   recently?

23   A.   Yes, I have.

24   Q.   And when were your most recent visits?

25   A.   January 2nd and December 19th.

1        **THE COURT:**  Back on that phone issue, when was that

2   that you tried to get it programmed in?

3        **THE WITNESS:**  Last year.

4        **THE COURT:**  Was it at the very start of the program?

5        **THE WITNESS:**  No.  No.  It was like -- like sometime

6   in like August, September when I got it put in.

7        **THE COURT:**  And you said your public defender, so not

8   any of the civil lawyers.

9        **THE WITNESS:**  No.

10       **THE COURT:**  This is on your criminal case?

11       **THE WITNESS:**  Uh-huh.

12       **THE COURT:**  That's a "yes"?

13       **THE WITNESS:**  Yes.

14       **THE COURT:**  Okay.

15  **BY MS. KHABBAZ:**

16  **Q.**  So you said you attended legal visits December 19th and

17  January 2nd.  Were you strip searched after either of these

18  legal visits?

19  **A.**  Yes.  At the -- for the first time, December 19th.

20  **Q.**  And had you attended legal visits prior to December 19th?

21  **A.**  Yes.

22  **Q.**  Were you strip searched after those?

23  **A.**  No.

24  **Q.**  Now, focusing in on your December 19th visit --

25       **THE COURT:**  With respect to that, did they advise you

1  at the time that this was nationwide BOP policy?

2           THE WITNESS:  Ma'am?

3           THE COURT:  The strip search.

4           THE WITNESS:  No.

5           THE COURT:  Did someone tell you that?

6           THE WITNESS:  No.

7           THE COURT:  That it was BOP policy nationwide to do

8  this?

9           THE WITNESS:  No.

10          THE COURT:  Proceed.

11 BY MS. KHABBAZ:

12 Q.   After your December 19th visit after you were strip

13 searched, did anything else happen after this visit?

14 A.   Yes.  I was allowed to go to main line.  And as I was

15 heading over to main line, I was standing in line, Officer

16 Solordio --

17          THE COURT:  Officer who?

18          THE WITNESS:  Solordio.  I don't think I'm pronouncing

19 it right, but it's Solordio.  The officer had asked me what did

20 I have in my pocket, and I told him, I said, it's my hat.

21 And -- sorry.

22 BY MS. KHABBAZ:

23 Q.   It's okay.  Take your time.

24 A.   But I told him it was my hat in my pocket.

25          And he was like what else do you have?

1   **Q.**   Were you trained with anybody else?

2   **A.**   No.

3   **Q.**   So in this training with you and Officer Narayan, did

4   anything happen during that training that made you feel

5   uncomfortable?

6   **A.**   Yes.   He made certain open-end remarks to me.   And he also

7   had touched my lower back.

8   **Q.**   Why did those remarks -- what about the remarks made you

9   feel uncomfortable?

10  **A.**   Just the fact that, you know, he told me that I was really

11  lucky that there was cameras in the room.   It -- it made me

12  feel like he was insinuating if there wasn't cameras in the

13  room, that maybe something might happen.

14  **Q.**   And did he touch you at all during this training?

15  **A.**   Yeah.   Yes.

16  **Q.**   Where did he touch you?

17  **A.**   On my lower back.

18  **Q.**   How long did he touch you for, if you recall?

19  **A.**   Just a couple of seconds.

20  **Q.**   Was there anything else that happened during this training

21  that made you feel uncomfortable?

22  **A.**   He had asked me to come into his office.

23  **Q.**   And why did that make you feel uncomfortable?

24  **A.**   Because there's no cameras in there.   It was just me and

25  him alone in there and out of view of the other workers that

1    were in the warehouse.

2    Q.   Did you go into his office?

3    A.   I did.

4    Q.   And how long were you in the office for?

5    A.   Probably less than a minute.

6    Q.   What happened after this?

7              THE COURT:   Did anything happen?

8              THE WITNESS:   Like what?

9              THE COURT:   When you went into the office for that

10   minute, did anything happen?

11             THE WITNESS:   I just grabbed a test from him and then

12   I left.

13             THE COURT:   Grabbed his?

14             THE WITNESS:   I grabbed a test for the forklift

15   training, and then I walked out.

16             THE COURT:   Okay.   Thanks.

17   BY MS. JANSSEN:

18   Q.   What happened after this?

19   A.   I just went back to our unit.

20   Q.   Did you report anything about what happened?

21   A.   No, I didn't.

22   Q.   But did anyone come to talk to you about it?

23   A.   Yes.   One of the other commissary supervisors came and

24   called me into her office to talk to me about it.

25   Q.   How long after the training was this?

1    A.   About an hour or two.

2    Q.   So you hadn't reported anything?

3    A.   No.   I hadn't said anything.

4              THE COURT:   Who asked you?   Who was that officer?

5              THE WITNESS:   Officer Lopez.

6    BY MS. JANSSEN:

7    Q.   What happened when she called you into her office?

8    A.   She called me into her office and she told me that I was

9    being inappropriate with her coworkers and that I needed to

10   stop and that was an official warning.

