JESSE LASLOVICH
United States Attorney
MADISON L. MATTIOLI
   MT Bar No. 36411284
ABBIE J.N. CZIOK
   MT Bar No. 55781377
Assistant U.S. Attorneys
U.S. Attorney's Office
901 Front Street, Suite 1100
Helena, MT 59626
Phone: (406) 457-5269 – Madison
        (406) 457-5268 – Abbie
Fax: (406) 457-5130
Email: madison.mattioli@usdoj.gov
        abbie.cziok@usdoj.gov

MARK STEGER SMITH
   MT Bar No. 4160
TIMOTHY A. TATARKA
   CA Bar No. 277219
Assistant U.S. Attorneys
U.S. Attorney's Office
James F. Battin Federal Courthouse
2601 2nd Ave. North, Suite 3200
Billings, MT 59101
Phone: (406) 247-4667 – Mark
        (406) 247-4642
Fax: (406) 657-6058
Email: mark.smith3@usdoj.gov
        timothy.tatarka@usdoj.gov

Attorneys for Defendant
United States of America and Federal Defendants

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.; G.M.; A.S.; and L.T., individuals on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs<br>          v.<br><br>UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS, a governmental entity; BUREAU OF PRISONS DIRECTOR COLETTE PETERS, in her official capacity; FCI DUBLIN WARDEN THAHESHA JUSINO, in her official capacity; OFFICER BELLHOUSE, in his individual capacity; OFFICER GACAD, in his individual capacity; OFFICER JONES, in his individual capacity; LIEUTENANT JONES, in her individual capacity; OFFICER LEWIS, in his individual capacity; OFFICER NUNLEY, in his individual capacity, OFFICER POOL, in his individual capacity, LIEUTENANT PUTNAM, in his individual capacity; OFFICER SERRANO, in his individual capacity; OFFICER SHIRLEY, in his individual capacity; OFFICER SMITH, in his individual capacity; and OFFICER VASQUEZ, in her individual capacity,<br><br>                    Defendants. | CASE NO. 4:23-CV-04155-YGR<br><br>**UNITED STATES' POST EVIDENTIARY HEARING BRIEF** |

# TABLE OF CONTENTS

I.      INTRODUCTION........................................................................................................1

II.     LEGAL STANDARDS ...............................................................................................1

III.    ARGUMENT...............................................................................................................3

      a.      Plaintiffs Have Failed to Meet their Heavy Burden of Proving that Dublin
              Inmates are Currently Facing an Imminent Threat of Irreparable Harm or
              Deliberate Indifference to a Serious Known Risk of Harm to Inmates ...........................3

            i.      Plaintiffs are not facing a serious risk of sexual abuse ..........................3

            ii.     Allegations of staff sexual abuse are investigated by authorities outside
                 Dublin..............................................................................................................7

            iii.    Inmates know how to and are reporting concerns to current staff as
                 well as those outside of Dublin without facing retaliation...................................9

                 1.      Any allegations of retaliation can be reported by the means
                      identified above and all allegations of retaliation for reporting
                      sexual misconduct are referred to OIA or OIG......................................12

                 2.      Visual searches are required by policy....................................................13

                 3.      Inmate work details are reassigned to combat drug introduction ............14

                 4.      SHU is not used to retaliate against those reporting sexual
                      assault.....................................................................................................15

             iv.     Dublin has implemented new procedures to deter and address staff
                   misconduct, which have changed Dublin culture................................................16

             v.      Although not binding, Dublin has meaningfully implemented the Moss
                 Group recommendations ...................................................................................18

      b.      Plaintiffs' Requested Relief is Not Narrowly Tailored to the Harms at Issue ................21

IV.     CONCLUSION...........................................................................................................24

UNITED STATES' POST EVIDENTIARY HEARING BRIEF

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Brown*,
  768 F.3d 975 (9th Cir. 2014) ................................................................................................ 23

*Baze v. Rees*,
  553 U.S. 35 (2008) ................................................................................................................ 2

*Bell v. Wolfish*,
  441 U.S. 520 (1979) .............................................................................................................. 9

*Farmer v. Brennan*,
  511 U.S. 825 (1994) .............................................................................................................. 2

*Griffin v. Gomez*,
  741 F.3d 10 (9th Cir. 2014) ........................................................................................... 9, 17

*Helling v. McKinney*,
  509 U.S. 25 (1993) ................................................................................................................ 2

*Hernandez v. Cnty of Monterey*,
  110 F. Supp. 3d 929 (N.D. Cal 2015) .................................................................................. 22

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022) .............................................................................................. 22

*Hook v. State of Arizona*,
  120 F.3d 921 (9th Cir. 1997) ............................................................................................... 23

*Madrid v. Gomez*,
  889 F. Supp. 1146 ................................................................................................................ 23

Mazurek v. Armstrong,
  520 U.S. 968 (1997) .............................................................................................................. 2

*Nettles v. Grounds*,
  830 F.3d 922 (9th Cir. 2016) ............................................................................................... 21

*Nken v. Holder*,
  556 U.S. 418 (2009) .............................................................................................................. 2

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) .............................................................................................................. 2

Case No. 4:23-cv-04155-YGR

UNITED STATES' POST EVIDENTIARY HEARING BRIEF

*Overton v. Bazzetta*,
　539 U.S. 126 (2003).................................................................................................... 9

*Porter v. Nussle*,
　534 U.S. 516 (2002).................................................................................................. 21

*Smith v. Marsh*,
　194 F.3d 1045 (9th Cir.1999)...................................................................................... 1

*Stanley v. Univ. of S. Cal.*,
　13 F.3d 1313 (9th Cir. 1994)........................................................................................ 2

*Stone #1 v. Annucci*,
　No. 20-CV-1326 (RA), 2021 WL 4463033 (S.D.N.Y. Sept. 28, 2021) ...................... 20, 21

*Turner v. Safley*,
　482 U.S. 78 (1987)........................................................................................................ 9

*Winter v. Nat. Res. Def. Council, Inc.*,
　555 U.S. 7 (2008) ..................................................................................................... 1, 2

**Statutes**

18 U.S.C. § 3626 ............................................................................................ 3, 6, 21, 22

U.S. Const. Amend. VIII................................................................................................. 2

UNITED STATES' POST EVIDENTIARY HEARING BRIEF

## I.     INTRODUCTION

Plaintiffs filed this emergency motion six months ago. Six months ago, they did not present evidence sufficient to grant their motion. After the first three days of the evidentiary hearing, it became clear that Plaintiffs still lacked evidence to support their motion. Not only did they fail to present evidence of imminent, irreparable harm from systemic sexual abuse and retaliation, but they also failed to show that Dublin officials have been deliberately indifferent to any serious risk of known harm to inmates housed there, especially when considering the substantive changes that have taken place at Dublin over the past two years. Contrary to Plaintiffs' assertions that the government's witnesses left their evidence materially unrebutted, the government presented testimony that directly contradicted the overstated position of urgency Plaintiffs present.

Things are not perfect at Dublin. No one has claimed otherwise. But the Eighth Amendment does not require perfection. It requires that prison officials respond reasonably to known risks, and the evidence presented to this Court before, during, and after the evidentiary hearing demonstrates just that. There is work left to be done at Dublin, but Plaintiffs' motion is not supported by the evidence or the law, and is not narrowly tailored to the harm alleged. There is simply no factual or legal support for the extraordinary relief Plaintiffs seek of appointing the first special master in the Bureau's history, especially when weighed against the concrete and meaningful remedial work that has been done at FCI Dublin. This Court should deny Plaintiffs' motion.

