| | |
|---|---|
| **From:** | Amaris Montes |
| **To:** | France, Robert (BOP) |
| **Cc:** | Mattioli, Madison (USAMT); Cziok, Abbie (USAMT); Ernest Galvan; Kara Janssen; Oren Nimni; Susan Beaty; Cha-Kim, Stephen; Luma Khabbaz; Anderson, Carson |
| **Subject:** | Re: [EXTERNAL] Re: Client concerns |
| **Date:** | Tuesday, February 13, 2024 5:36:24 PM |

Hello Rob,

Thank you for the additional information. Regarding K.D., as I expressed in my previous email, K.D.'s family informed us of ongoing struggles in order to put her family on the visitation list including refusing to accept the forms for the people the Court instructed to process, and kicking them out of the facility even though the Court gave explicit orders requiring officers to accept and process them quickly. While we are glad some of her family have finally been put on the list, it should not have required such issues. As for her additional family members, the court was clear that the refusal to process K.D.'s family visitation was an issue and, at the very least, her family members should be processed swiftly, as all family members should. K.D.'s nephew has attempted to submit these forms by mail and in person and has continued to face issues. Therefore, this treatment is still concerning.

Additionally, K.D. has informed us that BOP is now refusing to release her directly to the community in March, even though she has met all the requirements to be able to do so, considering her FSA credits and good time. She is being told that she is required to be released in a halfway home in March, with officers explicitly stating that this is because her testimony during the PI hearing means she needs "mental health support" which she can only find in a halfway house. This is concerning for a number of reasons: 1) This amounts to punishing K.D. for her testimony at the hearing, since she will have to serve her full time in prison, plus an additional time in the halfway house before she is released to her family, instead of simply being released to her family in March; 2) If her mental health was a concern, she should have received appropriate care previously; 3) She has already been qualified to be released to a halfway house for many months, so there is no reason why she could not have been released to a halfway house already where she could have obtained those services prior to her full time being served, and then be released to her family as planned in March.  I will also remind you that the only disciplinary that is currently on K.D.'s record is the disciplinary where she reported Campos's pat search that made her feel uncomfortable, for which she was punished. This disciplinary has affected her ability to be released for months, as it affected her FSA credits, which means the BOP has punished K.D. with unnecessary incarceration for reporting actions that made her uncomfortable. If the BOP is serious about building trust with incarcerated people and ensuring people are comfortable with reporting officer misconduct, K.D.'s story does not instill faith for the BOP, and it would be in BOP's interest to ensure K.D. is treated appropriately and for the disciplinary to be removed.

Regards,
Amaris


On Thu, Feb 8, 2024 at 6:51 PM France, Robert (BOP) <Rfrance@bop.gov> wrote:

> Good afternoon Amaris:

Your concerns regarding K.D. are noted. K.D.'s relatives, Paul (Uncle) and Robyn (Aunt) Catalano arrived on January 8, 2024. They filled out the required paperwork and returned it to the Captain. Their background checks were completed, and they were added to K.D.'s approved visitor list. They were informed of the days and hours social visiting is offered and given the printable visitation rules, located in the institution supplement. Her daughter, C.D., is also approved as a visitor. Those were the three individuals that the Court ordered me to assist in facilitating their addition to K.D.'s visitation list. Based on representations made to me, these three individuals have been/are able to visit K.D.

Neither I nor the U.S. Attorney's Office interpreted the Court's Order to allow additional members of K.D.'s family to be able to provide staff the visitation forms in person. BOP policy requires the inmate to mail out the visitation forms to their proposed visitor(s). The proposed visitor(s) must complete the form and mail it directly to the BOP staff responsible for processing the inmate's visiting list. If K.D. (or any inmate) were exclusively afforded special treatment with respect to this policy, we would potentially invite safety and security concerns for all parties concerned.

C.H.'s medications were discontinued on January 23, 2024, as a result of her reporting some adverse side effects from her morning anti-depressant pill, including GI distress. When she reported that information to our BOP contract physician, he made the decision to stop the medication. A tele-psychiatry appointment is scheduled for Tuesday, February 13, 2024, which will include addressing the medication concern. C.H. has continued to have weekly appointments with BOP's psychologists. She responded positively to intervention and engaged in treatment. To the extent staff required her to sign a release of information, normal protocol is not to discuss/share an inmate's medical history with anyone outside of the DOJ network unless, in part, there is a signed release by the person whose medical information is the subject of the potential release. Presumably, staff were concerned about records being made available to the Court, without knowing intricacies about in camera viewing or our joint-stipulated Protective Order.

Special Investigative Services had initiated an investigation concerning R.F. on the basis of intelligence provided by the inmate population that initially resulted in R.F.'s placement in the SHU. Based on preliminary findings from that investigation and in accordance with safety and security concerns, R.F. has been temporarily transferred to the Metropolitan Detention Center in Los Angeles until she is designated to another facility commensurate with her security needs. With respect to her property, her property was secured, inventoried and is in the SHU. She apparently filled four green duffel bags worth of property, more than double the normal amount. Her property will be handled consistent with BOP policy and practice concerning inmates that are to be redesignated to another facility.

