| | |
|---|---|
| ERNEST GALVAN – 196065 | STEPHEN CHA-KIM* |
| KARA J. JANSSEN – 274762 | ARNOLD & PORTER KAYE SCHOLER LLP |
| ADRIENNE SPIEGEL - 330482 | 250 West 55th Street |
| LUMA KHABBAZ - 351492 | New York, NY 10019-9710 |
| ROSEN BIEN GALVAN & GRUNFELD LLP | Telephone: 212.836.8000 |
| 101 Mission Street, Sixth Floor | Email: stephen.cha-kim@arnoldporter.com |
| San Francisco, California 94105-1738 | CARSON ANDERSON – 317308 |
| Telephone: 415.433.6830 | ARNOLD & PORTER KAYE SCHOLER LLP |
| Email: egalvan@rbgg.com | 3000 El Camino Real |
| kjanssen@rbgg.com | Five Palo Alto Square, Suite 500 |
| aspiegel@rbgg.com | Palo Alto, CA 94306-3807 |
| lkhabbaz@rbgg.com | Telephone: 650.319.4500 |
| | Email: carson.anderson@arnoldporter.com |
| SUSAN M. BEATY – 324048 | OREN NIMNI* Mass. Bar No. 691821 |
| CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE | AMARIS MONTES* Md. Bar No. 2112150205 |
| | D. DANGARAN *Mass. Bar No. 708195 |
| 1999 Harrison Street, Suite 1800 | RIGHTS BEHIND BARS |
| Oakland, California 94612-4700 | 416 Florida Avenue N.W. #26152 |
| Telephone: 510.679.3674 | Washington, D.C. 20001-0506 |
| Email: susan@ccijustice.org | Telephone: 202.455.4399 |
| | Email: oren@rightsbehindbars.org |
| | amaris@rightsbehindbars.org |
| | d@rightsbehindbars.org |

Attorneys for Plaintiffs                                           *Admitted pro hac vice

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.; G.M.; A.S.; and L.T., individuals on behalf of themselves and all others similarly situated, | Case No. 4:23-CV-04155-YGR |
| | **PLAINTIFFS' REPLY POST-EVIDENTIARY HEARING BRIEF** |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS, et al., | |
| Defendants. | |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ..................................................................................................................1

II. Dublin Residents Remain at Serious Risk of Ongoing Sexual Abuse and Retaliation. ...........................................................................................................................1

    A. The Declarations of Identified Witnesses Must Be Considered as Evidence. ...........................................................................................................2

    B. Contrary to BOP's Mischaracterizations, the Unrebutted Record Shows Ongoing Sexual Misconduct at Dublin. ...................................................2

    C. Dublin's Claims of a Changed Culture Are Utterly Unsupported. ..........................4

        1. Dublin's PREA Practices Remain Unchanged and Deficient.....................5

        2. The Government Refuses to Acknowledge the Breadth of the TMG Report and Fails to Explain Why Dublin Has Done Little to Nothing to Act on its Recommendations. ......................................................6

    D. The Court Should Strike BOP Testimony Regarding the TMG Working Plan and DOJ Task Force Report and Draw an Adverse Inference From the Government's Refusal to Disclose The Records. ...............................................7

    E. The Reporting Mechanisms Cited by Defendants Are Wholly Inadequate to Address the Unique Problems at Dublin or Cure the Risk of Sexual Abuse or Retaliation. ..................................................................................................8

        1. Defendants' Arguments Regarding the Role of Outside Agencies Are Misleading..............................................................................................8

        2. Defendants' Arguments Regarding Retaliation Reporting Lack Foundation in the Record and Do Not Rebut Plaintiffs' Showing of Likelihood of Success on their Retaliation Claims.....................................8

    E. Retaliation is Ongoing. .........................................................................................10

III. Plaintiffs' Requested Relief Is Necessary And Narrowly Tailored ..................................13

    A. BOP Mischaracterizes the Nature of the Requested Relief ..................................13

    B. The Government Ignores Most of the Authority Plaintiffs Cite and Misapprehends the Three Cases It Bothers to Address .........................................14

    C. Defendants Ignore Authority that Amply Supports the Requested Relief.............15

IV. CONCLUSION..................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Newsom*,
  2021 WL 930454 (N.D. Cal. Mar. 11, 2021) ................................................................. 15

*Balla v. Idaho State Bd. of Correction*,
  2011 WL 108727 ............................................................................................................ 15

*Coszalter v. City of Salem*,
  320 F.3d 968 (9th Cir. 2003) ......................................................................................... 12

*Hernandez v. Cnty of Monterey*,
  110 F. Supp. 3d 929 (N.D. Cal. 2015) ........................................................................... 14

*Hook v. State of Ariz.*,
  120 F.3d 921 (9th Cir. 1997) ......................................................................................... 14

*Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*,
  799 F.2d 547 (9th Cir. 1986) ........................................................................................... 2

