UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA          *ORIGINAL*

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS, ET AL., )<br><br>Plaintiffs, )<br><br>vs )<br><br>UNITED STATES OF AMERICA )<br>FEDERAL BUREAU OF PRISONS, )<br>ET AL., )<br><br>Defendants. )<br>_____ ) | **Preliminary Injunction**<br><br>**Order to Show Cause**<br><br>NO. CV 23-04155-YGR<br><br>Pages 1 - 70<br><br>Oakland, California<br><br>Tuesday, February 27, 2024 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

For Plaintiffs:

      ARNOLD & PORTER KAYE SCHOLER LLP
      250 West 55th Street
      New York, NY 10019
**BY:** **STEPHEN SEUNGKUN CHA-KIM,**
      **ATTORNEY AT LAW**

      ARNOLD & PORTER KAYE SCHOLER LLP
      5 Palo Alto Square, Suite 500
      3000 El Camino Real
      Palo Alto, CA 94306
**BY:** **CARSON ANDERSON, ATTORNEY AT LAW**

(Appearances continued next page)

Reported By:     Raynee H. Mercado, RMR, CRR, FCRR, CCRR
               CSR No. 8258

    Proceedings reported by electronic/mechanical stenography; transcript produced by computer-aided transcription.

 1                        **APPEARANCES (CONTINUED)**

 2

 3     For Plaintiffs:
                              ROSEN BIEN GALVAN & GRUNFELD LLP
 4                            101 Mission Street, Sixth Floor
                              San Francisco, CA 94105
 5                     BY:  **ERNEST JAMES GALVAN,**
                            **KARA JANSSEN,**
 6                          **LUMA KHABBAZK, ATTORNEYS AT LAW**

 7                            RIGHTS BEHIND BARS
                              416 Florida Avenue NW
 8                            Washington, DC 20001
                       BY:  **OREN NIMNI,**
 9                          **AMARIS MONTES, ATTORNEYS AT LAW**

10                            CALIFORNIA COLLABORATIVE
                              FOR IMMIGRANT JUSTICE
11                            1999 Harrison Street, Suite 1800
                              Oakland, CA 94612
12                     BY:  **SUSAN M. BEATY, ATTORNEY AT LAW**

13

14     For Defendants:
                              OFFICE OF THE UNITED STATES ATTORNEY
15                            901 Front Street, Suite 110
                              Helena, MT 59626
16                     BY:  **MADISON MATTIOLI,**
                            **ABBIE CZIOK (Via Zoom)**
17                          **ASSISTANT UNITED STATES ATTORNEYS**

18
       Also Present:         **ROBERT FRANCE**
19

20

21                            --o0o--

22

23

24

25

```
 1    Tuesday, February 27, 2024                        9:17 a.m.
 2                    P R O C E E D I N G S
 3                         --o0o--
 4
 5         THE CLERK:  Good morning, everyone.  These
 6    proceedings are being court-reported by this court.  Any other
 7    recording of this proceeding either by video, audio, including
 8    screen shots or other copying of the hearing is strictly
 9    prohibited.
10       Your Honor, now calling the civil matter 23-CV-04155-YGR
11    California Coalition for Women Prisoners et al. versus United
12    States of America Federal Bureau of Prisons et al.
13       Request parties to step forward and state their names and
14    appearances for the record starting with the plaintiffs.
15         MR. NIMNI:  Good morning, Your Honor.  Good to be
16    back in your court.  Oren Nimni for the plaintiffs.
17         THE COURT:  Okay.  You're going to need to speak up.
18         MR. NIMNI:  Oren Nimni for the plaintiffs.  Good
19    morning.
20         MR. GALVAN:  Good morning, Your Honor.  Ernest
21    Galvan, Kara Janssen, and Luma Khabbaz for the plaintiffs.
22         THE COURT:  Good morning.
23         MX. BEATY:  Good morning, Your Honor.  Susan Beaty
24    for the plaintiffs.
25         MR. CHA-KIM:  Good morning, Your Honor.  Stephen
```

```
 1    Cha-Kim and Carson Anderson for the plaintiffs.

 2             MS. MONTES:  Good morning, Your Honor.  Amaris Montes

 3    with Rights Behind Bars for the plaintiffs.

 4             THE COURT:  You can use that mic, Ms. Mattioli.

 5             MS. MATTIOLI:  I just didn't see the camera.

 6    Good morning.  Madison Mattioli for the United States.

 7             THE COURT:  Good morning.

 8             MR. FRANCE:  Good morning, Your Honor.  Robert France

 9    for the Bureau of Prisons.

10             THE COURT:  Good morning.

11        And let's get Ms. Cziok?  Does she have speaking

12    privileges?

13             MS. CZIOK:  Morning, Your Honor.  Abbie Cziok for the

14    United States.

15             THE COURT:  Okay.  Good morning.

16        All right.  We have a couple motions to deal with today.

17        Are there other things that people want to deal with today

18    other than the two pending motions?

19        Anything from the plaintiffs?

20             MR. CHA-KIM:  Good morning, Your Honor.

21        Mx. Beaty and I wanted to follow up on two discrete orders

22    that the Court raised during the preliminary injunction

23    hearing for BOP to investigate certain retaliation matters.

24        We had an update on how that's been going and just request

25    further instruction on how to proceed on those.
```

1     And these are the matters that Your Honor put under a

2     confidentiality order.

3          **THE COURT:**  Okay.

4     Anything -- any other topics?

5          **MR. CHA-KIM:**  Nothing from the plaintiffs, Your

6     Honor.

7          **MS. MATTIOLI:**  Nothing from the government, Your

8     Honor.

9          **THE COURT:**  Okay.

10    Who's arguing the motions?

11         **MR. NIMNI:**  Oren Nimni for the plaintiffs, Your

12    Honor.

13         **THE COURT:**  For both?

14         **MR. NIMNI:**  Yes.

15         **THE COURT:**  And on the other side?

16         **MS. MATTIOLI:**  Madison Mattioli for the United

17    States.

18         **THE COURT:**  All right.  Well, come to the mic.  I

19    don't ever give anybody the mic for free.  I have both folks

20    up here at the same time.

21    Let's talk first about the motion for class certification

22    which we've not yet had argument on.

23    We'll start with you, Ms. Mattioli.  You ar- -- the

24    opposition brief in part was talking about the wrong standard.

25    This is not a 23(b)(3) class that is being suggested.  It is a

1    23(b)(2) class.

2         I understand if you don't typically do civil litigation,

3    you might not understand the distinction.  But it is a

4    distinction with a difference.  There are no damages that are

5    being sought for purposes of class certification.

6         Any response?

7              **MS. MATTIOLI:**  Your Honor, I also apologize.

8         Ms. Cziok is arguing the class certification motion.  And

9    she should be online.

10             **THE COURT:**  Okay.

11        Ms. Cziok?

12             **MS. CZIOK:**  Good morning, Your Honor.

13        For that matter, we just cited *Bowerman* and --

14                        (Simultaneous colloquy.)

15             **MS. CZIOK:**  -- the only two cases that we cited that

16   cited the wrong standard.  The remaining cases were about the

17   23(b)(2) standard.

18             **THE COURT:**  I couldn't understand you.

19             **MS. CZIOK:**  Would you like me to speak up, Your

20   Honor?  Am I speaking too quietly?

21             **THE COURT:**  No, it's not quiet.  It's just not as

22   clear.

23             **MS. CZIOK:**  Okay.  I'll slow down.

24        Your Honor, the only cases that we cited with that

25   incorrect standard were *Bowerman* and *Owino*.  The other cases

```
 1    all cite the correct standard, Your Honor, for 23(b)(2).

 2              THE COURT:  Do you agree that it is the (b)(2)

 3    standard that is at issue here?

 4              MS. CZIOK:  Yes, Your Honor.

 5              THE COURT:  And do you agree that because of that,

 6    predominance isn't really at issue?  There's a common

 7    question.

 8              MS. CZIOK:  Yes, Your Honor.

 9              THE COURT:  Okay.

10              MS. CZIOK:  Yes, Your Honor.

11              THE COURT:  So with respect to the claims, or the --

12    it seems to me that they've satisfied the numerosity issue

13    under Rule 23.

14         Do you agree?

15              MS. CZIOK:  We agree with that, Your Honor.

16              THE COURT:  And let's talk about commonality under

17    the correct standard.

18         None of the issues that the Court would be dealing with

19    for purposes of class -- class trials, class issues are

20    individual.  These are all policy issues that relate to them

21    all.

22         So do you disagree?

23              MS. CZIOK:  I agree that it would be policy issues,

24    Your Honor.  But we disagree that they've satisfied the proof

25    that there is a policy or common practice with regard to -- I
```

```
 1   think they've identified four different practices or policies
 2   on page 13 or 14 of their brief.  And they haven't shown
 3   sufficient evidence that there are practices that are common,
 4   which is their -- their burden to show.
 5          THE COURT:  Okay.  Their brief is only 13 pages.  Are
 6   you talking about the ECF numbers?
 7          MS. CZIOK:  Oh, yes.  Pardon me, Your Honor.
 8          THE COURT:  So the common questions that they
 9   identify are policies and practices with respect to issues of
10   sexual assault.
11          MS. CZIOK:  Yes, Your Honor.  And they have not shown
12   sufficient evidence in their brief that there is a practice
13   ongoing at this time of sexual assault at the facility such
14   that class certification is appropriate.
15       They have to provide enough evidence that there is
16   actually a practice or actually a policy, and they have not
17   done so.
18          THE COURT:  All right.
19                  (Simultaneous colloquy.)
20          MS. CZIOK:  They've just shown a couple discrete
21   incidents that are not related, and this is not sufficient to
22   prove the standard for a 23(b) --
23          THE COURT:  So one of the reasons -- I did not
24   realize you were going to argue this motion; otherwise, I
25   probably would not have granted the request.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
1        You need to listen very carefully, because I tried to stop
2   you.
3            MS. CZIOK:  Okay.
4            THE COURT:  All right?  Or look up at the camera and
5   not at your notes, and you'll see me try to stop you.
6   Otherwise, I'll just mute you.
7        A response on the sexual assault issue.
8            MR. NIMNI:  Yes, Your Honor.  I think Ms. Cziok might
9   be confusing questions on the merits with questions for class
10  certification.
11           THE COURT:  Well, don't you agree that with respect
12  to class certification, it is a merits issue?
13           MR. NIMNI:  I do agree that there needs to be a
14  threshold showing that there are policies and practices that
15  the -- that would be addressed to the class in common and that
16  would have common legal answers.
17       And I think what we've put forth is that there are common
18  policies with how they deal with reporting sexual assault, how
19  they deal with accountability for sexual assault, and that
20  there has been a common practice of people being at an
21  unconstitutional risk, which is the standard, are people at an
22  unconstitutional risk of serious bodily harm, and that is
23  common facility-wide.
24       Getting further more granularly, I think would be merits
25  questions.  But we've set forth those common practices and
```

1    policies as a threshold matter for the sexual assault, and

2    then the same for the retaliation.

