United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**CALIFORNIA COALITION FOR WOMEN PRISONERS, ET AL.,**

Plaintiffs,

v.

**UNITED STATES, ET AL.,**

Defendants.

**Case No.:** 4:23-cv-4155-YGR

**ORDER GRANTING THE MOTION FOR CLASS CERTIFICATION;**

**GRANTING IN PART AND DENYING IN PART THE MOTION FOR PRELIMINARY INJUNCTION;**

**GRANTING THE RELATED SEALING MOTIONS**

Re: Dkt. Nos. 10, 11, 45, 75, 99, 102, 111, 143, 159, 162, 168, 176, 178, 184, 191, 197, 199, 204, 206, 209

The Federal Correctional Institute ("FCI") Dublin is a dysfunctional mess. The situation can no longer be tolerated. The facility is in dire need of immediate change. Given the record presented and the Court's personal observations, further magnified by recent events, the Court finds the Bureau of Prison ("BOP") has proceeded sluggishly with intentional disregard of the inmates' constitutional rights despite being fully apprised of the situation for years. The repeated installation of BOP leadership who fail to grasp and address the situation strains credulity. The Court is compelled to intercede.

For the reasons set forth below, the Court **GRANTS** plaintiffs' motion for class certification and **GRANTS IN PART AND DENIES IN PART** the motion for preliminary injunction. The Court issues these, and other anticipated Orders so that the constitutional rights of those imprisoned at the prison are no longer at significant risk. The Court shall appoint a special master forthwith. The Court will issue further Orders narrowly tailored to address the ongoing retaliation which has resulted from the convictions and sentencings of five prison officials, including the previous warden, for criminal sexual abuse and sexual contact. The special master shall assist the Court to ensure compliance with these orders. The Court has scheduled a conference on March 15, 2024, to further address the issue.

United States District Court
Northern District of California

# I.   BACKGROUND

## A.   PROCEDURAL BACKGROUND

Plaintiffs California Coalition for Women Prisoners, R.B., A.H.R., S.L., J.L., J.M., G.M., A.S., and L.T. bring this putative class action against defendants the United States of America; BOP; BOP Director Colette Peters; and the FCI Dublin Warden.[1] Pending before the Court is plaintiffs' Motion for Class Certification under Federal Rule of Civil Procedure 23(b)(2), their Motion for a Preliminary Injunction on their Eighth Amendment and First Amendment claims, and various related sealing motions. (Dkt. Nos. 10, 11, 45, 75, 99, 102, 111, 143, 159, 162, 168, 176, 178, 184, 191, 197, 199, 204, 206, 209.)[2]

Plaintiffs filed their complaint on August 16, 2023, and amended in January 2024. (Dkt. No. 1 and 152, First Amended Complaint, "FAC".) In August of 2023, they concurrently filed their motion for a preliminary injunction and class certification. (Dkt. Nos. 10 and 11.) This case was related to the forty-eight-plus other civil rights cases currently pending against various FCI Dublin officers who have been criminally indicted or convicted. (*See* Case No. 4:22-cv-5137-YGR, Dkt. No. 152.) Because criminal proceedings against various officers are pending, the Court stayed all requests for individual damages until July 19, 2024.

The Court presided over an evidentiary hearing held from January 3–9, 2024, considered the parties' briefing filed before and after the evidentiary hearing, entertained oral argument on the December 11, 2023, and February 27, 2024, and conducted an in-person nine-hour inspection of the FCI Dublin prison and its satellite camp.

Shortly before the evidentiary hearing in late December, plaintiffs filed a request for an emergency order directing FCI Dublin to allow plaintiffs' counsel more time to prepare their witnesses for the upcoming hearing. (Dkt. No. 79.) Plaintiffs' counsel was concerned that their

---

[1] Plaintiffs also bring suit against several FCI Dublin officers in their individual capacities. Because these claims are not relevant for either class certification or preliminary injunctive relief, the Court does not address these claims here.

[2] The Court also **GRANTS IN PART** the related sealing motions. To the extent publicly referenced in this Order, the Court finds that the information is not sufficiently sensitive to outweigh the right of the public to have access to the information. To expedite release of this Order, the Court will address plaintiffs' objections under separate cover.

clients had been "conspicuously and inexplicably targeted by strip searches, cell searches and confiscation of legal papers" and that FCI Dublin was planning on transferring some of their witnesses to other facilities. (*Id.*) One potential witness who had earlier agreed to meet with plaintiffs' counsel and testify refused to do so after notice of the strip search. (*Id.*)

The Court granted the motion in part and convened an emergency hearing on January 2, 2024. Given the severity of the retaliation allegations, the Court requested the United States Attorney for the Northern District of California to attend the January 2, 2024, hearing and ordered defendants not to transfer "any person on the witness lists filed in this action until further order of th[e] Court." (*Id.*)

During the evidentiary hearing, the Court heard from nine FCI Dublin officials: warden Dulgov, associate warden Deveney, executive assistant and satellite camp administrator Agostini (collectively, "the New Leadership"), special investigative specialist ("SIS") lieutenant Putnam, deputy captain E. Quezada, regional family support coordinator Newman, health services administrator Wilson, chief psychologist Mulcahy, and correctional camp counselor Campos; chief of the Office of Internal Affairs ("OIA") Reese; and fourteen inmates.

After the hearing, the Court paid an unannounced visit to FCI Dublin on February 14, 2024. It spent nine hours touring first the prison, including medical services, dentist's office, various housing units, the cafeteria during lunch, the UNICOR call center, the commissary, and the Special Housing Unit ("SHU"); then the satellite camp, with its two housing units and the non-functioning kitchen. During its visit, the Court spoke confidentially to at least one hundred inmates who readily approached throughout the day. In addition, the Court spoke to correctional staff, medical staff, and counselors.

### B.   FACTUAL BACKGROUND

#### 1.   The Facility

FCI Dublin is an all-female facility composed of a low security federal prison and an adjacent minimum-security satellite camp located in Alameda County, California.[3] These are

---

[3] FCI Dublin, *Federal Bureau of Prisons*, (https://www.bop.gov/locations/institutions/dub/).

United States District Court
Northern District of California

BOP's two lowest security classifications.[4] It was built in July of 1974. The adjacent satellite camp was built as a federal detention center for adult males until 2014 when BOP repurposed it. FCI Dublin, unlike many other BOP facilities, operates under a modified 6:00 a.m. to 2:00 p.m. schedule. The facility currently houses roughly 550 incarcerated persons at the prison and over 100 at the satellite camp.[5] The great majority of persons who are incarcerated at FCI Dublin were convicted of drug offenses[6] and more than 90% are survivors of trauma.[7]

FCI Dublin consists of three housing units with two wings each. There are staff offices downstairs in each of the wings for counselors, unit management, and custody staff. Multiple computers are available in each unit in an open area. Each unit also contains separate rooms with a monitor for video visitation and newly-installed pilot phones to allow incarcerated persons to contact their attorneys and other inmate care confidentially. The prison contains medical and dental services, food service, recreation areas, the commissary, the visitation areas, the administration building, and other outbuildings for work details.

The SHU contains sixteen cells in two wings. Each cell has its own toilet and shower. The SHU cells can house two incarcerated persons at a time. The only visibility the cells have is a window slit facing the internal hallway, along with a slot on the cell door for officers to pass those held in the SHU food and hygiene items. Inmates are offered an hour of daily time for "recreation" in outdoor cages. The SHU has a small room with one computer and a phone which the staff refer to as its "law library."

The satellite camp is adjacent to the prison and has two wings, a non-functioning kitchen, a law library, and a common area in the middle of each wing for recreation. Each wing has eight showers that are commonly used, and each cell contains its own toilet. Various cells have been stripped of the tiles on the floor.

---

[4] Bureau of Prisons, *Inmate Security Designation and Custody Classification*, (https://www.bop.gov/policy/progstat/5100_008cn.pdf).

[5] *See, supra,* Note 3.

[6] Until recently, and when the sexual abuse investigation detailed further below was ongoing, the facility was overcrowded. Ex. O, BOP, *Dublin Task Force Report*, March 2022 at 4–6.

[7] Tr. 40:22.

United States District Court
Northern District of California

1

2. **History of Sexual Abuse**

FCI Dublin, like many other federal prisons that house female inmates, has a history of sexual abuse.[8] In 1999, after a criminal investigation, BOP entered into a settlement to address and reduce the risk of horrific sexual abuse at the prison.

Twenty years later, a whistleblower's complaint sparked a Department of Justice ("DOJ") criminal investigation that inculpated FCI Dublin officers ranging from the warden to the chaplain. The first, Ross Klinger, charged in June of 2021, served as a former BOP correctional officer and recycling technician.[9] He pled guilty to, among other things, having sexual intercourse with various incarcerated women. After his arrest, Klinger agreed to cooperate with DOJ's investigation into the widespread sexual abuse at FCI Dublin, which was incredibly valuable as the majority of incarcerated victims and witnesses were "extremely reluctant" to speak with federal prosecutors.[10]

Shortly after, DOJ filed criminal indictments against various officers, including the previous warden Ray J. Garcia.[11] As the warden, Garcia had the sole authority to decide whether a complaint made under the Prison Rape Elimination Act ("PREA") should be referred to criminal authorities. He was also responsible for ensuring that FCI Dublin complied with PREA by training BOP regional staff, overseeing PREA officers at FCI Dublin, and administering PREA auditing. Instead, he "created and perpetuated a culture of abuse at FCI Dublin." As the most powerful person at FCI Dublin, Garcia held the power to liberate—by granting compassionate release motions—and

---

[8] On December 13, 2022, the bipartisan Permanent Subcommittee on Investigations launched an investigation into the sexual abuse of female prisoners in BOP custody. It concluded that in at least two-thirds of federal prisons there were substantiated allegations of sexual abuse over the past decade. Sexual Abuse of Female Inmates in Federal Prisons Staff Report, *Permanent Subcommittee on Investigations, United States Senate*, (https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf) ("PSI report").

[9] *United States v. Klinger*, Case No. 4:22-cr-31-YGR (pled guilty to six counts of sexually abusing a ward).

[10] *Id.*, Sentencing, January 24, 2024.

[11] *United States v. Garcia*, Case No. 4:21-cr-429-YGR. After a jury trial, Garcia was found guilty of three counts of sexual abuse of a ward, four counts of abusive sexual contact, and one count of false statements to a government agency.

United States District Court
Northern District of California

1    further punish—by placing incarcerated women in the SHU.[12] He used both tactics to coerce

2    incarcerated women at the facility into sexually abusive relationships and ensure their silence.

3    Many of the women he abused testified that they were terrified he would place them in the SHU,

4    where they would be confined to "little cells, like dungeons," in retaliation. Before he was arrested

5    and during trial, Garcia insisted that the incarcerated women who testified against him were lying

6    for "personal gain."[13]

7           Given Garcia's "egregious conduct," it was "no surprise that the staff Garcia supervised

8    were *themselves* abusing inmates."[14] In total, eight FCI Dublin officers were indicted and six have

9    been sentenced.[15] Many of the incarcerated persons who DOJ interviewed during its criminal

10   investigation were initially reluctant to speak out, both because they distrusted whether law

11   enforcement would believe them and for fear of being placed in the SHU in retaliation.[16] Several

12   who testified were, in fact, placed in the SHU after reports of sexual abuse.

