1  JESSE LASLOVICH
   United States Attorney
2    MADISON L. MATTIOLI                    MARK STEGER SMITH
     MT Bar No. 36411284                     MT Bar No. 4160
3    ABBIE J.N. CZIOK                       TIMOTHY A. TATARKA
     MT Bar No. 55781377                     CA Bar No. 277219
4    Assistant U.S. Attorneys              Assistant U.S. Attorneys
     U.S. Attorney's Office                U.S. Attorney's Office
5    901 Front Street, Suite 1100          James F. Battin Federal Courthouse
     Helena, MT 59626                      2601 2nd Ave. North, Suite 3200
6    Phone: (406) 457-5269 – Madison       Billings, MT 59101
          (406) 457-5268 – Abbie           Phone: (406) 247-4667 – Mark
7    Fax: (406) 457-5130                        (406) 247-4642 – Tim
     Email: madison.mattioli@usdoj.gov     Fax: (406) 657-6058
8          abbie.cziok@usdoj.gov           Email: mark.smith3@usdoj.gov
                                                 timothy.tatarka@usdoj.gov
9  Attorneys for Federal Defendants and
   Defendant United States of America.
10

11               IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION
12

13  CALIFORNIA COALITION FOR WOMEN
    PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.;
14  G.M.; A.S.; and L.T., individuals on behalf of     CASE NO. 4:23-CV-04155-YGR
    themselves and all others similarly situated,
15
                      Plaintiffs
16               v.                                     UNITED STATES' BRIEF IN SUPPORT OF
                                                        ITS RULE 60 MOTION FOR RELIEF
17  UNITED STATES OF AMERICA FEDERAL
    BUREAU OF PRISONS, a governmental entity;           EXCERPTS FILED UNDER SEAL
18  BUREAU OF PRISONS DIRECTOR
    COLETTE PETERS, in her official capacity;
19  FCI DUBLIN WARDEN THAHESHA JUSINO,
    in her official capacity; OFFICER
20  BELLHOUSE, in his individual capacity;
    OFFICER GACAD, in his individual capacity;
21  OFFICER JONES, in his individual capacity;
    LIEUTENANT JONES, in her individual
22  capacity; OFFICER LEWIS, in his individual
    capacity; OFFICER NUNLEY, in his individual
23  capacity, OFFICER POOL, in his individual
    capacity, LIEUTENANT PUTNAM, in his
24  individual capacity; OFFICER SERRANO, in
    his individual capacity; OFFICER SHIRLEY, in
25  his individual capacity; OFFICER SMITH, in
    his individual capacity; and OFFICER VASQUEZ,
26  in her individual capacity,

27                    Defendants.

28

**INTRODUCTION**

The federal Bureau of Prisons (BOP) respectfully requests relief from this Court's Order at Doc. 254-1 (Attachment A.1), filed under seal on April 15, 2024, pursuant to Fed. R. Civ. P. 60(b).

As the Court explained in its preliminary injunction order, the situation at FCI Dublin requires "immediate change," partly as a result of "significant lack of health services and severe understaffing." (Doc. 22 at 1, 10.) The Director of the BOP, acting under her authority under 18 U.S.C. § 3621(b), has determined that the immediate change required is closure of the facility and transfer of all adults in custody (AICs) housed there. BOP is aligned with the Court in its commitment to the safe and orderly transfer of AICs in the wake of this closure and is committed to working with the Court to address its concerns. However, this Court's April 15 Order re: Transfer of Inmates at FCI Dublin (Transfer Order) and Attachment A.1, as interpreted by the Special Master, are counterproductive in terms of promoting safety and welfare. As set forth in greater detail below, prompt AIC transfers ████████████ ████████████████████████ is the best and only mechanism of ensuring AIC health and safety, as well as that of BOP staff. Further, provisions of the Court's Transfer Order and Attachment A.1 exceed the Court's authority, extend the role of the Special Master beyond that envisioned by the Prison Litigation Reform Act (PLRA), and violate the separation of powers as envisioned in the United States Constitution. These Orders must be modified to afford appropriate deference to the BOP in carrying out its executive decision to close FCI Dublin and transfer all AICs to other institutions.

## I.    LEGAL STANDARD

Federal Rule of Civil Procedure 60(b) provides the grounds for relief from a final judgment, order, or proceeding. It states, in pertinent part, that "on motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise… [or] (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)."

