**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CALIFORNIA COALITION FOR WOMEN PRISONERS, ET AL.,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA BUREAU OF PRISONS, ET AL.,**<br><br>Defendants. | **Case No.:** 4:23-cv-4155-YGR<br><br>**ORDER RE CLOSURE OF FCI DUBLIN & PRELIMINARY INJUNCTION**<br><br>Re: Dkt Nos. 251, 256, 258, 262–63 |

Institutions matter. When successful, they provide the structure needed to promote and implement important policies. When they fail, the collapse not only harms those they were created to serve but also those who operated within them, whether or not they contributed to the demise. The Federal Correctional Institution in Dublin and satellite camp (collectively, "FCI Dublin") are now closed. No adults in custody ("AICs") remain. That said, closure is not synonymous with escape. Given the closure, issues of security no longer predominate. Thus, in this Order, the Court publicly summarizes the events which transpired (including some corrections to lawyers' representations) and outlines the necessary and continued monitoring of the Bureau of Prisons ("BOP").

\*      \*      \*

Shortly after the Court issued a preliminary injunction to protect the constitutional rights of the AICs housed at FCI Dublin and appointed a Special Master to assist therewith, the BOP announced its decision to shutter FCI Dublin and relocate the population. BOP had advised the Court that it was considering closure, although no certainty existed, and noted that if it occurred, for security reasons, it would have to be conducted quickly.

Although it had as much time as needed to prepare, BOP's operational plan for closure of FCI Dublin was ill-conceived and, like Swiss cheese, full of holes. BOP regional staff worked the prior weekend hastily reviewing AIC case files to recommend placements. Arrangements were also made with the Justice Prisoner and Alien Transportation System ("JPATS") to halt all other

prisoner transportation so that the week could be dedicated to the transfers. Beyond those preparations, BOP ignored other operational issues including the proper movement of the AICs' property and the appropriate communication and messaging to the AICs and staff who were not advised of the closure until the last minute. Further, despite regular and direct email communications with the Court, through counsel, BOP "announced" the closure to the Court by burying it in an administrative filing on Friday, April 12, 2024. Immediately upon actually learning of the closure, the Court intervened to ensure proper attention was paid to the AICs' needs (medical, mental health, or otherwise) and to direct the onward transfer of the AICs, the last of which left on May 1, 2024.

## I. BACKGROUND

### A. Events Preceding the Closure of FCI Dublin

After an evidentiary hearing, nine-hour personal visit to the facility, and in light of recent events, the Court concluded, on March 15, 2024, that conditions at FCI Dublin required immediate change. (Dkt. No. 222 at 1.) The Court did not come to this conclusion lightly but instead based the decision on careful consideration of the record, which evinced BOP's repeated and intentional disregard of the AICs' constitutional rights. To safeguard the AICs, the Court certified their class, issued a preliminary injunction, and appointed seasoned corrections expert Wendy Still as Special Master to assist the Court. (*See* Dkt. No. 232.)

The Court's order appointing Still was issued on March 26, 2024. On Friday, April 5, 2024, the Court met with BOP Assistant Regional Director, Western Region and FCI Dublin Acting Warden Nancy McKinney,[1] FCI Dublin Acting Executive Assistant and Camp Administrator Greg Chaffee, the Special Master, union representatives for the correctional officers, and counsel to review the plan for assessing with more particularity the problems at FCI Dublin in light of the preliminary injunction order. Special Master Still arrived on site on Monday, April 8, 2024. Importantly, during the week preceding the facility's closure, she began to uncover the extent of FCI Dublin's internal deterioration. Operationally, conditions were

---

[1] On May 6, 2024, the Court learned that McKinney had been replaced as warden by C.D. Nash, who had previously served as Associate Warden.

worse than BOP officials had led the Court to believe. As noted above, on that Friday, April 12, the BOP filed a notice (in the body of a sealed attachment to an administrative motion) wherein it "informed" the Court of its intention to close the facility over the following week, without specifying when such closure would begin. The BOP's obfuscation is obvious. Its lack of transparency with the Court resulted in negative consequences.[2] In fact, BOP Regional Director, Western Region Melissa Rios-Marques refused to advise Special Master Still of the impending closure, which would begin the next day, even when asked directly on Sunday, April 14.

