MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
KARA J. JANSSEN – 274762
ADRIENNE SPIEGEL – 330482
LUMA KHABBAZ – 351492
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Email: mbien@rbgg.com
       egalvan@rbgg.com
       kjanssen@rbgg.com
       aspiegel@rbgg.com
       lkhabbaz@rbgg.com

SUSAN M. BEATY – 324048
CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE
1999 Harrison Street, Suite 1800
Oakland, California 94612-4700
Telephone: (510) 679-3674
Email: susan@ccijustice.org

OREN NIMNI*
 Mass. Bar No. 691821
AMARIS MONTES*
 Md. Bar No. 2112150205
RIGHTS BEHIND BARS
416 Florida Avenue N.W. #26152
Washington, D.C. 20001-0506
Telephone: (202) 455-4399
Email: oren@rightsbehindbars.org
       amaris@rightsbehindbars.org

STEPHEN S. CHA-KIM*
 N.Y. Bar No. 4979357
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8000
Email: stephen.cha-kim@arnoldporter.com

CARSON D. ANDERSON – 317308
ARNOLD & PORTER KAYE SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, California 94306-3807
Telephone: (650) 319-4500
Email: carson.anderson@arnoldporter.com

* Admitted *pro hac vice*

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS et al.,<br><br>Defendants. | Case No. 4:23-cv-04155-YGR<br><br>**JOINT CASE MANAGEMENT STATEMENT**<br><br>Judge: Hon. Hon. Yvonne Gonzalez Rogers<br>Date: May 16, 2024<br>Time: 2:00 pm<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Trial Date: None Set |

[4490585.2]

Case No. 4:23-cv-04155-YGR

JOINT CASE MANAGEMENT STATEMENT

The parties, through counsel, have met and conferred as required by Rule 26(f) of the Federal Rules of Civil Procedure and jointly file this report as required by Rule 26(f)(2), and in preparation for the Case Management Conference set for May 16, 2024.

## I.   JURISDICTION AND SERVICE

### A.   Plaintiffs' Statement

The Court has jurisdiction over Plaintiffs' claims for injunctive relief under 28 U.S.C. § 1331 governing "all civil actions arising under the Constitution, laws or treaties of the United States." This Court also has jurisdiction over Plaintiffs' claims for compensatory relief under 28 U.S.C. § 1346(b). Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) with respect to any state law claims, as they are related to and form part of the same case or controversy as claims based on the federal Constitution, laws, and/or treaties.

Venue is "determined as of the time of the filing of the action," *Technograph Printed Circuits, Ltd. v. Packard Bell Elecs. Corp.*, 290 F. Supp. 308, 326 (C.D. Cal. 1968). Venue is proper in this district under 28 U.S.C. § 1391(b)(2) (district where substantial part of events or omissions occurred) and 28 U.S.C. § 1391(e)(1)(B), (C) (official capacity actions against officers or employees of the United States may be brought in any judicial district substantial part of events or omissions occurred, or where plaintiff resides).

Plaintiffs have served all defendants including all individual defendants. See Dkts. 23, 27-31, 44, 213, 217-218, 220-221, 224-225.

### B.   Federal Defendants' Statement

Defendants agree that federal courts have original jurisdiction over all civil actions arising under the Constitution, have exclusive jurisdiction over claims brought against the United States under 28 U.S.C. § 1346(b) and §§ 2671-80 (the Federal Tort Claims Act), and that the FTCA provides a limited waiver of the United States' sovereign immunity when its employees are negligent in limited circumstances. Defendants disagree that 28 U.S.C. §§ 1332 or 1367(a) apply to claims brought under the FTCA. Defendants disagree that Plaintiffs have established

jurisdiction in this case. If the Court has subject matter jurisdiction over a live controversy in the Northern District of California, Defendants agree that venue is appropriate in this Court.

