1   Jaqueline Aranda Osorno (SBN 308084)
        jaosorno@publicjustice.net
2   Alexandra Z. Brodsky*
        abrodsky@publicjustice.net
3   Sarah Ortlip-Sommers*
        sortlip-sommers@publicjustice.net
4   PUBLIC JUSTICE
5   1620 L Street NW, Suite 630
    Washington, DC 20036
6   Telephone: (202) 797-8600
7   *Pro Hac Vice Forthcoming

8   Angelica Salceda (SBN 296152)
        asalceda@aclunc.org
9   Chessie Thacher (SBN 296767)
        cthacher@aclunc.org
10  Shaila Nathu (SBN 314203)
        snathu@aclunc.org
11  AMERICAN CIVIL LIBERTIES UNION
12  FOUNDATION OF NORTHERN CALIFORNIA, INC.
    39 Drumm Street
13  San Francisco, CA 94111
    Telephone: (415) 621-2493
14

15  *Attorneys for Intervenors*

16

17                    **UNITED STATES DISTRICT COURT**

18          **NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

19  CALIFORNIA COALITION FOR WOMEN          Case No. 4:23-cv-04155
    PRISONERS, et al.,
20                                          **NOTICE OF MOTION AND**
                                            **MOTION TO UNSEAL COURT**
21                   Plaintiffs,            **RECORDS AND PROTECT**
                                            **ACCESS TO PUBLIC**
22                                          **PROCEEDINGS; MEMORANDUM**
                       v.                   **OF POINTS AND AUTHORITIES**
23                                          **IN SUPPORT**

24  UNITED STATES OF AMERICA; UNITED
    STATES OF AMERICA FEDERAL BUREAU OF
25  PRISONS, et al.,                        Judge: Yvonne Gonzalez Rogers
                                            Date: July 16, 2024
26                   Defendants.            Time: 2:00 p.m.
                                            Courtroom: 1 (Fourth Floor)
27

28

---

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on July 16, 2024, at 2:00 p.m., or as soon thereafter as the matter may be heard, at the Oakland Federal District Courthouse, 1301 Clay Street, Courtroom 1, Fourth Floor, intervenors The Appeal, Victoria Law, American Civil Liberties Union of Northern California, and the First Amendment Coalition (collectively, "Intervenors") will and hereby do move the Court to unseal Dkt. Nos. 45, 75, 107, 113, 114, 116, 157-1, 159, 162, 168, 176, 242, 244, 251, 252-1, 254-1, 260-1, 264-1, 275-1, 287-1; unseal all documents related to Dkt. Nos. 45, 75, 143, 159, 162, 168, 176, 178, 184, 191, 197, 199, 204, 206, 209, 236, 239, 242, 244, 247, 251, 258, 263, 292; and enter minute orders for the closed proceedings held between April 15, 2024, and May 8, 2024.

This Motion is based on (1) the accompanying Memorandum of Points and Authorities, (2) the Declaration of Stephen Sinclair filed in support of this Motion, (3) the Notice of Motion and Memorandum of Points and Authorities in Support of the Motion to Intervene for the Limited Purpose of Unsealing Court Records and Protecting Access to Public Proceedings (Dkt. No. 316), as well as the declarations and exhibits filed in support thereof, and (4) the entire record in this action.

Dated: June 11, 2024                      Respectfully submitted,

                                          PUBLIC JUSTICE

                                          */s/ Jaqueline Aranda Osorno*
                                          Jaqueline Aranda Osorno (SBN 308084)
                                          Alexandra Z. Brodsky*
                                          Sarah Ortlip-Sommers*
                                          *Pro Hac Vice Forthcoming*

                                          AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                                          OF NORTHERN CALIFORNIA, INC.

                                          Angelica Salceda (SBN 296152)
                                          Chessie Thacher (SBN 296767)
                                          Shaila Nathu (SBN 314203)

                                          *Attorneys for Intervenors*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... 4

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 7

INTRODUCTION ................................................................................................................... 7

BACKGROUND ...................................................................................................................... 8

   I.   Institutional Secrecy, with Little Accountability for Abusers, Contributed to
       Decades of Sexual Misconduct at FCI Dublin .................................................. 8

   II.  FCI Dublin's "Culture of Abuse" was Designed to Silence, While the Facility's
       Dysfunction Helped to Hide Official Misdeeds ............................................. 10

   III. The Public has a Vested Interest in Investigating Misconduct at FCI Dublin and
       the Facility's Recent Closure Makes Holding Officials Accountable More Challenging ........... 11

PROCEDURAL HISTORY ................................................................................................... 12

ARGUMENT .......................................................................................................................... 14

   I.   Records Should be Unsealed Because There Are No Compelling Reasons for Secrecy ............. 15

      A.  The "Compelling Reason" Standard Applies to Any Documents "More Than
           Tangentially Related to the Merits" ................................................................. 15

      B.  Maintaining the "Safety and Security" of the Now Closed FCI Dublin is Not
           a Compelling Reason to Seal Documents ...................................................... 16

      C.  The Public Has a Significant Interest in Information about FCI Dublin That Is Not
           Outweighed by Any Compelling Reasons for Secrecy ...................................... 19

      D.  For All Documents that Remain Sealed, the Court Should Issue Sealing Decisions
           that Articulate the Factual Bases for Sealing .................................................... 22

   II.  Court Proceedings Should be Open to the Public ............................................. 22

   III. Relief Should be Ordered Expeditiously ......................................................... 23

CONCLUSION ........................................................................................................................ 24

# TABLE OF AUTHORITIES

**Cases**........................................................................................................................**Page(s)**

*Associated Press v. U.S. Dist. Ct. for Cent. Dist. of Calif.*,
   705 F.2d 1143 (9th Cir. 1983) ................................................................... 14

*Bond v. Utreras*,
   585 F.3d 1061 (7th Cir. 2009) ................................................................... 24

*Braggs v. Dunn*,
   382 F. Supp. 3d 1267 (M.D. Ala. 2019) .............................................. 18, 20

*Courthouse News Serv. v. Planet*,
   947 F.3d 581 (9th Cir. 2020) ............................................................... 23, 24

*Ctr. for Auto Safety v. Chrysler Grp., LLC*,
   809 F.3d 1092 (9th Cir. 2006) ....................................................... 15, 16, 19

*Foltz v. State Farm Mut. Auto. Ins. Co.*,
   331 F.3d 1122 (9th Cir. 2003) ............................................................. 16, 22

*Forbes Media LLC v. United States*,
   61 F.4th 1072 (9th Cir. 2023) ........................................................ 14, 15, 19

*Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*,
   24 F.3d 893 (7th Cir. 1994) ...................................................................... 24

*Grover v. Lange*,
   No. 1:21-cv-252, 2022 WL 22715342 (W.D. Mich. Apr. 15, 2022).......... 18

*Hernandez v. Cnty. of Monterey*,
   No. 13-CV-02354-BLF, 2023 WL 5418753 (N.D. Cal. Aug. 21, 2023)........... 20

*Houchins v. KQED, Inc.*,
   438 U.S. 1 (1978).............................................................................. 20, 22

*In re Copley Press, Inc.*,
   518 F.3d 1022 (9th Cir. 2008) ............................................................. 15, 23

*Int'l News Serv. v. Associated Press*,
   248 U.S. 215 (1918).................................................................................. 24

*Johnson v. Sullivan*,
   Civ. No. 08-3346 (JBS/AMD), 2009 WL 2365478 (D.N.J. July 29, 2009) ........................ 18

