Jaqueline Aranda Osorno (SBN 308084)
    jaosorno@publicjustice.net
Alexandra Z. Brodsky*
    abrodsky@publicjustice.net
Sarah Ortlip-Sommers*
    sortlip-sommers@publicjustice.net
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
Telephone: (202) 797-8600
*Pro Hac Vice Forthcoming

Angelica Salceda (SBN 296152)
    asalceda@aclunc.org
Chessie Thacher (SBN 296767)
    cthacher@aclunc.org
Shaila Nathu (SBN 314203)
    snathu@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

*Attorneys for Intervenors*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS; et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA; UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS, et al.,<br><br>Defendants. | Case No. 4:23-cv-04155<br><br>**DECLARATION OF STEPHEN SINCLAIR IN SUPPORT OF MOTION TO UNSEAL COURT RECORDS AND PROTECT ACCESS TO PUBLIC PROCEEDINGS**<br><br>Judge: Yvonne Gonzalez Rogers<br>Date: July 16, 2024<br>Time: 2:00 p.m.<br>Courtroom: 1 (Fourth Floor) |

# DECLARATION OF STEPHEN SINCLAIR

I, Stephen Sinclair, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the following is true and correct:

**I. Introduction & Summary of Qualifications**

1. I am the CEO of the Justice & Liberty Group LLC. Public Justice has retained me in connection with *California Coalition for Women Prisoners et al., v. Federal Bureau of Prison, et al.*, Case No. 4:23-cv-04155. Public Justice has retained me to provide expert opinions based on my corrections experience on what kind of information, if disclosed, could compromise the safety and security of a carceral institution. In this matter, I have been retained at $300 an hour. The independent opinions set forth herein are based on my personal and professional knowledge and are set forth to a reasonable degree of professional certainty. If called as a witness to testify, I could and would testify competently thereto.

2. My experience in adult corrections includes the thirty-two years I spent as an employee of the Washington State Department of Corrections ("WADOC"). I began as a Correctional Officer at the Washington State Penitentiary in September 1988 and concluded my career as the agency Secretary. I was appointed Secretary of WADOC in April 2017, confirmed by the Washington State Senate in January 2018, and served until May 2021.

3. During my career, I have led numerous significant changes within WADOC, many, but not all, of which are highlighted in my Curriculum Vitae (Attachment A).

4. Throughout my career, I was involved in determining policy and practice related to safety and security matters. I was a WADOC's Captain's Committee member, reviewing agency safety and security policies and implementing approved changes at a facility level. For approximately four years, I was co-chair of the WADOC Statewide Security Advisory Committee, which comprised staff from all levels of the organization and was responsible for evaluating safety and security suggestions made by line staff. Adopted changes were implemented in policy, procedures, and practice. This committee was also used as a sounding board for agency-initiated changes that were related to safety and security.

5. In various roles during my career, beginning as a Correctional Investigator, I received ongoing training related to criminal investigation. This training included, but was not limited to, training

received at the Washington State Patrol Investigators Academy, the Walla Walla Reserve Police Officer Academy, and numerous other investigator training provided by WADOC, the Washington Criminal Justice Training Academy, and other organizations.

6. In addition to my work experience, I possess a Master of Public Administration degree from the University of Washington; I have attended thousands of hours of training sponsored by WADOC, the Washington State Criminal Justice Training Academy, the Washington State Patrol Investigator Academy, Washington State Tactical Officers Association, and the Walla Walla Police Department. My experience includes training and hours worked as a Reserve Police Officer for the Walla Walla Police Department.

7. I have served four years as a Commissioner of the Washington State Criminal Justice Training Academy (2017-2021), overseeing curriculum development for basic academies for Law Enforcement and Corrections and certification standards. I also spent four years as a member of the Washington State Sentencing Guidelines Commission (2017-2022). I am an active member of the Correctional Leaders Association (CLA) and the American Correctional Association (ACA). I received the 2020 Tom Clements Award for Innovation from CLA and was recognized by Washington Governor Christine Gregoire in 2009 for excellence in management.

