JESSE LASLOVICH
United States Attorney
MADISON L. MATTIOLI
  MT Bar No. 36411284
ABBIE J.N. CZIOK
  MT Bar No. 55781377
Assistant U.S. Attorneys
U.S. Attorney's Office
901 Front Street, Suite 1100
Helena, MT 59626
Phone: (406) 457-5269 – Madison
         (406) 457-5268 – Abbie
Fax: (406) 457-5130
Email: madison.mattioli@usdoj.gov
        abbie.cziok@usdoj.gov

MARK STEGER SMITH
  MT Bar No. 4160
TIMOTHY A. TATARKA
  CA Bar No. 277219
Assistant U.S. Attorneys
U.S. Attorney's Office
James F. Battin Federal Courthouse
2601 2nd Ave. North, Suite 3200
Billings, MT 59101
Phone: (406) 247-4667 – Mark
         (406) 247-4642 – Tim
Fax: (406) 657-6058
Email: mark.smith3@usdoj.gov
        timothy.tatarka@usdoj.gov

Attorneys for Federal Defendants.

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.; G.M.; A.S.; and L.T., individuals on behalf of themselves and all others similarly situated,<br><br>Plaintiffs<br>v.<br><br>UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS, a governmental entity; BUREAU OF PRISONS DIRECTOR COLETTE PETERS, in her official capacity; FCI DUBLIN WARDEN THAHESHA JUSINO, in her official capacity; OFFICER BELLHOUSE, in his individual capacity; OFFICER GACAD, in his individual capacity; OFFICER JONES, in his individual capacity; LIEUTENANT JONES, in her individual capacity; OFFICER LEWIS, in his individual capacity; OFFICER NUNLEY, in his individual capacity; OFFICER POOL, in his individual capacity, LIEUTENANT PUTNAM, in his individual capacity; OFFICER SERRANO, in his individual capacity; OFFICER SHIRLEY, in his individual capacity; OFFICER SMITH, in his individual capacity; and OFFICER VASQUEZ, in her individual capacity,<br><br>Defendants. | CASE NO. 4:23-CV-04155-YGR<br><br>**FEDERAL DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................. ii

I.    INTRODUCTION................................................................................................... 1

II.    FACTUAL BACKGROUND ................................................................................ 3

    a.    The Investigation of FCI Dublin in 2020 and 2021 ........................................3

    b.    FCI Dublin from January 2022 to Present .....................................................4

        i.    Increased Oversight at FCI Dublin by Outside Entities......................4

        ii.    Completely New Management at FCI Dublin....................................5

        iii.    New Policies Deter and Address Staff Misconduct at FCI Dublin...........................................................................................6

        iv.    New and Upgraded Cameras at FCI Dublin .......................................6

        v.    New Methods of Reporting Abuse at FCI Dublin Outside of BOP........................................................................................6

        vi.    Timely and Consistent Access to Confidential Attorney Calls, Legal Mail, and Visits ............................................................7

        vii.    Appropriate Use of Special Housing Units and Contraband Searches at FCI Dublin ....................................................................8

        viii.    Medical and Mental Health Care Provided to all Inmates .................9

    c.    Allegations of Sexual Misconduct in 2022 and 2023 ..................................10

III.    PRELIMINARY INJUNCTION LEGAL STANDARD ............................................. 11

IV.    ARGUMENT........................................................................................................ 12

    a.    Plaintiffs are Not Likely to Succeed on the Merits......................................13

    b.    Plaintiffs Will Not Suffer Imminent Irreparable Harm ...............................16

    c.    The Balance of Equities & Public Interest Favor Defendants .....................20

    d.    The Requested Relief Does Not Satisfy the Requirements of 18 U.S.C. § 3626. .............................................................................................21

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Am Trucking Ass'ns, Inc. v City of Los Angeles*,
   559 F3d 1046 (9th Cir. 2009) ...................................................................12

*Arizona Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014)...................................................................17

*Armstrong v. Brown*,
   768 F.3d 975 (9th Cir. 2014) ....................................................................24

*Baze v. Rees*,
   553 U.S. 35 (2008) ...................................................................................13

*Bell v. Wolfish*,
   441 U.S. 520 (1979)..................................................................................16

*Benisek v. Lamone*,
   138 S. Ct. 1942 (2018) .......................................................................17, 19

*Bernhardt v. L.A. Cnty.*,
   339 F.3d 920 (9th Cir. 2003) ...................................................................20

*Boardman v. Pac. Seafood Grp.*,
   822 F.3d 1011 (9th Cir. 2016)...................................................................17

*Brown v. Plata*,
   563 U.S. 493 (2011)............................................................................13, 20

*Caribbean Marine Servs. Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) ...................................................................17

*DISH Network Corp. v. FCC*,
   653 F.3d 771 (9th Cir. 2011) ...............................................................17, 19

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014)...................................................................20

*Farmer v. Brennan*,
   511 U.S. 825 (1994)..............................................................12, 13, 14, 20

*Fraihat v. U.S. Immigr. & Customs Enf't*,
   16 F.4th 613 (9th Cir. 2021) ....................................................................16

*Helling v. McKinney*,
    509 U.S. 25 (1993) ..................................................................................................13

*Hernandez v. Cnty. of Monterey*,
    305 F.R.D. 132 (N.D. Cal. 2015) ............................................................................13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) ..................................................................................23

*Hoffer v. Sec'y, Fla. Dep't of Corr.*,
    973 F.3d 1263 (11th Cir. 2020) ................................................................................21

*In re Excel Innovations, Inc.*,
    502 F.3d 1086 (9th Cir. 2007) ..................................................................................17

*Johnson v. Lewis*,
    217 F.3d 726 (9th Cir. 2000) ....................................................................................23

*Mauro v. Arpaio*,
    188 F.3d 1054 (9th Cir. 1999) ............................................................................16, 21

*Nettles v. Grounds*,
    830 F.3d 922 (9th Cir. 2016) ....................................................................................21

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................................................................11

*Porter v. Nussle*,
    534 U.S. 516 (2002) ..................................................................................................21

*Roberts v. Spalding*,
    783 F.2d 867 (9th Cir. 1986) ....................................................................................23

*Stanley v. Univ. of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994) ....................................................................................12

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ..................................................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...............................................................................................11, 20

**Statutes**

18 U.S.C. § 2241 ...............................................................................................................4
18 U.S.C. § 3626(a)(3)(A) ................................................................................................20

18 U.S.C.A. § 3626(2) .................................................................................................12
18 U.S.C.A. § 3626(a) ...................................................................................................2
18 U.S.C.A. § 3626(a)(2) ................................................................................12, 21, 22
U.S. Const. Amend. VIII...............................................................................................13

**Rules**

Fed. R. Civ. P. 23 ....................................................................................................2, 13

**Regulations**

28 CFR § 115.71(i)........................................................................................................24

