## I.    FCI Dublin Chief Psychologist, A███ Mulcahy

### Section: Findings[1]

In her review of Special Master Still's Findings, FCI Dublin Chief Psychologist, A███ Mulcahy, clarifies the following:

1) On page 6, the Special Master finds, "*Over half of the women and other AICs at FCI-Dublin were serving time for drug-related crimes, but did not have access to Medication Assisted Treatment or substance use disorder (SUD) education and related programs, despite rampant illegal drug use within the facility.*"

**Objection**: This finding is inaccurate. We provided AICs several support groups including: (a) Non-Residential Drug Abuse Program ("NRDAP"); (b) Drug Education; (c) Trauma in Life; (d) Basic Cognitive Skills; (e) Seeking Safety; and (f) Cognitive Processing. *See* Mulcahy Attachments 1, 9 – 14.[2]

---

[1]    Section titles are derived from the Table of Contents of the Special Master's Report.

[2]    Mulcahy Attachment 1, page 1 is Psychology's Drug Education Treatment Groups Review Report dated June 12, 2023, through April 12, 2024. The remainder of the exhibit includes Psychology's AIC Rosters for the Drug Education Report dating from March 2023, through April 2024. Note, pages 2 – 6 are March 2023, Unicor Drug Education Rosters; pages 7 – 9 are April 2023, Unicor Drug Education Rosters; pages 10 – 14 are April – May 2023, Unicor Drug Education Rosters; pages 15 – 27 are June – July 2023, Camp Drug Education Rosters; pages 28 – 45 are October – November 2023, FCI Drug Education Rosters; pages 46 – 49 are remaining Drug Education Rosters for October – November 2023; pages 50 – 56 are November 2023, Camp Drug Education Rosters; pages 57 – 61 are December 2023 – January 2024, Drug Education Rosters; pages 62 – 75 are February – April 2024, Drug Education Rosters; pages 76 – 86 are remaining Drug Education Rosters for February – April 2024. The Rosters do not show Drug Education Treatment Groups were held in either August or September 2023.

Mulcahy Attachment 9, page 1, is Psychology's NRDAP Treatment Groups Review Report dated June 13, 2023, through April 11, 2024. The remainder of the exhibit includes Psychology's NRDAP Rosters for NRDAP dating from March 2023 through April 2024. Note, pages 2 – 9 are March – June 2023, Camp NRDAP Rosters; pages, 10 – 21 are FCI NRDAP Rosters for March – June 2023; pages 22 – 29 are March – July 2023, Unicor NRDAP Rosters; pages 30 – 37 are remaining NRDAP Rosters for March – June 2023; pages 38 – 44 are June – August 2023, FCI NRDAP Rosters; pages 45 – 50 are remaining FCI NRDAP Rosters for June – August 2023; pages 51 – 58 are June – September 2023, Camp NRDAP Rosters; pages 59 – 62 are September – November 2023, Camp NRDAP Rosters; pages 63 – 68 are November 2023 – April 2024, Diversion Group Rosters; and pages 69 – 74 are remaining Diversion Group Rosters for November 2023 – April 2024.

Mulcahy Attachments 10 and 11 are Psychology's AIC Rosters for "Trauma in Life," held at the Camp and the FCI in December 2023 and March 2024, respectively.

Mulcahy Attachment 12 is Psychology's AIC Rosters for "Basic Cognitive Skills" from December 2023 through March 2024.

Mulcahy Attachment 13 is Psychology's AIC Rosters for "Seeking Safety." Note, pages 1 – 7 are Camp Rosters for February- June 2023; pages 8 – 13 are FCI Rosters for March – October 2023; and pages 14 – 20 are Camp Rosters for June – October 2023.

2) On page 7, the Special Master finds, "*Staff augmentation (redirection) resulted in program closures and the inability of AICs to access rehabilitative programming and to earn FSA and GTC credits*."

**Objection**: Psychology staff and Special Populations staff were never reassigned. Programming was always available to AICs in these areas.

3) On page 9, the Special Master finds, "*There was no bridge between an Administrative Remedy and PREA protocols. If an AIC submitted an allegation of PREA via a Remedy it was answered, yet not forwarded to the PREA Compliance Manager (PCM). The Warden's responses to the PREA Administrative Remedies all stated the AIC's allegations will be reviewed and referred for further investigation as deemed appropriate, yet the AICs were never interviewed regarding their allegations. This is alarming especially in light of the sexual abuse that had occurred at this facility. This process gap endangered the sexual safety of AICs*."

**Objection**: This is not accurate. While I cannot say for certain that we did not miss any administrative remedy filings alleging PREA, I know many of our opened PREA cases were first filed as an administrative remedy. To the extent AICs alleged sexual abuse in administrative remedy filings, those claims would be referred to the Office of the Inspector General for a determination whether a case should be opened by OIG, deferred to the Office of Internal Affairs or whether no formal investigation is required.

4) On page 12, the Special Master finds, "*FCI-Dublin did not have a standardized PREA protocol in place, to include forms, that would be kept in a PREA file in the PREA Compliance Manager's Office. Additionally, the facility did not have a PREA checklist in each file to enable necessary elements to be easily identified if missing or upon completion*."

**Objection**: This is not accurate. We do have a standardized protocol in place, consistent with BOP policy. While I understand one member of the Special Master's team, in her review of PREA, did not like or agree with our tracking system, we follow BOP agency practice. As such, we use a tracking log (Western Region) and maintain check lists of documents within our files. The tracking log tracks whether medical and psychological documents and contacts are complete, retaliation monitoring is complete, and whether safeguarding is complete.

---

Mulcahy Attachment 14 is Psychology's AIC Rosters for "Cognitive Processing" from May through October 2023.

5) On page 12, the Special Master finds, "*There was no mechanism in place to ensure PREA Administrative Remedies that were granted were sent to the PREA Compliance Manager for appropriate follow-up. This follow-up may include interviewing the AIC and/or sending the AIC's case file to the OIA/OIG for investigation. It would also entail the creation of a new PREA file if one did not already exist.*"

**Objection**: This is not accurate. PREA allegations made *via* administrative remedy were sent to the PREA Compliance Manager email box.

6) On page 12, the Special Master finds, "*AIC Property processing from the beginning to the end of the closure process was chaotic and created anxiety for both the AICs and staff.*"

**Objection**: To minimize potential loss, Psychology staff, including myself, provided AICs with lotions, body washes, and other hygiene products. The Special Master noted these actions and appeared appreciative that we indeed did our best to assuage anxiety.

### *Section: Operations*

In the Operations Section of the Special Master Report, Dr. Mulcahy clarifies the following statements:

1) On page 30, under *Causes for broken operational practice at FCI Dublin, institutional level*:

- "*Terminating a drug program while waiting for new model leaving the facility without a residential drug treatment program.*"

**Objection**: All RDAP participants either completed the program or transferred to other facilities to complete the program at the designated institutions. While Female Integrated Treatment ("FIT") was not activated, AICs appropriate for RDAP were transferred to other facilities when "time-appropriate." NRDAP continued to run. *See* Mulcahy Attachment 9.

- "*Medical and mental health treatment was not within the policy and community standards of care.*"

**Objection**: This is not accurate. Psychology services and programs were offered consistent with BOP policy and guidelines.

- "*Language access is a serious issue for non-English speakers. Interpretation services were not regularly used and documents were not translated for Limited English Proficient AICs.*"

**Objection**: Language Line was available and frequently used by Psychology and Health Services.

3

2) On page 31, the Special Master states "*PREA protocol was not adhered to and disjointed, Furthermore, it did not contain all of the necessary elements for an effective system that rose to the level of the federal PREA standards.*"

**Objection**: This is not accurate. Policy and federal statute were adhered to; evidenced in an internal audit completed in November/December 2022.

3) On page 33, the Special Master recommends, "*Drug treatment and education on the harm of illicit substances to individuals and the community should be available and accessible at BOP facilities. Finding: A considerable number of AICs at FCI-Dublin were imprisoned for sales and distribution. Focused attention should have been made at FCI -Dublin on trafficking and trading within the facility and significant effort put into the detection and eradication of drugs within the facility.*"

**Objection**: The BOP offers programs includes Residential Drug Abuse Programs ("RDAP"), NRDAP, and Drug Education. FCI Dublin offered NRDAP and Drug Education. *See* Mulcahy Attachments 1, 9. In conjunction with offering programs to AICs, staff also made efforts to minimize introduction of drugs into the facility by performing visual searches after in -person meetings and in screening incoming mail. ████████████████████████████
████████████████████████████████████████████████

**Further Response**: In my review of the Special Master's findings, it seems there is an ongoing pattern in which the Report asserts that FCI Dublin failed to have processes in place in many areas. The documentation provided in support of my response, however, shows we do have processes. Perhaps in their investigation, the Special Master and her team needed a better understanding of who to ask and what to ask so that they received all required data.

### *Section: Mental Health*

In the Mental Health Section of the Special Master Report, Dr. Mulcahy clarifies the following statements:

1) On page 45, the Special Master states, "*The mental health staff (psychologists) appear to have a more organized system of care and use standardized instruments and tools to evaluate inmates for a variety of mental health issues. The Chief of Mental Health and her staff attempted to provide adequate service to their patients. Due to their high number of vacancies, they too were only able to prove crisis level of care.*"

**Objection**: While staffing impacted our ability to run more groups, we nonetheless continued to provide individual treatment for our Care 2 and Care 3 AICs consistent with BOP

policy and guidelines. *See* Mulcahy Attachments 2 – 5.[3] In other words, my team provided care to AICs which was consistent with the community standard.

2) On page 46, the Special Master states, "*It should be noted that with the limited number of staff both in custody and mental health, the programs that are standard in most jails and prison are not occurring in FCI-Dublin. According to the Chief of Mental health and her staff, with the limited resources at the facility they have not been able to achieve those goals. The staff sexual abuse that occurred at this facility further complicated their efforts as their limited staff became the PREA response team. A large number of the women who were victims of the sexual abuse at the facility were part of the mental health program. Instead of the Psychology Department implementing programs to address the inmate population's mental health needs, their time was spent responding to allegations of PREA violations. This negatively impacted the patients that were victims of the abuse and also patients who were in the mental health program as now they were not getting seen at all.*"

**Objection**: This is not accurate. While we only had three psychologists for Summer/Fall 2023, all required clinical contacts (advanced care) and requests for services were completed. *See* Mulcahy Attachments 2, 3.

3) On page 46, the Special Master asserts, "*The medical experts spoke to one patient that stated previously she was being seen monthly but at the time of our visit she had not had a scheduled appointment in months due to the clinicians' workload associated with PREA related responsibilities. Another patient stated that even when she was scheduled the appointment did not take place due to short staffing levels or some crisis or emergency at the facility.*"

**Objection**: While I am not certain who this AIC is, it is possible this person was decreased from a Care 2 Mental Health to a Care 1 Mental Health. If this is the case, the AIC would no longer need be seen on a monthly schedule.

4) On page 46, the Special Master notes, "*The other area of concern is the lack of access to a psychiatrist. It is a well-established practice to utilize tele-psychiatry in prisons. It is our*"

---

[3]    Mulcahy Attachment 2 is an excel spreadsheet which tracked ongoing treatment for FCI Dublin's Care 2 Mental Health AICs in 2023. Attachment 3 is an excel spreadsheet which tracked ongoing treatment for FCI Dublin's Care 3 Mental Health AICs in 2023. Note, "DCLF" stands for Diagnostic and Care Level Formulation note, "MHTS" stands for Mental Health Transfer Summary, and "Tx plan" indicates the treatment plan. Mulcahy Attachment 4 is an excel spreadsheet which tracked ongoing treatment for FCI Dublin's Care 2 Mental Health AICs in 2024. Attachment 5 is an excel spreadsheet which tracked ongoing treatment for FCI Dublin's Care 3 Mental Health AICs in 2024. Note, "DCLF" stands for Diagnostic and Care Level Formulation note, "MHTS" stands for Mental Health Transfer Summary, and "Tx plan" indicates the treatment plan.

*expert opinion that these patients could have benefited from having ongoing access to a psychiatrist to address their mental health needs. The clinical case workers attempted to provide some psychotherapy but failed due to staffing levels. Many of the AICs encountered had a mental health diagnosis, but their medication wasn't the typical psychiatric medication for their conditions. The patients and the mental health clinician at the facility did not believe the contract provider was managing the patient medications appropriately. It was reported that the mental health staff would attempt to have a patient seen by the tele-psychiatrist, only to be denied by the in-house contract medical provider.*"

**Objection**: We provided ongoing psychotherapy at FCI Dublin. *See* Mulcahy Attachment 6.[4]

5) On pages 46-47, Special Master Still states, "*Treating patients with mental illness is much more complex than simply managing medications. There are many factors that impact a person's ability to cope with mental illness like environmental, social, past trauma, and life stressors, that make it critical to have robust and diverse treatment teams in place to ensure all domains are addressed in a holistic manner. In most facilities the patient has a multidisciplinary treatment team that works with the patient in development of a treatment plan with goals. This did not occur in FCI-Dublin. In reviewing health records of patients in the mental health program, the experts were unable to find any documentation that this level of support was occurring.*"

**Objection**: We do have monthly Care Coordination and Reentry ("CCARE") meetings. Mulcahy Attachments 7, 8.[5] Participants usually include members of Psychology Services, Health Services, Correctional Services, and Unit Team.[6] During these meetings, we discuss treatment planning and treatment participation. We typically discuss an individual AIC's adaptive functioning, whether psychotropic medication is indicated, whether any change in prescriptions need to be made, and whether that AIC is successfully programming and/or maintaining a work detail in the institution.

