UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA    *ORIGINAL*

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

CALIFORNIA COALITION FOR WOMEN )
PRISONERS, et al.,             )
                              )          Motions Hearing
          Plaintiffs,         )
                              )
  vs.                         )          NO. CV 23-04155-YGR
                              )
UNITED STATES OF AMERICA      )
FEDERAL BUREAU OF PRISONS,    )
et al.,                       )
                              )
          Defendants.         )
_____)          Pages 1 - 110

                                         Oakland, California
                                         Friday, August 2, 2024


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:          ARNOLD & PORTER KAYE SCHOLER LLP
                         5 Palo Alto Square, Suite 500
                         3000 El Camino Real
                         Palo Alto, CA 94306
                   BY:   CARSON ANDERSON, ATTORNEY AT LAW

                         Arnold & Porter Kay Scholer LLP
                         Three Embarcadero Center, 10th Floor
                         San Francisco, California  94111
                   BY:   MARK RAFTREY, ATTORNEY AT LAW


          (Appearances continued next page)

Reported By:       Raynee H. Mercado, RMR, CRR, FCRR, CCRR
                   CSR No. 8258


     Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

**APPEARANCES CONTINUED**

```
For Plaintiffs:        ROSEN BIEN GALVAN & GRUNFELD LLP
                       101 Mission Street, Sixth Floor
                       San Francisco, CA 94105
                  BY:  KARA JANSSEN,
                       ADRIENNE SPIEGEL, ATTORNEYS AT LAW

                       RIGHTS BEHIND BARS
                       416 Florida Avenue NW , Suite 26152
                       Washington, DC 20001
                  BY:  OREN NIMNI, ATTORNEY AT LAW

                       CALIFORNIA COLLABORATIVE
                       FOR IMMIGRANT JUSTICE
                       1999 Harrison Street, Suite 1800
                       Oakland, CA 94612
                  BY:  SUSAN M. BEATY, ATTORNEY AT LAW

For Defendants:        OFFICE OF THE UNITED STATES ATTORNEY
                       901 Front Street, Suite 110
                       Helena, MT 59626
                  BY:  MADISON MATTIOLI,
                       ASSISTANT UNITED STATES ATTORNEY

                       United States Department of Justice
                       Federal Bureau of Prisons
                       7338 Shoreline Drive
                       Stockton, California  95219
                  BY:  ROBERT J. FRANCE, SENIOR ATTORNEY

                       United States Department of Justice
                       Federal Bureau of Prisons
                       Federal Correctional Institution
                       5701 8th Street - Camp Parks
                       DUBLIN, CALIFORNIA  94568
                  BY:  KRISTI SUTTORNEY, ATTORNEY ADVISOR


For Intervenors ACLU   ACLU of Northern California, Inc.
of Northern California 39 Drumm Street
Inc., The Appeal,      San Francisco, California  94111
Victoria Law,     BY:  JAQUELINE ARANDA OSORNO,
First Amendment        ANGELICA SALCEDA, ATTORNEYS AT LAW
Coalition:


                       --o0o--
```

# I N D E X

FRIDAY, AUGUST 2, 2024

**DEFENDANTS' WITNESSES**                                    **PAGE**

LOTHROP, WILLIAM W.

(SWORN)                                                    44

DIRECT EXAMINATION BY MS. MATTIOLI                          44

CROSS-EXAMINATION BY MR. NIMNI                              52

REDIRECT EXAMINATION BY MS. MATTIOLI                        59

RECROSS-EXAMINATION BY MR. NIMNI                            62

EXAMINATION BY THE COURT                                    63

--o0o--

```
 1    Friday, August 2, 2024                          1:00 P.M.

 2                      P R O C E E D I N G S

 3                           --o0o--

 4

 5         THE CLERK:  Calling civil case 23-4155-YGR,

 6    California Coalition for Women Prisoners, et al. versus United

 7    States of America Federal Bureau of Prisons, et al.

 8      Counsel, please state your appearances.

 9         MR. NIMNI:  Good afternoon, Your Honor.  Oren Nimni

10    for the plaintiffs.

11         THE COURT:  And when you come up, to the extent that

12    you all have designated who is arguing what portions of the

13    various things that are on calendar, if you would let me know.

14         MR. NIMNI:  Of course, Your Honor.  I will be arguing

15    on the motion to dismiss.  And to the extent the Court

16    requests any questioning of -- of Mr. Lothrop, who's here as a

17    witness, I'll be conducting that.

18      My colleague, Mr. Anderson, will be discussing the motion

19    to intervene.

20         THE COURT:  Okay.

21         MR. ANDERSON:  Good afternoon, Your Honor.  Carson

22    Anderson from Arnold & Porter.

23         MS. MATTIOLI:  Good afternoon --

24         THE COURT:  Hold on, Ms. Mattioli.  I see lots of

25    other lawyers over there.
```

```
 1              MS. JANSSEN:  Kara Janssen, counsel for plaintiffs.
 2   I will be here as needed, but I am not arguing either of the
 3   motions.
 4              THE COURT:  Okay.  Ms. Janssen, good afternoon.
 5       I see Mx. Beaty.  I see -- who else?  Just grab a mic.
 6                   (Off-the-record discussion.)
 7              THE COURT:  I see Mx. Beaty.
 8              MX. BEATY:  Yes.  Susan Beaty for the plaintiffs,
 9   Your Honor.
10              THE COURT:  And is there -- is that Adrienne Spiegel?
11              MS. SPIEGEL:  It is, yes.  Adrienne Spiegel for the
12   plaintiffs.  I'm also not planning to argue any of today's
13   motions.
14              THE COURT:  Okay.
15       And you are...?
16              MR. RAFTREY:  Mark Raftrey, Arnold & Porter.  Not
17   planning to argue any motions.
18              THE COURT:  Okay.  Your name is what again?
19              MR. RAFTREY:  Mark Raftrey.  Last name is
20   R-A-F-T-R-E-Y.
21              THE COURT:  Okay.
22              MR. RAFTREY:  Thank you.
23              THE COURT:  All right.  I saw some other people stand
24   up.
25              MS. ARANDA OSORNO:  Good afternoon, Your Honor.
```

```
 1    Jacqueline Arando Osorno for intervenors.  And I'll be arguing
 2    the motion to unseal.
 3              THE COURT:  Okay.
 4              MS. SALCEDA:  Good afternoon, Your Honor.  Angelica
 5    Salceda on behalf of the ACLU for intervenors.
 6              THE COURT:  Okay.  You all can take a seat at -- I
 7    don't care what side you want, but there are plenty of chairs
 8    up here.
 9              MS. ARANDA OSORNO:  Thank you, Your Honor.
10              THE COURT:  Ms. Mattioli, good afternoon.
11              MS. MATTIOLI:  Good afternoon, Your Honor.  Madison
12    Mattioli for the United States.
13              THE COURT:  Good afternoon.
14       Mr. France, I see you over there.
15              MR. FRANCE:  Good afternoon, Your Honor.  Robert
16    France also for the United States.
17              THE COURT:  And then is -- Kristi Sutton, is it?
18              MS. SUTTON:  Good afternoon, Your Honor.  Kristi
19    Sutton for the United States.
20              THE COURT:  Great.
21       And I take it we have our BOP official with us.
22              MS. MATTIOLI:  Yes, Your Honor.
23              THE COURT:  Okay.
24       All right.  We have a lot to do today so we'll get
25    started.
```

1        I would like to start with updates primarily from BOP.  So

2   I think that's probably you, Mr. France?

3            **MR. FRANCE:**  Yes, Your Honor.

4            **THE COURT:**  And then I don't care who comes up on the

5   plaintiffs' side, but maybe Ms. Janssen would be the

6   appropriate person.

7        All right.  Let me just bring up some information.

8        The Court, along with the parties, have been receiving the

9   weekly updates from Ms. Still.  I'm showing 126 unresolved

10  medical alerts.

11       Are those still unresolved, to your knowledge, Mr. France?

12           **MR. FRANCE:**  Yes, to my knowledge.  There are some

13  alerts that are time interval alerts that are dependent on

14  appointments to get lab works done at certain thresholds of

15  time down the road.

16       There are other alerts that need to be resolved that

17  depend on the last vaccination shot for hepatitis B.  So those

18  consist of about -- probably about half of the alerts that are

19  remaining.

20       And then --

21           **THE COURT:**  What about the other 60-plus?

22           **MR. FRANCE:**  Those are alerts that we're working

23  diligently to close.

24           **THE COURT:**  But they're still outstanding.

25           **MR. FRANCE:**  They're still outstanding, that's

```
 1        correct.

 2                THE COURT:  And they're not resolved.

 3                MR. FRANCE:  Presently they're not resolved, but

 4        they're being attended to.

 5                THE COURT:  I show 63 MAT alerts.  What is the status

 6        of those?

 7                MR. FRANCE:  In -- in some instances, Your Honor, I

 8        know that our agency has sent strike teams to facilities to

 9        assist with triaging medical care as needed.  I can't speak to

10        the specifics of those alerts any more than that --

11                THE COURT:  All right.

12                MR. FRANCE:  -- at this time.

13                THE COURT:  Then I need updates.

14                MR. FRANCE:  Understood.

15                THE COURT:  When can you get it to me?

16                MR. FRANCE:  I can send you an email over the weekend

17        if that's to the Court's pleasure.

18                THE COURT:  I show 39 still unresolved mental health

19        alerts or mental health issues that have not been resolved.

20                MR. FRANCE:  Your Honor, my understanding of the

21        alert system is the alert system was only put in place for

22        medical alerts and not mental health alerts.

23                THE COURT:  Well, maybe "alert" was the wrong word

24        then.  You're getting the same spreadsheet I am, correct?

25                MR. FRANCE:  Yes.
```

1          **THE COURT:**  Okay.  So you know that there's a column

2     with the mental health issues or AICs who are identified.

3     I've got 39 still outstanding that have not been resolved,

4     correct?

5          **MR. FRANCE:**  Yes.  Well, that's -- that may be true,

6     Your Honor.  Our medical team is working with the Special

7     Master to resolve specific issues.  I know that in some cases

8     that there is some discrepancy on getting alerts removed if --

9     if AICs have been released or gone to halfway houses.

10        In some cases, the Special Master had insisted that there

11     needed to be notification even if they weren't in our

12     custodial care.

13         **THE COURT:**  How many of those 39 does that represent?

14         **MR. FRANCE:**  I don't have a specific number on that,

15     Your Honor.  I know that generally speaking from my

16     conversations with our health services chief and other people

17     that are on her team that have their weekly conversations with

18     the Special Master.

19         **THE COURT:**  So it's not zero, right?

20         **MR. FRANCE:**  That's probably a fair presumption, but

21     I don't have specifics on that number.

22         **THE COURT:**  Do you have any updates, Ms. Janssen?

23         **MS. JANSSEN:**  We are in contact with -- with class

24     members from the rosters to confirm whether or not actions

25     were taken as appropriate to clear these alerts.

1          We are collecting declarations on that which we can

2     provide to the Court as needed or in any other form.

3          We have a lot of concerns because we have been hearing

4     from individuals, whose alerts have been cleared, that at

5     least for some of those people, they have not seen anyone or

6     are unclear how that happened.

7          While there may be an explanation for that, we have a lot

8     of questions about exactly how this process is taking place

9     and, specifically, if people are being seen, because we are

10    hearing from individuals that they are not actually being seen

11    in all cases by medical before these alerts are cleared.

12         In addition, we are continuing and have been of course

13    conveying these to the Special Master as appropriate to

14    receive concerns from people who, while they may have been

15    seen initially immediately after transfer by mental health,

16    have struggled to be seen or access services since then and so

17    would, of course, greatly appreciate an update on those

18    efforts as well.

19         In addition, we continue to get questions from folks about

20    the property claim forms that were submitted at this point,

21    you know, a month or more go, as well as issues with their

22    case reviews, credits, management variables, and other things

23    that individuals believe are impacting their ability to move

24    to other institutions or to halfway houses in which they

25    believe may be in retaliation.

```
1          Those are the various issues that we remain concerned

2     about.

3               MR. FRANCE:  So I'd like to speak to that if I could,

4     Your Honor.

5               THE COURT:  Well, sure.  We can move to that one.

6               MR. FRANCE:  Yeah, just generally speaking,

7     plaintiffs' counsel has --

8               THE COURT:  Hold on.

9               MR. FRANCE:  Okay.

10              THE COURT:  I show, according to the last

11    spreadsheet, 137 remaining outstanding issues with respect to

12    property claims.

13              MR. FRANCE:  Yeah, I think that number is probably

14    around 148 or 149.  And we have a person in our office that's

15    dedicated to doing that.  But that individual is also

16    responsible for other property claims in the western region.

17    So those are being investigated in the normal course.

18       There's a possibility that if everybody were to submit a

19    property claim, we could have upwards of 600 claims on top of

20    the claims that she is responsible for doing.

21              THE COURT:  Well, I'll just remind you that none of

22    this would have happened but for BOP's own conduct --

23              MR. FRANCE:  Yes.

24              THE COURT:  -- and their inability to create a

25    process to transfer these individuals where perhaps none of
```

1    this would have happened in the first instance.

2        So you can have your normal course, but I still have

3    137 outstanding issues with respect to property from the

4    closure that happened a few months ago.

5        So what is the timetable for resolving those?

6        **MR. FRANCE:**  I can speak to this.  The AICs have up

7    to a year to make a property claim submission under the

8    statute.  There is no --

9        **THE COURT:**  137 have already been made.  Those are

10   the ones I'm asking about.

11       **MR. FRANCE:**  Yes.  Well, those have to be handled

12   individually so it's on a case-by-case basis.

13       **THE COURT:**  How long?

14       **MR. FRANCE:**  I would say minimally, Your Honor, at

15   least six months because there's a lot of claims there and

16   there'll be a lot more.

17       I'm trying to be sensitive to the fact that, again, we

18   have limited personnel to work on that.  I know that may not

19   be persuasive to the Court, but there's just practical

20   realities with that that we have to deal with.

21       **THE COURT:**  You're also asking to dismiss this case

22   because everything is hunky-dory and everything's been fixed.

23   And apparently you're sitting here and you're telling me you

24   can't even resolve property claims for six months.  Yet you

25   don't want to have this case pending.

```
1            MR. FRANCE:  Your Honor, when it -- with respect to

2    the property claims, there is no time frame on when those need

3    to be resolved by statute.  So handling those in the normal

4    course --

5            THE COURT:  Perhaps -- perhaps by statute.  So now I

6    have to give you an order by which to resolve it.  That's what

7    you're telling me.

8        Since you don't have a statutory deadline, and BOP caused

9    the problems themselves, that what you're saying is "I can do

10   it in six months, but I don't have to do it in any given

11   amount of time."  So what you're telling me is that I have to

12   give you a deadline by which to resolve this.

13           MR. FRANCE:  I'm -- I'm just saying, Your Honor, that

14   we're doing it as fast as we can, but in addition to resolving

15   those claims, we also have to resolve the claims from the

16   other institutions in the west, and we're trying to triage

17   that as best as we can.

18           THE COURT:  I understand.  And "In the meantime,

19   Judge, dismiss the case."  Right?  That's what you're saying,

20   too.

21           MR. FRANCE:  Yeah, yes.  But this is --

22           THE COURT:  Yes.

23           MR. FRANCE:  This is unrelated to that.

24           THE COURT:  It's not unrelated.  It's all integrated.

25       But we'll get to the motion to dismiss, Ms. Mattioli.  You
```

1    don't have to sit up in your seat.  I can see you.  I'm a

2    parent.  I can see out of the back of my head just like you

3    can.

4        All right.  We're going to keep going about all of the

5    things that are still outstanding in light of the motion to

6    dismiss.

7        At the beginning of July, I ordered you to give me an

8    update with respect to compassionate release requests.  There

9    were eight adults in custody who were at Dublin who brought

10   these requests because of the sexual abuse specific

11   allegations.

12       They were filed back in 2023.  I understand additional

13   ones were filed in 2024.  What is the status of all of those

14   requests that stems precisely from the allegations giving rise

15   to this lawsuit?

16           **MR. FRANCE:**  Some of those have been closed, Your

17   Honor.  And I can give you the names of those in a separate

18   correspondence.  And some are still pending review.

19           **THE COURT:**  How many?  There's eight at issue.  Do

20   you have a number?

