IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.; G.M.; A.S.; and L.T., individuals on behalf of themselves and all others similarly situated,<br><br>Plaintiffs<br>v.<br><br>UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS, a governmental entity; BUREAU OF PRISONS DIRECTOR COLETTE PETERS, in her official capacity; FCI DUBLIN WARDEN THAHESHA JUSINO, in her official capacity; OFFICER BELLHOUSE, in his individual capacity; OFFICER GACAD, in his individual capacity; OFFICER JONES, in his individual capacity; LIEUTENANT JONES, in her individual capacity; OFFICER LEWIS, in his individual capacity; OFFICER NUNLEY, in his individual capacity, OFFICER POOL, in his individual capacity, LIEUTENANT PUTNAM, in his individual capacity; OFFICER SERRANO, in his individual capacity; OFFICER SHIRLEY, in his individual capacity; OFFICER SMITH, in his individual capacity; and OFFICER VASQUEZ, in her individual capacity,<br><br>Defendants. | CASE NO. 4:23-CV-04155-YGR<br><br><br><br>**DECLARATION OF ARTHUR DULGOV**<br><br><u>FILED UNDER SEAL</u> |

I, Arthur Dulgov, hereby declare as follows:

1. I am currently the Interim Warden at the Federal Correctional Institution ("FCI") at Dublin, California, which is part of the Federal Bureau of Prisons ("BOP"), United States Department of Justice. I have occupied this position since December 2023; have been an employee of the BOP since 2008; have worked in many other BOP institutions such as the Metropolitan Correctional Center at San Diego and the Federal Correctional Complex at Victorville, California. Prior to my current assignment, I was the Warden at FCI Safford, Arizona. As the Interim Warden, I have supervisory oversight over FCI Dublin, which has the same authority and responsibility as a permanent Warden. The title of Interim Warden merely reflects BOP's immediate need to reassign an established Warden to a BOP facility.

2. FCI Dublin is comprised of two facilities: a low security female correctional facility that is also commonly referred to as FCI Dublin Low, and a minimum-security female prison camp that is commonly referred to as the Satellite Camp Prison at FCI Dublin ("SCP Dublin").

3. My duties and responsibilities as the Warden include supervising an Executive Staff team comprised of Associate Wardens and an Executive Assistant. In turn, my Executive Staff supervise department-head level staff, such as the Captain. While many of my duties encompass large-scale matters like budget and resource allocations, or overseeing institutional policies and practices, I also routinely interact with both staff and inmates on a daily basis, and personally monitor various areas and operations throughout FCI Dublin. There are also certain BOP policies that mandate a Warden's review and approval, such as requesting the transfer of an inmate.

4. BOP Program Statement (PS) 5100.08, CN-1, <u>Inmate Security Designation and Custody Classification</u>, Chapter 7, describes most of BOP's transfer procedures. A true and correct copy of Chapter 7 of PS 5100.08, CN-1, is attached hereto as Exhibit 1. The entire policy is publicly available at www.bop.gov This policy allows for different kinds of transfers, such as a "Temporary Transfer" for security reasons. In such an event, I need to request approval from the Designation and Sentence Computation Center ("DSCC"), which is BOP's centralized entity for reviewing and approving transfers.

5. On January 31, 2024, inmate R▓▓▓ ▓▓▓, Register No. ▓▓▓ ("▓▓▓"), was placed in the Special Housing Unit ("SHU") based on the belief that she might have been encouraging other inmates to file false complaints against staff. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ A true and correct copy of the Administrative Detention Order for this placement, explaining that she was placed in SHU "pending a SIS investigation" is attached hereto as Exhibit 2.

6. On February 1, 2024, staff assigned to the SHU reported that ▓▓▓ said she would not be eating or drinking until she was released from SHU. Two other SHU inmates, ▓▓▓, Register No. ▓▓▓ ("▓▓▓"), and ▓▓▓, Reg. No. ▓▓▓ ("▓▓▓" also stated their intention to go on a hunger strike. A true and correct copy of the memorandum from

staff member Lockett dated February 1, 2024, that reported these statements why these inmates were in the SHU Recreation area, is attached hereto as Exhibit 3. ▇'s stated reason for joining ▇ on a hunger strike was because of a cell change, and ▇ appeared to be joining as a show of support for ▇. *Id.* This exhibit is an internal document relating to the specifics of institution management. This document is a sensitive document based on privacy as different inmate names are mentioned, and because it contains a reference to our staffing situation, which if disclosed, could jeopardize institutional safety and security. There is also a reference in this document about staff exercising her discretion to make an exception related to our established processes, which would be disruptive to the orderly running of the institution at it would describe a method and/or precedent for bypassing our established practices.

