

**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T

OPI:            HSD/HPB
NUMBER:    6031.04
DATE:          June 3, 2014

# Patient Care

/s/
*Approved*:  Charles E. Samuels, Jr.
Director, Federal Bureau of Prisons

1. **PURPOSE AND SCOPE**

To effectively deliver medically necessary health care to inmates.

a. **Summary of Changes**

*Policy Rescinded*
P6031.03       Patient Care (8/23/12)

The following changes were made:

- Section 15.  Added language on the ordering of chronic care medications.
- Section 18.  Replaced use of BP-A0659 (Medical Summary of Federal Prisoner/Alien In Transit) with BEMR Exit Summary for Inmate Intra-system Transfer.
- Section 20.  Clarified schedule for performing baseline mammographies.

2. **PROGRAM OBJECTIVES**

The expected result of this program is:

Health care will be delivered to inmates in accordance with proven standards of care without compromising public safety concerns inherent to the agency's overall mission.

3. **DIRECTIVES REFERENCED**

*Program Statements*

| | |
|---|---|
| P1070.07 | Research (5/12/99) |
| P1351.05 | Release of Information (9/19/02) |
| P3735.04 | Drug Free Workplace (6/30/97) |
| P4500.09 | Trust Fund/Deposit Fund Manual (1/13/14) |
| P4700.06 | Food Service Manual (9/13/11) |
| P5050.49 | Compassionate Release/Reduction in Sentence; Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) & 4205(g) (8/12/13) |
| P5280.09 | Inmate Furloughs (1/20/11) |
| P5324.09 | Sexually Abusive Behavior Prevention and Intervention Program (8/20/12) |
| P5324.08 | Suicide Prevention Program (4/5/07) |
| P5521.05 | Searches of Housing Units, Inmates, and Inmate Work Areas (6/30/97) |
| P5553.07 | Escapes/Deaths Notifications (2/10/06) |
| P6010.03 | Psychiatric Evaluation and Treatment (8/12/11) |
| P6010.04 | Health Services Administration (6/20/13) |
| P6013.01 | Health Services Quality Improvement (1/15/05) |
| P6027.01 | Health Care Provider Credential Verification, Privileges, and Practice Agreement Program (1/15/05) |
| P6070.05 | Birth Control, Pregnancy, Child Placement and Abortion (8/9/96) |
| P6080.01 | Autopsies (5/27/94) |
| P6090.03 | Health Information Management (7/31/12) |
| P6190.04 | Infectious Disease Management (6/2/14) |
| P6270.01 | Medical Designations and Referral Services for Federal Prisoners (1/15/05) |
| P6340.04 | Psychiatric Services (1/15/05) |
| P6360.01 | Pharmacy Services (1/15/05) |
| P6370.01 | Laboratory Services (1/15/05) |
| P6400.02 | Dental Services (1/15/05) |

Code of Federal Regulations, Chapter 29, Part 1910.95

4. **AGENCY ACA ACCREDITATION PROVISIONS**

- Standards for Adult Correctional Institutions, 4th Edition: 4-4322M, 4-4344M, 4-4346, 4-4347, 4-4348, 4-4349, 4-4350, 4-4351M, 4-4352, 4-4353M, 4-4354M, 4-4359M, 4-4360, 4-4362M, 4-4363M, 4-4365M, 4-4367, 4-4370M, 4-4374, 4-4375, 4-4377, 4-4380M, 4-4381M, 4-4382M, 4-4389M, 4-4397M, 4-4398, 4-4400M, 4-4401M, 4-4402M, 4-4412, 4-4426, and 4-4427

- Performance-Based Standards for Adult Local Detention Facilities, 4th Edition: 4-ALDF-2A-45M, 4-ALDF-4A-13M, 4-ALDF-4C-01M, 4-ALDF-4C-03, 4-ALDF-4C-04, 4-ALDF-4C-05, 4-ALDF-4C-06, 4-ALDF-4C-08M, 4-ALDF-4C-09, 4-ALDF-4C-13M, 4-ALDF-4C-19M, 4-ALDF-4C-20, 4-ALDF-4C-22M, 4-ALDF-4C-23M, 4-ALDF-4C-24M, 4-ALDF-4C-26, 4-ALDF-4C-27, 4-ALDF-4C-29M, 4-ALDF-4C-34, 4-ALDF-4C-35, 4-ALDF-4C-37, 4-ALDF-4D-01M, 4-ALDF-4D-02M, 4-ALDF-4D-03M, 4-ALDF-4D-15M, 4-ALDF-4D-16, 4-ALDF-4D-17M, and 4-ALDF-4D-18M

- Standards for Administration of Correctional Agencies, 2nd Edition: 2-CO-1F-14

*Records Retention Requirements*
Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) system in Sallyport.

5. **DEFINITIONS**

a. **Health Services Unit (HSU).**  The HSU is the organizational unit that provides urgent and routine health care.  In addition, the HSU is the designated part of an institution, including Medical Referral Centers (MRC) that delivers health care to inmates on an ambulatory or observation basis.  The provision of health care is subdivided into:

- Urgent Services.
- Observation Services.
- Ambulatory Care Services.

b. **Outpatient Clinic.**  This area within the HSU provides diagnostic and other support services health care staff uses to provide urgent care and ambulatory care services.  It includes examination rooms, treatment rooms, dental clinic, radiology and laboratory areas, pharmacy, waiting areas, and administrative offices.

c.  **Observation Area.**  The observation area provides accommodations of limited duration for inmates who are being treated for noncritical illnesses, recovering from surgery, or require observation, and who do not require acute care hospitalization or 24-hour nursing care.

d.  **Medical Referral Center (MRC).**  An MRC provides a full range of diagnostic and therapeutic services, consistent with its individual mission; and a wide range of inpatient specialty consultative and other services.  **Inpatient services are available only at MRCs.**

The Medical Director will designate each MRC's mission(s).  Each MRC will seek and maintain accreditation by the Joint Commission for the Accreditation of Healthcare Organizations  under appropriate standards in accordance with its mission.  Unless Bureau policy specifies otherwise, MRCs will organize their programs to comply with Joint Commission standards.

e.  **Primary Care Provider Team (PCPT).**  A PCPT is a core group of health care providers and support staff whose function is to provide direct patient care.

f.  **Advance Directive.**  For purposes of this PS, an "advance directive" is a written instrument (sometimes referred to as a "living will" or other similar document) by which a patient expresses his/her health care wishes in the event of a terminal or irreversible condition, during which that individual is no longer able to communicate such wishes to the health care provider due to incapacitation.

Advance directives may address the patient's wishes concerning the withholding or withdrawal of resuscitative, life-sustaining, or other types of medical care.

Advance directives may appoint a proxy decision maker for these type health care decisions.

g.  **Proxy Decision Maker.**  For purposes of this PS, a proxy decision maker is a person authorized to make healthcare treatment decisions for a patient who is incapacitated and unable to make and/or communicate such decisions himself/herself. The term "proxy decision maker" is used generally in this PS, and may refer to such person as named in an advance directive, formally executed power of attorney, or as appointed by a court.

The authority, parameters, and procedures for creating such proxies are governed by the laws of the state in which the institution operates.

Under no circumstances will another inmate be appointed as proxy decision maker.

h.  **Life Sustaining or Life Prolonging Procedures.**  "Life sustaining" or "life prolonging" procedures include any medical intervention or procedure that uses artificial means to sustain a vital function or artificially prolong life, e.g. mechanical ventilation, dialysis.

i.  **Terminal Condition.**  A "terminal condition" means an incurable or irreversible medical condition which, in the attending physician's opinion, is such that death will occur within a short time regardless of the application of medical procedures.

j.  **"Do Not Resuscitate" (DNR) Order.**  A "Do Not Resuscitate" order is the attending physician's directive, recorded in the inmate's health record, to withhold or withdraw extraordinary life-sustaining measures.

6.  **PROGRAM RESPONSIBILITY**

Clinical care of inmates at Bureau institutions is under the direction of the Clinical Director, who provides direct patient care and supervises other health care providers. Administrative responsibility and supervision of non- clinical staff is under the Health Services Administrator's (HSA) direction.

7.  **SCOPE OF SERVICES – CATEGORIES OF CARE**

The Bureau of Prisons provides five major levels of care that define care provided to inmates.

**Note:**  Ordinarily, pretrial or non-sentenced inmates, and inmates with less than 12 months to serve, are ineligible for health services in subsections c., d., and e.

a.  **Medically Necessary – Acute or Emergent.**  Medical conditions that are of an immediate, acute or emergent nature, which without care would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life-threatening.

Examples of conditions considered acute or emergent include, but are not limited to:

- Myocardial infarction.
- Severe trauma such as head injuries.
- Hemorrhage.
- Stroke.
- Status asthmaticus.
- Precipitous labor or complications associated with pregnancy.
- Detached retina, sudden loss of vision.

Treatment for conditions in this category is essential to sustain life or function and warrant immediate attention.

b. **Medically Necessary – Non-Emergent.** Medical conditions that are not immediately life-threatening but which without care the inmate could not be maintained without significant risk of:

- Serious deterioration leading to premature death.
- Significant reduction in the possibility of repair later without present treatment.
- Significant pain or discomfort which impairs the inmate's participation in activities of daily living.

Examples of conditions considered medically necessary, non-emergent include, but are not limited to:

- Chronic conditions (diabetes, heart disease, bipolar disorder, schizophrenia).
- Infectious disorders in which treatment allows for a return to previous state of health or improved quality of life (HIV, tuberculosis).
- Cancer.

c. **Medically Acceptable – Not Always Necessary.** Medical conditions which are considered elective procedures, when treatment may improve the inmate's quality of life. Relevant examples in this category include, but are not limited to:

- Joint replacement.
- Reconstruction of the anterior cruciate ligament of the knee.
- Treatment of non-cancerous skin conditions (e.g. skin tags, lipomas).

These therapeutic interventions always require review by the Institution Utilization Review Committee. Relevant factors to consider in approving the proposed treatment in this category include, but are not limited to:

- The risks and benefits of the treatment.
- Available resources.
- Natural history of the condition.
- The effect of the intervention on inmate functioning in his/her activities of daily living.

d. **Limited Medical Value.** Medical conditions in which treatment provides little or no medical value, are not likely to provide substantial long-term gain, or are expressly for the inmate's

convenience. Procedures in this category are usually excluded from the scope of services provided to Bureau inmates. Examples in this category include, but are not limited to:

- Minor conditions that are self-limiting.
- Cosmetic procedures (e.g. blepharoplasty).
- Removal of non-cancerous skin lesions.

Any treatment in this category which a health care provider recommends and the Clinical Director feels is appropriate will require the Institution Utilization Review Committee's review.

e. **Extraordinary.**  Medical interventions are deemed extraordinary if they affect the life of another individual, such as organ transplantation, or are considered investigational in nature.

Any treatment provided in this category requires the Medical Director's review and approval with notification to the Regional Director.

8. **UTILIZATION REVIEW**

Every institution will have an established Utilization Review Committee (URC), chaired by the Clinical Director. Other members should include, but not be limited to the:

- HSA or Assistant HSA.
- Medical Trip Coordinator.
- Health care provider(s) directly involved in the reviewed cases.
- Director of Nursing (if applicable).
- A chaplain or social worker.

