JESSE LASLOVICH
United States Attorney
MADISON L. MATTIOLI
  MT Bar No. 36411284
ABBIE J.N. CZIOK
  MT Bar No. 55781377
Assistant U.S. Attorneys
U.S. Attorney's Office
901 Front Street, Suite 1100
Helena, MT 59626
Phone: (406) 457-5269 – Madison
     (406) 457-5268 – Abbie
Fax: (406) 457-5130
Email: madison.mattioli@usdoj.gov
     abbie.cziok@usdoj.gov

MARK STEGER SMITH
  MT Bar No. 4160
TIMOTHY A. TATARKA
  CA Bar No. 277219
Assistant U.S. Attorneys
U.S. Attorney's Office
James F. Battin Federal Courthouse
2601 2nd Ave. North, Suite 3200
Billings, MT 59101
Phone: (406) 247-4667 – Mark
     (406) 247-4642
Fax: (406) 657-6058
Email: mark.smith3@usdoj.gov
     timothy.tatarka@usdoj.gov

Attorneys for Defendant
United States of America and Federal Defendants

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA COALITION FOR WOMEN PRISONERS; R.B.; A.H.R.; S.L.; J.L.; J.M.; G.M.; A.S.; and L.T., individuals on behalf of themselves and all others similarly situated,<br><br>Plaintiffs<br>v.<br><br>UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS, a governmental entity; BUREAU OF PRISONS DIRECTOR COLETTE PETERS, in her official capacity; FCI DUBLIN WARDEN THAHESHA JUSINO, in her official capacity; OFFICER BELLHOUSE, in his individual capacity; OFFICER GACAD, in his individual capacity; OFFICER JONES, in his individual capacity; LIEUTENANT JONES, in her individual capacity; OFFICER LEWIS, in his individual capacity; OFFICER NUNLEY, in his individual capacity, OFFICER POOL, in his individual capacity, LIEUTENANT PUTNAM, in his individual capacity; OFFICER SERRANO, in his individual capacity; OFFICER SHIRLEY, in his individual capacity; OFFICER SMITH, in his individual capacity; and OFFICER VASQUEZ, in her individual capacity,<br><br>Defendants. | CASE NO. 4:23-CV-04155-YGR<br><br>**UNITED STATES' REPLY TO DOC. 163** |

The United States respectfully submits its response to Plaintiffs' brief filed on February 20,

2024. First, a contempt order is not appropriate at this time because the BOP's decision to transfer R.F. was based on a reasonable, good faith understanding of the Court's December 30, 2023 order. Second, R.F.'s SHU placement and subsequent transfer were motivated by legitimate safety and security concerns.

## I.     A contempt order is not appropriate.

Defendants acted on a reasonable interpretation of the court's order, and when they realized that that understanding was not consistent with the Court's, they promptly moved to undo their actions. Plaintiffs only cite a portion of the language from the Ninth Circuit's case *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*. The Court acknowledged that, "there is no good faith exception to the requirement of obedience to a court order," per se, but recognized that "a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the court's order." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (internal formatting and quotation marks omitted); *see also Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) ("The contempt need not be willful; however, a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the court's order." (citations and internal quotation marks omitted)). Thus, a reasonable, albeit incorrect, understanding of a court's order should not be subject to contempt.

Here, there is clear and convincing evidence that Defendants substantially complied with a good faith, reasonable interpretation of the Court's order by maintaining the availability of individuals on Plaintiffs' witness list for witness preparation and testimony at the hearing, thereby addressing the concerns raised in Plaintiffs' motion for administrative relief.

Defendants made a reasonable, honest mistake in failing to understand the Court's order as applying to a transfer made after the hearing and unrelated to witness availability for hearing preparation or testimony. While Defendants acknowledge the order was not expressly tied to the hearing, they reasonably interpreted its open-ended nature as a function of the Court's suggestion that the hearing could be rescheduled for additional time to prepare witnesses. Once the hearing concluded, the individuals on the witness list were no longer potential "witnesses," as that term was one only meaningful as applied to the then-concluded evidentiary proceeding. The mistake was regrettable and

once the Court's intention was understood on February 14, 2024, Defendants rectified the situation within 48 hours.

The Assistant United States Attorneys representing the federal defendants in this case as well as the Bureau of Prisons attorneys advising FCI Dublin on R.F.'s temporary transfer take full responsibility for having honestly but incorrectly interpreted the Court's order. The undersigned did not intend to evade the Court's instructions, nor show any lack of respect for the Orders of this Court. Indeed, the history of this litigation demonstrates counsel for Defendants unstintingly comply with orders they understand, e.g., notices have been immediately posted in housing units, blankets have been provided, inspections arranged, etc. Defendants respectfully maintain that sanctions are not merited under these circumstances.

## II.    R.F.'S placement in SHU and subsequent temporary transfer were motivated by legitimate safety and security concerns.

