**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CALIFORNIA COALITION FOR WOMEN PRISONERS, ET AL.,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA FEDERAL BUREAU OF PRISONS, ET AL.,**<br><br>Defendants. | Case No.: 4:23-CV-04155-YGR<br><br>**ORDER APPROVING MOTION FOR FINAL APPROVAL OF CONSENT DECREE;**<br><br>**AND**<br><br>**FINAL JUDGMENT**<br><br>Re: Dkt. No. 465 |

Plaintiffs in this action are hundreds of women who endured well-documented systemic abuse, sexual assault, and acts of retaliation at the federal women's correctional facility FCI Dublin. Since plaintiffs filed suit, the Court has conducted an unannounced site visit to the facility, issued an order for injunctive relief, overseen the criminal trials of several former Dublin staff, and appointed a special master who authored a comprehensive report of the conditions leading to this action and has continued to oversee the government's compliance with this Court's orders. Meanwhile, the parties in this action have engaged in no less than seven settlement conferences over months of negotiations to resolve class members' claims. Those negotiations produced a consent decree for which class members now seek final approval. Having carefully considered the papers submitted and the pleadings in this action, and for the reasons set forth below, the Court hereby **GRANTS** the Motion for final approval of the proposed consent decree.

**I.   Background**

   **A.  Factual Background**

The factual developments leading to this action were documented in detail in this Court's order granting plaintiffs' motion for class certification and granting in part the motion for injunctive relief. (*See* Dkt. No. 222 at 1-13.) In short, the approximately 650 women housed at FCI Dublin

and its satellite camp endured years of systemic sexual assault and whistleblower retaliation as perpetrated by all levels of facility staff, including the FCI Dublin warden himself. The allegations led to numerous criminal convictions and hundreds of individual plaintiffs filing civil suits.

In August 2023, plaintiffs filed a complaint and a motion for both class certification and a preliminary injunction, alleging systemic abuse faced by adults in custody ("AICs") at FCI Dublin[1]. The Court held several days of evidentiary hearings in January 2024, followed by an unannounced, in-person, nine-hour inspection of the facility and its satellite camp in February.

Finding defendants to be deliberately indifferent to the plight of the Dublin AICs, the Court entered injunctive relief in March 2023, which included the appointment of a special master to oversee compliance with the Court's order. Four days after Special Monitor Wendy Still[2] began her observation, defendants announced the shuttering of FCI Dublin. In the following days and weeks, Dublin AICs endured further trauma as they were chaotically transferred to alternative Bureau of Prisons ("BOP") facilities throughout the country. Monitor Still has ably continued her oversight responsibilities, which included authoring a comprehensive report on the abuses at Dublin, and the parties have engaged in continued efforts to resolve this matter. As a result of those efforts, the parties now propose the consent decree before the Court.

### B. Terms of the Proposed Consent Decree

Under the terms of the proposal, the class is afforded injunctive relief across eight categories for a two-year term from the date of Court approval. The consent decree also contains provisions for ongoing monitoring and implementation of the relief provided, dispute resolution procedures, and for attorney's fees and costs. The consent decree is attached hereto at Exhibit A and incorporated by reference.[3]

---

[1] Throughout this order, reference to AICs shall specifically mean those formerly housed at Dublin and who are part of the injunctive class, unless otherwise specified.

[2] Wendy Still was initially appointed Special Master, and then continued her responsibilities as the Court-appointed Senior Special Monitor to oversee the implementation of the Court's injunctive relief.

### 1. Injunctive Relief

#### i. Medical and Mental Health Care

The consent decree requires the Monitor to provide monthly updates on the status of any AIC who is the subject of a Medical and/or Mental Health Alert, the adequacy of mental health staffing across BOP facilities housing AICs, and wait times for mental health services by outside providers. Upon request of class counsel or class member, the BOP is also required to provide AICs updates on the status of any request to receive services from outside providers. BOP also agrees to provide mental and medical health care to AICs in their primary language to the extent feasible. Subject to ongoing Monitor reporting, AICs will also be entitled to Rape Crisis Center assistance upon request. Finally, the BOP mut share with the Monitor "its policies, practices, and implementation of credentialing for medical and mental health providers and clinicians" for all facilities housing AICs. (Dkt. No.438-2, ¶¶ 34-41.)

