UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA COALITION FOR WOMEN PRISONERS

V.                          NO. 4:23-CV-4155-YGR

UNITED STATES OF AMERICA, et al.

FILED
APR 17 2025
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

PLAINTIFF/CLASS MEMBERS MOTION FOR ENFORCEMENT OF CONSENT DECREE REGARDING COMMUNITY PLACEMENT

The Plaintiff/Class Member, Rhonda Fleming, moves the Court for enforcement of the Consent Decree, Paragraph-72, regarding community placement. In support, the Class Member presents the following:

RELEVANT CASE BACKGROUND

The Court approved the Consent Decree. The Consent Decree is subject to enforcement by the Court.

At this time, Federal Medical Center-Carswell, specifically Warden T. Rule, is in violation of the Consent Decree.

First, Defendant United States employees have issued "new" guidelines on the application of Second Chance Act transfers to halfway house. See Exhibit-A, "Forbes Magazine," reporting by Walt Pavlov on SCA changes. Numerous inmates had their transfer dates to halfway house rescinded on April 2, 2025.

The unit team has stated the "new" guidelines are applicable to all inmates. This would mean that Dublin Class Members are no longer going to be given a individualized review for transfer to a halfway house.

Second, the present Class Member was given a First Step Act date for September 2027, while at Federal Prison Camp-Bryan. This calculation was for over 6 years of FSA credits because the Class Member has been incarcerated for the entire time the FSA law has been in effect.

The prison officials at FMC-Carswell, along with the Designation Center in Grand Prairie, Texas, have recently wiped out 5 years of FSA credits, in violation of the FSA law.

The Class Member has communicated with Warden Rule, in writing and verbally, the BOP Liaison, and the Dublin Monitor. Exhibit-B, Most Recent Email Communications with all named Parties.

-1-

VIOLATIONS OF THE CONSENT DECREE

At this time, the Defendants are violating the agreements of the Consent Decree as follows:

1. The new FBOP policy of limiting an inmate to 60 days MAXIMUM in a halfway house, violates the Consent Decree, in Paragraphs 68-72. Exhibit-C, Excerpt of Consent Decree.

2. The intentional changing of the FSA credits earned, AFTER, the approval by the Court of the Consent Decree violates the agreement. The status quo of all Class Members should not have been changed, regarding their FSA credits. Whatever amount of FSA credits had been calculated while the approval of the Consent Decree was in process should have remained.

3. In accordance with 18 U.S.C. Section 3621(b), the present Class Member and many others are all **eligible** for community placement. The Court may refer to Rodriguez v. Smith, 541 F.3d 1180 (9th Cir. 2008), which defines eligibility pursuant to Section 3621(b) and the law's mandatory requirement for an individualized review. The inmate in this case was transferred to a halfway house with 7 to 8 years left on his sentence. If the FBOP fails to consider the five mandatory statutory factors, this Court has jurisdiction to grant relief. This is further supported by the Consent Decree.

CONCLUSION

The Class Member moves the Court to order the Defendants to comply with the Consent Decree, ignoring any "new" guidelines on the Second Chance Act or the taking of First Step Act credits previously calculated and awarded to the Class Members.

Class Member Fleming moves for an order for the processing of her transfer to community placement, in accordance with the First Step Act and the Second Chance Act law.

Respectfully Submitted,

/s/ R Fleming

Rhonda Fleming, Class Member
April 9, 2025
FMC-Carswell
Reg. No. 20446-009
Po Box 27137
Fort Worth, Texas 76127

CERTIFICATE OF SERVICE

Service is performed by the electronic filing of this document by the United States District Clerk.

_____
Rhonda Fleming, Class Member

SUBJECT: Forbes: Money Personal Finance Under Budget Pressure, Bureau Of Prisons To Cut Halfway House Time
DATE: 04/02/2025 11:06:03 AM

From Rev. Jeff Grant, White Collar Support Group, info@prisonist.org

Bureau of Prisons Under Pressure To Cut Halfway House Time

The Federal Bureau of Prisons (BOP) is currently facing significant pressure to operate within its $8.3 billion budget, which remains unchanged from the previous year due to a continuing resolution. As a result, the BOP is grappling with the challenge of managing its resources amid understaffing and deteriorating facilities. In light of these constraints, the BOP has decided to limit the prerelease custody period for inmates under the Second Chance Act to a maximum of 60 days, significantly reducing the time eligible inmates can spend in halfway houses or home confinement.