11   Q.   Do you know how she found out what happened?

12   A.   I imagine that one of the other workers --

13             THE COURT:   So you don't know?

14             THE WITNESS:   No.

15   BY MS. JANSSEN:

16   Q.   Did she -- did -- did she provide you with any paperwork

17   at this meeting, any report, anything like that?

18   A.   No.

19   Q.   So what happened after this meeting?

20   A.   A day later I was fired from my job.

21   Q.   And that was your job in the food service warehouse?

22   A.   Yes.

23   Q.   Okay.   How did you find out that you were being fired from

24   your job?

25   A.   I went to work and my work supervisor told me that I'm not

1  allowed to be there and that they're most likely going to

2  reassign me.

3  **Q.**   Did you ask why?

4  **A.**   I did.

5  **Q.**   Did anyone explain to you why you were losing your job?

6  **A.**   No.

7  **Q.**   Was your job reassigned?

8  **A.**   It was.

9  **Q.**   What is your new job?

10 **A.**   I am an orderly and I clean the showers in our unit.

11 **Q.**   How much -- how many hours a week were you able to work in

12 your old job?

13 **A.**   Seven to eight hours a day.  So like 35, up to 40 hours a

14 week.

15 **Q.**   And how much were you able to make in that job?

16 **A.**   At least $44 a month.

17 **Q.**   And in your new job, how many hours a day can you work?

18 **A.**   We can work up to half an hour a day.

19 **Q.**   And how much do you make in a given month with your new

20 job?

21 **A.**   Probably up to like $5.

22 **Q.**   And how has that impacted you?

23 **A.**   Well, I can't pay my restitution anymore with the money

24 that I'm working -- that I'm making from work.

25 **Q.**   Have you asked to change jobs?

1    **A.**   I have.

2    **Q.**   What was the response?

3    **A.**   That that's not going to be possible.

4              **THE COURT:**   Who did you ask?

5              **THE WITNESS:**   I asked Mrs. Agostini and Ms. Campos.

6    **BY MS. JANSSEN:**

7    **Q.**   Do you see this new job as a better or worse job?

8    **A.**   It's a worse job.

9    **Q.**   In what ways?

10   **A.**   It's probably one of the dirtier jobs that we have.   There

11   is not a lot of work.   There's no opportunity to move up in our

12   job.   And there's a considerably less pay, so...

13   **Q.**   Were other people's jobs reassigned at this time?

14   **A.**   Not during the same time that mine was, no.

15   Q.   Have you met with legal counsel at the camp?

16   A.   Yes.

17   Q.   Have you experienced any retaliation after any of those

18   legal visits?

19   A.   Not necessarily.

20   Q.   Are you afraid at all you'll be retaliated against after

21   testifying today?

22   A.   Yes.

23   Q.   And why is that?

24   A.   Because there's been a lot of other retaliation going on

25   with my work and pretty much reporting anything, you know.

1    Q.   Ms. Newman, you testified that you work for the western

2    region and you said 20 institutions is under your ambit; is

3    that correct?

4    A.   That is.  So I work for the assistant director for the

5    Reentry Services Division, but I'm responsible for the western

6    region and the northeast region right now.

7    Q.   Okay.  How many states are in that western region that

8    you're responsible for?

9    A.   I can't tell you states, but I can tell you

10   40 institutions, if that helps.

11   Q.   It's 40 institutions?

12   A.   Yes.  Combined total.  But if I were just overseeing

13   western region, it would just be 20.

14   Q.   Okay.  So 40 for northeast and western?

15   A.   Yes, sir.

16   Q.   You testified about your working setup at the camp.  About

17   how -- what are your work hours?

18   A.   So I work typically 6:00 to 2:00, sometimes 5:30 to 1:30.

19   It varies a little bit because phone calls and meetings are

20   three hours ahead because all of my counterparts are on the

21   East Coast.

22   Q.   Okay.

23   A.   So it varies sometimes.

24   Q.   So about how much of your day is spent on the phone calls

25   and meetings?

957

1    **A.**   Sometimes half a day.   And sometimes I'm on phone calls

2    responding to family concerns or advocates or that type of

3    thing.

4    **Q.**   Okay.   And you do those meetings and phone calls in the

5    same place with the glass walls?

6    **A.**   Yes, sir.

7    **Q.**   So people can see that you're taking those calls and

8    meetings?

9    **A.**   Yes, sir.

10   Q.   When you're not there, are incarcerated individuals able

11   to reach you?

12   A.   Not right now, no.   No, sir.

13   Q.   You testified that your role is to get to the ground truth

14   of certain allegations.   Do you recall that?