## II.    LEGAL STANDARDS

Injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To meet that standard, Plaintiffs here must make "a clear showing" that they are likely to succeed on the merits of their Eighth Amendment claims,[1] that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public

---

[1] Post-evidentiary hearing, Plaintiffs claim they can demonstrate success on the merits of their First Amendment claims (doc. 142 at 7). But they did not brief success on the merits of any First Amendment claims in their preliminary injunction motion, nor did they address any of the other preliminary injunction factors as related to the First Amendment. They should be precluded from doing so now in keeping with standard motion practice. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir.1999) (a party may not raise new legal issues for the first time in its reply brief).  Moreover, as addressed below, Plaintiffs' First Amendment claims show neither irreparable harm nor deliberate indifference.

interest. *Id.* at 20. Where the government is a party, the balance of hardships and the public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A request for a mandatory preliminary injunction seeking relief well beyond the status quo is disfavored and shall not be granted unless the facts and law clearly favor the moving party. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319–20 (9th Cir. 1994).

The Ninth Circuit's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (citations omitted). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (*per curiam*)). Speculative harm cannot be imminent or irreparable. *Id.* (citing *O'Shea v. Littleton,* 414 U.S. 488, 154-55, 502 (1974) ("[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury"))).

Prison officials violate the prohibition against "cruel and unusual punishments," U.S. Const. Amend. VIII, "only when two requirements"—one objective, the other subjective—"are met." *Farmer v. Brennan*, 511 U.S. 825,834 (1994). The "objective prong" of the Eighth Amendment requires a showing that "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Moreover, the conditions presenting the risk must "be sure or very likely to cause serious illness and needless suffering *and* give rise to sufficiently *imminent* dangers." *Baze v. Rees*, 553 U.S. 35, 49-50 (2008) (emphasis added).

The subjective prong requires Plaintiffs to show that BOP officials are currently aware of and disregarding an excessive risk to inmate health or safety *and that they will continue to disregard that risk* "during the remainder of the litigation and into the future." *Farmer*, 511 U.S. at 846 (emphasis added). Prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause. *Id.* at 845. Indeed, this Court must consider BOP officials' current attitudes and conduct in an action for injunctive relief. *Id.* at 845. "An inmate seeking an injunction on the ground that there is a contemporary violation of a nature likely to continue . . . must come forward with evidence

from which it can be inferred that the defendant-officials were *at the time suit was filed, and are at the time of summary judgment*, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so." *Id.* at 845-46 (emphasis added and quotation marks omitted). And the constitution does not require that all harms are averted. *See id.* at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

Finally, specific to prisoner litigation, this Court cannot issue any prospective relief, including preliminary relief, without finding that any relief sought is "narrowly drawn, extend[s] no further than necessary to correct the harm the court finds requires preliminary relief, and [is] the least intrusive means necessary to correct that harm." 18 U.S.C.A. § 3626(a)(1).

## III.   ARGUMENT

### a. Plaintiffs Have Failed to Meet their Heavy Burden of Proving that Dublin Inmates are Currently Facing an Imminent Threat of Irreparable Harm or Deliberate Indifference to a Serious Known Risk of Harm to Inmates

#### i. Plaintiffs are not facing a serious risk of sexual abuse

Plaintiffs claim that sexual abuse and harassment are "ongoing" at Dublin (doc. 142, *passim*) yet fail to adduce any actual evidence supporting the claim. As of 2023 and 2024, staff on inmate sexual abuse is virtually non-existent, and the few allegations that have been raised during this time do not involve contemporaneous sexual contact. Allegations involving contemporaneous sexual contact require transfer to an outside hospital for physical examination and evidence collection (tr. at 193, 988, 999, Exhibit 217), and in the twelve months preceding the evidentiary hearing, only one inmate required transfer to an outside hospital for examination, and the allegation was inmate-on-inmate sexual assault. (Tr. at 193, 988, 999, Exhibit 217.) Contrary to Plaintiffs' repeated assertions, Dublin is not currently a sexualized environment. (*See e.g.*, tr. at 81, 216-17.) When asked, Plaintiffs' witness, E.R., did not even understand the term. (Tr. at 730.)

In support of their claims that conditions at Dublin perpetuate a culture of sexual assault and harassment, Plaintiffs point to the hearing testimony of five inmates – R.B., E.R., K.C., L.P.R., and T.M. – which they contend *adds to* the forty-seven declarations they filed in support of their motion, yet R.B. and T.M. also filed declarations. (Docs. 142 at 9; 10-2; 10-25.) And even though Plaintiffs disclosed the

identities of forty-one of the forty-seven declarants immediately prior to the evidentiary hearing, this Court should consider only the testimony (written or oral) of those who testified and were subject to cross-examination. Moreover, fifteen of the forty-seven declarants were released from Dublin prior to the filing of the lawsuit (docs. 10-32, 10-33, 10-34, 10-36, 10-37, 10-38, 10-39, 10-40, 10-41, 10-42, 10-43, 10-44, 10-45, 10-46, 10-47), and in some cases were released nearly two years prior to the filing of this lawsuit. (*See* Docs. 10-45, 10-47.) They did not testify. So, not only were they not subject to cross-examination, but they also lack any material knowledge of current conditions in the facility as they were released long before the hearing on this motion and their declarations should not be considered. Even if they are considered, by Plaintiffs' own admission, the forty-seven declarations collectively identify just four incidents of alleged staff sexual misconduct during 2023. (Doc. 142 at 9.)

R.B. is the only Plaintiff who testified regarding conduct identified by Plaintiffs as "recent," and her testimony was not personal (she was not recently subject to sexual harassment or assault), nor was she a percipient eyewitness to a recent identifiable event. (*See* doc. 142 at 9.) Her statements even arguably related to staff sexual misconduct were related to past allegations against individuals placed on leave, criminally prosecuted, or investigated and cleared. (Tr. at 621.) E.R.'s testimony was similarly not personal; she testified that she witnessed a single event of alleged staff sexual assault nearly twelve months ago, and that she reported it to Dublin staff. (*Id*. at 723-24, 733-34, 738-40.)

The remaining four accounts of alleged personal experiences are largely not recent, nor are they indicative of widespread or rampant sexual assaults or a culture of abuse. L.P.R. testified that six months ago she was in the shower during or close to count time and an officer told her to get out of the shower, asked her for her ID, made eye contact with her through the window in her room as she was getting dressed, and then a female unit manager came in while L.P.R. was in her bra and underwear and asked her for her ID. (*Id*.. at 782-85.) T.M. testified consistent with her declaration that seven months ago she was in the shower during or close to count time and an officer opened the shower curtain, that she reported it, and that he no longer works in her Unit. (*Id*. at 896-97.) She also testified that two months ago that an officer told her she "owed him" for getting her out of a disciplinary report, which she interpreted to be sexual, and that after that she talked to psychology. (*Id*. at 897-99.) K.C. testified that during a work training three months ago an officer told her she was lucky there were no cameras in the

room and touched her lower back for a couple of seconds. (*Id*. at 928-29.) K.D. testified she had seen "like four or five" sexual incidents involving three officers at the camp but did not identify a timeframe, the officers or inmates involved, and stated that she did not report it. (*Id*. at 703-04.)