R.F. and several other inmates were part of a hunger strike that has since ended. Inmates

have consistently received hygiene items.  Concerning legal access, R.F. and the others have had access to their attorneys.  For example, multiple inmates requested legal calls on February 5, 2024.  R.F. had an approximately 20 minute legal call.  When she finished, she advised inmate J.S. of R.F.'s conversation with their shared lawyer regarding what was allegedly happening in SHU and that her lawyers would be unavailable for more calls and to try calling in about two hours.  R.F. stated multiple times to SHU staff that she would be advising the other inmates that it would be unnecessary for them to call their shared lawyer because she had already advised the lawyers of the alleged situation in SHU.  She also represented to SHU staff that it would be less of an inconvenience to pull inmates for legal calls.  R.F. also advised inmate K.S. of the same message regarding their shared lawyer.  K.S. and J.S. declined to have a legal call after they received the message from R.F.  On Tuesday, February 6, 2024, R.F. had an approximately 30 minute legal call.  When she returned, R.F. relayed a message to L.Z. that R.F. has just spoke to their shared lawyer and that the lawyers would be having a meeting and unavailable for two hours.  When the staff member walked to L.Z. and Y.F.'s cell and asked if they would like a legal call, L.Z. stated, "I don't need to call we have the same lawyer" and Y.F. stated "after lunch."  L.Z. then added that "we all have the same lawyer, they're in a meeting."

    While inmates have continued to receive hygiene items in SHU, shampoo had to be temporarily rationed for a few days until a delivery arrived earlier yesterday.  Finally, Law library access is pending repair following an inmate damaging the terminal several weeks ago.

    To the extent you have additional concerns, your clients are encouraged to utilize the Administrative Remedy Program or file an administrative tort claim.

Thank you,

Rob

---

**From:** Amaris Montes <amaris@rightsbehindbars.org>
**Sent:** Monday, February 5, 2024 6:07 PM
**To:** France, Robert (BOP) <Rfrance@bop.gov>; Mattioli, Madison (USAMT) <MMattioli@usa.doj.gov>; Cziok, Abbie (USAMT) <ACziok@usa.doj.gov>
**Cc:** Ernest Galvan <egalvan@rbgg.com>; Kara Janssen <KJanssen@rbgg.com>; Oren Nimni <oren@rightsbehindbars.org>; Susan Beaty <susan@ccijustice.org>; Cha-Kim, Stephen <stephen.cha-kim@arnoldporter.com>; Luma Khabbaz <lkhabbaz@rbgg.com>
**Subject:** [EXTERNAL] Re: Client concerns

Hello Counsel,

We are following up about the above email. Please provide information to address the concerns above.

Additionally, we have received updated information about RF that she and a number of others who are in the SHU are currently on hunger strike. We have been informed that some individuals have been denied access to all communication, all property including legal and personal property, basic hygiene items, law library access, and no ability to report abuse. We were informed that individuals have been threatened and intimidated with incident reports or withholding privileges for being on hunger strike. As you know, these actions are protected by the First Amendment, and punishing individuals for using their First Amendment rights is unlawful and contrary to BOP policy. This is all especially concerning because some of these individuals, including RF, have not been informed why they are placed in the SHU. Please provide information about this situation, and what immediate steps you will take to address this.

Best,

Amaris

On Fri, Feb 2, 2024 at 1:15 PM Amaris Montes <amaris@rightsbehindbars.org> wrote:

> Hello Counsel,
>
> We are emailing you with a few client concerns. As you recall, during the evidentiary hearing, the Judge ordered K.D.'s visitation forms to be processed. *See* Transcript 704:18-706:20. We have been informed by K.D.'s family that they have had several issues having their visitation forms processed or even accepted. K.D.'s daughter and nephew have not been approved, despite many attempts to submit their forms, including by fax and delivering it in person. K.D.'s family attempted to submit the forms for her daughter and her nephew in person in the lobby according to the Judge's instructions, and they refused to accept the documents. They attempted to do this yesterday for K.D.'s daughter, but the officer refused to accept them and responded rudely, stating "he will not be intimidated by a court order" and ordered K.D.'s family to leave the building. K.D.'s family attempted to request to speak to other officers to sort out this issue (including Officer Campos, K.D.'s unit manager), but was denied. We have heard Officer Agostini mentioned to K.D. this morning that her daughter may be on the list now, but her family has no way to confirm this since their attempts of correspondence have been ignored or rejected. Obviously, this is concerning given the Court's direct orders to have K.D.'s visitation forms accepted and processed. We request you confirm K.D.'s family is on the visitation list or immediately have these forms accepted and processed. We will notify the court by the end of the day absent any response addressing this issue today.

Further, at the January 26 hearing, we raised the issue of CH being taken off her psychiatric medication after the hearing and having her cell searched twice by an officer who previously harassed her. *See* Transcript at 13:11-16. AW Deveney told the Court he would look into it. Since then, we have heard that she has still not been provided her psych medication and has not met with a psychiatrist. She also let us know that Dr. Mulcahy asked her to sign a release for the Judge, which we do not understand the purpose behind. Please advise as to CH's concerns.

Lastly, we have received a call from RF, another witness, who let us know that she has been placed in the SHU under investigation and was not given a reason. She also reports bad conditions in the SHU and being unable to access property that she is entitled to in the SHU. Please advise as to why RF has been placed in the SHU.

Best,

--

**Amaris Montes**

Director of West Coast Litigation and Advocacy

Rights Behind Bars | www.rightsbehindbars.org

416 Florida Avenue NW, #26152 Washington, DC 20001

(Office): (202) 455-4399

(Cell): (202) 627-0175

*she/her/ella*

--

**Amaris Montes**

Director of West Coast Litigation and Advocacy

Rights Behind Bars | www.rightsbehindbars.org

> 416 Florida Avenue NW, #26152 Washington, DC 20001
>
> (Office): (202) 455-4399
>
> (Cell): (202) 627-0175
>
> *she/her/ella*

--
**Amaris Montes**
Director of West Coast Litigation and Advocacy

Rights Behind Bars | [www.rightsbehindbars.org](www.rightsbehindbars.org)

416 Florida Avenue NW, #26152 Washington, DC 20001

(Office): (202) 455-4399

(Cell): (202) 627-0175

*she/her/ella*