*Knight v. Richardson Bay Reg'l Agency*,
  637 F. Supp. 3d 789 (N.D. Cal. 2022) ........................................................................... 14

*Kosegarten v. Dep't of the Prosecuting Att'y*,
  907 F. Supp. 2d 1143 (D. Haw. 2012) ........................................................................... 12

*Madrid v. Gomez*,
  889 F. Supp. 1146 (N.D. Cal. 1995) .............................................................................. 14

*Monroe v. Meeks*,
  2021 WL 5882129 (S.D. Ill. Dec. 13, 2021) .................................................................. 15

*Rhodes v. Robinson*,
  408 F.3d 559 (9th Cir. 2005) ................................................................................... 10, 13

*United States v. Bennett*,
  363 F.3d 947 (9th Cir. 2004) ........................................................................................... 7

*Singh v. Gonzales*,
  491 F.3d 1019 (9th Cir. 2007) ......................................................................................... 8

ii

*Smith v. Marsh*,
  194 F.3d 1045 (9th Cir. 1999) ...................................................................................................12

*United States v. Bardell*,
  2022 WL 16921698 (M.D. Fla. June 6, 2022)..............................................................................15

*United States v. Suquamish Indian Tribe*,
  901 F.2d 772 (9th Cir. 1990) ........................................................................................................15

*Yelp Inc. v. Paxton*,
  2024 WL 413464 (N.D. Cal. Feb. 1, 2024) ....................................................................................2

## I. INTRODUCTION

There has never been a federal facility like Dublin. There is no dispute that under Warden Garcia, incarcerated individuals were at the mercy of a culture of impunity putting them at serious risk of sexual abuse and retaliation in violation of the Constitution. The Department of Justice's prosecutions have identified some of the "bad apples," but the Bureau of Prison's ("BOP") blind confidence that the underlying systemic rot has been materially fixed—even as criminal investigations are ongoing and dozens of officers continue to be walked off (only as a result of the evidentiary hearing)—strains credulity. Instead, the clear weight of the evidence before the Court shows otherwise.

That evidence shows that, despite some personnel changes, the conditions at Dublin still present an unconstitutional risk of sexual abuse to those incarcerated there and that, rather than curb retaliation, the post-Garcia administrations have made it worse. Left with few facts and legal arguments, Defendants resort to mischaracterized descriptions of Plaintiffs' testimony and requested relief. But, despite the extraordinary situation presented by Dublin, Plaintiffs do not seek to paint every officer with the same brush, nor do they seek outlandish relief. They seek a narrowly drawn order curbing these constitutional infirmities to make Dublin a safe place to be housed. Accordingly, for the reasons set forth below, the only viable way to ensure that Dublin residents do not face serious risk of ongoing constitutional harm in the years to come, and as this case proceeds, is entry of a preliminary injunction—supervised by a neutral party who can appropriately implement the reforms that Dublin unquestionably needs, and that the Court has already begun to grant. *See* Tr. 32:1-5, 705:16-25, 1285:13-14; ECF Nos. 88, 157.

## II. Dublin Residents Remain at Serious Risk of Ongoing Sexual Abuse and Retaliation.

Contrary to BOP's mischaracterizations, the record is full of hearing and declaration testimony of dozens of Dublin residents vividly attesting in detail to firsthand experiences of sexual abuse, harassment, and retaliation, from the end of the Garcia era through the present. This credible and unrebutted testimony shows the inevitable given how little has changed in this period: Dublin cannot identify a single relevant policy related to preventing abuse that has been changed

1

since Garcia's departure; it cannot explain why it has ignored the vast majority of the recommendations the Moss Group ("TMG") laid out almost two years ago to fix the facility "in shambles"; and it cannot explain why numerous staff, new and old, continue to be criminally investigated and/or suspended due to allegations of sexual misconduct to this day. BOP's blind insistence of a "changed culture" in face of this record is not only meritless, it continues to place Dublin's residents at risk and must be remedied.

### A. The Declarations of Identified Witnesses Must Be Considered as Evidence.

At the outset, BOP's contention that the Court should disregard dozens of affidavits properly submitted by Dublin residents, Defendants' Post-Hearing Brief ("Opp.") at 4, is meritless. The Court instructed Plaintiffs to disclose the names of those witnesses who wished their declarations to be considered by the Court. Dec. 18, 2023 H'rg Tr. at 23. After weighing the risks of retaliation, 41 of the 47 declarants gave Plaintiffs permission to disclose their identities to Defendants' counsel. ECF No. 111-3. BOP independently became aware of the declarants' identities as well. Tr. 1103:9-1104:16 (Dr. Mulcahey testifying that she and Lt. Putnam identified all 47 declarants in December and shared names with legal department). BOP had the chance to present its own evidence rebutting the declarations, including calling Dublin residents, but failed to do so. Dec. 18 Tr. at 23 (Defendants' counsel requesting declarant names because "we may have witnesses that can speak to certain pieces of the declarations"). Accordingly, because the Court provided BOP ample opportunity to rebut the declarations in an adversarial hearing, the Court may and should properly rely upon the declarations at issue. *See generally Yelp Inc. v. Paxton*, 2024 WL 413464, at *6 (N.D. Cal. Feb. 1, 2024) (citing *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986)).