3            **THE COURT:**  What's your showing with respect to

4    sexual assault as it exists now as opposed to before?

5            **MR. NIMNI:**  Yes, Your Honor.

6        So, once again, the standard is are people at risk of

7    serious bodily harm.  And what we've shown as far as practices

8    and policies is a series of incidents where people are walked

9    in on in the shower, people are watched getting undressed, and

10   then we've -- also have specific evidence about relationships

11   between incarcerated people and officers, touching of breasts,

12   touching of the lower back, and that all of those things

13   meet the Eighth Amendment --

14           **THE COURT:**  That's all before.  Most of this -- most

15   of your evidence is before.

16           **MR. NIMNI:**  With all due respect, Your Honor, all

17   of that evidence --

18           **THE COURT:**  You should know --

19           **MR. NIMNI:**  -- just cited.

20           **THE COURT:**  -- given your status, that you should

21   never say to a judge "with all due respect."

22           **MR. NIMNI:**  Understood, Your Honor.

23           **THE WITNESS:**  At least not this courtroom, because it

24   is -- it lacks respect.

25           **MR. NIMNI:**  Understood.  I meant no disrespect.

 1        That's not my understanding of the evidence.  My

 2   understanding of evidence that I just cited is all of those

 3   incidents have occurred not just since 2022 when the new

 4   administration's took over.  But since summer of 2022 when

 5   Deveney/Agostini took over, and most of the evidence that I

 6   just cited occurred in 2023.  The walking in on the shower --

 7        THE CERTIFIED STENOGRAPHIC REPORTER:  Slow down, please.

 8                     (Simultaneous colloquy.)

 9        **THE COURT:**  Certainly, the hands on the lower back,

10   that was at trial.  That was before.

11        **MR. NIMNI:**  That -- excuse me, Your Honor.  That was

12   before when?

13        **THE COURT:**  That was a part of the criminal trial,

14   that evidence that you're talking about.

15        **MR. NIMNI:**  No, Your Honor.  That was evidence that

16   came from a witness at the preliminary injunction hearing from

17   KC.  That was not evidence for the criminal trial.

18        **THE COURT:**  What do you say about the fact that all

19   of the -- or most of the declarations that you provided to me

20   were cookie-cutter, template lawyering, lawyer-like

21   declarations?

22        **MR. NIMNI:**  Well, I -- I disagree with that

23   characterization.  We -- there are common facts to all of the

24   people at the facility.  They all are at the same facility,

25   observed by the same officers, subject to the same policies,

 1    subject to the same practices, so a number of the inclusions

 2    in the declarations were similar--

 3         **THE COURT:**  Breathe.  Because you're talking so fast

 4    I'm not getting things on the real time.

 5         **MR. NIMNI:**  I understand, Your Honor.

 6      So, of course, there are some similarities across the

 7    declarations because everyone's at the same facility, they all

 8    experience the same culture, the same sexualized

 9    environment --

10         **THE COURT:**  No one ever -- what -- did you ever hear

11    from your client, any of your clients, the term "sexualized

12    environment"?

13         **MR. NIMNI:**  No, Your Honor.  I'm using that term to

14    describe --

15         **THE COURT:**  And yet --

16         **MR. NIMNI:**  -- factual --

17         **THE COURT:**  And yet, in these declarations, you all,

18    the lawyers, use that term.

19         **MR. NIMNI:**  I -- I don't recall whether we used that

20    term in particular, but I -- I think what the declarations go

21    to show and what the evidence at the preliminary injunction

22    hearing go to show is that regardless of whether we call it a

23    sexualized environment or that there's ongoing risk of serious

24    bodily harm because people are watched in the showers, people

25    are watched being undressed, there are sexual relationships

1   between officers and people who are incarcerated, all during

2   2023 -- that was the testimony the KD, from KC, from ER, from

3   SL.  SL was from 2022, but after Deveney and Agostini took

4   over.

5       All of those pieces of testimony are evidence of common

6   culture and common practices at the facility that at least

7   meet the Rule 23 (b)(2) standard for the initial showing.

8           THE COURT:  A response on this issue.

9           MS. CZIOK:  Your Honor, on this issue, we continue to

10  state that in their class action briefing, they highlighted

11  primarily conduct that occurred before 20- -- pardon me --

12  before 2023.  That would not be relevant to the class

13  certification issue.

14      The few issues that they did note from 2023 do not show a

15  consistent practice that puts the entire class at risk of --

16  of the results of such a practice because there is no such

17  practice.

18          THE COURT:  The first two categories of alleged

19  common questions deal with sexual abuse, assault, and/or risk.

20      The third relates to medical and mental health responses,

21  and the harm generally.

22      How is that not a common issue?

23          MS. CZIOK:  Your Honor, it -- numbers three and four

24  still relate to the issue of sexual assault, and --

25          THE COURT:  I'm looking at 3, and page 13 of 18,

```
 1    lines 11, 12, and 13, and there is zero reference to sexual
 2    assault.
 3            MS. CZIOK:  Correct, Your Honor, on those pages.  But
 4    I still understand --
 5            THE COURT:  That's the question I'm asking,
 6    Ms. Cziok.  How --
 7         That's the issue.  Do you have a response on that issue or
 8    not?
 9            MS. CZIOK:  Your Honor, the response is similar,
10    which is that they have not shown that there is -- they still
11    have a burden to show that there actually is an ongoing
12    practice or policy, and they have not done so, to show that
13    there is inadequate medical and mental health responses to
14    mitigate any risks.  They have not shown that this is a -- a
15    practice or policy.
16            THE COURT:  Response.
17            MR. NIMNI:  Again, I believe that we have shown that
18    in the briefing.  And then further, the testimony that Your
19    Honor heard at the preliminary injunction hearing was in part
20    about serious staffing deficiencies and mental health and
21    medical care.  And those are quintessential pieces of evidence
22    for class certification in *Plata*, in *Coleman*, in *Armstrong*, in
23    a number of cases out of the Ninth Circuit.
24         Understaffing, lack of provision of medical care, those
25    are all common questions because they're systemic questions.
```

1    You -- you just can't provide medical care if you don't have

2    certain staff, and so that does apply class-wide.

3           THE COURT:  How are staffing deficiencies not a

4    common question?

5           MS. CZIOK:  Your Honor, because, for example,

6    comparing this case to *Parsons*, in *Parsons*, they showed with

7    testimony of actual employees at the prison, at that prison

8    that they were talking about, and with expert reports that

9    there was an ongoing issue that staffing --

10          THE COURT:  What was the procedural posture of

11   *Parsons*?

12          MS. CZIOK:  Pardon me, Your Honor?

13          THE COURT:  What was the procedural posture of

14   *Parsons*, Mr. Nimni?

15          MR. NIMNI:  I don't know at what stage Ms. Cziok is

16   referring to, but I don't believe that testimony came in

17   regards to class certification.  I believe those were merits

18   question as to whether there actually was deficient medical

19   care.

20          THE COURT:  What was the procedural posture?

21          MS. CZIOK:  Your Honor, that was at the class stage

22   whether -- when the Court was deciding whether to approve a

23   class for *Parsons*.

24      The Court did consider expert reports, deposition

25   testimony to come to its conclusion that a class was

1   appropriate in that case.  And it relied on all of that

2   testimony in deciding that there was a common practice or

3   policy of understaffing.

4            **THE COURT:**  Any response?

5            **MR. NIMNI:**  Yes, Your Honor.

6      Regardless of the stage that *Parsons* was at, I -- there's

7   no requirement that there be expert testimony.

8      My -- my friend's own witnesses testified that they were

9   understaffed.  And so expert testimony, of course, can be

10   valuable, but I don't think it's necessary here to establish

11   what's a fairly common question for prison litigation.

12           **THE COURT:**  Okay.  Anything else on staffing?

13           **MS. CZIOK:**  Your Honor, just a short response to

14   that, which is staffing levels -- I'm -- across the country

15   are low, and so there was testimony at the preliminary

16   injunction hearing that current staffing levels are lower than

17   they'd like them to be.

18      But there's been no testimony that that has led to

19   substandard care across -- in a way that's a practice at the

20   prison.

21           **THE COURT:**  Well, I would disagree with that

22   assessment in terms of the record.

23      The fourth issue they raise relates to access to counsel.

24      Are you still maintaining that position, Mr. Nimni?

25           **MR. NIMNI:**  We agree that access to counsel has --

 1    has improved.

 2         We do have serious questions still about the first element

 3    of number four, the effective reporting mechanisms.  And that

 4    was a lot of the testimony that came out in the preliminary

 5    injunction hearing as well as in the declarations, that there

 6    aren't effective reporting mechanisms where people are free

 7    from retaliation and that that chills reporting.

 8         And Your Honor heard from a number of witnesses who said,

 9    I know X, Y, and Z is going on, but I don't report because

10    either I'm unaware of the reporting mechanisms or, more

11    importantly, because I know what happens when you report and

12    that I've been threatened with retaliation or I've seen other

13    people be retaliated against or I've experienced retaliation

14    myself and that those reporting mechanisms that exist are

15    ineffective.

16         We agree that some access to counsel improvements have

17    been made, including the phone line at the facility, which

18    there was some dispute about how effective it's been.  But

19    generally, it's been a useful addition.

20         But I do believe that the -- on the main -- the common

21    question as far as reporting mechanisms for misconduct, that

22    still remains a common question and practice.

23              **THE COURT:**  A response?

24              **MS. CZIOK:**  Your Honor, as to the access to counsel

25    issue, we contend that there is adequate access to counsel.

1    This is not a pretrial facility, yet they still -- inmates

2    still have access during -- via the phone lines to their

3    counsel at many, many times of the day.

4        There's also visiting times which counsel for plaintiffs

5    has taken advantage of.  And so there is adequate access to

6    counsel.