13          DOJ's investigation into the sexual abuse at FCI Dublin is ongoing.

14                **3.       Current Conditions and BOP's Knowledge Thereof**

15          During the evidentiary hearing, as noted, fourteen inmates testified about the conditions at

16   FCI Dublin. The Court received evidence that BOP established the "Dublin Support Team Task

17   Force" to investigate and provide support to FCI Dublin in light of DOJ's ongoing criminal

18

19   _____

20   [12] *Generally*, Dkt. No. 145, Sentencing Memorandum of United States.

     [13] *Id.*

     [14] *Id.*

21   [15] *United States v. Bellhouse*, Case No. 4:22-cr-66-YGR (convicted of two counts of sexual

22   abuse of a ward and three counts of abusive sexual contact); *United States v. Highhouse*, Case No.
     4:22-cr-16-HSG (pled guilty to two counts sexual abuse of a ward, two counts of abusive sexual

23   contact, and one count of making a false statement); *United States v. Chavez*, Case No. 4:22-cr-
     104-YGR (pled guilty to one count of sexual abuse); *United States v. Smith*, Case No. 4:23-cr-110-

24   YGR (indicted for several counts of sexual abuse of a ward, abusive sexual contact, and one count
     of aggravated sexual abuse); *United States v. Nunley*, Case No. 4:23-cr-213-YGR (pending

25   indictment for sexual abuse of a ward, abusive sexual contact, and making false statements); *United

26   States v. Jones*, Case No. 4:23-cr-212-YGR (pled guilty to six counts of sexual abuse of a ward and
     one count of making a false statement).

27   [16] *See, e.g.*, *United States v. Bellhouse*, Case No. 4:22-cr-66-YGR, Dkt. No. 177, Sentencing

28   Memorandum of United States (noting evidence that one woman who was sexually abused by
     Officer Bellhouse was placed in the SHU after reporting the abuse).

investigation.[17] In March 2022, the Task Force internally published its findings and recommendations, which the Court has since reviewed and considered as part of the evidentiary record. Importantly, and as a preview, the report corroborates much, though not all, of the inmates' testimony and the Court's own conclusions regarding the facility's existing environment. It also demonstrates the extent and duration of BOP's own knowledge of those conditions.

Despite the criminal indictment of various FCI Dublin officers, which had occurred almost a year earlier, allegations of ongoing sexual misconduct continued.[18] Some of these allegations were not only relayed by inmates but corroborated by FCI Dublin staff. OIA Chief Reese confirmed as much.

As part of the evidentiary record, plaintiffs submitted forty-seven declarations in August 2023. Of those, the focus related mainly to claims of sexual misconduct stemming from the prior criminal cases. The Court is skeptical of some of the claims made in the declarations and in-court testimony. First, the Court is not at all convinced that any of the inmates ever used the term "sexualized environment." That is a term drafted by lawyers and either fed to clients or regurgitated by lawyers in court. Second, those who testified that the criminal cases and sentences had no impact on deterrence were not believable. The unannounced visit's purpose was in part to ask a much larger group of inmates more open-ended questions to discern whether sexual misconduct at FCI Dublin was still pervasive.

The Court finds the allegation that a "sexualized environment" persists today at FCI Dublin exaggerated. Most of the sexual misconduct testified about dated back to then-warden Garcia's administration and was charged in the criminal cases. That said, the Court also does not believe the government's assertion that it has eradicated the issue of sexual misconduct. The truth is somewhere in the middle—allegations of sexual misconduct have lingered but to characterize it as pervasive goes too far. However, and as the Court finds herein, because of its inability to promptly investigate the allegations that remain, and the ongoing retaliation against incarcerated persons who report misconduct, BOP has lost the ability to manage with integrity and trust. While BOP has, for

---

[17] Dublin Task Force Report at 8.

[18] *See, supra,* Note 25; some of these allegations led to the criminal indictment of Officer "Dirty Dick" Smith. *See also*, Dublin Task Force Report at 7, 10–11.

United States District Court
Northern District of California

example, installed additional cameras throughout the facility, additional facility cameras can only do so much. Many prison facilities have for that reason started using body cameras as well, both for the protection of the inmates and the staff. FCI Dublin has not.

### 4.    Staffing, Lack of Communication, Lack of Trust

The New Leadership consistently testified that FCI Dublin was effectively in dire straits upon their arrival. First, the majority of the staff had insufficient training. Over fifty percent had been hired during the COVID years and had not been provided normal training. Second, to say morale was low was an understatement. Staff did not feel supported as was corroborated by the annual administrative assessments conducted at FCI Dublin. Moreover, staff did not trust nor welcome the new arrivals. Quezada testified to the hostility and anger from staff, including the loosening of the lug nuts on her vehicle. Deveney described FCI Dublin as "the worst institution I've come across."

The source of the problems were apparent: the stigma associated with the ongoing criminal investigation, the high cost of living in the Dublin area, the failure of the federal pay scale to be competitive with similar local or state institutions, and the failure of the General Services Agency to authorize on-site house trailers for staff.[19] Because of the high cost of living, in addition, staff was often forced to live far away, which makes commutes long, morale low, and recruitment and retention difficult.[20]

None of these reflections were new. In March 2022, the Task Force reported the same. It concluded that abusive conduct, lax oversight, and an atmosphere of intimidation had combined to create an institutional culture of abuse that persisted "even when staff turnover occurred." Another "key observation" was the "significant lack of communication" between FCI Dublin staff and its incarcerated population. This again was quite evident during the evidentiary hearing when the Court questioned the Dublin officers about the means and manner with which they were communicating with the inmates. Whether on topics as significant as national policy or as routine as uniform changes, FCI Dublin staff failed to communicate effectively.[21]

---

[19] Dublin Task Force Report at 24.
[20] Dublin Task Force Report at 24.
[21] *See also*, Dublin Task Force Report at 11–12.

United States District Court
Northern District of California

1    The testimony at the evidentiary hearing collectively revealed that because of the pervasive

2    lack of communication, and the fact that over 90% of the inmates suffer from mental distress, the

3    ways in which the New Leadership was communicating with inmates, even if reasonable, was

4    viewed as "retaliation" or punishment. During the hearing, inmates repeatedly reported that they are

5    often threatened with the SHU for making any kind of report, whether for malfeasance like sexual

6    abuse or the enforcement of their rights, such as filing a medical complaint. This was not new

7    information; the Task Force had acknowledged that "[r]etaliation in the face of staff threats is

8    reprehensible and the Bureau has and must take ongoing steps to ensure inmate safety."[22]

9    The evidentiary hearing exposed the extensive distrust between staff and inmates though,

10   admittedly, pockets of trust do exist. Some staff are genuinely invested in the mission. Others are

11   reported to use profanity and derogatory language routinely, a basic failure to model respect. The

12   Task Force reported the same.[23]

13   Incarcerated persons consistently testified and advised during the visit that unit managers

14   were either inaccessible or "lacked a full understanding" of how to manage important

15   administrative functions, such as how the FIRST Step Act process works or how to process

16   compassionate release requests. None of these deficiencies are new.[24] Because of them, inmates

17   appeared to have no access to routine processes, such as the forms to file administrative

18   grievances.[25]

19   Incarcerated persons credibly testified that staff would single them out after testifying. This

20   is consistent with the New Leadership's own testimony that staff were hostile even to them.

21   Further, their failure to communicate and provide transparent explanations for operational changes

22   merely increased that distrust. Resorting to correctional "policies" that are not evidence-based—

23   such as a visual, or strip, search—*only after* incarcerated persons started engaging in

24   constitutionally-protected activities, such as meeting with their attorneys to file this suit, are

25

26   _____
     [22] Dublin Task Force Report at 12, 34–45 (FCI Dublin officer told inmates that if they were

27   to file any further grievance, "you will be got and go to SHU before you make it back.").
     [23] Dublin Task Force Report at 16–17.

28   [24] Dublin Task Force Report at 31, 33.
     [25] Dublin Task Force Report at 33.

1  logically viewed as retaliatory by the incarcerated population. Then-acting warden Dulgov's in-
2  court explanation for these operational changes was delivered in a defiant and entitled manner. The
3  Court finds he was and effectively deaf to the inmates' BOP-inflicted trauma, concerns, and needs.
4  The Court left the evidentiary hearing with grave concerns about his leadership abilities, motives,
5  and judgment. Recent events magnify the concern.

### 5. Medical and Mental Health Resources

7  The testimony and site visit demonstrated the significant lack of health services and severe
8  understaffing. Here, again, for the reasons referenced above, inmates believe that this lack of
9  services is intentionally retaliatory. The Task Force recognized as much[26] and testimony and
10 documents confirm that new leadership did not act to rectify the situation. Although onsite staff
11 claims to be up to date on medical appointments, it appears to have done so by disregarding inmate
12 concerns to clear the backlog. During its inspection, the Court heard a refrain so consistent from so
13 many inmates in different quarters and without prompting to demonstrate its reliability: in response
14 to their health concerns, medical staff told them to "lose weight and drink water." Additionally,
15 serious conditions, like possible breast cancer, are ignored because FCI Dublin does not have the
16 capacity onsite to treat them.[27]

### 6. Dilapidated Conditions and Lack of Programming

18 The dilapidated condition of the camp especially and the deplorable lack of programming
19 merely compound the problem. The Court observed mold, the lack of hot water for showers in
20 some of the units, and repeated refrains about the lack of warmth during the winter months. The
21 Court has issued orders addressing some of these issues with which FCI Dublin has complied but,
22 again, BOP knew about these problems years ago.[28] With respect to programming, FCI Dublin does
23 not comply with BOP policy. Evidence-based recidivism reduction programs, psychology
24 programs, and vocational and occupational training, among others, are either limited or nonexistent.

---

[26] Dublin Task Force Report at 25.

[27] Dublin Task Force Report at 26. Even when it did have the capacity, because of the toxic mistrust between staff and inmates, staff refused to process inmate paperwork for medical care. Medical staff refused to see inmates for urgent issues even when the Task Force members attempted to intervene.

[28] Dublin Task Force at Report at 20–21.