## II.    PROCEDURAL BACKGROUND

On March 15, 2024, the Court granted class certification and granted in part and denied in part the motion for preliminary injunction and ruled it would "appoint a special master forthwith." (*See* Doc. 222.) The Special Master was directed to focus on three areas the Court identified as problematic:

reducing the risk of sexual abuse, medical/mental health care, and the monitoring and deterring of retaliatory actions by staff. *Id*.

BOP has been considering the closure of FCI Dublin for many years. The closure is now compelled due to FCI Dublin's perpetual short-staffing, aging infrastructure, and ongoing allegations of staff misconduct. Details regarding the closure of a federal prison are highly sensitive and cannot become public in advance of the closure due to serious safety and security risks to all involved. (Lothrop Decl., Doc. 236-2.) As such, the information can be shared only on a need-to-know basis. Once the timeline for closure of FCI Dublin was solidified, it became apparent that the Court had a need to know. Accordingly, BOP made *ex parte* contact with the Court to inform it of the impending facility closure, omitting any logistical details. (Doc. 235.) BOP again notified the Court *ex parte* of the impending facility closure on April 12, 2024, this time including estimated dates of the closure but omitting logistical details. (Docs. 251, 251-1, 251-2, 251-3.)

The logistical details involved with the mass transfer of all AICs at a particular facility cannot be changed on the fly. Extensive resources and employee hours have already been invested in the move

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Even though BOP has assured Dublin staff they will not lose their jobs because of the closure, many staff are frustrated with the uncertainty, and many have refused to report for duty at an already understaffed facility. BOP has brought in for temporary duty [REDACTED] staff members from institutions around the country to assist in this movement, [REDACTED] [REDACTED]. Additionally, local FCI Dublin staffing numbers and availability continue to dwindle. When the closure of FCI Dublin was announced on Monday, April 15, 2024, local staff were offered the opportunity to be excused from work for the remainder of the day to deal with the news, and approximately 90% of local FCI Dublin staff left work for the remainder of the day. Since that time, local staff at Dublin have suffered from a significant morale decline, [REDACTED] [REDACTED].

On April 15, 2024, the Court issued an Order re: Transfer of Inmates at FCI Dublin. (Doc. 252.) This Order states:

> The Court is aware that the Bureau of Prisons ("BOP") has announced its intended closure of FCI Dublin…. [G]iven some of BOP's significant inadequacies previously referenced, **BOP SHALL UPDATE CASEWORK** for all inmates in the manner identified in Attachment A hereto, including classification and release dates. This updated casework is required, in part, to ensure inmates are transferred to the correct location. This includes whether an inmate should be released to a BOP facility, home confinement, or halfway house, or granted a compassionate release. The result of these case reviews and transfer designations **SHALL** be reviewed with the Special Master prior to transfer. The detail in Attachment A is **SEALED** for security reasons."

*Id*.

Attachment A.1 states:

[REDACTED]

[REDACTED]



(*See* Doc. 254-1 (SEALED)).

Ms. Still has stated to Interim Warden N.T. McKinney that she interprets the Court's order as authorizing her to require a BOP doctor to conduct an in-person patient encounter with every AIC, as well as the medical provider on her team to have an in-person patient interview with every AIC and conduct a complete review of the AICs entire electronic medical record prior to Ms. Still approving transfer. (McKinney Decl., ¶ 5.) Ms. Still has indicated that the medical provider on her team could sit in while BOP's doctor does the inpatient encounter to streamline the process, however that individual could not be onsite before noon today. BOP has dedicated substantial resources to bringing in multiple doctors to assist with AIC transfers this week, and Ms. Still has one medical provider on her team. Moreover, these procedures – above what BOP requires – are significantly delaying the transfer process. (McKinney Decl., ¶ 5-6.)

The delay in the closure of FCI Dublin may adversely affect the medical care of AICs. Based on Interim Warden McKinney's independent review of FCI Dublin operations during her short tenure, she

has determined that consultations for medical services are prone to significant delay due to staffing shortages and few outside providers willing to medically treat FCI Dublin inmates for fear of receiving an allegation of sexual abuse. For example, dentistry consults that have been approved and just waiting to be scheduled by BOP's third-party medical scheduler are ▮▮▮▮▮▮ overdue. Radiology consults that were approved and are waiting to be scheduled are ▮▮▮▮▮▮ overdue. Mammogram consults that have been approved and are just waiting to be scheduled are ▮▮▮▮▮▮ ▮▮▮ overdue. (McKinney Decl., ¶ 9.)