### B. Closure of the Facility

The BOP began to prepare the AICs for transport to other facilities during the early morning hours of Monday, April 15 and had one bus loaded before the Court actually became aware of the closure. The Special Master who was then on-site communicated myriad concerns regarding, among others, the medical clearance process for the AICs being prepared for transport and the eligibility of such individuals for community placements (*i.e.*, home confinement, halfway homes) or release. Based thereon, the Court ordered all transport of the AICs halted. No AICs were transported from FCI Dublin that first day. Those who had been moved onto the bus were eventually returned to the facility. Other buses which had been called to the facility were not loaded.

### C. The Closure

Over the two-plus weeks that followed, the Court provided operational guidance to the BOP relative to the closure of FCI Dublin and transport of the AICs. This guidance came in three main forms. One, the Special Master and her team worked long hours at the facility to address the AICs' concerns, gather information, and ensure compliance with Court orders. Two, the Court held regular sealed status conferences, sometimes as frequently as every other day, with counsel and Warden McKinney to oversee closure and transport issues as they arose. Three, the Court issued a series of sealed orders providing specific directions to BOP. The Court provides a high level overview of such guidance, and the conditions necessitating it, below.

---

[2] Given the BOP's operational and security concerns, as well as the privacy interests of the AICs, the Court **GRANTS** the sealing motions at Dkt. Nos. 251, 258, and 263 except to the extent this Order relies upon the information sought to be sealed therein.

As a preliminary matter, the Court notes that both parties have engaged in posturing, both in public and to the Court. The posturing incompletely captured the facts on the ground, fueled public disinformation, and unnecessarily complicated the operational process. For instance, counsel for the BOP created the impression in a public filing (which was later publicly reported) that FCI Dublin staff abandoned their posts due to the closure of the facility. This representation was devoid of necessary context, such as the fact that BOP brought in outside staff who told the officers that they had been relieved of their tasks, thereby creating confusion not only as to the expectations of them as employees but also as to their job prospects. The chaos was of the BOP's own making. Class counsel, for their part, blindly served as a conduit for AIC complaints without distinguishing between those which were plausibly meritorious and others that lacked any measure of reasonableness. For example, at one point, class counsel claimed certain AICs had been flown from FCI Dublin to a different location only to be flown back; a claim that strains logic and credulity. They also misrepresented the eligibility of non-U.S. person AICs for community placement. That some validation of AIC complaints by class counsel was necessary should have been obvious; indeed, ninety percent of the population suffers from trauma and views events through that lens. The closure was particularly difficult on those who were being transported farther away from families and for staff who were not sure they would keep their jobs. Some of this could have been mitigated had the BOP actually followed a fully conceived operational plan. Nonetheless, the posturing made it harder, not easier, for the Court to collaborate with the parties to address meritorious concerns in real time.

To illuminate, the Court summarizes below key operational considerations on which the Court, including through the Special Master, provided guidance and oversight.

### i. Inadequate Staffing

A key component of FCI Dublin's dysfunction has been the significant lack of adequate staffing. (*See, e.g.*, Dkt. No. 222 at 8–10.) The facility's staffing levels have consistently remained at critically low levels and impacted virtually every area of the facility. This jeopardized the AICs' health and safety, due process, access to programming,[3] and basic rights.

---

[3] In addition to the issues explored below, the Court notes that inadequate staffing also limited the programming available to the AICs at FCI Dublin. Such programming is important for at least two reasons. First, it enables the AICs to make productive use of their time in custody.

**Medical and Mental Health Care.** As set forth in the preliminary injunction order, the AICs at FCI Dublin have long been denied constitutionally adequate medical and mental health care due in large part to lack of sufficient staffing. (*See id.* at 10:12–14 ("During inspection, the Court heard a refrain so consistent from so many [AICs] in different quarters and without prompting to demonstrate its reliability: in response to health concerns, medical staff told them to 'lose weight and drink water.'").)