## II.   STATEMENT OF FACTS

### A.   Plaintiffs' Statement

Plaintiffs are persons who survived the years of criminal abuse and retaliation at the currently closed FCI Dublin prison and camp facility.  This abuse and retaliation was the result of the practices, policies, and customs of the Bureau of Prisons as a whole.  Plaintiffs continued to suffer daily retaliation, lack of access to basic human needs, and risk of sexual abuse in the facilities to which the Defendant officials hurriedly transferred them, in a rush to escape monitoring by the Special Master that began work just days earlier.

Until the BOP decided to temporarily close it on April 12, 2024, Defendant officials operated FCI Dublin as an all-female facility, housing federal prisoners in a low security prison and an adjacent minimum security satellite camp.  In March 2024, when this Court issued its order on class certification and preliminary injunction, the prison housed roughly 550 incarcerated persons and the camp over 100 incarcerated persons.  *California Coalition for Women Prisoners v. U.S.*, No. 4:23-CV-4155-YGR, 2024 WL 1290766, at *2 (N.D. Cal. Mar. 15, 2024).

The California Coalition for Women Prisoners (CCWP) and eight individual incarcerated people brought this action in August 2023, and simultaneously moved for class certification and a preliminary injunction. The Court held an evidentiary hearing on the motions from January 3-9, 2024.  Fourteen incarcerated people testified about the ongoing risks of sexual assault, retaliation, and lack of access to basic human needs at FCI Dublin, such as medical care, mental health care, and sanitation.  Government witnesses, including a new warden, testified that "new leadership" had reformed and would continue to reform Dublin, and that no outside supervision was necessary.

On January 24, 2024, five additional FCI Dublin officials were placed on administrative leave, including a captain who testified on behalf of BOP at the evidentiary hearing weeks earlier.

On March 11, 2024, the FBI executed a search warrant at Dublin and walked off members of the new leadership team, including the latest warden, the Assistant Warden, and the Executive

Assistant who testified before the Court during the January evidentiary hearings.

On March 15, 2024, this Court issued an Order Granting the Motion for Class Certification, and Granting and Denying in Part the Motion for Preliminary Injunction. *CCWP,* 2024 WL 1290766. The Court found that "because of its inability to promptly investigate the allegations that remain, and the ongoing retaliation against incarcerated persons who report misconduct, BOP has lost the ability to manage with integrity and trust." *Id.* at *5.

The Court further found that even under the "new leadership," incarcerated people faced staff retaliation "for making any kind of report, whether for malfeasance like sexual abuse or the enforcement of their rights, such as filing a medical complaint." *Id.*

The Court found that BOP's response to the sexual assault crisis at FCI Dublin was "deliberately indifferent to plaintiffs' risk of abuse." *Id.* at *15. The Court based this finding on three facts–repeated failures to appoint leadership "capable of understanding and responding to the gravity of the situation," failure to reform the investigative process for sexual assault allegations to ensure independent investigations, and failure to institute zero tolerate of staff abuse by allowing abusive officers to remain on the job. *Id.*

The Court also found that medical and mental health services were inadequate to address the serious needs of a population with a history of trauma, and that BOP was deliberately indifferent to the resulting risks of serious harm. *Id.* at *17-18.

The Court found that that incarcerated persons faced retaliation for reporting sexual abuse, or even for complaining about things that staff interpreted as a sexual abuse complaint. One common form of retaliation is placement in the Special Housing Unit (SHU). Defendant officials contended that they were simply applying BOP nationwide policies on SHU placement neutrally, and that they needed to use the SHU to deter false allegations against staff. The Court rejected these contentions. *Id.* at *23.

The Court further certified a class of "all people who are now, or will be in the future, incarcerated at FCI Dublin and subject to FCI Dublin's uniform policies, customs, and practices concerning sexual assault, including those policies, customs, and practices related to care in the aftermath of an assault and protection from retaliation for reporting an assault."