*Kamakana v. City & Cnty. of Honolulu*,
   447 F.3d 1172 (9th Cir. 2006) ............................................................ passim

*Kelly v. Wengler*,
   979 F. Supp. 2d 1243 (D. Idaho 2013) ...................................................... 20

*Lugosch v. Pyramid Co. of Onondaga*,
   435 F.3d 110 (2d Cir. 2006)................................................................................................. 24

*Mitchell v. Cate*,
   No. 2:11-CV-1240 JAM AC, 2014 WL 1671589 (E.D. Cal. Apr. 28, 2014)....................... 18

*Newman v. Graddick*,
   696 F.2d 796 (11th Cir. 1983) ....................................................................................... 18, 23

*Perry v. Schwarzenegger*,
   302 F. Supp. 3d 1047 (N.D. Cal. 2018) ......................................................................... 15, 17

*Phoenix Newspapers, Inc. v. U.S. Dist. Ct. for Dist. of Ariz*,
   156 F.3d 940 (9th Cir. 1998) ............................................................................................... 23

*Porretti v. Dzurenda*,
   11 F.4th 1037 (9th Cir. 2021) .............................................................................................. 20

*Publicker Indus., Inc. v. Cohen*,
   733 F.2d 1059 (3d Cir. 1984)............................................................................................... 23

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980).............................................................................................................. 14

*Rosas v. Baca*,
   No. CV 12-00428 DDP (SHx), 2023 WL 7429105 (C.D. Cal. Nov. 8, 2023) .................... 20

*Ruiz v. Clark*,
   No. 1:20-cv-00893-AWI-EPG (PC), 2021 WL 3033215 (E.D. Cal. July 19, 2021)........... 18

*San Jose Mercury News, Inc. v. U.S. Dist. Ct.*,
   187 F.3d 1096 (9th Cir. 1999) ............................................................................................. 14

*Storm v. Twitchell*,
   No. 1:12-CV-00179-CWD, 2014 WL 4926119 (D. Idaho Sept. 29, 2014)......................... 20

*Union Oil Co. of Calif. v. Leavell*,
   220 F.3d 562 (7th Cir. 2000) ............................................................................................... 22

*United States v. Brooklier*,
   685 F.2d 1162 (9th Cir. 1982) ............................................................................................. 23

*United States v. Index Newspapers LLC*,
   766 F.3d 1072 (9th Cir. 2014) ............................................................................................. 23

**Rules ...................................................................................................................... Page(s)**

Civil L.R. 79.5 ............................................................................................................................ 13

**Other Authorities** .................................................................................................**Page(s)**

Keri Blakinger & Richard Winton, *Women at California Prison Dubbed the 'Rape Club' Now Worry Where They'll be Transferred*, L.A. Times (Apr. 16, 2024) .................................................. 11

Lisa Fernandez, *Dozens of Women Detail Rape and Retaliation at Dublin Prison, Real Reform is Questioned*, KTVU FOX 2 (Sept. 23, 2022) ...................................................................... 11

Lisa Fernandez, *FCI Dublin Transfers Complain of Poor Treatment, Retaliation at Other Prisons*, KTVU FOX 2 (May 7, 2024) ........................................................................................ 12

Lisa Fernandez, *FCI Dublin: Congress Calls for Hearings to Investigate Prison Closure*, KTVU FOX 2 (May 25, 2024) ........................................................................................................... 11

Lisa Fernandez, *'Cultural rot:' U.S. Congressional Team Tours Dublin Prison After Sex Scandal Widens*, KTVU FOX 2 (Mar. 14, 2022) .............................................................................. 11

Michael Balsamo & Michael R. Sisak, *Whistleblowers Say They're Being Bullied for Exposing Federal Prison Abuses*, PBS NEWSHOUR (Feb. 24, 2022) ............................................... 11

Michael Balsamo & Michael R. Sisak, *Women's Prison in Dublin Nicknamed 'The Rape Club:' AP Investigation California*, Associated Press (Feb. 7, 2022) .......................................... 8

Sen. Permanent Subcomm. on Investigations, *Rep. on Sexual Abuse of Female Inmates in Federal Prisons* 17-18 (Dec. 13, 2022) ....................................................................................... 8

Sydney Johnson, *US Representatives Call for Investigation Into Abrupt East Bay Prison Shutdown*, KQED (May 24, 2024) ..................................................................................................... 11

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

3

4

5

6

7

8

9

10

11

Rape, abuse, and dysfunction have come to define the Federal Correctional Institution Dublin ("FCI Dublin"). For decades, institutional secrecy and a toxic culture gave cover to staff who serially preyed on and sexually assaulted women incarcerated at the facility. The media and other members of the public have long tried to investigate this abuse as a way to effect change and secure accountability. Such scrutiny is, historically, one of the only reasons that correctional officers, and correctional institutions, have had to account for their misconduct. That scrutiny is needed today—both inside and outside the courtroom. As cases proceed against the Bureau of Prisons ("BOP") and those responsible for abuse at FCI Dublin, the public deserves to understand the full range of the prison's horrors. The facility may now be shuttered, but the need for transparency remains as pressing as ever.

12

13

14

15

16

17

18

19

By the present motion, Intervenors The Appeal, Inc., Victoria Law, the American Civil Liberties Union of Northern California, and the First Amendment Coalition seek to vindicate the public's right of access to information about FCI Dublin surfaced in this litigation. Specifically, they assert that the right of access protected by both the First Amendment and the common law warrants unsealing presumptively public records of significant public interest. Intervenors also seek additional information relating to previous closed court proceedings and request that future proceedings be open to the public; or, to the extent that closure might be warranted for certain limited reasons, request that the public receive timely notice to state their objections to an intended closure.[1]

20

21

22

23

Intervenors do not seek to unseal records that contain sensitive or private information about class members or others who were incarcerated at FCI Dublin. Rather, Intervenors seek information that sheds additional light on Defendants' conduct and its legal consequences, both in regard to Defendants' treatment of incarcerated people and in relation to Defendants' possible evasion of federal court

24

25

26

27

28

[1] The specific records sought to be unsealed are all sealed motions to seal (and all attachments) (Dkt. Nos. 45, 75, 159, 162, 168, 176, 242, 244); the sealed notice to the Court regarding FCI Dublin's closure (Dkt. No. 251); all documents related to Dkt. Nos. 45, 75, 143, 159, 162, 168, 176, 178, 184, 191, 197, 199, 204, 206, 209, 236, 239, 242, 244, 247, 251, 258, 263, 292; sealed court testimony from the evidentiary hearing on Plaintiffs' motion for a preliminary injunction (Dkt. Nos. 107, 113, 114, 116); and sealed Court orders (Dkt. Nos. 157-1, 252-1, 254-1, 260-1, 264-1, 275-1, 287-1) (hereafter "the requested records"). If any records are unsealed, briefs should be unredacted accordingly.

oversight. FCI Dublin's lack of transparency made abuse possible for far too long. It is finally time for the full extent of official misdeeds to come into the light.