8. Since my retirement in May 2021, I have remained involved in the corrections field, researching, analyzing, and providing expert opinions in cases related to confinement in city, county, and state-operated confinement facilities. In summary, I have spent much of the past 35 years working with, thinking about, and analyzing the field of adult corrections on topics including, but not limited to, the use of force, the use of administrative segregation and restrictive housing, prison regulations, correctional operations and the policies required to operate a safe and humane corrections systems/facilities. My expert work has been for both plaintiffs and defendants, and all case involvement during my WADOC career was as a defendant.

**II. Safety & Security in Corrections**

9. The term "safety and security" is broadly used in corrections; it is nearly a mantra. Correctional staff at all levels use this term to describe their role in the organization or even as a reminder to others to refer them back to the mission. Through my work as a corrections expert, I have

often heard the term used by corrections officials to protect documents from the public eye. I believe this is unfortunate because it is often not based on genuine safety and security concerns.

10. In Washington State, where I served, I was present for several evolutions of law changes that have expanded public disclosure laws, most of which were enacted decades ago. I can clearly remember when these laws took effect, and there was opposition. The first term we used was "safety and security" to protect information we thought was vital to our mission. In hindsight, even our arguments back then were based on something other than sound logic. Now, decades later, after having lived and worked through these changes, I recognize the insignificant impacts nearly full disclosure has had on the actual safety and security of the institutions and agencies where I worked. As an example, I recall the agency's use of force policy being considered restricted and not available for public viewing. The logic at the time was that disclosure would jeopardize "safety and security" because we didn't want people, especially incarcerated people, to know all the tools in our toolbox. Over time, our logic crumbled, and even this policy that we held sacred is now available on the internet.

11. Generally, the term "safety" in a carceral setting is about keeping staff, the incarcerated, and anyone else interacting with a correctional setting safe from unwarranted harm. This is influenced by external and internal safety requirements governed by state and federal agencies (e.g., OSHA, Health Departments, state agencies responsible for ensuring industrial safety, etc.). In a carceral setting, operational practices like movement control, adequate staffing, a grievance system, a functional classification system, and the availability of programming to engage the incarcerated population all intertwine to create safer correctional environments. All correctional institutions have the additional responsibility to protect those in their custody and care from unreasonable or unjustified physical harm caused by other incarcerated individuals and even staff. In my experience, what influences safety is a broad topic, but what must remain confidential to ensure safety is very narrow.

12. In corrections, the term "security," like safety, is one of the core responsibilities of each staff member and the governing agency itself. Security is about having policies, practices, and a functioning physical plant to ensure incarcerated individuals remain in custody for the period defined by the sentencing courts. Security includes ensuring those incarcerated only have access to items and materials that are authorized for their use or possession. Everything else is considered contraband.

13. "Safety and security" also encompasses a broad responsibility of all criminal justice entities to prevent the commission of a crime, investigate when there is probable cause to believe that a crime has been committed, and bring to justice those who have committed a crime. It is no secret crimes are committed in correctional settings, and even crimes committed in our communities that are orchestrated there. Incarcerated individuals and staff, can and are engaged in various criminal activities. There are limited times when exposure of correctional intelligence and investigative matters can jeopardize the criminal investigation and risk the loss of evidence. The public interest is served by investigating these crimes, and there is a loose nexus between safety and security because a lawless correctional facility is not safe or secure.

14. In my opinion, "safety and security" are about keeping people safe from harm, ensuring incarcerated individuals don't escape custody or evade criminal prosecution when a crime has been committed, and preventing unauthorized items from reaching the incarcerated population. In my opinion, when considering whether or not to share corrections-related information or documents publicly, the questions to ask are:

*1. Will a person or people be physically harmed if this information is made public?*

*2. Will this information legitimately contribute to an effort for an incarcerated individual to escape from custody or any individual to evade prosecution for crimes committed?*

*3. Will this information directly contribute to the introduction of contraband into a correctional facility?*

If I did not answer yes to at least one of these questions, I would struggle to understand the logic of concealing information from the public eye. As a former public official, I recognize that releasing some information publicly can be embarrassing and even lead to tort liability, but it does not follow that disclosure of such information would threaten the safety and security of a carceral institution.