**Other Authorities**

11A Wright & Miller, Federal Practice and Procedure: Civil 2d § 2948.1 (2d ed. 1995) .....17

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

During and immediately following the height of the pandemic, alarming allegations of staff misconduct at the Bureau of Prisons' ("BOP") Federal Correctional Institution at Dublin, California, ("FCI Dublin") came to light, sparking an investigation by the U.S. Department of Justice ("DOJ"). In the past two years, DOJ has indicted eight BOP employees, including the former warden and chaplain, for sexual abuse of inmates housed at FCI Dublin.[1] The message has been clear: DOJ will not tolerate criminal misconduct in the care and safety of incarcerated persons. *Id.* The Federal Bureau of Investigation ("FBI") and the Office of the Inspector General ("OIG") have led the investigations of sexual abuse and misconduct allegations at FCI Dublin. BOP has placed an additional 19 correctional staff members on administrative leave pending these investigations into allegations of sexual abuse. BOP has completely replaced FCI Dublin's executive and management teams. FCI Dublin now has the most cameras of any BOP facility in the Western Region, with new and upgraded cameras placed in areas where abuse was known to occur in the prison. With COVID lockdown orders removed, outside mental health providers are again able to visit FCI Dublin in person to provide mental health services to inmates, and attorneys have full access to speak to survivors. Bad actors have been removed, and conditions at FCI Dublin have improved significantly in recent years. Under new leadership, previous depredations will not recur, and conditions and services will continue to improve.

This Court should deny Plaintiffs' motion for a preliminary injunction as they cannot establish the requirements for injunctive relief.[2] Plaintiffs cannot show likely success on the

---

[1] DOJ Press Release, Two More Dublin Federal Correctional Officers to Plead Guilty to Sexually Abusing Multiple Female Inmates, https://www.justice.gov/usao-ndca/pr/two-more-dublin-federal-correctional-officers-plead-guilty-sexually-abusing-multiple (last visited November 13, 2023).

[2] Although Plaintiffs fashion their motion for a preliminary injunction as being on behalf of themselves "and all others similarly situated," and assert that the "*people within FCI Dublin* have been assaulted and harassed at staggering rates," the Court should consider this application solely on behalf of the named Plaintiffs R.B.; A.H.R.; S.L.; J.L.; J.M.; G.M.; A.S.; and L.T. A

merits because they are unable to establish an Eighth Amendment violation. The overwhelming majority of declarations in support of Plaintiffs' motion center on past misconduct perpetrated by BOP employees who have been prosecuted, terminated, transferred, investigated, placed on leave or cleared, or who quit or died. The few remaining declarations alleging more recent misconduct demonstrate that BOP has promptly addressed those allegations, and no threat remains. As explained in detail below and referenced in the attached declaration, BOP has taken myriad steps to address and prevent sexual misconduct at FCI Dublin, including many of the steps Plaintiffs request as final injunctive relief against the BOP. Plaintiffs therefore cannot demonstrate that defendant-officials, at the time suit was filed, were knowingly and unreasonably disregarding an objectively intolerable risk of harm to Plaintiffs (the operative Eighth Amendment standard), and that they will continue to do so into the future.

Plaintiffs have failed to demonstrate immediate irreparable harm because FCI Dublin has been, and will continue, taking steps to address the issues raised by Plaintiffs. Further, the balance of equities and public interest tip decidedly in Federal Defendants' favor here because FCI Dublin has already taken steps to prevent Plaintiffs' alleged harm. Plaintiffs' requested remedies are premature, and such remedies would interfere with facility safety and administration.

Plaintiffs also cannot satisfy the additional burden placed upon them by the Prison Litigation Reform Act ("PLRA"), 18 U.S.C.A. § 3626(a). The relief requested by Plaintiffs is not narrowly drawn, extends further than necessary to correct any violation of their federal rights, and is inevitably more intrusive than necessary given the corrective measures already deployed. Accordingly, Federal Defendants respectfully request that the Court deny Plaintiffs' Request for a Preliminary Injunction.

---

preliminary injunction based on putative class members, including those in the group California Coalition for Women Prisoners, is premature at this time, as this Court has not certified a class action pursuant to Fed. R. Civ. P. 23, and that motion is presently stayed.

## II. FACTUAL BACKGROUND

The BOP operates FCI Dublin, located in Dublin, Alameda County, California. FCI Dublin is an all-female low security correctional institution with an adjacent minimum security Satellite Prison Camp ("SPC") for female inmates. (Decl. ¶ 2.) There are currently 714 total inmates housed across the prison.[3]

### a. The Investigation of FCI Dublin in 2020 and 2021

Beginning in 2020, DOJ launched an investigation into FCI Dublin which "revealed significant findings of wrongdoing by multiple correctional officers at that facility."[4] The investigation, led by DOJ, through OIG and the FBI, continues to this day. (*Id.*; Decl. ¶¶ 17-19.) In June 2021, the U.S. Attorney's Office for the Northern District of California charged the first of a series of prison officials with crimes related to the sexual abuse of inmates at the facility. In February 2022, former Correctional Officer ("CO") Ross Klinger pleaded guilty, and his sentencing is scheduled for December 2023. Also in February 2022, former Chaplain James Highhorse pleaded guilty, and was sentenced to 84 months in prison. In June 2022, former CO John Bellhouse was convicted on all counts by a jury, and sentencing is scheduled for December 1, 2023. In October 2022, former CO Enrique Chavez pleaded guilty, and this Court sentenced him to 20 months in prison. In December 2022, former Warden Ray Garcia was convicted on all counts by a jury, and this Court sentenced him to 70 months in prison. In April 2023, former CO Darrel Smith was indicted on twelve counts, and a status conference is scheduled for January 4, 2024. In July 2023, former COs Andrew Jones and Nakie Nunley pleaded guilty, and their sentencings are set for November 15, 2023, and March 6, 2024, respectively. (*Id.*)

---

[3] Federal Bureau of Prisons, FCI Dublin (https://www.bop.gov/locations/institutions/dub/) (last visited November 13, 2023).

[4] DOJ Press Release, Two More Dublin Federal Correctional Officers to Plead Guilty to Sexually Abusing Multiple Female Inmates, https://www.justice.gov/usao-ndca/pr/two-more-dublin-federal-correctional-officers-plead-guilty-sexually-abusing-multiple (last visited November 13, 2023).

### b. FCI Dublin from January 2022 to Present

Undeniably, in the years leading up to the above-described investigation, FCI Dublin was afflicted with several problem corrections officers and supervisors who inflicted sexual abuse and harassment, who covered up such acts, and who retaliated against informers. But when these problems were discovered and brought to light, BOP worked diligently alongside the FBI and OIG to remove the bad actors and otherwise remedy deficiencies at the facility. There is no ongoing problem for the Court to address via injunction.