---

[4]    Mulcahy Attachment 6 is a collective female AIC Roster showing clinical interventions from May 2023 through November 2023. The Roster shows that 15 FCI Dublin AICs received clinical interventions from Dr. Mulcahy and/or her staff.

[5]    Mulcahy Attachment 7 are records of CCARE monthly meetings throughout 2023. Mulcahy Attachment 8 are records of 2024 CCARE monthly meetings.

[6]    While these are the usual participants at CCARE meetings, only psychology and medical staff are required to be present.

### *Section: Medication Assisted Treatment*

1) On page 47, Special Master still asserts, "*During the visit there were two women placed on suicide watch. The facility did not have any space in the housing area where a suicide watch or safe monitoring can be performed. When patients needed monitoring, they are escorted to the administrative side of the medical building and placed in a room or in five-point restraints while another inmate performs the watch. Having other inmates perform clinical functions is against every acceptable standard in National Commission on Correctional Health Care and Affordable Care Act. The practice of havinginmates perform clinical duties is simply unacceptable and unsafe for various reasons. Clinically, inmates are not trained to recognize early signs of distress or emergent symptoms, from a security perspective having inmates monitor others at their most vulnerable state sets up a dangerous power dynamic. This is even more of a concern for the women in seclusion. This type of practice was eliminated from most systems over 30 years ago.*"

**Objection**: This statement is misleading and inaccurate. ██████████████ ████████████████████████████████████████████████ ████████████████ While we did have two AICs on suicide watch while the Special Master and her team were at FCI Dublin, neither were in restraints.

**Further Response**: Suicide watch companion programs are consistent with BOP policy. AIC companions do NOT serve a clinical function. Rather, they solely provide observation. AIC companions are extensively trained before they can perform this function. *See* Mulcahy Attachment 15 at 13 – 16.[7]

**Further Response**: BOP policy specifically provides for the selection and training of companion AICs:

Because of the very sensitive nature of such assignments, the selection of inmate observers requires considerable care. To provide round-the-clock observation of potentially suicidal inmates, a sufficient number of observers should be trained, and alternate candidates should be available.

Observers will be selected based upon their ability to perform the specific task but also for their reputation within the institution. In the Program Coordinator's judgement, they must be mature, reliable individuals who have credibility with both staff and inmates. They must be able, in the Program Coordinator's judgement, to protect the suicidal inmate's privacy from other inmates, while being accepted in

---

[7]    Program Statement 5324.08, "*Suicide Prevention Program.*"

the role by staff. Finally, in the Program Coordinator's judgement, they must be able to perform their duties with minimal need for direct supervision.

In addition, any inmate who is selected as a companion must not:

- Be in pre-trial status or a contractual boarder;
- Have been found to have committed a 100-level prohibited act within the last three years; or
- Be in FRP, GED, or Drug Ed Refuse status.

. . . .

Each observer will receive at least four hours of initial training before being assigned to a suicide watch observer shift. Each observer will also receive at least four hours of training semiannually. Each training session will review policy requirements and ███████████████████████████████████████████ ███████████████████



. . . .

Observers will meet at least quarterly with the Program Coordinator or designee to review procedures, discuss issues, and supplement training. After inmates have served as observers, the Program Coordinator or designee will debrief them, individually or in groups, to discuss their experiences and make program changes, if necessary.

. . . .

Although observers will be selected on the basis of their emotional stability, maturity, and responsibility, they still require some level of staff supervision while performing a suicide watch.

- This supervision will be provided by staff who are in the immediate area of the suicide watch room or who have continuous video observation of the inmate observer.
- In all cases, when an inmate observer alerts staff to an emergency situation, staff must immediately respond to the suicide watch room and take necessary action to

prevent the inmate on watch from incurring debilitating injury or death. In no case will an inmate observer be assigned to a watch without adequate provisions for staff supervision or without the ability to obtain immediate staff assistance.

THE DECISION TO USE INMATE OBSERVERS MUST BE PREDICATED ON THE FACT THAT IT TAKES ONLY THREE TO FOUR MINUTES FOR MANY SUICIDE DEATHS TO OCCUR.

- Supervision must consist of at least 60-minute checks conducted in-person. Staff will initial the chronological log upon conducting checks.

. . . .

*See* Mulcahy Attachment 15 at 14 – 16.

2) On page 48, Special Master Still asserts, "*It was also reported that when the facility correctional officers' staff was low, some of the staff assigned to the healthcare unit would be pulled and redirected to cover custody posts. This was part of a disturbing pattern noticed amongst health care staff—that of dual loyalty to the correctional officers and to patients. This problem is not unique to FCI-Dublin, but one that needs to be corrected. Healthcare staff working in a carceral setting first and foremost must focus, advocate, and care for the individuals housed at the respective correctional facility.*"

**Objection**: Clinical staff are not reassigned.

### Section: Prison Rape Elimination Act

In the PREA Section of the Special Master report, Dr. Mulcahy clarifies the following statements:

1) On page 93, Special Master still observes, "*The PCM at FCI-Dublin had recently been changed from Chief Psychologist Dr. Alison Mulcahy to Associate Warden (AW) C.D. Nash effective March 13, 2024. AW Nash, now the Acting Warden, was initially on bereavement leave. As a result, Dr. Mulcahy with interviewed with respect to the PREA program. She was very knowledgeable regarding the FCI-Dublin's PREA process.*"

**Objection**: I have never been the PREA Coordinator Manager ("PCM"). The PCM cannot be delegated below an Associate Warden position. The prior PREA Coordinator was Associate Warden Patrick Deveney and is now Acting Warden Charmaine Nash.

2) On page 93, Special Master still states, "*Dr. Mulcahy was asked if there were any forms she used to track cases, or what her procedure was if there was an AIC that reported a PREA. She said, everyone would know to notify a psychologist or her, as Chief Psychologist. A Sexual Abuse Intervention by Psychology Services would be completed that*"

9

*would state the date and time of the incident, the reason for the referral, and who made the referral. The evaluation results and recommendations for follow-up would then go back to her as the PCM.*"

**Objection**: This statement is misleading and appears to insinuate that people just "know" what to do. FCI Dublin staff knew what to do because notifying her or another psychologist of a PREA allegation is based on BOP policy. Indeed, included in annual training for FCI Dublin staff, is refresher training on the steps for notification.

3) On page 93, the Special Master asserts, "*As the PCM, Dr. Mulcahy, makes the determination whether an AIC needs only crisis intervention or full treatment. Full treatment would include a medical evaluation by institution Health Services, and thereafter, depending on the psychologist's evaluation, whether the AIC needed to be seen at the local hospital with a Rape Crisis Center advocate*."

**Objection**: The determination of whether an AIC needs only crisis intervention or full treatment is for the PCM to make. I am not the PCM, however, and this determination would have been made by Mr. Deveney, and now Acting Warden Nash. In accord with full PREA protocols, to make the determination of whether an AIC needs crisis intervention or full treatment, the PCM would obtain input from other BOP staff including the Health Services Administrator ("HSA") and the Special Investigations Agent ("SIA").

4) On pages 93-94, Special Master Still states, "*Again, Dr. Mulcahy was asked if there were any forms to track any of the information she stated there was a checklist (OneSource First Responder Reference Guide) for first responders. First responders were responsible for providing the completed checklist to the Operations Lieutenant. Dr. Mulcahy was asked what would happen to the PREA process if she was not there to handle it. She said she did not know*."

**Objection**: This is misleading. I stated that I did not know to whom tasks would be delegated to in my absence. Again, however, I am not the PCM. While I understand the Special Master and her team had a monumental task at FCI Dublin, I would have hoped, given their month-long presence at FCI Dublin and the subsequent month they had to complete this Report, they would have understood I was not the PCM.

5) On page 94, Special Master Still states, "*Lieutenant Baudizzan was asked if he maintained any tracking logs and he stated he uses the same PREA list Dr. Mulcahy utilizes. He said the only cases he is allowed to have anything to do with involve incidents of AIC on AIC. All staff on AIC cases are referred to the OIA and the OIG. When this occurs, he indicated has no control, and receives very little additional information on the status of the case*."

**Objection**: The tracking log is standard practice in the BOP. It complies with BOP policy and federal statute.

**Further Response**: Lieutenant Baudizzon, as Special Investigative Supervisor ("SIS") maintains a log of AICs who raise PREA allegations against other AICs. Special Agents within the Office of Internal Affairs ("SIA"), maintain investigative files on cases involving staff. From my recollection, the concern shared by the Special Master and her team was that separate files on these cases were not maintained or did not exist. The Special Master and her team believed that all information should be maintained in a separate file by the PCM and tracked on the tracking log. In the event there was information missing on the PREA tracking log regarding PREA cases involving staff, we are not involved after those cases are referred to OIA/OIG.

6) On page 95, Special Master Still asserts, "*There was no process to ensure any PREA related complaint made via the Administrative Remedy process was referred to the OIG. We could not find any record that the Administrative Remedy PREA complaints had been referred for formal investigation as Ms. Rios stated in her response. In addition, the follow-up actions required by PREA were not followed for these complaints*."

   **Objection**: This would be something the SIA has access to and tracks. ▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7) On page 96, Special Master Still states, "*Any class member that had filed a PREA Administrative Remedy that was not added to the PREA list must be monitored to ensure the appropriate PREA protocols are started, and services provided if they haven't been already*."

   **Objection**: There were a handful of handwritten notes the Special Master and her team received while here. Once they reviewed them, they observed some contained new allegations of sexually abusive behavior. Because the AICs had been transferred, I contacted the receiving facilities to request PREA protocol be initiated. *See* Mulcahy Attachment 16.[8]

### Section: Attachments

1) Regarding page 104 and 105's Attachment C, "FCI-Dublin 2023 Administrative Remedies PREA Filings," Dr. Mulcahy clarifies that all are also listed on FCI Dublin's PREA tracking log.

---

[8]    Mulcahy Attachment 16 are emails I sent to BOP staff at the AIC's designated institutions, informing them of the need to institute PREA protocol.

## II.    FCI Dublin Supervisor of Education, A██████ Lamirand

### *Section: Findings*

In his review of Special Master Still's Findings, FCI Dublin Supervisor of Education, A████ Lamirand, clarifies the following findings:

1) On page 6, the Special Master finds, "*AICs with shorter sentences were prioritized and AICs with long terms could not access many of the needed programs.*"

**Objection**: While some programs including General Education Development ("GED"), English as a Second Language ("ESL"), and select post-secondary courses prioritize release date, other programs, including Adult Continuing Education ("ACE"), Vocational Training ("VT"), and other select post-secondary courses do not prioritize release dates. Because FCI Dublin indeed housed many AICs with shorter sentences, the Special Master's findings that longer-term AICs were not prioritized may not reflect the reality of the population and indeed be skewed in terms of percentage.

2) On page 6, the Special Master finds, "*A high number of AICs with Hispanic ethnicity identified the need for bilingual materials/staff at every level and which did not exist creating multiple language access issues for Limited English Proficiency (LEP) AICs.*"

**Objection**: BOP policy does not require Education to have a specific number of bilingual staff. Nonetheless, in the beginning of November 2023, FCI Dublin's Education Department had three bilingual staff. One bilingual staff member, however, transferred in March 2023 and another retired in November 2023. As such, up through the end of November 2023, at least two bilingual staff members were available in Education daily at both the FCI and the satellite camp. It is not contradictory of BOP policy to have one bilingual staff member.

3) On page 6, the Special Master finds, "*Insufficient programs were not available to address the needs of the AICs and resulted in failure for AICs to earn First Step Act (FSA) and Good Time Credits (GTC).*"

**Objection**: GCT in education is earned regardless of enrollment. In accord with the Violent Crime Control and Law Enforcement Act ("VCCLEA") and the Prison Litigation Reform Act ("PLRA"), the only AICs who may lose the 12 days of Good Conduct Time ("GCT") associated with the literacy program (GED Standard) are AICs who are eligible and refuse to enroll, who are eligible and withdraw, and who are actively enrolled but receive an incident report associated with the program. *See* Lamirand Attachment 1 at 28.[9]

---

[9]        Program Statement 5350.28, "Literacy Program (GED Standard)."

**Further Response**: Regarding FSA and Earned Time Credits ("ETCs"), these credits are earned through AICs actively trying to fulfill their identified FSA needs. Simply not being in a refusal status for a FSA class ensures an AIC is earning ETCs. Therefore, FCI Dublin's alleged inability to meet the demand for FSA classes does not hinder an AIC from earning ETCs associated with the FSA. *See e.g.*, Lamirand Attachment 1 at 13.