21           **MR. FRANCE:**  I believe there is eight -- I believe

22   there were 11 at issue for 2023.  I believe three are

23   resolved.  And I think there are eight still at issue or seven

24   still at issue for 2023.

25           **THE COURT:**  When are they going to get resolved?

1          **MR. FRANCE:**  The -- the team is working diligently to

2     investigate those and to make a decision.

3          Some of those decisions are pending upcoming criminal

4     trial next year.  And some of that information is tied up with

5     OIG and the FBI.

6          And some, I believe, are being routed to the director's

7     office for review as well.

8          But we --

9          **THE COURT:**  Do you know the number?

10          **MR. FRANCE:**  -- closed -- we closed a number in early

11     July.

12          **THE COURT:**  Do you know the number which fall into

13     each of those categories?

14          **MR. FRANCE:**  In early July, I can tell you the

15     number.  I have it on my computer, but I don't have it in

16     front of me.

17          **THE COURT:**  Okay.  Well, pull it up while you're

18     sitting and Ms. Mattioli is up here, whenever she gets up

19     here.

20          **MR. FRANCE:**  Sure.  Sure.

21          **THE COURT:**  There were additional ones filed in 2024.

22     Do you know what the number is of those?  And, again, I'm

23     talking about the ones that were specifically related to

24     sexual abuse allegations from Dublin.

25          **MR. FRANCE:**  Yes, I have that on a spreadsheet.  I

1    can give you an update on that as well.

2        **THE COURT:**  With respect to the disciplinary due

3    process violations, as you know, the number that were

4    previously reviewed, the western region hearing administrator

5    reviewed all of the disciplinary actions taken by FCI Dublin

6    during the period of January 1, 2024, through the closure date

7    of May 1, 2024.

8        There were 552 disciplinary actions written up by FCI

9    Dublin officers.  A total of 120, that is, 22 percent were

10    expunged.  So what is the status of the AICs classification

11    level time credits, earnings and release dates?

12        **MR. FRANCE:**  So that's being communicated to our

13    western correctional program's administrator for dissemination

14    into the various regions in the Bureau of Prisons for

15    correction.

16        As I indicated to the Special Master still in a separate

17    correspondence, if an AIC has a year or less on their

18    sentence, their program review normally happens within 90

19    days.  It's been about 90 days since facility closure.

20        And I would estimate those updated numbers would be

21    incorporated into the next team's review for ones that have

22    more than a year on their sentence.  Those happen

23    approximately every 180 days.  And so those will happen in

24    their normal course as well.

25        I would submit, Your Honor, that for ones where they're

1    getting expungement of good conduct time -- and that's not all

2    of the incident reports at play.  Several are UDC reports

3    where there's no good conduct time taken.  But for ones that

4    are more than a year, it's not going to have an appreciable

5    effect on their release date because they would have had to

6    lose an extraordinary amount of good conduct time for that to

7    be moved up that dramatically.

8        But there is a process of communicating that to the

9    appropriate people and disseminating it out to the field.

10           THE COURT:  Well, given that 22 percent were

11   expunged, I then asked that the review next happen for the

12   2020 to 2023 time frame given all of the misconduct that

13   happened at Dublin.  What is the status of those additional

14   reviews of all of those disciplinary incidents?

15           MR. FRANCE:  So I was told by Ms. -- the regional

16   discipline hearing administrator that in a separate

17   conversation with the Special Master over the past week, that

18   she wanted the regional discipline hearing administrator to

19   focus on AICs with release dates through the balance of 2024

20   and then proceed to 2025.

21       I saw a spreadsheet of approximately several hundred AICs

22   that would need to be reviewed in order to fall in that time

23   line of the balance of 2024, 2025, 2026.

24       Some of those AICs have 12 incident reports.  And so that

25   requires the discipline hearing administrator to go through

```
 1    each of them individually and go through the process of seeing

 2    what, if anything, requires the incident report to be

 3    expunged, and then through -- go through the normal reporting

 4    mechanism.

 5        That's one person that's doing that, in addition to having

 6    to review all the other ones in the office for the other

 7    institutions in the west.

 8            THE COURT:  Again, a major problem, major issues, all

 9    resulting from the conduct that occurred by Dublin officers

10    and correctional staff.

11        And yet, again, you want me to dismiss this case because

12    apparently everything's working and everything's done.

13        Clearly still major issues to be resolved.  And

14    accountability.  We are very far from having resolution of

15    issues that occurred out there and making sure that these

16    individuals who could have been harmed in lots of different

17    ways and perhaps are receiving time that they shouldn't or at

18    least are potentially being incarcerated with release dates

19    that may be impacted.

20            MR. FRANCE:  And we're --

21            THE COURT:  It's just -- it's just -- I have to tell

22    you, it is -- it strains credulity for this motion to have

23    been filed given everything that is outstanding.  It strains

24    credulity.

25        But we'll keep going.
```

1    How many PREA investigations are outstanding with respect

2    to actions taken at Dublin?

3        **MR. FRANCE:**  So we estimated about 42 or 43.  What we

4    did proactively is if there was any investigation that was

5    still open when the AICs left Dublin, we reset the clock on

6    that to zero days and made that effective July 1st so there

7    would be 90 additional days of monitoring.  And that's ongoing

8    at their current facilities to make sure there's no

9    retaliation.

10        **THE COURT:**  And when are those going to get resolved?

11        **MR. FRANCE:**  Well, presuming there's no issues that

12    emerge in the 90 days, then that would put us at the end of

13    September.

14        But we didn't have to do that.  But we did that as an

15    extra added measure of precaution.

16        **THE COURT:**  I have 101 outstanding

17    transportation-related issues that have not been resolved.  Is

18    that right, approximately?

19        **MR. FRANCE:**  Approximately.  Yes.

20        **THE COURT:**  And when are those getting resolved?

21        **MR. FRANCE:**  Those were forwarded, as you saw from

22    some of the correspondences that I sent to -- to chambers,

23    those were forwarded to the Office of Internal Affairs for

24    investigation.  Beyond that, I can't speak to where those are

25    in the investigative process.

1      I did connect Ms. Still with somebody that reports

2  directly to Ms. Reese's office.  Should she have any specific

3  questions on that, she can raise those with that individual.

4      But as far as I can tell you, Your Honor, those are under

5  investigation, and I can't provide the Court any more

6  specifics on those.

7          **THE COURT:**  But unresolved.  Right?

8          **MR. FRANCE:**  As far as I know, the investigation is

9  ongoing and a determination has not been made.

10          **THE COURT:**  Did you personally draft the declaration

11  for Mr. Lothrop?

12          **MR. FRANCE:**  Yes, I had input in that.  That's

13  correct.

14          **THE COURT:**  You and who else?

15          **MR. FRANCE:**  Myself and the U.S. Attorney's Office

16  for the District of Montana.

17          **THE COURT:**  The Court has found in its preliminary

18  findings that all of the issues with respect to medical,

19  mental health, and -- and then I didn't find it with respect

20  to the transportation or property issues, but certainly with

21  respect to mental health and medical, that those -- that had

22  this case gone to trial immediately, there would have been a

23  likelihood of success by the plaintiffs with respect to their

24  claims.

25      You rely on Mr. Lothrop's declaration to argue that there

```
 1    are no more constitutional conditions.  And yet none of these

 2    things have been fully resolved.

 3        So did you share with him before he signed this

 4    declaration that there were 126 medical alerts outstanding,

 5    63 MAT alerts -- or not alerts but MAT indicators outstanding,

 6    39 mental health outstanding, compassion -- and then

 7    everything else we've gone through?

 8        Did you share all of that data with him?

 9            MR. FRANCE:  Yes.  He's generally aware that there

10    are issues that we're working through at other institutions.

11    But as you'll hear in argument, there are some distinctions

12    that we would like the Court to consider.

13            THE COURT:  Okay.  Well, let's move to that.

14        I take it Ms. Mattioli's coming to the stand.  So you can

15    go back and find the other information for me.

16            MS. MATTIOLI:  Your Honor, if I may just --

17            THE COURT:  You may not yet.

18            MS. MATTIOLI:  Okay.

19            THE COURT:  First, the government -- or the BOP, I

20    should say.  I won't say the government given that different

21    government branches are serving in different capacities in

22    this particular case, given all the criminal indictments.

23        The BOP argues, based in part on this declaration which is

24    all of one page, that the case is moot.  We'll start there.

25        Is it moot?
```

1          **MR. NIMNI:**  No, Your Honor.  And I'm happy to walk

2     through a couple of different things -- couple of different

3     reasons why.

4          Starting with the declaration, and we can address some of

5     the issues with the declaration, but starting with the

6     declaration, it's almost irrelevant to the issue of mootness.

7          The declaration mostly speaks to -- I believe the thrust

8     of the declaration is that there are presently no plans to

9     reopen FCI Dublin as a facility that would house female adults

10    in custody.

11         Now, there are reasons why -- there are problems with the

12    declaration, but whether or not that's true, there are ongoing

13    problems for the same plaintiffs, the same class members

14    incarcerated by the same defendants under the same policies,

15    and that's just not the stuff of mootness.

16         The issues are ongoing.  This Court is well aware of that

17    from the testimony even back in the preliminary injunction

18    hearing where officials from BOP also testified, from the

19    Special Master's report, from the weekly updates.  All of

20    these things indicate that the same plaintiffs are being

21    harmed by the same defendants, and that doesn't equal

22    mootness.

23         Now, as to the declaration itself -- and maybe we'll learn

24    more of this if Mr. Lothrop is questioned -- but even on its

25    face, it's not clear to me that this binds the BOP in any way

1    to any particular sort of behavior, that there's been any

2    policy or administrative changes that bind the BOP in any way.

3    And it doesn't seem to address in any way the ongoing

4    medical issues, risk of sexual assault, risk of retaliation.

5    It's -- the mootness argument boils down to the same

6    argument that BOP has been making since we filed this case

7    almost a year ago, which is, you know, at first it was, okay,

8    it's only a couple of officers.  Then it was, okay, it's some

9    officials.  Then it was, okay, it's the higher level

10    officials.  Then it's, okay, it's the facility.  And it's

11    always "and now everything is okay."

12    And that's just not what the evidence bears out.  And at

13    the very least, it's a case that should go forward to trial,

14    and the evidence should be presented and a fact finder should

15    be able to determine whether those constitutional issues that

16    we raised and that this Court found a likelihood of success on

17    have been resolved or whether they haven't.

18    Right now it's clear that they haven't.

19            **THE COURT:**  Why is it moot?

20            **MS. MATTIOLI:**  Your Honor, the legal argument as to

21    why it's moot is that the conditions of confinement claims

22    that were raised in plaintiffs' complaint that were litigated

23    through the preliminary injunction, through the evidentiary

24    hearing, and in the amended complaint relate to unique

25    conditions of confinement at FCI Dublin.

```
1              THE COURT:  Well, how have you shown to me that it is
2    unique?
3              MS. MATTIOLI:  There is no evidence that it is not.
4    There is no evidence in the record that --
5              THE COURT:  If you cannot -- you can't clear any of
6    these outstanding issues at any of these facilities.  You
7    still haven't been able to clear them.
8              MS. MATTIOLI:  Your Honor, some of them have been
9    cleared.
10             THE COURT:  Some --
11             MS. MATTIOLI:  A great number of them have --
12             THE COURT:  But not all.
13             MS. MATTIOLI:  Not all.
14             THE COURT:  Well, then how's it moot if you've not
15   done it all and have given me no assurance whatsoever as to a
16   timetable when they will be resolved?
17             MS. MATTIOLI:  I believe Mr. France was able to say
18   within six months.
19             THE COURT:  Well --
20             MS. MATTIOLI:  Maybe --
21             THE COURT:  -- maybe in six months I'll dismiss it as
22   moot.  But we're not at six months.  And you've given me zero
23   assurance.
24        I'm looking at the staffing reports in these other
25   facilities.  He tells me he's got one person doing some of
```

1    these things for the entire country.  That's not moot.

2         **MS. MATTIOLI:**  Your Honor, I think it goes back to

3    the nature of the alerts that remain to be cleared.  This

4    Court --

5         **THE COURT:**  It's not moot if it's ongoing and

6    outstanding.  It is not resolved.  How is there any

7    accountability whatsoever?  How would there be any

8    accountability?

9      By the way, Congress is asking the same question.

10        **MS. MATTIOLI:**  And they did just pass legislation

11   that will increase oversight of the prisons.

12        **THE COURT:**  Because there hasn't been sufficient

13   accountability.  And yet you would like this Court to just

14   wipe its hands clean and let you go on your merry way -- not

15   you personally, but the BOP -- with respect to all of those

16   hundreds of individuals who are out there.

17        **MS. MATTIOLI:**  The BOP understands this Court's

18   position.  The government understands this Court's position

19   and the public's perception of this being an escape from

20   accountability.  But that's not what it is.  It is a coequal

21   branch of government.

22        **THE COURT:**  You are not a coequal branch of

23   government.  The BOP is not a branch.

24        **MS. MATTIOLI:**  I understand, Your Honor.

25        **THE COURT:**  Right?

1        **MS. MATTIOLI:**  But they are --

2        **THE COURT:**  The executive is a branch, and the

3    executive branch is actually prosecuting people at the BOP.

4        **MS. MATTIOLI:**  The BOP, through their director's

5    office, made a decision to remedy issues in the facility by

6    closing it.  There were issues unique to Dublin that we all

7    know --

8                    (Simultaneous colloquy.)

9        **THE COURT:**  -- of those issues have been resolved.  I

10   agree.  What I don't agree with is how you can stand there and

11   tell me that it is all resolved such that it is legally moot.

12       **MS. MATTIOLI:**  I don't think -- I don't think that's

13   the government's position, Your Honor.  We're not saying that

14   all of the medical alerts are cleared.  That's not -- nowhere

15   in Mr. Lothrop's declaration does it say all of the alerts

16   have been cleared.  What it says is --

17       **THE COURT:**  What you have argued -- you have argued,

18   quote, "There has been no showing that plaintiffs are likely

19   to succeed improving nor have they alleged that

20   unconstitutional conditions persist at other BOP facilities."

21       **MS. MATTIOLI:**  That's true.  The -- some of the

22   medical alerts are for routine preventative medical care.

23   It's not a violation of the Constitution for that routine

24   preventative care to take a little bit longer due to the

25   triage of prioritizing inmates and AICs with more

 1   significant --

 2                  (Simultaneous colloquy.)

 3        **MS. MATTIOLI:**  -- medical conditions.

 4        **THE COURT:**  I've seen no analysis of the outstanding

 5   issues by the BOP.  You've not given me any analysis of that.

 6   You gave me a one-page declaration by someone who said, "Yeah,

 7   we closed Dublin."

 8      By the way, I know that.  I could have taken judicial

 9   notice of it.

10      And "maybe we won't open it again."  Okay.  That doesn't

11   give me any assurance of anything whatsoever other than maybe

12   you won't open it again.

13        **MS. MATTIOLI:**  I understand, Your Honor.  And I -- I

14   think based on our receipt of the tracking spreadsheets and

15   my -- our understanding of the -- the amount of alerts that

16   have been cleared in a relatively short amount of time and the

17   nature of the outstanding alerts, like Mr. France said, some

18   of the alerts can't be cleared until six months has passed so

19   somebody can get a second booster of a vaccine.

20        **THE COURT:**  I am particularly concerned about there

21   are some severe medical issues still outstanding.  I'm

22   concerned about the mental health issues in particular.  These

23   mental health issues stem directly to what was happening out

24   there.

25      And yet, I still hear complaints -- I have hundreds of

1    letters from people who are still struggling.  And -- and I am

2    not saying -- because I understand at some point, you know,

3    we'll get to a point.  But to claim at this -- at this

4    juncture, three months after you closed, that you've mooted

5    everything?  Like I said, it strains credulity.

6        **MS. MATTIOLI:**  I think, Your Honor, it just goes back

7    to the distinction that we -- we have not claimed that there

8    is no -- that there are no outstanding issues.  That has never

9    been the claim.

10       The claim is that subject matter jurisdiction rests on

11   there being a live case or controversy which stems from the

12   allegations in the complaint.

13       Nowhere in the complaint do they mention other facilities.

14   Nowhere in the complaint do they mention staffing ratios at

15   FCI Danbury or SeaTac.  We have memos that we're receiving

16   from plaintiffs' counsel that we have done a -- a scratch of

17   the surface to find gross inaccuracies in what is being

18   represented to the Court and the Special Master through those

19   memos.