7. PS 5562.05, <u>Hunger Strikes</u>, provides guidance whenever an inmate engages in a hunger strike. A hunger strike can be announced by an inmate or observed by staff, such as when an inmate starts refusing meals over a period of time. Once there is sufficient reason to believe inmate(s) are engaging in a hunger strike, various protocols are initiated, such as psychological and medical follow-up. A true and correct copy of PS 5562.05 is attached hereto as Exhibit 4, and is publicly available at www.bop.gov

8. On February 3, 2024, psychology staff performed Hunger Strike Reviews of inmates in SHU, who were suspected of being on hunger strike based on either their announcement of such, or because they missed one or more meals. Inmate ▇ S▇-▇, Reg. No. ▇ ("S▇-▇"), indicated he was on a hunger strike to "see if I could." A true and correct copy of the Hunger Strike Review for S▇-L▇ for 2/3/24 is attached hereto as Exhibit 5. All of the Hunger Strike Review documents are mental health records that are created and maintained by BOP psychology staff and marked "Sensitive But Unclassified." These records are so labeled because they contain private information, such as psychology staff's subjective observations and opinions and related medical information. BOP mental health and medical records are considered extremely sensitive information, and only shared with other BOP staff on a need-to-know basis. BOP psychology services policy further requires the internal review of their records before disclosure to their patients, to ensure release would not be harmful.

See Program Statement 5310.17, <u>Psychology Services Manual</u>, pages 26-27, available at <u>www.bop.gov</u> To protect inmates and to observe federal law (5 U.S.C. § 552a (Privacy Act), FCI Dublin does not and may not publicly disclose such information.

9. Inmate Y▮▮▮ L▮▮▮ F▮▮▮, Reg. No. ▮▮▮▮ ("F▮▮▮"), began refusing meals on February 1, 2024, did not speak to Psychology staff when they visited on February 3, 2024, but did not appear to be in distress. A true and correct copy of the Hunger Strike Review for F▮▮▮ for 2/3/24 is attached hereto as Exhibit 6.

10. Inmate L▮▮▮ R▮▮▮-T▮▮▮. Reg. No. ▮▮▮▮ ("R▮▮▮-T▮▮▮"), explained she was on hunger strike to communicate her frustration with different things, e.g., being apart from her girlfriend who was housed in a different area in SHU. A true and correct copy of the Hunger Strike Review for R▮▮▮-T▮▮▮ for 2/3/24 in attached hereto as Exhibit 7.

11. Inmate C▮▮▮ A▮▮▮ M▮▮▮. Reg. No. ▮▮▮▮ ("M▮▮▮"), began missing meals on February 2, 2024, did not speak to Psychology staff when they visited on February 3, 2024, but did not appear to be in distress. A true and correct copy of the Hunger Strike Review for M▮▮▮ for 2/3/24 is attached hereto as Exhibit 8.

12. Inmate A▮▮▮ E▮▮▮ R▮▮▮, Reg. No. ▮▮▮▮ ("R▮▮▮") stated she was on hunger strike because of her continued placement in SHU. A true and correct copy of the Hunger Strike Review for R▮▮▮ for 2/3/24 is attached hereto as Exhibit 9.

13. Inmate L▮▮▮ Z▮▮▮, Reg. No. ▮▮▮▮ ("Z▮▮▮") stated he went on hunger strike due to concerns with her medical treatment. A true and correct copy of the Hunger Strike Review for Z▮▮▮ for 2/3/24 is attached hereto as Exhibit 10.

14. Inmate B▮▮▮ E▮▮▮, Reg No. ▮▮▮▮ ("E▮▮▮") stated he was on hunger strike because of his SHU placement. A true and correct copy of the Hunger Strike Review for E▮▮▮ for 2/3/24 is attached hereto as Exhibit 11.