The URC will review the following areas:

- Outside medical, surgical, and dental procedures.
- Requests for specialist evaluations, in-house or escorted trips to the specialist's office (approved by the Clinical Director).
- Requests for "Limited Medical Value" treatments/procedures (approved by the CD).
- Retrospective review of all cases sent to the community hospital during hours when no health care provider was on duty at the institution.
- Case considerations for extraordinary care.
- Concurrent review of inpatients at community hospital (monitoring length of stay and interventions).
- Other services the primary care provider or the Clinical Director have recommended.

**Note:** Care considered "Medically Necessary – Acute or Emergent" does not require URC review prior to the treatment being provided.

a. **Recommendations.** The URC must select one or more of the following, to address each case presented to it:

- Approve the request without modification.
- Refer the inmate for further evaluation to a staff physician.
- Refer the inmate for further evaluation to a specialty consultant.
- Put the inmate on a waiting list, with recommended parameters as to the length of time the procedure may be delayed without increasing the risk of additional morbidity.
- Determine that the procedure is contraindicated, due to unacceptable risk to the inmate if it is performed.
- Deny the request for the procedure.

b. **Decisions.** As chair of the committee, the Clinical Director is the final authority for all URC decisions.

The CD will notify inmates in writing when URC decisions are made with a copy of the notification placed in the inmate's health record. The reason for the decision should be indicated where applicable.

The CD is under no obligation to follow consultant recommendations. If the recommendations are not followed, the CD will document his/her justification in the inmate health record.

If a specific intervention is not pursued, the inmate will be advised that his/her condition will continue to be monitored and ongoing treatment provided as necessary, and that re-submission of the request will be considered if medically indicated.

c. **Secondary Reviews.** The Clinical Director may request a secondary review for treatments or procedures in the categories of "**Medically Acceptable – Not Always Necessary**" and "**Limited Medical Value**" on a case-by-case basis through the regional Clinical Specialty Consultants or a Central Office physician. The CD will document such discussions in the inmate health record.

d. **Pre-certification.** The Medical Director may periodically require pre-certification (prior approval) for certain types of cases (e.g. high risk, high cost, or questionable efficacy). Institutions will be notified by memorandum when pre- certification requirements are in effect.

e. **Retrospective Review.** Institutions should consider a retrospective review of emergency cases based on URC findings as part of the institution Quality Improvement Program.

9.  **EMERGENCY/URGENT CARE**

Each institution will have an Institution Supplement for providing 24 hour medical, dental and mental health care. Each supplement will include procedures for notifying the HSU for initial assistance, screening and, if appropriate, subsequent transfer of the inmate(s) to the HSU or to external emergency facilities. The procedures will address:

- Arrangements for on-site first aid and crisis intervention.
- Use of one or more HSU urgent treatment rooms or other facilities.
- Use of the HSU emergency medical vehicle for transporting inmates across the compound.
- Appropriate method of transfer of the inmate from the institution to a community medical facility.
- Provision of emergency treatment in the absence of 24 hour on-site medical coverage.
- Emergency on-call procedures for hours that health care providers are not on-site.

ACA standards require a four-minute response to life- or limb-threatening medical emergencies.

Institutions without 24-hour on-site medical coverage, or those with multiple facilities separated by significant distance, are required to have procedures incorporated into the institution supplement by which this ACA standard can be met.

A team of "first responders" should be established for each shift, with documented training in first aid and CPR. Numbers on each team, and the designation of team members, will be negotiated locally:

- Use of one or more designated hospital emergency rooms or other appropriate facilities.
- Emergency on-call physician, dentist, and mental health professional services when the emergency health facility is not located in a nearby community.
- Security procedures providing for the immediate transfer of inmates when appropriate.

The HSU will conduct two emergency disaster drills per year. All drills will be critiqued to identify deficiencies and opportunities to improve. Documentation will be maintained in the HSA's office.

At MRC's, compliance with ACA and Joint Commission standards will be considered sufficient to meet the above requirements.

All health care practitioners, including HSAs and AHSAs, and Lieutenants will maintain CPR and Automated External Defibrillator (AED) certification.  The HSA will be responsible for

maintenance and supplies (unexpired pacing pads/electrodes) for the AED according to the manufacturer's recommendations.  Other staff may request CPR/AED training.

Annual review of the above supplement will be done during initial orientation to the HSU and annually thereafter.

Annual review of this supplement will be considered as part of in-house Continuing Professional Education.

## 10.  OBSERVATION SERVICES

Institutions may provide limited observation bed space.  These beds are not used in lieu of transfer to a community hospital or MRC. Observation beds will only provide limited outpatient services for short stay inmates.

Observation beds are located in the HSU.  Neither patient examination rooms nor the Urgent Care Room will be used as observation rooms.  Inmates placed on observation status **do not** require medical treatment(s) normally provided in an MRC or community hospital setting.

a.  **Written Procedures Required.**  Each institution using observation beds will have written procedures delineating their use, conforming to this policy. These policies will include procedures for:

- ■  Designation of physical location of observation beds.
- ■  Evaluation.
- ■  Level of care provided.
- ■  Supervision requirements.
- ■  Release of inmates from observation beds.
- ■  Sight and sound requirements (i.e. nurse call systems or visual monitoring systems).
- ■  Direct observation every 30 minutes.

If the sight and sound requirements cannot be met by call buttons, electronic monitoring, or direct observation, then observation beds will not be used.

b.  **Operations.**  Observation rooms may only be used in accordance with the following:

- ■  Only a physician may authorize their use when the room is used for medical observation.  (If the room is used for suicide prevention, all requirements of the Program Statement **Suicide Prevention Program** apply).

- The Clinical Director will notify the Warden and other appropriate institution staff of the inmate's observation status.
- The CD will advise the Warden on the inmate's medical status and monitoring recommendations.
- The institution will have a plan to transfer the inmate to a community hospital in an emergency situation.
- The inmate will be oriented to life safety and fire evacuation procedures of the unit.

c. **Initiation and Discontinuation.** The following procedures apply to the initiation and discontinuation of observation status.

- A physician must be on call 24 hours per day.
- A physician will write an order on the Chronological Record of Medical Care (SF-600) admitting an inmate to observation status.
- When the physician authorizes use of medical observation telephonically, the physician must evaluate the inmate personally within four hours.
- All encounters between the inmate on observation and a health care provider will be recorded on an SF-600 form.
- Vital signs (temperature, blood pressure, pulse, respiration, pulse oximetry, if indicated) will be ordered by the physician and recorded on any inmate upon initiation of observation status, and daily thereafter, or as clinically indicated.
- Other diagnostic procedures such as laboratory tests, radiographs, etc. will be ordered, as indicated, by the physician.
- The Medical Duty Officer/physician on call will evaluate the inmate personally once daily, including weekends and holidays.
- Observation status may only be discontinued by a physician, ideally by the same physician who authorized the observation.

d. **Appropriate Use.** HSU observation rooms may be used in cases that do not require 24-hour nursing care, such as an inmate recovering from a surgical procedure in the local community, or to ensure that an inmate is prepared properly for a medical/dental procedure. Examples of appropriate observation room use include:

- Preparation of inmates for diagnostic studies such as upper/lower G.I. series, fasting purposes, etc.
- Upon return from out-patient surgery to assist adjustment in use of crutches, cane, casts, etc. Control of pain associated with known kidney stones.
- 24-hour urine collection, e.g. if the urine requires refrigeration.
- Ruling out infectious hepatitis (hepatitis A) requires isolation procedures.

■  Routine postoperative care such as indwelling catheters (status post prostate surgery), or surgical drains.

A physician will review the need for continued observation after the first 24 hours.  Inmates may only remain in observation status for 72 hours.

Observation rooms will **never** be used (not all inclusive):

■  To rule out myocardial infarction.
■  For inmates suddenly incontinent of bowel or urine.
■  To rule out stroke.
■  For acute mental health changes.
■  For mental health diagnoses (placement of a mental health inmate in a locked room constitutes seclusion and other requirements apply).
■  For reasons that may be deemed punitive such as restricting the inmate from recreation and other activities due to continued complaints such as back pain, etc.

## 11.  NEGATIVE PRESSURE ISOLATION ROOMS (NPIR)

Infectious Disease Isolation Rooms are negative air pressure-capable rooms constructed and operated in accordance with Centers for Disease Control (CDC) guidelines.

The CD will determine the length of stay for an inmate assigned to negative pressure isolation with tuberculosis, chickenpox, herpes zoster, or other infections requiring air-borne precautions.

The CD will consult with the Medical Director for guidance on medications, length of stay, and contact investigations. See the Program Statement on Infectious Disease Management.

The Medical Director will determine which institutions must maintain certified Negative Pressure Isolation Rooms.

Institutions without these rooms will have a local procedure for immediate transfer of inmates with suspected active tuberculosis or other highly contagious airborne diseases to a community hospital or other BOP institution within close proximity with NPIR capability.

## 12.  AMBULATORY CARE SERVICES

Each institution will have written policies and/or procedures for providing ambulatory care services.  Procedures for the Outpatient Department will include at least:

- Management of inmates with mental illnesses or disorders.
- Patient privacy.
- Infection control.
- Poison control.
- CPR.
- Patient triage/sick call procedures.
- Medical duty status.
- Treatment of patients in special housing units and detention status.
- Intake screening.
- Urgent treatment.
- Staffing (describing implementation of the PCPT model).
- Chronic care clinics.
- Accident reporting.
- Advance directives.
- Autopsies.
- EKG (including procedures to obtain stat interpretations).
- Physical examinations.
- Eyeglasses.

a. **Primary Care Provider Teams.**  The PCPT is designed to improve health care services delivery by enhancing continuity of care and promoting preventive health care measures. The PCPT is designed to function in the same manner as a medical office in a community setting. Under the PCPT model, each inmate is assigned to a medical team of health care providers and support staff who are responsible for managing the inmate's health care needs.

Assigning inmate caseloads to PCPTs will provide less duplication of services because team members will be more familiar with the medical problems of inmates assigned to the team.

Adequate numbers of mid-level providers (MLP) need to be available to provide diagnostic and treatment services to the inmate population during the typical weekday hours when the bulk of health care is delivered in our institutions.

For this model to be effective, teams are designed with support staff, such as nurses, medical assistants, health information technicians, and medical clerical staff, to perform duties and services which support the MLPs and physicians as they see their patients in the clinic.

Virtually all patient care provided to inmates will be by appointment, scheduled several days to weeks in advance through requests from the inmate, or follow-up appointments determined by the providers.  When fully implemented, "sick call" will be eliminated (see Section 17).

Administrative facilities [Metropolitan Correctional Centers (MCC), Metropolitan Detention Centers (MDC), Federal Detention Centers (FDC), the Federal Transportation Center (FTC)] and MRCs, although not required, may establish PCPTs.  The staffing pattern and provider/inmate ratios may be different based on patient acuity levels at administrative facilities.

Administrative and non-clinical functions supporting the HSU (e.g. budget, infection control, quality improvement activities, pharmacy services, laboratory and x-ray services and the ordering of supplies) will be performed by staff other than PCPT staff.

PCPT staff may participate in HSU committees and meetings which relate to patient care.

Appropriate levels of support staff must be achieved when implementing PCPT.

Institutions are to assign inmates to health care providers fairly and equitably.  The method of assigning inmates will be negotiated locally.

Achieving this model will occur at different rates for different institutions.  Factors affecting this rate of change include:

- Current staffing patterns.
- Unique institution missions and populations.
- Staff attrition.
- Ability to recruit and retain the desired mix of staff.
- Adequate administrative support staff.
- Adequate numbers of examination rooms, consultant rooms, equipment, etc.

Each institution must develop a contingency plan to address staff shortages which may occur after implementation of PCPT. Implementation will be negotiated locally.