FCI Dublin executive staff placed R.F. in SHU based on information that R.F. had potentially encouraged another inmate to file a false complaint against staff. (Deveney Decl. *passim*, Dulgov Decl. Doc. 161-3 at 2.) FCI Dublin Associate Warden Patrick Deveney explained the basis for R.F.'s initial SHU placement as necessary pending an investigation into behavior that seriously threatened the orderly running of the institution. (Deveney Decl. 4-15.) "Pending investigation" is the same reason listed on the administrative detention order provided to this Court. Lt. Allen Baudizzon was not involved in R.F.'s SHU placement, nor was R.F. informed that her placement in SHU was based on staff finding screws in her cell, which occurred after she had been placed. (Deveney Decl.)

R.F. states that she was housed in SHU Cell 102 for seven days. (Doc. 166 at 2.) She raises various concerns about the conditions in SHU. (*Id*. at 2-3.) SHU Lieutenant Eric Sanchez explained that prior to RF's placement in Cell 102, SHU staff reported possible mold and contacted the FCI Dublin's Safety and Occupational Health Specialist. The Specialist treated Cell 102 with Sporicidin on January 29-30, 2024. Following the second treatment on January 30, 2024, Cell 102 was ready for the next inmate placement. (Sanchez Decl. at 2.) The cell was cleaned prior to her placement, staff were not aware of any "human filth," and R.F. did not communicate to anyone in SHU there was water on the

floor of her cell. (*Id*.) Had she done so these issues would have been resolved or R.F. would have been relocated. (*Id*.) All inmates were provided hygiene items. (*Id*. at 2-3.)

Upon her arrival in SHU, R.F. immediately commenced a hunger strike. (Deveney Decl., Doc. 161-3 at 2.) Thereafter, nine inmates joined her in hunger striking. (Doc. 161-3 at 5.) In the executive staff's experience, "hunger strikes can lead to serious health concerns that may eventually require forced medical intervention." (Doc. 161-3 at 5-6.) As a result, Interim Warden Art Dulgov began contemplating a temporary transfer of R.F. "to reduce of risk of more inmates going on a hunger strike, pending further investigation into R.F.'s role." (Doc. 161-3 at 5.) After R.F. accepted a nutritional drink on February 6, 2024, Dulgov submitted a request to temporarily transfer R.F. (Doc. 161-3 at 5.) This decision was made based on reasonable correctional judgment and upon the advice of counsel. (Doc. 161-3 at 5.) Within three days of R.F.'s temporary transfer, all inmates in SHU resumed eating all regular meals. (Doc. 161-3 at 6.)

A week later, on February 14, 2024, this Court conducted an onsite, unscheduled visit lasting nine hours at the FCI Dublin Prison and Satellite Camp. (*See* Docs. 155, 157 at 1.) Following this visit, this Court issued an Order to Show Cause why the government should not be held in contempt or sanctioned for transferring R.F., in violation of the Doc. 88, and ordered her returned. (Doc. 155.) On February 15, 2024, the undersigned, in consultation with BOP Western Regional Counsel Dennis Wong and FCI Dublin staff, arranged for the immediate return of R.F. to Dublin. (Deveney Decl.) Dublin staff requested advice as to whether they could place R.F. in general population upon her return to FCI Dublin, or whether she needed to return to SHU based on her initial placement. (Deveney Decl.)

To answer this question, and to help prepare the government's response to the Order to Show Cause, Wong reviewed of the documentation concerning R.F.'s initial placement in SHU and subsequent temporary transfer. (Wong Decl. at 4.) Wong concluded there was insufficient documentation surrounding R.F.'s initial placement in SHU that – regardless of the potential legitimacy of these charges – R.F.'s continued placement in SHU was not warranted. (*Id*.) As such, he recommended that she be housed in general population. (Deveney Decl.) On February 16, 2023, R.F. returned to FCI Dublin and was placed in general population. An SIS investigation into her role in the

hunger strikes was subsequently completed, and it was determined that each inmate had their own reasons for declaring a hunger strike and their actions were not related. (Deveney Decl.)

Deveney explained the basis for R.F.'s initial SHU placement as necessary pending an investigation into behavior that seriously threatened the orderly running of the institution. BOP maintains this decision was based on sound correctional considerations and, while R.F.'s placement in SHU was insufficiently documented, it was not motivated by animus or in retaliation for her testimony. Additionally, and as stated, it is now clear that BOP misinterpreted this Court's prior order prohibiting witness transfers (doc. 88) as being time limited to pre-evidentiary hearing, but R.F.'s temporary transfer was motivated by legitimate safety concerns based on management's belief that R.F.'s presence in SHU may encourage prolonged or additional hunger strikes. Dublin management determined that temporarily moving R.F. was the best way to ensure everyone's safety at that time. They requested concurrence from BOP's Western Regional Office to temporarily transfer R.F. to stabilize conditions in SHU and investigate her role in the joint hunger strikes. Her temporary transfer was communicated transparently to Plaintiffs' counsel and was not motivated by animus or done in retaliation for her testimony.

The United States respectfully submits this response and requests that the Court terminate the Order to Show Cause and decline to impose sanctions.

Respectfully submitted on this 23rd day of February, 2024.

JESSE A. LASLOVICH
United States Attorney

*/s/ Madison L. Mattioli*
MADISON L. MATTIOLI
ABBIE J.N. CZIOK
MARK STEGER SMITH
TIMOTHY A. TATARKA
Assistant U.S. Attorneys
Attorneys for Federal Defendants

5                                    Case No. 4:23-cv-04155-YGR