#### ii. Alerts and Reporting

The Monitor will report monthly on class member alerts pertaining to AIC concerns in the areas described below. BOP is required under the terms of the consent decree to provide any documentation requested by the Monitor to fulfill this obligation. (*Id.* ¶ 42.)

#### iii. Staff Abuse and Retaliation

The consent decree provides procedural protections for AICs placed in administrative detention status. First, detailed documentation with an explanation concerning the placement shall be provided to the AIC and the Monitor within 24 hours of the designation. Second, a chain of review for all such designations is automatically in place, with a BOP Regional Director able to make a determination as to whether they agree with the decision to place the AIC in administrative detention. The decree ensures AICs receive administrative remedy forms upon their placement in detention. Subject to security needs, AICs placed in detention will also receive supplemented phone

---

[3] The summary of terms provided below is intended to capture the most important elements of the consent decree. The parties are bound by the text of the consent decree itself, not by this Court's summary.

1  call, correspondence, visitation, exercise, and program participation rights, and the ability to access
2  the commissary "with the same frequency as the general population." (*Id.* ¶ 46.) AICs in
3  administrative detention are also entitled to confidential, two-way communication with the Monitor
4  and medication devices and prescription medication within 24 hours. The consent decree specifies
5  procedures for AICs to report any BOP failure to adhere to these protections, which include
6  ongoing reporting by the Monitor and a review process within BOP.

7  As for reports of ongoing retaliation, AICs are entitled to submit complaints directly to the
8  Monitor or BOP liaison, and reports automatically are to be sent to the Office of Internal Affairs
9  (OIA) and the DOJ's Office of the Inspector General (OIG). The consent decree permits the
10 monitor to recommend reconsideration of any action taken with respect to an AIC and corrective
11 action to address the retaliation.

12 Opportunities to confidentially report instances of staff physical or sexual abuse are
13 guaranteed to AICs as well. AICs are entitled to documentation stating the results of any follow-up
14 investigations and the Monitor is required to continuously report on any such allegations.

### iv. Designation and Release

Class members are entitled to placement "as close as practicable to the Class Member's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence." (*Id.* ¶ 69.) AICs with longer than nine months remaining on their sentence may not spend more than six months in administrative detention or at a Federal Transfer Center. Credit is awarded for time housed at FCI Dublin or in administrative detention facilities following the transfer therefrom. The Monitor is required to continuously report on the AICs' current designations as well as time remaining and time credits, and BOP has agreed to release any eligible class member to community placement as soon as possible. The consent decree ensures no AIC loses time credits due to transfer from Dublin, and the Monitor is empowered to ensure this provision is implemented. Additionally, BOP has agreed, subject to Monitor oversight, to "continue to review all disciplinary incident reports issued to Class Members at FCI Dublin between January 1, 2020, and May 1, 2024 . . . [and to] expunge all disciplinary reports that are found to contain due process, evidentiary, or other procedural violations, and adjust Class Members' security and

4

recidivism classifications, FTCs, and release dates accordingly." (*Id.* ¶ 75.) The Monitor will report on BOP's review and on compassionate release requests.

### v.    Access to Counsel and the Monitor

The consent decree guarantees ongoing routine access to confidential communication with the Monitor and class counsel.

### vi.    Processing of Damage Related to Closure Due to Property Loss

The Monitor will continue to review AIC claims of property loss and damage due to the transfer from FCI Dublin. BOP is required to respond to any claims filed by December 1, 2024 by July 1, 2025, and an appeals process is established for any denied claim.

### vii.    Special Master Report

The consent decree expressly states that the Special Master's report does not in itself create a cause of action or right to relief for any AIC.

### viii.    Additional Relief

"BOP Director will issue a formal, public acknowledgement to victims of staff sexual abuse at FCI Dublin. Following any BOP final decision regarding the lease, sale, or reopening of the FCI Dublin property, BOP will notify the Monitor and Class Counsel of such decision." (*Id.* ¶¶ 88-89.)