While the BOP may be able to find places to cut its budget, it must do so in an environment where it is understaffed, overworked and in crumbling buildings. Now the BOP is facing the reality that no new money is coming its way and one of the casualties of this strategy is to cut halfway house placement of inmates. The BOP gave internal guidance to all of its 120 prisons that the Second Chance Act prerelease custody is to be capped at 60 days, a blow to those inmates who are eligible for up to a year of prerelease custody. The BOP's statement read:

"In response to ongoing budget constraints, all individuals releasing to the community under Second Chance Act (SCA) authority after April 21, 2025, will have their dates adjusted and reduced to a maximum of 60 days. However, First Step Act placements will continue as planned.

Individuals who have completed the Residential Drug Abuse Program (RDAP) will have their transfer date reduced to allow for a 125-day placement in the Residential Reentry Center (RRC)."
Second Chance Act Explained

The Second Chance Act, enacted during President George W. Bush's administration and later expanded by the First Step Act, allowed inmates to transition into the community for up to a year. Previously, inmates could serve ten percent of their sentence in home confinement, with an additional six months in a halfway house. This approach has been essential in facilitating the reintegration of inmates into society, especially during the COVID-19 pandemic when the BOP utilized halfway houses to house vulnerable inmates, resulting in a successful completion rate.

Halfway houses played a pivotal role in the BOP's fight against COVID-19. Under the CARES Act, the BOP was allowed to send inmates with underlying health conditions to home confinement for a part of their sentence, some having many years remaining. The program was a success with over 99% of inmates completing their sentence at home without incident. President Biden later commuted the remaining sentences of those on home confinement under the CARES Act just before he left office.

However, recent reports indicate that capacity issues at halfway houses are being cited as a reason for the reduction in prerelease time, a claim disputed by community leaders like Phillip Nunes, Executive Director of the Eastern Ohio Correction Center and President of the International Community Justice Association. Nunes asserts that halfway houses currently have capacity and could expand without needing new contracts with the BOP. This is similar to what former Acting Director Hugh Hurwitz stated in a piece in the Atlanta Journal. He emphasizes that the proposed 60-day limit is insufficient for inmates, particularly those who have spent decades in prison, to secure housing and employment.

What Are Halfway Houses

The reliance on halfway houses has been crucial, especially considering that over 90% of federal prisoners will eventually return to society. These facilities serve as vital transitional spaces, allowing inmates to adjust to life outside of prison. Despite the BOP's increased dependence on halfway houses over the last five years, it has not taken steps to expand their capacity.

Over 90% of all federal prisoners eventually will be released to society after successfully serving their sentences, halfway houses allow the prisoner to prove their desire to be a better person and allow time for adjustment back into the free world. With the passage of both the Second Chance Act and First Step Act, the BOP became more reliant on halfway houses but has failed to expand that capacity over the past 5 years.
Halfway Houses Speak Out

EX-A-1

Nunes said that his members were caught off guard. "We have had a great relationship with the BOP over the years," Nunes said, "as our members have worked through problems with the BOP falling behind on its payments to halfway houses." Nunes told me that it was not uncommon for the BOP to be 120-180 days late on paying halfway house contractors, where the majority of money paid under the contract goes toward staffing. The BOP acknowledged some issues associated with late payments because of a new account payables software. "It has been difficult to run these halfway houses, many of which are non-profits, without a line of credit if you're doing work with the BOP," Nunes said, "you can't staff your organization properly when the funds are so stretched out."

That the BOP is limiting halfway house placement is something that confuses Nunes as he says that halfway houses cost less than housing someone at a BOP facility and even less for those on home confinement. "Pam Bondi [Attorney General] said at her confirmation hearing that she wanted to expand the use of halfway houses," Nunes said, "and this move is not only counter to her comments but I'm not sure how it actually saves any money."