15   A.   Yes, sir.

16   **Q.**   Okay.   Are you familiar with the allegations that have

17   been raised by individuals in this case, either in the

18   Complaint or in the Motion for Preliminary Injunction?

19   **A.**   I haven't read all of the documentation.   I have not been

20   privy to everything.

21   **Q.**   Are you generally aware of the nature of the allegations

22   in this case?

23   **A.**   Yes.   Yes, sir.

24   **Q.**   Can you tell me in about how many of the specific cases

25   that have been raised in -- in this case that you were part of

1   the process to get to the ground truth of?

2   **A.**   I haven't been a part of all of that.

3   **Q.**   How many have you been a part of?

4   **A.**   So if there were concerns as far as halfway house, I've --

5   I've spoken with a couple of inmates about that and we've

6   worked on that.  Or like the MINT program, those type of

7   things.  So I'm not privy to all of the information that

8   you're -- you're asking me.

9   **Q.**   Okay.  Let me ask a different question.

10      Do you understand your responsibilities to include looking

11   into PREA allegations?

12   **A.**   So if there is a PREA allegation, then I follow the

13   protocols.

14   **Q.**   How many PREA allegations have you been involved at the

15   camp or FCI in any way in the past -- since you started your

16   job?

17   **A.**   I've been involved in one PREA allegation, and that was

18   from -- so I was at Carswell, and that was from an inmate when

19   I was doing rounds that had an allegation.  So I stopped what I

20   was doing, I took her directly over to psychology because she

21   said the PREA allegation happened at another location.

22      So I wanted to make sure that Dublin had done everything

23   they needed to do to take care and make sure the adult in

24   custody had been seen, if they needed supportive care or

25   anything like that, and the protocols had been followed.

1  so I -- pretty soon I will have the deputy assistant director

2  will be my supervisor.  So likely we will get a site visit.

3  **Q.**   Anything planned?

4  **A.**   Nothing's planned yet.

5  **Q.**   To your knowledge, has that person ever been to Dublin?

6  **A.**   Not that I'm aware of.

7  **Q.**   Just on the subject of PREA allegations, you said, for

8  instance, that one thing you might do is you could keep the

9  person with you in the office; is that right?

10  **A.**   That is what you do to safeguard the person.

11  **Q.**   What about after you leave for the day?

12  **A.**   So that person typically -- so you call the OPS

13  lieutenant, and it's their job to check to get them to medical,

14  to get them to psychology.  And at that point, they can

15  determine if the -- if the adult in custody feels safe to be in

16  general pop, then they would be in general population.  If they

17  don't, then they need to make other arrangements for that

18  person.

19  **Q.**   Do you have any authority to overrule a determination made

20  by the lieutenant about where a PREA -- someone who makes a

21  PREA complaint, where they're ultimately taken?

22  **A.**   So if -- if I had concerns where an adult in custody was

23  being placed after a PREA allegation, I would speak with the

24  executive staff there.

25  **Q.**   Do you have any authority to overrule their determination?

1   **A.**   No, I do not.

2   **Q.**   You talked a bit about the shower curtain.

3   **A.**   Yes, sir.

4   **Q.**   And that's at the camp or FCI?

5   **A.**   That was at the FCI.

6   **Q.**   Okay.   Have you ever been around the showers when they're

7   being used and there are guards around?

8   **A.**   So primarily at the camp.   And typically the officers,

9   from what I've seen, are not around because there's one officer

10  at the camp.

11  **Q.**   Okay.   What about the FCI?

12  **A.**   I have not been around when those showers were being used

13  in the units.

14  **Q.**   If inmates are having conversations or complaints about

15  the shower rods that are not brought to your attention, would

16  you be privy to those?

17  **A.**   Not necessarily, no.

18  **Q.**   Okay.   What do you mean not necessarily?

19  **A.**   If I became aware of it or if an adult in custody

20  approached me about a concern, then I would look into it and

21  get it remedied.

22  **Q.**   Okay.   So you mentioned one incident where you looked at

23  the shower rods and spoke to a lieutenant.   Are you aware of

24  any other instances in which inmates have complained about the

25  feelings of safety in the shower?

1   **A.**   So I -- I didn't bring it to the attention of a

2   lieutenant.   I brought it to the attention of the associate

3   warden.

4   **Q.**   My question --

5   **A.**   Go ahead.   Ask --

6   **Q.**   It's more specific to are you aware personally in your

7   time at the facility of instances in which residents have

8   complained about feelings of safety or otherwise in their

9   showers?

10   **A.**   No, sir.

11          MR. CHA-KIM:  May I have one moment, Your Honor?

12          THE COURT:  Yes.

13          MR. CHA-KIM:  Ms. Newman, thank you very much.

14          THE WITNESS:  Thank you.

15          THE COURT:  Redirect?

16                     REDIRECT EXAMINATION

17   BY MS. CZIOK:

18   **Q.**   Just to be clear, are you employed by OIA?