Of the eight Plaintiffs in this case, only four Plaintiffs filed declarations and testified at the evidentiary hearing and none of them testified that they had recently been sexually assaulted or witnessed a sexual assault: R.B. (doc. 10-2; tr. at 608-674) (allegations of sexual harassment before or during COVID); J.L. (doc. 10-3; tr. at 873-895) (sexual assault in 2021)[2]; J.M. (doc. 10-4; tr. at 745-765) (sexual assault allegations in 2021); and S.L. (doc. 10-15; tr. at 561-608) (allegations of sexual assault and harassment in 2022). Four Plaintiffs alleging past misconduct did not testify: A.H.R. (doc. 10-14) (allegations of sexual harassment from July of 2022); G.M. (doc. 10-5) (allegations of sexual assault in 2020 and 2021); A.S. (doc. 10-6) (sexual assault in 2020 and 2021); and L.T. (doc. 10-11) (allegations of sexual abuse and harassment from 2019 – 2021). Additionally, paragraph 14 of Plaintiff A.H.R.'s declaration states, "[j]ust last week, on Thursday, August 10," another guard was walked off, yet he signed his declaration was signed two days earlier on August 8, 2023. (Doc. 10-14 at 4-5.) This testimony was not subject to cross-examination. Plaintiff S.L. also signed her declaration the same day (doc. 10-15 at 7), and her declaration contains the same future statement that, "on Thursday August 10th," another officer was walked off. (*Id*. at 5.) S.L. was subject to cross-exam, but both declarations were signed under penalty of perjury, and both declarations attest to facts that occurred *after* the dates they signed them. These statements should not be considered.

Three non-Plaintiffs filed declarations and testified at the evidentiary hearing and none of them identified instances of recent sexual assault: T.M. (doc. 10-25; tr. at 895-922) (discussed above), A.V. (doc. 10-27; tr. at 846-861 (A.V. stated, "I personally haven't witnessed any [sexual abuse since this Court began sentencing former Dublin employees]." Tr. at 854-55, 858-59)); C.A.H. (doc. 10-30; tr. at 765-781 (C.A.H. testified she was subject to abuse in 2021 and that she was a lookout in 2020 while another officer was with a fellow inmate, but she had not seen anything like that since and that neither of those officers are still at Dublin. Tr. at 767-69.)). Plaintiffs two remaining witnesses were not declarants or Plaintiffs, and again, neither witness identified instances of recent sexual assault: M.M. (tr. at 803-

---

[2] J.L. was released from Dublin on January 22, 2024. (Jan. 26, 2024 Tr. at 4.)

819) (M.M. testified that six months ago, during or after count, two male officers walked into her cell while she was using the restroom and that she reported it, tr. at 804-05), R.F. (tr. at 819-846) (R.F. made a single vague reference to a report she made to Associate Warden Patrick Deveney regarding ongoing sexual misconduct and issues with the showers, tr. at 837).

The testimony of thirteen inmates, almost half of whom are housed in the same unit (*see e.g.*, tr. at 597, 842, 860, 894), is not representative of the entire inmate population. To the contrary, Plaintiffs hand-selected a small fraction of inmates to testify on their behalf and even those witnesses identified a just handful of isolated incidents of alleged sexual misconduct in 2023 and do not point to widespread, systemic misconduct. (Doc. 142 at 9.) As such, this evidence falls far short of the evidence of imminent and irreparable injury required to support the extraordinary preliminary relief Plaintiffs seek. In any event, the allegations of staff misconduct raised in the declarations and the thirteen inmates' testimony in this case have been referred to BOP's Office of Internal Affairs (OIA) and the Office of Inspector General (OIG) for the U.S. Department of Justice (DOJ). (Tr. at 366-67.) And contrary to Plaintiffs' arguments, the number of cases opened by OIA out of Dublin is not "suspiciously low" (doc. 142 at 22); OIA opened approximately one hundred cases of alleged sexual misconduct referred from Dublin in 2023. (Tr. at 321.) However, of these hundred cases, only two related to activity allegedly occurring in 2023. (Tr. at 321, 331.) Those cases, like all others, were referred to OIG, which is where they remain under active investigation. (*Id.*)

Far from leaving Plaintiffs' testimony materially unrebutted (doc. 142 at 6), Plaintiffs' own witnesses and BOP presented material testimony and documentary evidence directly rebutting Plaintiffs claims that inmates currently housed at Dublin face an unconstitutional risk of harm from sexual assault. Indeed, based on OIA Chief Beth Reese's review of recent claims opened with OIA, she has no "reason to believe that there are currently the same issues going on at Dublin that there were in 2020," but that investigations into staff misconduct are always ongoing as OIA opens between five and six thousand cases per year nationwide. (Tr. at 321-22.) She stated, "[t]he types of allegations that we're receiving now [from Dublin] are more along the lines of very routine administrative prison misconduct." (Tr. at 322-23; *see e.g.*, tr. at 816 (T.M. testified, Dublin is "boring.").)

BOP presented the testimony of Dublin inmate S.M., who arrived at Dublin in June of 2023. (Tr. at 495.) She described her experience at Dublin as "a better experience than [she] had originally anticipated prison to be," specifically when it came to the programming and medical care. (Tr. at 495-96.) S.M. has not been sexually assaulted by a staff member while incarcerated at Dublin, nor has she witnessed any incidences of sexual assault. (Tr. at 505.) She testified she "absolutely" knew what she could do to bring that up with somebody if she were assaulted or witnessed an assault. (Tr. at 505-06.) She decided to testify after overhearing an inmate in her Unit say she had talked to a Lieutenant "about a couple things that were going on as far as the court hearing." (Tr. at 494.) After sleeping on it, S.M. "felt that [she] needed to go there as well to make sure the right things were being said for the prison. . . " (Tr. at 494.) A few days before the hearing, witness R.F. verbally attacked S.M. on several occasions, telling her she was on the "snitch list" for testifying for the government, and attempted to intimidate her into not testifying. (Tr. at 506-12.)

Plaintiffs have failed to meet their burden of presenting evidence showing they are entitled to the extraordinary remedy of a mandatory preliminary injunction because the evidence demonstrates that Dublin inmates are not currently facing an unconstitutional risk of sexual assault.

## ii. Allegations of staff sexual abuse are investigated by authorities outside Dublin

Plaintiffs continue to be under the mistaken impression that Dublin staff or local OIA SIA staff investigate allegations of staff sexual abuse (i.e., criminal misconduct). But allegations of sexual misconduct are investigated by OIG or the FBI and are never handled at the local level. (Tr. at 405-07.) As stated, all declarations and testimony in this case relating to alleged criminal misconduct have been referred to OIG. (Tr. at 366-67.) BOP's OIA is an independent component of the Director's Office and is responsible for classifying allegations of employee misconduct it receives and investigating serious but non-criminal employee misconduct. (Exhibit 216, tr. at 304.) Contrary to Plaintiffs' assertions that "OIA is unaware of any but the few cases Dublin bothers to refer" (doc. 142 at 22), OIA can receive allegations from any number of sources to include inmates, inmates' families, advocacy organizations (including Plaintiffs' lawyers), the press, Congress, prison staff, or a facility's Warden. (Tr. at 304, 344-45.) When OIA receives an allegation, it must determine whether it alleges staff misconduct and

whether there is sufficient information to undertake a meaningful investigation. (Tr. at 305.) If the answer to both of those questions is yes, OIA moves forward with classifying and referring the allegations to OIG as appropriate. (Tr. at 305.)