### B. Contrary to BOP's Mischaracterizations, the Unrebutted Record Shows Ongoing Sexual Misconduct at Dublin.

Plaintiffs have now presented an unrebutted record of an unbroken pattern of staff sexual misconduct, ranging from sexual acts, inappropriate touching, unlawful voyeurism, and harassment, dating from the entrance of the "new guard" circa early 2022 to late 2023. *See*

2

Plaintiffs' Post-Hearing Brief ("Pls.' Br.") at 3-6 (citing, *inter alia*, T.M. propositioned for sexual favors in December 2023, E.R. witnessing groping of breast in November 2023, K.C. being touched/harassed in November 2023, L.P.R. being forced to keep clothes off in August 2023, T.M. being watched in the shower in June 2023, A.R. groped and rubbed in January 2023, K.D. witnessing three officers have sex with incarcerated persons in 2023, J.M. threatened to keep officer's sexual relations with her friend a secret in February 2022, S.L. coerced into sex acts with Officer Gacad ten times in 2022). BOP's attempts to mischaracterize or inappropriately minimize this testimony are unpersuasive.

To begin, BOP seeks to dismiss the testimony as a whole as not reflective of "recent" or "widespread" misconduct. Opp. 4. But BOP makes no effort to square that mischaracterization with the testimony of abuse and harassment that has repeatedly occurred as recently as December 2023.[1] Indeed, BOP dismisses other testimony, such as M.M.'s, as non-recent or not serious, even though she testified about an objectively unlawful incident when two male officers walked in on her while she used the bathroom just six months before. Opp. 5-6. And although BOP questions why K.D. "did not identify a timeframe" for the "four or five sexual incidents involving three officers at the camp" she discussed in her testimony, Opp. 5, K.D. very clearly stated that these sexual incidents occurred in 2023. Tr. 703:3-22. BOP cannot on one hand laud the recent post-Garcia staffing changes as a magic bullet solution to the crisis and on the other cast aside all misconduct that occurred under the new regime.

Moreover, BOP's attempts to undermine individual witnesses' stories of abuse and feelings of vulnerability are meritless—they misstate the testimony or leave out key context:

- BOP suggests L.P.R.'s harassment was not grave by misstating that she was wearing her bra and underwear when an officer walked into her cell. Opp. 4. In fact, L.P.R. testified that she was still pulling up her underwear as Officer Groover entered; Officer Groover then refused to close the cell door, and stood right outside with Officer Singh standing right outside. Tr. 784:9-785:6.

---

[1] BOP also contends that R.B. is the only named Plaintiff who testified regarding "recent" sexual misconduct. Opp. 8. But BOP ignores the testimony of Plaintiffs S.L. and J.M. Tr. 592:15-17, 747:4-5. In any event, whether testimony regarding recent incidents came from Plaintiffs or putative class members is irrelevant, since both credibly speak to current conditions at Dublin.

3

- BOP also minimizes T.M.'s testimony by suggesting that the officer who pulled back her shower curtain "no longer works in her Unit," Opp. 4, but T.M. testified that she still sees him around, and he continues to stare at her until she looks at him. Tr. 899:8-18.

- BOP suggests T.M. did not feel at risk because she testified that Dublin is "boring," Opp. 6, but this quote, which comes from M.M. not T.M., was in the context of the lack of work materials at Dublin. Tr. 816:2-6. Shortly before, M.M. actually testified that it is "terrifying living here." Tr. 815:23-25. Moreover, both T.M. and M.M experienced staff sexual misconduct as recently as 2023. Tr. 804:7-805:4; 896:14-897:15.

- BOP makes much of the fact that E.R. did not understand the term "sexualized environment," but ignores the fact that in early 2023 she witnessed Officer Celestial grope an incarcerated woman's breasts. Tr. 732:15-733:14.

BOP similarly misrepresents or takes testimony out of context to improperly suggest that witnesses have positive attitudes about Dublin. For instance, BOP characterizes "J.M." as feeling positively about the pilot phone line. Opp. 12. It was T.M., not J.M., who testified that the pilot phone system "is really good," but she also went on to say that it is difficult to access the legal phone, because it is in the same room as the video visiting equipment and legal calls cannot be made any time a video visit is taking place. Tr. 909:5-16. T.M. also testified that it took a month to get her public defender's number added to the phone system. Tr. 909:17-20. BOP also suggested that both J.L. and "K.D."[2] support its contention that cameras have had a positive effect, because they have been installed where J.L. was assaulted and K.C. was told by an officer she "was lucky that there was cameras in the room." Opp. 17. However, J.L. testified that the cameras still have blind spots, including the room where she was assaulted in food service. Tr. 876:2-21.[3] And K.C. actually testified that the comment about cameras was made as an officer was harassing and touching her. Tr. 927:8-24.