7        As to reporting mechanisms, there are a number of

8    different ways that individuals can report incidents.

9    There's --

10           THE COURT:  The question is, is it a common question?

11   Sounds like you're conceding this is a common issue.  How

12   it --

13           MS. CZIOK:  Pardon me.

14           THE COURT:  -- operates how it exists, whether or not

15   it's effective, that's all common.

16           MS. CZIOK:  Pardon me, Your Honor.

17       I'm contending that opposing counsel has not shown

18   sufficient evidence that there is a common practice of lack of

19   access to counsel or that there are --

20           THE COURT:  We've moved on from lack of -- we've

21   moved on from counsel.  He's already made some concessions in

22   that regard.

23       The question that he focused on was effective reporting

24   mechanisms.  That, again, seems to me to be common.  How it

25   exists --

1          **MS. CZIOK:**  Your Honor --

2          **THE COURT:**  -- how it's communicated, how it

3    operates, these are all common issues.

4          **MS. CZIOK:**  Your Honor, we disagree in that this is

5    an issue that specifically opposing counsel has stated that

6    there is a denial or -- denial of effective reporting

7    mechanisms, and the evidence to date has not known that there

8    is --

9          **THE COURT:**  Well, there's an issue about retaliation,

10   and there's certainly evidence in the record that could be

11   construed to suggest retaliation.

12         **MS. CZIOK:**  And, Your Honor, we contend that the

13   reporting mechanisms have not been denied, and so there is --

14   there's not sufficient evidence to create a class on this

15   particular issue because there are multiple reporting

16   mechanisms that have been shown to work, and they are working.

17   And --

18                    (Simultaneous colloquy.)

19         **THE COURT:**  It doesn't sound like they're working.

20   No one's talking to them.  No one's communicating because

21   everybody's afraid they're going to be retaliated against.

22     That's --

23         **MS. CZIOK:**  Your Honor --

24         **THE COURT:**   -- problem out there.

25         **MS. CZIOK:**  Your Honor, I -- we, the United States,

1   contend that still these -- these reporting mechanisms for,

2   example, all of the -- all of the declarations that were

3   submitted in support of the motion for preliminary injunction,

4   all of those prior to the hearing in January were reported to

5   the Office of Internal Affairs.

6       And so that, for example, shows that this process is, in

7   fact, working and that people are not being denied effective

8   reporting mechanisms.

9           **THE COURT:**  The next factor, the adequacy of class

10  counsel, does either side wish to be heard on this?

11          **MR. NIMNI:**  No, Your Honor.

12          **MS. CZIOK:**  Your Honor, those arguments are very

13  similar to the commonality questions.  There's a lot of

14  overlap, so --

15          **THE COURT:**  How is adequacy of counsel an overlap

16  with common questions?

17      Are they -- are plaintiffs counsels adequate or not?

18          **MS. CZIOK:**  Oh, pardon me, Your Honor.

19      We -- we do not dispute that -- that element.

20          **THE COURT:**  Now, whether or not the class

21  representatives are typical?  You want to discuss that?

22      Yes or no?

23          **MS. CZIOK:**  What -- are you speaking to me, Your

24  Honor, or plaintiff's counsel?

25          **THE COURT:**  You.

1    **MS. CZIOK:**  Your Honor, no, we do not make an

2    argument about this in our brief.

3    **THE COURT:**  Again, your -- your voice is not clear,

4    to me anyway.

5    Say that again.

6    **MS. CZIOK:**  Okay.  We did not make an argument about

7    this particular issue in our brief.

8    **THE COURT:**  Do you wish to be heard on that topic?

9    **MR. NIMNI:**  No, I believe they've waived any

10   argument, Your Honor.

11   **THE COURT:**  When are you going to be prepared to go

12   to trial?

13   **MR. NIMNI:**  I think that plaintiffs could be prepared

14   for trial in -- what is it now?  It's February?  I think

15   before the end of the year.  I'd say maybe nine months of

16   discovery.

17   **THE COURT:**  Ms. Mattioli?

18   **MS. MATTIOLI:**  We agree with that, Your Honor.

19   **THE COURT:**  Well, at least you agree on something.

20   Okay.  That's the class cert motion.

21   Anything else on that motion?

22   **MR. NIMNI:**  Nothing further for plaintiffs, Your

23   Honor.

24   **MS. CZIOK:**  No, Your Honor.

25   **THE COURT:**  All right.

1          Do you wish to be heard on the -- now that you've filed

2   post-hearing briefs on the injunctive relief?

3          Do you wish to be heard?

4              **MR. NIMNI:**  Yes, Your Honor.

5          Unless Your Honor has specific questions, I'd just like to

6   walk through briefly why plaintiffs, both in their initial

7   filings and in our post-argument filings, meet the standard

8   for preliminary injunctive relief that we've requested on both

9   of our claims.

10         We've established that there is a risk of serious bodily

11  harm, and risk is the standard, not whether there actually are

12  sexual assaults, although there is evidence of that -- recent

13  evidence of from ER, from KD, from KC.

14             **THE COURT:**  Let me say to you --

15             **MR. NIMNI:**  -- from SL.

16             **THE COURT:**  I think your stronger case is

17  retaliation.

18             **MR. NIMNI:**  Yes, Your Honor.

19             **THE COURT:**  Not sexual -- not risk of sexual abuse.

20             **MR. NIMNI:**  I understand, Your Honor.

21         As to retaliation, I think they fall -- the retaliation

22  falls into two categories.  First, the use of punitive

23  measures, the SHU; restriction to commissary; restriction to

24  phone access and visitation as punishment are threat of

25  punishment for reporting misconduct.

1    And I think even the -- the recent example of RF is

2    instructive, that the briefs from my friend on the other side

3    in -- both in their filings on the post-evidentiary hearing

4    and in the show cause order are very concerned with rooting

5    out false claims of sexual assault.

6    And in order to do that, they place people in the SHU for

7    investigatory reasons, for protective custody, for all these

8    other reasons, despite testimony from Assistant Warden Deveney

9    that they don't actually place people in the SHU unless

10   they're a security threat.

11   And I think that just isn't borne out by the evidence,

12   that there's wide use of the SHU, there's wide use of

13   disciplinary restrictions to visitation and to phone calls and

14   all these sorts of other privileges.  And they justify it by

15   saying they're trying to weed out false allegations.

16   But I think at a facility with a history like Dublin, they

17   should be very worried about finding the accurate allegations.

18   Then the second category are the pieces of retaliation

19   that were brought up right before the evidentiary hearing, the

20   institution of the strip searches and bathroom watching.

21   And I understand the government's argument that the strip

22   searches are according to policy.  I think there's some debate

23   over that in the documents, whether it's "shall strip search"

24   or whether it's "may strip search," but regardless, the timing

25   here is probative.

1    The strip searches didn't start when the new

2    administration came in.  They didn't start in July when

3    Deveney and Agostini came in.  They started right -- a few

4    started right after a demand letter was sent from plaintiffs,

5    and then really they started in earnest in December of 2023,

6    well after the new administration came in.

7    And that timing, plus the actual strip-searching and

8    watching people go to the bathroom when there's no evidence in

9    the record that they found contraband through the legal

10   visits, that's extremely probative evidence that there is

11   retaliation going on.

12   And so I think both the testimonial evidence and the

13   documentary evidence as far as how the SHU is used, and the

14   actual effect, which is that it chills people from reporting

15   sexual abuse.  And Your Honor heard witness after witness talk

16   about how they would have talked about something but they

17   didn't feel safe to because they were retaliated against and

18   that they actually were retaliated against or they saw their

19   friends be retaliated against or officers told them that they

20   would face retaliation.  And that actually did chill people.

21   And they felt safe coming in front of Your Honor and

22   reporting here, and numerous allegations came out at the

23   hearing and in the declarations.  But that's not an effective

24   system.

25   And then same with the strip searches and the bathroom

1   usage.  And so there, plaintiffs clearly have established

2   likelihood of success on the merits of that -- the retaliation

3   claims -- and meet the other preliminary injunction factors.

4           MS. MATTIOLI:  So, Your Honor, they -- in their

5   motion for preliminary injunction in the section titled

6   "Success on the Merits," they only briefed the Eighth

7   Amendment issue which looks at a deliberate indifference

8   standard.  It requires actual subjective knowledge of an

9   objectively unconstitutional risk of harm and a deliberate

10  indifference by prison administrators to that risk.

11      Post-hearing, during the hearing, we changed to the First

12  Amendment claim.  I could find no case where preliminary

13  injunction was granted on the basis of a First Amendment

14  violation.

15      The Bureau of Prisons has been uniform in the response

16  that allegations of retaliation are taken seriously.

17  Ms. Reese testified that OIA has open cases investigating

18  alleged retaliation out of Dublin.

19      There are effective reporting mechanisms because they are

20  being reported.  They are going up the chain, and they're

21  being investigated.

22      The issue that Mr. Nimni points to with KD and RF, the

23  touchstone of retaliation is that it can serve no legitimate

24  penological purpose, the action.

25      And the action that was taken in the case of RF was done

1    for a legitimate safety and security reason at the

2    institution.  It was done weeks after she testified --

3              **THE COURT:**  In violation of my order.

4         **MS. MATTIOLI:**  Which --

5              **THE COURT:**  In violation of my order.

6         **MS. MATTIOLI:**  Which --

7              **THE COURT:**  I don't know if whoever looked at that

8    just forgot it was there, but it was clear.  And I understand

9    that people think that they -- it had a temporal limit on it.

10   There was no temporal limit.

11      That's why I was shocked when I heard because when I

12   issued that order, those issues of retaliation were front and

13   center.

14             **MS. MATTIOLI:**  I understand, Your Honor.

15      And the issue that I believe Mr. Nimni was referring to

16   was her being placed in SHU.  There was --

17             **THE COURT:**  And there's evidence of people being

18   placed in SHU without -- even though I've heard testimony that

19   it wasn't for purposes of investigations, there continue to be

20   those kind of people put in SHU.

21             **MS. MATTIOLI:**  So in this specific case, Your Honor,

22   there was a safety and security issue with the allegation that

23   RF was coaching an inmate who did not speak English as their

24   first language.

25             **THE COURT:**  I -- I understand, and I have --

1    You should all -- I have issues with RF.  I don't know

2    that she's the most credible person, so -- that will come out

3    in the order as well.