This lack of programming not only limits opportunities for enrichment and the wages incarcerated persons need to buy additional supplies at the commissary but also results in fewer opportunities to earn credits toward the FIRST Step Act and, therefore, longer sentences. BOP has done little to address the lack of programming since it was put on notice by the Task Force report. What limited programming was available, the Task Force noted, was distributed unevenly: inmates with longer sentences and Spanish-speaking inmates were unable to them.[29]

### 7.  Food Services and Religious Accommodations

During its unannounced visit, the Court observed other concerning conditions. Although not within the scope of this Order, among the concerns raised during the Court's unannounced visit were the restrictions on prayer groups, lack of adequate kosher meals, and lack of fresh and nutritious food. Incarcerated persons report that food service's carb-heavy offerings, unsurprisingly, have made them gain significant weight with an attendant increase in weight-correlated concerns, like diabetes. The Dublin Task Force itself observed that food served in the cafeteria, at times, was not "remotely consistent" with national BOP policy and "grossly inadequate."[30]

### 8.  Inadequate Response: Moss Group Report

After the Task Force published its report, FCI Dublin hired a private organization, the Moss Group, to address staff morale and institutional culture. This report was provided to the Court during the evidentiary hearing. The Moss Group, like the Dublin Task Force, concluded that the source of FCI Dublin's issues were: the lack of continuity among executive staff, the low staff morale of officers due to media attention and outside scrutiny, and the high cost of living in Dublin. Again, the Group observed a fear-based environment. It found that the lack of accountability helped perpetrate the "sexualized environment" that existed under Garcia and engendered distrust between staff and the incarcerated population. It recommended rebuilding an environment of professionalism with zero tolerance for abusive language or sexual misconduct, and leadership support for custodial staff.[31]

---

[29] Dublin Task Force Report at 17–19, 31.
[30] Dublin Task Force Report at 21–23.
[31] Moss Group, *Assessment Report, Building a Culture of Safety* at 11, 13.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Because of the "toxic" culture, staff fear that incarcerated persons will report them for

2    completing good operational practices, like cell searches, as retaliation. The newer ones fear that

3    they will lose their jobs due to inmate complaints, so they reported shying away from enforcing

4    rules. The spiral of distrust decreases safety and morale on both sides of the equation, and

5    ultimately, results in the facility not being able to deliver on its core mission.  The Moss Group

6    concurred with some of those assessments.[32]

7           **9.      Changes at FCI Dublin after the Dublin Task Force Report**

8    The New Leadership team[33] testified that, after DOJ's criminal investigation and BOP's

9    internal reckoning, BOP brought them in to "overhaul" FCI Dublin's executive team. Other

10   managerial staff was also hired. Each received new training, such as trauma-informed care.

11   Importantly, the reporting mechanism for sexual conduct, as well as other criminal activity,

12   changed. OIA is now in charge of investigating all serious but non-criminal employee

13   misconduct.[34] OIA is then required to submit any criminal misconduct, including sexual abuse, to

14   the Office of the Inspector General ("OIG"). Prior to his departure, associate warden Deveney was

15   named the PREA coordinator, in charge of monitoring PREA compliance and sexual assault

16   allegations brought within the prison. In addition, as noted, in compliance with the Task Force's

17   recommendations, FCI Dublin has installed many new cameras throughout its facility. FCI Dublin

18   now has 385 cameras in operation, more than any other facility in its region.

19   Currently, there is one chief psychologist, Dr. Mulcahy, at FCI Dublin along with three staff

20   psychologists and one drug treatment specialist.[35] Dr. Mulcahy's department provides several

21   services for inmates, including programming like the RESOLVE program for women have

22   previously been sexually abused or the Trauma Life Workshop. In addition, FCI Dublin recently

23   started working with Tri-Valley Haven, a rape crisis center that comes into the facility to provide

24   30 to 45-minute sessions for incarcerated persons.[36] Wilson is the current health services

25

26   _____

[32] Moss Group Report at 11, 13, 22.

27   [33] As the Court notes below, the New Leadership team has since been replaced.

[34] Dkt. No. 206-3 ¶ 3.

28   [35] Tr. 1044:11–13

[36] Tr. 1072.

administrator. In that position, he oversees both the provision of health care, including dental care, to the incarcerated population as well as its administration. Wilson testified that he oversees a staff of one vocational nurse, a registered nurse, a contractor nurse whose contract runs only for 120 days, an administrative assistant, a health information technologist, a full-time clinical pharmacist, and a part-time pharmacist.[37] FCI Dublin, however, only has one part-time physician who works 32 hours a week.[38]

### 10.   Post-Hearing Developments

At the end of its site visit, the Court told FCI Dublin staff that it had found out, through news reports, that FCI Dublin had transferred an incarcerated woman who testified at the evidentiary hearing, first to the SHU and then to another facility. It did so without prior authorization in violation of the Court's December 30, 2023, Order which unambiguously indicated: "Defendants are **Ordered Not to Transfer** any person on the witness lists filed in this action until further order of this Court." (Dkt. No. 88 (emphasis in original).) For that reason, the Court issued an Order to Show Cause why the government should not be held in contempt or sanctioned. (Dkt. No. 155.)

In addition, the Court issued an Order granting immediate, specific relief to plaintiffs based on emergency health and safety concerns observed at the satellite camp. (Dkt. No. 157.) Though the Court noted that it would not address all of plaintiffs' concerns until after the pending motions were fully briefed, it found that some required "immediate attention because they [fell] well below the standard of care required" of BOP. (*Id.*) First, it observed that, in one of the satellite camp units, only four of the eight showers were working and of those two had lukewarm water while the other two had only cold water. (*Id.*) The Court required FCI Dublin to ensure that all showers were in working condition and provided hot water by the end of February. (*Id.*) Second, it required FCI Dublin to have licensed contractors inspect the Satellite Camp for asbestos, black mold, and a possible gas leak. (*Id.*) It did so after observing black mold in the kitchen and housing units, hearing about possible asbestos problems from the inmates, and being told by every single inmate it

---

[37] Tr. 992–96.
[38] Tr. 992:10–11.

United States District Court
Northern District of California

1    talked to at the satellite camp that they had previously smelled natural gas throughout the facility.

2    Third, it ordered FCI Dublin to pass out an extra set of blankets to the incarcerated persons at the

3    satellite camp. (*Id.*) Finally, it ordered FCI Dublin to respond to various urgent medical requests it

4    had observed, including the outbreak of a possibly infectious skin rash. (*Id.*)

5        After its Order to Show Cause, the government provided a response as to why it had

6    transferred the incarcerated woman first to the SHU and then to another facility. Government

7    counsel noted that it had misunderstood the Court's Order and, after a hearing, the Court discharged

8    its contempt and sanctions Order.

9        In addition, FCI Dublin gave the women incarcerated at the satellite camp an extra blanket,

10    insured that seven of the eight hot showers were fixed, and contracted for mold, asbestos, and

11    natural gas inspections. Each of these inspections was carried out. Because of the Court's Order,

12    FCI Dublin also provided an additional health screening at the satellite camp.

13        On March 11, 2024, the FBI executed a search warrant at FCI Dublin. The New Leadership

14    plus a captain were walked off the facility. The defendant then filed a notice to inform the Court

15    that it had, again, replaced FCI Dublin's entire executive team. (Dkt. No. 211.)

16    **II.   CLASS CERTIFICATION**

17        Plaintiffs move to certify a class of "[a]ll people who are now, or will be in the future,

18    incarcerated at FCI Dublin and subject to FCI Dublin's uniform policies, customs, and practices

19    concerning sexual assault, including those policies, customs, and practices related to care in the

20    aftermath of an assault and protection from retaliation for reporting an assault." (Dkt. No. 11,

21    "Class Certification Mot." at 2.) They do so solely under Fed. R. Civ. P. 23(b)(2) and, at this

22    juncture, for the purpose of adjudicating their motion for preliminary injunction on a classwide

23    basis. Defendant opposes.

24        **A.   LEGAL FRAMEWORK**

25        A party moving for class certification must first demonstrate that it can meet the four

26    requirements of Rule 23(a): (1) **numerosity:** the class is so numerous that joinder of all members is

27    impracticable; (2) **commonality:** there are questions of law or fact common to the class; (3)

28    **typicality:** the claims or defenses of the representative parties are typical of the claims or defenses

United States District Court
Northern District of California

United States District Court
Northern District of California

1   of the class; and (4) **adequacy:** the representative parties will fairly and adequately protect the

2   interests of the class. In addition, certification under Rule 23(b)(2) is proper only if "the party

3   opposing the class has acted or refused to act on grounds generally applicable to the class."

   **B.   RULE 23(A)**

       **1.   Numerosity**

       A class must be sufficiently numerous that joinder of all members is impracticable. Fed. R.

   Civ. P. 23(a)(1). "Although there is no exact number, some courts have held that numerosity may

   be presumed when the class comprises forty or more members." *Krzesniak v. Cendant Corp.*, No.

   05-cv-5156, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007). Plaintiffs contend that this

   requirement is met because, as of August 2023, BOP reported that there were 674 people

   incarcerated at FCI Dublin. The government does not dispute this.

       For that reason, the numerosity element is satisfied.

       **2.   Commonality**

       Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P.

   23(a)(2). To satisfy this requirement, the common questions must be of "such a nature that it is

   capable of classwide resolution—which means that determination of its truth or falsity will resolve

   an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v.

   Dukes*, 564 U.S. 338, 350 (2011).  For purposes of Rule 23(a)(2), "even a single common question

   will do." *Id.* at 359 (cleaned up). In prison-conditions cases, commonality is satisfied where the

   lawsuit challenges "systemic policies and practices that allegedly expose inmates to a substantial

   risk of harm," even where there are "individual factual differences among class members." *Parsons

   v. Ryan*, 754 F.3d 657, 681–82 (9th Cir. 2014) (collecting cases) (internal quotation marks and

   citation omitted).

       Plaintiffs argue that common issues include whether: (1) the BOP policies and practices

   place plaintiffs at a substantial risk of harm because they permit sexual assault to occur, do not

   provide effective reporting mechanisms, fail to impose accountability, and facilitate retaliation; (2)

   whether defendants, who have known about staff sexual abuse and harmful conditions at FCI

   Dublin for years, have been deliberately indifferent to that risk; (3) whether defendants abdicated

United States District Court
Northern District of California

1    their oversight obligations to ensure adequate medical and mental health responses have been taken

2    to mitigate the risk of harm to the class; and (4) whether, as part of their denial of effective

3    reporting mechanisms, defendants' denial of access to counsel violates the constitutional rights of

4    the class. Plaintiffs submit that BOP and FCI Dublin's policies and practices constitute common

5    evidence capable of answering these questions "in one stroke." *Wal-Mart*, 564 U.S. at 350.

6          The Court agrees with that BOP and FCI Dublin's policies and practices will provide

7    common proof of whether FCI Dublin has placed its incarcerated population at risk of sexual abuse,

8    retaliation, and medical neglect. Anyone incarcerated at FCI Dublin is subject to the same BOP-

9    wide policies on sexual assault prevention and reporting as well as their specific implementation by

10   the officer overseeing reporting of PREA allegations at FCI Dublin. Plaintiffs proffer that FCI

11   Dublin has a prison-wide custom of placing incarcerated persons accused of falsely reporting or

12   actually committing sexual assault in the SHU, even if the investigation ultimately concludes they

13   did neither. And there is evidence in the record that FCI Dublin's medical and mental health

14   services are understaffed. Because this is sufficient for commonality purposes, the Court does not

15   consider whether all the questions put forth by plaintiffs can be answered by common proof.