FCI Dublin has ▮▮ pending consults. Of those ▮▮ pending consults, ▮▮ are routine and ▮▮ are considered urgent. BOP's Health Services Utilization Review nurses will provide follow-up care with all AICs with consults at their receiving sites as a measure of oversight to ensure all sub-specialist appointments are scheduled and completed. The delay in transfer exacerbates medically needed mammograms, x-rays, and gastrointestinal appointments. (McKinney Decl., ¶ 10.) Moreover, given the aforementioned delays in outside consult scheduling, requiring completion of these consults prior to transfer is impossible. BOP can provide the court and SM with information on where these individuals are going and provide assurance that the receiving facilities are aware of their medical needs.

These medical issues and the dedication of largescale manpower and equipment investment in the FCI Dublin closure creates urgency of the scheduled movements. To ensure the safe and secure transport of AICs, and to ensure the safety of the public at large, BOP must dedicate an adequate number of trained staff, dedicate sufficient transport busses, and coordinate adequate airlift resources. Use of each of these resources necessarily depletes availability of those resources for other missions and in other locations. BOP was originally scheduled to move ▮▮ inmates per day out of FCI Dublin. Since the imposition of the Court's order, BOP is thus far scheduled to move only about ▮▮ inmates. (McKinney Decl., ¶ 15.) The aforementioned logistical limitations create extraordinary urgency – in addition to safety and security concerns – the longer this process is delayed.

### III.   ARGUMENT

As the Court has recognized, immediate action is necessary to address the long-standing issues at FCI Dublin. The Director, pursuant to her authority is taking that action, which requires a massive expenditure of resources over a short time-period. The result will be the transfer of inmates to facilities

1    with better staffing and culture than Dublin. The transitional period, however, is one freighted with

2    logistical, security, and safety hurdles, all of which are exacerbated the longer the process is drawn

3    out—putting both inmates and staff at risk.

4          The Court is understandably interested in safeguarding the interests of the inmate population

5    during this transfer period. In particular, the Court's Transfer Order and Attachment A.1 identified three

6    areas of concern: (1) classification and release dates, (2) medical clearance of inmates, and (3) review of

7    compassionate release motions. As currently framed and interpreted by the Special Master, however, the

8    Court's Transfer Order and Attachment A.1 run the risk of dangerously and unconstitutionally drawing

9    out the transition, adding to, rather than relieving the risks to AICs. BOP seeks clarification of the Order

10   to enable BOP to respond to the Court and Special Master's concerns, and seeks modification of the

11   Order to expedite the transfer process and provide for its safe completion while BOP possesses the

12   means to accomplish these mass transfers.

13   **a.   The Designation of Inmates to Facilities is Within the Exclusive Authority of BOP.**

14        Chapter 18 U.S.C. § 3621(b) delegates the authority to determine the Place of Imprisonment to

15   the BOP, stating:

16   > (b) Place of Imprisonment.—**The Bureau of Prisons shall designate the place of
17   > the prisoner's imprisonment**, and shall, subject to bed availability, the prisoner's security
18   > designation, the prisoner's programmatic needs, the prisoner's mental and medical health
19   > needs, any request made by the prisoner related to faith-based needs, recommendations of
20   > the sentencing court, and other security concerns of the Bureau of Prisons, place the
21   > prisoner in a facility as close as practicable to the prisoner's primary residence, and to the
22   > extent practicable, in a facility within 500 driving miles of that residence. …. **The Bureau
23   > may designate any available penal or correctional facility that meets minimum
24   > standards of health and habitability established by the Bureau, whether maintained
25   > by the Federal Government or otherwise** and whether within or without the judicial
26   > district in which the person was convicted… **The Bureau may at any time, having regard
27   > for the same matters, direct the transfer of a prisoner from one penal or correctional
28   > facility to another.**

     Chapter 18 U.S.C. § 3625(b) prohibits determinations, decisions, or orders under the subchapter

     from judicial review under the Administrative Procedure Act, to include 18 U.S.C. § 3621(b).