The full extent of the facility's inadequate medical and mental health care and related staffing issues became clear as the Special Master began to interview officers and review records. As she observed, FCI Dublin has repeatedly failed to follow BOP departmental policy related to completing timely health intakes; sick call access was delayed for extended periods; medical needs, including relative to communicable diseases, went untreated or lacked any follow up; and specialty appointments were not timely scheduled. Relatedly, drug treatment programs were not available for the majority of the population that requested treatment, despite drugs being rampant at the facility. Mental health services were also inadequate. By way of illustration, access to psychiatry services was blocked administratively despite repeated requests from the psychology department itself.

The effect of these shortcomings was felt acutely by the AICs during the 16-day period leading to the closure of the facility. It became clear, for instance, that certain AICs had not been properly cleared by medical providers for transit. To the extent clearances had been obtained, the Court was concerned that they were nothing more than rubber-stamps based solely on cursory reviews of the relevant files. Further, such clearances did not meaningfully engage with the fact that many AICs had waited so long for care that even otherwise routine matters may have become more serious given lack of timely treatment in the first instance.

In light of these deficiencies, including their cumulative impact on AICs' wellness, and to prevent additional deterioration in connection with FCI Dublin's closure, the Court took immediate steps to mitigate the situation. This included requiring that (i) the AICs be medically cleared prior

---

Second, lack of programming makes significant amounts of the facility's population unable to earn credits that could impact their release dates and rehabilitative recovery.

5

to transfer and provided medications needed during their transit to other facilities, which sometimes takes multiple weeks, and (ii) the BOP attend to the AICs in need of urgent medical consults. As a result, the BOP flew in additional temporary medical providers, as did the Court. To the extent the Court's medical experts questioned clearances for certain AICs, they met and conferred with the BOP medical staff to reach a mutually-agreeable position with respect to each and every individual.

As part of this process, the Court required the BOP medical staff to compile a comprehensive roster of the AICs which flagged with "alerts" certain individuals as needing additional medical and/or mental health follow up. The Court will use this document to monitor the care provided by BOP to these individuals upon arrival at their new facilities.

**Administrative Remedies & Casework.** The administrative remedy process at FCI Dublin was also effectively non-functional, again due in large part to inadequate staffing. Legitimate issues and complaints raised by the AICs routinely went unaddressed for months, if not years. For public transparency, the effect of this administrative debacle meant some AICs were not released to community placements like half-way houses or home confinement on time. The Court ordered BOP to conduct casework reviews for every AIC *before* transferring them in order to ensure that the AICs were properly classified and their casework not subjected to additional administrative delays in connection with their transfer to new facilities.

The administrative deficiencies were particularly egregious in the context of the AICs' requests for compassionate release, a responsibility of the facility's warden.[4] The Special Master, based on extensive interviews and review of documents, determined that FCI Dublin's processing of such requests was woefully inadequate. Many requests were lost (despite having been properly submitted) or not tracked, let alone adjudicated.[5] To rectify this, the Special Master and Warden McKinney are reviewing all identified requests and processing them, which is nearly complete.

---

[4] Such applications are submitted to the warden in the first instance and may only be submitted to an AIC's sentencing judge (i) if the BOP agrees to grant compassionate release; (ii) the AIC contests a denial by the BOP; or (iii) the BOP fails to timely act on the request. *See* 18 U.S.C. 3582(c)(1)(A).

[5] There is no evidence that such requests were shredded. The issue was administrative.

Thus, the AICs waiting for responses should have them already or have them soon. As a result, a few AICs were released to community placements.

As of May 3, 2024, the Court has received 21 requests for compassionate release submitted directly. (*See* Dkt. Nos. 267–74; 276–86; 290; 296.) These requests are procedurally improper and are **DENIED WITHOUT PREJUDICE** on the grounds that this Court was not the sentencing judge for any of the applicants and, thus, has no authority to rule on them. The AICs may resubmit their completed requests to the appropriate judge. A supplemental order is issued herewith addressing this topic and providing guidance to the AICs.