The Court announced that it would appoint a Special Master to be onsite at FCI Dublin. After a three-week process of party-nominations and Court interviews, the Court selected a longtime former correctional official, Wendy Still, as Special Master.

Ms. Still began her on-site presence at FCI Dublin on Monday April 8, 2024. Four days later, on April 12, 2024, the BOP informed the Court in a sealed filing that it would close FCI Dublin. Despite having presented a parade of officials testifying under penalty of perjury at the January 2024 evidentiary hearing, and in numerous declarations before and after the hearing, that conditions at Dublin were constitutional and improving, the BOP now turned 180 degrees, and told the Court that Dublin must be closed within days to prevent unconstitutional conditions from continuing there.

On May 7, 2024 the Court issued an Order re Closure of FCI Dublin & Preliminary Injunction (Dkt. 300) detailing the impacts of the "ill-conceived" closure on the class members' welfare, the steps taken to attempt to mitigate those impacts by the Court and Special Master, and additional steps necessary to further protect the class members in the months leading up to trial. As the Court's May 7 Order noted, "the BOP cannot hide from or escape its obligations merely by closing FCI Dublin." While the closure addresses physical issues with the facilities significant issues remain, and must be addressed in a trial of this matter to determine what further injunctive relief is necessary including the following factual issues:

- Do BOP policies, practices, and customs regarding put class members at risk of sexual abuse? Does BOP properly document and investigate claims of sexual abuse and are officers with substantiated claims properly disciplined? Has BOP put in place necessary protective measures including confidential reporting mechanisms, access to counsel, independent investigation, ensuring officers with substantial claims of sexual assault and harassment are not left in positions of power over AICs, proper use of cameras, processes to provide documentation necessary for non-citizen AICs to get U-Visas, and processes to assist survivors with compassionate release petitions?.

- Do BOP policies, practices and customs allow retaliation in the BOP system? Does the agency still categorically refuse to investigate claims of retaliation on the

national level? Does BOP continue to allow retaliation against people who report staff misconduct, in particular, sexual misconduct? Is the BOP retaliating against the people who transferred from Dublin, including in the rushed evacuation process? Such retaliation includes post-Dublin SHU placements, "purging" First Step Act packets during and after the transfers to disrupt and delay community placement, manipulating post-transfer job assignments to disrupt credit earning, verbal threats targeting people for speaking up and "causing" Dublin to close, strip searches and other tactics to impede access to counsel at new facilities.

- Is the BOP treating people transferred from Dublin differently than similarly situated AICs? Disparate treatment to be proved at trial includes placement far from family support, out-of-custody-level placements, placement of long-term AICs in pretrial detention facilities.

- Is BOP medical and mental care staffing deficient? Are receiving facilities adequately able to absorb the needs of all those they rapidly transferred from Dublin? Are deficiencies in care endemic to the BOP system as a whole? Is the BOP meeting the trauma-related medical and mental health needs of the persons transferred from Dublin?

- Has BOP addressed the dire conditions, including medical and financial, that contribute to ongoing sexual exploitation of incarcerated people?

- Does BOP continue to miscalculate good time credits of those in its custody and therefore hold them inside long beyond what the law envisions?

- Has BOP changed its policies, practices and procedures in any substantive way to correct the glaring deficiencies highlighted at FCI Dublin?

- Did BOP and its officials know of the extent of unconstitutional activity at FCI Dublin (assaults, medical care, retaliation) and continue to operate as usual, including by representing to this Court that all was well before closing FCI Dublin?