## BACKGROUND

### I.    Institutional Secrecy, with Little Accountability for Abusers, Contributed to Decades of Sexual Misconduct at FCI Dublin

The sexual misconduct at FCI Dublin has been so pervasive and notorious that the prison goes by a special name: "The rape club." Dkt. No. 152 (Am. Compl.) ¶ 245. Shielded by prison leadership and hidden from public view, FCI Dublin staff sexually assaulted incarcerated women with near impunity for decades. *See* Dkt. No. 222 (Omnibus Order Granting Mot. for Class Certification; Granting in Part & Denying in Part Mot. for Prel. Inj.; and Granting Related Sealing Mots.) at 5–10.[2]

As recounted in a report by the U.S. Senate's Permanent Subcommittee on Investigations, the history of FCI Dublin's abuse includes egregious misconduct stretching back at least thirty years: In 1996, officers brought three women from FCI Dublin to a male housing unit at an adjacent facility, opened the doors to their cells, and allowed them to be raped by the men incarcerated there; in the late 1990s and early 2000s, four officers were convicted of sexually abusing women incarcerated at the facility; and in the early 2010s, approximately a dozen FCI Dublin employees were reportedly removed for sexual abuse, including one who used his prison locker to store videotapes of himself having sex. *See* Sen. Permanent Subcomm. on Investigations, *Rep. on Sexual Abuse of Female Inmates in Federal Prisons* 17-18 (Dec. 13, 2022), https://tinyurl.com/SenateSexualAbuseReport2022 [hereinafter "PSI Report"]. The PSI Report states that not a single officer alleged to have been involved in the incidents around 2010 was arrested for that misconduct. *Id.* at 18.

Sometime around 2020, the Department of Justice ("DOJ") began investigating new claims of sexual assault at FCI Dublin after receiving a whistleblower complaint. *See* Dkt. No. 222 at 5. This investigation, which implicates approximately twenty officers and staff, remains ongoing. *Id.* at 5–10, 23–26. To date, seven officers and staff—including the former warden Ray Garcia and the former

---

[2] *See also* Michael Balsamo & Michael R. Sisak, *Women's Prison in Dublin Nicknamed 'The Rape Club:' AP Investigation California*, Associated Press (Feb. 7, 2022), https://www.ktvu.com/news/womens-prison-in-dublin-nicknamed-the-rape-club-ap-investigation.

1    chaplain James Highhouse—have been convicted and sentenced to serve years in prison for sexual

2    abuse, abusive sexual contact, and lying to federal agents.[3] Notably, the chaplain received a sentence of

3    eighty-four months for, among other things, invoking the religion of an incarcerated woman to coerce

4    oral sex. *See* Dkt. No. 222 at 23. An eighth case against an officer nicknamed "Dirty Dick Smith"—who

5    was indicted for several counts of sexual abuse and abusive sexual contact, and one count of aggravated

6    sexual abuse—is set for trial in March 2025. *See United States v. Smith aka Dirty Dick Smith*, 4:23-cr-

7    110-YGR, Dkt. Nos. 1 (Indictment) & 50 (Minute Order).

8         The specific conduct underlying these cases is horrific and demonstrates that FCI Dublin

9    officials at all levels condoned and covered up abuse. For example, it was an open secret that officer

10   Andrew Jones used the staff bathroom in the FCI Dublin kitchen to assault the incarcerated women that

11   he supervised. *See Jones*, Case No. 4:23-cr-212-YGR, Dkt. No. 20 (U.S. Sentencing Mem.) at 2–4.

12   Jones also once locked a woman inside the kitchen warehouse, where—after using another guard's

13   office to enter the warehouse—he raped her. *Id.* at 4. During this assault, a fellow officer witnessed

14   Jones ejaculating on the woman's face, but rather than help, he "started calling [the woman] 'Becky,' a

15   slang term for oral sex." Dkt. No. 222 at 23. Another prolific abuser, officer Nakie Nunley, apparently

16   liked to call women into his private office and then masturbate while he forced them to strip, bend over,

17   and show him their buttocks. *See Nunley*, Case No. 4:23-cr-213-YGR, Dkt. No. 21 (U.S. Sentencing

18   Mem.) at 1–7. Nunley, who admitted to abusing seven women, sometimes also forced sex or digital

19   penetration. *See id.* "When his victims told him to stop . . . , he laughed in their faces." *Id.* at 1.

20

21   [3] The seven cases in order of prison sentence length are: *United States v. Jones*, Case No. 4:23-cr-212-
22   YGR (pleaded guilty to six counts of sexually abusing a ward and one count of making false statements,
     and sentenced to ninety-six months); *United States v. Highhouse*, Case No. 4:22-cr-16-HSG (pleaded
23   guilty to two counts of sexually abusing a ward, two counts of abusive sexual contact, and one count of
     making false statements, and sentenced to eighty-four months); *United States v. Nunley*, Case No. 4:23-
24   cr-213-YGR (pleaded guilty to four counts of sexually abusing a ward, five counts of abusive sexual
     contact, and one count of making false statements, and sentenced to seventy-two months); *United States
25   v. Garcia*, Case No. 4:21-cr-429-YGR (convicted of three counts of sexually abusing a ward, four
     counts of abusive sexual contact, and one count of making false statements, and sentenced to seventy
26   months in prison); *United States v. Bellhouse*, Case No. 4:22-cr-66-YGR (convicted by jury of two
     counts of sexually abusing a ward and three counts of abusive sexual conduct, and sentenced to sixty-
27   three months); *United States v. Chavez*, Case No. 4:22-cr-104-YGR (pleaded guilty to one count of
     abusive sexual contact and sentenced to twenty months); *United States v. Klinger*, Case No. 4:22-cr-31-
28   YGR (pleaded guilty to three counts of sexually abusing a ward and sentenced to time-served after
     cooperating with government).

1

## II.     FCI Dublin's "Culture of Abuse" was Designed to Silence, While the Facility's Dysfunction Helped to Hide Official Misdeeds

2      To coerce sex and to ensure that victims did not report abuse, FCI Dublin officers used their

3  authority to demean, intimidate, threaten, and harass. *See* Dkt. No. 222 at 5–6, 37–40. Staff—from the

4  warden down—created a "culture of abuse." *Id.* at 5, 8, 37, 40. Officer Jones, for example, railed against

5  "snitch bitches" and was particularly aggressive to "Spanish-speaking inmates." *Jones*, Case No. 4:23-

6  cr-212-YGR, Dkt. No. 20 (U.S. Sentencing Mem.) at 1–2. Other officers threatened to search cells; take

7  away privileges like visitation rights with family; deduct "good time" credits; demote workers into less

8  desirable positions; initiate transfers to other facilities; and place people in the Special Housing Unit

9  ("SHU"), where the "little cells" were like "dungeons." Dkt. No. 222 at 6, 37, 39.

10     These threats were not idle. One woman explained that she was so fearful of retaliation, but so

11  desperate to escape her abuser, Dirty Dick Smith, that she attempted suicide. *Id.* at 23, 34. Several

12  women who spoke out against their abusers were also placed in the SHU. *Id.*; *see also id.* at 6 n.16, 7,

13  37. And the very indictments and convictions meant to bring survivors justice have resulted in "ongoing

14  retaliation." *Id.* at 1, 9–10. Witnesses to the abuse or those involved in the present litigation have been

15  subjected to "correctional 'policies,'" including strip searches, after engaging in "constitutionally-

16  protected activities, such as meeting with their attorneys to file this suit." *Id.* at 9–10; *see also id.* at 37,

17  39–40.

18     Women incarcerated at FCI Dublin were all the more vulnerable because of the incompetence

19  and disorder plaguing the prison's operations. The facility had no workable system for reporting abuse;

20  casework files were out of date; and requests for compassionate release went missing or unanswered.