15. There are a minimal number of documents maintained by correctional agencies, which, if revealed to the public, could threaten the safety and security of a correctional institution. What pieces of knowledge could an incarcerated person obtain from the public domain that would threaten the safety and security of a correctional setting? This also must be balanced against (1) what incarcerated people already know and could themselves share with the public based on their observations and constant

interactions with the system's rules and staff that confine them, and (2) what can be relayed to them by free people in the community with access to the vast knowledge of the internet. If the incarcerated population knows it, it should be synonymous with the public knowing it because communication goes both ways.

### III. Examples of Confidential Correctional Information

16. Based on my experience, my shortlist of information that will likely have safety and security implications includes:

*Confidential Informant Information*

17. Information provided by an incarcerated individual, or even by a private citizen, to correctional staff or law enforcement to further or assist with criminal or administrative investigations that could lead to criminal prosecution should be considered confidential. In correctional settings, the knowledge that someone is providing information to officials greatly increases the probability they will be seriously harmed. This risk exists in communities just like it does in correctional settings, but the difference is that incarcerated individuals can't escape the environmental threat. Suppose the agency's knowledge of someone acting as a confidential informant is revealed. In that case, it can and will follow the individual for the remainder of their incarceration, placing them in constant jeopardy.

*Detailed Schematics and Drawings*

18. On rare occasions, detailed schematics and drawings of a correctional facility's physical structure or security systems can identify potential vulnerabilities that can assist in escape attempts. This is a classic vulnerability often played out in dramatic movies and television. Unfortunately, some of these characterizations are based on actual events. Once released, the distribution can't be controlled in today's digitized world, and there will forever be a vulnerability. It is important to note that incarcerated people can see a large percentage of the facility in their daily lives. Still, they may not be able to see the potential pathways to escape that may exist in the utility infrastructure or ways to defeat security systems from electrical diagrams. There is no harm in revealing what the incarcerated people already have knowledge of.

***Incarcerated Person Pre-Transport Information***

19. The release of information related to the pending transport or intended destination of incarcerated individuals can have devasting consequences, as noted in the recent assisted escape of an incarcerated person from the Idaho Department of Corrections. Before a security transport, it is necessary to keep details like timing, route, and destination undisclosed to protect and avoid assisted escape. However, the risk is limited after the fact unless these three elements (timing, route & destination) are routinely used. Making any part of a security transport routine is a bad security practice; however, it may be unavoidable based on other factors like physician availability, first appearances, etc. Even in these instances, the need to protect the information after the fact isn't logical because the transported incarcerated person will know where they went and likely some details about the route. They can easily share this information over the phone or during visits. When transporting incarcerated individuals, there is a risk at any point along the route and at the destination when not transporting them to a secure location like another correctional facility. The correctional practice I support and am most familiar with is keeping all pre-transport information confidential.

20. There is additional risk when transporting notorious incarcerated individuals, which is the risk of external attack by vigilantes seeking justice they feel was not served upon conviction. I include this only because I have done many of these transports and know what it feels like to be a corrections officer providing the security of someone pending trial or hearing, which was advertised on the news the night before. As I said previously, some things are unavoidable.

***Emergency Response Checklists***

21. Some facilities and agencies, like mine, may have developed a checklist for staff that spells out specific actions to be taken in any emergency, which are commonly called Emergency Response Checklists. They are generally topical, addressing actions to be taken for emergencies like earthquakes, power failures, riots/disturbances, hostage-taking, etc. If disclosed, these documents could compromise safety and security if they give too many details about response tactics in an organized crisis event, which could hamper an adequate response. Disclosure of these documents should be reviewed on a case-by-case basis.

*Other Unique Documents*

22. Based on my experience, other unique documents like those relating to key control and key replacement may need to be kept confidential. These are examples of unique documents that could aid in an escape attempt and should be confidential.