#### i. Increased Oversight at FCI Dublin by Outside Entities

In March 2022, BOP formed a multidisciplinary task force to inspect, monitor, and make recommendations to FCI Dublin regarding the prison's handling of alleged sexual abuse. This task force visited FCI Dublin in March 2022 to speak with inmates and staff and to provide an additional platform for inmates to report sexual misconduct or concerns with their safety and well-being. (Decl. ¶ 6.) On August 1, 2023, Office of Internal Affairs ("OIA") Program Statement 1210.25 was revised to reflect that all investigations of mismanagement and employee misconduct will be conducted and overseen by OIA. Accordingly, BOP refers all allegations of sexual abuse at FCI Dublin to OIA. Upon suspicion of criminal conduct, BOP may refer the matter directly to OIA and to OIG or the FBI simultaneously, but OIA refers all sexual abuse allegations to OIG. Program Statement 1210.25 directs that the subject of the allegation or complaint must not be questioned or interviewed prior to OIG clearance and OIA's release. OIG may refer criminal matters (i.e., sexual abuse of an inmate) to DOJ's Civil Rights Division ("CRD"), for prosecutorial consideration under the provisions of the Sexual Abuse Act of 1986, 18 U.S.C. § 2241 *et seq.* and other applicable statutes. These policies ensure that any alleged BOP employee perpetrator at FCI Dublin is investigated by authorities outside the facility. (Decl.¶¶ 16-17; Decl. Attachment 1.)

Additionally, OIG and FBI have each dedicated two Special Agents to handle any cases of alleged sexual abuse at FCI Dublin. They regularly visit FCI Dublin for any case related issues. OIA has posted one on-site agent at FCI Dublin who monitor for any ongoing abuses.

Decl. ¶ 17.) BOP's Western Regional Office also employs a regional Special Investigative Agent ("SIA"), who supervises internal investigations into staff and inmate misconduct. (Decl. ¶ 18.)[5]

### ii.     Completely New Management at FCI Dublin

Beginning in January 2022, BOP completely overhauled the FCI Dublin Executive team. (Decl. ¶ 7.) Warden, T. Jusino, started in February 2022; Associate Warden, P. Deveney, started in July 2022, and Associate Warden C.D. Nash started in June 2023; Captains Jesus Valero and Ericka Quezada started in June and July 2022. (*Id.*) BOP also replaced managerial staff at FCI Dublin, recruiting and hiring a new Case Management Coordinator, Employee Development Manager, Facilities Manager, Food Services Administrator, Health Services Administrator, Chief Psychologist, Unit Managers, and Supervisory Chaplain, to name just a few. (Decl. ¶ 8.)

Beginning January 2023, FCI Dublin staff, including all new hires, received training on topics specific to female offenders, such as Trauma-Informed Care, Effectively Managing Female Offenders, Prison Rape Elimination Act ("PREA") for Medical and Mental Health Care, and PREA for Investigating Sexual Abuse in a Confinement Setting. Additional training includes Addressing Inmate Sexual Misconduct, Discrimination and the EEO Process, Ethics/Standards of Conduct, and Supervision of Offenders. (Decl. ¶ 10.)

Associate Warden P. Deveney became FCI Dublin's PREA Coordinator in July 2022. He has dedicated substantial time monitoring for retaliation and implementing procedures for inmate transfers to outside hospitals to gather evidence of sexual assault, and for the evaluation and treatment of such assaults. He has ensured the continuation of PREA professional development and refresher training at FCI Dublin. Associate Warden Deveny ensures that Sexual Safety training, a component of PREA, is consistently provided to FCI Dublin inmates. (Decl. ¶ 11; Decl. Attachment 2.)

---

[5] Job Duties of SIS Positions, https://oig.justice.gov/reports/BOP/e0609/app2.htm (last visited November 13, 2023).

### iii.    New Policies Deter and Address Staff Misconduct at FCI Dublin

Since formation of the task force, BOP has instituted policies to deter and address staff misconduct. (Decl. ¶ 5.) As mentioned, Program Statement 1210.25 was revised to reflect that all investigations of mismanagement and employee misconduct will be conducted and overseen by OIA. (*Id.*, ¶ 16; Decl. Attachment 1.) FCI Dublin currently has 19 staff on administrative leave based on sexual abuse allegations, up from 16 staff six months ago. Where allegations of sexual abuse are sustained in administrative review, employees are disciplined, up to and including removal. FCI Dublin has terminated three employees suspected of sexual abuse. (Decl. ¶ 33.) Additionally, OIA sends a weekly report to the leadership of each of the BOP's six regions to advise of any new sexual misconduct allegations. This ensures that BOP leadership is aware of allegations as they arise, and of the outcome of any associated investigations and proceedings. Since early in Director Colette Peters' tenure, she and OIA meet monthly to discuss progress on existing cases, major case developments, and new issues. (*Id.*, ¶ 34.)

### iv.    New and Upgraded Cameras at FCI Dublin

Since formation of the task force, BOP has installed new cameras in areas where abuse was known to occur and upgraded cameras that required modernization. In May 2022, the task force procured funding for 141 updated cameras at FCI Dublin. The goal was to have 323 video cameras operational by September 30, 2023. Instead, FCI Dublin now has 385 cameras online and recording. Of the 19 Western Regional institutions, FCI Dublin now has the most cameras. (Decl. ¶¶ 57-60.)

### v.    New Methods of Reporting Abuse at FCI Dublin Outside of BOP

Since formation of the task force, BOP has provided new and confidential methods for inmates to report abuse and retaliation both internally and to outside authorities not employed by BOP. These methods include: emailing OIG directly through the Trust Fund Limited Inmate Computer System ("TRULINCS"); writing to OIG directly; calling Tri-Valley Haven Staff advocates; calling the National PREA Reporting Hotline; submitting a sensitive request directly to the BOP Regional Office; writing directly to the Regional Director of BOP; third-party

reporting on behalf of an inmate; calling the Crime Stoppers Hotline; emailing the Warden directly; emailing FCI Dublin Department heads and/or any department within the institution using TRULINCS; and emailing the FCI Dublin Task Force email box. When an inmate emails OIG using TRULINCS, the email is not traceable from the institution. (Decl. ¶ 12.) Additionally, all inmates can request an unmonitored legal phone call to speak to their attorney and all inmates can send special/legal mail, which is not read by staff. (*Id.*, ¶¶ 12, 15, 46.) The current Warden at FCI Dublin enforces new and existing policies to ensure secure and confidential means exist to report sexual abuse to BOP and outside authorities. (*Id.*, ¶ 46; Decl. Attachment 3.)