4) On page 6, the Special Master finds, "*Almost two-thirds of the population at FCI-Dublin were between the ages of 25 and 44 years but limited educational and rehabilitative programming was available. To facilitate successful re-entry upon release, education and vocational training should have been available and a focus for this age group.*"

**Objection**: The Special Master's Report later identifies four vacancies for Vocational Training ("VT") instructors, with a total of five VT positions slated by the BOP. *See* pg. 36. Before FCI Dublin's closure, we had the Culinary Arts VT position filled, and were actively soliciting positions for Industrial Maintenance Technology and Dog Trainer. We had also selected a Personal Trainer instructor and were slated for filling a Hydroponics position for the next fiscal year. These numbers represent an additional three VT positions allocated to the Education Department since my arrival at FCI Dublin in 2021. While we undeniably had difficulty filling the positions, it does reflect the BOP's attempt to increase VT opportunities for AICs. Indeed, due to the challenge of hiring BOP VT instructors, we added VT classes from outside entities such as College of Alameda and Purdue University. Programs offered to AICs from the College of Alameda included the Alameda Transportation and Logistics Academic Support ("ATLAS") and Occupational Safety and Health Administration ("OSHA"). Purdue University offered AICs Pest Control programs.

5) On page 7, the Special Master finds, "*Staff augmentation (redirection) resulted in program closures and the inability of AICs to access rehabilitative programming and to earn FSA and GTC credits.*"

**Objection**: As previously explained, GCT is not linked to program completion.

6) On page 7, the Special Master finds, "*A review of program availability based on the data that was provided reflects there were serious programming issues faced by the AICs at FCI-Dublin. Waiting lists were extensive and some of the AICs interviewed stated they had been on waiting lists for well over a year. AICs with shorter sentences were prioritized, and AICs with both short and long terms could not access many of the needed programs for rehabilitative and credit earning purposes.*"

**Objection**: GCT in education is earned regardless of enrollment. In accord with the Violent Crime Control and Law Enforcement Act ("VCCLEA") and the Prison Litigation Reform Act

("PLRA"), the only AICs who may lose the 12 days of GCT associated with the literacy program (GED Standard) are AICs who are eligible and refuse to enroll, who are eligible and withdraw, and who are actively enrolled but receive an incident report associated with the program. *See* Lamirand Attachment 1 at 28.

**Further Response**: U.S. Citizens and AICs who need GED or English as a Second Language ("ESL") cannot refuse initial enrollment. As such, this number would be zero. The BOP does not track AICs who refuse ACE, VT, or other programs.

**Further Response**: Upon review of SENTRY, the Education Quarterly Roster Reports for 2022, 2023, and 2024, regarding AICs who voluntarily withdrew from Education and Recreation programing, reflects that: in 2022, four AICs withdrew; in 2023, eight AICs withdrew; and in 2024, 22 AICs withdrew.

**Further Response**: Regarding FSA and Earned Time Credits ("ETCs"), these credits are earned through AICs actively trying to fulfill their identified FSA needs. Simply not being in a refusal status for an FSA class ensures an AIC is earning ETCs. Therefore, FCI Dublin's alleged inability to meet the demand for FSA classes does not hinder an AIC from earning ETCs associated with the FSA. *See e.g.*, Lamirand Attachment 1 at 13.

### Section: Facility Profile

On page 20, Table 11, the Special Master's table shows that AICs with a projected time left to serve as 4 months or less represented 18.4% of FCI Dublin's population.

**Objection**: Please note that AICs within this time frame who have a GED need are often not enrolled in the literacy program becausethere is simply not enough time to complete the testing and instruction. At FCI Dublin we received many AICs with shorter sentences who were unable to participate in programs due solely to their sentenced being shorter than most of the programs offered.

### Section: Operations

In the Operations Section of the Special Master Report, Mr. Lamirand clarifies the following finding:

1) On page 31, the Special Master finds, "*Insufficient programs were not available to address the needs of the AIC and resulted in failure for AICs to earn FSA and GTC.*"

**Objection**: GCT in education is earned regardless of enrollment. In accord with the Violent Crime Control and Law Enforcement Act ("VCCLEA") and the Prison Litigation Reform Act ("PLRA"), the only AICs who may lose the 12 days of GCT associated with the literacy program (GED Standard) are AICs who are eligible and refuse to enroll, who are eligible and withdraw,

and who are actively enrolled but receive an incident report associated with the program. *See* Lamirand Attachment 1 at 28.

**Further Response**: Regarding FSA and Earned Time Credits ("ETCs"), these credits are earned through AICs actively trying to fulfill their identified FSA needs. If an AIC is not in refusal status for a FSA class, she will earn FTCs. Therefore, FCI Dublin's alleged inability to meet the demand for FSA classes does not hinder an AIC from earning ETCs associated with the FSA. *See e.g.*, Lamirand Attachment 1 at 13.

### *Section: Staffing in the Bureau of Prisons*

In the Section addressing Staffing in the BOP, Mr. Lamirand clarifies the following statement:

1) On page 35, the Special Master asserts, "*BOP uses cooks, teachers, andnurses to guard AICs. This temporary fix pulls employees away from their usual duties and negatively impacts inmates by limiting visitations, <u>recreational time</u>, and academic enrichment opportunities*." (underline added for emphasis).

**Objection**: All BOP employees who work in an institution are considered correctional workers first, regardless of the position to which they are assigned. Because non-custody staff are correctional workers and receive correctional officer training, they can perform programmatic functions without the presence of a Correctional Officer. This method also allows non-custody staff to assume the duties of Correctional Officers during AIC disturbances, or because of custody staff shortages. All BOP institution staff are trained to work with AICs, respond to emergencies, and follow security procedures. In training all BOP employees to be correctional workers first, we can ensure the safety and security of institutions and the public. Nevertheless, recreational staff were exempt from augmentation at FCI Dublin.

### *Section: Programs*

In the Programs Section of the Special Master Report, Mr. Lamirand clarifies the following statements and data:

1) On page 81, Special Master Still states, "*Generally, as defined, an eligible AIC who successfully participates in Evidence-Based Recidivism Reduction Programs or Productive Activities that are recommended based on the AIC's risk and needs assessment may earn FSA Time Credits to be applied toward prerelease custody or early transfer to supervised release*."

**Objection**: This was initially the case, but as the BOP was challenged on its inability to meet programming demands, the rules softened to permit ETC accumulation for those on waiting

lists and non-refusal status. Active participation in an actual class is not the only way to earn ETC. *See* Lamirand Attachment 10 at 8. FCI Dublin was able to change its application and continue adhering to BOP policy.

2) On page 81, Special Master Still explains, "*Additionally, an AIC who is serving a term of imprisonment of more than one year other than a term of imprisonment for the duration of the prisoner's life, may receive credit toward the service of the prisoner's sentence of up to 54 days for each year of the prisoner's sentence imposed by the court, subject to determination by the BOP that, during that year, the AIC has displayed exemplary compliance with institutional disciplinary regulations. If the BOP determines that, during that year, the AIC has not satisfactorily complied with such institutional regulations, the AIC shall receive no such credit toward service of the AlC's sentence or shall receive such lesser credit as the BOP determines to be appropriate. <u>In awarding credit under this section, the BOP shall consider whether the AIC during the relevant period, has earned, or is making satisfactory progress toward earning, a high school diploma or an equivalent degree</u> .*" (underline added for emphasis).

**Objection**: The underlined sentence applies to 12 days of GCT. AICs on a GED waiting list are still considered to be making satisfactory progress towards their GED and are earning these 12 days. Being on a GED waiting list does not negatively impact an AIC's ability to earn GCT as it relates to programing.

3) On page 83, Table 30, the two rows below have been extracted from the Special Master's original table.

| Program Name | 2024 Start | 2024 Compl | 2024 Waitlist | 2023 Start | 2023 Comp | 2022 Start | 2022 Comp |
|---|---|---|---|---|---|---|---|
| Bureau Literacy Prog. | 69 | 11** | | 95 | 15** | 142 | 28** |
| English as a Second Language | 16 | ** | | 19 | 2** | 31 | 1** |

**Objection**: Regarding the Bureau Literacy Program, the highlighted numbers are incorrect. My records reflect that in 2022, we had 37 AICs complete the program (Lamirand Attachment 2 at 4) and in 2023, we had 34 AICs complete the program. *Id.* at 1, 3.[10]

**Further Response**: The "start" number listed in the Special Master's table is misleading as enrollment is fluid and may change week-to-week. For example, while we may have 69 AICs enrolled on a given day, in "real time," we may be providing literacy program education to double that number due to the dynamic nature of BOP populations which are consistently incoming and outgoing.

**Further Response**: While the BOP sets completion goals for programs to track overall program effectiveness, these numbers often do not accurately reflect the degree to which learning takes place within an institution. To earn a GED for example, an AIC must complete four tests: Science, Social Studies, Reading and Language Arts, and Math. AICs often will complete a number of these tests before they are either released or transferred elsewhere. Unfortunately, the hours spent working towards those test completions are not credited towards the institution's overall instructional efficacy. Indeed, an AIC may spend 200 hours within the literacy program at FCI Dublin and pass three of four tests, only to be transferred to another institution which will be credited with her completion with minimal hours invested. In instances where an AIC is released prior to earning a GED, the BOP receives no credit for instruction provided.

Partial completions of the GED hide the labor involved in administering these tests. In the first two quarters of FY 2024 (six months), FCI Dublin ordered 207 GED tests to administer, resulting in 15 GED completions. These 207 tests were administered to 73 different individuals with an average of 2.8 tests administered per person. In total, FCI Dublin ordered 19,350 minutes of tests or 322 hours of testing. Each AIC in the Literacy Program has also received a battery of "TABE" (Test of Adult Basic Education) diagnostic tests representing an additional 325 minutes, or 5.5 hours of testing. In the case of 2024 testers, that is a potential 400 hours of diagnostic testing administered. Simply put, completions neither accurately reflect student progress within these programs nor show the efforts of instructors. While 58 inmates benefited from both GED instruction and examination but will not be reflected in data reporting the overall effectiveness of FCI Dublin's Literacy Program.

Another example of this paradox relates to Post Secondary Programs. Since 2021, FCI

---

[10]    This attachment is FCI Dublin's 2022 and 2023 GED Roster. Note, "PCP" codes are for GED completions. For FY 2022 we had 37 completions and for FY 2023 we had 34 completions. Also note, in FY 2023, we had 88 AICs leave the program without earning a GED ("PWI"). Lamirand Attachment 2 at 3. These AICs may have been released or transferred to another facility. My records further indicate, included in the 34 AIC completions in FY 2023, we had two Spanish speaking AICs earn their GED. *Id.*

Dublin has partnered with Las Positas College to provide a 3-year program culminating in an associate degree. This program was slated to finish in December of 2024 and produced zero completions for the Education Department. Nonetheless, the approximately 25 AICs who participated over the course of threeyears earned transferable college credit and, moreimportantly, learned they are capable of pursuing college level degrees in the future.

**Further Response**: Regarding English as a Second Language ("ESL"), these numbers are not representative of how many AICs are programed in a fiscal year. In 2022, we had two ESL completions, in 2023, we had four ESL completions, and in 2024, we had six ESL completions. Lamirand Attachment 9.[11] I note, however, in 2022, 20 AICs left the program (*id.* at 1) and in 2023, 19 AICs left the program (*id.* at 2), due to release or transfer. This negates the idea that there were only 20 slots available for the year as seat vacancies would be filled by new AICs. *Id.* Please note that 2022 and 2023, FCI Dublin housed a much smaller population, and the demographics were different than they were in 2024. After the COVID-19 moratorium was lifted and we were again permitted to accept AICs, we experienced an increase in Spanish speaking, foreign AICs. A distinction must here be made between "ESL NEED" AICs and "ESL EXEMPT" AICs. Only AICs who are United States citizens are mandated ESL instruction. Foreign AICs may enroll in ESL, but they are not mandated to do so. Because FCI Dublin's ESL services were adequate to educate the eight inmates identified as ESL NEED, extra seats were filled with AICs having an ESL EXEMPT Status. *See* Lamirand Attachment 3 at 2.[12]

4) Page 84, Table 30, continued; the following five rows have been extracted from the Special Master's original table.

| Program Name | 2024 Start | 2024 Compl | 2024 Waitlist | 2023 Start | 2023 Comp | 2022 Start | 2022 Comp |
|---|---|---|---|---|---|---|---|
| General Education Dev. | Un-known | | 98 | | | | |
| Occ Ed Job Cert | 81 | 47 | | 130 | 109 | 130 | 82 |
| Occ Ed Tech Cert | 10 | | | 6 | | | |
| Occ Ed Voc Market | 38 | ** | | 26 | ** | 24 | 2** |

---

[11]    This document is FCI Dublin's 2022, 2023, and 2024 ESL completions. Note, "PCN" and "PCR" are ESL completion codes.

[12]    FCI Dublin's 2022 and 2024 ESL rosters.

| Post Secondary Education | 23 | | | 19 | 9 | 17 | 1 |
|---|---|---|---|---|---|---|---|

**Objection**: While the Special Master distinguishes the Literacy Program and the GED Program, in two separate rows, the programs are, in practice, the same.

**Further Response**: Regarding the Occupational Education Job Certifications, the highlighted number is not accurate. My records reflect that, in 2023, we had 186 completions. *See* Lamirand Attachment 4.[13] My records show we had 77 more completions in 2023, than the Special Master indicates in her table.

**Further Response**: Regarding the Occupational Technical Certifications, "Tech" or "T" Certifications are any occupational training program or curriculum which is certified through an accrediting agency. Our "T" program was the Alameda College Logistics Program. While the Special Master's table shows an enrollment in 2023 of six AICs, my 2023 College of Alameda Logistics Roster reflects, we had 11 AICs enrolled. *See* Lamirand Attachment 11. [14] We had a class capacity of 20 and only 19 AICs signed up for the class. Ultimately, three AICs declined, four AICs were pending transfer, and one AIC had a recent incident report.