20       **THE COURT:**  So why aren't you -- why don't you want

21   to go to trial?  I offered to take this case to trial in

22   October.  You refused.

23       So you ready to go to trial?  If there's nothing, then are

24   you ready to go to trial, Ms. Mattioli?  I'll finish up my

25   four-month criminal trial and turn this courtroom into a

1    different trial venue.

2         MS. MATTIOLI:  I think it's important to remember --

3    to understand also that in providing the weekly spreadsheets

4    to the Court and the Special Master, BOP is committed to

5    clearing the alerts.  BOP is unified in the goal that the

6    Court has, which is to ensure that the fallout from the

7    closure of FCI Dublin goes no further than necessary.

8         Closing the facility is a measure of accountability.  It

9    is an acknowledgment that there were issues there that,

10   despite enormous expenditure of resources and staffing changes

11   and training and consulting groups and upgraded cameras, they

12   could not solve the cultural problem that persisted in that

13   facility.

14        Out -- not to mention the lack of medical care that was

15   exacerbated by the reputation of the facility, that was

16   cultivated over years.  There are community providers who are

17   unwilling to provide care to a female population because of

18   the fear of having allegations of sexual assault raised

19   against them.

20        This -- this exact situation has never happened in the

21   history of the Bureau.  And they -- they did everything they

22   could to fix that issue.

23        The next step in the playbook was to close the facility,

24   relocate the AICs to other more successful institutions that

25   have the staffing, including medical staff, to address those

 1    issues.

 2        No -- no facility is fully staffed.  The agency -- there

 3    is a shortage.  There is -- we cannot dispute that.  But there

 4    are no facilities that I am aware of that community providers

 5    are refusing to treat the AIC population because they don't

 6    want to lose their medical licenses.

 7            **THE COURT:**  So this is all news to me.  This is --

 8    there's -- there has been -- the representations that you just

 9    made are nowhere in the record.  Nowhere.  So you may be

10    right, but that's not in the record anywhere.

11            **MS. MATTIOLI:**  I believe I have made references, Your

12    Honor, to the lack of community providers being willing to

13    treat this population.

14            **THE COURT:**  I have not heard any evidence to that

15    effect.

16            **MS. MATTIOLI:**  Okay.  I think it's important to

17    understand the argument that the government and the BOP is

18    making is not that everything is fine, don't look any further,

19    we've got it under control.

20        There was an acknowledgment by the agency that the issues

21    at that facility, highlighted in part through this litigation

22    and the evidentiary hearing, the FBI raid and removal of the

23    executive staff for the umpteenth time, those things changed

24    the course of the decision-making in the agency.

25        It was not preplanned in order to deprive the court of

```
 1    jurisdiction.  If that were the case, they would have done it
 2    a long time ago.
 3         THE COURT:  Well, I -- I can appreciate that you can
 4    acknowledge that the BOP is acknowledging that issues are
 5    still outstanding.  That part of your statement we agree on.
 6      What we don't agree on is the second part of your
 7    statement.  Because by bringing a motion to dismiss, you are
 8    in fact arguing that no one need look any further, you have it
 9    all under control, and so therefore the case should be
10    dismissed.  You are arguing that.
11         MS. MATTIOLI:  I think what we're arguing, Your
12    Honor, is that there are -- there are policies in place.  The
13    constitution requires a level of care in those other
14    facilities.  And absent a specific allegation and evidence
15    that those facilities are failing to adhere to policy or meet
16    those standards, like I said, the clearing of an alert that
17    requires somebody to have a teeth cleaning, that is not an
18    unconstitutional condition of confinement.
19      Serious medical needs have been treated because that's
20    what BOP policy and the Constitution require.
21         THE COURT:  Again, you've given me nothing in the
22    nature of a specific analysis with respect to specific issues.
23    Nothing.  All you gave me was a one-page declaration from that
24    gentleman over there.  That's all you gave me.
25         MS. MATTIOLI:  And the purpose of providing that
```

1    declaration, Your Honor -- I understand your point and the --

2    we would be able to provide the additional analysis to you

3    based on the spreadsheets, the nature of the alerts that

4    remain outstanding and our analysis of whether or not the lack

5    of those alerts being cleared is a violation of the

6    Constitution.  Our position is that it is not.

7            **THE COURT:**  That's not what you did, Ms. Mattioli.

8            **MS. MATTIOLI:**  I understand.

9            **THE COURT:**  Any response?

10           **MR. NIMNI:**  Just briefly, Your Honor.

11       A lot of what Ms. Mattioli is discussing is extra record

12   evidence.  It's not appropriate to evaluate at a motion to

13   dismiss.  Many of the arguments that Ms. Mattioli is making

14   would be appropriate to come out as evidence at trial, and

15   then a finder of fact could evaluate whether those conditions

16   are actually unconstitutional.

17       This is a case largely about Dublin, but also we named the

18   director of the BOP.  This is also an agency case because

19   there are policies that directly informed what was going on at

20   FCI Dublin or were not being properly enforced at FCI Dublin.

21       And just to bring it back to the standard that we're on

22   here at a motion to dismiss, *West Virginia vs. EPA* lays out

23   what the court needs to consider, the government's high burden

24   in moving for mootness when -- by voluntary cessation of their

25   activity.  And in *West Virginia vs. EPA*, the EPA said

1    another -- the EPA, another executive agency, said, oh, you

2    know, all of our -- even though we've litigated this case

3    saying that everything we've been doing was fine, now this

4    case is moot because we've -- you know, we've changed course.

5        And the Supreme Court made very clear that the consistent

6    litigation position that everything that they were doing was

7    constitutional and fine meant that there was nothing

8    preventing the EPA there and the BOP here from going back to

9    the exact same behavior.

10       There've been no policy changes.  There have been some --

11   like medical alerts have been cleared.  Some things have

12   happened.  Those are all record evidence that might come out

13   at trial.

14       But right now what we have is -- I appreciate the

15   acknowledgment that things are not going okay at BOP and that

16   they weren't going okay at Dublin.  But that wasn't the

17   litigating position of BOP throughout the entirety of this

18   case until closure.

19       The litigating position of BOP was there are no

20   constitutional issues at Dublin and that there continue to be

21   no constitutional issues with medical care, retaliation, and

22   risk of sexual assault at FCI Dublin.  That was, from day one,

23   BOP's litigating positions until closure.  And they haven't

24   changed that or reversed that in any meaningful way.  And that

25   is the crux of voluntary cessation mootness.

1     So, you know, perhaps some of this evidence is true.

2   Perhaps it's not.  The Court is getting a lot of evidence

3   through the Special Master and through weekly updates and

4   reports.  All of those would inform summary judgment and trial

5   after discovery.

6     **MS. MATTIOLI:**  Your Honor, if you go back to the

7   first amended complaint and plaintiffs' claims that this is a

8   case against BOP, we named BOP, there's two references in the

9   hundreds of paragraphs about being transferred to other

10   facilities in retaliation.  I understand their position that

11   the closure changed the nature of the complaints in this case

12   but that's not how litigation works.

13     They, in their complaint, sued the BOP for its failures to

14   manage FCI Dublin and the AIC population therein.  That's what

15   the evidence that this preliminary injunction was granted on

16   consisted of, were the unique conditions of confinement at FCI

17   Dublin.

18     In order for the closure to not moot those claims, there

19   has to be a reasonable expectation that those AICs will be

20   transferred back, that those same conditions will exist again,

21   which is the purpose of Mr. Lothrop's declaration is to show

22   that that cannot happen.

23     Also when we're talking about them -- when they're saying

24   that they're challenging policies, and BOP's in charge of

25   policy, that is not what they were challenging.  Nowhere in

1    the amended complaint do they challenge as unconstitutional a

2    single BOP policy.  They challenge the implementation or lack

3    thereof of the policies in this specific facility.

4        To say that they've received complaints from AICs who've

5    been transferred elsewhere, that is also not record evidence.

6    There is no evidence -- there's no allegation in the complaint

7    that they're challenging a nationwide policy that would apply

8    to other facilities.  And there is no evidence to support that

9    this population will ever return to FCI Dublin or that those

10   conditions will again resume.

11       **THE COURT:**  All right.  Identify for me, to the

12   extent that you disagree with what Ms. Mattioli just said,

13   identify for me where in the complaint it shows otherwise.

14       **MR. NIMNI:**  Of course, Your Honor.

15       So paragraphs 8, 60 through 70, 71 through 105,

16   258 through -62, 263 through -67.

17       And I agree -- I don't -- I don't want to misrepresent

18   plaintiffs' position.  We're not trying to litigate the

19   conditions of confinement at every single BOP facility.

20       Who we represent is the certified class of plaintiffs here

21   who are affected by the conditions at FCI Dublin that were

22   allowed by BOP.  And at the preliminary injunction hearing,

23   many officials from FCI Dublin testified, but also higher

24   level officials from BOP testified.  And one of the main

25   pieces of testimony was, for example, Beth Reese's testimony

```
1    where she said as a categorical rule BOP-wide, we do not

2    investigate, at her office, claims of retaliation, that those

3    are left to the individual facilities.

4        And that was part of the argument of why retaliation

5    claims were swept under the rug at FCI Dublin.

6            MS. MATTIOLI:  Your Honor, if I may --

7            MR. NIMNI:  Additional --

8            THE COURT:  Hold on.

9            MS. MATTIOLI:  That misstates the testimony just a

10   bit.

11           THE COURT:  I said hold on.

12           MS. MATTIOLI:  Okay.

13           THE COURT:  Do not interrupt.

14           MR. NIMNI:  Additionally, Ms. Mattioli made a series

15   of references of what's in the record and what's not in the

16   record.  This is a motion to dismiss.  It's defendant's burden

17   to show that the case is moot through voluntary cessation.

18   It's an extremely high burden.  They have not met it with this

19   declaration.

20       We have the same plaintiffs incarcerated by the same

21   defendants.  That just isn't mootness.  If -- if this record

22   evidence that Ms. Mattioli -- if Ms. Mattioli wants to

23   challenge class members' experiences of what's going on in BOP

24   custody or advance the evidence that she's discussing about

25   what each medical alert means, that is perfectly fine, but
```

1    that's something that should come out through discovery.  Then

2    we can have summary judgment briefing.  Then we can have

3    trial.

4        It's just completely inappropriate at the motion to

5    dismiss stage, particularly in a case, though, where we

6    actually do have a lot of evidence.  We have evidence from the

7    preliminary injunction hearing, from the Special Master, from

8    the weekly updates, from BOP itself about experiences that the

9    class members are having as a result of what happened in FCI

10   Dublin and a result of the BOP transfer of those class members

11   that are unresolved.

12       **THE COURT:**  So why isn't this better resolved on

13   summary judgment where you can say, here's the status, here's

14   the evidence, these 150 -- 126 alerts are all medical -- or

15   dental appointments for teeth cleaning.  If that's in fact

16   what it is, which I am not sure I would agree with you as I

17   sit here.

18       **MS. MATTIOLI:**  The government filed a motion to

19   dismiss based on Mr. Lothrop's declaration based on its

20   understanding that what it needed to prove in order to

21   establish -- to overcome the voluntary cessation exception to

22   mootness was that there was no reasonable probability that the

23   challenged conduct could recur.

24       The closure of that facility and the second highest

25   ranking official in the agency saying it will never reopen to

1   house female AICs meets that burden, especially when

2   considering the presumption of good faith that is afforded to

3   governmental entities when they change policies and take

4   action.

5           THE COURT:  Are you saying there's a policy change?

6           MS. MATTIOLI:  It --

7                   (Simultaneous colloquy.)

8           THE COURT:  Are you saying there's a policy change?

9           MS. MATTIOLI:  There isn't a policy change but --

10          THE COURT:  Okay, then don't say there is.

11          MS. MATTIOLI:  As a general matter, Your Honor, when

12   governments change policies or take action in response to

13   litigation, so long as it is done in good faith, the court,

14   under the law, must presume that it is in good faith unless

15   there's evidence to the contrary.

16          THE COURT:  I don't know you, Mr. Lothrop, but I have

17   to tell you I am a little -- I've sentenced too many BOP

18   officials to take anything without a grain of salt.

19   Nothing -- nothing against you personally, though.

20       And the record will reflect that he acknowledged by

21   shaking his head in an affirmative-type -- affirmative-type

22   way.

23          MS. MATTIOLI:  I think the agency understands the

24   position that the Court is in.  The agency understands --

25          THE COURT:  Well, you should also understand that I

1    never -- and I said this at the outset.  You all remember, at

2    the very beginning I said I had no interest in running Dublin.

3    But we do what we have to do.  That's our obligation as

4    judges.  We do what we have to do.

5        So I have no interest in -- in the job that many of my

6    colleagues have who have run some of these state facilities

7    for decades.  That's not my goal.

8        But my goal is to make sure that what we started is

9    finished and is finished properly.  And I am not about to find

10   that it is over and done without full accountability with

11   respect to the issues that we started here.  So that's my

12   position.

13       Mr. Nimni, you gave an example of Ms. Reese.  Are there

14   other policy failures that you're arguing in this case?

15           **MR. NIMNI:**  All of the policy failures that we're

16   arguing about, Your Honor, are either -- are simply BOP

17   policy -- I mean we named the director, we named the Bureau of

18   Prisons because -- and we heard from other Dublin staff that

19   occasionally their hands were tied by BOP policy.

20       And so a lot of the relief that we've requested, for

21   example, things like a third-party confidential reporting

22   mechanism, which now in some respects exists with the Special

23   Master's email despite some of the issues that have been going

24   on there.

25       Those sorts of things would be -- my understanding is

1   those communication mechanisms are designated at a BOP or

2   regional-wide level as far as whether those reporting

3   mechanisms are allowed or exist, and so the relief would run

4   against the BOP.

5            **MS. MATTIOLI:**  Your Honor, Ms. Reese has provided

6   three declarations in this case.  And her testimony at the

7   evidentiary hearing was that it used to be that OIA would not

8   routinely engage in retaliation claims.

9        With the reorganization of OIA and the policy change that

10  took that chain of reporting from the local facility and put

11  it with her office, when it came to FCI Dublin, all

12  allegations against staff of any nature were taken by OIA and

13  not handled at the local level.

14       What she was referring to in that testimony was just as a

15  general matter, if there were a standalone retaliation

16  complaint, which there rarely is, it would not rise to the

17  level of something that her office would investigate.  But

18  when it comes to FCI Dublin, those cases are all referred.

19       And that is happening at the local institutions, the

20  receiving institutions, because that's what is required by BOP

21  policy.

22       Any allegations of retaliation that are being raised by

23  former AICs that were at Dublin at their new facilities are

24  being referred and investigated.

25            **THE COURT:**  Do you want to respond, Mr. Nimni?

1          **MR. NIMNI:**  As to the last point, that's not my

2    memory of the testimony.  We can -- we're happy to submit the

3    portion of the -- of the PI transcript just to clear things

4    up.

5          As far as what's going on at the new facilities, once

6    again that's evidence that I don't believe is in the record

7    and is inappropriate to rely on at the motion to dismiss

8    stage.

9          We have, you know, relief that would run against the BOP.

10   We have allegations that BOP lack of oversight over Dublin

11   allowed a number of these things to happen.

12         And, you know, as telling, as I mentioned before, the

13   government's position -- or BOP's position was, up until the

14   closure in this court that everything is fine.

15         And I also have nothing against you, Mr. Lothrop.  But

16   your declaration --

17         But Mr. Lothrop's declaration is not definitive.  There's

18   no policy change.  There's no rule making.  There's no

19   internal memoranda that it addresses about how things are

20   going to change.

21         All it says is there are no immediate plans to open FCI

22   Dublin and it wouldn't reopen as the type of facility that

23   would house female AICs.  And BOP is able to presently care

24   for its female AIC population and anticipates the ability to

25   do so in the future.

 1          It's a lot of qualifying language.  It doesn't bind a

 2     future BOP in a new presidential administration to any of

 3     these things.

 4          And to the extent that Ms. Mattioli thinks that this case

 5     isn't about the specific plaintiffs incarcerated by the

 6     defendants but is rather about the building of FCI Dublin, if

 7     that is the world that we're -- if that's the world that we're

 8     operating in, then there's no reason that whoever gets

 9     reincarcerated there, whether it be men or women, wouldn't be

10     subject to the exact same lack of medical care, risk of

11     retaliation, risk of sexual assault.