15. Although these aforementioned inmates in the SHU appeared to have different reasons for why they were refusing meals and stating their intention to be on a hunger strike, I was concerned with F▮▮▮'s role in either motivating or directing them to join her in a hunger strike. It is my experience that hunger strikes can lead to serious health concerns that may eventually require

1 forced medical intervention. In addition, monitoring and attending to inmates on a hunger strike
2 means it becomes more challenging for SHU staff to attend to the other SHU inmates who are
3 not on hunger-strike, such as accommodating recreation time, exchanging supplies and linens,
4 and facilitating access to the law library. As a result, on February 3, 2024, I began
5 contemplating transferrin█ ███ emporarily to another BOP facility to reduce of risk of more
6 inmates going on a hunger strike, pending further investigation into █████'s role. At this
7 time, █████ had missed nine meals (9), J██ had missed seven meals (7), R████-T████) ad
8 missed five (5) meals, and the rest (*i.e.*, S█████-L████, R███, M█████, E█████, F█████,
9 Z████, S████) ad missed three (3) meals, which was over a three-day period. As part of my
10 evaluation and decision-making process, I consulted with BOP Legal staff, who advised me I
11 could follow normal BOP procedures, which included a possible temporary transfer.
12  16. From February 3, 2024, through February 5, 2024, I did not transfer █████ while she was still
13 fully engaging in a hunger strike as I was concerned moving her might further complicate health
14 concerns. When I was informed █████ ccepted a nutritional drink on February 6, 2024, I then
15 decided it would be prudent to temporarily move █████ to another facility so we could better
16 regain order in the SHU, pending further investigation of █████'s actual role in the hunger
17 strikes. I was concerned a prolonged hunger strike and/or an expanded hunger strike in SHU
18 would pose a serious threat to the safety and safety of call concerned in SHU. So, on February 6,
19 2024, after again consulting with BOP Legal staff, I submitted a request to the DSCC to transfer
20 █████. A true and correct copy of my request is attached hereto as Exhibit 12. This exhibit is
21 an internal document relating to the specifics of institution management. This document is
22 sensitive because it includes our preliminary and professional assessment of the situation, which
23 if publicly disclosed, may adversely affect the safety and security of the subject(s), particularly
24 as this assessment in this memo may lack context and subject to further investigation. The
25 DSCC approved this request on the same day, and inmate █████) as transferred to the
26 Metropolitan Detention Center ("MDC") at Los Angeles, California, on the same date.
27  17. From SHU housing records which track meals accepted and refused, each of the above-
28 referenced inmates selectively resumed eating at different dates and times. For example,

1. ▇efused the morning and lunch meal on February 4-5, 2024, but did accept the evening meal on these days. ▇hen resumed accepting all three meals on February 6, 2024. A true and correct copy of Escobar's SHU Housing Record from January 27, 2024, through February 10, 2024, is attached hereto as Exhibit 13. SHU Housing Records contain private and sensitive information about inmates and are not publicly available. SHU Housing Records may list sensitive reasons for a person's placement in SHU, include notes about special visitors, and/or contain separatee information (e.g., name of another inmate whom they need to be apart from). For instance, a SHU Housing Record notating a pending transfer may be a security breach if the inmate is not yet aware of such an event, and a note that investigative staff spoke with the inmate can compromise confidentiality. Accordingly, SHU Housing Records contain information about inmates and related sensitive operations that are not publicly disclosed. ▇ accepted her first meal at lunch on February 6, 2024, refused the evening meal later that day, and then began accepting all meals on February 7, 2024. A true and correct copy of ▇'s SHU Housing Record from January 28, 2024, through February 10, 2024, is attached hereto as Exhibit 14. Based on the SHU Housing Records for these inmate, not including ▇, it appears every inmate was accepting every meal by February 9, 2024.

18. On February 16, 2023, ▇ returned to FCI Dublin. ▇ will be permitted to remain in general population pending the completion of an investigation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed this 17th day of February, 2024, at Dublin, CA.

ARTHUR DULGOV
Digitally signed by ARTHUR DULGOV
Date: 2024.02.17 11:51:50 -08'00'

ARTHUR DULGOV
Interim Warden
Federal Correctional Institution, Dublin, CA