When implementing the PCPT model, the following general guidelines should be considered for existing institutions:

(1) **Staffing Pattern**.  Each institution will assess the current health services staffing pattern and restructuring plan.  For example, a day shift PCPT staffing pattern for 1,000 general population inmates will have one physician, three mid-level practitioners, a registered nurse, one or two licensed practical nurses and/or medical assistants, two health information technicians, and a medical clerical staff person.  Based on this example, each MLP would be assigned a caseload of approximately 330 inmates.

Insufficient staffing will have an adverse effect on the quality, continuity, and cost-effectiveness of health care.

Additional staffing will be required to provide health care services after hours and on weekends.

Additional staff and posts will be required for most satellite camps as well as satellite FDCs and WITSEC Units.

The provider-to-inmate ratio may also need to be adjusted depending on institution's security level, physical layout, and mission.

For a 1,000-bed female institution, one additional mid-level practitioner and one additional female clinical support person for chaperone purposes will be required.

(a)  **Physician**. A physician will provide clinical oversight for multiple provider teams.  The physician, as the licensed provider of the team, is responsible for the care that team delivers. As such, it is the physician's responsibility:

■  To consult with the other team members.
■  To provide training and mentoring.
■  To directly evaluate and treat severely ill and medically complex inmates.

While the MLP is the PCPT's primary care provider, physicians are also responsible for providing direct patient care. Physicians will medically manage inmates with complex conditions on an ongoing basis notwithstanding the assignment of that inmate to an MLP. (Refer to Section 15 for discussion of the physician's role and referral procedures for complex conditions).

(b)  **Mid-level Practitioner (MLP).**  The MLP will serve as the primary point of contact for inmates assigned to their caseload.  They will serve as the primary provider for:

■  Routine requests for evaluation of new complaints.
■  Ongoing management of reoccurring conditions.
■  Emergencies when clinically indicated.

Refer to Section 15 for the MLP's role in Chronic Care Clinics.

(c)  **Clinical Nurse (RN)**. When the PCPT model is implemented, the Clinical Nurse will serve as the coordinator for the out-patient area.  Duties will include but not be limited to:

- Managing patient flow and triage.
- Responding to institution emergencies with MLP or physician back up.
- Coordinating the workload/duties of the Licensed Practical/Vocational Nurse (LPN/LVN).
- Screening new arrivals and assessing inmates returning from consultant visits or hospitalizations.
- Providing patient education, etc.

(d)  **Licensed Practical/Vocational Nurse (LPN/LVN)**. The LPN/LVN, who is accountable to the RN, will provide healthcare support for other clinical staff.  LPN/LVN duties will include but not be limited to:

- Collecting patient information including vital signs and blood pressure checks.
- Providing dressing changes.
- Administering treatments and/or medications.
- Performing EKGs, etc.

(e)  **Health Information Technician (HIT)**.  The HIT will obtain medical records for the health care providers.  Other duties will include:

- Entering SMD data.
- Filing lab/x-ray/consultant reports.
- Scheduling consultant visits, etc.

(f)  **Medical Clerical Staff**. Clerical staff will be responsible for:

- Ordering/stocking forms and supplies in the examination and treatment rooms.
- Answering the telephone.
- Locating inmates who do not report for scheduled appointments.
- Clerical support for the PCPT.
- Assisting with SMD entry, entering call-outs, etc.

(2)  **After-Hour Coverage.** After-hour, weekend, and holiday coverage will be provided by registered nurses and/or EMTs, where available, based on the institution's hours of in-house health care staff coverage.

An MLP may, under special circumstances, be assigned to evening and weekend coverage at institutions/complexes where the institution's size and complexity warrants.

Local procedures will be established to provide for emergencies including:

- Calls from institution staff requesting an emergency appointment for an inmate during day watch, Monday-Friday.   In this situation, typically, triage will be conducted by the team's registered nurse and the inmate's primary MLP would see the inmate if necessary.
- Significant medical emergencies such as trauma, heart attack, asthma attack, etc. will be treated immediately by appropriate team members.

(3) **Vacancies.**   As Health Services vacancies occur, each vacancy should be evaluated carefully to determine the best type of provider to hire to implement the PCPT model.

Institutions are encouraged to fill these positions with appropriate Bureau staff through the Priority Placement Program, Merit Promotion Plan, voluntary transfer, Public Health Service (PHS), etc.

Activating institutions will develop a Health Services staffing pattern consistent with the PCPT model.

## 13.  SPECIAL HOUSING UNITS (SHU)

All Health Services Units will have procedures and control systems to ensure continuity of medical and psychiatric care and treatment for inmates housed in SHUs. Health care staff will be informed immediately when an inmate is transferred to SHU. Procedures will be determined locally.

Local procedures will include at least the following:

- Protocols to provide for the assessment and review of inmates transferred to SHU.
- A health care provider will make daily rounds during the "lights on" period, except in extenuating circumstances. These rounds will be announced and recorded on the Special Housing Unit Record (BP-A0292).
- A mechanism describing how SHU inmates will notify medical staff of their need for health care.
- Daily rounds to triage urgent requests for care (should be accomplished by the same staff member who conducts the morning pill line in SHU, typically an RN/LPN/LVN).
- Procedures for follow-up care by an MLP or physician. All SHU inmate encounters, including medication refills or dispensing of over-the-counter medications, will be documented in the inmate health record.

The health record should be available when a SHU inmate is examined or treated for all but the most minor of conditions, if possible.

Health care staff will take particular care to monitor any inmate who is a potential suicide risk. See the Program Statement **Suicide Prevention Program**.

## 14. REFERRAL PROCEDURES BETWEEN HEALTH CARE PROVIDERS

Each institution will develop and maintain a log book (or equivalent computerized tracking system available to all HSU staff) to facilitate referrals between health care providers and the physician. Recommended elements of this log include:

- Date of referral.
- Register number.
- Inmate last name, first name.
- Referring provider.
- Referred to Dr._____.
- Reason for referral.
- Date referral noted by physician, with physician's initials.
- Date inmate to be seen by physician.
- Date seen by physician.

Inmates who are evaluated by an MLP on three separate occasions, without a definitive diagnosis or response to treatment, will be referred to a physician for evaluation.

## 15. CHRONIC CARE CLINICS

Chronic Care Clinics (CCCs) are a means for inmates with ongoing medical needs to be tracked and seen by a health care provider at clinically appropriate intervals. A physician will see all inmates assigned to a CCC every 12 months, or more often if clinically indicated.

The frequency of CCC follow-up care will be determined based on clinical need and communicated to the inmate's primary MLP, who will provide this care.

The physician will review the health records of all CCC follow-up encounters the MLPs perform.

High risk or medically complex chronic care inmates will be seen more frequently in accordance with good clinical judgment, in addition to or in conjunction with regular visits with their primary provider.

All treatment and management decisions a physician or MLP make will be communicated to the inmate's assigned primary provider for continuity of care.

The CD or staff physician will:

- Initially examine all new arrivals from other institutions that have a CCC assignment, within 14 days of arrival, to establish a treatment plan and follow-up intervals appropriate for the inmate's medical needs.
- Personally examine and approve all additions and deletions of inmates to a CCC.

The CD retains overall professional responsibility for managing CCC inmates.  The CD is expected to provide consultation to the MLPs as needed.

Prescribers may order chronic care medications for up to 365 days, except with the limitations outlined in the National Drug Formulary.   Inmates chronically taking medications that cannot be prescribed for 365 days will be followed by a physician.

## 16.  DOCUMENTATION

The HSA will ensure that a Bureau approved tracking system is maintained and is accessible to all Health Services Staff, to ensure identification and follow-up of patients assigned to CCCs.

Generally, inmates should not be placed in separate clinics to address various conditions (e.g., a diabetic patient with angina and high cholesterol should be seen on only one CCC (primary diagnosis) and all relevant issues addressed at each visit).

In some cases, it is appropriate to assign an inmate to multiple clinics if this allows better tracking for follow-up by outside specialists, e.g. psychiatrists and infectious disease consultants.

CCC visits will be documented on the Chronological Record of Medical Care (SF-600) using the **SOAP** format (see below.)

CCC entries will be preceded by a block stamp identifying the note as "Chronic Care Clinic," or a specific condition such as "Diabetic Clinic" or "Mental Health Clinic."

All Progress Notes must be legible and written in black or dark blue ink.

a.  **SOAP Format.**   Patient encounters will be documented using the SOAP format:

**S**-Subjective or Symptomatic data.
**O**-Objective Data.
**A**-Assessment.
**P**-Plan.

**Patient education** is a required element of the treatment plan. Education may be documented under "P," or may be documented separately ("**SOAPE**").

Patients who complain of pain, will be assessed and treated if necessary.

b.  **Administrative Notes.**  Administrative notes are notes placed on the SF-600 to document issues important to the inmate's care when the inmate is not seen by the provider at the time of the entry, such as:

- ■ Review of laboratory and radiology results.
- ■ Review of consultant reports.
- ■ CD updates on an inmate's status in the community hospital.
- ■ Medication refills not related to a clinic visit.
- ■ Instances when the inmate is not examined or does not report for a scheduled appointment.

c.  **Request for Consultation.**   All requests for consultation by an outside consultant or contract health care provider must be in writing on the Consultation Sheet form (SF-513).  Sufficient clinical information should be provided at the top of the SF-513, or by attaching copies of documents from the inmate health record, to describe the inmate's complaint or condition, and the information being sought by the referring physician.

The CD, or designee, must review and approve all requests for consultation by a specialist prior to the consultation.

It is expected that a staff physician will have examined most inmates referred to an outside consultant.

**All** encounters by consultant providers will be documented on the SF-513. Transcribed consultation reports will be filed with the SF-513.

Contract consultants who evaluate inmates within the institution will not document on the Progress Notes.

All consultation reports will be reviewed, co-signed and dated by the Clinical Director or staff physician.

Bureau physicians are not obligated to follow all consultant recommendations. If a consultant makes a recommendation which is outside Bureau policy or scope of services, the CD will

document thoroughly the reasons the consultant's recommendations are not followed, based on input from the staff physician.

17.  **TRIAGE/ACCESS TO CARE**

Triage is defined as the classification of patients according to priority of need for examination and/or treatment. Triage allows truly urgent conditions to be addressed adequately on the same day, while also allowing more routine conditions or concerns to be addressed at a scheduled appointment.   During triage the following will occur:

- The inmate will provide a brief history.
- Vital signs will be taken, if indicated.
- An appointment will be scheduled with the appropriate provider within a time frame appropriate for the inmate's condition and medical needs.
- If no follow-up appointment is warranted, the inmate will be advised of other options (e.g. obtaining over-the-counter medications from the Commissary, submitting an Inmate Request to Staff (BP-A0148), etc.

An Inmate Request for Triage Services will be completed for each inmate. The form is to be pre-printed onto an SF-600. These forms will be filed in Section 1 of the inmate health record.

If no appointment is scheduled as a result of triage, this will be noted on the triage form and will be turned in to the Health Information Department for filing.

a.  **Appointments.**  Virtually all clinical services provided to the inmates will be by appointment, scheduled several days to weeks in advance through a request from the inmate or follow-up appointments determined by the providers.

Institutions not yet implementing the full PCPT model will use the triage system described above.

Inmates may request clinical services on a daily basis by completing the Inmate Request for Triage Services form. Health Services staff will triage and prioritize the requests and schedule appointments based on need.

Physicians and other health care providers will be available five days per week to provide clinical services.