## 2.    Monitoring and Implementation

The Consent Decree affords the Monitor a reasonable staff and budget to complete her duties, and she is guaranteed access to both BOP facilities and to class members. Class members, in turn, are guaranteed access to class counsel. The parties have agreed to enter into a protective order governing the sharing of confidential information. The parties furthermore jointly request Ms. Still be appointed as Special Monitor. The request is **GRANTED**.

## 3.    Dispute Resolution

Should any disagreement arise in the course of interpreting the consent decree, parties have agreed to first meet and confer and, if necessary, to seek mediation from Magistrate Judge Spero or another magistrate judge or mediator.

## 4.    Notice to Class Members and Final Approval

In addition to seeking court approval, parties sent out notice to class members of the proposed consent decree, and opportunity was given for class members to file objections. Notice was sent out to all class members before December 22, 2024, and class members were given until February 7, 2025 to file any objection.

### 5. Attorneys' Fees

BOP has agreed to pay class counsel's reasonable attorneys' fees and costs.

## II. LEGAL STANDARD

The Court is required to find the proposed consent decree "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e). In so deciding, the Court must take into account whether "the class representatives and class counsel have adequately represented the class;" "the proposal was negotiated at arm's length;" "the proposal treats class members equitably relative to each other;" and "the relief provided for the class is adequate." *Id.* With specific regard to the latter, the Court must consider "the costs, risks, and delay of trial and appeal;" "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)."

In *Hanlon v. Chrysler Corp.*, the Ninth Circuit identified the following factors relevant to assessing a settlement proposal: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceeding; (6) the experience and views of counsel; (7) the presence of a government participant; and (8) the reaction of class members to the proposed settlement. 150 F.3d 1011, 1026 (9th Cir. 1998).

## III. ANALYSIS

### A. Pre-requisites to Approval

The Court has already found, in granting preliminary approval, that the consent decree was the result of arm's-length negotiations, and that the proposed consent decree was sufficiently fair to

trigger notice to the class. Additionally, the Court found counsel to be "experienced and knowledgeable" and to "have actively prosecuted and defended this litigation" (Dkt. No. 442 ¶ 2.)

### B. The Consent Decree is Fair, Reasonable, and Adequate

As stated in its order granting preliminary approval and on the record at the hearing for final approval, the Court finds the consent decree to be fair. Parties have negotiated an agreement that provides procedural protections for class members moving forward, and allows for the continuation of the Monitor's work ensuring that, to the extent possible, past harms are rectified. In so deciding, the Court has considered the *Hanlon* factors and found that the class would be well-served with the strong protections afforded by the consent decree without subjecting class members to further delay and possible trauma in the form of a trial. Considering, especially, that the vast majority of class members did not object, the Court is satisfied that the consent decree is fair.

At the preliminary approval hearing, the Court raised several concerns which the parties have largely addressed. The Court's biggest concern was ensuring the parties had agreed upon a system to ensure complete and timely payment of the Monitor, as well as to ensure that the Monitor had access to adequate resources to implement the decree. In follow-up briefing, the parties informed the Court that they had met with the Monitor, who provided budget and staffing requests along with "additional project management plans." (Dkt. No. 455 at 1.) The parties informed the Court that they:

> agreed to develop a process for reviewing the budget on a regular basis to determine whether the budget need to be increased, decreased, or shifted, in certain areas and to account for the ongoing reduction in the class size due to releases and any other changes as implementation continues. This process will include quarterly meetings to discuss any requests from the Senior Monitor and her team as well as any concerns from the Parties. To the extent the Parties disagree they will utilize the dispute resolution mechanisms contained in the proposed Consent Decree.

(*Id.*) The Court is satisfied the parties have a process in place to ensure the Monitor receives timely compensation for her hard work and has access to adequate staffing to complete her responsibilities.

7

1    Additionally, the parties' first filing following preliminary approval intimated there were
2 still uncertainties with regard to the specific class definition. Parties attested as follows:

> Defendants provided Plaintiffs with a list of all people who were incarcerated at FCI Dublin between the filing of Complaint in this action and the Court's order certifying a class under Rule 23(b)(2). Plaintiffs are reviewing this list which indicates there are approximately 59 individuals who were housed at FCI Dublin following the filing of this matter, were transferred prior to class certification in March of 2024, and remain in custody. The parties will have a more fulsome update regarding the definition of the settlement class by January 31, 2025.