Nunes also said there is still some confusion over the BOP announcement in that he does not know if those who are currently in halfway houses but have more than the 2 months remaining in prerelease custody will be returned to prison. "Last week," Nunes said, "our members were looking at ways to expand capacity so they may have hired people. Today, they may be letting them go."

Outrage By Non-Profit Stakeholders

Many advocates of criminal justice reform were also caught off guard by the announcement. "This is deeply troubling," said Rabbi Moshe Margaretten, President of Tzedek Association, "Drastically reducing halfway house placements flies in the face of both logic and clear data demonstrating a significant reduction in recidivism for those who participate in this program."

The president of Families Against Mandatory Minimums, Shaneva D. McReynolds, released a statement, "At first blush, the rationale for this policy decision does not hold water. Prisons come with a menu of fixed costs that do not apply to halfway houses and certainly do not apply to home confinement. At a time of dangerous understaffing, it cannot be that holding people in prison rather than a halfway house or home confinement will save money for the Bureau of Prisons. We will closely follow this change"

BOP Could Make Other Hard Choices

I have been receiving letters and emails from BOP staff, inmates and family members of inmates about the shortages being experienced by federal prisons across the country. This announcement of cutting time at halfway houses is the first time the BOP mentioned that it had ongoing budget issues, though it comes as no surprise. There are also billions needed to shore up staffing and fix over $3 billion in infrastructure. It is difficult to see how the BOP's decision to limit halfway houses is going to end up saving any money. In fact, both the First Step Act and the Second Chance Act, both heavily reliant on halfway house placement, were passed by Congress overwhelmingly on an assumption that they would save money on the costs of incarceration. The BOP even held town halls last year stating that it was going to increase halfway house placements by combining the benefits of both laws. Now, less than 6 months later, the BOP is reducing the impact of the programs.

The BOP has a number of ongoing projects that cost substantial money to implement but they are not requirements of the law like First Step Act and Second Chance Act. Accenture, a strategic consulting firm tasked with helping the BOP attract workers, is under a multi-million contract for marketing and attracting new BOP workers. While critical, it is not a requirement of law to fund such a program. IBM is updating the central repository of all inmate information on a system called Sentry. Again, a worthwhile program but not something mandated by a law.

One BOP case manager who reached out to me wishing to not be identified, told me, "This is extremely frustrating for case managers, as we are left telling all these inmates that their halfway house date has changed. Imagine all the inmates that will be kept incarcerated for no valid reason other than the BOP's failure to plan."

Here's the actual memo:
April 1 2025

EX- A-2

Memorandum for: Inmate Population

Subject: Limited Second Chance Act

On March 31, 2025, new guidance was set forth. Due to resource restraints, all pending Second Chance Act (SCA) will be reduced to a maximum of 60 days. The only exception to this will be RDAP, their transfer date will reduce to allow for a 125 day

---

placement in RRC.

You will still be assessed for SCA and complete an individual assessment; however, the Bureau of Prison's will not support any recommendation over 60 days.

You will still be able to apply First Step Act Time Credits, (FTC's).

Also note, the auto calculator on the FTC projection worksheets will be updated to reflect zero days for SCA.

EX-A-3

TRULINCS 20446009 - FLEMING, RHONDA ANN - Unit: CRW-I-N

----------------------------------------------------------------------------

FROM: 20446009
TO: Dublin Monitor
SUBJECT: ***Request to Staff*** FLEMING, RHONDA, Reg# 20446009, CRW-I-N
DATE: 04/09/2025 06:31:02 AM

To: COMMUNITY PLACEMENT
Inmate Work Assignment: NA

RE: COMMUNITY PLACEMENT

We would like clarification on the issue of eligibility for transfer to community placement. Under the terms of the consent decree and 18 U.S.C. Section 3621(b), many of us are eligible for transfer to community placement.

We are being told that if we have an immigration or other type of detainer we are not eligible. We are also told based on the length of our sentence, we are not eligible.

This violates the consent decree. The FBOP is required to transfer us to community placement, unless, there is some type of "public safety" factor. I do not have such a designation as a white-collar offender.