19   **A.**   No, ma'am.

20   **Q.**   Are you employed by OIG?

21   **A.**   No, ma'am.

22          MS. CZIOK:  Nothing further.   Thanks.

23                        EXAMINATION

24   BY THE COURT:

25   **Q.**   The facilities that you have oversight over, are they all

1    was overwhelming because having the multiple staffing changes

2    resulted in a distrust of the healthcare system.  So people

3    would double back two, three times a week just to make sure

4    they were going to be seen or to confirm that they were going

5    to be seen, and it just created an exponential kind of backlog

6    of daily chaos, is how I would put it.

7    **Q.**   What did you do moving forward then to make changes to the

8    triage system?

9    **A.**   Part of that involved myself conducting sick call in the

10   mornings.  Triaging each and every one of those requests and

11   appropriately per policy managing those appointments based on

12   the complaint is how soon the appointment should be.

13       Using that and the amount of providers available, we were

14   able to kind of manage the healthcare so that people that truly

15   needed to be seen that day weren't being turned away to wait

16   for an appointment.

17   **Q.**   So practically speaking, what does that mean when you come

18   in in the morning?  What happens?

19   **A.**   So each morning between 6:00 and 6:30, inmates have sick

20   call, which if they have routine complaints, sore throat, back

21   ache, whatever, they can submit a written request to access

22   healthcare services.

23       The problem is we are short-staffed.  We -- we are short

24   providers, so we have more patients than providers or

25   appointments.  That's a risk medically because you don't want

1

2

3                       <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Monday, January 8, 2024

8

9     *Pamela Batalo Hebel*

10    _____
      Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11    U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Volume 5

Pages 1136 - 1317

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

CALIFORNIA COALITION FOR WOMEN    )
PRISONERS, ET AL.,                )
                                  )
            Plaintiffs,           )
                                  )
  VS.                             )      NO. CV 23-04155-YGR
                                  )
UNITED STATES OF AMERICA          )
FEDERAL BUREAU OF PRISONS,        )
ET AL.,                           )
                                  )
            Defendants.           )
_____  )


                        Oakland, California
                        Tuesday, January 9, 2024

                  __EVIDENTIARY HEARING__

__APPEARANCES__:

For Plaintiffs:

                  ARNOLD & PORTER KAYE SCHOLER LLP
                  250 West 55th Street
                  New York, NY 10019
            BY:  **STEPHEN SEUNGKUN CHA-KIM, ESQUIRE**

                  ARNOLD & PORTER KAYE SCHOLER LLP
                  5 Palo Alto Square, Suite 500
                  3000 El Camino Real
                  Palo Alto, CA 94306
            BY:  **CARSON ANDERSON, ESQUIRE**


Reported By:      Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                  Official Reporter

1  oversight requirements or recommendations that the task force

2  recommended was the addition of a third associate warden and a

3  second captain.  Do you recall that?

4  **A.**    I do.

5  **Q.**    Who is the third associate warden currently, sir?

6  **A.**    We do not have a third associate warden currently.

7  **Q.**    How long has that recommended post been vacant?

8  **A.**    The third associate warden retired in August.

9  **Q.**    Okay.   And how long had that person been in that third

10  associate warden position?

11  **A.**    Approximately a year.

12             **THE COURT:**   Who was that?

13             **THE WITNESS:**   That was AW -- Associate Warden Beth

14  Buckner.

15  **BY MR. CHA-KIM:**

16  **Q.**    Was that the first person to hold that role?

17  **A.**    For the third associate warden position, yes.

18  **Q.**    Okay.   And is there currently a posting out to fill the

19  third associate warden position?

20  **A.**    There is not.

21             **THE COURT:**   Why not?

22             **THE WITNESS:**   Your Honor, at this time, the initial

23  response for what was required or needed for Dublin was

24  administrative, the extreme oversight.   With the process or

25  implementation of the working plan, the progress that we've

1  made, we didn't feel that the third associate warden position

2  was -- was -- was required any further.  We actually replaced

3  it with an attorney.

4          THE COURT:  You mean you replaced it with in-house

5  counsel?

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  Proceed.

8  BY MR. CHA-KIM:

9  Q.  The in-house counsel position that replaced the third

10 associate warden, when did that person start?

11 A.  That person started approximately three weeks ago.

12 Q.  And is that person located on staff or on site at Dublin?

13 A.  Yes.

14 Q.  Who is that person?

15 A.  She's actually sitting at the table.

16 Q.  Could you identify her by name, please.

17 A.  I'm sorry.  I'm drawing a blank right now.  Kristi Sutton.

18 Q.  That's okay.  It's early.

19 A.  Yeah.

20 Q.  Is it your understanding that this new counsel position's

21 responsibilities are similar to what the third associate warden

22 was carrying out?

23 A.  No.  The third associate warden position was more focused

24 on correctional services and responsibilities and oversight of

25 correctional services and UNICOR.