OIG "is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice."[3] OIG has "jurisdiction over the criminal and administrative misconduct of all DOJ staff." (Tr. at 306.) OIG requires that OIA send them all allegations that could be criminal in nature but can review any allegations sent to OIA and has the right of first refusal on all OIA cases. (Tr. at 306-07.) BOP has no control over OIG's investigations, and OIG can receive allegations from any source, to include members of the public, attorneys, or advocates. Allegations of sexual misconduct (i.e., that if true would be criminal) have always been investigated by OIG or the FBI and are never handled at the local level. (Tr. at 405-07.) Only if OIG declines to retain a case is it sent back to OIA for potential investigation by an OIA Special Agent. (Tr. at 306-07.)

In part due to the events at Dublin, OIA was reorganized in 2023 so that BOP's local investigators (the Special Investigative Agents or SIAs at individual institutions) work directly for and are supervised by OIA rather than the Wardens at each institution. (Tr. at 308, 356, 377-79.) This ensures a division between staff investigations of non-criminal conduct and local leadership. Additionally, OIA has assigned two special agents at FCI Dublin who similarly do not report to Dublin leadership. Again, their presence ensures increased oversight at Dublin.

Plaintiffs claim Dublin's staffing changes are immaterial because prison administrators, in their reasonable professional judgment, determined that the additional positions created in response to the crisis were no longer needed. (Tr. at 1146-47.) By way of background, in addition to completely new supervisors and department heads in 2022, BOP restructured the executive team to increase and improve oversight at Dublin. The Executive Assistant/Satellite Camp Administrator position was revived and filled by Morgan Agostini, an additional Associate Warden position was created and filled by Patrick Deveney, and an additional Correctional Captain position was created and filled by Ericka Quezada. By the end of 2022, the executive team at Dublin included the Warden, three Associate Wardens (as

---

[3] U.S. DOJ Office of the Inspector General, About the Office, https://oig.justice.gov/about, last accessed February 16, 2024.

opposed to the former two), an Executive Assistant (as opposed to the former zero), two Captains (as opposed to the former one), and a newly created "family planning coordinator position as a neutral party to assist the institution in any issues they may have with outside stakeholders," which was filled by Amberly Newman. (Tr. at 13-14, 177-78.) The evidence establishes that BOP responded reasonably to the crisis in implementing new positions, and that Dublin is no longer in crisis. This Court should give deference to the agency's staffing decision.

### iii. Inmates know how to and are reporting concerns to current staff as well as those outside of Dublin without facing retaliation

Plaintiffs argue that inmates have "consistently faced punishment and retaliation" for reporting staff sexual misconduct. (Doc. 142 at 12.) But the examples of retaliation Plaintiffs point to are examples of experienced prison officials' "execution of policies to preserve internal order and discipline and to maintain institutional security," which this Court is required to give wide-ranging deference. *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (alterations omitted). Considering the swift and severe consequence of administrative leave for staff receiving sexual abuse allegations involving of any form of inappropriate touching (i.e., the small of a back as opposed to a breast) it is well within Dublin officials' professional and reasonable discretion to impose sanctions for individuals deemed to be lodging false staff sexual abuse allegations. Multiple witnesses testified that Dublin is short-staffed. (*See e.g.*, tr. at 18, 196, 199, 971, 1125, 1134.) Less staff on site poses a safety and security risk for everyone incarcerated at Dublin. "Prison management is complex and requires expertise, planning, and the commitment of resources." *Griffin v. Gomez*, 741 F.3d 10, 20–21 (9th Cir. 2014) (citing *Turner v. Safley*, 482 U.S. 78, 85 (1987) (internal quotation marks omitted)). "In particular, federal courts should exercise restraint when reviewing management decisions taken by prison administrators to secure the safety of prisoners and [] prison personnel. *Id*. at 21; *see also Overton v. Bazzetta*, 539 U.S. 126, 135 (2003).

Moreover, Plaintiffs cannot meaningfully dispute the evidence BOP presented that executive staff have worked diligently to build trust with the inmate population – not through platitudes and good intentions – but through concrete and measurable actions. As such, existing reporting mechanisms are sufficient for the inmate population to confidentially report concerns, and they are, in fact, reporting them. Plaintiffs' witnesses testified that they trust and feel safe with some prison staff. (Tr. at 817 ("[I

1   trust my] counselor, Ms. Miner."; tr. at 759-60 (Ms. Miner); tr. at 793 (Ms. Miner); tr. at 733, 744 (Ms.

2   Gonzalez "makes me feel safe," "my bosses [in reg] made me feel safe, too."")) They additionally

3   provided examples of staff members speaking out on behalf of inmates. (*See e.g.*, tr. at 639 (Ms. Doyle

4   discretely pulled R.B. and "said I just wanted to make sure you're okay…"))

5        To build trust, new management reinstated the practice of all department heads and executive

6   staff standing main line[4] every day they are on shift (as they are able) to demonstrate they are

7   approachable and interested in communicating with the inmate population. (*See e.g.*, tr. at 184-85, 370,

8   497-98, 538, 1055.) Deveney testified that when he started standing main line in July 2022, he would

9   "have a line probably almost a football field long of inmates that wanted to make complaints." (Tr. at

10  185.) Now, he can stand main line and "may have one or two inmates" that want to raise minor things he

11  can usually address within a day or two. (*Id.*)

12       Additionally, new management is committed to being visible and present through doing regular

13  rounds in the housing units and holding town halls to communicate important information. (*See e.g.*, tr.

14  at 246, 264, 402, 525-26, 532-34, 538.) Inmates feel comfortable raising issues with executive staff

15  during rounds. (*See e.g.*, tr. at 158-59, 538.) To improve transparency and communication regarding

16  methods of reporting abuse, Deveney created PREA informational flyers and instructed staff to post

17  them in every housing unit. These flyers include information about how to report PREA concerns as

18  well as Deveney's photo so inmates know by face who they can approach with issues. (Tr. at 186-87,

19  627, 900.) He acknowledged that some inmates may be uncomfortable speaking with him, so he also

20  listed on this flyer Tri-Valley Haven's rape crisis phone line as well as detailed instructions on how to

21  report directly to OIG, both of which are entities outside Dublin. (Tr. at 187.)

22       Inmates also have direct access to each of the various department heads through TRULINCS,

23  which is the messaging, video visiting, and phone calling system that the inmate population utilizes. (*See

24  e.g.*, tr. at 20, 206, 502-04, 534.). Deveney monitors seven of these staff email boxes. (Tr. at 183.) He

25  has a practice of monitoring these inboxes day and night, and even testified that it's not uncommon for

26  him to respond to inmate requests in the middle of the night. (*Id.*) He estimated that he typically

27

28  _____

    [4] Main line is a term used in a correctional setting for standing in line at mealtimes. (Tr. at 184,
    1055.)

responds to inmate requests made to any one of these inboxes within 24 to 48 hours. (Tr. at 207-08.) In the drop-down menu in TRULINCS, not only can inmates instantly contact department heads, but also OIG, friends and family, or advocacy groups. (*See e.g.*, tr. at 207, 503-04, 534, 599, 627, 894, 900, 935, 1055, 1063.) Inmates can and do use these email boxes to raise issues directly with staff, advocates, and OIG (*see e.g.*, tr. at 627, 845) and emails sent to OIG are not traceable at the institution level. (Tr. at 208, 631-32.)