C. **Dublin's Claims of a Changed Culture Are Utterly Unsupported.**

Contrary to Defendants' conclusory assertion that Dublin "has implemented new procedures" that "have changed Dublin culture," Opp. 16, the evidence shows nothing of the sort.

---

[2] BOP mistakes K.D. for K.C.

[3] E.R. also testified that she witnessed Officer Celestial groping an incarcerated person's breasts in the commissary warehouse, and she overheard him telling her that there were no cameras back there. Tr. 725:9-14.

4

### 1. Dublin's PREA Practices Remain Unchanged and Deficient.

No administration since Garcia has bothered to review or implement a single policy or procedure relevant to preventing and investigating sexual abuse—even where the need is glaringly obvious. *See* Pls.' Br. 11-12. Dublin does not even have the required written PREA institutional response plan, meant to ensure that correctional, medical, and other staff follow lawful and consistent procedures in responding to allegations of abuse. *Id*. at 13 (citing Deveney testimony conceding he had no idea as PREA compliance manager Dublin is required to have plan); *see also* 28 C.F.R. § 115.65. BOP offers nothing to explain these failures in its brief.

Instead, Defendants falsely seek to credit Dublin for placing employees suspected of PREA violations on administrative leave. BOP claims Dublin has a unique "practice of placing staff on administrative leave any time there is a possible allegation of any type of touching," not just "touching of the genitalia or breasts of a female inmate," implying that Dublin enforces a broad definition of sexual abuse. Opp. 17. But the PREA regulations already define sexual conduct beyond non-genital/breast contact and other types of touching. *See* 28 C.F.R. § 115.5; 115.71. And, in any event, the record shows that Dublin does not in fact place staff members accused of inappropriate touching, of the breasts/genital or otherwise, on administrative leave: E.R. reported witnessing Officer Celestial grope a woman's breasts in November 2023, and Celestial was only placed on leave after E.R.'s testimony, Tr. 723:21-724:20, 739:9-740:20, 1174:5-13; K.C. reported being inappropriately touched by Officer Narayan, but he was still working at Dublin at the time of the evidentiary hearing. Tr. 741:5-8.[4] Instead, it is only because of the Court's scrutiny that Dublin has begun to remove additional staff members. *See* Jan. 26, 2024 Hrg. Tr. 12:8-13:1 (acknowledging five managers, among them Lt. Quezada, who testified for the Defendants, are on administrative leave).[5]

---

[4] Concerningly, Plaintiffs continue to learn that other staff members with allegations of misconduct remain on the job despite being identified in FTCA filings, among other places, that have been in the possession of BOP for months.

[5] Defendants contend in a footnote without explanation or citation that not all of the recent suspensions were "due to allegations of a sexual nature." Opp. 18 n.9. That assertion is impossible to evaluate as the Government has not provided any details to the Court about why these

5

**2.      The Government Refuses to Acknowledge the Breadth of the TMG Report and Fails to Explain Why Dublin Has Done Little to Nothing to Act on its Recommendations.**

Although Defendants seek to downplay the TMG draft report and recommendations [Ex. N] as "non-binding," Opp. 18, the centrality of the TMG Report to the key issues in this matter became clear during the hearing. It is not in serious dispute that the TMG Report is a frank assessment of underlying problems at Dublin that initially caused an environment of serious abuse. Nor does BOP dispute that its recommendations are the only evidence in the record of any kind of overarching plan Dublin adopted to change that status quo.

Having finally reviewed the TMG Report after it was produced post-hearing, Plaintiffs detailed Deveney's ignorance of the report's actual contents, including a litany of very specific action items in areas ranging from training, monitoring grievances, reviewing SHU criteria, and staffing requirements. Pls.' Br. 13-15. Defendants' brief responds to none of this substance, instead simply stating that (1) Dublin has "largely closed th[e] training gap" TMG identified, and per TMG's recommendation of "increased oversight," (2) hired a family support coordinator, (3) had some supervisors work nights and weekends, and (4) installed cameras. Opp. 18-21. Putting aside the fact that the Defendants apparently wish to ignore the vast majority of the TMG Report—including several highly relevant and material recommendations, which Dublin made no effort to meet according to the record—these four action items hardly support the inference of an administration dedicated to changing culture. The annual staff training it claims "closed the gap" was a half hour presentation, which is self-evidently insufficient. *See* Pls.' Br. 15. And BOP fails to explain how the family support coordinator has any relevancy given her admitted lack of involvement in PREA matters, *id.* at 20; does not attempt to explain how Deveney, Agostini, and (the now on administrative leave) Quezada working overtime had any material and non-speculative impact on preventing abuse; and simply ignores the issues Plaintiffs raised regarding

---

individuals were placed on administrative leave. Of relevance, however, of the 19 administrative leave placements known to Plaintiffs as of the evidentiary hearing, "18 or 19 of them" were due to "sexual allegations." Tr. 1162:15-20.