4    There is a -- a lot of -- there's a lot of coaching going

5    on and perhaps on both sides.

6    But go ahead.

7    **MS. MATTIOLI:**  Well, Your Honor, the -- the issue

8    with retaliation is that it depends on the specific

9    individuals involved.  It doesn't just depend on the timing

10   and -- the prison administrators can't divorce their knowledge

11   of the individuals involved when making decisions about the

12   orderly running of the institution or the safety of other

13   inmates.

14   The decision to place RF in SHU was not done in

15   retaliation for her testimony at this hearing.  I can recall

16   no testimony that anybody would be upset about.  There is --

17   there was no retaliatory motive behind that.  The information

18   that was known at the time was a very serious risk.

19   **THE COURT:**  My question is processes.  That's the

20   question.

21   **MS. MATTIOLI:**  And while she was in SHU, she made

22   several legal phone calls.  She raised the issue immediately.

23   She had access to the --

24   **THE COURT:**  The question is ultimately one of

25   process.  Ultimately, that's what it's about.  There is no way

1    that I can have -- and I told -- when I went on my unannounced

2    tour, I told all of the inmates that I talked to I was not

3    there to address individual issues.  There are processes in

4    place to deal with them.

5        Now, as you all know I did ask for information on a -- on

6    a few that I was particularly concerned about.  But I made no

7    promises.

8        So what I'm concerned about are processes.  And there are

9    processes that I am concerned about at that institution.  What

10   I'd like -- so a response from the plaintiffs on this issue

11   that your retaliation claims are based on First Amendment as

12   opposed to Eighth Amendment and the fact that you failed to

13   brief that.

14        **MR. NIMNI:**  Yes, Your Honor.  I'll address that, and

15   if I might, I can address a few of the other points raised by

16   Ms. Mattioli.

17        As to the standard that this court is operating under,

18   it's true that in our preliminary injunction brief, we raised

19   the retaliation issues as supportive of our Eighth Amendment

20   risk of harm claims.

21        However, testimony came out at the evidentiary hearing and

22   also our briefing in the post -- in the post-hearing briefing

23   very -- very clearly raised this as a First Amendment claim,

24   and that claim was raised by our complaint as well.

25        And so normally -- you know, my friend on the other side

1     raises a case talking about how you're not allowed to raise

2     new issues in reply briefs.  This isn't a reply brief.

3         We had ample testimony.  We had an opening post-argument

4     brief.  Ms. Mattioli was able to respond.  She was well put on

5     notice.  They chose not really to respond to the First

6     Amendment issues.  Then we had a reply brief, so this -- this

7     issue is well briefed before the Court.

8         I mean, of course, we could file another preliminary

9     injunction under the First Amendment, but I think just for

10    efficiency's sake, it's all been briefed.

11        And under the First Amendment, the standard is not

12    deliberate indifference.  The standard is whether there is --

13    whether people have engaged in a protected activity and

14    whether they've been punished as a result of that protected

15    activity.

16        And then the Court looks at a number of factors to

17    determine causation, including the things like timing, like

18    processes, like discretion, like all of these different

19    things.  And so this is well encompassed within a First

20    Amendment claim.

21        We still think we would win under a deliberate

22    indifference standard because of the evidence that we put

23    forth, but that's not the appropriate standard to evaluate the

24    claims here.

25        As to -- Ms. --

1          **THE COURT:**  I'm not exactly sure how you -- unless

2     you're arguing a conspiracy, which you haven't argued.

3          Under the Eighth Amendment, because there's a subjective

4     component and because I cannot deal with individual issues but

5     need to deal with policy issues, how do you get there even

6     under the Eighth Amendment?

7          **MR. NIMNI:**  Under the Eighth Amendment, the way that

8     we get there is a combination of policies, practices, and

9     cultures.  And essen- -- and culture.  And same with the way

10    that we would get there under the sexual abuse, sexual

11    misconduct allegations, which is that there is a culture at

12    FCI Dublin that a number of witness testified to that when you

13    report -- or when something happens and you come forth to

14    report, you are retaliated against.

15         And whether that's part of a explicit discussion amongst

16    defendants or that's just the culture there or, as defendants

17    said, they're trying really, really hard to weed out false

18    allegations.  But that practice and that culture has led to

19    widespread retaliation that this court heard about.

20         And then there are specific actual policies, like the --

21    they had practices like the strip search practice and policy,

22    like the bathroom practice and policy.  So a combination of

23    the widespread culture, which functions, in effect, as a

24    practice and a policy, and then the actual on-paper practices

25    and policies that FCI Dublin engages in.

1       Both of those are evidence of the -- the sort of

2  subjective knowledge and that witnesses have come forth

3  before -- well before the case was even filed and come forth

4  and said, this is what goes on at FCI Dublin -- Apologies.

5       (Record read by the Certified Stenographic Reporter as

6  follows:  "...what goes on at FCI Dublin --")

7       **MR. NIMNI:**  This is what went on under the Garcia

8  administration, and this is what is continuing to go on with

9  reference to when people are placed in SHU or lose privileges

10 for reporting.

11      So I think the facility was well on notice that this had

12 been a problem, and the actions that they've taken over the

13 course of 2022, 2023, have, in many cases, exacerbated the

14 problem.  For example, like strip searching people after legal

15 visits.

16      The other thing -- and this goes to another point that

17 Ms. Mattioli raised as far as what happens to these claims of

18 retaliation at OIA.  Beth Reese was in this courtroom and

19 testified that when OIA receives allegations and the conduct

20 described is something that the officer could be allowed to do

21 under policy, that they categorically do not investigate those

22 cases.

23      But that is essentially every case of retaliation.  Every

24 case of retaliation in prison, in policing, in the employment

25 context is usually done under a pretext of something that an

1    employer or an officer could do, but the reason that it's bad,

2    the reason that it violates the First Amendment or the

3    standard here, is because they've done it in a specific way to

4    target people and to chill reporting or other protected

5    activity.

6        And so where we have the main investigative body

7    categorically denying the ability to even investigate claims

8    of retaliation when they comport with some kind of policy,

9    that means that there is no effective way to curb the

10   retaliation that the witnesses have testified about.

11       **THE COURT:**  All right.  A response.

12       **MS. MATTIOLI:**  So, Your Honor, there's a lot of

13   points that I'd like to respond to, the first being that

14   Ms. Reese actually testified that very rarely does her office

15   receive a free-standing report of retaliation that is not also

16   tied to some other form of misconduct.

17       And so if we want to talk about RF specifically, the

18   allegation that she was helping the individual inmate file was

19   an allegation against a staff member.  And so that did get

20   reported up to OIA and OIG and will be investigated.

21       And if there's a retaliation component so that such as --

22   you know, he's saying that all of these claims of retaliation

23   are tied to reporting sexual misconduct.  If -- once the

24   allegation of sexual misconduct is made, the retaliation

25   becomes part of that investigation.

1        And also the standard for retaliation is that the action

2   did not reasonably advance a legitimate correctional goal.

3   And that is the point that we raised in our post-hearing

4   brief, is that the timing of FCI Dublin conducting visual

5   searches following contact visits increased in part because of

6   the increase in attorney visitation during that time.

7        As Ms. Cziok said, FCI Dublin is not a pretrial facility.

8   Attorney visits are less common there.  And -- and there are

9   new staff that rotate in and out.

10       There is -- there was an issue that then Captain Quezada

11  testified to with training of staff in understanding that

12  visual searches following contact visits with any member of

13  the public are required by policy.

14       To the extent that it wasn't being done before, Your Honor

15  has recognized there were a lot of things at Dublin that

16  weren't -- policies that were not being followed and they are

17  now.

18       That doesn't make it retaliation just because it happened

19  before the evidentiary hearing.

20       There's -- also the argument that the inmates' subjective

21  fear of reporting does not translate to prison officials'

22  subjective knowledge and disregard of an objective risk.

23       The fact is -- and this is court heard testimony regarding

24  increased transparency, increased communication with the

25  inmate population.  Notices have been posted in all the

1  housing units.  The pilot phone program, which is

2  unprecedented at any other BOP facility, has been made

3  available virtually 24/7 to the inmate population.

4       There is no other prison in the country that has that type

5  of access to attorneys.  The inmates can use the computers

6  virtually the same unfettered amount.  They have to wait in

7  line, but Your Honor was there and could see how the system

8  functions.

9       They can write emails to OIG directly.  They can and do

10  write emails to the press directly.  They have constant

11  communication with the outside.  And claims that there are not

12  acceptable mechanisms to report to outside of the facility are

13  not based on the evidence that this court heard.

14       **MR. NIMNI:**  Your Honor, if I might, just a couple of

15  responses?

16       **THE COURT:**  (Nods head.)

17       **MR. NIMNI:**  First, as to whether there is record

18  evidence as to the fact that the reporting mechanisms don't

19  work, I think that there is from all of the witnesses -- from

20  all of plaintiffs' witnesses that testified exactly to that

21  fact, that they either are unaware of the reporting mechanisms

22  or, more importantly, that they are chilled from using the

23  reporting mechanisms because of retaliation.

24       I understand Ms. Mattioli to be saying that there is this

25  pilot phone line and that people can email the press, but

1  that -- that's not really the question for retaliation.  It's

2  not whether they can have the option to do the activity.  The

3  question is are they retaliated against and are they chilled

4  from doing it even if they do.

5      And this court heard testimony that some people did not

6  report serious misconduct because they were retaliated against

7  previously or they saw other people retaliated against or they

8  were retaliated against after they report that misconduct.

9  And you also heard that that had a chilling effect

10  facility-wide.

11      As to Ms. Reese's testimony, it's in our opening

12  post-evidentiary-hearing brief where she says very

13  specifically that they categorically do not investigate claims

14  where the underlying conduct could be justified by policy.

15      As to Ms. Mattioli's claim that there aren't preliminary

16  injunction cases that deal with retaliation on this scale,

17  it's true that there aren't in a preliminary injunction

18  posture.

19      But *Armstrong*, for example, the Court there appointed a

20  706 expert -- a neutral to go in and -- that was a case about

21  disability discrimination and medical care.

22          **THE COURT:**  Slow down.

23          **MR. NIMNI:**  That was a case about disability

24  discrimination and medical care, but there were also serious

25  allegations of a broken culture and retaliation against people

1    that report.

2        And there, the Court -- and I think the Court might do the

3    same here -- reported --

4            **THE COURT:**  Seriously, you need to slow down.