16         The government's arguments otherwise do not persuade. Its opposition largely rests on the

17   argument that "individual fact and legal questions predominate over questions of policies related to

18   sexual assault." This, as the government conceded at the February 27, 2024, hearing, is the wrong

19   standard—whether individualized issues predominate is the standard for a damages class under

20   Rule 23(b)(3), not an injunctive class under (b)(2). *See Parsons*, 754 F.3d at 688 (holding that Rule

21   23(b)(2) "does not require that the issues common to the class satisfy a Rule 23(b)(3)-like

22   predominance test.") Standard aside, the government's focus on individualized issues misstates the

23   relief sought. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 844 (1994) (internal citation omitted)

24   (holding that the question, for deliberate indifference under the Eighth Amendment, is whether

25   prison officials "exposed a prisoner to a sufficiently substantial risk of serious damages to [their]

26   future health," not whether a particular prisoner was particularly at risk). The motion does not

27   contend that the individual, past harms suffered by named plaintiffs call for class treatment; instead,

28   it argues that class certification is warranted because plaintiffs are all subject to a collective, future

risk of injury under BOP policy and FCI Dublin custom. *See Parsons*, 754 F.3d at 676. As the Ninth Circuit explained in *Parsons*, when affirming the certification of a prison-conditions injunctive class, "[a]lthough a presently existing risk may ultimately result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers exactly the same constitutional injury when [they are] exposed to a single . . . policy or practice that creates a substantial risk of serious harm." *Id.* at 678. What named plaintiffs' declarations do—along with the hours of testimony presented at the evidentiary hearing, the hundreds of pages submitted as exhibits in support, and the Court's own inspection of FCI Dublin—is present evidence that such policies and practices exist. That volume of evidence is sufficient for the type of class sought here, the government's arguments otherwise notwithstanding.

The rest of the government's opposition on this point focuses on whether plaintiffs' claims are meritorious, rather than common. Again, this is the wrong question at class certification. Whether FCI Dublin places its incarcerated population at risk for retaliation, for example, is a question that will be answered on the basis of its common customs even if the ultimate answer is that it does not.

For those reasons, the commonality element is satisfied.

### 3. Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "The typicality requirement looks to whether the claims of the class representatives [are] typical of those of the class, and [is] satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted) (alterations in original), *abrogated on other grounds by Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022). The requirement is "permissive," and the representative's claims need only be "reasonably co-extensive with those of absent class members." *Id.* (internal citation and quotation marks omitted).

The class certification motion argues that named plaintiffs are typical because they have all spent significant time at FCI Dublin; have experienced the same BOP and FCI Dublin policies and practices as the rest of the putative class; and have suffered the same alleged harms. The government argues, without elaboration, that the typicality requirement is not met because named plaintiffs have suffered different types of harm. "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citation and quotation marks omitted). That each named plaintiff's alleged harm is factually distinct does not mean that their claims are of a distinct nature. Named plaintiffs bring the same type of claims—risk of sexual abuse and retaliation—for the same type of circumstances—incarceration at FCI Dublin, under the same policies and practices. For that reason, they meet the permissive typicality requirement.

The typicality requirement is satisfied.

### 4. Adequacy

For adequacy, Rule 23 requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requires inquiry into whether named plaintiffs and their counsel have any conflicts of interest with other class members, and whether plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). The government does not dispute that plaintiffs and their counsel will adequately represent the class.

Plaintiffs have already expended significant time meeting with their counsel to present the case, preparing declarations in support of the class certification and preliminary injunction motions, and attending an evidentiary hearing in which their testimony spanned several days. Class counsel has extensive experience litigating class actions on prison conditions in particular and have already shown themselves willing to vigorously represent their clients' interests.

The adequacy element is satisfied.

United States District Court
Northern District of California

1

**C.    RULE 23(B)(2)**

Rule 23(b)(2) permits certification of a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." To obtain certification under Rule 23(b)(2), plaintiffs must describe "the general contours of an injunction that would provide relief to the whole class, that is more specific than a bare injunction to follow the law, and that can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019) (quoting *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014)).

Plaintiffs seek the following injunctive relief: appointment of a special master that will oversee a comprehensive audit conducted by an outside agency of all FCI Dublin policies concerning staff sexual abuse, reporting, and retaliation; implementation of policies recommended by the outside auditor in consultation with organization plaintiff California Coalition for Women Prisoners; FCI Dublin's submission to quarterly site visits and provision of quarterly public reports regarding staff sexual abuse and retaliation, grievances against facility staff, and use of internal punitive measures; end of the use of solitary confinement or punitive segregation at FCI Dublin until it is determined that such confinement will not be used in a retaliatory manner; development of a substantive process for the return of non-contraband items seized from individuals' cells during searches; development and implementation of policies and procedures to provide high-quality offsite medical and mental healthcare for all members of the class; creation of a system to provide class members with documentation of reporting and participating in staff misconduct and to streamline and support requests from class members for related relief; and ensuring that all class members have consistent, timely, and confidential access to legal counsel. (Dkt. No. 10-48.)

Plaintiffs have sufficiently described the "general contours" of the injunction they seek, along with the common course of conduct for which it generally applies. Plaintiffs seek, for example, to stop the retaliatory use of the SHU and end the medical neglect of those incarcerated at FCI Dublin. For that reason, certification of this prison-conditions class is warranted. Indeed, the

"primary role" of Rule 23(b)(2) "has always been the certification of civil rights class actions." *Parsons*, 754 F.3d at 686.

The Court therefore **GRANTS** plaintiffs' motion to certify a Rule 23(b)(2) class. It also **GRANTS** plaintiffs' motion to appoint the named plaintiffs and class counsel as its representatives.

## III.   PRELIMINARY INJUNCTION[39]

### A.   LEGAL FRAMEWORK

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Alternatively, a preliminary injunction may issue where "serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor" if the plaintiff "also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. This is the Ninth Circuit's "sliding scale" approach, in which "the elements of a preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* at 1131. In all cases, at an "irreducible minimum," the party seeking an injunction "must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Pimental v. Dreyfus*, 670 F.3d 1096, 1105–06 (9th Cir. 2012) (quoting *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009)). "Where, as here, the government opposes a preliminary injunction, the third and fourth factors merge into one inquiry." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021).

In the context of prison litigation, the Court cannot give prospective relief without meeting the requirements of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626. The PLRA requires that any preliminary injunction sought "must be narrowly drawn, extend no further than

---

[39] In addressing these arguments, the Court will at times reference evidence submitted under seal. In addition, shortly before issuance, BOP once again changed FCI Dublin's executive team. The Court still relies on the testimony given by the past warden, assistant warden, satellite camp administrator, and captain.

United States District Court
Northern District of California

necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." *Id.* § 3626(2). In addition, the Court must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief" and respect principles of comity. *Id.* "At the same time, however, federal courts 'must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners.'" *Porretti*, 11 F.4th at 1047 (quoting *Brown v. Plata*, 563 U.S. 493, 511 (2011)). A preliminary injunction under the PLRA automatically expires after 90 days "unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." 18 U.S.C. § 3626(2).

## B.   LIKELIHOOD OF SUCCESS

Plaintiffs argue that they are likely to succeed on both their Eighth Amendment deliberate indifference and First Amendment retaliation claims.[40] The government challenges both.[41]

### 1.   Eighth Amendment

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (cleaned up). By prohibiting "cruel and unusual punishments," the Eighth Amendment both "places restraints on prison officials" and "imposes duties" on them. *Id.* at 832. Prison officials are restrained from sexually abusing incarcerated persons because "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th

---

[40] Though plaintiffs also request injunctive relief on their Fifth Amendment claim, *see* FAC ¶¶ 258–62, they did not brief this claim in their preliminary injunction briefing, so the Court does not address it here.

[41] The government argues in a footnote in its post-evidentiary hearing opposition that the Court should not consider plaintiffs' First Amendment retaliation claim because it was briefed only in their post-evidentiary hearing brief. Putting aside that substantive arguments raised in footnotes are disfavored, the government had ample notice that plaintiffs sought injunctive relief on their retaliation claim from both plaintiffs' initial brief, evidence presented at the evidentiary hearing, and their post-evidentiary hearing briefs. The Court therefore considers both the Eighth and First Amendment claims here.

United States District Court
Northern District of California

Cir. 2000) (quoting *Farmer*, 511 U.S. at 834). They are also duty-bound to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832 (internal quotation marks and citations omitted). For that reason, Eighth Amendment claims fall into "three broad categories": failure to address the "serious medical needs of prisoners"; challenges to the conditions of confinement; and assertions that prison staff used excessive force against a prisoner. *Bearchild v. Cobban*, 947 F.3d 1130, 1140 (9th Cir. 2020) (internal citations omitted).

Whatever the category of claim, prison officials violate the Eighth Amendment "only when two requirements are met": the "deprivation alleged must be, objectively, sufficiently serious" and the prison official must have, subjectively, acted with "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834 (internal quotation marks and citation omitted). "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. A prisoner seeking prospective relief "for unsafe conditions," does not, however, need "to await a tragic event such as an actual assault before obtaining relief." *Id.* at 845 (cleaned up).

Plaintiffs allege two categories of Eighth Amendment claims here: **(a) excessive force**: plaintiffs allege that FCI Dublin has a "sexualized environment" that continues to place its incarcerated population at imminent risk of sexual abuse despite the criminal convictions of prison officials ranging from the previous warden to chaplain and BOP's subsequent replacement of all previous prison management; and **(b) inadequate medical and mental health services:** plaintiffs argue that its medical and mental health services are woefully understaffed, subjecting its incarcerated population—including survivors of sexual abuse committed by previous prison officials—to medical neglect.[42] The Court addresses both.

---

[42] Throughout plaintiffs' FAC, in their preliminary injunction briefing, at the evidentiary hearing, and in the Court's own inspection of FCI Dublin, the claims for serious medical neglect and unconstitutional conditions of confinement were raised. The claims sound in the Eighth Amendment. *See Farmer*, 511 U.S. at 832. Because the Court gave both parties the opportunity to be heard on the medical and mental health services available at FCI Dublin and, given the urgency of need the Court itself witnessed, it considers these claims here while acknowledging that plaintiffs' papers are unhelpfully vague as to the grounds for relief.

United States District Court
Northern District of California

### a.      Risk of Sexual Abuse

The parties do not dispute that the incarcerated persons at FCI Dublin were previously subjected to egregious, systematic sexual abuse by the very person charged with protecting them from such misconduct. Nor do they dispute that then-warden Garcia fostered a corrupt culture of misconduct and impunity so pervasive that DOJ has so far criminally indicted eight officers. What the parties do dispute, heatedly, is whether FCI Dublin is still demonstrating deliberate indifference to the incarcerated population's risk of sexual abuse.

***Objectively serious deprivation.*** There can be no question that the sexual abuse that many incarcerated persons suffered at FCI Dublin was objectively horrific. Because the Court tried and sentenced many of these officers, it understands the backdrop well. One woman was raped in 2019 by then-chaplain Highhouse, a man many incarcerated at FCI Dublin sought out because "you can always trust a chaplain."[43] Highhouse used the incarcerated woman's religion to coerce her into giving him oral sex and then proceeded to rape her for months.[44] She was threatened with the SHU if she reported Highhouse and was told nobody would take the word of an incarcerated woman over the prison chaplain. Another incarcerated woman reported that then-officer Jones took her to the warehouse, locked her in, raped her, and then ejaculated on her face.[45] Another officer witnessed the exchange and, instead of reporting the abuse and protecting her, started calling her "Becky," a slang term for oral sex.[46] A Spanish-speaking incarcerated woman was allegedly raped by then-officer Smith and felt so trapped she attempted to commit suicide.[47] The officer that found her, she alleges, pepper-sprayed her and hand-cuffed her still-bleeding wrists.[48] She was later placed in the SHU after reporting the abuse.[49] Some officers' disregard for the incarcerated population was so

---

[43] *United States v. Highhouse*, Case No. 4:22-cr-16-HSG-1, Dkt. No. 23, United States' Sentencing Memorandum at 3.