          An inmate may not dictate when a transfer should occur, nor does the Court have the authority to

     decide this issue. "The BOP is solely responsible for designating the place of confinement." 18 U.S.C. §

     3621(b); *see United States v. Dragna*, 746 F.2d 457, 458 (9th Cir. 1984) (district court does not have

jurisdiction to decide the location of a defendant's incarceration; that decision rests solely with the executive branch); *see also United States v. Charry Cubillos*, 91 F.3d 1342, 1343 n.1 (9th Cir. 1996) (same); *Smith v. Sanders*, 2009 WL 2900317, at *1 (C.D. Cal. Sept. 3, 2009) ("Like the RDAP program, [which] the BOP administers under § 3621I, the BOP in this case has the sole authority to make RRC placement determinations under § 3621(b)"); *Espinoza v. Rios*, 2011 WL 4084365, *4 (E.D. Cal. Sep. 13, 2011) (internal citations omitted); *Adams v. Thomas*, 2012 WL 1205104, at *1 (D. Or. April 11, 2012) ("[L]ike the RDAP program the BOP administers under 3621I, the BOP has the sole authority to make RRC placement determinations pursuant to 3621(b)... the BOP's decision to deny petitioner's RRC transfer request is a substantive, discretionary determination by the BOP that was not reviewable in district court."); *Bristow v. Johnson*, 2015 WL 18923184, *5 (C.D. Cal. Apr. 22, 2015) ("Alternatively, to the extent petitioner is challenging the warden's individualized determination as to the amount of time that petitioner should spend in RRC placement, the Court lacks jurisdiction over any such challenge."); *Wong v Ponce*, Slip Copy, 2017 WL 784913, *5 (E.D. Cal. March 1, 2017) ("The courts have uniformly found that habeas review of RRC placement determinations by the BOP is not permitted."); *English v. Ives*, 2012 WL 4038495 (E.D. Cal.) (substantive decision regarding inmate placement in an RRC not reviewable by the court, *citing Reeb*); *Geiger v. Adler*, 2011 WL 5417093 (E.D. Cal. Nov. 8, 2011) (same); *Binford v. Thomas*, 2011 WL 1791198 (D. Or. May 10, 2011) (same); *Han v. Benov*, 2011 WL 4084185 (E.D. Cal. Sept. 13, 2011) (same); *Ingram v. Thomas*, 2011 WL 1791234 (D. Or. May 10, 2011); *Spears v. Rios*, 2011 WL 4055247 (E.D. Cal. Sept. 12, 2011) (same); *Gary v. Rios*, 2011 WL 4055292 (E.D. Cal. Sept. 12, 2011) (same); *Brown v. Sanders*, 2011 WL 4899919 (C.D. Cal. Sept. 1, 2011) (same); *Cheung v. Tews*, No. 2011 WL 4529672 (N.D. Cal. Sept. 29, 2011) (same); *Pua v. Tews*, 2011 WL 4529735 (N.D. Cal. Sept. 29, 2011) (same); *Tekle v. Washington–Adduci*, 2011 WL 4802433 (C.D. Cal. Aug. 24, 2011) (same).

It is beyond question that transfer of inmates falls within the exclusive authority of the BOP, and it is not subject to judicial review.

### b. The Provision of Medical Care is Within the Exclusive Authority of BOP.

Chapter 28 C.F.R. § 0.96(o) states in pertinent part that the Director of the BOP "is authorized to exercise or perform any of the authority, functions, or duties conferred or imposed upon the Attorney

General by any law relating to the commitment, control, or treatment of persons (including insane prisoners and juvenile delinquents) charged with or convicted of offenses against the United States, including the taking of final action in promulgating rules governing the control and management of Federal penal and correctional institutions and providing for the classification, government, discipline, treatment, care, rehabilitation, and reformation of inmates confined therein. (18 U.S.C. 4001, 4041, and 4042). Chapter18 U.S.C. § 4001(b)(2) states in pertinent part that "[t]he Attorney General may establish and conduct industries, farms, and other activities and classify the inmates; and provide for their proper government, discipline, treatment, care, rehabilitation, and reformation." Under Chapter 18 U.S.C. § 4042(a)(2), BOP, under the direction of the Attorney General, shall (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise.