Outside of the compassionate release context, the Special Master also determined that FCI Dublin's casework systems were not current. As noted above, irregularities in existing AIC casework impacted AIC time credits and eligibility for community placement or release, among others. The Court intervened to ensure AIC casework was appropriately updated prior to transfer by requiring a casework review for each individual. The results have been positive. For example, Warden McKinney, in consultation with the Special Master, agreed to advance certain release dates scheduled through the end of May 2024 by several weeks based, at least in part, on the casework review process undertaken. This is an example of the sensible and collaborative partnership demonstrated by certain figures in BOP leadership who have, jointly with the Court and Special Master, sought to rectify past harms at FCI Dublin by timely and responsibly addressing the AICs' concerns during closure of the facility.

      *ii.*    *Transportation-Related Concerns*

Next, the Court became aware of transportation issues regarding the movement of the ACIs to new facilities. Class counsel raised two main categories of concerns, those relative to (i) injuries purportedly sustained during transit, and (ii) destruction of AIC property.[6] The Court addresses each.

---

[6] Class counsel also alleged that the buses lacked sufficient feminine hygiene products, toilet paper/bathroom facilities, food, and heat, with one particularly egregious case for an AIC on her monthly cycle. Unfortunately, there was no video to confirm the allegations. Thereafter, the Special Master and Warden arranged for video surveillance cameras, with audio enabled, to be deployed on the remaining buses. The Special Master (or members of her team) and the Warden also boarded the remaining buses to independently confirm sufficient supplies had been loaded and

**Injuries Sustained During Transit**. Class counsel have relayed myriad complaints from various class members concerning the conditions of their transports. Among those are complaints that individual AICs sustained injuries during transit. The Court responded by ordering the identification of such AICs, cataloguing of their complaints, immediate medical examinations upon arrival at new facilities, as well as photographic documentation of any injuries. The BOP has since produced to the Court, Special Master, and plaintiffs' counsel a range of records and photographs for most of those AICs.

While such efforts are ongoing, the Court's preliminary review of the documentation provided suggests any alleged injuries were superficial and caused by overly tight restraints. The Court has reviewed the photographs and has seen no evidence of cuts, welts, or significant bruising. It is not surprising that sitting several hours with restraints would be uncomfortable and lead to soreness, but security protocols cannot be avoided and the complaints appear exaggerated. Class counsel will be provided with those pictures and are ordered to transmit the same to any attorney who may represent an AIC individually for review of the AIC, if appropriate, by their own physicians.

**Destruction of AIC Property**. Given BOP's lack of forethought, it is not surprising that the Court received credible allegations from some of the AICs that, in the process of being moved, they were required to leave behind certain of their personal property, which was then taken by others. The early sets of AICs were provided *only one duffle* bag to pack all of their items, or one duffle bag was packed for them by BOP staff. Some individuals were forced to leave the facility before receiving commissary items they had already purchased.

After the Court raised these issues, the BOP began providing, as of April 18, 2024, the AICs with three boxes per person in which to pack their belongings, the rest of which would be abandoned. Two of the boxes would be shipped to the AIC's final destination. One box would be shipped to the AIC's home address. The BOP agreed to pay for all shipping costs. This is an example of an obvious operational issue which the BOP should have anticipated and rolled out with precision. The BOP

---

to ensure the transports had sufficient heat and blankets accessible. As to the latter point, the response from the AICs were that the buses were too warm.

either did, and ignored its obligations, or did not in the first instance. In either event, the result was the same and the responsibility for the operational failure lies with the BOP.

The Court takes matters of AIC property seriously, especially where, as here, funds to replenish lost items are limited and the closure occurred through no fault of the AICs. The Court ordered the BOP to distribute claim forms to class members for lost and/or destroyed property.[7] The Court is awaiting a response from the BOP regarding making whole those AICs who paid for, but did not receive, commissary items. Monitoring for compliance and follow-up will continue.

### iii. Immigration-Related Concerns

In addition, the Court notes that class counsel have raised concerns relative to the eligibility of certain AICs who are not legally in the United States for community placement. The Court will not go into detail due to the sensitivities involved. However, the Court notes, for transparency purposes, that such concerns are being tracked by the Special Mater, actively addressed with counsel for the BOP, and that any individuals found eligible for such programs are being identified and their cases addressed in the normal course. Most of the cases raised by counsel appear to lack meritorious claims. However, as previously mentioned, the Special Master is still in the process of ensuring all casework documents are appropriately processed, which may change this analysis. Monitoring for compliance and follow-up will continue.