**B.     Federal Defendants' Statement**

The California Coalition for Women Prisoners (CCWP) and eight individual incarcerated

people brought this action in August 2023, and simultaneously moved for class certification and a preliminary injunction. Plaintiffs' motion centered completely on conditions of confinement at FCI Dublin. (*See e.g.*, dkt. 10 at 6-7, "[t]hose incarcerated <u>at FCI Dublin</u> have been and continue to be subject to a systemic campaign of staff sexual assault, harassment, and retaliation which makes sexual abuse a fact of incarceration <u>at the facility</u> . . . It is hard to overstate how pervasive the sexual misconduct and retaliation <u>at FCI Dublin</u> is, and how well aware officials at every level were and are of this ongoing problem." (emphasis added); "[t]he past and ongoing harms to those incarcerated <u>at FCI Dublin</u> include physical harm, psychological harm, and damage to their well-being and relationships in every way imaginable. <u>All those incarcerated at the facility</u> remain subject to extremely high risk of substantial injury from sexual assault <u>while they remain at FCI Dublin</u>." (emphasis added); and at 17, 19, 21-22, 26.) The declarations in support of the preliminary injunction similarly focused exclusively on conditions of confinement at FCI Dublin, and all declarations contained this statement: "FCI Dublin's inadequate systems for preventing, detecting, and responding to sexual abuse have caused actual harm to myself and others incarcerated at FCI Dublin and put myself and other incarcerated persons at substantial risk of serious harm from sexual assault, harassment, and retaliation from staff." (Dkts. 10-1-10-47.)

The Court held an evidentiary hearing on the motions from January 3-9, 2024. Fourteen incarcerated people, largely from the same two housing units, testified about conditions of confinement at FCI Dublin, including their perceptions of ongoing risks of sexual assault, retaliation, and lack of access to confidential reporting mechanisms, counsel, and medical and mental health care.

BOP witnesses testified consistently that BOP earnestly attempted to remedy issues at FCI Dublin through traditional means, by installing new leadership at the facility and implementing the recommendations of an outside consulting group. When they testified, new leadership was confident they had reformed and would continue to reform the culture at FCI Dublin, and that no outside supervision was necessary. However, due to the intense scrutiny of new leadership, and despite collectively exercising sound judgment on hundreds of occasions, BOP placed nine supervisory employees on administrative leave pending investigation into allegations of non-

sexual misconduct between January 9 and March 11, 2024.

On March 11, 2024, the government provided notice to the Court that BOP had replaced the Acting Warden, an Associate Warden, the Executive Assistant/Satellite Camp Administrator, and the Acting Captain at FCI Dublin, and that "[t]his change is consistent with ongoing actions by BOP leadership to enact positive changes at FCI Dublin, and in response to recent developments that were raised in post-hearing motions (*see. e.g.*, docs 163, 166, 175) and in the February 27, 2024 show cause hearing. This new team has been charged with developing a plan for the future of the facility and presenting it to Bureau leadership for consideration." (Dkt. 211.)

Far from an impulsive decision, BOP leadership had been considering the closure of FCI Dublin for many years, and determined that closure was compelled post haste "due to FCI Dublin's perpetual short-staffing, aging infrastructure, and ongoing allegations of staff misconduct." (*See* dkts. 211; 257 at 3.) After news of the closure became public, the government explained that "[d]etails regarding the closure of a federal prison are highly sensitive and cannot become public in advance of the closure due to serious safety and security risks to all involved. (Lothrop Decl., Doc. 236-2.) As such, the information can be shared only on a need-to-know basis. Once the timeline for closure of FCI Dublin was solidified, it became apparent that the Court had a need to know given the Order requiring advance notice of the transfer of any AIC listed on either party's witness list. Accordingly, BOP made *ex parte* contact with the Court [(about a month prior to the announcement of the closure – on or about March 13, 2024)] to inform it of the impending facility closure, omitting any logistical details. (Doc. 235.)