21  *See* Dkt. No. 300 (Order re Closure of FCI Dublin & Prelim. Inj.) at 4–7. The facility also lacked

22  adequate medical care, sufficient mental health services, and requisite educational and vocational

23  programming. Dkt. No. 222 at 10–11, 29–30, 33. Living conditions were deplorable as well. Women

24  were, at times, exposed to asbestos and black mold and forced to live in frigid cells without warm

25  blankets or hot water. *Id.* at 10-11, 13. FCI Dublin's efforts to address "fundamental operational

26  requirements" were, in short, an "utter failure." Dkt. No. 300 at 15.

27

28

---

### III.   The Public has a Vested Interest in Investigating Misconduct at FCI Dublin and the Facility's Recent Closure Makes Holding Officials Accountable More Challenging

Members of the press have long attempted to investigate the sexual assaults and institutional failures occurring at FCI Dublin. These news stories have informed the public about the facility's hidden abuse, as well as themselves spurred external investigations and calls for change. The Senate's PSI Report, for example, relied on numerous works by the Associated Press about FCI Dublin. *See* PSI Report at 15, 16, 18, 22. Significantly, many of these press accounts have also drawn critical attention to the retaliation faced by whistleblowers and led to calls for their protection.[4]

The media has served a particularly valuable role in drawing attention to FCI Dublin's recent chaotic closure. Reporters have described a poorly planned and hastily executed operation to empty the facility beginning April 15, 2024.[5] This coverage generated an enormous public outcry and again galvanized congressional action. For instance, on April 24, five U.S. Senators sent a letter to the BOP Director, and on May 24, congressional leaders called for the U.S. House of Representatives and the U.S. Attorney General to investigate the abrupt closure.[6]

This news reporting is also consistent with the Court's own finding that "BOP's operational plan for closure of FCI Dublin was ill-conceived and, like Swiss Cheese, full of holes." Dkt. No. 300 at 1.

---

[4] *See also* Michael Balsamo & Michael R. Sisak, *Whistleblowers Say They're Being Bullied for Exposing Federal Prison Abuses*, PBS NEWSHOUR (Feb. 24, 2022), https://www.pbs.org/newshour/politics/whistleblowers-say-theyre-being-bullied-for-exposing-federal-prison-abuses; Lisa Fernandez, '*Cultural rot:' U.S. Congressional Team Tours Dublin Prison After Sex Scandal Widens*, KTVU FOX 2 (Mar. 14, 2022), https://www.ktvu.com/news/cultural-rot-u-s-congressional-team-tours-dublin-prison-after-sex-scandal-widens; Lisa Fernandez, *Dozens of Women Detail Rape and Retaliation at Dublin Prison, Real Reform is Questioned*, KTVU FOX 2 (Sept. 23, 2022), https://www.ktvu.com/news/dozens-of-women-detail-rape-and-retaliation-at-dublin-prison-real-reform-is-questioned.

[5] *See, e.g.*, Keri Blakinger & Richard Winton, *Women at California Prison Dubbed the 'Rape Club' Now Worry Where They'll be Transferred*, L.A. Times (Apr. 16, 2024), https://www.latimes.com/california/story/2024-04-16/closure-of-womens-prison-dubbed-the-rape-club-stokes-worry.

[6] *See* Letter from U.S. Senators to Colette Peters, Director, Federal Bureau of Prisons (Apr. 24, 2024) https://tinyurl.com/LettertoDirectorPeters; Letter from U.S. Representatives to Committee Leaders (May 24, 2024) https://tinyurl.com/LettertoHouseCommittees; *see also* Sydney Johnson, *US Representatives Call for Investigation Into Abrupt East Bay Prison Shutdown*, KQED (May 24, 2024), https://www.kqed.org/news/11987663/us-representatives-call-for-investigation-into-abrupt-east-bay-prison-shutdown; Lisa Fernandez, *FCI Dublin: Congress Calls for Hearings to Investigate Prison Closure*, KTVU FOX 2 (May 25, 2024) https://www.ktvu.com/news/fci-dublin-congress-calls-hearings-investigate-prison-closure.

---

1    Many of those who were transported out of FCI Dublin have since made "credible allegations" that their

2    medications and personal property were lost, stolen, or destroyed during the process. *Id.* at 8; *see also id.*

3    at 4–5. Some of those transported have pending compassionate release requests, including, according to

4    some counsel, "at least five survivors of Dublin staff sexual assault." Dkt. No. 262 (Pls.' Mot. for TRO)

5    at 6. Continued news reporting also indicates those transferred are facing retaliation and poor treatment

6    in other BOP facilities.[7]

7         In light of these disturbing accounts, it is imperative that the media and the public have

8    transparency about BOP's misconduct leading up to, and including, the facility's closure. As this Court

9    surmised: "BOP's obfuscation is obvious." Dkt. No. 300 at 3. But also clear is the Court's admonition:

10   "[T]he BOP cannot hide from or escape its obligations by merely closing FCI Dublin." *Id.* at 13.

11                                    **PROCEDURAL HISTORY**

12        The California Coalition for Women Prisoners (CCWP) and eight people formerly incarcerated

13   at FCI Dublin (collectively, "Plaintiffs") brought this action in August 2023 alleging violations of the

14   Eighth Amendment's prohibition on cruel and unusual punishment and the Fifth Amendment's

15   protection of substantive due process, as well as federal statutory law. Dkt. Nos. 1, 152. Plaintiffs moved

16   for class certification and a preliminary injunction. Dkt. Nos. 10, 11. The Court held an evidentiary

17   hearing over multiple days in January 2024. Dkt. Nos. 101, 104, 110, 117, 126.

18        On March 15, 2024, following a site visit by the Court, an order to address immediate health and

19   safety issues, and motion practice relating to retaliation allegations, this Court granted Plaintiffs' motion

20   for a preliminary injunction, concluding that FCI Dublin was "a dysfunctional mess . . . in dire need of

21   immediate change." Dkt. No. 222 at 1; *id.* at 35 n.107.[8] It further found that the BOP had "proceeded

22   sluggishly with intentional disregard of [incarcerated people's] constitutional rights despite being fully

23   apprised of the situation for years." *Id.* at 1; *see also* Dkt. Nos. 79, 155, 157, 186.

24

25   _____

26   [7] *See* Lisa Fernandez, *FCI Dublin Transfers Complain of Poor Treatment, Retaliation at Other Prisons*,
     KTVU FOX 2 (May 7, 2024) https://www.ktvu.com/news/fci-dublin-transfers-complain-of-poor-
     treatment-retaliation-at-other-prisons.

27

28   [8] Regarding BOP's deliberate indifference concerning the myriad health and safety issues, the Court
     opined: "It should not have taken a Court order to prompt action." Dkt. No. 222 at 35.

Given its findings, the Court appointed a Special Master to oversee Defendants' compliance with the Court's orders on April 5, 2024. Dkt. No. 248. Less than two weeks later, on April 12, Defendants filed a sealed notice informing the Court that the BOP intended to close the facility. Dkt. No. 251; *see* Dkt. No. 300 at 3. On April 15, the Court held a closed hearing after learning that the BOP had attempted to transfer incarcerated people to other facilities. *See* Dkt. Nos. 252, 300 at 3. The hearing was noticed on the docket as an unnumbered line entry shortly before the proceeding was scheduled to begin. From that day through May 8, the Court provided "operational guidance to the BOP" related to the facility's closure and transfer of incarcerated people. Dkt. No. 300 at 3. This guidance included holding "regular sealed status conferences, sometimes as frequently as every other day, with counsel and [the warden]." *Id.* None of the hearings were noticed on the public docket. From the limited information available on the record, it appears that the Court may have sealed these proceedings at least in part "for security reasons." *See* Dkt. No. 260.