**IV.   Common Documents Marked Confidential in Litigation**

23. Based on my experience as a correctional expert that has reviewed thousands of documents produced in litigation, there are general categories of documents that are commonly marked confidential for "safety and security" reasons. In my opinion, disclosure of many of these documents would not actually jeopardize safety and security. Each topical area should be reviewed through the lens of the three questions I posed previously. I believe the analysis should also include a finer level of detail. Does the entire document meet this level of confidentiality, or can only parts of the document be redacted? Often, I see entire documents concealed, including the document's name, and I struggle with the logic of this approach.

*Agency and Local Policy*

24. Agency policy is often written at an agency level, providing standards that must be met locally. Policies describe how a particular policy expectation will be carried out. The policy tends to be one and the same for smaller municipal or county detention facilities. Based on my knowledge of the large volume of policies maintained by WADOC and numerous other agencies' policies I have reviewed during my expert work, policies rarely describe actual tactics that, if revealed, would jeopardize safety and security.

25. For example, a transportation policy may say that transportation officers must alter their route when transporting individuals to commonly used destinations. An argument could be made the policy contains detailed tactics about how transports are carried out, and if revealed, this information could jeopardize someone's safety. This is an example where logic plays a vital role because the commonsense statement about altering routes does not increase risk or create a safety concern for anyone involved; the policy itself does not disclose any details about actual routes.

26. As an additional example, consider a governing policy for Special Emergency Response Team (SERT) or Hostage Rescue Team (HRT). These policies will spell out the purpose or intent of the policy and then set requirements like:

- The selection process for membership would include physical standards to be met, psychological testing to be completed, and the like.
- Authorized weaponry—like a sidearm (pistol), longarm (rifle), and a myriad of less lethal force options available to corrections and law enforcement today (e.g., Pepper spray, Taser, 40mm Sponge Round, etc.).
- Other authorized equipment—Uniforms, helmets, breaching tools, etc.
- Team structure—Team Leader, Assistant Team Leader, Squad leaders, breachers, designated marksmen (snipers), etc.
- (Rarely, if at all) Communications practices, including frequencies used and storage location of weaponry. NOTE: All of this information, if included, should be redacted.

27. One could argue that disclosing these governing policies could compromise safety and security: "our most elite tactical unit will be compromised, and people could die as a result." This is not even close to being true. One could search Google to see what commonly used S.W.A.T. equipment is or what the requirements are to be on a S.W.A.T. team. Only the tactics used by these teams could, if revealed, compromise safety and security. The tactics used to resolve a situation are defined at the time of the incident by the officer's training, the environment, and the crisis to be resolved, not the policy. Depending on the agency, they may include information like radio frequencies, storage locations, and other minutia that should be redacted, but it would not be necessary to exclude the entire policy.

28. Policies relating to emergency response bodies, like the policy I described above, are some of the most sensitive policies one could argue should be confidential but, in my opinion, does not need to be. If this is true for this policy, it should be true for every less sensitive policy.

*Post Orders and Procedures*

29. Post Orders are a tool for relaying routine and emergency response procedures to correctional officers so anyone assuming a particular post knows what they are supposed to do as a matter of routine or what to do in specific emergencies. In most cases, the emergency response portion

simply directs staff to stop all movement of incarcerated people, secure particular doors, and notify a designated emergency control point, not necessarily in that order.

30. In my experience, Post Orders rarely contain information that, if revealed, would compromise safety and security. Remember that incarcerated individuals can observe staff 24-7, and they do. All correctional staff are taught this in their basic academy. Incarcerated individuals already know the routine activities of the assigned staff, so what is wrong with the general public learning the activities of its public employees?

31. On rare occasions when the Post Order contains potentially compromising information, the details can be redacted, but there is no need for the entire document to be kept from the public. As an example, a Post Order may include an emergency response section that specifies that in case of a riot, staff should retreat to a certain area. Where that certain area is located is something to keep confidential because if known by the incarcerated population during a planned incident, they could plan the escape route.