### vi. Timely and Consistent Access to Confidential Attorney Calls, Legal Mail, and Visits

Since formation of the task force, BOP has introduced the Pilot Phone Program. Through this program, BOP installed a dedicated phone line in a private room in each housing unit at FCI Dublin. These phone lines provide direct and unmonitored telephone access to lawyers and approved mental health providers. The lines are both unmonitored and unrecorded, and available for inmate use between 8:00 a.m. and 2:00 p.m. daily in 30-minute increments. (Decl. Attachment 9.) FCI Dublin has added 279 phone numbers of mental health providers and attorneys to the system. FCI Dublin inmates use this system regularly and seem pleased with the access it provides. (Decl. ¶ 51.) Also in 2023, FCI Dublin secured funding and installed three attorney-client visiting rooms to provide additional confidentiality and security for inmates meeting with counsel. (Decl. ¶ 52.)

If legal mail is properly marked under BOP policy, staff will only open it in the presence of the inmate, scan it for contraband without reading the contents, and give it directly to the inmate. (Decl. ¶ 46.) Attorneys can meet with their clients in the FCI Dublin visiting room and, again, their communications are confidential and secure. If they encounter any issues with the process, they can seek assistance from the Western Regional Counsel's Office. (*Id*; Decl. Attachments 7, 8.)

### vii.    Appropriate Use of Special Housing Units and Contraband Searches at FCI Dublin

Plaintiffs claim FCI Dublin should end the use of "solitary confinement" until they can assure that such confinement will not be used as part of a practice of retaliation. (*See* Doc. 10 at 1.) This claim is founded on several incorrect facts. "Solitary confinement" is a misnomer. In BOP institutions, inmates in Special Housing Units ("SHU") are securely separated from the general inmate population. This "restrictive housing" is any type of detention that involves three basic elements: (1) removal from the general inmate population, whether voluntary or involuntary; (2) placement in a secure cell, often with cellmate; and (3) limited daily time outside of the cell. The housing is not invariably solitary; BOP often houses two segregated inmates together in the same cell. Special Housing Units serve an important penological purpose. They help ensure the safety, security, and orderly operation of prisons by providing alternative housing assignments for inmates removed from the general population. (Decl. ¶ 21-22; Decl. Attachment 5.)

To ensure the SHU is used appropriately, BOP issued guidance in October 2019, reiterating the PREA requirement that inmates at high risk for sexual victimization shall only be placed in segregated housing after BOP has assessed all available alternatives. BOP policy also requires staff to avoid interruptions to an inmate's access to programs, privileges, education, and employment. (Decl. ¶ 20.) Assignment to the SHU tends to cause such interruptions, so BOP continues to explore all SHU alternatives to protect individuals while minimizing restrictions. Recently, some inmates in SHU for disciplinary violations separately raised PREA allegations about conduct predating their placement in SHU. In those instances, the inmates remained in SHU pursuant to the initial placement. But FCI Dublin officers do not use SHU as a reprisal for sexual abuse allegations. (Decl. ¶ 23.)

Indeed, FCI Dublin staff are not aware of any retaliation by current staff. All allegations of employee misconduct, including sexual misconduct and retaliation, are promptly referred to OIA for investigation. Any decision to use Special Housing Units, cell searches, and/or transfers

involve multiple layers of BOP review, both within and beyond the local institution, pursuant to established policies and procedures. (Decl. ¶ 21; Decl. Attachment 5.) Since October 2022, inmates have only been placed in SHU for specific reasons unrelated to lodging a PREA complaint—refusing to provide a urine sample, using narcotics, and possessing narcotics. (Decl. ¶ 23). Plaintiffs have also asked for a substantive process for inmates to seek the return of noncontraband items seized during searches. (Doc. 10 at 1.) FCI Dublin has such a procedure in place: Inmates can submit a form to the confiscation officer to request return of the property. (Decl. ¶ 32; Decl. Attachment 6.)

### viii.    Medical and Mental Health Care Provided to all Inmates

Plaintiffs claim FCI Dublin fails to provide necessary access to medical and mental healthcare.  (*See* Doc. 10 at 1.) Contrary to that claim, however, BOP provides comprehensive inmate healthcare. As of January 2023, FCI Dublin maintains four nurses, a paramedic, a pharmacist, four psychologists, two drug treatment specialists, one master's level clinician and some support staff. (Decl. ¶ 38.) In October 2022, FCI Dublin re-established a relationship with Tri-Valley Haven, a non-governmental community organization providing mental healthcare services. (Decl. ¶ 12.) In March 2023, Tri-Valley Haven advocates began going to FCI Dublin twice per week to provide in-person services to inmates. The inmates were notified that these advocates would be providing mental healthcare services regularly, and inmates were able to request services through the Chief Psychologist. Executive staff continue to receive positive feedback from both inmates and Tri-Valley advocates about this arrangement, and Tri-Valley will continue providing care at FCI Dublin until at least October 2027. (Decl. ¶ 41; Decl. Attachment 4.)

FCI Dublin Psychology services also offers other mental healthcare support programs. The RESOLVE program is a trauma-focused treatment program for female inmates who have a history of physical and/or sexual abuse. Inmates can seek further Dialectical Behavior Therapy ("DBT") and Cognitive Processing Therapy ("CPT") group therapy through this program. The Trauma Life Workshop provides supportive strategies for inmates with traumatic life events. The

Circle of Strength Program is a 13-week workshop that provides weekly information on adjustment to incarceration, understanding triggers, coping skills, and open discussion topics to prepare for release back to the community, and Female Integrated Treatment ("FIT") is a holistic treatment group focused on trauma, substance abuse, and vocational needs. (Decl. ¶¶ 42-45.)

### c.  Allegations of Sexual Misconduct in 2022 and 2023

Plaintiffs contend that the harm to be prevented by their preliminary injunction is that Plaintiffs will continue to be assaulted and retaliated against and will suffer further physical and psychological injury. (Doc. 10 at 27.) As noted, however, most of these allegations have been investigated and are in the process of being resolved, and the few more recent reports of sexual misconduct and retaliation have been promptly addressed by the facility.