**Further Response:** Regarding the Occupational Education Vocation Market, while I am not certain what this section refers to, Marketable OT Training is training which provides entry level job skills and use "Live Work" to do the training. Notice in the VT completions Rosters (*see* Lamirand Attachment 4), we use "PCM" for some VT completions. This stands for Program Complete Marketable. The only Marketable course we offered at FCI Dublin was a Culinary Class.

**Further Response**: Regarding Post Secondary Education, Special Master Still's table indicates, in 2022, we had one AIC complete. My records show this number is not accurate. The Special Master's error is understandable, however, given the complexity in maintaining post-secondary records. The BOP only permits Education to use two codes: Post-Secondary Education Correspondence Classes ("PSE PC") and Post-Secondary Education In-Person ("PSE PP"). My records show, in 2022, there were 11 PSE PC (Correspondence) completions and 23 PSE PP (In-Person) completions. *See* Lamirand Attachment 5. There were also 28 PCC completions ("Program Complete Certificate") which is separate from PCP completions. In total, there were 62 PSE completions. I note, however, many of these completions are "double completions," where

---

[13]    This attachment represents the roster for Occupational Education Job Certifications for 2023. "PCP," "PCA," and "PCM" are all completion codes. This document shows 167 PCP, 11 PCM, and 8 PCA ("Program Complete Apprenticeship").

[14]    AIC ▮▮▮▮ was originally enrolled because Education believed she could collect some credit before her release.

an AIC earned two completions. The BOP's tracking process of post-secondary makes it very difficult to show what programs were completed by which AICs.

5) On page 85, Special Master Still asserts, "*No evidence could be found to verify that the following programs were in fact being offered as of April 2024*:
   - *Apprenticeship Training*
   - *Vocational Training-Servesafe*
   - *Vocational Training-Servesafe Alcohol*
   - *Vocational Training-Baking*
   - *Vocational Training-Cake Decorating*
   - *Resilience Support-Veterans Group*
   - *Talking with your Doctor (for older Adults)*

**Objection:** At no point did the Special Master request from the Education Department, *via* the Supervisor of Education, to see verification of these programs. If she asked, I could have provided her the following relevant information:

- **Apprenticeship Training:** this training is conducted by work foreman, mostly in the Facilities Department. This would explain why the Special Master never witnessed the program in operation. While I do not yet have my next Education Quarterly Roster, attached here, is a previous roster showing how the program ran. *See* Lamirand Attachment 6.[15]

- **Vocational Training-Servesafe and Vocational Training-Servesafe Alcohol:** Between these two programs, we see approximately 200 completions each year. These courses are short and there is, on occasion, down time between the end of one course and the beginning of the next course. Please note, running a roster for this program on any given day may provide misleading numbers because of the fluidity of enrollment. *See* Lamirand Attachment 7.[16]

- **Vocational Training-Baking and Vocational Training-Cake Decorating:** These two programs were removed to accommodate a more comprehensive 600-hour culinary arts program which began in November 2023. *See* Lamirand Attachment 8.

---

[15]     The highlighted roster, dated May 3, 2024, shows all AICs who were enrolled in the apprenticeship program up through the time all AICs transferred out of FCI Dublin.

[16]     This starred roster reflects ServeSafe Completions for the 1st and 2nd Quarter of 2024. The roster reflects 103 completions the first half of the year. *See* pg. 3.

6) On page 85, Special Master Still states, "*It was difficult to determine what programs were actually available at the facility. Different staff had different answers, and there was not a single repository in which all of the program data could be retrieved. The SMT was advised they would need to inquire with each person that held programs to obtain the requested information.*"

**Objection**: This statement is not wholly accurate. FCI Dublin's Special Populations Program Coordinator had a master roster of programs offered at the institution which he updated during monthly FSA meetings. This roster was available to the AIC population in their units and on a bulletin board outside of Food Service where AICs lined up to get their meals. *See* Lamirand Attachment 13. During Admission and Orientation, Mr. Chavez informed AICs to look for the bulletins at the dining hall and in their respective units. Mr. Chavez also communicated with AICs through an email box addressed to the Special Populations Program Coordinator and would advise them to review the bulletins. When the roster required updates, Mr. Chavez provided Unit Team new copies for the units and replaced the old bulletin posted at the dining hall.

7) On page 85, Special Master Still asserts, "*GED classes were mandatory for those without a high school education, yet a waitlist of over 100 AICs remained as of April 2024. FCI-Dublin had a large Hispanic immigration population. However, English as a Second Language never had an enrollment higher than 20 over the last two years, with only 2 completing the program due to a lack of available program slots.*"

**Objection**: As explained above, Special Master Still's numbers are not representative of how many AICs are programed in a fiscal year. We had six ESL completions in 2024. Lamirand Attachment 9 at 2. In 2023, my records also show four ESL completions. *Id*. at 1. My records also show that 19 AICs left the program ("PWI") due to release or transfer; this negates the idea that there were only 20 slots available for the year as seat vacancies would be filled by new AICs. *Id*. As previously explained, in 2022 and 2023, FCI Dublin housed a much smaller population, and the demographics were very different than they were in 2024. After the COVID-19 moratorium was lifted and we were again permitted to accept AICs, we experienced an increase in Spanish speaking, foreign AICs.

8) On page 86, Special Master Still asserts, "*The team was provided with a series of waiting lists in which if the AIC was FSA eligible they were earning credits while they were on the waitlist. However, if they were not FSA eligible, credit was not earned until the AIC was placed in the class and began earning GTC.*"

**Objection**: This statement is unclear because eligibility is not derived from earning GCT. While some classes may impact an AIC's recidivism level and consequently his or her ability to

apply time credits, GCT do not impact FSA eligibility. Further, GCT is not earned through class enrollment. *See* Lamirand Attachment 10 at 10-11.[17]

### *Section: Attachments*

9) On page 106, Attachment D, there is a reference to AIC ████, who claims that, because staff hated her and harassed her, she lost her job at UNICOR.

**Objection**: AIC ████ was counseled multiple times to attend class and GED testing sessions but was frequently absent. My staff tried placing her in multiple classes with different teachers but saw no improvement. I recall reaching out to Psychology and Unit Team collaborate on an effective management plan. *See* Lamirand Attachment 12.[18]

---

[17]    Program Statement 5410.01, "First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)."

[18]    Lamirand Attachment 12 are emails exchanged between BOP staff regarding AIC Rivas and show our ongoing efforts to address her behavioral issues.

### III.    FCI Dublin Acting Warden, C███████ Nash

#### *Section: Findings*

In her review of Special Master Still's Findings, Acting Warden Nash clarifies the following findings:

1) On page 12, the Special Master finds, "*No clear data (MAP and Climate) was used for program planning.*"

**Objection**: To the best of my knowledge, the Special Master never interviewed Programming Staff, and as such, has no foundation for this statement.

2) On page 12, the Special Master finds, "*FCI-Dublin did not have a standardized PREA protocol in place, to include forms, that would be kept in a PREA file in the PREA Compliance Manager's Office. Additionally, the facility did not have a PREA checklist in each file to enable necessary elements to be easily identified if missing or upon completion.*"

**Objection**: These records were ███████████████████████████████ Prior to the confiscation of documents, the referenced forms were maintained in a PREA file in the PREA Compliance Manager's Office.

3) On page 12, the Special Master finds, "*There was no mechanism in place to ensure PREA Administrative Remedies that were granted were sent to the PREA Compliance Manager for appropriate follow-up. This follow-up may include interviewing the AIC and/or sending the AIC's case file to the OIA/OIG for investigation. It would also entail the creation of a new PREA file if one did not already exist.*"

**Objection**: P███ Deveney, ████████████████████████████████ ████, was the PREA Compliance Program Manager. In this capacity, Mr. Deveny ensured PREA administrative remedies that were granted were sent to him for appropriate follow-up.

#### *Section: Prison Rape Elimination Act ("PREA")*

On page 91 of the Report, Special Master Still asserts that "*A PREA team, led by the PCM should be established.*"

**Objection**: A PREA Compliance Manager and a PREA Team were always present at FCI Dublin. Specifically, prior to Ms. Nash becoming PREA Compliance Manager, P███ Deveney held this position. Ms. Nash further explains that Chief Psychologist A████ Mulcahy, Health Services Administrator Monte W████, and SIS Lieutenant A███ Baudizzon comprise FCI Dublin's PREA Team.

### IV.    Western Regional Correctional Programs Administrator, C███████ Hubbard

*Section: Findings*

In his review of Special Master Still's Findings, Western Regional Correctional Programs Administrator, C███████ Hubbard clarifies the following statements and findings:

1) On page 5, the Special Master states, "*The BOP had previously advised the Court it was considering closing the facility, and if it occurred, for security reasons, it would have to be conducted quickly. Upon becoming aware of the closure, the Court intervened to ensure proper attention to the needs of the AICs (e.g., medical, mental health, casework, etc.), and to direct and oversee the transfer of the AICs*.

**Objection**: The BOP had an organized plan to transfer the Adults in Custody ("AICs") from FCI Dublin in conformity with BOP policy and constitutional mandate. This plan was significantly disrupted due to ongoing requirements and demands imposed by the Special Master, which required hasty and continued amendment.

2) On page 11, the Special Master states, "*Their reviews identified AIC classification levels that should have been reduced, community referral packages that had not been completed, FSA and GTC credits that needed to be updated that impacted eligible release dates, and other casework deficiencies that existed*."

**Objection**: There was one case in which a DHO sanction had been expunged, but notice was not sent to the Designation and Sentence Computation Center ("DSCC") to re-apply lost GCT. In collaboration with the Special Master who inquired into the specific AIC, Mr. Hubbard's team confirmed this oversight and immediately had the error corrected. This oversight was simply human error and is exactly why we have administrative remedies, copouts, and Mainline. [19]

3) On page 11, the Special Master states, "*AICs with shorter sentences were prioritized, and AICs with both short and long terms could not access many of the needed programs for rehabilitative and credit earning purposes*."

**Objection**: Federal Time Credit ("FTC") are no longer earned based on the number of programs completed. Rather, eligible AICs are in "earning status" until they refuse an Evidence-based Recidivism Reduction ("EBRR") Program or Productive Activity ("PA") recommended to them by BOP staff based on a need.

4) On page 12, the Special Master finds, "*The closure was unnecessarily rushed. Methodical, planned, thoughtful practices could not be carried out, leading to mass*

---

[19]    During lunch, FCI Dublin Department Heads are called to the dining area to provide AICs an opportunity to ask questions about their confinement.

*chaos. Communication from leadership changed daily leading to even more confusion.*"

**Objection**: The BOP had an organized plan to transfer the AICs from FCI Dublin in conformity with BOP Policy and constitutional mandate. The mission became fluid as BOP had to respond and adjust due to ongoing requirements directed by the Court and the Special Master to be able to proceed with the transfer of AICs from FCI Dublin to their receiving institutions on the timeline the agency had crafted.

5) On page 12, the Special Master finds, "*Many of the staff who were brought in from men's facilities to assist in packing property had never worked with women or transgender AICs, and had no idea how to communicate or deescalate the emotional responses the AICs had during the chaotic closure process associated with their property.*"

**Objection**: The Special Master again asserts a conclusory statement as fact notwithstanding she provides no supporting basis. The BOP staff who work in male facilities are familiar with communicating and working with transgender AICs because male facilities also confine transgender AICs.

### *Section: Operations*

In the Operations Section of the Special Master Report, Mr. Hubbard clarifies the following statements:

1) On page 29, the Special Master states "*Position of regional gender-responsive monitor was left unfilled.*"

**Objection**: Dr. B███ Winters is the Regional Psychology Services Administrator for the Western Region. Her collateral duties include Regional Female Offender Coordinator and Regional Inmates with Disabilities Coordinator. Dr. Winters has held these positions since March 2021. Dr. Winters provided periodic services to Dublin staff, and in April 2024, assisted with transferring AICs during the closure. From April 15, 2024, through April 22, 2024, Dr. Winters assisted with providing AICs mental health services as they prepared for transfer (e.g., assessment of mental status, provision of coping skills, Suicide Risk Assessments, Suicide Watch Contacts, Post Suicide Watch Reports, Clinical Contacts, etc.).

It is my understanding that, during the closure, Dr. Winters worked within the Psychology Services building, where the Special Master was also working with her team. Dr. Winters introduced herself as Regional Psychology Services Administrator, and she had periodic informal interactions with the Special Master from April 15 through April 22, 2024. It Is also my

understanding that the Special Master neither asked Dr. Winters nor Dr. Mulcahy about the position of regional gender-responsive monitor.

2) On page 31, the Special Master finds "*Insufficient programs were not available to address the needs of the AIC and resulted in failure for AICs to earn FSA and GTC*."

**Objection**: The Special Master again asserts a conclusory statement as fact notwithstanding she provides no supporting basis. Any lack in programming opportunities at FCI Dublin would not impact FTC or GCT. Rather, an AIC refusing GED programming, when offered, would impact FTC and GCT. Further, refusing EBRR/PA based on needs would affect FTC, but not GCT. An AIC earns the same number of FTC whether he or she completes one, ten, or a hundred programs. AICs only lose credit when they refuse to take a recommended progra m for which they have an identified need.