12          Now none of that evidence is in the record because this is

13     a motion to dismiss.  And we're --

14          **THE COURT:**  And what authority do you have for the

15     proposition that absent a policy change or rule making, the

16     BOP doesn't qualify for a voluntary cessation exception?

17          **MR. NIMNI:**  I would rely on *West Virginia vs. EPA* and

18     also *FBI vs. Fikre*.  So both of those are cases where an

19     agency claims to voluntarily cease its activity.  In *Fikre*,

20     which was a case about the sort of no-fly list, there a

21     high-level official did submit a declaration and the

22     Supreme Court said a declaration just that you're not going to

23     do this isn't enough.  There needs to be something more

24     that -- to meet this high bar that binds the agency so that we

25     don't think that this is reasonably expected to happen in the

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    future, particularly considering -- and now we're on

2    *West Virginia vs. EPA* -- particularly considering that this

3    has been their litigation position from day one that

4    everything was fine.  There's nothing in this declaration that

5    means that BOP couldn't revert to that exact same position.

6            **THE COURT:**  Do you -- do you have a response with

7    respect to the case law?

8            **MS. MATTIOLI:**  I do, Your Honor.

9        Those -- in each of those cases, especially *Fikre*, the --

10   the issue that hung up the court was the quality of the

11   declaration.  There's a lot of terms like "vague," "sparse."

12   Mr. Lothrop is here.

13           **THE COURT:**  Well, the reason he's here is because it

14   was pretty vague, it was pretty generic, and it was only one

15   page.  So do you want to bolster and call him to the stand?

16           **MS. MATTIOLI:**  I would, Your Honor.

17           **THE COURT:**  All right.  Come forward, sir.

18       And you'll have an opportunity to cross.

19       Ms. Mattioli, you can move over to the other podium.

20       And courtroom deputy will put you under oath.

21           **THE CLERK:**  You can go ahead and step into the

22   witness box.

23

24   / / /

25   / / /

1        **WILLIAM W. LOTHROP,**

2   called as a witness by the defendants, having been duly sworn,

3   testified as follows:

4            **THE WITNESS:**  I do.

5            **THE CLERK:**  Thank you.

6            **THE COURT:**  All right.  Good afternoon.

7            **THE WITNESS:**  Good afternoon.

8            **THE COURT:**  You may proceed.

9            **MS. MATTIOLI:**  Thank you, Your Honor.

10           **THE COURT:**  And why don't you state your name and

11  spell your last name for the record.

12           **THE WITNESS:**  It's William Lothrop, L-O-T-H-R-O-P.

13                     **DIRECT EXAMINATION**

14  BY MS. MATTIOLI:

15  **Q.**  Good afternoon, Mr. Lothrop.  Thank you for being here.

16      What is your current position?

17  **A.**  Deputy director.

18  **Q.**  Of...?

19  **A.**  The Bureau of Prisons.

20           **THE COURT:**  Okay.  I think maybe moving that mic up.

21  We had a witness here who was having issues with the mic.

22      All right.  Let's try that again.

23      Deputy director --

24           **THE WITNESS:**  Deputy Director of the Federal Bureau

25  of Prisons.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   BY MS. MATTIOLI:

2   Q.   Thank you.

3           THE COURT:   Much better.   Thank you.

4   BY MS. MATTIOLI:

5   Q.   How long have you been in this role?

6   A.   Two years.

7   Q.   And how did you come to be in the role?

8   A.   I started in November of 1992 as a correctional officer

9   and worked my way up through the ranks as a lieutenant,

10  captain, associate warden, warden, regional director, and then

11  deputy director.

12  Q.   And what -- what does the deputy director of the Federal

13  Bureau of Prisons do?

14  A.   So I oversee the operations of 120 prisons.   I supervise

15  the regional directors who are -- that are supervising those

16  wardens in those facilities.

17       I also provide information to the director.   I take in

18  information from the -- the regional directors of ongoings of

19  the institutions, discuss them with the director.   And my main

20  job to provide the resources that the RD's, the regional

21  directors, need for the facilities.

22  Q.   Are you involved in decision-making?

23  A.   Yes.

24  Q.   And how are you involved in decision-making?   What does

25  that look like?

1    **A.**  High-level decision-making, not necessarily at the

2    institution level or the regional level, but -- at central

3    office level when -- you know, those decisions that affect the

4    entire agency.

5    **Q.**  Would that include the decision to temporarily close a

6    facility?

7    **A.**  Yes.

8    **Q.**  And when the agency is considering a temporary closure,

9    can you explain what that means and what you consider?

10   **A.**  So we take into consideration what resources that we've

11   already provided the -- and what -- what the issue is.  So we

12   had to individualize that for each facility.

13          **THE COURT:**  Can you remind me, when did you become

14   deputy director?

15          **THE WITNESS:**  July of 2022.

16          **THE COURT:**  Okay.  Thank you.

17   **BY MS. MATTIOLI:**

18   **Q.**  And just to stop you briefly, would it be fair to say that

19   when you began your position, you -- did you understand what

20   was going on at FCI Dublin?

21   **A.**  Not fully.  Not fully.  You know, was aware of, you

22   know -- in very general what was -- what was taking place.  I

23   was a regional director at the time.  So there was some

24   communication at the table at our execs team meetings.

25          So I caught -- I knew in general what was going on.

1          **THE COURT:**  Regional director of what area?

2          **THE WITNESS:**  Southeast region.

3     BY MS. MATTIOLI:

4     **Q.**  And I interrupted you when you were discussing

5     considerations.  I -- I'd like to back up.

6          Has BOP ever closed a facility?

7     **A.**  Yes.

8     **Q.**  And can you give the Court an example, a general example,

9     of what would lead to that decision?

10    **A.**  We individualize.  We try to come to the -- get to the

11    bottom of what's going on at the facility.  Obviously it's --

12    it's not a decision that's taken lightly whatsoever.  It's --

13    it's a very difficult decision to -- to close a facility

14    because there's so many things that need to be taken into

15    account.

16         But so we individualize it, figure out what resources that

17    we can provide in order not to close it.  The goal is not to

18    close.  But when we get to a point where we realize we need to

19    close the facility, that's -- that's -- that's what we have to

20    do.

21    **Q.**  So what are some examples -- and we can now talk

22    specifically about FCI Dublin -- of resources that you know

23    personally the agency devoted to not closing the facility?

24    **A.**  So there were several administration changes there,

25    wardens, associate wardens.  We added additional positions

1    there.  When we did get a warden in that requested additional

2    positions, additional monitoring in the evenings and things

3    like that, so we provided additional positions in the way of

4    an additional associate warden, captain, and some other --

5    other positions that we gave them.

6       We had switched out a large number of the department

7    heads, the other supervisors in the facility.  We sent task

8    force and audit teams and other resources that -- to go in and

9    do interviews, and -- and to assess the facility.

10      We had a third party, the Moss Group, that had come in for

11   them the look at what issues that were at the facility and

12   kind of guide us in a -- in a direction because what we've --

13   what we had done up to that point was not working.

14   **Q.**  So I want to turn to the declaration and the statement

15   that you made.  And paragraph 6 says, "BOP had been seriously

16   exploring the closure of FCI Dublin over the past couple of

17   years."

18      And that's sort of what you just described.

19   **A.**  Yes.

20   **Q.**  And the next sentence -- the next line says, "As mounting

21   challenges suggested that meeting expected standards might not

22   be possible, including most recently the removal of several

23   executive staff members on March 11th, 2024."

24   **A.**  Yes.

25   **Q.**  Can you describe the mounting challenges that suggested to

1   you the measures you had attempted to implement were not

2   working and the agency needed to do something else?

3   **A.**  It was continued -- the same -- we kept hearing the same

4   thing over and over again, the retaliation, the sexual abuse,

5   the infrastructure issues that were there.  And those just

6   continued to grow and grow until it got to the national level,

7   which it got to my level.  And that's -- we knew we had to

8   address those concerns.

9   **Q.**  And then the next -- I'm going to go back up to

10  paragraph 4.  It says, "The BOP has no immediate plans to

11  reopen FCI Dublin absent first addressing factors that have

12  caused previous issues."

13      Why -- why did you say that BOP has no immediate plans?

14  **A.**  Those -- some of those contributing factors for closing

15  the facility still remain at that facility.  And some of them

16  are out of our control.  Local community health care providers

17  are outside of our control.  We can dump as much recruiting

18  effort as we can into the facility.  If we can't staff the

19  facility to an acceptable level, we can't -- we couldn't be

20  able to reopen it.

21  **Q.**  What about the factor that you have listed, aging

22  infrastructure, environmental and safety concerns, what needs

23  to be done in order to address those factors?

24  **A.**  So we had a security assessment that was completed a few

25  weeks ago.  Last week we had an architectural and engineering

1    firm come in and do a infrastructure survey, audit for us so

2    that we could determine what infrastructure needs that

3    facility has.

4        We haven't received those final reports yet.  I expect

5    them, you know, any time now.

6    **Q.**  Do you have a rough estimate based on any assessments that

7    were done in the past what it might cost the agency to repair

8    those issues?

9    **A.**  Rough estimate, it would be in the tens of millions of

10   dollars to repair that facility.

11   **Q.**  And is it your statement that BOP will not reopen

12   FCI Dublin until those issues are addressed?

13   **A.**  That's correct.

14   **Q.**  And the last thing that you say in your declaration.

15   Assuming the infrastructure, safety, and environmental issues

16   can be addressed, will the agency ever use this facility to

17   house female AICs?

18   **A.**  No.  The issues in the community still exist.  It would be

19   the same staffing -- staff that would be there.  And the

20   issues still are there.  And I think it's -- it's rooted in

21   that culture of the facility.

22       And even removing that entire population and putting a new

23   one in I don't think would resolve those issues.  So, no, we

24   will not be putting another female population at FCI Dublin.

25   **Q.**  Do you have precedent in the agency for that approach, to

1  switch the population if you reopen?

2  **A.**  Yes.  We've done that at both USP Atlanta and USP Thomson,

3  Illinois.

4  **Q.**  And why is it -- why is it necessary to change the

5  population when you reopen?

6  **A.**  When we -- when we close the facility, we -- we go do

7  intensive training.  Train the staff back to the basics-type

8  training, advanced training and communication.  And then we

9  also send them out TDY to other facilities so that they can

10  work at other facilities alongside facilities that are -- that

11  are successfully being run and to basically get a taste of how

12  a facility should run when it is running appropriately.

13       So that's the course of action.  And then we bring them

14  back with a lower security -- normally a lower security AICs.

15  **Q.**  The last thing I would like you to clarify, if you could.

16  There's been some references to it being a temporary closure.

17  Why does the -- in light of what you said, "We need

18  assessments, we need to do repairs," why are we calling it a

19  temporary closure?

20  **A.**  So the Bureau of Prisons has the authority to temporary

21  close and we have the authority to assign the population to a

22  facility, what population we would like housed at that

23  facility.  However, we don't have the authority to permanently

24  close a facility.  We have to seek congressional concurrence

25  with that.

1    **Q.**  There are formal steps that need to --

2    **A.**  There's formal steps, yes.

3    **Q.**  Have any of those formal steps been taken?

4    **A.**  No, they haven't.  Not yet.

5          **MS. MATTIOLI:**  Okay.  That's all I have.

6          **THE COURT:**  Cross.

7                          **CROSS-EXAMINATION**

8    **BY MR. NIMNI:**

9    **Q.**  Good afternoon, Mr. Lothrop.

10   **A.**  Good afternoon.

11   **Q.**  Just a couple of questions for you.

12        When was the first time you became aware that BOP was

13   exploring the closure of FCI Dublin?

14   **A.**  I can't definitively put an answer, put a date on that.

15   It has been years.  Even prior to me taking this role and even

16   before I was a regional director in the southeast region, I

17   was a warden in the western region, and there was -- there was

18   talks about it then.

19   **Q.**  Okay.  So a long time.

20        And have you ever been involved in a prison closure

21   before?

22   **A.**  Yes, I have.

23   **Q.**  Which prison?

24   **A.**  USP Thomson, USP Atlanta.

25   **Q.**  And how did you first learn that there were discussions of

1  closing FCI Dublin?

2  **A.**  I think the first time that I learned -- the communication

3  about it when it was first talked about, I was the warden

4  in -- in Phoenix, and the regional director at the time was

5  discussing some options with the wardens.

6  **Q.**  And I believe you testified and also in your declaration

7  said that the reasons for discussing closing FCI Dublin were

8  aging infrastructure and also staff misconduct, including

9  sexual assault and retaliation; is that correct?

10  **A.**  Correct.

11  **Q.**  And I believe you just testified that during your tenure

12  as deputy director, those conditions continued to grow and

13  grow worse; is that correct?

14  **A.**  Not at Dublin.  By the closure of Dublin, that -- that

15  minimized -- or not minimized -- um, we hit -- you know, we

16  hit the -- the point where we felt as if we could do nothing

17  more at Dublin except close the facility.

18      That was the increasing amount of medical appointments in

19  the community that the -- the care providers were refusing.

20  We couldn't send, you know, any more exec staff than we

21  already had to the facility.  We were increasing incentives

22  and intention -- intention bonuses -- retention bonuses,

23  excuse me, and we just couldn't get staff to the facility.

24      We were doing the best we could.  We started TDY'ing

25  employees from other facilities to come to Dublin to work.  We

1    were bringing in resources like the regional employees to come

2    to the region and work.  And that's just -- it wasn't

3    sustainable.

4    Q.  At what point did you become aware that the conditions at

5    FCI Dublin had not improved concerning medical care?

6    A.  I think early 2024, February, March, somewhere in that

7    time frame, is -- is when we realized that, you know,

8    certainly right after the FBI raid and that exec staff and

9    when those exec staff were -- were removed, I -- we felt we

10   had no other choice.

11   Q.  And what about the condition -- at what point did you

12   become aware that the conditions at FCI Dublin had not

13   improved concerning sexual -- risk of sexual assault?

14   A.  I don't know that I can speak on behalf of knowing that it

15   was increasing, decreasing.  It was always prevalent, meaning

16   that it was continuously being brought up in the news.  There

17   was always a new story every couple months.  It seemed like

18   somebody else was -- was going into -- you know, that was

19   convicted.  So it just continued to resurface over that period

20   of time.

21   Q.  And the same question for retaliation.  At what point did

22   you become aware that the risk of retaliation against AICs for

23   reporting misconduct had not significantly approved --

24   improved at FCI Dublin?

25   A.  I don't think I can speak that it hadn't improved or

 1    didn't improve, but we continued to hear that people were

 2    being retaliated against.

 3    **Q.**  Are you aware that the Bureau of Prisons litigation

 4    position up until the closure of FCI Dublin was that there was

 5    no risk of sexual assault at FCI Dublin?

 6    **A.**  I didn't.

 7    **Q.**  I'm sorry, I didn't hear.

 8    **A.**  I did not.

 9    **Q.**  And are you aware that the BOP's litigating position was

10    that there was no unconstitutional risk of retaliation up

11    until the closure of FCI Dublin?

12    **A.**  I did not.

13    **Q.**  And are you aware that the BOP's litigating position was

14    that there were no unconstitutional deficiencies in medical or

15    mental health care at FCI Dublin?

16    **A.**  I did not.

17    **Q.**  And you spoke a little bit before about the closure

18    process.

19    **A.**  Yes.

20    **Q.**  Has BOP issued any internal memoranda concerning the

21    closure -- the decision to not reopen FCI Dublin as a women's

22    facility?

23    **A.**  The -- no, we have not released any documents.

24    **Q.**  Has the BOP issued any proposed rule-making concerning FCI

25    Dublin and the plans to not reopen it as a women's facility?

1  **A.**  No, not at this time.

2  **Q.**  Other than your declaration, has the BOP bound itself to

3  not reopening FCI Dublin as a women's facility?

4  **A.**  No.

5  **Q.**  And you spoke before about other facility closures that

6  you'd been involved in.  It was USP Thomson, and what was the

7  other one?

8  **A.**  USP Atlanta.

9  **Q.**  USP Atlanta.  Were either of those facilities closed in

10  the middle of litigation?

11  **A.**  No.  I don't believe so.

12  **Q.**  But FCI Dublin was closed one week after the Special

13  Master was appointed in this case; is that correct?

14  **A.**  Correct.

15          **THE COURT:**  Did that impact the decision?