Urgent Care services (injuries, chest pain, asthma attacks) will be available at all times, either through on-site providers or community emergency services.

b.  **Examination Areas**.  Staff will see inmates individually in a private examination area. Other inmates will not be present, except in emergencies or other unusual circumstances (i.e., as a translator when staff interpreters are not available).

Ordinarily, the examiner will have the inmate's health record during all inmate visits.  If the health record is not available for a routine examination, the inmate should be rescheduled. Staff will document the reason the health record was not available.

The examining room will have adequate space (minimum of 100 sq. ft.), running water, and provision for both the examiner and inmate to be seated.

There will be adequate desk space so that the examiner may make notes in the inmate health record.

Necessary forms, equipment, and supplies, including an examining table will be available.

A sharps bio-hazard disposal container, mounted to the wall if possible, will be located in all rooms where needles and syringes are used.

Appropriately labeled bio-hazardous waste containers will be available.

Examination rooms will be cleaned regularly including the disinfection of examination tables and contaminated surfaces.  Inmate orderlies may perform this task.

Between each patient, the examination table must either be wiped down with a disinfectant or the table paper must be changed.

When patient encounters are conducted in a satellite area (segregation, special custody units, industry locations, camps, units with difficult egress, etc.), adequate space and equipment will be available, consistent with the requirements above.

The **SOAP** label may be used to document a patient encounter in Special Housing/detention units in lieu of the inmate's health record.  This label is then affixed to the SF-600.

c.  **Privacy.**  Staff will provide inmates the opportunity to discuss their medical complaints without other inmates being present.

## 18.  INTAKE SCREENING

a.  **Newly Incarcerated Inmates.**  Health Services clinical staff will conduct an initial assessment of each newly committed inmate upon his/her arrival at an institution.  This screening is to determine:

- ■  Urgent medical, dental, or mental health care needs.
- ■  Signs of acute drug or alcohol intoxication or symptoms of withdrawal.
- ■  Restrictions on temporary work assignments.
- ■  Freedom from contagious infectious disease.

Inmates with perceived immediate medical/dental/mental health needs will be referred to the appropriate health care staff for evaluation.

b.  **Bureau Intra-system Transfers**.  The BEMR Exit Summary for Inmate Intra-system Transfer will be reviewed and annotated appropriately at each receiving institution, including the designated institution.

It is prohibited to transfer inmates between Bureau institutions, (including all holdover status inmates, i.e., DEA, U.S. Marshals Service, Bureau of Immigration and Customs Enforcement [formerly INS], FBI, etc.), who have not been screened for TB.  This prohibition does not apply to court-related activities or inmates being transferred on writ (to non-Bureau institutions).

It is the HSA's responsibility to ensure health services staff completing the BEMR Exit Summary for Inmate Intra-system Transfer have documented TB screening results and that the inmate is cleared for transfer prior to electronically signing the form.

Transporting officials will not accept any inmate for transfer unless either PPD or chest x-ray results are completed and satisfactory for transfer, as noted on the BEMR Exit Summary for Inmate Intra-system Transfer.

## 19.  PHYSICAL EXAMINATIONS

a.  **Short-Term Examination.**  For individuals in predictably short-term custody (FDCs/MCCs/MDCs/Jails), an initial screening physical examination to determine medical needs will be done **within 14 days of admission** on the appropriate physical examination form.

**However, TB screening must be initiated within two working days of incarceration**. (See the Program Statement **Infectious Disease Management**.)

Initial screening physical examinations include, but are not limited to, the following components:

(1) **Medical and Mental Health.** Complete the history and screening physical examination form(s).

Inmates showing signs of acute drug or alcohol intoxication or withdrawal symptoms will be managed in accordance with the institution's local procedure for detoxification of chemically dependent inmates.

Staff will obtain a detailed history of substance use and conduct an examination.

Health Services staff will complete a written referral to the institution Chief Psychologist and Clinical Director for any inmate showing evidence of substance dependence/abuse.

(2) **Dental.** Complete the dental intake screening form(s) in accordance with the Program Statement **Dental Services**.

(3) **Ordering of appropriate laboratory and diagnostic tests,** if clinically indicated. Examples include hepatitis screening, sickle cell screening (hemoglobin electrophoresis is recommended over Sickledex), sexually transmitted disease (STD) testing, chest x-ray, EKG. (Refer to the Program Statement **Infectious Disease Management** for HIV testing.)

The physical examination is considered complete when the above three steps are completed. The CD will review and sign the completed physical examination form.

Clinically indicated laboratory test results do not need to be received prior to signing the physical examination form.

Any abnormal laboratory results generated as part of the physical exam must be documented in the progress notes.

The inmate must be counseled regarding any necessary follow-up treatment or testing within a clinically appropriate time frame.

Intra-system transfers do not need a second complete initial physical examination as long as one has been completed for this period of confinement.  Inmates who present any new medical problems will be assessed appropriately.

b.  **Long-Term Examination.**  For individuals in predictably long-term incarceration (sentenced/designated), an initial complete physical examination to determine medical needs will be done within 14 days of admission on the appropriate examination forms.

**However, TB screening must be initiated within two working days of incarceration**. (See the Program Statement **Infectious Disease Management**.)

The initial complete physical examination includes, but is not limited to, the following components:

(1)  **Medical and Mental Health.**  Complete the history and physical examination form(s).

Inmates showing signs of acute drug/alcohol intoxication or withdrawal symptoms will be managed in accordance with the institution's local procedure for detoxification of chemically dependent inmates.

Staff will obtain a detailed history of substance use and conduct an examination.

Health Services staff will complete a written referral to the institution Chief Psychologist and Clinical Director for any inmate showing evidence of substance dependence/abuse.

(2)  **Dental.**  Complete the dental examination forms in accordance with the Program Statement **Dental Services**.

(3) **Ordering of appropriate laboratory and diagnostic tests,** if clinically indicated.  Examples include hepatitis screening, sickle cell screening (hemoglobin electrophoresis), STD testing, chest x-ray, EKG, age-appropriate preventive health examinations.  (Refer to the Program Statement **Infectious Disease Management** for HIV testing.)

The physical examination is considered complete when the above three steps are completed.  The CD will review and sign the complete physical examination form.

Clinically indicated laboratory test results do not need to be received prior to signing the physical examination form.

Any abnormal laboratory results generated as part of the physical exam must be documented in the progress notes.

The inmate must be counseled regarding any necessary follow-up treatment or testing within a time frame which is clinically appropriate.

The long-term examination policy applies to all Bureau institutions, except as noted above under the short-term physical examination section. Unless clinically indicated, Health Services staff does not need to complete a new physical examination on an inmate who has had one documented, provided the inmate has been in continuous custody.

A complete physical examination will be required for inmates who are out of BOP custody for more than 30 days (e.g., furlough, writ, or a halfway house failure).

For an inmate transferred from another Bureau institution, staff need not conduct a second complete initial physical assessment if the inmate does not present any new medical problems and has already had a complete health assessment for this period of confinement.

c.  **Periodic Health Examinations.**  The Medical Director will ensure the availability of age-specific preventive health examinations (e.g., cancer screening) for the inmate population.

Information regarding these examinations will be made available through the A&O process, posted information in the HSU, and individual patient education associated with clinical encounters.

d.  **Food Handlers' Examinations**.  Inmates will not be assigned to Food Service work details until they are cleared by Health Services.  If a complete history and physical examination has been documented but is more than one year old, a brief in-person examination will be conducted to update the inmate's history and screen for the conditions listed below.

This encounter will be documented on the SF-600 and the date of clearance for Food Service will be updated on SENTRY.

Annual Food Handler examinations will not be required, however, upon orientation to Food Service, Food Service staff will provide inmates with an information sheet instructing them to report to their detail supervisor should they display symptoms of any of the following:

- Acute or chronic inflammatory conditions of the respiratory system.
- Acute or chronic skin conditions.

- Acute or chronic intestinal infections (vomiting or diarrhea).
- A communicable disease.

**Note:**  HIV, HBV, or HCV infection or latent TB (positive PPD without active tuberculosis) pose no risk of food borne transmission.

**Inmates with HIV, HBV or HCV infection or latent TB are not precluded from working in Food Service based on this status alone.**

The primary care provider will determine the inmate's suitability for Food Service.

Inmates will sign and date a copy of the information provided to them and this copy will be maintained on file in the Food Services Department.

When an inmate notifies the detail supervisor of the presence of any of the above signs or symptoms, he/she will be referred to the HSU for re-examination.

Inmates will be monitored daily for health and cleanliness by the Food Services Administrator, or designee.

Inmates exhibiting signs of infected cuts or boils will be referred to the HSU for re-examination.

## 20.  FEMALE HEALTH CARE

a.  **Requirements for Routine Physical Examinations of Female Inmates.**  In addition to the elements described in Section 19 for complete physical examinations (long-term), the following elements apply to routine physical examinations of female inmates:

- A gynecological and obstetrical history, including sexual activity and any recent rape history.
- Order a pregnancy test for females of childbearing age (urine or serum) and other tests as clinically indicated.
- Conduct a breast and pelvic examination.  A female staff member will be present when a male provider performs breast and pelvic examinations (except in emergency situations when a female staff member is not available).
- Annual breast examinations will be made available to inmates upon request.
- Self-examination instructions will be given to all females at the time of the breast examination.
- Offer Pap smear; collect chlamydia, gonorrhea and/or other endo-cervical cultures from vaginal and/or anal orifices when clinically indicated.

The Medical Director will ensure the availability of age- specific preventive health examinations (e.g., cervical, breast) for the female inmate population.

b. **Mammography.**  Mammography will be used as a diagnostic tool.

- **Sentenced Status**.  Perform baseline mammography for sentenced females aged 50-74 years old unless a younger female is assessed to have a high risk for developing breast cancer.
- **Pre-sentenced or Holdover Status**.  Perform baseline mammography for pre-sentenced or holdover female inmates aged 50-74 years old who have been continuously housed at the institution for 12 months.  When the 12-month interval is reached, baseline mammography should be scheduled within 30 days and completed before the end of the second year of being continuously housed at the institution.  Females younger than 50 years of age in pretrial or holdover status for 90 days, and who have identified risk factors for breast cancer, should be scheduled for baseline mammography.

If the inmate refuses mammographic screening, a Medical Treatment Refusal form (BP-A0358) will be signed.

When a breast mastectomy is performed in the treatment of cancer, breast reconstruction is considered Medically Necessary, Not Emergent (Level 2).

Chest x-rays are only required during the initial physical exam if clinically indicated.

Female inmates of child bearing age will be questioned as to the possibility of being pregnant prior to taking any x-rays.  This information will be documented on the Radiologic Consultation Request/Report form (BP-A0622).

c. **Prescription Birth Control.**  Upon request, inmates will be provided information pertaining to appropriate methods for birth control.  Ordinarily, the medical indication and appropriateness of prescribing birth control medication in a correctional environment is limited to:

- Hormonal manipulation for menstrual irregularity.
- Hormonal replacement therapy in post-menopausal women as clinically indicated.

Prior approval of the Bureau's Medical Director is required if a clinician believes birth control is medically appropriate for a condition other than those noted above.

Sterilization may not be provided as a form of birth control.

Intrauterine devices (IUDs), or other implanted contraceptive devices, will not be made available to inmates.  Inmates entering the Bureau with these devices in place will be advised of possible complications associated with continued use, with documentation in the inmate health record.  These devices may be removed upon the inmate's request.

d.  **Pregnancy.**  When pregnancy is confirmed, the inmate will be referred to a physician within 14 days for an initial examination and management of the pregnancy.