(Dkt. No. 452 at 2.) The class definition remains as negotiated. In the motion for final approval, plaintiffs stated:

> The class definition is currently based on the date of class certification, but Class Counsel has previously indicated support for expanding the definition to include those who were at FCI Dublin when the Complaint was filed, as well as victims of FCI Dublin staff sexual and physical abuse. The Consent Decree is court-enforceable and includes a dispute resolution process in the event differences in interpretation arise.

(Dkt. No. 465 at 18.)

Lastly, the Court notes that defendants request a stay to re-negotiate two provisions. Further, counsel indicates to the Court they do "not have sufficient information to ascertain whether BOP has sufficient resources to implement the Consent Decree, specifically with respect to the Monitor's estimated fees and costs during the period of monitoring." (Dkt. No. 464 at 2.) Defendants cite the "change in administration, the change in key personnel, and the issuance of Executive Orders that may impact some provisions in the Consent Decree" as reasons for this. (*Id.*) The request to re-negotiate is denied. The Court will not withhold final approval on this basis. After months of negotiations, the parties have a signed consent decree and the Court considers both parties bound by its terms. Furthermore, as plaintiffs note in opposition, "the requirement that the district court approve a class action settlement does not affect the binding nature of the parties' agreement." *In re Syncor Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008).[4]

---

[4] *See also Collins v. Thompson*, 679 F.2d 168, 172 (9th Cir. 1982) ("There are two steps in reaching a settlement in a class action: (1) the parties by themselves reach an agreement of

8

### C. Objections

Only eleven class members (including organizational plaintiff California Coalition of Women Prisoners) filed objections to the consent decree, representing a small number of the total class. Numerous class members listened to the final approval proceedings and either voiced no objection or asked questions which were answered. As the Court mentioned, this is a negotiated settlement. Perfection is not the standard. The Court finds the concerns expressed in the objections well-founded but not sufficient to defeat final approval of the consent decree:

- One class member raised serious concerns as to the improper punitive use of administrative detention and the lack of procedural protections for class members subjected thereto. (Dkt. No. 443.) This class member also expressed a lack of trust that designations for release or community placement would happen in good faith. The Court finds the consent decree contains adequate procedural safeguards to protect class members from the concerns raised, including the ongoing use of the Monitor to ensure BOP compliance.

- Two class members objected on the basis that the decree does not call for defendants "to release minimum to low recidivism and security risk rated sexual abuse survivors from Dublin's 'Rape Club' to immediate home confinement detention." (Dkt. Nos. 444, 450.) The Court finds that the consent decree contains provisions to offer care and support to survivors of sexual abuse as well as procedures to ensure release as soon as practicable. In addition, class members may still petition their sentencing judges for compassionate release based upon their individual experience, situation, and background.

- One class member expressed that they were subject to ongoing retaliation due to their status as a Dublin AIC, and expressed general objections to the consent decree based thereon. However, this class member did not identify a specific provision of the decree they found objectionable. (Dkt. No. 449.) The Court understands the class member's concern as to

---

settlement, and (2) the court evaluates the proposed settlement. The reason for judicial approval is not to give the negotiating parties more time or even to ensure that the settlement is fair as between the negotiating parties, but rather to ensure that other unrepresented parties and the public interest are treated fairly by the settlement. . . . Judicial approval of a consent decree is clearly a condition subsequent, and should not affect the legality of the formation of the proposed consent decree as between the negotiating parties.").

ongoing retaliation but feels that the consent decree contains adequate safeguards to protect class members from ongoing retaliation.

- One class member described the painful details of the retaliation she endured at Dublin, including a demotion from her job, and expressed anger that under the consent decree, her sentence would only be shortened by two months and that she would not receive financial compensation for her demotion. (Dkt. No. 454.) The Court shares the class member's anger, but feels class counsel has been able to negotiate a consent decree that addresses her concerns to the extent possible. This class member will be entitled to the Monitor's review of her remaining sentence and entitled to community placement as soon as she is eligible under federal law. The Court further notes that this consent decree affords injunctive relief only without depriving any class member of the right to sue for damages.