I was eligible for transfer in May 2023 before Defendant FBOP retaliated against me and took away my transfer to home confinement. Nothing has changed in my record which would make me ineligible, right now, to transfer to community placement.

Many of the Class Members would appreciate clarification on the issue of eligibility for transfer to community placement. We are being stonewalled on this matter. Not one of us is being processed for transfer to community placement.

Thank You,

Rhonda Fleming
-----FLEMING, RHONDA ANN on 4/9/2025 6:16 AM wrote:

>

Warden Rule,

I have been communicating with the J. Epplin, BOP Liaison, on the issue of community placement.

The Dublin consent decree, which is in effect, states that any Class Member that is "eligible" for community placement, will be transferred to the community...to include those with detainers. I have no detainer, but I point out this fact, as a reference to how broad the Class Members right to community placement is, in the settlement agreement/consent decree.

As I told the Liaison below, I have communicated several times with my unit team(Mr. Moore), and you about community placement. We know I am eligible for community placement.

There is nothing that in the BOP Program Statement or Section 3621(b) that could be construed as making me ineligible for community placement. My home address has been approved by the U.S. Probation Office and I am a white-collar offender. There is no "public safety" issue attached to my file.

To be in compliance with the consent decree, inmates like me are due transfer to community placement, based on the fact what I am "eligible" for this placement.

Otherwise, the FBOP and FMC-Carswell is violating the consent decree, within the first two weeks of its enactment.

Please ask Mr. Moore, my case manager, to confer with me on this matter.

Thank You,

EX-B-1

Rhonda Fleming
-----FLEMING, RHONDA ANN on 4/8/2025 7:00 PM wrote:

TRULINCS 20446009 - FLEMING, RHONDA ANN - Unit: CRW-I-N
------------------------------------------------------------------------------

\>

ELIGIBILTY FOR COMMUNITY PLACEMENT

Please see the email I sent to the BOP Liaison. I am 100% eligible for community placement. The warden and unit team refuse to process my transfer to community placement.

The consent decree is clear. If a Class Member is eligible, they will be transferred to community placement.

The FBOP is violating the consent decree.

Rhonda Fleming
-----FLEMING, RHONDA ANN on 4/8/2025 6:57 PM wrote:

\>

COMMUNITY PLACEMENT/FSA CREDITS

Our consent decree says that any Class Member that is eligible for community placement will be transferred to the community.

I am eligible for community placement. The five factors are not being considered, under Section 3621(b). The only factor the prison officials consider are the projected release date. That date does not preclude me from eligibility for placement in the community, especially when the FBOP area intentionally miscalculating our First Step Act credits.

I have spoke to the warden and with the unit team. However, they are refuse to comply with the consent decree. They say I am not eligible for placement in the community.

Now, if you can tell me I am NOT eligible for community placement, as the BOP Liaison, please do so.

I do not want to waste your time with these emails. If you say I am "not eligible" that is good enough for me.

Rhonda Fleming
-----Dublin Liaison on 4/7/2025 11:37 AM wrote:

\>

Good morning/afternoon Ms. Fleming, if you believe you are being denied FSA credits in accord with the consent decree's terms, I encourage you to first work with your unit team to resolve this issue. In the event your inquiry goes beyond the privileges set forth in the consent decree, I again encourage you to speak with unit team, as they are uniquely suited to review your records and history. Of course, if you remain dissatisfied with the result, please use the administrative remedy procedure to address any grievance you have.

J. Epplin, BOP Liaison

As a reminder, this email box does not replace the BOP Administrative Remedy Program. This email is not to be used in place of regular PREA reporting. This email box is not monitored 24 hours a day/7 days a week and you may not receive a response for a few business days or may not receive a response if not a Dublin Consent Decree related concern.

---

From: ~^! FLEMING, ~^!RHONDA ANN <20446009@inmatemessage.com>
Sent: Thursday, April 3, 2025 11:14 AM
Subject: ***Request to Staff*** FLEMING, RHONDA, Reg# 20446009, CRW-I-N

Ex-B-2

To: Miscalculation of First Step Act Credits
Inmate Work Assignment: na

Please see email sent to the Dublin Monitor, below.