1  Q.   Sure.   You just spoke about there is a phase one, there's

2  a phase two, and I think you might have mentioned a phase

3  three, but correct me if you didn't.   When is phase one?

4  A.   There isn't a necessary time frame.   It all depends on how

5  the course of naturally making progress at an institution can

6  happen.   So there isn't necessarily when is phase one, when is

7  phase two.   It's when you start to meet those -- those goals or

8  recommendations, then you start to transition into the next

9  phase.

10  Q.   I see.   And are you still currently in phase one?

11  A.   I'd say we're in between phase one and phase two.   We're

12  working into phase two.

13  Q.   All of that would be reflected in the working plan

14  document that the Judge is going to get later?

15  A.   I would say that that's reflective.

16  Q.   Okay.   When is the last time you looked at that document?

17  A.   It's been about three weeks.

18  Q.   Who -- just so the Judge has context when she gets that

19  document, who edits that document?

20  A.   It's a collaborative effort between central office, the

21  regional office, and locally at the -- at the institutional

22  level.

23  Q.   At the institutional level, to your knowledge, who edits

24  that document?

25  A.   That would be the executive assistant, myself, the -- the

1160

1    captain has input on that, the other associate wardens, the

2    warden.  So we all collectively work on that document.

3  **Q.**   And, again --

4            **THE COURT:**  Which captain?

5            **THE WITNESS:**  Captain Quezada.

6            **THE COURT:**  And how do you spell that?

7            **THE WITNESS:**  Q-U-E --

8            **THE COURT:**  Oh, okay.  I know who you're...

9  **BY MR. CHA-KIM:**

10 **Q.**   Just to orient the Judge when she gets that document, is

11   this a document that is iterative in the sense that it's

12   constantly being changed?  Or are prior versions of it saved

13   somewhere?

14 **A.**   It's an active live document, so we're constantly updating

15   it.  So we don't change the recommendations.  We -- we just

16   make --

17           **THE COURT:**  But the question is a little bit

18   different.  Let's say you change it once a month.  If I asked

19   you for each version every month, are you writing over it, or

20   are you saving each version of it?

21           **THE WITNESS:**  We're writing over it, but we --

22   obviously we have emailed out the working plan back to central

23   office.  So we would have -- we could backtrack and go back and

24   say okay, well, this is -- this is the last document that we

25   sent out to you.  But we -- we do write over it.

1          **THE COURT:**  Stop writing over it.

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  Keep going.

4          MR. CHA-KIM:  Thank you, ma'am.

5     Q.   Now, the -- 19 individuals are currently on administrative

6     leave for some sort of sexual misconduct; is that right?

7     A.   That's -- that's correct.

8     Q.   Okay --

9     A.   No, I'm sorry.  Let me rephrase.  Not all 19 are for

10    sexual misconduct.

11    Q.   If the Agostini declaration stated that the 19 were for

12    sexual misconduct, would that be incorrect, then?

13    A.   I would have to -- I would have to check.

14         THE COURT:  So can I -- I thought that they were on

15    leave immediately upon allegations.  So is it -- so explain

16    that to me.

17         THE WITNESS:  Your Honor --

18         THE COURT:  Because confirmation and allegations are

19    two different things.

20         THE WITNESS:  Yes.

21         So we receive an allegation.  We confirm the allegation.

22    If we can't confirm the allegation, if there's some type of

23    touching and we can't confirm the allegation, then we

24    immediately start the process for removal.  So that will happen

25    immediately.

1    work.  And if they're on -- if they're on workmen's comp or

2    they're out of the institution, we have to establish that

3    meeting immediately once they return to the facility.

4    **Q.**   Am I correct in understanding, then, sir, that placement

5    on administrative leave only occurs in the event of a referral

6    out to an external agency?

7    **A.**   Can you repeat the question?

8    **Q.**   Sure.  You say there's a referral -- sorry -- placement on

9    administrative leave within 24 hours of a referral.  So I'm

10   asking is it your understanding that someone is placed on

11   administrative leave for this type of accusation only in the

12   event of a referral made out to an external agency?

13   **A.**   That would be consistent.

14   **Q.**   Meaning you never put someone in administrative leave

15   while you look into matters internally, as you testified about?

16   **A.**   I wouldn't be aware of that.

17   **Q.**   Is there anything that prevents you from doing something

18   like that?

19   **A.**   From doing something -- from what?

20   **Q.**   From placing someone on administrative leave while you

21   look into whether there should be a referral made.

22   **A.**   Not that I'm aware of.

23   **Q.**   I want to ask quickly about your testimony about instances

24   of non-touching allegations.

25        So you would agree that under PREA, certain violations can

1    **A.**    We did.

2    **Q.**    Okay.  Do you still have it?

3    **A.**    We do.

4    **Q.**    Okay.  Are you able to talk about an Officer Cooper?