Inmates can (and do) write to OIA and OIG using the mail, which is considered special or legal mail and is not monitored or read by staff. (Tr. at 208, 345-46, 627.) The Crime Stoppers number is painted on the walls in every housing unit (tr. at 212, 371, 534, 599) and this is a direct line to Special Investigative Services (SIS) where the inmate population can make a report that is only monitored by SIS. (Tr. at 212.) Inmates do not have to add this number to their call lists, it does not use their personal telephone minutes, and it does not show up on their numbers dialed list. (Tr. at 371.) Former OIA Special Investigative Agent (SIA) Stephen Putnam had a practice of explaining this to the inmates, so they were aware of this confidential reporting method. (Tr. at 371.) He also told them that if they were worried about someone overhearing them on the phone with SIS, they could dial the Crime Stoppers number and let the answering machine pick up without saying anything. (Tr. at 371-72.) Putnam testified he would then know they called and would arrange to speak with them in person. (Tr. at 371-72.)

The inmate population also has direct access to SIS and SIA and can approach these individuals as they are standing main line (tr. at 370) or utilize the inmate-to-SIS email box, which only SIS staff have access to (tr. at 371, 918). If an inmate were concerned that someone may be watching them type emails, Putnam would tell them to just indicate in the message whichever SIS staff member they wished to speak to, and SIS would call them up to confidentially speak to SIS staff in person. (Tr. at 371-73, 383-84, 401-02.) Putnam did everything he could to communicate his position to the inmates and develop rapport with them so they felt comfortable reporting to him. (Tr. at 409-410.) The Court can be confident these practices will continue with Putnam's replacement.

Executive staff have also dramatically increased responsiveness to inmates' emails, administrative remedies, and tort claims. Agostini is also Dublin's administrative remedy coordinator.

(Tr. at 529-30.) When she arrived at Dublin, staff were "working to answer administrative remedies that had been open since 2020." (Tr. at 530.) From July to November of 2022, Dublin executive staff "cleared up the entire backlog of administrative remedies" and tort claims. Even now, staff are caught up. (*See e.g.*, tr. at 165, Captain Quezada stated she had only one tort claim potentially outstanding at the hearing, and it was just a few days late, if at all.) (Tr. at 530.) Agostini testified that if, while reviewing administrative remedies, she became aware that an inmate was attempting to report staff sexual abuse, she would immediately report it to the SIA and the Prison Rape Elimination Act (PREA) compliance manager, Deveney. (Tr. at 537.)

Another practice unique to Dublin, and the agency, is that Dublin inmates have virtually unfettered access to outside attorneys and advocates through Dublin's pilot phone program. Any inmate can request a legal or advocacy phone number to be programmed in and then has access to a room with a door that closes in the housing unit where they can make a confidential, unmonitored, unrecorded call. The pilot phones are available any time the unit is open. (Tr. at 203-211, 219, Exhibits 418, 844.) Currently, Dublin has 368 numbers programmed into the pilot phone. (Tr. at 205.) Dublin inmate S.M. stated that her experience using the pilot phone program has "been great." (Tr. at 499.) She testified that she had no issues getting phone numbers added to the list and that she was able to use the phone to call her lawyer. (*Id*.) She stated she has not perceived anyone, inmate or staff, treating her differently for using the pilot phone. (Tr. at 500.) J.M. testified that the pilot phone system "is really good" but that it shares a space in her housing unit with the video visiting space. (Tr. at 909.) S.L. testified that the pilot phone is a positive thing that the new administration has done. (Tr. at 602-04.) L.R.P. testified that she has used the pilot phone line in her Unit to contact her lawyer, which she agreed is a positive thing. (Tr. at 794-95.) There is ample evidence to suggest that each of the aforementioned reporting mechanisms are more than sufficient for inmates to confidentially report any issues, including any alleged retaliation.

### 1. Any allegations of retaliation can be reported by the means identified above and all allegations of retaliation for reporting sexual misconduct are referred to OIA or OIG

Nearly every witness who appeared before this Court corroborated that Dublin is currently facing a serious drug problem. (*See e*.g., tr. at 197-99, 620, 702, 718, 760, 817, 893, 919, 934; doc. 46-1 at 11-12.) As such, Dublin's executive staff have recommitted to enforcing national BOP policies aimed at

deterring drug distribution and implemented several practices to address this issue, including consistently enforcing visual and cell searches to control the spread of contraband, rotating work assignments, creating a drug diversion program for inmates, and limiting the use of SHU for positive urinalysis tests. (*See e*.g., tr. at 51-53, 197-98; doc. 46-1 at 11-12.)

### 2. Visual searches are required by policy

Visual searches for contraband following contact visits with members of the public is national BOP policy (tr. at 22-23) and is required to be enforced consistently regardless of whether contraband is actually recovered.[5] The policy exists to deter the introduction and spread of contraband as well as detect it. Plaintiffs state that, beginning in December, staff began to conduct strip searches after and restroom escorts during legal visits as a form of retaliation. ███████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████[6] The restroom escort policy came up following visitation on January 2, 2024, which was an unprecedented 8-hour legal visit. (*See* doc. 88 at 2.) Dublin is not a pretrial detention center, it houses sentenced individuals, so the overall volume of attorney visitation in general is significantly lower than other (social) visitation. Staff and inmates likely were unfamiliar with the restroom escort policy because legal visits historically were of much shorter duration, and attorney visitation at Dublin increased significantly in the lead up to the proceedings in this case, leading to an increase in searches.

Regardless, while restroom escorts during and visual searches after contact visits are required by national BOP policy, it is not clear whether it was done under the previous administration, nor has it

_____

[5] BOP Program Statement 5521.06, Searches of Housing Units, Inmates, and Inmate Work Areas, https://www.bop.gov/policy/progstat/5521_006.pdf, last accessed February 16, 2024.

[6] Pursuant to Federal Rule of Evidence 201(b)(2), the Court can take judicial notice of information obtained from government websites, as they are not subject to reasonable dispute. FCI Dublin is a low security institution, while the Camp is minimum security. https://www.bop.gov/locations/institutions/dub/, last accessed February 16, 2024.

always consistently done during this administration. Both Quezada and Putnam have brought to the current executive staff's attention inconsistencies with staff conducting visual searches that needed to be addressed. (Tr. at 145, 410-11, Exhibit 417.) However, visual searches at Dublin are not being employed in a retaliatory way as there is evidence that policy is being enforced against individuals not involved with this case, and the failure of a staff member to conduct a visual search when it is required is an employment issue that has been addressed through training and counseling, if necessary. (Tr. at 130, 150-56.) Inmate S.M., who testified in the government's case in chief, stated she had a contact visit the week of the evidentiary hearing, and that following that visit she was visually searched by staff. (Tr. at 514-15.) Plaintiffs also argue that enforcement of national BOP policy has a chilling effect on inmates' right to counsel. But any inmate who does not wish to be visually searched following a contact visit is free to use the pilot phone day or night to communicate on an unmonitored line with counsel, or email them, as witnesses in this case have made clear they know how to do so. (*See e.g.*, January 2, 2024 Tr. at 22 (between Mx. Beaty and Ms. Janssen, 150 individual phone calls were made in the last six weeks from the pilot phones.))

Deveney testified he had no personal knowledge of a member of his staff conducting a visual search to retaliate against an inmate for reporting sexual misconduct, nor has he ever instructed a staff member to conduct a visual search of a particular inmate because he was upset about the content of the inmate's legal visit or call. (Tr. at 215.) Quezada testified that she has never instructed a member of her staff to conduct a visual search of a particular inmate because she was concerned about the content of the inmate's legal visit or call, nor was she personally aware of a member of her staff conducting visual searches following inmates' legal visits with some attorneys but not others, and she was not aware of which inmates had retained any particular group of attorneys. (Tr. at 39.) There is no evidence to suggest current administrators have subjective knowledge of or have been deliberately indifferent to the risk of retaliation against those who meet with attorneys to report misconduct.