1  the utility of the new cameras (their absence from known areas of abuse, officers knowing full well
2  where the blind spots are, the impossibility of one person monitoring all of the feeds, etc.), *id.* at
3  18.

4       **D.**     **The Court Should Strike BOP Testimony Regarding the TMG Working Plan and DOJ Task Force Report and Draw an Adverse Inference From the Government's Refusal to Disclose The Records.**

6       During the evidentiary hearing, the Government affirmatively introduced both the DOJ
7  Task Force Report [Ex. O] and the Dublin TMG Report "working plan" [Ex. S] as exhibits under
8  seal, but now seeks to claw them back from consideration in the record. As Plaintiffs have set
9  forth, Pls.' Br. 15-16, to which the Government offers no compelling response, the Government
10 may run away from its own records, but it may not do so without evidentiary consequences.

11      As an initial matter, BOP witnesses testified favorably about these exhibits' contents. *See*
12 *id.* at 16. Now BOP effectively seeks to rely on such testimony *in lieu of* the document itself. Opp.
13 19 (calling TMG working plan "redundant" because its witnesses testified about its contents). The
14 Court may not properly consider such self-serving testimony about the purported contents of
15 documents that the proponent will not allow the other side to scrutinize. Accordingly, all such
16 testimony should be stricken or given no weight whatsoever. *See United States v. Bennett*, 363
17 F.3d 947, 953 (9th Cir. 2004) (explaining best evidence rule).

18      Moreover, given the plain relevance (and discoverability) of the contents of these records—
19 and the existence of an attorney's-eyes-only protective order and the ability to keep them under
20 seal—the Government's refusal to stand by them can only support an adverse inference. The
21 Government contends no such inference is needed because the Court previously stated that any *ex*
22 *parte* exhibit that is not disclosed to Plaintiffs "will not be reviewed" or "considered." Opp. 19
23 (quoting Tr. 1312:10-11). But the Court was merely observing, accurately, that the *content* of such
24 records would not be subject to the Court's analysis should the Government decline to produce
25 them; by contrast, the *fact* of the records' existence are established. And if such records constitute
26 "relevant evidence in [a party's] control," the decision to "fail to produce" them nonetheless has
27 consequences, namely "an inference that the evidence is unfavorable." *Singh v. Gonzales*, 491 F.3d
28

7

1019, 1024 (9th Cir. 2007) (citation omitted). Even without any review or consideration of the records' contents, which the Government affirmatively is preventing, the Court may properly draw such an inference.

> E. **The Reporting Mechanisms Cited by Defendants Are Wholly Inadequate to Address the Unique Problems at Dublin or Cure the Risk of Sexual Abuse or Retaliation.**
>
>> 1. **Defendants' Arguments Regarding the Role of Outside Agencies Are Misleading.**

Defendants assert that allegations of sexual abuse at Dublin are investigated by outside agencies but make no attempt to argue how these investigations somehow cure the constitutional deficiencies at Dublin. Opp. 7-9. Instead, Defendants merely recount their understanding of how the OIA and OIG processes work on paper, and in doing so again reveal gaps and contradictions that demonstrate the impotence of the existing framework. For example, Defendants claim that Plaintiffs are mistaken that local OIA/SIA investigate claims of sexual misconduct, but later make clear that OIA/SIA *are* responsible for "classifying allegations of employee misconduct and investigating serious but non-criminal employee misconduct." Next, Defendants tout the reorganization of SIA to report directly to OIA rather than the Warden, but neglect to mention that the current SIA at Dublin, Lt. Baudizzon, is also the locally employed SIS Lieutenant answerable to the Warden, and has allegations of misconduct against him. Jan. 26 H'rng Tr. 13:2-10; Tr. 821:5-825:15.

>> 2. **Defendants' Arguments Regarding Retaliation Reporting Lack Foundation in the Record and Do Not Rebut Plaintiffs' Showing of Likelihood of Success on their Retaliation Claims.**

Defendants make conclusory arguments that, whatever their conduct, their decisions as prison administrators should not be questioned, and that they are justified in punishing people with placement in the SHU and loss of significant privileges because "Dublin is short-staffed" and to deter false allegations of misconduct from incarcerated people. Opp. 9. Defendants proffered justifications both fail. First, Defendants do not have unfettered discretion and short staffing is no license for unconstitutional conduct. Second, Defendants in their brief, and in their testimony,

8

justify their punitive actions as responses to a fear of false reports of staff misconduct. Yet Defendants can only point to one allegation they deemed to be false in the voluminous record already before this Court, and Defendants' conduct in that incident (punishment of K.D. for an alleged false PREA allegation) was severely called into question at the evidentiary hearing. Instead of being concerned with chilling reporting, actually discovering bad actors, or preventing retaliation, Defendants' primary concern is guarding against a hypothetical wave of false allegations where there is no record evidence of this occurring—at a facility that has some of the most widespread sexual misconduct in BOP history.