5            **MR. NIMNI:**  Apologies, Your Honor, and Madam Court

6    Reporter.

7        There, the Court appointed a rule 706 neutral to go in,

8    investigate, and make recommendations as to how retaliation

9    was working in that facility.  So courts are -- are well able

10   to do that.

11       As to RF, my understanding from Ms. Mattioli today is that

12   the argument is she was placed in the SHU for a valid

13   penological purpose.  It wasn't for retaliation.  But that's

14   not what the evidence shows.

15       The declaration of Mr. Huang, in fact, says that there was

16   not a valid reason to put her -- there wasn't enough

17   documentation, and there wasn't a valid reason to place her in

18   the SHU.  And then she was transferred out of Dublin, in

19   violation of this court's orders, but also in violation of the

20   First Amendment.

21       It is well understood that hunger strikes are a First

22   Amendment protected activity and that transfers are a classic

23   form of retaliation.  And so it's -- the RF example -- I don't

24   think the record demonstrates what Ms. Mattioli is saying as

25   to it being just a clear individualized incident where the

```
1    prison was engaging in its normal penological functions.

2        I actually think it's some evidence of a much greater

3    wrought as a -- as far as use of the SHU and use of other

4    retaliatory mechanisms.  It's not my understanding that

5    Mr. Huang reviews all SHU placements, that that was

6    idiosyncratic to this incident.

7        But that in this case, he found that there was no reason

8    to do that here, and I think we've had significant evidence

9    that there -- the SHU has been used as retaliation in other

10   instances.

11           MS. MATTIOLI:  Your Honor, the response to that is

12   that it misstates Mr. Huang's declaration, which was filed

13   under seal.  He did say that upon his review of the

14   documentation, it did not appear that her return to SHU when

15   she came back to Dublin was warranted at that moment in time.

16           THE COURT:  Well, I read the declaration.  It is,

17   Mr. Nimni, under seal --

18           MR. NIMNI:  Apologies.

19           THE COURT:  -- and you should know that.

20           MR. NIMNI:  Apologies.  I didn't see that section is

21   under seal, but I apologize.

22           THE COURT:  There is considerable amount of material

23   under seal in this case for a reason.  You are all admonished

24   that when you make your notes for argument, you better

25   highlight what's under seal.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1          **MR. NIMNI:**  Apologies, Your Honor.

2          **THE COURT:**  Because that's a violation of my order.

3          **MR. NIMNI:**  I understand.

4          **THE COURT:**  I disagree with your assessment of what

5    you're saying about Wong.  That's not what he said.  I've read

6    his declaration.  And I can point you to the line, but that is

7    not what he said in its entirety.  We can move on from that.

8    My own assessment is what controls.

9          **MS. MATTIOLI:**  Understood, Your Honor.

10         And Mr. Deveney also filed a declaration.  There are

11   portions of it that are under seal.  But that declaration in

12   combination with Mr. Huang's declaration -- both in my opinion

13   clearly lay out the legitimate penological reasons for the

14   initial placement.  The assessment made at the time that the

15   initial placement was not sufficiently documented happened in

16   the middle of an investigation.

17         It was interrupted due to the this court's visit at the

18   facility.  And when BOP through counsel, myself -- the

19   U.S. Attorney's office realized that the transfer was done in

20   violation of a court order, we immediately returned her to the

21   facility.  And that is what prompted Mr. Huang's involvement.

22         Mr. France normally would have advised on that issue.  He

23   was out of the country.  So Mr. Huang stepped in to answer the

24   question of when she comes back, where do we put her.  Does

25   she go back to SHU, or do we put her in general population.

1    That is the reason that he reviewed that documentation.

2          **THE COURT:**  Okay.  So I want you to look at page 2 of

3    his declaration.

4          **MS. MATTIOLI:**  Yep.

5          **THE COURT:**  Line 16 through 18.

6          **MS. MATTIOLI:**  Yep.

7          **THE COURT:**  That sentence talks about initial.

8          **MS. MATTIOLI:**  Correct.  And it also talks about

9    documentation.

10         **THE COURT:**  Well, that's what's required, and that's

11   a process issue, isn't it?  It is a process.

12         **MS. MATTIOLI:**  That is correct, Your Honor.  And that

13   is why I made the point that his assessment occurred in the

14   middle of an investigation that would have developed the

15   documentation.

16         **THE COURT:**  The documentation should be there before

17   anything happens.  Otherwise, they shouldn't be put in the

18   SHU.

19         **MS. MATTIOLI:**  I understand, Your Honor.  And --

20         **THE COURT:**  And that's a process issue that is a

21   concern to me.

22         **MS. MATTIOLI:**  I understand, Your Honor.

23      I believe that Mr. Deveney acknowledged in his

24   declaration -- and if he didn't, I will do so on his behalf --

25   that the documentation was lacking, but the reasons that the

1    decision was made are clearly laid out in his declaration.

2    And I maintain -- we maintain that they were not done for an

3    improper purpose.

4            **THE COURT:**  I understand that's your perspective.

5            **MS. MATTIOLI:**  Okay.

6            **THE COURT:**  And I understand that RF is a

7    particularly unique individual.  And it is not clear to me

8    that I would -- if I grant class cert, that I would identify

9    her as a class repetitive.  It is not at all clear to me that

10   she is typical.

11       And as I said, I have problems with some of her -- I have

12   credibility issues with her.

13           **MR. NIMNI:**  Your -- Your Honor, just --

14           **MS. MATTIOLI:**  Not a named plaintiff.

15           **MR. NIMNI:**  Yeah, I just wanted to clarify that RF is

16   not -- we're not seeking to make RF a class representative.

17   And I agree that I don't want to get bogged -- too bogged down

18   in individuals for the purposes of the preliminary injunction.

19       Obviously, for the show cause hearing, that's about this

20   particular individual.  The only two points that I would make

21   are that placing someone in SHU for investigation is something

22   we heard does not occur as a way to prevent retaliation and

23   just did occur here.

24       And that the underlying conduct that -- for the reason

25   that they placed -- they placed RF in SHU, it's not clear to

1    me exactly what the security concern is.  And I don't want to

2    tread on something that's under seal as to why -- what RF's

3    conduct was here.

4        But I can just say as a general matter, many prisons have

5    people, credible or otherwise, that engage in legal assistance

6    for other people and helping other people file complaints is

7    not usually a reason that people are punished.

8            THE COURT:  Yeah, but charging them a thousand

9    dollars?  I'm not so sure about that.

10           MR. NIMNI:  That's -- that's not -- I agree, Your

11   Honor but that's not my understanding of --

12           THE COURT:  That's what she testified to.

13           MR. NIMNI:  Right, Your Honor.  But the -- at least

14   my read of Deveney and Dolgov's declarations is it wasn't

15   the -- it wasn't -- there wasn't -- the monetary component

16   wasn't the reason that she was placed in SHU.  It was more

17   about their concern that she was coaching people to make false

18   allegations about an officer that no longer works there.

19           THE COURT:  Again, it's an issue with her.

20           MR. NIMNI:  I understand, Your Honor.  And I don't

21   want to get bogged down in her.  I -- I just do think that

22   some of process and systemic irregularities that came out even

23   in RF's case -- the worry about with false reporting, the use

24   of the SHU, the use of a retaliation transfer are indicative

25   of other things that this court heard in the testimony and in

1  the declarations.

2         **THE COURT:**  Well, I think we should move on.

3     Unless you want to -- one last word.

4         **MS. MATTIOLI:**  No, thank you, Your Honor.

5         **THE COURT:**  All right.

6     What I will say about -- and look, I'm going to try to

7  resolve this soon.  One, we had to have the hearing.  Two, I

8  had to have the briefing.  We are now at oral argument, and it

9  will take me a little while but not too long to get an order

10 issued.

11     I will say that my order was not intended to interfere

12 with the proper administration of the facility.  But you had

13 to ask permission, and you had to give me the reasons why.

14 That was my decision to allow my order, to -- not -- well, to

15 modify my order as to a particular individual.

16     You cannot operate on your own at this point.

17        **MS. MATTIOLI:**  Understood, Your Honor.

18        **THE COURT:**  All right.

19     Any other issues that you want to be heard on with respect

20 to this motion?

21        **MR. NIMNI:**  The -- the -- on the order to show cause

22 or on the preliminary injunction?

23        **THE COURT:**  The preliminary injunction.

24        **MR. NIMNI:**  The preliminary injunction?  I just

25 wanted to address -- and I assume Ms. Mattioli also wants to

```
 1    address the relief that might come out of a preliminary

 2    injunction here.

 3        I think we've narrowly targeted the relief at what we

 4    think will bring the facility just over the constitutional

 5    threshold, which is the requirement under the PLRA.  Specific

 6    limitations to SHU, specific auditing, specific investigatory

 7    work, a lot of which can be done either through a 706 neutral

 8    or through a special master.  And that's at the regular

 9    process in these prison cases just because there are, as Your

10    Honor saw, a lot of very specific things --

11            THE COURT:  Is there a difference between a 706

12    neutral, a special master, or a monitor?

13        Is there any difference?

14            MR. NIMNI:  As a doctrinal matter, yes.  The process

15    that this court has to go through under the PLRA for

16    appointment of special master is slightly different than the

17    process that you would have to go through for a 706 neutral

18    where my understanding is that the special master restrictions

19    of the PLRA don't apply.

20        But it's really -- the function, I think, would be the

21    same, but the process for appointment would be different.