[44] *Id.*

[45] *United States v. Jones*, Case No. 4:23-cr-212-YGR-1, Dkt. No. 20, United States' Sentencing Memorandum at 2.

[46] Dkt. No. 10-3, J.L. Decl. ¶ 5.

[47] Dkt. No. 10-30, C.A.H. Decl. ¶¶ 4, 7.

[48] *Id.* ¶ 7.

[49] *Id.* ¶ 8.

United States District Court
Northern District of California

pervasive it became a joke: "it's not PREA if it's pre-approved."[50] These accounts are a small, but representative, sample of the sexual abuse testimony the Court has heard. It is because of accounts like these that the Court found the previous warden, and certain members of his staff, so morally and ethically corrupt it imposed sentences substantially more onerous than the Sentencing Guidelines recommended.[51]

A more difficult question presented is whether people incarcerated at FCI Dublin are still at risk of sexual abuse. In support, plaintiffs present allegations of sexual abuse spanning from the Garcia to the Dulgov administrations. Because a preliminary injunction requires an imminent need for relief, the Court summarizes only the evidence postdating DOJ's criminal investigation and FCI Dublin's executive overhaul.

In March 2022, one incarcerated person testified that then-officer Gacad started harassing her.[52] He "grabbed her butt," kissed her, and groped her every time she was on her work assignment.[53] Later, in May 2022, officer Gacad entered her cell at night, kissed her, and touched her genitals.[54] Another reported that then-officer Poole was sexually abusing an incarcerated woman, had choked her, and had threatened her into silence.[55] In July 2022, a transgender male inmate testified that officer Vazquez kissed him on the lips and made suggestive comments.[56] Several inmates complained that, in 2022, they were inappropriately groped by medical staff.[57] More recently, plaintiffs submitted evidence that an officer who was still working at FCI Dublin as of March 2024 had been accused of undressing and molesting an inmate repeatedly from April 2022 to September 2022.[58]

---

[50] Dkt. No. 10-7, J.D. Decl. ¶ 6.

[51] *See, e.g.*, *United States v. Garcia*, Case. No. 4:21-cr-429-YGR, Dkt. No. 166, Judgment.

[52] Dkt. No. 10-15, S.L. Decl. ¶ 4.

[53] *Id.* ¶ 5.

[54] *Id.* ¶ 6.

[55] Dkt. No. 10-4, Decl. J.M. ¶ 6.

[56] Dkt. No. 10-14, Decl. A.H.R. ¶ 9.

[57] *See, e.g.*, Dkt. No. 31, Decl. M.S. ¶ 4.

[58] Dkt. No. 209-3 at 2.

United States District Court
Northern District of California

1    In 2023, several inmates reported that officers looked in on them while they were

2  showering.[59] In January 2023, officer Caston allegedly told an incarcerated woman that she had

3  "big-ass titties," groped her, and "rubbed his penis" on her backside.[60]  During the evidentiary

4  hearing, an inmate testified that she witnessed officer Celestial grope another incarcerated women's

5  breasts in March 2023.[61] The witness eventually reported what she had seen to then-SIS lieutenant

6  Putnam, who she testified told her she was not the first one that had reported officer Celestial for

7  abuse.[62] At the time of the hearing, she was still working under officer Celestial's supervision,

8  despite requesting a transfer because of the sexual abuse she witnessed.[63]

9    Most recently, an incarcerated woman, K.C., testified that in November 2023 officer

10  Narayan touched her lower back and told her that she was "lucky that there was cameras in the

11  room," "insinuating" that without cameras "something might happen."[64] After the incident, K.C.

12  was berated by another officer for "being inappropriate with [the officer's] coworkers" and was

13  fired from her job at food services, where she was paid $44 a month, and transferred to a job

14  cleaning showers, where she was paid only $5 a month.[65]

15    During the evidentiary hearing, the Court noted that the bulk of incidents proffered dated

16  from 2022 and therefore predated then-warden Dulgov's administration. The Court also noted that

17  it had imposed severe punishments on the convicted FCI Dublin officers to deter such misconduct.

18  Because of that, the Court expressed skepticism that the current conditions at FCI Dublin were "the

19  worst by far," as one incarcerated woman testified.[66] The Court was concerned that plaintiffs'

20  counsel was leading, or coaching, the witnesses to use incendiary and conclusory phrases like

---

[59] The government argues that the Court should consider only the testimony of the incarcerated women who testified at the evidentiary hearing and not the rest of the declarations. As stated, the Court focuses on more recent allegations of sexual assault, whether elicited through declaration or at the hearing. That said, the Court does not weigh heavily alleged sexual assault where the inmate did not witness or experience the alleged sexual assault.

[60] Dkt. No. 10-43, Decl. A.R. ⁋⁋ 5–8.

[61] Tr. 724:12–20.

[62] Tr. 740:17–20.

[63] Tr. 741:5–6.

[64] Tr. 927:8–14.

[65] Tr. 929:7–10, 20.

[66] Tr. 661:20–23.

1    "sexualized environment."[67] The Court's unannounced visit was conducted, in part, to ask open

2    ended questions intended to better discern the state of affairs at FCI Dublin.

3              During its nine-hour visit, the Court spoke to approximately 100 inmates it encountered

4    throughout the prison, from the various housing units, to medical and food services, the SHU, the

5    UNICOR facility, and the satellite camp. It asked almost every incarcerated person it encountered

6    whether they thought sexual misconduct was still prevalent at FCI Dublin. The answer, largely, was

7    no. Though the Court acknowledges the limitations of such a visit,[68] the Court still finds it

8    probative that, when asked spontaneously, many incarcerated persons responded that they did not

9    fear sexual misconduct.

10             Given all the evidence before it, the Court ultimately concludes that plaintiffs have

11   demonstrated that there is still a risk of sexual abuse. Ultimately, the Court finds that FCI Dublin is

12   still in transition. Although much of the incarcerated population does not fear abuse, plaintiffs have

13   presented incidents of sexual misconduct that occurred as recently as November of 2023. Further,

14   approximately twenty officers have been accused of misconduct, investigations are in progress, and

15   they remain on administrative leave. Taken as a whole, the record undermines the government's

16   argument that the Court should be confident that risk of sexual misconduct has been eradicated.

17             In so finding, the Court acknowledges that many of the officers currently stationed at FCI

18   Dublin are professional and respectful. The Court also agrees that FCI Dublin's new pilot phone

19   program and camera coverage are important steps in addressing the risk of sexual misconduct. Yet

20   a culture of distrust and impunity, perpetrated from the top of the prison hierarchy, does not change

21   overnight.

22             ***Deliberate indifference.*** Importantly, the Court finds that BOP's response to the crisis

23   unfolding at FCI Dublin demonstrates that it has been, and is, deliberately indifferent to plaintiffs'

24   risk of abuse. This is for at least three reasons. First, BOP has repeatedly failed to appoint a prison

25   warden who is capable of understanding and responding to the gravity of the situation. Just this

26   
       ---

27        [67] *See, e.g.*, Tr. 730:6–8.

28        [68]  For instance, the prison successfully passed a PREA evaluation even though then-warden
     Garcia assaulted an incarcerated woman while the auditors were at FCI Dublin. *United States v.
     Garcia*, Dkt. No. 145 at 2–3.

United States District Court
Northern District of California

1    week, BOP has had to install the third executive team at the prison in a little over two years because

2    DOJ has, again, walked-off the warden, associate warden, satellite camp administrator, and

3    captain.[69]

4        Second, the evidentiary hearing revealed that PREA allegations are not solely investigated

5    by OIG, as the government claims. Defendants themselves testified that an allegation of sexual

6    misconduct will often pass through several levels of scrutiny before it reaches OIG's desk. An

7    incarcerated person who wishes to report sexual misconduct will often do so directly to FCI Dublin

8    staff. As PREA administrator, then-assistant warden Deveney testified that he received many of

9    these grievances. He stated, however, that he did not simply forward all complaints to OIA. Instead,

10   he conducted his own "factfinding" of the allegation by, checking cameras for example, to

11   determine if he thought the grievance was credible.[70] These determinations were never

12   documented. If the assistant warden determined the grievance was not credible or substantiated,

13   then he simply closed it. Only when he independently determined that the allegation was credible

14   did he forward it to OIA. OIA then screens the grievance for allegations of criminal misconduct.[71]

15   If a grievance does implicate criminal misconduct, OIA forwards it to OIG. Part of the problem,

16   which Deveney conceded, is that FCI Dublin still does not have an institutional PREA plan in place

17   to ensure "that allegations of sexual abuse are referred for investigation to [the] agency with the

18   legal authority to conduct criminal investigations," as required by regulation. 28 C.F.R.

19   § 115.22(b).

20       Likely due to the different levels of scrutiny, within which prison staff can still exert ample

21   discretion, grievances of sexual misconduct can take months, if not years, to investigate and

22   prosecute. Chief Reese, the head of OIA, noted in her testimony that OIA first received complaints

23   of sexual abuse from FCI Dublin in 2019.[72] Yet the government did not start prosecuting these

24   cases, and requiring staff to leave FCI Dublin, until 2021.

25

26

27       [69] Dkt. No. 211.
         [70] Tr. 225:7–13.

28       [71] Tr. 229:13–24.
         [72] Tr. 333:25, 334:1.

Third, as the record shows, "zero tolerance" is not quite "zero." The Court is aware of at least two cases that demonstrate that not all officers accused of a PREA violation are now on administrative leave. In one, then-satellite camp administrator Agostini testified that, even though an incarcerated women reported that officer Cooper had walked in on her while she was showering, because the allegation did not constitute "physical touching," he was not placed on administrative leave.[73] In the second, an incarcerated woman filed a serious allegation of sexual abuse in March 2023.[74] Apparently because the incarcerated woman misspelled the name of the accused officer, BOP failed to conduct any further investigation. It was not until plaintiffs' counsel brought the grievance to the Court's attention and independently ascertained the officer's name that BOP placed him on administrative leave.[75]

FCI Dublin's incarcerated population will only be safe from further sexual predation when their allegations are properly reported and promptly investigated. BOP and FCI Dublin know this. BOP's failure to promptly respond to allegations in 2019 that then-Chaplain Highhouse was raping an incarcerated woman, for example, is why in 2021 he still had a position of power to abuse. Indeed, in its review of FCI Dublin's culture and practices, the Dublin Task Force warned that FCI Dublin's toxic culture was created, in part, because of a failure to follow policy. This culture could persist, the Task Force concluded, "even when staff turnover occurred."[76]

For those reasons, despite the progress that has been made, the Court has no option but to conclude that the government's response has been insufficient. The Court does not come to this decision lightly. Both sides have presented their case in all-or-nothing terms; both lack credibility and are counterproductive.  Instead, in making this extraordinary decision, the Court grounds itself in BOP's repeated failure to ensure that the extraordinary history of this facility is never repeated.

---

[73] Tr. 1131:4–9.

[74] Dkt. No. 209-3.

[75] Dkt. No. 209-3. The Court has read the administrative grievance filed by this plaintiff at Dkt. No. 209-5. The government's response—that it did not have sufficient information to determine the identity of the accused officer—is not credible. *See* Dkt. No. 206-3.