Doc. 254-1, Attachment A.1, states in pertinent part that ████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████ Attachment A.1, as interpreted by the Special Master, makes unclear which entity is tasked with completing the medical clearance of AICs, and does not define ███████████

Similarly, Attachment A.1 does not define ████████████████ As the Court heard during the January evidentiary hearing and through subsequent filings, BOP utilizes a third party to schedule medical care in the community. An AIC may have a pending consult for any manner of care in the community, but the speed with which those appointments happen depends, in part, on the third-party scheduler's ability to find a willing and suitable provider in the community, and on the backlog of scheduled patients needing to see that provider. An AIC gets in the same queue as patients in the community. Again, requiring completion of these consults prior to transfer is an impossibility and is outside BOP's control.

Finally, Attachment A.1 doesn't clarify the Special Master's role in her "review" of medical transfer evaluations, nor does it state anywhere in the Order that the Special Master must approve of the transfers or otherwise has the power to veto them. BOP does not know whether it is the Special Master

(or a member of her team) who will medically clear the inmates, or if it will be BOP's doctors. If the Special Master or her team are performing all medical clearances, will they assume liability if there is a medical emergency in-transit? These are all issues that undercut BOP's clearly delineated duty of care to provide care for individuals in our custody until the expiration of their prison sentence. *Kaneakua v. Derr*, 2023 WL 4534526, at *2 (D. Haw. July 13, 2023); s*ee also McCormick v. City of Wildwood,* 439 F. Supp. 769 (D.N.J. 1977) ("A jailer duty to provide reasonable medical care is nondelegable and the duty attaches as soon as a prisoner is placed under the jailer custody.").

### c. Closure of FCI Dublin is Within the Exclusive Authority of BOP.

Chapter 18 U.S.C. § 4042, Duties of Bureau of Prisons, likewise identifies the obligations of the Federal Bureau of Prisons under the direction of the Attorney General. The first directive of that statute, in subparagraph (a)(1) states that the BOP shall "have charge of the management and regulation of all Federal penal and correctional institutions". Thus, the BOP is empowered and obligated to run, and indeed close, institutions as necessary. To effectuate that obligation, the Attorney General has made certain delegations of authority to the BOP in 28 CFR § 0.96, stating (in part):

> The Director of the Bureau of Prisons is authorized to exercise or perform any of the authority, functions, or duties conferred or imposed upon the Attorney General by any law relating to the commitment, control, or treatment of persons (including insane prisoners and juvenile delinquents) charged with or convicted of offenses against the United States, including the taking of final action in the following-described matters:
> …
> (c) Designating places of imprisonment or confinement where the sentences of prisoners shall be served and ordering transfers from one institution to another, whether maintained by the Federal Government or otherwise, pursuant to 18 U.S.C. 4082 as it existed before the enactment of Pub. L. 98–473 (applicable to offenses committed prior to November 1, 1987).
> (d) Extending the limits of the place of confinement of prisoners for the purposes specified, and within the limits established, by 18 U.S.C. 4082(c) as it existed before the enactment of Public Law 98–473, and otherwise performing the functions of the Attorney General under that section (applicable to offenses committed prior to November 1, 1987).
> …
> **(p) Establishing and designating Bureau of Prisons Institutions (18 U.S.C. 4001, 4042).**

(emphasis added.)

Delegations of authority explicitly include making designations and indeed, operation (or closing the operations) of a prison to be within the exclusive jurisdiction of the BOP. The authority of the BOP

1  to operate prisons or to close them has been upheld by the Ninth Circuit in *Serrato v. Clark*, 486 F.3d
2  560 (9th Cir. 2007).

3        The Bureau of Prisons operated two "shock" incarceration facilities pursuant to 18 USC § 4046 –
4  the Intensive Confinement Center (ICC) (i.e., a "boot camp") for men at Lewisburg, Pennsylvania, and
5  the Intensive Confinement Center for women at Bryan, Texas. Through a daily regimen of physical
6  training, work assignments, education, vocational training, and substance abuse treatment, the program
7  sought to improve offenders' decision making, self-direction, and self-image and help them gain
8  permanent employment. The 6-month incarceration period at the ICC facilities was followed by a
9  community corrections period during which participants finished out their sentences, first at a halfway
10 house and subsequently under home confinement. Successful completion resulted in up to 6 months off
11 a federal sentence. Due to budget pressures and research showing that boot camp did not reduce
12 recidivism, BOP terminated the programs.