### iv. Concerns Regarding Disciplinary Records

Lastly, the Court was recently informed by the Special Master that FCI Dublin's disciplinary records have been the subject of gross neglect by leadership. Warden McKinney referred the Special Master to the Western Regional Hearings Administrator to examine this issue further. The Administrator and Special Master pulled a sample of ten incidents from the period ranging from April 25, 2022 to April 23, 2024. Each were reviewed. The Administrator consulted with additional BOP leadership and determined that each incident record was riddled with errors,

---

[7] The Court was recently informed by the Special Master that FCI Dublin staff may have written on various claims forms that the AICs left certain of their remaining items at the facility unsecured when they were transferred. If true, this represents an affirmative attempt by staff to flout the administrative process by which the AICs incarcerated at BOP facilities are able to seek redress for lost property. The Special Master's assessment of this alleged practice is ongoing.

9

including due process issues. For instance, the AICs had not been notified of the disciplinary charge for which they were found guilty, sanctions were incommensurate with the infractions charged and were inconsistently applied, and timeliness issues abounded. Following this review, *all ten incidents* were expunged from the AICs' records based on the determination of the Administrator.

Resolution of this issue must occur promptly.  The AIC's are entitled to due process for disciplinary infractions. The outcomes of disciplinary reviews such as these impact the AICs' classification designations. Such designations may have meaningful impacts on the eligibility of the AICs for community placement or release. Given each incident randomly selected merited expungement, the Court has no confidence that the disciplinary infractions of class members were appropriately processed. A comprehensive audit is therefore necessary to ensure the AICs were transferred to the right facilities and eligibility determinations with respect to community placements or release were accurate in the first instance or are revised and acted upon. Monitoring for compliance and follow up relative to the audit is required.

## II.   CONTINUED MONITORING OF CLASS MEMBER WELFARE

As set forth at length above, the conditions at FCI Dublin prior to its closure were constitutionally suspect. While closure certainly obviates the need, at least for now, to address certain concerns identified in the Court's prior order, other issues may persist, until proven otherwise. The cumulative impact of FCI Dublin's insufficient staffing and related medical and mental health care inadequacies is still being felt by the AICs in need of treatment, not to mention the property and audit issues. Continued monitoring of class members' welfare is therefore warranted until BOP provides the Court with sufficient proof that the issues can be, and are being, addressed.

As such, the Court hereby **ORDERS** the BOP to take measures to identify, track, and respond to AICs' concerns as outlined below. A full list of the actions required to be taken is included in Section V of this Order.

### A.   Staffing Concerns

Ensuring that transferee institutions have sufficient staffing to address the needs of the AICs previously incarcerated at FCI Dublin is paramount. Accordingly, the Court requires the BOP to

provide a staffing report on each transferee institution[8] with details on the number of budgeted, authorized positions and associated vacancies, broken down by department. The staffing report shall be provided in the first instance for the period since January 1, 2024 and shall be updated through the trial on this action unless otherwise ordered. Such monthly reports shall also address staffing augmentations.

### B. Medical and Mental Health Alerts

Assuming adequate staffing is in place, the Court expects transferee institutions to timely address the class member medical and mental health concerns already communicated (*e.g.*, those called out through "alerts" placed by the Special Master). To assist the Court in ensuring compliance with such directives, the BOP shall submit weekly reports updating the aforementioned ACI roster. These updates shall address actions taken to address alerts and, when the BOP believes compliance is complete, requests to the Special Master to terminate them. No alerts will be removed until the Court and Special Master are satisfied that the required action has been taken. Updates shall continue until the trial on this action unless otherwise ordered.

### C. Additional Items Requiring Ongoing Monitoring

Finally, the Court addresses a limited number of additional items. First, the BOP shall include with the above-referenced roster updates descriptions of actions taken to resolve the AICs' concerns relative to transportation-related concerns, including lost property. Second, the BOP shall facilitate the Special Master's continued access to necessary information and technology, as well as that of designated members of her team. Third, the BOP shall ensure class members do not lose time credits for time spent in transit to their new facilities given that the closure was solely the result of the BOP's own deficiencies. Fourth, the BOP shall update the AIC roster to track any Prison Rape Elimination Act ("PREA") claims previously made by class members and any claims

---

[8] The Court understands FCI Dublin AICs have been transferred to the following BOP facilities: Aliceville FCI, Carswell Federal Medical Center, Hazelton FCI, Miami Federal Detention Center ("FDC"), Pekin FCI, Philadelphia FDC, SeaTac FDC, Tallahassee FCI, Victorville Medium I FCI, and Waseca FCI.