On March 15, 2024, this Court issued an Order granting the motion for class certification and granting and denying in part the motion for preliminary injunction. (Dkt. 222.) The Court found that "[FCI] Dublin is a dysfunctional mess. The situation can no longer be tolerated. The facility is in dire need of immediate change." (*Id*. at 1.) The Court stated further it was issuing this Order "and other anticipated Orders so that the constitutional rights of those imprisoned at the prison are no longer at significant risk. The Court shall appoint a special master forthwith. The Court will issue further Orders narrowly tailored to address the ongoing retaliation which has resulted from the convictions and sentencings of five prison officials, including the previous

warden, for criminal sexual abuse and sexual contact. The special master shall assist the Court to ensure compliance with these orders." (*Id*.) Key findings supporting this ruling by the Court centered solely on conditions at FCI Dublin. (*See e.g.*, *id*. at 8, 10-12, 22, 26-27, 30-31, 35, 37-42.)

The Court stated: "Plaintiffs move to certify a class of '[a]ll people who are now, or will be in the future, incarcerated at FCI Dublin and subject to FCI Dublin's uniform policies, customs, and practices concerning sexual assault, including those policies, customs, and practices related to care in the aftermath of an assault and protection from retaliation for reporting an assault.' They do so solely under Fed. R. Civ. P. 23(b)(2) and, at this juncture, for the purpose of adjudicating their motion for preliminary injunction on a classwide basis." (*Id*. at 14 (citing doc. 11 at 2).) The Court granted the class certification motion, finding that Plaintiffs had satisfied the Rule 23(b)(2) factors based on the numerosity of those incarcerated at FCI Dublin (then-674), the commonality of questions sought to be answered (whether "BOP and FCI Dublin's policies and practices will provide common proof of whether FCI Dublin has placed its incarcerated population at risk of sexual abuse, retaliation, and medical neglect"), and typicality of the named plaintiffs' claims (finding "named plaintiffs bring the same type of claims—risk of sexual abuse and retaliation—for the same type of circumstances—incarceration at FCI Dublin, under the same policies and practices of the conditions of confinement at FCI Dublin."). (Dkt. 222 at 15-17.)

After a three-week process of party-nominations, and Court interviews, the Court selected a former correctional official, Wendy Still, as FCI Dublin special master to assist BOP in complying with this Court's Orders. Ms. Still began her on-site presence at FCI Dublin on Monday April 8, 2024. BOP again notified the Court *ex parte* of the impending facility closure through an under-seal filing on April 12, 2024, this time including estimated dates of the closure but omitting logistical details." (Dkts. 251, 251-1, 251-2, 251-3.)

Under the supervision of the Court and special master, the last AIC left FCI Dublin on May 1, 2024.

## III.   LEGAL ISSUES

### A.   Plaintiffs' Statement

Plaintiffs identify the following legal issues:

- Whether Defendants subjected and subject class members to unconstitutionally deficient medical and mental health care in violation of the Eighth Amendment. The Court has already granted a preliminary injunction on this question and deemed Plaintiffs likely to succeed on the merits of their claims.

- Whether Defendants subjected and subject class members to unconstitutional risk of serious bodily injury from sexual misconduct in violation of the Eighth Amendment. The Court has already granted a preliminary injunction on this question and deemed Plaintiffs likely to succeed on the merits of their claims.

- Whether Defendants subjected and subject class members to an unconstitutional risk of retaliation for reporting sexual misconduct and retaliation in the Bureau of Prisons in violation of the First Amendment. The Court has already granted a preliminary injunction on this question and deemed Plaintiffs likely to succeed on the merits of their claims.

**B.     Federal Defendants' Statement**

- Whether Plaintiffs' claims for injunctive relief as pled in their first amended complaint are moot in light of the closure of FCI Dublin.

- Whether Plaintiffs can maintain any claims for injunctive relief related to the operation of FCI Dublin in light of its closure.

- Whether Plaintiffs can meet the Rule 23(b)(2) factors to certify subclasses of individuals who were housed at FCI Dublin from March 15 to May 1, 2024.

- Whether severance of any remaining injunctive claims from individual damages is appropriate given that global settlement is being negotiated in all damages claims, and those cases are currently stayed.