Throughout the proceedings, and as set forth in the attached Exhibit 1, the Parties have requested to file documents under seal, including documents related to requests for injunctive relief, allegations of retaliation, and the facility's closure.[9] Some of the motions are themselves under seal. The Court has granted most of these motions without decisions articulating the specific bases for sealing. *See, e.g.*, Dkt. Nos. 222, 300. In some instances, however, the Court has acknowledged the public's right of access and discussed information found in sealed documents. *See* Dkt. No. 222 at 2 n.2 (granting in part all pending sealing motions but noting that, "[t]o the extent publicly referenced in this Order, the Court finds that the information is not sufficiently sensitive to outweigh the right of the public to have access to the information"); *id.* at 20 n.39 (explaining that the Court "at times reference[s] evidence submitted under seal"); Dkt. No. 300 at 3 n.2 (granting pending sealing motions "[g]iven the BOP's operational and security concerns, as well as the privacy interests of [incarcerated people], . . . except to the extent this Order relies upon the information sought to be sealed therein").

---

[9] Most of Plaintiffs' motions to seal (and every motion to seal that Intervenors challenge) relate to documents that Defendants want to seal. *See, e.g.*, Dkt. No. 183 (Plaintiffs' Administrative Motion to Consider Whether Another Party's Material Should Be Sealed). For that reason, Intervenors discuss only Defendants' inability to establish compelling reasons for sealing. *See* Civil L.R. 79-5(f)(3).

1    This Court has also sealed testimony and certain of its orders. *See* Ex. 1. In particular, all Court

2    orders with sealed attachments relating to the facility closure and ensuing transfer were sealed "for

3    security reasons." Dkt. Nos. 252, 254, 260, 264, 275, 287.

4    The Court held a case management conference on May 22, 2024. Dkt. No. 309. This case is set for

5    trial beginning on June 23, 2025. Dkt. No. 310.

6    **ARGUMENT**

7    Intervenors are media and advocacy organizations that seek to protect one of the most

8    "indispensable attribute[s]" of the American legal system: open access to judicial records and court

9    proceedings. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980). Rooted in both common

10   law and the First Amendment, the right of access "is justified by the interest of citizens in 'keep[ing] a

11   watchful eye on the workings of public agencies.'" *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d

12   1172, 1178 (9th Cir. 2006) (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597–99 (1978)).

13   Such access is "often important to a full understanding of the way in which the judicial process and the

14   government as a whole are functioning." *Associated Press v. U.S. Dist. Ct. for Cent. Dist. of Calif.*, 705

15   F.2d 1143, 1145 (9th Cir. 1983) (internal quotations omitted); *see also San Jose Mercury News, Inc. v.

16   U.S. Dist. Ct.*, 187 F.3d 1096, 1101-02 (9th Cir. 1999) (explaining "unbroken string of authorities"

17   supporting access to court records in civil cases).

18   In this case, the Court has closed certain court proceedings without notice and sealed many court

19   documents, including (1) portions of briefs and exhibits relating to injunctive relief and a variety of

20   other legal issues, (2) motions to seal, (3) hearing transcripts, and (4) court orders. These documents are

21   all presumptively public under both common law and the First Amendment. *See Kamakana*, 447 F.3d at

22   1178 (recognizing that the common law right of access attaches to all judicial documents except those

23   "traditionally kept secret"); *Forbes Media LLC v. United States*, 61 F.4th 1072, 1077 (9th Cir. 2023)

24   (recognizing that, under the First Amendment, "the public generally has presumptive access to judicial

25   opinions, hearings, and court filings"). Some of the sealing was explained as necessary "for security

26   reasons" at FCI Dublin, Dkt. No. 264 at 1, or because disclosure would purportedly harm "the interest of

27   prison security," Dkt. No. 193 at 2. But FCI Dublin is now closed and the reasons for secrecy are

28   presumably greatly diminished. The Court should therefore reevaluate whether records concerning

1   Defendants' operations and conduct need to remain sealed. *See Perry v. Schwarzenegger*, 302 F. Supp.

2   3d 1047, 1055 (N.D. Cal. 2018) (explaining that "continued sealing is conditional").

3          Intervenors structure their argument in three parts: Part I sets forth the compelling reasons

4   balancing test applicable to when a record may be sealed and explains why Defendants cannot overcome

5   the strong presumption of public access; Part II analyzes considerations for the limited instances when

6   closure of court proceedings is permitted and urges the Court to provide the public with additional

7   information relating to the closed proceedings held between April 15, 2024, and May 8, 2024; and Part

8   III explains the need for expeditious relief where, as here, First Amendment rights are at stake.

9   **I.      Records Should be Unsealed Because There Are No Compelling Reasons for Secrecy**

10          **A.  The "Compelling Reason" Standard Applies to Any Documents "More Than
               Tangentially Related to the Merits"**

11

12          As a preliminary matter, Intervenors note that they rely on a body of caselaw relating to the

13   public right of access that is not always clear about whether "the right of access" is grounded in common

14   law, the First Amendment, or both. The Ninth Circuit has recognized this ambiguity and explained: "Our

15   cases have not been precise in detailing how the First Amendment and common law rights may differ in

16   scope once the rights attach, although we have observed that '[t]he First Amendment is generally

17   understood to provide a stronger right of access than the common law.'" *Forbes Media LLC*, 61 F.4th at

18   1081 (quoting *United States v. Bus. of Custer Battlefield Museum & Store*, 658 F.3d 1188, 1197 n.7 (9th

19   Cir. 2011). With respect to the First Amendment's stronger protections, the presumption of public

20   access can only be "overcome by a compelling governmental interest." *In re Copley Press, Inc.*, 518

21   F.3d 1022, 1026 (9th Cir. 2008). Whereas, once the common law presumption of access attaches, "the

22   party seeking to overcome it must point to 'compelling reasons' supporting sealing, supported by

23   specific factual findings." *Forbes Media LLC*, 61 F.4th at 1081 (citing *Kamakana*, 447 F.3d at 1178).

24          Here, the distinction between these two tests is immaterial. Defendants cannot carry even the

25   lesser burden under common law, so they necessarily cannot meet the higher constitutional standard.

26   Defendants must, at a minimum, "demonstrate compelling reasons" to keep under seal any documents

27   that are "more than tangentially related to the merits," regardless of whether the underlying legal issues

28   are technically dispositive. *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1103 (9th Cir.

2006); *see Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003) (noting the "compelling reasons" standard). There is a single carveout to the common law "compelling reasons" standard: for documents attached to a discovery motion unrelated to the merits of a case, "a party need only satisfy the less exacting 'good cause' standard" to seal documents. *Ctr. for Auto Safety*, 809 F.3d at 1097. But in this case, the docket reflects no discovery motions to which the lower "good cause" standard might apply. Thus, everything on the current docket concerning the requested records is "more than tangentially related to the merits" of this case and is subject to at least a "compelling reasons" analysis. *See id.* at 1098 ("Most litigation in a case is not literally 'dispositive,' but nevertheless involves important issues and information to which our case law demands the public should have access.").