*Information Relating to Staffing Levels*

32. It should be no secret that correctional agencies nationwide are struggling to staff their facilities post-COVID-19 and, for many jurisdictions, for years before the pandemic. This fact can even be found in the media on occasion. From my experience, the recruitment and retention of staff, including correctional staff and medical staff, has been an ongoing challenge for most correctional agencies.

33. Before I was Secretary of WADOC, I was the Director of Prisons, and one of our challenges was recruitment and retention. Because of this, I had reports developed that were reviewed routinely to track the vacancy rate at any given facility. When a facility was experiencing or about to experience staffing shortages, I could direct agency resources and various strategies to help the facility. It was an essential part of my role. I can't even imagine how this information would jeopardize safety and security. The incarcerated population already knows there is a problem because they experience it firsthand. After all, programs and activities are shut down due to a lack of staffing, and they see staff working multiple shifts as a matter of routine. It is impossible to keep this information secret. As I previously stated, if the incarcerated population knows it, it should be synonymous with the public knowing it because communication goes both ways.

34. Certain staffing information may compromise safety and security in one narrow area. Suppose the area or facility is suffering extreme staffing challenges. In that case, a facility may make the difficult decision to close critical security posts related to perimeter security and other vital internal control points. In this instance, which posts and when they are vacant should not be shared. They would be "yes" answers to my guiding questions 2 and 3. Again, this is a narrow subset of information related to a specific situation. If documents about staffing contain this information, it can be redacted. In my opinion, outside the narrow subset of information related to key security posts, the only risk of disclosing information relating to staffing is possible embarrassment in the public eye for failing to staff your facilities fully. Even this is doubtful based on the labor shortages most organizations are facing.

*Audits and Inspections*

35. I don't recall a time in my experience when audits or inspections by external agencies were anything but public information. I am reasonably sure that during my career I experienced every conceivable audit or inspection one could expect in a correctional setting and even a couple I wouldn't have expected. In my experience, the results of inspections and audits related to the health and safety of staff and incarcerated individuals were publicly available if they did not involve findings relating to security systems like alarms, or video surveillance footage.

36. In the case of internal security management and emergency preparedness audits where the facility's performance or lack thereof identifies security gaps, specific information should be kept confidential until the security issue is rectified.

*Movement Records*

37. In general, once a transport is complete, records of an incarcerated person and where they have been incarcerated need not be confidential. Routine records kept about internal daily movements like sick-call, medical appointments, visits, etc., are all records that are after the fact and present no safety and security threat. These records are a necessary and routine part of correctional record keeping. When it comes to the location of an incarcerated people, most correctional systems have internet-based programs, so an incarcerated person can be found by friends, family, or anyone else. In my experience, there has never been a need to conceal where an incarcerated person has been within the system.

### V. Conclusion

38. Based on my experience in corrections, many documents and records are created daily, and most are routinely available to the public. I have provided examples of the narrow subset of documents that should be kept confidential to ensure the safety and security of our correctional institutions, but they are extremely limited.

39. I acknowledge that it is easier to determine what should and shouldn't be made public when you have spent as many years as I have in the field of corrections. The courts have a daunting task in making these decisions. I assume it is difficult to know the harm that can be caused to plaintiffs and defendants alike by not releasing information that could influence the outcome of litigation. But as explained in this declaration, it is my opinion that only a minimal number of documents maintained by correctional agencies could, if revealed to the public, threaten the safety and security of a correctional institution.

I certify that, to the best of my knowledge and belief:

i. The statements of fact in this report are true and correct.

ii. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and are my personal, unbiased, and professional analyses, opinions, and conclusions.

iii. I reserve the right to modify or supplement my opinions should additional information become available.

iv. I have no personal interest or bias with respect to the parties involved; and

v. My compensation is not contingent on an action or event resulting from this declaration's analyses, conclusions, or opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June  10 , 2024, in  Olympia        , Washington.

*Stephen Sinclair*
_____
Stephen Sinclair, CEO
Justice & Liberty Group LLC