Plaintiffs allege that, in March 2022, Officer Gacad began to sexually harass S.L. (Docs. 10 at 14-15; 10-15 at 2-4.) S.L. acknowledges that, following this harassment, "[Special Investigative Supervisor ("SIS")] staff confronted Gacad with allegations of abuse," and he no longer works at FCI Dublin. (Docs. 10 at 15; 10-15 at 3.) ███████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████ Plaintiffs allege that beginning in July 2022, Officer Vasquez began to sexually harass A.H.R. (Doc. 10 at 15.) However, BOP placed Vasquez on administrative leave by the time the Complaint was filed. (*Id*.) ███████████████████████████████ ████████████████████████████████ Plaintiffs allege that around September or October 2022, Officer Cooper exposed and watched A.T. and T.M., who were in the shower. (Docs. 10 at 11; 10-24; 10-25.) T.M. emailed SIS about the incident. (Doc. 10-25 at 2-4.) ███████████ ████████████████████████████████████████████████████████████████████████ ███████████ Plaintiffs allege that around November 2022, Officer Cortez shined a flashlight on an inmate (R.B.) who was giving herself an enema. (Docs. 10 at 16; 10-2 at 4-5.) R.B. did not report the incident. █████████████████████████████████████████████████████ ████████████████████████

Plaintiffs allege that around January 2023, Officer Caston sexually assaulted A.R., which they reported to SIS. (Docs. 10 at 15-16; 10-43.) ███████████████ ███████████████████████ During this same time, Plaintiffs allege that, Lieutenant Jones threatened retaliation for reporting misconduct and made workers stand in the rain while she yelled at them. (Docs. 10 at 17-18; 10-7; 10-22; 10-27; 10-39.) ███████████ ███████████████████████ Also in January 2023, Plaintiffs allege Officer Shirley retaliated for inmates reporting misconduct. (Docs. 10 at 17-18; 10-5.) ████████████ ████████████████████████████████████████████████

Around April 2023, Plaintiffs allege Captain Valero walked in on an inmate when she was naked, but the allegation is unsupported by a declaration. (*See* Docs. 10 at 10 (referencing Captain Valera [sic]); 10-9.) ███████████████████████████ ██████████ Plaintiffs allege that in late April 2023, Officer Lewis ordered A.S. to unzip their sweatshirt, and has done so "nearly every day since then." (Doc. 10-6 at 6.) Visual inspection for contraband is standard procedure, including under bulky layers like a sweatshirt. (Decl. ¶ 29.) A.S. has several means available to make a complaint if this process is abused, but BOP is not aware of any complaints against Lewis. (Decl. ¶ 38, §§ 2, 4.) Plaintiffs allege Lieutenant Putnam ignored reports of misconduct, discouraged reporting, retaliated against those who reported, and was hugged by a naked woman. (Doc. 10 at 19-21.) Putnam was investigated through the above-mentioned processes and cleared of any impropriety. (Decl. ¶ 37.)

### III. PRELIMINARY INJUNCTION LEGAL STANDARD

Injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To meet that standard, the moving party must make "a clear showing" that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id*. at 20. Where the government is a party, the balance of hardships and the public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The decision whether to

grant or deny a motion for preliminary injunction is a matter of the district court's discretion. *Am Trucking Ass'ns, Inc. v City of Los Angeles*, 559 F3d 1046, 1052 (9th Cir. 2009). A request for a mandatory injunction seeking relief well beyond the status quo is disfavored and shall not be granted unless the facts and law clearly favor the moving party. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319–20 (9th Cir. 1994).

Specific to prisoner litigation, this Court cannot issue any prospective relief, including preliminary relief, without first making the findings required under the PLRA. The PLRA requires that any relief sought "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C.A. § 3626(2).

Crucially, this Court must consider prison officials' current attitudes and conduct in an action for injunctive relief. *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (citation omitted). "An inmate seeking an injunction on the ground that there is a contemporary violation of a nature likely to continue . . . must come forward with evidence from which it can be inferred that the defendant-officials were *at the time suit was filed, and are at the time of summary judgment*, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so." *Id.* at 845-46 (emphasis added and quotation marks omitted).

## IV. ARGUMENT

By their preliminary injunction motion, Plaintiffs seek all the same relief they pursue on the merits. (*See* Docs. 1 at 82-83; 10 at 7-8.) Plaintiffs propose to shoehorn the merits into a time-compressed snapshot. Such an approach is invalid. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits"). Further, under the PLRA, any order granting preliminary relief would expire after 90 days. 18 U.S.C.A. § 3626(a)(2). Mindful of the specific constraints imposed by 18 U.S.C.A. § 3626(2), the Court should decline to interpose the extraordinary remedy of preliminary injunction here. BOP, DOJ, and several other agencies have undertaken massive efforts to root out the offenders at FCI Dublin and address any risk of harm

to Plaintiffs. No harms extant require preliminary relief, so any preliminary injunction would be overbroad and unduly intrusive.

### a. Plaintiffs are Not Likely to Succeed on the Merits

This Court should deny Plaintiffs' motion for preliminary injunction because they cannot show success on the merits of their Eighth Amendment Claims. Plaintiffs assert only that this is a "systemic case" and do not focus on the individual circumstances of each named Plaintiff and declarant. (Doc. 10 at 25-27.) Plaintiffs cite *Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 152-53 (N.D. Cal. 2015) and *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011) as precedent for this approach. But both of those cases dealt with injunctive relief on behalf of putative class members under Fed. R. Civ. P. 23. Here, however, this Court has not certified a class action, nor is that motion presently before the Court. Further, even if this were a "systemic case", Plaintiffs have not met the heavy burden of establishing that an injunction is necessary to correct FCI Dublin's current policies and practices—taken as a whole—to protect against *future* harm to inmates. *Hernandez*, 305 F.R.D. at 156. Where prison officials are taking demonstrable steps to prevent future harm to inmates, an injunction serves no purpose.

The correct framework for analyzing success on the merits in this case requires Plaintiffs to make an individualized showing that prison officials are currently acting with deliberate indifference to a serious risk of future harm *to them*, which Plaintiffs cannot do. A prison official violates the prohibition against "cruel and unusual punishments," U.S. Const. Amend. VIII, "only when two requirements"—one objective, the other subjective—"are met." *Farmer*, 511 U.S. at 834. The "objective prong" of the Eighth Amendment requires a showing that "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Moreover, the conditions presenting the risk must "be sure or very likely to cause serious illness and needless suffering and give rise to sufficiently *imminent* dangers." *Baze v. Rees*, 553 U.S. 35, 49-50 (2008) (emphasis added).

Plaintiffs have failed to demonstrate that they are currently facing an objectively serious risk of sexual assault by prison officials at FCI Dublin. Indeed, allegations relating to assaults and retaliation by employees that have been terminated or even federally prosecuted cannot support a continuing violation – regardless of the employees' culpability. *See Farmer*, 511 U.S. at 847 n.9 ("[E]ven prison officials who had a subjectively culpable state of mind when the lawsuit was filed could prevent issuance of an injunction by proving, during the litigation, that they were no longer unreasonably disregarding an objectively intolerable risk of harm and that they would not revert to their obduracy upon cessation of the litigation."). Most of Plaintiffs' allegations involve removed and criminally charged officials (i.e., ███████████████ ████████ (removed or on leave); Bellhouse, Chavez, Garcia, Highhouse, Jones, Klinger, Nunley, Smith (criminally charged).) As such, Plaintiffs have failed to show that these individuals, who are no longer at FCI Dublin, pose an objective risk of continuing harm to Plaintiffs.