### V.    FCI Dublin Acting Human Resources Manager, C███████ Graham

#### *Section: Staffing in the Bureau of Prisons*

In her review of the Special Master report's section on staffing, Acting Human Resources Manager, C██████ Graham notes:

1) On page 34, the Special Master asserts: "*Additionally, an exhaustive amount of overtime is utilized, and augmentation are some of the problems that have plagued the Bureau.10 FCI-Dublin has an overall vacancy rate of 38%% which is actually even higher, 51% when factoring in the 27 staff on administrative leave.*"

   **Objection**: FCI Dublin's vacancy rate without staff on administrative leave is 27%. This number jumps to 63% when accounting for staff on administrative leave. *See* Graham Attachment 1.[20]

   **Further Response**: It is no secret that BOP staff did not want to TDY at FCI Dublin for fear of being accused of sexual misconduct and having their character questioned. Other ag ency staff concluded that some FCI Dublin AICs were weaponizing PREA claims against staff to try and get a payday and/or get out of prison early under the 2023 Compassionate Release amendments, and these same staff passed up promotions at FCI Dublin to remain in their current positions earning less money.

#### *Section: Operations*

In the Operations Section of the Special Master Report, Ms. Graham clarifies the following statements:

1) On page 29, the Special Master asserts the following two statements: " *Executive staff actions did not take misconduct seriously and failed to act (as identified in multiple reports in 2021 - 2022);*" and "*Although the BOP Director claims significant resources have been devoted to the problem, there is no evidence that this is the case. FCI-Dublin has the second highest vacancy rate in the Western Region when factoring in the staff that are off on administrative leave, and the highest medical staff vacancy rate*."

   **Objection**: The two statements are contradictory. Indeed, in placing numerous FCI Dublin staff on administrative leave for allegations of misconduct shows that allegations of misconduct are taken seriously by the BOP. FCI Dublin has utilized both relocation and retention incentives to  increase the quantity and quality of the applicant pool. On April 27, 2023, the BOP affirmed FCI Dublin's 25% retention request for all staff. Prior to April 27, 2023, FCI Dublin had a  10%

---

[20]    Graham Attachment 1 is FCI Dublin's staffing report for pay period 8 (4/21/2024 through 5/4/2024). This report is the same staffing report Special Master Still cites to in  the Report. *See* Special Master Report at 35.

retention request for all staff since August 28, 2022. FCI Dublin had consistently held monthly staff recruitment/hiring events since November 2022.

**Further Response**: FCI Dublin's recruitment and retention challenges represent a perfect storm of high living costs, hazardous working conditions, and uncompetitive salaries with other staff. On September 25, 2022, Yahoo News posted an article entitled, "The 10 Most Unaffordable Cities in America." In this article, Dublin was listed as one of the top ten unaffordable cities in America. According to the article, the annual cost of living in Dublin is $122,115.99. According to Zillow, the average home cost is $1,456,742, an 18.2% increase from the previous year. The average cost for a two-bedroom apartment is $3,054 per month. According to 2023 Payscale Inc., the cost of living in Dublin exceeds the National Average in all categories to include housing by 157%, utilities by 31%, groceries by 31%, transportation by 35%, and overall costs by 71%. According to gasbuddy.com, a cost of a gallon of gas ranges from $4. 25 - $5.59 per gallon in Dublin. The CA Department of Corrections offers an annual salary for Correctional Officers ranging from $47,988 - $98,852, with various benefits. Alameda County starts recruits at salaries ranging from $83,740 - $128,315. The BOP starts correction officers at FCI Dublin at $60,754 for a GS5-1 law enforcement officer.,719.

**Further Response**: Adding to the staffing challenges is that the BOP policy prohibits hiring another staff member to replace someone put on indefinite, paid administrative leave. Taken together, it is clear the BOP took misconduct seriously.

### *Section: Staffing*

In the Staffing Section of the Special Master Report, Ms. Graham clarifies the following statements:

1) On page 38, the Special Master finds: "*Staffing vacancies led to system failures in almost every area within FCI-Dublin. This facility had the second highest vacancy rate in the Western Region; 51% specifically when factoring in the 27 staff that are on administrative leave.* "

**Objection**: As explained above, when accounting for staff on administrative leave, the vacancy percentage at FCI Dublin is 63%. Graham Attachment 1.

## VI.    FCI Dublin Administrative Remedy Clerk, S█ Cleland

### *Section: Findings*

In her review of Special Master Still's Findings, FCI Dublin's Administrative Remedy Clerk and Warden's Secretary, clarifies the following findings:

1) On page 8, the Special Master finds, "*The primary outcome of "closed/explanation" and the boiler-plate, non-substantive responses to Administrative Remedies indicate that AICs are given very little information about their claims. These canned responses reflect a dismissive and non-problem-solving philosophy of the Administrative Remedy process. The files made available to the Special Master's Team (SMT) did not contain any information about the investigation of the Administrative Remedy complaint.*"

**Objection**: The Special Master and her team asked me to provide hard copies of all BP-9 forms for the past three years. While *I never received the hard copies back* from the Special Master, I began scanning all hard copy BP-9s and attachments in December 2022 when I came on board at FCI Dublin. A review of the digital copies of these files – which are exact copies of what I provided to the Special Master – showed that, at least in some cases, there were accompanying attachments. *See* Cleland Attachment 1. It was not unusual in cases involving medical care, however, not to receive accompanying attachments, as medical staff had access to BEMR, and they would draft responses based on their respective investigations. To illustrate how grievances to medical were communicated and received, attached here are emails between myself, HSA Wilson, and/or other FCI Dublin medical staff. Cleland Attachment 2.

**Further Response**: Special Master team member B█ Owen, who I understand is the team's Data and Research Expert, spoke to me about our administrative remedies for approximately ten minutes. Because M█ Agostini, FCI Dublin's Administrative Remedy Coordinator, was on ██████████████ Ms. Owen was unable to obtain further clarity from her. If Ms. Owen inquired further, however, she would have learned that the investigatory process requires that sensitive details are not divulged in the administrative remedy response, which could lead to harm to both staff and AICs alike if found in the wrong hands. Upon conclusion of the investigation, the outcome is communicated to the AIC by SIS.

2) On page 8, the Special Master finds, "*The AICs were not able to readily obtain the BP-9 forms, Administrative Remedy Request form. To obtain any of the forms necessary to file a remedy at any level, the AIC had to request the form from staff and justify the need for the form which had a chilling effect on the process as AICs were fearful of retaliation. The forms were not available in Spanish or other languages, and translation and confidential interpretation services were not readily available.*"

**Objection**: In reviewing my records, I could only find one instance of an AIC emailing the DUB-InmateToWarden email box alleging she had issues obtaining a BP-9 form. Cleland Attachment 3 at 1-2. Shown from the other emails received by AICs, while they had questions regarding their remedies, there were no allegations of being denied grievance forms. *Id*. at 3-34.

**Further Response**: I also understand, through BOP Agency Counsel's communications with FCI Dublin Counselors Glasper-Minor[21] and Wegner,[22] neither the Special Master, nor any of her team approached them to ask about how AICs obtained grievance forms. Counselor Strack[23] stated, while she remembered speaking with the Special Master, to the best of her recollection, she also does not recall speaking about grievance forms with either the Special Master or her team.

Counselor Glasper-Minor, in Housing Unit A/B Unit explained, in her unit, BP-9 forms are posted in the units and freely available without a request to staff. Once an AIC completed the form, she gave the AIC a copy and placed the original in the Unit Manager's Box/Outbox. If, however, the grievance was about the Unit Manager, the form would be given to the Warden's Secretary.

Counselor Wegner, in Housing Unit C/D added that his usual procedure in assisting an AIC file a BP-9 was to provide the form immediately when asked. He would initial and date the top of the form before handing the BP-9 to the AIC. When the AIC returned the form for filing, he gave the form to the Warden's Secretary that same day. Counselor Wegner stated he does not recall AICs being hesitant to ask him for the grievance forms.

Counselor Strack, in Housing Unit E/F explained, at the request of an AIC, she provided grievance and administrative remedy forms to include informal resolution forms and BP-9, 10, and 11 forms. Ms. Strack explained she has all forms readily available in her office and on her person when making SHU rounds. Ms. Strack also provided addresses to AICs depending on which remedy was being filed. Ms. Strack further posted these addresses for grievances and appeals on the Housing Unit bulletin boards. Regardless of whether an AIC was in her Housing Unit, Ms. Strack would provide requested forms and addresses. In her experience, AICs did not appear hesitant to ask for grievance forms. Upon receipt of a completed BP-9 form, Ms. Strack personally delivered the forms to the Warden's Secretary.

---

[21]    Ms. Glasper-Minor is FCI Dublin's Counselor for Housing Units A/B.

[22]    Mr. Wegner is FCI Dublin's Counselor for Housing Units C/D.

[23]    Ms. Strack is FCI Dublin's Counselor for Housing Units E/F.

Ms. Strack explained, as to informal resolution, if the Unit Manager delayed in signing the form and/or a response by the relevant staff member was delayed or not received, she documented this on the AIC's form that informal resolution was attempted, but no response was received. She would then update the AIC and provide them a copy of the informal resolution with her notes. If they chose to then pursue their grievance, Ms. Strack provided the necessary forms and answered any questions they had. In the event an AIC asked for BP-9 forms, she confirmed they had four copies of any supporting documentation or evidence attached, to reduce the possibility of rejection.

Ms. Strack further explained, if she observed any responses or receipts needing to be distributed back to AICs, she would deliver these documents to the AICs so they could pursue their grievances should they wish to do so. While Ms. Strack observed instances in which AICs would not receive their BP-9 responses timely, she did her best to make sure AIC's rights were protected and they had full and fair access to the administrative remedy process.

**Further Response**: While I understand the BP-9 forms are not in Spanish, I cannot recall receiving any complaints as to this issue. It is also my experience that English-speaking AICs often assist AICs who do not speak English in filing remedies. Indeed, the BOP's Administrative Remedy policy expressly allows for AICs to assist one another in preparing remedies. *See* Cleland Attachment 4 at 8.[24]

3) On page 8, the Special Master finds, "*The Administrative Remedy Program Statement was outdated and did not mirror the facility's procedure. The informal level was oftentimes bypassed. The Administrative Remedy process should not bypass the informal level, absent exigent circumstances. These exceptions should have been delineated in an updated Program Statement.*"

**Objection**: To informally revolve issues, AICs emailed the Dub-InmateToWarden box and often attached responses to their BP-9s to show that they did try to resolve the issue informally. This process was much faster as the email boxes were responded to Monday through Friday and responses were given either that same day or within a few days, depending on the issue and availability of the subject matter expert.

**Further Response**: The effect of waiving informal resolution was that AICs could directly file a BP-9 form without having the form rejected solely for failure to seek informal resolution. In avoiding this hurdle, AICs potentially could receive both relief and response in a shorter time. Further, while the Special Master refers to a Program Statement, the waiver of informal resolution was an informal rule which FCI Dublin executive staff were considering having written in FCI Dublin's institution supplement. While memorializing the waiver of informal resolution did not

---

[24]      Program Statement 1330.18, "Administrative Remedy Program."

ultimately occur, it is important to note that institution supplements, unlike Program Statements, are not national policy, but rather, are crafted as specialized guidance dependent on an institution's needs. Indeed, what may be needed at one institution may not be relevant or needed at another institution.

**Further Response**: Because institution supplements are not national policy, a staff's failure to follow or abide by the supplement does not necessarily violate BOP policy.

4) On pages 8-9, the Special Master finds, "*When an AIC wrote an Administrative Remedy request, they would enter the date they submitted the form in the space provided. A review of the dates written on the form by the AIC's, compared to the date received and entered into Sentry, by either the clerk or counselor, sometimes reflected a 30-day difference. The program statement defines that a request or appeal, if accepted, is considered filed on the date it is logged into the Administrative Remedy Index. In many cases, there were significant time-frame discrepancies between the date the AIC signed the form and when it was entered as received.*"

**Objection**: It was not unusual for an AIC to date the form and give it to Unit Team for filing weeks or even a month later. Unit Team does not review grievances for the purpose of confirming/changing dates.

5) On page 9, the Special Master finds, "*A quality control process should have been implemented to ensure Administrative Remedy timeframes are followed, along with a remedy in circumstances in which timelines are violated, except in exigent circumstances. The actual process should have been reflected in the Program Statement.*"

**Objection**: FCI Dublin had an administrative remedy quality control process and the logs showing our tracking were provided to the Special Master. *See* Cleland Attachments 5 – 7. In connection with quality control, I also sent reminders to staff in the event deadlines to respond were either impending or missed. Most remedies were responded to within a reasonable timeframe.

6) On page 9, the Special Master finds, "*A review of the Administrative Remedies determined the majority were denied arbitrarily in that it did not appear that a thorough review was conducted to determine the validity of the complaint. The canned language was repetitive among many of the responses and not tailored to each appeal.*"

**Objection**: To the best of my knowledge, the Special Master neither accessed, nor reviewed any responses issued at the Region or Central Office level. Indeed, the Special Master later admits that "Regional-level Administrative Remedies, including those deemed sensitive were not examined." *See* Special Master Report at 63. In any event, the purpose of the administrative

32

remedy process and the availability of appeal, which the Special Master accurately outlined in her Report (*see* pg. 63), is to avoid arbitrary denials. BOP policy expressly states that,

> [r]equests or Appeals shall be investigated thoroughly, and all relevant information developed in the investigation shall ordinarily be supported by written documents or notes of the investigator's findings. Notes should be sufficiently detailed to show the name, title, and location of the information provided, the date the information was provided, and a full description of the information provided. Such documents and notes shall be retained with the case file copy. When deemed necessary in the investigator's discretion, the investigator may request a written statement from another staff member regarding matters raised in the Request or Appeal. Requested staff shall provide such statements promptly. For a disciplinary Appeal, a complete copy of the appealed disciplinary actions record shall be maintained with the Appeal file copy.