16          **THE WITNESS:**  No.

17  **BY MR. NIMNI:**

18  **Q.**  At what point was the final decision made?

19  **A.**  The final decision was made, like I said, February or

20  March.

21  **Q.**  Before the FBI raid?

22              (Simultaneous colloquy.)

23          **THE WITNESS:**  I believe in February.

24      There was discussions of closing the camp in February.

25  The FCI, I'm not sure whether it was February or March.

1  BY MR. NIMNI:

2  **Q.**  And in January when the preliminary injunction hearing was

3  going on in this case, were you aware that FCI Dublin would

4  likely close?

5  **A.**  The decision hadn't been made, but we had been talking

6  about it, yes.

7  **Q.**  And I believe you spoke about the staff at FCI Dublin.

8  Are all of the staff, other than those who have been indicted

9  and convicted, that were working at FCI Dublin at the time of

10  the closure still employed by BOP?

11  **A.**  Yes.

12  **Q.**  And they're still paid by BOP?

13  **A.**  Yes.

14  **Q.**  And does anything prevent those same staff from working at

15  another BOP facility?

16  **A.**  No.  They would have to apply through the normal process.

17  **Q.**  And does anything prevent those same staff from working at

18  FCI Dublin were it to open again?

19  **A.**  No.

20  **Q.**  And I believe you said that if FCI Dublin were to reopen,

21  it would not reopen as a women's facility; that's correct?

22  **A.**  Correct.

23  **Q.**  So is it safe to assume that it would reopen potentially

24  as a men's facility?

25  **A.**  Yes.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   **Q.**  Is it BOP's position that male AICs are not subject to --

2   or cannot be subject to retaliation?

3   **A.**  No.  They can be.

4   **Q.**  Is it BOP's position that male AICs cannot receive

5   Constitutionally deficient medical care?

6   **A.**  Correct.

7   **Q.**  Is it BOP's position that male AICs cannot be at risk of

8   sexual assault?

9   **A.**  Correct.

10  **Q.**  If there were an administration change -- there's an

11  election coming up.

12  **A.**  Yes.

13  **Q.**  If there's an administration change, would anything bind a

14  future BOP to the position that you articulated in your

15  declaration to not reopen FCI Dublin until a certain -- until

16  certain metrics are met and definitely not as a women's

17  facility?

18  **A.**  Right.  BOP still maintains the authority of what -- what

19  population is housed at each facility.

20      I can't speak on a -- on a new administration coming in

21  and -- and what they're -- what they would choose to do with

22  it.

23  **Q.**  Okay.  So nothing would bind them?

24  **A.**  Not me.  I --

25  **Q.**  Okay.  Nothing further --

1   **A.**  Not sure of the question exactly, I guess.

2          **MR. NIMNI:**  Nothing further.

3                   **REDIRECT EXAMINATION**

4   **BY MS. MATTIOLI:**

5   **Q.**  I just wanted to clear up a point that Mr. Nimni made

6   because I was unclear.

7          I think what you said was that male AICs cannot be at risk

8   of sexual assault.

9   **A.**  No.  They can be.

10  **Q.**  Okay.  Can male AICs be retaliated against by staff?

11  **A.**  Yes, they can be.

12  **Q.**  Okay.  So why is it -- why did the director's office come

13  to the conclusion that a different population, that is, one of

14  male AICs, wouldn't experience what the female population

15  experienced there?

16  **A.**  I think there was other -- there was other factors there.

17  Like the medical care.  We're all aware that -- that the

18  female population requires specialty medical care that was

19  difficult for the agency and the community to -- to -- to

20  meet.

21         Male population is -- is less likely to have -- to need

22  those specific medical needs.  We feel that it's easier for us

23  to do that.

24         We feel that with the proper training and communication,

25  training that were given to the AIC -- or to the staff, I'm

1    sorry -- that a male population can succeed there.

2    **Q.**  Do you recall when the decision was made to close the

3    Dublin camp?

4    **A.**  I believe it was in 2023.  There was a vote amongst the

5    exec staff.  And it was put forth to close both the FCI and

6    the camp.  We deferred the FCI and we approved to close the

7    camp.

8            **THE COURT:**  So if officials from the BOP testified in

9    a way that suggested otherwise, that would have been a

10   misrepresentation to this Court?

11           **THE WITNESS:**  Your Honor, they wouldn't be aware of

12   that.

13           **THE COURT:**  Who was aware of that?

14           **THE WITNESS:**  That was amongst the executive staff,

15   which would be myself and director, the regional directors.

16           **THE COURT:**  Which regional director?

17           **THE WITNESS:**  Would be all of -- each of the regional

18   directors would have been in that meeting.

19   **BY MS. MATTIOLI:**

20   **Q.**  If I could help to clarify.  When you say "executive

21   staff," are you referring to the executive staff at the

22   institution?

23   **A.**  No.  I'm speaking about the executive staff at the

24   national level.

25   **Q.**  When would executive staff at an institution be notified

1   of a decision?

2   **A.**   There would be a timeline that was developed by our

3   legislative affairs group that would line out when the

4   notifications would be made.  And it would really depend on

5   the situation for the closure of when the notification would

6   be made.

7   **Q.**   How long would you estimate that it took to organize the

8   movement of AICs out of FCI Dublin?  How long was that being

9   worked out?

10  **A.**   We started soon after we -- the decision was made.  So in

11  March, we started to evaluate where they could be housed.

12  **Q.**   Were there any -- had you ever looked into that before to

13  preliminarily assess whether it could be done?

14  **A.**   I'm not sure.

15  **Q.**   Can you estimate what the cost to the agency of moving all

16  of the AICs was?

17  **A.**   No.  I couldn't put a cost on it.  It -- it was quite a

18  bit though.

19         **THE COURT:**   More than it cost to operate the

20  facility?

21         **THE WITNESS:**   Not more than it cost to operate the

22  facility, no.

23         **MS. MATTIOLI:**   That's all I have.

24

25

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

| | |
|---|---|
| 1 | **RECROSS-EXAMINATION** |
| 2 | **BY MR. NIMNI:** |
| 3 | **Q.** Hello again, Mr. Lothrop.  Just a few quick questions on |
| 4 | the timeline that Ms. Mattioli was asking you about. |
| 5 |     Can you just remind me when the decision to close FCI |
| 6 | Dublin was made? |
| 7 | **A.** I believe it was in March of 2024. |
| 8 | **Q.** Do you know when in March? |
| 9 | **A.** I don't recall, no. |
| 10 | **Q.** Do you know if it was early March? |
| 11 | **A.** Yes, I believe it was -- yes, early in March would have |
| 12 | been our exec staff meeting. |
| 13 | **Q.** And was that before the removal of the -- the most recent |
| 14 | removal of the executive team at FCI Dublin? |
| 15 | **A.** I don't -- I don't recall. |
| 16 | **Q.** Are you aware that on March 11th, counsel for BOP |
| 17 | represented to the Court that the staff -- the executive staff |
| 18 | at BOP was removed and that a new team has been put in place |
| 19 | and, quote, charged with developing a plan for the future of |
| 20 | the facility? |
| 21 | **A.** I'm aware that the exec staff was switched out, yes.  I'm |
| 22 | not sure what they testified in court. |
| 23 | **Q.** And are you aware that BOP and counsel for BOP at no point |
| 24 | in that March 11th notice to the Court indicated that the |
| 25 | facility may be closed? |

1    **A.**  I don't believe they would have known at that point.

2    **Q.**  All right.  Thank you, Mr. Lothrop.

3           **MS. MATTIOLI:**  I have no further questions, Your

4    Honor.

5                   **EXAMINATION BY THE COURT**

6           **THE COURT:**  So I have a question, a few questions

7    about this one-page declaration.

8        Did you review it before coming in today?

9           **THE WITNESS:**  Yes, I did.

10          **THE COURT:**  Okay.

11       This was filed on June 18th of this year.  As you know,

12   it's one page.  I can give you a copy if you need to look at

13   it.

14       When it was given to you by counsel, did you make changes?

15          **THE WITNESS:**  No, I didn't, Your Honor.

16          **THE COURT:**  So they drafted it.  You -- and did they

17   draft it after -- and don't tell me what was said, but after

18   meeting with them?

19          **THE WITNESS:**  Yes.

20          **THE COURT:**  And how many meetings did you have with

21   them?

22          **THE WITNESS:**  We had two meetings.

23          **THE COURT:**  How long did the meetings last?

24          **THE WITNESS:**  I don't recall how long but more than

25   an hour.

EXAMINATION BY THE COURT

1      **THE COURT:**  Each meeting lasted more than an hour?

2      **THE WITNESS:**  Each meeting, yes.

3      **THE COURT:**  And after each of those two meetings,

4  which lasted more than an hour, they drafted a one-page

5  declaration, you made no changes, and you signed it?

6      **THE WITNESS:**  Yes, Your Honor.

7      **THE COURT:**  Did you review -- have you reviewed any

8  of the spreadsheets that the Court has been receiving on a

9  weekly basis?

10     **THE WITNESS:**  I have not.

11     **THE COURT:**  Did you review any of the specifics of

12  the 126 medical alerts that are outstanding?

13     **THE WITNESS:**  No, I haven't.

14     **THE COURT:**  Have you reviewed any of the details of

15  the 63 -- there's a -- there's a MAT column -- of those issues

16  that are outstanding?

17     **THE WITNESS:**  No, I haven't.

18     **THE COURT:**  Did you review any of the specifics with

19  respect to the 39 individuals who still have mental health

20  issues?

21     **THE WITNESS:**  No, I haven't.

22     **THE COURT:**  So you have absolutely no idea as to the

23  details of that; do I understand that?

24     **THE WITNESS:**  Correct.

25     **THE COURT:**  So when you say that the BOP is presently

 1   able to care for its female AIC population, you say that not

 2   knowing the specifics of any of the information the Court has;

 3   is that right?

 4            THE WITNESS:  That's correct.

 5            THE COURT:  Did you review anything with respect to

 6   the Dublin-specific AICs before signing this one-page

 7   substantive declaration?

 8            THE WITNESS:  I don't recall what we did.  We

 9   reviewed some documents, but I don't know what -- I don't

10   recall what we -- we reviewed.

11            THE COURT:  Do you recall anything about those

12   documents?

13            THE WITNESS:  There was concerns about mental health,

14   medical help.  I knew that we were tracking, that we were

15   putting -- tracking things in place, tracking mechanisms in

16   place.

17       I had assigned a -- an employee that would track for us

18   out of central office certain aspects of the AICs that were

19   moved from Dublin to -- to other facilities.

20            THE COURT:  Okay.  What you do you mean by that?

21            THE WITNESS:  And that was the -- making sure that

22   they were seen by medical upon arrival, that their -- any

23   administrative remedies that they had put in followed them to

24   their new facility and were -- were getting the answers.

25       I knew there was -- I was told that there was -- made

1    aware of the issues with the property.  So those -- those

2    things were being tracked at the -- at this -- this person in

3    central office is tracking those for us.

4          **THE COURT:**  But my question is documents.

5          **THE WITNESS:**  Correct.

6          **THE COURT:**  What was it -- what was the nature of the

7    documents that you reviewed?

8          **THE WITNESS:**  I believe it was the -- the mental --

9    mental health needs and the medical needs that weren't being

10   met at Dublin.

11         **THE COURT:**  In what form did you review it?

12         **THE WITNESS:**  I guess I'm not --

13         **THE COURT:**  So you said you didn't -- you didn't

14   review the spreadsheet and you didn't review all of the

15   specifics.  So I'm trying to understand what kind of document

16   you might have been looking at prior to signing this

17   declaration.

18         **THE WITNESS:**  I'm not sure.  I'm not sure what -- I

19   can't recall what kind of document it was.

20         **THE COURT:**  Was it one document?

21         **THE WITNESS:**  And when I'm telling you I didn't

22   review the spreadsheets, I'm talking about in the last two

23   days I have not reviewed a spreadsheet.  It may have been on a

24   spreadsheet form when I signed that declaration.  There may

25   have been a spreadsheet form.  But the spreadsheets that I

1   testified to just now are the ones -- are you talking about

2   that I looked at in the last two days since I've --

3          THE COURT:  Well, I'm -- you signed this declaration

4   on June 18th.

5          THE WITNESS:  Correct.

6          THE COURT:  And you've made representations to me in

7   this declaration.

8          THE WITNESS:  Correct.

9          THE COURT:  And I want to know what it is you

10  reviewed prior to making these declarations.

11         THE WITNESS:  So medical and mental health documents.

12         THE COURT:  Like what?

13         THE WITNESS:  Like I said, I don't recall the type of

14  document.  It may have been that spreadsheet.  But I know

15  it -- it concerned mental health follow-ups and medical

16  follow-ups.

17         THE COURT:  So you don't know if it was an Excel

18  spreadsheet versus some other kind of form?

19         THE WITNESS:  I -- I don't recall.

20         THE COURT:  Who provided the documents to you?

21         THE WITNESS:  Our legal counsel.

22         THE COURT:  And did they review the documents with

23  you, or did you review them on your own?

24         THE WITNESS:  Yes, during the meeting we reviewed

25  them.

1    **THE COURT:**  Okay.  What else do you recall that you

2  reviewed?

3    **THE WITNESS:**  We looked at the -- they were

4  explaining to me what the document -- what we were requesting

5  in the document, which -- 'cause I -- obviously I didn't

6  understand what we were -- what the ultimate goal was for the

7  document which was understanding that Dublin is now closed,

8  that population has moved out, and explaining to me what --

9  what it meant to -- for the case to become mute [sic].

10    **THE COURT:**  When you -- how many facilities did you

11  move the female AICs to?

12    **THE WITNESS:**  I believe they went to seven

13  facilities.

14    **THE COURT:**  And prior to their arrival, did you

15  increase the medical staff at each facility?

16    **THE WITNESS:**  No.  We did not.

17    **THE COURT:**  Have you increased the medical staff at

18  those facilities since their arrival?

19    **THE WITNESS:**  There may be an increase in the hiring.

20  We may have hired more at those facilities.  I'm not sure at

21  each one if there was a -- we didn't personally add any

22  additional staffing to those facilities.

23    **THE COURT:**  So even though you had all these cost

24  savings from shutting down Dublin, you didn't increase the

25  medical staff or the mental health staff at any of the other

1   facilities?

2           **THE WITNESS:**  No.  So the ones that we moved them to

3   were open beds.  So those facilities are staffed at the

4   level --

5           **THE COURT:**  Aren't they all understaffed?

6           **THE WITNESS:**  They are understaffed only because --

7                   (Simultaneous colloquy.)

8           **THE COURT:**  So you sent them to understaffed

9   facilities and didn't increase the staffing.  Do I understand

10  that right?

11          **THE WITNESS:**  Correct.  Correct.

12          **THE COURT:**  Ms. Mattioli, any follow-up with respect

13  to my questions?

14          **MS. MATTIOLI:**  No, Your Honor.

15          **THE COURT:**  Mr. Nimni?

16          **MR. NIMNI:**  No, Your Honor.

17          **THE COURT:**  All right.  You may step down, sir.

18  Thank you.

19          **THE WITNESS:**  Thank you, Your Honor.

20          **THE COURT:**  Are you from DC?

21          **THE WITNESS:**  Yes.

22          **THE COURT:**  Well, at least our weather is better

23  here.

24          **THE WITNESS:**  I'm sorry?

25          **THE COURT:**  I said at least our weather is better

1    here.

2              THE WITNESS:  Yes, much cooler.

3              THE COURT:  Okay.  Let's move on.  We have a few

4    other things to discuss today.

5         Does anybody wish to be heard on the -- on the other

6    motion before we move to the motion to intervene, or do you

7    submit on the papers?

8              MS. MATTIOLI:  Nothing further from the government,

9    Your Honor.

10             MR. NIMNI:  Apologies, Your Honor.  Which other

11   motion?  There are so many motions.

12             THE COURT:  We had the -- we've got the motion to

13   intervene, the motion to unseal.  There were -- I thought

14   there was another motion with respect to Ms. Still.  There's a

15   motion to stay.  There are lots of motions that I will be

16   resolving.