The HSA will notify the inmate's unit manager promptly when pregnancy is confirmed.  (Refer to the Program Statement **Birth Control, Pregnancy, Child Placement and Abortion**.)

All pregnant inmates will be offered HIV antibody testing with documentation on the SF-600.

A prenatal vitamin should be prescribed to all pregnant inmates unless contraindicated.

e.  **Childbirth.**  Prior to an inmate giving birth, the Warden will ensure the person or agency taking custody of the child is asked to take responsibility for all medical expenses from the time of delivery (including the first three days after birth).

Unit management, or a social worker if available, will obtain a signed statement of responsibility from whomever receives custody of the child.

This statement of responsibility will clearly indicate the signing party accepts financial responsibility for all medical expenses for the child.

A copy of the signed statement of responsibility will be sent to the HSA for placement in the outside hospitalization file and another copy sent to the Controller.

Administrative discretion to pay for the immediate postnatal care of the child born to a female inmate is authorized when no other resource can be compelled to pay.  Legislation is not required to authorize payment for the child's immediate medical needs.  It is reasonable for the Bureau to provide for the child's medical expenses:

- For the first three days following routine vaginal delivery.
- Up to seven days following delivery by Cesarean section.

The Regional Director may extend this an additional seven days for extenuating circumstances on a case-by-case basis.  Any further extension will require approval by the Medical Director.

f.  **Pregnancy Statistic Reporting Requirements.**  Institutions will report the name, register number, and expected due date of all pregnant females to the Chief of Health Information Management, Health Services Division, Central Office, via BOPNet GroupWise.

All live births will be reported to the Chief of Health Information Management.

A follow-up report is required for all pregnancies that end in other than a live birth (i.e., abortion, miscarriage, premature birth, stillbirth).

## 21.  INMATE IMMUNIZATIONS

Refer to the Program Statement **Infectious Disease Management**.

Staff will notify inmates of the availability of immunizations through A&O and posted information in the HSU.

Health Services staff will maintain a standard immunization record in each inmate health record. Upon request, the Health Information Department will provide inmates with a copy of their immunization records following their release.

## 22.  SURGICAL SERVICES

Health Services staff will ensure that Consent for Anesthesia forms (SF-522) are completed for:

- ■  All ambulatory-type surgical procedures.
- ■  Local anesthesia for diagnostic and therapeutic purposes.
- ■  Joint injections.
- ■  Flexible endoscopy.

Consent forms are strongly recommended for laceration repair (suturing), especially on the face, or when fascia or tendon sheaths require closure.

All institutions will have written surgical policies and procedures in accordance with Joint Commission and safety standards.

23.  **SURGICAL PATHOLOGY**

Histology/cytology specimens removed during a surgical procedure will be sent to an approved pathologist for examination.  All specimens will be packaged in preservative as indicated by type of specimen and local procedures.  All specimens will be labeled with the following:

- Inmate name.
- Register number.
- Date of collection.
- Source of specimen.

Refer to the Program Statement **Dental Services** for information regarding dental pathology.

24.  **SERIOUS ILLNESS AND DEATH PROCEDURES**

An Institution Supplement will be developed to incorporate specific information covered in the categories listed below, including:

- Serious Illness and Death Procedures, including who may pronounce death according to state law, and notification of the coroner or medical examiner.
- Inmate Advance Directives ("Living Wills").
- Request for consideration of reduction in sentence ("compassionate release").
- "Do Not Resuscitate" (DNR) Orders.

For further information refer to the Program Statement **Escapes/Deaths Notifications**.

When an inmate's medical condition becomes life-threatening and death may be imminent, the principles and procedures listed below will be followed.

The Bureau remains committed to the principle of preserving and extending life.   A seriously ill or dying inmate should be provided care consistent with this goal.

When an inmate is in a community hospital, the Bureau retains authority regarding administrative decisions (visitors, movement of the inmate, limits on medical services the Bureau will authorize, etc.) and the hospital retains authority for professional medical decisions (drug regimen, laboratory tests, x-rays, treatment performance, etc.).

As long as the treatment conducted by the hospital and agreed to by the inmate or family does not exceed the scope of medical services the Bureau provides, normally the treatment will be permitted.

In most cases, the inmate will be in a local hospital and the hospital will have procedures complying with State law regarding the involvement of next of kin.

The hospital will be permitted to follow its established bylaws concerning seriously ill or dying inmates, e.g. initiating DNR orders and discontinuing artificial life support.

The Bureau will be kept informed of the treatment the inmate is receiving, but medical staff of the hospital will retain the authority for decisions concerning treatment.

a.  **Serious Illness.**  An inmate's serious illness is of immediate concern to the inmate's family; the institution will notify the next of kin promptly.  If approved by the Warden, the immediate family member (next of kin) will be made aware of the medical condition and the limitations placed on visiting.

While the Bureau will continue to control conditions under which a family member may visit, consideration will be given to providing the maximum opportunity for visitation.  (Refer to Program Statement **Inmate Visiting**.)

As soon as possible, the HSU will notify the Warden and Chaplain by phone or in person of the inmate's condition, and the Warden, or designee, will arrange to notify the family. Subsequently, the Warden will be notified of the illness by confirming memorandum from a medical staff member.

The memorandum will describe the illness briefly and provide a prognosis, if possible.  A copy of the memorandum will be sent to the Chaplain.  If a pretrial inmate becomes seriously ill, requires major surgery, or dies, the Warden, or designee, will also notify the committing Court and the U.S. Attorney's Office. (Refer to the Program Statement **Escapes/Deaths Notifications**.)

When inmates are suitable candidates for early release through a Reduction in Sentence (often called compassionate release) and the inmate and family desire such an arrangement, the institution will expedite processing of the request.  (Refer to the Program Statement **Compassionate Release; Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) & 4205(g)**).

If an inmate is a suitable candidate for medical furlough, refer to the Program Statement **Furloughs**.

In case of death, the Warden or the Warden's representative will notify the family of the deceased in the same manner as serious illness notification.

b. **Autopsies.**  Inmates who expire as a result of a known terminal disease do not routinely require an autopsy.  Refer to the Program Statement **Autopsies**, and the Autopsy Authorization form (BP-A0797).

Before initiating an autopsy or embalming, a determination of the inmate's religious preference will be made.  Religions, including Judaism and Islam, forbid embalming.  Additionally, there are other religion specific requirements involving autopsies and embalming.

It is critical the institution's religious services department head be consulted prior to final authorization for an autopsy or embalming.

Each institution will develop procedures describing when to contact the local coroner or medical examiner regarding such issues as:

- Performing an autopsy.
- Who will perform the autopsy.
- Obtaining State-approved death certificates.
- Local transportation of the body.

State laws regarding these issues vary greatly and when legal questions arise, the Regional Counsel should be contacted.  State law provisions and guidelines on when to contact the coroner or medical examiner will be incorporated into an Institution Supplement and a copy forwarded to the Regional Counsel.

c. **Advance Directives and "Do Not Resuscitate (DNR) Orders."**  Increasingly, inmate and health care providers are confronted with difficult and sensitive decisions regarding health care, including the decision to have extraordinary means of care and life support withheld or withdrawn in cases of a terminal condition or irreversible illness.  This section provides guidance on creating and implementing these advance directives.

Inmates may direct, in advance, to withhold or withdraw certain medical treatments when recovery or cure is not possible.

Inmates may appoint, in advance, proxy decision makers who will make critical health care decisions for them should they become incapacitated and unable to make such decisions for themselves.

The Bureau's withholding or withdrawal of resuscitative or life-support services pursuant to an Advance Directive or DNR order, is consistent with sound medical practice and is not associated with assisting suicide, voluntary euthanasia, or expediting the inmate's death.

The patient's right to refuse medical treatment is not absolute and, in all cases, will be weighed against legitimate governmental interests, including the security and orderly operation of correctional institutions.

d.  **Institution Supplement**.  To facilitate the creation and implementation of advance directives and DNR orders, each institution will develop an Institution Supplement according to this Program Statement.

The Warden, Regional Director, and Medical Director must review and approve Institution Supplements. Supplements will be negotiated locally prior to implementation.

Regional and local Bureau legal staff should be consulted in drafting Institution Supplements under this section.

(1)  **Advance Directives.**  Each Institution Supplement addressing advance directives must:

- Provide information which complies with the law of the state where the institution is located. A copy of the relevant state's law should be an attachment to each Institution Supplement.
- Include a sample standard form for inmate use if available from the relevant state statutes on advance directives.
- Include instructions for inmates wishing to execute advance directives before, or after, the onset of a seriously debilitating or terminal illness, including the option of retaining private legal counsel at the inmate's expense for assistance.
- Require filing inmates' executed advance directives in the inmate health record.

(2)  **DNR Orders**.  Each Institution Supplement addressing DNR orders must:

- Provide information which complies with the law of the state where the institution is located. A copy of the relevant state's statutes should be an attachment to the Institution Supplement, if they exist.  This includes state laws addressing non-liability of healthcare practitioners who implement advance directives in good faith.
- Instruct that, in all cases, decisions a competent inmate expressed supersede any previously executed advance directive to the contrary.
- State that DNR orders **will never** be invoked while an inmate is housed at a general population institution. Emergency resuscitative measures must always be performed on an inmate who suffers cardiopulmonary arrest at a general population institution.  Advance

directives may be implemented only at community health care facilities or MRCs, while the inmate is under a physician's direct care and treatment.

■   Instruct that validly executed advance directives will be honored by entering DNR orders as appropriate at MRCs.

■   Instruct that validly executed advance directives will be honored by community healthcare facilities according to their by-laws and relevant state and local laws.

The Institution Supplement will also include the following procedures for implementing DNRs:

(a)  All DNR orders written for inmates in MRCs must be approved by the Clinical Director (CD) or acting CD.

(b)  A valid DNR order must be documented in the inmate's health record, including:

■   Standard terminology (i.e., "Do Not Resuscitate" or "DNR"), legibly written, signed by the ordering physician, and placed on the front of the record and inpatient chart, as well as the doctor's order sheet.

■   The inmate's diagnosis.

■   The inmate's prognosis.

■   The inmate's written advance directive, or other authorized expression of healthcare decisions, as well as available documentation of the inmate's informed consent, when available.

■   Documentation regarding the inmate's competence, when the decision to enter a DNR is based on his/her expressed request.

■   The wishes of immediate family member(s), if available.

■   Decisions and recommendations of other medical staff or consultants, with documentation of names.

(c)  DNR orders are subject to regular review by the ordering physician.

(d)  Inmates with DNRs in their health record remain entitled to maximal therapeutic efforts short of resuscitation.

(e)  Bureau physicians at MRCs may not be compelled to sign a DNR based on their clinical judgments, or ethical or religious convictions.

To protect the interests of both the inmate and the Government, the Government may, in some cases, seek judicial or administrative review of the declaration in an Advance Directive.

When the inmate is unconscious or otherwise unable or incompetent to participate in the decision, every reasonable effort will be undertaken to obtain written concurrence of one or several immediate family members.  The attending physician must document these efforts in the health record.

A DNR order may be the result of the attending physician's decision that the inmate is in a terminal condition and further medical treatment is futile.   When a DNR order conflict exists between the primary care physician and the inmate or the inmate's proxy decision maker, a referral to the MRC ethics committee will be made.

Should the committee be unable to resolve the conflict, the issue will be referred to the Bureau's Medical Director for final determination.