- Another class member wrote to express concern that the decree lacks sufficient legal authorization to be enforced properly. Given the class member's experiences with the BOP until now, the concern is understandable. The Court wants to reassure this and all class members that the consent decree's terms are legally binding upon defendants, and compliance is subject to court order upon final approval. By the consent decree's own terms, this class member will be entitled to access to the Monitor and class counsel in order to report any future failure by defendants to adhere to the consent decree's terms. This AIC further objects to the fact that sexual assault survivors are not automatically entitled to home confinement. As plaintiffs note, "[t]he Consent Decree provides meaningful class-wide relief related to community placements, including ongoing monitoring of eligibility and release, and requires BOP to release eligible class members to community placement as soon as practicable." (Dkt. No. 465 at 10.) And "[t]o the extent that class members are not eligible for release to community placement and request release based on extenuating circumstances, there are other avenues for such relief, including filing for compassionate release." (*Id.* at 11.)

- Finally, several Dublin AICs wrote to the Court not to object to the consent decree, but to express frustration at ongoing retaliation or conditions of their confinement. The Court

believes that the access to class counsel and to the Monitor ensured by the consent decree will provide these AICs a pathway to have these concerns adjudicated.

- The Court further received letters from institutional plaintiff the California Coalition of Women Prisoners, and non-party Family Violence Law Center (FVLC). The former stated that it "welcome[s] the proposed consent decree" but had "critical concerns from coalition members about potential gaps in the Consent Decree, especially in light of the BOP's proven inability to protect and care for people in its custody." (Dkt. No. 463.) Those concerns were as follows:
    - Ensuring AICs transferred from Dublin before class certification are afforded the protections of the injunctive relief.
    - Concerns that BOP would be unable to enforce the conditions to which it bound itself. The Court is glad that the parties mutually worked out guarantees concerning the Monitor's budget and staffing, and reminds all parties the consent decree is legally binding upon defendants.
    - Concerns that the decree does not push BOP enough to review compassionate release requests and ensure the release of all eligible class members from incarceration. The Court is mindful that the consent decree empowers the Monitor to review and report on BOP efforts to release eligible class members, and views the consent decree as conferring upon the BOP a legal obligation to use all tools at its disposal within the law to ensure the prompt release of all eligible class members.
    - Finally, the Coalition advocates for the consent decree to require "BOP to provide regular updates . . . on the status of BOP officials placed on administrative leave for abuse or misconduct at FCI Dublin." (*Id.*) The Court appreciates the concern. Class members are afforded several protections to guard against ongoing staff abuse and retaliation, regardless of whether staff at facilities housing class members were ever placed on leave. Should a class member have concerns specific to a staff member at

11

their current facility, the consent decree guarantees routine and swift confidential communication with the Monitor and with class counsel to report those concerns.

FVLC likewise offered two requests. First, FVLC requests access to class members with whom it is working to provide ongoing care and support. The consent decree provides for access to rape crisis centers who currently have a memorandum of understanding with the BOP. Since FVLC does not, they are concerned that they will be unable to access their clients. Second, as FVLC currently receives no federal funding for its work with sexual abuse survivors, FVLC requests that the consent decree require BOP facilities to apply for federal funding under the Prison Rape Elimination Act of 2003 ("PREA"). The Court is not prepared to change the terms of the negotiated settlement.  It appears that these issues can be addressed directly with the Monitor.

### IV.  CONCLUSION

For the reasons set forth above, the motion for final approval of the consent decree is **GRANTED.**

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that final judgment is **ENTERED** in accordance with the terms of the Settlement and the Order Granting Preliminary Approval filed on December 20, 2024, and is **EFFECTIVE** March 31, 2025. The Court anticipates that miscellaneous orders will or may be required as a result of this adjudication.

This document constitutes a **FINAL JUDGMENT.**

This terminates Docket No. 465.

**IT IS SO ORDERED**.

Date: **2/27/2025**

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**