TRULINCS 20446009 - FLEMING, RHONDA ANN - Unit: CRW-I-N

---

Thank You,

Rhonda Fleming
-----FLEMING, RHONDA ANN on 4/3/2025 6:13 AM wrote:

>

RE:   Miscalculation of First Step Act Credits

I am a Dublin Class Member.  Since we have been moved from Dublin, my FSA credits have been re-calculated, intentionally taking 6 years of earned credits.

I need your assistance on this matter.  I have been incarcerated since the First Step Act was enacted, so I am an inmate that should have a full 6 years and 8 months of credit, applied to transfer me to community placement.

Thank You,

Rhonda Fleming

EX-B-3

injuries and mistreatment suffered by Class Members during transport between BOP facilities, including the status of investigation into transport issues.

### D. Designation and Release

#### 1. Designations

EX-C-1

68. The Monitor shall review and report on Class Member designations. Monthly reports will include information about where Class Members are designated, and quarterly reports will include whether Class Members are designated to facilities with adequate programming, and educational, and vocational opportunities.

69. BOP shall designate the place of the Class Member's imprisonment, and shall, subject to bed availability, the Class Member's security designation, the Class Member's programmatic needs, the Class Member's mental and medical health needs, any request made by the Class Member related to faith-based needs, recommendations of the sentencing court, and other security concerns of the BOP, place the Class Member in a facility as close as practicable to the Class Member's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence. BOP shall also endeavor to designate Class Members in the lowest security level facility possible.

70. No Class Member with longer than nine (9) months remaining on their sentence shall be housed in an Administrative Detention Facility for any period longer than six (6) months, or at a Federal Transfer Center for any period longer than one month. Time housed at FCI Dublin or at Administrative Detention Facilities following transfer from FCI Dublin shall count towards the 18-month waiting period to apply for transfer to a new facility.

71. The Monitor shall review and provide in monthly reports Class Members' release dates, FTCs, and eligibility for release to community placements (i.e. home confinement or Residential Reentry Centers). Reports will include any changes to Class Members' eligibility for FTCs or release to community placements, and any issues receiving or applying credits, or being released when eligible.

72. BOP shall release to community placement any Class Member eligible for

FLEMING, RHONDA  20446009

16

CONSENT DECREE

Case No. 4:23-cv-04155-YGR

1  community placement under the FSA or the SCA as soon as practicable after the Class
2  Member becomes eligible. When consistent with the FSA and 18 U.S.C. § 3621(b), BOP
3  will not deny FTCs or release to community placement under the FSA to any Class
4  Member on the basis of immigration status or the existence of a detainer alone.

### 2. Credit Loss Due to Transfer

EX-C-2

73.  BOP shall ensure that no Class Member lost FTCs or was in a non-earning status of FTCs due to transfer from FCI Dublin. This includes transfers directly from FCI Dublin and transfers following subsequent redesignations through December 31, 2024, and applies to time in transit, time at Federal Transfer Centers, and time in Administrative Detention Facilities. This also includes any credits lost due to changes in available programming or job placements at new facilities.

74.  Following a report by a Class Member that they lost FTCs or were placed in non-earning status due to the FCI Dublin's closure, including transfers directly from FCI Dublin and transfers following subsequent redesignations through December 31, 2024, the BOP and the Monitor shall conduct a review of the Class Member's FTCs. The Monitor shall review the BOP's FSA Time Credit Assessment Worksheet and any other necessary documentation to make this assessment. If the BOP concludes that the Class Member lost FTCs or was placed in non-earning status improperly, BOP shall take corrective action to ensure that the credits are restored. If the Monitor concludes the Class Member lost FTCs or was placed in non-earning status improperly, the Monitor may recommend that BOP take corrective action.

### 3. Disciplinary Review

75.  BOP will continue to review all disciplinary incident reports issued to Class Members at FCI Dublin between January 1, 2020, and May 1, 2024, as described in the Court's Orders at ECF 300 and 372. BOP will expunge all disciplinary reports that are found to contain due process, evidentiary, or other procedural violations, and adjust Class Members' security and recidivism classifications, FTCs, and release dates accordingly. The Monitor shall review and report on this process, including the reclassification of Class

FLEMING, RHONDA 20446009