5            **THE WITNESS:**  Your Honor, I'm not able to talk about

6    Officer Cooper.

7    **BY MR. CHA-KIM:**

8    **Q.**    Are you able to talk about an Officer Groover?

9    **A.**    To my knowledge, I'm not -- I am not authorized to talk

10   about Officer Groover.

11   **Q.**    Okay.

12           **THE COURT:**  Hold on.

13           I understand, and while it was not shared with you,

14   Mr. Cha-Kim, that OIA has opened investigations with respect to

15   all allegations made during this evidentiary hearing.  So

16   there's no need to go through all those names as OIA has opened

17   up investigations.

18           **MR. CHA-KIM:**  Understood, Your Honor.

19           Am I allowed to ask the associate warden about actions he

20   may have been aware of prior to that OIA opening it up

21   recently?

22           **THE COURT:**  At this point they're under investigation.

23           **MR. CHA-KIM:**  Understood.

24           **THE COURT:**  Let's move on to something else.

25   / / /

1  in the case of PREA allegations?

2  **A.**   Logistically, there is no other options.  It's you're

3  either going to be -- you can maintain in general population

4  because your safety is not at risk, or you have to look at

5  means to ensure the safety of that individual.

6      We don't have any -- we don't have a -- any -- many middle

7  ground, Your Honor, on putting them in another, say, housing

8  unit.  Every -- all the inmates in general population at the

9  FCI have access to each other.

10      So if there's a concern or if there's animosity or there's

11  a threat to that individual, we -- we unfortunately would have

12  to utilize restrictive housing.  But --

13          **THE COURT:**  So, and the problem with that is the level

14  of restriction that is programmed for anyone in the SHU.  And

15  so it's not at all clear to me why you couldn't move them into

16  the housing unit where the SHU is located without the

17  restrictions that are set there for punishing someone who has

18  violated the rules or is being put in the SHU for -- for a

19  punitive reason.  That is not at all clear to me.

20          **THE WITNESS:**  Utilizing restrictive housing, you have

21  administrative detention and then you have disciplinary

22  segregation.  You do have -- there's a separate entity while

23  you're placed in SHU.

24      While you're under investigation or you're under --

25          **THE COURT:**  But these people aren't under

1    investigation.   And those people work for you.

2            THE WITNESS:   That's accurate.

3        Your Honor --

4            THE COURT:   Let me tell you something.   You're going

5    to have to figure it out because I'm not going to tolerate it.

6    So start thinking.

7            THE WITNESS:   Yes, Your Honor.

8            THE COURT:   Go ahead.

9            MR. CHA-KIM:   Thank you, Judge.

10   Q.   Sir, you testified that the legal pilot line was the

11   result of a DOJ collaboration.   Do you recall that?

12   A.   It was a collaborative effort.

13   Q.   Okay.   So you started in 2022?

14   A.   Yes.

15   Q.   Okay.   So you weren't aware of the fact that the pilot

16   line came about after a line of correspondence back and forth

17   between legal advocates and BOP lawyers starting in 2018; were

18   you aware of that fact?

19   A.   No.

20   Q.   Okay.

21   A.   The way it was brought to my attention was trying to find

22   confidential ways for our individuals in our care to be able to

23   contact their -- their attorneys or their legal advocates.

24   Q.   You testified -- you were asked if you're aware of a

25   member of your staff conducting a visual search to retaliate,

1    two.

2    Q.   All right.  This document doesn't tell me what's phase one

3    or phase two, does it?

4    A.   I don't believe so.

5    Q.   So how am I supposed to know that?

6    A.   I can take a look at it again, Your Honor, and try to

7    establish that.

8    Q.   Okay.  So what I'm going to have you do is I'm going to

9    have you take this document back.  We've got an attorney

10   lounge.  It's comfortable.  And you sit there and you annotate

11   it so I know.  And then we'll make copies and that's the one

12   I'll accept.

13        THE COURT:  Can you hand this to him.

14   Q.   The Moss report -- well, tell me about the training that

15   they're supposed to be doing next week.

16   A.   The training, 17th to the 19th, is gender-informed care,

17   learning to work with individuals in our care --

18   trauma-informed care.  I'm sorry, Your Honor.  Learning to work

19   with individuals in our care that deal with trauma.

20   Q.   And who are they training?

21   A.   Non-bargaining staff, department heads, managers.

22   Q.   So non-union staff?

23   A.   Non-union, yes, Your Honor.

24   Q.   But wouldn't the -- isn't it the union staff that deal

25   directly with the population?

1  **A.**   We all do, but they deal more directly with the

2  population, yes.

3  **Q.**   So management is getting three days of training and union

4  staff is getting none?

5  **A.**   We are working in that direction.  Working with the

6  central office, we are establishing our trauma-informed care

7  for our bargaining unit staff.

8  **Q.**   Is that in there, in that plan?

9  **A.**   I'd have to check, Your Honor.