### 3. Inmate work details are reassigned to combat drug introduction

Some inmates have complained that their work details were switched in retaliation. (Tr. at 200.) Deveney stated to combat the drug problem, Dublin staff have "also looked at reassignments of -- of work details," and that, in his opinion, "those reassignments have had the most impact in minimizing or

1   eliminating drug introduction at the -- at the institution." (Tr. at 199-200.) He explained it is a "best

2   practice" to reassign work details every six months, excluding those work details that require longer

3   participation – such as an electrician's apprenticeship or a work detail through UNICOR. (Tr. at 200.)

### 4.   SHU is not used to retaliate against those reporting sexual assault

5   Some inmates have complained they are put in SHU in retaliation. However, there are multiple

6   layers of institutional review regarding the use of SHU that prevent its use for individual retaliation. Any

7   time a member of the staff wishes to place an inmate in SHU, they are required to call Captain Quezada

8   – day or night – and inform her of the reason the inmate is being placed in SHU. She has the ultimate

9   discretion over that decision. (Tr. at 55.) After an inmate is placed in SHU, she is required to inform all

10  executive staff – the Warden, two Associate Wardens, and the Executive Assistant. (Tr. at 56.) The

11  correctional lieutenants then send an email to the other department heads to inform them of the inmate's

12  name and the reason they were placed in SHU. (*Id*.)

13  Every week, the Warden, the AWs, the Executive Assistant, the Captain, the unit managers, the

14  Case Management Coordinator, either the Health Services Administrator or the assistant, the chief

15  psychologist, the Special Housing Unit lieutenant, the Special Investigative lieutenant, and usually a

16  Special Investigative Services (SIS) technician meet in person to discuss every single inmate in SHU.

17  (Tr. at 58-59, 196-97, 398-99, 537, Exhibit 407.) Inmates still have contact with department heads on a

18  regular basis while in SHU, they are seen by medical twice per day, a lieutenant at least once per shift,

19  psychology weekly and as needed. (Tr. at 64-65, 1119-20, Exhibit 405.) Additionally, inmates can still

20  access the pilot phone and computer to report to OIG while in SHU. (Tr. at 47-48.) Captain Quezada

21  implemented a practice at Dublin where only those inmates who pose a risk to the security of the

22  institution are placed in SHU. (Tr. at 51-53.) She also has discretion to grant early release to inmates in

23  SHU for disciplinary segregation and testified that she makes "a habit of doing so." (Tr. at 66, Exhibit

24  408.) There is no evidence to suggest that absent this Court's intervention, Dublin staff will suddenly

25  halt these reformative practices.

26  Moreover, the use of SHU as protective housing is a "last resort" after all other alternatives are

27  explored. (Tr. at 46.) Deveney testified that during his tenure, SHU has not been used as a form of

28  retaliation for PREA purposes, nor has it been used to place inmates in restrictive housing for reporting

PREA allegations. (Tr. at 200-02.) With respect to past practices, Putnam stated the number of inmates he placed in Special Housing as protection was less than five over the course of eight years. (Tr. at 373.) He explained that in two of those situations, he had information that certain inmates were involved with staff members, but he could not identify the inmates as PREA victims because they "were denying everything." (Tr. at 374-75.) He placed those inmates in SHU to keep them safe from the alleged staff perpetrators while he investigated the allegations. (*Id*.) From August of 2023 to January of 2024, Putnam did not place any inmate in SHU for their own protection. (Tr. at 385.) Nor has he ever issued a shot for a PREA report he "thought" was unfounded. (Tr. at 385.) Contrary to what seems to be Plaintiffs' belief, PREA victims can still be placed in SHU for disciplinary reasons. (Tr. at 404.)  Agostini is not aware of an inmate being placed in SHU in retaliation for reporting staff sexual misconduct, nor has she ever placed or recommended placement in SHU to retaliate against an inmate. (Tr. at 538-39.) Dr. Mulcahy is not aware of inmates being placed in SHU after filing a PREA allegation. (Tr. at 1103.) In fact, she encourages inmates to report any alleged retaliation and has herself reported allegations of retaliation inmates have raised with her following a PREA complaint. (Tr. at 1104-05, 1121-22.) Chief Reese said OIA is investigating a small number of cases alleging staff retaliation out of Dublin. (Tr. at 338.)

### iv.  Dublin has implemented new procedures to deter and address staff misconduct, which have changed Dublin culture

In his role as PREA Compliance Manager, Deveney has implemented increased follow-up procedures for all suspected PREA victims. By way of background, when Deveney arrived at Dublin in July of 2022, he conducted an initial internal PREA audit to assess how many PREA cases prior management had been tracking. His review indicated only 37 cases. (Tr. at 185.) Within the first week, Deveney updated that number from 37 to 120. (*Id*.) As of January 2023, they were tracking 160 cases. (*Id*., 187-88.) This is significant because it allows the institution to follow up with these individuals to check in with them and to do retaliation monitoring. (Tr. at 186.) Policy states that they must only document follow up encounters with any alleged PREA victim every 90 days, but Deveney has instituted a practice at Dublin of having the institution follow up every 30 days. (Tr. at 186, 368-69, Exhibit 207.) This is above and beyond what is required by national policy and exists to ensure that

individuals in Dublin's custody are not retaliated against for reporting sexual assault, and if they are, those concerns are voiced to the SIA (who does not report to Dublin) and investigated accordingly.

Deveney is also responsible for and committed to conducting PREA unannounced rounds (tr. at 180), which is a practice required by DOJ's PREA Prisons and Jail Standards[7] to protect inmates against sexual abuse and sexual harassment by limiting the possibility that inmates and staff will be left alone and unmonitored through adequate and ongoing supervision. The "[p]erformance of periodic unannounced rounds by intermediate and upper-level supervisors on all shifts [exists] to deter, prevent, and detect sexual abuse and sexual harassment of inmates in the facility."[8] These rounds are documented and audited by a third party every three years. (Tr. at 180.)

Contrary to Plaintiffs' portrayal of the hearing, BOP presented evidence that Dublin has implemented heightened procedures to enforce zero tolerance of staff sexual misconduct. (Tr. at 167-68, 216.) Plaintiffs blatantly mischaracterize Deveney's testimony, stating he "consistently misstated the definition of staff sexual misconduct, stating that sexual touching is required." (Doc. 142 at 18.) Deveney actually testified that PREA protocols require prison staff to be placed on administrative leave only where there has been an allegation of physical touching of the genitalia or breasts of a female inmate. (Tr. at 189-90.) However, Dublin has implemented a practice of placing staff on administrative leave any time there is a possible allegation of any type of touching (i.e., the small of a back as opposed to a breast). (Tr. at 189-90, 225.) This is a Dublin-specific precaution that exists to ensure that all PREA allegations are investigated and taken seriously. If an allegation could not factually have occurred based on limited, preliminary factfinding, the staff member would not be placed on leave, but Dublin staff would still refer the allegation to OIA and OIG to ensure an appropriate investigation. (Tr. at 257.) In all cases, documentation – including video – is preserved. (Tr. 1150-51.) Limited factfinding serves another purpose as well, because OIA requires enough facts to accurately classify allegations and undertake a meaningful investigation. (Tr. at 305.)

---

[7] PREA Resource Center, https://www.prearesourcecenter.org/sites/default/files/content/prisonsandjailsfinalstandards_0.pdf, last accessed February 16, 2024.