Defendants' other arguments concerning reporting and retaliation are equally unpersuasive. For example, Defendants place great weight on the testimony of some witnesses that trust some individual staff members at Dublin. Opp. 9-10. Plaintiffs have never argued that every staff member at Dublin is bad or untrustworthy, but instead that the *system* at Dublin puts them at risk. Of course there are some staff members who are attendant to prisoner concerns, as they should be, although at Dublin that number is quite small with most inmates pointing to one person, Ms. Minor, and with all of the trusted officials being female officers who make up a paltry minority of officers at Dublin generally. Tr. 759:21-24; 793:6-7; 817:17-20; 18:1-7. Defendants also point to their clearance rate of administrative remedies and federal tort claims as evidence that retaliation is no longer a problem and that existing reporting mechanisms work. Opp. 11-12. First, clearance of an administrative remedy or tort has no bearing on whether someone was retaliated against for making a complaint, so this does not stand for Defendants' desired proposition. Second, clearance of an administrative remedy or tort claim does not correspond to executive responsiveness. An administrative remedy can be "cleared" by being denied, as was the experience for all named Plaintiffs, and federal tort claims are "cleared" when the agency simply allows the tort claim to languish for over six months. Tr. 530:4-22. Plaintiffs here filed federal tort claims and none received any remedy as part of that or any other internal BOP process.

On the other hand, Defendants never address the clear testimony that allegations of retaliation are not automatically directed to OIA or OIG, Tr. 319:9-22, and that even once they get

9

to OIA, OIA categorically refuses to investigate any claim of retaliation where the officer's underlying conduct would be allowed by policy. Tr. 338:15-339:14. This makes virtually all allegations of retaliation subject to screening and diversion and ensures that few if any are properly addressed.

### E. Retaliation is Ongoing.

Despite Defendants' insistence that retaliation is not occurring, the evidence shows that Defendants continue to retaliate against those who attempt to report staff misconduct, even in the last several weeks.

For example, R.F.'s recent experience exemplifies serious issues with the use of SHU at Dublin. R.F. was placed in the SHU while she was under investigation for allegedly encouraging people to make false allegations against an officer, even though Defendants later admitted this to be invalid. ECF No. 161-3 at ¶ 5; ECF No. 176-4, ¶4 (Regional Counsel for BOP admitting that he "did not see adequate documentation to support R.F.'s initial placement in SHU"). This directly contravenes Defendants' assertions that no one is placed in the SHU simply because they are under investigation. Demonstrating the lack of any proper adherence to process around SHU placements, R.F. was provided no documentation or hearing while she was in SHU for a week, the norm in the SHU for numerous others. ECF No. 166 at ¶ 6. R.F. was later transferred while on hunger strike, a quintessential form of retaliation in the prison context. *See, e.g.*, *Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005) (even threat of prison transfer for reporting misconduct is the "archetype" of First Amendment claim).

It is not just R.F.'s experience that demonstrates the total lack of credibility of BOP witnesses who testified that SHU is not used to retaliate at Dublin. *See* Opp. 16. S.L. was thrown in the SHU for weeks after reporting Gacad's serial sexual abuse. Tr., 567:7-21, 575:5-577:24. Moreover, while BOP contends that weekly oversight by Deveney and SIS staff ensures that SHU is never used in retaliation, Opp. 15, the experience of these individuals proves otherwise, each of them having suffered in SHU precisely at the direction of Deveney and/or SIS/SIA Lieutenants Putnum and Bauddizon. Tr., 567:7-21, 575:5-577:24; ECF No. 166. Indeed, the Administrative

1  Detention Order purportedly justifying R.F.'s SHU detention is completely devoid of any detail
2  whatsoever (*see* ECF No. 162-3), enabling the after-the-matter pretextual justification that BOP
3  provided only after the issue was before the Court.
4        In addition to SHU placements, Dublin staff continue to retaliate against those who file
5  complaints, access counsel, or provide testimony in other ways. For example, weeks after she
6  testified at the evidentiary hearing, C.A.H. was once again taken off her psychiatric medications.
7  ECF No. 160-2 Ex. B at 2. Despite the fact that she's suffered significant mental health issues
8  since being raped by a Dublin guard, including two recent suicide attempts, C.A.H. was given no
9  replacement for this medication. *Id.* at 5. After Plaintiffs raised this concern at the January 26
10 hearing, Deveney told the Court that he would look into it. Jan. 26 Tr. 13:17. After following up
11 with BOP counsel, Plaintiffs were informed that C.A.H. was not scheduled for a tele-psychiatry
12 appointment until February 13, 2024, leaving her without medications for at least three weeks. *Id.*
13 at 2. K.D. has also continued to suffer retaliation in recent weeks. Although the Court ordered
14 Dublin to process the visitation forms for K.D.'s family, Tr. 704:18-706:20, K.D.'s family reported
15 ongoing issues despite numerous attempts to submit the forms by fax and in person. ECF No. 160-
16 2 Ex. B at 4 (Officer refusing to accept forms and **stating "he will not be intimidated by a court**
17 **order" before ordering family to leave building**) (emphasis added).
18       The recent experiences of Plaintiffs' witnesses only add to the robust record of retaliation
19 at Dublin. The affidavit and hearing evidence provide numerous other examples of ongoing
20 retaliation for engaging in protected activities such as reaching out to counsel, filing reports, or
21 testifying in court. *See, e.g.,* Tr. 686:8-687:18; 902:12-15; 575:5-577:24.
22       Although Defendants point to security concerns to justify retaliatory practices, they fail to
23 present any evidence of security issues that warrant purported disciplinary action. For example,
24 Defendants argue that post-legal visit strip searches are required by policy in order to prevent
25 transmission of contraband. Pls.' Br. 17. But BOP policy does not mandate strip searches after all
26 legal visits, but rather, instructs that "[s]taff *may* conduct a visual search *where there is a*
27 *reasonable belief* that contraband may be concealed" and offers some examples including contact
28