22            THE COURT:  What are the differences?

23            MR. NIMNI:  Under the PLRA for appointment of a

24    special master, I believe it's each side has to submit a list

25    of names.  They have a series of strikes.  The Court, then,
```

1    makes a -- a decision.  Defendant -- actually, both parties

2    have the ability to for an interlocutory appeal as to the

3    appointment of the special master in particular.  And I don't

4    believe any of those mechanisms are in place, absent court

5    order, for a 706 neutral.

6        Either path that this court might choose, though, I think

7    that's the ideal formulation for executing this form of relief

8    and any additional monitoring that needs to go on at the

9    facility just to ensure that the SHU is not used as a method

10   of retaliation or any of the other punishments to ensure other

11   compliance with this court's orders and to understand more

12   about the deficiencies and the practices at FCI Dublin.

13       But either path just has different procedural hooks that

14   this court needs to go through.

15           MS. MATTIOLI:  So, Your Honor, the response to that

16   is that FCI Dublin does not need a special master to ensure

17   compliance with court orders.

18           THE COURT:  I understand that's your perspective.

19           MS. MATTIOLI:  I'm going to tell you some examples.

20   The only court order that they did not comply with was a

21   mistake on the part of their attorneys.

22       Every time Your Honor instructed a witness to post a

23   notice, to provide blankets, to send somebody to the hospital,

24   it was done.

25       The mold and asbestos company is on site as we speak.

1       A natural gas inspector came last week.

2       Every time you have asked them to do something, they have

3   done it.

4       And to get to an appointment of a special master, this

5   court has to find a constitutional violation warranting that

6   appointment.

7       And we maintain that especially under a First Amendment

8   analysis, but under an Eighth Amendment analysis, if we're

9   looking at a systemic issue, the patterns, practices, and

10  customs at FCI Dublin today do not pose an unconstitutional

11  risk of sexual assault to those incarcerated there.

12      There are over 19 staff members placed on administrative

13  leave, many of whom do not have substantiated allegations

14  against them.

15          **THE COURT:**  Which is the concern as well.  That is,

16  why -- why are they still -- well, let's get to that later.

17      Part of the staffing deficiencies are -- are because

18  they've put all these people on -- on administrative leave,

19  and you don't have enough people there.

20          **MS. MATTIOLI:**  That's correct, Your Honor.  But

21  that's a response that the facility implemented to ensure that

22  allegations of sexual abuse are taken seriously.  And that is

23  why false allegations of staff sexual misconduct are taken

24  equally as seriously.

25          **THE COURT:**  Okay.  So BOP is not replacing

```
 1    individuals --
 2              MS. MATTIOLI:  Correct.
 3              THE COURT:  -- that are put on leave.
 4              MS. MATTIOLI:  That's correct.
 5              THE COURT:  I walked through that facility, and it
 6    was -- if you go into one of the dormitories, counselors
 7    aren't there -- no one's around doing what they're supposed to
 8    be doing.  Why?  They're all on leave.
 9         And I heard at least from one staff member that they don't
10    expect them to -- to come back until after the lawsuit's over,
11    which in and of itself is concerning.
12         If there are no allegations, why aren't they -- if the
13    allegations have been proven to be false, why aren't they
14    back?
15              MS. MATTIOLI:  Well, they haven't yet be proven to be
16    false, Your Honor, because the process that's in place is that
17    they got sent to OIA, who then forwards criminal allegations
18    to OIG.
19         Once they're with OIG, they have their own time line, and
20    it could take years for them to investigate a criminal matter.
21    The local facilities, which I do think plaintiffs are still
22    mistaken about, the special investigative agents at the local
23    facilities who now report directly to OIA, they are not
24    responsible for classifying allegations of staff misconduct,
25    and they're not responsible for investigating criminal
```

1   allegations of staff misconduct.

2       Once a criminal allegation has been made in a way that is

3   credible, could have happened under the facts, it goes up

4   because that is the process that has been put in place as a

5   response to what happened at Dublin.

6       Those processes take time.  And FCI Dublin doesn't have

7   control over them once they have been initiated.

8       They have been engaging in recruitment efforts.  I know

9   that the staffing is an issue for the facility.  They are

10  stuck between a rock and a hard place because if they don't

11  put staff members on leave, we have emails and phone calls

12  about allegations and why aren't you taking those allegations

13  seriously.

14      They have decided to adopt a uniform response; that is, if

15  there's an allegation of touching such as to the small of an

16  inmate's back, which is the incident that Mr. Nimni referred

17  to -- I watched the video myself.  Less than two seconds.  An

18  inmate was falling out of a forklift.  That person is on

19  administrative leave because he touched the small of her back.

20  That is where the facility is at.  And it is creating a

21  staffing issue.

22          **THE COURT:**  And it's a problem.

23          **MS. MATTIOLI:**  I agree.

24          **THE COURT:**  It's a problem.  That facility cannot

25  operate without staff.

1          **MS. MATTIOLI:**  I understand.

2          **MR. NIMNI:**  If I might just make one record

3    correction, Your Honor --

4          **THE COURT:**  Not yet.

5          **MR. NIMNI:**  -- that's it's not -- I don't know about

6    this video.  Obviously we haven't seen the video, but that's

7    not the incident that I'm referring to.  I'm referring to an

8    incident where a witness here testified that she was brought

9    into a room by an officer, her back was touched, and then she

10   was told that she was lucky that there weren't -- that there

11   were cameras operative.

12         **MS. MATTIOLI:**  And Your Honor can look at the

13   testimony.  That is -- I respectfully disagree that that's

14   what she testified to.

15         **THE COURT:**  All right.

16      You want to finish up on the distinction between the

17   special master and the 706 neutral?

18         **MS. MATTIOLI:**  Your Honor, the -- yes.

19      So a constitutional violation in this case is not

20   supported by the facts that you heard and the law as it was

21   briefed, even less so with the retaliation claims.  Because

22   we're at a preliminary injunction stage in the proceedings,

23   they have to show imminent irreparable injury from the

24   constitutional violation and the likelihood of success on the

25   merits.

1      Then -- they're also asking for a mandatory preliminary

2   injunction, which goes well beyond preserving the status quo.

3   And that is highly disfavored under the law.

4      I don't -- they have not met their burden of proof.  We

5   have now heard the testimony of 26 witnesses.  They filed 47

6   declarations.  Your Honor visited the facility.  And the

7   remedial orders that you issued immediately were related to

8   environmental issues, and the medical care of two specific

9   inmates.

10      I don't believe that the record supports a factual

11   conclusion that the Constitution is being violated on that

12   scale in this case.

13      **THE COURT:**  Well, I'm concerned about the SHU.  And

14   I'm concerned about the policies.

15      And the only -- and I wasn't going to do that in a

16   one-page order right after I'd been there.  That is part of

17   this process.  And whether I like it or not, I've got to let

18   you all have argument.  That doesn't mean that I wasn't

19   concerned with what I saw.

20      **MS. MATTIOLI:**  Understood, Your Honor.

21      There is a difference, though, under the law with a

22   remedial order that seeks to correct conditions of confinement

23   that aren't tied to a constitutional violation.  I believe

24   that you still have to find that the use of the SHU at FCI

25   Dublin today violates the Eighth Amendment for anybody that is

1    placed there.  And I don't believe that the record supports

2    that conclusion.

3            MR. NIMNI:  I don't believe that that's what the

4    showing needs to be, Your Honor.

5        First, as we've discussed, this could proceed under --

6    either under the Eighth Amendment or under the First

7    Amendment.  But it doesn't need to be that anyone that's

8    placed in the SHU, that's a violation of the constitutional

9    rights.

10       The allegations in the complaint and then the preliminary

11   injunction and the post-hearing briefing are about chilling

12   specifically people that try to report misconduct.  And so we

13   heard testimony that there are diversionary programs for

14   people who have opioid use disorder, for example.

15       There was a lot of discussion about whether there could be

16   diversionary programs from the SHU for people that report

17   sexual misconduct.  There's ample testimonial and documentary

18   evidence of retaliation and that -- just that the SHU is not

19   used in the way that the witnesses testified to, that it's not

20   used just for security concerns; it's used for protective

21   custody.  That's Exhibit 412 from the -- from the evidentiary

22   hearing, that it's used for investigatory reasons for

23   protective custody.  That's the testimony of SL.  And the

24   recent declaration of RF.

25       And so a special master or 706 neutral is a regular

1  practice that courts engage in in prison litigation for this

2  purpose, whether -- where there's allegations of malice on one

3  hand but on -- incompetence on the other.  And either that

4  lead to a finding of deliberate indifference or a violation

5  of -- of constitutional rights.

6       And the special master or the neutral can go in and make

7  all of these individualized remedial orders and look at the

8  policies, the procedures, and how they actually function on a

9  day-to-day level and make specific remedial orders or

10  recommendations rather than parties needing to come to the

11  court every week when something new happens because of the

12  current state that the facility is in.

13       **MS. MATTIOLI:**  Your Honor, the only response I have

14  on that is that we still are talking about a preliminary

15  injunction, which requires -- that -- we're talking about

16  relief at the beginning of the case without having engaged in

17  robust discovery.

18       If we would like to proceed on an expedited basis to the

19  merits, that is something that we have agreed we can do.

20       There is no evidence to suggest that they cannot wait to

21  hire an expert on the merits.  There is no evidence of

22  imminent irreparable injury that justifies a mandatory

23  preliminary injunction at this stage in the case.

24       I anticipate that both sides will hire experts to inform

25  the Court as to the ultimate relief.

1          **MR. NIMNI:**  Your Honor --

2          **THE COURT:**  I still haven't heard about the

3   difference, then, with a special master versus a 706 neutral.

4      Do you want to address that or not?

5          **MS. MATTIOLI:**  Your Honor, the only cases that I read

6   that talked about the 706 neutral expert were cases where the

7   parties had jointly agreed to retain an expert for the

8   purposes of informing the Court.

9          **MR. NIMNI:**  Your Honor, on the 706 neutral, I think

10   what I was discussing with *Armstrong* is instructive where

11   there -- there was a neutral appointed by the Court to look at

12   some of the disability issues and the medical issues.  But

13   then retaliation issues came to the fore, and the Court

14   widened the mandate of that neutral.

15      And then just as to whether the violations are imminent,

16   I -- I won't belabor the point.  I think we've had argument on

17   it.  You heard from witnesses and declarations that

18   retaliation and fear of reporting are consistent and ongoing

19   right now.

20      But just one minor point about, for example, the strip

21   searches and the using the bathroom -- watching people using

22   the bathroom.  One reason to grant a preliminary injunction,

23   of course, is to stop the constitutional violations that are

24   ongoing and that are imminent right now.  That's the standard.

25      Another reason that courts often grant some form of

1    preliminary relief is because there are concerns that

2    plaintiffs won't be able to properly litigate the case during

3    the pendency of the discovery and trial because of the actions

4    of defendants.  And that's at least what the allegations were

5    and what the testimony as from witnesses here, is that they

6    felt like -- and JL testified to this in particular, that she

7    had to choose between using the bathroom and seeing her lawyer

8    because she knew that -- despite having a stomach issue, she

9    knew she was going to be watched and surveilled while using

10   the bathroom, and that was embarrassing and shameful, and that

11   she was just trying to see her lawyer and there was no

12   evidence that contraband was coming in through the legal

13   visits.

14       So I think the preliminary injunction is particularly

15   necessary when there are allegations of retaliation that might

16   impact the ability to litigate the -- the case to fruition.

17       **MS. MATTIOLI:**  Your Honor, the response to that, as

18   we pointed out in our post-evidentiary brief, the bathroom

19   escort policy had not, to my understanding, been an issue at

20   the facility before because they had never entertained an

21   eight-hour legal visit.  That was another unprecedented

22   situation that the facility was dealing with.

23       And it is required by policy that during a contact visit,

24   inmates are -- that visual supervision is maintained even

25   while they're using the rest room.  That is a national BOP

1  policy.  It is not a local supplement.  It is not something

2  unique to FCI Dublin.

3      But the situation of having someone need to use the rest

4  room during a legal visit might have been a unique situation

5  that had never come up before.

6      And, again, Your Honor, just to touch back on the

7  *Armstrong* case, that -- my recollection is that that case had

8  been litigated for over decades.  And there were numerous

9  findings of noncompliance with prior remedial orders.  I --

10     We are just at the beginning of this case.  There isn't

11  evidence to suggest, outside of the one issue --

12         **THE COURT:**  So -- so, Ms. Mattioli, I have a full

13  docket.

14         **MS. MATTIOLI:**  I understand.

15         **THE COURT:**  I cannot be going out to Dublin and

16  spending a full day every week, every month.

17         **MS. MATTIOLI:**  Understood.

18         **THE COURT:**  So how else do I -- and how else do I get

19  my concerns addressed without having a neutral to assist and

20  doing spot checks to make sure they're doing what they're

21  supposed to be doing?

22         **MS. MATTIOLI:**  Your Honor could inform the

23  facility -- I mean, you've -- you've referenced SHU policies,

24  but it's unclear which policies you are concerned about.

25     It seems that the only examples that have been raised in