[76] Dublin Task Force Report at 11.

United States District Court
Northern District of California

### b.      Inadequate Medical and Mental Health Services

Plaintiffs argue that FCI Dublin does not provide its incarcerated population, many of whom are survivors of sexual abuse, with constitutionally adequate medical or mental health care. The government disagrees.

The Eighth Amendment proscribes the government from demonstrating "deliberate indifference to [the] serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To state a claim for medical neglect, an incarcerated person must demonstrate, first, a "serious medical need," and, second, that the prison acted or failed to act in such a harmful way that it evidenced deliberate indifference. *Id.* at 106. When presented with a case of systemic medical neglect, a court may consider "systemwide deficiencies in the provision of medical and mental health care[], taken as a whole." *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011). Deliberate indifference can be caused by either prison officers delaying or denying medical care or by prison medical staff providing inadequate care. *Estelle*, 429 U.S. at 104. An "inadvertent failure to provide adequate medical care," however, is not sufficient. *Id.* at 105.

***Serious medical need.*** Plaintiffs proffer evidence of serious medical and mental health care needs. In this regard, context matters. As then-assistant warden Deveney testified, 90% of FCI Dublin's incarcerated population have a history of trauma.[77] Many are survivors of sexual abuse that both predated and occurred during their incarceration at FCI Dublin. These survivors suffer from anxiety, depression, panic attacks, post-traumatic stress disorder, and paranoia.[78] Their trauma, at times, manifests itself physically, with incarcerated women reporting that they have lost their menstrual cycle and suffered from hair and significant weight loss, and partial vision loss.[79] Some have attempted to commit suicide.[80]

One incarcerated woman testified that, due to a botched surgery that occurred while she was incarcerated, she must self-administer an enema, a painful and protracted process that requires her

---

[77] Tr. 40:22. Agostini and Mulcahy concurred.
[78] *See, e.g.*, Dkt. No. 10-17, Decl. J.L.H. ¶ 10.
[79] *See, e.g.*, Dkt. No. 10-5, Decl. G.M. ¶ 20.
[80] Tr. 774:4–21.

United States District Court
Northern District of California

1    to completely undress.[81] Another reported suffering from fibromyalgia which causes her to

2    experience partial paralysis and, at times, leaves her in "excruciating pain."[82] During her

3    incarceration, one of the declarants testified that she lost her hearing to the point that she could not

4    work.[83] Another developed seizures while at FCI Dublin.[84] Many women incarcerated at FCI

5    Dublin have a history of cancer, including breast cancer and leukemia.[85]

6          During its unannounced visit, the Court also witnessed the serious medical and mental

7    health needs of FCI Dublin's incarcerated population. Inmates complained of dental care needs

8    ranging from wisdom teeth that needed removing, dental abscesses, cavities, and general lack of

9    oral hygiene. The Court witnessed that many women suffered from skin issues, especially at the

10   satellite camp where many women had a similar skin rash and one woman had lost all of her hair

11   since she was incarcerated. Diabetes is common, as are other weight-correlated issues. One

12   incarcerated person described diabetic foot sores so severe they had turned necrotic. Cancer,

13   including breast cancer, and reproductive health is a recuring concern. One incarcerated woman

14   brought along medical files detailing endometriosis so widespread she was afraid she would be left

15   barren while another testified that she needed to be scheduled for a hysterectomy.  Various women

16   complained about severe menstrual bleeding; one woman was pregnant. Many incarcerated persons

17   had suffered serious or chronic injuries, such as broken bones, a fractured eye socket, and carpal

18   tunnel.

19         The incarcerated women also shared their experiences with trauma. Many survivors talked

20   about enduring struggles with drug abuse, post-traumatic stress disorder, seizures, anxiety, and

21   suicidality. These symptoms, the Court witnessed, were magnified in the isolated confines of the

22   SHU.

23

24

25

26   [81] Dkt. No. 10-2, R.B. Decl. ¶¶ 9–10.
     [82] Dkt. No. 10-4, J.M. Decl. ¶ 17.

27   [83] Dkt. No. 10-11, L.T. Decl. ¶ 16
     [84] Dkt. No. 10-20, B.S. Decl. ¶ 15.

28   [85] Dkt. No. 10-2, R.B. Decl. ¶ 12; Dkt. No. 10-18, E.A. Decl. ¶ 15; *see also*, Dublin Task
     Force Report at 26.

United States District Court
Northern District of California

***Deliberate indifference.*** BOP understands that incarcerated persons "have a higher prevalence of chronic medical and mental health conditions than the general population."[86] Despite this, as staff testified and the Court observed, FCI Dublin's medical and mental health care is woefully understaffed. Then-assistant warden Deveney acknowledged that FCI Dublin only had fifty percent of the necessary medical and mental healthcare staff.[87] FCI Dublin, according to BOP policy, is missing three mid-level health care providers, one paramedic, and two physicians.[88] Perhaps most astonishingly, for a population that has recently ranged from 650 to over 700 incarcerated persons, FCI Dublin has only one, part-time, physician. Despite having the diagnostic equipment to conduct, for example, mammograms and x-rays onsite, it does not have the necessary specialists. For that reason, the examinations only occur in offsite facilities. At the time of the evidentiary hearing, FCI Dublin had neither an optometrist nor a dentist, though a dentist arrived the week of the Court's visit.

During the evidentiary hearing, the Court heard from health care administrator Wilson, who worked as a physician assistant for three months before he was promoted around December 2022 to oversee FCI Dublin's entire health care administration.[89] His promotion occurred after DOJ's criminal investigation began and the Dublin Task Force visited.[90]

Wilson stated that his first goal was to organize the process of attending to patients because, at the time, that process was "overwhelming" due to "multiple staffing changes [which] resulted in a distrust of the healthcare system."[91] The system for scheduling incarcerated patients was an "exponential kind of backlog of daily chaos," he testified.[92] In short, FCI Dublin was, and is, "short-staffed."[93] Only for truly urgent conditions, like a dental swelling or a urinary tract infection,

---

[86] FED. BUREAU OF PRISONS, CARE LEVEL CLASSIFICATIONS FOR MEDICAL AND MENTAL HEALTH CONDITIONS OR DISABILITIES 1 (2019), (https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf.)
[87] Tr. 1155.
[88] Tr. 998–99.
[89] Tr. 967:1–23.
[90] Tr. 967.
[91] Tr. 971:1–2.
[92] *Id.*
[93] Tr. 971:23.

1   is care provided in a timely fashion. Wilson testified that he did not proactively track whether he

2   was seeing incarcerated patients as frequently as BOP policy requires and emphasized that in fact

3   FCI Dublin was not in compliance.[94]

4       Dr. Mulcahy, FCI Dublin's chief psychologist, also testified that her department was

5   "understaffed" and her services and treatment programs were seriously oversubscribed.[95] For

6   example, Dr. Mulcahy estimated that one trauma-informed program offered, Resolve, had a 100-

7   person waitlist.[96] Other programs that were previously offered, like the Residential Drug Abuse

8   Program, were no longer offered.[97] She was "not surprised to hear," Dr. Mulcahy testified, that FCI

9   Dublin's survivors of sexual abuse did not feel like they had sufficient access to psychological care,

10  though she believed this was in part due to distrust of the staff.

11      That said, Dr. Mulcahy's department has been a consistently bright spot during these

12  proceedings. Though not universally beloved, which is to be expected, many of the incarcerated

13  women who testified stated that they appreciated Dr. Mulcahy's therapy and expertise. The

14  psychology department also does not seem to suffer from the same level of disfunction. According

15  to Dr. Mulcahy, all new inmates at FCI Dublin are always seen within fourteen days of arrival. She

16  had an internal program to ensure she kept track of all appointments and callbacks. While

17  acknowledging that "we know SHU placement can also increase risk of suicidal behavior," Dr.

18  Mulcahy testified that she regularly visits those incarcerated in the SHU.[98] Dr. Mulcahy stated that

19  she had recently implemented a diversion program to ensure that incarcerated persons who suffer

20  from opioid or other drug addiction received treatment and support instead of simply ending up in

21  the SHU.[99] More recently, Dr. Mulcahy reestablished a connection to an outside rape crisis center,

22

23

24      [94] Tr. 973:16–25 and 974:13–16. Later, the government brought charts to the evidentiary
        hearing that did, in fact, seem to track some of the care provided by the health administration. The
25      conflicting accounts, at this early juncture, are concerning enough that the Court recounts Wilson's
        initial testimony.
26      [95] Tr. 1059:10 and 1060:11–12.
        [96] Tr. 1059:1–10.
27      [97] Tr. 1048.
        [98] Tr. 1081:7.
28      [99] Tr. 1079.

United States District Court
Northern District of California

United States District Court
Northern District of California

Tri-Valley Haven.[100] Tri-Valley Haven provides counseling to the prison but slots are significantly limited.[101] Despite this, Dr. Mulcahy testified, the introduction of a rape crisis center was a positive step toward transparency.

The lack of staffing was confirmed during the Court's unannounced visit. The first place the Court inspected was health services.  Other than one lab technician, every door in health services was closed due to lack of staff. Those waiting in the dental clinic had waited months, if not longer, to receive dental care because FCI Dublin had only that very day acquired a dentist. The dentist, who was well-liked, had been asked to come out of retirement to help FCI Dublin provide care.

The impact of FCI Dublin's understaffed medical care system was stark. Throughout its nine-hour visit, the Court heard differing opinions on everything from the staff to the geese feces that covers every inch of the sidewalk. The one, universal opinion was that FCI Dublin's medical services were horribly inadequate. Beyond the lack of staffing, at least one member of the staff was routinely, and consistently, reported to be disrespectful and dismissive. To many concerns, the Court was told that the standard refrain from healthcare staff to inmates was "drink water and exercise." Not surprisingly, the incarcerated population has a deep mistrust of the medical staff.

The depth of medical need that the Court witnessed, as stated above, was serious. The leadership has failed to act with any sense of urgency or creativity in resolving the issue. The situation is compounded for Spanish-speaking inmates who may not have the necessary interpretation services to make their illnesses understood. Another incarcerated person, situated at the satellite camp, told the Court that they are so sparsely supervised that an inmate broke her wrist, was not seen for days, and secured a splint only because another inmate built one out of cardboard and spare clothes.

At times, staff errors derail the limited care afforded. One incarcerated woman testified that she received an ultrasound on the wrong breast because there was no physician available at FCI Dublin to fix a mistake made on the referral.[102] Another, who was concerned that without reproductive health treatment she would be left infertile, was repeatedly turned away. As noted

---

[100] Tr. 1069.
[101] Tr. 1072.
[102] R.B. Decl. ⁋ 16.

1    elsewhere, one survivor of a previous officer's sexual abuse tried to commit suicide and was

2    pepper-sprayed and hand-cuffed. It was not until the second time she tried to take her own life that

3    she was given the medical and psychological attention she needed.

4           At the satellite camp, inmates identified, and the Court observed, conditions that may

5    develop into significant health concerns. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) (holding

6    that it could not agree that "prison authorities may not be deliberately indifferent to an inmate's

7    current health problems but may ignore a condition of confinement that is sure or very likely to

8    cause serious illness and needless suffering the next week or month or year.") The satellite camp's

9    infrastructure is aging; incarcerated persons were concerned that some of the crumbling materials

10   contained now-friable asbestos. While touring the camp kitchen and some of the cells, the Court

11   could see visible spots of black mold.