13       When the ICCs were closed, inmate Serrato petitioned for writ of habeas corpus, claiming,
14 among other things, that the decision of BOP to terminate boot camp program violated Administrative
15 Procedure Act (APA), and the separation of powers.

16       The Ninth Circuit held otherwise. *Serrato* now stands for the proposition that the decision to
17 terminate the ICC program in the BOP was not susceptible to judicial review under the APA, and that
18 such termination of the ICC did not violate separation of powers by impermissibly impinging on
19 Congress, USSC, or the judiciary. The Court noted "BOP's decision to terminate boot camp is not
20 susceptible to judicial review under the APA because the decision was "committed to agency discretion
21 by law." 5 U.S.C. § 701(a)(2); *see* 486 F.3d at 567. The Court further noted, "BOP's discretionary
22 decision how to allocate its lump sum appropriation does not impermissibly impinge on Congress, the
23 Sentencing Commission, or the judiciary." *See Id.* at 570.

24       Similarly, this Court should not infringe BOP's ability to close FCI Dublin. Preventing the
25 redesignation of inmates to other facilities results in a de facto ruling that the Court – should it and the
26 Special Master fail to approve such transfers – has the ultimate authority to decide whether and/or when
27 FCI Dublin should close. This not only violates the statutory command in 18 USC § 3621(b), stating,
28 "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this

subsection is not reviewable by any court", but it is wrests authority to operate (or decline to operate) a prison from the Executive improperly into the Judiciary.

### d. The Concerns Addressed in The Court's Transfer Order Can Be Addressed Without Further Delaying Closure and Risking Staff and Inmate Safety.

#### i. BOP has appropriately classified AICs and calculated release dates.

The classification and redesignation of AICs were done quickly, but not arbitrarily, and BOP has gone through an exhaustive process to ensure redesignations have occurred in accordance with all applicable requirements. BOP has already considered and reviewed whether inmates should be transferred to the same or lesser security institutions, to home confinement, to residential re-entry centers, or whether they had an imminent release date. The Designation and Sentence Computation Center (DSCC) undertook a massive effort to ensure all placements were appropriate and individually considered. Redesignations began at approximately ███████████████████████████████, and designators worked overtime all weekend with the goal to have all redesignations completed by ████████████████████████████████████████████ ████████.

Individuals with a projected release date prior to April 19, 2024, were identified and exempted from the mass movement, as were individuals projected to transfer to Residential Re-Entry Centers. Special population inmates, such as transgender inmates, were identified and DSCC coordinated with the Transgender Executive Counsel (TEC) to consider and select appropriate designations for each. DSCC also worked to maximize "programming" beds, that is, beds reserved for inmates participating in special programs within the BOP, such as the "FIT" program, to ensure qualifying individual could benefit from beneficial programming. (The Female Integrated Treatment, or FIT Program is an institution-wide, residential treatment program that offers integrated cognitive-behavioral treatment for substance use disorders, mental illness, and trauma related disorders, as well as vocational training, to female participants.) ████████████████████████████████████ ████████████████████ Airlifts were coordinated to minimize lengthy bus rides. Extensive efforts were made to redesignate and transport all affected inmates in a safe, secure, and efficient manner. More importantly,

1  there is no evidence to suggest any errors in designation, and, even if such errors existed, they can be

2  corrected and cannot justify prolonging the operation of FCI Dublin.

3        To foster cooperation with the Special Master and her team, Interim Warden McKinney has

4  instructed all FCI Dublin staff to provide whatever materials the Special Master or her team has

5  requested. Subject matter experts, to include programs and casework experts, are available on site to

6  address questions and show documentation and outline our review process, which will allow her to

7  understand the BOP process and approve transfers. However, under the current constraints, BOP has

8  been able to clear significantly fewer inmates for transfer than its targets. (McKinney Decl., ¶ 4.) The

9  government is committed to providing transparency, has provided, and will continue to provide the

10 requisite release date calculations for every transferee prior to transfer.