11

of retaliation such class members make arising out of having filed such claims,[9] retaliation complaints filed by class members of which they are aware, and to identify to whom they have been referred. Updates shall continue until the trial on this action unless otherwise ordered.

### III.    OUTSTANDING MOTIONS

Having addressed the conditions at FCI Dublin preceding its closure as well as the Court's plans for continued monitoring of the ACIs' welfare, the Court turns next to two outstanding motions from the parties, only one of which requires analysis at this stage.[10]

On April 16, 2024, the BOP filed a Rule 60 motion for relief from the Court's emergency orders. The BOP characterized the Court's orders as imposing "a de facto requirement that [it] keep FCI Dublin open [after April 19, 2024] and keep inmates at that facility despite the various shortcomings and limitations the Court has previously identified." (Dkt. No. 257 at 15:4–6.)  The BOP argued this implicit directive exceeded the Court's authority and requested, as relief, that the Court permit the BOP to "continue with its process of safely transferring out all AICs, while including the Special Master in all requested information." (*Id.* at 15:9–10.)

As previously communicated to the BOP, the motion is **DENIED**. Three considerations drive this analysis. *One*, the steps taken by the Court relative to the closure of FCI Dublin were explicitly contemplated by its prior preliminary injunction order. As set forth therein, the Court put the BOP on notice that it anticipated issuing additional orders "so that the constitutional rights of those imprisoned at [FCI Dublin] are no longer at significant risk." (Dkt. No. 222 at 1:20–21.)

---

[9] The Special Master informs the Court that, as with many other administrative deficiencies at the facility, FCI Dublin did not appropriately track and process PREA claims filed by its AIC population. Thus, the Special Master anticipates identifying to the BOP additional individuals who, through no fault of their own, have not previously been tracked as having PREA claims.

[10] In addition to the government's motion for relief, which is addressed below, plaintiffs filed a request for a temporary restraining order seeking to enjoin transfer of the FCI Dublin AICs to other facilities. *See* Dkt. No. 262. Shortly after the filing was received, the Court orally informed plaintiffs that any attempt to prevent closure of the facility was denied as the determination to shutter FCI Dublin was within the BOP's discretion. Thus, the entire motion is **TERMINATED AS MOOT**. Any specific issues which plaintiffs believe are not mooted must be reasserted given the changed circumstances.

12

*Two*, the Court's guidance to the BOP regarding closure of the facility represents a logical extension of the commands of preliminary injunction order. Indeed, the Court's sealed orders concerned similar topics, including medical and mental health care and administrative remedies, which the BOP had effectively ignored in its operational plans for the closure.

*Three*, the Court did not and could not order the BOP to abandon its decision to close the facility, nor did the Court require that the facility remain open until a specific date. Instead, the Court's guidance required the BOP to provide constitutionally adequate care and processes to FCI Dublin's AICs.

It strains credulity for the BOP to assert that the Court's guidance to the BOP was unlinked to any source of legitimate authority. Context is important. The Court determined the ACIs at FCI Dublin were not receiving constitutionally required care and took steps to address such deficiencies, such as entering a preliminary injunction. Once closure was announced, the Court took steps to adapt the preliminary injunction to changing circumstances. Further, the BOP cannot hide from or escape its obligations by merely closing FCI Dublin.  The class members have been denied medical and mental health treatment for years in some cases, and months in others.  The Court will not tolerate continued delay.