**IV.     MOTIONS**

Plaintiffs filed their Motions for Preliminary Injunction and for Class Certification on August 17, 2023. The Court granted Plaintiffs' Motion for Class Certification and granted in part Plaintiffs' Motion for Preliminary Injunction on March 15, 2024. Plaintiffs have no pending

motions before the Court.

## V. AMENDMENT OF PLEADINGS

Plaintiffs filed the First Amended Complaint on February 9, 2024. Federal Defendants responded by answering the First Amended Complaint on May 6, 2024.

## VI. EVIDENCE PRESERVATION

The parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guidelines") and have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to the issues reasonably evident in this action.

### A. Plaintiffs' Statement

Plaintiffs remain concerned regarding reports of shredding of hard copy documents and deletion of electronic material, and have raised those concerns with the Court.

Specifically, Defendants filings at ECF No. 292 only addressed document destruction after the commencement of Dublin's closure, and shockingly stated that "[o]n April 26, 2024, the BOP issued litigation hold notices to capture evidence related to this litigation that might not be otherwise protected by RIDS [Records Inventory and Disposition Schedules]." ECF No. 292, George Declaration, ¶25. Of course, a litigation hold should have been put in place by BOP immediately after this litigation was filed. Nonetheless, as a professional courtesy, on October 31, 2023, Plaintiffs sent Defendants a letter reminding them of their document preservation obligations. Defendants never responded to this letter and to date have not provided any explanation for why a litigation hold was not in place prior to April 26, 2024.

Defendants' failure to put a litigation hold in place at the outset of this litigation has prejudiced Plaintiffs. In addition to the reports of document shredding that led to the Court's Orders at ECF Nos. 264-1, 275-1, and 287-1, more than a month prior Plaintiffs received reports of mass shredding by officials including Agostini, Campos, and Martinez, and removal of large trashbags filled with documents, during the days leading up to the March 11, 2024 FBI raid. Plaintiffs immediately notified Defendants on March 15, 2024 of these reports of document destruction. Again, Defendants never responded to these emails. Plaintiffs will take discovery on

Defendants destruction of evidence and, if warranted, will move for sanctions based on spoliation of evidence.

### B. Federal Defendants' Statement

BOP understands Plaintiffs have ongoing concerns regarding alleged shredding and deletion of electronic material immediately prior to and during the closure of the facility. Counsel for the BOP has asked Plaintiffs' counsel on several occasions for greater specificity as to who was seen shredding or deleting electronic material, who witnessed this alleged destruction, and when this destruction occurred. Plaintiffs' statement above alleges that three staff members were responsible for alleged shredding and deletion of material. However, two of the people they name were not working at FCI Dublin during the closure of the facility (or immediately prior to the closure of the facility).

Moreover, even though Plaintiffs have repeatedly alluded to alleged shredding of documentation as misconduct, BOP policy both permits and prohibits shredding, depending on the type or classification of document. BOP's Records and Information Management Office are responsible for guiding BOP staff in the creation, maintenance, and archiving of all records to ensure compliance with federal regulations and policies. The RIM Office issues guidance intended to establish best practices and proper instructions for records and information management methods. Records are categorized and scheduled according to approval by the National Archives and Records Administration. Basic Records management training is required for all permanent BOP employees annually, and the same training is required for all agency contractors during the hiring process and annually. To provide clarification and transparency, the BOP outlined this process in the declaration of Lindsey George, the Chief of the Records and Information Management Office in BOP's Central Office. Ms. George confirmed pursuant to the above-referenced policy that records with short retention schedules may be disposed of locally and records with longer retention periods are typically sent to an approved off-site storage location to be housed for their prescribed retention period, which represents the first layer of protection. Additional layers of protection include litigation hold notices, which have been placed in this case as warranted/need arose, and at a more local level to include BOP counsel, who directed FCI

Dublin executive staff at "Open Up" and "Close Out" conferences not to destroy any documents and to preserve all electronic media. Many of the records for which preservation was requested have lengthy retention periods. To those which do not, such as video surveillance related to the closure and transfer of FCI Dublin AICs, BOP issued a litigation hold to ensure the video was not lost.