### B. Maintaining the "Safety and Security" of the Now Closed FCI Dublin is Not a Compelling Reason to Seal Documents

Defendants have presented several bases for sealing court documents, including repeated arguments that documents should be sealed because "[m]aintaining the security of prisons is a compelling interest, as the issues of discipline, order, safety, and security in penal institutions are crucial." Dkt. Nos. 184, 193, 197, 236, 239, 258. Relying on the broad premise that "information about how FCI is managed [] relates directly to institutional safety," Defendants have argued, for example, that the Court should seal information about the process for moving people into the SHU, Dkt. No. 193 at 3; the procedures by which people were able to report sexual abuse, Dkt. No. 197 at 2; and the findings of "the Moss Group Report," which had "analyzed norms and practices" impacting "sexual safety" at FCI Dublin, Dkt. No. 193 at 3.

But Defendants cannot overcome the public's right of access to these matters simply by making a "blanket claim" about institutional safety. *Kamakana*, 447 F. 3d at 1185. Such a claim, "will not, without more, suffice to exempt a document from the public's right of access." *Id.* To the extent that the Court previously found that Defendants had satisfied their legal burden to seal under the common law, the First Amendment, or both, the considerations are different now that FCI Dublin is closed. Indeed, as the Court itself recognized, "issues of security no longer predominate" in this matter. Dkt. No. 300 at 1.

The changed conditions at FCI Dublin warrant reevaluation of sealing decisions initially justified by a need to "maintain" safety and security. *See Kamakana*, 447 F.3d at 1181-82 (considering whether

compelling reasons existed to continue sealing court records). There is no carceral institution left to protect. All individuals who were incarcerated at FCI Dublin have been transferred out. There are no staff to operate the facility. All that remains at FCI Dublin seems to be empty cells and deserted offices. Without an active facility to operate, manage, or secure, there are likely few safety or security interests to protect. For that reason, documents that were previously sealed for safety and security reasons should be unsealed. *See Perry*, 302 F. Supp. 3d at 1055 (explaining that "continued sealing is conditional").

Moreover, even if the facility were not closed, it is unlikely that Defendants could have justified sealing many of the documents it sought to seal for safety and security reasons. Public disclosure of documents relating to carceral facilities rarely jeopardizes the "safety and security" of a particular facility. "The term 'safety and security' is broadly used in corrections; it is nearly a mantra." Decl. of Stephen Sinclair in Supp. of Mot. to Unseal & Protect Access, dated June 10, 2024 ("Sinclair Decl.") ¶ 9. In general, the concept of "safety" relates to "keeping staff, the incarcerated, and anyone else interacting with a correctional setting safe from unwarranted harm." *Id.* ¶ 11. The term "security" relates to "ensur[ing] incarcerated individuals remain in custody for the period defined by the sentencing courts." *Id.* ¶ 12. Policies and practices relating to, for example, "movement control, adequate staffing, a grievance system, a functional classification system, and the availability of programming to engage the incarcerated population all intertwine to create safer correctional environments." *Id.* ¶ 11. Ultimately, however, "what must remain confidential to ensure safety is very narrow." *Id.*; *see also id.* ¶ 15.

A close look at Defendants' motions to seal the Moss Group Report reveals that the logic of Defendants' institutional safety arguments, if accepted, would result in impermissibly broad categories of information being kept from the public. *See* Dkt. No. 193 at 2–3. Defendants argued in part that the Moss Group Report should be sealed because it contains "detailed recommendations about staffing and supervision changes that should be made," which "may provide enough insight into facility management that could be exploited to the detriment of inmate and employee safety." *Id*. at 3. Defendants further argued that the information contained in the report "could possibly be reverse engineered to understand daily operations and patterns in the prison," which could be "exploited to continue the introduction and distribution of contraband." *Id.*

.

1    Defendants' position is absurd: Incarcerated people understand daily operations and staffing

2    patterns because of "their observations and constant interactions with the system's rules and staff that

3    confine them." Sinclair Decl. ¶ 15. Information relating to understaffing is particularly easy to observe

4    because incarcerated people experience the effects firsthand when "programs and activities are shut

5    down due to a lack of staffing, and they see staff working multiple shifts as a matter of routine. It is

6    impossible to keep this information secret." *Id.* ¶ 33; *see also Braggs v. Dunn*, 382 F. Supp. 3d 1267,

7    1275 (M.D. Ala. 2019) (considering whether to seal quarterly correctional staffing reports and noting

8    that the information "would hardly give [incarcerated people] any more knowledge of staffing presence

9    than what they can already learn with their own eyes"). Moreover, this Court itself has publicly relied on

10   the Moss Group Report and discussed the report's findings that FCI Dublin's "lack of accountability

11   helped perpetrate the 'sexualized environment' that existed under [the former warden] and engendered

12   distrust between staff and the incarcerated population." Dkt. No. 222 at 11.

13   For good reason, district courts within the Ninth Circuit have declined to seal documents for

14   "safety and security" reasons where defendants failed to establish a specific harm or failed to overcome

15   the public's presumptive right of access. *See, e.g.*, *Mitchell v. Cate*, No. 2:11-CV-1240 JAM AC, 2014

16   WL 1671589, at *5 (E.D. Cal. Apr. 28, 2014) (denying motion to seal exhibit over defendants' safety

17   and security argument because information was already elsewhere in the record); *Ruiz v. Clark*, No.

18   1:20-cv-00893-AWI-EPG (PC), 2021 WL 3033215, at *2 (E.D. Cal. July 19, 2021) (ordering defendants

19   to file debriefing reports with incarcerated people's personal information redacted rather than fully

20   sealing documents).

21   Federal trial courts in other parts of the country have reached similar results as well. *See*

22   *Newman v. Graddick*, 696 F.2d 796, 803-04 (11th Cir. 1983) (allowing media access to court documents

23   notwithstanding testimony that publication of the documents "could make prison violence 'a

24   possibility'"); *Grover v. Lange*, No. 1:21-cv-252, 2022 WL 22715342, at *3 (W.D. Mich. Apr. 15,

25   2022) (denying motion to seal sexual assault investigation documents where defendants advanced only

26   "generalized conclusion" and "fail[ed] to articulate" how public access would threaten prison safety and

27   security); *Braggs*, 382 F. Supp. 3d at 1271, 1277 (denying in part motion to seal statistics showing

28   correctional understaffing in state prisons); *Johnson v. Sullivan*, Civ. No. 08-3346 (JBS/AMD), 2009

1   WL 2365478, at *3 (D.N.J. July 29, 2009) (denying motion to seal special investigations report of prison

2   beating where defendants failed to make "particularized showing" of safety and security concern to

3   overcome presumption of access).

4         This Court should reject Defendants' generalized assertions and closely scrutinize whether there

5   is a meaningful nexus between disclosure and the injury Defendants allege, which must be specific and

6   grounded in fact, not "hypothesis or conjecture." *Kamakana*, 447 F.3d at 1179. Examples of some of

7   Defendants' most unconvincing arguments include arguments that "preliminary assessments" relating to

8   incarcerated people's placement in the SHU should be sealed in part because they "may lack context and

9   are subject to further investigation, so publicizing preliminary assessments may harm the integrity of

10  future assessments." Dkt. No. 193 at 3. Even less convincing is Defendants' argument that a document

11  relating to a hunger strike should be sealed because it contained a reference "about staff exercising her

12  discretion to make an exception related to our established processes, which would be disruptive to the

13  orderly running of the institution as it would describe a method and/or precedent for bypassing our

14  established practices." Dkt. No. 161-3 ¶ 6; *see id.* ¶ 16. "Disruption" is vague, "the orderly running of

15  the institution" is broad, and the likelihood of any harm materializing is speculative at best—a far cry

16  from what is required by law. *See Forbes*, 61 F.4th at 1081 (explaining that sealing must be "supported

17  by specific factual findings.").