Even assuming conditions at FCI Dublin currently pose an unreasonable risk of future harm to Plaintiffs' health or safety, they still have wholly failed to demonstrate how current BOP officials have acted with deliberate indifference to that risk. The Eighth Amendment requires Plaintiffs to show that BOP officials, at the time the suit was filed, knew of, and disregarded, an excessive risk to inmate health or safety *and* that prison officials will continue to disregard that risk "during the remainder of the litigation and into the future." *Id*. at 846 (emphasis added). Prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause. *Id*. at 845. And the constitution does not require that all harms are averted. *See id*. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted").

Today, BOP officials are not recklessly disregarding a known risk of imminent harm to Plaintiffs. To the contrary, and as outlined extensively in section II, BOP has taken aggressive and appropriate measures to abate any known risk of harm to Plaintiffs. The very few allegations

that relate to actions taken since the beginning of 2022, the formation of the BOP taskforce, and the replacement of FCI Dublin's executive and managerial team do not support a showing that prison officials are acting with deliberate indifferent toward Plaintiffs' risk of future harm.

For example, Plaintiffs allege that around March 2022, Officer Gacad began to sexually harass S.L. (Docs. 10 at 14-15; 10-15 at 2-4.) S.L. acknowledges that, following this harassment, "[Special Investigative Supervisor] staff confronted Gacad with allegations of abuse," and he no longer works at FCI Dublin. (Doc. 10 at 15; ███████████████████████████████ ███████████████████████████████████████████████████████.) Plaintiffs allege that beginning in July 2022, Officer Vasquez began to sexually harass A.H.R. (Doc. 10 at 15.) However, by Plaintiffs' own admission, BOP placed Vasquez on administrative leave by the time the Complaint was filed. (*Id*.; ███████████████████████████ ████████████████████████.) Indeed, Plaintiffs acknowledge that A.H.R. filed an emergency request for administrative remedy in March 2023 and Vasquez was placed on administrative leave. (Doc. 1 at 35.) Finally, Plaintiffs allege that in January 2023, Officer Caston sexually assaulted A.R., which they reported to SIS. (Docs. 10 at 15-16; 10-43.) ████ ████████████████████████████████████████ None of these more recent allegations of sexual assault support an inference that BOP officials have been deliberately indifferent to an intolerable risk of continuing harm to S.L., A.H.R., or A.R. In each instance of alleged abuse, the officer was promptly investigated and either left the prison voluntarily or was placed on administrative leave.

To the extent Plaintiffs claim that current management will not continue to work to change the culture at the prison, there is no evidence to support that claim. The entire executive and management staff has been overhauled, with a new Warden and Associate Warden starting in 2022 and 2023. Since the new management team started, they have made numerous changes, like installing new cameras and upgrading existing cameras in areas where abuse was known to happen; implementing confidential and reliable telephone access to attorneys through the Pilot Phone Program; installing new meeting pods where clients and attorneys can meet in private;

requiring annual training specific to female offenders; and renewing a memorandum of understanding with Tri-Valley Haven to provide support to sexual assault survivors at the facility. BOP has enacted and updated numerous policies and procedures to address sexual assault since March 2022, which further belies any notion that BOP is acting with the reckless disregard necessary to support a finding of unconstitutional, systemic deliberate indifference. *See Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 619 (9th Cir. 2021) ("[T]he slew of national guidance, directives, and mandatory requirements that the agency issued and then frequently updated in the spring of 2020 belies the notion that ICE acted with the 'reckless disregard' necessary to support a finding of unconstitutional, system-wide deliberate indifference.").

To the extent Plaintiffs claim that institutional policies regarding SHU and contraband searches constitute cruel and unusual punishment, Courts are required to "give wide-ranging deference to prison officials' adoption and execution of policies to preserve internal order and discipline and to maintain institutional security," *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (alterations omitted), which serves a legitimate penological interest. *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999). Search policies control the spread of contraband in the prison, and SHU helps ensure the safety and security of inmates and staff while promoting orderly prison operation. Related policies of monitoring inmates at FCI Dublin all involve fundamental issues of institutional security, governed by nationwide BOP policy. None of these policies are a form of punishment or used to retaliate against Plaintiffs at FCI Dublin. Nor are they used to harass or abuse Plaintiffs or deter them from reporting sexual assault. As noted, any reported retaliation is investigated. As such, Plaintiffs cannot show likelihood of success enjoining these neutral policies as unconstitutional under the Eighth Amendment. In sum, Plaintiffs are not likely to succeed on the merits of their Eighth Amendment claims.

### b.  Plaintiffs Will Not Suffer Imminent Irreparable Harm

Plaintiffs will not suffer irreparable harm prior to the resolution on the merits because instances of sexual misconduct have been addressed at all levels: among other things, employees

have been investigated and discharged where appropriate, the management team has been replaced, and a multidisciplinary task force was formed to address all inmate reports. An adequate showing of irreparable harm has been described as the "single most important prerequisite for the issuance of a preliminary injunction". *See* 11A Wright & Miller, Federal Practice and Procedure: Civil 2d § 2948.1 (2d ed. 1995). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy . . . ." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

"[A] plaintiff must demonstrate *immediate* threatened injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (emphasis added); *cf. Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (same). Related to the immediacy of the threatened injury is the requirement that relief be sought shortly after the alleged harm occurred. The Supreme Court has held that where a motion for preliminary injunction is filed years after the harm occurred, the delay weighed against granting the motion. *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). The harm must also be concrete; "[s]peculative injury does not constitute irreparable injury." *Baldrige*, 844 F.2d at 674; *cf. In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) (same). Plaintiffs bear the burden of demonstrating a likelihood of immediate, irreparable harm. *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

Plaintiffs argue the harm at risk if the motion is not granted is that inmates "will continue to be assaulted and retaliated against." They also contend "solitary confinement inflicts cognizable irreparable injury." (Doc. 10 at 27.) They do not identify any other kind of harm that Plaintiffs will face if their motion is denied. This harm is not immediate, was not timely raised, and is speculative, particularly considering FCI Dublin's many corrective actions.

Plaintiffs have not demonstrated that any harm is immediate. They have presented no evidence that assaults continue today or that the staff committing misconduct are still in position to do so. Plaintiffs' declarations discuss specific instances of sexual misconduct occurring primarily between 2019 and 2021, and very rarely 2022 or 2023. (*See, e.g.,* Docs. 10-1 at 2-3;

10-4 at 3; 10-47 at 2-3.) Since 2022, FCI Dublin has participated in the prosecutions of prior employees and has investigated others. (Decl. § (6).) Of the people mentioned in Plaintiffs' motion and declarations, former Warden Garcia, Chaplain Highouse, and Officers Bellhouse, Chavez, Jones, Klinger, Nunley, and Smith are all at some stage of criminal prosecution and are no longer working at FCI Dublin. (Decl. ¶ 35.) ██████████████████████████████ ██████████████████████ Officer Ramos is deceased. (Decl. ¶ 38.) ████████████████ ██████████████████████████████████████████ are all on administrative leave pending investigation. (Decl. ¶ 36.)