Cleland Attachment 4 at 10. Insofar as the Special Master alleges responses to AIC grievance appeals at either the Regional or Central Office level are "canned" or "repetitive," it is my experience in reviewing administrative remedy responses, that this statement is inaccurate and subjective.

7) On page 9, the Special Master finds, "*Many of the Administrative Remedy packages were incomplete. If an AIC submitted exhibits, they were not attached to the BP-9, Administrative Remedy Request form, making an audit difficult as a result of missing documentation. The Program Statement mandates that all the supporting documents shall be kept in the Warden's Administrative Remedy File along with all supporting material. A review of these files determined this does not occur.*"

   **Objection**: It was not uncommon for AICs to write "see attached," on a BP-9 form, but not include any attachments. I would not reject a grievance on this basis, nor do I recall this happening. I keep and scan all documents together. As such, if there is no attachment, it is because nothing was attached.

8) On page 9, the Special Master finds, "*If an appeal was s [sic] rejected and the reason was correctable, the notice of rejection is supposed to inform the AIC of a reasonable time extension within which to correct the defect and resubmit the Request or Appeal. FCI left the time of extension granted up to a staff member rather than providing a specified completion time is subjective and a flaw in due process.*"

   **Objection**: If a remedy was rejected, and was correctable, our system in SENTRY would automatically generate a 5-day notice of rejection, which would be given to the AIC. The 5-day

requirement to correct the deficiency was often expanded a week or two to provide the AIC sufficient time. *See e.g.*, Cleland Attachment 8. By allowing AICs to correct deficiencies and by being flexible in allowing for extra time, we provided additional opportunity for AICs to obtain relief. Indeed, informal resolution is not limited to a one-shot attempt. Rather, AICs are free to pursue their rights and file as many remedies as they wish.

9) On page 9, the Special Master finds, "*Administrative Remedy Procedures under PREA fall very short of the National PREA Standard 115.52. The Standard states that Administrative Remedies regarding allegations of sexual abuse may be filed at any time, yet a review Administrative Remedies indicated they were rejected based on missed time constraints. That is in direct conflict with the PREA standard*."

**Objection**: I did a search in SENTRY for 2023 and found no rejected PREA remedies. I also pulled all rejected remedies related to staff to ensure one was not mis-coded. I further reviewed 2022 and 2024 and found no rejected administrative remedies alleging PREA. *See* Cleland Attachment 9.

10) On page 9, the Special Master finds, "*There was no bridge between an Administrative Remedy and PREA protocols. If an AIC submitted an allegation of PREA via a Remedy it was answered, yet not forwarded to the PREA Compliance Manager (PCM). The Warden's responses to the PREA Administrative Remedies all stated the AIC's allegations will be reviewed and referred for further investigation as deemed appropriate, yet the AICs were never interviewed regarding their allegations. This is alarming especially in light of the sexual abuse that had occurred at this facility. This process gap endangered the sexual safety of AICs*."

**Objection**: Of the 20 PREA remedies filed, a review of my records shows that eight remedies were sent to the Region and forwarded to Ms. Agostini and to me. Cleland Attachments 19, 20. Because I do not have access to Dub-PREACompliance, I am unable to confirm whether 12 PREA remedies were also sent to the PREA Coordinator. The other eight PREA cases, I have records showing they were indeed sent to the PREA Coordinator. I have included an attachment here listing the 20 PREA remedies filed in 2023. *See* Cleland Attachment 10. AIC ███ is highlighted in this record because, while I know the remedy was sent to "WXRO-EXEC," I am unsure whether it was thereafter forwarded to DUB-PREACompliance. *See* Cleland Attachment 19 at 14 – 20.

11) On page 9, the Special Master finds, "*The Administrative Remedy review indicates that medical concerns were the most common reason for filing. However, many appear to have remained unaddressed for months or never*."

**Objection**: My records for 2023 reflect that we received answers from medical usually within 90 days. Cleland Attachment 6. This longer response time was due to staffing shortages in medical. HSA Wilson was usually the only person answering remedies.

12) On page 10, the Special Master finds, "*A review of BOP-wide data indicates that less than 2% of Administrative Remedies were granted. FCI-Dublin's grant rate was slightly lower. While fully recognizing that some appeals are indeed frivolous or a misuse of the process, it is difficult to justify such a small grant or relief rate.*"

**Objection**: Determining whether an administrative remedy is granted is not as "black and white" as it may seem. Indeed, when an AIC alleges a grievance regarding medical care, it is common practice to not deny a medical complaint, but rather, provide explanation of the treatment and care they received and inform the AIC that the response is provided for informational purpose only. As such, while one person may view these responses as denials, they also provide the AIC with information as to their medical care and advises them to continue to work with medical staff in the event they experience further issue. *See e.g.*, Cleland Attachment 13.[25] To illustrate a larger picture of how FCI Dublin responds to grievances and how answering grievances is not as simple as a grant or denial, I included responses from 2023 through 2024, covering issues involving, *inter alia*, FSA credits, food, and programming. Cleland Attachment 14.[26]

### Section: Administrative Remedies

In the Administrative Remedies Section of the Special Master Report, Ms. Cleland clarifies the following statements:

1) On page 64, the Special Master notes, in her conversations with the former Interim Warden, the Warden stated the administrative remedy system was "broken" and was not reliable.

**Objection**: My records do not show the system to be broken. In collaboration with BOP staff, I obtained our 2023 Administrative Remedy records. *See* Cleland Attachment 11. In review of this record, however, I noted that some remedies appeared to be unanswered. I knew, however, this was not accurate and that all remedies were answered in 2023. As such, I again collaborated with BOP staff to determine the root of the issue. It became clear that when the original report

---

[25]    Cleland Attachment 13 are a few examples of responses to AICs regarding their medical grievances from 2023 and 2024.

[26]    Please note, all grievances alleging staff misconduct and PREA have been removed from this attachment. For the Court's reference, Ms. Cleland wrote the AIC's last name on each response. Ms. Cleland also notes, because FCI Dublin continues to respond to 2024 grievances, this list is not all-inclusive for 2024. Upon review of her records, Ms. Cleland has determined, in 2023, there were **157 remedies closed which were accompanied with an "informational purpose" explanation.** Also in 2023, there were only **28 rejections**. In terms of percentages, this indicatesthatapproximately **85% of FCI Dublin's remedies were closed for "informational purposes" whileonly 15% were "rejected."**

listed a remedy as rejected, it listed the remedy as unanswered. A second 2023 report is attached here, which accurately reflects the administrative remedy data. *See* Cleland Attachment 12. The relevant remedies are highlighted in yellow.

2) On page 67, the Special Master concedes "time frames were met," but goes on to assert that the process is otherwise "ineffective and non-productive."

**Objection**: Three grievances were "officially" granted in 2023 at the local level. *See* Cleland Attachment 15. While not a high number, this shows the process is neither ineffective nor non-productive. Indeed, as I previously explained, the AIC is provided valuable information in the responses and can then make more informed decisions on how to thereafter proceed.

3) On page 68, the Special Master extracts a sample PREA response, in apparent dissatisfaction with FCI Dublin's response.

**Objection**: The Privacy Act requires minimizing details in responding to these complaints. Pursuant to both statute and BOP policy, responses must be prepared to minimize personal staff details as they are subject to release to the public.

4) On pages 69-70, the Special Master mirrors what was already stated in earlier findings.

**Objection**: Because these findings are repetitive, my previous comments are equally applicable here.

5) On pages 71, the Special Master asserts, "Allegations of an egregious nature should not be rejected simply because of self-imposed timelines in a Program Statement. The BOP should update their training, related Program Statements and qualify control processes to ensure allegations of this nature of promptly and appropriately addressed."

**Objection**: A review of 2023 administrative remedies shows only 28 were rejected. Of those rejected, 13 were correctible and 10 involved disciplinary matters.[27] Only five remedies were rejected for being untimely. *See* Cleland Attachment 17. Of the 13 correctible remedies, seven remedies were re-submitted. Cleland Attachments 16, 18.[28]

---

[27]    The 10 rejected remedies alleging disciplinary matters involved issues relating to the AIC's disciplinary hearings. As such, these remedies must be filed at Region. *See* Cleland Attachment 4 at 6.

[28]    Cleland Attachment 18 reflects the outcome of each resubmitted grievance. The attachment shows that five of the seven responses provided explanation and resolved on "Informational Purposes Only" and two remedies were "rejected."

### *Section: Attachments*

1)  Regarding pages 104 and 105's Attachment C, "FCI-Dublin 2023 Administrative Remedies PREA Filings," it is my understanding that Dr. Mulcahy clarified that all AICs who alleged PREA *via* administrative remedy  are also listed on FCI Dublin's PREA tracking log.

### VII.    Western Regional Health Services Administrator, R███ Gilliam

*Section: Findings*

In his review of Special Master Still's Findings, Western Regional Health Services Administrator R███ Gilliam, clarifies the following:

1) On page 7, the Special Master finds, "*At FCI-Dublin, there was a lack of adequate nursing and medical provider evaluation and oversight. Record reviews indicate that in many cases, nurses and providers did not perform an adequate history of the patient's complaint or perform adequate physical examinations, even when the patients presented with symptoms of serious medical conditions. This brings into question the existing policy and procedure used for credentialing and privileging of medical providers, and the ongoing performance evaluation, peer review process, and competency auditing of nursing personnel.*"

   **Objection**: While I do not recall any issues being raised at FCI Dublin regarding credentialing of medical staff, the BOP uses the primary source credential verification and granting of clinical privileges or practice agreements for health care providers at BOP institutions. These providers include BOP staff, Public Health Services (PHS) staff, consultants, and those who provide treatment using telehealth. All initial staff credentials are completed by Grand Prairie. *See* Gilliam Attachment 1.[29]

2) On page 7, the Special Master finds, "**During the review of health records, the medical experts found significant problems with the management of chronic disease patients related to the timeliness and/or quality of care patients are receiving.**"

   **Objection**: The BOP utilizes Clinical Practice Guidelines.[30]

3) On page 8, the Special Master finds, "*Existing programs were not leveraged, as evidenced by the inconsistent assignment to a Chronic Care Clinic (CCC) for many patients with a chronic problem or with a condition that required close follow up. The CCC appears to be how BOP clinicians are alerted to follow up on chronic conditions like diabetes, asthma, and rheumatologic diseases.*"

   **Objection**: Chronic care clinics ("CCC") are a BOP-wide categorization and standardization tool for AIC medical needs. AICs with certain medical conditions are placed into

---

[29]    Gilliam Attachment 1 is Program Statement 6027.02, *Health Care Provider Credential Verification, Privileges, and Practice Agreement Program*.

[30]    *See* BOP: Health Management Resources. The BOP Clinical Guidance is made available to the public for informational purposes only.

a CCC and are then routinely seen for scheduled appointments with their assigned primary care provider ("PCP"). During CCC appointments the clinical director ("CD") is usually present as well to assist in diagnosis, management, and continued care of the inmate in the CCC. CCCs are currently established for the following:

- Cardiac (diseases of the heart and circulatory system)
- Diabetes (both Type I and Type II, including inmates on insulin and oral antidiabetics)
- Endocrine/Lipid (diseases such as hypothyroidism or hyperlipidemia)
- Gastrointestinal (diseases such as GERD and ulcerative colitis)
- General (for inmates needing follow ups for diseases or problems not covered in other CCCs)
- Hypertension (specifically for the management of high blood pressure)
- Infectious Disease (for diseases such as hepatitis, HIV, and tuberculosis)
- Mental Health (psychological disorders like depression, bipolar, and schizophrenia)
- Nephrology (diseases of the kidneys, bladder, prostate, and other urinary structures)
- Neurology (diseases involving the brain, spinal cord, and the peripheral nervous system)
- OB GYN (women's health, obstetrics, gynecology)
- Orthopedic/Rheumatology (diseases involving bones, joints, muscles, and ligaments)
- Pulmonary/Respiratory (lung and breathing problems such as asthma and sleep apnea)

4) On page 8, the Special Master finds, "*A review of specialty care medical records identified serious deficiencies existed in the timeliness and/or quality of care provided to patients. Many issues were related to the provider's failure to monitor and implement the specialty consultants' recommendations in a timely manner.*"

   **Objection**: The physician is under no obligation to follow consultant recommendations. If the consultant's recommendations are not followed, the physician will document his/her justification in the Electronic Health Record ("EHR"). *See* Gilliam Attachment 2 at 46 – 48.[31]

5) On page 8, the Special Master finds, "*A process for managing work-related injuries for inmates was not evident. Several cases of accidents leading to significant morbidity were identified by the SMT and evaluated. FCI-Dublin did not follow-up to appropriately address the injury and the issue was not documented.*"

---

[31]    Gilliam Attachment 2 is Program Statement 6031_005, *Patients*.