17             MR. NIMNI:  Yes, Your Honor.

18        Just briefly on the motion regarding Ms. Still.  I think

19   this Court's July 1st order and July 3rd order -- I'm happy to

20   get into some of the deficiencies with the government's

21   motion, but, really, to save us all a lot of time, the Court's

22   July 1st order complies with the needs, narrowness,

23   intrusiveness standards of the PLRA, appoints Ms. Still --

24   reappoints Ms. Still as monitor, which is the normal course

25   for these cases.  And nothing in defendant's brief really

 1  addresses that order other than the needs, narrowness,

 2  intrusiveness standards.

 3      I do believe they make one point about whether or not this

 4  Court is able to reissue a 90-day preliminary injunction.  And

 5  I would just like to direct the Court's attention to a Ninth

 6  Circuit case from 2001, which is not in the briefing,

 7  *Mayweathers vs. Newland*.  The citation for that is

 8  258 F.3d 930, and the pin cite is 934.

 9      And there the Ninth Circuit makes very clear that under

10  the Prison Litigation Reform Act, a judge may either, once

11  preliminary relief expires, may either make that relief final

12  or may reissue or issue a new preliminary injunction as a

13  court has the inherent authority to do.

14      On the motion to stay --

15          **THE COURT:**  So I --

16      **MR. NIMNI:**  Oh, apologies, Your Honor.

17          **THE COURT:**  Go ahead.

18      **MR. NIMNI:**  On the motion to stay, we don't believe a

19  stay is necessary during this time.  We have a discovery

20  schedule.  We've issued document requests.  We're in the

21  process of trying to get those from defendants.  And we just

22  think this case should proceed on the course that was set by

23  this Court so that we can get towards trial.

24          **THE COURT:**  A permanent injunction wouldn't issue

25  until trial.  Typically what I do anytime I have a request for

 1   injunctive relief -- we get lots in IP cases.  I took a major

 2   antitrust case from preliminary motion to trial in eight

 3   months.  And I've offered to resolve this issue at trial on an

 4   expedited -- on an expedited calendar.

 5       I understand that both parties have refused that offer.

 6   And again, because the BOP is the one under the injunction,

 7   I'll ask you again, do you wish to advance the schedule so I

 8   can get to a decision on a permanent injunction or not?

 9           **MS. MATTIOLI:**  Your Honor, we can take that under

10   consideration and let the Court know.

11       I just, as a minor point to all of this, the July 1st and

12   3rd orders came out while the motion to dismiss was pending.

13   The agency and the government have not fully evaluated the

14   position that we take as to those orders.  We rest on the

15   arguments that we made in the motion to dismiss, which is that

16   the PLRA, by its express terms, limits the period of

17   injunctive relief to 90 days.  It expired on June 15th because

18   it was not made final prior to that date.  That -- that's the

19   argument.

20       To the -- to the extent that the July 1st and 3rd orders

21   require an additional response, we intend to do that, and as

22   part of that response, may consider consenting to an expedited

23   docket.

24           **THE COURT:**  Okay.  Let's move to the motion to

25   intervene.

1          **MR. NIMNI:**  Thank you, Your Honor.

2          **THE COURT:**  And to unseal.

3      As a courtesy, we sent an email out advising that we would

4   go through these documents document by document.  And I did

5   that so that no one was surprised.  You should have them with

6   you because that's the plan.

7      Ms. Mattioli, are you arguing this?

8          **MS. MATTIOLI:**  Yes.

9          **THE COURT:**  So I understand that there are

10  13 documents that are now in dispute.  A number of them were

11  resolved, I thought; is that right?  Or no?  Yes.

12     So in civil litigation, civil litigators, I think, are

13  much more attuned to these issues, Ms. Mattioli, than lawyers

14  who come from the government side and do principally criminal

15  work.

16     You are required under the law, if you want me to keep

17  something sealed, to be very specific, and you failed to do

18  that.  Generic references are not sufficient.  Generic

19  arguments are not sufficient.

20     So we were moving very quickly.  And it is better to seal

21  and then unseal than to unseal something that should have been

22  sealed.

23     So we start at Docket 45-4.  This is Agostini's

24  declaration.  The fact that Agostini made a declaration is not

25  a sealable issue.

1    **MS. MATTIOLI:**  Understood, Your Honor.  In our

2    July 31st response, we submitted a declaration from Beth Reese

3    that covers the subject matter of this declaration.

4        **THE COURT:**  Everything in this declaration is not

5    sealable.

6        **MS. MATTIOLI:**  No.  There's a redacted version in the

7    docket.  The only portion of that docket --

8        **THE COURT:**  So 45-4, I -- it's our understanding that

9    you're still -- well, there is no highlighting.  There's --

10   it's -- I was under the impression that the 29-page document

11   you were still seeking to seal in its entirety.

12       **MS. MATTIOLI:**  No.

13       **THE COURT:**  All right.  Where on the docket?  Give me

14   a page and -- a document number and a page where you tell me

15   exactly what pages and lines you're seeking to seal.

16       **MS. MATTIOLI:**  In doc 40 -- excuse me, Your Honor.

17    Doc 46-1 has a redacted version of this declaration.  And

18   the only paragraphs that are redacted are on page 14,

19   paragraphs 36, 37, and 38.

20    The subject matter in those paragraphs is covered by the

21   declaration of Beth Reese that we submitted to the Court on

22   the 31st of this month.

23                    (Pause in the proceedings.)

24       **THE COURT:**  Okay.  So we're going to need some

25   clarity.  The briefing refers to 45-4 which is not

 1    highlighted.  It doesn't mention 46.  So you're saying that I

 2    need to look at 46?

 3         MS. MATTIOLI:  Your Honor, the under-seal version of

 4    that document is 45-4.

 5         THE COURT:  Right.  Which is -- which is the entire

 6    document.

 7         MS. MATTIOLI:  Okay.

 8         THE COURT:  Okay.  So that tells me that you're --

 9    currently the entire document is under seal.

10         MS. MATTIOLI:  Okay.  So the only information in 45-4

11    that needs to remain sealed is on page 14, paragraphs --

12    starting on page 14, paragraphs 36, 37, and 38.

13         THE COURT:  And where did you -- where is that

14    information?

15         MS. MATTIOLI:  Your Honor, I apologize for the format

16    of the chart.  I believe the -- the chart with updated

17    positions indicates that that's the approach, but it is not

18    outlined by page number or paragraph.  And I can do that for

19    the Court.

20         THE COURT:  So I'm supposed to read your mind,

21    Ms. Mattioli?

22         MS. ARANDA OSORNO:  Jacqueline Aranda Osorno, counsel

23    for intervenors, The Appeal, the ACLU of Northern California,

24    Victoria Law, and the First Amendment Coalition.

25         THE COURT:  So paragraph 36 relates to -- and I'm

 1    going to read line 16 -- I'm going to read lines 17 and 18.

 2    It says:  The following individuals are on administrative

 3    leave pending the results of sexual abuse investigation.

 4        That's what those two lines read.

 5            MS. ARANDA OSORNO:  Okay.

 6            THE COURT:  And then there are seven individuals

 7    listed and the dates upon which they were placed on leave.

 8        Why should that be in the public record?  Or maybe I don't

 9    know if you knew that or not.

10            MS. ARANDA OSORNO:  We did not know that that

11    specifically, Your Honor.  In part because the motion to seal

12    lacks -- the original motion to seal lacks specificity about

13    the content that the government was seeking to seal.

14        And the declaration that was submitted in support of that

15    original motion similarly had just very general assertions

16    about the type of information that was there.

17        So based on Your Honor's representation right now that the

18    information relates to the -- was it the names of the

19    individuals under investigation and the dates of when they are

20    placed on leave?

21            THE COURT:  Correct.

22            MS. ARANDA OSORNO:  I do believe that that's

23    information of public interest.  And I -- these are public

24    servants who have been accused of being part of a systemic

25    culture of sexual abuse that is beyond dispute.  Your Honor

1    clearly recognizes the severity of the issues underlying this

2    case.  And --

3         **THE COURT:**  Well, but they're not under federal

4    indictment.  That's not what this says.  It says that they're

5    on administrative leave.

6         **MS. ARANDA OSORNO:**  I think that -- I think the fact

7    that they're under -- that they are under investigation is a

8    matter of -- of public significance.

9         **THE COURT:**  Well, it's a matter of public interest.

10    I know you would all like to know it.  The question is whether

11    the law -- do you have any Ninth Circuit law that says that

12    the privacy interest of an employee's current status and an

13    employee's personnel issues are required to be in the public

14    record?

15         **MS. ARANDA OSORNO:**  At this -- well, first, Your

16    Honor, I will -- I would just like to state that it is

17    actually the government's burden to show that that privacy

18    interest is one that is protected by the law, and there's been

19    no specific briefing on this issue.  I do not have a Ninth

20    Circuit authority to support my argument now.  But as the

21    issue has not been briefed, I would request the opportunity to

22    brief that before the Court.

23         **THE COURT:**  Look --

24              (Simultaneous colloquy.)

25         **THE COURT:**  -- I'm in a four-month trial.  I actually

1    don't want to have to do this if I thought you all had done

2    this already.  So have you not gone line-by-line,

3    page-by-page?

4         **MS. MATTIOLI:**  We did, Your Honor.  And we -- we have

5    spent several hours going over the documents that were filed

6    under seal in this case.  The product of those meetings was

7    the exhibit that we did file.  And the government has agreed

8    that almost everything in the case should be unsealed with the

9    exception of the names of individuals who have not yet been

10   indicted.

11       And the Northern District of California submitted a

12   response to the Court's request.  That is not routinely

13   information that is shared with the public --

14        **THE COURT:**  The United States -- the United States

15   Attorney for the Northern District took no position on this

16   issue.

17        **MS. MATTIOLI:**  But did explain that the reputational

18   and privacy interests of individuals who have not yet been

19   charged is a reason that they don't disclose that information

20   in their proceedings.

21       We relied on that same reasoning in our response.  We have

22   not received the response on that.  As Jackie says, they

23   didn't respond to the argument that those are compelling

24   privacy interests.

25       And it probably would have been prudent to get the

 1   response before coming to talk about these -- I have a list of

 2   nine documents.  It's the government's position that that's a

 3   very narrow scope of -- and the only thing we seek to keep

 4   sealed.

 5          THE COURT:  Stop.  Left her finish coughing.

 6                 (Pause in the proceedings.)

 7          THE COURT:  Okay.  I'm looking at this chart of

 8   yours -- or that was filed at 351-1.  And this does not

 9   identify the specific lines and pages.  And if you don't

10   identify the specific lines and pages, then I can't hear from

11   the litigants.

12      So on page 14, I understand the request is for lines 19

13   through 25 only.  Correct?

14          MS. MATTIOLI:  One moment, Your Honor.

15          THE COURT:  And that is the officers' names and the

16   dates that they were placed on leave.

17          MS. MATTIOLI:  Including the footnote on line 28.

18          THE COURT:  On page 15, what lines are you

19   requesting?

20          MS. MATTIOLI:  Three, 4, and 7 through 28.

21          THE COURT:  With respect to 3 and 4, that just says

22   that allegations were found to be unsubstantiated and

23   unfounded.  And I believe that that information came out

24   during the hearing.

25          MS. MATTIOLI:  You're -- that's correct, Your Honor.

1    Those lines can be unsealed.

2           **THE COURT:**  So 7 through 28 relates to the status

3    of -- of Dublin -- or BOP employment with the officers that

4    were actually referenced in the complaint, so that you know.

5        What else -- then on page 16, it continues, so lines 1

6    through 9.  Or I should say 1, and then 3 through 9?

7           **MS. MATTIOLI:**  Correct, Your Honor.

8           **THE COURT:**  Line 2 relates to Officer Ramos who's

9    deceased.  So he has no privacy interest, given --

10       All right.  Anything else on this document?

11          **MS. MATTIOLI:**  No, Your Honor.

12          **THE COURT:**  So the Court will unseal everything

13   except for that.  And if you want to do a second round of

14   briefing, you can do a second round of briefing.  Okay.

15       With respect to 45-5, what lines specifically?  Again I

16   was under the impression based on the briefing that you're

17   seeking to seal the entirety of this -- of your opposition to

18   the motion for preliminary injunction.

19          **MS. MATTIOLI:**  Understood, Your Honor.  That was just

20   an error in docketing.  It was my understanding because there

21   is a redacted version in the docket, that this could remain

22   under seal because it's the same document as the public

23   version with the exception of the highlighted portion.  Which

24   is confusing and I apologize for that.

25       I -- we can go through the lines that we seek to keep

1    sealed.  They're very few in this document.  And the rest can

2    be unsealed.

3            THE COURT:  Is there a public version?  So there's a

4    public version of 45-5?

5            MS. MATTIOLI:  Yes.

6            MS. ARANDA OSORNO:  There is, Your Honor.  At -- I

7    believe it's at Docket 46.

8            THE COURT:  Okay.  So why are we talking about 45-5?

9            MS. ARANDA OSORNO:  That -- because that -- that is

10   the unredacted document that we are asking to see.

11           THE COURT:  You're seeking to -- okay.  So I don't --

12   I don't have -- you said it's at 46?

13           MS. ARANDA OSORNO:  That's right, Your Honor.

14                   (Pause in the proceedings.)

15           THE COURT:  So am I right then the first redaction

16   happens at page 15?

17           MS. MATTIOLI:  Yes, Your Honor.

18           THE COURT:  Then that's ECF 15 --

19           MS. MATTIOLI:  Yes.

20           THE COURT:  -- of 30?

21           MS. MATTIOLI:  So the corresponding line numbers in

22   45-5 on page 15 are 11 through 26.

23                   (Pause in the proceedings.)

24           THE COURT:  And this relates to all of the

25   allegations of the individuals who are cross-referenced in the

```
 1    prior document?
 2             MS. MATTIOLI:  Correct.
 3             THE COURT:  The grounds for unsealing are the same?
 4             MS. ARANDA OSORNO:  May I add something, Your Honor?
 5             THE COURT:  Sure.
 6             MS. ARANDA OSORNO:  I would just like to point out
 7    that the motion to seal the particular document that we're
 8    discussing right now is document 45 which was itself under
 9    seal and was only unsealed earlier this week.
10       So I just want to point to the recency of the availability
11    of information that intervenors have had to --
12             THE COURT:  So do you want -- do you want time to --
13             MS. ARANDA OSORNO:  I -- I don't.  I just -- I just
14    wanted to point that out and say that this motion to seal was
15    actually opposed by plaintiffs in Docket 47.
16       And plaintiffs have had the opportunity -- they've had the
17    benefit of seeing the proposed redactions.  And they have made
18    strong arguments for why those redactions should not stand,
19    including that much of this proposed seal information are
20    facts that were taken from plaintiffs' filings.
21             THE COURT:  Things were -- I'm sorry.  I did not hear
22    you.  I didn't hear the last thing you said.
23             MS. ARANDA OSORNO:  Yes.  That many of the facts that
24    the government wants to seal were actually -- are actually
25    public and were taken from plaintiffs' filings so....
```

```
 1              THE COURT:  All right.  Well, do I have a plaintiffs'
 2      attorney who can tell me what portions were taken from your
 3      filing?
 4         Can you come to the microphone.  I've got multiple up
 5      here.  And identify yourself again for the record.
 6              MR. ANDERSON:  Your Honor, this is Carson Anderson
 7      from Arnold & Porter.
 8              THE COURT:  So we're on document 45-5.
 9              MR. ANDERSON:  I think specifically are we discussing
10      page 10?
11              MS. MATTIOLI:  It's 15 of the ECF, but yes.
12              MR. ANDERSON:  Well, there's no ECF numbers on the
13      unredacted version, right?
14              THE COURT:  So page 10 of the document.
15              MR. ANDERSON:  Yes.
16              THE COURT:  Subsection C.
17              MR. ANDERSON:  Sure.  So just -- just looking at --
18      at this paragraph here, we can see quotes that are from
19      plaintiffs' complaint, and so that's an allegation that
20      plaintiff made so --
21              THE COURT:  So --
22              MR. ANDERSON:  -- that shouldn't be sealed, right?
23              THE COURT:  -- where --
24              MS. MATTIOLI:  Your Honor, for the -- for the sake of
25      time, the government concedes lines 11 through 13 -- I'm
```

1  sorry -- 11 through 14, stopping after the parentheses that

2  says docs 10 at 15 can be unsealed, that is information that

3  came from the plaintiffs' complaint.

4       THE COURT:  All right.  Let me just say this.

5  Anything that came from the plaintiffs' complaint will be

6  unsealed.  I just need to know what that is.  All right?