## 25.  BODY SEARCHES FOR CONTRABAND

Under no circumstances will laxatives, enemas, or emetics (any form) be used to induce a bowel movement or vomiting to help remove contraband.  The only exception is, if a medical condition requires prescribing laxatives, enemas, or emetics, the Clinical Director must order this medication weighing the potential danger to the inmate if contraband is present.

When a Warden authorizes a cavity search as stated in the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**, qualified health care personnel will perform the cavity search.

The use of a fluoroscope, major instrument (including anoscope or vaginal speculum), urinary catheter, or surgical intrusion will only be authorized for medical reasons, with the inmate's consent.

The only exception is if an x-ray examination is determined necessary for the safety and security of the institution, the **Warden, with the Regional Director's approval,** may authorize the physician to order a non-repetitive x-ray examination to determine if concealed contraband is present in or on the inmate.  (Refer to the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas** for further direction.)

## 26.  SPECIAL DIETS

Unless clinically indicated as part of the treatment regimen, medical staff will not order special food items. When a special diet is required to supplement a medical regimen, the Program Statement **Food Service Manual** will be consulted.

Special diets will be prescribed only by the CD, staff physician, staff psychiatrist, or staff dentist.

MLPs at MRCs may prescribe a special diet, but it must be countersigned by the primary physician.

Weight loss diet programs will not be implemented without the physician's approval.

Documenting patient education regarding diet recommendations in the health record is the responsibility of the prescriber and dietitian.

If there is no full-time dietitian, it is highly recommended that MRCs contract for a consultant dietitian who will provide counseling services and patient education.

27.  **EYE CARE**

a.  **Eyeglasses**.  The Bureau will furnish prescription eyeglasses to any inmate requiring them, as documented through a professional prescription.  Federal Prison Industries, FCI Butner, NC, is the only approved vendor at Government expense.

Inmates may purchase reading glasses at commissaries which stock them.

The HSA, in consultation with the CD and consultant optometrist, may elect to stock a supply of reading glasses in various magnifications which the optometrist may dispense when the inmate only requires magnification.

The HSA may purchase glasses through usual supply procedures.

Inmates may retain their eyeglasses at admission. All such glasses are subject to inspection for contraband.  Inmates may retain this pair of eyeglasses until the lenses or frames must be changed or repaired, at which point the Bureau will furnish replacement eyeglasses through Federal Prison Industries.

b.  **Contact Lenses**.  Contact lenses will only be prescribed when, in the clinical judgment of a Bureau or contract optometrist or ophthalmologist, with the concurrence of the CD and HSA, an eye-refractive error is best treated with the prescription of contact lenses.   Generally these cases are limited to the following:

- Diagnosis of keratoconus.
- Certain inmates with artificial lens implants.

HSU staff will evaluate sentenced inmates arriving at an institution with contact lenses and refer them to a Bureau or contract optometrist or ophthalmologist to determine whether they may retain the lenses. Unless contact lenses are medically necessary, HSU staff will inform the inmate that an appointment will be made with the institution's optometrist for an eyeglass prescription.

The only exception to the above is non-sentenced inmates who are housed in BOP institutions.

Once the glasses are received, the contact lenses must be returned to the inmate's personal property or mailed home.

HSAs will ensure adequate contact lens supplies are available for inmates authorized contact lenses (those who must wear contacts as opposed to glasses), non-sentenced inmates, or those awaiting eyeglasses.

## 28. HEARING CONSERVATION PROGRAM

Whenever individual occupational noise exposure equals or exceeds the eight-hour time weighted average (TWA) sound level of 85 decibels (and above) measured on the "A" scale (dBA), the institution will initiate a hearing conservation program. At a minimum, the program will meet the requirements of paragraphs (c) through (o) of 29 CFR Part 1910.95. Major elements include:

- Monitoring areas where noise levels are expected to equal or exceed an eight hour time weighted average of 85 dBA.
- Notification of inmates occupationally exposed to a TWA at or above 85 dBA.
- Audiometric testing for those exposed.
- A training program.

a. **Initial Survey.** The Safety Manager will arrange for an initial survey of the institution to identify work areas where inmates are subjected to noise exposure of 85 dBA TWA or higher. The Safety Manager will designate any work assignment where an inmate is exposed to a TWA threshold that meets or exceeds 85 dBA as a high noise job.

The Safety Manager will notify the HSA and the affected department head of each high-noise job designation. Each inmate assigned to a high-noise job will:

- Be fitted with hearing protection.
- Be required to wear the hearing protection device while working.

■   Be trained in accordance with 29 CFR 1910.95.

The Safety Manager will be responsible for ensuring hearing protection fitting and training.  The department head of the high noise area is responsible for ensuring that hearing protection is worn in the work area.

The department head will notify the HSA when an inmate is assigned to a high-noise area.  The HSA or designee, will obtain a baseline audiometric test as soon as possible, but no later than six months after that job assignment, and the HSA will notify the department head of the date when testing is performed. Audiometric tests will be made at the 500, 1,000, 2,000, 3,000, 4,000, 6,000, and 8,000 Hertz (hz) frequencies.

When mobile test vans are used to meet the audiometric testing obligation, the HSA will obtain the audiometric test as soon as possible, but no later than one year after the job assignment.

Detectable hearing loss at initial testing does not preclude the inmate's assignment to a high-noise area, provided hearing protection is worn.

Inmates who are deaf may be allowed to work in high- noise areas, provided an assessment of safety factors is performed to determine if the work place is otherwise safe and appropriate, with or without reasonable accommodations.

Inmates who are intra-system transfers, and who are assigned to a high-noise area in their new institution, will use the baseline audiogram performed at the sending institution, if available.

b. **Annual Retesting.**  Each inmate assigned to a high-noise area must receive audiometric retesting at least annually.  It is the department head's responsibility to notify the HSA of each inmate needing annual testing.

Upon retesting, any inmate found to have a standard threshold change or shift of 10 dB or more as compared to a baseline average over 2,000, 3,000, or 4,000 hz frequencies must be retested within 30 days.

The results of the retest will be considered the annual audiometric test.

It is important to factor in age-related hearing loss as described in 29 CFR 1910.95, Appendix F, when administering an annual retest.

Unless the Clinical Director determines that a standard threshold shift of greater than 10 dB is not work-related or aggravated by occupational noise exposure, the Safety Manager will ensure that the inmate is:

- ■ Refitted with hearing protection.
- ■ Trained in its use and care.
- ■ Required to wear the hearing protective device.

The HSA will notify the Safety Manager of each inmate who must be refitted and retrained.

c. **Audiometric Testing.** Audiometric tests will be performed by a licensed or certified audiologist, otolaryngologist, or other physician, or by a technician who is certified by the Council of Accreditation in Occupational Hearing Conservation. Staff who have demonstrated skill and knowledge satisfactorily, as determined by a licensed or certified audiologist, otolaryngologist, or other physician, may also perform audiometric testing.

Skill and knowledge must be demonstrated in:

- ■ Administering audiometric examinations.
- ■ Obtaining valid audiograms.
- ■ Properly using, maintaining, and checking calibration and proper functioning of the audiometers being used.

A technician who operates microprocessor audiometers does not need to be certified. A technician who performs audiometric tests must be responsible to an audiologist, otolaryngologist, or physician.

Audiometric tests will be conducted with audiometers that meet the specifications of the American National Standard Specification for Audiometers, S3.6-1969.

If used, pulse-toned and self-recording audiometers will meet the requirements specified in 29 CFR 1910.95, Appendix C, "Audiometric Measuring Instruments."

Audiometric calibrations will be performed in accordance with 29 CFR 1910.95 (h)(5).

Record keeping will be performed and maintained in accordance with 29 CFR 1910.95 (m).

29. **DEAFNESS AND HEARING AIDS**

Hearing aids can be justified only by bona fide clinical indication.  The CD, in consultation with an audiologist or otolaryngologist, will determine if a hearing aid is medically necessary.

HSAs will ensure that batteries are available for inmates with hearing aids.

If an inmate brings a personal hearing aid into the institution, after verification, he/she will be allowed to keep it.  However, the inmate may not purchase a personal hearing aid once committed to an institution.

30. **INMATES WITH GENDER IDENTITY DISORDER**

Inmates with a possible diagnosis of Gender Identity Disorder (GID), including inmates who assert they have GID, will receive thorough medical and mental health evaluations from medical professionals with basic competence in the assessment of the DSM-IV/ICD-10 sexual disorders and who have participated in BOP's GID training, including the review of all available community health records.  The evaluation will include an assessment of the inmate's treatment and life experiences prior to incarceration as well as experiences during incarceration (including hormone therapy, completed or in-process surgical interventions, real life experience consistent with the inmate's gender identity, private expressions that conform to the preferred gender, and counseling).

If a diagnosis of GID is reached, a proposed treatment plan will be developed which promotes the physical and mental stability of the patient.  The development of the treatment plan is not solely dependent on services provided or the inmate's life experiences prior to incarceration. The treatment plan may include elements or services that were, or were not, provided prior to incarceration, including, but not limited to: those elements of the real life experience consistent with the prison environment, hormone therapy, and counseling.  Treatment plans will be reviewed regularly and updated as necessary.

Current, accepted standards of care will be used as a reference for developing the treatment plan. All appropriate treatment options prescribed for inmates with GID in currently accepted standards of care will be taken into consideration during evaluation by the appropriate medical and mental health care staff.  Each treatment plan or denial of treatment must be reviewed by the Medical Director or BOP Chief Psychiatrist.  Hormone therapy must be requested through the non-formulary review process, and approved by the Medical Director and /or Chief Psychiatrist. Consultation with the Chief of Psychology prior to such approval may be appropriate in some cases.

In summary, inmates in the custody of the Bureau with a possible diagnosis of GID will receive a current individualized assessment and evaluation. Treatment options will not be precluded solely due to level of services received, or lack of services, prior to incarceration.

## 31. **STERILIZATION**

Inmates will not be sterilized, except for bona fide medical indications (e.g. as the result of surgical treatment for cancer of the reproductive organs).

## 32. **DIALYSIS**

Inmates with renal disease requiring dialysis (including peritoneal dialysis) will be referred to the Medical Designator for transfer to an MRC or other institution capable of providing dialysis.

A dialysis "re-use" program is permitted.

## 33. **SEXUALLY TRANSMITTED DISEASES**

Refer to the Program Statement **Infectious Disease Management**.

## 34. **STANDARD PROCEDURES FOR DETERMINING ALCOHOL INTOXICATION**

Staff may be asked to determine whether an inmate is intoxicated. Two procedures are used most often to determine alcohol intoxication.

The Captain, or designee, may administer a breathalyzer test to determine the presence of alcohol. Use of a breathalyzer will remain a non-medical function.

Medical staff may be asked to obtain a blood sample to determine alcohol content.

Usually, blood alcohol testing would be reserved for situations when this information is needed as part of a criminal investigation, or when specifically requested by the Warden. Then, medical staff will:

■   Draw blood and forward it to an approved laboratory for testing.
■   Complete all chain-of-custody documentation in accordance with the request for this examination.

The inmate's consent is required before blood is drawn, except in medical emergencies when the patient is unable to consent.

35. **DETOXIFICATION**

The CD will establish local protocols for evaluating and treating inmates who require detoxification from mood and mind altering substances such as alcohol, opiates, hypnotics, sedatives, etc.  Based on specific guidance from the Medical Director, these detoxification protocols will be implemented based on a physician's order.

Treatment and supportive measures will permit withdrawal with minimal physiological discomfort.