10  **Q.**   And when is that supposed to happen, the training of the

11  union staff?

12  **A.**   We are still trying to establish that date.

13       We have conducted other trainings, like deescalation

14  training, which is working on communication with our inmate

15  population, understanding the types of individuals that we're

16  trying to work with.

17  **Q.**   When did that training happen?

18  **A.**   Deescalation training was roughly April, May of '23.

19  **Q.**   How long did it last?

20  **A.**   It was three or four days, and all staff were trained, I

21  believe.

22  **Q.**   Onsite?

23  **A.**   Onsite by a contractor.

24  **Q.**   Was that The Moss Group?

25  **A.**   No.  That was separate.

1    individuals who are serving in jobs and in serving in those

2    jobs are building skills?

3              THE WITNESS:  We --

4              THE COURT:  So how do you deal with them?  Because it

5    seems to me part of the goal is to give skills to these

6    individuals.  And if somebody is becoming expert in HVAC,

7    right, that's a really positive thing.  But if you're

8    constantly shifting people around, then they're not going to be

9    able to build skills.

10             THE WITNESS:  You're right, Your Honor.  And then in

11   those cases, they do stay on for a longer period of time, and

12   that's where it would be wanted.

13       UNICOR would be another area where they would stay on that

14   job longer so they could get their 500 hours for FSA, or First

15   Step Act, credits to -- for early release.

16       So we do work with the inmate population when it's -- when

17   it's in areas that we can identify that there's a greater need

18   to help them reenter into society.

19       But for the overall case, someone working in the food

20   service warehouse or trust fund warehouse where they're moving

21   pallets, there really isn't -- there isn't an exception there

22   to warrant them to stay on that position for longer than is

23   needed.  And there is an increased concern with complacency or

24   getting too familiar with that -- that area.

25       So in certain cases, yes, we do -- we have identified

1  certain positions that warrant placement for longer periods of

2  time.

3           THE COURT:  There's also a concern, and this was

4  testified to by the person who is expert in these HVAC systems

5  there, that the facilities, if you are very far away, if you're

6  on the wings, and I don't have -- I've got some memory of how

7  the institution is set up, but it's not -- I don't have it

8  memorized -- that those rooms that are far away are very cold.

9  It is winter.  Temperatures are dropping.  And they don't have

10 sufficient blankets.

11          THE WITNESS:  So I am aware of the heating issues that

12 we have.  Our HVAC systems aren't the best.  When I'm aware

13 that there's an issue, I address it immediately to the point

14 that I put in a corrective action that I want staff to do

15 temperature checks on a daily basis to make sure that they stay

16 at -- that they're within policy.

17          THE COURT:  But are those temperature checks being

18 done in the middle of the night?

19          THE WITNESS:  No, Your Honor.

20          THE COURT:  And, see, that's the problem.  Because

21 during the day, it could be a lovely day.  But temperatures can

22 drop 20, 25 degrees at night.

23      So how are you -- so it doesn't sound like you're getting

24 information on the actual issue that they're raising.  And in

25 the United States, people should not have to be in their cells

1  while in a visitation area mandatory for minimum security

2  institutions?

3  **A.**   Yes.  Again, so they don't hide contraband.

4  **Q.**   And you believe there's a policy that says that?

5  **A.**   I do.  I have not seen it, but I'm certain that's what

6  we -- that makes the most logical sense to me.

7  **Q.**   Okay.  I was handed a document today, Exhibit T, that

8  seems to suggest that's not the case.  Take a look at that.

9  Read the second paragraph.

10       Doesn't that exclude minimum security facilities from the

11  policy?

12  **A.**   It does.

13  **Q.**   So the policy of the BOP does not make it mandatory.

14       I'll take it back.

15       Is that right?  According to this document that was handed

16  to me, Exhibit T?

17  **A.**   Yes.  According to that policy supplement -- policy

18  statement, rather, that would be correct.

19  **Q.**   Do you have any information about whether other minimum

20  institution facilities that you've been at are keeping people

21  under visual search while they're in the restroom?

22  **A.**   This is the first time I've been posed with that question.

23  **Q.**   So the answer is no?

24  **A.**   Correct.

25  **Q.**   With respect to your notice, document 423, was anything

1

2

3                     <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Tuesday, January 9, 2024

8

9     *Pamela Batalo Hebel*

10    _____
      Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11    U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pages 1 - 14

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

CALIFORNIA COALITION FOR WOMEN  )
PRISONERS, et al.,               )
                                 )
          Plaintiffs,            )
                                 )
   VS.                           )     NO. 23-CV-04155-YGR
                                 )
UNITED STATES OF AMERICA,        )
FEDERAL BUREAU OF PRISONS, et    )
al.,                             )
                                 )
          Defendants.            )
_____ )

                        San Francisco, California
                        Friday, January 26, 2024

            **TRANSCRIPT OF REMOTE ZOOM PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:
                    ROSEN, BIEN, GALVAN & GRUNFELD, LLP
                    101 Mission Street, Sixth Floor
                    San Francisco, CA 94105
            BY:  **ERNEST J. GALVAN**
                 **KARA JANSSEN**
                 **ATTORNEYS AT LAW**

                    RIGHTS BEHIND BARS
                    416 Florida Avenue Northwest
                    Suite #26152
                    Washington, DC 20001
            BY:  **OREN NIMNI**
                 **AMARIS MONTES**
                 **ATTORNEYS AT LAW**

(Appearances Continued on Page 2.)