[8] *Id*. at 11.

1      Dublin executives had placed at least 19 employees on administrative leave prior to the

2  evidentiary hearing (doc. 46-1 at 13), and several more have been placed on leave since then. (January

3  26, 2024 Tr. at 4, 12-13.)[9] Contrary to Plaintiffs' characterization of these actions (doc. 142 at 11),

4  allegations are not evidence and placing staff on leave pending a thorough investigation into allegations

5  of misconduct is not evidence of deliberate indifference. Nor is it evidence that sexual abuse is ongoing.

6  Deveney explained that one way an institution can measure its success in gaining the trust of the inmate

7  population is by the number of complaints department heads receive. (Tr. at 183.) This seems

8  counterintuitive, but, as he explained, if an institution doesn't have a healthy culture, the executive staff

9  may not get reports or complaints coming to them. (Tr. at 183.) From his perspective, one of the issues

10 that led to the crisis at Dublin was a "very fundamental breakdown of communication to the point that

11 the inmate population no longer trusted in communicating with the staff and management and

12 leadership." (Tr. at 183.) This is in stark contrast to institutions that have cultivated healthy

13 communication in a correctional setting, where inmates trust prison officials and feel comfortable raising

14 issues directly with staff.

15     Thus, an increase in PREA allegations coming out of Dublin is not an indication that abuse is

16 still occurring. Deveney testified that when embarking on the path of changing an institution's culture,

17 that comes "with the understanding that PREA allegations will increase." (Tr. at 251.) This conclusion

18 stemmed from the research of the Moss Group (TMG), who has conducted "200 assessments of

19 correctional settings that have dealt with sex abuse scandals," and in each of those assessments, "PREA

20 allegations have increased every single time." (Tr. at 251-52.) Accordingly, Deveney stated that an

21 increase in PREA allegations over the past two years would not lead him "to believe that actual sex

22 abuse is occurring at the institution. It leads me to believe that a culture is starting to -- to evolve to

23 building trust to actually report it to our staff." (Tr. at 252.)

24             **v.  Although not binding, Dublin has meaningfully implemented the Moss
25                Group recommendations**

26     In a demonstration of commitment to a changing institutional culture at Dublin, BOP

27 commissioned a third-party consulting agency, TMG. TMG conducted a cultural assessment of Dublin

28

---

[9] Not all employees were placed on leave due to allegations of a sexual nature.

in March of 2022. (*See e.g.*, tr. at 163-64, 175-79.) [10] Their findings were memorialized in writing, and Dublin implemented a working plan to track implementation of these recommendations. (Tr. at 165-66, 236-37, 526-28, *in camera* Exhibit N.) The Court heard testimony about the plan and Plaintiffs cross-examined government witnesses about the plan (*see e.g.*, tr. at 229-238). The plan itself is deliberative and redundant, so BOP did not submit it as an exhibit.  This Court need not draw any adverse inference from BOP's decision to not submit the working plan. As this Court stated, "[i]f [Plaintiffs] are not provided a document, it will not be reviewed, and it will not be considered." (Tr. at 1312.) BOP selected which documents to produce in reliance on this statement.

One TMG recommendation was an increased emphasis on staff training. New leadership has prioritized staff education and training. For example, sometime around October 2022, then-Deputy Captain Quezada learned that staff were conducting visual searches of inmates during every urinalysis test – a practice inconsistent with policy. (Tr. at 16.) She immediately "arranged for all of the female correctional officers" (because they would be the only ones performing urinalysis tests) "to attend a class that [she] held on the correct procedures for urinalysis testing," and visual searches. (*Id*.) This training included policies regarding pat searches, visual searches, procedures for conducting urinalysis tests, the differences in managing female versus male offenders, and communication techniques. (Tr. at 17.) BOP has largely closed this training gap, and all Dublin staff now receive thorough annual and refresher training specific to female offenders, de-escalation training, and PREA training. (Tr. at 21, 527; Doc. 46-1 at 5-6.)

Another TMG recommendation was increased oversight at the facility. BOP's Central Office approved the creation of ombudsman-type positions known as "family support coordinators". Amberly Newman was hired as the Bureau's first Regional Family Support Coordinator. (Tr. at 177-78, 316, 942.) Her role is to be the "neutral party" between staff and inmates. (Tr. at 948-49.) Although she is responsible for 20 institutions in the Western Region, her office is located at Dublin. (Tr. at 943 -47.) (Tr. at 943-47.) No one at Dublin supervises Newman or has any input into her employee performance

---

[10] The government did not intend to introduce or rely on the cultural assessment or Dublin's working plan, which is an internal deliberative document, did not introduce or mention either document in its opposition to the PI, and didn't address either document at the hearing until after Quezada mentioned TMG in response to this Court's questions of her. (Tr. at 166, 203, 332, 1145.) The Moss Group report has been produced to Plaintiffs, but the working plan has not.

reviews. (Tr. at 949, 952.) Her supervisor is located at the Bureau's Central Office in Washington D.C. (Tr. at 949.) Newman can address issues that inmates bring to her attention (like getting help with a medication refill) or issues she notices on her own (like replacing a tattered shower curtain). Her impact at the institution can be immediate. (Tr. at 950, 953, 964.) While she is not on the executive staff at Dublin (tr. at 960-61), she can elevate any issues directly to BOP's Central Office (tr. at 949). She also acts as a liaison between the facility and outside stakeholders, spending up to half a day on the phone or in meetings addressing family concerns or advocacy group concerns. (Tr. at 957.) Her presence in and oversight of the institution is another example of Dublin's changing culture.

Another change implemented to increase oversight at Dublin is the requirement for department heads to put in time on "off shifts." Dublin is "a 6:00 to 2:00 institution," meaning that, typically, management and executive staff work Monday through Friday from 6:00 a.m. to 2:00 p.m., and the hours between 2:00 p.m. and 6:00 a.m. are considered "off-shift." (Tr. at 176, 231, 956, 1044.) In direct response to allegations that criminal activity was occurring when most management personnel were off duty, and to increase oversight during "off-shift hours," around July of 2022, Dublin implemented "a late-night coverage" for all management. (Tr. at 176, 230-31.) This meant that Deveney and other members of the executive team, to include Quezada and Agostini, were required to work weekends and late nights alongside the staff who worked "off-shift" hours. (Tr. at 176.)

Another TMG recommendation was to continue Dublin's implementation of new cameras to capture as well as deter misconduct. Today, there are at least 385 cameras online and recording at the institution, which is the most cameras of any BOP facility in the Western Region. (Tr. at 196, 540.) They have been updated with better fiber cable and the pixel system in the cameras is very clear. Dublin is "the pilot program for the updated camera system agency wide." (Tr. at 196.) Captain Quezada implemented a practice within correctional services of having two staff members conduct visual searches whenever possible, as well as a practice requiring that staff stand in plain view of cameras whenever visual searches are conducted. (Tr. at 37, 127-28.) The existence of cameras protects both staff and inmates. (Tr. at 127.)

Plaintiffs argue there is a lack of material benefit from cameras at Dublin, yet nearly every declaration they filed in support of their motion cited the lack of cameras as a contributing factor to past

abuse. They also cite *Stone #1 v. Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033, at *11 (S.D.N.Y. Sept. 28, 2021) for the proposition that a failure to install and monitor camera shows deliberate indifference to the risk of sexual assault. The Court actually held that inadequate placement and monitoring of cameras "is plausibly alleged to have allowed the correction officer defendants to engage in sexual abuse without fear of being discovered." *Id*. Plaintiffs in this case have not plausibly alleged inadequate placement or monitoring of cameras at Dublin. They point to speculative harm based on a concern about footage retention, yet don't identify a single instance where someone has recently made an allegation of sexual abuse and camera footage was written over or unavailable. (Doc. 142 at 24-25.)