11

visits that are "*sufficient* to justify a visual search."[6] BOP Program Statement § 552.11(c) Searches of Inmates, Visual Search, https://www.bop.gov/policy/progstat/5521_006.pdf, last accessed February 23, 2024 (emphasis added). Furthermore, Defendants' own log indicates that contraband was only found through a strip search in the visitation room one time in the last two years. Tr. 27:9-28:1. The timing also supports a retaliatory motive: strip searches only began in earnest during the weeks leading up to the evidentiary hearing in this matter. *See, e.g.*, *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (timing can be probative and properly considered as circumstantial evidence of retaliatory intent). Though Defendants claim the visual search policy "is required to be enforced consistently regardless of whether contraband is actually recovered," they fail to explain why enforcing this policy suddenly became necessary in December 2023. This explanation also fails to account for the fact, well documented in the criminal proceedings and civil claims, that *officers* have introduced contraband for years in order to facilitate sexual abuse, but Defendants point to no new searches or other protocols related to officer conduct.

Additionally, Defendants' assertion that Plaintiffs should be precluded from seeking relief on their retaliation claims should be rejected. Opp. 1. Defendants' contend that Plaintiffs cannot argue their First Amendment retaliation claim for the first time in a reply brief. *Id.* But Plaintiffs' post-hearing brief is not a reply brief, it is an opening brief. The reason parties generally cannot raise claims for the first time in a reply brief is because it deprives the opposing party of notice of those claims and an opportunity to respond. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). That is not the case here; Defendants were well able to address all of Plaintiffs' arguments in the post hearing response brief, Opp. 9 (citing First amendment cases in support of their position). And in any event retaliation has been mentioned and briefed in this case both as a standalone claim

---

[6] At the hearing, BOP introduced as an exhibit under seal a document purporting to show that strip searches are mandatory. *See* Ex. H. But because BOP has refused to produce more than one excerpted page, it is not possible to tell in what contexts this particular policy is meant to apply. Accordingly, Ex. H lacks probative value and should be disregarded. *See Kosegarten v. Dep't of the Prosecuting Att'y*, 907 F. Supp. 2d 1143, 1157 (D. Haw. 2012).

and as a factor that contributes to ongoing risk of sexual assault and an inability to report this abuse. ECF No. 10 at 14-18.[7]

### III. Plaintiffs' Requested Relief Is Necessary And Narrowly Tailored

#### A. BOP Mischaracterizes the Nature of the Requested Relief

Defendants assert without explanation that relief related to quality offsite medical and mental health care, the return of non-contraband items, a system to provide inmates with documentation of reporting and involvement in investigations, and access to counsel are categorically "unrelated to preventing assault and retaliation." Opp. 22. Not so. First, medical and healthcare providers, including those offsite, are first-line responders to PREA abuse, 28 C.F.R. § 115.61, and Dublin is seriously deficient in providing adequate medical access (*see, e.g.* ECF No. 157-1), which can add to the vulnerability and abuse of survivors, some of whom were abused by medical staff. Second, clear documentation is an important part of PREA, 28 C.F.R. § 115.71(f)(2), and the Court repeatedly saw instances of unreliable and inconsistent documentation. *See, e.g.,* Tr. 95:12-96:15, 108:18-110:12, 1025:5-11, 1026:13-1029:1. Third, the malicious seizing and retention of personal affects has been a favored retaliatory tool at Dublin. *See* ECF No. 10 at 14. Finally, adequate access to counsel is self-evidently imperative to residents' ability to report abuse and thereby deter future harm.

Defendants next make the conclusory claim that relief related to audits and site visits addressing abuse and retaliation are "based on activities occurring well over two years ago." Opp. 22. But, as discussed, the record is replete with examples of harms stretching over the past two years and into the weeks following the hearing that amply justify the need for audits and site visits.