```
 1   this proceeding are based on inmates' subjective beliefs as to
 2   why they were placed in SHU.  There are documents to support
 3   many of the reasons.  I looked at several of them in preparing
 4   for the original hearing.
 5        There's a huge drug problem at the facility.  Many -- you
 6   know, community punishment is imposed where there is
 7   contraband found in common areas.
 8        Job assignments are rotated when people are suspected of
 9   trafficking drugs.
10        The same is true for the use of visual searches.  It -- it
11   is required regardless of whether contraband is recovered.
12   And I understand there's a -- a concern that legal visits
13   should be different.  But that is a national policy, and it
14   serves a legitimate penological interest.  And it actually
15   protects the inmates who are housed at Dublin from the risk of
16   illegal substances being introduced.
17             THE COURT:  They -- there is no evidence that
18   that's -- that that is a -- that is how drugs are coming in.
19             MS. MATTIOLI:  There's no --
20             THE COURT:  There's no evidence of that.  And their
21   own records show that there's no evidence of that.
22             MS. MATTIOLI:  Your Honor, I -- I disagree.
23             THE COURT:  There was one incident over the course, I
24   think, of 18 months.
25             MS. MATTIOLI:  And there have been other incidents
```

1   where drugs have not been recovered as part of the contraband

2   search because they've been inside the person's body.  It's

3   not the -- the purpose of contra- -- the visual search is not

4   only for detection.  It's a deterrent so that

5   inmates understand --

6           **THE COURT:**  Deterrent that wasn't used prior, and the

7   timing can matter.  And it certainly is not the primary source

8   of how drugs are -- are getting in.

9       I haven't heard anything on the other side about legal

10  mail, and perhaps that's because that seems to be the primary

11  door through which drugs are going into the facility.

12      Still haven't answered my question, which is that I have

13  concerns, which I will articulate.  I cannot personally be out

14  there micromanaging Dublin.

15          **MS. MATTIOLI:**  Understood.

16          **THE COURT:**  And I can't do -- and you all are

17  advocates, so I don't trust either side.  No offense.  But you

18  have a job to protect your client.  They have a job to be

19  advocates.  And it is not as black or as white as either of

20  you make it.  It is gray.

21      And I certainly learned an awful lot by spending those

22  nine hours out there.  And I learned that the perspective of

23  each side is not wholly accurate of what my own assessment is.

24      So the plaintiffs will go off and they will be advocates,

25  but I can tell you a lot of what they've written, I don't

1      agree with from what I've seen and what I've heard.

2          The same exists on your side as well.

3          So I have -- like I said, I have concerns, and I think

4      these concerns need to be addressed and can't wait a year.

5              **MS. MATTIOLI:**  If I could, Your Honor --

6              **THE COURT:**  And that's what you're asking me to do.

7      You're all asking me to wait a year to have a full-blown

8      trial, and then I have to issue an order.

9          And I don't think these -- I don't think the concerns that

10     I have can wait a year.

11             **MS. MATTIOLI:**  Your Honor has expressed the rightful

12     position that documents and evidence matter.  And when BOP has

13     been asked to bring in evidence to support the things that

14     it's doing, it has provided that evidence.

15         The inmates that you spoke with that raised issues, the

16     evidence demonstrates that the documents that BOP maintains

17     contradict what you were told by the inmates.  BOP was in the

18     process of already remedying the issues that were brought to

19     your attention.

20         This is an issue that is common in prison litigation, is

21     that inmates often don't understand the reasons that things

22     are being done.  They don't understand what prison officials

23     are doing when they are doing it.  And we have acknowledged

24     issues with communication, with the inmate population.  And

25     this administration has committed to transparency and

1    communication with the inmate population.

2        And if that is an issue that this court would like to

3    continue to address, I could tell you that the facility would

4    be open to improving communication with the inmate population,

5    as they have been.

6        But the issue isn't that things aren't being done or that

7    SHU is being used to retaliate.  The issue that the inmates'

8    subjective perception of what is going on isn't always

9    accurate.  And there is another side to the story.  And there

10   are documents and there are -- there is evidence and there are

11   policies to support what the prison is doing.

12           **THE COURT:**  All right.

13       Anything else?

14           **MR. NIMNI:**  Just very briefly, just to address a

15   couple of quick points on documents and evidence regarding the

16   SHU.  I would just direct the Court both to our briefing but

17   also back to Exhibit 412 which talks about an individual who

18   reported sexual abuse and then was placed in the SHU and at --

19   I believe there's a notation that says "PC" for "protective

20   custody," "no security issue" or "no security concern" and

21   that that's just one of the two SHU logs that defendants

22   produced for the evidentiary hearing.

23       And similarly, the indication with the situation with RF

24   is the only reason that she was put in there was a single line

25   listed in the exhibit that they attached, which Your Honor can

1    look at.

2       And so I think that their representation that they have

3    all this documentation shows that the SHU is used for X, Y, or

4    Z reason doesn't comport, both with the testimony, but also

5    with their own documents.

6       And just one additional note on -- on a special master.  I

7    think Ms. Mattioli correctly stated that Your Honor has made a

8    number of orders.  And the facility has been generally, with

9    some few exceptions, good about complying with those orders to

10   bring in documents and to -- to do particular things.

11      But the question for a special master isn't just, are they

12   good at following the particularized orders of the court, but

13   the special master takes on the role of doing those

14   particularized orders so the court doesn't continue to need to

15   make findings on an inaccurate notice about a disciplinary

16   policy or phone use or blankets or all these sorts of things.

17      That's -- that can be the role of the special master, not

18   just to enforce the court's orders but to actually construct

19   remedial procedures both for the SHU and other things that are

20   concerning to -- to plaintiffs and potentially to both

21   parties.

22          MS. MATTIOLI:  Again, Your Honor, I would just

23   maintain that this case is not like the other cases.  The

24   historic overcrowding cases, the systemic issues that needed

25   the appointment of the special master.

1        The -- I believe the evidence has demonstrated there are

2   mechanisms in place to report if the SHU is being used

3   inappropriately, and they are being reported.  And they are

4   being investigated.

5        I can represent to you that OIG is investigating this

6   issue with RF.  There are other entities who are responsible

7   for oversight of potentially criminal activity.  The facility

8   has demonstrated --

9            **THE COURT:**  Criminal activities don't necessarily --

10   are not -- do not equate with constitutional issues.

11            **MS. MATTIOLI:**  I understand, Your Honor.

12        But free-standing allegations of retaliation often come

13   with allegations of criminal activity.  And it is a

14   potentially criminal act to violate a court order, to transfer

15   somebody for a retaliatory purpose.  Those are serious

16   allegations.  And the bureau takes them seriously.

17        There are mechanisms to report -- the -- the PLRA requires

18   exhaustion.  We don't have any evidence that any individual

19   plaintiff has exhausted any of these claims.

20            **THE COURT:**  And, again, we are not talking about

21   individual issues.

22        Individual issues are merely examples or datapoints.  They

23   give color to the issue of policy.  We have to -- and -- and I

24   need to be focused on policy.

25            **MS. MATTIOLI:**  Understood, Your Honor.

 1          **MR. NIMNI:**  And I won't belabor the point, Your

 2   Honor, but just one PLRA note.  The PLRA does require

 3   exhaustion, but that's an affirmative defense that defendants

 4   need to raise.  Plaintiffs don't need to plead it or put it in

 5   their preliminary --

 6          **THE COURT:**  You know how many --

 7          **MR. NIMNI:**  -- findings.

 8          **THE COURT:**  Do you know how many cases I have from

 9   prisoners?

10          **MR. NIMNI:**  I do, Your Honor.

11          **THE COURT:**  We all have them.  We understand what the

12   individual approach looks like.

13          **MR. NIMNI:**  Even -- even for class cases, though.

14   Ms. Mattioli is correct that our named plaintiffs -- not our

15   organizational plaintiff, but our named plaintiffs would have

16   to exhaust.

17      But just wanted to know that that's an affirmative defense

18   that they need to raise and isn't at issue for this hearing --

19          **MS. MATTIOLI:**  And on that point, Your Honor, we have

20   not answered the complaint yet because the complaint has both

21   claims for injunctive relief as well as damages, individual

22   damages claims.

23      With the newly amended complaint, they also have

24   individual FTCA claims.  It seems incompatible to bring a

25   class case for injunctive relief alongside damages claims

1    that -- beside the point, the other damages cases are also

2    stayed until July.

3        I was not exactly sure how the Court wanted to address

4    that issue with the injunctive claims being pled in the same

5    complaint.

6             **THE COURT:**  Well, that's a case management issue.

7             **MS. MATTIOLI:**  Understood.

8             **THE COURT:**  And there have been plenty of times

9    when -- in fact, I think it was June of 2021.  I tried a class

10   action that included five individual claims.  So you can try

11   class actions that have injunctive relief for the class only,

12   and then the individuals in their testimony, they have -- they

13   assert at the exact same time their individual claims.

14       So it's not -- it's not uncommon in the civil arena.  It

15   can be done.  It's a case management issue.

16            **MS. MATTIOLI:**  Understood.

17            **THE COURT:**  So you still have to answer the

18   complaint.  When -- when is the answer due?

19            **MS. MATTIOLI:**  I believe with the filing of the

20   amended complaint, we have a new answer deadline.  I'm not

21   sure off the top of my head.

22            **MR. NIMNI:**  Yeah.

23            **THE COURT:**  When was it filed?

24            **MR. NIMNI:**  I believe last Friday we filed the

25   amended complaint after the plaintiffs exhausted their FTCA

```
 1     administrative process.