12          Compounding the problem is that, even in the best of circumstances, FCI Dublin is not

13   equipped to handle some of the chronic or urgent needs of its incarcerated population. A Care Level

14   2 facility like FCI Dublin is meant for incarcerated persons who are "stable" and require clinician

15   evaluations every one to six months.[103] These types of facilities are best equipped to manage

16   conditions that require only routine monitoring. Care Level 3 inmates, on the other hand, are

17   patients who have chronic medical or mental health conditions that require more frequent

18   monitoring. Examples given by BOP guidance include patients with cancer in partial remission,

19   severe mental illness on medication, or high-risk diabetic foot.[104] Health administrator Wilson

20   testified that, as a Care Level 2 facility, FCI Dublin does not have any Care Level 3 patients.[105] Yet

21   during the evidentiary hearing and its unannounced visit, the Court heard from several incarcerated

22   women who seem to qualify for Care Level 3. Wilson implicitly acknowledged this; he testified

23   that someone who attempted to commit suicide twice, as one incarcerated woman who testified did,

24   should not be in a Level Care 2 facility.[106]

25   _____

26   [103] BOP CARE LEVEL CLASSIFICATIONS, *supra* note 86.

     [104] *Id.*

27   [105] Tr. 968:12–14 and 976:12–17. Later, Dr. Mulcahy testified that FCI Dublin in fact has
     the capacity to house some Care Level 3 incarcerated persons. Again, at this early juncture and in
28   the interest of laying out its concerns, the Court recounts Wilson's testimony as presented.

     [106] *See* Tr. 1034.

United States District Court
Northern District of California

While acknowledging that at this early stage the record before it is necessarily incomplete, the Court finds that plaintiffs are likely to demonstrate that defendants were deliberately indifferent to their serious medical needs. The evidence demonstrates that FCI Dublin's lack of staffing, along with other systemic deficiencies, has left FCI Dublin incapable of providing constitutionally adequate medical and mental health care. Moreover, in determining whether prison conditions amount to "unnecessary and wanton infliction of pain," courts can be informed by the "psychological trauma" carried by a particular incarcerated population. *See Jordan v. Gardner*, 986 F.2d 1521, 1525, 1528 (9th Cir. 1993) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Given the facility's shocking history of sexual abuse, and the fact that multiple defendants testified that 90% of its population suffers from trauma, FCI Dublin's failure to provide adequate staffing amounts to unnecessary punishment.

Defendants' response does not persuade. The remedial measures taken are too little, and too late. It should not have taken a Court order to prompt action.[107] Accordingly, the Court lacks confidence that defendants will act differently.[108] BOP's own Dublin Task Force detailed many of the exact same concerns the Court witnessed in its unannounced visit two years ago. Yet the situation remains relatively the same. The Task Force raised the issues of (i) mold in the satellite camp; (ii) the lack of adequate staffing of the medical and mental health care; (iii) the monthslong wait times for even urgent problems, like breast cancer; and (iv) the serious distrust of staff. The

---

[107] As previously noted, the Court issued orders following its visit for immediate, specific issues based on emergency health and safety concerns at the satellite camp. As relevant, it ordered the government to schedule asbestos, mold, and infectious diseases inspections and requested the medical histories of incarcerated women who had particularly concerning symptoms. Dkt. No. 157.

[108] The government responded by sending the medical histories of those two individuals and ordering an evaluation by an infectious disease expert. To its credit, the government had been aware of the concerning symptoms of those incarcerated individuals which the Court raised. It is not clear to the Court, however, that their symptoms were addressed with sufficient urgency.

With respect to the outbreak of a red rash the Court witnessed, this concern was not addressed by medical staff because it was raised by various incarcerated women but rather because the Court ordered it. This quick inspection turned up some serious issues, including a case of ringworm. Dkt. No. 199-3. Without the Court's intervention, it is not clear that this highly infectious disease would have been caught.

Task Force advised that FCI Dublin's medical care was a "significant liability risk to the agency but more importantly, may result in lasting harm to the inmates."[109] BOP has knowingly, and therefore deliberately, failed to address that risk.

### 2.     First Amendment[110]

"Of fundamental import to prisoners are their First Amendment rights to file prison grievances and to pursue civil rights litigation in the courts." *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005) (cleaned up). "Without those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices. And because purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." *Id*.

Within the prison context, a First Amendment retaliation claim has five elements: "(1) An assertion that a state actor took some adverse action against an inmate; (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."[111] *Rhodes*, 408 F.3d at 567–68. In determining whether the government's action reasonably advanced a legitimate correctional goal, courts must "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (quoting *Sandin v. Conner*, 515

---

[109] Dublin Task Force Report at 26.

[110] Though it is not within the scope of plaintiffs' preliminary injunction motion, one of the issues raised during the Court's unannounced visit was that FCI Dublin is failing to provide Jewish inmates with a sufficiently nutritious kosher diet. *See Shakur v. Schriro*, 514 F.3d 878, 885 (9th Cir. 2008) (A "prison's refusal to provide a kosher meat diet implicates the Free Exercise Clause.") Should it become apparent in the course of this litigation that the provision of diets to fulfill inmates' sincerely held beliefs raises classwide constitutional questions, the Court will address them then.

[111] In its post-evidentiary hearing opposition, the government suggests that plaintiffs can only succeed on their First Amendment retaliation claim if they show that prison officials were deliberately indifferent. This state-of-mind requirement applies only to Eighth, not First, Amendment claims, as laid out above. For that reason, the Court declines to apply this standard in evaluating plaintiffs' First Amendment claims.

United States District Court
Northern District of California

1    U.S. 472, 482 (1995)). "In sum, there must be mutual accommodation between institutional needs

2    and objectives and the provisions of the Constitution that are of general application." *Wolff v.*

3    *McDonnell*, 418 U.S. 539, 556 (1974).

4         Plaintiffs argue that FCI Dublin continues to retaliate against those who report misconduct,

5    including sexual abuse. That retaliation has taken many forms: transfer to the SHU; cell searches;

6    loss of privileges like visitation, good time credits, or a coveted job; and, more recently, strip

7    searches and bathroom inspections after a legal visit. Defendants respond that these are prison

8    policies executed to maintain institutional order and safety that must be examined with due

9    deference. In particular, the government emphasizes three institutional concerns: FCI Dublin is

10   short staffed; it faces a serious drug problem; and given its zero tolerance policy, under which staff

11   are walked off after an accusation of sexual misconduct, significant sanctions are required for false

12   PREA allegations.

13        Retaliation was the foundation upon which then-warden Garcia built a "culture of abuse."

14   DOJ indicted Garcia and the seven others, all of whom silenced their victims by threatening them

15   with, or actually sending them to, the SHU. Each reinforced the threat with private admonitions that

16   no one would believe incarcerated women and publicly justified this retaliation by accusing their

17   victims of making up PREA allegations for their own "personal gain." The message was potently

18   deployed. Many incarcerated women testified they did not report the abuse because they were

19   terrified of ending up in the SHU's "dungeon"-like cells and confident that no one would believe

20   their reports.

21        Plaintiffs claim that they face an ongoing risk of retaliation-by-SHU for reporting

22   misconduct at FCI Dublin. Placement in the SHU for reporting a PREA violation is an (1) adverse

23   action (2) because of (3) plaintiffs' protected conduct that would (4) chill their First Amendment

24   rights. The remaining issue is whether such a policy, nonetheless, reasonably advances a legitimate

25   correctional goal.

26        The government contends it does. It claims FCI Dublin's use of the SHU is narrowly

27   tailored: prison officials only place incarcerated persons in segregated housing for reporting *false*

28   allegations of sexual misconduct. In that way, the use of the SHU advances two complementary

United States District Court
Northern District of California

correctional goals: (i) to stop false reporting by incarcerated persons and (ii) to keep staff members from being placed on administrative leave for a false report. The government submits that, in fact, one of plaintiffs' witnesses has made a demonstrably false PREA allegation.

The Court understands that FCI Dublin's incarcerated population could have reason to falsely report. A PREA allegation, at FCI Dublin especially, brings powerful consequences. For an incarcerated person, these consequences are perceived as positive. By accusing an officer of sexual misconduct, an incarcerated person might reason that they could avoid rules that are onerous, get rid of officers they do not like, and perhaps most compellingly, be released from prison early, bolster a civil claim for damages, or avoid deportation. Various incarcerated persons, in fact, told the Court that they believed others had falsely reported.

During its inspection, the Court also heard from inmates and staff alike that prison officials are now scared that they will receive a PREA allegation in exchange for imposing institutional order. In other words, prison staff also fear retaliation. To say staff morale at the prison is low would be an understatement. After their then-warden was criminally indicted, many staff members reported feeling "hurt, angry, confused, and completely failed by their previous administration," its own form of "trauma," according to chief psychologist Dr. Mulcahy.[112] Some quit, feeling pressured by the constant media attention and outside scrutiny. The ones who have stayed, and the new ones who have joined, reported feeling that the risk of false reports is high, to the point of impacting their job to impose prison rules uniformly.  Further, given its now infamous reputation, FCI Dublin has a hard time recruiting and maintaining staff. Many officers have had to start working significant over-time to make up the deficit. Several officers reported feeling frustrated that their colleagues were put on administrative leave pending investigation into their alleged misconduct with no foreseeable end date.

Though the Court understands the human nature on either end of a false PREA allegation, much of this is speculative because the record at this early stage only reflects one example of an alleged false PREA report. K.D., an incarcerated woman who testified during the evidentiary hearing, accused an officer of conducting an "aggressive and demeaning" pat down search during

---

[112] Tr. 1042:18–22.

which she felt the officer inappropriately touched her breasts and nipples.[113] K.D. reported the officer, though she never specifically claimed it was PREA violation.[114] Because she included a report of inappropriate touching, however, officer Baudizzon reasonably understood her to be making an allegation of sexual harassment. Instead of discussing the incident with her, however, he accused her of making a false PREA report after watching a video of the incident. To punish K.D. for making what officer Baudizzon interpreted to be a false PREA allegation, K.D. was fired from her lucrative job; her visitation rights were taken away so she could not speak to her family for months; she was prohibited from using the commissary; and she lost good time credits, which pushed her release date back ten months and almost landed her in the SHU.