11         **ii.   BOP appropriately medically clears AICs for transfer and provides needed**

12              **medications.**

13       It is standard practice for BOP to evaluate AICs for medical clearance prior to any transfer and

14 ensure that needed medications are provided. Chapter 18 U.S.C. § 3621(i)(1) requires continued access

15 to medical care and provides that, to "ensure a minimum standard of health and habitability, the [BOP]

16 should ensure that each prisoner in a community confinement facility has access to necessary medical

17 care, mental health care, and medicine through partnerships with local health service providers and

18 transition planning." With respect to completing all pending medical consults prior to transfer, BOP's

19 Health Services Utilization Review nurses will provide follow-up care with all AICs with consults at

20 their receiving institutions as a measure of oversight to ensure all sub-specialist appointments are

21 scheduled and completed. But delays in transfer exacerbate medically needed mammograms, x-rays, and

22 gastrointestinal appointments that can be provided by willing and available providers at the AIC's

23 receiving institutions. Again, BOP can provide the court and SM with information on where these

24 individuals are going and provide assurance that the receiving facilities are aware of their medical needs.

25 This facet of paragraph 4 of Attachment A.1 should be eliminated.

26       Attachment A.1 appears to make a blanket demand that two weeks of medication shall be

27 shipped when any inmate transfers. Even if the Court intended to state that it applied to only inmates

28 with active prescriptions, this is an arbitrary amount – assigned without any knowledge of an inmate's

medical profile, their place of designation, the length for their transfer from FCI Dublin to their new facility, or whether the inmate would even be permitted to possess the medication they might otherwise be required to take on a daily basis. There are some drugs AICs cannot transfer on their person, especially across state lines (e.g., MAT drugs). (McKinney Decl., ¶ 12.) This facet of paragraph 4 of Attachment A.1 should be eliminated.

### iii. BOP appropriately handles compassionate release motions.

Concerning reductions in sentence, agency policy outlines the process by which the BOP can make a motion for Compassionate Release only after review of the request by the Warden, the General Counsel, and either the Medical Director for medical referrals or the Assistant Director, Correctional Programs Division, for non-medical referrals. At the conclusion of this process, the General Counsel will forward the entire matter to the BOP Director for a final decision. If the BOP Director approves the request, she will contact the U.S. Attorney in the district in which the inmate was sentenced regarding moving the sentencing court on the BOP's behalf to reduce the minimum term of the inmate's sentence to time served. The BOP lacks independent authority to grant Compassionate Release, only the AIC's sentencing court has the authority to grant compassionate release. (McKinney Decl., ¶ 13.)

Pertaining to FCI Dublin AICs, there are currently ▮ administrative requests pending with BOP for compassionate release. Of these ▮ requests, ▮ remain under the Warden's Review at FCI Dublin; ▮ remain under the Reduction in Sentence Coordinator's review at FCI Dublin; and the remaining ▮ remain under OGC Review at BOP's Central Office after FCI Dublin referred them for further processing. To the extent any of the ▮ Compassionate Releases under OGC review were to reach a decision while those AICs were in-transit to their new facility, BOP would be able to immediately release them from their in-transit location. The sending institution, or FCI Dublin, would coordinate with the institution where the AIC would be temporarily housed, in-transit, to effectuate the release. (McKinney Decl., ¶ 14.) BOP will inform the Special Master of the results of all pending compassionate release requests and coordination with the receiving facility with respect to any inmates granted release. But there is simply no need to disrupt the transfer and confine inmates in an understaffed facility to keep the Special Master appraised of the progress of the review process.

The facet of paragraph 4 of Attachment A.1 requiring BOP to complete review of compassionate release requests and review with the Special Master prior to transfer should be eliminated.

## CONCLUSION

In sum, the perverse effect of the Court's Transfer Order after April 19 is a de facto requirement that BOP keep FCI Dublin open and keep inmates at that facility despite the various shortcomings and limitations the Court has previously identified. The Court not only lacks jurisdiction to impose such a requirement, but it is also antithetical to the overall objective of safeguarding inmate safety and welfare. Given the above information, along with Interim Warden McKinney's declaration, this Court should allow BOP to continue with its process of safely transferring out all AICs, while including the Special Master in all requested information – as it has been doing since the closure was announced.

Dated this 16th day of April, 2024.


JESSE A. LASLOVICH
United States Attorney


/s/ *Madison L. Mattioli*
MADISON L. MATTIOLI
ABBIE J.N. CZIOK
MARK STEGER SMITH
TIMOTHY A. TATARKA
Assistant U.S. Attorneys
Attorneys for Federal Defendants