**IV.   NEXT STEPS**

The BOP has represented to the Court that they intend to try this case. Thus, the Court **SETS** a case management conference on **Thursday, May 16, 2024 at 9:00 a.m.** to address pretrial scheduling as well as any questions the parties may have after reviewing this Order. The case management conference will be held via Zoom and accessible to the public.[11] The parties shall follow all local rules with respect to the filing of case management statements.  As orally advised, the Court can currently accommodate a trial in the Fall/Winter of 2024.[12]

---

[11] The case management conference will be accessible via the public hearings link posted on the Court's public webpage: https://www.cand.uscourts.gov/judges/gonzalez-rogers-yvonne-ygr/.

[12] For clarity, the Court notes that this litigation is currently separate from sixty-plus other cases which concerns exclusively claims arising out of FCI Dublin staff sex abuse. Those proceedings are stayed until the summer 2024 and may be extended to facilitate ongoing settlement discussions.

## V. CONCLUSION

The BOP's closure of FCI Dublin, especially coming so soon after issuance of this Court's preliminary injunction, created serious concerns relative to the AICs' welfare, some of which persist. The Court has taken, and continues to take, active steps to address these concerns, including by implementing compliance systems to hold the BOP accountable to providing class members constitutionally adequate care, no matter their current locations.

To that end and in summary, the BOP is hereby **ORDERED** as follows. The below directives may be adjusted in the months to come.

1. The BOP shall provide a monthly staffing report to the Court and Special Master for each BOP facility to which FCI Dublin class members were transferred.
    a. The staffing report shall include the number of budgeted, authorized positions and associated vacancies detailed by correctional, casework, program, mental health, and medical classifications.
    b. The first report shall include staffing and vacancies as of January 1, 2024.
    c. The staffing report shall also include staffing augmentations for such facilities.
2. The BOP shall maintain and provide a weekly update to the tracking roster created for the class members housed at FCI Dublin. Columns and associated information will be updated to reflect any changes occurring during the reporting period. The roster shall be distributed to the Court, Special Master, and class counsel.
3. The BOP's updates shall include details regarding alerts, such as alerts addressed and any proposed alerts to be removed from the roster. The Special Master's approval is required prior to the removal of an alert. Any proposed removal of alerts shall include what the alert required (*i.e.*, medical follow- up, mental health) and the action taken in response.
4. The BOP's roster updates will also include information related to the existence of property and transportation related claims/issues as well as their resolution.
5. The Special Master and designated team members will continue to have access to information relative to this litigation, and they will be provided with BOP laptops and PIV cards to access that information. They will only access information related to class members and information needed for reporting to the Court.
6. The BOP shall ensure no credit loss occurs for class members due to the transfer from FCI Dublin to other BOP facilities. The BOP shall confirm the same in a written declaration.
7. The BOP's weekly reports shall inform the Court, Special Master, and class counsel of any updates relative to PREA claims made by class members concerning conduct at FCI Dublin, including with respect to any claims of retaliation made by such AICs.
8. The BOP Western Regional Disciplinary Hearing Administrator shall audit FCI Dublin's Unit Disciplinary Actions and Disciplinary Hearing Officer's actions between April 25,

2022 and May 1, 2024. Necessary corrective actions shall be taken on incidents and associated disciplinary actions where due process and other errors occurred. To the extent such issues are identified, they shall be tracked via the above-mentioned roster.

Given the utter failure of FCI Dublin to address fundamental operational requirements, the Court's monitoring and compliance outlined herein is necessary, unfortunately. Given Warden McKinney's collaboration, the Court has a measure of hope that the outstanding issues can be addressed promptly, allowing the Court to retract from the need to oversight, although she has now been replaced. The BOP serves an important purpose. The Director's challenge is to find more people like Warden McKinney to implement those goals and weed out, or retrain, others who have contributed to the reputational decline of the BOP. In the meantime, the Court will continue to provide oversight to safeguard class members from adverse actions connected to the events that transpired at FCI Dublin.

\*   \*   \*

To ensure transparency, the Court **ORDERS** that the BOP provide a copy of this Order to each member of the certified class via the Trust Fund Limited Inmate Computer System ("TRULINCS") within no more than **three (3) business days**. Class members are reminded that the Court has appointed class counsel to represent their interests in this litigation. Their contact information is appended hereto as Attachment A.

This terminates Dkt. Nos. 251, 256, 258, 262–63.

**IT IS SO ORDERED**.

Date: May 8, 2024

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**