## VII. DISCLOSURES

The parties have not yet exchanged initial disclosures. Plaintiffs propose to do so on May 22, 2024. Federal Defendants propose to do so on or before July 15, 2024. (See schedule tables below.)

## VIII. DISCOVERY

### A. Plaintiffs' Statement

The parties entered into a stipulated protective order on January 22, 2024 (Dkt. 127) followed by a modified stipulated protective order on March 5, 2024. Dkt. 201. Numerous documents were exchanged as part of the evidentiary hearings in January 2024 and Plaintiffs have begun propounding written discovery and anticipates taking multiple depositions of BOP officials and former FCI Dublin officers and employees. Plaintiffs anticipate needing more than the 10 depositions permitted under Federal Rule of Civil Procedure 30 to depose each of the Defendants as well as other relevant witnesses identified in discovery. The parties intend to enter into a stipulated e-discovery order.

There is currently a dispute regarding access to incarcerated plaintiffs for purposes of conducting psychological evaluations. Dkt. 216; also filed in the related case *M.R.*, 4:22-cv-05137-YRG at Dkt. 144. Plaintiffs in this matter joined with several other Plaintiffs in filing a Motion for Relief from the Non Dispositive Pretrial Order of Magistrate Judge on March 27, 2024, filed in the related case *M.R.*, 4:22-cv-05137-YGR at Dkt. 179, which is still pending before the Court. There are no other current disputes.

### B. Federal Defendants' Statement

Defendants agree with Plaintiffs' statement and add that they also anticipate taking more

than 10 depositions.

Defendants object to responding to written discovery requests served prior to the Rule 26(f) conference, as outlined in Fed. R. Civ. P. Rule 26 (d)(1) ("[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order.").

## IX. CLASS ACTIONS

### A. Plaintiffs' Statement

This Court granted class certification on March 15, 2024 certifying a class of "[a]ll people who are now, or will be in the future, incarcerated at FCI Dublin and subject to FCI Dublin's uniform policies, customs, and practices concerning sexual assault, including those policies, customs, and practices related to care in the aftermath of an assault and protection from retaliation for reporting an assault." Dkt 222. This class definition encompasses all those who were transferred from Dublin to other Bureau of Prisons facilities and are still subject to the same national policies, practices and customs.

### B. Federal Defendants' Statement

Defendants disagree that the class definition encompasses those transferred from FCI Dublin, as the class definition is explicit in its plain terms. As the Court stated: "Plaintiffs move to certify a class of '[a]ll people who are now, or will be in the future, incarcerated at FCI Dublin and subject to FCI Dublin's uniform policies, customs, and practices concerning sexual assault, including those policies, customs, and practices related to care in the aftermath of an assault and protection from retaliation for reporting an assault.'" (Dkt. 222 at 14 (emphasis added).) Further, as noted above, the class certification analysis (numerosity, commonality, typicality, and adequacy) is predicated exclusively on conditions at FCI Dublin. (*Id.* at 15-18.)

## X. RELATED CASES

This matter, as well as 61 other matters have been related to *M.R. v. United States,* Case No. 4:22-cv-05137-YGR along with sixty-one other matters. Dkt. 193.

## XI. RELIEF

### A. Plaintiffs' Statement

Plaintiffs seek permanent injunctive relief on behalf of the certified class of all persons incarcerated at FCI Dublin as of the time of filing including individuals transferred to other facilities run by Defendant BOP.

The individual named Plaintiffs in this action also seek nominal, compensatory, and punitive damages, attorneys' fees and costs, and any other relief that the Court deems appropriate. No class-wide damages are sought.

### B. Federal Defendants' Statement

BOP opposes the requested injunctive relief, and requests that this Court dismiss Plaintiffs' first amended complaint with prejudice.

## XII. SETTLEMENT AND ADR

At this time, the parties are willing to explore all options for resolution, including settlement. The parties request that the Court appoint a Magistrate Judge to assist the parties with settlement negotiations.

## XIII. OTHER REFERENCES

The Court ordered appointment of a special master on March 15, 2024. The parties agree that this case is not suitable for reference to the Judicial Panel on Multidistrict Litigation.

## XIV. NARROWING OF ISSUES

The parties may be willing to stipulate to certain facts, to be determined after adequate discovery has been completed.

## XV. SCHEDULING

Plaintiffs propose the following schedule:

| PLAINTIFF'S PROPOSED SCHEDULE | |
|---|---|
| Initial Disclosures Exchanged | May 22, 2024 |
| Completion of Fact Discovery: | September 13, 2024 |
| Initial Expert Designation: | September 27, 2024 |

| **PLAINTIFF'S PROPOSED SCHEDULE** | |
|---|---|
| Rebuttal Expert Designation: | October 4, 2024 |
| Expert Reports: | October 28 , 2024 |
| Supplemental/Rebuttal Expert Reports: | November 7, 2024 |
| Completion of Expert Discovery: | November 17, 2024 |
| Pretrial motion filing cutoff: | December 2, 2024 |
| Pretrial Conference date: | December 17, 2024 |
| Trial date: | January 7, 2025 |

Defendants propose the following schedule:

| **DEFENDANTS' PROPOSED SCHEDULE** | |
|---|---|
| Initial Disclosures Exchanged | July 15, 2024 |
| Completion of Fact Discovery: | February 10, 2025 |
| Initial Expert Designation: | December 10, 2024 |
| Rebuttal Expert Designation: | January 10, 2025 |
| Expert Reports: | December 10, 2024 |
| Supplemental/Rebuttal Expert Reports: | January 10, 2025 |
| Completion of Expert Discovery: | February 10, 2025 |
| Pretrial motion filing cutoff: | April 8, 2025 |
| Mandatory Settlement Conference (MSC): | April 15, 2025 |
| Pretrial Conference date: | May 5, 2025 |
| Trial date: | May 12, 2025 |

## XVI. TRIAL

### A. Plaintiffs' Statement

Regarding the injunctive relief claims, Plaintiffs anticipate a 10-day trial with 5 days for the presentation of Plaintiffs' case and 5 days for the presentation of Defendants' case. Regarding

the damages claims, claims as to the individual defendants are expected to go to a jury trial while claims against the United States, the claims "shall" be tried to the bench. *See* 28 U.S.C. § 2402.

### B. Federal Defendants' Statement

Defendants anticipate at least a 15-day jury trial on any injunctive claims, with 5 days for Plaintiffs' presentation and 10 days for Defendants.

The damages claims are tried to the Court and timing for those will be set upon the conclusion of global mediation.

## XVII. DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS

Not applicable to either party.

## XVIII. PROFESSIONAL CONDUCT

The attorneys of record for the parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

## XIX. OTHER

The parties are aware of none.

Pursuant to Local Rule 5-1(i)(3) concurrence in the filing of this document has been obtained from each of the signatories below.

DATED: May 9, 2024                          Respectfully submitted,

                                            ROSEN BIEN GALVAN & GRUNFELD LLP

                                            By: */s/ Ernest Galvan*
                                                Ernest Galvan

                                            Attorneys for Plaintiffs


                                            JESSE A. LASLOVICH
                                            United States Attorney

                                            */s/ Madison L. Mattioli*
                                            MADISON L. MATTIOLI
                                            ABBIE J.N. CZIOK
                                            MARK STEGER SMITH
                                            TIMOTHY A. TATARKA

|   |   |
|---|---|
| | Assistant U.S. Attorneys |
| | Attorneys for Federal Defendants |