18         **C. The Public Has a Significant Interest in Information about FCI Dublin That Is Not**
               **Outweighed by Any Compelling Reasons for Secrecy**
19

20         In determining whether there are compelling reasons to seal court records, a court must

21  "conscientiously balance[] the competing interests of the public and the party who seeks to keep certain

22  judicial records secret." *Ctr. for Auto Safety*, 809 F.3d at 1097 (alteration in original). Here, as just

23  discussed, *supra* I(B), the closure of FCI Dublin has rendered Defendants' safety and security concerns

24  moot. It is now difficult to conceive of any operational or security risks that could justify secrecy. All

25  that remains is an empty federal prison with a long history of abuse. But on the other side of the scale,

26  there are many significant reasons why the public's interest in transparency tips sharply in favor of

27  unsealing.

28

---

NOTICE OF MOTION AND MOTION TO
UNSEAL COURT RECORDS & PROTECT ACCESS          19                    Case No. 4:23-cv-04155

1    First, as a general matter, "conditions in jails and prisons are clearly matters 'of great public

2    importance.'" *Houchins v. KQED, Inc.*, 438 U.S. 1, 8 (1978) (quoting *Pell v. Procunier*, 417 U.S. 817,

3    830 n.7 (1974)). "Each person placed in prison becomes, in effect, a ward of the state for whom society

4    assumes broad responsibility." *Id*. It therefore follows that the public "always" has an interest in

5    preventing the violation of constitutional rights for people in government custody. *See Porretti v.*

6    *Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021) (analyzing public interest in context of preliminary

7    injunction). As explained by a sister district court in Idaho: "Whether conditions at the county jails

8    violate the Eighth Amendment of the United States Constitution is important information for the general

9    public to know, so that our country can continue to maintain humane incarceration facilities." *Storm v.*

10   *Twitchell*, No. 1:12-CV-00179-CWD, 2014 WL 4926119, at *14 (D. Idaho Sept. 29, 2014); *see also*

11   *Rosas v. Baca*, No. CV 12-00428 DDP (SHx), 2023 WL 7429105, at *2 (C.D. Cal. Nov. 8, 2023)

12   (recognizing "the important public need for fuller information about conditions within the [Los Angeles

13   County] jails").

14   Additionally, "the public has a strong interest in knowing how their tax dollars are spent" at

15   correctional facilities and how officials are conducting themselves in the public's name. *Hernandez v.*

16   *Cnty. of Monterey*, No. 13-CV-02354-BLF, 2023 WL 5418753, at *4 (N.D. Cal. Aug. 21, 2023). "Penal

17   facilities are public institutions which require large amounts of public funds, and their mission is crucial

18   in our criminal justice system." *Houchins*, 438 U.S. at 8. Taxpayers, in particular, bear the responsibility

19   not only for funding prisons, but also for covering costly settlements or damage awards when officers

20   abuse their positions. *See, e.g.*, *Kelly v. Wengler*, 979 F. Supp. 2d 1243, 1246 (D. Idaho 2013)

21   (explaining that, in context of contracted private prison, "[w]ith public money comes a public concern

22   about how that money is spent"); *Braggs*, 382 F. Supp. 3d at  1272 ("[C]ertain Alabamians may care

23   about correctional understaffing because they care about whether their tax dollars are misspent; others

24   may care about the issue because they do not want their government to violate the Constitution. Either

25   way one looks at it, Alabamians indisputably have a powerful interest in overseeing [the Alabama

26   Department of Corrections'] performance.").

27   When viewed in the context of these overriding principles, it is abundantly clear that the public

28   has a significant interest in information about FCI Dublin, including its unexpected and chaotic closure.

1   For decades, officers at every level of management created a culture of abuse and serially preyed on

2   women incarcerated at the facility. *See* Dkt. No. 222 at 5–10, 23–29. The recent assaults giving rise to

3   the present litigation were horrific and frequent, taking place in open warehouses, common bathrooms,

4   prison cells, and staff offices. *See id.*; *see also supra* Background (Sections I-II). And yet, this blatant

5   misconduct continued for years—in part because of the secrecy that enshrouded FCI Dublin's

6   operations. The public now seeks answers about how so many people could be abused within FCI

7   Dublin's walls for so long. But this accountability will remain elusive without transparency and access

8   to the requested court records.

9         The public also has an interest in scrutinizing Defendants' compliance with federal court orders

10  and the BOP's ability, or inability, to address some of the core allegations about abuse and

11  mismanagement raised in this litigation—as well as in the other forty-eight civil matters currently

12  pending against BOP and FCI Dublin staff. Dkt. No. 222 at 2. FCI Dublin's recent and abrupt closure,

13  its transfers of individuals to facilities across the country, and the news that some women formerly

14  incarcerated at FCI Dublin are facing retaliation in their new facilities all deserve, and continue to

15  garner, widespread public interest. That these matters are of significant public interest is confirmed by

16  the fact that FCI Dublin has been the subject of congressional hearings, a U.S. Senate Report, and

17  ongoing federal investigations. *See, e.g.*, PSI Report; Dkt. No. 222 at 5; *supra* Background (Sections I

18  & III).

19        Finally, Intervenors—as members of the news media and advocacy groups—have a special

20  interest in unsealing the requested court records. For years, they have attempted to investigate the

21  sexual assaults, management problems, and deplorable living conditions at FCI Dublin. They have

22  dedicated significant time and resources to this pursuit and to trying to hold the BOP and officials

23  responsible for their misdeeds. *See supra* Background (Section III); *see also* Decl. of Molly Greene in

24  Supp. of Mot. to Intervene ("Greene Decl.") ¶ 6 (noting that Intervenor The Appeal has published

25  original reporting about the experiences of women incarcerated at FCI Dublin); Decl. of Victoria Law

26  in Supp. of Mot. to Intervene ("Law Decl.") ¶¶ 6-8 (describing Intervenor Victoria Law's past reporting

27  and interest in future reporting); Decl. of Abdi Soltani in Supp. of Mot. to Intervene ("Soltani Decl.")

28  ¶¶ 4-9 (describing Intervenor ACLU of Northern California's advocacy relating to conditions at FCI

1  Dublin). The requested records relate to this body of work and could provide an important lens into FCI

2  Dublin's culture of abuse.

3  The Supreme Court long ago observed that the media, "acting as the 'eyes and ears' of the

4  public, . . . can be a powerful and constructive force, contributing to remedial action in the conduct of

5  public business." *Houchins*, 438 U.S. at 8.  And while both the public's and the media's access rights in

6  the carceral setting can be "subject to limits," *id.*, there are no countervailing reasons to restrict access

7  to the information sought here. After "conscientiously balanc[ing]" the public's significant interest in

8  the records with Defendants' diminished need for secrecy, the Court should unseal the requested

9  records. *Kamakana*, 447 F.3d at 1179.

10
11
### D.  For All Documents that Remain Sealed, the Court Should Issue Sealing Decisions that Articulate the Factual Bases for Sealing

12  As previously discussed, this Court has granted multiple motions to seal without articulating the

13  factual bases for sealing documents. *See* Dkt. No. 222 at 2 n.2; *id.* at 20 n.39; Dkt. No. 300 at 3 n.2.  It

14  is well established, however, that "if the court decides to seal certain judicial records, it must 'base its

15  decision on a compelling reason and articulate the factual basis for its ruling, without relying on

16  hypothesis or conjecture.'" *Kamakana*, 447 F.3d at 1179 (quoting *Hagestad v. Tragesser,* 49 F.3d

17  1430, 1434 (9th Cir. 1995)). That explanation allows for meaningful "appellate review of whether

18  relevant factors were considered and given appropriate weight." *Foltz*, 331 F.3d at 1135 (quoting

19  *Hagestad*, 49 F.3d at 1434). And, as courts have opined, "[t]he political branches of government claim

20  legitimacy by election, judges by reason." *Union Oil Co. of Calif. v. Leavell*, 220 F.3d 562, 568 (7th

21  Cir. 2000). Accordingly, this Court should—for any document that warrants continued sealing—issue a

22  reasoned decision so that the public can better understand why secrecy is warranted.

23  ## II.   Court Proceedings Should be Open to the Public

24  Intervenors also seek transparency about the closed hearings that took place between April 15

25  and May 8, 2024. Presumably because of the speed at which circumstances were evolving, the Court did

26  not publicly notice the hearings, issue any closure orders, or enter any minute entries, as has been the

27  Court's prior practice in this case. *See, e.g.*, Dkt. No. 250 (Civil Minutes for April 5, 2024 status

28

1   conference regarding Special Master). But as discussed previously, *supra* I(B), security is no longer a

2   compelling reason for secrecy and the law now demands a fuller accounting.

3        Rightfully, "America has a long history of distrust for secret proceedings." *United States v. Index*

4   *Newspapers LLC*, 766 F.3d 1072, 1084 (9th Cir. 2014). Such "[s]ecret proceedings are the exception

5   rather than the rule in our courts." *Id.* The Ninth Circuit has "long presumed a First Amendment right of

6   access to court proceedings," including civil proceedings. *Courthouse News Serv. v. Planet*, 947 F.3d

7   581, 589 (9th Cir. 2020) (internal quotations omitted); *see also Publicker Indus., Inc. v. Cohen*, 733 F.2d

8   1059, 1071 (3d Cir. 1984) (holding First Amendment guarantees right of access to hearings on motion

9   for preliminary injunction); *Newman*, 696 F.2d at 800–01 (same as to pre- and post-trial hearings in case

10  involving "the release or incarceration of prisoners and the conditions of their confinement").

11       When the First Amendment right of access attaches, it can only be overcome "by a compelling

12  governmental interest." *Copley Press*, 518 F.3d at 1026. A "court ordering closure must 'make specific

13  factual findings'" justifying secrecy. *Phoenix Newspapers, Inc. v. U.S. Dist. Ct. for Dist. of Ariz*, 156

14  F.3d 940, 949 (9th Cir. 1998) (quoting *Oregonian Pub. Co. v. U.S. Dist. Ct. for Dist. of Oregon*, 920

15  F.2d 1462, 1466 (9th Cir. 1990)). Importantly, "those excluded from the proceeding must be afforded a

16  reasonable opportunity to state their objections." *United States v. Brooklier*, 685 F.2d 1162, 1167-68

17  (9th Cir. 1982).

18       Consistent with these principles, Intervenors request that the Court issue minute orders for the

19  closed hearings and unseal the orders issued in connection with those hearings so that the public can

20  better understand both the nature of those proceedings and the Court's role in mitigating the harm to

21  which Defendants may have subjected incarcerated people. Intervenors also request that, to the extent

22  the Court plans to hold future closed hearings, the hearings are noticed with sufficient time to allow the

23  public, including Intervenors, a meaningful opportunity to challenge the closure.

24  **III.   Relief Should be Ordered Expeditiously**

25       Intervenors are mindful of this Court's busy schedule, but respectfully request that the Court

26  consider and rule on their motions promptly to avoid irreparable harm. "[A] necessary corollary of the

27  right to access is a right to timely access." *Courthouse News Serv.*, 947 F.3d at 594. And where the

28  right of access is grounded in the First Amendment, as it is here, "[e]ach passing day" without access to

1    records "may constitute a separate and cognizable infringement of the First Amendment." *Lugosch v.*

2    *Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d Cir. 2006) (alternation in original) (holding that a

3    court's delay in ruling on a motion to intervene and unseal records was "effectively a denial of any

4    right to contemporaneous access" that infringed on First Amendment rights).

5        In addition, Intervenors have an express interest in reporting news about FCI Dublin, tracking

6    reports of ongoing retaliation, and supporting the survivors of sexual assault at the facility—factors that

7    add to the urgency here. *See* Greene Decl. ¶ 8 (stating that access to information contained in the sealed

8    documents will further journalists' efforts to cover FCI Dublin); Law Decl. ¶¶ 8-9 (noting Intervenor

9    Victoria Law's plans to continue reporting on FCI Dublin and the women previously incarcerated at the

10   facility); Soltani Decl. ¶¶ 8-9 (Intervenor ACLU of Northern California affirming its commitment to its

11   continued advocacy on behalf of and supporting individuals formerly incarcerated at FCI Dublin).

12       As courts have recognized, "'[t]he newsworthiness of a particular story is often fleeting.'"

13   *Courthouse News*, 947 F.3d at 594 (quoting *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24

14   F.3d 893 (7th Cir. 1994) *superseded by rule on other grounds in Bond v. Utreras*, 585 F.3d 1061 (7th

15   Cir. 2009)). To delay or postpone disclosure of the requested court records therefore "undermines the

16   benefit of public scrutiny and may have the same result as complete suppression." *Id.*; *see also Int'l*

17   *News Serv. v. Associated Press*, 248 U.S. 215, 235 (1918) ("The peculiar value of news is in the

18   spreading of it while it is fresh.") *abrogated on other grounds by Erie R.R. Co. v. Tompkins*, 304 U.S.

19   64. Accordingly, Intervenors respectfully request that the Court promptly grant this motion and bring

20   much needed transparency to the misconduct at FCI Dublin.

21                                         **CONCLUSION**

22        The circumstances of this case have been far from ordinary, but it is precisely for that reason that

23   this Court should favor transparency over secrecy. The public has a well-established right to access court

24   records and proceedings in this case, which are of significant public interest. Meanwhile, Defendants

25   likely cannot prove that there remain compelling reasons for such extensive sealing.

26   /

27   /

28   /

---

For these reasons, and the reasons described above, Intervenors respectfully request that the Court:

1. Unseal records for which there are no compelling reasons for secrecy;

2. Order the parties to file unredacted public versions of any briefs or notices previously containing redaction of sealed material;

3. Issue orders articulating the factual basis for sealing when the court determines sealing is necessary and appropriate;

4. Enter minute orders for all closed hearings that were held between April 15, 2024, and May 8, 2024;

5. Ensure that future court proceedings are open to the public, but if a hearing is anticipated to be closed, provide timely public notice such that any person excluded from the proceeding(s) has a reasonable opportunity to object to the closure.

Dated: June 11, 2024                                    Respectfully submitted,

                                                        PUBLIC JUSTICE


                                                        */s/ Jaqueline Aranda Osorno*
                                                        Jaqueline Aranda Osorno (SBN 308084)
                                                        Alexandra Z. Brodsky*
                                                        Sarah Ortlip-Sommers*
                                                        *Pro Hac Vice Forthcoming*


                                                        AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                                                        OF NORTHERN CALIFORNIA, INC.

                                                        Angelica Salceda (SBN 296152)
                                                        Chessie Thacher (SBN 296767)
                                                        Shaila Nathu (SBN 314203)

                                                        *Attorneys for Intervenors*