Plaintiffs' declarations mention few incidents in 2023. These incidents fall short of sexual assault, involving (e.g.) glimpses of naked inmates that may have been unwitting, (*see, e.g.*, Doc. 10-2 at 4-5.) And in 2023, the incidents are primarily related to the conduct of officers who are now on administrative leave, like Lieutenant Jones and Officer Cooper. (*See, e.g.*, Docs. 10-2 at 4-5; 10-3 at 4; 10-20 at 4.) Therefore, the threat of any continuing sexual misconduct is not immediate.

Claims relating to other personnel still employed at FCI Dublin do not illustrate any immediate risk of irreparable harm. Plaintiffs claim Officer Cooper exposed and watched two inmates in the shower (Docs. 10-24; 10-25.) ████████████████████████████████████ ████████████████████████████████████ Plaintiffs allege Officer Cortez shined a flashlight on an inmate ("R.B.") who was giving herself an enema. (Doc. 10-2 at 4-5.) R.B. states this procedure occurs daily and can take up to two hours. (*Id.*) R.B adduces no basis to conclude Officer Cortez had any improper motive, or that this encounter was anything other than the accidental biproduct of a regular cell check. Plaintiffs claim Officer Shirley retaliated against inmates reporting misconduct. (Doc. 10-5.) ████████████████████████████ ████████████████████████████████ Plaintiffs allege that Officer Valero walked in on an inmate when she was naked, but the allegation is unsupported by a declaration. (*See* Doc. 10-9.) Plaintiffs claim Officer Lewis ordered A.S. to unzip their sweatshirt, (doc. 10-6 at 6,) but such visual inspection for contraband is standard procedure, and BOP is not aware of any complaints

(before the declaration) that Officer Lewis was abusing the process. Plaintiffs allege Lieutenant Putnam ignored reports of misconduct, discouraged reporting, retaliated against those who reported, and was hugged by a naked woman. (Doc. 10-12.) He is still employed following an investigation that concluded complaints were unsubstantiated.

The individuals Plaintiffs allege committed the sexual misconduct either no longer work at Dublin or have been investigated and cleared. Further, the substantiated misconduct occurred primarily in 2020 and 2021. The purported harm caused by sexual misconduct is not imminent because there has been no showing that misconduct is ongoing. Plaintiffs have not met their burden. *DISH Network Corp.*, 653 F.3d at 776-77.

The alleged harm caused by retaliation is also not imminent. FCI Dublin has established safeguards to prevent retaliation, like replacing the management staff, ensuring inmates' access to counsel, and providing multiple channels for inmates to make reports. (Decl. ¶ 7, §§ (2), (8).)

Plaintiffs obliquely reference harm caused by solitary confinement, (Doc.10 at 27), but the case they cite does not mention solitary confinement. Further, as explained in the attached declaration, "solitary confinement" is a misnomer, as Special Housing Units at Dublin still provide for dual occupancy. (Decl. ¶ 22.) Management is ensuring that SHU is not used as a form of retaliation. (Decl. ¶¶ 23-27.) Alternative housing like SHU is central to the BOP's ability to maintain safety at the facility. (Decl. ¶ 21.) Thus, there is no threat of immediate harm from the housing units.

Nor were Plaintiffs' remedies promptly pursued. Again, most of Plaintiffs' cited instances of sexual misconduct are from 2020 and 2021. As 2024 nears, staffing and conditions have changed at FCI Dublin substantially, and the parties are years out from the alleged misconduct. Plaintiffs' delay in seeking a preliminary injunction should weigh against issuance of an injunction, especially considering all the intervening prosecutions, disciplinary actions, and corrective actions at the facility. *Benisek*, 138 S. Ct. at 1944. The only harm Plaintiffs identify occurred because of past acts—they don't identify any prospective, irreparable harm. The sexual misconduct at issue occurred around two to three years ago, is not ongoing, and is being actively

monitored by the staff at FCI Dublin, FBI, OIG, and others. (Decl. §§ 1-3.) Given the numerous steps BOP has taken to prevent harm from sexual misconduct and retaliation at FCI Dublin, any alleged harm is speculative.

### c.  The Balance of Equities & Public Interest Favor Defendants

The third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry when the government opposes a preliminary injunction. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The "balance of equities" concerns the burdens or hardships to the Plaintiffs compared with the burden on Defendants if an injunction is ordered. *See Winter*, 555 U.S. at 24–31. The "public interest" mostly concerns the injunction's "impact on non-parties rather than parties." *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003).

As to prisons specifically, "Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals." *Brown*, 563 U.S. at 511. It is also extremely relevant that FCI Dublin is in the process of actively remedying any problems, not ignoring them. The United States should be given a reasonable time to institute corrective measures, and for those measure to take effect, prior to requiring it to adopt those proposed by Plaintiffs. *See Farmer*, 511 U.S. at 847 (cautioning that a district court may "exercise its discretion if appropriate by giving prison officials time to rectify the situation before issuing an injunction"); 18 U.S.C. § 3626(a)(3)(A). Plaintiffs have virtually no evidence of ongoing abuses since 2023. Given this, along with the many corrective actions at Dublin to improve conditions, judicial intervention would be premature.

Plaintiffs want the Court to establish outside supervision of FCI Dublin and for FCI Dublin to create additional processes and policies to increase transparency and oversight. (Doc. 10 at 4.) But all of Plaintiffs concerns have been addressed by remedial actions at Dublin since 2022. The management staff was overhauled in 2022. (Decl. § (1).) A task force was formed to ensure that any sexual assault was investigated. (*Id*.) New management instituted new rules

where appropriate and continues to ensure enforcement of extant policies. (Decl. §§ (1), (3), (8), (11).) Further, few of the officers referenced in Plaintiffs' complaint are still employed at FCI Dublin, and those that are were investigated. (Decl. § 6.)

The burden on Plaintiffs if the injunction is not ordered is minimal, given that the prison is already working to address the identified issues. But the burden on Defendants to adopt Plaintiffs' proposed relief would be substantial. Disallowing the use of separate housing units would impact FCI Dublin significantly because the use of such units is vital to orderly and safe administration of the facility. *Mauro*, 188 F.3d at 1059. Requiring all inmates to receive healthcare offsite would necessitate additional staff to coordinate transportation and schedules and to take the inmates to and from their appointments. It would increase security risk as inmates would more frequently be entering and leaving the facility.

### d.  The Requested Relief Does Not Satisfy the Requirements of 18 U.S.C. § 3626.

Plaintiffs' claims, which seek to change their conditions of confinement under the Eighth Amendment, cannot meet the standards imposed by the PLRA. *Nettles v. Grounds*, 830 F.3d 922, 934 (9th Cir. 2016) (prisoners must comply with the PLRA if a claim challenges "any aspect of prison life" other than the "fact or duration of the conviction or sentence"). The PLRA is intended to "reduce the quantity and improve the quality of prisoner suits." *Porter v. Nussle*, 534 U.S. 516, 516 (2002).

As noted above, in evaluating preliminary injunctions, the PLRA requires that any relief sought "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). This statute "require[s] particularized findings that each requirement imposed by the preliminary injunction satisfies each of the need-narrowness-intrusiveness criteria." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1278 (11th Cir. 2020). In making these findings, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief . . . ." 18 U.S.C. § 3626(a)(2). Importantly, any "[p]reliminary injunctive relief shall automatically expire on the date that is 90

days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." *Id.*

The relief sought by Plaintiffs does not meet these constraints for several reasons. A central issue is that Plaintiffs' proposed relief often would not redress the Plaintiffs' alleged harms (i.e., that inmates "will continue to be assaulted and retaliated against …[causing] further physical and psychological injuries"). (Doc. 10 at 27.) Plaintiffs' proposed relief of requiring offsite medical care, providing a procedure for returning non-contraband items, and providing greater access to counsel are unrelated to preventing assault and retaliation, and therefore should be denied on that ground alone.

However, even if we assume that each form of relief is meant to address a specific kind of harm (even if not raised by Plaintiffs), the relief is not narrowly drawn, goes further than necessary, or is simply moot because of current corrective actions at FCI Dublin. The first through third requests for relief regarding audits and site visits seem to attack facility oversight based on activities occurring primarily in 2020 and 2021. These forms of relief are no longer necessary. New management started at Dublin in 2022, and the current Warden has taken steps to institute new policies and to ensure all policies are followed. (Decl. § (1).) Because these changes corrected any oversight issues, there is no need for further relief. Requiring any additional corrective action would not be narrowly drawn to address the situation *as it exists now*. A request for "quarterly" site visits is also particularly inapt given that any injunction will expire in 90 days (effectively mooting any order for "quarterly" relief). 18 U.S.C. § 3626(a)(2). The requests for these remedies should be denied.

Plaintiffs' fourth requested remedy asks that solitary confinement not be used. As explained, such units serve a legitimate penological purposes and the cells in these units are dual occupancy and do not as a matter of course require that a person be housed alone. (Decl. ¶ 21.) Presumably this relief seeks to curtail retaliatory housing practices. But disallowing solitary confinement across the board is intrusive and would adversely impact public safety and the

operation of the prison. (*See* Decl. ¶ 21.) Dublin has taken steps to ensure Special Housing Units are used appropriately and for non-retaliatory purposes, (decl. ¶¶ 23-25), so no further action is necessary. Plaintiffs' fourth requested remedy is overbroad and should be denied.

Plaintiffs' fifth request asking that FCI Dublin develop a process for the return of non-contraband items seized during searches has already been addressed. There is a form that inmates may fill out asking for the return of their items. (Decl. ¶ 31, Attachment 4.) Additionally, this request addresses an alleged harm compensable via money damages, making it ineligible for injunctive relief. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) ("Monetary injury is not normally considered irreparable."). Thus, no further action is necessary, and this request should be denied.

Plaintiffs' sixth request that FCI Dublin develop and institute polices for "high-quality offsite medical and mental health care" is far too broad, and could impact public safety, especially in light of the prison's recent efforts to enhance on-site physical and mental healthcare. "High-quality" is amorphous and susceptible to multiple interpretations. It would arguably mandate that FCI Dublin provide a higher standard of care than the constitutionally "adequate" care required by existing Ninth Circuit precedent. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). Further, the Ninth Circuit has recognized that offsite medical care is not required by the Eighth Amendment. *Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir. 1986) ("A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution.")

And for good reason. Requiring that any medical care be provided "off-site" would increase the costs of already-expensive healthcare and would diminish public safety by more frequently sending inmates into the community. This, in turn, would require a significant increase in administrative planning and staffing to escort individuals to and from appointments. As to mental healthcare, Tri-Valley Haven is currently offering in-person sessions at the prison, which Plaintiffs acknowledge in their brief and declarations. (Decl. ¶ 41; Docs. 10 at 22; *also,* 10-5 at 5; 10-11 at 5.) Requiring offsite medical and mental healthcare is simply not "narrowly

drawn" relief and goes further than necessary to correct any harm. The requested relief should be denied.

The seventh requested relief seeks a system to provide inmates with documentation of reporting and participation in investigations. (Doc. 10 at 4.) BOP is required by law to retain any written reports of administrative or criminal investigations for as long as the alleged abuser is employed or incarcerated, plus five years. 28 CFR § 115.71(i). Requiring any additional documentation or inmate participation on top of these existing procedures would be an impermissible "attempt to 'micro manage' prison administration." *Armstrong v. Brown*, 768 F.3d 975, 983 (9th Cir. 2014).

Plaintiffs also ask for a streamlined way to make other requests (doc. 10 at 4), but such relief is vague and not narrowly drawn—different requests must be directed to different individuals through unique channels. Plaintiffs cite two examples. *Id*. Specifically, Plaintiffs have asked for a streamlined way to make compassionate release requests and U-visa certification requests. FCI Dublin already has a compassionate release request process, which seven individuals have used successfully. (Decl. ¶ 55.) Further, it is not the prison that assists with U-visa applications, but the prosecuting body, like the U.S. Attorney's office. (Decl. ¶ 54.)

Finally, since the beginning of 2023, the prison has instituted procedures to ensure inmates have consistent access to counsel. Dublin is observing policies allowing confidential in-person and mail correspondence between client and attorney. There are areas designated in FCI Dublin to allow confidential visits while allowing unobstructed visual supervision, along with the construction of individual meeting room "pods." (Decl. ¶ 46, 48, 51.) In March 2023, FCI Dublin updated its rules, regulations, and procedures for all visits, including legal, and if attorneys encounter issues, they can seek assistance from the Western Regional Counsel's Office. (Decl. ¶ 50.) Federal Defendants are taking significant measures to ensure attorneys and clients may communicate securely and confidentially. No further relief is necessary because the alleged harm has already been addressed.

Plaintiff's requests are not narrowly drawn and extend further than necessary given that

the facility is already taking numerous steps to prevent further harm. Some of the requests are also moot given that FCI Dublin has performed the required tasks.

## CONCLUSION

Federal Defendants respectfully request that this Court deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted on this 13th day of November, 2023.

JESSE A. LASLOVICH
United States Attorney


*/s/ Madison L. Mattioli*
MADISON L. MATTIOLI
ABBIE J.N. CZIOK
MARK STEGER SMITH
TIMOTHY A. TATARKA
Assistant U.S. Attorneys
Attorneys for Federal Defendants