**Objection**: Each AIC receives familiarization training during the institution's Admission and Orientation on occupational safety and health programs. *See* Gilliam Attachment 4 at 29.[32] The AICs must sign the forms BP-A0169, Uniform Basic Safety Regulations and BP-A0139, Notice of Right to File for Compensation for a Work-Related Injury. *See* Gilliam Attachment 3 at 13.[33] A copy of each form is placed in the AIC's Central File. *Id*. BOP policy provides for AIC injury investigations (*id*. at 17 – 18) and asserts the following:

> The purpose of an inmate injury investigation is to find the cause of the injury. Work-relatedness for compensation purposes is concluded by determining whether the injury took place at the assigned workplace during assigned hours and was incidental to the employment.

> The assigned workplace is any place the inmate is authorized to be performing an assignment, not just the workstation. For example, if a worker slipped on the way to the bathroom from a workstation, it is considered a work injury. If they slipped on the sidewalk outside the building on the way to lunch, it is not a work injury. The Institution Safety Committee must decide each case individually. Listed below are procedures for documenting inmate injuries:

> ■ Obtain the injury assessment from the Health Services Department.

> ■ Complete a BP-A0140, Injury Report – Inmate – Part 1 form for all inmate work-related injuries.

> ■ Lost-Time Work Injuries require a completed BP-A0140, Injury – Lost – Time Follow-Up – Part 2 form.

> ■ Lost-time compensation must be paid per the Federal Inmate Compensation Act.

> ■ The detail of assignment at the time of injury is responsible for lost-time compensation, including for those transferred to a Medical Center for additional care.

> Transfer of Records. Copies of injury reports maintained in the Occupational Safety and Health Department should not be forwarded unless requested by the receiving institution.

---

[32]    Gilliam Attachment 4 is FCI Dublin's Admission and Orientation Handbook, which is provided to all AICs during Admission and Orientation.

[33]    Gilliam Attachment 3 is Program Statement 1600_014, *National Occupational Safety and Health Policy*.

Records Retention. Inmate injury records must be retained for the duration of the sentence plus three years.

**Further Response**: Pursuant to BOP policy:

Inmate Injury Assessment. Medical employees must document an inmate injury assessment in the EHR and schedule a follow-up appointment as clinically indicated. This will include assessment of any injury, regardless of severity or cause; work-related, recreational, assault related, accidental, or self-inflicted.

Employees completing the injury report should exactly quote the patient when describing how the injury occurred. All reports of injury will be documented regardless of the severity of the injury. A LIP will review and co-sign all injury reports as soon as possible, ordinarily the next working day.

Employees will send a copy of completed inmate work-related injury assessments to the Environmental and Safety Compliance Manager for inclusion in the Occupational Safety and Health Administration (OSHA) tracking logs.

*See* Gilliam Attachment 2 at 33.

6) On page 8, the Special Master finds, "*The BOP has acceptable guidelines for preventive care. FCI-Dublin providers appear to have clear guidelines, in particular, for screening for infectious diseases like Tuberculosis, Hepatitis C, HIV, and Sexually Transmitted Illnesses, along with routine primary care screening for anemia, thyroid illness and diabetes. Unfortunately, test results were not consistently followed up and or documented putting the health and safety of AICs and staff at risk.*"

**Response**: BOP Policy expressly provides that:

The expected results of this program are:

a. Testing will be performed by qualified health care personnel.

b. Medical laboratory test reports will be accurate and timely.

c. Laboratory test results will be reported to inmates as necessary and incorporated into the inmate's health record.

d. Accurate records will be maintained.

e. Safety and quality control procedures will be enforced. Gilliam Attachment 5 at 1.[34]

---

[34]     Gilliam Attachment 5 is Program Statement 6370_01, *Laboratory Services.*

*Section: Medical*

In the Medical Section of the Special Master Report, Mr. Gilliam clarifies the following statements:

1) On pages 40 – 41, the Special Master observes, "*During the over three weeks on site, several critical findings substantiated that patients are not being provided timely access to care including medical, mental, dental, vision, diagnostic and specialty services.). In many cases, this population of patients had not been provided care and treatment for serious health conditions. The lack of access falls outside community standards of practice and led to delays in diagnosis and treatment, preventable pain and suffering, and demonstrable harm to patients. Additionally, important BOP access to care policies and care guidelines have not been followed. As an example, patients are not receiving the expected 14-day New Arrival History and Physical (H&P) timely. We were provided a list by the facility that documented delays of more than four months for the initial H&P.*"

**Objection**: On December 1, 2023, FCI Dublin had one overdue New Arrival History and Physical ("H&P"). Our highest number of overdue H&Ps was on March 22, 2024, at 75. On April 15, 2024, that number dropped to 36 overdue H&Ps. *See* Gilliam Attachment 9.[35]

**Further Response**: The spike in numbers is likely, in part, due to ongoing litigation demands which pulled the Executive Staff and Department Heads away from their primary functions. A second possible reason for the spike, was the removal of the moratorium of new AICs transferring to FCI Dublin.

2) On page 41, the Special Master observes, "*The sick call process was inefficient and ineffective, and no process was in place to track health services requests (HSR) to determine appropriateness of care. Patients are waiting months to be seen and when seen, may not have critical physical exams performed. According to staff, the facility had an open sick call process, meaning a patient can walk into the clinic, Monday through Friday, and hand in an HSR. However, no system is in place to monitor statistics associated with HSRs, a standard in correctional health settings. These statistics typically include time*"

---

[35]    Gilliam Attachment 9 is a graph obtained by Mr. Gilliam showing FCI Dublin's H&Ps from January 2020 through the closure. Upon review of the graph, there is a recent "spike" in H&P numbers towards the end of 2023. Mr. Gilliam explains the spikes in the graph are likely caused by staffing shortages. Indeed, in December 2023, FCI Dublin lost the contract advance practice provider ("APP"). The APPs are the primary providers for sick call and H&P. The APP also assists with CCC by performing follow-up visits and meeting with the AIC every six months or quarterly depending on the AIC's health. In addition to suffering from staffing shortages, when the COVID-19 moratorium lifted, FCI Dublin saw an increase in AIC population; further straining resources.

*stamping when requests are received, triaging requests according to clinical acuity, and time stamping when the inmate was evaluated by a clinician.*"

**Objection**: FCI Dublin had a process in handling health service requests ("HSRs"). The sick call procedure at FCI Dublin was conducted daily [36] from 7:00am – 7:30am. This coincided with morning pill line. When sick call opened, sick call forms were made available to the AICs. Once the AIC completed the form, that form was triaged by clinical staff who would determine an appropriate timeline in which the AIC should be seen. The AIC would be advised of the suspense date of the request. Clinical staff signed the form which included the appointment timeline range. This form was then used as a scheduling tool for non-clinical staff. This form is not part of the AIC's medical record and is not uploaded to BEMR. At no time did nonclinical staff perform triage of AIC's at FCI Dublin. The same procedure was utilized at 7:30am at the Camp and 8:00am in the Special Housing Unit. *See* Gilliam Attachment 8.[37]

**Further Response**: Emergencies are addressed at any time, day-or-night, including Wednesdays.

**Further Response**: AICs have the right to be assessed for pain during each medical visit.

3) On page 41, the Special Master observes, "*The process appeared to be heavily dependent on a part-time contract physician who reported she triages the HSR slips due to lack of nursing staff who typically perform this task. She reports seeing any inmate who was triaged as an "urgent request" on the same day or within 24 - 48 hours. HSRs she deems routine are set aside to be scheduled. According to the patients and confirmed by staff, the routine (non-urgent) requests are rarely seen. This shortage of nursing and provider staff led to missed opportunities for prevention or early intervention of medical issues and has resulted in higher and costlier rates of urgent, emergency, or specialty care in addition to **causing undue pain and suffering to inmates**. The lack of basic clinical operational processes and staff has led to a complete failure of the health system.*" (emphasis added).

**Objection**: These broad, sweeping statements are challenging to counter, as they lack foundation. The BOP has a sick call scheduling guideline, which is followed by BOP staff to the best of their abilities.

4) On pages 41, the Special Master observes, "*The lower clinical classification of inmates and of the facility was frequently cited by staff as a reason for less intensive staffing and*

---

[36]    Sick call was conducted daily except for Wednesdays.

[37]    Gilliam Attachment 8 is a graph obtained by Mr. Gilliam showing FCI Dublin's late sick calls from January 2020 through the closure.

monitoring of inmate health and wellness. Regardless of the level of classification of inmates housed at FCI-Dublin, women housed there still require preventative, primary, specialty and chronic care that meets established standards of care and existing BOP guidelines. In addition to inadequate clinical staffing, we uncovered inappropriate coverage of clinical issues by non-licensed staff. **_As an example, the person tasked with scheduling medical appointments was the Assistant Health Services Administrator (AHSA) who is a non-clinical person. Although scheduling in and of itself does not require clinical decision, when interviewed the AHSA stated he reviews the HSRs and determines who should be scheduled first, in essence providing a clinical triage of cases. When unsure of what to do, he would ask the doctor to provide a recommendation and he would follow it. It was clear he knew this process was inappropriate and below universally accepted practice standards that prohibit non-clinical staff from performing clinical triage and determining when a patient should be seen._** In fact, in California and many other states, a non-clinical person performing medical triage is considered to be in violation of medical and nursing board regulations that prohibit the practice of medicine by non-licensed individuals._" (emphasis added).

**Objection**: Much of this statement is misleading and unsubstantiated. The AHSA's task of scheduling an AIC is appropriate as he or she must review the AIC's request to schedule the appointment. The physician triages the patient, informs the AHSA, and the AHSA then schedules the AIC for an appointment. The AHSA performs merely a clerical function.

5) On page 42, the Special Master observes, "*A concerning pattern was noted with inmates being transferred between BOP facilities with unaddressed or untreated medical issues only to land in a new facility and still not get medical care. Many examples of women being told to have preventative exams done at new facility or addressing chronic care issues at new facility were noted.*"

**Objection**: This is false. FCI Dublin had only two overdue CCCs. Since January 1, 2023, to the date of the closure, the highest number of overdue CCCs was six, which was in August of 2023. *See* Gilliam Attachment 7.[38]

6) On page 42, the Special Master states, "*A key component of functioning health systems is a robust oversight process that continually ensures clinicians have the education and skills to perform in their role and protects patients from discrepancies in care. For physicians this takes the form of credentialing and formal request and approval of clinical privileges*

---

[38]     Gilliam Attachment 7 is a graph obtained by Mr. Gilliam showing FCI Dublin's CCC from January 2020 through the closure.

*in addition to ongoing performance evaluations and peer review. Although BOP staff stated there is a credentialing and privileging process, it was not clear how effective this process was and how peer review was being performed for the licensed providers working at FCI-Dublin. Given the myriad of clinical issues and deviations from standards of care noted for the contract physician, we would have expected a functioning peer review process to have uncovered concerning patterns that could have been addressed. It was also not evident nursing staff was having ongoing competency testing. The lack of this oversight was evident as record reviews show that in many cases, nurses and providers did not perform an adequate history of the patient's complaint or perform adequate physical examinations, even when the patients presented with symptoms consistent with serious medical conditions.*" (footnote omitted).

**Objection:** The BOP uses the primary source credential verification and granting of clinical privileges or practice agreements for health care providers at BOP institutions. Gilliam Attachment 1. These providers include BOP staff, Public Health Services (PHS) staff, consultants, and those who provide treatment using telehealth. All initial staff credentials are completed by Grand Prairie. Clinical skills competency reviews are completed every other year.

7) On pages 43 – 44, the Special Master states, "*The medical experts met with the Assistant Health Service Administrator (AHSA), and the person responsible for scheduling both on and off-site appointments to learn the process and criteria for approving or denying consultations. According to staff, there is a Utilization Review Committee that meets every two weeks to discuss consult referrals. The meeting is chaired by the Regional Medical Director. Staff from the regional office and the local prison also participate in the process. The medical experts were not sure what nationally accepted criteria was being utilized to objectively review cases and the AHSA was unaware of the tool being used to approve or deny a clinical consultation or medical service. It is also not clear what the process is for informing providers and inmates of care that is denied and the reason for denial. It is not clear if or how providers and inmates request a second opinion. This appears to be a system issue as many patients report not knowing if or when they will see a specialist and a deviation from community standards.*" (footnote omitted).

**Objection**: The AHSA is an administrative position. As previously explained, the physician triages the patient, informs the AHSA, and the AHSA then schedules the AIC for an appointment. While I cannot definitively say who the Special Master spoke to while at FCI Dublin, if she spoke to BOP physicians or clinical staff, she would likely understand the AHSA is an administrative position.

**Further Response**: The Utilization Review ("UR) committee is conducted by the clinical director (or acting clinical director). The UR committee members use their best clinical judgement to decide how to address requested consults. They do not use a national set of guidelines. However, certain types of consults are required to be sent to the Region for further review. At the Regional level, consult requests are evaluated using the "InterQual" criteria as one element of the review. InterQual is a widely used, evidence-based tool used to screen specialty care for clinical appropriateness. The BOP has used InterQual for more than 10 years.

8) On pages 44 – 45, the Special Master states, "*The BOP has acceptable guidelines for preventive care. FCI-Dublin providers appear to have clear guidelines for screening for infectious diseases like Tuberculosis, Hepatitis C, HIV, and Sexually Transmitted Illnesses (STIs) along with routine primary care screening for anemia, thyroid illness and diabetes. Unfortunately, test results are not consistently followed up. We reviewed cases of patients having incomplete syphilis treatment, untreated/not evaluated hypothyroid illness and cases of severe iron deficiency anemia not adequately addressed. The medical experts reviewed other medical records where the provider has ordered either tests or treatments that did not get completed. It is unclear if this is due to the lack of nursing staff, or the staff are just not completing the task. Over 100 charts of patients were reviewed by the medical experts and in the majority of the records the Hepatitis B vaccine was ordered but none had been administered. There was also inconsistent Well Woman Care (WWC). **Many women did not have a Pap Smear on file, and in some cases, particularly around late October 23, 2023, the medical experts identified cases where documentation of a gynecologic exam including obtainment of Pap Smear was on file, but no Pap Smear result was in the record. It is not clear if the test was not sent to the lab, if the test was lost, or if the result was not obtained from the lab. BOP staff conveyed this may have been at the same time an upgrade occurred in BEMR.** Clinical systems upgrades should be planned, and audits should occur to check on unexpected issues that may arise from upgrades. Community standards include tracking of screening tests like Pap Smears and Mammograms in a log to ensure results do not fall through the cracks but no evidence was provided that this was done. **Although there is frequent documentation of women declining or refusing treatment, particularly of sensitive exams like WWC, the experts question the validity of the documentation because in our interviews with AICs it was clear they wanted preventive care.** The medical experts also received a large number of complaints regarding gynecological issues that had gone untreated. A persistent pattern was noted of medical staff documenting AICs were not compliant with medications or other treatment. In some cases, like Pap Smears or other gynecological denials, AICs were referred for two issues, for a*

*screening Pap Smear or for insertion of IUD or pelvic ultrasound for example. If the AIC changed her mind and no longer wanted an IUD, the Pap Smear was not done either and the note will reflect "patient declined Pap Smear because she does not want IUD".* **A review of charts also showed women frequently got presumptive treatment for vaginal infections without an expected pelvic exam. Although presumptive treatment is not outside standards of care, in several cases women were treated with various antibiotics without improvement and eventually sent to the emergency department without ever having a physical exam performed."** (footnotes omitted and emphasis added).

**Objection**: Initially, I will note it is hard to challenge comments made on anonymity. Second, when an AIC refuses treatment he or she must sign a refusal form. If the AIC refuses to sign the form, two staff members would sign. After further review, the "missing" Pap Smear lab tests were found in the document section of the electronic medical file.

**Further Response**: To the best of my knowledge, in 2023, approximately five AICs who were treated with an antibiotic returned to medical, claiming the antibiotic did not clear their infection or rash. These AICs were thereafter treated with a different antibiotic. It is not unusual for an antibiotic to not be effective in certain people. I am also aware of one AIC who, while treated with two different antibiotics, required transport to the hospital as the antibiotics were ineffective. Not unlike how people obtain treatment in the community, it is not unusual for a physician, drawing from his or her medical knowledge, to ask a patient her symptoms and provide an antibiotic without examining the vagina. In the event AICs at FCI Dublin experienced antibiotic issues, they were always welcome to follow-up with medical staff to address their issues.

### Section: Medication Assisted Treatment

In the Medication Assisted Treatment Section of the Special Master Report, Mr. Gilliam clarifies the following statements:

1) On page 50, the Special Master asserts, "*The medical experts found significant problems with pharmacy and medication administration, including lack of continuity upon arrival, delayed refill of medication, lapses of medication orders, medication errors and delays of medication in urgent situations, such as dental abscesses. It was reported by many patients that their medication has been changed, dosage reduced, or discontinued for no known cause and without a conversation with the provider. It is not clear if this was due to prescriber preference or differences in formularies across BOP, which should be standardized. Of significant concern was that the nursing/medication technician in the SHU did not*

*adhere to standards of nursing practice regarding medication administration. The patients housed in SHU were given medications though the cell doors. With very little light in the cells and on the unit, the nurse administering the medication could not ensure that the patient ingested the medications. Also, the patients were not asked to open their mouth to check that the medication was swallowed.*"

**Objection**: Because the BOP utilizes a National Drug Formulary, on occasion, an AIC's medication may change to comply with our formulary. The BOP has a non-formulary procedure. *See* Gilliam Attachment 6.[39] BOP policy expressly states, "[e]ach institution will use the Bureau's National Drug Formulary. The Formulary is the listing of medications that may be utilized in the Bureau. The listing includes restrictions, if applicable." *Id*. at 8. This policy further provides:

> In certain instances where staffing levels are appropriate, it may be acceptable to have non-pharmacist personnel such as trained Pharmacy Technicians or trained Medication Technicians perform verification of non-judgmental or non-discretionary pharmacy functions. Appropriate instances include:
> - Checking unit dose cart fills.
> - Checking medications that have been legally repackaged into unit dose form.
> - Checking stock prepared for addition to inventory for AMDCs.
> - Performing the visual check of the medication to be dispensed.
> - Performing verification procedures for an automated dispensing robot (e.g., ScriptPro®).
>
> The processes listed require consultation with and written approval from the Regional Chief Pharmacist. A formal written request from the institution is sent to the Regional Chief Pharmacist and includes current staffing levels and an explanation of the local procedures that will be in place for this process. The period of approval is limited to one year, after which a renewal must be submitted.

*Id*. at 10-11. This policy further provides for the administration, dispensing, distribution and prescribing of medications and expressly states:

> The following procedures will be followed for directly observed therapy (DOT):



---

[39]    Gilliam Attachment 6 is Program Statement, 6360_002, *Pharmacy Services*.

- Medications will be stored in appropriate packaging and clearly labeled until administration.
- The administration of medication will be documented in the eMAR promptly after it is completed.
- When using an AMDC, the individual removing a controlled substance from the AMDC must be the same individual who signs the eMAR except in cases of an emergency.
- When an inmate patient refuses to take a prescribed DOT medication, or is a "no-show," that decision is documented on the eMAR.
- Ordinarily, all DEA controlled substances taken by mouth are crushed or administered in liquid form.

*Id*. at 18-19.

**Further Response**: Although we cannot guarantee AICs always consume their medication, as a general practice, BOP staff are trained to ask AICs to open their mouth and check the medication was swallowed.

2) On pages 50 – 51, the Special Master maintains, "*Review of medical records showed the contract physician would regularly discontinue medications for "lack of compliance." However, this was done in some cases without interviewing the patient regarding reason for not taking medications, such as side effects. Even in cases when patients told the contract physician, they did not like how a medication made them feel, she would discontinue, not offer an option and label the inmate "non-compliant." The medical experts did not find an existing process for following up with patients who did not pick up medications ordered as "Keep on Person." Of most concern was the missing process for identifying medications that should not be skipped or stopped abruptly. Multiple entries were noted where a physician documented an inmate did not pick up medication and an order for discontinuing the medication was placed. No regular evidence inmates were counseled on importance of taking medication or asked why they discontinued medication was noted in patient records*."

**Objection**: All BOP institutions have a system(s) in place for ensuring medications not picked up by AIC patients after 10-14 days are returned to stock in the EHR. Gilliam Attachment 6 at 21. Medications not picked up by AIC patients at Central Pharmacy Processing Services ("CPPS") BOP institutions are returned to the filling pharmacy using the return module of the

Electronic Health Record ("EHR"). The keep on person ("KOP") medication is ordered via-computer by the AIC and is normally filled within two business days.

3) On page 51, the Special Master states, "*Of significant concern was the lack of MAT. An alarming number of patients voiced concerns about their MAT medication being reduced by one-third without any reason or explanation. There was also a long wait list for patients requesting to be evaluated for the MAT program. The medical record review and patient interviews show that inmates had free access to illegal opioids and other drugs. With the high volume of street drugs flooding the facility this has become a crisis. Both the custody staff and the inmate population said they had never seen the amount of street drugs in the facility as it is now. Patients with a history of drug addiction that have been sober for years state it is harder to remain sober when street drugs are readily available. Reports of inmates pressuring individuals to buy and use drugs were common. Even in situations when an inmate has the diagnosis of severe Opioid Use Disorder, MAT was not routinely offered or available. The distribution and access to Naloxone for inmates was not clear.*"

**Objection**: Narcan is readily available with every Automated External Defibrillator ("AED").

4) On pages 51 – 52, the Special Master asserts, "*The facility was not equipped to respond to medical emergencies. The facility had been classified as a level 2 facility by the BOP. Being a level 2 facility, it was not funded or allocated positions for nurses to provide 24/7 coverage. The medical experts believe the patients' medical conditions at the facility were much higher than a level 2 facility. Regardless of the facility level, a basic expectation of a correctional facility is to have trained staff that can respond to emergencies in a timely manner. FCI-Dublin failed to have adequate staffing levels to respond to the patients when there were medical and mental health emergencies. Due to the lack of healthcare staff when there was an emergency, it fell on the correctional officers to respond. This is unacceptable as this placed an undue burden on the correctional officers to respond to an emergency and decide if the patient needed to be sent out or stable enough to wait until medical staff report to work essentially. Correctional officers were essentially being asked to clinically triage patients without appropriate training or licensure.*"

**Objection**: All BOP staff are trained in Basic First Aid, Cardiopulmonary Resuscitation ("CPR"), and AED. If a medical emergency is announced, all available BOP staff respond. If health

service staff are not on-site, the Lieutenant either has the clinical director's contact information and/or has the authority to activate 911. The average response for emergency responders in the Dublin area is ▮ minutes.

5) On page 52, the Special Master states, "*FCI-Dublin only staffed the facility with health care staff 12 hours per day. This left 12 hours where the patients were depending on untrained non-health care staff to respond to medical or mental health emergencies. During the medical experts' time at the facility, they witnessed such emergencies, once when a patient collapsed from possible drug use, sustaining a 2.5 cm laceration on her head. This occurred at approximately 4 p.m. There was not a medical person available at the facility that could legally respond and triage the patient. The correctional staff, including the warden responded to the patient, and provided first aid, by placing pressure on the wound. They obtained a gurney and took the patient to the medical treatment room. While in the room the custody staff were attempting to locate gauze and other supplies to stop the bleeding. One of the staff there was a medication technician, a classification that is not used in California outside of the BOP systems. An ambulance should have been called to transport this AIC to the hospital, but instead, custody staff put the AIC in a vehicle and transported her to the hospital*."

**Objection**: All BOP staff are trained in Basic First Aid, Cardiopulmonary Resuscitation ("CPR"), and AED. If a medical emergency is announced, all available BOP staff respond. If health service staff are not on-site, the Lieutenant either has the clinical director's contact information and/or has the authority to activate 911. The average response for emergency responders in the Dublin area is ▮ minutes.

6) On page 52, the Special Master states, "*Although the medical experts were concerned about not having the appropriate level of clinical staff onsite to respond to emergencies, they would like to commend correctional staff, acting warden, and the medication technician for doing a good job under duress without appropriate staffing in the witnessed emergency*."

**Objection**: All BOP staff are trained in Basic First Aid, Cardiopulmonary Resuscitation ("CPR"), and AED. If a medical emergency is announced, all available BOP staff respond. If health service staff are not on-site, the Lieutenant either has the clinical director's contact information and/or has the authority to activate 911. The average response for emergency responders in the Dublin area is ▮ minutes.

7) On pages 52 – 53, the Special Master asserts, "*There did not appear to be a standard credentialing and privileging process for the facility. The human resource staff*

51

*was not clear on the process. She believed the credentialing process occurred from the regional office, but was unable to confirm. With the vacant Clinical Director position for the past three years, functions like peer review and provider evaluations did not occur. The medical experts were informed by the AHSA that he reviews the providers and the nursing staff documentation for quality and compliance. When questioned about his qualification to perform clinical reviews and/or evaluate the clinical staff, he stated he only looks to ensure they do not miss anything. It is clear the absence of this key position contributed to the poor health care that occurred at this facility. There was no clinical oversight by a qualified staff member. If it existed, then it failed to capture serious gaps in knowledge and diversion from standards of care. There were also concerns about the contract physician's practice and the fact that there were no other clinical staff that could provide clinical supervision to the Physician Assistant, who is also the HSA.*"

**Objection**: For BOP staff physicians, physician assistants, nurse practitioners, registered nurses, and dentists, the credential process is initially completed by Grand Prairie. The credentialing process is an administrative action verifying schooling, confirming the provider has an unrestricted license, and confirming the provider as has the necessary documents to perform the job they are hired for. This process is completed by the quality improvement nurse, who is also tasked with maintaining files, and ensuring the files are up to date. The clinical oversite for FCI Dublin was Dr. Hosseini, a Regional MAST Physician. Dr. Hosseini was delegated by the Regional Medical Director, the responsibility of oversight otherwise handled by a Clinical Director. In this capacity, Dr. Hosseini would take after-hour calls, review documents sent by BOP medical staff, approve or deny consultations, provide reviews of cases, and was available for follow-up inquiries from contract physicians or providers.

8) On page 61, the Special Master finds, "*Patients at FCI-Dublin were not provided timely access to care. This includes lack of timely access to all components of health care (e.g., medical, mental, dental, vision, diagnostic, and specialty services). In many cases, this population of patients had not been provided care and treatment for their serious health conditions. This resulted in delays in diagnosis and treatment, preventable pain and suffering, and demonstrable harm to patients.*"

**Objection**: As of April 15, 2024, only one CCC was overdue.