7  Everybody understand the order?

8       MS. MATTIOLI:  And for clarity, Your Honor, then that

9  does not include quotes from the paragraphs referenced in

10 45-4.  They sort of blend together.  I just want to make sure

11 there's not an inadvertent -- and I can -- I can give the

12 Court detailed --

13      THE COURT:  What you all are going to do is you're

14 going to meet again after this and you're going to go through

15 it yourselves.

16      MS. MATTIOLI:  Okay.

17      THE COURT:  Anything that comes from the plaintiffs'

18 complaint is not -- is unsealed.

19    Is there anything from plaintiffs' complaint on page 16?

20      MS. MATTIOLI:  Yes.

21      THE COURT:  That's unsealed.

22    Page -- well, 19 of 30, 14 of the document.

23      MS. MATTIOLI:  That -- that information does not come

24 from plaintiffs' complaint.

25      THE COURT:  Twenty of 30, page 15 of the document?

| | |
|---|---|
| 1 | **MS. MATTIOLI:**  Lines 9 through 14 are taken from the |
| 2 | declarations. |
| 3 | **THE COURT:**  Of what? |
| 4 | **MS. MATTIOLI:**  The plaintiffs' -- the declarations in |
| 5 | support of the motion for preliminary injunction. |
| 6 | **THE COURT:**  They're unsealed. |
| 7 | **MS. MATTIOLI:**  Same with lines 15 through 17, there's |
| 8 | a reference to doc 1024 and 1025. |
| 9 | Same with lines 18 -- |
| 10 | **THE COURT:**  Okay.  I'm not going to do this here. |
| 11 | **MS. MATTIOLI:**  Okay. |
| 12 | **THE COURT:**  All of that is -- anything that's from |
| 13 | their complaint is unsealed.  I need to know what's left so |
| 14 | that I can make decision with respect to what's left. |
| 15 | Understand? |
| 16 | **MS. MATTIOLI:**  Yes, Your Honor. |
| 17 | **THE COURT:**  Okay.  Moving to the next document. |
| 18 | **MS. ARANDA OSORNO:**  I believe the next document is |
| 19 | 159-3. |
| 20 | **THE COURT:**  I have --I have 75-3. |
| 21 | **MS. MATTIOLI:**  I believe we withdrew the sealing |
| 22 | request on that. |
| 23 | **THE COURT:**  75-3 is the defendants' opposition to a |
| 24 | motion for class certification. |
| 25 | **MS. MATTIOLI:**  Oh.  That -- that one had -- the |

```
1    excerpts that are under seal in that document, Your Honor, are
2    medical information of plaintiffs, and intervenors have agreed
3    not to seek to have that unsealed.
4             THE COURT:  Is that correct?
5             MS. ARANDA OSORNO:  That's correct, Your Honor.
6             THE COURT:  All right.  So the motion with respect to
7    that is withdrawn.
8        The next document I have is the defendants' post
9    evidentiary hearing briefing.  This is 159-3.
10            MS. MATTIOLI:  That's correct, Your Honor.
11            THE COURT:  And here --
12            MS. MATTIOLI:  Just to save time, Your Honor, the
13   government withdraws its request to have page 17 of that
14   document sealed.
15            THE COURT:  All right.  That's unsealed.
16            MS. MATTIOLI:  Yes.
17            THE COURT:  That was the only thing.
18            MS. MATTIOLI:  Correct.
19            THE COURT:  All right.  So the entire -- so that will
20   be unsealed in its entirety given there was only one issue.
21       The next one I have is 178-3, plaintiffs' reply post
22   evidentiary hearing brief.
23       Here I'm seeing requests for redactions on page 6 of the
24   document, 10 of 20 ECF.  That's the first.
25       Who -- and who sought to seal?  The government.  The
```

```
 1        defense?
 2                 MR. ANDERSON:  Not plaintiffs.
 3                 MS. MATTIOLI:  Correct, Your Honor.  I believe as
 4        reflected in the chart, that this sealing request related to
 5        evidentiary hearing exhibits in Docket 162-3, which we agreed
 6        should be unsealed subject to the redaction of personally
 7        identifying information.
 8                 THE COURT:  So the request to seal is withdrawn?
 9                 MS. MATTIOLI:  Correct.
10                 THE COURT:  And the same with the word on line 17?  I
11        see no reason to seal that.
12                 MS. MATTIOLI:  If I could have the indulgence for one
13        second, Your Honor.
14                         (Pause in the proceedings.)
15                 MS. MATTIOLI:  It can be unsealed, Your Honor.  I
16        think I know which one --
17                 THE COURT:  It's the second word.
18                 MS. MATTIOLI:  Yeah.
19                 THE COURT:  All right.  Unsealed.
20           Then the next sealing occurred on page 10, page 14 of
21        20 for ECF.
22           And then at page 10 and 11.
23                 MS. MATTIOLI:  Just for the sake of the order, Your
24        Honor, I think we did skip 172-2.  I'm having trouble pulling
25        up --
```

1      **THE COURT:**  No, no, let's focus on this one.  If we

2  have to go back, we'll go back.

3      **MS. MATTIOLI:**  Can you remind me of the doc number,

4  please.

5      **THE COURT:**  We're at 178-3.

6      **MS. MATTIOLI:**  And which page were you on?

7      **THE COURT:**  Page 10 of the document, 14 of 20 ECF.

8      **MS. MATTIOLI:**  Your Honor, this information relates

9  to the document at 176-4 that the government continues to

10  request remain sealed.

11    Same with line 27 on that same page, and lines 1 and 2 on

12  the following page.

13      **THE COURT:**  Has anybody talked to the AIC that's

14  referenced?

15      **MR. ANDERSON:**  I believe it's RF.

16      **THE COURT:**  Yes.

17      **MR. ANDERSON:**  Is that right?

18    We would request that her full name stay under seal and

19  her reg number stay under seal.  I don't think that implicates

20  this passage here though.  It does implicate other documents

21  that we'll talk about.

22      **THE COURT:**  My question is, is RF requesting that it

23  be sealed?

24      **MR. ANDERSON:**  I have not asked that question

25  specifically of RF.

```
 1              THE COURT:  Okay.  So that one I'll make a decision

 2     on.

 3          You want to go back to something?

 4              MS. MATTIOLI:  Your Honor, it's confusing, but I

 5     believe that the excerpt referenced in this document appears

 6     several times in the docket due to an error on my part.

 7          I believe we -- 172-2 is the next document that I have,

 8     and that relates to this excerpt.

 9              THE COURT:  All right.  I'll look at that.

10          You said 172-2?

11              MS. MATTIOLI:  Correct.

12              MR. ANDERSON:  And this document is identical to

13     176-4.  So we can cross them both off at the same time.

14              MS. ARANDA OSORNO:  Your Honor, I believe that

15     document is also identical to 184-4.

16              THE COURT:  Which document?

17              MS. ARANDA OSORNO:  172-2 --

18              THE COURT:  Is the same --

19              MS. ARANDA OSORNO:  -- 176-4 and 184-4 I believe are

20     all the same document.  I believe it's all the declaration of

21     Dennis Wong.

22              THE COURT:  Okay.

23              MR. ANDERSON:  And so plaintiffs would request on --

24     on page 2 of that document --

25              THE COURT:  So 184-4 is the declaration of Patrick
```

1    Deveney.

2         **MS. ARANDA OSORNO:**  Maybe it's 184-5.  They exist on

3    the 184 docket as well.

4         **THE COURT:**  184-5 is Dennis Wong.

5         **MS. ARANDA OSORNO:**  Okay.

6              (Pause in the proceedings.)

7         **THE COURT:**  I'm waiting for her to get power.

8              (Pause in the proceedings.)

9         **THE COURT:**  Okay.  You're operational now?

10        **MS. MATTIOLI:**  Yes.

11        **THE COURT:**  All right.  So 184-5 is the declaration

12   of Dennis Wong.  And that is identical to 172-2?

13        **MR. ANDERSON:**  (Nods head.)

14        **MS. ARANDA OSORNO:**  That's correct.

15        **MR. ANDERSON:**  Correct.  In addition to 176-4.

16        **THE COURT:**  All right.  Does anybody wish to be heard

17   on that document?

18        **MR. ANDERSON:**  Plaintiffs would just request that on

19   page 2 at line 5, RF's full name and reg num appears, and we

20   would request that that remain sealed.

21        **THE COURT:**  Okay.  And the argument to keep it

22   sealed?

23        **MS. MATTIOLI:**  Your Honor, that is covered by the

24   declaration of Beth Reese.  The justification for sealing is

25   that the information that is sealed contains to ongoing

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    administrative and/or criminal investigations and as such is

2    sensitive and should not be disclosed.

3         **THE COURT:**  And RF's position is unknown?

4         **MR. ANDERSON:**  We will follow up with RF and let the

5    Court know.

6         **THE COURT:**  Ms. Jansen, could you come to the mic,

7    please?

8         **MS. JANSSEN:**  My apologies.

9      We can confirm with RF again.  I did have multiple

10   conversations with RF around the time that these documents

11   were filed.  At that time, she had made no request to have

12   this under seal, and in fact very much preferred the opposite.

13        However, they were put under seal in an abundance of

14   caution and per the rules as they had been placed under seal

15   by the government which we had opposed.

16        **THE COURT:**  Okay.

17        **MS. MATTIOLI:**  And to clarify, Your Honor, it is not

18   RF's privacy rights that the government seeks to protect with

19   this document because her name can be -- she -- I believe

20   she's identified by initial.

21        **THE COURT:**  But the investigation that you refer to

22   is an investigation of her?

23        **MS. MATTIOLI:**  Not exactly, no.

24        **THE COURT:**  Well, who?

25        **MS. MATTIOLI:**  Your Honor, this --

 1          **THE COURT:**  Could you -- is it somewhere on here that

 2    you could tell me?

 3          **MS. MATTIOLI:**  All of paragraph 4, Your Honor, I

 4    believe.

 5          **THE COURT:**  Okay.  I'll go back and look at it.

 6       The next one I had is 184-3.  And here the sealed portion

 7    is on page 4, ECF 4 of 5.  Same issue?

 8          **MS. MATTIOLI:**  Line 18, Your Honor.

 9          **THE COURT:**  Right.  I have lines 18 to 26.  Is this

10    the same issue?

11          **MS. MATTIOLI:**  I have 18 through 28.  Same issue.

12          **MR. ANDERSON:**  Plaintiffs have no need to keep this

13    under seal.

14          **THE COURT:**  Okay.  There is nothing on 28.  I have

15    the last sentence in the paragraph beginning "A week later,"

16    and the beginning of the last paragraph on that page until we

17    get to "on February 16."

18       I'm at 184-3.

19       It almost sounds like Bingo.

20          **MS. MATTIOLI:**  Yes, Your Honor, 18 through 26 should

21    remain sealed.  Same issue.

22          **THE COURT:**  Same issue.  All right.

23       Moving to the next document I have is 184-4.  And I have

24    paragraphs 5 through 11.  Then paragraph 20 through 22.  Plus

25    there are a couple of registration numbers.

1          **MS. MATTIOLI:**  That's correct, Your Honor.

2          **THE COURT:**  Okay.

3          **MS. MATTIOLI:**  And that's the same document at 173.

4          **THE COURT:**  Okay.

5          **MS. MATTIOLI:**  The government's position is that

6    information should remain -- remain sealed, same issue.

7          **MR. ANDERSON:**  From plaintiffs, on page 2, lines 14

8    and 17 contain reg numbers that we would say should remain

9    sealed.

10          **THE COURT:**  You -- you believe it should remain

11    sealed?

12          **MR. ANDERSON:**  Yes.

13          **THE COURT:**  Okay.  Which -- all of them?

14          **MR. ANDERSON:**  I think -- I think per Ms. Jansen's

15    statement, line 17 can be unsealed but CB's registration

16    number appears in line 14.

17          **THE COURT:**  Paragraphs 5 through 11, is it your

18    perspective that those should be sealed?

19          **MR. ANDERSON:**  Those can be unsealed.

20          **THE COURT:**  I thought some of this was in the hearing

21    that was open to the public.

22      I -- I take -- paragraph 8, I thought that was open to the

23    public.  So why would I seal it here if it's open to the

24    public?

25          **MS. MATTIOLI:**  We can go back through that, Your

1  Honor, and we will submit a more narrow sealing request.

2        **THE COURT:**  All right.  Then we've already talked

3  about 184-5, which is also identical to 172-2 and 176-4.

4      Then I have 197-3, which I understand you're seeking to

5  seal in its entirety?

6        **MS. MATTIOLI:**  Your Honor, we would withdraw the

7  request to have the entire document sealed.  And instead

8  beginning on page 4 of the ECF lines 9 through 27 and page 5

9  of the ECF from 1 to 13.  They're not exactly lined up, but

10  paragraphs 11 through 20 we would request remain sealed.

11        **MR. ANDERSON:**  Yeah, plaintiffs -- the full name of

12  AY appears at page 2, line 16, page 4, lines 9 to 10 and 23 to

13  24 and 25 to 27, and page 5, lines 3 to 4 and 6 to 8.  And we

14  would posit that AY's full name should remain under seal.

15        **THE COURT:**  It should remain under seal.

16        **MR. ANDERSON:**  It should remain under seal.

17        **THE COURT:**  Okay.  And that's because this person has

18  an ongoing claim being litigated at BOP?  Or for what reason?

19        **MR. ANDERSON:**  Number one, there is an ongoing claim.

20  Number two, this relates to a -- a sexual assault, and we

21  think the survivor's identity should remain sealed for privacy

22  reasons.

23        **MS. MATTIOLI:**  And the government's position, Your

24  Honor, as in Ms. Reese's declaration, this relates to an open

25  investigation, and that's why the details should remain sealed

```
 1   at this time.

 2          THE COURT:  Do you wish to be heard at all?

 3          MS. ARANDA OSORNO:  I would, Your Honor.

 4      There are several factual shortcomings as well as legal

 5   analytical shortcomings in the government submission from

 6   Wednesday.  There's been a reference to an ongoing

 7   investigation.  The declaration of Ms. Reese that was

 8   submitted on Wednesday lacks very little details.  So I

 9   would --

10          THE COURT:  Well, that's why we're having this

11   hearing.  So -- and I'm looking at it.  And plaintiffs'

12   counsel is agreeing that there's an ongoing investigation with

13   respect to someone who I suspect the plaintiffs represent.

14          MS. MATTIOLI:  And, Your Honor, Ms. Reese's

15   declaration specifically refers to the page numbers and the

16   line numbers.  She declares personal knowledge of the subject

17   matter and that they are under investigation.

18      The reason that we're seeking to keep them sealed is

19   because details, if made public, could jeopardize the

20   investigation.  We shouldn't have to reveal the details in

21   order to justify sealing.  She was as specific as she could be

22   in this declaration.

23          THE COURT:  Any -- anything else you want to be heard

24   on with respect to this issue?

25          MS. ARANDA OSORNO:  I am unclear about whether this
```

1    relates to the investigation of someone in the class or

2    allegations of mis- -- or if the subject of the investigation

3    is a government employee.

4         **THE COURT:**  Well, the class are -- class members made

5    lots of allegations against employees.  This is nothing

6    outside of employees.  That's the entire case.

7         **MS. ARANDA OSORNO:**  I think I do not understand

8    plaintiffs' position.  There's an open investigation about the

9    misconduct of a government employee.  And plaintiffs' position

10   is that that investigation is ongoing and the details should

11   be sealed?

12        **MR. ANDERSON:**  Our position is that the survivor's

13   identity, AY, should remain sealed.  AY has filed a complaint

14   with lots of allegations that are public.  So we don't think

15   the rest of the declaration of -- of Mr. France should be

16   sealed, but AY's name should be sealed.

17        **MS. ARANDA OSORNO:**  And proposed intervenors do not

18   seek to unseal the names or any personally identifying

19   information of any of the survivors of sexual abuse.

20        **THE COURT:**  All right.  I understand the issues.

21      Next I have 197-6 that I understand the entire thing is

22   seeking to --

23        **MS. MATTIOLI:**  Your Honor, just -- on 197-6 starting

24   on page 3 of the ECF -- excuse me -- I'm looking at the

25   wrong --

```
 1                   (Pause in the proceedings.)

 2          MS. MATTIOLI:  Page 2 of the ECF, lines 10 through

 3    28, page 3 of the ECF, lines 1 and 2, we seek to keep sealed.

 4       Again, it contains the AICs full name and register number.

 5    We believe that should be sealed.

 6          THE COURT:  I don't know that we're looking at the

 7    same document.  197-6?

 8          MS. MATTIOLI:  Excuse me, Your Honor.  I had moved on

 9    to 206-3.

10       On 197-6, beginning on page 3 of the ECF, lines 22 through

11    28 should remain sealed.  Page 4 of the ECF, lines 1 through

12    10 -- excuse me -- 1 through 8 should remain under seal.

13          THE COURT:  Has the balance been unsealed already?

14          MS. MATTIOLI:  No.

15          MR. ANDERSON:  And plaintiffs request that on page 3,

16    line 22, again contains the full name and reg num of AY, and

17    that should be sealed for privacy concerns.

18          THE COURT:  All right.

19       Well, let's get the rest of it unsealed.  And I'll

20    consider the portions that you're seeking to remain sealed.

21          MS. MATTIOLI:  We did have one more, Your Honor.  I

22    think 206-3.

23          THE COURT:  That's next.

24       That's my next number, 206-3.

25       Again, this has been sealed in its entirety?
```

1    **MS. MATTIOLI:**  Correct.  We would ask that the Court

2    keep under seal starting on page 2, lines 10 through 28,

3    page 3, lines 1 through 2.

4    **THE COURT:**  All right.  I -- this is the same issue.

5    **MS. MATTIOLI:**  Correct.

6    **THE COURT:**  Get the balance unsealed.  Okay.

7    Then on page 12, these are maps?

8    And on page -- or I'm sorry.  247-2 are maps.  And 247-3

9    are maps, as I understand it.

10    **MS. MATTIOLI:**  Your Honor, I -- it's the position

11    that those should remain sealed for security reasons.

12    **THE COURT:**  Is there any reason to seal page 1 of 45?

13    **MS. MATTIOLI:**  Which doc number are you looking?

14    **THE COURT:**  247-2.  What is the reason to seal

15    page 1?  The maps are on page 41 -- oh, okay.  That's not --

16    so you're just seeking to seal pages 41 through 45.

17    **MS. MATTIOLI:**  Correct.

18    **THE COURT:**  Okay.  And the same with the other?

19    **MS. MATTIOLI:**  Yes.

20    **THE COURT:**  Okay.

21    First off, anything that I've unsealed [sic], you need to

22    get it sealed [sic] -- unsealed by Monday.  Okay?

23    **MS. MATTIOLI:**  Yes, Your Honor.

24    **THE COURT:**  To make it -- to make it easier to

25    understand, I think it's best to do it as one filing with a

```
 1        table of contents just like we went through that identifies
 2        the documents.
 3           If you want to be heard once these portions get unsealed,
 4        that's fine.  How much time do you want to brief -- so you're
 5        going to see something, they'll do it by Monday.  So by
 6        Tuesday you'll have it.
 7           I understand their perspective, but you said you wanted a
 8        chance to be heard.  So how much time do you want?
 9              MS. ARANDA OSORNO:  Your Honor, I suppose the
10        question is not just -- is whether there's going to be any
11        specificity about the nature of the information that remains
12        sealed.  I can't really respond --
13              THE COURT:  The -- the --
14              MS. ARANDA OSORNO:  I don't have the benefit of
15        knowing what we're fighting about.  So I can't --
16              THE COURT:  So -- so I will let them make a proffer
17        because a lot of this is repeat -- it's a lot of repetitive
18        information.
19              MS. ARANDA OSORNO:  Yes, Your Honor.
20              THE COURT:  But there are two to three buckets.
21              MS. ARANDA OSORNO:  Yes, Your Honor.
22              THE COURT:  And Ms. Mattioli is going to tell you
23        what she can, and that's what you're going to have to --
24        that's what you can respond to.
25           And you can -- you know, you'll be able to see the other
```

1    stuff that was there that was unsealed.  But given the nature

2    of the allegations, I'm not going to go through and have yet

3    another declaration made.  I'm going to have her tell you

4    right now, and then you can let me know whether or not you're

5    going to want to respond.

6            **MS. ARANDA OSORNO:**  Understood, Your Honor.

7            **MS. MATTIOLI:**  I believe it is outlined in the

8    responsive filing and the declaration of Beth Reese that the

9    only category of excerpts and informations the government

10   seeks to keep under seal are the names of federal employees

11   who have been investigated administratively or criminally,

12   related to allegations raised in this case.

13       There is a new investigation that is referenced in

14   Ms. Reese's declaration that is a different investigation than

15   the subject matter contained in the declaration.  I know it's

16   confusing.

17           **THE COURT:**  Well, that's -- I'm not sure you've done

18   a good enough job.

19       There are -- there are names.  There is an incident with

20   respect to RF.  What, if anything, can you say about that?

21           **MS. MATTIOLI:**  What I can say is that there is a lot

22   of information that can be inferred about that situation from

23   the show-cause hearing that was public, from this Court's show

24   cause order, and from the response provided by BOP to the

25   Court's show cause order.

1      The information that was provided in response to that

2   situation with RF is now being investigated separately.

3           **MS. ARANDA OSORNO:**  Your Honor --

4           **THE COURT:**  Again, to the extent that it was already

5   publicly heard, it needs to be unsealed.

6           **MS. MATTIOLI:**  Understood.

7           **THE COURT:**  Go ahead.

8           **MS. ARANDA OSORNO:**  I just wanted to note that in the

9   evidentiary submission from Wednesday, Ms. Reese says that

10  she's not familiar with the specific parameters of the new

11  investigation that we're currently discussing.

12      And it's -- it -- again I cannot see the information that

13  is sealed, but the -- the legal analysis and the notice

14  together with the facts in the declaration do not show a nexus

15  between why release of the specific information would harm an

16  ongoing investigation.

17          **THE COURT:**  And this is news to me.  So if -- and

18  again, I -- this has been a bit obtuse which is why I was

19  going to go document by document.

20      So if there's a new investigation with respect to this

21  incident with RF that's in these filings, and this

22  information, again to the extent it was already in -- in the

23  public record, it needs to be unsealed.

24      So you're ordered to do that.

25          **MS. MATTIOLI:**  Understood, Your Honor.

1      **THE COURT:**  And if Reese is saying she doesn't know

2  anything about it, then there needs to be -- then I need to

3  know who's -- I need something from someone telling me that

4  there's a new investigation, and it needs to be under oath in

5  a declaration.

6      **MS. MATTIOLI:**  Understood, Your Honor.

7      **THE COURT:**  Then there is another incident that

8  relates to many of these redactions regarding AY.  So your

9  proffer with respect to all of that.

10      **MS. MATTIOLI:**  Is the same justification for keeping

11  under seal the information in 45-4 and 45-5 relating to the

12  employment status of federal employees who have not yet been

13  charged with a crime and don't have a forum to vindicate the

14  reputational and privacy interests that would be harmed by the

15  release of their names.

16      **THE COURT:**  Is there -- well, can it then be redacted

17  without that person's name?

18      **MS. MATTIOLI:**  Yes.

19      **THE COURT:**  Maybe I said that wrong.  Can it be

20  unsealed?

21      **MS. MATTIOLI:**  Yes, subject to redaction.

22      **THE COURT:**  Other than the name of the person?

23      **MS. MATTIOLI:**  If -- if we're talking about AY, Your

24  Honor, that goes to several documents.  I would have to go

25  line by line and --

1    **THE COURT:**  We always have to go line by line.  My

2    question is AY is not requesting that this information be

3    sealed?

4    **MS. MATTIOLI:**  Correct.

5    **THE COURT:**  Has AY filed a claim?

6    **MR. ANDERSON:**  Yes.  AY has filed a complaint that

7    includes most of these details, if not all, except obviously

8    she wouldn't know anything about an investigation.  But it

9    does include this individual's name.

10    **THE COURT:**  Okay.  So if it's already in the public

11    record, why would I seal it?

12    **MS. MATTIOLI:**  We would default to the position that

13    it is -- it still implicates their privacy rights which they

14    have not consented to.  And with an ongoing criminal or

15    administrative investigation into the truth of those --

16    **THE COURT:**  But you're saying that you want to

17    protect their privacy, but it's already in the public record.

18    **MS. MATTIOLI:**  But we didn't put it there.  The

19    government --

20    **THE COURT:**  Okay.  But I have to decide.  So you

21    don't put it there.  The record will reflect that you've asked

22    that I seal it.

23    **MS. MATTIOLI:**  Understood.

24    **THE COURT:**  And then I can unseal it.

25    So I need to know from you if there's anything in here

1  that's not already in the public record.  And if it's not in

2  the public record, you know, then -- then I think the argument

3  is stronger.

4    So I'll order the plaintiffs and BOP counsel to meet and

5  confer, and let me know what, of the information with respect

6  to AY, is already in the public record.

7    **MS. MATTIOLI:**  Understood, Your Honor.

8    **THE COURT:**  And then it's not your decision, it's my

9  decision.

10    **MS. MATTIOLI:**  Understood.

11    **THE COURT:**  And if it's already in the public record,

12  you'll get it -- this is going to be all repetitive so it's

13  not as if you won't -- you don't have it.

14    **MR. ANDERSON:**  Your Honor, I have the case number for

15  AY's complaint.

16    **THE COURT:**  You can give it to her.  I'm not going to

17  do this myself.

18    **MR. ANDERSON:**  Oh, I meant for the public record, in

19  case a member of the public wanted to go look at it after --

20  after hearing.

21    **THE COURT:**  Go ahead.  You can say it.

22    **MR. ANDERSON:**  Yeah, it's 4:24-CV-01365.

23    **THE COURT:**  Okay.  Let me know by Wednesday whether

24  you want to file something and when you can get it on file.

25    If not, then I will just -- I'll just proceed on my own.

1          **MS. ARANDA OSORNO:**  Yes, Your Honor.  And for the

2     sake of clarity, you are saying that by Wednesday you would

3     like to know whether I would like more time to file a

4     response?

5          **THE COURT:**  Correct.

6          **MS. ARANDA OSORNO:**  Understood.

7          **THE COURT:**  And you can just send a note to the email

8     box, just the YGR proposed order P.O. Box.

9        To make it so that it is not -- well, actually not

10    Wednesday.  When can the two of you meet and confer on what of

11    this is either in the -- I need -- I'm going to need more

12    information.  So sound -- I think the two of you still need to

13    talk.

14         **MS. MATTIOLI:**  Any time, Your Honor.

15         **MR. ANDERSON:**  We can talk by Monday.

16         **THE COURT:**  Okay.  So just let me know by the end of

17    the week by -- by Friday.

18         **MS. ARANDA OSORNO:**  Yes, Your Honor.

19         **THE COURT:**  They're going to talk.  Then we're going

20    to get these things unsealed.  And then just let me know by

21    Friday whether or not you want to brief.  Okay?

22         **MS. ARANDA OSORNO:**  Yes, Your Honor.

23         **THE COURT:**  All right.

24       Is there anything else to discuss today?

25         **MR. ANDERSON:**  I have one further sealing issue, Your

1    Honor.

2            **THE COURT:**  Okay.

3            **MR. ANDERSON:**  In our opposition to the motion to

4    dismiss, we filed -- I believe it was Exhibit A.  It's at

5    ECF 339-3, a copy of Special Master Still's report.  We filed

6    that under seal and filed an administrative motion to

7    determine whether or not whether another party's information

8    should be sealed.

9      I don't believe defendants filed a brief in support of

10   that.  Pursuant to Local Rule 79-5(f)(3), we would request

11   that the Special Master's report be unsealed.  We have lots of

12   named plaintiffs and class members who are asking us for it.

13           **MS. MATTIOLI:**  No objection.

14           **THE COURT:**  All right.  It's unsealed.

15           **MR. ANDERSON:**  Thank you, Your Honor.

16           **THE COURT:**  Okay.

17           **MS. ARANDA OSORNO:**  Your Honor, I have a couple more

18   things on my list.  Sorry.

19           **THE COURT:**  That's okay.  Look, there was a lot of

20   confusion.  This is -- this is what we thought the totality

21   was.  Go ahead.

22           **MS. ARANDA OSORNO:**  Docket number 292 is a notice of

23   manual filing of documents under seal.  Our position is that

24   the documents should be docketed and, if there is a need for

25   them to be sealed, that the government file the appropriate

1  sealing procedure.

2      Ms. Mattioli made a representation to us that those

3  documents relate to issues of record retention during the

4  closure of FCI Dublin and that they include a declaration

5  discussing that particular subject.  So we would ask for that

6  to be docketed unsealed.

7          **MS. MATTIOLI:**  The reason that those were filed, Your

8  Honor, was in response to an order that the Court issued that

9  is also under seal.  I believe it goes to an issue that we

10  discussed.  Defendants have no objection to those documents

11  being unsealed, assuming that the Court's order ordering us to

12  file them is also unsealed.

13          **THE COURT:**  Okay.  And no one objects?

14          **MR. ANDERSON:**  No, Your Honor.

15          **THE COURT:**  All right.  They're unsealed.

16          **MS. ARANDA OSORNO:**  Your Honor, relatedly, we have an

17  outstanding request for attachments of certain of your orders

18  to be unsealed.  I understand that they may include sensitive

19  information including names and register numbers, and we would

20  again agree that that information could be redacted, but we

21  would request that those attachments be unsealed.

22          **THE COURT:**  Any objections?

23          **MS. MATTIOLI:**  No, Your Honor.

24          **MR. ANDERSON:**  No.

25          **THE COURT:**  Okay.  They're unsealed.

1          **MS. ARANDA OSORNO:**  Thank you, Your Honor.

2      The final thing on my list, we also moved to unseal some

3  transcripts.  And this relates to docket entry 113 and 114.

4      Ms. Mattioli made the representation that these ex-parte

5  proceedings did not relate to the merits of the case.  We ask

6  for clarification about the nature of those proceedings.  We

7  don't have a position about whether or not they were sealed

8  and properly -- I understand they were ex-parte, but that does

9  not mean they cannot be sealed at a later date.

10      I would like the opportunity to make that argument once I

11  understand what the proceedings were.

12          **THE COURT:**  In this the one we had in chambers?

13          **MR. ANDERSON:**  I'm unaware of the content.

14          **MS. MATTIOLI:**  Yes, Your Honor.

15          **MR. NIMNI:**  In this hearing we had in chambers?  Was

16  that --

17          **MS. MATTIOLI:**  Yes.

18          **THE COURT:**  They're going to remain sealed.

19          **MS. ARANDA OSORNO:**  Thank you, Your Honor.

20          **THE COURT:**  Okay.  What else?

21          **MS. ARANDA OSORNO:**  I don't have a specific document,

22  but if I may be heard, a sort of very, very short closing

23  statement.

24          **THE COURT:**  On what?

25          **MS. ARANDA OSORNO:**  I would just ask Your Honor to

1    consider issuing a detailed analysis for anything that remains

2    sealed so that the public can have the benefit of

3    understanding the way that the Court is understanding these

4    sealing disputes and the way in which the government's

5    arguments are being interpreted by the Court in making these

6    decisions.

7          **THE COURT:**  Okay.  It means it's going to take longer

8    but okay.

9          **MS. ARANDA OSORNO:**  I understand.

10          **THE COURT:**  All right.

11          **MS. ARANDA OSORNO:**  You have great clerks, I think,

12    though, so hopefully not too long.

13          **THE COURT:**  I have great clerks, but I also have a

14    crushing docket right now.

15          **MS. ARANDA OSORNO:**  I understand, Your Honor.

16          **THE COURT:**  All right.  That's why I said I'm not

17    going to do this work on my own; they're going to do it for

18    me.

19      So, all right.  Anything else?

20          **MS. MATTIOLI:**  No, Your Honor.

21          **MR. ANDERSON:**  Nothing from plaintiffs, Your Honor.

22          **MS. ARANDA OSORNO:**  No, Your Honor.

23          **THE COURT:**  Okay.  All right.  Everybody travel

24    safely.

25      We're adjourned.  Thank you.

1          (Proceedings were concluded at 3:46 P.M.)

2                          --o0o--

3

4

5

6                  **CERTIFICATE OF REPORTER**

7

8          I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10   I further certify that I am neither counsel for, related to,

11   nor employed by any of the parties to the action in which this

12   hearing was taken, and further that I am not financially nor

13   otherwise interested in the outcome of the action.

14

15   _____

16          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

17                  Thursday, August 2, 2024

18

19

20

21

22

23

24

25