**Methadone Detoxification.**  MCCs, MDCs, FDCs, MRCs, the FTC, and jail units with a methadone detoxification mission, will provide methadone detoxification if clinically indicated.  These missions will be determined by the Medical Director.

These institutions must have a current methadone license.

This program requires special registration through the Substance Abuse and Mental Health Services Administration (SAMHSA)

If an institution has a methadone detoxification program, the institution Chief Pharmacist will complete and maintain registration for a methadone program.

Waivers to this requirement must be requested in writing to the Medical Director.  The request must detail a specific plan with a community-based program which can readily provide methadone detoxification.

Institutions which could conceivably house pregnant inmates must have a contingency in place for **methadone maintenance**.  Ordinarily, pregnant inmates should not be detoxified from opiates until after delivery.

Refer to the Program Statement **Pharmacy Services** for additional information regarding methadone administration.

36.  **VITAMINS AND NUTRITIONAL SUPPLEMENTS**

Inmates will be referred to the commissary to purchase vitamins when their use is for general prevention or health maintenance or for conditions when their use has been promoted but not scientifically proven (e.g. Peyronie's disease, macular degeneration.)

Each multiple vitamin tablet may not contain more than 150% of the Recommended Daily Allowance (RDA) of each vitamin and mineral.

Particular attention should be given to limiting excessive intake of the fat-soluble vitamins (A, D, E, and K.)

Vitamin C tablets may not exceed 500 mg per tablet.

Vitamins which may be purchased from the commissary are listed in the Program Statement **Trust Fund/Deposit Fund Manual**.

When a vitamin supplement is clinically indicated as part of a treatment regimen, the vitamin will be considered medication and will be supplied by the HSU, subject to restrictions in the National Drug Formulary.

Health Services staff will not prescribe, nor will the commissary sell, nutritional supplements such as glucosamine/chondroitin, fish oil, herbal preparations, and other non-Food and Drug Administration (FDA) approved substances.

37.  **AUTOLOGOUS BLOOD BANKING**

The CD will determine when autologous blood collection is medically necessary (e.g. the inmate has an extremely rare blood type, surgery will predictably require transfusion, such that autologous blood banking may be performed).

The CD may authorize autologous blood collection.

Surgical consultants may not require the Bureau to authorize autologous blood banking for an inmate prior to surgery.

38.  **ORGAN DONATION BY INMATES**

These procedures apply to inmates currently incarcerated in the Bureau, not to posthumous donations:

Organ donation is only permitted when the recipient is a member of the inmate donor's immediate family (parents, siblings, and biological children.)

Hospitalizations or fees involved will not be at the Government's expense including all costs associated with guarding the inmate at off-site facilities.  This includes the U.S. Marshals Service.

The inmate must sign a statement indicating the desire to donate an organ to a specific relative. The consent must state the following:

- The inmate understands the possible dangers of the operation.
- The inmate agrees of his/her own free will.
- The Government will not be held responsible for any complications or financial responsibilities.

When an inmate is appropriately designated as community custody, the inmate may request consideration for a medical furlough, in accordance with the Program Statement on Inmate Furloughs.

The local institution will coordinate procedures such as transportation, custody, classification, compatibility determinations, evaluation, hospitalization, furlough status, etc.

Inmates are not authorized to donate blood or blood products.

Inmates may not list themselves as posthumous organ donors while incarcerated.

Any exception to the above will be considered by the Medical Director on a case by case basis.

## 39.  INMATES AS RECIPIENTS OF ORGAN TRANSPLANTATION

The Bureau will consider organ transplantation as a treatment option for inmates in accordance with the following procedures:

When the CD at an institution determines it is medically necessary to evaluate an inmate's suitability for an organ transplant, he or she will initiate an organ transplant laboratory/ specialist consultant work-up at the institution.

When a specialist determines an inmate may be a potential candidate for organ transplantation and the Clinical Director recommends that further evaluation is medically appropriate; the inmate will be **evaluated** at an appropriate facility such as a transplant center in the vicinity of either the institution or a Bureau MRC.

If an organ transplant center considers an inmate suitable for a transplant, the institution CD will compile all pertinent medical/surgical/case management/mental health/social work information and forward to the Medical Director for consideration.

If the Medical Director determines that an organ transplant is medically indicated, the inmate will be approved for surgery at an appropriate transplant center in accordance with Bureau policy, transplant center regulations, and state and federal laws.

The Bureau will pay medical care and hospitalization costs associated with organ donors.

These expenses are limited specifically to those costs directly related to the transplant procedure itself.

## 40.  PHYSICAL THERAPY/REHABILITATION SERVICES

Bureau-staffed Rehabilitation Services are ordinarily limited to medically designated inmates at MRCs.  Each MRC will have a written local policy outlining at least the following topics:

- Scope of services.
- Referral process from health care providers.
- Referral process to health care providers.
- Use of inmate workers in the department.
- Quality Improvement Program.
- Preventive maintenance of equipment.
- Infection control.
- Procurement of durable medical equipment and supplies.
- Safety/security.

Inmates at non-MRCs occasionally require assessment and treatment by a physical therapist. CDs should consider telephone or tele-health consultation with an MRC therapist to help design a specific program for a specific inmate.  Alternatively, therapists in the local community may be used intermittently.

Inmates requiring extended, formal physical therapy should be referred to an MRC via a Medical /Surgical and Psychiatric Referral Request form (BP-A0770).

Prior to submitting the BP-A0770, the CD will discuss the inmate's diagnosis and current condition with an MRC therapist, to determine if the transfer is appropriate, and if the inmate can or will benefit from physical therapy or other modalities.

## 41. SOCIAL WORK SERVICES

Currently, Social Work services are available only at MRCs. Guidance from the Medical Director will be provided in relation to expanding the role of social workers to serve non-MRC inmates.

Each MRC will have a written local policy for Social Work Services, outlining the following topics:

- Scope of services.
- Referral process from health care providers.
- Referral process to health care providers.
- Quality Improvement Program.
- Transitional care/release planning, end-of-life care, and advance directives.

## 42. SEXUAL ASSAULT PREVENTION AND INTERVENTION

a. **Prevention**. General training requirements for staff will be in accordance with the Program Statement **Sexually Abusive Behavior Prevention and Intervention Program**.

Medical staff will refer to Psychology Services all inmates who have been identified as victims of:

- Sexually aggressive behavior.
- Sexual pressure.
- Sexual harassment.
- Sexual assault.

b. **Intervention.** When an inmate reports being sexually assaulted, medical staff will document the inmate's complaint and subjective/objective findings fully on the Inmate Injury Assessment and Followup form (BP-A0362) and notify institution authorities regarding this complaint immediately. The plan for further evaluation and treatment will also be included on the BP-A0362.

In order not to compromise medical evidence on an inmate who reports a recent sexual assault, it is recommended that the inmate be transported to a community facility/rape crisis center that is equipped (in accordance with local laws) to evaluate and treat sexual assault victims.  (Refer to the Program Statement **Sexually Abusive Behavior Prevention and Intervention Program**.)

Institutions may use on-call contracted clinical care staff to provide sexual abuse/assault treatment.  These clinical care providers would report to the institution via a contractual arrangement when institution authorities call.

Only in institutions where extreme security concerns exist may in-house physicians be used to provide treatment, examination, and forensic evidence gathering to inmates who report sexual abuse/assault.

Annually, these staff must be specifically trained and demonstrate knowledge and skills in sexual abuse/ assault treatment and forensic evidence gathering.

An individual who has recognized expertise in this field (e.g. sexual abuse/assault treatment staff in a community-based hospital emergency department or community-based rape crisis center) must perform this training.

The Clinical Director will ensure (whether treatment has been provided in-house or in the community) that appropriate infectious disease testing, medical examination, and medical physical evidence collection has been conducted and the results of all examinations/ evaluations have been provided to institution SIS staff.

Specific procedures for evaluating and treating victims of sexual abuse/assault will be included in the Institution Supplement for the Sexually Abusive Behavior Prevention and Intervention Program.

## 43.  EXAMINATION BY PERSONAL PHYSICIAN

Ordinarily, inmates are not permitted to use their own physicians or other providers, whether on a reimbursable or non-reimbursable basis, or whether there was a prior relationship between the inmate and the provider.

There is no prohibition if a provider, ordinarily used or specially engaged by the Bureau, happens to have been a prior health care provider to the inmate; however, this is discouraged.

Discretion may be exercised to permit a private physician visit only when a private physician was treating an inmate prior to incarceration.Should an inmate request to be examined by a specific physician during incarceration, the Warden, upon consultation with the Regional Director and Medical Director, may permit such a visit **for examination only** at the inmate's expense.

Such action may not be routine and it is anticipated that it will be infrequent.

Should permission be granted for such a visit, the Warden will ensure reasonable time and space for the examination are provided.

The inmate will execute an Authorization for Release of Medical Information (BP-A0621). The visiting physician will be licensed by the state in which the institution is located. The Health Services Administrator, or designee, will verify the license in accordance with the Program Statement **Credentialing, Privileging, and Practice Agreements**.

The staff physician will meet with the visiting physician and freely discuss the case and be present during the exam.

The staff physician will have authority from the Warden to terminate the examination if inappropriate activities are witnessed.

While the visiting physician will not be provided the inmate's health record for unsupervised perusal (but may review it under supervision), the staff physician should freely discuss the record, particularly in response to the visiting physician's questions.

If the personal physician requests copies of the inmate's health record, this request will be managed in accordance with the Freedom of Information Act (FOIA) as described in Program Statement on Health Information Management.

The visiting physician will provide a written report. The staff physician should review any recommendations the visiting physician makes and accept any documents that the physician may present, but is under **no** obligation to carry out the visitor's recommendations.

If the private physician's recommendations are not followed, an entry will be made in the inmate's health record to explain this decision.

Any documents the visiting physician provided will be filed properly in the health record. (Section 5, Civilian Records Divider)

The staff physician will document the visit in the progress notes.

## 44.  INVOLUNTARY MEDICAL TREATMENT/REFUSAL OF TREATMENT BY INMATES

See the Program Statement **Psychiatric Services** for guidance regarding involuntary medication and/or hospitalization for psychiatric illness.

Any refusal of recommended or offered treatment or a diagnostic procedure will be documented in the inmate health record.  The inmate will be asked to sign a Medical Treatment Refusal form (BP-A0358).

If the inmate refuses to sign, two staff witnesses will attest and sign to the fact that the consequences of refusing the proposed treatment or procedure were explained to the inmate in a language he/she understood.

As a general rule, medical and dental treatment including medication is given only when the inmate consents.  Exceptions may be made when a Bureau or contract physician determines:

- There is a danger to life or of serious permanent injury to the inmate.
- The inmate poses a risk to others by refusing treatment (e.g. infectious tuberculosis).
- There is a court order for evaluation or treatment to be provided.

Diagnostic procedures relating to potential communicable disease may be mandatory for the protection of the inmate or other inmates and staff.  (Refer to the Program Statement **Infectious Disease Management**.)  These procedures include, but are not limited to:

- Tuberculin screening tests.
- Chest x-rays.
- Blood specimens for hepatitis or HIV (post-exposure incident).

Refusal of such procedures will require an incident report.  The Clinical Director will determine whether medical isolation is clinically indicated.

An inmate may revoke a signed BP-A0358 if he/she later decides to follow the health care providers' medical advice.  If the proposed treatment's potential outcome has been compromised by the delay associated with the inmate's refusal, this will be communicated to the inmate and

documented thoroughly in the inmate's health record (e.g., delay in accepting recommended treatment for cancer may affect the treatment's success.)

The CD and/or HSA should consult with Bureau legal staff whenever questions arise regarding involuntary medical treatment not addressed in this Program Statement.

## 45.  EXPERIMENTATION AND PHARMACEUTICAL TESTING

Inmates in the custody of the Federal Bureau of Prisons will not be used as subjects for any non-therapeutic medical experimentation.

This does not preclude the use of approved clinical trials that may be warranted for a specific inmate's diagnosis or treatment when recommended by the CD and approved by the Medical Director.

Such measures must have the inmate's prior written consent and must be conducted under conditions approved by the Department of Health and Human Services.

Research regarding disease prevalence, response to accepted therapeutic interventions, etc., can be performed under protocols meeting the requirements of the Program Statement **Research**.

## 46.  RADIOLOGY SERVICES

Radiology services provided or made available by the Bureau will be designed to meet the needs of patients in accordance with professional practices and legal requirements.  Appropriate radiographic or fluoroscopic diagnostic and treatment services will be provided or made available.

a.  **Staffing.**  A registered radiologic technologist or a radiologic technician is required as part of each institution's clinical staff.  Bureau staff with documentation of radiologic technician training obtained from an accredited community source may also be utilized.

The registered radiologic technologist will be a graduate of a program in radiologic technology, approved by the Council on Medical Education of the American Medical Association.

b.  **Procedure Manual.**  Each institution will have written procedures which cover:

■  Identification of the current director of radiology.
■  Scheduling.
■  Examinations performed.

- Administration of diagnostic materials.
- Infection control procedures.
- Management of isolation patients.
- Management of emergency patients.
- Care of the critically ill.
- Preventive maintenance.
- Radiation safety/safety precautions.
- Disaster plans.
- Required records and reports.
- Preparation of patients.
- Calibration and safe use of equipment.
- Inspection of x-ray safety equipment for defects.
- Radiation exposure precautions.
- Precious metal recovery.

c. **Record keeping.**  A daily x-ray log, in a bound ledger or in electronic form, will be established in the x-ray department.  The log will contain:

- Register number.
- Patient name.
- Type of study.
- Number of exposures.
- Name of person performing study.
- X-ray exposure technique.
- Reason for and number of retakes, if applicable.
- Date film was sent for interpretation.
- Date report returned.
- Date film was returned.

X-ray films will be identified with a name imprint system. Imprint identification of radiographic films is the only method permitted.  Information required includes:

- Institution name.
- Patient name.
- Register number.
- Date of birth.
- Sex.
- Date of exam.

d.  **Privacy.**  A concerted effort will be made to ensure patient privacy at all times, particularly for undressing and dressing, examination, waiting in the department, and evacuation of contrast media.

The changing area and patient bathroom will connect directly with the examination room when physical plant and resources permit.

e.  **Ordering Radiographic Examinations.**  Diagnostic radiology services will be performed only upon the written request of a physician, dentist, or MLP.

A Radiographic Report (SF-519A) will be used for ordering radiographic exams.  (Forms other than the standard form may be used, if they are the designated form of a contractual, non-Bureau radiology service.)  All forms must contain:

- Patient's full name and register number.
- Age and sex.
- Examination requested.
- Name of requesting provider.
- Reason for the examination.
- Inpatient or outpatient status (if applicable).
- Date of requested examination.
- Name of the institution.

f.  **Radioactive Sources/Radioisotopes.**  Use of any radioactive sources or radioisotopes (MRCs only) will be limited to physicians who have been granted privileges for radioactive sources.

Orders for using radioactive sources or radioisotopes will be written and accompanied by:

- A concise statement of reason for use.
- Total dosage.
- Incremental dosages in standard measurements (cGy or Rads).
- Number of treatments.

g.  **Evaluation/Interpretation of Radiographic Film.**  After the examination is completed, the date of the exam will be written on the request form.

The ordering clinician will review all STAT requests on the same date as ordered.

Ideally, films should be reviewed (a "wet read") prior to sending the films to a radiologist for interpretation to look for abnormalities such as active TB or fractures which require immediate attention.

This review should be performed within two working days of the examination, so as not to delay the final interpretation.

Films will then be sent for a radiologist's interpretation.

A radiologist will interpret all x-ray examinations; the interpretations will be recorded on the x-ray report form, or on a report form the radiology group uses.

The radiologist who interpreted the film must sign (authenticate) all completed x-ray reports.

h. **Distribution of Reports.**   Authenticated, dated reports of all examinations performed will be filed in the inmate's health record.

Completed radiographic reports will be reviewed within two working days, dated, and initialed by the CD prior to distribution and filing.

The reviewing physician must ensure that timely, appropriate follow-up actions are initiated on all abnormal findings, and that any actions taken are documented in the Progress Notes of the inmate's health record.

The original copy of the completed report will be filed in the inmate's health record.

The second copy will be distributed to the requesting clinician.

The third copy will be filed in the inmate's x-ray film envelope.

i. **Filing/Transfer/Retention of Radiographic Files.**  Radiographic films on inmates will be filed in the terminal digit format, the same format as for inmate health records.

Each film envelope will contain the inmate's name and register number, with a chronological record of the dates and studies performed.

Radiographic films of inmates being transferred to other Federal institutions will be mailed to the receiving institution within five working days of when the inmate is transferred.  All available x-rays will accompany the inmate's health record at the time of transfer to an MRC.

Files on inmates released from Federal custody will be placed in an inactive file.  The terminal digit system will be used on inactive files, and they will be separated by year.

Inactive files will be maintained in a separate secure area and kept for five years.  During the sixth year, they will be transferred to the Defense Logistics Agency for silver recovery and destruction.

j.  **Safety.**  Signs will be posted on the door to the X-ray Suite and prominently inside the department, instructing individuals to notify the technician if they are pregnant.

When diagnostic agents are administered, safety precautions will include provision for an emergency drug tray, oxygen, airways, and the capability to administer intravenous support.

Appropriate safety equipment will be used for all examinations.  Leaded gloves, aprons, and gonadal shields will be visually inspected by staff and films of the shields will be taken at least twice a year for defects.

The films will be sent to the radiologist for interpretation.

Documentation must include a signed report from the radiologist.

Fluoroscopy may also be used to inspect x-ray safety equipment, with signed documentation by a radiologist.

Precautions will be taken to minimize radiation exposure through appropriate shielding and collimation.  All doors must be closed during x-ray procedures.  The field will be coned down with a collimator as much as possible.

Exposure switches of equipment must be arranged to prevent its operation from outside the shielded area.

The person performing portable x-ray procedures, as well as anyone assisting, will wear a lead apron.  Lead gloves will be provided if manual support of position for x-ray is necessary.

All unnecessary personnel will be removed from the immediate area, and the technician performing the procedure will stand as far away as possible from the x-ray tube when making an exposure.

Proper shielding of radiation sources will be maintained. Periodic inspection and evaluation of radiation sources, including calibration of equipment, will comply with Federal, state, and local laws and regulations.

OSHA and FDA regulations regarding the handling, removal, and storage of any radioactive material will be followed.

k. **Radiation Monitoring.** All personnel who use or work in close proximity to radiological equipment will wear a film badge while on duty to monitor cumulative radiation exposure. Individuals will ensure that their badges are not subjected to unnecessary exposure or left in the x-ray room.

Quarterly reports of cumulative exposure will be maintained by the HSA and reviewed and initialed by the CD.

All reports of high exposure or overexposure will be investigated to determine the cause.

FDA recommendations will be followed.

l. **FDA Radiation Survey.** The FDA requires surveys of radiographic equipment at HSUs every two years. The HSA, in consultation with the RHSA, will take corrective action and prepare a response to the report. The HSA will maintain a copy of the report and the corrective action taken if appropriate.

m. **Use of X-ray for Body Searches.** This requires an order from the Warden with the Regional Director's approval. Refer to the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**.

n. **Preventive Maintenance.** All HSUs will establish a preventive maintenance program to be conducted by qualified staff (i.e., a certified biomedical staff member) or establish service contracts for repair and preventive maintenance of radiographic equipment.

Manufacturer's recommendations will be followed when establishing preventive maintenance procedures.

Infection control procedures will be followed after each inmate contact with a cassette.  This entails wiping the cassette with an approved cleaning solution (check manufacturer's recommendations).

The x-ray table top must be wiped down with a disinfectant solution after each patient use.

o.  **Precious Metal Recovery Program.**  It is DOJ policy that, unless exempted by the Assistant Attorney General for Administration or designee, a silver recovery program will be implemented at each Bureau location using precious metal-bearing waste.

Each institution is required to comply with the support agreement between the Department of Defense (DOD) and DOJ Number SC 4400-88154-804, May 1986, and the Program Statement **Property Management Manual**.

Written procedures will be established at each institution to recover precious metals from scrap and waste film.  Examples of precious metal-bearing waste include photographic fixing (hypo) solution, photographic and x-ray film, silver alloys, dental scrap, batteries, and electronic parts.

Scrap film is film damaged in processing or purged from the medical files; it will be kept until sufficient quantities are available to warrant silver recovery.

Institutions with automatic film processors will have silver recovery units attached to the processor.

Institutions using a manual, tank-type processing system will save all hypo solution.

## 47.  MISCELLANEOUS

a.  **Medical Duty Restrictions/Convalescence.**  Medical Duty Status restrictions must be consistent with the inmate's medical and/or mental health condition. Refer to SMD/MDS Technical Reference Manual for the list of restrictions which are available in SENTRY.

**Medical Idle.**  Maximum of three calendar days for recuperation from an acute illness or injury. The inmate is restricted to his/her quarters except for meals, religious services, and medical call-outs or pill lines.

**Medical Convalescence.**  Maximum of 30 calendar days for extended recuperation from an illness, injury, or surgery.  Convalescence is specifically indicated to facilitate recuperation by

not subjecting the inmate to the rigors of his/her job assignment, or to minimize the risk of injury to the inmate, other inmates, or staff at the work site due to the inmate's medical condition.

Inmates on convalescent status may attend other programs including education classes, drug awareness programs, etc.  Restrictions on recreational activities may be written on a case-by-case basis.  (For example, an inmate who is rehabilitating from orthopedic surgery may need access to the recreation facilities to walk, or to do specific exercises prescribed by their health care providers.)

b.  **Inmate Injury Assessment and Follow-up (BP-A0362).**  An inmate must complete a BP-A0362 form for even the most minor injuries, regardless whether they are related to work, recreation, assault, off-duty time, or occupational illness.

In each case the inmate should be quoted directly as to how the accident or occupational illness occurred.

All injury reports must be reviewed and signed by a physician as soon as possible.  Under normal circumstances, this will occur the next working day.

A copy of the form will be forwarded to the Safety Manager.

c.  **Medical Footwear.**  The Bureau is responsible for providing one pair of safety shoes to each inmate, suitable for their job assignment.  The Program Statement **Inmate Personal Property** lists other types of shoes which inmates may bring into the institution, or purchase at their own expense.

Occasionally, custom shoes or orthotic devices may be medically necessary to accommodate a significant foot deformity or to decrease the chance of injury to feet with impaired sensation.  For example, an inmate with a diabetic neuropathy may need an extra deep, extra wide toe box in their work shoe in order to minimize irritation.

The Clinical Director must approve all requests for purchase of custom shoes and/or orthotic devices.

Custom shoes or orthotic devices will be purchased through the institution Health Services Cost Center.

d.  **Feminine Hygiene Products.**  The HSU will provide only medically indicated feminine hygiene products.  The institution will stock sanitary napkins.