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
               Official United States Reporter

1    for the Bureau of Prisons.

2              **THE COURT:**  All right.  Great.

3         Well, even though I delayed in getting to you, I can

4    assure you that you're happy you were not at the courthouse

5    today.  We have had -- they've closed off streets.  They've got

6    more security personnel here than we normally have.  There was

7    a big hearing in another courtroom, and it's been a little

8    crazy today.

9         So, plus, I didn't want to have people fly from Montana

10   and other places for this update.

11        Associate Warden Deveney, got an update for me?

12             **MR. DEVENEY:**  Yes, Your Honor.  Good afternoon.

13             **THE COURT:**  Good afternoon, sir.

14             **MR. DEVENEY:**  So you requested me to review the court

15   transcripts of the testimony from the inmates.  I have.  In

16   that process, we did receive one allegation from direct

17   testimony that has resulted in a staff member placed on

18   administrative leave.

19        With, in addition to that, we had one, another individual

20   who came back to the institution and claimed a pre-allegation,

21   and in the process of that we had placed another staff member

22   on administrative leave.

23        JL, she has since received a compassionate release and has

24   been released.

25        SL, I followed up with her regarding her -- sorry, not her

```
1            So that should help you, Mr. Galvan.

2                 MR. GALVAN:  Thank you.

3                 THE COURT:  Okay?

4                 MR. GALVAN:  Your Honor, looking at my notes, I

5    realize I had two other things for Associate Warden Deveney.

6    If I can ask them before we adjourn?

7                 THE COURT:  All right.

8                 MR. GALVAN:  Our clients told us that five managers

9    were walked off this week, including one who testified, Captain

10   Cazada (phonetic), and the SIS lieutenant, which left us with a

11   question:  Who is in charge of SIS now?

12                MR. DEVENEY:  Can you repeat that question?

13                MR. GALVAN:  Sure.

14        Our clients told us this week that there were five

15   managers, all female managers, who were put on leave or walked

16   off this week, including Captain Cazada, who testified, and

17   Lieutenant Hardey, who we were told was the SIS lieutenant.

18        And so the question is:  Since SIS is so important, who

19   has SIS now?

20                THE COURT:  Well, first of all, were five female

21   managers walked off?

22                MR. DEVENEY:  There were five managers placed on

23   administrative leave.

24                THE COURT:  Okay.  And did they include those two,

25   Cazada and Hardey?
```

```
 1            MR. DEVENEY:  They did.

 2            THE COURT:  Okay.  So who is in charge of SIS now?

 3            MR. DEVENEY:  Well, there's Acting Captain Bodazan

 4    (phonetic) and Acting Captain Ayello (phonetic).

 5            MR. GALVAN:  Is Bodazan also in charge of SIA now?

 6            MR. DEVENEY:  He has been acting in the capacity of

 7    SIA.  So starting Monday, he will have a dual role.  He won't

 8    be acting captain at that point.

 9            MR. GALVAN:  So he'll be both SIA and SIS?

10            MR. DEVENEY:  Yes.

11            MR. GALVAN:  And then I had an individual witness-

12    client concern.  CH, who testified -- so that's Charlie Hotel,

13    CH -- told us that after the hearing she was taken off of her

14    psychiatric medication, and that an officer who had previously

15    harassed her has searched her cell twice.  And so she wanted us

16    to raise that with you.

17            MR. DEVENEY:  Okay.  I can look into that.

18            MR. GALVAN:  Thank you.

19       Thank you, Your Honor.

20            THE COURT:  Okay.  Anything else?

21       Anything that defendants want to say or any other updates

22    from defendants?

23            MS. MATTIOLI:  No, Your Honor.

24            THE COURT:  Okay.  All right.  Well, I know this was

25    short, but I've been on since 8:00 a.m., so I tried to get to
```

1    you as soon as I could.

2         Okay.  All right.  Everybody have a good weekend.

3         **VOICES:**  Thank you, Your Honor.

4         (Proceedings concluded at 2:07 p.m.)

5                    ---o0o---

6              **CERTIFICATE OF REPORTER**

7         I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10   DATE:  Thursday, February 1, 2024

11

12

13   _____

14   Stephen W. Franklin, RMR, CRR, CPE
     Official Reporter, U.S. District Court

15

16

17

18

19

20

21

22

23

24

25