Evidence presented at the hearing demonstrated that cameras have had a positive effect on the population. J.L. acknowledged that Dublin staff have installed new cameras in the area of food services she was assaulted in, and that there is now a camera that faces the entire warehouse. (Tr. at 875-76.) T.M. testified that when an officer made her uncomfortable, she pushed him away from her door so they could "be in the hallway and under a camera." (Tr. at 898.) She testified that she went to talk to psychology about this incident and hasn't seen the officer since. (Tr. at 899.) S.L. testified she has seen the new cameras installed in the housing units. (Tr. at 606.) K.D. testified that in November of 2023 an officer touched her lower back for a few seconds during a forklift training and said she "was lucky that there was cameras in the room." (Tr. at 927.) These are egregious allegations and have been referred for investigation, yet demonstrate the deterrent effect of the cameras.

**b. Plaintiffs' Requested Relief is Not Narrowly Tailored to the Harms at Issue**

Plaintiffs' claims, which seek to change their conditions of confinement under the Eighth Amendment, cannot meet the standards imposed by the Prison Litigation Reform Act (PLRA). *Nettles v. Grounds*, 830 F.3d 922, 934 (9th Cir. 2016) (prisoners must comply with the PLRA if a claim challenges "any aspect of prison life" other than the "fact or duration of the conviction or sentence"). The PLRA is intended to "reduce the quantity and improve the quality of prisoner suits." *Porter v. Nussle*, 534 U.S. 516, 516 (2002). As noted above, in evaluating preliminary injunctions, the PLRA requires that any relief sought "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Plaintiffs' requests do not satisfy these factors.

Plaintiffs' proposed relief is not tailored to redress their alleged harms (i.e., that inmates "will continue to be assaulted and retaliated against …[causing] further physical and psychological injuries"). (Doc. 10 at 27.) Plaintiffs' proposed relief of requiring offsite medical care, providing a procedure for returning non-contraband items, and providing greater access to counsel are unrelated to preventing assault and retaliation, and therefore should be denied on that ground alone. However, even assuming that each form of relief is meant to address the harm alleged, the relief is not narrowly drawn, goes further than necessary, or is simply moot because of current conditions at Dublin.

The first through third requests for relief in Plaintiffs' motion regarding audits and site visits attack facility management and oversight based on activities occurring well over two years ago, and as such, these forms of relief are no longer necessary. A request for "quarterly" site visits is also inapt given that any injunction will expire in 90 days (effectively mooting any order for "quarterly" relief). 18 U.S.C. § 3626(a)(2). Plaintiffs' fourth requested remedy asks that SHU not be used because it could be used to retaliate yet they presented no current evidence of that practice. Prohibiting the use of SHU for any inmate is overly broad, intrusive, and would adversely impact safety and security in the institution. Plaintiffs' fifth request asking that FCI Dublin develop a process for the return of non-contraband items seized during searches has already been addressed via BOP forms, and this request addresses an alleged harm compensable via money damages, making it ineligible for injunctive relief. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) ("Monetary injury is not normally considered irreparable.").

Plaintiffs' sixth request that Dublin develop and institute polices for "high-quality offsite medical and mental health care" is not tailored to preventing sexual assault or retaliation for reporting, vague, and overly broad especially considering the prison's recent efforts to enhance on-site physical and mental healthcare. The seventh request for relief seeks a system to provide inmates with documentation of reporting and participation in investigations. Again, this request for relief is not tailored to the harm alleged and would not prevent an inmate from being sexually assaulted or retaliated against. The eighth request is that Dublin ensure all inmates have consistent, timely, and confidential access to legal counsel, including providing private meeting spaces for all attorney visits. This is similarly not tailored to the harm alleged, and in any event, is moot in light of Dublin's Pilot Phone Program.

1    Plaintiffs cite *Hernandez v. Cnty of Monterey*, 110 F. Supp. 3d 929, 939–40 & 941 (N.D. Cal

2    2015) for the proposition that "granting plaintiffs' motion for preliminary injunction requesting 16

3    remedial elements ranging from medical care, disability accommodations, and mental health care" was

4    appropriate "because 'it hews to the specific conditions challenged.'" (Doc. 142 at 26-27.) However,

5    *Hernandez*, like *Brown v. Plata*, 563 U.S. 493 (2011), is an historic conditions of confinement case that

6    is factually distinguishable from this case. *Hernandez* dealt with conditions of confinement in a pretrial

7    detention center – not a prison – and the Magistrate Court found evidentiary support for a preliminary

8    injunction from four expert reports as well as evidence of the jail's noncompliance with administrative

9    segregation checks, which was a factor present in four inmate suicides in five years. The same factual

10   support for an injunction simply isn't present here. Similarly, Plaintiffs cite *Armstrong v. Brown*, 768

11   F.3d 975, 985–86 (9th Cir. 2014) for the proposition that "finding specific instructions appropriate

12   where the 'State's prior accountability system had failed.'" (Doc. 142 at 27.) But BOP's accountability

13   systems haven't failed; meaningful changes in institution culture have taken place over the last two

14   years without Court oversight.

15   Plaintiffs cite no binding authority in support of their contentions they are entitled to a

16   mandatory preliminary injunction or a special master in this case. Their post-hearing brief centers on

17   Second, Eighth, and Tenth Circuit cases that all sit in vastly different procedural postures from this case

18   – a factor that cannot be overlooked when considering the propriety of preliminary relief. They cite a

19   single case from the Ninth Circuit, *Hook v. State of Arizona*, 120 F.3d 921, 926 (9th Cir. 1997), and a

20   single case from this district, *Madrid v. Gomez*, 889 F. Supp. 1146, 1282, 1198-=–99 (N.D. Cal. 1995).

21   This case is readily distinguishable from *Hook*, where the exceptional circumstance justifying the

22   appointment of a special master was the defendant's "history of noncompliance with the consent decree"

23   especially in light of its statements that "it lacked the resources to constantly monitor compliance with

24   the decree, as it was required to do because of [its own] noncompliance." This Court does that have that

25   record before it. The *Gomez* Court determined special master "clearly appropriate" to assist with

26   developing a remedy for Eighth Amendment violations where the court was not persuaded that changes

27   that "were likely motivated by this litigation, and . . . had not been cemented in any formal written

28   policy" would be permanent. *Id*. at 1198-99. This case is similarly distinguishable as this Court has

1  before it evidence that conditions at Dublin have continued to improve over the last two years rather

2  than deteriorate. Many of the changes implemented at Dublin took place long before litigation ensued

3  and there is no evidence to suggest that the major corrective action is impermanent or motivated by

4  litigation.

5  **IV.    CONCLUSION**

6     The government respectfully request that this Court deny Plaintiffs' Motion for Preliminary

7  Injunction.

8     Respectfully submitted on this 16th day of February, 2024.

9

10                                JESSE A. LASLOVICH
                                  United States Attorney

11                                */s/ Madison L. Mattioli*
12                                MADISON L. MATTIOLI
                                  ABBIE J.N. CZIOK
13                                MARK STEGER SMITH
                                  TIMOTHY A. TATARKA
14                                Assistant U.S. Attorneys
                                  Attorneys for Federal Defendants
15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES' POST EVIDENTIARY HEARING BRIEF