---

[7] In responding to the Plaintiffs' First Amendment claim, Defendants misstate the applicable standard. Plaintiffs are not required to show deliberate indifference, but instead must show that officers (1) took some adverse action against a prisoner (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005). Defendants argue elsewhere that they have legitimate penological goals, so clearly understand this claim as a First Amendment claim, but misunderstand the contours of the applicable analysis.

Finally, the Government contends that relief related to the return of non-contraband is also foreclosed because the issue is "addressed via BOP forms" and implicates "irreparable" monetary injury. Opp. 22. The former contention is meritless—as the evidence showed, the whole point of these proceedings is that BOP procedures are not being followed. The latter too is unavailing because it redresses not a monetary injury but an unconstitutional retaliatory taking. *Knight v. Richardson Bay Reg'l Agency*, 637 F. Supp. 3d 789, 800 (N.D. Cal. 2022) ("The Ninth Circuit has held that an alleged constitutional infringement will often alone constitute irreparable harm.") (citation and quotation marks omitted).

### B. The Government Ignores Most of the Authority Plaintiffs Cite and Misapprehends the Three Cases It Bothers to Address

Defendants attempt to substantively distinguish only three of the long list of authorities Plaintiffs cited in their brief. Each attempt is unconvincing. First, the Government points out that *Hernandez v. Cnty of Monterey*, 110 F. Supp. 3d 929 (N.D. Cal. 2015), involved a pretrial detention center and the relief ordered there was in part based on "expert reports." Opp. 23. But it makes no difference that the facility in *Hernandez* housed pretrial detainees, because the court, applying well-established principles, "rel[ied] on the same analytical framework for those sentenced under the Eighth Amendment," which is applicable here. *Hernandez*, 110 F. Supp. 3d at 934. Moreover, Defendants have provided no authority for its position that experts are required for Plaintiffs to meet their burden of proof, and BOP offers no reason this Court cannot weigh the evidentiary record to date without the assistance of an expert.

Next, the Government asserts that *Hook v. State of Ariz.*, 120 F.3d 921 (9th Cir. 1997), should be distinguished because the appointment of a special master there was justified by the defendant's "history of noncompliance," a record it says is lacking here. Opp. 23. The Government also avers that *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995) is inapt, without any citation to evidence or explanation, because "conditions at Dublin have continued to improve." Opp. 23. The Government is incorrect on both counts. Far from showing Dublin to be an improving facility, the record here is full of examples of Dublin flagrantly violating basic standards related to prisoner

14

well-being, and failing to comply with Court retaliation orders. *See, e.g.*, ECF No. 155, 157. In any event, *Hook* reaffirmed the principle that, in addition to noncompliance, courts have wide latitude to appoint special masters "due to the complexity of the underlying litigation" or where the court "lack[s] the resources to constantly monitor" the defendant. 120 F.3d at 926. To state the obvious, the Court itself cannot continually investigate and issue piecemeal relief here, even where relief is needed; addressing a problem as complex as Dublin is precisely the type of scenario the Ninth Circuit has recognized calls for a special master. *Id.* (citing *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990)); *see also Madrid*, 889 F. Supp. at 1282 ("Developing a comprehensive remedy . . . will be a complex undertaking involving issues of a technical and highly charged nature" and "requiring a substantial expenditure of time and the expertise of someone experienced in prison administration").

### C. Defendants Ignore Authority that Amply Supports the Requested Relief.

Finally, rather than addressing the remainder of Plaintiffs' special master cases, the Government simply disparages them as out of Circuit. Opp. 23. But there is no reason these special master examples are inapposite, and instead they demonstrate the utility of a special master to oversee issues like the present. *See e.g.*, *Monroe v. Meeks*, 2021 WL 5882129, at *3 (S.D. Ill. Dec. 13, 2021) (special master for 8th Amendment violations in preliminary injunction stage); *Balla v. Idaho State Bd. of Correction*, 2011 WL 108727, at *1-2 (D. Idaho Jan. 6, 2011) (special master for medical treatment and psychiatric care injunction); *Armstrong v. Newsom*, 2021 WL 930454, at *3 (N.D. Cal. Mar. 11, 2021) (Fed. R. Evid. 706 court appointed expert to monitor retaliation against incarcerated disabled persons); *United States v. Bardell*, 2022 WL 16921698 (M.D. Fla. June 6, 2022) (special master to investigate BOP violating court order).

## IV. CONCLUSION

For the reasons stated herein, in Plaintiffs' Opening Post-Hearing Brief, Plaintiffs' Motion for Preliminary Injunction and the Reply in support thereof, Plaintiffs' Motion for Preliminary Injunction should be granted.

| | | |
|---|---|---|
| 1 | DATED: February 23, 2024 | Respectfully submitted, |
| 2 | | **Arnold & Porter Kaye Scholer LLP** |
| 4 | | By:  */s/ Stephen Cha-Kim* |
| 5 | | Stephen Cha-Kim |
| 6 | | Attorneys for Plaintiffs |