 2             MS. MATTIOLI:  I will work with Mr. Nimni, Your

 3     Honor, on that issue.

 4             THE COURT:  Okay.

 5             MR. NIMNI:  Apologize.  I'm being told it was

 6     February 9th.

 7             THE COURT:  Okay.

 8        So probably -- I don't know if it's 30 days or 20 days.

 9     It's one of those.

10             MS. MATTIOLI:  Okay.

11             THE COURT:  All right.

12        Anything else on the injunction?

13             MR. NIMNI:  Nothing further from plaintiffs, Your

14     Honor.

15             MS. MATTIOLI:  No, Your Honor.

16             THE COURT:  Okay.  Do you wish to be heard on the

17     order to show cause?

18             MR. NIMNI:  I can speak briefly unless you'd prefer

19     to hear from defendants first.

20             THE COURT:  I don't intend to hold the defendant in

21     contempt.  I am satisfied that they sought permission or

22     advice from their attorneys.  And so I put this on the

23     attorneys' plate.  That's the contempt piece.

24        Whether there should be sanctions?  That wasn't really

25     addressed.
```

```
1           You want to start.

2              MS. MATTIOLI:  Yes, Your Honor, I believe as we did

3     address in our response that there is no good-faith exception

4     to civil contempt per se.  But contempt is not appropriate.

5              THE COURT:  So you understand there's a difference

6     between contempt and sanctions.

7              MS. MATTIOLI:  Correct.  And I was going to -- when

8     we are talking about sanctions, good faith does matter.  And

9     it was my good-faith misunderstanding of this court's order

10    that gave the advice to the prison that they could temporarily

11    transfer RF.  And I did not seek permission from the Court to

12    do so.

13       I do not believe that sanctions would be appropriate

14    for -- in that case.

15             MR. NIMNI:  The Court has pretty wide discretion over

16    the type of sanctions you might want to grant if you want to

17    grant sanctions.  We think sanctions would be appropriate for

18    two reasons.

19             THE COURT:  On whom?

20             MR. NIMNI:  On --

21             THE COURT:  On Ms. Mattioli?

22             MR. NIMNI:  It seems like your -- Your Honor has

23    determined that this is the role of the attorneys in giving

24    advice about the transfer of RF.

25       And so we think that either Ms. Mattioli or BOP counsel,
```

1    potentially Mr. France, might be the subject of sanctions if

2    that's the focus of this court's inquiry.

3        The --

4            **THE COURT:**  Do I sanction you for violating my order

5    to maintain certain things under seal?

6            **MR. NIMNI:**  I would hope not, Your Honor.  But if,

7    Your Honor is interested in doing so, I would ask that I be

8    able to brief the issue.

9            **THE COURT:**  So --

10           **MR. NIMNI:**  I -- as far as the transfer, we do

11   believe that the Court's order was clear.  But also

12   importantly, that any transfer for hunger strike activity

13   independently violates the First Amendment, so there are two

14   bases why the transfer just should the not have occurred.

15       But in our perspective, as we discussed if the preliminary

16   injunction -- in the discussion on the preliminary injunction,

17   this also is just indicative of other deeper problems with the

18   system at FCI Dublin for putting people in the SHU, for

19   transferring them, for evaluating.

20       And so if this court --

21           **THE COURT:**  Okay.

22           **MR. NIMNI:**  -- didn't want to engage in --

23           **THE COURT:**  So at this point, you need to segregate

24   the conduct of the lawyers from the conduct of the BOP

25   officials.  Because the record that is in front of me is that

1    the BOP officials did not do this without checking with the

2    lawyers.

3              **MR. NIMNI:**  Understood, Your Honor.

4              **THE COURT:**  So -- it wasn't as if, you know, they

5    were apparently sensitive enough to the issue that they

6    checked with the lawyers.

7              **MR. NIMNI:**  Understood, Your Honor.

8              **THE COURT:**  Okay.  So --

9              **MR. NIMNI:**  We --

10             **THE COURT:**  -- Ms. Mattioli had nothing to do with

11   Dublin until somebody appointed her and 30 other U.S.

12   Attorneys to represent, you know, these individuals in all of

13   these individual cases and in this class action.

14             **MR. NIMNI:**  Yes, Your Honor.  And my sympathies to

15   Ms. Mattioli for her appointment.

16        I think -- just to reiterate, I do this think the order

17   was clear and that it's an independent First Amendment

18   violations, so sanctions -- either monetary sanctions or if we

19   were talking about BOP officials --

20             **THE COURT:**  We're not.

21             **MR. NIMNI:**  -- credibility sanctions might be

22   appropriate.

23        But we're not so I think --

24             **THE COURT:**  Do you want me to sanction Ms. Mattioli

25   what -- how do you want me the sanction her?

```
 1           MR. NIMNI:  It's up to the discretion of your court.
 2    I understand her good faith arguments and some of the
 3    confusion, so I don't think a harsh sanction is necessary, but
 4    there was a clear court order, and it is a clear
 5    constitutional violation.
 6           THE COURT:  And, Mr. France, how do you want me to
 7    sanction him?
 8           MR. NIMNI:  I --
 9           THE COURT:  Or is it -- or is it Mr. Huang or France?
10    Who is it.
11           MR. NIMNI:  It's not clear to me exactly the chain of
12    advice that led to this particular action, and so I think the
13    sanction would be most appropriately applied to the person
14    that was most responsible for giving that advice.  Whether
15    that's Ms. Mattioli, Mr. France -- I don't believe there's
16    evidence that it was Mr. Huang, but I might be mistaken.
17           THE COURT:  All right.
18       Response?
19           MS. MATTIOLI:  If the question is who is responsible
20    for the advice, it was me.  Mr. France and I discussed the
21    issue.  And I did ask him to communicate to plaintiffs'
22    counsel without prompting from anyone that she had been
23    transferred temporarily.
24       The purpose for the transfer was explained in Dolgov's
25    declaration.  It was not done to discourage her from
```

1    exercising her First Amendment rights.

2        The concern was that she was coaching or coercing other

3    inmates in SHU to participate in a demonstration that could

4    have led to safety risks for those individuals.

5        That was the reason that was stated to me as to why we

6    need to temporarily transfer her to regain safety and security

7    in the SHU.

8        I told them -- the advice of counsel was treat her as you

9    would any other inmate.

10       And if you have a legitimate supportable basis to transfer

11   her temporarily -- she was never not in FCI Dublin custody.

12   She was temporarily removed from the SHU to stabilize the

13   population.  And as soon as she left, everybody resumed

14   eating.

15       Those were the reasons that were stated to me, was that

16   this is a safety issue that we would do regardless of who she

17   is.

18       There was nothing stated to me that it had anything to do

19   with her exercising her right to protest.  The issue was

20   encouraging others.

21       And I maintain that if presented with the same evidence

22   today, I would have made a different call.  And I would have

23   sought permission from this court and would have laid out

24   those reasons for Your Honor clearly and explicitly and asked

25   for permission to temporarily transfer her.

1    I apologize to the Court that that was not done.  It was

2    an honest mistake based on a -- a misinterpretation of an

3    order that came through in a flurry of activity, which has

4    happened many times in this case.

5    We were preparing for a large evidentiary hearing that was

6    going to last multiple days with multiple witnesses and not

7    having undertaken any discovery.  That was a huge ask.

8    This order came out in response to plaintiffs' request for

9    increased access to inmates to prepare for that hearing.  So

10   when I read that order, I interpreted it incorrectly as being

11   time limited to preparation for the evidentiary hearing.

12   That was my mistake.  And I realize now that it was

13   incorrect.

14           THE COURT:  All right.  Anything else?

15           MR. NIMNI:  Nothing further from plaintiffs, Your

16   Honor.

17           MS. MATTIOLI:  No, Your Honor.

18           THE COURT:  If this had been 2012 and I was a

19   brand-new judge -- or 2010 or 20- -- 2008 and I was brand-new

20   judge, I'd probably order sanctions.

21   I've been around long enough to know that lawyers make

22   mistakes.  The point is you need to follow my orders.

23           MS. MATTIOLI:  Understood, Your Honor.

24           THE COURT:  I told Mr. Deveney -- and I see him

25   here -- that inmates get put in the SHU for violating orders

1  in Dublin, and I don't want to have to put him in my holding

2  tank for violating my order, so don't do it.

3      Don't do it on either side.

4      It's discharged.

5          **MS. MATTIOLI:**  Thank you, Your Honor.

6          **THE COURT:**  All right.

7      What else do you want to discuss today?

8          **MR. NIMNI:**  Nothing further from plaintiffs, other

9  than the issue that my co-counsel raised, which I believe is

10  limited to a sidebar confidential group that I am not a part

11  of.

12          **MS. MATTIOLI:**  That's correct, Your Honor.  But

13  nothing further from the government.

14          **THE COURT:**  All right.

15      Then you'll be hearing from me in writing I'll take it

16  under submission.

17      And we're adjourned.

18          **MR. NIMNI:**  Thank you, Your Honor.

19          **THE COURT:**  The sidebar will not be on the record,

20  Raynee.  And we're adjourned.

21          **MR. NIMNI:**  Thank you, Your Honor.

22          **MS. MATTIOLI:**  Thank you, Your Honor.

23          (Proceedings were concluded at 11:14 P.M.)

24                      --o0o--

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Friday, March 1, 2024