It is beyond dispute that the government's goals—to protect staff and deter fraud—are legitimate; what the First Amendment demands, however, is that the government's means *reasonably* advance those ends. As K.D.'s experience makes self-evident, FCI Dublin's use of the SHU, among other punitive methods, to deter false reports will have the perhaps unintended but surely foreseeable consequence of deterring incarcerated persons from making *true* reports. During the evidentiary hearing, various incarcerated women reported that had previously been placed in the SHU for reporting abuse. One incarcerated woman, for example, testified that she was placed in the SHU as "under investigation" after she reported that officer Gacad sexually abused her in 2022.[115] Soon after the evidentiary hearing, R.F., who testified, was placed in the SHU for allegedly aiding someone else make a false PREA report.[116] R.F., believing she had been retaliated against, went on a hunger strike. FCI Dublin transferred her to another facility without notifying the Court in express violation of the Court's no-transfer Order. After the Court ordered defendants to show cause, BOP transferred her back to FCI Dublin and the government conceded it neither had cause nor the proper

---

[113] Tr. 677:20–25, 678:1–16.
[114] Tr. 681–82.
[115] Tr. 576.
[116] Another incarcerated person who was scheduled to testify at the evidentiary hearing was also placed in the SHU. While the Court was visiting FCI Dublin, it asked why she had been placed there and was told for "compromising staff." No further explanation was available at the time from her SHU documentation. The Court noted its concern with staff.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  documentation for placing R.F. in the SHU. R.F. claims, credibly on this count, that the then-

2  warden and assistant warden actually targeted her for her involvement in this suit.[117]

3        Given the legitimate concerns raised by both parties, the Court must weigh the importance

4  of the interests affected. The prison fears retaliation that will worsen staff morale; the prisoners fear

5  retaliation that will keep them from reporting sexual abuse. Ultimately, the Court concludes, FCI

6  Dublin's long history of using the SHU to inappropriately quell inmates' First Amendment rights

7  can no longer be countenanced. *See Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (threats

8  of transfer because of inmates' complaints are retaliatory); *Hines v. Gomez*, 108 F.3d 265, 269 (9th

9  Cir. 1997) (additional confinement that chilled protected speech considered retaliatory); *Wolff v.

10  McDonnell*, 418 U.S. 539, 557 (1974) (loss of good time credits implicated a liberty, due process

11  interest that cannot be "arbitrarily abrogated"); *Watison v. Carter*, 668 F.3d 1108, 1115 (9th Cir.

12  2012) (placing an inmate in administrative segregation constitutes an adverse action); *Shepard v.

13  Quillen*, 840 F.3d 686, 690 (placing someone in administrative segregation for reporting staff

14  misconduct is an adverse action); *cf. Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir. 1993)

15  (placing a "higher value" on a prisoner's life "than on the staff's morale will constitute 'deliberate

16  indifference'"). The Court understands that, since Garcia's administration, much has changed. As

17  the government notes, FCI Dublin has made an informed effort to move away from the culture of

18  abuse Garcia left behind. What FCI Dublin cannot seem to leave behind, however, is its suspicion

19  that it is the system, not incarcerated women, that is being abused.

20        The evidence does not support the argument of widespread false reporting, at least not yet.

21  Even so, the Court is not convinced that the SHU would be a reasonable method of addressing it.

22  The SHU is draconian. As the evidentiary hearing demonstrated, and the Court has witnessed,

23  incarcerated women are terrified of it. Defendants understand this. Dr. Mulcahy testified that

24  isolation in those small, white cells leads to an increased risk of suicide. With a population of which

---

26  [117] Dkt. No. 197. As the Court noted during one of the hearings, it generally did not find

27  R.F. to be a credible witness. She has filed hundreds of complaints against BOP, many of which
    have been dismissed as frivolous. She has also provided other incarcerated women with help on

28  their compassionate release motions, for which she testified, they "blessed" her with a $1,000.
    Nonetheless, on this point, the Court finds her allegation of retaliation here to be credible.

United States District Court
Northern District of California

1   90% have experienced trauma, that risk is compounded. Using it to punish FCI Dublin's

2   incarcerated population for making false reports of misconduct poses a serious risk of also deterring

3   legitimate ones.

4          The government's arguments otherwise do not persuade. First, the government implies that,

5   because FCI Dublin now provides its incarcerated population more methods than ever to

6   confidentially report retaliation, plaintiffs cannot assert a First Amendment claim. "Speech can be

7   chilled even when not completely silenced." *Rhodes*, 408 F.3d at 568. The First Amendment does

8   not place prisoners in a "Catch-22," where they are precluded from obtaining relief by the very act

9   of seeking it. *Id.* at 569. The fact that incarcerated persons can now report retaliation from the SHU

10  is cold comfort.

11         Second, because FCI Dublin is understaffed, the government argues, its use of the SHU to

12  deter false reporting is reasonable. Being short-staffed is not an excuse for retaliatory conduct,

13  especially when staffing levels are a consequence of DOJ's criminal investigation. Those

14  incarcerated should not bear the penalty of then-warden Garcia's administration of abuse.  *Cf.*

15  *Jordan*, 986 F.2d at 1529 (rejecting a jail superintendent's rationale for imposing a new penological

16  policy because "[t]he wish to avoid a lawsuit from an employees' union" could not "provide a

17  justification for inflicting pain of a constitutional magnitude upon inmates")

18         Finally, and perhaps most critically, the Dublin Task Force's report suggests that the issue

19  of staff morale fundamentally stems from a broader distrust between FCI Dublin and its

20  incarcerated population. The Task Force warned FCI Dublin that this distrust is fueled by both a

21  pervasive lack of communication and the derogatory manner with which some staff treat those

22  incarcerated. It is because of this distrust, the Task Force noted, that operational changes are

23  viewed as "retaliation," or punishment, for being sexually assaulted.[118] More broadly, the Task

24  Force noted, incarcerated persons are concerned with retaliation because they are regularly

25  threatened with it for making any kind of request. Remarkably, FCI Dublin has not addressed the

26  issue proactively by communicating more openly with its incarcerated population. For that reason,

27

28

---

[118] Dublin Task Force at 12.

1   as the Court witnessed during the evidentiary hearing, the imposition of what FCI Dublin insists are

2   national protocols—like visual searches after legal visits—are widely perceived as retaliation.

3       **C.   IRREPARABLE HARM**

4       The parties dispute whether plaintiffs are likely to suffer irreparable harm absent a

5   preliminary injunction. "It is well established that the deprivation of constitutional rights,"

6   including lack of adequate medical care, "unquestionably constitutes irreparable injury." *Melendres*

7   *v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976));

8   *Porretti*, 11 F.4th 1037 at 1050.

9       As stated, the Court finds that plaintiffs are likely to succeed in their Eighth Amendment

10  claims for the risk of sexual abuse and serious medical neglect, along with their First Amendment

11  claim that they face an ongoing risk of retaliation. Without injunctive relief, plaintiffs will face

12  ongoing retaliation, including internal transfer to the SHU or external transfer to an outside facility,

13  for filing allegations of sexual abuse. Due to the severe understaffing of FCI Dublin's counselors,

14  medical staff, and psychologists, plaintiffs risk imminent and serious medical injury, including lack

15  of treatment for serious medical ailments, psychological distress, and risk of suicide. *See Porretti*,

16  11 F.4th at 1050 (finding that these types of injuries constituted irreparable harm).

17      In so finding, the Court is informed by the fact that prison officials at FCI Dublin

18  acknowledged its incarcerated population was suffering ongoing and untreated trauma from the

19  sexual abuse inflicted on them by the previous administration. FCI Dublin's chief psychologist, Dr.

20  Mulcahy, for example, testified that many of the incarcerated persons at FCI Dublin had "survived

21  some pretty horrific and traumatic things at the hands of some former staff."[119] With such a

22  magnitude of need, Dr. Mulcahy testified that, though she was trying to regain the trust of the

23  incarcerated population and provide programming, she did not think the mental health services

24  available were "sufficient."[120]

25

26

27

28
    ---
    [119] Tr. 1042:23–24.
    [120] Tr. 1072:9–11

### D.    BALANCE OF EQUITIES/PUBLIC INTEREST

"The third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry when the government oppose a preliminary injunction." *Porretti*, 11 F.4th at 1050. The Court therefore examines these two factors in tandem.

"It is always in the public interest to prevent violation of a party's constitutional rights." *Porretti*, 11 F.4th at 1050 (cleaned up). Those incarcerated at FCI Dublin and its satellite camp were subject to horrific, systemic sexual abuse that resulted in the unprecedented criminal indictment of eight prison officials, including the previous warden, chaplain, and various correctional officers. It understands that, since then, BOP has made changes to FCI Dublin's personnel and culture. Those changes have had some positive impacts: Of the estimated one hundred incarcerated women, transgender men, and non-binary people the Court spoke to during its nine-hour visit to FCI Dublin and its satellite camp, no one complained that the prison still had a "sexualized" culture.

The Court nonetheless remains concerned with the recent allegations of sexual assault, especially because the Court spoke to less than fifteen percent of the total population. Moreover, staff remain under investigation and plaintiffs have brought forth serious allegations of retaliation, including a few involving sexual assault.

In addition, probative evidence exists that FCI Dublin continues to deter inmates from filing administrative grievances by threatening its incarcerated population with citations on their record, the loss of good time credits and better paying jobs, and placement in the SHU for doing so. Its medical and mental health services are understaffed, leaving those incarcerated at FCI Dublin without access to urgently needed care. Without the requisite staff, the conditions of confinement, especially at the satellite camp, have progressively deteriorated. Given FCI Dublin's extraordinary recent history, which continues to shape the way that prison officials manage and treat the incarcerated individuals in their care, the public interest would be best served by, and the balance of equities favors, injunctive relief.

1  **E.    REQUESTED RELIEF**

2        Based on the foregoing, the Court will appoint a special master consistent with federal law.

3  18 U.S.C. § 3626(f)(1)(A). Too much remains to be done urgently and the Court cannot be

4  physically present on the property on a daily basis to ensure compliance. The remedial actions

5  necessary are entirely too complex without the help of a special master.  *Id.* § 3626(f)(1)(B).

6        However, the Court finds that some of the relief sought by plaintiffs is currently not

7  merited. As to the issue of reporting staff misconduct and access to legal counsel, the Court finds

8  that there is an insufficient record of constitutional risk requiring the requested relief. BOP has

9  provided numerous avenues for confidential reporting through email and the TRULINK process

10  and direct communication to lawyers and the DOJ among others.[121] The Court agrees that

11  communication could be better but that alone does not justify monitoring. On this point, the

12  requested relief is **DENIED.**

13        Moreover, as to the request to fix the computer's privacy screens, the Court did not observe

14  people waiting in long lines to use the computers, so any privacy risk to a person using the

15  computer is too attenuated. Although it is obvious that the system is not perfect, perfection is not

16  required. Further, FCI Dublin now provides more legal access than other institutions. For that

17  reason, this request relief is **DENIED.**

18        Further, the Court does not find any need to address the return of non-contraband items

19  seized from individuals' cell during searches. The record does not indicate a currently existing

20  constitutional risk requiring such relief. Accordingly, the request is **DENIED.**

21  **IV.    CONCLUSION**

22        For the reasons set forth above, including recent events after the evidentiary hearing, the

23  Court **GRANTS** the motion for class certification and **GRANTS IN PART AND DENIES IN PART** the

24  motion for a preliminary injunction. The Court ordered the parties to appear before it on **Friday,**

25  **March 15, 2024, at 3:00 p.m.** The Court will issue a supplemental order on the requested relief

26  after that hearing.

27  _____

28        [121] In fact, the direct email to DOJ was closed after a significant decrease in
contemporaneous reports suggested that the facility was operating within proper parameters.

This terminates Dkt. Nos. 10, 11, 45, 75, 99, 102, 111, 143, 159, 162, 168, 176, 178, 184, 191, 197, 199, 204, 206, 209.

**IT IS SO ORDERED**.

Date: **March 15, 2024**

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE